JUDGE PRESKA

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMNESTY INTERNATIONAL USA, CENTER FOR CONSTITUTIONAL RIGHTS, INC. and WASHINGTON SQUARE LEGAL SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, DEPARTMENT OF STATE, AND THEIR COMPONENTS <br><br> Defendants. | 07 CV 5435 <br><br> CIVIL ACTION DOCKET No. [] <br><br> JUN 0 7 2007 <br><br> **COMPLAINT** |

**PRELIMINARY STATEMENT**

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, for injunctive and other appropriate relief, and seeking the immediate processing and release of agency records requested by Plaintiffs from Defendants Central Intelligence Agency ("CIA"), Department of Defense ("DOD"), Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), Department of State ("DOS"), and their components.

2.  Since 2001, the United States Government has orchestrated the rendition and secret detention of individuals in connection with the "War on Terror."

3.  Rendition and secret detention typically involve the apprehension of individuals by local security forces, often with the help of U.S. agents, followed by stripping, handcuffing, shackling, blindfolding, and hooding of the detainees in preparation for flights by which they are transferred

to foreign destinations such as Syria, Jordan or Egypt for detention and interrogation, sent to secret U.S. facilities, or a combination of both. Detention in both foreign destinations and secret U.S. facilities involves interrogation techniques such as sleep deprivation, prolonged solitary confinement and sensory manipulation.

4.  The use of both rendition and secret detention has been officially acknowledged at the highest levels of the United States Government. On December 5, 2005, Secretary of State Condoleezza Rice stated that the United States uses "rendition" to transport terrorism suspects to third countries for interrogation, detention or to bring individuals "to justice." On September 6, 2006, President George W. Bush acknowledged that "a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program..." and revealed that this program had been reviewed and approved by the CIA and DOJ.

5.  Amnesty International USA ("Amnesty"), the Center for Constitutional Rights, Inc. ("CCR") and Washington Square Legal Services, Inc. ("WSLS") (collectively "Plaintiffs") have submitted FOIA requests ("Plaintiffs' Requests") to Defendants seeking records concerning rendition and secret detention of individuals in the "War on Terror."[1] Plaintiffs' Requests seek records related to evaluations and authorizations, policies and procedures, identities of individuals and locations, activities of private contractors and non-governmental actors, and treatment of, and injuries sustained by, individuals transferred or detained.

---

[1] The CCR submitted a FOIA request in December 2004. Amnesty and WSLS submitted two FOIA requests in April 2006. Due to the similarity of the CCR Request and the Amnesty and WSLS Requests, CCR, Amnesty and WSLS (collectively "Plaintiffs") join in this single action for injunctive relief. The CCR Request to DOD Office of Freedom of Information/Security Review is attached as Exhibit A. CCR also filed identical requests with the CIA, DOD and its components, DOJ and its components, and DOS. Amnesty's and WSLS' Requests to the CIA are attached as Exhibits B and C. Amnesty and WSLS also filed identical requests with DOD and its components, DHS and its components, DOJ and its components, and DOS.

6. Despite official United States Government acknowledgment of the rendition and secret detention of individuals in connection with the "War on Terror," as well as widespread reporting on these practices by the media and other sources, Defendants refuse to release, and continue to unlawfully withhold, known documents that are clearly responsive to Plaintiffs' Requests. Defendants have refused to provide — and in some cases have failed to conduct adequate searches for — documents plainly within the categories of documents sought in Plaintiffs' Requests. Indeed, the CIA has not substantively responded to Plaintiffs' Requests in any way even though it has been more than two years since Plaintiff CCR filed its FOIA request.

7. There is a compelling public interest in disclosure of the requested documents concerning the rendition and secret detention of individuals in the "War on Terror." To vindicate the public's right to information about government practices and policies, Plaintiffs seek an injunction requiring that Defendants immediately process Plaintiffs' Requests and release records that are and have been unlawfully withheld.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C. §§ 701-706. Venue properly lies in this District pursuant to 5 U.S.C. § 552 (a)(4)(A) and (B).

