UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

AMNESTY INTERNATIONAL USA, CENTER   :
FOR CONSTITUTIONAL RIGHTS, INC., and  :
WASHINGTON SQUARE LEGAL SERVICES,  :     **ECF CASE**
INC.,  :
  :
         Plaintiffs,  :     07 CV 5435 (LAP)
  :
     v.  :
  :
CENTRAL INTELLIGENCE AGENCY,  :
DEPARTMENT OF DEFENSE,  :
DEPARTMENT OF HOMELAND SECURITY,  :
DEPARTMENT OF JUSTICE, DEPARTMENT  :
OF STATE, and THEIR COMPONENTS,  :
  :
         Defendants.  :
-------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF THE DEPARTMENT OF HOMELAND SECURITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No. (212) 637-2777
Facsimile No. (212) 637-2717

JEANNETTE A. VARGAS
BRIAN M. FELDMAN
Assistant United States Attorneys
EMILY E. DAUGHTRY
Special Assistant United States Attorney
     -Of Counsel-

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    DHS's Search for Responsive Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    ICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    CBP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            a.    Office of International Affairs . . . . . . . . . . . . . . . . . . . . . . . . . 8

            b.    Office of Field Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            c.    Office of Anti-Terrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            d.    Office of Intelligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            e.    Office of Public Affairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        3.    Office of Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.    I&A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        5.    Headquarters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    Plaintiffs' Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.    SUMMARY JUDGMENT STANDARDS IN FOIA CASES . . . . . . . . . . . . . . . . . . 17

II.    DHS CONDUCTED A REASONABLE SEARCH . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Cases:**

Assassination Archives & Research Ctr. v. CIA, 720 F. Supp. 217
(D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Associated Press v. DOJ, No. 06 Civ. 1758 (LAP), 2007 WL 737476
(S.D.N.Y. Mar. 7, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Carney v. DOJ, 19 F.3d 807 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

Garcia v. DOJ, Office of Info. & Privacy, 181 F. Supp. 2d 356
(S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473 (2d Cir. 1999) . . . . . . . . . . . . . . . . 18, 19, 20

Halpern v. FBI, 181 F.3d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Iturralde v. Comptroller of the Currency, 315 F.3d 311 (D.C. Cir. 2003) . . . . . . . . . . . . . . . 19

Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19
(D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lawyers Comm. for Human Rights v. INS, 721 F. Supp. 552
(S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Moayedi v. U.S. Customs & Border Prot., 510 F. Supp. 2d 73
(D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Oglesby v. Army, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Perry v. Block, 684 F.2d 121 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Safecard Servs., Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 18

Triestman v. DOJ, Drug Enforcement Admin., 878 F. Supp. 667
(S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Weisberg v. DOJ, 745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wood v. FBI, 432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**<u>Statutes and Rules</u>:**

Freedom of Information Act, 5 U.S.C. § 552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant the Department of Homeland Security ("DHS," the "Department," or the "Government"), respectfully submits this memorandum of law in support of its motion for partial summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This motion presents a single question: whether DHS conducted an adequate search in response to an April 25, 2006 Freedom of Information Act ("FOIA") request (the "Request" or the "FOIA Request") from Plaintiffs Amnesty International USA, and Washington Square Legal Services, Inc. (collectively, "Plaintiffs").[1]  Although this litigation concerns two other FOIA requests and four other federal agencies – the Central Intelligence Agency, the Department of Justice, the Department of State, and the Department of Defense – neither of those requests, and none of those other agencies, are at issue in this motion.  Moreover, although DHS partially withheld information from four pages of documents in response to the FOIA Request, the parties have already settled their disputes regarding those partial withholdings.  Thus, the only issue now before the Court is the adequacy of DHS's search in response to the Request.

The FOIA Request seeks records regarding the identity, location, and confinement of "Ghost Detainees," which the Request defines as "persons apprehended since September 11, 2001," "who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information."  Plaintiffs made their Request to specific components of DHS – Immigration and Customs Enforcement ("ICE"), Customs and Border Patrol ("CBP"), the Office of Policy, the Office of Intelligence and Analysis ("I&A"), U.S. Citizenship and Immigration Enforcement ("USCIS"), and the Coast Guard – as well as to the Privacy Office at DHS headquarters.

---

[1]  Plaintiff Center for Constitutional Rights, Inc., was not a signatory to the Request.

DHS conducted wide-ranging searches of those record systems most likely to contain responsive documents and surveyed offices that might possibly have responsive records. In so doing, the Department faithfully discharged its obligations under FOIA. Accordingly, the Court should grant partial summary judgment to DHS and hold that the Department conducted an adequate search for documents responsive to the Request.

