### UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF NEW YORK

AMNESTY INTERNATIONAL USA, CENTER
FOR CONSTITUTIONAL RIGHTS, INC. and
WASHINGTON SQUARE LEGAL SERVICES,
INC.,

       Plaintiffs,

  v.

CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE, DEPARTMENT
OF HOMELAND SECURITY, DEPARTMENT
OF JUSTICE, DEPARTMENT OF STATE, AND
THEIR COMPONENTS

       Defendants.

**ECF CASE**

07 CV 5435 (LAP)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR
PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEPARTMENT OF
HOMELAND SECURITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ..........................................................................1

BACKGROUND ................................................................................................2

    A.  The Requests ..........................................................................................2

    B.  Agency Response ...................................................................................4

        1.  Immigration and Customs Enforcement ("ICE") ........................5

        2.  Customs and Border Protection ("CBP") ...................................6

        3.  Office of Intelligence and Analysis ("I&A")...............................10

        4.  Office of Policy..........................................................................10

        5.  Office of Privacy (Headquarters).............................................11

    C.  Subsequent Discussions With the Government ...................................12

ARGUMENT ..................................................................................................13

I.    Plaintiffs' Motion for Partial Summary Judgment Should Be Granted................................13

    A.  DHS Adopted An Unreasonably Narrow Interpretation of Plaintiffs'
        Requests ...............................................................................................14

    B.  DHS Failed to Use Reasonable Search Protocols.................................16

II.    This Court Should Deny the Government's Motion for Partial Summary Judgment
    and Order DHS to Conduct a Reasonable Search.............................................................18

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

**Statutes and Rules:**

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998)................................................13

*Davis v. Dep't of Justice*, 460 F.3d 92 (D.C. Cir. 2006) ................................................16

*Defenders of Wildlife v. Dep't of Agriculture*, 311 F. Supp. 2d 44 (D.D.C. 2004)......................19

*Founding Church of Scientology of Washington v. NSA*, 610 F.2d 824 (D.C. Cir. 1979)..16,18, 19

*Friends of Blackwater v. Dep't of Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005) ........................19

*Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1979)................................................20

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ................................................13, 18

*Hemenway v. Hughes*, 601 F. Supp. 1002 (D.D.C. 1985) ................................................14

*James v. U.S. Customs & Border Protection*, 474 F. Supp. 2d 154 (D.D.C. 2007) ....................19

*LaCedra v. Exec. Office for U.S. Att'ys*, 317 F.3d 345 (D.C. Cir. 2003) ................................13, 14

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995)............................14, 18, 19

*Oglesby v. U.S. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990)................................................16

*Public Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1 (D.D.C. 2003) ....................................17

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ..........................................1, 13, 14, 15, 16

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ................................13, 16

*Wilderness Soc'y v. Bureau of Land Mgmt., No. Civ.A. 01CV2210*, 2003 WL 255971 (D.D.C. 2003) ................................................16

**Statutes and Rules:**

Freedom of Information Act, 5 U.S.C. § 552...................................................................passim

Fed. R. Civ. P. 56.........................................................................................................13

Local Rule 56.1......................................................................................................2, 19

Plaintiffs Amnesty International USA and Washington Square Legal Services, Inc. ("Plaintiffs") submit this memorandum in support of their motion for partial summary judgment and in opposition to the government's motion for partial summary judgment.

## PRELIMINARY STATEMENT

The question before the Court is whether the Department of Homeland Security ("DHS") conducted a search reasonably calculated to locate all records responsive to Plaintiffs' Freedom of Information Act ("FOIA") requests. *See Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

On April 25, 2006, Plaintiffs submitted FOIA requests to DHS and six of its components for records concerning the rendition and secret detention of individuals in connection with the U.S. government's anti-terrorism efforts. DHS did not take reasonable steps to find or produce responsive documents. Instead, DHS adopted an unduly narrow reading of the requests that excluded centrally relevant records from search and disclosure. DHS also used search techniques not reasonably designed to retrieve responsive records from electronic files and databases. As a result, despite DHS's undeniable involvement in activities relevant to Plaintiffs' requests, DHS located only two documents. Now it asserts that even these fall outside the scope of the requests and were mistakenly produced to Plaintiffs.

DHS has flouted its statutory duties in responding to Plaintiffs' FOIA requests. This Court should grant Plaintiffs' motion for partial summary judgment, deny the government's motion for partial summary judgment, and order DHS to conduct a reasonable search for responsive records without further delay.

# BACKGROUND[1]

### A.    The Requests

Plaintiffs sent their FOIA requests to the following DHS entities: (1) Immigration and Customs Enforcement; (2) Customs and Border Protection; (3) Office of Intelligence & Analysis; (4) Office of Policy; and (5) Office of Privacy.[2]  At the time Plaintiffs filed their requests, some aspects of the U.S. government's rendition and secret detention program had been directly acknowledged by senior government officials and had been the subject of inter-governmental investigations and numerous media reports.[3]  However, many key facts remained—and continue to remain—undisclosed.  Accordingly, Plaintiffs requested records concerning (1) the "apprehension, transfer, detention, and interrogation" of persons who have been detained by the United States under secret or irregular conditions, (2) the locations that have been used for such detention, and (3) the names and identities of detainees.[4]

There is strong evidence that DHS has been involved in rendition and possesses responsive records related to persons who were rendered or secretly detained.  DHS describes itself as the "focal point for all terrorism-related intelligence."[5]  One aspect of DHS's mission is to "gather information from all field operations and other parts of the Intelligence Community; analyze it for homeland security implications; and appropriately disseminate it to policymakers,

---

[1] The facts surrounding Plaintiffs' FOIA requests and DHS's response are more fully enumerated in Plaintiffs' Statement of Material Facts, submitted pursuant to Local Rule 56.1(a).

