UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMNESTY INTERNATIONAL USA, CENTER FOR CONSTITUTIONAL RIGHTS, INC. and WASHINGTON SQUARE LEGAL SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, DEPARTMENT OF STATE, AND THEIR COMPONENTS <br><br> Defendants. | ECF CASE <br><br> 07 CV 5435 (LAP) |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Plaintiffs state that there is no genuine issue to be tried with respect to the following facts:

1. On April 25, 2006, Plaintiffs filed Freedom of Information Act requests with the Department of Homeland Security ("DHS") and several of its component entities—including Immigration and Customs Enforcement, Customs and Border Protection, Office of Intelligence and Analysis, and Office of Policy. *See* Declaration of Kyle DeYoung ("DeYoung Decl.") ¶ 2.

2. Plaintiffs requests sought records concerning (1) the "apprehension, transfer, detention, and interrogation" of persons who have been detained by the United States under secret or irregular conditions; (2) the locations that have been used for detention; and (3) the

names and identities of detainees. *See* Plaintiffs' FOIA Request to DHS, dated April 25, 2006 at 2-3, DeYoung Decl. Ex. 2.

3.    DHS describes itself as the "focal point for all terrorism-related intelligence." DHS, Office of Inspector General, Survey of DHS Intelligence Collection and Dissemination, June 2007, DeYoung Decl. Ex. 3. One aspect of the Department's mission is to "gather information from all field operations and other parts of the Intelligence Community; analyze it for homeland security implications; and appropriately disseminate it to policymakers, DHS components, and federal, state, and local partners." *Id.*

4.    Officials have stated that information obtained from secret detainees "has become a crucial pillar of US counterterrorism efforts," that the names of terrorist suspects identified by detainees have been "shared . . . broadly within the U.S. intelligence and law enforcement communities," and that detainee-provided information has helped the United States learn of and respond to a number of terrorist threats. *See* Office of the Director of National Intelligence, Summary of the High Value Terrorist Detainee Program, DeYoung Decl. Ex. 4.

5.    DHS is tasked with securing the nation's borders by identifying and excluding suspected terrorists. *See, e.g.*, Customs and Border Protection, Anti-Terrorism Initiatives, DeYoung Decl. Ex. 5.

6.    In September 2002, U.S. immigration officials at Kennedy International Airport apprehended and detained Canadian citizen Maher Arar. *See Matter of Arar*, Decision of the Regional Director, October 7, 2002, DeYoung Decl. Ex. 8; *see also* Excerpts from the Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report*

*of the Events Relating to Maher Arar, Factual Background, Volume I* (2006), DeYoung Decl. Ex. 6.

7.   In October 2002, the Regional Director of the Immigration and Naturalization Service (which became part of DHS in 2003) issued a decision concluding that Arar was "clearly and unequivocally inadmissible to the United States" because he was "a member of . . . Al-Qaeda." *See Matter of Arar, supra*. Immigration officials authorized the transfer of Arar to Syria, where he was detained for nearly a year. *See id.; see also* Commission of Inquiry, *supra*.

8.   The DHS Inspector General has investigated Arar's case since at least July 2004. *See* DHS, Office of the Inspector General, Fiscal Year 2007 Annual Performance Plan, at 52, DeYoung Decl. Ex. 10 (noting that DHS is evaluating Arar's "extraordinary rendition" to "[d]etermine how U.S. immigration officials arrived at their decision to remove this person to Syria and whether the decision was made within prescribed INS policies"); *see also* Press Release, Office of Senator Patrick Leahy, *Leahy, Specter Press DOJ, DHS On Investigations Into Rendition Of Canadian Citizen Maher Arar To Syria* (Feb. 28, 2007), DeYoung Decl. Ex. 11.

9.   A Canadian government inquiry has found that Arar was not involved in terrorism. *See* Excerpts from Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report of the Events Relating to Maher Arar: Analysis and Recommendations* (2006), DeYoung Decl. Ex. 6. However, Arar remains on a DHS watch list. Letter from Michael Chertoff and Alberto Gonzalez to the Honorable Stockwell Day, dated January 16, 2007, DeYoung Decl. Ex. 9.

10. In December 2005, U.S. immigration officials at Hartsfield International Airport denied entry to German citizen Khaled El-Masri. El-Masri was reportedly turned away "based on information [CBP] received from other American agencies." *See* Scott Shane, *German Held in Afghan Jail Files Lawsuit*, N.Y. Times, Dec. 7, 2005, at A25, DeYoung Decl. Ex. 12.; *see also* Glenn Kessler, *U.S. Said To Admit German's Abduction Was an Error*, Wash. Post, Dec. 7, 2005, at A18, DeYoung Decl. Ex. 13. (reporting that El-Masri was "turned away because his name was on a Homeland Security watchlist").

