# EXHIBIT #6
# TO
# DEYOUNG DECLARATION



# Report of the Events Relating to Maher Arar

## Analysis and Recommendations



Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar

> The Report of the Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar as originally submitted to the Governor in Council included some material which in this published version has been omitted in the interests of national security, national defence or international relations (indicated by [***] in the text). The decision to omit this material is made by the Government of Canada, and does not represent the views of the Commission of Inquiry.

© Her Majesty the Queen in Right of Canada,
represented by the Minister of Public Works
and Government Services, 2006

Cat. No: CP32-88/1-2006E
ISBN 0-660-19648-4

Available through your local bookseller or through
Publishing and Depository Services
Public Works and Government Services Canada
Ottawa, Ontario
K1A 0S5

Telephone: (613) 941-5995
Orders only: 1 800 635-7943
Fax: (613) 954-5779 or 1 800 565-7757
Internet: http://publications.gc.ca

Printed by Gilmore Print Group

Ce document est également publié en français sous le titre
*Rapport sur les événements concernant Maher Arar*

www.ararcommission.ca

mentioned the possibility of Syria to the RCMP. He also said that the U.S. Department of Justice was still considering whether to permit Project A-O Canada to interview Mr. Arar.

In light of the information that Mr. Arar might be going to Syria rather than Canada, the Project team met to reconsider whether it should interview Mr. Arar in New York. However, Project members were concerned that, if Mr. Arar refused to co-operate, the United States could use his refusal as a reason to send him to Syria. They did not want to be seen as participating or acquiescing in a decision to send him to Syria. That perception, they reasoned, could be harmful to the RCMP. Because of that concern, the Project members decided that it would not be advisable to interview Mr. Arar unless they knew three things: why Mr. Arar was in U.S. custody, what Mr. Arar had said to the American authorities and, importantly, where he was going to be sent. Later in the day, Project A-O Canada put those questions to an American official, who responded that he did not have the answers and that Mr. Arar's case was now an INS matter.

Although Mr. Arar had already been removed from New York by this time, the Project's reaction to the prospect of Mr. Arar's removal to Syria is noteworthy. The officers did not want to do anything that could be seen as participating or acquiescing in the decision. They were obviously aware that, if nothing else, a decision to send Mr. Arar to Syria against his wishes would be problematic from a public perception standpoint, and they did not want to be associated with such a decision. Nonetheless, the officers did nothing to discourage the Americans from sending Mr. Arar to Syria once they learned of the possibility, even though they did not know he had already been removed from the United States.

Finally, on an unrelated matter, Mr. Arar's counsel has queried whether an RCMP officer or other Canadian official was present at any time when Mr. Arar was questioned by American authorities in New York. I have canvassed this issue and there is no evidence to suggest that any Canadian officials were present on any of the occasions when Mr. Arar was interviewed while detained in New York.

## 2.6
### AMERICAN REMOVAL ORDER

The October 7, 2002 removal order for Mr. Arar indicated that, on October 1, the INS had instituted removal proceedings under section 235(c) of the U.S. *Immigration and Nationality Act*, charging Mr. Arar with being a member of a foreign terrorist organization. The Regional Director of the INS who signed the

order stated that, based on all the information, classified and unclassified, Mr. Arar was clearly and unequivocally inadmissible for entry into the United States, and that he was a member of a foreign terrorist organization, al-Qaeda.[18]

According to the order, the Commissioner of the INS had determined that Mr. Arar's removal to Syria would be consistent with the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, meaning that he was satisfied that Mr. Arar would not be tortured, apparently because of an assurance received from Syrian authorities.[19]

The unclassified information relied upon is described in the order. It pertains to interviews of Mr. Arar on September 26 and 27 at John F. Kennedy International Airport. During the interviews, Mr. Arar reportedly said that he was a citizen of Syria and Canada, and that he had lived in Tunisia for three months. While he denied any links to a terrorist organization, he did admit to an association with Abdullah Almalki, which included three business dealings with him. He also admitted having met Mr. Almalki at a restaurant (Mango's) in October 2001 and having talked in the rain with him. Finally, he admitted knowing "Ahman El-Maati." Clearly, the unclassified information falls well short of establishing that Mr. Arar is a member of al-Qaeda. If there is information supporting that conclusion, it must be classified.

The order states that a detailed discussion of the classified information relied upon is contained in a separate addendum. That addendum has not been disclosed and there is no way of knowing for certain what information it contains.

## 2.7
## RCMP INVOLVEMENT IN REMOVAL ORDER

I have carefully reviewed all of the evidence relating to communications about Mr. Arar between the RCMP and American officials both before and during Mr. Arar's detention in New York. There is no evidence to suggest that any members of the RCMP participated or acquiesced in the American decision to remove Mr. Arar to Syria.[20] On the contrary, as I have indicated above, no members of the RCMP other than Inspector Roy even considered the possibility of Syria until October 8, after Mr. Arar had been removed from the United States. Inspector Roy testified that he had only learned of the "Syrian threat" on October 7, and had had no contact with American officials about that threat.

The question arises as to whether the American authorities relied upon information provided by the RCMP in making the removal order. Without the evidence of the American authorities or access to the classified addendum to the removal order, I cannot be sure what information they used. However, I do