# EXHIBIT #32
# TO
# DEYOUNG DECLARATION

WILMERHALE

July 3, 2006

**Catherine Kane Ronis**

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

**By Certified U.S. Mail, Facsimile, and E-mail**

Office of General Counsel
Attn: FOIA Appeals, Department of Homeland Security
Department of Homeland Security
Washington, DC 20528

Re: *Freedom of Information Act Appeal - Case Number DHS/OS/PO 06-527*

Dear Associate General Counsel:

On April 25, 2006 Amnesty International USA[1] ("Amnesty") and Washington Square
Legal Services ("WSLS") filed two requests for information under the Freedom of Information
Act regarding detainees secretly held by the United States Government, including "Ghost
Detainees/Prisoners," "Unregistered Detainees/Prisoners" and "CIA Detainees/Prisoners" ("the
Requests"). Your agency, the Department of Homeland Security's Office of the Under Secretary
for Policy, aggregated our two Requests and processed them under the case number DHS/OS/PO
06-527. Although the Department of Justice's Office of Public Affairs granted our request for
expedited processing for identical requests, your agency denied our request for expedited
processing on May 3, 2006. Copies of the Requests and the denial letter are attached. See
Exhibits A-C.

Pursuant to 6 C.F.R. Part 5 §5.9, Amnesty and WSLS hereby appeal the Office of the
Under Secretary for Policy's denial of expedited processing of the Requests. As set forth in 5
U.S.C. § 552(a)(6)(E)(i)(I) and 6 C.F.R. Part 5 §5.5(d), information requests qualify for
expedited processing where (1) the failure to obtain the requested information on an expedited
basis could reasonably be expected to pose an imminent threat to the life or physical safety of at
least one individual, or (2) where the requestor is primarily engaged in disseminating information
and there is an urgency to inform the public about an actual or alleged Federal government
activity, beyond the public's right to know about government activity generally. As
demonstrated in our original requests, and elaborated upon below, the Requests qualify for
expedited treatment under both standards.

---

[1] Amnesty International USA is the U.S. Section of Amnesty International: see http://www.amnestyusa.org/about/

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Baltimore   Beijing   Berlin   Boston   Brussels   London   Munich   New York   Northern Virginia   Oxford   Palo Alto   Waltham   Washington

WILMERHALE

Office of General Counsel
July 3, 2006
Page 2

1.  **Amnesty is primarily engaged in disseminating information and there is a clear "urgency to inform the public concerning actual or alleged government activity"**

  a.  **Amnesty is primarily engaged in disseminating information**[2]

Amnesty plainly qualifies as an entity primarily engaged in disseminating information. As a human rights organization, Amnesty's primary activity involves disseminating information to the public regarding human rights. According to its governing statute, Amnesty's human rights mission is accomplished by *disclosing* human rights abuses accurately, quickly and persistently. It researches individual cases as well as patterns of human rights abuses and then *"these findings are publicized, and members, supporters and staff mobilize public pressure on governments and others to stop the abuses."*[3] As it explains on its website: "We search out the facts. We send experts to talk with victims, observe trials and interview local human rights activists and officials. We monitor thousands of media outlets and maintain contact with reliable sources of information all over the world. We publish detailed reports. We inform the news media. We publicize our concerns in leaflets, posters, advertisements, newsletters and websites."[4]

Amnesty disseminates this information through its heavily subscribed website, <www.amnestyusa.org>, and directs e-mails to its more than 330,000 members in the United States.[5] The website addresses human rights issues in depth, provides features on human rights issues in the news, and contains an online library containing thousands of documents and articles relating to the issues addressed by Amnesty -- including information and documents obtained on issues covered by the Requests.[6] Amnesty also conducts news briefings, issues press releases,

---

[2] As explained in the Requests, WSLS is also an entity primarily engaged in disseminating information. However, because Amnesty clearly meets this requirement, the Requests qualify for expedited treatment regardless of whether WSLS also qualifies. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 30 n5 (2004) ("as long as one of the plaintiffs qualifies as an entity 'primarily engaged in disseminating information' the requirement is satisfied") (citing *Al-Fayed v. CIA*, 254 F.3d 300, 309 (D.C. Cir. 2001)).

[3] Statute of Amnesty International, *Methods*, available at http://web.amnesty.org/pages/aboutai-statute-eng (as amended by the 27th International Council, meeting in Morelos, Mexico, 14 to 20 August 2005).

[4] "How Does Amnesty International carry out its work?" *available at* http://www.amnestyusa.org/about/faq.html. *See also* http://www.amnestyusa.org for feature articles, in-depth reports, and current news concerning human rights.

