# EXHIBIT #39
# TO
# DEYOUNG DECLARATION



# Remarks Upon Her Departure for Europe

**Secretary Condoleezza Rice**
As-Aired
Andrews Air Force Base
December 5, 2005



(7:15 a.m. EST)

Good morning. We have received inquiries from the European Union, the Council of Europe, and from several individual countries about media reports concerning U.S. conduct in the war on terror. I am going to respond now to those inquiries, as I depart today for Europe. And this will also essentially form the text of the letter that I will send to Secretary Straw, who wrote on behalf of the European Union as the European Union President.

The United States and many other countries are waging a war against terrorism. For our country this war often takes the form of conventional military operations in places like Afghanistan and Iraq. Sometimes this is a political struggle, a war of ideas. It is a struggle waged also by our law enforcement agencies. Often we engage the enemy through the cooperation of our intelligence services with their foreign counterparts.

We must track down terrorists who seek refuge in areas where governments cannot take effective action, including where the terrorists cannot in practice be reached by the ordinary processes of law. In such places terrorists have planned the killings of thousands of innocents – in New York City or Nairobi, in Bali or London, in Madrid or Beslan, in Casablanca or Istanbul. Just two weeks ago I also visited a hotel ballroom in Amman, viewing the silent, shattered aftermath of one of those attacks.

The United States, and those countries that share the commitment to defend their citizens, will use every lawful weapon to defeat these terrorists. Protecting citizens is the first and oldest duty of any government. Sometimes these efforts are misunderstood. I want to help all of you understand the hard choices involved, and some of the responsibilities that go with them.

One of the difficult issues in this new kind of conflict is what to do with captured individuals who we know or believe to be terrorists. The individuals come from many countries and are often captured far from their original homes. Among them are those who are effectively stateless, owing allegiance only to the extremist cause of transnational terrorism. Many are extremely dangerous. And some have information that may save lives, perhaps even thousands of lives.

The captured terrorists of the 21st century do not fit easily into traditional systems of criminal or military justice, which were designed for different needs. We have to adapt. Other governments are now also facing this challenge.

We consider the captured members of al-Qaida and its affiliates to be unlawful combatants who may be held, in accordance with the law of war, to keep them from killing innocents. We must treat them in accordance with our laws, which reflect the values of the American people. We must question them to gather potentially significant, life-saving, intelligence. We must bring terrorists to justice wherever possible.

For decades, the United States and other countries have used "renditions" to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice.

In some situations a terrorist suspect can be extradited according to traditional judicial procedures. But there have long

been many other cases where, for some reason, the local government cannot detain or prosecute a suspect, and traditional extradition is not a good option. In those cases the local government can make the sovereign choice to cooperate in a rendition. Such renditions are permissible under international law and are consistent with the responsibilities of those governments to protect their citizens.

Rendition is a vital tool in combating transnational terrorism. Its use is not unique to the United States, or to the current administration. Last year, then Director of Central Intelligence George Tenet recalled that our earlier counterterrorism successes included "the rendition of many dozens of terrorists prior to September 11, 2001."

-- Ramzi Youssef masterminded the 1993 bombing of the World Trade Center and plotted to blow up airlines over the Pacific Ocean, killing a Japanese airline passenger in a test of one of his bombs. Once tracked down, a rendition brought him to the United States, where he now serves a life sentence.

-- One of history's most infamous terrorists, best known as "Carlos the Jackal," had participated in murders in Europe and the Middle East. He was finally captured in Sudan in 1994. A rendition by the French government brought him to justice in France, where he is now imprisoned. Indeed, the European Commission of Human Rights rejected Carlos' claim that his rendition from Sudan was unlawful.

Renditions take terrorists out of action, and save lives.

In conducting such renditions, it is the policy of the United States, and I presume of any other democracies who use this procedure, to comply with its laws and comply with its treaty obligations, including those under the Convention Against Torture. Torture is a term that is defined by law. We rely on our law to govern our operations. The United States does not permit, tolerate, or condone torture under any circumstances. Moreover, in accordance with the policy of this administration:

-- The United States has respected -- and will continue to respect -- the sovereignty of other countries.

