UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

AMNESTY INTERNATIONAL USA, CENTER
FOR CONSTITUTIONAL RIGHTS, INC., and
WASHINGTON SQUARE LEGAL SERVICES,
INC.,

                       Plaintiffs,

               v.

CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF HOMELAND SECURITY,
DEPARTMENT OF JUSTICE, DEPARTMENT
OF STATE, and THEIR COMPONENTS,

                     Defendants.

---------------------------------------------------------- x

**ECF CASE**

07 CV 5435 (LAP)

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF THE DEPARTMENT OF HOMELAND SECURITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No. (212) 637-2777
Facsimile No. (212) 637-2717
Brian.Feldman@usdoj.gov

JEANNETTE A. VARGAS
BRIAN M. FELDMAN
Assistant United States Attorneys
EMILY E. DAUGHTRY
Special Assistant United States Attorney
      -Of Counsel-

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUPPLEMENTAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.      DHS-OGC's Search for Responsive Records . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.      CRCL's Search for Responsive Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.       LOCAL CIVIL RULE 56.1 STATEMENTS WOULD BE
        INAPPROPRIATE IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.      DHS CONDUCTED AN ADEQUATE SEARCH . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.      DHS's Search Was Reasonably Designed To Locate Any
            Responsive Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.      DHS Did Not Read the FOIA Request Narrowly . . . . . . . . . . . . . . . . . 8

            2.      DHS Reasonably Conducted a Subject Matter Search,
                 Rather Than a Name Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            3.      DHS Reasonably Decided Where to Search . . . . . . . . . . . . . . . . . . . . . 14

            4.      DHS's Search Methods Were Reasonable, Even If
                 Not Designed By An Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      B.      Plaintiffs' Claim That DHS "Must" Have Additional
            Responsive Records Is Pure Speculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            1.      Plaintiffs Only Speculate That DHS Might Have
                 Responsive Records Relating to Arar . . . . . . . . . . . . . . . . . . . . . . . . . 24

            2.      Plaintiffs Only Speculate That DHS Might Have
                 Responsive Records Relating to El-Masri . . . . . . . . . . . . . . . . . . . . . . 25

            3.      Plaintiffs Only Speculate That DHS Might Have
                 Responsive Records Relating to Hamdi . . . . . . . . . . . . . . . . . . . . . . . 26

      C.      Plaintiffs Are Unable To Overcome The Presumption
            That DHS Acted In Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.  DHS PROPERLY WITHHELD PRIVACY INFORMATION
     UNDER EXEMPTION 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     A.    The Records Are "Similar Files" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     B.    The Balance Between The Public And Private Interests
           Weighs Against Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**Cases:**

Ali v. Federal Bureau of Prisons, __ U.S. __, __ S. Ct. __, 2008 WL 169359
(Jan. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Am.-Arab Anti-Discrimination Comm. v. DHS, 516 F. Supp. 2d 83
(D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Arar v. Ashcroft, 414 F. Supp. 2d 250 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . 7, 11, 24, 25

Assasination Archives & Research Ctr. v. CIA, 720 F. Supp. 217
(D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Associated Press v. DOJ, 06 Civ. 1758 (LAP), 2007 WL 737476
(S.D.N.Y. Mar. 7, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Baker & Hostetler LLP v. Dep't of Commerce, 473 F.3d 312 (D.C. Cir. 2006) . . . . . . . . . . . . 23

Biberman v. FBI, 528 F. Supp. 1140 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bibles v. Or. Natural Desert Ass'n, 519 U.S. 355 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Boyd v. Criminal Div., DOJ, 475 F.3d 381 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 27

Campbell v. DOJ, 164 F.3d 20 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 29

Ctr. for Public Integrity v. OPM, No. 04-1274, 2006 WL 3498089
(D.D.C. Dec. 4, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

Citizens for Responsibility & Ethics in Washington v. Dep't of Interior,
503 F. Supp. 2d 88 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Davis v. DOJ, 460 F.3d 92 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Defenders of Wildlife v. U.S. Dep't of Agriculture, 311 F. Supp. 2d 44
(D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 22, 28

DOJ v. Reporters Comm. for Freedom of Press, 489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . 33, 35

El-Masri v. United States, 479 F.3d 296 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FBI v. Abramson, 456 U.S. 615 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Ferguson v. FBI, 89 Civ. 5071 (RPP), 1995 WL 329307
      (S.D.N.Y. June 1, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

FLRA v. U.S. Dep't of Veterans Affairs, 958 F.2d 503 (2d Cir. 1992) . . . . . . . . . . . . . . . 31, 32

Founding Church of Scientology v. NSA, 610 F.2d 824 (D.C. Cir. 1979) . . . . . . . . . . . . . . . 22

Friends of Blackwater v. United States Dep't of Interior, 391 F. Supp. 2d 115
      (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Garcia v. DOJ, Office of Info. & Privacy, 181 F. Supp. 2d 356
      (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 32

Gearbulk, Ltd. v. U.S. Customs Serv., 90 Civ. 443 (RPP), 1991 WL 719
      (S.D.N.Y. Jan. 2, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

Giannullo v. City of New York, 322 F.3d 129 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 7

Goland v. CIA, 607 F.2d 339 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Grand Centr. P'ship, Inc. v. Cuomo, 166 F.3d 473 (2d Cir. 1999) . . . . . . . . . . . . . 19, 20, 26, 27

Halpern v. FBI, 181 F.2d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

Hamdi v. Rumsfeld, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hemenway v. Hughes, 601 F. Supp. 1002 (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Holy Spirit Ass'n for Unification of World Christianity v. U.S. Dep't
      of State, 536 F. Supp. 1022 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Hopkins v. HUD, 929 F.2d 81 92d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Hudgins v. IRS, 620 F. Supp. 19 (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Iturralde v. Comptroller of the Currency, 315 F.3d 311 (D.C. Cir. 2003) . . . . . . . . . . . . . 21, 23

James v. CBP, 474 F. Supp. 2d 154 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 29

_Judicial Watch, Inc. v. Export-Import Bank_, 108 F. Supp. 2d 19
(D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

_Judicial Watch, Inc. v. FDA_, 449 F.3d 141 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

_Kimmel v. U.S. Dep't of Defense_, Civil Action No. 04-1551,
2006 WL 1126812 (D.D.C. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 34

_Kowalczyk v. DOJ_, 73 F.3d 386 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13

_LaCedra v. EOUSA_, 317 F.3d 345 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28

_Lakin Law Firm, P.C. v. FTC_, 352 F.3d 1122 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 33, 35

_Landmark Legal Found. v. EPA_, 272 F. Supp. 2d 59 (D.D.C. 2003) . . . . . . . . . . . . 13, 14, 27, 28

_Lechliter v. Dep't of Defense_, 371 F. Supp. 2d 589 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . 13

_Lesar v. DOJ_, 636 F.2d 472 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

_Long v. OPM_, No. 5:05-CV-122, 2007 WL 2903924
(N.D.N.Y. Sept. 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

_Massey v. FBI_, 3 F.3d 620 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

_Maynard v. CIA_, 986 F.2d 547 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19, 21, 28

_Meeropol v. Meese_, 790 F.2d 942 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

_Minier v. CIA_, 88 F.3d 796 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

_NAACP Legal Def. & Educ. Fund, Inc. v. HUD_, 07 Civ. 3378 (GEL)
2007 WL 4233008 (S.D.N.Y. Nov. 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

_Nation Mag. v. U.S. Customs Serv._, 71 F.3d 885 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 11

_Nat'l Assoc. of Criminal Defense Lawyers v. DOJ_, No. Civ. A 04-0697,
2006 WL 666938 (D.D.C. Mar. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

_Nix v.United States_, 572 F.2d 998 (4th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

_Nkihtaqmikon v. Bureau of Indian Affairs_, 493 F. Supp. 2d 91
(D. Me. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Oglesby v. Dep't of the Army, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Perlman v. DOJ, 312 F.3d 100 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Perry v. Block, 684 F.2d 121 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Phillips v. ICE, 385 F. Supp. 2d 296 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Public Citizen, Inc. v. Dep't of Educ., 292 F. Supp. 2d 1 (D.D.C. 2003) . . . . . . . . . . . . . . 21, 22

Safecard Servs., Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 24

Sands v. United States, No. 94-0537-CIV, 1995 WL 552308
    (S.D. Fla. June 19, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Schrecker v. DOJ, 217 F. Supp. 2d 29 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Sherman v. U.S. Dep't of Army, 244 F.3d 357 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 32

Stone v. Defense Invest. Serv., 816 F. Supp. 782 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . 22

Stuler v. IRS, 216 Fed. Appx. 240, 2007 WL 485230
    (3d Cir. Feb. 15, 2007) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Thomas v. Office of the United States Attorney, E.D.N.Y.,
    171 F.R.D. 53 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Treistman v. DEA, 878 F. Supp. 667 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Truitt v. Dep't of State, 897 F.2d 540 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

U.S. Dep't of Defense v. FLRA, 510 U.S> 487 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S. Dep't of State v. Ray, 502 U.S. 164 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S. Dep't of State v. Washington Post Co., 456 U.S. 595 (1982) . . . . . . . . . . . . . . . . . . . . 30, 21

Van Bourg, Allen, Weinberg & Roger v. NLRB, 728 F.2d 1270 (9th Cir. 1984) . . . . . . . . . . . 31

Voinche v. FBI, 940 F. Supp. 323 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Weisberg v. DOJ, 745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Wilderness Soc'y v. U.S Bureau of Land Mgmt., No. Civ. A. 01CV2210,
    2003 WL 255971 (D.D.C. Jan. 15, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Wood v. FBI, 432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 33, 34

Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321 (D.C. Cir. 1999) . . . . . . . . . . . . . . . 20, 22

**Statutes and Rules:**

Freedom of Information Act, 5 U.S.C. § 552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

43 C.F.R. § 2.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6 C.F.R. § 5.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Local Civ. R. 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

