

# human rights *first*

**MEMORANDUM**

To:     Members of the UN Human Rights Committee

From:   Human Rights First

Date:   June 7, 2006

Re:     Human rights consequences of U.S. counter-terrorism measures since September 11, 2001

Headquarters

333 Seventh Avenue
13" Floor
New York, NY 10001

Tel: (212) 845-5200
Fax: (212) 845-5299

Washington D.C. Office

100 Maryland Avenue, N.E.
Suite 500
Washington, DC 20002

Tel: (202) 547-5692
Fax: (202) 543-5999

www.humanrightsfirst.org

*This document was originally submitted in October 2005 prior to the United States' submission of its Third Periodic Report. It has since been updated as of June 6, 2006.*

Human Rights First welcomes the opportunity to submit information on the human rights consequences of U.S. counter-terrorism measures, including the worldwide detention of individuals by the United States since September 11, 2001. Despite a number of improvements in U.S. practices following the revelations of torture and abuse at the Abu Ghraib detention facility in Iraq in April 2004, the United States still fails to comply with key obligations under the International Covenant on Civil and Political Rights (ICCPR), for which this Committee is charged with monitoring compliance. This submission focuses on key areas in which U.S. conduct falls short of ICCPR requirements.

This submission begins by discussing the scope and applicability of international human rights law in various aspects of what the United States has called the "global war on terror," and discusses recent U.S. actions in the larger context of international humanitarian law. Section II focuses on two key areas in which the United States has failed to comply with its obligations under the ICCPR, namely the prohibition of torture and cruel, inhuman and degrading treatment, and the prohibition against arbitrary detention. A list of proposed questions to ask of the United States regarding the scope and application of the ICCPR and the United States' adherence to these prohibitions follows at the end of the submission.

## I.   LEGAL BACKGROUND

We recognize that the Human Rights Committee (HRC) is tasked specifically with monitoring State compliance with the ICCPR, and has stressed the importance of receiving information relevant to the implementation of the ICCPR. With that in mind, we still believe it is helpful to begin with some brief legal background on the several overlapping bodies of laws applicable to the United States' actions in the "war on terror," including both international human rights law, as well as key international humanitarian law (IHL) provisions. We do this in part to put in context the United States' assertions in recent years that international human rights law does not apply alongside international humanitarian law in the "global war on terror."[1]

By framing a variety of disparate actions (such as the war in Afghanistan, which is clearly governed by IHL, and the rendering of individuals from the Gambia to the U.S. Naval Base at Guantanamo Bay, Cuba, (Guantanamo) which is almost as clearly not an element of armed conflict subject to IHL) under the singular rubric of "global war on terror," the United States has sought to limit its legal obligations, if any, to those contained in IHL, to the exclusion of international human rights law. We believe this argument is incorrect, and that both IHL and international human rights law work in tandem to constrain U.S. actions in and outside the context of traditional international armed conflict. Further, we believe that the United States' efforts to elide these bodies of law have contributed to its violations of both IHL and international human rights law that are the subject of our analysis below.

This section thus begins by noting what bodies of law are applicable to the variety of U.S. actions since September 11, 2001. It then focuses on the application of and the protections provided under international humanitarian law with respect to the detention and treatment of detainees in both international and non-international armed conflict (the situations governed by IHL) in order to contextualize U.S. arguments.

Bodies of Law Applicable to "Global War on Terror"
International humanitarian law (IHL)—primarily encompassed in the four Geneva Conventions of 1949 and the two Additional Protocols of 1977 and in customary international humanitarian law[2]—applies to armed conflict, be it international or non-international in nature. IHL defines "international armed

---

[1] Add'l Response of the United States to Request for Precautionary Measures-Detainees in Guantanamo Bay, Cuba at 3-5, July 15, 2002 *available at* http://www.ccr-ny.org/v2/legal/september_11th/docs/7-23-02GovtResponsetoObservations_andIACHR_Decision.pdf (last visited Oct. 11, 2005); *see also* Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operational Considerations 6 (Apr. 4, 2003), *available at* http://www.defenselink.mil/news/Jun2004/d20040622doc8.pdf (last visited Oct. 8, 2005) (stating that the ICCPR "does not apply to operations of the military during international armed conflict").
[2] The United States is a party to the four Geneva Conventions of 1949. *See* Geneva Convention [I] for the Amelioration of the Condition of the Wounded and Sick in the Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention [II] for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of the Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 7 U.N.T.S. 85;
Convention [III] Relative to the Treatment of Prisoners of War, Aug, 12, 1949, 6 U.S.T. 3116, 75 U.N.T.S. 135 [hereinafter Third Geneva Convention]; Geneva Convention [IV] Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949 6 U.S.T. 3516, 75 U.N.T.S. 287 [hereinafter Fourth Geneva Convention]. It is not a party to the two Additional Protocols, but important segments of Additional Protocol I are widely regarded as customary international law. *See generally*, JEAN-MARIE HENCKAERTS & LOUISE DOSWOLD-BECK, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW (2005); *see also* William H. Taft, IV, *Symposium: Current Pressure on Int'l Humanitarian Law: The Law of Armed Conflict After 9/11: Some Salient Features*, 28 YALE J. INT'L L. 319, 322-23 (2003) (arguing that Article 75 of Additional Protocol I is customary international law). Mr. Taft was the Legal Advisor of the U.S. State Department from 2001 to 2005.

conflict" as "any difference arising between two States and leading to the intervention of armed forces...even if one of the Parties denies the existence of a state of war."[3] "Non-international armed conflict," broadly, exists when armed groups engage in hostilities against a State, or against one another within a State, and where those hostilities exceed the scope of internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature.[4] IHL does not apply to the detention and treatment of individuals outside the context of an international or non-international armed conflict.

International human rights law and domestic law regulating the detention and treatment of individuals continue to have binding force even where IHL is applicable.[5] International human rights law in particular applies in international and non-international armed conflicts insofar as it does not conflict with relevant provisions of international humanitarian law and has not been made the subject of derogation in accordance with the requirements laid out in any applicable treaty.[6]

When governments act outside of the context of an international or non-international armed conflict, such as when the U.S. detains an individual in Sarajevo or the Gambia and transfers him to Guantanamo,[7] international human rights law, domestic law, and in some cases international criminal law all regulate the detention and treatment of individuals.

IHL in International Armed Conflict
As noted above, international armed conflict is defined in the Geneva Conventions as "any difference arising between two States and leading to the intervention of armed forces...even if one of the Parties denies the existence of a state of war."[8] The war in Afghanistan beginning in October 2001 and the war in Iraq beginning in March 2003 are both clearly international armed conflicts under this definition.

---

[3] THE GENEVA CONVENTIONS OF AUG. 12, 1949: COMMENTARY I GENEVA CONVENTION 32 (Jean Pictet ed. 1994).

[4] THE GENEVA CONVENTIONS OF AUG. 12, 1949: COMMENTARY III GENEVA CONVENTION 36 (Jean Pictet ed. 1994).