## PARTIES

9. Plaintiff Amnesty International USA ("Amnesty") is the United States Section of Amnesty International. Amnesty is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. Amnesty is dedicated to bringing about a world in which every person enjoys all of the human rights

enshrined in the Universal Declaration of Human Rights and other international human rights instruments. To accomplish this goal, Amnesty engages in research and action campaigns. At the heart of every campaign is the dissemination of information about particular human rights abuses that Amnesty has documented. Amnesty expends extensive resources researching alleged abuses to generate reports and shape its campaigns. Amnesty publishes reports, press briefings, newsletters, and urgent action requests informing the public about human rights, including the prohibition on torture and the prohibition on disappearances. Amnesty also disseminates information through its website <www.amnestyusa.org>.

10.   Plaintiff Center for Constitutional Rights ("CCR") is a New York-based legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in fields of civil and international human rights, including extensive materials on detainees and others apprehended after September 11, 2001. CCR publishes regular newsletters, know-your-rights handbooks, and other informational materials for public dissemination. These materials are also available through CCR's Development and Outreach Departments. CCR operates a website <www.ccr-ny.org>, that addresses the issues on which the Center works. The CCR website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

11.   Plaintiff Washington Square Legal Services ("WSLS") is a not-for-profit corporation that houses the clinical program of the New York University ("NYU") School of Law, of which the International Human Rights Clinic is a part. The Clinic is also a project of the Center for Human Rights and Global Justice ("CHRGJ") and an official program at NYU School of Law, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues. CHRGJ is a research center at NYU School of Law. CHRGJ aims to advance

human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website <www.chrgj.org> discussing human rights issues.

12.     Defendant CIA is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

13.     Defendant DOD is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). Defense Intelligence Agency ("DIA"), Department of the Army ("Army"), Department of the Navy ("Navy"), and Department of the Air Force ("Air Force") are components of DOD.

14.     Defendant DHS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). U.S. Immigration & Customs Enforcement, Office of Investigations ("ICE"), U.S. Citizenship & Immigration Services ("CIS"), U.S. Customs & Border Protection ("CBP"), U.S. Coast Guard, Office of Intelligence & Analysis ("OIA"), and Privacy Office are components of DHS.

15.     Defendant DOJ is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). Office of Information & Privacy ("OIP"), Criminal Division, "Federal Bureau of Investigation ("FBI"), Executive Office for U.S. Attorneys ("EOUSA"), Office of Inspector General ("OIG"), and Office of Intelligence Policy & Review ("OIPR") are components of DOJ.

16.     Defendant DOS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

I. **THE U.S. GOVERNMENT'S RENDITION AND SECRET DETENTION OF INDIVIDUALS IN THE "WAR ON TERROR"**

17. Since 2001, the United States Government has orchestrated the rendition and secret detention of individuals in connection with the "War on Terror."[2]

18. Rendition and secret detention typically involve the apprehension of individuals by local security forces in a foreign country, often with the involvement of U.S. agents. After an initial interrogation by these local and/or U.S. agents, individuals are typically stripped naked; handcuffed, shackled, and blindfolded; have earplugs inserted in their ears and their mouths covered, and are hooded. *See, e.g.,* Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Eur. Parl. Doc. 10957 (June 12, 2006); Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake: German Citizen Released After Months in Rendition*, Wash. Post, Dec. 4, 2005.

19. Individuals are then typically transferred using a variety of aircraft, including civilian or military aircraft, to foreign destinations for further interrogation and detention. This has included transfer to third countries for foreign interrogation and detention (commonly known as "extraordinary rendition"), detention in secret U.S. facilities (e.g., "black site" detention), or a combination of both. *See id.*

### A. Transfer to Third Countries for Foreign Interrogation and Detention

20. On December 5, 2005, Secretary of State Condoleezza Rice stated that the United States uses "rendition" to transport terrorism suspects apprehended abroad to third countries for interrogation, detention or to bring them "to justice." Secretary of State Condoleezza Rice,

---

[2] As used in this complaint, the term "rendition" means the transfer of an individual from one government to another either (a) without the benefit of regular transfer procedures such as extradition or immigration proceedings, or (b) through the perversion of such regular procedures. The term "secret detention" means the detention of an individual in an unofficial or unknown place of custody, or the detention of an individual in an official or known place of custody where the fact of the individual's detention is kept hidden or concealed.