## BACKGROUND

### A.    The Request

By letters dated April 25, 2006, Plaintiffs filed FOIA requests with ICE, CBP, the Office of Policy, I&A, the DHS Privacy Office, USCIS, and the Coast Guard. See Declaration of Catrina M. Pavlik-Keenan, dated November 30 ("Pavlik-Keenan Decl."), ¶ 3 (ICE); Declaration of Shari Suzuki, dated November 30, 2007 ("Suzuki Decl."), ¶ 4 (CBP); Declaration of Nicole Bertucci, dated November 30, 2007 ("Bertucci Decl."), ¶ 3 (Policy); Declaration of Sandy Ford Page, dated November 30, 2007 ("Page Decl."), ¶ 3 (I&A); Declaration of Vania T. Lockett, dated November 29, 2007 ("Lockett Decl."), ¶ 7 (Privacy Office at DHS headquarters); see also Stipulation dated November 30 ("Stipulation"), at 2 (Coast Guard and USCIS), attached to the Declaration of Brian M. Feldman, dated November 30, 2007 ("Feldman Decl."). Plaintiffs did not deliver requests to any other component of DHS. See Letter to Departmental Disclosure Office (Privacy Office), dated April 25, 2006 ("FOIA Request"), at 1 (listing agencies and components served with requests), Lockett Decl., Ex. A.

The Request is entitled "'Request Submitted Under the Freedom of Information Act for Records Concerning Detainees, including 'Ghost Detainees/Prisoners,' 'Unregistered Detainees/Prisoners,' and 'CIA Detainees/Prisoners.'" See FOIA Request at 1. The Request

2

provides definitions for the types of records within its scope.  Specifically, in a section entitled "Scope of Request," the Request explains, in bolded and italicized text, that the request is limited to records regarding "individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information," i.e., records regarding individuals being secretly detained.  Id. at 2.  The Request states that these individuals "have been referred to, among other things, as "ghost detainees/prisoners," "unregistered detainees/prisoners," "CIA detainees/prisoners," and "Other Governmental Agency Detainees."  Id. at 2-3.  The Request further limits its scope to "persons apprehended since September 11, 2001."  Id. at 3.

The Request then articulates three specific requests, for records regarding: (1) "[t]he apprehension, transfer, detention, and interrogation of persons within the Scope of the Request," (2) "[c]urrent and former places of detention where individuals within the Scope of the Request have been or are currently being held," and (3) "[t]he names and identities of detainees who fall within the scope of the request."  Id. at 4-5.

### B.    DHS's Search for Responsive Records

DHS thoroughly searched for documents potentially responsive to the Request, as described in detail below.  See infra at 4-7 (ICE), 8-11 (CBP), 11-13 (Office of Policy), 13-14 (I&A), 14-17 (DHS Headquarters).[2]

---

[2]  The parties have stipulated to the adequacy of the searches of USCIS and the Coast Guard.  See Stipulation ¶ 2.  Accordingly, those offices' searches are not described herein.

1.     **ICE**

ICE commenced its search at the office of one of its components, Detention and Removal Operations ("DRO"), because that component regularly detains and removes aliens.  See Pavlik-Keenan Decl. ¶ 5.  The five offices of DRO are (i) the Criminal Alien Division, (ii) the Compliance Enforcement Division, (iii) the Removal Management Division, (iv) the Detention Management Division, and (v) the Management Development Program.  See id. ¶ 6.  The ICE FOIA and Privacy Act Office (the "ICE FOIA Office") forwarded the FOIA request to the DRO Office of Intelligence Operations, a DRO office within the Criminal Alien Division, based on their belief that, if any office within DRO was likely to have responsive documents, it would be Intelligence Operations.  See id.

The Chief of Intelligence Operations responded that, based on his knowledge of his office and discussions with personnel in his office, DRO Intelligence Operations was not likely to have any records responsive to the FOIA Request.  See id. ¶ 7.  The Chief further explained that, based on his position as the Chief of Intelligence Operations, he knew DRO did not detain individuals in the manner described in the Request.  See id.

Nevertheless, the Chief of Intelligence Operations conducted extensive searches of both unclassified and classified DRO records.  See id. ¶ 8.  He first conducted an unclassified search of Intelligence Operations' electronic files by searching through its file on DRO's shared drive for any records responsive to the FOIA Request.  Id.  He personally searched the shared drive by opening the electronic folders, and documents within those folders, as necessary to determine if any documents were responsive.  Id.  He found no responsive documents.  Id.  The Chief of

Intelligence Operations then personally searched his office's classified documents, by hand, to determine whether any documents were responsive. See id. ¶ 9. None were. Id.