[2] Plaintiffs also sent requests to U.S. Citizenship and Immigration Services and the Coast Guard but these requests are not at issue.  In addition, Plaintiffs submitted a second request to DHS seeking certain specified memoranda and reports relating to secret detentions.  DHS's processing of that request will be addressed at a later date.

[3] Since Plaintiffs' requests were filed, President Bush officially acknowledged that the United States operates a program of rendition and secret detention.  *See* Press Release, White House, President Discusses Creation of Military Commissions To Try Suspected Terrorists (Sept. 6, 2006), attached to the Declaration of Kyle DeYoung ("DeYoung Decl.") as Exhibit 1.

[4] *See* April 25, 2006 FOIA Request at 2-3, DeYoung Decl. Ex. 2.

[5] DHS, Office of Inspector General, Survey of DHS Intelligence Collection and Dissemination, June 2007, DeYoung Decl. Ex. 3.

DHS components, and federal, state, and local partners."[6]  The information DHS collects apparently comes in part from detainees who are the subject of Plaintiffs' requests.[7]  DHS is also tasked with securing the nation's borders by identifying and excluding suspected terrorists;[8] some of these individuals may have been detained as part of the government's secret detention and rendition program.  Further, in its border security role, DHS has come into direct contact with specific individuals who have been subject to rendition and secret detention.

In 2002, for example, the Immigration and Naturalization Service ("INS")—which became part of DHS in 2003—directly facilitated the rendition and secret detention of Canadian citizen Maher Arar.  Federal immigration officials apprehended Mr. Arar at Kennedy International Airport, and the INS Regional Director later authorized his transfer to Syria, where he was reportedly held in secret detention for nearly a year.[9]  As recently as January 2007, DHS Secretary Michael Chertoff sent a letter to the Canadian government confirming DHS's ongoing decision to keep Mr. Arar on its watch list, excluding him from entry into the United States.[10]

---

[6] *Id.*

[7] *See* Office of the Director of National Intelligence, Summary of the High Value Terrorist Detainee Program, DeYoung Decl. Ex. 4.

[8] *See, e.g.,* Customs and Border Protection, Anti-Terrorism Initiatives, DeYoung Decl. Ex. 5.

[9] *See, e.g.,* Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report of the Events Relating to Maher Arar: Analysis and Recommendations* ("Canadian Inquiry Report") (2006), DeYoung Decl. Ex. 6; Associated Press, *Congress Apologizes to Victim of Rendition,* L.A. Times, Oct. 19, 2007, DeYoung Decl. Ex. 7; *Matter of Arar,* Decision of the Regional Director, October 7, 2002, attached as Ex. D to Mr. Arar's Complaint in *Arar v. Ashcroft,* 414 F. Supp. 2d 250, 252-57 (E.D.N.Y. 2006) (No. 04-cv-0249), DeYoung Decl. Ex. 8.

[10] *See* January 16, 2007 Letter from Michael Chertoff and Alberto Gonzalez to the Honorable Stockwell Day, DeYoung Decl. Ex. 9.  An official commission appointed by the government of Canada found that Mr. Arar had no terrorist connections.  *See* Canadian Inquiry Report at 16-21. Mr. Arar testified remotely before two U.S. House of Representatives subcommittees on October 18, 2007 but was not able to testify in person because his name remains on the DHS watch list. *See* DeYoung Decl. Ex. 9.

The DHS Inspector General has investigated Mr. Arar's case since at least July 2004[11] and

Congress has criticized DHS for failing to disclose information about its inquiry.[12]

Immigration officials also denied entry to German citizen Khaled El-Masri at Hartsfield

International Airport in Atlanta in December 2005.  It has been widely reported that Mr. El-

Masri was abducted in Macedonia in late 2003 and transferred to Afghanistan, where he was

secretly detained by the U.S. government until officials realized they had abducted the wrong

man.[13]  Mr. El-Masri was reportedly turned away in December 2005 because his name was on a

Homeland Security watchlist.[14]  Mr. El-Masri was later permitted to enter the United States,

apparently after DHS reviewed his case.[15]

Given the record of DHS involvement with these individuals, the agency must possess

records concerning the rendition and secret detention of Mr. Arar and Mr. El-Masri, as well as

other aspects of the government's rendition and secret detention activities.

**B. Agency Response**

In response to Plaintiffs' requests, DHS has not been forthcoming.  Instead, DHS and its

components engaged in a pattern of avoidance and delay, and interpreted Plaintiffs' requests

---

[11] Documents available on the DHS website directly refer to DHS's inquiry into the Arar case. *See, e.g.*, DHS, Office of the Inspector General, Fiscal Year 2007 Annual Performance Plan (Rev. April 2007) at 52, DeYoung Decl. Ex. 10, (DHS evaluating Mr. Arar's "extraordinary rendition" to "[d]etermine how U.S. immigration officials arrived at their decision to remove this person to Syria and whether the decision was made within prescribed INS policies").