11. It has been widely reported that El-Masri was captured in Macedonia in late 2003 and transferred to and detained in Afghanistan for several months. *See, e.g.*, Kessler, *supra*; Shane, *supra*.

12. On December 8, 2005, counsel for El-Masri sent a letter to DHS seeking assurances that El-Masri would be permitted to enter the United States in the future. *See* Letter from ACLU to Condoleezza Rice and Michael Chertoff, Dec. 8, 2005, DeYoung Decl. Ex. 13.

13. In November 2006, El-Masri was permitted to enter the United States following a review of his case by DHS. *See* Dana Priest, *The Wronged Man*, Wash. Post, Nov. 29, 2006, DeYoung Decl. Ex. 15; *see also* Letter from Robert Jackstra, Executive Director, Travel Security and Facilitation, U.S. Customs and Border Protection, to Ann Beeson, dated January 5, 2006, DeYoung Decl. Ex. 42.

14. Immigration and Customs Enforcement ("ICE") "is the largest investigative branch of DHS," "uphold[s] public safety by targeting people, money and materials that support terrorist and criminal activities," and helps staff the National Targeting Center, which "brings together information and personnel from numerous government agencies to detect and respond to

persons arriving at U.S. ports of entry who are matches or potential matches on national terrorist watch lists." ICE FY2006 Annual Report, at 2, 16, *available at* http://www.ice.gov/doclib/about/ICE-06AR.pdf, last viewed January 4, 2008.

15. Plaintiffs submitted their requests to ICE on April 25, 2006. See DeYoung Decl. ¶ 2. Despite filing a timely appeal to ICE's denial of expedited processing on July 3, 2006, and confirming their continuing need for the records in response to a September 21, 2006 letter from ICE on October 19, 2006, Plaintiffs did not receive any substantive response from ICE until August 15, 2007. *See* DeYoung Decl. ¶ 4, Exs. 16, 17, 18.

16. Four of the five divisions in ICE's Office of Detention and Removal Operations ("DRO") concluded that they did not possess responsive records without conducting a search. *See* Pavlik-Keenan Decl. ¶¶ 6-10.

17. The Chief of the Intelligence Operations office in DRO's Criminal Alien Division searched the office's unclassified electronic files and a classified safe. *See id.* ¶¶ 8-9. The Pavlik-Keenan declaration does not describe the search terms or search protocol used by the Chief of Intelligence Operations. No other officials in the Criminal Alien Division conducted a search.

18. The head of the Operations Division in ICE's Office of Intelligence concluded that the office did not possess responsive records without conducting a search. *See id.* ¶¶ 13-14. No other Office of Intelligence divisions reviewed Plaintiffs' requests or conducted searches.

19.     The head of the National Security Division in ICE's Office of Investigations concluded that the division did not possess responsive records without conducting a search. *See id.* ¶ 12.

20.     The ICE FOIA officer instructed the Office of Investigations to search three Treasury Enforcement Communications System ("TECS") database reports. *See id.* ¶ 16-18. TECS was searched using the terms "ghost," "unregistered," "CIA," and variations of "prisoner" and "detainee." *Id.* ¶ 19. The agency did not search TECS for records referring to "other governmental agency," "OGA," or "high value" prisoners/detainees or for records concerning Arar, El-Masri, or other specific individuals.

21.     Documents discovered during the TECS searches were deemed non-responsive, *see id.* ¶ 19, but the Pavlik-Keenan declaration does not describe the process by which the agency made its responsiveness determinations. Nor does the Pavlik-Keenan declaration specify what other TECS databases were not searched.

22.     The head of the Operations Division in ICE's Office of International Affairs examined his classified files but not unclassified or electronic files. *See id.* ¶ 15. No other Office of International Affairs divisions reviewed Plaintiffs' requests or conducted searches.

23.     No other ICE office—including the Office of the Principal Legal Advisor, Office of Policy and Planning, Office of Congressional Relations, Office of Public Affairs, or the offices of the Assistant Secretary or Chief of Staff—examined Plaintiffs' requests or searched for records.

24. Customs and Border Protection ("CBP") "is responsible for protecting our nation's borders in order to prevent terrorists and terrorist weapons from entering the United States." DHS, Department Subcomponents and Agencies, *available at* http://www.dhs.gov/xabout/structure/index.shtm, last viewed January 4, 2008. It "assess[es] all passengers flying into the U.S. from abroad for terrorist risk," CBP, Protecting Our Borders Against Terrorism, *available at* http://www.cbp.gov/xp/cgov/toolbox/about/mission/cbp.xml, and operates the National Targeting Center, *see Targeting Center the Brains Behind Anti-Terror Efforts*, CBP TODAY, Nov./Dec. 2005, *available at* http://www.cbp.gov/xp/CustomsToday/2005/nov_dec/targeting.xml, last viewed January 4, 2008.