[5] *See* http://www.amnestyusa.org/about/aiusa_annualreport.pdf p3.

[6] *See e.g.*, Amnesty International, Public Statement (with Human Rights Watch, the International Commission of Jurists and the Association for the Prevention of Torture), *Twelve Steps to End Renditions and Secret Detentions in*

WILMERHALE

Office of General Counsel
July 3, 2006
Page 3

and publishes newsletters, annual country reports, a quarterly magazine and other materials.[7] Indeed, Amnesty's mission fundamentally depends on disseminating information to its members, governments and the public. Thus, "the publicizing of human rights abuses is a core component of Amnesty International's mission and is central to all of its activities."[8]

Courts have determined that entities similar to Amnesty are primarily engaged in dissemination of information for the purpose of receiving expedited processing of their FOIA requests. *See e.g., Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (determining that the Leadership Conference on Civil Rights, a coalition of national organizations whose mission is to promote civil rights legislation and policy, was primarily engaged in dissemination of information for the purpose of expediting its FOIA requests); *ACLU*, 321 F. Supp. 2d at 29 n5 (determining that the Electronic Privacy Information Center (EPIC), a public interest research organization, was primarily engaged in dissemination of information for the purposes of expediting its request); *Electronic Privacy Info. Center v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003) (determining that EPIC was a representative of the news media for the purposes of a fee waiver). In making this determination, the critical question is whether the entity in question "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience." *EPIC*, 241 F. Supp. 2d at 11. While the EPIC Court discussed this standard in the context of whether or not the EPIC met the "representative of the news media" requirement for a fee waiver, the analysis applies with equal force to the very similar "primarily engaged in disseminating information" requirement for expedited processing. *See ACLU*, 321 F. Supp. 2d at 29 n5 (relying on the same language from *EPIC*, 241 F. Supp. 2d at 11, in

---

*Europe,* June 27, 2006, IOR 10/001/2006; Amnesty International, Public Statement, *Council of Europe: PACE calls for an end to rendition and secret detention*, June 27, 2006, IOR 10/002/2006; Amnesty International, Press Release, *USA: Front companies used in secret flights to torture and "disappearance,"* May 4, 2006, AMR 51/054/2006; Amnesty International, Press Release, *US: Government creating "climate of torture,"* May 3, 2006, AMR 51/070/2006; Amnesty International, *Europe: Partners in crime: Europe's role in US renditions,* June 14, 2006, EUR 01/008/2006; Amnesty International, *Below the radar: Secret Flights to torture and 'disappearance,'* April 5, 2006, AMR 51/051/2006; Amnesty International, *Secret Detention in CIA "Black Sites,"* Nov. 8, 2005, AMR 51/177/2005. All of these documents are available on <www.amnestyusa.org>.

[7] The fact that Amnesty publishes these periodicals alone is sufficient to establish that Amnesty is a representative of the media, *see EPIC*, 241 F. Supp. 2d at 11-14 (concluding that EPIC is a news media entity because it publishes periodicals); *National Security Archive v. DOD*, 880 F.2d 1381, 1386 (D.C. Cir. 1989), and therefore to meet the "primarily engaged in disseminating information" standard. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n5 (D.D.C. 2004).

[8] Declaration of Curt Goering, Senior Deputy Executive Director for Policy and Programs, Amnesty International, USA, ¶ 5 (attached as Exhibit D).

WILMERHALE

Office of General Counsel
July 3, 2006
Page 4

concluding that EPIC was primarily engaged in dissemination of information for the purposes of expediting its request).[9]

Given the extent of Amnesty's disclosure of human rights information and publishing activities, the organization easily satisfies the "primarily engaged in disseminating information" requirement for expedited processing of the Requests.

### b.    There is "urgency to inform the public" about secret or irregular apprehension, transfer or detention

There is also clear urgency to inform the public on the issues of secret detention, ghost detainees, and extraordinary rendition. Courts have consistently recognized that ongoing media attention to an issue is an indicator of urgency. *See Al-Fayed v. CIA*, 254 F.3d 300, 308 (2001) (recognizing fact that an issue "is the subject of current news coverage" is an important factor in deciding whether compelling need exists); *ACLU of Northern Cal. v. DOD*, 2006 WL 1469418, *7 (N.D. Cal. May 25, 2006) ("If anything, extensive media interest usually is a fact *supporting* not *negating* urgency in the processing of FOIA request.") (emphasis in original); *ACLU*, 321 F. Supp. 2d at 29-31 (newspaper articles reflecting public concern a factor supporting finding of urgency).