-- The United States does not transport, and has not transported, detainees from one country to another for the purpose of interrogation using torture.

-- The United States does not use the airspace or the airports of any country for the purpose of transporting a detainee to a country where he or she will be tortured.

-- The United States has not transported anyone, and will not transport anyone, to a country when we believe he will be tortured. Where appropriate, the United States seeks assurances that transferred persons will not be tortured.

International law allows a state to detain enemy combatants for the duration of hostilities. Detainees may only be held for an extended period if the intelligence or other evidence against them has been carefully evaluated and supports a determination that detention is lawful. The U.S. does not seek to hold anyone for a period beyond what is necessary to evaluate the intelligence or other evidence against them, prevent further acts of terrorism, or hold them for legal proceedings.

With respect to detainees, the United States Government complies with its Constitution, its laws, and its treaty obligations. Acts of physical or mental torture are expressly prohibited. The United States Government does not authorize or condone torture of detainees. Torture, and conspiracy to commit torture, are crimes under U.S. law, wherever they may occur in the world.

Violations of these and other detention standards have been investigated and punished. There have been cases of unlawful treatment of detainees, such as the abuse of a detainee by an intelligence agency contractor in Afghanistan or the horrible mistreatment of some prisoners at Abu Ghraib that sickened us all and which arose under the different legal framework that applies to armed conflict in Iraq. In such cases the United States has vigorously investigated, and where appropriate, prosecuted and punished those responsible. Some individuals have already been sentenced to lengthy terms in prison; others have been demoted or reprimanded.

As CIA Director Goss recently stated, our intelligence agencies have handled the gathering of intelligence from a very small number of extremely dangerous detainees, including the individuals who planned the 9/11 attacks in the United States, the attack on the U.S.S. Cole, and many other murders and attempted murders. It is the policy of the United States that this questioning is to be conducted within U.S. law and treaty obligations, without using torture. It is also U.S. policy that authorized interrogation will be consistent with U.S. obligations under the Convention Against Torture, which prohibit cruel, inhuman, or degrading treatment. The intelligence so gathered has stopped terrorist attacks and saved innocent

lives – in Europe as well as in the United States and other countries. The United States has fully respected the sovereignty of other countries that cooperate in these matters.

Because this war on terrorism challenges traditional norms and precedents of previous conflicts, our citizens have been discussing and debating the proper legal standards that should apply. President Bush is working with the U.S. Congress to come up with good solutions. I want to emphasize a few key points.

-- The United States is a country of laws. My colleagues and I have sworn to support and defend the Constitution of the United States. We believe in the rule of law.

-- The United States Government must protect its citizens. We and our friends around the world have the responsibility to work together in finding practical ways to defend ourselves against ruthless enemies. And these terrorists are some of the most ruthless enemies we face.

-- We cannot discuss information that would compromise the success of intelligence, law enforcement, and military operations. We expect that other nations share this view.

Some governments choose to cooperate with the United States in intelligence, law enforcement, or military matters. That cooperation is a two-way street. We share intelligence that has helped protect European countries from attack, helping save European lives.

It is up to those governments and their citizens to decide if they wish to work with us to prevent terrorist attacks against their own country or other countries, and decide how much sensitive information they can make public. They have a sovereign right to make that choice.

Debate in and among democracies is natural and healthy. I hope that that debate also includes a healthy regard for the responsibilities of governments to protect their citizens.

Four years after September 11, most of our populations are asking us if we are doing all that we can to protect them. I know what it is like to face an inquiry into whether everything was done that could have been done. So now, before the next attack, we should all consider the hard choices that democratic governments must face. And we can all best meet this danger if we work together.

Thank you.
2005/1130 (FINAL)


Released on December 5, 2005


BACK TO TOP