## LIST OF ABBREVIATIONS

| | |
|---|---|
| Department of Homeland Security | DHS, the Department, or the Government |
| DHS Office of General Counsel | DHS-OGC |
| DHS Office of the Inspector General | DHS-OIG |
| DHS Office of Civil Rights and Civil Liberties | CRCL |
| DHS Office of Policy | Policy |
| DHS Office of Intelligence and Analysis | I&A |
| Immigration and Naturalization Service | INS |
| Memorandum of Law in Support of the Department of Homeland Security's Motion for Partial Summary Judgment, dated Nov. 30, 2007 | Moving Brief, or Moving Br. |
| Memorandum of Law in Support of Plaintiffs' Cross Motion for Partial Summary Judgment and Opposition to Department of Homeland Security's Motion for Partial Summary Judgment, dated Jan. 4, 2008 | Opposition Brief, or Opp. Br. |
| Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1, dated Jan. 4, 2008 | Plaintiffs' 56.1 Statement, or 56.1 Statement |
| Request Submitted Under the Freedom of Information Act for Records Concerning Detainees, including "Ghost Detainees/Prisoners," "Unregistered Detainees/Prisoners," and "CIA Detainees/Prisoners" | The FOIA Request, or Plaintiffs' Request, or the Request |
| Transcript of Attorney General Alberto B. Gonzales and Federal Trade Commission Chairman Deborah Platt Majoras at Press Conference Announcing Identity Theft Task Force Interim Recommendations, dated September 19, 2006 | Gonzales Tr. |
| U.S. Customs and Border Protection | CBP |
| U.S. Immigration and Customs Enforcement | ICE |

<u>**LIST OF DECLARATIONS REFERENCED**</u>

<u>**Declarations Submitted November 30, 2007**</u>:

Declaration of Nicole Bertucci, dated November 30, 2007 ("Bertucci Decl.")

Declaration of Brian M. Feldman, dated November 30, 2007 ("Feldman Decl.")

Declaration of Vania T. Lockett, dated November 29, 2007 ("Lockett Decl.")

Declaration of Sandy Ford Page, dated November 30, 2007 ("Page Decl.")

Declaration of Catrina M. Pavlik-Keenan, dated November 30, 2007 ("Pavlik-Keenan Decl.")

Declaration of Shari Suzuki, dated November 30, 2007 ("Suzuki Decl.")


<u>**Declarations Submitted January 4, 2008**</u>:

Declaration of Kyle M. DeYoung, dated January 4, 2008 ("DeYoung Decl.")

Declaration of Daniel L. Regard, dated January 4, 2008 ("Regard Decl.")


<u>**Declarations Submitted February 4, 2008**</u>:

Declaration of Brian M. Feldman, dated February 4, 2008 ("Supp. Feldman Decl.")

Declaration of Vania T. Lockett, dated February 4, 2008 ("Supp. Lockett Decl.")

Declaration of James W. McNeely, dated February 4, 2008 ("McNeely Decl.")

Declaration of William T. Kammer,dated February 4, 2008 ("Kammer Decl.")

Defendant DHS[1] respectfully submits this reply memorandum of law in further support of its motion for partial summary judgment, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, and in opposition to Plaintiffs' cross-motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiffs' FOIA Request limits its scope to records regarding persons "who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." This language appears in the Request in bold and italics. Yet it appears nowhere in Plaintiffs' Opposition Brief.

This omission is telling because it highlights Plaintiffs' inability to contest the central issue here – the adequacy of the Department's search. DHS conducted a thorough search, in which high-level agency officials and other staff personally searched their files, and components searched their electronic record systems and certain classified files for records within the prescribed scope of the FOIA Request. Indeed, when DHS discovered that two components that never even received the Request from Plaintiffs – DHS-OGC and CRCL – had responsive documents, DHS required that those components also complete comprehensive searches. At the end of the day, few DHS records were found, most of which were public documents such as media reports. Those documents have been released to Plaintiffs with minimal redactions.

Plaintiffs, disappointed with the results of this search, now seek to amend their Request to use this litigation, and their position in the DHS FOIA processing queue, to search for materials never sought in their initial request. Such manipulation, however, is unfair to other FOIA requesters and would deprive DHS of an adequate opportunity to respond to new requests at the administrative level, thus unduly burdening this Court. Moreover, if requesters were

---

[1]  For the Court's convenience, this brief contains a list of abbreviations on page vii.

permitted to shift the focus of their request after the fact, agencies would be deprived of the ability to know and fulfill their search obligations, while requesters would be encouraged to litigate and continuously amend old requests, rather than submit new ones administratively. Plaintiffs therefore should not be able to rewrite the terms of their Request.

Nor should Plaintiffs be able to second-guess the hard work of the DHS components by demanding the use of more and different search terms, without any evidence that those terms would locate responsive materials. There will always be ways – usually an unlimited number of ways – in which an already reasonable search could be modified in the hopes of discovering additional responsive records. Here, Plaintiffs employ an expert in electronic discovery to propose some ideas on that score. FOIA, however, does not require expert consultants, and an adequate search need not find every responsive record. The only test is one of reasonableness. The Department was obligated to proceed in good faith and to conduct reasonable searches in those locations where responsive materials were reasonably likely to be kept. It did so and thereby satisfied its obligations.

The Court should therefore grant DHS's motion for summary judgment and deny Plaintiffs' cross-motion.

## SUPPLEMENTAL BACKGROUND

As detailed in the Moving Brief, DHS conducted extensive searches at ICE, CBP, the Office of Policy, I&A, and DHS Headquarters, none of which discovered responsive records. See Moving Br. at 3-17. Since submitting its Moving Brief, DHS has conducted searches at two additional components, DHS-OGC and CRCL. See Supp. Lockett Decl. ¶¶ 6-8; McNeely Decl. ¶¶ 6-14. Although both of these components have independent FOIA processing capabilities and

2

could have received the Request directly from Plaintiffs, see Lockett Decl. ¶¶ 3-4; Supp. Lockett

Decl. ¶ 4, Plaintiffs did not serve their Request on either, see Supp. Lockett Decl. ¶ 4; McNeely

Decl. ¶ 3.  In the course of processing records responsive to another FOIA request submitted by

Plaintiffs, however, DHS discovered several documents from DHS-OGC and CRCL, which DHS

identified as potentially responsive to the FOIA Request at issue in this motion.  See Supp.

Lockett Decl. ¶ 4; McNeely Decl. ¶ 3.  Accordingly, DHS decided to task DHS-OGC and CRCL

with conducting searches.  See id.

## A.  DHS-OGC's Search For Responsive Records

DHS-OGC's search involved every attorney in its office.  Each attorney received a copy

of the FOIA Request, and was required to search his or her paper and electronic files, e-mails,

and any classified records.  See Supp. Lockett Decl. ¶ 6.  Additionally, DHS-OGC conducted

hand searches of that office's classified records.  See id. ¶ 8.

Unsurprisingly, DHS-OGC located very few responsive records.  See id. ¶ 7.  In addition

to three documents that originated with either the Department of Justice or the Department of

State,[2] DHS-OGC located only three public reports (not authored by DHS), an e-mail compiling

links to public media articles, and six e-mails attaching media reports.  See id. ¶¶ 9-12; id., Exs.

A, B, C.  DHS-OGC released these records in full or with minimal redactions.  See id..

## B.  CRCL's Search For Responsive Records

CRCL senior staff determined that, to the extent CRCL might have responsive records,

those records would most reasonably be within the purview of one of four CRCL staff members:

_____

[2]  Both agencies are defendants in this action and will address these documents in their
own summary judgment motions.

(1) the CRCL Administrator, (2) the Deputy Officer for Programs and Compliance, (3) the Director of Review and Compliance, and (4) the Director of the Civil Liberties Program.  <u>See</u> McNeely Decl. ¶ 6.  Each of these staff members was tasked with conducting a search, and was instructed to use terms including ghost detainees/prisoners, unregistered detainees/prisoners, CIA detainees/prisoners, other governmental detainees, and OGA detainees.  <u>Id.</u> ¶ 7.

The CRCL Administrator, who tracks all materials incoming to the CRCL Officer (<u>i.e.</u>, the individual heading CRCL, <u>see id.</u> ¶ 4), searched her e-mail account, as well as the e-mail account of the CRCL Officer, <u>see id.</u> ¶ 8.  Additionally, the CRCL Administrator searched the CRCL Executive Correspondence Tracking system, which tracks items referred to CRCL for action through the Executive Secretariat.  <u>See id.</u>  She found no responsive records.  <u>See id.</u>

The Deputy Officer for Programs and Compliance and the Director of Review and Compliance likewise searched their e-mail and electronic records, as well as the Director of Review and Compliance's paper files.  <u>See id.</u> ¶¶ 9-10.  These searches revealed nothing responsive.  <u>See id.</u>  Moreover, a contractor searched the automated system of records for Review and Compliance, with the same negative results.  <u>See id.</u> ¶ 10.

The Deputy Officer for Programs and Compliance and the Director of Review and Compliance affirmed that CRCL had not handled any complaints nor advised DHS leadership on issues related to the FOIA Request.  <u>See id.</u> ¶¶ 9-10.

The Director of Civil Liberties Programs conducted a search of his e-mail, hard copy, and electronic records for responsive records, but found none.  <u>See id.</u> ¶ 11.  He also conducted an electronic search of CRCL's classified communication system, which likewise revealed no

4

responsive documents.  See id.  The Director was familiar with CRCL's hard copy classified

holdings, which are very limited, and confirmed that none were responsive.  See id.

Finally, the Director identified individual staff members within the Engagement Team

and Policy sections of Civil Liberties Programs who could have possibly worked on issues

relating to the Request, and required them to conduct searches as well.  See id.  The Engagement

Team leader confirmed that his team had no responsive records.  See id.  In the Policy section,

one individual located seven responsive records.  See id.[3]

Of the seven responsive records, only three were CRCL records, and, in each, the only

responsive information was contained in an e-mail from the Heritage Foundation describing a

press conference.  See id. ¶ 12.  CRCL released all three of its records, with privacy redactions

and redactions of internal agency phone and facsimile numbers.  See id. ¶¶ 12, 17.