[5] For a discussion of how U.S. domestic law applies to aspects of U.S. detention and interrogation operations in the "global war on terror," see *Hamdi v Rumsfeld*, 542 U.S. 507 (2004); *Rasul v Rumsfeld*, 542 U.S. 466 (2004).

[6] As a body of *lex specialis*, international humanitarian law would prevail over conflicting provisions of a body of *lex generalis*, or a body of law which is generally applicable, such as international human rights law. For example, during an international armed conflict, a combatant is "privileged" to target soldiers of the opposing side. The prohibition against the arbitrary deprival of life under Article 6 of the ICCPR is read in light of the "combatant's privilege in times and places of international armed conflict. *See also* ICJ, Legality of the Threat of Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, § 25 (July 8). Article 4(2) of the ICCPR lists the non-derogable provisions in the treaty. They include the right to life and the right to be free from torture and cruel, inhuman and degrading treatment and punishment.

[7] While U.S. officials have asserted that the Guantánamo prisoners are battlefield detainees who were engaged in combat when arrested, some were arrested in places far from Afghanistan. For example, soon after the camp opened, Guantánamo became home to six Algerians (five claiming naturalized Bosnian citizenship), forcibly transported by U.S. officials from Bosnia to Guantánamo. *See* HUMAN RIGHTS FIRST, ASSESSING THE NEW NORMAL: LIBERTY AND SECURITY FOR THE POST-SEPTEMBER 11 UNITED STATES 53 (2003). Such individuals are obviously not being detained in the context of international armed conflict, which is defined in the Geneva Conventions as the use of armed force between States. See, fn. 3, *supra*. They also cannot be said to be detained in the context of non-international armed conflict so long as the hostilities in question do not surpass the threshold for non-international armed conflict, see text at fn. 23, *supra*, and so long as the parties, affected territory, relationship of events to the conflict and time frame of the conflict cannot be identified, *see*, Gabor Rona, *Interesting Times for International Humanitarian Law: Challenges from the "War on Terror*, 17 TERRORISM & POL. VIOLENCE 157 (2005).

[8] THE GENEVA CONVENTIONS OF AUG. 12, 1949: COMMENTARY I GENEVA CONVENTION 32, *supra* note 3.

All persons detained during international armed conflict are "protected" under either Geneva Convention III (prisoners of war), or Geneva Convention IV (civilians), or under the customary provisions of Article 75 of Additional Protocol I.[9] No one detained in the context of an international armed conflict falls outside of the protections of treaty or customary international humanitarian law.[10]

In international armed conflict, detained members of the opposing military forces are generally entitled to prisoner of war status and treatment under the Third Geneva Convention.[11] Lawful combatants have the right to participate directly in hostilities.[12] They may not be prosecuted for engaging in lawful acts of war. They may, however, be interrogated, held until the end of the hostilities and tried for criminal conduct.[13] Prisoners of war may not be subjected to inhumane treatment.[14]

Individuals who are not members of the opposing military forces and take no part in hostilities, as well as those who do take direct part in hostilities (variously called unlawful combatants or unprivileged belligerents) are generally entitled to civilian status and treatment under the Fourth Geneva Convention.[15] Such individuals, including unlawful combatants, who fulfill the nationality criteria laid out in the Fourth Geneva Convention, are protected under that Convention.[16] Individuals who do not fulfill the nationality criteria, at a minimum remain protected by the provisions of Common Article 3 of the Geneva Conventions and article 75 of Additional Protocol I as treaty or customary international law.[17]

---

[9] THE GENEVA CONVENTIONS OF AUG. 12, 1949: COMMENTARY IV GENEVA CONVENTION 51 (Jean Pictet ed. 1994). "[It is] a general principle which is embodied in all four Geneva Conventions of 1949 [that] every person in enemy hands must have some status under international law…*There is no* intermediate status; nobody in enemy hands can be outside of the law." In addition, Additional Protocol I, Article 75, applies "fundamental guarantees" to persons "who do not benefit from more favourable treatment under the Conventions or under this Protocol." *See* Protocol Additional to the Geneva Conventions of 12 Aug 1949 and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3 [hereinafter Additional Protocol I]. This point has been stated on more than one occasion by former legal adviser to the State Dep't, William H. Taft, IV. Taft, *supra* note 1, at 320-23.
[10] *Id.*
[11] Some authorities assert that all members of the armed forces are entitled to prisoner of war status, in accordance with the Third Geneva Convention, art. 4(A)(1). Others assert that the provisions of the Third Geneva Convention, Art. 4(A)(2)(a) through 4(A)(2)(d), applicable on its face to members of militia and other volunteer corps that do not form part of the armed forces, apply equally to members of the armed forces. In any event, detainees who have not had their status determined by a "competent tribunal" in accordance with Article 5 of the Third Geneva Convention are entitled to prisoner of war treatment. *See* Third Geneva Convention, *supra* note 2, at arts. 4(A), 5.
[12] Additional Protocol I, *supra* note 9, at art. 43(2).
[13] Third Geneva Convention, *supra* note 2, at arts. 102, 118, 119.
[14] *Id*, at art. 13.
[15] Fourth Geneva Convention, *supra* note 2, at art. 4.
[16] *See* Opinion on the Possible Need for Further Development of the Geneva Conventions, Eur. Comm'n for Democracy through Law (Venice Comm'n), Op. No. 245/2003, CDL-AD(2003) 18 *available at* http://www.venice.coe.int/docs/2003/CDL-AD(2003)018-e.pdf (last visited Oct. 5, 2005); *Cf* Adam Roberts, The Laws of War in the War on Terror, Terrorism and the Military, International Legal Implications, Wybo P. Heere (ed), TMC Asser Press, 2003, 65-92 (arguing that unlawful combatants are only protected under Article 75 of Additional Protocol I and Common Article 3).
[17] *See* Third Geneva Convention, *supra* note 2, at art. 3; *see also* Protocol Additional to the Geneva Conventions of 12 Aug 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts art. 75, June 8, 1977, 1125 U.N.T.S. 609 [hereinafter Additional Protocol II]; Taft, *supra* note 1, at 322-23 (arguing that Article 75 of Additional Protocol I is customary international law).