*Remarks Upon Her Departure for Europe*, Dec. 5, 2005. Secretary Rice further stated that "in conducting such renditions, it is the policy of the United States . . . to comply with its laws and comply with its treaty obligations..." and indicated that, "where appropriate, the United States seeks assurances that transferred persons will not be tortured." *Id.*

21. As part of this practice, the United States Government transfers detainees for foreign interrogation and detention to third countries criticized for their poor treatment of prisoners (e.g. Syria, Jordan, or Egypt). Individuals transferred to third countries for foreign interrogation and detention have reportedly been subjected to ill treatment, such as prolonged solitary confinement, beatings and other abuse — including in cases where assurances were sought by the United States. *See, e.g.,* Deneen L. Brown & Dana Priest, *Deported Terror Suspect Details Torture in Syria; Canadian's Case Called Typical of CIA,* Wash. Post, Nov. 5, 2003; Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations; 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities,* Wash. Post, Dec. 26, 2002.

22. Rendition to third countries for foreign interrogation and detention reportedly involves all Defendants. *Id.*

**B. Transfer to Detention in Secret U.S. Facilities**

23. Prior to September 6, 2006, numerous news articles and other reports had disclosed the existence of a U.S. secret detention program. *See, e.g.,* Amnesty International, *United States of America: Below the radar: Secret flights to torture and 'disappearance,'* Apr. 5, 2006; Brian Ross & Richard Esposito, *Exclusive: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons,* ABC News, Dec. 5, 2005; Human Rights Watch, *List of "Ghost Prisoners" Possibly in CIA Custody* (last updated Dec. 1, 2005); Amnesty International, *United States of America/Yemen: Secret Detention in CIA "Black Sites,"* Nov. 8, 2005. The secret detention

program was reportedly authorized by President Bush in a Presidential Directive or Finding signed on or about September 17, 2001. *See, e.g.*, Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005.

24.     On September 6, 2006, President Bush acknowledged that "a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency." White House Office of the Press Secretary, *News Release: President Discusses Creation of Military Commissions to Try Suspected Terrorists*, Sept. 6, 2006. On the same day, the Office of the Director of National Intelligence ("DNI") released a "Summary of the High Value Terrorist Detainee Program" and "Biographies of High Value Terrorist Detainees Transferred to the US Naval Base at Guantánamo Bay" and acknowledged that planning for the program began shortly after September 11, 2001, and that by 2002, its implementation was already underway.

25.     In these disclosures, President Bush and the Office of the DNI officially provided selective additional details about secret detention, including the following:

- thousands of people, besides the fourteen whose names have been disclosed, have been captured in connection with the "War on Terror," yet never sent to Guantánamo;

- the names and biographical information collected from some specific individuals held in the secret detention program;

- individuals have been released from the program, with "many" being "returned to their home countries for prosecution or detention," and fourteen high-level detainees held in the program were transferred to the U.S. Naval Base at Guantánamo Bay, Cuba on or around September 6, 2006;

- the United States Government has shared information produced by the secret detention program with entities outside the CIA, including allies in the "War on Terror";

- detainees held in secret detention have been subjected to an "alternative set of interrogation techniques"; and

- the CIA's Office of the Inspector General has investigated and audited the secret detention program.

26. President Bush also stated that the program "has been subject to multiple legal reviews by the Department of Justice and CIA lawyers" and that the "alternative set of procedures" used for interrogation in the program were "extensively" reviewed and approved by the DOJ. The Office of the DNI twice confirmed that the DOJ had provided legal advice on the procedures used in the program. *See* Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

27. Other reports have identified the role of other agencies and their components in the secret detention program. For example, it is reported that in June 2005, Gordon R. England, then Acting Deputy Secretary of Defense, and Philip D. Zelikow, counselor of the Department of State, co-authored a nine-page memo urging Congressional approval for the secret detention program. *See* Tim Golden, *Detainee Memo Created Divide in White House*, N.Y. Times, Oct. 1, 2006. It is similarly reported that by "the end of 2005," military lawyers began review of the "C.I.A.'s evidentiary files on the high-value detainees" to determine the feasibility of prosecution of the detainees by military commissions at Guantánamo Bay. *Id.*

28. Individuals interrogated in the secret detention program reportedly have been subject to ill treatment including "waterboarding" (a form of mock execution, wherein the detainee is strapped to a board inclined so that the detainee's head is below his feet, cellophane is wrapped over the detainee's face and water is poured over the detainee to simulate drowning), sensory deprivation and beatings. *See, e.g.*, Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described*, ABC News, Nov. 18, 2005.