After completing these searches, the Chief of Intelligence forwarded the FOIA Request to each of the Deputy Assistant Directors for each of DRO's divisions, excepting its Management Development Program. See id. ¶ 10. All of the Deputy Assistant Directors responded that, based on their knowledge of the activities of their divisions, they knew their divisions would not have any records responsive to the FOIA Request. Id.

The ICE FOIA Office also asked three other components of ICE, in addition to DRO, to conduct searches because they might possibly have responsive documents. See id. ¶ 11. Specifically, the ICE FOIA Office asked the following offices to conduct searches: (i) the Office of Investigations, because that office conducts criminal investigations into threats to national security; (ii) the Office of Intelligence, because that office analyzes intelligence information for ICE; and (iii) the Office of International Affairs, because that office supports ICE with intelligence relating to investigations and officer safety. See id.

None of the offices located responsive documents. The only division within the Office of Investigations likely to have responsive records was the National Security Division, which is a division headed by a Deputy Assistant Director. Id. ¶ 12. The Acting Deputy Assistant Director of the National Security Division responded that, based on his knowledge of the activities of the National Security Division, he knew the division would not have any records responsive to the FOIA Request. Id. Likewise, the Deputy Assistant Directors of the operational divisions of the Office of Intelligence and the Office of International Affairs explained that, based on their knowledge of the activities of their divisions, they knew their divisions also would not have any

records responsive to the FOIA Request.  See id. ¶¶ 13-14.  In an abundance of caution, the

Operations Deputy Assistant Director for the Office of International Affairs conducted a hand

search of his classified records for any records responsive to the FOIA Request, but found none.

See id. ¶ 15.

At the request of the ICE FOIA Office, the Office of Investigations also conducted a

search of the Treasury Enforcement Communications System ("TECS").  See id. ¶ 16.  TECS is

used by the Office of Investigations, the Office of Intelligence, and the Office of International

Affairs.  Id.  If any documents regarding apprehension, transfer, detention, or interrogation were

maintained by these offices, TECS is the system of records that would be most likely to include

such documents.  Id.  TECS includes the records of known criminal law violators and wanted

persons, with personal information on individuals, such as their names, aliases, dates of birth,

addresses, physical descriptions, and identification numbers, as well as details and circumstances

regarding searches, arrests, and seizures of persons and things.  Id. ¶ 17.

The Office of Investigations used a search application called NetLEADS to conduct its

search of TECS.  See id. ¶¶ 16, 18.  The NetLEADS search matrix permits the query of single

terms, multiple terms, or a combination of terms within one or all of the following TECS

database reports:  Intelligence Reports, Reports of Investigations ("ROIs"), and Seized Asset and

Case Tracking System ("SEACATS") incident reports.  Id.  ¶ 18.  ROIs are investigative reports

detailing the course of an investigation; a single ROI may contain agency codes, narratives, and

personally identifiable information.  Id.  SEACATS incident reports are ICE's and CBP's

automated system for tracking seized assets, seizures, penalties, liquidated damages activities,

and all related revenue issues.  Id.  The Office of Investigations used the following terms to run

6

its NetLEADS query: (1) "ghost" with "prisoner," "prisoners," "imprisonment," "imprisoned,"

"imprison," "detainee," "detainees," or "detention"; (2) "unregistered" with "prisoner,"

"prisoners," "imprisonment," "imprisoned," "imprison," "detainee," "detainees," or "detention";

and (3) "CIA" with "prisoner," "prisoners," "imprisonment," "imprisoned," "imprison,"

"detainee," "detainees," or "detention."  Id. ¶ 19.  All of the documents produced by the queries

were searched for any records responsive to the FOIA Request.  Id.  No responsive records were

found, and ICE concluded that it had completed a search of any records likely to contain

responsive documents.  Id.  ¶¶19, 21.

### 2.    CBP

At CBP, the FOIA Appeals, Policy and Litigation Branch (the "CBP FOIA Office")

determined, based on the nature of the Request, that no CBP office would likely have reponsive

records.[3]  See Suzuki Decl. ¶ 6.  Specifically, the Request asked for records regarding persons

being held in secret ("about whom the United States has not provided public information"), and

the CBP FOIA Office did not know of any office at DHS involved in, or with records

concerning, any such detention.  See id.