[12] *See* Press Release, Office of Senator Patrick Leahy, *Leahy, Specter Press DOJ, DHS On Investigations Into Rendition Of Canadian Citizen Maher Arar To Syria* (Feb. 28, 2007), DeYoung Decl. Ex. 11.

[13] *See* Scott Shane, *German Held in Afghan Jail Files Lawsuit*, N.Y. Times, Dec. 7, 2005, at A25, DeYoung Decl. Ex. 12.; *see also* Glenn Kessler, *U.S. Said to Admit German's Abduction Was an Error*, Wash. Post, Dec. 7, 2005, at A18, DeYoung Decl. Ex. 13.

[14] *See* note 13, *supra*.

[15] *See* Letter from ACLU to Condoleezza Rice and Michael Chertoff, Dec. 8, 2005, DeYoung Decl. Ex. 14; Dana Priest, *The Wronged Man: Ex-Detainee Seeks Answers U.S. Doesn't Want To Give*, Wash. Post, Nov. 29, 2006, DeYoung Decl. Ex. 15; *see also* Letter from Robert Jackstra, Executive Director, Travel Security and Facilitation, U.S. Customs and Border Protection, to Ann Beeson (Counsel for Mr. El Masri), dated January 5, 2006, DeYoung Decl. Ex. 42.

unreasonably narrowly. Indeed, the government's declarations reveal that very little searching has actually taken place. Given DHS's perfunctory handling of Plaintiffs' requests, it is no surprise that DHS and its components came up with virtually no responsive records. The response of each DHS component is discussed in turn.

### 1. Immigration and Customs Enforcement ("ICE")

Plaintiffs submitted their requests to ICE on April 25, 2006. Despite filing a timely appeal to ICE's denial of expedited processing on July 3, 2006, and confirming their continuing need for the records in response to a September 21, 2006 letter from ICE on October 19, 2006, Plaintiffs did not receive any substantive response from ICE until August 15, 2007—more than two months after filing their complaint. *See* DeYoung Decl. Exs. 16, 17, 18.

The declaration of Catrina Pavlik-Keenan gave Plaintiffs their first glimpse into ICE's search. Ms. Pavlik-Keenan avers that ICE forwarded Plaintiffs' request to its Office of Detention and Removal Operations ("DRO"). *See* Pavlik-Keenan Decl. ¶ 10. Four of DRO's five division heads then concluded, without conducting a search, that their divisions had no responsive documents. *See id.* Only one subcomponent of the DRO, the Office of Intelligence Operations within the Criminal Alien Division, actually conducted a search. The head of that office searched the office's unclassified electronic files and a classified safe and found no responsive documents. *Id.* ¶¶ 8-9. Ms. Pavlik-Keenan does not describe the search terms or search protocol used.

According to the declaration, Plaintiffs' requests were shared with three other ICE offices—the Office of Intelligence, Office of International Affairs, and Office of Investigations. The Office of Intelligence concluded, without conducting any search, that it did not have responsive documents. *Id.* ¶ 13-14. The head of operations for the Office of International

Affairs examined his classified files, though apparently not his unclassified or electronic files, and found no responsive documents. *Id.* ¶ 15. The only official in the Office of Investigations to receive Plaintiffs' requests was the head of the National Security Division, who also concluded, without a search, that the division had no responsive documents. *Id.* ¶ 12. Ms. Pavlik-Keenan indicates that no other ICE office—including the Office of the Principal Legal Advisor, Office of Policy and Planning, Office of Congressional Relations, Office of Public Affairs, or the offices of the Assistant Secretary or Chief of Staff—searched for responsive documents or was informed of Plaintiffs' requests.

The ICE FOIA officer did instruct the Office of Investigations to search TECS, an electronic database used by several ICE offices. *Id.* ¶¶ 16-18. The agency searched for the terms "ghost," "unregistered," and "CIA," with variations of "prisoner" and "detainee." *Id.* ¶ 19. It did not search for "other governmental agency" or "OGA" prisoners/detainees, even though those terms were listed in Plaintiffs' requests, or for "high value" detainees. Reports indicate that these are common terms used by U.S. government agencies when discussing CIA detainees and operations.[16] Nor did the agency search for records concerning Mr. Arar, Mr. El-Masri, or other individuals known to have been rendered or secretly detained.[17] According to Ms. Pavlik-

---

[16] *See, e.g.,* Sworn Statement of MNF-I, C2, IMIR CW2, Annex to Fay/Jones/Kern Report (June 16, 2004), DeYoung Decl. Ex. 19. (explaining that ghost detainees were "usually sourced from TF-121 or Other Governmental Agencies"); Sworn Statement of SGT, 372nd MP Co, Annex to Fay/Jones/Kern Report (May 7, 2004), DeYoung Decl. Ex. 20. (stating that "ghost detainees were detainees who were brought to our facility by Other Government Agencies (OGA)."). The media has confirmed that "OGA" or "other government agencies" is a term used to describe the CIA. *See, e.g.,* R. Jeffrey Smith, *Soldier Described White House Interest: Staff Requested Data from Abu Ghraib, Probers Told*, Wash. Post, June 9, 2004, at A3, DeYoung Decl. Ex. 21. ("OGA" is "a euphemism for the CIA"). The Director of National Intelligence uses the term "high value" to describe detainees in the rendition and secret detention program. S*ee* Summary of the High Value Terrorist Detainee Program, DeYoung Decl. Ex. 4

[17] This omission is particularly problematic because the Office of Field Operations in Customs and Border Protection apparently relied on ICE's search of TECS, *see infra*, and Plaintiffs' administrative appeal to that office referenced individuals who had been subject to rendition and secret detention by name. *See* DeYoung Decl. Ex. 22.