25. By letter dated May 17, 2006, CBP's Office of International Affairs informed Plaintiffs that it possessed no responsive records. *See* DeYoung Decl. Ex. 23.

26. The Director of the Training and Assistance Division in the Office of International Affairs concluded without conducting a search "that the division did not maintain any programs related to issues covered by the FOIA request and would not have any responsive documents." Suzuki Decl. ¶ 10. The FOIA processor in the Office of International Affairs did not forward Plaintiffs' request to the office's other three divisions.

27. By letter dated June 1, 2006, CBP's Office of Field Operations informed Plaintiffs that it had located "four (4) pages of requested documents," which it produced in redacted form. These documents were two "Significant Incident Report[s]" from the Norfolk Sub-Office concerning the April 5, 2002 transfer of Yasser Hamdi to the Norfolk Naval Air Station. *See* DeYoung Decl. Ex. 24.

28. The Hamdi documents were located by the Executive Director of the Office of Field Operations' Admissibility Requirements and Migration Control division. Suzuki Decl. ¶ 15. The Suzuki declaration states that the Executive Director "erroneously believed" that the Hamdi documents were responsive. *Id*. The declaration does not explain why the Hamdi documents were deemed non-responsive or why they were nevertheless produced to Plaintiffs.

29. The FOIA processor in the Office of Field Operations did not forward Plaintiffs' request to other officials in the office and no division of the office other than the Admissibility Requirements and Migration Control division conducted a search.

30. The Office of Field Operations "maintains records regarding individuals primarily in the Treasury Enforcement Communications System ('TECS')." Suzuki Decl. ¶ 12. However, the Office of Field Operations did not search TECS.

31. By letter dated June 8, 2006, CBP's Office of Anti-Terrorism stated that, "[a]fter consultation within CBP, it has been determined that records of the type you seek . . . would not be reasonably expected to be located in any office of the U.S. Customs and Border Protection." *See* DeYoung Decl. Ex. 25.

32. The FOIA processor in the Office of Anti-Terrorism conducted an electronic search of the office's work management system using as search terms "Ghost Detainees," "Ghost Prisoners," "Unregistered Detainees," "Unregistered Prisoners," "CIA Detainees," "CIA Prisoners," "Other Governmental Agency Detainees," and "OGA Detainees." Suzuki Decl. ¶ 17-18. The FOIA processor searched certain hard copy files by "scanning the files" for the same keywords. *Id*. ¶ 19. The FOIA processor did not use as search terms the singular "detainee" or "prisoner," did not search for keywords in close proximity to each other (e.g., "detainees of the

CIA" as opposed to "CIA detainees"), and did not search for the names of specific individuals such as Arar or El-Masri.

33.  Any documents discovered during these searches were deemed non-responsive, *see id.* ¶ 18, but the Suzuki declaration does not describe the process by which the agency made its responsiveness determinations.

34.  In July 2006, Plaintiffs filed administrative appeals to CBP's responses. *See* DeYoung Decl. ¶ 4, Exs. 22, 26.

35.  In letters dated February 28 and April 2, 2007, CBP informed Plaintiffs that the Office of International Affairs and the Office of Anti-Terrorism "assert[] that [they] made a good faith effort to locate responsive records, and that [they] did so in a manner which could reasonably be expected to produce the information requested." *See* DeYoung Decl. Exs. 27, 28. Plaintiffs received no response from CBP regarding its appeal of the Office of Field Operations search. *See* DeYoung Decl. ¶ 4.

36.  The division directors of CBP's Office of Intelligence informed the FOIA processor without searching that their divisions did not have responsive records and "that the Office of Intelligence was not responsible for detainees of the type described in the FOIA request." Suzuki Decl. ¶ 23.

37.  One Office of Intelligence division director informed the FOIA processor that "records for the Office of Intelligence [a]re primarily maintained in TECS." Suzuki Decl. ¶ 24. However, the Office of Intelligence did not search TECS.

38. The head of the Customer Service Center in CBP's Office of Public Affairs scanned "a report for the 'emerging issues' category of questions [generated on CBP's public website] for the past year." Suzuki Decl. ¶ 26. The office did not conduct other searches.

39. No other CBP office—including the Chief Counsel's Office, the Policy and Planning Office, the Congressional Affairs Office, or the offices of the Commissioner, Deputy Commissioner, or Chief of Staff—was forwarded Plaintiffs' requests or searched for records.

40. DHS's Office of Intelligence and Analysis ("I&A") "gather[s] information from all field operations and other parts of the Intelligence Community; analyze[s] it for homeland security implications; and appropriately disseminate[s] it to policymakers, DHS components, and federal, state, and local partners." DHS, Office of Inspector General, Survey of DHS Intelligence Collection and Dissemination, June 2007, *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-49_Jun07.pdf, last viewed January 4, 2008.