The Requests clearly relate to a subject of general public interest and ongoing media attention. As explained in the original Requests, media sources around the world have avidly covered news related to these matters, but much pertinent information concerning rendition and ghost detainees is not yet known to the public. Indeed, media interest in secret detention, ghost detainees, and extraordinary rendition has only increased since the filing of the original Requests.[10]

---

[9] *See also* 32 C.F.R. § 286.4(d)(3)(ii) (Department of Defense Regs) ("Representatives of the news media . . . would normally qualify as individuals primarily engaged in disseminating information.").

[10] *See e.g.,* Jan Sliva, *EU concedes rendition flights took place*, The Herald, (June 28, 2006); Ike Seamans, *Above the law*, The Miami Herald, (June 25, 2006); *MIDDLE EAST: Region still lacks support for torture victims, say observers*, Reuters Foundation, (June 25, 2006); *The Detention Dilemma*, The Washington Post, (June 19, 2006); Barrie Dunsmore, *Ugly portrait emerges dot by dot*, Times Argus, (June 18, 2006); Josh White, *Bad Advice Blamed For Banned Tactics*, The Washington Post, (June 17, 2006); Anemona Hartocollis, *Judges Press CIA Lawyer Over Withheld Documents*, The New York Times, (June 13, 2006); *Court Weighs ACLU Request on CIA Terror Documents*, New York Sun, (June 13, 2006); Larry Neumeister, *Court Urges to Protect CIA Detention Info*, Guardian Unlimited (June 13, 2006); *Euro MP's to Extend Probe Into CIA Activities*, Expatica, (June 13, 2006); *Court Will Investigate Alleged CIA Flights*, Los Angeles Times, (June 13, 2006); Jeremy Smith, *EU Lawmakers Back Report on CIA Terror Kidnappings*, Reuters, (June 12, 2006); Jan Sliva, *Probe of CIA Prisons Implicates EU Nations*, Forbes, (June 7, 2006).

WILMERHALE

Office of General Counsel
July 3, 2006
Page 5

In addition, the urgency to inform the public is further underscored here by the fact that the European Union and the Council of Europe are conducting official investigations into the practice of rendition and the involvement of European countries in extraordinary rendition and secret detention.[11]  In the last month alone, each of the investigations has produced a report, thereby further heightening public interest in these topics.[12]  These European investigations have encountered difficulties in obtaining information about these practices[13] and have highlighted the extent to which there is a lack of information about the system.[14]  Where public debate and

---

[11] In the Council of Europe there is an investigation by Secretary General Terry Davis pursuant to Article 52 of the European Convention and an inquiry by Senator Dick Marty for the Parliamentary Assembly of the Council of Europe: *see generally* http://www.coe.int/T/E/Com/Files/Events/2006-cia/.  The European Parliament has a Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners: *see generally* http://www.europarl.europa.eu/activities/expert/committees/presentation.do?committee =2073&language=EN.  *See generally* Craig Whitlock, *European Inquiry Fails to Confirm Secret CIA Prisons; But U.S. Tactics Called 'Appalling,'* WASH. POST, Jan. 25, 2006, at A16.

[12] Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June 2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf; Secretary General, *Secretary General's supplementary report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies*, SG/Inf (2006)13, 14 June 2006, *available at* http://www.coe.int/t/E/Com/Press/Source/SG_Inf(2006).doc; Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners, Interim report on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners, 15 June 2006, *available at* http://www.europarl.europa.eu/omk/sipade3?PUBREF=- //EP//NONSGML+REPORT+A6-2006-0213+0+DOC+PDF+V0//EN&L=EN&LEVEL=2&NAV=S&LSTDOC=Y.

[13] Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June 2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf para. 23; Council of Europe, Parliamentary Assembly, Resolution 1507 *Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states* (2006), *available at* http://assembly.coe.int/Main.asp?link=/Documents/AdoptedText/ta06/Eres1507.htm, para. 11 (noting that "Attempts to expose the true nature and extent of these unlawful operations have invariably faced obstruction or dismissal, from the United States and its European partners alike. The authorities of most Council of Europe member States have denied their participation, in many cases without actually having carried out any inquiries or serious investigations.");  Secretary General, *Secretary General's report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies*, SG/Inf (2006) 5, Feb. 28, 2005, *available at* https://wcd.coe.int/ViewDoc.jsp?Ref=SG/Inf(2006)5&Sector=secPrivateOffice&Language=lanEnglish&Ver=origin al&BackColorInternet=9999CC&BackColorIntranet=FFBB55&BackColorLogged=FFAC75 paras. 16 – 19.