## ARGUMENT

## I.    LOCAL CIVIL RULE 56.1 STATEMENTS WOULD BE INAPPROPRIATE IN THIS CASE

As an initial matter, in accordance with the general practice in this Circuit, DHS has

submitted neither a Local Civil Rule 56.1 statement nor counter-statement in this FOIA action.

See, e.g., Ferguson v. FBI, 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995)

(noting "general rule in this Circuit" is that Local Civil Rule 56.1 statements not be submitted in

FOIA cases), aff'd, 83 F.3d 41 (2d Cir. 1996).  Cf. NAACP Legal Def. & Educ. Fund, Inc. v.

HUD, 07 Civ. 3378 (GEL), 2007 WL 4233008, at *1 n.1 (S.D.N.Y. Nov. 30, 2007) (granting

Government's summary judgment motion as "properly made" without Rule 56.1 statement).

─────────────────────

[3]  In processing the CRCL records, DHS, in accordance with its standard practice, treated
e-mails and attachments as separate records.  See id.

The rationale underlying this practice is that, in FOIA cases, "agency affidavits alone will support a grant of summary judgment." Ferguson, 1995 WL 329307, at *2. Other statements included in a Local Civil Rule 56.1 statement would thus neither be material nor properly before the Court for adjudication, and submission of a Local Civil Rule 56.1 statement would serve only to distract the Court from material questions of fact. Further, were the Government required to respond to such statements in FOIA cases, it would be forced to address matters beyond the scope of a FOIA lawsuit.

Plaintiffs' 56.1 Statement is illustrative of these dangers. Although the only facts properly before the Court for adjudication are those presented in DHS's declarations, Plaintiffs' 56.1 Statement contains over fifty paragraphs. Some of those paragraphs are characterizations of the material set forth in DHS's declarations, which add nothing but argument. See, e.g., 56.1 Statement ¶¶ 16-23 (characterizing ICE's search). Other paragraphs reference allegations immaterial to this Court's decision on summary judgment, mostly by citation to unauthenticated documents or inadmissible hearsay, see, e.g., id. ¶¶ 12-13. See Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record"); see also Local Civil Rule 56.1(d) ("Each statement . . . must be followed by citation to evidence which would be admissible"). None of these statements are helpful in presenting material disputes to the Court.

Perhaps most troubling, however, are those paragraphs in Plaintiffs' 56.1 Statement that appear to call upon this Court to adjudicate sensitive matters of national security, none of which are material. For instance, Plaintiffs' 56.1 Statement sets forth various allegations regarding two individuals, Maher Arar and Khaled El-Masri. See 56.1 Statement ¶¶ 6-13. There has been

6

litigation involving both of those individuals in other jurisdictions. See El-Masri v. Tenet, 05-cv-1417 (E.D. Va.) (filed Dec. 6, 2005); Arar v. Ashcroft, 04-cv-249 (E.D.N.Y.) (filed Jan. 22, 2004). In both cases, the United States informed the respective courts that the allegations at issue could not be adjudicated without interfering with foreign relations, revealing intelligence-gathering methods, or damaging national security. See El-Masri v. United States, 479 F.3d 296, 299-300, 313 (4th Cir. 2007) (affirming dismissal upon proper invocation of state secrets doctrine by the United States), cert denied, 128 S. Ct. 373 (2007); Arar v. Ashcroft, 414 F. Supp. 2d 250, 287 (E.D.N.Y. 2006) (noting the United States' invocation of the state secrets doctrine). Yet, to respond to Plaintiffs' 56.1 Statement, the Government would have to address similar allegations. There is no reason why those sensitive matters should be litigated in a motion concerned solely with the adequacy of DHS's search. If the Court wishes a Local Rule 56.1 statement or counterstatement, however, DHS will submit one promptly.[4]

## II.    DHS CONDUCTED AN ADEQUATE SEARCH

### A.    DHS's Search Was Reasonably Designed To Locate Any Responsive Documents

DHS's searches were "'reasonably designed to identify and locate responsive documents.'" Garcia v. DOJ, Office of Info. & Privacy, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002). Plaintiffs' efforts to impugn those searches are unavailing. First, Plaintiffs suggest that DHS, in relying upon the explicit limiting language of the Request itself, somehow read the

---

[4] If the Court were to invite DHS to respond to Plaintiffs' 56.1 Statement, DHS would dispute assertions appearing throughout Plaintiffs' statement. DHS would dispute, for instance, Plaintiffs' mischaracterization of their FOIA Request, see 56.1 Statement ¶ 2, and their unsupported allegations regarding government activities, see, e.g., id. ¶¶ 6-13, as well as Plaintiffs' mischaracterizations of DHS's searches, see, e.g., id. ¶¶ 16-19, and of correspondence between the parties, see id. ¶¶ 50-51.

Request too narrowly.  Second, Plaintiffs attempt to fault DHS for not searching by specific

names, though the Request lists none.  Third, Plaintiffs complain that DHS should have searched

additional components, offices within those components, and databases within those offices,

although Plaintiffs provide no facts establishing any reasonable likelihood that such searches

would yield more fruitful results.  Finally, Plaintiffs nitpick DHS's search methods, using an

expert comparator, without evidence that their expert's suggested methodology would retrieve

any additional responsive records.  None of these complaints, as a matter of law, undermine the

adequacy of DHS's search.

### 1. DHS Did Not Read the FOIA Request Narrowly

This litigation cannot be about demands never stated in Plaintiffs' FOIA Request.  An

agency is entitled to "reasonably read [a FOIA] request literally."  Nat'l Assoc. of Criminal

Defense Lawyers v. DOJ, No. Civ. A. 04-0697, 2006 WL 666938, at *2 (D.D.C. Mar. 15, 2006);

see 5 U.S.C. § 552(a)(3)(A) (requiring agency to search for "reasonably describe[d]" records);

see also Halpern v. FBI, 181 F.3d 279, 288 (2d Cir. 1999) ("[A] FOIA request binds an agency

to disclose information to the extent that the agency is able to determine precisely what records

are being requested.").  Where an agency conducts a reasonable search based on the language in

a request, the agency has no further "obligation to search anew based upon a [requester's]

subsequent clarification."  Kowalczyk v. DOJ, 73 F.3d 386, 388 (D.C. Cir. 1996).  Otherwise,

"[r]equiring an additional search each time the agency receives a letter that clarifies a prior

request could extend indefinitely the delay in processing new requests."  Id.

Here, the scope of Plaintiffs' seven-page FOIA Request was carefully and expressly

delineated.  In bold and italics, in a section entitled "Scope of Request," the Request states that it

is limited to "individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information," i.e., individuals being secretly detained by or with the involvement of the United States. Request at 2 (bold and italics omitted). The Request refers to such individuals as, inter alia, "ghost detainees." See id. at 1-3. Each demand for documents – for records relating to (1) "apprehension, transfer, detention and interrogation" (2) "[c]urrent and former places of detention" and (3) "names and identities of detainees" – is specifically limited to records "within the Scope of Request." See id. at 4-5. DHS conducted a thorough search for all such records.

In their Opposition Brief, Plaintiffs attempt to rewrite their FOIA Request. Notably, the limiting language reproduced above, which governed DHS's response, appears nowhere in the brief. Instead, new terms appear, including, principally, the undefined term "rendition,"[5] and the

---

[5] Plaintiffs never define the term "rendition," for which there is no universally accepted definition. Indeed, Plaintiffs' sources and Opposition Brief appear to ascribe several different meanings to the term. For instance, in the statement of Chris Kojm, Deputy Executive Director before the National Commission on Terrorist Attacks Upon the United States, March 24, 2004, DeYoung Decl., Ex. 40, rendition is defined with respect to action by the Central Intelligence Agency to help catch terrorist suspects outside of the United States. Id. at 3. By contrast, Secretary of State Condoleezza Rice, in her Remarks Upon Her Departure for Europe, dated December 5, 2005, DeYoung Decl., Ex. 39, describes "rendition" more broadly as a process of bringing criminals to justice in any case "where, for some reason, the local government cannot detain or prosecute a suspect, and traditional extradition is not a good option." Id. at 1-2. In yet another use of the term, Plaintiffs describe an immigration removal as "rendition." See Opp. Br. at 3-4 (describing removal of Maher Arar as "rendition"). None of these definitions would necessarily bring "rendition" within the scope of Plaintiffs' Request, i.e., "rendition" does not necessarily involve "individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." Request at 2.

Likewise, Plaintiffs' Opposition Brief uses the term "irregular," see Opp. Br. at 15, without ever defining it. As with the term "rendition," there is no reason to believe that the term "irregular," not otherwise qualified, means secret. Thus, while records about "rendition" or "irregular processes" might include records within the scope of the Request, neither term has

names "Arar" and "El-Masri," which appear throughout the Opposition Brief.  See Opp. Br. at 1-4, 6-10, 12, 15-19.  None of these terms appear in the actual Request.

Plaintiffs could have asked DHS to search for any of these items.  The information now cited by Plaintiffs regarding "rendition," Arar, and El-Masri, was largely available by April 25, 2006, when Plaintiffs filed their Request.[6]  Further, by April 2006, both Arar and El-Masri had filed public lawsuits, see El-Masri v. Tenet, 05-cv-1417 (E.D. Va.) (filed Dec. 6, 2005); Arar v. Ashcroft, 04-cv-249 (E.D.N.Y.) (filed Jan. 22, 2004), and Plaintiff Amnesty International had published a news feature on "rendition," see Amnesty International, USA: The secretive and illegal US programme of "rendition," dated April 5, 2006, available at http://www.amnesty.org/ en/alfresco_asset/e2af587d-a2d8-11dc-8d74-6f45f39984e5/amr510562006en.pdf.  Indeed, as long ago as November 2003, co-Plaintiff Center for Constitutional Rights submitted a request for DHS records, which expressly sought Arar-related documents.  See FOIA Request, dated Nov. 4, 2003 (FOIA request for documents relating to Arar), Supp. Lockett Decl., Exhibit ("Ex.") D.  By contrast, Plaintiffs here chose to submit a detailed Request, using none of these terms.[7]

_____

been defined as coterminous with the scope of the Request; accordingly, despite Plaintiffs' apparent suggestion to the contrary, neither "rendition" nor "irregular" is synonymous with secret detention "by or with the involvement of the United States."  Request at 2.