Individuals who are not members of the opposing military forces, including unlawful combatants, may be interned for "imperative reasons of security."[18] They have a right to appeal the decision of their internment without delay and to have that decision reconsidered every six months, if possible.[19] They must be released once the security concerns necessitating internment no longer exist, unless they are serving a lawful sentence.[20] In addition, civilians may be interrogated and prosecuted under the detaining state's domestic law for direct participation in hostilities and for any other acts that are illegal under domestic or international criminal law.[21] Detained civilians are at a minimum protected against violence to life and person, outrages upon personal dignity, torture and cruel, humiliating and degrading treatment.[22]

IHL in Non-International Armed Conflict
Determining the existence of non-international armed conflict can be more complicated than determining the existence of international armed conflict. As noted, non-international armed conflict exists when armed groups engage in hostilities against a State, or against one another within a State, and where those hostilities exceed the scope of internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature.[23] To the extent the present hostilities in Iraq and Afghanistan continue to amount to armed conflict, they are of a non-international nature, as they no longer consist of one State using armed force against another.[24]

IHL treaty provisions regulating detention in non-international armed conflict are minimal. All persons detained during a non-international armed conflict are protected under Common Article 3 of the Geneva Conventions and customary international humanitarian law. Common Article 3 prohibits cruel treatment, torture, mutilation, violence to life, outrages upon personal dignity, humiliating and degrading treatment, taking of hostages, and the passing of sentences without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.[25] In addition, persons participating in the non-international armed conflict can be tried for acts of belligerency under domestic laws.[26]

## II.   UNITED STATES' FAILURE TO COMPLY WITH ICCPR

### A. TREATMENT OF DETAINEES

---

[18] Fourth Geneva Convention, *supra* note 2, at arts. 41, 78.
[19] *Id.*
[20] *Id.,* at art. 132.
[21] *See* Opinion on the Possible Need for Further Development of the Geneva Conventions, *supra* note 16.
[22] Fourth Geneva Convention, *supra* note 2, at art. 3
[23] THE GENEVA CONVENTIONS OF AUG. 12, 1949: COMMENTARY III GENEVA CONVENTION 36, *supra* note 4.
[24] See, text at fn 7, *supra*.
[25] Third Geneva Convention, *supra* note 2, at art. 3; *see also* Additional Protocol II of 1979 also governs non-international armed conflict, but the United States is not a party to the treaty. Additional Protocol II, *supra* note 17.
[26] Rona, *supra* note 7.

ICCPR Article 7 prohibits the United States from subjecting detainees to torture, or to cruel, inhuman, or degrading treatment or punishment.[27] Article 10 requires that all detainees be treated with humanity and with respect for the inherent dignity of the human person.[28] To that end, the treaty imposes on the United States a non-derogable duty to prevent torture, and cruel, inhuman and degrading treatment and to punish those found in violation of this obligation.[29]

This section discusses the United States' argument that the ICCPR does not apply extraterritorially. It then turns to a discussion of how the United States, by providing vague legal guidance and inadequate training on treatment of detainees to deployed soldiers, has failed to prevent torture and cruel, inhuman and degrading treatment of detainees in its custody. Lastly, this section details how the United States has failed to meaningfully punish those responsible for implementing policies leading to the torture and cruel, inhuman and degrading treatment of individuals in U.S. custody.

Scope of Application of the ICCPR
The United States claims that the ICCPR, in its entirety, does not apply outside the territory of the United States, including at the U.S. Naval Station in Guantanamo Bay, Cuba.[30] In making its argument, the United States points first to the ordinary meaning of the treaty, and second to the language in the *travaux préparatoires* (the negotiating history) of the Covenant. But a look at U.S. law defining what is within the territory of the United States indicates that the United States' obligations under the ICCPR do extend to individuals held in U.S. military custody.

U.S. statutes and case law consider U.S. overseas military bases to be within the territory of the United States. Under 18 U.S.C. § 7(9)(A), for purposes of asserting criminal jurisdiction over offenses committed *by or against* a national of the United States, "the premises of United States…military…including the buildings, parts of buildings, and land appurtenant" are considered within the United States' special maritime and territorial jurisdiction. Indeed, the United States is asserting jurisdiction over alleged illegal conduct taking place by a U.S. national, David Passaro, a CIA contractor at a U.S. military base in Afghanistan, arguing to a U.S. federal court that the U.S. military base in Afghanistan is within the special maritime and territorial jurisdiction of the United States.[31]

In particular, the U.S. Supreme Court in *Rasul v Bush*, in holding that U.S. federal courts do have the jurisdiction to hear challenges by Guantanamo detainees to the legality of their detention, described

---

[27] International Covenant on Civil and Political Rights (ICCPR), Dec. 16, 1966, art. 7, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976), *available at* http://www.unhchr.ch/html/menu3/b/a_ccpr.htm (last visited Oct. 17, 2005) [hereinafter ICCPR], at art. 7.
[28] *Id.*, at art. 10(1).
[29] *Id.*, at art. 7; *see also* UN Human Rights Comm., General Comment No. 20, Replaces General Comment 7 Concerning Prohibition of Torture and
Cruel Treatment or Punishment (Art. 7), at ¶ 11, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1994) [hereinafter General Comment 20], *available at*
http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/6924291970754969c12563ed004c8ae5?Opendocument (last visited Oct. 5, 2005); UN Human Rights Comm., General Comment No. 21, Replaces General Comment 9 Concerning Humane Treatment of Persons Deprived of Liberty (Art. 10), at ¶ 7, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1992) [hereinafter General Comment 21], *available at* http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/3327552b95111fb98c12563ed004cbc59?Opendocument (last visited Oct. 5, 2005).
[30] *See* Third Periodic Report of United States to Human Rights Committee, at Annex I, U.N. Doc. CCPR/C/USA/3 (2005).
[31] Indictment, United States v David A. Passaro, No. 04-211 (E.D.N.C. June 17, 2004).

Guantanamo Bay as "a territory over which the United States exercises plenary and exclusive jurisdiction."[32] The majority opinion went onto state: "Whatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within 'the territorial jurisdiction' of the United States."[33]

Failure to Prevent Torture and Cruel, Inhuman and Degrading Treatment
Since September 11, 2001, the United States has failed to prevent the torture and cruel, inhuman and degrading treatment of detainees in its custody. In particular, the United States' failure to provide deployed military personnel with adequate training and clear guidance, coupled with its replacement of applicable bodies of law with vague and frequently changed Executive policies contribute to the torture and cruel, inhuman and degrading treatment of detainees in U.S. custody.[34]

As a result, nearly 100 detainees have died in U.S. custody since 2002 in Iraq and Afghanistan.[35] Of those, at least 45 detainees died in U.S. custody due to suspected or confirmed criminal homicides.[36]

Current policy on the treatment of detainees is based in part on a February 7, 2002 Presidential order by which the President declined to recognize as binding as a matter of law the Geneva Convention protections to detainees deemed to be al Qaida or Taliban.[37] Instead, the President required only humane treatment to the extent consistent with military necessity.[38] Although the President mandated that detainees be treated "in a manner consistent with the principles of Geneva," he gave no indication of how those principles were to be implemented in the absence of *de jure* applicability of the Conventions themselves.[39] This order removed decades of military training on Geneva-based legal interrogation and detention methods without replacing it with any identified legal structure.