## II. THE REQUESTS

29. Plaintiffs' Requests seek information regarding five aspects of the rendition and secret detention of individuals by the U.S. in connection with the "War on Terror":[3]

    I.    Records that analyze the legality of rendition and/or secret detention under domestic and international law, consider the legal basis for, appropriateness of, or propose, authorize, approve, report on, describe, reject, and/or evaluate rendition and/or secret detention. Such records include, for example:

- The Presidential Directive or Finding signed on or about September 17, 2001.

- DOJ records concerning the legality of the secret detention program, including interrogation procedures.

- Records concerning the CIA Office of the Inspector General's investigation and audit of the secret detention program.

- The June 2005 memorandum drafted by Gordon R. England and Philip D. Zelikow, urging the Bush Administration to obtain Congressional approval for the secret detention program, and a draft of this memorandum, prepared by England, Zelikow, Matthew C. Waxman (then Deputy Assistant Secretary of Defense for Detainee Affairs) and John B. Bellinger III (Legal Advisor to the Secretary of State).

    II.    Records that set out standards, policies, procedures, and/or rules concerning conduct, and records concerning derogations from those policies, procedures, and/or rules on rendition and/or secret detention. Such records include, for example:

- Records reflecting the "multiple safeguards" that have been "built into the program to ensure its professionalism." Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

- Records reflecting the approval or non-approval by "specific senior CIA officers" and the Director of the CIA of the use of interrogation procedures in connection with specific detainees. *Id.*

- Records reflecting instances in which interrogation sessions were terminated by "non-participant" observers authorized to halt sessions when "anything unauthorized is occurring," including records concerning referrals to the CIA's Office of Inspector General and/or the DOJ. *Id.*

---

[3] Plaintiffs' Requests do not seek records pertaining to detainees previously or currently held at Guantánamo Bay unless they were secretly and/or irregularly transferred to a third country from Guantánamo, or at some point held in a secret United States facility, including the secret facility reportedly within Guantánamo.

- Records concerning rules or policies governing who is eligible for rendition, including criteria for determining when "traditional extradition is not a good option." Secretary of State Condoleezza Rice, *Remarks Upon Her Departure for Europe*, Dec. 5, 2005.

- Records setting forth procedures and policies used to ensure that the United States "compl[ies] with its treaty obligations, including those under the Convention Against Torture," and to guarantee respect for "the sovereignty of other countries" when carrying out a rendition. *Id.*

III. Records concerning the identities of individuals subjected to rendition and/or secret detention; the locations of their apprehension, transfer, and detention; and information about their fate and whereabouts. Such records include, for example:

- Records confirming the existence, locations, and arrangements concerning the facilities used to detain individuals.

- Records concerning the apprehension, transfer, and detention, and identities, fate and whereabouts of the detainees, including the fourteen "high-value" detainees transferred to Guantánamo Bay prior to September 6, 2006 and others whose custody has been acknowledged by the United States Government.

- Records concerning communications with foreign governments regarding the rendition and/or secret detention of individuals, including the names of the approximately 86 individuals in respect of whom the program allegedly yielded intelligence, half of whom the United States and its allies claimed to have "removed from the battlefield," and records concerning the return of individuals to home countries for detention or prosecution. Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

- Records relating to communications with foreign governments regarding the rendition and/or secret detention of individuals, including those concerning arrangements for transfer, handover of custody, interrogation plans, and assurances concerning detention and/or treatment.

IV. Records reflecting communications with or about the activities of private contractors and non-governmental actors, including non-governmental organizations, contractors, and companies in relation to rendition and/or secret detention. Such records include, for example:

- Records indicating whether and to what extent the International Committee of the Red Cross and/or other humanitarian or human rights organizations had, have, or will have access to detainees, including but not limited to records related to particular decisions to grant or deny such groups access to any detainee or group of detainees.