Nevertheless, the CBP FOIA Office determined that, although no office at CBP would

likely have documents, certain offices were the most reasonable to search.  See id. ¶ 7.  The CBP

---

[3]  At the time CBP received the Request, CBP had twenty offices: the Office of the
Commissioner, the Office of Finance, the Office of Human Resources Management, the Office
of Training and Development, the Equal Employment Opportunity Office, the Office of
Anti-Terrorism, the Office of Policy and Planning, the Office of Public Affairs, the Office of
Information and Technology, the Office of Chief Counsel, the Office of the Secure Border
Initiative, the Office of the Secure Freight Initiative, the Office of Congressional Affairs, the
Office of Internal Affairs, the Office of Intelligence, the Office of International Affairs, the
Office of Field Operations, the Office of the Border Patrol, the Office of Customs and Border
Protection Air and Marine, and the Office of International Trade.  See Suzuki Decl. ¶ 5.

FOIA Office decided to search the Office of International Affairs, because that office focused on, inter alia, global security and counter-terrorism; the Office of Field Operations, because that office handled CBP inspections, interdiction, and security at ports of entry; the Office of Anti-Terrorism, because that office led CBP's anti-terrorism efforts; the Office of Intelligence, because that office was the central intelligence branch of CBP; and the Office of Public Affairs, because that office interacted with the public regarding activities at CBP and, therefore, might have received complaints regarding the issues presented in the Request.  Id.

### a.     Office of International Affairs

The FOIA Processor for the Office of International Affairs forwarded the request to the Training Assistance Division within the Office of International Affairs because that was the only division within the office that she believed, based on her knowledge of the operations of the Office of International Affairs, might have possibly have responsive records.  Id. ¶¶ 8-9.  The Director of the Training Assistance Division stated that the division did not maintain any programs related to the issues covered by the FOIA request and would not have responsive documents.  See id. ¶ 10.  Accordingly, the Office of International Affairs advised Plaintiffs that it did not have any records related to the subject of the FOIA request.  Id. ¶ 11.

### b.     Office of Field Operations

The Office of Field Operations maintains it records regarding individuals primarily in TECS.  See id. ¶¶ 12-13; see also supra Part B.2.  As described above, a search of TECS, using the NetLEADS search engine and terms drawn for the FOIA Request, was conducted by ICE, and no responsive documents were located.  See supra Part B.2.

8

In addition to the TECS search described above, the Office of Field Operations' FOIA Processor showed the FOIA Request to the Executive Director of the Office of Admissibility Requirements and Migration Control, which is a division of the Office of Field Operations. See Suzuki Decl. ¶ 14. The FOIA Processor inquired with the Executive Director because his office handles issues regarding admissibility into the United States, and the FOIA Processor believed that he might have additional information about any responsive records. Id. The Executive Director indicated that, based on his knowledge of the operations of the division, there were no documents in the Office of Field Operations responsive to the FOIA Request.[4] Id. ¶ 15.

### c.      Office of Anti-Terrorism

In the Office of Anti-Terrorism, the FOIA Processor first performed an electronic search of the office's Enterprise Program Management Office (the "ePMO"). Id. ¶ 17. The ePMO is a web-enabled project work management system that was used to identify, assign and track work activity within the Office of Anti-Terrorism. Id. The ePMO was used as an internal tracking system and a shared network drive for all Office of Anti-Terrorism products, and contained all correspondence received by, all working documents of, and all documents issued by the Office of Anti-Terrorism. Id. In addition to the ePMO, the FOIA Processor searched the office's

---

[4] He recalled, however, from his personal experience in an Immigration and Naturalization Service office (outside the Office of Field Operations), a record that he erroneously believed was responsive to the Request. Id. The Executive Director searched a compact disc he maintained from his prior work and located the four-page document, which DHS produced to Plaintiffs with redactions. Id. ¶¶ 15-16. The documents were not, in fact, responsive to the Request. The four pages, which are attached to the Suzuki declaration as Exhibit C, do not concern any "individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." Instead, they describe the very public arrival of an individual to Norfolk, Virginia, including the media attention surrounding the event.

shared network drive because, prior to the existence of ePMO, the staff at the Office of

Anti-Terrorism would save work products to the shared network drive.  See id. ¶ 20.  The FOIA

Processor conducted both searches using the following search terms, drawn from the FOIA

Request: "Ghost Detainees," "Ghost Prisoners," "Unregistered Detainees," "Unregistered

Prisoners," "CIA Detainees," "CIA Prisoners," "Other Governmental Agency Detainees" and

"OGA Detainees." Id. ¶ 18, 20.  No responsive documents were located.  Id.