Keenan, the searches did locate documents containing the selected search terms. But the agency deemed such documents non-responsive without explaining how that determination was made.

### 2. Customs and Border Protection ("CBP")

CBP is the only DHS component that located and disclosed documents to Plaintiffs, though the government now claims those documents are not responsive to Plaintiffs' requests. Plaintiffs received correspondence from three CBP offices—the Office of International Affairs ("OIA"), Office of Field Operations ("OFO"), and Office of Anti-Terrorism ("OAT"). By letter dated May 17, 2006, OIA informed Plaintiffs that it possessed no responsive records. *See* DeYoung Decl. Ex. 23. On June 1, 2006, OFO produced four pages of documents in redacted form. *See id.* Ex. 24.[18] These documents were two "Significant Incident Report[s]" from the agency's Norfolk Sub-Office discussing the April 5, 2002, transfer of Yasser Hamdi from Cuba to the Norfolk Naval Air Station. *Id.*. By letter dated June 8, 2006, OAT stated that, "[a]fter consultation within CBP, it has been determined that records of the type you seek . . . would not be reasonably expected to be located in any office of [CBP]." *Id.* Ex. 25. OAT's statement is difficult to square with OFO's disclosure of the documents regarding Mr. Hamdi or CBP's contact with Mr. Arar and Mr. El-Masri.

In July 2006, Plaintiffs administratively appealed CBP's responses. *See id.* Ex. 26. Plaintiffs noted that none of the offices had provided any information about the searches they conducted, making it impossible to evaluate their reasonableness. *Id.* at 2. Plaintiffs also explained that CBP almost certainly had records relating to Mr. Arar and Mr. El-Masri. *Id.* at 4. More than six months later, CBP informed Plaintiffs that OIA and OAT had denied Plaintiffs' appeals. *See id.* Exs. 27, 28. The OFO did not respond at all.

---

[18] The government has since agreed to remove one of these redactions; and Plaintiffs have agreed not to challenge the remaining redactions.

The declaration of Shari Suzuki confirms the inadequacy of CBP's search effort. According to Ms. Suzuki, OIA's FOIA processor did not forward Plaintiffs' requests to three of OIA's four divisions, and no one in OIA searched for records. Only the Training and Assistance Division received the requests, and its director simply responded, without searching, "that the division did not maintain any programs related to issues covered by the FOIA request and would not have any responsive documents." Suzuki Decl. ¶ 10. Even if the OIA does not administer a rendition or secret detention program, it may possess information pertaining to apprehensions, transfers, detentions, or interrogations.

As for OAT, Ms. Suzuki avers that the FOIA processor conducted an electronic search of the office's online work management system using as search terms "Ghost Detainees," "Ghost Prisoners," "Unregistered Detainees," "Unregistered Prisoners," "CIA Detainees," "CIA Prisoners," "Other Governmental Agency Detainees," and "OGA Detainees." Suzuki Decl. ¶¶ 17-18. The FOIA processor also searched certain hard copy files by "scanning the files" for these same keywords. *Id.* ¶ 19. According to the declaration, the FOIA processor did not use more flexible search terms that would locate documents referring to a single "detainee" or "prisoner," or to "detainees" or "prisoners" in proximity to other key words (*e.g.*, "detainees of the CIA" as opposed to the cited search term "CIA detainees"). Nor did the FOIA processor search for documents regarding Mr. Arar, Mr. El-Masri, or other individuals reported to have been secretly detained or rendered by the U.S. government. Ms. Suzuki states that "[n]o responsive documents were located," *id.* ¶ 18; however, she does not indicate whether the searches returned documents that were then deemed non-responsive or explain who made any such determination or what criteria were used.

Meanwhile, OFO's FOIA processor showed Plaintiffs' requests to a single official—the Executive Director of Admissibility Requirements and Migration Control. *See id.* ¶ 14. The Executive Director located the Hamdi documents, which, according to the Suzuki declaration, "he erroneously believed w[ere] responsive to the request." *Id.* ¶ 15. The declaration does not explain why the government now deems the Hamdi documents non-responsive.

Although the declaration notes that OFO "maintains records regarding individuals primarily in a system called TECS," *id.* ¶ 12, OFO did not search this system. Instead, Ms. Suzuki avers that "[a] search of TECS . . . was conducted by U.S. Immigration and Customs Enforcement." *Id.* ¶ 13. As ICE did not finish its processing of Plaintiffs' request until August 2007, OFO could not possibly have relied on ICE's not-yet-conducted search when it wrote to Plaintiffs a year earlier, on June 1, 2006, asserting that it had completed its search and found only the Hamdi documents. *See* DeYoung Decl. Exs. 24, 29. Moreover, as discussed above, ICE did not search TECS for documents related to "other governmental agency" or "OGA" prisoners/detainees, "high value" detainees, or records related to Mr. Arar, Mr. El-Masri, or other individuals known to have been rendered or secretly detained.