41. In a letter dated July 25, 2006, I&A informed Plaintiffs that, "[a]fter a thorough search of the Office of Intelligence and Analysis files, no records responsive to your request were identified." DeYoung Decl. Ex. 30. Plaintiffs filed an appeal challenging the adequacy of the I&A search but did not receive a response. *See id.* ¶ 5, Ex. 31.

42. Each I&A division electronically searched files maintained on its shared drives using the following search terms: "'detainees' or 'prisoner' and 'ghost'; 'unregistered detainees' and 'ghost' or 'prisoners'; 'CIA detainees' and 'prisoners' or 'ghost'; 'US Government' and 'ghost detainees' or 'prisoners.'" Page Decl. ¶ 8-10. I&A did not search for other phrases used in Plaintiffs' request, including "unregistered prisoners," "CIA prisoners," or "other

governmental agency" or "OGA" prisoners/detainees. Nor did I&A search for specific individuals such as Arar or El-Masri.

43.     DHS's Office of Policy "develop[s] and integrat[es] Department-wide policies, planning, and programs in order to better coordinate the Department's prevention, protection, response and recovery missions." See http://www.dhs.gov/xabout/structure/editorial_0870.shtm, last viewed January 4, 2008.

44.     In a letter dated November 28, 2006, DHS informed Plaintiffs that "[a] search of the Office of Policy using the search criteria you specified did not produce any responsive records." DeYoung Decl. Ex. 33. Plaintiffs appealed the adequacy of this search but received no response other than an acknowledgment of receipt. See DeYoung Decl. ¶ 6, Ex. 32.

45.     The Office of Policy official who initially processed Plaintiffs' requests left her job without leaving behind any details of her search. Bertucci Decl. ¶ 9.

46.     The Office of Policy conducted a new search by distributing Plaintiffs' request to employees in each of the office's subdivisions with instructions to provide documents to the appropriate subdivision head. "The head of each subcomponent then compiled the answers from all such employees into a response to the Office of Policy Executive Secretariat." Bertucci Decl. ¶¶ 11-12. The Bertucci declaration does not state how many employees conducted searches, what search protocols they used, whether they passed on any documents to their superiors, or how decisions about responsiveness were made.

47.     The Office of Privacy houses DHS's central FOIA office. The office "determined that no DHS office was likely to maintain records responsive to the request because DHS does

not have programs, known to [] staff, which involve detaining individuals 'about whom the United States has not provided public information.'" Lockett Decl. ¶ 10. The office therefore did not conduct any searches beyond the component searches described above until after Plaintiffs filed suit in this Court.

48. In October 2007, the central FOIA office searched the Office of the Executive Secretariat, which "functions as a document clearinghouse for senior leadership." Lockett Decl. ¶¶ 11-13. Employees conducted "an electronic search of the text of the Deputy Executive Secretary's emails" and an electronic search of a shared network drive and computer database using the following search terms: "'detainees,' 'ghost detainees,' 'unregistered detainees,' 'unregistered prisoners,' 'CIA detainees,' 'CIA prisoners,' 'rendition,' 'ghosting,' and 'ghost.'" *Id.* ¶ 16-18. Other email accounts in the office were not searched, and the declaration does not state that the Executive Secretary's email attachments were searched. The electronic searches did not use as search terms the singular "detainee" or "prisoner," did not search for keywords in close proximity to each other (e.g., "detainees of the CIA" as opposed to "CIA detainees"), and did not search for the names of specific individuals such as Arar or El-Masri.

49. The central FOIA office did not share Plaintiffs' request with, or conduct searches of, other DHS entities, including the Office of the Inspector General, Office of the General Counsel, Office of Operations Coordination, Office of Legislative Affairs, or Office of Civil Rights and Civil Liberties.

50. During discussions between the parties in October 2007, the government indicated that it would consider conducting supplemental searches in response to Plaintiffs' concerns about DHS's failure to locate responsive documents and proposed that Plaintiffs

identify documents, or sets of documents, that might exist. Plaintiffs responded by detailing the involvement of DHS in the Arar and El-Masri cases and explaining that DHS must have records relating to their apprehension, transfer, detention, and/or interrogation. *See* DeYoung Decl. Ex. 35.

51.    The government decided not conduct supplemental searches, and instead took the position that records pertaining to Arar and El-Masri fell "outside the scope of the request." DeYoung Decl. Ex. 36.

52.    The government informed Plaintiffs in December 2007 that DHS has recently located records that are responsive to the requests at issue here while searching for documents responsive to Plaintiffs' related request concerning certain memoranda and reports pertaining to secret detention. *See* DeYoung Decl. Ex. 41.