[14] *See, e.g.*, Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June

WILMERHALE

Office of General Counsel
July 3, 2006
Page 6

investigations are ongoing, there is a particular value to the disclosure of information, in order to accurately frame the debate or conclude the investigation.

Finally, the urgent need to inform the public about secret detention, ghost detainees, and extraordinary rendition is further supported by the fact that these alleged government practices are ongoing. As a result, the alleged program's details and the potential violation of individuals' human rights are of immediate concern to Amnesty and the general public. *See ACLU*, 321 F. Supp. 2d at 30 ("Because the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of a finding of expediency").

In short, given the widespread and continuing interest that surrounds these issues, the fact that both the controversy and the alleged government programs are ongoing, and that fundamental components of the alleged program are still unknown, it is clear that there is urgency to inform the public about the information sought by the Requests.

2.    **"Failure to obtain the records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual"**

Amnesty and WSLS have requested information regarding the government's program for secretly or irregularly apprehending, transferring or detaining individuals, which allegedly involves the ongoing unlawful detention and abuse of individuals by or with the involvement of U.S. agents. There are publicly reported allegations that individuals are being abused as part of the government's secret detention programs. The Requests therefore satisfy the requirement that denying a request for expedited processing "could reasonably be expected to pose an imminent threat to the life or physical safety of at least one individual."

For example, *ABC News* reported that ten detainees held by the U.S. in secret sites were subjected to "enhanced interrogation techniques," including waterboarding.[15] The *Washington Post* reported that one suspect held in custody by the U.S. Government was held incommunicado for nearly five months, and subjected to threats of violence and physical harm. The captive was reportedly told "You are in a country where no one knows about you, in a country where there is no law. If you die, we will bury you, and no one will know." He was kicked and beaten, and

---

2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf, para. 16.

[15] Brian Ross & Richard Esposito, *Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC NEWS, Dec. 5, 2005, *available at* http://abcnews.go.com/WNT/Investigation/story?id=1375123.

WILMERHALE

Office of General Counsel
July 3, 2006
Page 7

analysis of his hair after he was released revealed he was malnourished during his captivity.[16] In addition, there have been reports of torture of CIA "ghost detainees" in Afghanistan[17] and in Iraq[18], including, in at least one case, the death of a prisoner, Manadel al-Jamadi.[19] Amnesty International's research shows that other individuals secretly detained suffered mistreatment,[20] and that torture and other forms of ill-treatment is typical of the experience of those subjected to extraordinary rendition.[21] It has further been reported that the United States' secret detention system has been designed to facilitate the gathering of intelligence unhindered by the due process

---

[16] Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, WASH. POST, Dec. 4, 2005, at A1.

[17] HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* 2 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (detailing the ill-treatment of one "ghost" detainee in the Salt Pit resulting in death).

[18] Press Release, American Civil Liberties Union, Newly Released Army Documents Point to Agreement Between Defense Department and CIA on "Ghost" Detainees, ACLU Says: Declassified Annexes to Fay Report, Which Denied Link, Contain Further Evidence of Brutal Army Abuses (Mar. 10, 2005), *available at* http://www.aclu.org/safefree/general/17597prs20050310.html. Many of the documents released by the Department of Defense pursuant to the ACLU's FOIA request, *available at* http://www.aclu.org/torturefoia/released/030905/, describe torture and mistreatment of "ghost" detainees. See, e.g., Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SGT, 372nd MP, Camp Victory, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SPC/E4, B Co., 66th MI Group, 202nd MI BN, Annex to Fay/Jones/Kern Report (May 24, 2004); Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of SGT, 372nd MP, Annex to Fay/Jones/Kern Report (May 7, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004). *See also* Center for Human Rights and Global Justice, Human Rights First, Human Rights Watch, *By the Numbers: Findings of the Detainee Abuse and Accountability Project* (2006) *available at* http://www.nyuhr .org/docs/By_The_Numbers.pdf.

[19] Douglas Jehl & Tim Golden, *C.I.A. is Likely to Avoid Charges in Most Prisoner Deaths*, N.Y. TIMES, Oct. 23, 2005, at 6; Jane Mayer, *A Deadly Interrogation: Can the C.I.A. legally kill a prisoner?*, NEW YORKER, Nov. 14, 2005, at 44.

[20] *See* Amnesty International, BELOW THE RADAR: SECRET FLIGHTS TO TORTURE AND "DISAPPEARANCE," Apr. 5, 2006, *available at* http://web.amnesty.org/library/Index/ENGAMR510512006?open&of=ENG-USA.