[6] See, e.g., Glenn Kessler, U.S. Said to Admit German's Abduction Was an Error, Wash. Post, Dec. 7, 2005, DeYoung Decl., Ex. 13, cited at Opp. Br. at 4 n.13; Letter from ACLU to Condoleezza Rice and Michael Chertoff, Dec. 8, 2005, DeYoung Decl., Ex. 14, cited at Opp. Br. at 4 n.15; statement of Christopher Kojm, before the National Commission on Terrorist Attacks Upon the United States, March 24, 2004, DeYoung Decl., Ex. 40, cited at Opp. Br. 17 n.24.

[7] Plaintiffs argue that DHS should have "consult[ed] Plaintiffs about the intended scope of their requests."  Opp. Br. at 15.  DHS, however, did not have difficulty understanding the Request's scope.  As Plaintiffs concede, consultation is appropriate only where "an agency is uncertain about what precise records a requester is seeking."  Id. at 14.  There was therefore no need for consultation in this case.  Significantly, the ambiguities introduced in Plaintiffs' brief are based on language found nowhere within their Request.  Cf. Ali v. Federal Bureau of Prisons,

Plaintiffs are not only factually wrong in accusing DHS of "narrow[ly] reading [their] request," Opp. Br. at 13; <u>see also</u> Opp. Br. at 14-16, but, moreover, the authorities they cite do not support their argument.  Here, Plaintiffs challenge DHS's adherence to the express language of Plaintiffs' Request as opposed to Plaintiffs' later-stated demands.  In all but one of the cases cited by Plaintiffs, by contrast, courts criticized agency interpretations that directly contradicted the requests as originally written.  <u>See</u> <u>LaCedra v. EOUSA</u>, 317 F.3d 345 (D.C. Cir. 2003) (agency improperly interpreted request for "all documents" as limited to specific enumerated documents), <u>cited</u> <u>at</u> Opp. Br. at 13-14; <u>Nation Mag. v. U.S. Customs Serv.</u>, 71 F.3d 885, 889-92 (D.C. Cir. 1995) (agency improperly interpreted request for records "pertaining to" Ross Perot's drug interdiction efforts as limited to records indexed under his name), <u>cited</u> <u>at</u> Opp. Br. at 14; <u>Truitt v. Dep't of State</u>, 897 F.2d 540, 541-46 (D.C. Cir. 1990) (agency improperly interpreted request for certain Albania-related records anywhere as excluding such records in a particular file), <u>cited</u> <u>at</u> Opp. Br. at 13-15; <u>Wilderness Soc'y v. U.S. Bureau of Land Mgmt.</u>, No. Civ. A. 01CV2210, 2003 WL 255971, at *3-5 (D.D.C. Jan. 15, 2003) (agency improperly interpreted request for all documents "pertaining to" discussions regarding a claim to exclude, <u>inter alia</u>, documents submitted in support of that claim), <u>cited</u> <u>at</u> Opp. Br. at 16.  In the remaining case, <u>Hemenway v. Hughes</u>, 601 F. Supp. 1002 (D.D.C. 1985), a district court stated, in dicta, that the one-sentence <u>pro</u> <u>se</u> request at issue was ambiguous, but that the agency should have construed it to include the more extensive of two possible interpretations because the request suggested "what information the [requester] wanted."  <u>Id.</u> at 1004-05.  By contrast, here, Plaintiffs' seven-

---

__ U.S. __, __ S. Ct. __, 2008 WL 169359, at *7 (Jan. 22, 2008) ("[W]e are unpersuaded by petitioner's attempt to create ambiguity where the statute's structure and text suggest none.").

page single-spaced Request, which was submitted to DHS by Plaintiffs' attorneys, sets forth the information Plaintiffs wanted in painstaking detail, and DHS searched for all such records.

If Plaintiffs intend to seek different records, now that searching has ended, they may submit a new FOIA request.  Cf. Citizens for Responsibility & Ethics in Washington v. Dep't of Interior, 503 F. Supp. 2d 88, 102 (D.D.C. 2007) (noting that requester "is perfectly free to file an additional FOIA request specifically tailored" to different records).  They may not, however, use this litigation as a vehicle to change their original request.  See, e.g., Nat'l Assoc. of Criminal Defense Lawyers, 2006 WL 66938 at *2; Thomas v. Office of the United States Attorney, E.D.N.Y., 171 F.R.D. 53, 55 (E.D.N.Y. 1997).  To permit such manipulation would allow a requester to jump the queue for pending requests so as to "extend indefinitely the delay in processing new requests."  Kowalczyk, 73 F.3d at 388; see also Biberman v. FBI, 528 F. Supp. 1140, 1144 (S.D.N.Y. 1982) ("Stated simply, the litigation would then be a vehicle for endless additional FOIA requests . . . and would effectively grant to litigating plaintiffs a preference over all other FOIA claimants.").  Cf. Hemenway, 601 F. Supp. at 1005 ("[A] requester should not be permitted to alter the substance of his request once it has been made."), cited at Opp. Br. at 14.  That manipulation would encourage unnecessary and potentially endless litigation and, moreover, would deprive federal agencies of the ability to know their search obligations in response to a specific FOIA request.

**2.    DHS Properly Conducted a Subject Matter
Search, Rather Than a Name Search**

Although Plaintiffs' Request includes no specific names, Plaintiffs attempt to criticize DHS for conducting a subject matter search, rather than a name search.  See Opp. Br. at 18; see

also Opp. Br. at 6-10, 15.  In so doing, Plaintiffs fundamentally misstate agencies' obligations

under FOIA and ignore the realities agencies face in conducting searches pursuant to FOIA.

FOIA requires that agencies locate and disclose documents, not that they launch

government-wide investigations.  See Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp.

2d 19, 27 (D.D.C. 2000) ("'FOIA was not intended to reduce government agencies to full-time

investigators on behalf of requesters.'" (quoting Assassination Archives & Research Ctr. v. CIA,

720 F. Supp. 217, 219 (D.D.C. 1989))).  An agency is thus "not obliged to look beyond the four

corners of the request for leads to the location of responsive documents." Kowalczyk, 73 F.3d at

389; see also Maynard v. CIA, 986 F.2d 547, 560 (1st Cir. 1993) (FOIA has no "requirement that

an agency conduct further searches on the basis of unspecified 'clues'"); Lechliter v. Dep't of

Defense, 371 F. Supp. 2d 589, 594 (D. Del. 2005) ("To locate leads for responsive documents,

an agency is not required to look beyond the four corners of the request." (quotation marks

omitted)); Garcia, 181 F. Supp. 2d at 368 (an "agency is not expected to take extraordinary

measures to find the requested records").  Thus, DHS had no obligation to conduct a

government-wide investigation, across any number of federal agencies, to learn the names of

"individuals who were, have been, or continue to be deprived of their liberty by or with the

involvement of the United States and about whom the United States has not provided public

information."  Request at 2.  See Landmark Legal Found. v. EPA, 272 F. Supp. 2d 59, 64

(D.D.C. 2003) (FOIA does not "require[ an agency] to compile a list of [items] meeting the

parameters of [the] FOIA request, and to conduct its search from there").  Cf. Halpern, 181 F.3d

at 298 ("reasonableness demands a certain respect for the practicalities of the situation.").  Nor

could DHS simply search with the names now proposed by Plaintiffs because, by so doing, DHS would be perceived as representing that those individuals came within the scope of the Request.

In any event, FOIA does not permit Plaintiffs to pose questions to the Government in the disguise of a FOIA request.  See Stuler v. IRS, 216 Fed. Appx. 240, 2007 WL 485230, at *1 (3d Cir. Feb. 15, 2007) (unpublished) (federal agencies are not required to "answer questions posed as FOIA requests"); Sands v. United States, No. 94-0537-CIV, 1995 WL 552308, at *5 (S.D. Fla. June 19, 1995); Landmark Legal Found., 272 F. Supp. 2d at 64; Hudgins v. IRS, 620 F. Supp. 19, 21-22 (D.D.C. 1985).  Yet, here, answering a government-wide question, and a particularly sensitive one at that – "identify the names of any secret detainees" or, with respect to any proposed names, "confirm that these individuals were secret detainees" – is precisely what devising a name search would require.  FOIA does not obligate DHS to conducting a name search in these circumstances.

### 3.    DHS Reasonably Decided Where to Search

Plaintiffs also complain that DHS should have searched additional components, offices, and databases for responsive records.  See Opp. Br. at 12, 18-19.  Plaintiffs fail, however, to articulate any valid reasoning that would warrant additional searches.

First, with respect to components, the only component for which Plaintiffs contend that a search would be fruitful is DHS-OIG.[8]  As an initial matter, Plaintiffs never sent a FOIA Request

---

[8] The only other components identified by Plaintiffs and not searched by DHS are the Office of Operations Coordination and the Office of Legislative Affairs.  See id.  Yet Plaintiffs articulate no rationale for why these components would be likely to have documents relating to secret detention.  Cf. Weisberg v. DOJ, 745 F.2d 1476, 1487 (D.C. Cir. 1984) ("The Department's detailed affidavits stating that it has no reason to believe materials will be found in those components withstand [plaintiff's] generalized attack.").  Moreover, as with DHS-OIG, Plaintiffs never asked DHS to search these components.

to DHS-OIG, although they were free to do so.  See Lockett Decl. ¶¶ 3-4.  Indeed, Plaintiffs'

demand for a DHS-OIG search appears for the very first time in their Opposition Brief, despite

various opportunities to do so prior to the completion of DHS's searches and submission of

summary judgment motions.[9]  In any event, Plaintiffs' only purported authority for requiring a

DHS-OIG search – their quotation of Friends of Blackwater v. Dep't of Interior, 391 F. Supp. 2d

115 (D.D.C. 2005), for the proposition that components must "refer a FOIA request to [any

component] that is 'likely to have' responsive" records – is unavailing.  See Opp. Br. at 19 n.27.