The lack of clarity on the applicable laws pertaining to the treatment of detainees was exacerbated as the United States began authorizing interrogation techniques for use at Guantanamo that violated the

---

[32] Rasul v Bush, 542 U.S. 466.
[33] *Id.* at 480.
[34] *See* HUMAN RIGHTS FIRST, GETTING TO GROUND TRUTH (2004) *available at* http://www.humanrightsfirst.org/us_law/PDF/detainees/Getting_to_Ground_Truth_090804.pdf (last visited Oct. 17, 2005); *see also* Maj. Gen. George R. Fay, AR 15-6 INVESTIGATION OF INTELLIGENCE ACTIVITIES AT ABU GHRAIB, Aug. 25, 2004, at 66 [hereinafter FAY REPORT]; Maj. Gen. Antonio Taguba, AR 15-6, INVESTIGATION OF THE 800TH MILITARY POLICE BRIGADE (Feb. 2004) [hereinafter TAGUBA REPORT]; FINAL REPORT OF THE INDEP. PANEL TO REVIEW DOD DETENTION OPERATIONS 34-38, app. E (Aug. 2004) [hereinafter SCHLESINGER REPORT]; Vice Adm. Albert T. Church III, EXEC. SUMM. OF REPORT ON DEP'T OF DEFENSE (DOD) INTERROGATION OPERATIONS (UNCLASSIFIED) 4-6 [hereinafter CHURCH REPORT], *available at* http://www.defenselink.mil/news/Mar2005/d20050310exe.pdf (last visited Oct. 5, 2005) (full report classified).
[35] Human Rights First, COMMAND'S RESPONSIBILITY: DETAINEE DEATHS IN U.S. CUSTODY IN IRAQ AND AFGHANISTAN (Feb. 2006), *available at* http://www.humanrightsfirst.org/command.
[36] *Id.* In submissions to the CAT Committee, the United States stated that there were 120 deaths of detainees under Department of Defense control in Afghanistan and Iraq. *See* Response of the United States to List of Issues to be Considered During the Examination of the Second Periodic Report of the United States of America at 72 (2005) *available at* http://www.ohchr.org/english/bodies/cat/docs/AdvanceVersions/listUSA36_En.pdf (last visited June 7, 2006).
[37] Memorandum from President George W. Bush to Vice President Richard Cheney et al. (Feb. 7, 2002), *available at* http://www.humanrightsfirst.org/us_law/etn/gonzales/memos_dir/dir_20020207_Bush_Det.pdf (last visited Oct. 11, 2005).
[38] *Id.*
[39] *Id.*

prohibition on torture and cruel, inhuman and degrading treatment.[40] As early as November 2002, Secretary of Defense Donald Rumsfeld personally approved the use of military dogs to induce fear and exploit individual phobias for the interrogation of a specific detainee at Guantanamo.[41] This along with other legally suspect interrogation methods were authorized for all detainees at Guantanamo on December 2, 2002, when Secretary Rumsfeld approved the use of stress positions, 20-hour interrogations, removal of clothing, deception to make detainees believe the interrogator was from a country known for torture, use of false documents and reports, isolation for up to 30 days and sensory deprivation.[42] Given the expressed reservations of the approved interrogation techniques from senior members of the U.S. military, Secretary Rumsfeld rescinded his authorization of some of the December approved techniques.[43] But yelling at detainees, using multiple interrogators, and deceiving detainees into believing the interrogator was from a country known to torture continued to be authorized policy.[44] These interrogation techniques remained official U.S. policy until April 2003, when a Working Group convened by Secretary Rumsfeld recommended 35 interrogation techniques for use at Guantanamo.[45] On April 16, 2003, Secretary Rumsfeld approved 24 of the 35 recommended interrogation techniques, including isolation for up to 30 days, dietary and environmental manipulation, sleep deprivation, and deceiving detainees into believing they had been transferred to a country that permits torture.[46]

The replacement of clear legal guidance with vague policy and the authorization of legally suspect interrogation techniques create a situation where torture and mistreatment is likely to occur. At least four separate Pentagon investigations found that a lack of clear legal guidance and training contributed to the torture and mistreatment of detainees in U.S. custody.[47] An investigation conducted by U.S. Army Major General George Fay, looking into allegations of abuse at Abu Ghraib, found that "inadequate interrogation doctrine and training…the lack of a clear interrogation policy" resulted in the torture and mistreatment of detainees in Iraq.[48]

Despite this documented failure of the U.S. Government to adequately train and provide legal guidance to the military over the past two years and pervasive evidence that such failure has resulted in widespread torture and cruel, inhuman and degrading treatment of detainees, it remains unclear what, if any, corrective measures have since been taken.[49]

---

[40] Josh White, *Abu Ghraib Tactics Were First Used at Guantanamo*, WASH. POST, July 14, 2005, at A1.
[41] Lt. Gen. Randall M. Schmidt, EXEC. SUMM. OF INVESTIGATION INTO FBI ALLEGATIONS OF DETAINEE ABUSE AT GUANTANAMO BAY, CUBA DETENTION FACILITY 14 *available at* http://www.humanrightsfirst.org/us_law/detainees/schmidt-army-reg-150605.pdf (last visited Oct. 12, 2005)
[42] SCHLESINGER REPORT, *supra* note 34.
[43] CHURCH REPORT, *supra* note 34
[44] SCHLESINGER REPORT, *supra* note 34, at 35, app. E.
[45] Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operational Considerations 6, *supra* note 1.
[46] Memorandum from Secretary of Defense Donald Rumsfeld on Counter-Resistance Techniques in the War on Terrorism to Commander, U.S. Southern Command (Apr. 16, 2003), *available at* http://www.defenselink.mil/news/Jun2004/d20040622doc9.pdf (last visited Oct. 11, 2005).
[47] FAY REPORT, *supra* note 34; TAGUBA REPORT, *supra* note 34; SCHLESINGER REPORT, *supra* note 34; CHURCH REPORT, *supra* note 34.
[48] FAY REPORT, *supra* note 34, at 8.
[49] See Statement of Senator John McCain Amendment on Army Field Manual, July 25, 2005, State News Service.

For example, the President has as yet provided no additional guidance on what laws and regulations do apply to govern U.S. treatment of Taliban and al Qaida detainees. Current U.S. policy statements indicate the ongoing position that the Geneva Conventions do not apply. The Department of Defense is currently revising Army Field Manual 34-52.[50] The revised version is not yet public, and the Department of Defense is reportedly considering including in the Manual a separate, classified list of permissible interrogation techniques that could be used only against so-called "enemy combatants."[51] Although the United States has stated that it now adheres to the recently-passed McCain Amendment banning cruel, inhuman or degrading treatment or punishment, it remains unclear how the Administration will construe the terms cruel, inhuman and degrading.[52]

Lastly, while the U.S. Government has asserted that detainees will be treated humanely as a matter of U.S. policy, it has yet to define humane treatment in any consistent public way.[53] Daniel Dell'Orto, the Deputy General Counsel to the Department of Defense on July 14, 2005, struggled to provide the Senate Armed Services Committee with a definition of humane treatment, and reiterated that humane treatment would be provided only as "consistent with military necessity."[54] More recently, in connection with a confirmation hearings for the post of Deputy U.S. Attorney General, the nominee Timothy Flanigan (previously a legal advisor to the President), was unable to articulate any clear content for this standard of treatment. Indeed, when pressed on the question whether certain techniques, such as waterboarding (simulated drowning), mock executions, physical beatings, and forcing a detainee to assume a painful stress position for an extended period of time were permissible, Flanigan demurred that it depended on the facts and circumstances surrounding its use.[55]