- Records concerning contracts, invoices, and payments, or other arrangements with private companies or individuals providing food, utilities, provisions, supplies, and other goods and materials, or providing services such as transportation, translation and interpretation, interrogation and incarceration, security, construction, food provision and/or preparation, utilities such as water, electricity and fuel, and medical, dental and psychological and/or psychiatric services.

V. Records concerning the treatment of, injuries to, and illnesses and deaths of individuals subject to rendition and/or secret detention. Such records include, for example:

- Records concerning investigations, inquiries, disciplinary proceedings, and other actions taken in relation to injuries, illnesses or deaths of detainees.

- Records concerning policies and rules about the treatment of, injuries to, and illnesses and deaths of detainees.

- Records reflecting the actions of medical, dental, and psychological and/or psychiatric personnel in relation to specific detainees, including death certificates and autopsy records.

- Records concerning the involvement of medical and/or psychological and/or psychiatric personnel in the interrogation of detainees.

30. On December 21, 2004, Plaintiff CCR submitted its FOIA request to CIA; DOD, including its components DIA, Army, Navy, and Air Force; DOJ, including its components FBI and OIPR; and DOS. The CCR Request contains a request for expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(I)[4/] and a request for a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A).[5/]

31. In April 2006, plaintiffs Amnesty and WSLS submitted two FOIA requests to Defendants DOD, including its components DIA Army, Navy, and Air Force; DOJ, its components OIP, FBI, and OIPR; DOS; DHS and its components ICE, CIS, CBP, OIA, and Privacy Office; and the CIA. The Amnesty and WSLS Requests contain requests for expedited processing under 5

---

[4/] The DIA, a component of DOD, the Office of Information and Privacy, a component of the DOJ, and the FBI granted CCR's request for expedited processing.

[5/] The DOD and FBI granted CCR's requests for a fee waiver.

U.S.C. § 552(a)(6)(E)[6/] and requests for a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A).[7/]

### III.    AGENCY RESPONSES

32.    No defendant timely responded to Plaintiffs' Requests.

33.    Since filing the Requests, Plaintiffs have spent significant time and effort attempting to obtain responsive documents from Defendants without resorting to litigation. These efforts included written correspondence and numerous telephone calls with the Defendants and their components, as well as filing administrative appeals with agencies that determined they would not provide Plaintiffs documents responsive to the Requests. In these communications and appeals, Plaintiffs presented evidence of the Defendants' involvement in the rendition and/or secret detention of individuals in connection with the "War on Terror" and identified documents responsive to the Requests that are likely possessed by each Defendant. These efforts have been to no avail.

34.    In total, Plaintiffs have only received five documents from all of the Defendants combined. These records consist of four pages of a redacted document from DHS, three documents from DOS (two of which are redacted), one redacted document from the DOJ Office of Information and Privacy, and one highly-redacted document from the FBI. None of the other agencies has released a single record in response to Plaintiffs' Requests. Despite the fact that more than two years has passed since CCR filed its Request and a year has passed since Amnesty and WSLS filed their Requests, the CIA has not substantively responded to Plaintiffs' Requests in any way. Despite the clear responsiveness of the documents listed above to Plaintiffs'

---

[6/] The "OIPR", a component of the DOJ, purportedly granted Amnesty and WSLS' request for expedited processing in September 2006. OIPR responded to Amnesty and WSLS in October 2006, and Amnesty and WSLS appealed the OIPR's response in December 2006. OIPR has not responded to the appeal.

[7/] United States Immigration and Customs Enforcement, a component of DHS, granted Amnesty and WSLS' request for a fee waiver.

Requests, none of the Defendants has produced any of these documents to either CCR or Amnesty and WSLS.

35. Defendants have also denied Plaintiffs' requests for expedited processing of the Requests and Plaintiffs' requests for a waiver of applicable fees.

## CAUSES OF ACTION

### First Cause of Action:
### Violation of FOIA for Failure to Expedite the Processing of Plaintiffs' Requests
### Against All Defendants

36. Plaintiffs repeat and reallege paragraphs 1-35.

37. Defendants' failure to expedite the processing of Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a)(6)(E)(iii), and Defendants' own regulations promulgated thereunder.