        In addition to the ePMO and shared drive searches, the Office of Anti-Terrorism's FOIA

Processor performed a search of hard copy files within the Office of Anti-Terrorism.  See id.

¶ 19.  The hard copy files consisted of incoming correspondence and outgoing final products

signed by the Assistant Commissioner of the Office of Anti-Terrorism.  See id.  Although the

documents in the hard copy files would likely be found in the ePMO, a manual search of these

hard copy files was also performed by scanning the files for the same keywords used in the

electronic search.  Id.  No responsive records were located.  Id.

                    d.      *Office of Intelligence*

        Each division of the Office of Intelligence received a copy of the FOIA Request.  See id.

¶¶ 22-23.  All of the division directors responded that they knew their divisions did not have

responsive records.  See id. ¶ 23.  The directors further indicated that the Office of Intelligence

was not responsible for detainees of the type described in the FOIA request, i.e., "individuals

who were, have been, or continue to be deprived of their liberty by or with the involvement of

the United States and about whom the United States has not provided public information."  Id.

Moreover, the Director of Information Acquisition and Management Division of the Office of

Intelligence indicated that records of the Office of Intelligence were primarily maintained in

TECS, which, as noted above, had been searched with the NetLEADS search engine, which returned no responsive documents.  See id. ¶ 24.

e.    *Office of Public Affairs*

The FOIA Processor for the Office of Public Affairs, based on her knowledge of the operations of the office, determined that the Customer Service Center (the "CSC") was the only office within the division that was likely to maintain responsive records.  See id. ¶ 25.  The CSC handles general inquiries about CBP requirements and procedures.  Id.  The CSC also receives CBP-related complaints and maintains the "Questions" module on the CBP public website, which is an automated database that enables the general public to obtain information about CBP requirements at any time of day.  Id.

The head of the CSC searched for records by calling up a report for the "emerging issues" category of questions for the past year.  Id. ¶ 26.  The "emerging issues" categories include new questions that are not covered by existing categories, such as importing procedures and requirements.  Id.  The head of CSC scanned the entries made by CSC staff describing the inquiries made to CBP for terms such as "Ghost Detainees," "Ghost Prisoners," "Unregistered Detainees," "Unregistered Prisoners," "CIA Detainees," "CIA Prisoners" and "transit of prisoners of war."  Id.  No responsive documents were located, and CBP concluded that it had completed a search of all files records likely to contain responsive documents.  Id.  ¶¶ 26-27.

3.    **Office of Policy**

The DHS Office of Policy was created in July 2005 to centralize departmental policy development and coordination.  See Bertucci Decl. ¶ 6.  It is the central office for developing and

communicating policies across multiple components of DHS.  Id.  It does not conduct field operations.  See id.

The Office of Policy twice conducted an office-wide search for records responsive to the FOIA Request, but found none.  See id. ¶¶ 7-13.  Unfortunately, the office did not maintain records of its first search, which was coordinated by an Acting Chief of Staff who has since departed.  See id. ¶¶ 8-9.  The Office of Policy therefore searched a second time, coordinating its second search through its Executive Secretariat.  See id. ¶¶ 10-13.  The Office of Policy Executive Secretariat is responsible for managing records and communications between subcomponents at the Office of Policy.  Id. ¶ 10.  The Executive Secretariat coordinated the search in compliance with its standard operating procedure for conducting FOIA searches.  Id.

Pursuant to those standard operating procedures, the Executive Secretary distributed the FOIA Request to each of the seven subcomponents of the Office of Policy.  Id. ¶ 11.  Each subcomponent then distributed a copy of the FOIA Request to those employees most likely to have responsive documents, with instructions for them to locate responsive documents.  See id. ¶ 12.  All of the subcomponents reported to the Executive Secretariat that their employees had not located any responsive documents.  See id. ¶ 13.

In addition to the standard FOIA search conducted through the Office of Policy Executive Secretariat, the Office of Policy also conducted a search of classified records in the safe in the Office of the Assistant Secretary for Policy, the office that maintains all final Office of Policy documents.  See id. ¶ 14.  The FOIA processor hand-searched the safe and reviewed all of its classified materials for any documents referring to Ghost/Unregistered/CIA Detainees/Prisoners.  Id. ¶ 15.  No responsive records were found, and the Office of Policy

12

concluded that it had completed a search of any records likely to contain responsive documents.
See id. ¶¶ 15-16.