Ms. Suzuki indicates that two other CBP offices—the Office of Intelligence and the Office of Public Affairs—processed Plaintiffs' requests. However, no division directors in the Office of Intelligence conducted searches. Instead, they informed the FOIA processor that "based on their knowledge," their divisions did not have responsive records and "that the Office of Intelligence was not responsible for detainees of the type described in the FOIA request." Suzuki Decl. ¶ 23. Again, an office that is not directly "responsible" for detainees may still have responsive records. One division director "indicated that records of the Office of Intelligence were primarily maintained in TECS," but no one in the office searched that system. *Id.* ¶ 24.

The Office of Public Affairs' handling of Plaintiffs' requests was equally cursory. The head of the office's Customer Service Center simply scanned "a report for the 'emerging issues' category of questions [generated on CBP's public website] for the past year." *Id.* ¶ 26.

The Suzuki declaration confirms that no other CBP offices—including seemingly relevant offices such as the Chief Counsel's Office, Policy and Planning Office, Congressional Affairs Office, or offices of the CBP Commissioner, Deputy Commissioner, or Chief of Staff—were even contacted about Plaintiffs' request, let alone searched.

### 3. Office of Intelligence and Analysis ("I&A")

In a July 25, 2006 letter to Plaintiffs, I&A stated, without elaboration, that, "[a]fter a thorough search of the Office of Intelligence and Analysis files, no records responsive to your request were identified." DeYoung Decl. Ex. 30. Plaintiffs filed an appeal challenging the adequacy of the I&A search, *see id.* Ex. 31, but never received a response.

According to the declaration of Sandy Ford Page, each division within I&A received Plaintiffs' requests and conducted an electronic search of its classified and unclassified files. Page Decl. ¶¶ 7-8. "The following search terms were used: 'detainees' or 'prisoner' *and* 'ghost'; 'unregistered detainees' *and* 'ghost' or 'prisoners'; 'CIA detainees' *and* 'prisoners' or 'ghost'; 'US Government' *and* 'ghost detainees' or 'prisoners.'" *Id.* ¶ 10 (emphasis added). These searches apparently would not have returned documents discussing "unregistered detainees" or "CIA detainees" unless they also used the term "prisoners" or "ghost." Nor would the searches have returned documents referring to "unregistered prisoners" or "CIA prisoners," though these terms were expressly listed in Plaintiffs' requests. Moreover, I&A did not search for "other governmental agency" or "OGA" prisoners/detainees or for records concerning Mr. Arar, Mr. El-Masri, or others similarly situated.

### 4. Office of Policy

In a letter dated May 3, 2006, the central DHS FOIA office indicated that it would act on behalf of the Office of Policy and denied Plaintiffs' request for expedited processing. Plaintiffs appealed the denial of expedited processing but received no response. *See id.* Ex. 32. Instead, by letter dated November 28, 2006, the agency informed plaintiffs, without elaboration, that "[a] search of the Office of Policy using the search criteria you specified did not produce any responsive records." *Id.* Ex. 33. Plaintiffs appealed the adequacy of this search, but once again, the agency did not respond. *See id.* Ex. 34.

According to the declaration of Nicole Bertucci, after the departure of the Office of Policy official who processed Plaintiffs' requests, the agency conducted a new search. Bertucci Decl. ¶ 9. Ms. Bertucci explains that during this new search Plaintiffs' requests were distributed to employees in each of the Office's subdivisions with instructions to provide any documents to the appropriate subdivision head. *Id.* ¶ 11. Ms. Bertucci does not say how many employees conducted searches, what search protocols they used, whether they passed on any documents to their superiors, or how decisions about responsiveness were made.

### 5. Office of Privacy (Headquarters)

Plaintiffs also sent their requests to the Office of Privacy, DHS's central FOIA office. According to the declaration of Vania T. Lockett, central office staff "determined that no DHS office was likely to maintain records responsive to the request because DHS does not have programs, known to staff, which involve detaining individuals 'about whom the United States has not provided public information.'" Lockett Decl. ¶ 10.

In October 2007, the Office reevaluated its position and initiated a search of the Office of the Executive Secretariat, which "functions as a document clearinghouse for senior leadership."

*Id.* ¶¶ 11-13. Ms. Lockett states that agency employees conducted "an electronic search of the text of the Deputy Executive Secretary's e-mails" and found no documents. *Id.* ¶ 16. Employees did not search the email of any other official, and their search of the "text" of the Deputy Executive Secretary's emails presumably would have failed to locate search terms present in email attachments. Ms. Lockett further states that employees electronically searched, without success, a shared network drive and a computer database. All of these electronic searches used the following terms: "detainees," "ghost detainees," "unregistered detainees," "unregistered prisoners," "CIA detainees," "CIA prisoners," "rendition," "ghosting," and "ghost." *Id.* ¶ 18. The agency did not perform more flexible keyword searches or search for records pertaining to specific individuals such as Mr. Arar or Mr. El-Masri.

The Privacy Office chose not to search, or even share Plaintiffs' requests with, any other DHS office or component, such as the Office of the General Counsel, Office of the Inspector General, Office of Operations Coordination, or Office of Legislative Affairs.