[21] "Amnesty International has interviewed several victims of rendition. Their testimonies were coherent and plausible when checked against factual data such as flight information. Also consistent was the description, by every single one, of incidents of torture and other ill-treatment." Press Release, *Exposing Renditions*, AMNESTY INTERNATIONAL EU OFFICE, Apr. 5 2006, *available at* http://web.amnesty.org/library/Index/ENGAMR 510572006?open&of=ENG-344.

WILMERHALE

Office of General Counsel
July 3, 2006
Page 8

rights that normally guard against this abuse.[22]  Finally, it is widely recognized that secret
detention is conducive to torture and other forms of human rights violations.[23]

      If these reports are accurate, there plainly is an immediate threat to the life and physical
safety of a number of individuals.[24]  Expedited processing of records is therefore required to
prevent further harm to individuals currently detained and those likely to be detained in the
future.

                         *                       *                      *

---

[22] Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, at A1 ("…intelligence
officials defend the agency's approach, arguing that the successful defense of the country requires that the agency be
empowered to hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by
the U.S. legal system or even by the military tribunals established for prisoners held at Guantanamo Bay."); HUMAN
RIGHTS FIRST,  BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* ii (2005), *available at*
http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (discussing the rationale of U.S. security
policy on detentions which views detention as a means of intelligence gathering); HUMAN RIGHTS WATCH, THE
UNITED STATES' DISAPPEARED: THE CIA'S LONG-TERM "GHOST DETAINEES" 5-15 (2004), *available at*
http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (noting the intelligence gathering functions of
interrogating persons in secret detention and raising concerns about the reliability of such information).

[23] For example, the U.N. Committee Against Torture "note(d) with concern that the State party does not always
register persons detained in territories under its jurisdiction outside the United States, depriving them of an effective
safeguard against acts of torture (article 2)."  The Committee also expressed concern at "allegations that the State
party has established secret detention facilities, which are not accessible to the International Committee of the Red
Cross…The Committee is also concerned by allegations that those detained in such facilities could be held for
prolonged periods and face torture or cruel, inhuman or degrading treatment." Committee Against Torture,
*Conclusions and Recommendations of the Committee Against Torture: United States of America,*
CAT/C/USA/CO/2, 18 May 2006, *available at*
<http://www.ohchr.org/english/bodies/cat/docs/AdvanceVersions/CAT.C.USA.CO.2.pdf>, para. 16.

[24] The exact number of persons subjected to secret or irregular apprehension, transfer or detention is unknown.
Estimates of the number of persons rendered vary from around one hundred to several thousand.  Center for Human
Rights and Global Justice, *Beyond Guantánamo: Transfers to Torture One Year After* Rasul v. Bush (New York:
NYU School of Law, 2005) at 3.  With respect to secret detention, human rights organizations have identified by
name 29 individuals who they believe are held in secret detention and have stated that there is likely many more.
*See* WITNESS, *Outlawed: Extraordinary Rendition, Torture and Disappearances in the 'War on Terror',*
http://www.witness.org/index.php?option=com_rightsalert&Itemid=178&task=view&alert_id=49, released June 26,
2006.  *See also* Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the
"War on Terror"* (New York: NYU School of Law, 2005) *available at* http://www.nyuhr
.org/docs/Whereabouts%20Unknown%20Final.pdf; Human Rights Watch, List of "Ghost Prisoners" Possibly in
CIA Custody, http://hrw.org/english/docs/2005/11/30/usdom12109.htm (last updated Dec. 1, 2005).

WILMERHALE

Office of General Counsel
July 3, 2006
Page 9

Amnesty International USA and Washington Square Legal Services, Inc., certify that the foregoing statements regarding the bases for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi); 32 C.F.R. 286.4(d)(3)(iii)-(iv). We look forward to your reply to this appeal **within ten (10) days**, as required under 5 U.S.C. § 552(a)(6)(E)(ii)(II), 32 C.F.R. 286.4(d)(3), and 32 C.F.R. 286.4(d)(3)(v).

Thank you for your prompt attention. Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

If you need to reach someone by telephone or email, you may also contact Kyle DeYoung at WilmerHale at (202) 663-6785 or at kyle.deyoung@wilmerhale.com.

Sincerely,

Curt Goering
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

WILMERHALE

Office of General Counsel
July 3, 2006
Page 10

*Margaret Satterthwaite/byCR*

Margaret L. Satterthwaite
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York, NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-Mail: margaret.satterthwaite@nyu.edu

*Catherine K. Ronis*

Catherine K. Ronis
WilmerHale
1875 Pennsylvania Avenue
Washington, DC 20006
Tel: (202) 663-6380
Fax: (202) 663-6363
E-Mail: catherine.ronis@wilmerhale.com