Not only is the proposition set forth in Friends of Blackwater grounded in a regulation specific to

the Department of Interior, see 391 F. Supp. 2d at 121,[10] but, in any event, Plaintiffs have

demonstrated no reason to believe that DHS-OIG is an office likely to have responsive records.

The only DHS-OIG activity they identify as relating to their Request is an investigation into the

removal of Arar, see Opp. Br. at 4 & n.11, 19, but as explained in more detail below, there is no

reason to believe that such an investigation would include records concerning secret detention,

see infra Part II.B.1.  Plaintiffs have thus "utterly failed to rebut the Department's showing of

adequacy by coming forward with evidence to suggest that responsive documents might be

found" at DHS-OIG.  Weisberg, 745 F.2d at 1487.

    Second, Plaintiffs lack any basis to challenge decisions made within respective DHS

components regarding which of their own offices should be searched.  See Opp. Br. 19.  Each

---

[9]  Despite the fact that DHS's May 3, 2006 letter to Plaintiffs listing the DHS components
searching for responsive records did not include DHS-OIG, see Letter from Catherine M. Papoi,
dated May 3, 2006, Lockett Decl., Ex. B, Plaintiffs never asked for a search of that component
during the administrative process or at any time thereafter.

[10]  Compare 43 C.F.R. § 2.22(a)(1) ("If a bureau receives a request for records not in its
possession, but which it knows another bureau has or is likely to have, it will refer the request to
that bureau(s) for response.") with 6 C.F.R. § 5.4(a) ("the component that . . . receives a request
for a record . . . is the component responsible for responding to the request").

of the tasked components reasonably decided, based on their own knowledge of the workings of their offices, which particular offices would be reasonably likely to contain responsive records. Thus, in each of the declarations submitted to the Court, each DHS component confirms that all files likely to contain responsive materials were searched.  See Pavlik-Keenan Decl. ¶ 21; Suzuki Decl. ¶ 27; Page Decl. ¶ 14; Bertucci Decl. ¶ 16; Lockett Decl. ¶ 21.  Those declarations also detail that, before components declined to search any office that might potentially contain responsive documents, component staff first consulted with high-level personnel in those offices to confirm that searching would be futile.  See, e.g., Suzuki Decl. ¶¶ 22-23; Pavlik-Keenan Decl. ¶¶ 12-14.  This diligence directly contradicts Plaintiffs' suggestion that DHS has failed to explain why the components chose to search certain offices and not others.  See Opp. Br. at 19.

Plaintiffs rely solely on Defenders of Wildlife v. U.S. Dep't of Agriculture, 311 F. Supp. 2d 44 (D.D.C. 2004), cited at Opp. Br. at 20 n.29, to challenge the components' decision-making, but that case does not support Plaintiffs' position.  In Defenders of Wildlife, the district court distinguished between offices that almost certainly have responsive records and offices where the existence of records is merely speculative.  Specifically, the court held that one office – which had oversight over, as well as direct and significant involvement in, the subject matter of the FOIA request, and which was referenced in responsive documents produced by other components, see 311 F. Supp. 2d at 52-55 – could not justify a search returning no records with the "bare assertion that [an officer] saw the FOIA request and . . . stated that he had no responsive documents," id. at 55.  By contrast, the court deferred to agency FOIA staff in deciding not to search several other offices, because the plaintiffs' suggestions that those particular offices might have responsive documents "[we]re purely speculative claims about the existence and discoverability of other documents."  Id. at 56.  As the court explained, "there is

no requirement that an agency search every division within it when the agency believes that responsive documents" are located elsewhere.  Id.

Here, DHS searched all offices it believed might contain responsive records.  Where uncertain, components consulted with the most knowledgeable personnel to determine if a search would be futile.  They then properly excluded offices unlikely to have any responsive records.  See, e.g., Schrecker v. DOJ, 217 F. Supp. 2d 29, 35 (D.D.C. 2002) (holding agency fulfilled its search obligations where it explained why it searched certain offices).  Cf. Am.-Arab Anti-Discrimination Comm. v. DHS, 516 F. Supp. 2d 83, 88 (D.D.C. 2007) ("a search [that] would be futile . . . is unnecessary").  Plaintiffs simply speculate as to the existence of additional responsive documents and altogether fail to articulate why particular offices would have such records.  Their challenge, like the challenge rejected in Defenders of Wildlife, is thus without merit.

Third, Plaintiffs challenge the determinations by DHS regarding which databases to search.  See Opp. Br. at 19.  Plaintiffs' only articulated complaint, however, is that CBP relied on the search of the TECS database conducted by ICE.  See Opp. Br. at 6 & n.17; id. at 9.  This challenge is based on the faulty premise, addressed above, that DHS should have conducted name searches.  Beyond this erroneous challenge, Plaintiffs give no indication as to what other databases they believe should have been searched, or why.[11]  See Opp. Br. at 19.  This is in

---

[11]  Plaintiffs purport to rely on James v. CBP, 474 F. Supp. 2d 154 (D.D.C. 2007), as support for their challenge to DHS's decisions regarding which databases to search.  See Opp. Br. at 19.  In James, the defendant agency was CBP, and the James plaintiff sought records relating to his arrest by CBP.  474 F. Supp. at 159.  In response, CBP exclusively searched TECS, without explaining what that database contained, how it was queried, or why other records were not searched.  Id.  The court held that CBP's search, at least as described, was inadequate.  Id.  The contrast between James and the searches conducted here is perhaps best illustrated by looking at the CBP declaration in this case, which has none of the defects noted in James.  As an initial matter, in addition to a search of TECS, CBP also searched the ePMO

contrast to <u>Truitt v. Department of State</u>, 897 F.2d 540 (D.C. Cir. 1990), which Plaintiffs cite in their brief.  <u>See</u> Opp. Br. at 1, 13-16.  In <u>Truitt</u>, the D.C. Circuit held that an agency could not exclude a particular file from search where the FOIA request did not limit the locations to be searched and the unsearched file indisputably contained responsive records. <u>See</u> 897 F.2d at 542-46.  Here, by contrast, there is no evidence that <u>any</u> DHS file has additional responsive records.

At its core, Plaintiffs' complaint appears to be that DHS has not inventoried and described all of the databases it maintains.  This complaint is without merit.  FOIA nowhere "require[s] that an agency provide a comprehensive list of record systems unlikely to contain responsive records." <u>Maynard</u>, 986 F.2d at 563.  Instead, an agency satisfies its FOIA obligations where it searches databases most likely to contain responsive records.  <u>See</u> <u>Schrecker</u>, 217 F. Supp. 2d at 35.  As Plaintiffs' own authority provides, DHS may make such a showing by "averring that all files likely to contain responsive materials (if such records exist) were searched." <u>Oglesby v. Dep't of the Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990), <u>cited</u> <u>at</u> Opp. Br. at 16.  DHS did so here and satisfied its obligation to search appropriate files.

### 4.     DHS's Search Methods Were Reasonable, Even If Not Designed By An Expert

Plaintiffs present two additional challenges to DHS's search methods, but neither challenge has merit.  First, Plaintiffs summon the support of a purported expert in electronic

---

database, <u>see</u> Suzuki Decl. ¶¶ 17, 18, shared network drives, <u>see</u> <u>id.</u> ¶ 20, and hard copy files, <u>see</u> <u>id.</u> ¶¶ 19, 26. DHS also explained the nature of TECS in detail and set forth the specific terms used to search.  <u>See</u> Pavlik-Keenan Decl. ¶¶ 16-19.  Moreover, CBP detailed how it decided where to search, <u>see, e.g.</u>, Suzuki Decl. ¶ 7, and documented discussions which led CBP to conclude that searches of certain locations would be fruitless, <u>see, e.g.</u>, <u>id.</u> ¶¶ 14-15, 22-24. CBP's declaration, like that of the other components, thus provides exactly what the district court found lacking in <u>James</u>.

evidence and case management to challenge the methodology employed by the DHS FOIA staff

in responding to Plaintiffs' Request.  <u>See</u> Resume of Daniel L. Regard, JD, MBA, Managing

Director, Intelligent Discovery Services, Inc., Regard Decl., Ex. 1.  The expert opines that the

DHS component FOIA staffers should have avoided "compound phrases," including terms

included in the title of the Request, like "unregistered detainees," and "CIA detainees," <u>see</u>

Regard Decl. ¶ 12, and used more "broad and inclusive search terms," <u>see</u> <u>id.</u> ¶ 13 (suggesting

use of, <u>e.g.</u>, "ghost!" or "prison!" instead of "ghost" or "prison").  Plaintiffs argue that DHS's

searches were therefore insufficient.  <u>See</u> Opp. Br. at 17 & n.25.[12]

      This critique is doubly flawed.  As an initial matter, there will always be different ways

to conduct a search.  FOIA searches, however, need only be reasonable, <u>see</u> <u>Grand Centr. P'ship,</u>

<u>Inc. v. Cuomo</u>, 166 F.3d 473, 489 (2d Cir. 1999); <u>Gearbulk, Ltd. v. U.S Customs Serv.</u>, 90 Civ.