Failure to Ensure Accountability
The United States has failed to adequately discipline or charge individuals, particularly high ranking military and civilian leaders, private contractors, and members of the CIA, implicated in the torture or cruel, inhuman or degrading treatment of detainees by Pentagon investigations and reports of the International Committee of the Red Cross (Red Cross). Numerous sources have documented that detainees in Iraq, Afghanistan and Guantanamo have been subjected to severe beatings which in some cases led to death, to stress positions for long periods of time, mutilation, prolonged solitary confinement, intimidation by dogs, mock electrocutions, sexual humiliation, and to sleep, food and water deprivation.[56]

---

[50] See Hearing of the Personnel Subcommittee of the Senate Armed Services Committee, Military Justice and Detention Policy in the Global War on Terrorism, 109th Cong. (2005) [hereinafter Military Justice Hearings] (response of Daniel J. Dell'Orto, Principal Deputy General Counsel of Department of Defense). (response of Maj. Gen. Thomas J. Romig, Judge Advoc. Gen., United States Army).
[51] Eric Schmitt, *Army, In Manual, Limiting Tactics in Interrogation*, N.Y. TIMES, April 28, 2005, at A1.
[52] *See* Response of the United States to List of Issues to be Considered During the Examination of the Second Periodic Report of the United States of America at 110-11 (2005) *available at* http://www.ohchr.org/english/bodies/cat/docs/AdvanceVersions/listUSA36_En.pdf (last visited June 7, 2006).
[53] Military Justice Hearings, *supra* note 50.
[54] *Id.*
[55] Responses by Timothy Flanigan, Nominee to be Deputy Attorney General to Written Questions by Senator Richard J. Durbin *available at* http://balkin.blogspot.com/flanigan.durbin.pdf (last visited Oct. 17, 2005).
[56] *See Arkan Mohammed Ali, et al. v. Donald Rumsfeld*, (D.D.C., filed Mar. 1, 2005) (copy available at http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf); 151 CONG. REC. S2478-02 (daily ed. Mar. 10, 2005); Charlie Savage, *Files Suggest US Troops Tried to Hide Abuses*, Boston Globe, Feb. 18, 2005, at A1; Tim Golden, *Abuse Cases Open Command Issues at Army Prison*, N.Y. Times, Aug. 8, 2005, at A1; Donovan Webster, *The Man*

There have been a large number of investigations of such conduct by the U.S. military as of January 2006 – nearly 600 criminal investigations examining allegations of mistreatment of detainees – but the scope, nature, and thoroughness of the investigations are suspect, and the punishments typically inadequate. Allegations against 250 Soldiers have been addressed in courts-martial, non-judicial punishments, and other adverse administrative punishments.[57]

Further, there is evidence of responsibility for the torture and cruel, inhuman and degrading treatment of detainees at the higher levels of the U.S. Government, but no high ranking military officer or civilian commander has been punished and there has been minimal investigation of high level officials.[58] To Human Rights First's knowledge, the highest ranking military official to be judicially punished is at the rank of Major.[59] Only one of the 12 high-level U.S. government investigations conducted into detention and interrogation operations in Iraq, Afghanistan and Guantanamo was tasked with assessing accountability of senior Department of Defense officials,[60] and this study was limited to the role of military forces in detention and interrogation and suffered badly from an absence of real independence—the panel having been handpicked by the current Secretary of Defense.[61] Indeed many of these officials have been rewarded with promotions, including Alberto Gonzales, who was promoted from White House Counsel to U.S. Attorney General.[62]

Numerous sources, including Pentagon investigations and Red Cross reports also implicate private contractors and officials from "Other Government Agencies," commonly understood to be a reference to the CIA, in torture and cruel, inhuman and degrading treatment.[63] CIA officials have been involved in rendering individuals to third countries where they are likely to be tortured. Reportedly 100-150 individuals have been rendered from U.S. custody to a foreign country known to torture prisoners, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.[64] In spite of those reports, only one CIA contractor has been tried for his role in the death of a prisoner in Afghanistan.[65] No other private

---

*in the Hood*, Vanity Fair, Jan. 24, 2005, *available at* http://www.vanityfair.com/commentary/content/articles/050124roco01 (last visited Oct. 5, 2005).

[57] *See* Email from Maj. Wayne Marotto to Priti Patel, Fri 1/20/2006 5:10 PM; Francis J. Harvey and Peter J. Schoomaker, *Detainee Details*, NAT'L REVIEW ONLINE, Sept. 22, 2005, *available at* http://www.nationalreview.com/comment/harvey_schoomaker200509220821.asp (last visited Oct. 6, 2005); Monica Davey, *An Iraqi Police Officer's Death, A Soldier's Varying Accounts*, N.Y. TIMES, May 23, 2005, at A1; News Transcript, Dep't of Defense, DoD News Briefing (June 1, 2005), *available at* http://www.defenselink.mil/transcripts/2005/tr20050601-secdef2981.html (last visited Oct. 8, 2005).

[58] *See Arkan Mohammed Ali, et al. v. Donald Rumsfeld*, (D.D.C., filed Mar. 1, 2005) (copy available at http://www.humanrightsfirst.org/us_law/etn/lawsuit/PDF/rums-complaint-022805.pdf.

[59] *Detainee Details*, *supra* note 57; *An Iraqi Police Officer's Death, A Soldier's Varying Accounts*, *supra* note 57.

[60] *See* SCHLESINGER REPORT, *supra* note 34, at app. A.

[61] GETTING TO GROUND TRUTH, *supra* note 34, at 2.

[62] For other high level officials implicated in the abuse scandal who have been promoted, *see* Human Rights First, *One Year Later: Where are They Now* (2005), http://www.humanrightsfirst.org/us_law/etn/misc/where_now.htm.

[63] *See* CHURCH REPORT, *supra* note 34, at 17-19; FAY REPORT, *supra* note 34, at 52-55; SCHLESINGER REPORT, *supra* note 34, at 70.

[64] Douglas Jehl & David Johnston, *Rule Change Lets CIA Freely Send Suspects Abroad to Jails*, N.Y. TIMES, Feb. 6, 2005, at A1; Jane Mayer, Outsourcing Torture, NEW YORKER, Feb. 14, 2005, *available at* http://www.newyorker.com/fact/content/?050214fa_fact6 (last visited Oct. 5, 2005).

[65] *See* Indictment, United States v David A. Passaro, No. 04-211 (E.D.N.C. June 17, 2004).

contractor or CIA official has been sanctioned for subjecting detainees to torture or cruel, inhuman or degrading treatment.