### Second Cause of Action:
### Violation of FOIA for Failure to Make Promptly Available the Records Sought
### Against All Defendants

38. Plaintiffs repeat and reallege paragraphs 1-37.

39. Plaintiffs are informed and believe, and therefore allege, that the requested information is in the possession of the Defendants and came into their possession in the course of their official duties.

40. Defendants' failure to make promptly available the records sought by Plaintiffs' Requests violates FOIA, 5 U.S.C. § 552(a)(3)(A).

### Third Cause of Action:
### Violation of FOIA for Failure to Timely Respond to Plaintiffs' Requests
### Against All Defendants

41. Plaintiffs repeat and reallege paragraphs 1-40.

42. Defendants' failure to timely respond to Plaintiffs' December 2004 and April 2006 Requests violates FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and Defendants' own regulations promulgated thereunder.

### Fourth Cause of Action:
### Violation of FOIA for Failure to Release Records Sought by Plaintiffs' Requests
### Against All Defendants

43. Plaintiffs repeat and reallege paragraphs 1-42.

44. Plaintiffs are informed and believe, and therefore allege, that the requested information is in the possession of the Defendants and came into their possession in the course of their official duties.

45. Defendants' failure to release records sought by Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a)(1)-(3).

### Fifth Cause of Action:
### Violation of FOIA for Failure to Allow Fee Waiver
### Against CIA, DHS, DOJ and DOS,
### By Plaintiffs Amnesty and WSLS Against DOD

46. Plaintiffs repeat and reallege paragraphs 1-45.

47. Defendants' failure to allow the fee waiver sought by Plaintiffs' requests violates the FOIA, 5 U.S.C. § 552(a)(4)(A)(iii).

### Sixth Cause of Action:
### Violation of FOIA for Improperly Withholding Agency Records Sought
### Against DOD, DOJ, DOS and DHS

48. Plaintiff repeats and realleges paragraphs 1-47.

49. Plaintiffs are informed and believe, and therefore allege, that the requested information is in the possession of the Defendants and came into their possession in the course of their official duties.

50.     Defendants' improper withholding of agency records sought by Plaintiffs' Requests violates FOIA, 5 U.S.C. § 552(a)(1)-(3).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a) ORDER Defendants immediately and expeditiously to process Plaintiffs' FOIA requests and disclose the requested records;

b) EXPEDITE this proceeding as provided for in 28 U.S.C. § 1657;

c) SET a schedule for producing requested records to Plaintiff;

d) AWARD Plaintiffs their costs and reasonable attorneys fees incurred in this action; and

e) GRANT such other relief as the Court may deem just and proper.

Respectfully submitted,

*Shayana Kadidal* (signature)

Shayana Kadidal (SK-1278)
Center for Constitutional Rights, Inc.
666 Broadway, 7th floor
New York, NY 10012
Tel: (212) 614-6424
Fax: (212) 614-6499
E-mail: skadidal@ccr-ny.org

*Attorney for Center for Constitutional Rights, Inc.*

Bruce M. Berman
Kyle M. DeYoung
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6785
Fax: (202) 663-6363
E-Mail Kyle.DeYoung@wilmerhale.com

*Of Counsel*

*Margaret L. Satterthwaite* (signature)

Margaret L. Satterthwaite (MS-3953)
Washington Square Legal Services, Inc.
International Human Rights Clinic
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

*Attorney for Amnesty International USA and Washington Square Legal Services, Inc.*

Dated: June 7, 2007

# Exhibit A

# centerforconstitutionalrights

666 broadway new york, ny 10012
212.614.6464 www.ccr-ny.org

December 21, 2004

<u>Via Facsimile & U.S. Mail</u>

Office of Freedom of Information/Security Review
Room 2C757
1155 Defense Pentagon
Washington, D.C. 20301-1155
 fax number: (703) 693-7341

**Re: Request Submitted Under the Freedom of Information Act**

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the Center for Constitutional Rights ("Requester").