### 4. I&A

The FOIA staff responsible for I&A's search determined that I&A would not likely
maintain records responsive to the request, in light of I&A's mission, and because they did not
know of any I&A programs that involve secret detentions, i.e., detentions of individuals "about
whom the United States has not provided public information." See Page Decl. ¶ 6. The mission
of I&A is to provide intelligence support to DHS, to law enforcement, and to first responders,
and to secure the homeland and protect critical infrastructure. Id. I&A does not conduct field
operations, and none of its divisions is engaged in apprehension, transfer, detention, or
interrogation. See id. ¶¶ 6-7.

Although I&A was unlikely to have any documents responsive to the FOIA Request,
I&A nonetheless conducted a search of each of its divisions. See id. ¶ 8. Specifically, each
division received a copy of the request and searched its documents, both classified and
unclassified. Id. The divisions searched documents electronically because, within I&A, almost
all documents are maintained in electronic form and, where hard copy documents exist, they are
generally scanned to be maintained in an electronic form. Id.

In each division, I&A searched the division's electronic files, where are maintained on
I&A's available shared drives. Id. ¶ 9. I&A's shared drives consist of its local area networks: a
Shared Q drive (A,B,C) LANs, and a Shared S drive (C) LAN. Id. The Shared Q drive includes
I&A's e-mails and electronic records at all classification levels. Id. The Shared S drive contains
raw intelligence information and associated products, primarily for the Current Intelligence/

Watch & Warning Branch.  Id.  I&A searched these drives using the Microsoft Windows XP search engine.  Id.

Each division had a copy of the FOIA Request when conducting their searches.  See id. ¶ 10. The terms used to search included permutations of terms presented in the FOIA Request: "detainees" or "prisoner" and "ghost"; "unregistered detainees" and "ghost" or "prisoners"; "CIA detainees" and "prisoners" or "ghost"; "US Government" and "ghost detainees" or "prisoners."  Id.  The queries returned no results.  See id.

I&A also searched its Information Intelligence Fusion Database and the National Terrorist Database.  Id.  ¶11.  The Intelligence Fusion database is located on the Q drive, and contains finished intelligence products, e-mails associated with those products, and the I&A Library, which is an electronic library accessible by I&A.  Id.  The National Terrorist Database contains products and e-mails associated with the Current Intelligence/Watch & Warning Branch.  Id.  The databases were queried with the terms used in I&A's shared drive searches, and the queries returned no results.  Id.

In addition, the I&A FOIA representative conducted a search of the collective drives of all of the divisions, thus duplicating the efforts of the individual divisions.  See id. ¶ 12.  That set of queries also returned no results, and I&A concluded that it had completed a search of all files likely to contain responsive materials.  Id.  ¶¶ 12, 14.

### 5.    **Headquarters**

At DHS Headquarters, the DHS FOIA Office determined that no DHS office – including any component office –  would likely maintain records responsive to the request.  See Lockett Decl. ¶ 10.  The DHS FOIA Office made this determination based on the nature of the Request.

Specifically, the Request asked for records regarding the detention of persons "about whom the United States has not provided public information," and the DHS FOIA Office did not know of any DHS programs involving such detention. See id.

The DHS FOIA staff concluded, however, that, in the unlikely event that any DHS offices maintained responsive records, those offices would most likely be: ICE, Coast Guard, and CBP, because those are the DHS offices primarily involved in the detention of aliens; I&A, because that office is the central intelligence arm of DHS; and the Office of Policy, because that office considers wide-ranging policy issues involving DHS. See id. Those offices each conducted searches, as previously described or noted. See supra pp. 3-14 & n.2.

The DHS FOIA Office nevertheless decided to search the Office of the Secretary, by coordinating a search of the Office of the Executive Secretariat. See id. ¶ 11. The Office of the Secretary is comprised of the Secretary, the Deputy Secretary, the Chief of Staff, and the Military Advisor. See id. ¶ 12. Within the Office of the Secretary, the Executive Secretariat has primary record-management responsibilities; it also functions as the Department's central clearinghouse for documents requiring senior leadership attention or action. Id. ¶¶ 11-12. The Executive Secretariat thus manages the movement of documents between the Secretary's office and other offices within the Department, as well as between the Department, the White House, and other executive agencies. Id. The DHS FOIA Office decided to conduct a search of the Office of the Executive Secretariat because of its function in managing documents for senior leadership and because of the office's role in disseminating classified information. Id. ¶ 11. The Executive Secretariat searched both its unclassified and its classified records. See id. ¶¶ 13-20.