### C. Subsequent Discussions With the Government

During recent discussions with counsel for Plaintiffs, the government indicated that it would consider conducting supplemental searches and proposed that Plaintiffs identify relevant documents that might exist. In response, Plaintiffs detailed the involvement of DHS in the Arar and El-Masri cases, explained that DHS must possess records relating to their apprehension, transfer, detention, or interrogation and provided specific examples of responsive documents known to exist. *See* DeYoung Decl. Ex. 35.

The government ultimately decided not to perform any supplemental searches. Instead, it took the position that DHS's activities and records pertaining to Mr. Arar and Mr. El-Masri fell

"outside the scope of the request." *Id.* Ex. 36. The government has never explained how it reached this manifestly erroneous conclusion.

## ARGUMENT

## I.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED

It is well established that "an agency responding to a FOIA request must conduct a search reasonably calculated to uncover all relevant documents." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). The agency's efforts must be judged against FOIA's "most basic premise," "a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999); *see also Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) ("The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure."). Accordingly, an agency may not attempt to avoid its search and disclosure obligations by narrowly construing a document request. *See, e.g., LaCedra v. Exec. Office for U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003). Nor may an agency rely on "perfunctory searches," or decline "to follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).

As demonstrated by its own accounts, DHS has fallen far short of its statutory obligations. First, DHS relied on an inexplicably narrow reading of Plaintiffs' requests to exclude plainly responsive materials from search and disclosure. Second, DHS used inadequate search procedures and protocols—particularly those used to retrieve electronic records—that were not reasonably calculated to locate responsive documents. Indeed, DHS's belated and cursory response to Plaintiffs' requests reveals a striking disregard for its obligations under FOIA. Accordingly, this Court should grant judgment to Plaintiffs as a matter of law pursuant to

Fed. R. Civ. P. 56(c), and order DHS to conduct a reasonable search for all responsive documents under a fair reading of Plaintiffs' requests.

### A.    DHS ADOPTED AN UNREASONABLY NARROW INTERPRETATION OF PLAINTIFFS' REQUESTS

In order to assess the adequacy of an agency's search, it is necessary "first [to] ascertain the scope of the request itself." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995). Consistent with the purpose of FOIA, an agency "has a duty to construe a FOIA request liberally." *Id.* at 890; *see also Truitt*, 897 F.2d at 545. An agency "must be careful not to read [a] request so strictly that the requester is denied information the agency well knows exists in its files." *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985). The "obligation . . . 'to construe a FOIA request liberally'" precludes an agency from adopting a narrow construction as long as the "request is reasonably susceptible to the broader meaning." *LaCedra*, 317 F.3d at 348.[19]

In addition to reading FOIA requests liberally, courts and the Justice Department's Office of Information Privacy have recognized "the need for full and open communication" between the agency and the FOIA requester.[20] If an agency is uncertain about what precise records a requester is seeking, it is appropriate for the agency to give the requester "the opportunity to

---

[19] The Justice Department's Office of Information and Privacy (OIP) has instructed FOIA processors to construe all FOIA requests liberally. Thus, "federal agencies should go as far as they reasonably can to ensure that they include what requesters want to have included within the scope of their FOIA requests. Agencies can best do that through liberal interpretations of FOIA requests . . . ." DOJ, OIP, *Determining the Scope of a FOIA Request*, FOIA Update, Vol. 16, No. 3 (1995), DeYoung Decl. Ex. 37 ("FOIA requesters should not be held to the strict letter of their requests when an agency has good reason to conclude that a broader interpretation is more appropriate."). Liberal construction not only advances the underlying purpose of FOIA; it helps compensate for the fact that FOIA requesters are unfamiliar with the exact nature of an agency's files and must therefore "us[e] their best efforts to 'reasonably describe' the particular records they are seeking . . . in light of this limited knowledge of what might actually be there." *Id.*

[20] *Id.*

address [scope-related issues] as a participant in the agency's administrative process."[21]  Such communication helps assure that the agency's search accords with the requester's intent.  *See Truitt*, 897 F.2d at 544.

In this case, DHS narrowly construed Plaintiffs' requests, and did so without consulting Plaintiffs about the intended scope of their requests or informing Plaintiffs that DHS had deemed non-responsive centrally relevant subject matter.  Indeed, Plaintiffs did not learn of DHS's position until months after this litigation commenced, when the government revealed that DHS deemed documents concerning Mr. Arar and Mr. El-Masri outside the scope of the requests.  The government still has not explained how DHS reached this untenable conclusion.  It is beyond dispute that both Mr. Arar and Mr. El-Masri were subject to rendition and that both men have come into contact with components of DHS or its predecessor.[22]  Moreover, Plaintiffs' repeated mention of both men in their administrative appeals and in their recent discussions with the government should have left no doubt that Plaintiffs were seeking records pertaining to them and others similarly situated.  *See e.g.*, DeYoung Decl. Exs. 22, 35.

DHS's position with respect to the documents regarding Mr. Hamdi is also inexplicable. Despite the fact that Mr. Hamdi spent three years detained by the U.S. military under irregular circumstances and reportedly was held in what has been described as "secret military custody,"[23] the Suzuki declaration gives no explanation for DHS's post-disclosure determination that the documents are not responsive to the requests.

In sum, DHS's cramped and unnatural reading of Plaintiffs' requests—adopted without Plaintiffs' input or knowledge, and contrary to the letter and spirit of Plaintiffs' original

---

[21] *Id.*

[22] *See* Notes 7 and 10 *supra*.