4443 (RPP), 1991 WL 719, at *1 (S.D.N.Y. Jan. 2, 1991), and need not "actually uncover[]

every document," <u>see</u> <u>Grand Centr. P'ship</u>, 166 F.3d at 489; <u>see also</u> <u>Iturralde v. Comptroller of</u>

<u>the Currency</u>, 315 F.3d 311, 315 (D.C. Cir. 2003).  Thus, "there is no general requirement that an

agency search secondary references or variant spellings." <u>Maynard</u>, 986 F.2d at 560.  Here, the

search terms that Plaintiffs cite as insufficient are the terms appearing in the very title of their

Request.  <u>Compare</u> Opp. Br. at 8, 17-18 (criticizing use of terms "prisoners" and "detainees");

---

[12]  Among Plaintiffs' suggestions for additional or alternative search terms that DHS
might have used, is the term "high value" detainee.  Opp. Br. at 6, 9, 17, 19.  There are certain
problems, however, with this suggestion.  First, as Plaintiffs admit, this term appears nowhere in
their Request.  <u>See</u> Opp. Br. at 17.  Second, Plaintiffs' present no evidence that "high value' is a
synonym for secret.  Indeed, Plaintiffs' citation to "high value" detainees discusses the transfer
of such detainees to publicly acknowledged detention, suggesting that other publicly
acknowledged detainees might also be deemed "high value."  <u>See</u> Opp. Br. at 2-3 & nn.2, 7
(citing Plaintiffs' Exhibits 1 and 4).

id. at 6, 10, 16 (criticizing use of terms CIA, Unregistered, and Ghost, rather than "other governmental agency" and "OGA") with Request at 1 ("Request . . . for Records Concerning Detainees, including 'Ghost Detainees/Prisoners,' 'Unregistered Detainees/Prisoners,' and 'CIA Detainees/Prisoners'"). Faced with a range of possible approaches to searching for responsive documents, the DHS components' use of the terms highlighted in the Request was a reasonable one. Cf. Opp. Br. at 16 (conceding search will be unreasonable only if "designed to fail"[13]). Although Plaintiffs claim that their proposed search terms could have been used "with virtually no additional effort," id. at 18, the searches have been completed at this point; and requesters will always be able to insist, once a search returns no results, that different terms would have been more reasonable.

In any event, there is no reason to believe that doing additional searches would lead to the discovery of responsive documents. This case is unlike Public Citizen, Inc. v. Dep't of Educ., 292 F. Supp. 2d 1 (D.D.C. 2003), the only case relied upon by Plaintiffs in their criticism

---

[13] This is not a case where DHS designed its searches to fail, in contrast to the two cases Plaintiffs cite. The first, Davis v. DOJ, 460 F.3d 92 (D.C. Cir. 2006), cited at Opp. Br. at 16, is not even an adequacy of search case. Instead, the question in Davis was whether the FBI established a predicate for an exemption by taking reasonable steps to ascertain whether two individuals were alive. Id. at 95. The case is readily distinguishable in any event. In Davis, the FBI actually conceded that its methods "could not reasonably be expected" to succeed. Id. at 103. The FBI's methods depended on, inter alia, "participants in an audiotaped conversation . . . announcing their ages or dates of birth" or their social security numbers, id. at 100-03, and thus did not have "any likelihood of discovering whether the two individuals . . . were living or dead." Id. at 101. There – unlike here, where DHS's electronic terms would bring up records mentioning key words highlighted in the Request – FBI's methods were "plainly fated to reach a dead end." Id. at 103. In Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321 (D.C. Cir. 1999), cited at Opp. Br. at 16, the other case cited by Plaintiffs, the Coast Guard had refused to search an office that it had itself identified as likely to have responsive documents. Valencia-Lucena, 180 F.3d at 327. By contrast, here, DHS has not identified any office as likely to have responsive records, but nonetheless searched all places most likely to contain such records, using terms appearing most prominently in the Request, like "ghost detainees."

20

of DHS's search methodology.  See Opp. Br. at 17.  In Public Citizen, the requester sought

Department of Education ("DOE") records relating to borrowers who had been wrongfully

denied a discharge between 1992 and 2000.  See 292 F. Supp. 2d at 2-3.  The question presented

in Public Citizen was not whether the agency used appropriate electronic search terms; the

question was whether the agency should have conducted a paper search instead of an electronic

one.  See id. at 5-8.  The court held that DOE should have conducted a paper search where,

unlike here, (i) a substantial number of responsive records indisputably existed, see id. at 3, (ii)

the records were all retrievable through a paper search, see id. at 7-8, and (iii) it was beyond

dispute that an electronic search would miss a significant number of the responsive records, see

id.  None of those facts apply here.  Specifically, there is no evidence that additional responsive

records exist, could be retrieved in some other form, and would not be located in response to the

search terms used.  DHS therefore need not start its electronic searches over.

Plaintiffs' second challenge is to the propriety of "hand searches," i.e., manual searches

by agency personnel made with direct reference to the FOIA Request.  See Opp. Br. at 5-6, 8, 11,

20 n.30.  This is an unprecedented attack, and one that makes no sense.  In cases, like this one,

where a FOIA Request is descriptive in nature, the hand search, if feasible, is the most

comprehensive search solution.  Plaintiffs' criticism is illustrative.  In ICE's office of Detention

and Removal Operations ("DRO"), for instance, the Chief of the Intelligence Operations

reviewed the Request, see Pavlik-Keenan Decl. ¶ 6, personally searched electronic files "by

opening the electronic folders, and documents within those folders, as necessary to determine if

any documents were responsive," id. ¶ 8, and, "by hand," "personally searched Intelligence

Operations' classified safe for any documents responsive to the request," but found no

21

responsive documents, id. ¶ 9.  Plaintiffs charge that this description fails to reveal "the search terms or search protocol used."  Opp. Br. at 5.  In a manual search, however, there are no "search terms" or "search protocol" – the searcher simply reviews files to see if they contain records responsive to the Request.  This is precisely the search the Public Citizen court ordered.  See 292 F. Supp. 2d at 8.  Plaintiffs' criticisms of DHS's search methods thus lack merit.

### B.    Plaintiffs' Claim That DHS "Must" Have Additional Responsive Records Is Pure Speculation

All of Plaintiffs' complaints regarding DHS's search are ultimately undermined by the fact that Plaintiffs utterly fail to show that DHS has additional responsive records.  See Perry v. Block, 684 F.2d 121, 129 (D.C. Cir. 1982) (search deemed adequate in absence of "positive indications of overlooked materials"); Defenders of Wildlife, 311 F. Supp. 2d at 56 (same); Stone v. Def. Invest. Serv., 816 F. Supp. 782, 786 (D.D.C. 1993) )(same).  Cf. Valencia-Lucena, 180 F.3d at 327 ("positive indications of overlooked materials" existed where agency "fail[ed] to search the center it had identified as a likely place where the requested documents might be located"); Founding Church of Scientology v. NSA, 610 F.2d 824, 825, 837 (D.C. Cir. 1979) ("positive indications of over-looked materials" existed where agency search, which was never described in detail, missed 16 identifiable records).

Although Plaintiffs contend that "[t]here is strong evidence that DHS . . . possesses responsive records related to persons who were . . . secretly detained," Opp. Br. at 2, they fail to provide the Court with any such evidence.  Instead, Plaintiffs float unsupported theories, such as their speculation that DHS would have responsive records because (i) "information DHS collects apparently comes in part from detainees who are the subject of Plaintiffs' requests" and (ii) aliens at the border "may have been detained as part of the government's secret detention . . .

22

program." Id. at 3 (emphasis added). Such "speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." Safecard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991), quoted in Iturralde, 315 F.3d at 316; see also Baker & Hostetler LLP v. Dep't of Commerce, 473 F.3d 312, 318 (D.C. Cir. 2006) ("[Plaintiff's] assertion than an adequate search would have yielded more documents is mere speculation."). Compare Opp. Br. at 4 ("the agency must possess records concerning . . . secret detention" (emphasis added)) with Gearbulk, 1991 WL 719, at *1 ("Mere assertions that certain other documents 'must' exist do not raise a genuine issue of material fact and the agency is not required to prove beyond any doubt that a specific file or document does not exist.").

Aside from Plaintiffs' speculative and unsubstantiated suggestions regarding DHS's purported role in the CIA detention program, Plaintiffs' charge that DHS "must" have responsive documents is based solely on their claim that DHS possesses records related to Arar, El-Masri, and Yasser Hamdi. See Opp. Br. at 15. As explained below, however, Plaintiffs have failed to set forth evidence creating a sufficient predicate to justify searching for such records in response to this Request. Cf. Campbell v. DOJ, 164 F.3d 20, 28-29 (D.C. Cir. 1999) (finding requester "established a sufficient predicate to justify searching" for additional FBI records, where FBI conceded as much and records already produced referenced such additional FBI records).

### 1.    Plaintiffs Only Speculate That DHS Might Have Responsive Records Relating to Arar

Plaintiffs' claim that DHS has responsive records regarding Arar is based primarily on their bald assertion that "[i]t is beyond dispute that . . . Arar . . . [was] subject to rendition." Opp. Br. at 15; see also Opp. Br. at 2. This argument is doubly flawed. As an initial matter, "rendition" is not synonymous with secret detention. See supra at n.5. The Request is limited to

23

records regarding secret detention, i.e., to persons "who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." Request at 2.   Whether Arar was rendered or not is irrelevant to the issue of whether DHS has responsive records about secret, "CIA," or "ghost" detainees.

In any event, Arar was not rendered to Syria by the United States.  To the contrary, the United States has flatly denied that Arar was subject to "rendition."[14]  See Gonzales Tr. at 3 ("Some people have characterized his removal as a rendition.  That is not what happened here."), Supp. Feldman Decl., Ex. A.  As the record makes clear, Arar was removed to Syria pursuant to the immigration laws.  Accordingly, even if the FOIA Request sought records pertaining to rendition – which it plainly does not – records related to Arar would not be responsive.