### B.    ARBITRARY DETENTION

The ICCPR prohibits arbitrary detention and requires the United States to provide detainees with a meaningful opportunity to challenge the legality of their detention, to detain individuals only according to procedures established by law, and to provide detainees with reasons for their detention upon arrest.[66] Closely connected to the ICCPR's prohibition of torture, and cruel, inhuman, and degrading treatment and punishment, and of arbitrary detention, is the obligation on states to maintain a transparent detention system. Requirements include maintaining officially recognized places of detention, keeping registers of all in custody, and disclosing the names of all individuals detained to their families.[67]

As of June 2005, 68,000 people had been taken into U.S. custody since 2002, and about 30,000 of those were entered "into the system" and assigned internment serial numbers in Iraq, Guantanamo, and Afghanistan.[68] According to the Department of Defense, as of February 2006, the United States was holding 14,389 detainees in Iraq, 400 in Afghanistan, approximately 490 at Guantanamo Bay and one enemy combatant in the United States.[69] Approximately 36 detainees are believed to be held in secret detention locations throughout the world.[70]

All of these individuals in U.S. custody continue to be detained indefinitely at Guantanamo, in Iraq and Afghanistan, and elsewhere, outside of clearly established legal procedures. Despite favorable rulings from a number of federal courts, including the U.S. Supreme Court, detainees remain without a meaningful opportunity to challenge the legality of their detention. In addition, most detainees held by the United States have never been provided with particular reasons for their detention.

This section thus addresses the lack of a clear legal status for individuals detained at Guantanamo, in Iraq and Afghanistan, and at secret detention locations; the inadequate opportunity for detainees to challenge the legality of their detention; and the general secrecy surrounding U.S. detention operations.

Lack of Clear Legal Status

---

[66] ICCPR, *supra* note 27, at art. 9; *see also* General Comment 21, *supra* note 29.
[67] General Comment 20, *supra* note 29, at ¶ 11.
[68] News Transcript, Dep't of Defense, DoD News Briefing (June 1, 2005), *available at* http://www.defenselink.mil/transcripts/2005/tr20050601-secdef2981.html (last visited Oct. 5, 2005); Kathleen T. Rhem, *Army Improving Procedures For Handling Detainees*, AMER. FORCES PRESS SERVICE, Feb. 25, 2005, *available at* http://www-tradoc.army.mil/pao/TNSarchives/February05/025305.htm (last visited Oct. 5, 2005) (quoting Donald J. Ryder, Army's provost marshal general).
[69] Assoc. Press, *Details on Detainees in US Custody in Iraq*, Feb. 15, 2006, *available at* http://www.oregonlive.com/newsflash/iraq/index.ssf?/base/international-29/1140072383272540.xml&storylist=oriraq; U.S. Responses to Questions by CAT Committee available at http://www.us-mission.ch/Press2006/CAT-May5.pdf (last visited May 8, 2006); Josh White, *U.S. Frees 7 Afghans From Guantanamo*, WASH. POST, Feb. 10, 2006, A14; Andrew Zajac, *Legal Battle Plods Along for `Enemy Combatant,'* CHI. TRIB., Feb 10, 2006, *available at* http://www.mercurynews.com/mld/mercurynews/news/politics/13839118.htm
[70] Douglas Jehl, *Questions Left by C.I.A. Chief on Torture Use*, N.Y. TIMES, March 18, 2005, at A1.

There are no clearly established procedures under the law for the detention of individuals in Iraq, Afghanistan, Guantanamo, or in secret detention locations.[71] As Human Rights First has documented, the legal status of detainees in Iraq, Afghanistan and Guantanamo Bay continues to be subject to change partly in response to changing Administration policy, adverse judicial decisions, and growing pressure within the U.S. Congress to clarify the legal status of detainees.[72]

Since 2002, detainees in Afghanistan have been defined variously as "unlawful combatants," "enemy combatants," "unprivileged belligerents," or civilian internees.[73] Only the last of these designations is a defined legal category in international law. The Defense Department asserts that the United States holds detainees in Afghanistan under the legal authority of United Nations Security Council Resolutions 1368, 1373, and 1566 directing States to take necessary steps to prevent the commission of terrorist acts."[74] The United Nations Security Council resolution does not provide clear authority for the United States to detain individuals in Afghanistan, nor does it provide clearly established procedures for detention under the law.

In Iraq, the claimed legal status of U.S.-held detainees has shifted repeatedly throughout the United States' most recent involvement in the country. Since the transfer of sovereignty to the Iraqi Government, the United States as of March 2005 officially held only "security detainees," under United Nations Security Council Resolution 1546 and 1637, which recognizes Iraq's request for ongoing security assistance and gives multinational forces "the authority to take all necessary measures to contribute to the maintenance of security…in Iraq."[75] As with those detained in Afghanistan, the United Nations Security Council Resolution does not provide clear procedures established by law for the detention of individuals in Iraq.

President Bush has variously labeled those detained at Guantanamo as "enemy" or "unlawful combatants," a status without clear legal significance as applied by the Administration. U.S. Supreme Court Justice Sandra Day O'Connor in her plurality decision in *Hamdi v. Rumsfeld*, stated "[t]here is some debate as to the proper scope of this term, and the Government has never provided any court with the full criteria that it uses in classifying individuals as such."[76] More recently, Daniel Dell'Orto, Deputy General Counsel for the Department of Defense struggled to provide the Senate Armed Services Committee a legal definition of "enemy combatant."[77]

---

[71] International humanitarian law recognizes the right of parties to international armed conflict to detain members of enemy armed forces and civilians. However, neither the armed conflicts in Afghanistan or Iraq, nor the "global war on terror" are, at present, international armed conflicts. The term "international armed conflict" is understood in international humanitarian law to mean the use of armed force by one state against another.
[72] *See* Human Rights First, BEHIND THE WIRE 1-12 (Mar. 2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (last visited June 7, 2006) [hereinafter BEHIND THE WIRE]; Human Rights First, ENDING SECRET DETENTIONS 7-17 (June 2004), *available at* http://www.humanrightsfirst.org/us_law/PDF/EndingSecretDetentions_web.pdf (last visited Oct. 4, 2004); Military Justice Hearings, *supra* note 50.
[73] BEHIND THE WIRE, *supra* note 72, at 3-4.
[74] *Id.*
[75] *Id.*, at 4-6. The mandate for the Multi National Forces under SCR 1546 was extended under SCR 1637 passed in 2005. *See* Security Council Resolution 1637 *available at* http://www.un.org/Docs/sc/unsc_resolutions05.htm (last visited Apr. 20, 2006).
[76] Hamdi v Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2639 (2004).
[77] Military Justice Hearings, *supra* note 50.