We are filing this Request simultaneously with the Department of Defense (including its components, the Departments of the Army, Navy, and Air Force, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, and the Central Intelligence Agency. By this letter, we also request expedited processing pursuant to 5 U.S.C. § 552(a)(4)(E).

## Background on Records Requested

Recent news reports indicate that the Central Intelligence Agency "CIA") has been secretly operating a holding and interrogation center ("CIA Guantánamo Center" or "Center") within the larger American military-run prison at Guantánamo Bay, Cuba ("Guantánamo"). The reports further indicate that individuals apprehended after September 11, 2001, and held by the United States at Guantánamo ("Detainees") in the CIA Guantánamo Center have been separately interrogated by CIA agents.[1]

News reports also indicate that the CIA Guantánamo Center is "related to a network of holding centers operated by the CIA at undisclosed locations around the world"[2] since United States authorities began capturing individuals after the attacks of September 11, 2001.

---

[1] *See* David Johnston and Neil A. Lewis, "Officials Describe Secret C.I.A. Center at Guantánamo Bay," New York Time, December 17, 2004.
[2] *Id.*



Other news reports state that the "buildings used by the CIA are shrouded by high fences covered with thick green mesh plastic and ringed with floodlights . . . [t]hey sit within the larger Camp Echo complex, which was erected to house the Defense Department's high value detainees and those awaiting military trials on terrorism charges."[3] According to one military official, the "CIA's [Guantánamo] facility has been 'off-limits to nearly everyone on the base.'"[4]

According to a report by the Washington Post, in contrast to the majority of detainees held at Guantánamo, the CIA detainees "are held under separate rules and far greater secrecy."[5] Under a presidential decree and policies approved by Administration attorneys, "the CIA is allowed to capture and hold certain classes of suspects without accounting for them in any public way and without revealing the rules for their treatment."[6] According to other news reports, these detainees have not and will not receive review of their status through the Combatant Status Review Tribunals.[7]

In addition to the secret CIA Guantánamo Center, there have been numerous media reports during the last two years confirming the existence of CIA detention facilities located around the world, including one in an off-limits corner of the Bagram Airbase in Afghanistan, at Camp Cropper, a detention center on the outskirts of Baghdad International Airport,[8] on ships at sea,[9] on Britain's Diego Garcia Island in the Indian Ocean,[10] in a secret facility in Jordan,[11] and in secret locations outside of Iraq.[12] According to a report by Human Rights Watch, detainees are being held in more than 24 secret detention facilities across the globe.[13] Furthermore, government officials have admitted that even within known facilities, CIA officials have employed a policy under which "ghost prisoners" captured in Iraq and Afghanistan have been interrogated by CIA agents and have had their "identities and locations withheld from relatives, the International Red Cross and even Congress."[14] Finally,

---

[3] Dana Priest and Scott Higham, "At Guantánamo, A Prison Within A Prison; CIA Has Run a Secret Facility for Some Al Qaeda Detainees, Officials Say," Washington Post, December 17, 2004, at A01.
[4] Id.
[5] Id.
[6] Id.
[7] Suzanne Goldenberg, " 'Ghost Detainees' at Camp Delta: Pentagon Accused of Planning To Exclude Some Guantánamo Prisoners from Review," The Guardian, July 10, 2004 at 18.
[8] Eric Schmitt, "Abuse Inquiry Says Official Exercised Little Oversight," The New York Times, Dec. 4, 2004 at A10.
[9] Eric Schmitt & Douglas Jehl, "Army Says CIA hid More Iraqis than it Claimed," The New York Times, Sept. 9, 2003 at A1.
[10] Id.
[11] Inigo Gilmore & Robin Gedye, "Jordan Ghost Jail 'holds al-Qa'eda men' Israeli Intelligence Expert Claims to have Solved Mystery of Missing Terrorist Leaders Captured by American Forces in Past Three Years," The Daily Telegraph, Oct. 14, 2004 at 16.
[12] See Dave Goldiner, "Saddam's Pals on Hunger Strike," Daily News, December 13, 2004 at 20.
[13] Human Rights Watch, "The United States Disappeared: The CIA's Long Term 'Ghost Detainees'" October, 2004.
[14] Editorial, The Washington Post, "The CIA's Disappeared," October 26, 2004.

2