The search of the Office of the Executive Secretariat's unclassified records included searches of e-mail, electronic documents, and an electronic database.  See id. ¶ 14.  The e-mail portion of the search involved a search of the e-mails of the Deputy Executive Secretary.  See id. ¶¶ 14-15.  The Deputy Executive Secretary is the DHS official who manages operations for the Office of the Executive Secretariat, and he or she is copied on nearly all interagency communications at the DHS Secretary or Deputy Secretary level.  See id. ¶ 15.  The Deputy Executive Secretary is thus copied on, inter alia, emergency declarations for approval by the DHS Secretary for transmittal to the White House, arrangements with the White House for policy meetings, and communications between DHS components and outside agencies, including other homeland security stakeholders.  Id.  The following terms were used in an electronic search of the text of the Deputy Executive Secretary's e-mails: "detainees," "ghost detainees," "unregistered detainees," "unregistered prisoners," "CIA detainees," "CIA prisoners," "rendition," "ghosting," and "ghost."  Id. ¶ 16.  The queries returned no documents.  Id.

DHS also searched the Office of the Executive Secretariat's shared drive, which contains all DHS Secretary and Deputy Secretary briefing materials, as well as an Executive Secretariat database called the IQ/Executive Tracking System, which DHS uses to track correspondence of both the DHS Secretary and Deputy Secretary, and memoranda and directives from the Secretary and Deputy Secretary.  See id. ¶¶ 17-18.  In searching the drive and the databases, DHS used the same terms used in the e-mail search.  Id.  The queries produced no results.  Id.

In addition to these searches, a DHS employee conducted a hand search of the office's classified materials.  Id. ¶ 19.  The Office of the Executive Secretariat receives and disseminates certain classified communications of the DHS Secretary and the Deputy Secretary, and copies

16

are logged and stored in a classified safe.[5]  See id.  The safe is not routinely hand searched in response to FOIA requests.  See id. ¶ 20.  In this case, however, a reviewer examined each classified document within the safe of the Office of the Executive Secretariat to determine if any documents were responsive to the Request.  Id.  No responsive documents were found, and DHS concluded that it had completed a search of all files likely to contain responsive records.  Id. ¶¶ 20-21.

### C.    Plaintiffs' Lawsuit

On June 7, 2007, Plaintiffs filed a complaint in this action suit challenging, inter alia, DHS's response to the FOIA Request.  See Complaint at 16.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARDS IN FOIA CASES

"In order to prevail on a motion for summary judgment, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA."  Associated Press v. DOJ, No. 06 Civ. 1758 (LAP), 2007 WL 737476, at *3 (S.D.N.Y. Mar. 7, 2007).  "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search . . . are sufficient to sustain the agency's burden."  Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994) (footnote call omitted); see, e.g., Garcia v. DOJ, Office of Info. & Privacy, 181 F. Supp. 2d 356, 366-67 (S.D.N.Y. 2002).  Although the specificity required in an agency declaration "varies depending on the particular context," Halpern v. FBI, 181 F.3d 279, 297 (2d Cir. 1999), agency declarations should be detailed and

---

[5]  Other classified communications of the DHS Secretary and Deputy Secretary are facilitated by I&A, whose searches have already been described.  See id.; see also supra B.4.

17

nonconclusory, <u>Wood v. FBI</u>, 432 F.3d 78, 85 (2d Cir. 2005).  Such declarations may be made

by any individual supervising an agency's search.  <u>Carney</u>, 19 F.3d at 814 ("An affidavit from an

agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule

56(e); there is no need for the agency to supply affidavits from each individual who participated

in the actual search."); <u>see also</u> <u>Garcia</u>, 181 F. Supp. 2d at 368.

## II.    DHS CONDUCTED A REASONABLE SEARCH

An agency's search is adequate if it is reasonable.  A search is reasonable if it is

"'reasonably designed to identify and locate responsive documents.'"  <u>Garcia</u>, 181 F. Supp. 2d at

368 (quoting <u>Lawyers Comm. for Human Rights v. INS</u>, 721 F. Supp. 552, 566 (S.D.N.Y. 1989)

(Walker, J.)).  Adequacy thus turns on "'whether the search was reasonably calculated to

discover the requested documents, <u>not</u> whether it actually uncovered every document extant.'"