[23] *See, e.g.*, Bill Mears, *Supreme Court Rejects Appeal over Secret 9/11 Detentions*, CNN.com, Jan. 12, 2004, DeYoung Decl. Ex. 38 (Mr. Hamdi was "being held in secret military custody").

requests—flies in the face of the long-established rule that FOIA requests are to be liberally construed by government agencies to facilitate the disclosure of responsive documents. As a result, DHS has failed to search for and disclose responsive records that are almost certainly in its possession. After almost two years of delay, DHS must now honor its statutory obligations: DHS must locate and process records that it erroneously deemed non-responsive, and must search offices and files it previously excluded from its search—in part based on its overly narrow construction of the requests. *Cf. Wilderness Soc'y v. Bureau of Land Mgmt.*, No. Civ.A. 01CV2210, 2003 WL 255971, at *5 (D.D.C. 2003).

**B.    DHS FAILED TO USE REASONABLE SEARCH PROTOCOLS**

To the extent DHS conducted searches for responsive records, the methods it employed were not "reasonably calculated to uncover all relevant documents." *Truitt*, 897 F.2d at 542 (internal quotation marks omitted); *see also Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Although an agency's search need not be perfect, it cannot be designed to fail. *See Davis v. Dep't of Justice*, 460 F.3d 92, 103 (D.C. Cir. 2006); *see also Valencia-Luna*, 180 F.3d at 325-27. An agency may not evade its statutory responsibilities by employing substandard search procedures when more appropriate procedures are readily available and not excessively burdensome. *See Founding Church of Scientology of Washington v. NSA*, 610 F.2d 824, 835 (D.C. Cir. 1979).

The searches performed by DHS were plainly inadequate under this standard. DHS failed to search for key terms that it knew responsive records would likely contain. For example, several DHS components failed to search for records referencing "other governmental agency" ("OGA") detainees or "rendition," and none of the components searched for records discussing specific individuals such as Mr. Arar or Mr. El-Masri. Moreover, none of the DHS components

searched for records referring to "high value" detainees—a term that was not officially disclosed until after Plaintiffs filed their requests, but one that appears in Plaintiffs' complaint and one with which DHS officials would have been familiar—or other terms known to the government likely to elicit responsive documents.[24] *See Public Citizen, Inc. v. Dep't of Educ.*, 292 F. Supp. 2d 1, 7 (D.D.C. 2003) (criticizing an agency's limited electronic search that "filtered out" too many records before they could be "manually reviewed to determine whether [they] were responsive").

In addition, as further explained in the Declaration of Daniel L. Regard, an expert in electronic discovery, DHS's electronic searches were not reasonably designed to locate all responsive records. *See* Declaration of Daniel L. Regard ¶ 16. Rather than using reasoned judgment to determine how best to locate responsive records, DHS inappropriately relied on rigid search terms capable of locating only those documents containing the precise keywords entered, in the exact order they were entered into the system. *See id.* ¶¶ 6-11. Although anyone responsible for conducting electronic searches should understand the crucial importance of Boolean operators, root expanders, and wild card characters,[25] DHS tailored its searches in such a way that the searches would miss altogether responsive records containing even slight variations of their specific search terms. *Id.* ¶ 12. By using only plural terms such as "prisoners" and "detainees," several of the searches would have failed to locate documents referring to a "prisoner" or "detainee" in the singular, although such documents are equally responsive to Plaintiffs' requests. *Id.* Similarly, by using exact phrases such as "CIA detainees," several of the

---

[24] For example, U.S. government officials have used a variety of terms in addition to "rendition" when describing such operations. *See, e.g.* Condoleezza Rice, *Remarks Upon Her Departure to Europe,* Dec. 5, 2005, DeYoung Decl. Ex. 39 (referring to the "transfer" of detainees in connection with rendition operations); Christopher Kojm, Testimony Before the National Commission on Terrorist Attacks Upon the United States, March 24, 2004, DeYoung Decl. Ex. 40 ("catch and send" and "rendition" used interchangeably).

[25] Boolean operators allow searchers to find words in proximity to each other (e.g., "detainees of the CIA" as well as "CIA detainees"). Wild card characters allow searchers to find variations of a word (e.g., "detain," "detained," "detaining," "detainee," and "detainees"). *See* Regard Decl. ¶¶ 13 n.1, 15 n.2.

searches would have failed to locate documents that used slightly different terminology, such as "detainees of the CIA." *Id.* As a result, the electronic searches detailed in the government's declarations were deeply flawed, and could have been significantly improved with virtually no additional effort. *Id.* ¶ 13.

FOIA does not demand perfection, but it does require agencies to make efforts consistent with "a policy strongly favoring public disclosure of information." *Halpern*, 181 F.3d at 286. DHS did not honor this policy here. It is apparent that DHS adopted an unduly narrow reading of Plaintiffs' requests and failed to use appropriate search protocols. Accordingly, the Court should grant Plaintiffs' motion for partial summary judgment and order DHS to conduct a reasonable search, without delay, for all records in DHS's possession that were erroneously deemed non-responsive—including, at a minimum, records held by offices that were not searched and records pertaining to "other governmental agency" ("OGA") detainees, "rendition," "high value" detainees, as well as records pertaining to Mr. Arar, Mr. El-Masri, and all similarly situated persons.