Plaintiffs further contend that DHS should have records regarding a period of Arar's detention, specifically, his apprehension and detention at John F. Kennedy International Airport. See Opp. Br. at 3.  They nowhere claim, however, that this detention was secret.  See id.  Nor could they:  Plaintiffs have submitted an unclassified removal order with their brief.  See DeYoung Decl., Ex. 8.  Further, Arar has himself alleged, in public records created by co-Plaintiff Center for Constitutional Rights as Arar's counsel, that Arar's mother-in-law knew of his immigration detention as soon as he was put into removal proceedings, and that, shortly

_____

[14]  The only reference in Plaintiff's Opposition Brief to secret detention with respect to Arar concerns not Arar's detention with DHS but his subsequent imprisonment in Syria. See Opp. Br. at 3 (claiming [in] Syria, [Arar] was reportedly held in secret detention for nearly a year").  We note that even this allegation, that Arar was secretly detained by the Syrian government, is not supported by Plaintiffs' cited sources, see Opp. Br. at 3 nn. 9 & 10, and contradicts Arar's own allegations that Syrian officials confirmed to the Canadian Embassy that he was being detained there, Arar, 414 F. Supp. 2d at 255.

thereafter, he was visited by the Canadian Consulate and met with an attorney.  See Arar, 414 F.2d at 253.  Thus, records regarding Arar's immigration detention may indeed exist, but they are unresponsive to the Request.

### 2. Plaintiffs Only Speculate That DHS Might Have Responsive Records Relating to El-Masri

Nor can Plaintiffs undermine the adequacy of DHS's search by speculating that the search should have turned up documents relating to El-Masri.  See Opp. Br. at 4.  Plaintiffs speculate that DHS would have responsive records (i.e., records relating to secret detention) because, according to Plaintiffs, the media has reported that El-Masri at some point was held in secret, that at some later point DHS stopped him at the border, and that, more recently, DHS has permitted him to enter the United States.  Id.  On these allegations, Plaintiffs assert that DHS "must possess records concerning [his alleged] . . . secret detention."  Id.  In so doing, Plaintiffs presume that because an unknown DHS employee purportedly cross-checked El-Masri's name against an unspecified watch list, DHS must thereby have, in some unexplained manner, obtained records regarding El-Masri's alleged secret detention.  This is pure speculation.

### 3. Plaintiffs Only Speculate That DHS Might Have Responsive Records Relating to Hamdi

Plaintiffs' claim that DHS has records relating to a secret detention of Hamdi is similarly speculative.  See Opp. Br. at 7.  Although Plaintiffs deem "inexplicable" CBP's determination that its records relating to Hamdi were outside the scope of the Request, see id. at 15, they offer no explanation for how these pages might come within the scope of the Request.  The Request is limited to records regarding secret detention.  Yet the four pages released by CBP, which are attached to the Suzuki Declaration as Ex. C, describe the arrival of Hamdi to the United States,

25

in a very public manner, replete with media coverage.  See, e.g., Suzuki Decl, Ex. C, at 2.  Such

records have nothing to do with secret detention.  Thus, to the extent Plaintiffs claim that DHS

has records regarding Hamdi that are responsive to the Request, that claim lacks a factual

foundation.[15]

Plaintiffs have thus failed to show the existence of any overlooked materials, which could

possibly undermine the adequacy of DHS's searches.

### C.    Plaintiffs Are Unable To Overcome The Presumption That DHS Acted In Good Faith

At its essence, Plaintiffs' arguments boil down to the charge that the declarations

submitted by DHS should not be trusted and that, notwithstanding the search efforts detailed

therein, DHS acted in bad faith in order to withhold responsive records.  This charge, however,

fails as a matter of law.  It is well established that declarations "submitted by an agency are

accorded a presumption of good faith," Grand Cent. P'ship, 166 F.3d at 489, and "summary

judgment should be denied . . . only if the plaintiff makes a showing of bad faith sufficient to

---

[15]  Indeed, Plaintiffs have no evidence supporting their initial premise that Hamdi was ever held in secret detention.  The only evidence Plaintiffs cite in support of their speculation that Hamdi was ever in secret detention is a blatant mistake – a CNN article's misstatement of another report.  Specifically, the hearsay evidence cited by Plaintiffs is a CNN article entitled "Supreme Court rejects appeal over secret 9/11 detentions," which is attached to the DeYoung Declaration as Exhibit 38.  The fifth paragraph of the article, which Plaintiffs cite, states that another case taken up by the Supreme Court featured an "American suspect named Yasser Hamdi [who was] being held in secret military custody.  (Full story)."  Id.  The "Full story," however, reveals that the "secret military custody" portion of Plaintiffs' cited article is a misstatement.  See CNN, "Supreme Court expands review of U.S. war on terror," Jan. 9, 2004, available at http://edition.cnn.com/2004/LAW/01/09/scotus.enemy.combatant/, Supp. Feldman Decl., Ex B.  The report in fact says nothing about secret detention.  Id.  Instead, it shows a picture of Hamdi's capture, and chronicles his detention through to the present.  Id.  See also Hamdi v. Rumsfeld, 542 U.S. 507, 510-11 (2004) (chronicling Hamdi's detention, with no mention of secret detention).

impugn" those declarations, Triestman v. DEA, 878 F. Supp. 667, 672 (S.D.N.Y. 1995); see also

Grand Cent. P'ship, 166 F.3d at 489.  Here, Plaintiffs make absolutely no showing of bad faith.

   Nor could they.  Although Plaintiffs suggest that DHS delayed in responding to their

Request, see Opp. Br. at 13, 16, that DHS's additional searches undermine the adequacy of their

initial searches, see id. at 20, and that DHS erred in its interpretation of the Request, see id. at

16-18, none of these allegations could establish bad faith.  First, "delay in responding to a FOIA

request [does not] constitute[] bad faith."  Boyd v. Criminal Div., DOJ, 475 F.3d 381, 391 (D.C.

Cir. 2007); see also Grand Central P'ship, 166 F.3d at 489-90 (delay in production does not

show bad faith); Minier v. CIA, 88 F.3d 796, 803 (9th Cir. 1996); Maynard, 986 F.2d at 564;

Landmark Legal Found., 272 F. Supp. 2d at 62.  In this case, DHS's only delay in producing

responsive documents resulted from its decision to search new components; and that decision

was made simply because responsive records were discovered.

   Second, and relatedly, those "additional releases suggest a stronger, rather than a weaker,

basis for accepting the integrity of the search."  Meeropol v. Meese, 790 F.2d 942, 952 (D.C.

Cir. 1986); see also Grand Central P'ship, 166 F.3d at 489-90 (agency entitled to presumption of

good faith, where "some documents were not discovered until a second, more exhaustive

search"); Maynard, 986 F.2d at 565 ("Rather than bad faith, we think the forthright disclosure by

the [agency] that it had located the misplaced file suggests good faith on the part of the

agency."); Defenders of Wildlife, 311 F. Supp. 2d at 51-52, 56 (finding no bad faith, where

agency's office of general counsel first conducted search after filing of suit, because it is "settled

27

that the subsequent disclosure of documents initially withheld does not qualify as evidence of bad faith"), cited at Opp. Br. at 20 n.29; Landmark Legal Found., 272 F. Supp. 2d at 63.[16]

Third, as described above, DHS's interpretation of the Request was in good faith because DHS read Plaintiffs' Request exactly as it was written; Plaintiffs are merely attempting to introduce ambiguity by arguing that the Request centers on terms nowhere cited therein.  See supra Part II.A.1.  In any event, as Plaintiffs' own authority establishes, even an erroneous interpretation by DHS would not be sufficient to rebut the presumption of good faith. See LaCedra, 317 F.3d at 348, cited at Opp. Br. at 13.  DHS is thus entitled to the presumption that it acted in good faith, and summary judgment should be entered in its favor on the adequacy of its search.

## IV.    DHS PROPERLY WITHHELD PRIVACY INFORMATION UNDER EXEMPTION 6

The "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."  Center for Nat'l Sec. Studies v. United States Dep't of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003).  Thus, Congress recognized that "legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused."  FBI v. Abramson, 456 U.S. 615, 621 (1982); see also 5 U.S.C. §

---

[16]  Plaintiffs quote Goland v. CIA, 607 F.2d 339, 370 (D.C. Cir. 1979), reh'g denied, to suggest that DHS's recent discovery of responsive documents in newly searched components somehow creates "material doubt" about its original searches in other components.  See Opp. Br. at 20.  In Goland, however, the D.C. Circuit rejected the argument that newly discovered documents rendered the agency's search defective.  See 607 F.2d at 370; see also id. at 372 ("We are satisfied . . . that the original failure to uncover the documents was wholly understandable and not inconsistent with the district court's finding that the search was thorough.").

552(b).  These exemptions "are intended to have meaningful reach and application."  John Doe
Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).

In releasing documents recently located during the searches of CRCL and DHS-OGC,
DHS properly withheld the names and email addresses of DOD personnel; the private email
address of a State Department contractor; and the name, phone number and fax number of a
private third-party who had sent an email to DHS employees under FOIA Exemption 6.[17]  See
Supp. Lockett Decl. at ¶¶ 13-16; McNeely Decl. at ¶¶ 15-17.  Exemption 6 exempts from
disclosure records or information in "personnel and medical files and similar files the disclosure
of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. §
552(b)(6).  This exemption "is intended 'to protect individuals from the injury that can result
from the unnecessary disclosure of personal information.'"  Wood v. FBI, 432 F.3d 78, 86 (2d
Cir. 2005). .

An Exemption 6 analysis is a two-pronged inquiry.  Wood, 432 F.3d at 86.  First, the
Court "must determine whether the personal information is contained in a file similar to a
medical or personnel file."  Id.  Second, the Court should "balance the public's need for the
information against the individual's privacy interest to determine whether the disclosure of the
names would constitute a 'clearly unwarranted invasion of personal privacy.'"  Id. (quoting 5
U.S.C. § 552(b)(6)).  In performing this analysis, courts have routinely concluded that the types
of identifying information withheld by DHS are protected by Exemption 6.

---

[17] DHS also redacted the office phone number and fax number of another DHS employee
pursuant to Exemption 2 (low).  Plaintiffs have informed us that they are not challenging that
redaction in this litigation.

A.    The Records Are "Similar Files"

As to the first prong, the phrase "similar files" is broad in scope.  See U.S. Dep't of State

v. Washington Post Co., 456 U.S. 595, 600 (1982); see also Wood, 432 F.3d at 86-87 & n.6;

Associated Press v. DOJ, 06 Civ. 1758 (LAP), 2007 WL 737476, at *4 (S.D.N.Y. Mar. 7, 2007).