Right to Challenge Detention
Notwithstanding proceedings on behalf of Guantanamo detainees in U.S. federal court, which are actively opposed by the U.S. Government, none of the U.S.-held detainees has been provided a meaningful opportunity to challenge the legality of detention. Detainees in Afghanistan, Iraq and Guantanamo are provided some access to a mix of military, administrative, and judicial proceedings, while detainees held elsewhere apparently have no access to any even flawed proceeding in which to challenge the legality of their detention.[78]

Detainees in Afghanistan are provided with the most minimal process. The Combatant Commander under the authority of U.S. Central Command, reviews the status of detainees in U.S. custody.[79] The initial review by the detaining Combatant Commander is supposed to take place within the first 90 days of capture. Following that initial determination, the detaining Combatant Commander reviews each detainee's status on an annual basis.[80] It remains unclear on what basis the Combatant Commander makes these decisions.

In Iraq, the United States established the Combined Review and Release Board in August 2004 to consider the detention of particular detainees. The board—made up of six members of the Iraqi Government and three members of the Multi-National Forces—is tasked with determining whether a detainee poses a security risk. The detainee is not present as the board only reviews each detainee's file and is to consider several factors, including "circumstances of the detainee's capture, the length of detention prior to review, the level of cooperation by the detainee, and the detainee's potential for further acts of anti-Iraqi misconduct if released."[81] The board then recommends the release, release with a guarantor, or continued detention, but a final decision is made by the Multi-National Force's Deputy Commanding General for Detainee Affairs.[82] The detainee never has an opportunity to present his case or respond to accusations against him.

At Guantanamo, the United States established Combatant Status Review Tribunals (CSRTs)—while contesting the right of detainees there to full habeas proceedings in the U.S. federal courts—in order to determine whether detainees are indeed "enemy combatants." It has also established an Administrative Review Board, tasked with revisiting the status of those who continue to be held at Guantanamo.[83] Human Rights First has been the only non-governmental organization to observe CSRT proceedings,

---

[78] BEHIND THE WIRE, *supra* note 72, at 3-9.
[79] U.S. Second Periodic Report to CAT Committee, June 29, 2005, p. 57, CAT/C/48/Add.3.
[80] *Id.*
[81] *Iraqi Board Reviews 300 Cases During First Week*, AMER. FORCES PRESS SERVICE, Aug. 29, 2004, *available at* http://www.defenselink.mil/news/Aug2004/n08292004_2004082903.html (last visited Oct. 4, 2005); News Release, CENTCOM, Detainee Release Board Takes on Iraqi Partners (Aug. 16, 2004), *available at* http://www.centcom.mil/CENTCOMNews/News_Release.asp?NewsRelease=20040848.txt (last visited Oct. 4, 2005).
[82] *Iraqi Board Reviews 300 Cases During First Week*, *supra* note 81; News Release, CENTCOM, Detainee Release Board Takes on Iraqi Partners, *supra* note 81.
[83] Background Briefing, Dep.t of Defense, Defense Dep't Background Briefing on Combatant Status Review Tribunal (July 7, 2004), *available at* http://www.defenselink.mil/transcripts/2004/tr20040707-0981.html (last visited Oct. 5, 2005); Press Release, Dep.t of Defense, Transfer of Detainees Completed (Sept. 18, 2004), *available at* http://www.defenselink.mil/releases/2004/nr20040918-1363.html (last visited Oct. 5, 2005).

which we did in November 2004. These hearings began, in many cases, almost three years after the initial detention, making it close to impossible for detainees to advance witnesses and evidence in support of their positions. Thirty-eight detainees were found not to be enemy combatants through the CSRT process.[84] Flaws in the CSRT process were highlighted by Judge Joyce Hens Green in a district court decision.[85] In finding that the CSRTs violated the due process clause of the U.S. Constitution, Judge Green pointed to the failure of the CSRTs to provide detainees with sufficient notice of the factual basis for which they were detained, the inability of detainees to confront evidence against them, the lack of counsel, the possible use of evidence obtained through torture, and the vague overbroad definition of "enemy combatant."[86]

The Administrative Review Boards (ARB) were announced in May 2004 and commenced on December 14, 2004. The military has completed the first round of ARB hearings for all those held at Guantanamo and has embarked on the second round, having completed 113 hearings as of May 16, 2006.[87] The initial ARBs resulted in 14 releases (3 percent), 120 transfers (26 percent) and to continue to detain 329 individuals (71 percent).[88] Not all those slated to be released or transferred have been released or transferred. The ARBs are plagued by the same flaws as the CSRTs.[89]

In addition to the CSRT and ARB process, a handful of detainees held at Guantanamo are being tried before military commissions. The military commissions were first announced in November 2001 and proceedings in four cases began in August 2004.[90] Human Rights First had the opportunity to monitor proceedings in the commission cases at Guantanamo before a federal district court in Washington D.C. stayed the trials partly based on the commission's lack of compliance with international fair trial standards.[91] This decision by the federal district court was overturned by the U.S. Circuit Court of Appeals for the District of Columbia.[92] That Court held that relevant Geneva Convention standards were not "self-executing" and thus could not be enforced by an individual in a U.S. federal court.[93] The Court went on to state that in any case, those standards would not apply, as President Bush had

---

[84] News Release, Dep't of Defense, Detainee Transfer Announced (April 26, 2005), *available at* http://www.defenselink.mil/releases/2005/nr20050426-2821.html (last visited Oct. 5, 2005).
[85] *In re* Guantanamo Detainees, 355 F.Supp.2d 443 (D.D.C. 2005).
[86] *Id.* at 468.
[87] News Release, Dep't of Defense, Administrative Review Board Summary (May 16, 2006), *available at* http://www.defenselink.mil/news/arb2.pdf (last visited June 6, 2006).
[88] Dep't of Defense News Release, *Guantanamo Bay Detainee Administrative Review Board Decisions Completed*, Feb. 9, 2006, available at http://www.defenselink.mil/releases/2006/nr20060209-12464.html
[89] News Release, Dep't of Defense, Defense Department Conducts First Administrative Review Board (Dec. 14, 2004), *available at* http://www.defenselink.mil/releases/2004/nr20041214-1830.html (last visited Oct. 8, 2005).
[90] *See* Charging Statement for David Matthews Hicks, *United States v. Hicks*, *available at* http://www.humanrightsfirst.org/us_law/PDF/detainees/hicks-charges.pdf (last visited Jan. 21, 2005); *see also* Charging Statement for Ibrahim Ahmed Mahmoud al Qosi, *United States v. al Qosi*, *available at* http://www.humanrightsfirst.org/us_law/PDF/detainees/al_Qosi_referral.pdf (last visited Jan. 21, 2005); Charging Statement for Ali Hamza Ahmad Sulayman al Bahlul, *United States v. al Bahlul*, http://www.humanrightsfirst.org/us_law/PDF/detainees/al_Bahlul_referral.pdf (last visited Jan. 21, 2005); Charging Statement Salim Ahmed Hamdan, *United States v. Hamdan*, http://www.defenselink.mil/news/Jul2004/d20040714hcc.pdf (last visited Jan. 21, 2005).
[91] Hamdan v. Rumsfeld, 344 F.Supp.2d 152 (D.D.C. 2004), *overruled by* 415 F.3d 33 (D.C. Cir. 2005).
[92] Hamdan v Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005).
[93] *Hamdan*, 415 F.3d at 40.

determined Geneva was inapplicable to the conflict in Afghanistan.[94] A decision by the U.S. Supreme Court is expected in late June 2006.