<u>Grand Cent. P'ship, Inc. v. Cuomo</u>, 166 F.3d 473, 489 (2d Cir. 1999) (quoting <u>Safecard Servs.,</u>

<u>Inc. v. SEC</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991)) (emphasis added); <u>see also</u> <u>Weisberg v. DOJ</u>,

745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might

exist any other documents possibly responsive to the request, but rather whether the <u>search</u> for

those documents was <u>adequate</u>." (emphases in original)).  Where agency personnel familiar with

the agency's operations know the agency does not have responsive records, a reasonable search

may be none at all.  <u>See</u> <u>Am.-Arab Anti-Discrimination Comm. v. DHS</u>, No. 06-1770, 2007 WL

2812867, at *4 (D.D.C. Sept. 27, 2007) ("a search [that] would be futile . . . is unnecessary").

The Second Circuit has stressed that "an agency's search need not be perfect."  <u>Grand</u>

<u>Cent. P'ship</u>, 166 F.3d at 489; <u>see also</u> <u>Garcia</u>, 181 F. Supp. 2d at 368.  An "agency is not

expected to take extraordinary measures to find the requested records."  <u>Garcia</u>, 181 F. Supp. 2d

at 368; see also Halpern, 181 F.3d at 288 ("[A]n agency need not conduct a search that plainly is unduly burdensome."). For instance, "'[a]gencies are not required to perform searches which are not compatible with their own document retrieval systems.'" Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (quoting Assassination Archives & Research Ctr. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989)). Nor must an agency search each and every one of its record systems. Oglesby v. Army, 920 F.2d 57, 68 (D.C. Cir. 1990); see, e.g., Moayedi v. U.S. Customs & Border Prot., 510 F. Supp. 2d 73, 79-80 (D.D.C. 2007); Stone v. Def. Investigative Serv., 816 F. Supp. 782, 786 (D.D.C. 1993). Instead, a reasonable search will include those systems of records reasonably believed likely to contain responsive documents. See Oglesby, 920 F.2d at 68. After all, "'FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters.'" Judicial Watch, 108 F. Supp. 2d at 27 (quoting Assassination Archives & Research Ctr., 720 F. Supp. at 219).

Once an agency submits a search declaration describing a reasonable search, the agency is entitled to a presumption of good faith, and the Court may award summary judgment on that basis. Carney, 19 F.3d at 812; see also Grand Cent. P'ship, 166 F.3d at 489. To describe its reasonable search, an agency declaration should explain "the search terms and the type of search performed, averring that all files likely to contain responsive materials . . . were searched," Iturralde v. Comptroller of the Currency, 315 F.3d 311, 313-14 (D.C. Cir. 2003), but the agency need not "set forth with meticulous documentation the details of an epic search," Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). A FOIA plaintiff may then defeat summary judgment only upon a demonstration of bad faith. Grand Cent. P'ship, 166 F.3d at 489; see also Triestman v. DOJ, Drug Enforcement Agency, 878 F. Supp. 667, 672 (S.D.N.Y. 1995) ("[O]n a motion by the

government for summary judgment, if the government's affidavits are adequate on their face to merit judgment in the government's favor, summary judgment should be denied . . . only if the plaintiff makes a showing of bad faith sufficient to impugn the affidavits."); <u>Garcia</u>, 181 F. Supp. 2d at 366.  A plaintiff cannot establish bad faith "by purely speculative claims about the existence and discoverability of other documents."  <u>Grand Cent. P'ship</u>, 166 F.3d at 489.

Here, the Department of Homeland Security is entitled to summary judgment because, as described in detail above, the Department conducted more than reasonable searches in response to the FOIA Request.  For each component receiving the FOIA Request, and at its headquarters, DHS conducted thorough searches reasonably calculated to discover any responsive documents in the possession of the Department.  Accordingly, DHS satisfied its obligations under FOIA. <u>Cf.</u> <u>Garcia</u>, 181 F. Supp. 2d at 368.  In the absence of any evidence of bad faith, the Department is therefore entitled to summary judgment.  <u>See</u> <u>Grand Cent. P'ship</u>, 166 F.3d at 489.

## CONCLUSION

For the reasons stated above, the Court should grant partial summary judgment to DHS and hold that the Department conducted an adequate search for documents responsive to Plaintiffs' FOIA Request.

Dated:  New York, New York
        November 30, 2007

                    MICHAEL J. GARCIA
                    United States Attorney for the
                    Southern District of New York,
                    Attorney for Defendant
                    Department of Homeland Security


By:     /s/ Brian M. Feldman
        BRIAN M. FELDMAN
        JEANNETTE A. VARGAS
        Assistant United States Attorneys
        EMILY E. DAUGHTRY
        Special Assistant United States Attorney
        86 Chambers Street, Third Floor
        New York, New York 10007
        Telephone No. (212) 637-2777
        Facsimile No. (212) 637-2717