## II.    THIS COURT SHOULD DENY THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ORDER DHS TO CONDUCT A REASONABLE SEARCH

The court should not grant summary judgment to an agency where, after giving the FOIA requester "the benefit of the inferences favorable to its cause," the record includes unresolved issues of fact as to the adequacy of the agency's searches. *Founding Church*, 610 F.2d at 835. "Conclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment." *Nation Magazine*, 71 F.3d at 890. The record demonstrates the

inadequacy of DHS's efforts here.[26]  The government has failed to meet its burden for summary

judgment on the adequacy of its search as it has not "demonstrate[d] beyond material doubt that

its search was reasonably calculated to uncover all relevant documents." *Id.* (internal quotation

marks omitted).

The evidence in the record leaves "substantial doubts about the caliber of [the DHS]

search." *Founding Church*, 610 F.2d at 835.  The government's declarations fail to explain (1)

why DHS refused to search for documents pertaining to Mr. Arar and Mr. El-Masri; (2) why

DHS considers the documents produced regarding Mr. Hamdi to be non-responsive; (3) why

DHS components failed to search for records related to "other governmental agency" ("OGA")

detainees, "rendition," or "high value" detainees; (4) why DHS limited electronic searches to

narrowly constructed search terms; (5) why DHS chose not to search certain offices likely to

possess responsive documents, such as the Office of the Inspector General (which has

investigated the Arar incident);[27] (6) why DHS did not circulate Plaintiffs' request more broadly

among agency employees; (7) why DHS limited electronic searches to the databases mentioned

in the declarations;[28] (8) why DHS relied on assertions by agency officials, made without ever

---

[26] DHS did not submit a Statement of Material Facts in support of its Motion For Partial
Summary Judgment as required by Local Rule 56.1(a) so Plaintiffs have been unable to submit a
corresponding response showing that there exists a genuine issue pursuant to Local Rule 56.1(b).
By rule, DHS's "[f]ailure to submit such a statement may constitute grounds for denial of [its]
motion." Local R. 56.1(a).  In any event, Plaintiffs Statement of Material Facts in support of its
Motion for Partial Summary Judgment, as well as the declarations submitted by DHS,
demonstrate the inadequacy of DHS's search.

[27] *See e.g.*, *Friends of Blackwater v. Dep't of Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005)
("[F]ailure by one [] office to refer a FOIA request to another that is 'likely to have' responsive
documents is sufficient to render the agency's search inadequate.").

[28] *See, e.g.*, *James v. U.S. Customs & Border Protection*, 474 F. Supp. 2d 154, 159 (D.D.C.
2007) (CBP's "vague, cursory description alone does not provide sufficient detail for the Court
to determine whether TECS was the only CBP filing system likely to contain relevant
information.").

conducting a search, that particular offices did not possess responsive documents;[29] and (9) why

DHS never consulted with Plaintiffs during the administrative process about the scope of the

requests, and disregarded Plaintiffs' guidance in administrative appeals and subsequent

communications with the government.[30]

One further fact casts further doubt upon the adequacy of DHS's response. In response to

Plaintiffs' related FOIA request concerning certain enumerated memoranda and reports, DHS

initially stated that it had failed to identify any responsive records. After conducting additional

searches, however, DHS managed to locate hundreds of responsive documents. It is highly

likely that further searches will produce the same result here. *Cf. Goland v. CIA*, 607 F.2d 339,

370 (D.C. Cir. 1979) ("[T]he discovery of additional documents is more probative that the search

was not thorough than if no other documents were found to exist."). Indeed, the government

recently informed Plaintiffs that some of the records found in response to Plaintiffs' second

request are also responsive to the requests at issue here. *See* DeYoung Decl. Ex. 41.

In sum, DHS has failed to eliminate material doubt about the reasonableness of its efforts.

Summary judgment is plainly inappropriate under these circumstances.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs'

motion for partial summary judgment and deny DHS's motion for partial summary judgment.

---

[29] *See, e.g.*, *Defenders of Wildlife v. Dep't of Agriculture*, 311 F. Supp. 2d 44, 55 (D.D.C. 2004) ("[T]he bare assertion that the [official] saw the FOIA request and that he stated that he had no responsive documents is inadequate because it does not indicate that he performed any search at all.").

[30] Additional specific deficiencies are apparent in the individual declarations. First, Ms. Pavlik-Keenan does not describe the search of the Intelligence Operations division of ICE's Office of Detention and Removal, even though this was the only one of the Office's five divisions to be searched; nor does she explain why the head of operations in the Office of International Affairs did not search unclassified or electronic files. Second, Ms. Suzuki does not explain how the CBP's Office of Field Operations could have relied on the ICE search of TECS in its 2006 search, since that search did not occur until 2007. Third, the Lockett declaration does not explain why the Office of the Executive Secretariat did not search his email attachments.

Respectfully submitted,


Margaret L. Satterthwaite (MS-3953)
Washington Square Legal Services, Inc.
International Human Rights Clinic
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

Kyle M. DeYoung (KD-2181)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6785
Fax: (202) 663-6363
E-Mail Kyle.DeYoung@wilmerhale.com

*Attorneys for Amnesty International USA
and Washington Square Legal Services, Inc.*

Dated: January 4, 2008