"[T]he protection of Exemption 6 is not determined merely by the nature of the file in which the

requested information is contained."  Washington Post Co., 465 U.S. at 601; id. at 602 ("[W]e do

not think that Congress meant to limit Exemption 6 to a narrow class of files containing only a

discrete kind of personal information.").  Rather, the Supreme Court has indicated that it is "the

balancing of private against public interests, not the nature of the files in which the information

was contained, [that] limit[s] the scope of the exemption."  Id. at 599 (internal quotation marks

omitted).  Accordingly, "the exemption is intended to exclude from the disclosure requirements

all personnel and medical files, and all private or personnel information contained in other files

which, if disclosed to the public, would amount to a clearly unwarranted invasion of the privacy

of any person."  Id. at 602 n.3 (internal quotation marks omitted); see also Perlman v. DOJ, 312

F.3d 100, 106 (2d Cir. 2002).

Applying this standard, courts have recognized that Exemption 6 does not merely apply

to "files 'about an individual,'" but more broadly to "bits of personal information, such as names

and addresses," contained in otherwise releasable records.  Judicial Watch, Inc. v. FDA, 449

F.3d 141, 152 (D.C. Cir. 2006); see also Van Bourg, Allen, Weinberg & Roger v. NLRB, 728

F.2d 1270, 1273 (9th Cir. 1984); Phillips v. ICE, 385 F. Supp. 2d 296, 304 (S.D.N.Y. 2005).

The DHS records at issue here contain identifying information about specific individuals,

including names, email addresses, phone numbers and fax numbers.  Accordingly, these records

30

fall within the scope of Exemption 6.  See Kimmel v. U.S. Dep't of Defense, Civil Action 04-

1551, 2006 WL 1126812, at *3 (D.D.C. Mar. 31, 2006) (relies upon Washington Post's broad

interpretation of the term "similar files" in determining that "the name of an individual employed

by DoD" contained in an otherwise releasable record is protected by Exemption 6).

## B.    The Balance Between The Public And Private Interests Weighs Against Disclosure

The second prong of the Exemption 6 inquiry requires the Court to "balance the public's

need for the information against the individual's privacy interest to determine whether the

disclosure of the names would constitute a 'clearly unwarranted invasion of personal privacy.'"

Wood, 432 F.3d at 86 (quoting 5 U.S.C. § 552(b)(6)); see also FLRA v. U.S. Dep't of Veterans

Affairs, 958 F.2d 503, 505 (2d Cir. 1992).  This balancing is required once a cognizable privacy

interest has been identified.  See FLRA, 958 F.2d at 510.

"The privacy side of the balancing test is broad and encompasses all interests involving

the individual's control of information concerning his or her person."  Wood, 432 F.3d at 88

(quotation marks omitted).  For instance, "individuals, including government employees and

officials, have privacy interests in the dissemination of their names."  Massey v. FBI, 3 F.3d 620,

624 (2d Cir. 1993);[18] Lawyers Comm., 721 F. Supp. at 564-65; Garcia, 181 F. Supp. 2d at 371-

72; see also Lesar v. DOJ, 636 F.2d 472, 487 (D.C. Cir. 1980); Nix v. United States, 572 F.2d

998, 1006 (4th Cir. 1978).  Cf. Hopkins v. HUD, 929 F.2d 81, 87 (2d Cir. 1991) (privacy interest

in name and address); FLRA, 958 F.2d at 510 (same).  Federal employees likewise have a

---

[18]  This Court may rely upon Exemption 7(C) cases, such as Massey, 3 F.3d at 624, in
identifying privacy interests under Exemption 6.  See FLRA, 510 U.S. at 497 n.6; Sherman v.
Army, 244 F.3d 357, 361 n.6 (5th Cir. 2001) ("[T]he manner in which courts analyze the
applicability of exemption 7(C) is the same as that used with respect to exemption 6.").

privacy interest in their private, non-official email addresses, just as they have a privacy interest in their home address.  See, e.g., Nkihtaqmikon v. Bureau of Indian Affairs, 493 F. Supp. 2d 91, 108 (D. Me 2007) (private email addresses properly redacted under Exemption 6).

DOD employees have a particularized interest in protecting their identities.  In the wake of September 11, 2001, DOD enacted a more restrictive data release policy, out of a concern that enemies of the United States could "harrass, stalk, or cause harm in order to degrade the individual's or group's performance and thus threaten national and homeland security."  Long v. OPM, No. 5:05-CV-1522 (NAM/DEP), 2007 WL 2903924, at *13 (N.D.N.Y. Sept. 30, 2007) (quoting from Declaration of Michael B. Donley, Director, Administration and Management, Office of the Secretary of Defense).  As part of that revised policy, DOD no longer releases lists of names or other personally identifying information of personnel currently or recently employed with DOD.  Id.; see also Kammer Decl. at ¶ 3.  The more restrictive data release policy is part of a wider array of security procedures that were put into place to try "to make it as difficult as possible for adversaries to collect valuable information that will enable them to carry out attacks on DOD personnel."  Long, 2007 WL 2903924 at *14.  In light of these security concerns, DOD's policy of withholding the names of its employees has been routinely upheld by courts. See Long, 2007 WL 2903924, at *16-*17; Center for Public Integrity v. OPM, No. 04-1274 (GK), 2006 WL 3498089, at *6; Kimmel, 2006 WL 1126812, at *3; cf. Wood, 432 F.3d at 86, 88-89; Massey, 3 F.3d at 624.

Likewise, the Heritage Foundation official whose name, phone number and fax number was redacted also possesses a privacy interest in the protection of his or her identity.  Private citizens who correspond with the federal government to give information or express opinions

have a privacy interest in the protection of their identities.  See, e.g., Lakin Law Firm, P.C. v.

Federal Trade Comm'n, 352 F.3d 1122, 1123-24 (7th Cir. 2003) (recognizing that the "personal

identifying information" of private citizens who send correspondence to federal agencies is

"regularly exempt from disclosure" under FOIA); Voinche v. FBI, 940 F. Supp. 323, 329-30

(D.D.C. 1996) (Exemption 6 properly invoked to protect names and identifying information

about private citizens who wrote to federal government); Holy Spirit Ass'n for Unification of

World Christianity, Inc. v. U.S. Dep't of State, 526 F. Supp. 1022, 1034 (S.D.N.Y. 1981) (names

of individuals who wrote letters to their Senators properly redacted under Exemption 6).  Cf.

DOJ v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 765 (1989) ("[D]isclosure of

records regarding private citizens, identifiable by name, is not what the framers of the FOIA had

in mind.").  Accordingly, the Heritage Foundation official has a cognizable privacy interest in

protecting his or her name from being linked with an email that expresses personal views about a

controversial subject.

        Because the DOD employees, the State Department contractor and the private third party

whose names and identifying information were withheld undisputedly have a privacy interest in

the redacted information, the Court must balance this privacy interest against the public's

interest in disclosure.  "The only relevant public interest in the FOIA balancing analysis is the

extent to which disclosure of the information sought would shed light on an agency's

performance of its statutory duties or otherwise let citizens know what the government is up to."

Bibles v. Or. Natural Desert Ass'n, 519 U.S. 355, 355-56 (1997) (quotation marks and citations

omitted); see also U.S. Dep't of Defense v. FLRA, 510 U.S. 487, 495-96 (1994); Wood, 432

F.3d at 88; FLRA, 958 F.2d at 511.  "[D]isclosure of information affecting privacy interests is

33

permissible only if the information reveals something <u>directly</u> about the character of a government agency or official." <u>Hopkins</u>, 929 F.2d at 88.  If "the public interest has been adequately served by disclosure of redacted [records]," "[t]he addition of the redacted identifying information would not shed any additional light of the Government's conduct." <u>United States Dep't of State v. Ray</u>, 502 U.S. 164, 178 (1991); <u>see also</u> <u>Wood</u>, 432 F.3d at 88.

It is impossible to conceive of any light that would be shed on either DHS's or DOD's performance of its statutory duties through the disclosure of the names of DOD employees who were on an email chain forwarding a media article and a link to a public website.  <u>Wood</u>, 432 F.3d at 89; <u>Center for Public Integrity</u>, 2006 WL 3498089, at *6; <u>Kimmel</u>, 2006 WL 1126812, at *3.  Similarly, the disclosure of the name of the person from the Heritage Foundation who sent an email to various federal employees would not serve the purposes of FOIA in any meaningful respect.  To the extent that there is any public interest in information regarding federal employees' contacts with non-governmental organizations in this context, this interest is served through the release of the email and the disclosure of the organization which employs the individual who sent the email.  Identifying the specific person at the Heritage Foundation who sent the email, however, would not provide plaintiffs with any further information regarding the functioning of the federal government.  <u>Reporters Committee</u>, 489 U.S. at 774-75 ("[T]he FOIA's central purpose is to ensure that the <u>Government's</u> activities be opened to the sharp eye of public scrutiny, not that information about <u>private citizens</u> that happens to be in the warehouse of the Government be so disclosed."); <u>Lakin Law Firm</u>, 352 F.3d at 1125.

Accordingly, names, email addresses, phone numbers and fax numbers were properly withheld under Exemption 6.

## CONCLUSION

For the above-stated reasons, and for those set forth in DHS's Moving Brief, the Court should grant partial summary judgment to DHS and deny Plaintiffs' cross-motion for summary judgment.

Dated: New York, New York
      February 4, 2008

                                        MICHAEL J. GARCIA
                                        United States Attorney for the
                                        Southern District of New York,
                                        Attorney for Defendant
                                        Department of Homeland Security

By: _____
                                        BRIAN M. FELDMAN
                                        JEANNETTE A. VARGAS
                                        Assistant United States Attorneys
                                        EMILY E. DAUGHTRY
                                        Special Assistant United States Attorney
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Telephone No. (212) 637-2777
                                        Facsimile No. (212) 637-2717
                                        Brian.Feldman@usdoj.gov