The military commissions as currently constituted fail to provide the full fair trial protections required under the ICCPR.[95] Among the failings of the military commission proceedings are the unequal treatment of citizens and non-citizens, the non-independent nature of the tribunal, violation of the principle of legality,[96] the failure to provide adequate facilities for preparation of defense, limited access for the defendant to the evidence against him, and the failure to promptly inform defendant of charges.[97]

Secrecy in Detention

The ICCPR makes clear that all state parties have a duty to institute procedures that will minimize the risk of torture.[98] At the top of the list of required procedures are: maintaining officially recognized places of detention, keeping registers of all in custody, and disclosing the names of all individuals detained to their families.[99]

Since September 11, 2001, the United States has operated a worldwide detention system shrouded in secrecy. In some instances, the detention locations are secret; in other cases, the detention facility is documented, but the individuals held there are kept off of official registers.[100] As of March 2005, there were six main acknowledged U.S. detention facilities worldwide—3 in Iraq, 2 in Afghanistan and Guantanamo.[101] In addition to those acknowledged facilities, there were approximately 25 transient facilities —field prisons designed to house detainees only for a short period until they can be released or transferred to a more permanent facility—in Afghanistan and Iraq.[102] No independent monitors, including the Red Cross, visit detainees in these field prisons.[103]

There are also believed to be at least 9 'secret' detention locations used since September 2001— facilities never acknowledged by the United States. Based on press reports, government documentation, and original research, Human Rights First believes those facilities to be CIA facilities in Afghanistan, Guantanamo, and Jordan, detention facilities in Alizai, Kohat and Peshawar in Pakistan, a facility on the U.S. Naval Base on the island of Diego-Garcia, and detentions of prisoners on U.S. ships, particularly the USS Peleliu and USS Bataan.[104]

---

[94] *Id.*, at 41-43.
[95] ICCPR, *supra* note 27, at art. 14.
[96] *Id.*, at art. 15.
[97] *See* Human Rights First, Trials Under Military Order, May 2006, *available at* http://www.humanrightsfirst.org/us_law/PDF/detainees/trials_under_order0604.pdf (last visited June 5, 2006); Avidan Cover, Military Commission Proceedings Violate International Law, http://www.humanrightsfirst.org/media/2004_alerts/0817.htm.
[98] ICCPR General Comment 20, *supra* note 29, at 11.
[99] *Id.*
[100] *See* BEHIND THE WIRE, *supra* note 72, at 1-10; ENDING SECRET DETENTIONS, *supra* note 72, at 9-14.
[101] *See* BEHIND THE WIRE, *supra* note 72, at 1-10.
[102] *Id.*
[103] *Id.*
[104] *Id.*, at 1-11.

In addition to secret detention locations, the United States has failed to officially register all detainees in its custody. In Iraq, there are believed to have been up to 100 ghost detainees—detainees hidden from Red Cross monitors.[105] As of March 2005, United States still did not maintain a comprehensive register of detainees in custody and of where they were being held or disclose the names of all detainees to their families or to the Red Cross.[106]

Four months after the release of Human Rights First's *Ending Secret Detentions* report in June 2004, Congress enacted legislation in October 2004, requiring the Secretary of Defense to report regularly to the relevant committees in the U.S. House and Senate on the number and nationality of detainees in military custody, as well as on the number of detainees released from custody during the reporting period.[107] In particular, the new law requires the Secretary to provide to the Senate and House Armed Services Committees a report disclosing investigations into violations of domestic or international law regarding detainee treatment; and general information on foreign national detainees in Defense Department custody, including the numbers, nationalities, and average length of detention of such detainees, as well as information regarding detainees who have been released during the year and detainees transferred to the jurisdiction of other countries.[108] Under the legislation the Department of Defense was required to submit this information by July 28, 2005.[109] The information submitted to Congress remains classified.

### III. PROPOSED QUESTIONS FOR THE UNITED STATES

Regarding the scope and application of ICCPR
1. Does the United States believe that its obligations under the ICCPR can be superseded by a Presidential order? If so, can the United States explain in what instances that would be the case?

Regarding the prohibition of torture and cruel, inhuman and degrading treatment
1. What legal guidance is currently provided to U.S. soldiers in Iraq and Afghanistan on what laws are applicable in the interrogation and detention of individuals in U.S. custody? Can the United States provide the Committee with copies of the guidance that is in place?
2. What is the status of the revisions to the Army Field Manual 34-52? When does the United States expect the revisions to be completed? While the revisions are taking place, what regulations are currently in place?
3. Does the same guidance on the legal limits of U.S. detention and interrogation operations that apply to the U.S. Armed Forces also apply to U.S. intelligence agencies, including but not limited to the CIA? Are both torture and cruel, inhuman and degrading treatment prohibited by all U.S. intelligence agencies?
4. What specific interrogation techniques are currently permitted for use on detainees in Guantanamo, Iraq and Afghanistan?

---

[105] *Investigation of the 205th Military Intelligence Brigade At Abu Ghraib Prison: Hearing Before the Senate Armed Services Comm.*, 108th Cong. (2004) (statement of Gen. Paul Kern, Commanding General, United States Army Material Command).
[106] BEHIND THE WIRE, *supra* note 72, at 1-11.
[107] Ronald W. Reagan National Defense Authorization Act, Pub. L. No. 108-375, § 1092, 118 Stat. 2069-70 (2004).
[108] *Id.*
[109] *Id.*

5. What changes in training of military personnel has the United States made in the last two years in response to the widespread torture and cruel, inhuman and degrading treatment documented in Pentagon investigation and Red Cross reports?
6. Does the United States agree that it must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement? What steps have been taken to ensure that individuals are not being sent to third countries where there is a danger of torture or cruel, inhuman or degrading treatment? Does the United States believe diplomatic assurances are sufficient from countries in which torture and cruel, inhuman and degrading treatment and punishment are typically practiced?

Regarding the prohibition against arbitrary detention
1. Do detainees in Afghanistan, Iraq and at secret detention facilities have the opportunity to challenge the legality of their detention? If so, by what means?
2. Does the United States have a comprehensive register of all detainees in custody and where they are being held? How many people are currently being held in U.S. custody around the world?
3. Is there an official family notification policy in place for detainees held by the United States in Afghanistan, Iraq, and at Guantanamo?
4. Under what legal authority is the United States detaining individuals at secret detention locations, Guantanamo, and in Iraq and Afghanistan? What is their legal status?
5. How many detention facilities does the United States operate worldwide, and in what countries are those detention facilities located?