



# Torture by Proxy:
# International and Domestic Law Applicable to "Extraordinary Renditions"

*The Committee on International Human Rights*
*of the Association of the Bar of the City of New York*

*and*

*The Center for Human Rights and Global Justice,*
*New York University School of Law*

© 2004
ABCNY & CHRGJ, NYU School of Law
New York, NY

**Association of the Bar of the City of New York**

The Association of the Bar of the City of New York (www.abcny.org) was founded in 1870, and since then has been dedicated to maintaining the high ethical standards of the profession, promoting reform of the law, and providing service to the profession and the public. The Association continues to work for political, legal and social reform, while implementing innovating means to help the disadvantaged. Protecting the public's welfare remains one of the Association's highest priorities.

**Center for Human Rights and Global Justice**

The Center for Human Rights and Global Justice (CHRGJ) at NYU School of Law (http://www.nyuhr.org) focuses on issues related to "global justice," and aims to advance human rights and respect for the rule of law through cutting-edge advocacy and scholarship. The CHRGJ promotes human rights research, education and training, and encourages interdisciplinary research on emerging issues in international human rights and humanitarian law.

This report should be cited as: Association of the Bar of the City of New York & Center for Human Rights and Global Justice, *Torture by Proxy: International and Domestic Law Applicable to "Extraordinary Renditions"* (New York: ABCNY & NYU School of Law, 2004).

**The Association of the Bar of the City of New York**
**Committee on International Human Rights**

Martin S. Flaherty, Chair*
Jeanmarie Fenrich, Secretary

Patricia C. Armstrong*
Nicole A. Barrett
Hon. Deborah A. Batts**
Aarthi Belani (student member)*
Amy Christina Cococcia
Eric O. Darko*
Linda Ford
Douglas C. Gray
Alice H. Henkin
Sharon K. Hom
Miranda B. Johnson (student member)
Mamta Kaushal
Elise B. Keppler
Katharine Lauer
Sara E. Lesch
Marko C. Maglich
Nina Massen
Sam Scott Miller
David Eli Nachman
Elena Dana Neacsu*
Dyanna C. Pepitone
Christina Marie Posa
Robert J. Quinn
Marny A. Requa
Margaret L. Satterthwaite*
Hina Shamsi*
Mark R. Shulman
Liza May Velazquez
Katherine Zeisel (student member)*

\*    Members of the Committee who participated in the preparation of the Report
\*\*  Took no part in preparation or consideration of this Report

**Acknowledgments**

The Committee and the Center for Human Rights and Global Justice at NYU School of Law thank the following people for their work and/or assistance in the preparation of the Report:

Project director:
Margaret Satterthwaite, Center for Human Rights and Global Justice, NYU School of Law

Principal authors and researchers:
Angelina Fisher, Center for Human Rights and Global Justice, NYU School of Law
Hina Shamsi, ABCNY International Human Rights Committee. Member

Contributing authors:
Bassina Farbenblum, American Civil Liberties Union
Yael Fuchs, Columbia University School of Law (student)
David Lisson, University of Toronto School of Law (student)

Research assistance was provided by:
Aarthi Belani, Institute for International Law and Justice, NYU School of Law (student)
James Boeving, Columbia University School of Law (student)
Elena Dana Neacsu, Columbia University School of Law
Allison Young, Georgetown University School of Law (student)

Advice on the Report, or aspects of it, was provided by:
Paul Chevigny, NYU School of Law
Julia Hall, Human Rights Watch
Smita Narula, Center for Human Rights and Global Justice, NYU School of Law
Center for Constitutional Rights

Substantive review and comment on the Report was provided by:
Natasha Balendra, Center for Human Rights and Global Justice, NYU School of Law
John Cerone, New England School of Law
Paul Chevigny, NYU School of Law
James Cockayne, Institute for International Law and Justice, NYU School of Law (student)
Olivier De Schutter, NYU School of Law
Miles P. Fischer, Chair, ABCNY Military Affairs and Justice Committee
Martin S. Flaherty, Fordham University School of Law; Chair, ABCNY International Human Rights Committee
Scott Horton, Patterson, Belknap, Webb & Tyler, LLP; Chair, ABCNY International Law Committee
Sidney Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison LLP; Chair, ABCNY Civil Rights Committee
Claudia Slovinsky, Law Offices of Claudia Slovinsky; Chair, ABCNY Immigration and Nationality Law Committee

Principal copyeditor:
Patricia Armstrong, Center for Human Rights and Global Justice, NYU School of Law

Copyediting assistance:
Eric O. Darko, International Center for Transitional Justice
Elena Dana Neacsu, Columbia University School of Law
NYU School of Law students: Marissa Alternelson, Ahmen Ghappour, Andrew Hagan, Bryan
D. Kreyes, Erika Mae de Castro Lorenzana, Peter Nelson, Matthew Scott, Matthew Shrumpf,
Derek Soler, and Kathy Zeisel
Fordham University School of Law students: Lauren Attard, Kristen Hiensch, Brian
Honermann, Jason N. Visco and Nicole Washienko.

Web and distribution assistance:
Larissa Annoual, NYU School of Law (student)
Vilas Dhar, NYU School of Law (student)
Joanna Pozen , NYU School of Law (student)

We are also grateful to Nicole Barrett and Sullivan & Cromwell LLP, Sam Scott Miller and
Orrick, Herrington & Sutcliffe LLP, and Sidney Rosdeitcher and Paul, Weiss, Rifkind, Wharton
& Garrison LLP for summer associate assistance on aspects of the Report.

## Acronyms and Other References

| | |
|---|---|
| 9-11 Commission | National Commission on Terrorist Attacks Upon the United States |
| ABCNY | Association of the Bar of the City of New York |
| ACLU | American Civil Liberties Union |
| ATCA | Alien Torts Claims Act |
| AUMF | Authorization for Use of Military Force |
| BIA | Board of Immigration Appeals |
| CAT | Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| CAT Committee | Committee against Torture |
| CBP | Bureau of Customs and Border Protection, Department of Homeland Security |
| CCP | Crimes and Criminal Procedure |
| C.F.R. | Code of Federal Regulations |
| CIA | Central Intelligence Agency |
| CID | Cruel, inhuman or degrading |
| DCI | Director of Central Intelligence |
| DEA | Drug Enforcement Administration |
| DOD | Department of Defense |
| EOIR | Executive Office of Immigration Review |
| FARRA | Foreign Affairs Reform and Restructuring Act |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |
| FTCA | Federal Tort Claims Act |
| Geneva III | Geneva Convention (III) relative to the Treatment of Prisoners of War |
| Geneva IV | Geneva Convention (IV) relative to the Protection of Civilian Persons in Time of War |
| HRC | UN Human Rights Committee |
| INA | Immigration and Nationality Act |
| ICC | International Criminal Court |
| ICCPR | International Covenant on Civil and Political Rights |
| ICJ | International Court of Justice |
| ICRC | International Committee of the Red Cross |
| ICTR | International Criminal Tribunal for Rwanda |
| ICTY | International Criminal Tribunal for the former Yugoslavia |
| ILC | International Law Commission |
| MCM | Manual for Courts-Martial |
| MEJA | Military Extraterritorial Jurisdiction Act |
| NLRA | National Labor Relations Act |
| NSC | National Security Council |
| OAS | Organization of American States |
| PDD | Presidential Decision Directive |
| POW | Prisoner of war |
| Refugee Convention | Refugee Convention of 1951 |
| TPA | Torture Victims Protection Act of 1991 |
| UCMJ | Uniform Code of Military Justice |
| U.S.C. | United States Code |

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 2 |
| II. | | EXECUTIVE SUMMARY | 5 |
| III. | | RECOMMENDATIONS | 7 |
| IV. | | EXTRAORDINARY RENDITIONS: AN OVERVIEW | 8 |

| | | | | | |
|---|---|---|---|---|---|
| | A. | EXTRAORDINARY RENDITIONS – (NOT) A NEW PHENOMENON | | | 8 |
| | B. | EXTRAORDINARY RENDITIONS – CLOAKED IN SECRECY | | | 13 |
| | | *1.* | *"Off the Record": United States Involved in Extraordinary Renditions* | | 13 |
| | | *2.* | *"On the Record": United States Involved in "Renditions to Justice"* | | 15 |
| | | *3.* | *Summary: United States involved in Extraordinary Renditions* | | 18 |
| | C. | EXTRAORDINARY RENDITIONS VIOLATE U.S. LAW | | | 20 |
| | | *1.* | *Extraordinary Renditions and Existing Statutory Law (FARRA)* | | 20 |
| | | *2.* | *Extraordinary Renditions and the Courts* | | 22 |
| | | *3.* | *Extraordinary Renditions and Congress* | | 23 |
| | | *4.* | *Extraordinary Renditions and the Executive Branch* | | 24 |
| | | | (a) | The President's general power as Commander-in-Chief | 24 |
| | | | (b) | Presidential power to authorize covert actions and issue national security directives | 26 |
| | | | (c) | Presidential power to make international agreements | 28 |
| | | *5.* | *Extraordinary Renditions and the CIA* | | 29 |
| V. | | EXTRAORDINARY RENDITIONS VIOLATE INTERNATIONAL LAW | | | 30 |

| | | | | | |
|---|---|---|---|---|---|
| | A. | THE UNITED STATES IS OBLIGATED TO PREVENT EXTRAORDINARY RENDITIONS UNDER THE UN CONVENTION AGAINST TORTURE | | | 35 |
| | | *1.* | *CAT Prohibits Torture and Cruel, Inhuman or Degrading Treatment* | | 35 |
| | | *2.* | *CAT Prohibits the Transfer of Individuals to States Where They May Be in Danger of Torture* | | 36 |
| | | | (a) | Prohibition against transfers to subsequent states | 37 |
| | | | (b) | Standards for determining application of *non-refoulement* obligation to persons in danger of torture | 37 |
| | | | (c) | Types of transfers to which *non-refoulement* obligation applies | 40 |
| | | | (d) | Development of international law on *non-refoulement* | 41 |
| | | *3.* | *CAT Requires States Parties to Prevent, Prosecute and Punish Torture and Complicity to Torture* | | 44 |
| | | *4.* | *Scope of Application of CAT Standards Under International Law* | | 46 |
| | | | (a) | Scope of obligations regarding torture | 46 |
| | | | (b) | Scope of obligations regarding *non-refoulement* | 48 |
| | | *5.* | *The United States' Implementation of CAT* | | 48 |
| | | | (a) | Ratification | 48 |
| | | | (b) | Criminalization of torture | 49 |
| | | | (c) | FARRA Regulations | 50 |
| | | | | (i) Summary Removal | 50 |
| | | | | (ii) Removal | 52 |
| | | | | (iii) Extradition | 52 |
| | B. | THE UNITED STATES IS OBLIGATED TO PREVENT EXTRAORDINARY RENDITIONS UNDER THE ICCPR | | | 54 |
| | | *1.* | *The ICCPR Prohibits Torture, CID Treatment, and* Refoulement | | 54 |
| | | *2.* | *Scope of Application of ICCPR Standards under International Law* | | 56 |
| | | *3.* | *The United States' Implementation of the ICCPR* | | 59 |
| | C. | THE GENEVA CONVENTIONS' PROHIBITIONS OF EXTRAORDINARY RENDITIONS | | | 60 |

|   |   | *1.* | *Geneva III Protections* | 61 |
|   |   | *2.* | *Geneva IV Protections* | 62 |
|   |   | *3.* | *Additional Geneva Convention Protections* | 65 |
|   |   | *4.* | *The Geneva Conventions Require High Contracting Parties to Investigate and Prosecute Torture and Complicity to Torture as War Crimes* | 66 |
|   |   | *5.* | *The United States' Implementation of the Geneva Conventions* | 68 |
|   | D. | | THE REFUGEE CONVENTION'S PROHIBITIONS OF EXTRAORDINARY RENDITIONS | 68 |
|   | E. | | GUIDANCE PROVIDED BY INTERNATIONAL LAW ON CRIMINAL LIABILITY | 70 |
|   |   | *1.* | *Complicity, Conspiracy, and Aiding and Abetting* | 71 |
|   |   | *2.* | *Status of Certain Defenses to Criminal Liability under International Law* | 73 |
|   |   | | (a)    The Doctrine of Command Responsibility | 74 |
|   |   | | (i)    Individual criminal responsibility of commanders | 74 |
|   |   | | (ii)   Command responsibility | 75 |
|   |   | | (iii)  Superior orders defense | 77 |
|   |   | | (b)    Duress and Necessity | 78 |
|   |   | | (c)    Self-Defense | 78 |
|   | F. | | EXTRAORDINARY RENDITIONS IN THE CONTEXT OF THE "WAR ON TERROR" VIOLATE INTERNATIONAL LAW | 79 |
|   |   | *1.* | *The Prohibition Against Torture is Absolute and Non-Derogable* | 79 |
|   |   | *2.* | *Application of the Prohibitions against Torture and* Refoulement *in the Context of Terrorism or National Security Risk* | 82 |
| VI. | | | DIPLOMATIC ASSURANCES | 83 |
|   | A. | | LEGALITY OF DIPLOMATIC ASSURANCES UNDER INTERNATIONAL AND DOMESTIC LAW | 84 |
|   |   | *1.* | *International Law Applicable to Diplomatic Assurances* | 84 |
|   |   | *2.* | *U.S. Law Applicable to Diplomatic Assurances* | 85 |
|   | B. | | EXAMPLES OF USES OF DIPLOMATIC ASSURANCES | 86 |
|   | C. | | IN PRACTICE, DIPLOMATIC ASSURANCES ARE INADEQUATE SAFEGUARDS AGAINST TORTURE | 88 |
| VII. | | | STATE RESPONSIBILITY | 91 |
|   | A. | | U.S. CONDUCT IN RELATION TO EXTRAORDINARY RENDITIONS CONSTITUTES A BREACH OF INTERNATIONAL LAW | 92 |
|   |   | *1.* | Refoulement *Constitutes a Breach of International Law* | 92 |
|   |   | *2.* | *Complicity in Torture Constitutes a Breach of International Law* | 93 |
|   |   | *3.* | *The Failure to Prevent or Remedy Torture or CID Treatment Constitutes a Breach of International Law* | 93 |
|   | B. | | ACTS ATTRIBUTABLE TO THE UNITED STATES IN THE CONTEXT OF EXTRAORDINARY RENDITIONS | 96 |
|   |   | *1.* | *The United States is Liable for the Authorized and Unauthorized Actions of its Officials, including the Armed Forces, CIA and FBI* | 96 |
|   |   | *2.* | *The United States Is Liable for the Actions of Individuals or Groups Acting under its Instructions, Direction, or Control, including Private Actors* | 96 |
|   |   | *3.* | *The United States May Be Liable for the Actions of Organs of a Foreign State Acting under its Direction and Control* | 98 |
|   |   | *4.* | *The United States May Be Liable for Knowingly Assisting in the Unlawful Acts of a Foreign State* | 99 |
|   | C. | | A NOTE ON ADJUDICATING STATE RESPONSIBILITY | 100 |
| VIII. | | | INDIVIDUAL LIABILITY UNDER DOMESTIC LAW | 102 |
|   | A. | | PARTICIPATION IN EXTRAORDINARY RENDITIONS MAY RESULT IN CRIMINAL LIABILITY | 102 |
|   |   | *1.* | *Acts of Extraordinary Rendition May Amount To Conspiracy to Commit* | |

|  |  |  | *Torture and/or Aiding and Abetting in the Commission of Torture Pursuant to the Torture Act of 2000* | 103 |
|  |  | (a) | Jurisdiction | 103 |
|  |  | (b) | Offense | 103 |
|  |  |  | (i)   Conspiracy | 105 |
|  |  |  | (ii)  Accomplice Liability | 107 |
|  | 2. |  | *The Uniform Code of Military Justice (UCMJ) May be Used as a Sanction Against Extraordinary Renditions* | 109 |
|  |  | (a) | Jurisdiction | 109 |
|  |  | (b) | Offense | 110 |
|  | 3. |  | *The Military Extraterritorial Jurisdiction Act (MEJA) May Provide Jurisdiction for Prosecution of Involvement in Extraordinary Renditions* | 112 |
|  |  | (a) | Jurisdiction | 112 |
|  |  | (b) | Offense | 114 |
| B. |  |  | DEFENSES TO CRIMINAL LIABILITY GENERALLY ARE INAPPLICABLE TO MOST CASES OF EXTRAORDINARY RENDITIONS | 114 |
|  | 1. |  | *Necessity* | 115 |
|  | 2. |  | *Self-Defense and Defense of Others* | 117 |
|  | 3. |  | *Superior Orders* | 118 |
| C. |  |  | U.S. OFFICIALS PARTICIPATING IN EXTRAORDINARY RENDITIONS MAY FACE CIVIL LIABILITY FOR THEIR INVOLVEMENT IN THE PRACTICE | 119 |
|  | 1. |  | *Alien Tort Claims Act (ATCA)* | 120 |
|  | 2. |  | *Torture Victims Protection Act (TPA)* | 121 |
| IX. |  |  | CONCLUSION | 122 |

2                                                    Center for Human Rights and Global Justice

## I.    INTRODUCTION

Since September 11, 2001, and especially in the aftermath of the wars in Afghanistan and Iraq, the United States has detained a large number of persons in various parts of the world for investigative purposes. Techniques used by U.S. authorities to interrogate these detainees have long been the subject of extensive criticism by human rights groups[1] and humanitarian agencies.[2] However, it was not until the military began receiving reports of mistreatment of detainees in Iraq, particularly at Abu Ghraib prison, that the Department of Defense began internal investigations into the conduct of army personnel.[3] These investigations and their results were kept away from the public eye until photographs depicting abuses at Abu Ghraib surfaced in media reports and information about the abuses became publicly available. At that time, the United States initiated

---

[1]    *See, e.g.,* Amnesty Int'l., *USA: Memorandum to the U.S. Government on the Rights of People in U.S. Custody in Afghanistan and Guantánamo Bay* (April 2002), *available at* http://web.amnesty.org/library/index/engamr510532002 (last visited Oct. 25, 2004); Amnesty Int'l., *Iraq: Memorandum on Concerns Relating to Law and Order* (July 2003), *available at* http://web.amnesty.org/library/Index/ENGMDE141572003 (last visited Oct.25, 2004); *and* Human Rights Watch, *U.S.: Reports of Torture of Al Qaeda Suspects* (Dec. 27, 2002), *available at* http://www.hrw.org/press/2002/12/us1227.htm (last visited Oct. 25, 2004).

[2]    The International Committee of the Red Cross, which has a special status under international law as the guardian of international humanitarian law, issued a number of reports concerning ill-treatment of prisoners held by the United States, one of which was made public in the wake of the Abu Ghraib revelations. *See* International Committee of the Red Cross, *Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and other Protected Persons by the Geneva Conventions in Iraq During Arrest, Internment and Interrogation* (Feb. 2004), *available at* http://www.derechos.org/nizkor/us/doc/icrc-prisoner-report-feb-2004.pdf (last visited Oct.25, 2004).

[3]    A number of investigations have been conducted by the Department of Defense into the abuses at Abu Ghraib, with many of the reports now publicly available. *See, e.g.,* Maj. Gen. Antonio M. Taguba, *Article 15-6 Investigation of the 800th Military Police Brigade* (February 2004) (Taguba Report), *available at* http://www.npr.org/iraq/2004/prison_abuse_report.pdf (last visited Oct.25, 2004); Department of the Army Inspector General, *Detainee Operations Inspection* (July 2004), *available at* http://www.globalsecurity.org/military/library/report/2004/daig_detainee-ops_21jul2004.pdf (last visited Oct.25, 2004); Lt. Gen. Anthony R. Jones & Maj. Gen. George Fay, *Investigation of Intelligence Activities at Abu Ghraib* (August 2004), *available at* http://www.informationclearinghouse.info/article6784.htm (last visited Oct.25, 2004); *and* Independent Panel to Review Department of Defense Detention Operations, Final Report (August 2004), *available at* http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf (last visited Oct.25, 2004). It is now undisputed that U.S. military personnel committed acts that amounted to torture, and to cruel, inhuman or degrading (CID) treatment or punishment. General Taguba's report on the abuses at Abu Ghraib prison concludes that "between October and December 2003, at the Abu Ghraib Confinement Facility (BCCF), numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees. This systemic and illegal abuse of detainees was intentionally perpetrated by several members of the military police guard force ...." Taguba Report, at 16. Acts of abuse included "(a) Punching, slapping, and kicking detainees; jumping on their naked feet; (b) videotaping and photographing naked male and female detainees; (c) forcibly arranging detainees in various sexually explicit positions for photographing; (d) forcing detainees to remove their clothing and keeping them naked for several days at a time; (e) forcing naked male detainees to wear women's underwear; (f) forcing groups of male detainees to masturbate themselves while being photographed and videotaped; (g) arranging naked male detainees in a pile and then jumping on them; (h) positioning a naked detainee on a MRE Box, with a sandbag on his head, and attaching wires to his fingers, toes, and penis to simulate electric torture; (i) writing "I am a Rapest" (sic) on the leg of a detainee alleged to have forcibly raped a 15-year old fellow detainee, and then photographing him naked; (j) placing a dog chain or strap around a naked detainee's neck and having a female soldier pose for a picture; (k) a male MP guard having sex with a female detainee; (l) using military working dogs (without muzzles) to intimidate and frighten detainees, and in at least one case biting and severely injuring a detainee; (m) taking photographs of dead Iraqi detainees." Taguba Report, at 16-18. Other acts reported by the detainees who were found to be credible by General Taguba include (a) breaking chemical lights and pouring the phosphoric liquid on detainees; (b) threatening detainees with a charged 9mm pistol; (c) pouring cold water on naked detainees; (d) beating detainees with a broom handle and a chair; (e) threatening male detainees with rape; (f) allowing a military police guard to stitch the wound of a detainee who was injured after being slammed against the wall in his cell; (g) sodomizing a detainee with a chemical light and perhaps a broom stick; (h) using military working dogs to frighten and intimidate detainees with threats of attack, and (i) in one instance actually biting a detainee." *Id.*

investigations and congressional hearings into the abuses committed by U.S. officials. While the hearings focused on the mistreatment of prisoners at Abu Ghraib, members of Congress also questioned the scope of interrogation tactics generally used by U.S. actors.[4] This broader line of questioning has led to a widespread reconsideration of, and public debate over, the proper limits on interrogation in the "War on Terror." The standards relevant to defining clear limits – including federal law and human rights treaties (especially the UN Convention Against Torture[5]) – have gained prominence, with arguments about the interpretation of the standards debated in print, during Congressional hearings, and on television.

Similarly, new attention has been focused on the variety of settings in which such abuses have occurred. "War on Terror" detainees have been held in military installations both inside and outside the United States (such as the Naval Consolidated Brig in Charleston, North Carolina, the U.S. naval base at Guantánamo Bay, Cuba, and the U.S. air force base in Bagram, Afghanistan), as well as reportedly being held in secret detention centers run by the Central Intelligence Agency (CIA) and other government agencies (including suspected secret sites on U.S. naval ships and at certain foreign bases or prisons[6]). The media, human rights organizations, and congressional bodies

---

[4]    *See, e.g., Hearing on Allegations of Mistreatment of Iraqi prisoners Before the Senate Armed Services Committee,* 108th Cong. (May 2004), *available at* http://armed-services.senate.gov/ (last visited Oct.25, 2004).

[5]    United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* December 10, 1984, G.A. Res. 39/46, 39 UN GAOR Supp. No. 51, at 197, UN Doc. A/RES/39/708 (1984), *entered into force* June 26, 1987, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (1984), *as modified*, 24 I.L.M. 535, *available at* http://www.ohchr.org/english/law/cat.htm (last visited Oct. 24, 2004) (CAT). The United States ratified CAT in October 1994, and CAT entered into force with respect to the United States on November 20, 1994. The instrument of ratification contained certain declarations, reservations, and understandings relevant to U.S. obligations addressed in this Report, including a declaration that CAT Articles 1 through 16 were not self-executing (*i.e.*, that these provisions must be implemented by domestic legislation). *See* United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html_menu3/b/treaty12_asp.htm (last visited Oct.9, 2004). Other declarations, reservations and understandings are discussed below in the relevant Sections of this Report detailing U.S. CAT obligations. A reservation generally is a unilateral statement, made by a state when signing, ratifying, accepting, approving or acceding to a treaty that purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State. Vienna Convention on the Law of Treaties, concluded May 23, 1969, 1155 U.N.T.S. 331, 333, *entered into force* Jan. 27, 1980 (Vienna Convention), art. 2 para. 1(d). Section 2 of the Vienna Convention contains a regime on reservations which, together with the definitional article (Article 2(1)(d)), determines what constitutes a reservation, the criteria it must meet to be permissible, and the effect it will have, both in the event that it is accepted by other contracting states and in the event that it is not. Under international law, reservations are invalid if they "are incompatible with the object and purpose" of the treaty. Vienna Convention, art. 19 para. (c). A number of states have objected to the United States' reservations concerning specific provisions of CAT as contrary to the object and purpose of the Convention. *See* Declarations and Reservations of Finland (objecting to the United States' reservation to article 16), Netherlands (considering the United States' reservation to articles 1 and 16 to be contrary to the object and purpose of the Convention), Sweden (explaining that it does not consider the United States' reservation to article 16 to be valid or effective), *available at* http://www.ohchr.org/english/law/cat-reserve.htm (last visited Oct.25, 2004). The Committee Against Torture, authorized under CAT to monitor compliance with the Convention, has called on the United States to "withdraw its reservations, interpretations and understandings relating to the Convention." *Summary record of the first part of the 431st meeting: Slovenia, United States of America*, Committee Against Torture, UN Doc. CAT/C/SR.431 (2000). Also relevant to these discussions but less frequently invoked is the International Covenant on Civil and Political Rights, G.A. Res. 2200A (XXI), UN GAOR, 21st Sess., Supp. No. 16, at 52, UN Doc. A/6316 Dec. 16, 1966, *entered into force* 23 March 1976, 999 U.N.T.S. 171 *available at* http://www.ohchr.org/english/law/ccpr.htm (last visited Oct. 24, 2004) (ICCPR). As with CAT, the U.S. instrument of ratification of the ICCPR contained certain declarations, reservations, and understandings, including a declaration that ICCPR Articles 1 through 27 were not self-executing. *See* International Covenant on Civil and Political Rights, Declarations, Reservations and Understandings made by the United States, *available at* http://www.unhchr.ch/tbs.doc.nsf/887f7374eb89574c1256a2a0027ba1f/80256404004f315c125638b005f309e?OpenDocument (last visited Oct. 24, 2004). *See* discussion in Section V.B for more on the relevant substantive norms binding the United States under the ICCPR.

[6]    *See generally* Human Rights First, *Ending Secret Detentions* (June 2004) (discussing secret detention facilities suspected to exist on, *inter alia*, U.S. Naval ships, including the USS *Bataan* and the USS *Peleliu*, and inside foreign prisons such as the Al Jafr prison in Jordan), *available at*

are currently investigating the abuses that have allegedly taken place in these detention centers. Internal probes have also been announced or acknowledged; at the time of this writing, investigations into detention practices and/or interrogation procedures had been concluded or were being conducted by personnel within the following agencies: the CIA, the Department of Homeland Security, and the Department of Defense.

Despite this flurry of attention, one U.S. "anti-terror" tactic has largely escaped sustained scrutiny by Congress and other oversight bodies,[7] and has not yet become the focus of public debate: the practice of "extraordinary rendition." For the purpose of this Report, Extraordinary Rendition is the transfer of an individual, with the involvement of the United States or its agents[8], to a foreign state in circumstances that make it more likely than not[9] that the individual will be subjected to torture or cruel, inhuman, or degrading treatment. As the term suggests, this "extraordinary" practice appears to be one form of what is an acknowledged practice – the covert rendition by U.S. officials of individuals suspected of involvement in terrorism to "justice"– *i.e.*, for trial or criminal investigation either to the United States or to foreign states. What is "extraordinary" about this more recent form of rendition is the role of torture and cruel, inhuman or degrading (CID) treatment reportedly involved in such transfers: U.S. officials reportedly are seeking opportunities to transfer terrorist suspects to locations where it is known that they may be

---

http://www.humanrightsfirst.org/us_law/PDF/EndingSecretDetentions_web.pdf (last visited Oct.25, 2004); Human Rights Watch, *The United States "Disappeared": The CIA's Long-Term "Ghost Detainees"* (Oct.2004), *available at* http://www.hrw.org/backgrounder/usa/us1004 (last visited Oct.25, 2004).

[7]  This practice, however, is beginning to draw the attention of at least some members of Congress. *See, e.g.,* the questioning of Dr. Stephen A. Cambone, Under Secretary of Defense for Intelligence, by Senator Kennedy during the Senate Armed Services Committee hearing regarding the mistreatment of Iraqi prisoners. *Hearing on Allegations of mistreatment of Iraqi prisoners Before the Senate Armed Services Committee,* 108th Cong. (May 2004) (statement by Dr. S.A. Cambone, Under Secretary of Defense for Intelligence) (Cambone Statement). On June 23, 2004, Congressman Markey (Mass.) introduced legislation to stop the extra-judicial practice of sending terrorism suspects to foreign governments known to engage in torture. For the full text of the Markey bill, *see* http://www.house.gov/markey/Iraq.htm#LOC (last visited October 25, 2004).

[8]  Although this Report focuses mainly on cases in which U.S. actors are actually involved in the transfer of an individual, Extraordinary Rendition may be also considered to have occurred where an individual is placed in the custody of a foreign government at the direction of the U.S. government without U.S. officials ever being physically involved in the seizure or transfer. *See., e.g., Omar Abu Ali ex. rel Ahmed Abu Ali v. Ashcroft*, Case No. 1:04-CV-01258 JDB (D.D.C. filed July 28, 2004) (lawsuit alleging that Abu Ali was arrested and detained by Saudi Arabian officials at the request of the United States and that the respondents, acting under color of law violated U.S. law by engaging in the practice of "rendition to torture, namely placing an individual in the custody of a foreign government for purposes of interrogation in connection with suspected terrorist activities where harsh forms of interrogation are employed."), complaint *available at* http://www.humanrightsusa.org/modules.php?op=modload&name=News&file=article&sid=13 (last visited Oct.25, 2004).

[9]  This Report uses the "more likely than not" standard for assessing an individual's risk upon transfer because it is the test that the United States employs when assessing that risk. By using this standard, the Report intends to examine the set of transfers that would be illegal under U.S. law, while acknowledging that this approach excludes cases of Extraordinary Rendition that could be technically legal under federal law, but would violate international human rights law that is binding on the United States. The relevant human rights treaties contain significantly more protective standards concerning the level of risk of torture or CID treatment that an individual faces upon transfer. The standard under CAT requires the presence of "substantial grounds for believing [the individual] would be in danger of being subjected to torture" upon transfer. CAT, *supra* note 5, art. 4(1). The ICCPR has been authoritatively interpreted to prohibit transfer in cases where there are "substantial grounds for believing that there is a real risk of irreparable harm" from torture or CID treatment. Human Rights Committee, General Comment 31, *Nature of the General Legal Obligation on States Parties to the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (2004) (HRC General Comment 31). The United States has codified a standard that is more stringent, requiring that it be "more likely than not" that an individual will face torture upon transfer. For a discussion of U.S. law implementing CAT, *see* Section V.A.5. For a discussion of CAT standards, *see* Section V.A. for a discussion of ICCPR standards, *see* Section V.B.

tortured, hoping to gain useful information with the use of abusive interrogation tactics. At best, they appear to be turning a blind eye to abuses.

According to press reports, "regular" renditions – *i.e.,* transfers made without recourse to the regular legal procedures of extradition, removal, or exclusion, but not involving allegations of involvement in torture – have been occurring for more than a dozen years, and have included numerous transfers in the years leading up to September 11, 2001. According to reports, however, the frequency of renditions increased significantly and their scope widened as the United States engaged in the "War on Terror."[10] Moreover, reports suggest that the pattern of renditions shifted during this time, focusing less on rendition to "justice" in the form of criminal investigation and trial in the United States or abroad, and more on interrogation – often in circumstances that indicate torture was at least a foreseeable possibility. As the former Director of the CIA's Counterterrorist Center J. Cofer Black stated during testimony before the House of Representatives and U.S. Senate Intelligence Committees, "there was a before 9/11 and there was an after 9/11. After 9/11 the gloves come off."[11]

This Report will assess the legality of the practice of Extraordinary Rendition under both U.S. and international law. The purpose of the Report is not to establish or verify facts concerning such transfers; that is a task better left to human rights organizations, international bodies, congressional oversight committees, and the U.S. government itself. Rather, using publicly available factual scenarios, this Report will describe the laws relevant to Extraordinary Renditions and the sanctions that may be applicable to individuals involved in such transfers. It will demonstrate that Extraordinary Rendition is prohibited by U.S. law, and is illegal under international human rights and humanitarian law. It will also explain that the U.S. government has an obligation to prevent Extraordinary Renditions, and to fully investigate, prosecute, and punish those responsible for such acts when they do occur. In addition to these duties to prevent and punish Extraordinary Rendition, the U.S. government may be liable under the international law of state responsibility for such transfers at the hands of its agents, and in some circumstances for the ill-treatment that occurs in states to which individuals are transferred, giving rise to the international legal obligation to immediately cease the practice and to remedy such abuses through restitution, compensation, and satisfaction.

## II.   EXECUTIVE SUMMARY

This joint Report of the International Human Rights Committee of the Association of the Bar of the City of New York and the Center for Human Rights and Global Justice at New York University School of Law analyzes the legal standards applicable to the practice of Extraordinary Rendition. The Report defines Extraordinary Rendition as the transfer of an individual, with the involvement of the United States or its agents, to a foreign state in circumstances that make it more likely than not that the individual will be subjected to torture or cruel, inhuman, or degrading treatment. The Report's main findings are that Extraordinary Rendition is an illegal practice under both domestic and international law, and that, consistent with U.S. policy against torture, the U.S.

---

[10]   On September 13, 2001, the Sunday Tribune (Ireland) reported that upon learning that 15 of the 19 hijackers involved in the September 11, 2001 attacks were from Saudi Arabia, President Bush met with the Saudi Ambassador to the United States, Prince Bandar bin Sultan. During the meeting, President Bush reportedly told Ambassador Bandar that if any Al Qaeda operatives were captured "if we can't get them to co-operate, we'll hand them over to you." *See* Diarmuid Doyle, *Which Ones Are the Bad Guys, Then? The US's Contempt for the Rights of Its Prisoners Puts Saddam to Shame,* THE SUNDAY TRIBUNE (Ireland), Mar. 30, 2003.

[11]   *Hearing Before the Joint Investigation of the House and Senate Intelligence Committees,* 107th Cong. (Sept. 26, 2002), (statement of Cofer Black, former Chief of the Counterterrorist Center, Central Intelligence Agency), *available at* http://intelligence.senate.gov/0209hrg/020926.witness.htm (last visited Oct.25, 2004).

government is duty bound to cease all acts of Extraordinary Rendition, to investigate Extraordinary Renditions that have already taken place, and to prosecute and punish those found to have engaged in acts that amount to crimes in connection with Extraordinary Rendition.

The Report begins with an overview of the practice of Extraordinary Renditions as reported in the press; since Extraordinary Rendition appears to be a covert activity, the factual scenarios included in the Report have not been verified. Examples are given of cases in which the United States has allegedly been involved in transfers of individuals from inside the United States, from foreign states, and from U.S. military outposts to states well known to practice systematic or uncontrolled torture. The level of involvement of U.S. officials varies from case to case, but the facts in each example suggest that the United States is using this form of transfer as an interrogation technique in the "War on Terror." Indeed, while the use of Extraordinary Rendition has been denied in all official settings, officials speaking off the record have acknowledged the practice.

The Report next examines U.S. law to determine whether Extraordinary Renditions are, or could be, authorized by existing law or covert directives. After systematically considering the bases of authority for transfers of individuals by U.S. officials and the limits to that authority, the Report concludes that no publicly available statute, regulation, executive finding, directive or other action exists to authorize Extraordinary Rendition. Given the clear intent of Congress, expressed through legislation aimed at upholding U.S. obligations against torture and complicity in such abuse, and White House policy condemning torture, any purported authority to carry out Extraordinary Renditions would be an unauthorized derogation from U.S. law.

The Report then discusses the international law applicable to Extraordinary Rendition, including the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the International Covenant on Civil and Political Rights; the Geneva Conventions of 1949; and the Refugee Convention of 1951. The Report demonstrates that all of these treaties contain provisions preventing some aspects, or the entire practice, of Extraordinary Rendition. This Section concludes with a consideration of some guiding principles from international law on criminal liability that may be relevant in efforts to prosecute individuals who have been involved in Extraordinary Renditions. Standards explored include those governing complicity and conspiracy, the doctrine of command responsibility, and certain justifications and defenses available under international law. The Report then turns to the use of "diplomatic assurances"– promises made by governments not to torture or mistreat individuals who are being transferred into their custody. Because these promises are made only when the circumstances indicate that an individual is at risk of torture, and because there are no procedural safeguards allowing for their transparent implementation, the Report concludes that diplomatic assurances as currently used are ineffective.

The Report next demonstrates ways in which Extraordinary Rendition could leave the United States vulnerable to international liability under the doctrine of state responsibility. This Section explains that the U.S. government is required by international treaty law to prevent, investigate, prosecute, and punish acts amounting to Extraordinary Rendition. The Report concludes with a comprehensive examination of the U.S. criminal and civil statutes that are applicable to individuals involved in Extraordinary Rendition, demonstrating that such individuals may be open to criminal charges and/or civil liability for conspiracy and complicity in torture.

## III.   RECOMMENDATIONS

**End the use of Extraordinary Rendition and take actions to remedy and compensate those harmed in Extraordinary Renditions.**

- The president, the attorney general, the secretary of defense, and the secretary of homeland security should reject the practice of Extraordinary Rendition as contrary to U.S. and international law and policy.

- The United States should ensure that victims of Extraordinary Rendition are provided with adequate remedies.

**Initiate formal investigations into the practice of Extraordinary Rendition.**

- An independent commission, modeled on the National Commission on Terrorist Attacks Upon the United States (9-11 Commission) should be formed and charged with investigating Extraordinary Renditions.

- Congressional committees charged with oversight of the armed services, security and intelligence operations should fully investigate the practice of Extraordinary Rendition. Such investigations should include an examination of the alleged authority for Extraordinary Renditions, and an accounting of how such practices came to be approved, if they were.

- The inspectors general of all relevant agencies, including the Central Intelligence Agency, the Federal Bureau of Investigation, the Department of Defense, and the Department of Homeland Security should investigate the involvement of their personnel and institutions in Extraordinary Rendition.

- Agencies with custody of documents concerning Extraordinary Rendition, including the Central Intelligence Agency, should declassify and make public such documents, and must comply with requests for documents pursuant to the Freedom of Information Act.

- The president should declassify Presidential Decision Directives and any other order or finding relevant to Extraordinary Renditions.

- The U.S. government should cooperate fully with the Canadian inquiry into the removal of Maher Arar.

**Review and reform legislation and regulations relevant to Extraordinary Renditions.**

- Congress should review and supplement the implementing legislation and accompanying regulations concerning the Convention against Torture to ensure that there are no gaps allowing for Extraordinary Rendition. Specifically, regulations should be promulgated by the relevant agencies to ensure that the obligation of *non-refoulement* set out in the Convention against Torture and the International Covenant on Civil and Political Rights, and implemented by the Foreign Affairs Reform and Restructuring Act of 1998, is enforced with respect to all detainees in the control or custody of U.S. actors, regardless of whether the person is physically present in the United States, as required by statute. The

current failure to pass implementing legislation to this effect places relevant agencies at odds with their statutory duties.

- Congress should pass legislation modeled on H.R. 4674, drafted by Representative Markey, aimed at prohibiting Extraordinary Renditions.

- Congress should ensure that liability for complicity or conspiracy in torture is extended to civilian contractors working with U.S. armed forces, security personnel, or intelligence services.

**Implement a moratorium on diplomatic assurances.**

- The president, secretary of state, and attorney general should not rely upon diplomatic assurances as a means of negating the bar on transfers of those likely to face torture until and unless adequate safeguards have been implemented, including transparency, judicial review, and independent and effective monitoring.

**Undertake criminal investigations into alleged acts of Extraordinary Rendition.**

- Federal officials and military authorities should investigate individuals who may have been involved in acts that could amount to aiding and abetting or conspiracy to torture. Such investigations should include examination of officials involved in activities that could amount to aiding and abetting or conspiracy to torture, and should not be focused on only those lower level officials carrying out Extraordinary Renditions.

- Following such investigations, federal prosecutors and military officials should prosecute individuals concerning whom sufficient evidence exists to indict for aiding and abetting or conspiracy to torture.

- The United States should ensure that civil or military personnel involved in the custody, interrogation and treatment of any detainees be adequately trained and supervised in implementing the prohibition against torture and *refoulement.*

## IV.    EXTRAORDINARY RENDITIONS: AN OVERVIEW

### A.    Extraordinary Renditions – (Not) A New Phenomenon

No one knows for certain how many renditions (ordinary or extraordinary) have occurred because Congress is not notified about individual cases.[12] However, *Newsweek* reports that by 2004, the United States was running a covert charter airline moving CIA prisoners from one secret facility to another.[13] Usual destinations for rendered subjects are reported to be states such as Egypt, Jordan, Morocco, Saudi Arabia, Yemen, and Syria, all of which have been implicated by the U.S. State Department in using torture in interrogation.[14] The following examples of Extraordinary

---

[12]    According to intelligence officials, Congress, which oversees the CIA, knows of only the broad authority to carry out renditions, but is not informed about individual cases. Kareem Fahim, *The Invisible Men*, VILLAGE VOICE, Apr. 6, 2004, at 37.

[13]    Jon Barry et al., *The Roots of Torture*, NEWSWEEK, May 24, 2004, at 36.

[14]    *See, e.g.,* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES (2003) *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27938.htm (report on Syria) (last visited Oct.25, 2004); http://www.state.gov/g/drl/rls/hrrpt/2003/27930.htm (report on Jordan) (last visited Oct.25, 2004); http://www.state.gov/g/drl/rls/hrrpt/2003/27934.htm (report on Morocco) (last visited Oct.25, 2004);

Renditions have been reported by various news sources. We are not in a position to verify or disprove these accounts; instead, they are offered here as examples of the practices to which we will apply our legal analysis:[15]

- In September 1995, U.S. intelligence agents reportedly picked up from Croatia one of Egypt's most wanted Islamic militants, placed him on a ship in the Adriatic Sea for interrogation, and subsequently turned him over to Egyptian authorities. His family believes he was executed in Egypt.[16]

- In 1998, U.S. agents reportedly transferred Tallat Fouad Qassem, a leader of the Islamic Group, an Egyptian extremist organization, to Egypt after he was picked up in Croatia. Egyptian lawyers said he was questioned aboard a U.S. ship off the Croatian coast before he was taken to Cairo, where a military tribunal had already sentenced him to death *in absentia*.[17]

- Also in 1998, CIA officers working with the Albanian police reportedly seized five members of Egyptian Islamic Jihad who were allegedly planning to bomb the U.S. embassy in Tirana. After three days of interrogation, the men were flown to Egypt, allegedly aboard a CIA-chartered plane; two of the men were put to death.[18]

- In October 2001, Jamil Qasim Aseed Mohammed, a Yemeni microbiology student, was allegedly flown from Pakistan to Jordan on a U.S.-registered Gulfstream jet after Pakistan's intelligence agency reportedly surrendered him to U.S. authorities at the Karachi airport. U.S. officials alleged that Aseed Mohammed was an Al Qaeda operative who played a role in the bombing of the USS *Cole*. The handover of the shackled and blindfolded Aseed Mohammed reportedly took place in the middle of the night in a remote corner of the airport, without the benefit of extradition or deportation procedures.[19]

- On December 18, 2001, Ahmed Agiza and Mohammed al-Zari were expelled from Sweden and transferred to Egypt. According to the reputable Swedish TV program Kalla Fakta, both men were flown on a Gulfstream V, a private jet alleged to be owned by a U.S.

---

http://www.state.gov/g/drl/rls/hrrpt/2003/27937.htm (report on Saudi Arabia) (last visited Oct.25, 2004); http://www.state.gov/g/drl/rls/hrrpt/2003/27942.htm (report on Yemen) (last visited Oct.25, 2004). Reportedly, during the Clinton Administration, renditions of suspected terrorists to Egypt had been stopped after repeated complaints about the Egyptian government's brutal interrogation methods. More recently, however, when asked about complaints about human rights abuses in the countries alleged to be destination countries for rendered suspects, one Bush Administration official replied: "You can be sure that we are not spending a lot of time on that now." Peter Beinart, *Outsourcing*, THE NEW REPUBLIC, May 31, 2004, at 6.

[15]   This list is not exhaustive. Factual information used in this Report is based solely on reports published by reputable mainstream media sources.

[16]   Anthony Shadid, *America Prepares the War on Terror; U.S., Egypt Raids Caught Militants*, BOSTON GLOBE, Oct. 7, 2001, at A1.

[17]   *U.S. Bypasses Law in Fight against Terrorism*, INTERNATIONAL HERALD TRIBUNE, Mar. 12, 2002; Rajiv Chandrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASHINGTON POST, Mar. 11, 2002, at A1.

[18]   *U.S. Bypasses Law in Fight against Terrorism*, INTERNATIONAL HERALD TRIBUNE, Mar. 12, 2002; Rajiv Chandrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASHINGTON POST, Mar. 11, 2002, at A1.

[19]   *U.S. Bypasses Law in Fight against Terrorism*, INTERNATIONAL HERALD TRIBUNE, Mar. 12, 2002; Rajiv Chandrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASHINGTON POST, Mar. 11, 2002, at A1.

company and which reportedly is used mainly by the U.S. government.[20] Both were asylum seekers and the Swedish government had acknowledged that each had a well-founded fear of being persecuted if returned to Egypt. However, the men were excluded from refugee status based on secret evidence that they were associated with Islamist groups responsible for acts of terrorism.[21] To justify the expulsions, the Swedish government relied upon "diplomatic assurances" or formal guarantees from the Egyptian government that the two men would not be tortured and would have fair trials upon return. However, according to Human Rights Watch and a coalition of Swedish human rights groups, both men were tortured and ill-treated in Egyptian prisons upon transfer. Moreover, a trial monitor from Human Rights Watch provided a firsthand account of Agiza's re-trial by a military tribunal in April 2004 during which Agiza made serious allegations of torture and ill-treatment.[22] The re-trial was marred by numerous fair trial violations, proving a lack of compliance by the Egyptian authorities with their diplomatic assurances that Agiza would be granted a fair trial. Upon re-trial, Agiza was convicted again and sentenced to 25 years' imprisonment at hard labor. Kalla Fakta's report that the U.S. government was involved in the transfers of Agiza and al-Zari from Sweden to Egypt has been subsequently confirmed by the Swedish Ministry of Justice.[23]

- In January 2002, apparently based on information provided by the CIA, Indonesian authorities reportedly detained Muhammad Saad Iqbal Madni who is suspected by the CIA of having worked with Richard Reid (the "shoe-bomber").[24] According to a senior Indonesian official, a few days later, the Egyptian government formally asked Indonesia to extradite Iqbal, who carried an Egyptian as well as a Pakistani passport.[25] The Egyptian request did not specify the crime, noting broadly that Egypt sought Iqbal in connection with terrorism. On January 11, 2002, allegedly without a court hearing or a lawyer, Iqbal was put aboard an unmarked U.S.-registered Gulfstream V jet and flown to Egypt.[26] A senior Indonesian official said that an extradition request from Egypt provided political cover to comply with the CIA's request. "This was a U.S. deal all along," the senior official said, "Egypt just provided the formalities."[27]

---

[20]   *The Broken Promise,* (TV4 Kalla Fakta Broadcast, May 17, 2004) (English transcript *available at* http://hrw.org/english/docs/2004/05/17/sweden8620.htm (last visited Oct. 25, 2004)) (TV4 Kalla Fakta Broadcast); *see also* SEYMOUR HERSH, CHAIN OF COMMAND 54 (HarperCollins, 2004) (HERSH, CHAIN OF COMMAND).

[21]   In 1999, Agiza had been tried and convicted in absentia by an Egyptian military tribunal for terrorism-related acts. It remains unclear on what grounds al-Zari was expelled from Sweden and then imprisoned in Egypt. He was released from a Cairo prison in October 2003 without charge or trial, but remains under constant surveillance and is routinely summoned for interrogations. Human Rights Watch, *"Empty Promises:" Diplomatic Assurances No Safeguard against Torture* (April 2004), *available at* http://hrw.org/reports/2004/un0404/index.htm (last visited Oct. 25, 2004) (HRW Diplomatic Assurances Report).

[22]   Human Rights Watch, *Sweden: Torture Inquiry Must be Under U.N. Auspices; Independent Panel Must Probe Abuses by Sweden, Egypt and U.S. Operatives* (May 2004), *available at* http://www.hrw.org/english/docs/2004/05/27/sweden8621_txt.htm (last visited Oct. 25, 2004).

[23]   Craig Whitlock, *A Secret Deportation of Terror Suspects; 2 Men Reportedly Tortured in Egypt*, WASHINGTON POST, July 25, 2004, at A1.

[24]   *U.S. Bypasses Law in Fight Against Terrorism*, *supra* note 17; Chandrasekaran & Finn, *supra* note 17.

[25]   *U.S. Bypasses Law in Fight Against Terrorism*, *supra* note 17; Chandrasekaran & Finn, *supra* note 17.

[26]   *U.S. Bypasses Law in Fight Against Terrorism*, *supra* note 17; Chandrasekaran & Finn, *supra* note 17; Dana Priest & Joe Stephens, *Secret World of U.S. Interrogation: Long History of Tactics in Overseas Prisons Is Coming to Light*, WASHINGTON POST, May 11, 2004, at A1.

[27]   Chandrasekaran & Finn, *supra* note 17; *U.S. Bypasses Law in Fight Against Terrorism*, *supra* note 17.

- On January 17, 2002, just a few hours after Bosnia's Supreme Court ordered the release from detention of several Algerian citizens for lack of evidence, Bosnian police handed them over to U.S. authorities, who reportedly flew them to Guantánamo Bay.[28] The Human Rights Chamber of Bosnia-Herzegovina subsequently noted that there was no evidence to suggest that "the hand-over of the [individuals] can be interpreted to be an extradition. In particular, the diplomatic note of 17 January 2002 from the U.S. embassy cannot be understood to be a valid extradition request of the United States of America. In this note, the U.S. embassy in Sarajevo advised the government of Bosnia and Herzegovina that it was prepared to assume custody of the six specified Algerian citizens and it offered to arrange to take physical custody of the individuals at a time and location mutually convenient."[29] The Chamber held that the transfer of the individuals to the custody of U.S. forces "without seeking and receiving any information as to the basis of the detention constitutes a breach of [Bosnia and Herzegovina's and the Federation of Bosnia and Herzegovina's] obligations to protect the [individuals] against arbitrary detention by foreign forces."[30]

- Also in 2002, U.S. immigration authorities, reportedly with the approval of then-Acting Attorney General Larry Thompson, authorized the "expedited removal"[31] of a Syrian-born Canadian citizen, Maher Arar, to Syria. U.S. authorities alleged that Arar had links to Al Qaeda.[32] While in transit at John F. Kennedy International Airport in New York in September 2002, Arar was taken into custody by officials from the FBI and Immigration and Naturalization Service (since reorganized into the Department of Homeland Security) and shackled.[33] Arar's requests for a lawyer were dismissed on the basis that he was not a U.S. citizen and therefore he did not have the right to counsel.[34] Officials repeatedly questioned Arar about his connection to certain members of Al Qaeda.[35] Arar repeatedly denied that he had any connections whatsoever to the named individuals.[36] Despite his denials, he remained in custody and was eventually put on a small jet that first landed in Washington, D.C., and then in Amman, Jordan.[37] Once in Amman, Arar was allegedly

---

[28]   Priest & Stephens, *supra* note 26.

[29]   *Boudellaa et al. v. Bosnia and Herzegovina and the Federation of Bosnia and Herzegovina*, Cases Nos. CH/02/8679, CH/02/8689, CH/02/8690 and CH/02/8691, Human Rights Chamber for Bosnia and Herzegovina, Oct. 2002, para. 227.

[30]   *Id.* para. 233. The Human Rights Chamber noted that "[c]onsidering the broad interpretation of the term jurisdiction, this obligation arises even if under the Dayton Peace Agreement [Bosnia and Herzegovina and the Federation of Bosnia and Herzegovina] had no direct jurisdiction over U.S. forces stationed in Bosnia and Herzegovina." *Id.*

[31]   *See* Section V.A.5(c) of this Report for more detail on the procedure of "expedited removal," also referred to as "summary removal."

[32]   For additional information on the case of Maher Arar, *see* http://www.maherarar.ca/.

[33]   According to a lawsuit filed by Arar against Attorney General John Ashcroft and other U.S. officials, Larry D. Thompson (then Acting Attorney General), J. Scott Blackman (then Regional Director of the Immigration and Naturalization Services for the Eastern District), Edward J. McElroy (formerly District Director for the Immigration and Naturalization Services for the New York City District and presently District Director of U.S. Immigration and Customs Enforcement), Robert Mueller (Director of the Federal Bureau of Investigation), and others, unlawfully detained and interrogated Arar for thirteen days. Complaint and Demand for Jury Trial, filed with the U.S. District Court, Eastern District of New York in *Arar v. Ashcroft, et al., available at* http://www.ccr-ny.org/v2/legal/september_11th/docs/ArarComplaint.pdf (last visited Oct. 25, 2004) (Arar v. Ashcroft).

[34]   *Id.*

[35]   *Id.* paras. 31, 33.

[36]   *Id.* para. 38.

[37]   *Id.* para. 49.

blindfolded, shackled and put in a van. [38] Arar was then transferred to Syria. Despite the fact that he is a Canadian citizen and has resided in Canada for seventeen years, Arar's pleas to return to Canada were ignored. [39] Upon reaching Syria, Arar was transferred to a prison where he was allegedly beaten for several hours and forced to falsely confess that he had attended a training camp in Afghanistan in order to fight against the United States. [40] Arar remained in Syria for ten months during which he was repeatedly beaten, tortured, and kept in a shallow grave. [41] Arar has subsequently been released and returned to Canada. No charges were ever filed against him in any of the countries involved in his transfer. Following intense public pressure, the Canadian government initiated a public inquiry into the circumstances surrounding Arar's transfer. The U.S. government has refused the invitation to participate in the Canadian inquiry. U.S. officials, speaking on condition of anonymity, have said that the Arar case fits the profile of what they called covert CIA Extraordinary Rendition – the practice of turning over low-level, suspected terrorists to foreign intelligence services, some of which are known to torture prisoners. [42]

- In October 2002, Australian citizen Mamdouh Habib was arrested in Pakistan and, reportedly at the request of the U.S. authorities, flown to Egypt where, allegedly, he was severely tortured. [43] Habib remained in Egypt for six months, after which he was transferred to Guantánamo where he has been detained since. [44]

- In 2003, Human Rights Watch urged the United States to abandon reported plans to send Uighur Chinese detainees held at Guantánamo Bay to China, where they were likely to face mistreatment and possibly torture. [45] China has a long and well-documented history of repression of Uighurs, a Muslim, Turkic-speaking community within China. The Chinese government has reportedly systematically tortured and otherwise mistreated suspected Uighur separatists. On August 12, 2004, speaking to Japanese journalists, Secretary of State Colin L. Powell stated that the U.S. government would not send Uighurs to China

---

[38] *Id.*

[39] *Id.* paras. 53, 62.

[40] *Id.*

[41] *Id.* para 61; *see also* Priest & Stephens, *supra*, note 26.

[42] DeNeen, L. Brown & Dana Priest, *Deported Terror Suspect Details Torture in Syria; Canadian's Case Called Typical of CIA*, WASHINGTON POST, Nov. 5, 2003, at A1. Gar Pardy, one of Canada's most senior diplomats at the time, stated that, "The fact that you went looking for assurances, which is reflected here, tells you that even in the minds of people who made this decision…I mean, there were some second thoughts." 60 Minutes II, *His Year in Hell* (Jan. 21, 2004) *available at* http://www.cbsnews.com/stories/2004/01/21/60II/main594974.shtml (last visited Oct. 25, 2004).

[43] *The Trials of Mamdouh Habib* (SBS, Dateline, July 7, 2004) (transcript *available at* http://www6.sbs.com.au/dateline/index.php?page=archive&daysum=2004-07-07# (last visited Oct. 25, 2004)).

[44] Joint Press Release, Attorney-General The Hon. Daryl Williams AM QC MP and Minister for Foreign Affairs and Trade The Hon. Alexander Downer MP, Mamdouh Habib in United States Custody (Apr. 18, 2002), *available at* http://www.ag.gov.au/www/attorneygeneralhome.nsf/0/49DF56AF955E312CCA256B9F007F44FA?OpenDocumen t (last visited Oct. 25, 2004); *The Trials of Mamdouh Habib* (SBS, Dateline, July 7, 2004) (transcript *available at* http://www6.sbs.com.au/dateline/index.php?page=archive&daysum=2004-07-07# (last visited Oct. 25, 2004)).

[45] Human Rights Watch, *U.S.: Don't Send Detainees Back to China* (Nov. 26, 2003), *available at* http://www.hrw.org/press/2003/11/us112603.htm (last visited Oct. 25, 2004). *See also* Center for Constitutional Rights (CCR), *Inter-American Commission on Human Rights Asked to Take Urgent Action Regarding Reports of Torture Used on "Terrorism Detainees"* (Feb. 11, 2003) (CCR asked, *inter alia*, the Commission to take measures to stop the transfer of prisoners to third party states where torture is permitted), *available at* http://www.ccr-ny.org/v2/newsroom/releases/pReleases.asp?ObjID_OUMbKGaiNu&Content_195 (last visited Oct. 25, 2004).

and indicated that the United States was looking for third-party states willing to accept the Uighurs upon their release from Guantánamo Bay.[46]

## B.   Extraordinary Renditions – Cloaked in Secrecy

### 1.   *"Off the Record": U.S. Involved in Extraordinary Renditions*

In statements made off the record, U.S. officials have admitted that the government has engaged in Extraordinary Renditions. In many instances, however, the officials (and the press) refer to the practice of transferring an individual, with the involvement of the United States (or its agents) to a foreign country in circumstances that make it more likely than not the individual will be subjected to torture or CID treatment as *rendition* (as opposed to Extraordinary Rendition).[47] As a technical matter, this Report makes a distinction between rendition and Extraordinary Rendition. Rendition is a covert procedure, also known as "rendition to justice," which is apparently authorized by a number of presidential directives, despite being itself a deviation from legally codified procedures for transfers of individuals. Extraordinary Rendition appears to be an unauthorized version of rendition. While rendition has been publicly acknowledged by U.S. officials, the existence of Extraordinary Rendition, which involves the risk of torture or CID treatment, has been formally denied by government officials.[48] The distinction between the two practices, however, is increasingly being blurred and media reports, as well as U.S. officials themselves, often do not differentiate between them when speaking off the record. Regardless of what classification is used, however, the practice described by the following U.S. officials off the record violates international and U.S. law and policy.

According to an unnamed senior U.S. intelligence official there have been "a lot of rendition activities" since September 11, 2001: "We are doing a number of them, and they have been very productive."[49] Similarly, in an interview with the *Washington Post*, an unnamed U.S. diplomat acknowledged that "[a]fter September 11, [renditions] have been occurring all the time….It allows us to get information from terrorists in a way we can't do on U.S. soil."[50] According to another unnamed official, "[t]he temptation is to have these folks in other hands because they have different standards."[51] "Someone might be able to get information we can't from detainees," said another.[52] Another unnamed official who has been involved in rendering captives into foreign hands explained his understanding of the purpose of Extraordinary Renditions: "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them."[53] *Newsweek* reported that at a classified briefing for senators not long

---

[46]   U.S. Dept. of State, Office of the Spokesman, Interview: Secretary of State Colin L. Powell Roundtable with Japanese Journalists (Aug. 12, 2004) ("The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at."), *available at* http://www.usconsulate.org.hk/uscn/state/2004/081201.htm (last visited Oct. 25, 2004).

[47]   *See* Section IV.B.2 of this Report for an additional discussion of the distinction between *rendition* and *Extraordinary Rendition*.

[48]   *See* Cambone Statement, *supra* note 7.

[49]   Brown & Priest, *supra* note 42. It is not clear whether the reference is to "renditions" or Extraordinary Renditions.

[50]   Duncan Campbell, *September 11: six months on: U.S. sends suspects to face torture*, GUARDIAN (London), Mar. 12, 2002, at 4.

[51]   Brown & Priest, *supra* note 42.

[52]   *Id.*

[53]   Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations; 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities*, WASHINGTON POST, Dec. 26, 2002, at A1; Ken Coates, *A*

after September 11, 2001, then CIA Director George Tenet was asked whether Washington was planning to seek the transfer of suspected Al Qaeda detainees from governments known for their brutality. "Congressional sources" told *Newsweek* "that Tenet suggested it might be better sometimes for such suspects to remain in the hands of foreign authorities, who might be able to use more aggressive interrogation methods."[54] Most recently, on October 13, 2004, the Israeli newspaper *HaAretz* reported that the CIA runs a top-secret interrogation facility in Jordan, where at least 11 detainees who are considered Al Qaeda's most senior cadre are being held.[55] *HaAretz* relied on "international intelligence sources" who, according to the newspaper, "are considered experts in surveillance and analysis of Al-Qaida and are involved in interrogating the detainees."[56] *HaAretz* reported that detention of Al Qaeda suspects outside the United States "enables CIA interrogators to apply interrogation methods that are banned by U.S. law, and to do so in a country where cooperation with the United States is particularly close, thereby reducing the danger of leaks."[57]

Seymour M. Hersh, a well-respected journalist, asserts that Extraordinary Renditions form part of a special-access program (SAP) that was set up reportedly at the instigation of U.S. Secretary of Defense Donald Rumsfeld and allegedly with the approval of President Bush and the National Security Advisor Condoleezza Rice.[58] The SAP allegedly recruited highly-trained commandos and operatives from U.S. elite forces (*e.g.* Navy SEALs, Delta Force and CIA paramilitary experts), who would be able to cross borders "without visas and could interrogate terrorism suspects deemed too important for transfer to the military's facilities at Guantànamo, Cuba. They carried out instant interrogations – using force if necessary – at secret detention centers scattered around the world."[59] Hersh alleges that the SAP was known in detail to few operatives and officials, although reportedly Secretary of Defense, Donald Rumsfeld, General Richard Myers, Chairman of the Joint Chiefs of Staff, and Dr. Stephen Cambone, the Under Secretary of Defense for Intelligence, were "completely read into the program."[60] According to a former intelligence official quoted by Hersh, the goal was to keep the operation protected: "We are not going to read more people than necessary into our heart of darkness. The rules are 'Grab whom you must. Do what you want."[61] The transfers of Ahmed Agiza and Mohammed Al-Zari from Sweden to Egypt, allegedly with the involvement of U.S. officials, were conducted as part of the SAP.[62]

In response to Hersh's reports, the Department of Defense issued a statement noting that "Mr. Seymour Hersh's upcoming book apparently contains many of the numerous unsubstantiated

---

*Season of Cruelty*, MORNING STAR, Mar. 10, 2003, at 7. *See also A Review of the State Department Country Reports on Human Rights Practices: Hearing Before the Committee on International Relations, Subcommittee on International Terrorism, Nonproliferation and Human Rights*, 108th Cong. (April 30, 2003) (statement of Alexandra Arriaga, Director of Government Relations, Amnesty International) *available at* http://www.house.gov/international_relations/108/arri0430.htm (last visited Oct. 25, 2004).

[54]   John Barry, Michael Hirsh & Michael Isikoff, *The Roots of Torture*, NEWSWEEK, May 24, 2004, at 26.

[55]   Yossi Melman, *CIA Holding AL-Qaida suspects in secret Jordanian lockup*, HAARETZ, Oct. 13, 2004, *available at* http://haaretzdaily.com/hasen/spages/488039.html (last visited Oct. 25, 2004).

[56]   *Id.*

[57]   *Id.*

[58]   HERSH, CHAIN OF COMMAND, *supra* note 20, at 16,17, 47, 49-50; Seymour M. Hersh, *The Gray Zone*, THE NEW YORKER, May 24, 2004.

[59]   HERSH, CHAIN OF COMMAND, *supra* note 20, at 50.

[60]   HERSH, CHAIN OF COMMAND, *supra* note 20, at 51.

[61]   *Id.*

[62]   HERSH, CHAIN OF COMMAND, *supra* note 20, at 53-54.

allegations and inaccuracies which he has made in the past based upon unnamed sources."[63]  The Department of Defense response notes that investigations into detainee operations in Afghanistan, Iraq, "and elsewhere" are being or have been examined; however, the statement does not refute, or even address, *inter alia*, the existence of the SAP, the existence of secret detention centers, or the participation of the military and the CIA in Extraordinary Renditions.

Given the secrecy that surrounds Extraordinary Renditions, information about the practice is scarce. Although the CIA and other intelligence agents appear to be the main actors, immigration officials, FBI agents, military personnel (including elite Army forces), and contractors may also be involved.[64] According to news reports, transfers of individuals occur on U.S. chartered airlines,[65] but there appears to be no standard formula for dealing with individuals once they are rendered.[66] Sometimes, for instance in Saudi Arabia, U.S. officials allegedly "are able to observe through one-way mirrors the live investigations."[67] In other cases, according to a senior U.S. official, U.S. officials receive summaries of information obtained from interrogations after "feeding" the questions to foreign investigators.[68]

### 2.    *"On-the-Record": U.S Involved in "Renditions to Justice"*

On the record, U.S. government officials acknowledge only the existence of the practice of "rendition to justice" – a practice developed in the late 1980s when the technique was apparently created in order to allow U.S. law enforcement personnel to apprehend wanted individuals in "lawless" states like Lebanon during its civil war.[69] In the early 1990s, renditions to justice were allegedly exclusively law enforcement operations in which suspects were apprehended by covert CIA or FBI teams and brought to the United States or other states (usually the states having an interest in bringing the person to justice) for trial or questioning.[70] According to then FBI Director Louis J. Freeh, during the 1990s, the United States "successfully returned" thirteen suspected international terrorists to stand trial in the United States for completed or planned acts of terrorism

---

[63]   Press Release, U.S. Department of Defense, *Department of Defense Statement on Seymour Hersh Book*, Sept. 10, 2004, *available at* http://www.defenselink.mil/releases/2004/nr20040910-1240.html (last visited Oct. 25, 2004).

[64]   There is anecdotal evidence that the Army's elite DELTA force as well as Navy SEALS may also be involved in Extraordinary Renditions. HERSH, CHAIN OF COMMAND, *supra*, note 20, at 50.

[65]   Barry, Hirsh & Isikoff, *supra* note 54; TV4 Kalla Fakta Broadcast, *supra* note 20.

[66]   Coates, *supra* note 53.

[67]   *Id.*; *see also* Priest & Gellman, *supra* note 53.

[68]   Coates, *supra* note 53; Priest & Gellman, *supra* note 53.

[69]   Kareem Fahim, *The Invisible Men*, VILLAGE VOICE, Apr. 6, 2004, at 37.

[70]   Brown & Priest, *supra* note 42. One U.S. official, speaking on condition of anonymity, characterized such renditions as follows: "These are not abductions, these are renditions. If [the detainees] are wanted by foreign governments and there is concern that they are involved in terrorist activities, the idea is to render them to justice." Anthony Shadid, *America Prepares the War on Terror; U.S., Egypt Raids Caught Militants*, BOSTON GLOBE, Oct. 7, 2001, at A1.

Center for Human Rights and Global Justice

against U.S. citizens.[71] Then CIA Director George Tenet testified that the CIA took part in over eighty renditions before September 11, 2001.[72]

The National Commission on Terrorist Attacks Upon the United States (9-11 Commission) explained the practice of renditions as a counter-terrorism measure and described the role of the CIA in the practice:

> Under the presidential directives in the Clinton administration, [Presidential Decision Directive]-39 and PDD-62, the CIA had two main operational responsibilities for combating terrorism, rendition and disruption. ...[I]f a terrorist suspect is outside of the United States, the CIA helps to catch and send him to the United States or a third country.... Overseas officials of the CIA, FBI and State Department may locate the terrorist suspect, perhaps using their own sources. If possible, they seek help from a foreign government. Though the FBI is often part of the process, the CIA is usually the main player, building and defining the relationships with the foreign government intelligence agencies and internal security services.[73]

George Tenet, in a written statement to the 9-11 Commission confirmed that:

> CIA's policy and objectives statement for the FY 1998 budget submission prepared in early 1997 evidenced a strong determination to go on the offensive against terrorists. The submission outlined our Counterterrorist Center's offensive operations and noted the goal to "render the masterminds, disrupt terrorist infrastructure, infiltrate terrorist groups, and work with foreign partners."[74]

The interim staff report on diplomacy of the 9-11 Commission summed up the rendition process pre-September 11, 2001, as follows:

> The role of diplomacy was to gain the cooperation of other governments in bringing terrorists to justice. PDD-39 stated: "When terrorists wanted for violation of U.S. law are at large overseas, their return for prosecution should be a matter of the highest priority and shall be a continuing central issue in bilateral relations with any state that harbors or assists them." If extradition procedures were unavailable or put aside, the United States could seek the local country's assistance in a

---

[71]  *U.S. Counterterrorism Policy: Hearing Before the Senate Judiciary Committee*, 106th Cong. (Sept. 1998) (statement by Louis J. Freeh, Director of Federal Bureau of Investigation), *available at* http://www.fas.org/irp/congress/1998_hr/98090302_npo.html (last visited Oct. 25, 2004) (Freeh Statement). This figure includes the renditions of two suspects in the August 7, 1998, bombing of the U.S. embassy in Nairobi, Mohamed Rashed Daoud Al-'Owhali and Mohamed Sadeek Odeh. All of the examples given by Freeh involved renditions of suspects *to* the United States in order to stand trial.

[72]  *Counterterrorism Policy: Hearing Before the National Commission on Terrorist Attacks Upon the United States* (March 24, 2004) (statement by George Tenet, former Director of Central Intelligence), *available at* http://www.9-11commission.gov/archive/hearing8/9-11Commission_Hearing_2004-03-24.htm (last visited Oct. 25, 2004) (Tenet Statement to 9-11 Commission). It is not clear which transfers were included in this number, but it would appear that this number encompasses both transfers to the United States and those to other states.

[73]  *National Commission on Terrorist Attacks Upon the United States: Staff Statement 7, available at* http://news.findlaw.com/hdocs/docs/terrorism/911comm-ss7.pdf (last visited Oct. 25, 2004); *see also Counterterrorism Policy: Hearing Before the National Commission on Terrorist Attacks Upon the United States* (March 24, 2004) (statement by Christopher Kojm, Testimony of the Deputy Executive Director, National Commission on Terrorist Attacks Upon the United States, and former Deputy Assistant Secretary of State), *available at* http://www.9-11commission.gov/archive/hearing8/9-11Commission_Hearing_2004-03-24.pdf (last visited Oct. 25, 2004) (Kojm Statement).

[74]  Tenet Statement to 9-11 Commission, *supra* note 72.

rendition, secretly putting the fugitive in a plane back to America or some third country for trial.[75]

U.S. officials deny the existence of Extraordinary Renditions. According to a former covert field operations officer for the CIA, Mike Baker, torture was "not the point" of renditions; rather the "concept behind rendition is simply that moving the suspect to a third country, again, usually the origin of that suspect, will produce better cooperation, more information, as a result of normally such things as cultural affinity."[76]

In response to questioning by Senator Kennedy at the *Senate Armed Services Committee hearing regarding the mistreatment of Iraqi prisoners by some elements and certain personnel* (May 11, 2004), Dr. Stephen Cambone, Under Secretary of Defense for Intelligence, stated that he was not aware of any suspects "in DOD custody" who had been transferred to Saudi Arabia, Jordan, Morocco, or Syria for the purpose of gathering information. When asked by Senator Kennedy whether any suspects had been rendered for other purposes, Dr. Cambone replied: "If there are, I will come back to you and tell you. As best I know, there are not any persons under our custody that have been transferred."[77] Dr. Cambone also stated that to his knowledge, the United States has not been involved in turning over individuals "for torture and misbehavior – mistreatment."[78]

There is reason, however, to question such a statement from Dr. Cambone.[79] As recently as August 7, 2004, *The Oregonian* reported that a team of Oregon Army National Guard soldiers on duty in Iraq came across a walled compound in which the soldiers found dozens of Iraqi detainees who complained that they had been beaten, starved and deprived of water for three days.[80] According to the report, many of the Iraqis "including one identified as a 14-year-old boy, had fresh welts and bruises across their backs and legs."[81] The National Guard soldiers disarmed the Iraqi jailers and administered first aid to the prisoners.[82] However, when the highest-ranking U.S. officer on the scene radioed his superiors for instructions, he was told to return the prisoners to their abusers and immediately withdraw.[83] According to the news report, the U.S. embassy in Iraq confirmed the incident occurred and disclosed that the United States "raised questions about the… 'brutality' with Iraq's interior minister."[84] This case represents an instance of individuals in U.S. custody[85] being transferred to a state (*i.e.*, Iraq), pursuant to higher-command orders, under

---

[75]   *Formulation and Conduct of U.S. Counterterrorism Policy: Hearing Before the National Commission on Terrorist Attacks Upon the United States (Interim Report)* (Mar. 23, 2004), *available at* http://www.9-11commission.gov/archive/hearing8/9-11Commission_Hearing_2004-03-23.pdf (last visited Oct. 25, 2004).

[76]   *Is the U.S. Subcontracting for Torture?* Interview by Jonathan Mann and Susan Candiotti, CNN, with Mike Baker, a former covert field operations officer for the CIA, and Barbara Olshansky, assistant legal director, Center for Constitutional Rights (Nov. 12, 2003).

[77]   Cambone Statement, *supra* note 7.

[78]   *Id.*

[79]   *See, e.g.*, HERSH, CHAIN OF COMMAND, *supra* note 20, at 51-52 (claiming that Dr. Cambone was an instrumental figure in the SAP); Hersh, Gray Zone, supra note 58 (same).

[80]   Mike Francis, *Ordered to Just Walk Away*, THE OREGONIAN, Aug. 7, 2004, *available at* http://www.oregonlive.com/special/oregonian/iraq/index.ssf?/base-front_page/1091880082213032.xml (last visited Oct. 25, 2004); *see also U.S. troops ordered to ignore prisoner abuses*, THE ADVERTISER, Aug. 9, 2004.

[81]   Francis, *supra* note 80.

[82]   *Id.*

[83]   *Id.*

[84]   *Id.*

[85]   According to the news report, National Guard soldiers disarmed the jailors and took control of the prisoners. *Id.*

circumstances where it was clear that the individuals have been, and likely will continue to be, tortured. To our knowledge, Dr. Cambone has not publicly addressed the incident.

In a letter dated June 8, 2004 addressed to Senator Patrick Leahy, Defense Department General Counsel William Haynes stated: "Should an individual be transferred to another country to be held on behalf of the United States, or should we otherwise deem it appropriate, United States policy is to obtain specific assurances from the receiving country that it will not torture the individual being transferred to that country. We can assure you that the United States would take steps to investigate credible allegations of torture and take appropriate action if there were reason to believe that those assurances were not being honored."[86] Given that the process of obtaining diplomatic assurances is secret and not open to public scrutiny, it is impossible to verify Mr. Haynes' claim. However, in the case of Maher Arar, despite U.S. officials' insistence that they had received assurances in advance from Syria that Arar would not be mistreated, Arar's captors allegedly "hung him upside-down, gave him electric shocks and put him in a grave-like cell."[87]

### 3.    *Summary: United States Involved in Extraordinary Renditions*

Despite the formal denials of U.S. officials, off-the-record accounts as well as reports about rendered individuals suggest that Extraordinary Renditions do take place and, in fact, may be purposefully used as an interrogation technique. The practice appears to span a broad spectrum: from cases in which an individual is seized by U.S. officials and transferred by them to a third state known to use torture on detainees (*e.g.*, the 1998 case involving alleged seizure by the CIA in Albania of members of Egyptian Islamic Jihad who were subsequently transferred to Egypt, and the Arar case) to cases in which U.S. officials indirectly assist another state in transferring individuals to a third state that practices torture (*e.g.*, the case of Agiza and al-Zari who were transferred from Sweden to Egypt on a U.S.-chartered plane). Unfortunately, little additional information is available. According to news reports, the CIA's Inspector General has initiated an internal investigation into the agency's detention and interrogation practices in Iraq; however, it is not known whether renditions form part of that investigation.[88] No further information about the CIA's investigation is publicly available.[89] Nor is it known whether any other investigations with respect to individuals held at the so-called "secret detention facilities" are taking place. Other attempts to obtain additional information about renditions and Extraordinary Renditions have so far been without success. On January 9, 2004, the Office of the Inspector General of the Department of Homeland Security announced that he would review the reasons behind the removal of Maher Arar to Syria and look into general policies used by U.S. immigration officials to determine where to send non-immigrants who are removed. Unfortunately, the review's scope has been subsequently limited to an examination of the role of immigration officials only.[90] The United States has also

---

[86]    *See* Human Rights Watch, *U.S.: Don't Send Detainees Back to China* (Nov. 26, 2003), *available at* http://www.hrw.org/press/2003/11/us112603.htm (last visited Oct. 25, 2004).

[87]    *Arar case puts Canada on rights group's list*, TORONTO STAR, Apr. 15, 2004, at A8. Diplomatic assurances were also obtained by Sweden from Egypt in connection with the expulsion of Ahmed Agiza and Mohammed al-Zari.

[88]    Bradley Graham & Josh White, *General Cites Hidden Detainees*, WASHINGTON POST, Sept. 10, 2004, at A24; Dana Priest, *Torture: The Legal Road to Abu Ghraib and Beyond*, panel organized by The Center on Law and Security, N.Y.U. Law School (Sept. 23, 2004) (notes on file with the International Human Rights Committee, ABCNY).

[89]    Dana Priest, *Torture: The Legal Road to Abu Ghraib and Beyond*, *supra* note 88.

[90]    Letter from Clark Kent Ervin, Inspector General, U.S. Department of Homeland Security, to Congressman John Conyers, Jr. (Jan. 9, 2004) (on file with the International Human Rights Committee, ABCNY); Letter from Clark Kent Ervin, Inspector General, U.S. Department of Homeland Security, to Steven Watt, Center for Constitutional Rights (Aug. 30, 2004) (on file with the International Human Rights Committee, ABCNY) (stating that "we will not review the involvement of other agencies such as the Department of Justice, Federal Bureau of Investigation, Central Intelligence Agency, and the Department of State").

refused to co-operate with the public inquiry being conducted by Canadian authorities into the case of Maher Arar.[91]

In October 2003 and May 2004, the American Civil Liberties Union (ACLU), jointly with other human rights organizations, filed Freedom of Information Act (FOIA) requests seeking records concerning the interrogation and treatment of detainees and the extrajudicial rendition of detainees to states known to use torture.[92] The Defense Department and other federal agencies, however, failed to release records, prompting the ACLU and its co-litigants to file a lawsuit in federal court.[93] Following a hearing on September 10, 2004 at which the government sought to delay release of documents until 2005, on September 15, federal Judge Alvin K. Hellerstein ordered the government to "produce or identify'" the documents listed in the FOIA requests by October 15, 2004.[94] A list of the documents produced at the time of this writing is available on the website of the ACLU.[95]

---

[91]   Press Release, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, U.S. declines to directly cooperate with Arar Commission of Inquiry, (Sept. 21, 2004); *U.S. Won't Help Arar Inquiry*, CBC OTTAWA (Sept. 22, 2004), *available at* http://ottawa.cbc.ca/regional/servlet/View?filename=ot_arar20040922 (last visited Oct. 25, 2004).

[92]   Press Release, American Civil Liberties Union "The Public Should Know Of Our Government's Treatment of Individuals Captured And Held Abroad," Judge Says, (Sept. 15, 2004), *available at* http://www.aclu.org/SafeandFree/SafeandFree.cfm?ID=16465&c=281 (last visited Oct. 25, 2004).

[93]   *Id.*

[94]   *Id.* Documents that are not produced must be identified in a list that includes the author, addressee, date and subject matter. Documents that cannot be identified because of their classification status must be produced in a log to the court. The government must also supply the ACLU with a list called a "Vaughn index" stating its justification for withholding documents. *Id.*

[95]   ACLU, *Records Released in Response to Torture FOIA Request, available at* http://www.aclu.org/torturefoia/released/ (last visited Oct. 25, 2004). One of the released documents is a letter sent by William H. Taft, IV, legal advisor for the Department of State, to Christophe Girod, Head of Delegation, International Committee of the Red Cross (ICRC). The letter, dated May 11, 2004, was in response to the concern expressed by the ICRC about the transfer for prosecution of seven nationals of the Russian Federation from Guantanamo Bay to Russia. Taft reiterates the U.S. policy "not to expel, return ("*refouler*") or extradite individuals to other countries where it believes it is "more likely than not" that they will be tortured." He proceeds to say, however, that "[b]efore transfer from Guantanamo to the control of another government, United States policy is to obtain specific assurances from the receiving country that it will provide human treatment and not torture the individual to be transferred. In determining whether it is "more likely than not" that an individual would be tortured, the United States takes into account the treatment the individual is likely to receive upon transfer, including inter alia the expressed commitments of officials from the receiving country." Letter from William H. Taft, IV, legal adviser, Department of State, to Christophe Girod, Head of Delegation, International Committee of the Red Cross (May 11, 2004), *available at* http://www.aclu.org/torturefoia/released/State_Dept_ltr_051104.pdf (last visited Oct. 25, 2004). Taft concludes that the U.S. government obtained "assurances from senior Russian authorities that the detainees will be treated humanely in accordance with Russian law and obligations." *Id.* It is surprising that the U.S. government would find such assurances from Russian authorities credible, given that the U.S. State Department Country Report for 2003 unequivocally finds that "There were credible reports that [Russian] law enforcement personnel frequently engaged in torture, violence, and other brutal or humiliating treatment and often did so with impunity." U.S. DEP'T OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES (2003): Russia, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27861.htm (last visited Oct. 25, 2004). The 2002 State Department report also noted that while the Russian Constitution prohibits torture, violence, and other brutal or humiliating treatment or punishment "there were credible reports that law enforcement personnel frequently engaged in these practices to coerce confessions from suspects and that the Government often did not hold officials accountable for such actions. Neither the law nor the Criminal Code defines torture; it is mentioned only in the Constitution. As a result, it was difficult to charge perpetrators. The only accusation prosecutors could bring against the police was that they exceeded their authority or committed a simple assault. Prisoners' rights groups, as well as other human rights groups, documented numerous cases in which law enforcement and correctional officials tortured and beat detainees and suspects. Human rights groups described the practice of such abuse as widespread. Numerous press reports indicated that the police frequently beat persons with little or no provocation or used excessive force to subdue detainees." *Id.*

### C.    Extraordinary Renditions Violate U.S. Law

Given the secrecy surrounding Extraordinary Renditions and the formal denials by U.S. officials of the existence of the practice, it is difficult to ascertain what source of authority, if any, would provide the basis for U.S. engagement in Extraordinary Renditions. In this Section, we examine the U.S. legal standards that potentially could be applicable to Extraordinary Rendition. After a close examination of these potential sources of authority, we conclude that no publicly available statute, regulation, or executive finding, directive or other action exists to authorize Extraordinary Rendition. Given the clear intent of Congress, expressed through legislation aimed at upholding U.S. obligations against torture and complicity in such abuse, and the White House policy condemning torture, any purported authority to carry out Extraordinary Renditions would be an unauthorized derogation from U.S. law and policy.

#### 1.    *Extraordinary Rendition and Existing Statutory Law (FARRA)*

One of the most important pieces of U.S. legislation dealing with transfers of individuals is the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA).[96] Regulations adopted pursuant to FARRA (FARRA Regulations) address transfers from the United States by virtue of extradition or removal, and include safeguards against removal and extradition of an individual to a country where he or she fears torture. The FARRA Regulations do not deal with transfers originating outside the United States and thus contain no authority for Extraordinary Renditions. However, given that fact that the FARRA Regulations prohibit the removal or extradition of an individual to a state where he or she is more likely than not to be subjected to torture, and given the FARRA policy statement that the "United States [shall] not … expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, *regardless of whether the person is physically present in the United States*,"[97] it can be inferred that Congress intended to prohibit any transfers (whether originating in the U.S. or elsewhere), with the involvement of U.S. officials, to states where the individual is more likely than not to be tortured.

A more detailed look at the FARRA Regulations supports this conclusion. For example, in the context of extradition,[98] according to the 2000 U.S. report to the Committee Against Torture regarding U.S. compliance with CAT, "in the United States, domestic law grants the Secretary of State discretion to decide whether to surrender a fugitive who has been found extraditable. This is a sufficient basis for the Secretary…to satisfy herself before she orders the surrender of the fugitive that he or she will not be tortured after extradition."[99]

---

[96]    Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242.

[97]    FARRA, *supra* note 96, §1242(a) (emphasis added).

[98]    Generally, under the law of the United States, extradition to another state takes place pursuant to a duly ratified extradition treaty. The exceptions are (i) extradition to the international tribunals for the former Yugoslavia and Rwanda (Act Feb. 10, 1996, P.L. 104-106, Div A, Title XIII, Subtitle E, § 1342, 110 Stat. 486); (ii) extradition of non-U.S. nationals who have committed crimes of violence against a U.S. national in foreign countries in certain circumstances (18 U.S.C. §3181 with note, §3184); and extradition to Palau, the Marshall Islands and the Federated States of Micronesia pursuant to a legislative executive agreement (48 U.S.C.S. § 1901.

[99]    Committee Against Torture, Consideration of Reports Submitted by States Parties Under Article 19 of the Convention; Initial reports of States parties due in 1995: United States of America, CAT/C/28/Add.5, Feb. 8, 2000, available at http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/CAT.C.28.Add.5.En?OpenDocument (last visited Oct. 24, 2004) (U.S. Initial CAT Report).

Regulations concerning the removal of aliens from the United States, which are primarily found in the Code of Federal Regulations (C.F.R.) in Title 8, sections 208.16-208.18 and 1208.16-1208.18, prohibit the removal of aliens to states where they would more likely than not be subjected to torture.[100] For the purposes of these regulations, "torture" is understood to have the meaning prescribed in CAT Article 1, subject to the reservations, understandings, and declarations contained in the Senate's advice and consent to ratification of CAT.[101] Specifically, the regulations provide that where an individual subject to a removal order is more likely than not to be subjected to torture in the transferee state, such individual is eligible for a withholding or deferral of the removal order.[102] Aliens who are suspected of engaging in "terrorist activity," including those are suspected of providing material support to terrorist organizations,[103] are removable and excludable from entry into the United States even if they face prospective persecution, including torture, abroad. They are not eligible for withholding of removal on CAT grounds, but are able nonetheless to apply for a *deferral of removal* pursuant to Title 8, section 208.17(a), which provides protection from transfer.[104]

Certain individuals seeking to enter the United States, including those having engaged in terrorist activities, may be inadmissible to the United States, and therefore may be summarily removed.[105] The decision regarding summary exclusion usually occurs at the border or airport when a Department of Homeland Security Bureau of Customs and Border Protection (CBP) officer *suspects* that an arriving alien is inadmissible on one of several grounds, including security or related grounds. However, even in those circumstances, the governing regulations provide that "[t]he Service shall not execute a removal order under this section [summary exclusion] under circumstances that violate…Article 3 of the Convention against Torture."[106]

---

[100] The Department of Homeland Security has primary day-to-day authority to implement and enforce these regulations. The Department of Justice, through the Executive Office of Immigration Review (EOIR) has adjudicative authority over some detention and removal decisions.

[101] 8 C.F.R. §208.18(a). For a description of U.S. reservations and declarations, *see* Section V.A.5(a) of this Report. For a discussion of the legality under international law of United States' reservations and declarations, *see* note 5, *supra*.

[102] 8 C.F.R. §208.16(c)(4).

[103] Such individuals are considered a security threat covered under section 241(b)(3)(B) of the Immigration and Nationality Act (INA). Act June 27, 1952, ch. 477, 66 Stat. 163, *as amended* 8 U.S.C. §1101 *et seq.* Terrorist activity does not include material support if the secretary of state or attorney general, following consultation with the other, concludes in his sole discretion (which is not subject to a review) that the definition of "terrorist activity" does not apply. *Id.* § 212(a)(3)(B).

[104] *See* INA *supra* note 103, §§237(a)(4)(B) (2004), 241(b)(3)(B) (2004), 8 U.S.C. §§1227(a)(4)(B) (2000), 1231(b)(3)(B) (2000). Aliens to be designated as engaging in "terrorist activity" include those who, acting as an individual or part of an organization, (1) commit or incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity; (2) prepare or plan a terrorist activity; (3) gather information on potential targets for a terrorist activity; (4) solicit funds for a terrorist activity or organization, unless it can be demonstrated that the alien did not know and should not reasonably have known that solicitation would further terrorist activity; (5) solicit any individual for terrorist activity or membership, unless it can be demonstrated that the alien did not know and should not reasonably have known that solicitation would further terrorist activity; or (6) commit an act that the actor knows, or reasonably should know, affords material support to the terrorist organization, including providing a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons, explosives, or training. CRS Report for Congress, "The UN Convention Against Torture: Overview of U.S. Implementation Policy Concerning the Removal of Aliens," *available at* http://fpc.state.gov/documents/organization/31351.pdf (last visited Oct. 25, 2004) (CRS Report); *See* INA §212(a)(3)(B) (2004), 8 U.S.C. §1182(a)(3)(B) (2000).

[105] INA, *supra* note 103, §212(a)(3) (2004); § 235(c).

[106] 8 C.F.R. §235.8(4). Those held for summary removal who are not suspected of terrorism and fear persecution or torture if returned can apply for a "credible fear" interview, which if positive, entitles the individual to a full hearing before an immigration judge. INA *supra* note 103, §208.30.

Thus, while FARRA Regulations do not directly address Extraordinary Renditions, given that the regulations, and FARRA itself, are clear in their intent to offer protections to individuals against transfers to states where they are more likely than not to be subject to torture,[107] Congress must have intended to prohibit any practice that would forseeably result in torture, including Extraordinary Renditions.

### 2.    *Extraordinary Rendition and the Courts*

Although U.S. courts have not addressed Extraordinary Renditions, they have dealt with *rendition* [108] – that is, extrajudicial transfers of individuals *from* third countries *to* the United States, – generally holding that such transfers (usually taking the form of abductions) do not preclude U.S. courts from exercising jurisdiction over the transferred individuals (the *Ker-Frisbie* doctrine).[109] U.S. courts, however, have been more reluctant to accept jurisdiction where extrajudicial transfers were accompanied by torture by or with the acquiescence of the United States. Thus, in *United States v. Toscanino*,[110] the Court of Appeals for the Second Circuit refused to exercise jurisdiction over an individual charged with conspiracy to import narcotics who was kidnapped by the U.S. government from Montevideo, bound, blindfolded, held incommunicado for eleven hours, deprived of food and water, and subsequently transferred to Brasilia where he was tortured for 17 days in the presence and with the participation of a member of the U.S. Bureau of Narcotics. Judge Mansfield, writing for the Second Circuit, stated:

> Society is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law…. In light of these developments [in the protection of the rights of the accused] we are satisfied that the "Ker-Frisbie" rule cannot be reconciled with the Supreme Court's expansion of the concept of due process, which protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part. Although the issue in most of the cases forming part of this evolutionary process was whether evidence should have been excluded…, [w]here suppression of evidence will not suffice, …we must be guided by the underlying principle that the government should be denied the right to exploit its own illegal conduct, …and when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct. …Faced with a conflict between the two concepts of due process, the one being the restricted version found in Ker-Frisbie and the other expanded and enlightened interpretation

---

[107]    As discussed in Section V.A.5(c) of the Report, protections that are offered under FARRA do not comply fully with the obligations of the United States under CAT.

[108]    *See* Sections IV.B.1. and IV.B.2. of this Report.

[109]    *See, e.g., Ker v. Illinois*, 119 U.S. 436 (1886) (extrajudicial kidnapping from Peru of an individual for purposes of bringing him to trial in the United States on charges of larceny and embezzlement did not deprive the U.S. court of jurisdiction to try the defendant in the United States); *Frisbie v. Collins*, 342 U.S. 519, 522-23 (1952) (reaffirming the *Ker* doctrine, the court stated that "[t]here is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."); *United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (Supreme Court sustained the jurisdiction of a U.S. court to try a Mexican national who was brought to the United States through abduction rather than pursuant to the extradition treaty between the United States and Mexico).

[110]    500 F.2d 267 (2d Cir. 1974), *reh'g denied*, 504 F.2d 1380 (2d Cir. 1974). On remand, the court found "[no] credible evidence which would indicate any participation on the part of the United States officials prior to the time the defendant arrived in this country. Nor is there any evidence which shows that the abduction was carried out at the direction of United State officials." *United States v. Toscanino*, 398 F. Supp. 916, 917.

expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the Ker-Frisbie version must yield.[111]

Although the courts have subsequently reaffirmed the *Ker-Frisbie* and confirmed that a court may exercise jurisdiction over an individual regardless of the method used to bring the individual before the court,[112] those subsequent cases did not involve acts of torture of the abductee committed by or with the acquiescence of the U.S. officials.

### 3.    *Extraordinary Rendition and Congress*

Congress has taken an even more assertive position than the courts against transfers in circumstances where the transferee was more likely than not to be subjected to torture. In 1998, in compliance with the ratification by the United States of CAT, Congress enacted FARRA, discussed above, in which it explicitly stated that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, *regardless of whether the person is physically present in the United States.*"[113] Thus, Congress explicitly extended the principle of *non-refoulement* to persons who may be located *outside* the United States, although presumably limiting the operation of this policy to those within its jurisdiction. The extension of the *non-refoulement* policy is in line with recent interpretations of human rights standards, as discussed in Sections V.A.4 and V.B. below. Congress has also implemented legislation criminalizing acts of torture *and* conspiracy to commit torture, once again evidencing its legislative intent against torture by proxy.[114] Because Extraordinary Rendition entails the transfer of individuals to states where they are more likely than not to be tortured, the practice is a clear violation of Congressional intent and U.S. policy.[115]

---

[111]    500 F.2d at 274-75. *Cf. United States v. Lira*, 515 F.2d 68 (2d Cir. 1975), *cert. denied*, 423 U.S. 847 (1975). In *Lira*, the prisoner was charged with narcotics offenses and alleged that he had been arrested, taken to a local police station (and then to Chilean Naval Prison), tortured, forced to sign a decree expelling him from Chile, and subsequently sent to New York accompanied by of U.S. DEA agents and the Chilean police. Accepting jurisdiction, the Court distinguished *Lira* from *Toscanino* on the grounds that "the evidentiary hearing produced no proof that representatives of the United States participated or acquiesced in the alleged misconduct of the Chilean officials." *Id.* at 70.

[112]    *See, e.g., United States v. Alvarez-Machain*, *supra* note 109; *United States v. Best,* 304 F.3d 308 (3rd Cir. 2002).

[113]    FARRA, *supra* note 96, §1242(a) (emphasis added).

[114]    For a discussion of this legislation, *see* Section VIII.A.1. of this Report. For a more detailed description of U.S. ratification of CAT and the ICCPR, including descriptions of reservations and declarations, *see* Sections V.A.5. and V.B. of this Report.

[115]    In October 2004, Rep. Dennis Hastert introduced a bill (H.R. 10) a provision of which (section 3032) removes those suspected as terrorists from any protection against transfer to other countries known for their practice of torture. Indeed, under this provision, there would be no protection against such transfer even if it was for the specific purpose of interrogation under torture. This provision was denounced by human rights groups as well as by the White House. *See* Executive Office of the President, Statement of Administration Policy: H.R. 10-9/11 Recommendations Implementation Act Oct. 7, 2004). The bill has been subsequently amended by Rep. Hostettler. The Hostettler amendment provides that when dealing with suspected terrorists who "would threaten the national security or endanger the lives and safety of the American people" the secretary of homeland security may, in his or her "unreviewable discretion" determine that such individuals are specially dangerous aliens and should be detained until they are removed. Amendment to H.R. 10, offered by Rep. Hostettler (Oct. 4, 2004). The amendment further states that if such an alien has been granted any other protection under the immigration law restricting the alien's removal, such alien shall be detained and diplomatic assurances will be sought prior to the removal. The amendment, although still inconsistent with the United States' obligations under CAT, nonetheless evidences that members of Congress are resistant to authorizing blanket transfers to countries where an individual is more likely than not to be subject to torture.

Congress has explicitly legislated on this issue; accordingly, any executive authorization for Extraordinary Rendition would be at "its lowest ebb."[116] The seminal case dealing with the legitimacy of executive actions vis-à-vis congressional will is *Youngstown Sheet & Tube Co. v. Sawyer*.[117] In that case, the Supreme Court set out a tripartite division of executive actions and their respective legitimacy, holding that (i) as a general matter, a president's power is at a maximum when exercised in a manner expressly authorized by Congress, (ii) a president's power is in a "zone of twilight" if taken in the absence of congressional authorization, and (iii) a president's power is at "its lowest ebb" when incompatible with congressional will.[118] The Supreme Court reaffirmed *Youngstown* in *Dames & Moore v. Regan*.[119] In light of Congress' enactment of FARRA, any purported presidential authority for Extraordinary Renditions would be incompatible with expressed congressional intent; accordingly, any executive action purporting to authorize Extraordinary Rendition very likely would be considered outside the scope of executive authority. In any event, as will be demonstrated below, based on publicly available information, no executive authority for Extraordinary Renditions exists.

### 4.    *Extraordinary Rendition and the Executive Branch*

Extraordinary Renditions potentially implicate the Executive Branch's powers, including the president's specific powers to order covert actions as a commander-in-chief, and powers to make agreements with other nations.

### (a)    The President's general power as Commander-in-Chief

The Constitution of the United States vests the power over national security matters primarily in the political branches – the Legislative and the Executive Branches of government.[120] The Constitution, however, separates congressional and presidential powers by vesting with Congress the power to declare war, and to "define and punish. . . . Offenses against the Law of Nations" and to "make Rules concerning Captures on Land and Water,"[121] and by vesting in the president the power to wage war as "Commander in Chief of the Army and the Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."[122] In addition, Article II, section 3 of the Constitution directs that the president "shall take Care that the Laws be faithfully executed," thus confirming that the president cannot act outside the scope of laws enacted by Congress. The principle of separation of powers also serves as a check on the exercise of presidential authority.

In the context of a war, it is less clear "to what extent Congress can control decisions of the President as Commander in Chief in the conduct of wars authorized by Congress."[123] Likewise, the question of the role of the courts in regulating the Executive Branch's power during war remains

---

[116]    *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-638 (1952).

[117]    *Id.*.

[118]    *Id.* at 635-38.

[119]    453 U.S. 654 (1981).

[120]    *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2637 (2004) ("[O]ur Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them").

[121]    U.S. CONST. art. I, §8.

[122]    U.S. CONST. art. II, §2.

[123]    RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE U.S., §1, Reporters Note 3 (1987) (Restatement).

unsettled. Some commentators note that the Executive Branch has expanded by accretion its role in foreign affairs beyond its constitutionally enumerated powers.[124] Supreme Court cases throughout U.S. history, including the recently decided cases relating to detainees in the "War on Terror," make it clear that the power of the Executive Branch is not plenary.[125] The Executive Branch's wartime power is limited by the Constitution, by statutes,[126] and by treaty obligations.[127]

In April 2003, a Defense Department memo entitled "Detainee Interrogation in the Global War on Terrorism,"[128] drafted by the department's Working Group on Detainee Interrogation in the "War on Terror," took the position that the president, as Commander-in-Chief, is not bound by federal law and international treaties barring the use of torture. The memo asserted that

> Congress lacks authority. . . to set the terms and conditions under which the President may exercise his authority as Commander-in-Chief to control the conduct of operations during a war. . .Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield. Accordingly, we would construe [the law] to avoid this constitutional difficulty and conclude that it does not apply to the President's detention and interrogation of enemy combatants....[129]

It is not clear to what extent the Bush Administration adopted this legal reasoning.[130] However, the memo failed to apply (or even mention) the *Youngstown* rule.[131] Congress has not only given its advice and consent to CAT, but has enacted legislative provisions implementing the treaty.[132] Under the *Youngstown* analysis, any presidential act that involves violations of U.S. treaty and

---

[124]   Louis Henkin, Foreign Affairs and the Constitution 38 (Oxford University Press 1972) (Henkin).

[125]   For a thorough review of cases addressing the scope of the president's wartime powers, *see* The Association of the Bar of the City of New York: Committee on Federal Courts, The Indefinite Detention of "Enemy Combatants": Balancing Due Process and National Security in Context of the War on Terror (Feb. 6, 2004, revised Mar. 18, 2004), *available at* http://www.abcny.org/pdf/1C_WL06!.pdf (ABCNY, *Indefinite Detention Report*) (last visited Oct. 25, 2004).

[126]   *See, e.g.,* 18 U.S.C. § 4001(a) (2000) (Non-Detention Act, barring imprisonment or detention of a citizen "except pursuant to an Act of Congress"). *See also Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2641 (2004). As explained in the concurring opinion of Justices Souter and Ginsburg, Congress enacted this statute to guard against another episode like the WWII internments of citizens of Japanese ancestry.

[127]   *See Hamdi*, *supra* note 126, at 2637 (relying on Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949 [1955] 6 U.S.T. 3406, T.I.A.S. No. 3364, for the proposition that detention of combatants may last no longer than active hostilities).

[128]   Pentagon, Working Group Report on Detainee Interrogation in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operational Considerations (Apr. 4, 2003), *available at* http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf (last visited Oct. 25, 2004).

[129]   *Id.* at 21.

[130]   The Bush Administration later disavowed an August 1, 2002 Department of Justice memo that served as the basis of many of the conclusions in the April 4, 2003 document. Jay S. Bybee, Office of Legal Counsel of the Department of Justice, *Re: Standards of Conduct for Interrogation Under 18 U.S.C. §§23440-23440A* (Aug. 1, 2002), *available at* http://www.washingtonpost.com/wp-srv/nation/documents/dojinterrogationmemo20020801.pdf (Bybee Memorandum) (last visited Oct. 25, 2004). The crux of this memo was an attempt to narrow what constitutes torture under U.S. law. The Working Group's memo, however, has not been repudiated. Mike Allen & Susan Schmidt, *Memo on Interrogation Tactics Is Disavowed: Justice Document Had Said Torture May Be Defensible*, Washington Post, June 23, 2003, at A1.

[131]   *See* Section IV.C.3 of this Report.

[132]   Congress enacted FARRA, which regulates transfers from the United States, as well as 18 U.S.C. §§ 2340 and 2304A, which criminalize torture and conspiracy to commit torture.

statutory law very likely exceeds the scope of executive authority.[133] Because Extraordinary Renditions violate U.S. statutory law and binding treaty obligations,[134] presidential authorization for such practices very likely would be outside the scope of presidential authority.

        The fact that Congress, after the attacks of September 11, 2001, granted the president broad powers to wage the "War on Terror," does not alter this calculus. The Authorization for Use of Military Force (AUMF), issued on September 18, 2001, authorized the president to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11, 2001, and against those who "harbored such organizations or persons."[135] The U.S. government has contended that the AUMF and the Executive Branch's Article II constitutional powers provide blanket and unreviewable authorization for carrying out the "War on Terror."[136] In *Hamdi* and *Rasul*,[137] the Supreme Court rejected that stance. In *Hamdi*, the Court made clear that the AUMF did not give the government permission to indefinitely detain a suspect "for the purpose of interrogation."[138] The court did decide that the AUMF constitutes explicit congressional authorization for the detention of enemy combatants, but only because such detention was considered a "fundamental incident of war."[139] No such argument could apply to Extraordinary Renditions. No assertions have been made that this practice is a "fundamental incident of waging war;" instead, the U.S. government has formally denied that the practice takes place.[140]

### (b)    Presidential power to authorize covert actions and to issue national security directives

        Pursuant to the National Security Act of 1947,[141] the president has the authority to authorize covert actions upon a determination that "such an action is necessary to support identifiable foreign policy objectives of the United States and is important to the national security of the United States, which determination shall be set forth in a finding. . ."[142] The same statute

---

[133]    During a White House press briefing held on June 22, 2004, White House Legal Counsel Alberto Gonzales dismissed discussions in Bybee memorandum of the scope of the president's power as Commander-in-Chief as "unnecessary," "irrelevant," and "overbroad," and stated that the United States will follow its treaty obligations and U.S. law, both of which prohibit the use of torture. Press Briefing, White House Counsel Judge Alberto Gonzales, June 22, 2004, *available at* http://www.whitehouse.gov/news/releases/2004/06/20040622-14.html (last visited Oct. 25, 2004).

[134]    *See* Section V.A.5(c) of this Report for a discussion of FARRA and Section VIII.A.1. for a discussion of Sections 2340 and 2340A. *See generally* Sections IV.C. and V of this Report.

[135]    Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001). *See* ABCNY, *Indefinite Detention Report, supra* note 125, at 65-66.

[136]    *See, e.g., Hamdi*, 124 S. Ct., *supra* note 126 at 2636, Brief for Respondents (Solicitor General Theodore Olson arguing that the president has the power to detain "enemy combatants" during wartime, and that this authority is subject to only a deferential standard of review by the courts); Reply Brief for the Petitioner at 12-13, *Rumsfeld v. Padilla*, 124 S. Ct. 2711 (2004) (asserting that the president has authority to detain an "enemy combatant" under his Commander in Chief powers and Congress's Authorization).

[137]    *Rasul et al. v. Bush*, 159 L. Ed. 2d 548 (2004); *Hamdi*, 124 S. Ct *supra* note 126.

[138]    *Hamdi*, 124 S. Ct., *supra* note 126 at 2641.

[139]    *Id.* at 2640-41.

[140]    *See* Sections IV.B.1 and IV.B.2. of this Report.

[141]    50 U.S.C. §301 *et. seq.* (2004).

[142]    50 U.S.C. §413(b) (2004). The National Security Act of 1947 created the National Security Council, and directed the NSC, subject to the direction of the president, *inter alia*, to: "a) assess and appraise the objectives, commitments

explicitly provides that "[a] finding may not authorize any action that would violate the Constitution or any statute of the United States."[143] The president may also issue classified executive orders or directives on national security matters. Whether these directives have the force of law depends upon such factors as the president's authority to issue them, their conflict with constitutional or statutory provisions, and their promulgation in accordance with prescribed procedure.[144] As one commentator has pointed out, "[i]nherent in [the division of power] is the notion that the president must respect statutory commands even when they require a result contrary to his own policy preferences."[145] Accordingly, where there is a conflict between a presidential directive and a law enacted by Congress, agency heads must comply with the law.[146] Thus, for example, in *Chamber of Commerce v. Reich*,[147] the District of Columbia Circuit Court of Appeals declared illegal an executive order issued by President Clinton that directed federal agencies not to do business with contractors who hire permanent replacements for striking employees. The court, noting that the National Labor Relations Act (NLRA) permits the hiring of permanent replacements for strikers, concluded that an executive order to the contrary would upset the balance struck by Congress on an issue that "surely goes to the heart of United States labor relations policy."[148] Similarly, in *Building and Construction Trades Department v. Allbaugh*,[149] the court ruled illegal an executive order issued by President George W. Bush that prohibited federal contractors from using project labor agreements. The court held that the president lacked the authority under the Constitution and the Procurement Act to bar such agreements and that the executive order conflicted with the NLRA by prohibiting a practice that was considered legal under the Act.[150]

As detailed in Section IV.B.2 of this Report, a series of presidential decision directives (PDDs) apparently authorize transfers of suspected terrorists from foreign states to the United States. PDDs are National Security Council documents that announce presidential decisions and guide policy implementation. They range from the publicly available to the highly classified. According to the testimony of then-FBI Director Louis Freeh, "[t]he rendition process is governed by PDD-77, which sets explicit requirements for initiating this method for returning terrorists to stand trial in the United States."[151] This directive remains classified. Because many of the potentially relevant PDDs (including PDD-77) remain classified, the full scope of the relevant PDDs' authority is unknown. U.S. officials and the 9-11 Commission have also referred to PDD-

---

and risks of the United States in relation to our actual and potential military power, in the interest of national security, for the purposes of making recommendations to the president in connection therewith; and b) consider policies on matters of common interest to the departments and agencies of the government concerned with national security, and … make recommendations to the president in connection therewith." J.S. Lay & R.H. Johnson, ORGANIZATIONAL HISTORY OF THE NATIONAL SECURITY COUNCIL DURING THE TRUMAN AND EISENHOWER ADMINISTRATIONS, at 3 (Washington, D.C.: National Security Council, 1960).

[143]  50 U.S.C. §413(a)(5) (2004).

[144]  Harold C. Relyea, Specialist in American National Government, Government Division, *Report for Congress: Presidential Directives: Background and Overview*, Feb. 10, 2003, *available at* http://www.fas.org/irp/crs/98-611.pdf (last visited Oct. 25, 2004).

[145]  Robert V. Percival, *Presidential Administrations and Administrative Law: Presidential Management of the Administrative State: The Not-So-Unitary Executive*, 51 DUKE L. J. 963 (2001).

[146]  *Id.*

[147]  *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).

[148]  *Id.* at 1337.

[149]  *Building and Const. Trades Dept., AFL-CIO v. Allbaugh*, No. 01-0902, 2001 WL 1381197, at *18, 20 (D.D.C. Nov. 7, 2001).

[150]  *Id.*

[151]  Freeh Statement to 9-11 Commission, *supra* note 71.

39, entitled "U.S. Policy on Counterterrorism," signed on June 21, 1995 following the bombing of
the federal building in Oklahoma City, in circumstances that indicate this PDD may also be
implicated in rendition.[152] Since this PDD is available only in highly redacted form, any specific
provisions applicable to renditions are not publicly known. The Commission's interim staff report
on intelligence policy states that "under the presidential directives in the Clinton Administration,
PDD-39 and PDD-62, the CIA had two main operational responsibilities for combating terrorism,
rendition and disruption."[153] Based on available information, it seems that this directive dealt with
the transfers of suspected terrorists *to* the United States outside of formal extradition channels,
rather than renditions *from* the United States or *from* a third state to another foreign state. A
General Accounting Office report found that PDD-62, signed in May 1998, "reaffirmed PDD-39
and further articulated responsibilities for specific agencies."[154]

 Although the scope of various presidential directives is unknown, because Extraordinary
Renditions violate U.S. statutory law, and, as will be demonstrated in subsequent Report Sections,
treaty law (which is considered to be supreme law of the land under the Constitution), it is unlikely
that any PDD explicitly purports to authorize Extraordinary Rendition. Moreover, under U.S. law,
Congress could have authorized departure from international obligations of the United States.
However, not only did it not do so, but by enacting FARRA and sections 2340 and 2340A of the
U.S. Code, Congress reaffirmed United States' commitment to CAT and to the *jus cogens* norm of
the prohibition against torture. Without congressional authorization, it is unlikely that executive
orders can be issued in violation of the international obligations of the United States. Accordingly,
any PDD authorizing Extraordinary Rendition very likely would be outside the scope of
presidential authority.

### (c)     Presidential power to make international agreements

 The president has authority to make international agreements "dealing with any matter that
falls within his independent powers under the Constitution."[155] However, as stated above, pursuant
to Article III of the Constitution, the president has the duty to "take Care that the Laws be faithfully
executed" (take care clause).[156] Thus, under the "take care" clause, as well as in accordance with
U.S. jurisprudence, the president likely would be prohibited from making international agreements
that contravene the laws of the United States by permitting or aiding torture.[157] In addition, any
order permitting the transfer of individuals to other states in circumstances that constitute
complicity, participation, or assistance in CID treatment would also contravene stated

---

[152]  *Formulation and Conduct of U.S. Counterterrorism Policy: Hearing Before the National Commission on Terrorist
Attacks Upon the United States (Interim Report)*, (Mar. 23, 2004), *available at* http://www.9-
11commission.gov/archive/hearing8/9-11Commission_Hearing_2004-03-23.pdf (last visited Oct. 25, 2004);
GOVERNMENT ACCOUNTABILITY OFFICE, COMBATING TERRORISM: ISSUES TO BE RESOLVED TO IMPROVE
COUNTERTERRORISM OPERATIONS, (May 1999) (Washington, D.C.: U.S. General Accounting Office, 1999), at 3,
*available at* http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB55/gaonsiad-99-135.pdf (last visited Oct. 25, 2004)
("After the bombing of a federal building in Oklahoma City, Oklahoma, the President issued Presidential Decision
Directive (PDD) 39 in June 1995, which enumerated responsibilities for federal agencies in combating terrorism,
including domestic incidents.")

[153]  Kojm Statement, *supra* note 73.

[154]  GOVERNMENT ACCOUNTABILITY OFFICE, COMBATING TERRORISM: ISSUES TO BE RESOLVED TO IMPROVE
COUNTERTERRORISM OPERATIONS, *supra* note 152.

[155]  RESTATEMENT, *supra* note 123, at §303(4) (sole executive agreements).

[156]  U.S. CONST. art. III, § 2.

[157]  Under the "later in time" rule, sole executive agreements may be superseded by subsequent domestic legislation. A
clear congressional prohibition on Extraordinary Rendition would thus override any such agreements.

administration policies that detainees in the "War on Terror" be "treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria."[158]

### 5.   *Extraordinary Rendition and the CIA*

Because Extraordinary Renditions appear to be covert operations the existence of which is formally denied by the U.S. government, and because information about the operations of the CIA is similarly not available to the public, it is difficult to ascertain whether anything in the mandate of (or regulations governing) the CIA could be interpreted to authorize Extraordinary Renditions. This Section provides an overview of the scope of authorization of the CIA activities based on publicly available information and analyzes the practice of Extraordinary Renditions in light of that information.

The CIA was established and granted its general powers under the National Security Act of 1947.[159] It was first given authority to conduct covert operations by National Security Council (NSC) Directive 10/2, issued on June 18, 1948.[160] This authority has been reaffirmed and elaborated upon in several NSC directives and executive orders.

Provisions governing the CIA specify, among other things, how the CIA could use secret funds (a specific budget item to be allocated by the Director of Central Intelligence (DCI) as needed without normal accounting review), granted the CIA the right to borrow personnel from other government agencies, allowed the agency to ignore immigration laws, and gave the DCI the right to determine which of the agency's activities and documents should be kept secret.[161] It is noteworthy that the CIA's powers to override immigration laws are restricted to those affecting the *admission* of aliens. Specifically, section 403h provides that:

> Whenever the Director, the Attorney General, and the Commissioner of Immigration and Naturalization shall determine that the admission of a particular alien into the United States for permanent residence is in the interest of national security or essential to the furtherance of the national intelligence mission, such alien and his immediate family shall be admitted to the United States for permanent residence without regard to their inadmissibility under the immigration or any other laws and regulations, or to the failure to comply with such laws and regulations pertaining to admissibility....[162]

---

[158]   Military Order, "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," (Nov. 13, 2001), *available at* http://www.deathpenaltyinfo.org/article.php?scid=33&did=224 (last visited Oct. 25, 2004).

[159]   50 U.S.C. §§401 *et. seq.*

[160]   National Security Council Directive 10/2, June 18, 1948, *printed in* FOREIGN RELATIONS, 1945-1950, EMERGENCE OF THE INTELLIGENCE ESTABLISHMENT (United States Government Printing, 1996) Document 292 (NSC 10/2). *See Note on U.S. Covert Actions, in* FOREIGN RELATIONS *1964-1968*, Volume XXVI, Indonesia; Malaysia-Singapore; Philippines, Released by the Office of the Historian of the U.S. Department of State, *available at* http://www.state.gov/r/pa/ho/frus/johnsonlb/xxvi/4440.htm (last visited Oct. 25, 2004). NSC 10/2 defines "covert" operations as all activities "which are conducted or sponsored by this Government against hostile foreign states or groups or in support of friendly states or groups but which are so planned and executed that any U.S. Government responsibility is not evident to unauthorized persons and that if uncovered the US Government can plausibly disclaim any responsibility for them." NSC 10/2. The precise definition of covert operations has differed among administrations, although not in material ways. *See* David Isenberg, *The Pitfalls of U.S. Covert Operations*, CATO Policy Analysis No. 118 (April 7, 1989), *available at* http://www.cato.org/pub_display.php?pub_id=1645 (last visited Oct. 25, 2004).

[161]   *See, e.g.*, 50 U.S.C. §403(f), (g), (h).

[162]   50 U.S.C. §403h.

No similar authority, however, is given to the CIA in respect of a *removal* of individuals from the United States. Thus, because the Act explicitly includes the admission but not the removal of aliens, one can infer that congressional intent was *not* to grant the CIA powers to override laws governing *removal* of aliens.

Generally, CIA operations are subject to oversight by congressional intelligence committees. However, alternative oversight is provided for highly classified actions: if the president determines that it is essential to limit access to a finding to meet extraordinary circumstances affecting vital interests of the United States, the finding may be reported to the chairpersons and ranking minority members of the congressional intelligence committees, the Speaker and minority leader of the House of Representatives, the majority and minority leaders of the Senate, and such other member or members of the congressional leadership as may be included by the president.[163]

There are apparently CIA regulations in place that explicitly prohibit the use of or participation in torture by CIA officers. According to a *Washington Post* article, "the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries."[164] However, the same article reports that "the CIA, in practice, is using a narrow definition of what counts as 'knowing' that a suspect has been tortured: 'If we're not there in the room, who is to say?' said one official conversant with recent reports of renditions."[165] Since these regulations are not publicly available, it is not possible to analyze their consistency with U.S. and international law, or to determine whether they would appear to authorize Extraordinary Renditions. However, based on publicly available information, no authority for Extraordinary Renditions can be found in the CIA governing documents. This is not surprising given that the practice of Extraordinary Rendition is inherently contrary to both U.S. and international law.

## V.    EXTRAORDINARY RENDITIONS VIOLATE INTERNATIONAL LAW

In this Section of the Report, we consider in detail the international legal standards applicable to Extraordinary Renditions.[166] The United States is party to international human rights and humanitarian law treaties that prohibit both torture and the transfer of individuals to states where they are in danger or at risk of torture. Specifically, the United States is a party to the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[167] the International Covenant on Civil and Political Rights,[168] the Geneva Conventions of 1949,[169] and

---

[163]    50 U.S.C. §413(b).

[164]    Priest & Gellman, *supra* note 53.

[165]    *Id.*

[166]    As we noted in the Introduction and Overview Sections, this Report, including this international law discussion, addresses the different instances of Extraordinary Rendition and not renditions *per se*, which are beyond the scope of this Report.

[167]    CAT, *supra* note 5.

[168]    ICCPR, *supra* note 5.

[169]    Convention for the Amelioration of the Condition of the Wounded and the Sick in Armed Forces in the Field, Aug. 12, 1949, *entered into force* Oct. 21, 1950, *6 U.S.T. 3217*, 75 U.N.T.S. 31, *available at* http://www.icrc.org.ihl.nsf/7c4d08d9b287a42141256739003e636b/fe20c3d903ce27e3c125641c004a92f3 (last visited Oct. 24, 2004) (Geneva I); Convention for the Amelioration of the Condition of Wounded, Sick, and

the Refugee Convention of 1951.[170] Each treaty prohibits torture, a prohibition that has become a non-derogable norm under international law. To varying degrees, the treaties also prohibit cruel, inhuman, or degrading (CID) treatment; the differences among the treaties reflect the open-textured nature of the definition of CID treatment. Either directly or indirectly (*i.e.*, through the jurisprudence or commentary of courts or treaty or regional bodies charged with interpreting a particular treaty), each of these treaties includes another norm: the prohibition against the *refoulement*, or transfer, of an individual to another state where that individual faces the danger or risk of torture. Although these treaties may differ in their particulars, together with customary international law, they prohibit (and, in some instances, require the United States to criminalize) each of the different examples of Extraordinary Renditions described in Section IV.A. of this Report.

CAT prohibits both torture and CID treatment. It also explicitly prohibits the *refoulement* of individuals to states where there is a "substantial likelihood" that they "may be in danger of" torture.[171] The ICCPR prohibits torture and CID, but its *refoulement* protection is broader than that of CAT: as interpreted by the Human Rights Committee, the ICCPR prohibits the *refoulement* of individuals to states where they may be "at risk of" either torture or CID (or both). Geneva Convention (III) and Geneva Convention (IV) prohibit both torture and the inhuman treatment of prisoners of war and civilians classified as "protected persons" in the context of armed conflict. The transfer of a prisoner of war (POW) to a state where the POW is likely to be tortured or inhumanely treated is a violation of Geneva III. The unlawful transfer of a civilian classified as a "protected person" to such a state has harsher consequences–the transfer is a "grave breach" under Geneva IV, and is a criminal act. The Refugee Convention may also afford protection against torture and *refoulement* to individuals with a "well-founded fear of persecution" on specific enumerated grounds.

---

Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, *entered into force* Oct. 21, 1950, *6 U.S.T. 3217,* 75 U.N.T.S. 85, *available at* http://www.icrc.org/ihl.nsf/7e4d08d9b287a42141256739003e636b/44072487ec4c2131c125641e004a9977 (last visited Oct. 24, 2004) (Geneva II); Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, *entered into force* Oct. 21, 1950. *6 U.S.T. 3316,* 75 U.N.T.S. 135, *available at* http://www.icrc.org/ihl.nsf/7e4d08d9b287a42141256739003e636b/6fef854a3517b75ac125641e004a9e68 (last visited Oct. 24, 2004) (Geneva III); Convention Relative to the Protection of Civilian Persons in Times of War, Aug. 12, 1949, *entered into force* Oct. 21, 1950, *6 U.S.T. 3516,* 75 U.N.T.S. 287, *available at* http://www.icrc.org/ihl.nsf/7e4d08d9b287a42141256739003e636b/6756482d86146898c125641e004aa3c5 (last visited Oct. 24, 2004) (Geneva IV) (together, Geneva Conventions).

[170]  Convention Relating to the Status of Refugees, *opened for signature* July 28, 1951, *19 U.S.T. 6259, 6261,* 189 U.N.T.S. 150, 152, *entered into force* Apr. 22, 1954, *available at* http://www.ohchr.org/english/law/refugees.htm (last visited Oct. 24, 2004) (Refugee Convention). Although the United States did not ratify the Refugee Convention, it is a party to it through its accession to the 1967 Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, *19 U.S.T. 6223,* 606 U.N.T.S. 267, *entered into force* Oct. 1967, *available at* http://www.ohchr.org/english/law/protocolrefugees.htm (last visited Oct. 24, 2004) (1967 Protocol), which adopted and extended the Refugee Convention's protections. Also relevant is the American Declaration of the Rights and Duties of Man, May 2, 1948, OEA/ser. L./V/II.23, doc. 21 rev. 6, (1979), *available at* http://www.iachr.org/Basicos/basic2.htm (last visited Oct. 9, 2004) (American Declaration). The American Declaration was adopted by the Ninth International Conference of the OAS held at Bogota, Columbia, March 30-May 2, 1948, and applies to the United States through its membership in the Organization of American States (OAS). The Inter-American Court of Human Rights has determined that the American Declaration is a source of international obligation for the United States and other OAS member states that are not parties to the American Convention on Human Rights, based upon Articles 3, 16, 51, 112, and 150 of the OAS Charter. *See* Inter-Am. Court H.R., Advisory Opinion OC-10/89, *Interpretation of the American Declaration of the Rights and Duties of Man Within the Framework of Article 64 of the American Convention on Human Rights*, July 14, 1989, Ser. A No. 10 (1989), paras. 35-45.

[171]  The *refoulement* of individuals to states where they are in danger of CID treatment is not explicitly prohibited.

Under CAT, the prohibition against *refoulement* to torture requires both an objective assessment of the conditions in the state to which an individual may be transferred, and a subjective assessment of the danger particular to the individual. CAT protections apply when these assessments lead to a substantial likelihood of a danger of torture that is greater than "mere suspicion," but the likelihood does not have to rise to the level of "high probability." CAT protections, which apply to all types of transfers (including expulsion and extradition) are the most protective of any of the treaties to which the United States is a party. In order for ICCPR protections to apply, the individual must face a "real risk" of danger. This standard has also been interpreted to contain a subjective and an objective assessment, although the "real risk" standard is higher that the CAT "in danger of" threshold. [172]

Although the assessment whether a particular allegation of *refoulement* to torture meets the subjective component of both the CAT and the ICCPR tests must be made on a case-by-case basis, each alleged instance of Extraordinary Rendition described earlier in Section IV.A. meets the objective component. According to the U.S. Department of State's own annual human rights reports, each of the states to which individuals have allegedly been transferred is known to the United States as having a history of torture of detainees. Many of these states have also been identified by the United States as states that commonly use torture against individuals detained for alleged security reasons or because they are suspected of terrorism.

CAT, the ICCPR and the Geneva Conventions have each been interpreted to require that states investigate and criminalize torture by their own officials and those acting at the officials' direction. Under CAT, the requirement to criminalize acts of torture or complicity or participation in torture is directly imposed by the treaty itself, and, in the context of Extraordinary Renditions, applies to acts by U.S. state actors (or non-state actors acting with the consent or acquiesence of a state actor) that take place in territory under U.S. jurisdiction (interpreted to include territory over which the United States has factual control), acts on board of U.S.-registered ships or aircraft, or acts by U.S. state actors (or non-state actors acting with the consent or acquiescence of a state actor) anywhere in the world. [173]

The ICCPR has been interpreted to require a state party to prevent, punish, investigate and redress harm caused by acts of both torture and CID treatment, and complicity to torture and CID treatment, by state actors and by private parties. Failure to investigate and prosecute may result in liability on the part of the state itself. The scope of applicability of ICCPR protections is similar to CAT, but has been interpreted more broadly to include state responsibility for violations of an individual's ICCPR protections (i) in the physical territory of the state or (ii) that may be imputed to the state if the individual was in the power or effective control of the state (even if outside its territory) or if the violations were committed by state actors, regardless of where they took place. [174] The protections of the Geneva Conventions apply in situations of armed conflict, and to individuals who qualify as "protected persons" under the Conventions.

The breadth of these criminalization provisions and interpretations is a reflection of the importance placed by the community of nations on the anti-torture prohibition. Each of the cases of alleged Extraordinary Rendition described above must therefore be investigated and, if there are reasonable grounds for belief that torture was committed, or that U.S. agents or nationals were complicit in transferring an individual to a state where the person was tortured, the United States

---

[172]   A likely explanation for the higher ICCPR threshold is that the ICCPR has been interpreted to extend the *non-refoulement* protection over a broader range of abuse–including both torture *and* CID treatment or punishment–than CAT, which on its face protects only against *refoulement* to torture.

[173]   CAT, *supra* note 5, art. 5(1). For a detailed discussion of the scope of CAT's application, *see* Section V.A.4.

[174]   For a detailed discussion of the scope of the ICCPR's application, *see* Section V.B.2.

must prosecute. As described in greater detail below, the failure by a state party to investigate and prosecute allegations of torture and complicity in torture may itself give rise to a breach by the United States of its obligations under CAT and the ICCPR.

This Report focuses on the United States' obligations pursuant to the international treaties to which it is a party, primarily CAT and the ICCPR, as well as the Geneva Conventions and the Refugee Convention. Given the importance of international standards in interpreting U.S. domestic law[175] as reflected in part by recent U.S. Supreme Court decisions in which the court has explicitly looked to international law for guidance[176] in interpreting those obligations, we consider the commentary and decisions by the Committee against Torture (CAT Committee)[177] and the Human Rights Committee,[178] the bodies charged respectively by CAT and the ICCPR with interpreting each treaty, monitoring compliance by states with the treaty, and, if applicable, considering individual petitions. The primary treatise on CAT, which was written by two of the principal drafters of the convention and which includes analysis of the CAT *travaux préparatoires*, also provides assistance in interpreting CAT.[179]

---

[175]    *Murray* v. *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (a statute "ought never to be construed to violate the law of nations, if any other possible construction remains"). *See also United States* v. *P.L.O.*, 695 F. Supp. 1456, 1468 (S.D.N.Y. 1988) (noting "the lengths to which our courts have sometimes gone in construing domestic statutes so as to avoid conflict with international agreements..."); *INS v. St. Cyr*, 533 U.S. 289 (2001).

[176]    *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472 (2003); *Hamdi v. Rumsfeld*, 124 S.Ct. at 2641 (citing to international treaties for "clearly established" principles of the laws of war).

[177]    The Committee against Torture is the monitoring body created by the states party to CAT. CAT, *supra* note 5, arts. 17-24. It is charged with: (i) considering and commenting on country reports submitted under CAT (art. 19); (ii) the ability to inquire into an individual state's practices with regard to torture if it receives "reliable information" of "well-founded indications" that torture is being practiced in the territory of the state (art. 20); (iii) resolving inter-State disputes (art. 21); and (iii) determining individual complaints (art. 22). The Committee Against Torture "is not an appellate, a quasi-judicial or an administrative body, but rather a monitoring body created by the States parties themselves with declaratory powers only." Committee Against Torture, General Comment 1, *Communications concerning the return of a person to a State where there may be grounds he would be subjected to torture (article 3 in the context of article 22)*, U.N. Doc. A/53/44, annex IX at 52 (1998), *reprinted in* Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at 279 (2003) (CAT Article 3 Comment), para. 9. The United States is bound by the Article 20 inquiry procedure, and has entered a declaration accepting the Article 21 interstate complaint procedure. *See* United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html/menu3/b/treaty12_asp.htm (last visited Oct. 9, 2004). The United States has not accepted the competence of the CAT Committee under Article 22 to receive and consider complaints on behalf of individuals subject to U.S. jurisdiction who claim to be victims of a CAT violation. *Id.*

[178]    The Human Rights Committee is the most authoritative source, at the international level, of interpretations of a state's obligations under the ICCPR. Pursuant to the ICCPR, *supra* note 5. The Human Rights Committee is empowered to: (i) receive state party reports and comment on those reports (art. 40(4)); (ii) rule on complaints filed by a state party that another state party is not fulfilling its obligations under the Covenant (art. 41); and (iii) rule on complaints filed by individuals "who claim that any of their rights enumerated in the Covenant have been violated and who have exhausted all available domestic remedies" Optional Protocol to the International Covenant on Civil and Political Rights, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 59, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 302, *entered into force* March 23, 1976, *available at* http://www.ohchr.org/english/law/ccpr-one.htm (last visited Oct. 24, 2004). In ratifying the ICCPR, the U.S. Senate declared that "The United States . . . accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims that another State Party is not fulfilling its obligations under the Covenant." *See* 138 Cong. Rec. S4781-01 (daily ed., April 2, 1992).

[179]    *See* J. HERMAN BURGERS & HANS DANELIUS, THE UNITED NATIONS CONVENTION AGAINST TORTURE: A HANDBOOK ON THE CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT (1988). Pursuant to the Vienna Convention on the Law of Treaties, if a treaty term is "ambiguous or obscure," "recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion." The Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, *entered into* force Jan. 27, 1980, art. 32, 1155 U.N.T.S. 331, *available at* http://www.un.org/law/ilc/texts/treaties.htm (last visited Oct. 24, 2004) (Vienna Convention), art 32. The Vienna

An additional international legal instrument that applies to the United States through its membership in the Organization of American States (OAS) is the American Declaration on the Rights and Duties of Man.[180] We also look briefly to the American Convention on Human Rights (American Convention), which the United States signed on June 1, 1997, but has not yet ratified.[181]

In addition to the U.S. treaty obligations, we look to *jus cogens*[182] norms by which the United States is bound. The prohibition against torture has been universally recognized as a customary international law norm[183] and as a *jus cogens* norm applicable in times of war and peace, from which no derogation is permitted. [184] In *The Paquete Habana*, the U.S. Supreme Court recognized that customary international law applies to the U.S. domestic sphere.[185] As discussed in greater detail below, the prohibitions against torture and *refoulement* are specifically articulated in international law in numerous treaties (including treaties to which the United States is a party), in state practice (including that of the United States) and in the works of scholars.

The United States is not alone in facing the threat of terrorism both within its borders and against its citizens and interests abroad. The experience of other states and regions that have, and still are, facing the threat of terrorism offers useful guidance. Other sources we therefore look to include the European Convention for the Protection of Human Rights and Fundamental

---

Convention has not been ratified by the United States, but the provisions relied upon in this Report are considered to codify customary international law. The Vienna Convention has been treated as authoritative by the U.S. Department of State and several courts of appeal. *See* Maria Frankowska, *The Vienna Convention Before the United States Courts*, 28 Va. J. Int'l L. 281 (1988).

[180]  American Declaration, *supra* note 170.

[181]  American Convention on Human Rights, Nov. 22, 1969, KAV 2305, 9 ILM 673 (1970), O.A.S. Treaty Series No. 36, art. 5, P 2, OEA/Ser. L./V/II.23 doc. rev. 2, art. 5 *entered into force* July 18, 1978, *available at* http://www.cidh.org/Basicos/basic3.htm (last visited Oct. 25, 2004) (American Convention).

[182]  A *jus cogens* norm is defined in the Vienna Convention as "accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Vienna Convention, *supra* note 179, art. 53.

[183]  "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." RESTATEMENT, *supra* note 123, at §102 (2). The Restatement specifies that "[i]nternational agreements create law for the states parties thereto and may lead to the creation of customary international law [for states which are not parties] when such agreements are intended for adherence by states generally and are in fact widely accepted." *Id.* §102(3). The Restatement includes "torture or other cruel, inhuman or degrading treatment or punishment" as a violation of customary international law. *Id.* §702(d). Customary international law is part of the common law of the United States and is considered to control if there is no contrary treaty, statute or executive act. U.S. CONST., art. III, § 8; *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir. 1980).

[184]  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714, 717 (9th Cir. 1992), *cert. denied* 507 U.S. 1017, 113 S. Ct. 1812 (1993) (quoting Vienna Convention definition of *jus cogens* and noting that the prohibition against torture by state actors has "the force of a *jus cogens* norm"). *See also Kadic v. Karadzic, 70* F.3d 232 (2d Cir. 1996) (holding that torture is a violation of customary international law and upholding a civil suit against the leader of the Bosnian Serbs under the Torture Victim Protection Act of 1991); *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 499 (9th Cir. 1992) (finding that official torture violates customary international law); *Filartiga v. Pena-Irala,* 630 F.2d at 881, 883-84, 887 (2d Cir. 1980) (holding that torture is a violation of "the law of nations"); *Forti v. Suarez-Mason,* 672 F. Supp. 1531, 1541 (N.D. Cal. 1987*)* (following *Filartiga* and finding a universal proscription against official torture); Inter-Am. Comm'n H. R., *Report on the Situation of Human Rights of Asylum Seekers within the Canadian Refugee Determination System* OEA/Ser.L/V/II.106, Doc. 40 rev., February 28, 2000, para.154 (prohibition against torture is a *jus cogens* norm); *Prosecutor v. Furundzija*, Case No. No. IT-95-17/1-T, Judgment (ICTY Trial Chamber December 10, 1998) (recognizing prohibition against torture as *jus cogens* norm); *R. v. Bow Street Metropolitan Stipendiary Magistrate, Ex parte Pinochet Ugarte (No. 3)*, [1999] 2 W.L.R. 827 (H.L.) (same); Restatement, *supra* note 123, at cmt. n, (the prohibitions against torture and CID treatment and punishment have the status of *jus cogens* norms).

[185]  *The Paquete Habana,* 175 U.S. 677, 700 (1900).

Freedoms[186] (as interpreted by the European Court of Human Rights). Finally, this Report briefly examines the international criminal law standards that have been applied to prosecutions of individuals for violations of the anti-torture prohibition.

## A.   The United States is Obligated to Prevent Extraordinary Renditions under the UN Convention Against Torture

CAT defines and prohibits torture and conduct that is considered cruel, inhuman or degrading,[187] prohibits the transfer or *refoulement* of a person to a state that would subject the person to torture,[188] and requires the United States to prevent, investigate and criminalize direct, complicitous or other participation in torture by state actors and also non-state actors acting with the consent or acquiescence of a state actor.[189]

### 1.   *CAT Prohibits Torture and Cruel, Inhuman or Degrading Treatment*

As the Convention's preamble notes, at the time of CAT's formulation, torture and CID treatment were already prohibited by Article 5 of the Universal Declaration of Human Rights,[190] Article 7 of the ICCPR,[191] and also by the UN General Assembly's Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Punishment.[192] Unlike any of these instruments, though, CAT specifically defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.[193]

---

[186]   European Convention for the Protection of Human Rights and Fundamental Freedoms, 213 U.N.T.S. 222, *opened for signature* Nov. 4, 1950, *entered into force* Sept. 3, 1953, *as amended by* Protocols Nos 3, 5, 8, and 11 which *entered into force* on 21 September 1970, 20 December 1971, 1 January 1990, and 1 November 1998 respectively, *available at* http://www.echr.coe.int/Convention_webConvenENG.pdf (last visited Oct. 24, 2004) (European Convention).

[187]   CAT, *supra* note 5, art. 1.

[188]   *Id.* art. 3.1.

[189]   *Id.* art. 4.1.

[190]   Universal Declaration of Human Rights, G.A. Res. 217, UN GAOR, 3d Sess., UN Doc. A/810 (1948) art. 5, *available at* http://www.unhchr.ch/udhr/lang/eng.htm (last visited Oct. 24, 2004) (providing that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment").

[191]   ICCPR, *supra* note 5, art. 7 ("no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment").

[192]   Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 3452 (XXX), annex, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1975), *available at* http://www.ohchr.org/english/law/declarationcat.htm (last visited Oct. 24, 2004).

[193]   When ratifying CAT, the United States specified its understanding concerning the scope of "torture." *See* United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html/menu3/b/treaty12_asp.htm (last visited Oct. 9, 2004). The understanding is discussed in Association of the Bar of the City of New York, *Human Rights Standards Applicable to the United States'*

CAT makes it clear, therefore, that the torture prohibition includes conduct undertaken for the purposes of obtaining information by state actors, or by other persons acting with the consent or acquiescence of a state actor.[194]

CAT does not define CID, but the jurisprudence of the CAT Committee makes clear that CID punishment or treatment is on a continuum with torture, through Article 16, which requires ratifying states to prevent "other actors of cruel, inhuman or degrading treatment or punishment which do not amount to torture."[195] Article 16 further imposes on ratifying parties the same obligations with respect to investigation of allegations of CID treatment as the parties have with respect to investigation of torture allegations.[196]

### 2.    *CAT Prohibits the Transfer of Individuals to States Where They May Be in Danger of Torture*

CAT's prohibition against the transfer of individuals to states where they are in danger of torture is absolute and unqualified. CAT Article 3(1) states: "No State Party shall expel, return (*"refouler"*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[197] The scope of the CAT prohibition

---

*Interrogation of Detainees*, April 2004 (HR Standards Report) *available at*
http://www.abcny.org.pdf/HUMANRIGHTS.pdf (last visited Oct. 6, 2004), at 20-21. Acts that the CAT Committee has held constitute torture are discussed in greater detail in the HR Standards Report, pages 16-17.

[194]   *See also* BURGERS & DANELIUS, *supra* note 179, at 119 ("It is important to note . . . that the primary purpose of [CAT] is to eliminate torture committed by or under the responsibility of public officials for purposes connected with their public functions. Precisely because the public interest is sometimes seen in such cases as a justification, the authorities may be reluctant to suppress these practices."). For a discussion of liability of state actors, *see* Section VIII. of this Report.

[195]   In its ratification of CAT, the U.S. reservation to Article 16 of CAT provides that the United States considers itself bound by Article 16 only insofar as CID treatment is understood to mean "the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth and Fourteenth Amendments." *See* United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html/menu3/b/treaty12_asp.htm (last visited Oct. 25, 2004). For further discussion of the interpretation of this reservation, *see* HR Standards Report, *supra* note 193, at 27-30. Acts that the CAT Committee has found to constitute CID treatment or punishment are discussed in greater detail in the HR Standards Report, *supra* note 193, at 18-19.

[196]   CAT, *supra* note 5, article 16(1) provides:

1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.
2. Each State Party shall include this prohibition in the rules or instructions issued in regard to the duties and functions of any such person.

*See* Section V.A.3. of this Report, discussing CAT articles 10, 11, 12 and 13.

[197]   The CAT *non-refoulement* obligation prohibits transfers to states where an individual is in danger of torture, and not transfers to states where the individual faces the danger of CID treatment or punishment. This was a deliberate choice on the part of the drafters who were concerned that although "torture" could be defined with specificity, a definition of CID treatment or punishment was less easily specified. BURGERS & DANELIUS, *supra* note 179, at 70, 74, 122-23. As discussed below, however, the Human Rights Committee has interpreted the ICCPR (to which the United States is also a party), to impose the prohibition against *refoulement* to states where an individual faces the danger of CID treatment as well as the danger of torture. The United States should also be guided by the jurisprudence of the European Court of Human Rights and its Commission, interpreting Article 3 of the European Convention, *supra* note 186. Article 3 of the European Convention prohibits torture and CID treatment or punishment but does not include a prohibition against *refoulement*. Nevertheless, the European Court and the

against *refoulement* was broadly drafted in order to apply to (i) transfers to any other state where an individual is in danger of torture; (ii) all persons in danger of torture upon transfer; and (iii) all types of transfers (including, for example, deportations or transfers pursuant to extradition treaties).

### (a)    Prohibition against transfers to subsequent states

According to the CAT Committee, "the phrase 'another State' in article 3 refers to the State to which the individual concerned is being expelled, returned or extradited, as well as to any State to which the author may subsequently be expelled, returned or extradited."[198] Burgers and Danelius state that Article 3 "makes it clear that a State is not only responsible for what happens in its own territory, but it must also refrain from exposing an individual to serious risks outside its territory by handing him or her over to another State from which treatment contrary to [CAT] might be expected."[199]

### (b)    Standards for determining application of *non-refoulement* obligation to persons in danger of torture

The CAT *non-refoulement* obligation applies to all individuals who "would be *in danger of* being subjected to torture" (emphasis added) and not just to individuals who *would be tortured* upon transfer.[200] The focus is on future danger that could occur. CAT further provides that to determine whether "substantial grounds for believing that [an individual] would be in danger of being subjected to torture" exist, "the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."[201] In commentary and decisions, the CAT Committee has provided guidance on interpretation of the *non-refoulement* standard, and the considerations that should be taken into account in assessing the danger of torture.

First, the CAT Committee has interpreted "substantial grounds" to mean that "the risk of torture must be assessed [by the State Party and the Committee] on grounds that go beyond mere theory or suspicion. However, the risk does not have to meet the test of being highly probable."[202] The CAT Committee therefore interprets the "substantial grounds" threshold at a lesser level than that used by the United States: the United States ratified CAT subject to an understanding that it would interpret the CAT Article 3 phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in article 3 of the Convention, to mean "if it is more likely than not that he would be tortured."[203]

---

European Commission have interpreted European Convention Article 3 to prohibit transfers to states in which an individual may be subjected to torture or to CID treatment or punishment. *See Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (1989).

[198]    CAT Article 3 Comment, *supra* note 177, para.2.

[199]    BURGERS & DANELIUS, *supra* note 179, at 125.

[200]    This standard has a lower threshold than the Refugee Convention's *refoulement* prohibition, which requires a showing of a "well-founded fear of persecution." *See* Section V.D. below.

[201]    CAT, *supra* note 5, art. 3(2).

[202]    CAT Article 3 Comment, *supra* note 177, para. 6.

[203]    *See* United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html/menu3/b/treaty12_asp.htm (last visited Oct. 25, 2004).

Second, the CAT Committee has determined that the "substantial grounds for belief" requirement incorporates both (i) an objective assessment of the conditions in the state to which an individual is to be transferred,[204] and (ii) a subjective assessment of the danger of torture to the individual facing a transfer.[205] Thus, the CAT Committee has determined that applicants should not be returned to states where reports of conditions indicated the danger of torture and where the state of return was not a party to CAT.[206] For example, in *Khan v. Canada*, the Committee found that because Pakistan was not a party to CAT, the petitioner's return would not only put him in danger of torture, but would strip him of any possibility of applying for protection under CAT.[207] On the other hand, the fact that the state of return is a party to CAT does not preclude a finding that a particular person may be at risk of torture in that state.[208]

According to press reports, the United States has transferred individuals for interrogation to states including Egypt, Jordan, Syria, Saudi Arabia, Morocco, Yemen, and Egypt. These are all nations that the U.S. Department of State itself has identified as practitioners of torture on detainees, including as an interrogation method, in State Department human rights reports for each of 2001, 2002, and 2003. The United States thus has knowledge that the objective prong of the "substantial grounds for belief" test is likely satisfied in alleged cases of Extraordinary Rendition to each of these states:

- **Egypt**. In its 2003 report, the State Department found "there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained frequent." The "[p]rincipal methods of torture reportedly employed by the police and [security services] included victims being: stripped and blindfolded; suspended from a ceiling or doorframe with feet just touching the floor; beaten with fists, whips, metal rods, or other objects; subjected to electrical shocks; and doused with cold water. Victims frequently reported being subjected to threats and forced to sign blank papers for use against the victim or the victim's family in the future should the victim complain of abuse. Some victims, including male and female detainees and children reported that they were sexually assaulted or threatened with rape themselves or family members."[209]

---

[204]  Among the sources of information the CAT Committee will consider is whether the state to which an individual may be returned is "one in which there is evidence of a consistent pattern of gross, flagrant or mass violations of human rights." CAT Article 3 Comment, *supra* note 177, para 8.

[205]  According to the CAT Committee, "The grounds for belief are subjective to the individual in danger of being tortured." *Id*. para. 7. To assess a particular individual's risk, the CAT Committee will look to whether the individual has engaged in activity "within or outside the State concerned which would appear to make him/her particularly vulnerable to the risk of being placed in danger of torture were he/she to be expelled, returned or extradited to the State in question." *Id*. para 8. *See also Mutombo v. Switzerland*, Communication No. 13/1993, Committee Against Torture, U.N. Doc. A/49/44 at 45 (1994) (applicant for CAT relief must show that the risk of torture is specific to that individual).

[206]  *See Mutombo v. Switzerland*, Communication No. 13/1993, Committee Against Torture, U.N. Doc. A/49/44 at 45 (1994); *Khan v. Canada*, Communication No. 15/1994, Committee Against Torture, U.N. Doc. A/50/44 at 46 (1994).

[207]  *Khan v. Canada*, Communication No. 15/1994, Committee Against Torture, U.N. Doc. A/50/44 at 46 (1994).

[208]  *Alan v. Switzerland*, Communication No. 21/1995, Committee Against Torture, UN Doc. CAT/C/16/D/21/1995 (1996).

[209]  U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: EGYPT, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27926.htm ("The Constitution prohibits the infliction of "physical or moral harm" upon persons who have been arrested or detained; however, torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent. The November, 2002 session of the Committee Against Torture noted a systematic pattern of torture by the security forces . . . .") (last visited Oct. 9, 2004). *See also* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002: EGYPT, *available at*

- **Jordan.** In its 2003 report, the State Department stated that "police and security forces sometimes abuse detainees physically and verbally during detention and interrogation, and allegedly also use torture. Allegations of torture are difficult to verify because the police and security officials frequently deny detainees timely access to lawyers, despite legal provisions requiring such access. The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions, and extended solitary confinement."[210]

- **Morocco.** In its 2003 report, the State Department stated that "[t]he law prohibits torture, and the Government denied the use of torture; however, some members of the security forces tortured or otherwise abused detainees."[211]

- **Syria.** In its 2003 report, the State Department stated that former prisoners and human rights groups report "that torture methods include administering electrical shocks; pulling out fingernails; forcing objects into the rectum; beating, sometimes while the victim is suspended from the ceiling; hyper-extending the spine; and using a chair that bends backwards to asphyxiate the victim or fracture the victim's spine.... Although torture occurs in prisons, torture is most likely to occur while detainees are being held at one of the many detention centers run by the various security services throughout the country, and particularly while the authorities are attempting to extract a confession or information regarding an alleged crime or alleged accomplices."[212]

- **Saudi Arabia.** In its 2003 report, the State Department stated that "there were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners. Canadian and British prisoners that were released during the year reported that they had been tortured during their detention..... The Government continued to refuse to recognize the mandate of the UN Committee against Torture to investigate alleged abuses. A

http://www.state.gov/g/drl/rls/hrrpt/2002/18274.htm (same) (last visited Oct. 9, 2004) *and* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: EGYPT, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8248.htm (same) (last visited Oct. 9, 2004).

[210] U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: JORDAN, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27930.htm (last visited Oct. 9, 2004). *See also* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002: JORDAN, *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18279.htm (same) (last visited Oct. 9, 2004), *and* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: JORDAN, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8266.htm (same) (last visited Oct. 9, 2004)

[211] U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: MOROCCO, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27934.htm (last visited Oct. 9, 2004). *See also* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002: MOROCCO, *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18284.htm (same) (last visited Oct. 9, 2004) *and* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: MOROCCO, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8277.htm (same) (last visited Oct. 9, 2004).

[212] U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: SYRIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27934.htm (last visited Oct. 9, 2004). *See also* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002: SYRIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18289.htm (same) (last visited Oct. 9, 2004), *and* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: SYRIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8298.htm (same) (last visited Oct. 9, 2004).

government committee established in 2000 to investigate allegations of torture still had not begun functioning at year's end."[213]

- **Yemen.** In its 2003 report, the Department of State stated that "[Security forces continued to arbitrarily arrest, detain, and torture persons. The Government sometimes failed to hold members of the security forces accountable for abuses.... The Constitution is ambiguous regarding the prohibition of cruel or inhuman punishment, and members of the security forces tortured and otherwise abused persons in detention. Arresting authorities were known to use force during interrogations, especially against those arrested for violent crimes. Detainees in some instances were confined in leg-irons and shackles, despite a 1998 law outlawing this practice."[214]

### (c)    Types of transfers to which *non-refoulement* obligation applies

CAT Article 3's scope is broad and intended to encompass all transfers. The original draft of Article 3(1) referred to expulsion and *refoulement* only; the reference to extradition was added so that Article 3 would "cover all measures by which a person is physically transferred to another state."[215] Because of the breadth of this scope, concerns were raised during the drafting of CAT that the *non-refoulement* obligation could conflict with states' obligations under existing extradition treaties. According to a report of the Working Group on CAT, set up by the UN Commission on Human Rights:

> Some delegations indicated that their States might wish, at the time of signature or ratification of the Convention or accession thereto, to declare that they did not consider themselves bound by Article 3 of the Convention, in so far as that article might not be compatible with obligations towards States not Party to the Convention under extradition treaties concluded before the date of the signature of the Convention.[216]

Thus, states were aware of and on notice that a reservation or declaration regarding the primacy of extradition treaties over the CAT prohibition against *refoulement* could be made at the time of CAT ratification. Indeed, the initial version of CAT sent by President Reagan to the Senate for ratification included the reservation (intended to be included in the ratification instrument) that "[t]he U.S. does not consider itself bound by Article 3 insofar as it conflicts with the obligations of the United States toward States not a party to the Convention under bilateral extradition treaties

---

[213]  U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: SAUDI ARABIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27937.htm. *See also* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002: SAUDI ARABIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18288.htm (same) (last visited Oct. 9, 2004) *and* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: SAUDI ARABIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8296.htm (same) (last visited Oct. 9, 2004).

[214]  U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: Yemen, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27942.htm (last visited Oct. 25, 2004).

[215]  BURGERS & DANELIUS, *supra* note 179, at 126. The reference to *refoulement* originates in, but differs from, Article 33 of the Refugee Convention, which states that "No Contracting State shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra* note 170. But, whereas the Refugee Convention protects only persons who meet one of five specified categories that form a basis for persecution under the Refugee Convention, CAT was intended to apply to "any person who, for whatever reason, is in danger of being subjected to torture if handed over to another country." BURGERS & DANELIUS, *supra* note 179, at 125.

[216]  U.N. Doc. E/CN.4/1367, para. 18, *cited in* BURGERS & DANELIUS, *supra* note 179, at 126-27.

with such states."[217] This proposed reservation was not included in the final U.S. ratification and no such declaration was made by any state. The scope of the *non-refoulement* obligation therefore covers transfers of individuals to states with which the United States has extradition treaties and which may subject the individual to the danger of torture. These include states to which Extraordinary Renditions are reported to have been made, such as Pakistan,[218] Egypt, and Jordan.[219]

### (d)    Development of international law on *non-refoulement*

CAT Article 3's prohibition of *refoulement* is based in part on the jurisprudence of the European Commission of Human Rights,[220] interpreting the European Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention).[221] The jurisprudence of the European Commission, and subsequently that of the European Court of Human Rights, therefore is instructive and is evidence that the prohibition against *refoulement* to a state where an individual is in danger of torture is a broadly accepted international norm.

The European Convention does not contain an explicit prohibition against *refoulement*. However, Article 3 of the Convention provides that "[n]o one shall be subjected to torture or to inhuman or degrading treatment or punishment." The European Court has interpreted Article 3 to encompass a prohibition against *refoulement*, based on what it expressly identifies as a set of shared norms: the "common heritage of political traditions, ideals, freedom and the rule of law" of the states party to the European Convention.[222]

In the seminal case of *Soering v. United Kingdom*, the European Court of Human Rights held that the extradition to the United States of a German citizen accused of murder in the United States and arrested in the United Kingdom would be a violation of Article 3 of the European

---

[217]   S. Treaty Doc. No. 100-20, at iii, 9-14 (1988) (adding that "This reservation would eliminate the possibility of conflicting treaty obligations. This is not to say, however, that the United States would ever surrender a fugitive to a State where he would actually be in danger of being subjected to torture. Pursuant to his discretion under domestic law, and existing treaty bases for denying extradition, the Secretary of State would be able to satisfy himself on this issue before surrender.").

[218]   U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003: PAKISTAN, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27950.htm ("The Constitution and the Penal Code prohibit torture and other cruel, inhuman, or degrading treatment; however, security forces regularly tortured, and otherwise abused persons. Police routinely used force to elicit confessions. Human rights observers suggested that, because of widespread torture by the police, suspects usually confessed to crimes regardless of their actual culpability; the courts subsequently at times dismissed such confessions . . . Over the years, there have been allegations that common torture methods included: beating; burning with cigarettes; whipping the soles of the feet; sexual assault; prolonged isolation; electric shock; denial of food or sleep; hanging upside down; forced spreading of the legs with bar fetters; and public humiliation.") (last visited Oct. 9, 2004); the State Department Reports for Egypt and Jordan are described above in notes 209 and 210 respectively, and the text accompanying those footnotes.

[219]   18 U.S.C. §3181 (2002) (listing countries with which the United States has extradition treaties).

[220]   According to Burgers and Danelius (who participated in the drafting of CAT and whose authoritative text on the treaty includes discussion of the CAT *travaux préparatoires*), CAT Article 3 was "inspired by the case law of the European Commission of Human Rights with regard to Article 3 of the European Convention . . . . The Commission has considered that the prohibition of torture and inhuman or degrading treatment in article 3 of the European Convention does not only oblige a State to prevent torture within its own territory, but also to refrain from handing a person over to another State where he might, with some degree of probability, be subjected to torture." BURGERS & DANELIUS, *supra* note 179, at 125; *see also id.* at 125-128 (describing European Commission case law and the negotiations and discussions among states that lead to the final version of CAT Article 3, incorporating the European Commission's interpretation of Article 3 of the European Convention).

[221]   European Convention, *supra* note 186.

[222]   *Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (1989), para. 88.

Convention. The court emphasized the absolute, non-derogable prohibition on torture and of other inhuman or degrading treatment and held that:

> Article 3 makes no provision for exceptions and no derogation from it is
> permissible in time of war or other national emergency. This absolute prohibition
> of torture and of inhuman or degrading treatment or punishment under the terms of
> the Convention shows that Article 3 enshrines one of the fundamental values of the
> democratic societies making up the Council of Europe. It is also to be found in
> similar terms in other international instruments such as the 1966 International
> Covenant on Civil and Political Rights and the 1969 American Convention on
> Human Rights and is generally recognised as an internationally accepted
> standard.[223]

The court then examined whether the European Convention's Article 3 prohibition against torture and CID treatment also applied to the extradition of an individual to a state where the individual was at substantial risk for torture or CID treatment. The court concluded that it did:

> The fact that [CAT] should spell out in detail a specific obligation attaching to the
> prohibition of torture does not mean that an essentially similar obligation is not
> already inherent in the general terms of Article 3 of the European Convention. It
> would hardly be compatible with the underlying values of the Convention, that
> "common heritage of political traditions, ideals, freedom and the rule of law" to
> which the Preamble refers, were a Contracting State knowingly to surrender a
> fugitive to another State where there were substantial grounds for believing that he
> would be in danger of being subjected to torture, however heinous the crime
> allegedly committed . . . . [I]n the Court's view this inherent obligation not to
> extradite also extends to cases in which the fugitive would be faced in the
> receiving State by a real risk of exposure to inhuman or degrading treatment or
> punishment proscribed by that Article.[224]

The European Court subsequently confirmed its decision and extended its holdings to any kind of forced removal or transfer of an individual where there were substantial grounds to believe the person would face torture or ill-treatment.[225]

That the prohibition against *refoulement* to states where an individual faces the danger of torture is a broadly accepted norm is also shown in part by the large number of treaties that incorporate the prohibition, and the number and variety of states that have ratified them.[226] CAT

---

[223]   *Id.*

[224]   *Id.*

[225]   *Cruz Varas v. Sweden*, 201 Eur. Ct. H.R. (ser. A) (1989) paras. 69-70 (holding that European Convention Article 3's prohibition against a state's transfer of an individual to another state where the person will face a real risk of torture or CID treatment applies to expulsions as well as extraditions); *Vilvarajah and Others v. United Kingdom*, 215 Eur. Ct. H.R. (ser. A) (1991) para 103 (same).

[226]   To determine whether a principle included in international treaties is a part of customary international law, U.S. courts will look to, *inter alia*, the "relative influence of [non-ratifying or signatory states] in international affairs. *Flores*, 343 F.3d at 163. States that are not party to CAT include: Angola, the Bahamas, Barbados, Bhutan, Brunei Darussalam, the Central African Republic, Democratic People's Republic of Korea, the Dominican Republic, Gambia, Guinea-Bissau, India, Madagascar, Nauru, Nicaragua, Pakistan, San Marino, Sao Tome and Principe, Thailand and Sudan. For a full list of states that are not party to CAT, *see*
http://www.unhchr.ch/tbs/doc.nsf/newhvstatbytreaty?OpenView&Start=1&Count=250&Expand=1.1#1.1 (last visited Oct. 24, 2004). Many of these states have a relatively low profile in international affairs. Significantly, many of these states have committed themselves to the *non-refoulement* principle by ratifying other treaties that include the principle, including, for example, the African Union Convention Governing the Specific Aspects of Refugee Problems in Africa, *concluded on* Sept. 10, 1969, *entered into force* June 20, 1974, 1001 U.N.T.S. 45 (ratified by 44 states to date). For ratification status of these treaties, *see* Office of the United Nations High Commissioner for

Association of the Bar of the City of New York                                    43

has been ratified by an overwhelming majority of states.[227] The states that have not signed or ratified CAT are states that have yet to recognize fully the prohibition against torture in their own domestic law or practice. The practice of the states that have ratified or signed CAT also supports the conclusion that the *non-refoulement* principle embodied in CAT is widely accepted and enforced.[228]

A number of multinational or regional treaties ratified or enacted before CAT also support the status of *non-refoulement* as a principle of international law, and show that the protection afforded by the principle has expanded over time. As discussed in greater detail below, the Refugee Convention includes a prohibition against *refoulement* that specifically protects refugee who meet certain qualifications.[229] The United States is obligated to comply with the Refugee Convention through its accession to the 1967 Protocol, including the prohibition against *refoulement.* In the Americas, both the 1978 American Convention on Human Rights[230] and the 1987 Inter-American Convention to Prevent and Punish Torture[231] include prohibitions of *refoulement.* Article 13 of the Inter-American Torture Convention provides that:

> Extradition shall not be granted nor shall the person sought be returned when there are grounds to believe that his life is in danger, that he will be subjected to torture or to cruel, inhuman or degrading treatment, or that he will be tried by special or ad hoc courts in the requesting States.[232]

In Africa, regional treaties containing a *non-refoulement* standard include the Convention Governing the Specific Aspects of Refugee Problems in Africa[233] and the African [Banjul] Charter

---

Human Rights, Status of Ratifications of the Principal International Human Rights Treaties, *available at* http://www.unhchr.ch/pdf/report.pdf (Status of Ratifications) (last visited Oct. 25, 2004).

[227]  As of June 9, 2004, CAT had been ratified by 136 states and signed by 12 additional states. Only two states, the United States and Germany, entered reservations to Article 3. *See* Status of Ratifications, *supra* note 226, and http://www.unhchr.ch/tbs/doc.nsf/StatusfrsetOpenFrameSet (last visited Oct. 9, 2004). Neither reservation indicates an intent to derogate from CAT's *non-refoulement* requirement. The U.S. ratification of CAT states its understanding that Article 3.1's requirement of "substantial grounds" to mean "if it is likely than not that he would be tortured." *Id.* Germany declared its opinion that Article 3 expressed an obligation on the part of a state, which was met by existing German domestic law. *Id.*

[228]  Fifty-four states have recognized the competence of the Committee against Torture to receive and process individual communications concerning those states' practices under CAT Article 22. *See* Status of Ratifications, *supra* note 226.

[229]  *See* Section V.D.

[230]  Article 22(8) of the American Convention states that "In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinion." However, Article 27 of the American Convention allows a state to derogate from Article 22 (and other provisions) during "times of war or other public emergency that threaten the independence and security of the State party." *See* American Convention, *supra* note 181.

[231]  O.A.S. Treaty Series No. 67, *entered into force* February 28, 1987, *reprinted in* Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 83 (1992), *available at* http://www.oas.org/juridico/english/Treaties/a-51.html (last visited Oct. 24, 2004).

[232]  Unlike CAT and the European Court of Human Rights' case law on *refoulement*, the Inter-American Convention threshold for knowledge of likelihood of torture is not "substantial" grounds, but rather, *any* ground for belief that a person will be subject to torture or CID treatment.

[233]  The Convention Governing the Specific Aspects of Refugee Problems in Africa, *adopted* 1974, *entered into force* June 20, 1974, 1001 U.N.T.S. 45, *available through* http://www.africa-union.org/home/Welcome.htm (last visited Oct. 24, 2004), art. 2(3) ("No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened.... ").

on Human and Peoples' Rights.[234] Finally, the prohibition against *refoulement* is often recognized by scholars as a norm of customary international law.[235]

### 3.  *CAT Requires States Parties to Prevent, Prosecute and Punish Torture and Complicity to Torture*

CAT Article 4 requires that acts of torture must be treated as offenses under the criminal laws of the states party to the convention and "[t]he same shall apply to an attempt to commit torture and *to an act by any person which constitutes complicity or participation in torture*."[236] Article 1's definition of acts of torture includes the phrase "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."[237] Burgers and Danelius note that the breadth of the phrase was intended to encompass an offender who was "not directly connected with any public authority but that the authorities have hired him to help gather information or have at least accepted or tolerated his act."[238] Read together, these provisions require the United States to criminalize (i) direct acts of torture; (ii) complicity in torture; (iii) attempted torture; and (iv) aiding and abetting torture when committed by officials or non-state actors under the direction or with the consent or acquiescence of a state actor.[239] Depending on their degree of involvement in Extraordinary Renditions, U.S. officials and (U.S. or foreign) non-state actors acting with the consent or acquiescence of a U.S. official could therefore be liable directly for torture or complicity to torture, and could also incur liability for complicity, attempt, or aiding and abetting torture through the facilitation of the transfer or *refoulement* of an individual to a state where that individual is in danger of torture.[240]

Acts of torture by state actors or those acting with their consent or acquiescence may also render a state directly liable. According to Burgers and Danelius, "[i]f torture is performed by a public agency, such as the security police, the government of the country has no defence under [CAT] in saying that it was unaware of the act or even disapproved of it once it was informed."[241] Failure to investigate and prosecute could also constitute violations of CAT on the part of the state.

---

[234]  *Adopted* 26 June 1981, *entered into force* Oct. 21, 1986, OAU Doc. CAB/LEG/67/3, Rev. 5, *reprinted in* 21 I.L.M. 58 (1982), *available through* http://www.africa-union.org/home/Welcome.htm (last visited Oct. 24, 2004), art. 2(3) ("No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return or to remain in a territory where his life, physical integrity or liberty would be threatened for the reasons set out in Article I, paragraphs 1 and 2").

[235]  GUY S. GOODWIN-GILL, INTERNATIONAL LAW AND THE MOVEMENT OF PERSONS BETWEEN STATES 141 (1978); G. STENBERG, "NON-EXPULSION AND *NON-REFOULEMENT*: THE PROHIBITION AGAINST REMOVAL OF REFUGEES WITH SPECIAL REFERENCE TO ARTICLES 32 AND 33 OF THE 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES (1989); Martin A. Rogoff, *Interpretation of International Agreements by Domestic Court and the Politics of International Treaty Relations: Reflections on Some Recent Decisions of the United States Supreme Court*, 11 AM. U.J. INT'L L. & POL'Y 559, 579 (1996); David Weissbrodt and Isabel Hörtreitere, *The Principle of Non-refoulement: Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Comparison with the Non-refoulement Provisions of Other International Human Rights Treaties*, 5 BUFF. HUM. RTS. L. REV., 1, 7 (1999); Arthur Helton, *Applying Human Rights Law in U.S. Asylum Cases*, 3 INT'L CIV. LIBERTIES REP. 1, 2 (2000); A. Montavon-McKillip, *CAT Among Pigeons: The Convention Against Torture, A Precarious Intersection Between International Human Rights Law and U.S. Immigration*, 44 ARIZ. L. REV. 247, 269 (2002).

[236]  CAT, *supra* note 5, art. 4 (emphasis added).

[237]  *Id.*, art. 1 ("For the purposes of this Convention, the term 'torture' means any act . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.").

[238]  BURGERS & DANELIUS, *supra* note 179, at 120.

[239]  BURGERS & DANELIUS, *supra* note 179, at 120, 129, 130.

[240]  For a discussion of individual criminal liability under U.S. law, *see* Section VIII.A.

[241]  BURGERS & DANELIUS, *supra* note 179, at 120.

CAT Article 6 obligates a state to investigate (if circumstances warrant), assert jurisdiction over, and take into custody an individual who is alleged to have committed torture or is complicit in or has participated in torture, and investigate the circumstances surrounding the allegations.[242] CAT Article 7 incorporates into CAT the obligation to prosecute or extradite in cases of violations of the prohibition against torture.[243]

In addition, CAT requires the United States to train fully persons "who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention or imprisonment," including civil or military law enforcement and medical personnel, in the prohibition against torture.[244] CAT also requires the United States to review systematically and on an on-going basis, the rules and practices regarding the custody and interrogation of detainees in order to prevent any cases of torture.[245] If there are reasonable grounds to believe that torture has occurred in any territory subject to U.S. jurisdiction, the United States must ensure a prompt and impartial investigation, and also ensure that any alleged victim has timely recourse to an impartial authority that will examine allegations of torture.[246] Victims of torture by U.S. actors must have

---

[242] Article 6 of CAT, *supra* note 5, provides:

1. Upon being satisfied, after an examination of information available to it, that the circumstances so warrant, any State Party in whose territory a person alleged to have committed any offense referred to in article 4 is present shall take him into custody or take other legal measures to ensure his presence. The custody and other legal measures shall be as provided in the law of that State but may be continued only for such time as is necessary to enable any criminal or extradition proceedings to be instituted.
2. Such State shall immediately make a preliminary inquiry into the facts.
3. Any person in custody pursuant to paragraph 1 of this article shall be assisted in communicating immediately with the nearest appropriate representative of the State of which he is a national, or, if he is a stateless person, with the representative of the State where he usually resides.
4. When a State, pursuant to this article, has taken a person into custody, it shall immediately notify the States referred to in article 5, paragraph 1, of the fact that such person is in custody and of the circumstances which warrant his detention. The State which makes the preliminary inquiry contemplated in paragraph 2 of this article shall promptly report its findings to the said States and shall indicate whether it intends to exercise jurisdiction.

[243] CAT Article 7(1) provides: "1. The State Party in the territory under whose jurisdiction a person alleged to have committed any offense referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution." CAT, *supra* note 5.

[244] *Id.,* art. 10:

1. Each State Party shall ensure that education and information regarding the prohibition against torture are fully included in the training of law enforcement personnel, civil or military, medical personnel, public officials and other persons who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention or imprisonment.
2. Each State Party shall include this prohibition in the rules or instructions issued in regard to the duties and functions of any such person.

Unlike other CAT provisions (e.g. those imposing obligations on states party to review interrogation methods and techniques (art. 11), investigate allegations of torture and CID (art. 12), adjudicate allegations of torture or CID by an individual (art. 13)), Article 10's obligations are not based on the state party's jurisdiction over the territory in which its agents may be conducting interrogations. *See also* art. 16(1).

[245] *Id.,* art. 11 ("Each State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.").

[246] *Id.,* art. 12 ("Each State Party shall ensure that its competent authorities proceed to a prompt and impartial investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction.") and art. 13 ("Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given.").

access to redress and compensation through the U.S. legal system.[247] In the context of alleged Extraordinary Renditions, therefore, the United States must ensure that civil or military personnel involved in the custody, interrogation, and treatment of any detainees be trained in the prohibition against torture. The United States must also promptly investigate allegations of Extraordinary Rendition by U.S. actors, or those acting with their consent or acquiescence, and provide recourse and compensation to any individual who is found to have been Extraordinarily Rendered.

### 4.    *Scope of Application of CAT Standards Under International Law*

Together, CAT's prohibitions against torture and *refoulement*, and its criminal enforcement provisions, require the United States (i) to prohibit torture and complicity in torture and to punish acts of state actors (or non-state actors acting with their consent or acquiescence) that violate these prohibitions; (ii) to exercise criminal jurisdiction over such acts of torture and complicity in torture; and (iii) to prohibit the *refoulement* of individuals to states where they are in danger of torture. If, after fulfilling its obligation to investigate allegations of Extraordinary Rendition, the United States finds there is a reasonable basis to believe alleged Extraordinary Renditions occurred, the United States must exercise criminal jurisdiction over, and prosecute, U.S. officials, or individuals acting with their consent or acquiescence, who may have been involved in such Extraordinary Renditions that could amount to complicity in torture.

### (a)    Scope of obligations regarding torture

To implement CAT Article 4's requirement that each state party criminalize torture, attempted torture, and an act by "any person which constitutes complicity or participation in torture," CAT mandates that each state party "shall" establish jurisdiction over torture and complicity to torture:

(i)    When the offenses are committed in any territory under its jurisdiction or on board a ship or aircraft registered in that State;

(ii)    When the alleged offender is a national of that State;

(iii)    When the victim is a national of that State if that State considers it appropriate.[248]

In addition, CAT Article 5(2) requires each state party to establish jurisdiction over these offenses when the alleged offender is "present in any territory under its jurisdiction" and the state

---

[247]    *Id.*, art. 14:

1.    Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.

2.    Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.

[248]    *Id.*, art. 5(1). The broadest basis of jurisdiction in the context of Extraordinary Renditions is that of Article 5(1)(b), requiring that the United States exercise criminal jurisdiction over a U.S. national who directly participates in, or is complicit or otherwise participates in torture. According to the U.S. CAT ratification legislative history, implementing jurisdictional legislation was required only for this provision and for the Article 5(2) requirement that the United States extend its criminal jurisdiction over foreign offenders who commit torture abroad and are later found in a territory under U.S. jurisdiction. Sen. Exec. Rpt. 101-30, Resolution of Advice and Consent to Ratification (1990). This domestic legislation was enacted as 18 U.S.C. §2340A(a).

party choses not to extradite the alleged offender to another state party with jurisdiction.[249] Finally, CAT permits the exercise of "any criminal jurisdiction exercised in accordance with" the domestic laws of the state party.[250] Together, these CAT provisions constitute a mandatory system of universal jurisdiction over criminal acts of torture and complicity in torture.[251]

The Vienna Convention on the Law of Treaties requires that a treaty must be interpreted "in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."[252] Read in conjunction with each other, the plain language of the CAT torture prohibition, the requirement of criminalization of complicity or participation in torture, and the jurisdictional provisions, result in a positive obligation for the United States to assert jurisdiction over the following:

(i)     any act that violates CAT's torture prohibitions "in any territory over which [the United States] has jurisdiction";

(ii)    any act of torture or complicity to torture that occurs on a U.S.-registered ship or aircraft;[253]

(iii)   any act by a U.S. state actor, or a U.S. national acting with the consent or acquiescence of a U.S. state actor, who either directly engages in torture, or is complicit in torture, regardless of the state in which the action(s) take place;

(iv)    acts of a national of any other state who, acting with the consent or acquiescence of a U.S. state actor, either directly engages in torture, or is complicit in torture, and is present in "any territory under [U.S.] jurisdiction," and whom the United States decides not to extradite; and

(v)     any person over whom, or act over which, jurisdiction is permissible under the provisions of U.S. domestic law.

There is a dearth of case law and CAT Committee guidance on the content of the phrase "territory under its jurisdiction" as used in CAT. According to Burgers and Danelius, this phrase was intended to extend to "territories under military occupation, to colonial territories and to any other territories over which a State has factual control."[254] This interpretation of "territory under its jurisdiction" also applies to the other CAT provisions that incorporate the territorial jurisdictional requirement.[255] The legislative history of the CAT ratification into U.S. domestic law indicates that

[249] Article 5(2) can be seen as a basis for the assertion of universal jurisdiction, but this article does not obligate a state to establish jurisdiction over an alleged offender who is not within its territory. CAT, *supra* note 5.

[250] *Id.*, art. 5(3) ("This Convention does not exclude any criminal jurisdiction exercised in accordance with internal law.").

[251] BURGERS & DANELIUS, *supra* note 179, at 3.

[252] Vienna Convention, *supra* note 179, art. 31(1).

[253] In addition, if the requisite *mens rea* element is met for any participating U.S. official or non-state actor, (*see* Section VIII.A. of this Report), an argument could be made that the United States is required to assert jurisdiction if U.S.-registered ships or aircraft are used to transfer an individual to any state where the individual faces the danger of torture.

[254] BURGERS & DANELIUS, *supra* note 179, at 131.

[255] *Id.*, at 133. These provisions include CAT Articles 6 (requiring a state party in whose territory an individual is alleged to have committed a violation of CAT Article 4 to take that individual into custody, after ascertaining that the circumstances so warrant, in order to investigate the allegations) and 7 (requiring a state party either to extradite or prosecute an individual alleged to have committed a violation of CAT Article 4, who is in a territory under the jurisdiction of the state party).

the Senate had a narrower interpretation of the scope of "territory under its jurisdiction," stating that it referred to "all places that the State Party controls as a governmental authority, including ships and aircraft registered in that State."[256] In its formal instrument of CAT ratification, however, the United States did not make a reservation or other declaration reflecting this narrower understanding. For a discussion of the interpretation of precisely the same phrase used in the ICCPR's jurisdictional provisions, see Section V.B.2. below.

### (b)    Scope of obligations regarding *non-refoulement*

Given the object and purpose of CAT, the *non-refoulement* obligation should be applied not only to prohibit transfers by the United States of an individual from its own territory to another state where the individual is in danger of torture, but also to (i) the transfer of an individual located outside the United States but under the control of the United States or its agents, and (ii) the transfer of an individual from a second state to any subsequent state in which the individual faces the danger of torture. CAT Article 4's criminalization requirement does not apply directly to violations of the *refoulement* prohibition. However, actions taken by a U.S. state actor or a non-state actor acting with the consent or acquiescence of a state actor to transfer or *refoule* an individual to another state where the individual is in danger of torture may constitute enough state involvement to result in liability for torture or complicity in torture.

### 5.    *The United States' Implementation of CAT*

### (a)    Ratification

The United States ratified CAT in October 1994, with certain reservations, understandings and declarations, and enacted a new federal law to implement the requirements of the CAT relating to acts of torture committed outside the United States.[257] The United States is thus bound by CAT, subject to its reservations, understandings and declarations, as well as the international law norms that CAT codifies.[258]

Under U.S. implementing legislation and regulations, "acquiescence" that amounts to conspiracy or complicity to torture may result in liability for a U.S. state actor.[259] Thus, persons operating under the color of law do not necessarily need to engage directly in acts of torture to be culpable for them. For a public official to acquiesce to an act of torture, that official must, "prior to the activity constituting torture, have *awareness* of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."[260] Subsequent U.S. jurisprudence and administrative decisions have recognized that "willful blindness" by officials to torture may

---

[256]    S. Treaty Doc. No. 100-20, at 5, 9-14 (1988).

[257]    18 U.S.C. §2340 *et seq.* Domestic legislation was required because the Senate's advice and consent to CAT ratification was subject to the declaration that CAT was not self-executing. Sen. Exec. Rpt. 101-30, Resolution of Advice and Consent to Ratification (1990). (Ratification Resolution) One of the reservations was with respect to CAT Article 16, which requires states to prevent lesser forms of cruel and unusual punishment that do not constitute torture. According to the reservation, the United States considered itself bound to Article 16 to the extent that such cruel, unusual, and inhuman treatment or punishment was prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution. *Id.*; *see also* CRS Report, *supra* note 104.

[258]    *See* note 5 of this Report.

[259]    Ratification Resolution, *supra* note 257, at II.(1)(b); *see also* Section VIII.A. of this Report.

[260]    Ratification Resolution, *supra* note 257, at II.(1)(b)..

Association of the Bar of the City of New York                                                    49

constitute "acquiescence" under CAT,[261] but acquiescence does not occur when a government is aware of third-party torture but is unable to stop it.[262] In addition, mere non-compliance with applicable legal procedural standards does not *per se* constitute torture.[263] With respect to the provisions of CAT Article 3, which prohibits *refoulement* of persons to states where substantial grounds exist for believing the person would be subjected to torture, the United States declared its understanding that this requirement refers to instances in which it would be "more likely than not" that the alien would be tortured.[264]

The U.S. Initial CAT Report[265] states that the United States "has long been a vigorous supporter of the international fight against torture" and that "[torture] is categorically denounced as a matter of policy and as a tool of state authority."[266] The report further provides that prior to the enactment of the legislation implementing CAT, "the Department of State relied on the law and practice of the United States to provide authority for declining to extradite a fugitive to another State party where there are substantial grounds to believe he would be in danger of being subjected to torture."[267]

### (b)    Criminalization of torture

The U.S. obligation under CAT Articles 4 and 5 to criminalize and assert jurisdiction over acts of torture and complicity to torture is described in detail in Section V.A.3. above. Subsequent to its ratification of CAT, the United States enacted section 2340A of the U.S. criminal code to criminalize acts of torture occurring outside its territorial jurisdiction.[268] Pursuant to section 2340A, any person who commits or attempts to commit an act of torture outside the United States is subject to a fine and/or imprisonment for up to twenty years, except in circumstances where death results from the prohibited conduct, in which case the offender may be subject to imprisonment or

---

[261]   *See, e.g., Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003) (declaring that the correct inquiry in deciding whether a Chinese immigrant was entitled to relief from removal from the United States under CAT was not whether Chinese officials would commit torture against him, but whether public officials would turn a blind eye to the immigrant's torture by specified individuals); *Ontunez-Turios v. Ashcroft*, 303 F.3d 341 (5th Cir. 2002) (upholding Board of Immigration Appeals' deportation order, but noting that "willful blindness" constitutes acquiescence under CAT); *Bullies v. Nye*, 239 F.Supp. 2d 518 (M.D. Pa. 2003) (under CAT implementing regulations, acquiescence by government to torture by non-governmental agents requires either willful acceptance by government officials or at least turning a blind eye); *see also Pascual-Garcia v. Ashcroft*, 73 Fed.Appx. 232 (9th Cir. 2003) (holding that relief under CAT does not require that torture will occur while victim is in the custody or physical control of a public official).

[262]   *See, e.g., Moshud v. Blackman*, 68 Fed. Appx. 328 (3rd Cir. 2003) (denying alien's claim to reopen removal proceedings to assert a CAT claim based on her fear of female genital mutilation in Ghana, because although the practice was widespread, the Ghanian government had not acquiesced to the practice because it had been made illegal and public officials had condemned the practice); *Matter of S-V-*, 22 I&N Dec. 1306 (BIA 2000) (holding that protection under CAT does not extend to persons fearing entities that a government is unable to control).

[263]   Ratification Resolution, *supra* note 257, at II.(1)(e). *See also* CRS Report, *supra* note 104, at 5.

[264]   Ratification Resolution, *supra* note 257, at II.(2). This is the standard commonly used by the United States in determining whether to withhold removal for fear of persecution. *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *See also* CRS Report, *supra* note 104, at 6.

[265]   U.S. Initial CAT Report, *supra* note 99, para. 5.

[266]   *Id.* The same sentiment was expressed by President Bush on the United Nations International Day in Support of Victims of Torture: "The United States is committed to the world-wide elimination of torture and we are leading this fight by example." President George W. Bush, Statement by the President on the United Nations International Day in Support of Victims of Torture (June 26, 2003) (transcript *available at* http://www.whitehouse.gov/news/releases/2003/06/20030626-3.html (last visited Oct. 25, 2004).

[267]   U.S. Initial CAT Report, *supra* note 99, para. 165.

[268]   18 U.S.C., §2340A(a).

death.[269] Persons who conspire to commit an act of torture outside the United States are generally subject to the same penalties faced by those convicted of committing torture, except that in the case of conspiracy, the death penalty does not apply.[270] The United States asserts jurisdiction over these actions when (i) the offender is a national of the United States or (ii) the offender is present in the United States, irrespective of the nationality of the victim or offender.[271] Sections 2340 and 2340A are discussed in more detail in SectionVIII.A.1. below.

### (c)    FARRA Regulations

As part of its commitment to implement CAT, the United States, through the enactment of FARRA, required relevant agencies to promulgate regulations effectuating FARRA provisions.[272] The FARRA Regulations broadly address three categories of people: (i) individuals subject to "summary exclusion" (also known as "expedited removal"), (ii) individuals subject to removal orders, and (iii) individuals subject to extradition orders. The scope of CAT protection varies both among and within these categories.

### (i)    Summary Removal

Broadly speaking, an individual arriving to the United States may be summarily removed if the individual is found inadmissible pursuant to sections 212(a)(6)(C) or 7 of the INA (i.e., lack of required documents or misrepresentation)[273] or if the individual is viewed as a threat to national security.[274] In the latter case, if an immigration officer suspects that an arriving individual appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the INA (i.e., based on terrorism-related grounds),[275] the immigration officer is required to order the removal of

---

[269]    *Id.*

[270]    *Id.*

[271]    18 U.S.C. §2340A(b).

[272]    FARRA, *supra* note 96, §2242(b).

[273]    8 C.F.R. §235.3. Section 212(a)(6)(C) of the INA provides: Except as otherwise provided in this Act, aliens who are inadmissible under the following pragraphs are ineligible to receive visas and ineligible to be admitted to the United States:…

    (i)    Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act is inadmissible;

    (ii) (I) Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any p urpose or benefit under this Act (including section 274A) or any other Federal or State law is inadmissible.
    (II) In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

    (iii)  Waiver authorized.-For provision authorizing waiver of clause (i), see subsection (I).

    Section 212(a)(7) of the INA enumerates required documentation for entry to the United States.

[274]    8 C.F.R. §235.8.

[275]    Section 212(a)(3)(A) of the INA provides, in relevant part: "Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in: (i) any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information, …or (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the

the individual and report the action promptly to the district director.[276] The district director then forwards the report to the regional director for further action.[277] The regional director may deny any further inquiry or hearing by an immigration judge.[278] The decision of the regional director is final and there is no administrative appeal.[279] FARRA Regulations section 235.8(b)(4) provides that the "Service shall not execute a removal order under this section under circumstances that violate section 241(b)(3) of the Act [i.e., restrictions on removal to a country where the individual's life or freedom would be threatened] or Article 3 of the Convention Against Torture." However, no guidance is provided regarding when, how and by whom the determination of a CAT claim would take place. In fact, the same section explicitly states that provisions of part 208[280] "relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply."[281] Thus, the scope of CAT protection in the case of individuals arriving to the United States and *suspected* of being a threat to national security is unclear. Moreover, to the extent that some protocol for determination of CAT claims exists, lack of any review makes it impossible to evaluate the compliance of such a protocol with the protections afforded by CAT.

---

Government of the United States by force, violence, or other unlawful means, is inadmissible." INA Section 212(a)(3)(B) provides, in relevant part and with certain exceptions that the following people are ineligible for entry to the United States: "Any alien who (I) has engaged in a terrorist activity, (II) a consular officer or the Attorney General knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv)), (III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity, (IV) is a representative (as defined in clause (v)) of (aa) a foreign terrorist organization, as designated by the Secretary of State under section 219, or (bb) a political, social or other similar group whose public endorsement of acts of terrorist activity the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities, (V) is a member of a foreign terrorist organization, as designated by the Secretary under section 219, or is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this Act, to be engaged in a terrorist activity. (VI) has used the alien's position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities, or (VII) is the spouse or child of an alien who is inadmissible under this section, if the activity causing the alien to be found inadmissible occurred within the last 5 years." Section 212(a)(3)(C) provides, with certain exceptions, that "[a]n alien whose entry or proposed activities in the United States the Secretary has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible."

[276] 8 C.F.R. §235.8(a). For a detailed description of summary exclusion procedures, *see* CRS Report, *supra* note 104. If possible, the relevant officer or judge must take a brief statement from the alien, and the alien must be notified of the actions being taken against him and of his right to submit a written statement and additional information for consideration by the attorney general, who has authority to assess whether grounds exist to exclude the alien. INA §235(c)(2)(B). If the attorney general concludes, on the basis of confidential information, that the alien is inadmissible on security or terror-related grounds and the release of such information would be prejudicial on security or safety grounds, the CBP regional director is authorized to deny any further inquiry as to the alien's status and either order the alien removed or order disposal of the case as the director deems appropriate. *See* 8 C.F.R. § 235.8(b)(1). If the alien's designation as inadmissible is based on non-confidential information, however, the regional director has discretion to either conduct a further examination of the alien concerning his admissibility or to refer the alien's case to an immigration judge for a hearing prior to ordering removal. 8 C.F.R. § 235.8(b)(2). The regional director's written, signed decision must be served to the alien unless it contains confidential information prejudicial to U.S. security, in which case the alien shall be served a separate written order indicating disposition of the case, but with confidential information deleted. 8 C.F.R. § 235.8(b)(3).

[277] 8 C.F.R. §235.8(a).

[278] 8 C.F.R. §235.8(b).

[279] 8 C.F.R. §235.8(c).

[280] FARRA Regulations section 208.30 provides that "the Service has exclusive jurisdiction to make credible fear determinations [for individuals inadmissibile on terrorist-related grounds], and the Executive Office for Immigration Review has exclusive jurisdiction to review such determinations." 8 C.F.R. §208.30. It also specifies procedures for making a determination of credible fear claims.

[281] 8 C.F.R. §235.8(b)(4).

### (ii)    Removal

CAT-based procedures for individuals who are *not* subject to summary exclusion proceedings at the U.S. border are better-defined. In such cases, the determination of a CAT claim is made by an immigration judge.[282] Generally, an applicant for non-removal under CAT Article 3 has the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed state.[283] If credible, the applicant's testimony may be sufficient to sustain this burden without additional corroboration.[284] In assessing whether it is "more likely than not" that an applicant would be tortured if removed to the proposed state, all evidence relevant to the possibility of future torture is required to be considered, including, *inter alia*, (i) evidence of past torture inflicted upon the applicant; (ii) a pattern or practice of gross human rights violations within the proposed state of removal; and (iii) other relevant information regarding conditions in the state of removal.[285] For purposes of ascertaining a pattern of gross violations, substantial weight is generally given to the Country Reports on Human Rights Practices issued annually by the U.S. Department of State.[286] The Board of Immigration Appeals (BIA), the appellate administrative body within the Executive Office for Immigration Review, has recognized that evidence concerning the likelihood of torture must be particularized; evidence of torture of similarly situated individuals is insufficient alone to demonstrate that it is more likely than not that an applicant would be tortured if removed to a proposed state.[287]

If the immigration judge considering a CAT application determines that an individual is more likely than not to be tortured in the state of proposed removal, the individual is entitled to protection under CAT.[288] Generally, protection will be granted through the withholding of removal, unless the person falls within one of the categories of aliens described in section 241(b)(3)(B) of the INA, in which case the person will be denied the withholding of removal (although the person could seek to have his or her removal deferred).

### (iii)    Extradition

In the context of extradition, pursuant to Criminal Code sections 3184 and 3186, the secretary of state is the U.S. official responsible for the final determination of whether to surrender an alleged fugitive to a foreign state by means of extradition.[289] The regulations pertaining to extradition quote Article 3 of CAT,[290] and specify that "in order to implement the obligation assumed by the United States pursuant to Article 3 of the Convention, the State Department considers the question of whether a person facing extradition from the United States 'is more likely than not' to be tortured in the State requesting extradition when appropriate in making this

---

[282]   8 C.F.R. §208.16(4).

[283]   8 C.F.R. § 208.16(c)(2).

[284]   *Id.*

[285]   8 C.F.R. § 208.16(c)(3).

[286]   *See, e.g., In Re S- V-,* 22 I.&N. Dec. 1306, 2000 WL 562836 (B.I.A. 2000), *overuled on other grounds,  Zheng v. Ashcroft,* 332 F.3d 1186 (9th Cir. 2003); *In re M-B-A,* 231 I.&N. Dec. 474, 2002 WL 31201697 (B.I.A. 2002).

[287]   *See Matter of M-B-A,* 23 I&N Dec. 474 (BIA 2002)

[288]   8 C.F.R. §208.16(c)(4).

[289]   22 C.F.R. §95.2(b).

[290]   22 C.F.R. § 95.2(a)(1).

determination."[291] Using the language of CAT Article 3, the regulations stipulate that in making this determination, the authorities must take into account "all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."[292]

Generally, a decision to certify a detainee as extraditable is made initially by a judicial officer, and then the decision is presented to the secretary of state. If the individual subject to an extradition order asserts that he or she will be subject to torture in the state of extradition, "appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant."[293] Even if the individual does not make a claim pursuant to CAT, the State Department will give consideration "to the requesting country's human rights record, as set forth in the annual Country Reports on Human Rights Practices, from the perspective of Article 3 [of CAT]."[294]

Decisions of the secretary of state concerning surrender of alleged fugitives for extradition "are matters of executive discretion not subject to judicial review."[295] The regulations further provide that

> pursuant to FARRA Section 2242(d), notwithstanding any other provision of law, no court shall have jurisdiction to review these regulations, and nothing in Section 2242 shall be construed as providing any court jurisdiction to consider or review claims raised under the convention or Section 2242, or any other determination made with respect to the application of the policy set forth in Section 2242(a), except as part of the review of a final order of removal pursuant to Section 242 of the INA.[296]

The regulations note that section 242 is not applicable to extradition.[297]

Although the enactment of FARRA was a laudable step towards implementing CAT, the regulatory framework for implementation of the *non-refoulement* obligation of CAT and of FARRA suffers from certain deficiencies, including a lack of clear procedural guidelines for determination of CAT claims (in the context of summary removal proceeding for individuals deemed by an immigration officer to be inadmissible on possible terrorism-related grounds) and lack of administrative or judicial review in cases of summary removals and extraditions.[298] In those cases, therefore, there appears to be nothing to prevent arbitrary decisions and no procedural safeguards to ensure compliance with U.S. obligations under CAT and FARRA.

---

[291]   22 C.F.R. § 95.2(b).

[292]   22 C.F.R. § 95.2(a)(2).

[293]   U.S. Initial CAT Report, *supra* note 99, para. 167.

[294]   *Id.*.

[295]   22 C.F.R. § 95.4.

[296]   *Id.*

[297]   *Id.* In *Cornejo-Barreto v. Seifert*, 218 F.3d 1004 (9th Cir. 2000), the Ninth Circuit's stated that individuals who fear torture upon return to a state of extradition may present a habeas claim under the general habeas statute, 22 U.S.C. §2241, alleging violation of CAT, following the secretary of state's decision to return the alien. Subsequently, the Ninth Circuit held that its statement in *Cornejo* was advisory and nonbinding. *Cornejo-Barreto v. Seifert*, 379 F.3d 1075 (9th Cir. 2004). However, more recently the Court agreed to a rehearing *en banc*. 2004 WL (9th Cir. Oct. 19, 2004).

[298]   Generally, judicial appeal or review is available for any action, decision, or claim raised under CAT only insofar as it is part of a review of a final order of alien removal pursuant to INA section 242. 8 U.S.C. §1231.

In addition, there appears to be a gap in the implementation of FARRA's policy directive to apply the principle of *non-refoulement* regardless of whether the person is physically present in the United States. The United States has enunciated a clear policy "not to expel, extradite, or *otherwise effect* the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, *regardless of whether the person is physically present in the United States.*"[299] Congress evinced its intent to extend U.S CAT obligations to certain acts outside the United States through the enactment into the U.S. Code of sections 2340 and 2340A, which criminalize the act of and complicity in torture if the act occurs *outside the U.S. territory*.[300] However, neither the regulations governing extradition nor those governing removal proceedings under FARRA are designed to apply to persons being transferred by, or with the complicity of, U.S. actors *outside the United States* to third states. This failure to regulate against *refoulement* abroad not only represents a failure of regulatory agencies to comply with the directives of FARRA, but also constitutes a breach of the U.S. international obligation to implement and comply fully with the provisions of CAT.

### B.    The United States is Obligated to Prevent Extraordinary Renditions under the ICCPR

#### 1.    *The ICCPR Prohibits Torture, CID Treatment, and Refoulement*

The International Covenant on Civil and Political Rights, to which the United States is a party,[301] explicitly prohibits both torture and CID treatment: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."[302]

Although the ICCPR does not contain a direct prohibition against Extraordinary Rendition, the Human Rights Committee has interpreted Article 7 to require that states party to the ICCPR "must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or *refoulement*.[303] The Human Rights Committee also interprets ICCPR Article 2's obligation on a state party "to

---

[299]    FARRA, *supra* note 96, §2242 (emphasis added)

[300]    *Cf. Sale v. Haitian Centers Council Inc.*, 509 U.S. 155, 183, 113 S.Ct. 2549, 2565 (1993) (rejecting argument that the *non-refoulement* protections of Article 33 of the Refugee Convention had extraterritorial applicability to prevent *refoulement* of Haitians intercepted by U.S. officials on the high seas and holding that "a treaty cannot impose uncontemplated extraterritorial obligations on those who ratify it through no more than its general humanitarian intent."). The case was then brought before the Inter-American Commission on Human Rights, which stated that Article 33 of the Refugee Convention is not subject to geographical limitations. *Haitian Centre for Human Rights v. United States*, Case No. 10.675, Inter-Am. C.H.R. 51/95, OEA/ser.L/V./II.95 doc. 7 rev. at 550 (1997).

[301]    The ICCPR, *supra* note 5, was ratified by the United States in 1992, subject to a number of reservations, understandings and declarations. *See* 138 CONG. REC. S4781-01 (1992). As it would later do in its ratification of CAT, the United States sought to protect its interpretation of its international obligations in accordance with domestic jurisprudence and ratified the ICCPR with the reservation that "the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States." *See* International Covenant on Civil and Political Rights, Declarations, Reservations and Understandings made by the United States, *available at* http://www.unhchr.ch/tbs/doc.nsf/0/8025640400411315c125638b005f309c?OpenDocument (last visited Oct. 25, 2004).

[302]    ICCPR, *supra* note 5, art. 7.

[303]    Human Rights Committee, General Comment 20, *Article 7*, UN Doc. A/47/40 (1992) *reprinted in* Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1994), (HRC General Comment 20), para. 9.

respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized" by the Covenant as including a *non-refoulement* obligation:[304]

> [ICCPR Article 2's] obligation requiring that States Parties respect and ensure the Covenant rights of all persons in their territory and all persons under their control entails an obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm, such as that contemplated by article[] . . . 7 of the Covenant, either in the country to which removal is to be effected or in any country to which the person may subsequently be removed.[305]

Consistent with this interpretation, the Human Rights Committee has previously held that "[i]f a State party extradites a person within its jurisdiction in circumstances such that as a result there is a real risk that his or her rights under the Covenant will be violated in another jurisdiction, the State party itself may be in violation of the Covenant."[306] According to the Human Rights Committee, the state party "would itself be in violation of the Covenant if it handed over a person to another State in circumstances in which it was foreseeable that torture would take place. The foreseeability of the consequence would mean that there was a present violation by the State party, even though the consequence would not occur until later on."[307]

The Human Rights Committee has provided only limited guidance on the factors that would constitute a "real risk" of a violation of the ICCPR prohibition against torture, CID treatment or *refoulement*.[308] Legal commentators have noted, however, that the Committee's terminology tracks that of the European Court of Human Rights, and that ICCPR Article 7 should be interpreted in light of the court's jurisprudence interpreting Article 3 of the European Convention.[309] That jurisprudence shows that the "real risk" standard requires a higher showing than CAT's "in danger of" standard.[310] Legal commentators argue that the European Court of

---

[304]   ICCPR, *supra* note 5, art. 2(1) states: "Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized within the present Covenant, without distinction of any kind such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

[305]   HRC General Comment 31, *supra* note 9, para. 12; *see also* HRC General Comment 20, *supra* note 303, para. 9.

[306]   *Kindler v. Canada*, Communication No. 470/1991, Human Rights Committee, UN Doc. CCPR/C/48/D/470/1991 (1993), para. 13.1.

[307]   *Ng v. Canada*, Communication No. 469/1991, Human Rights Committee, UN Doc. CCPR/C/49/D/469/1991 (1994), para. 6.2

[308]   *See, e.g., Mrs. G.T. v. Australia*, Communication No. 706/1996, UN Doc. CCPR/C/61/D/706/1996 (1997), para. 8.4 ("A real risk is to be deduced from the intent of the country to which the person concerned is to be deported, as well as from the pattern of conduct shown by the country in similar cases.").

[309]   Weissbrodt & Hörtreitere, *supra* note 235, at 44-45 (citing Ralf Alleweldt, *Schutz Vor Abschiebung Bei Drohender Folter Oder Unmenschlicher Oder Erniedrigender Behandlung Oder Strafe: Refoulement- Verbote Im Volkerrecht Und Im Deutschen Recht Unter Besonderer Beruicksichtigung Von Artikel 3 Der Europaischen Menschenrechtskonvention Und Artikel 1 Des Grundgesetzes* [*Protection Against Expulsion In The Case of Threat of Torture or Inhuman or Degrading TreatmentoOr Punishment*], *and* M ANFRED NOWAK, THE UN COVENANT ON CIVIL AND POLITICAL RIGHTS: CCPR COMMENTARY 131 et seq. (1993)).

[310]   *See Chahal v. United Kingdom*, 23 Eur. Ct. H.R. 413 (ser. A) (1996), para. 79-82, 87-107 (in case where the United Kingdom sought to expel asylum seeker based on assertion that he was a threat to national security, the Court insisted on absolute nature of Article 3 protections even in the face of an alleged threat to national security, including in the context of expulsion cases, and found that despite an improvement in human rights conditions in India, abuses by security forces continued and the asylum seeker faced a "real risk" of ill-treatment by those forces if returned to India); *Soering v. United Kingdom*, 11 EHRR 439, 161 Eur. Ct. H.R. (ser. A) (1989) paras. 91, 96, 99 (assessment of "real risk" includes assessment of conditions in the state to which the individual is to be extradited, including the likelihood that the particular individual will be subject to ill-treatment in the receiving state that

Human Rights (and thus the ICCPR) standard is more stringent than that of CAT because the European Convention and ICCPR provide for *non-refoulement* protection over a broader range of abuse–including both torture and CID treatment or punishment–than CAT, which protects only against *refoulement* to torture.[311]

An additional basis for the ICCPR *non-refoulement* obligation may be found in the principle that, with the exception of a tiny subset of citizenship rights, states parties to the ICCPR may not distinguish between rights afforded to their own citizens and those extended to aliens. The Human Rights Committee has clarified that states may not discriminate between their own citizens and aliens in relation to the state's "territory and subject to its jurisdiction."[312] According to the Committee, "the general rule is that each one of the rights of the Covenant must be guaranteed without discrimination between citizens and aliens. Aliens receive the benefit of the general requirement of non-discrimination in respect of the rights guaranteed in the Covenant, as provided for in article 2 thereof."[313] Included among the rights of aliens under ICCPR is that "[t]hey must not be subjected to torture or to cruel, inhuman or degrading treatment or punishment.... If lawfully deprived of their liberty, they shall be treated with humanity and with respect for the inherent dignity of their person. Aliens are entitled to equal protection by the law. There shall be no discrimination between aliens and citizens in the application of these rights."[314]

## 2. *Scope of Application of ICCPR Standards under International Law*

The Human Rights Committee has interpreted both Article 7's prohibition against transfer of an individual to a state where he or she faces a real risk of torture or CID treatment or punishment,[315] and Article 2's "respect and ensure" obligation as requiring state parties to prevent,

---

would violate Article 3); *Cruz Varas v. Sweden*, 201 Eur. Ct. H.R. (ser. A) (1991) paras. 70, 77 to 86 (even though individual asserted he had been tortured upon his previous forced transfer to Chile by Sweden, where political conditions in Chile had changed at the time of potential subsequent expulsion, and where the individual's assertion of torture were not substantiated and deemed to lack credibility by the Court, there were no substantial grounds for belief that he faced a real risk of treatment prohibited by European Convention Article 3); *Vilvarajah and Others v. United Kingdom*, 215 Eur. Ct. H.R. (ser. A) (1991) at paras. 140-44 (requiring that the "real risk" be current and subjectively be faced by the individual; evidence of mass violations of human rights, "random" acts of torture against the population by security forces, or evidence of prior torture suffered by applicants did not suffice to show such a real risk).

[311] Weissbrodt & Hörtreitere, *supra* note 235, at 1, 50, 55-56.

[312] Human Rights Committee, General Comment No. 15, *The Position of Aliens under the Covenant, reprinted in* Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HR1\GEN\1\Rev.1 at 18 (1994), (HRC General Comment 15), para. 1 ("Reports from States parties have often failed to take into account that each State party must ensure the rights in the Covenant to "all individuals within its territory and subject to its jurisdiction" (art. 2, para. 1). In general, the rights set forth in the Covenant apply to everyone, irrespective of reciprocity, and irrespective of his or her nationality or statelessness."). *See also* Human Rights Committee, General Comment No. 18, *Non-Discrimination, reprinted in* Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HR1\GEN\1\Rev.1 at 26 (1994) (HRC General Comment 18), para. 1 ("Non-discrimination, together with equality before the law and equal protection of the law without any discrimination, constitute a basic and general principle relating to the protection of human rights. Thus, article 2, paragraph 1, of the International Covenant on Civil and Political Rights obligates each State party to respect and ensure to all persons within its territory and subject to its jurisdiction the rights recognized in the Covenant without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.").

[313] HRC General Comment 15, *supra* note 312, para. 2

[314] *Id.*, para. 7.

[315] HRC General Comment 20, *supra* note 303, para. 8 ("The Committee notes that it is not sufficient for the implementation of article 7 to prohibit such treatment or punishment or to make it a crime. States parties should inform the Committee of the legislative, administrative, judicial and other measures they take to prevent and punish acts of torture and cruel, inhuman and degrading treatment in any territory under their jurisdiction.").

investigate, and punish or remedy violations both by state agents and non-state actors, under that state's domestic laws.[316] Failure to protect individuals against such violations may engage the international responsibility of the state party.[317]

Examples of instances in which the Human Rights Committee has found a state party to be responsible for violations of the ICCPR generally encompass: (i) violations that occur within the physical territory of the state,[318] and (ii) violations that otherwise are imputable to the state. Under the jurisprudence of the Human Rights Committee, acts that may be imputed to the state include the following: (a) violations of an individual's ICCPR protections when that individual is in the "power or effective control" of a state, even if outside the territory of that state,[319] (b) acts within a

---

[316]   *Id.* para. 2 ("It is the duty of the State party to afford everyone protection through legislative and other measures as may be necessary against the acts prohibited by article 7, whether inflicted by people acting in their official capacity, outside their official capacity or in a private capacity."); HRC General Comment 31, *supra* note 9, para. 8 ("The Covenant cannot be viewed as a substitute for domestic criminal or civil law. However the positive obligations on States Parties to ensure Covenant rights will only be fully discharged if individuals are protected by the State, not just against violations of Covenant rights by its agents, but also against acts committed by private persons or entities that would impair the enjoyment of Covenant rights in so far as they are amenable to application between private persons or entities . . . . States are reminded of the interrelationship between the positive obligations imposed under article 2 and the need to provide effective remedies in the event of breach under article 2, paragraph 3. The Covenant itself envisages in some articles certain areas where there are positive obligations on States Parties to address the activities of private persons or entities . . . . It is also implicit in article 7 that States Parties have to take positive measures to ensure that private persons or entities do not inflict torture or cruel, inhuman or degrading treatment or punishment on others within their power."); *see also* HRC General Comment 20, *supra* note 303, at para. 13 ("States parties should indicate when presenting their reports the provisions of their criminal law which penalize torture and cruel, inhuman and degrading treatment or punishment, specifying the penalties applicable to such acts, whether committed by public officials or other persons acting on behalf of the State, or by private persons. Those who violate article 7, whether by encouraging, ordering, tolerating or perpetrating prohibited acts, must be held responsible.").

[317]   HRC General Comment 31, *supra* note 9, para. 8 ("There may be circumstances in which a failure to ensure Covenant rights as required by article 2 would give rise to violations by States Parties of those rights, as a result of States Parties' permitting or failing to take appropriate measures or to exercise due diligence to prevent, punish, investigate or redress the harm caused by such acts by private persons or entities.").

[318]   ICCPR, *supra* note 5, art. 2(1); *see also* Concluding Observations of the Human Rights Committee, Cyprus, UN Doc. CCPR/C/79/Add.88, para 3 (1998) (Cyprus not obligated to apply ICCPR protections to territory over which it did not exercise control because of occupation by another state). *But see* Concluding Observations of the Human Rights Committee, Bosnia and Herzegovina, UN Doc. CCPR/C/79/Add.14, para 4 (1992) (Republic of Bosnia-Herzegovina legally responsible for acts in territory over which it had factual and effective control, and also other parts of its territory). Professor Dominic McGoldrick sees this decision as "best understood in the context of Bosnia's newly attained statehood." Dominic McGoldrick, *Extraterritorial Application of the International Covenant on Civil and Political Rights*, *in* EXTRATERRITORIAL APPLICATION OF HUMAN RIGHTS TREATIES (FONS COOMANS AND MENNO T. KAMMINGA, eds., 2004), 50.

[319]   HRC General Comment 31, *supra* note 9, para. 10 ("States Parties are required by article 2, paragraph 1, to respect and to ensure the Covenant rights to all persons who may be within their territory and to all persons subject to their jurisdiction. This means that a State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party, even if not situated within the territory of the State Party . . . . [T]he enjoyment of Covenant rights is not limited to citizens of States Parties but must also be available to all individuals, regardless of nationality or statelessness, such as asylum seekers, refugees, migrant workers and other persons, who may find themselves in the territory or subject to the jurisdiction of the State Party. This principle also applies to those within the power or effective control of the forces of a State Party acting outside its territory, regardless of the circumstances in which such power or effective control was obtained, such as forces constituting a national contingent of a State Party assigned to an international peace-keeping or peace-enforcement operation.") and para. 12 ("article 2's obligation requiring that States Parties respect and ensure the Covenant rights of all persons in their territory and all persons under their control entails an obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm); *see also* Concluding Observations of the Human Rights Committee, Belgium, UN Doc. CCPR/C/79/Add.99 (1998), para. 14 (expressing concern about actions of Belgian soldiers in Somalia, and acknowledging that Belgium recognized the applicability of ICCPR to those actions); Concluding Observations of the Human Rights Committee, Croatia, UN Doc. CCPR/C/79/Add.15 (1992), paras. 7 and 10 (noting that Croatia was responsible for ICCPR violations in areas of Bosnia-Herzegovina under the control of Croatian military).

58                                                          Center for Human Rights and Global Justice

state's territory that have the effect of violating the individual's ICCPR protections, even if these effects occur outside the territory of that state;[320] (c) acts by state officials or agents of the state (including civilian contractors) that violate an individual's ICCPR protections, no matter where those acts occur;[321] and (d) violations of the state's obligation to "take appropriate measures or to exercise due diligence to prevent, punish, investigate and redress the harm caused by" ICCPR violations by state actors or private persons or entities.[322] The Human Rights Committee explicitly found that Article 7 requires states party to take measures against ICCPR violations by private persons to "ensure that private persons or entities do not inflict torture or cruel, inhuman or degrading punishment on others within their power."[323] In addition to these specific instances, other acts imputable to the State under general international law rue of attribution may come to light which amount to violations of the ICCPR.

      Although further factual development of the allegations of U.S. involvement in Extraordinary Renditions is necessary, based on the Human Rights Committee's jurisprudence, the United States could be liable for acts of torture or CID treatment or complicity to torture or CID treatment by state actors or private persons in each of the instances of alleged Extraordinary Rendition described above in Section IV.A. above. In addition, the United States could be liable for the *refoulement* of an individual under the control of the United States, or from territory under U.S.

---

[320] *Ng v. Canada*, Communication No. 469/1991, Human Rights Committee, UN Doc. CCPR/C/49/D/469/ 1991 (1994), para. 6.1 (extradition of applicant from Canada to the United States where the applicant could face the death penalty could violate Article 7 and render Canada liable for ICCPR violation because "if a State party takes a decision relating to a person within its jurisdiction, and the necessary and foreseeable consequence is that this person's rights under the Covenant will be violated in another jurisdiction, the State party itself may be in violation of the Covenant."); *see also Kindler v. Canada*, Communication No. 470/1991, Human Rights Committee, UN Doc. CCPR/C/48/D/470/1991 (1993) (same); *Lopez Burgos v. Uruguay,* Communication No. R.12/52, Human Rights Committee, UN Doc. Supp. No. 40 (A/36/40) at 176 (1981) , paras. 12.1-12.3 (in case involving the kidnapping of Uruguayan from Argentina by Uruguayan "security and intelligence forces," Human Rights Committee held that Article 2(1) "does not imply that the State party concerned cannot be held accountable for violations of rights under the Covenant which its agents commit upon the territory of another State, whether with the acquiescence of the Government of the State or in opposit ion to it. . . . .[I]t would be unconscionable to so interpret the responsibility under Article 2 of the Covenant as to permit a State party to perpetrate violations of the Covenant on the territory of another State, which violations it could not perpetrate on its on territory."); *Celiberti v. Uruguay*, Communication No. R.13/56, Human Rights Committee, UN Doc. Supp. No. 40 (A/36/40) at 185 (1981). Based on the reasoning applied by the Human Rights Committee in these cases, Professor McGoldrick thinks it makes no difference if the applicant had not been a Uruguayan national – it is the acts of arrest and abduction that violate ICCPR protections and bring the individual into the jurisdiction of the state committing those acts. McGoldrick, *supra* note 318, at 62.

[321] *Ng v. Canada*, Communication No. 469/1991, UN Doc. CCPR/C/49/D/469/1991 (1994), para. 6.1; *Kindler v. Canada*, Communication No. 470/1991, Human Rights Committee, UN Doc. CCPR/C/48/D/470/1991 (1993); *Lopez Burgos v. Uruguay,* Communication No. R.12/52, Human Rights Committee, UN Doc. Supp. No. 40 (A/36/40) at 176 (1981), paras. 12.1-12.3; *Celiberti v. Uruguay*, Communication No. R.13/56, Human Rights Committee, UN Doc. Supp. No. 40 (A/36/40), at 185 (1981).

[322] HRC General Comment 31, *supra* note 9, para. 8 ("[T]he positive obligations on States Parties to ensure Covenant rights will only be fully discharged if individuals are protected by the State, not just against violations of Covenant rights by its agents, but also against acts committed by private persons or entities that would impair the enjoyment of Covenant rights in so far as they are amenable to application between private persons or entities . . . . States are reminded of the interrelationship between the positive obligations imposed under article 2 and the need to provide effective remedies in the event of breach under article 2, paragraph 3. The Covenant itself envisages in some articles certain areas where there are positive obligations on States Parties to address the activities of private persons or entities.").

[323] *Id.* ("It is also implicit in article 7 that States Parties have to take positive measures to ensure that private persons or entities do not inflict torture or cruel, inhuman or degrading treatment or punishment on others within their power.")

control (e.g a secret detention facility)[324] to any other state where the person faces "a real risk" of torture or CID treatment, regardless of whether the person is actually subjected to ill treatment.[325]

The requirement that the United States investigate and prosecute allegations of Extraordinary Renditions is mandated by the terms of the Covenant, as interpreted by the Human Rights Committee. In order to ensure the effective application of ICCPR Article 7's protection against torture, CID treatment, and *refoulement*, the Human Rights Committee requires that state parties investigate allegations of breaches of the protections in the treaty, including those against torture, CID treatment, and *refoulement*, to bring offenders to justice in the case of criminal violations, and to provide appropriate remedies.[326] States are obligated not only to investigate and prosecute, but also to submit periodic reports that include information about training and instruction of state agents and medical personnel on ICCPR protections.[327] A failure by the state party to take any of these actions could itself give rise to a separate breach of the ICCPR by the state.[328] Finally, the Human Rights Committee has interpreted the Article 7 protections in conjunction with the Article 2(3) obligation to provide appropriate remedies as requiring state parties to provide effective complaint procedures and remedies under domestic law for breaches of Article 7.[329]

### 3.    *The United States' Implementation of the ICCPR*

The U.S. Senate ratified the ICCPR on April 2, 1992, and the ICCPR came into force for the United States on September 8, 1992.[330] The instrument of ratification contained certain declarations, reservations, and understandings, including a declaration that ICCPR Articles 1 through 27 were not self-executing (*i.e.*, that these provisions must be implemented by domestic legislation).[331] Even though the United States has ratified the ICCPR with the express declaration that it is not self-executing and has not implemented the ICCPR into domestic legislation, the United States is nonetheless under an obligation to enact legislation to give effect to any international agreement to which it is a party.[332] That obligation is included explicitly in Article 2

---

[324]    For a detailed discussion of the scope of extraterritorial application of the ICCPR, *See* McGoldrick, *supra* note 318.

[325]    HRC General Comment 31, *supra* note 318, para. 12 ("article 2's obligation requiring that States Parties respect and ensure the Covenant rights of all persons in their territory and all persons under their control entails an obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm").

[326]    *Id.*, at paras. 15, and 18 ("Where the investigations referred to in paragraph 15 reveal violations of certain Covenant rights, States Parties must ensure that those responsible are brought to justice. As with failure to investigate, failure to bring to justice perpetrators of such violations could in and of itself give rise to a separate breach of the Covenant. These obligations arise notably in respect of those violations recognized as criminal under either domestic or international law, such as torture and similar cruel, inhuman and degrading treatment (article 7).").

[327]    HRC General Comment 20, *supra* note 303, para. 10.

[328]    *Id.* para. 18.

[329]    *Id.*, para. 14; *see also* HRC General Comment 31, *supra* note 9, at para. 7 ("Article 2 requires that States Parties adopt legislative, judicial, administrative, educative and other appropriate measures in order to fulfill their legal obligations.").

[330]    *See* 138 Cong. Rec. S4783-84 (daily ed. Apr. 2, 1992); United Nations Treaty Collection: Declarations and Reservations, *available at* http://www.unhchr.ch/html/menu3/b/treaty12_asp.htm (last visited Oct. 25, 2004).

[331]    *See* International Covenant on Civil and Political Rights, Declarations, Reservations and Understandings made by the United States, *available at* http://www.unhchr.ch/tbs/doc.nsf/887f17374eb89574c1256a2a0027ba1f/80256404004f1315c125638b005f309e?OpenDocument (last visited Oct. 25, 2004).

[332]    *See* U.S. CONST. art. VI, §2 ("This Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties which shall be made under the authority of the United States, shall be the supreme law of the

of the ICCPR, which requires states party to implement and enforce the protections of the ICCPR.[333] Finally, the United States will be liable for violations of the ICCPR regardless of its failure to pass implementing legislation.

## C.   The Geneva Conventions' Prohibitions of Extraordinary Renditions

The four Geneva Conventions of 1949 codify a vast array of international humanitarian law standards on the treatment of prisoners of war and civilians during armed conflict and in occupied territories.[334] The protections afforded by the Geneva Conventions apply to (i) the actions of a High Contracting Party in territory under its control during an armed conflict, (ii) the actions of a High Contracting Party outside territory under its control, but which are taken in connection with an armed conflict, and (iii) to individuals falling within specified categories and classified as "protected persons."[335] The Conventions also apply "to all cases of partial or total occupation of the territory of a High Contracting Party, even if the occupation meets with no armed resistance."[336] A High Contracting Party to the Conventions is bound by their terms with respect to other states accepting and applying the Geneva Conventions.[337] The Geneva Conventions' protections have been interpreted to extend to individuals detained during the war in Afghanistan (though not without controversy), and also the U.S. war in, and occupation of, Iraq.[338] As discussed below, the Geneva Conventions' applicability to individuals captured by the United States in situations other than these two conflicts and held, for example, in so-called secret detention facilities is open to question. Of course, all detainees held by the United States – regardless of where or when they were captured or of their status – are entitled to humane treatment and the protection of human rights law, including CAT and the ICCPR.

---

[333] land); *see also* Restatement, *supra* note 123, at cmt. H ("If an international agreement . . . is non-self-executing, the United States is under an international obligation to adjust its laws and institutions as may be necessary to give effect to the agreement."); Louis Henkin, *Treaties in a Constitutional Democracy*, 10 MICH. J. INT'L L. 406, 425 (1989) ("The international obligation of the United States under a treaty is immediate, whether a treaty is self-executing or not. . . . [T]he United States has an obligation to enact necessary legislation promptly so as to enable it to carry out its obligations under the treaty.").

[333] *See also* ICCPR, *supra* note 5, art. 50 ("the provisions of the present Covenant shall extend to all parts of federal states without any exceptions or limitations.").

[334] Geneva Conventions, *supra* note 169

[335] Emanuela-Chiara Gillard, *International Humanitarian Law and Extraterritorial State Conduct, in* EXTRATERRITORIAL APPLICATION OF HUMAN RIGHTS TREATIES, (Fons Coomans and Menno T. Kamminga eds., 2004), 27. Common Article 2 of the Geneva Conventions provides that the Conventions are applicable to any "declared war or any other armed conflict between two or more High Contracting Parties even though the state of war has not been recognized." Geneva Conventions, *supra* note 169, art. 2. An influential source of interpretation of the Geneva Conventions is the International Committee of the Red Cross's Commentary on the Geneva Conventions, which states that "any difference arising between two States and leading to the intervention of armed forces is an armed conflict within the meaning of Article 2, even if one of the Parties denies the existence of a state of war." ICRC COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR, 20 (J.S. Pictet ed., 1958). In addition, Common Article 3 of the Geneva Conventions applies "in case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." Geneva Conventions, *supra* note 169, art. 3.

[336] *See* Geneva Conventions, *supra* note 169, art. 2.

[337] *Id.*

[338] For a discussion of the standards used to determine a state's "occupation" by another state, *see* Association of the Bar of the City of New York, *Supplement to the Report on Human Rights Standards Applicable to the United States' Interrogation of Detainees* (2004) (HR Standards Supplement), *available at* http://www.abcny.org/pdf/ABCNY-InterrogationReportSupp.pdf (last visited Oct. 24, 2004), at 5.

## 1. *Geneva III Protections*

Under Geneva III, "combatants" are entitled to POW status if they are members of the armed forces (other than medical personnel, chaplains,[339] spies or saboteurs). The specific requirements for combatant/POW status are set forth in Article 4 of Geneva III.[340] If there is any doubt as to whether captured persons meet Article 4's criteria for POW status, such persons are entitled to interim POW status until a "competent tribunal" determines their legal status.[341] A detailed discussion of the debate over the U.S. failure to establish such tribunals, the status and adequacy of the tribunals currently underway, and the U.S. categorization of detainees in the course of the war in Afghanistan as "enemy combatants" or "security detainees" to whom Geneva Convention protections do not apply is beyond the scope of this Report, but is discussed in detail in the HR Standards Report at pages 3-8 and 39-47, and at the HR Standards Supplement at pages 3-12.[342]

Briefly, Geneva III mandates that POWs be treated humanely at all times. This includes freedom from physical and mental torture, acts of violence, intimidation and insult, and exposure to public humiliation.[343] Pursuant to Article 14, POWs also "are entitled in all circumstances to

---

[339] Both medical personnel and chaplains may, however, still be entitled to POW protections under Geneva III even though they are not entitled to POW status. *See* Geneva III, *supra* note 169, art. 33.

[340] Article 4 of Geneva III, *supra* note 169, provides, in part:

Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:

1. Members of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces.
2. Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfill the following conditions:
    (a) That of being commanded by a person responsible for his subordinates;
    (b) That of having a fixed distinctive sign recognizable at a distance;
    (c) That of carrying arms openly;
    (d) That of conducting their operations in accordance with the laws and customs of war.
3. Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power.

Articles 43 and 44 of Additional Protocol I set out the circumstances in which an individual may be considered a prisoner of war in conflicts governed by that protocol.

[341] *See* Geneva III, *supra* note 169, art. 5; *see also*, U.S. Dept. of Army, Field Manual 27-10, *Law of Land Warfare*, art. 71 (1956); U.S. Dept. of Army, Regulation 190-8 Military Police, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees*, §1-5 (a)(2) (1997). Under U.S. military regulations, a "competent tribunal" pursuant to Article 5 of Geneva III consists of three commissioned officers. The regulations also require that persons whose status is to be determined: be advised of their rights; be permitted to attend all open sessions, call witnesses, question witnesses called by the tribunal; and, be permitted (but not compelled) to testify or otherwise address the tribunal and be provided with an interpreter. The regulations provide for the tribunal's determination of a detainee's status in closed session by a majority vote and require a preponderance of the evidence to support the tribunal's finding. *See* Erin Chlopak, *Dealing with the Detainees at Guantànamo Bay: Humanitarian and Human Rights Obligations Under the Geneva Conventions* 9 Hum Rts. Br. 6, 8 (2002).

[342] This Report notes, however, that pursuant to Geneva III, *supra* note 169, art. 118, POWs are required to be "released and repatriated without delay after the cessation of active hostilities." If detainees captured during the Afghan conflict and the war in, and occupation of, Iraq are POWs (but have not been adjudicated as such), continued detention, without charge, constitutes a breach of Article 118, unless such persons are detained in compliance with Geneva IV relating to detention of civilians (*e.g.* pursuant to Article 5 with respect to security detainees and Article 42 permitting internment "if the security of the Detaining Power makes it absolutely necessary.").

[343] Specifically, Article 13 of Geneva III, *supra* note 169, provides:

Prisoners of war must at all times be humanely treated. Any unlawful act or omission by the Detaining Power causing death or seriously endangering the health of a prisoner of war in its custody is prohibited, and will be

respect for their persons and their honour . . . . [and] shall retain the full civil capacity which they enjoyed at the time of their capture." With respect to interrogation in particular, Article 17 of Geneva III provides: "No physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind." As discussed in greater detail below, in Section V.C.1., the torture or inhumane treatment of POWs is classified as a "grave breach" of Geneva III, obligating the United States to investigate and prosecute any such torture as a war crime.[344]

Geneva III also mandates that POWs may not be transferred to other states unless those states are also parties to Geneva III, and will fully protect the rights of such POWs (including the protections against torture or inhuman treatment). Although the unlawful transfer of POWs to a third state is not classified as a "grave breach," Geneva III provides that if POW protections are not to be afforded by the third state, the Detaining Power is obligated to take back custody of the POW and intern the POW in a place where his or her rights will be respected.[345]

Thus, under Geneva III, the United States may be required to investigate and prosecute as a war crime any allegations of Extraordinary Rendition of POWs in which U.S. agents may have been complicit to torture. If a POW has been transferred to a third state where he or she has been subjected to torture, the United States, as the original transferring Power, must take effective measures to correct the situation or seek the return of the POW.

### 2. *Geneva IV Protections*

Geneva IV applies in international armed conflicts to the same extent as Geneva III. It covers "protected persons," defined as "those who, at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals."[346] "Protected persons" do not, however, include "[n]ationals of a State which is not bound by the Convention," "[n]ationals of a neutral State who find themselves in the territory of a belligerent State" and "nationals of a co-

---

regarded as a serious breach of the present Convention. In particular, no prisoner of war may be subjected to physical mutilation or to medical or scientific experiments of any kind which are not justified by the medical, dental or hospital treatment of the prisoner concerned and carried out in his interest.

Likewise, prisoners of war must at all times be protected, particularly against acts of violence or intimidation and against insults and public curiosity.

[344]   *Id.*, arts. 130 and 131.

[345]   Article 12 of Geneva III, *id.*, provides:

Prisoners of war are in the hands of the enemy Power, but not of the individuals or military units who have captured them. Irrespective of the individual responsibilities that may exist, the Detaining Power is responsible for the treatment given them.

Prisoners of war may only be transferred by the Detaining Power to a Power which is a party to the Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the Convention. When prisoners of war are transferred under such circumstances, responsibility for the application of the Convention rests on the Power accepting them while they are in its custody.

Nevertheless if that Power fails to carry out the provisions of the Convention in any important respect, the Power by whom the prisoners of war were transferred shall, upon being notified by the Protecting Power, take effective measures to correct the situation or shall request the return of the prisoners of war. Such requests must be complied with.

[346]   Geneva IV, *supra* note 169, art. 4.

belligerent State ... while the State of which they are nationals has normal diplomatic representation in the State in whose hands they are."[347] The term "protected persons" includes persons detained as spies or saboteurs as well as persons suspected of engaging in activities hostile to the security of the Occupying Power, with some limitations.[348] The fact that a person may have unlawfully participated in a conflict does not deprive that person of Geneva IV's protections against torture, inhumane treatment and unlawful transfer.[349] These Geneva IV protections would thus extend to individuals (who are not POWs covered by Geneva III) detained during the wars in Afghanistan and Iraq, and would protect them against torture, inhumane treatment and against transfer to other states where they may be subject to torture.

Like POWs under Geneva III, "protected persons" under Geneva IV cannot be subjected to coercive interrogation tactics. Specifically, Article 31 of Geneva IV provides that "[n]o physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties." Article 32 further provides that "any measure of such a character as to cause physical suffering or extermination of protected persons" is prohibited and that "[t]his prohibition applies not only to murder, torture, corporal punishments, mutilation and medical or scientific experiments not necessitated by the medical treatment of a protected person, but also to any other measures of brutality, whether applied by civilian or military agents."

Geneva IV contains detailed rules regarding the internment, transfer and deportation of civilians.[350] Article 45 specifically provides that:

> Protected persons shall not be transferred to a Power which is not a party to the Convention. . . .
>
> Protected persons may be transferred by the Detaining Power only to a Power which is a party to the present Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the

---

[347]  *Id.*

[348]  Specifically, Article 5 of Geneva IV, *id.*, provides:

Where in occupied territory an individual protected person is detained as a spy or saboteur, or as a person under definite suspicion of activity hostile to the security of the Occupying Power, such person shall, in those cases where absolute military security so requires, be regarded as having forfeited rights of communication under the present Convention.

In each case, such persons shall nevertheless be treated with humanity and, in case of trial, shall not be deprived of the rights of fair and regular trial prescribed by the present Convention. They shall also be granted the full rights and privileges of a protected person under the present Convention at the earliest date consistent with the security of the State or Occupying Power, as the case may be.

[349]  A debate exists as to whether persons who have directly participated in the war in Afghanistan hostilities and who do not qualify as POWs under Geneva III (*i.e.*, detainees considered to be "unlawful combatants" by the United States) should automatically be considered "protected persons" under Geneva IV, unless other exceptions apply. Recent decisions of the International Criminal Tribunal for the Former Yugoslavia have held that, "if an individual is not entitled to the protections of the Third Convention as a prisoner of war (or of the First or Second Conventions) he or she necessarily falls within the ambit of [Geneva IV]." *See Prosecutor v. Delalic*, Case No. IT-96-21-T, Judgment, (ICTY Trial Chamber November 16, 1998), para. 271; *see also Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, (ICTY Appeals Chamber, July 15, 1999). For a further discussion of the standards applicable to the determination of a "protected person" under Geneva IV, and the Bush Administration's designation of certain detainees as "enemy combatants," *see* HR Standards Supplement, *supra* note 338, at 3-5 and 9-10.

[350]  Geneva IV, *supra* note 169, arts. 41 and 42 (civilians may be interned only where "absolutely necessary"), art. 43 (internment order must be reconsidered upon the civilian's request, "as soon as possible by an appropriate court or administrative board" and periodically "at least twice yearly"), art. 45 (civilians may be transferred only to a Detaining Power that is a party to the Convention), art. 78 (civilian internment authorized only for "imperative reasons of safety"), arts. 79-126 (rules on treatment of civilian internees), arts. 127-28 (rules on transfers of internees), arts. 132-35 (rules on repatriation of civilian internees).

present Convention. If protected persons are transferred under such circumstances, responsibility for the application of the present Convention rests on the Power accepting them, while they are in its custody. Nevertheless, if that Power fails to carry out the provisions of the present Convention in any important respect, the Power by which the protected persons were transferred shall, upon being so notified by the Protecting Power, take effective measures to correct the situation or shall request the return of the protected persons. Such request must be complied with.

In no circumstances shall a protected person be transferred to a country where he or she may have reason to fear persecution for his or her political opinions or religious beliefs.

As discussed in greater detail below, in Section V.C.2., both the torture or inhuman treatment and the "unlawful deportation or transfer or unlawful confinement of a protected person" are classified as "grave breaches" of Geneva IV, obligating the United States to investigate and prosecute any such transfer as a war crime.[351]

It is unclear whether Geneva IV would apply to individuals detained outside the United States (and not Iraqi or Afghan nationals captured during the wars in Iraq or Afghanistan, respectively) as part of the "War on Terror," including individuals detained at the U.S. secret detention facilities. First, in the context of the so-called war against terrorism, the United States is not engaged in international armed conflict with another state during the course of which these individuals were detained. Second, without a status hearing (which have now begun in the case of detainees at Guantánamo only, and whose procedural adequacy has been called into question by military lawyers and human rights groups) it is not possible to determine whether a particular individual is an interned civilian to whom Geneva IV would apply. As noted above, however, regardless of whether Geneva IV protections apply, transfer of any of these individuals to states where they are in danger of torture would still clearly be prohibited under human rights treaties.

By its terms, Geneva IV ceases to apply "on the general close of military operations" in the case of an international conflict or, in the case of "occupied territory," "one year after the general

---

[351] *Id.*, arts. 147 and 148. Article 49 of Geneva IV, *id.*, prohibits "[i]ndividual or mass forcible transfer, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, . . . regardless of their motive." Geneva IV, *supra* note 169, art. 49. It has recently been reported that the CIA has secretly transferred detainees from Iraq for interrogations under authority of a draft legal opinion dated March 19, 2004 and authored by Jack Goldsmith, then Assistant Attorney General of the Department of Justice's Office of Legal Counsel. *See* Dana Priest, *Memo Lets CIA Take Detainees Out of Iraq: Practice is Called Serious Breach of Geneva Conventions*, WASHINGTON POST, Oct, 24, 2004, at A1; *see also* Jack Goldsmith, Office of Legal Counsel of the Department of Justice, *Re: Permissibility of Relocating Certain "Protected Persons" from Occupied Iraq*, (draft dated March 19, 2004), available at http://www.washingtonpost.com/wp-srv/nation/documents/doj_memo031904.pdf (last visited Oct. 26, 2004) (Goldsmith Memo). According to Bush Administration officials, the Goldsmith Memo "establishes an important exception to public assertions by the Bush administration since March 2003 that the Geneva Conventions applied comprehensively to prisoners taken in the conflict in Iraq." Douglas Jehl, *U.S. Action Bars Right of Some Captured in Iraq*, N.Y. Times, Oct. 26, 2004, at A1. The memo reasons that Article 49's protection against forcible transfer and deportation is not available to "illegal aliens" in Iraq. Goldsmith Memo at 2-8. The memo also reasons that Article 49's protections do not apply to transfers of either "protected persons" or of what the memo calls "illegal aliens" for the purposes of interrogations because such transfers do not apply to persons who have either been accused of an offense or who have not been accused but are removed only "temporarily" for interrogation as opposed to being "permanently uprooted" from their homes. *Id.* at 9-14. The memo's reasoning ignores the plain language of Article 49. Moreover, as the authoritative ICRC Commentary to Geneva IV states, Article 49's "prohibition is absolute and allows of no exceptions, apart from those stipulated in paragraph 2 [which authorizes *evacuation* as a preventative measure only in circumscribed instances for the *protection* of "protected persons."]" ICRC, COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR, 278 (J.S. Pictet ed., 1958).

close of military operations," or as long thereafter as the occupying power exercises the "functions of government."[352] But the questions of when military operations have ended or when a territory is no longer occupied are often not easily answered. For example, whether military operations have reached a "general close" and whether the United States constituted an Occupying Power after the establishment of the Karzai government in June 2002, and its recognition by the UN Security Council, are questions open to controversy. Similarly, U.S. military operations in Iraq are on-going, and, even though governing authority was in many respects transferred to the interim Iraqi Government on June 28, 2004, with the approval of the UN Security Council and the subsequent recognition of the new government by numerous nations, the United States continues to hold some of the powers of government, including legal and physical control over prisoners. Thus, the ability of some civilians captured in Afghanistan or Iraq to claim "protected person" status under Geneva IV today is subject to additional debate.[353] However, regardless of the characterization of the current conflicts in Afghanistan and Iraq, torture and CID treatment of civilian detainees from the war or ongoing conflict in Afghanistan and Iraq is not permitted, whether or not they qualify as "protected persons" under Geneva IV. All such persons are still entitled to the protections of international human rights law and to humane treatment under Common Article 3 and Article 75 of Additional Protocol I.

### 3.    *Additional Geneva Convention Protections*

Detained civilians captured in situations of international or non-international armed conflict who do not fall within the definition of "protected persons" in Geneva IV are nevertheless covered by Article 3 common to all four Geneva Conventions."[354] Common Article 3, which applies to armed conflict of any kind – international and non-international – is recognized as part of customary international law.[355] Pursuant to Common Article 3, detainees "shall in all circumstances be treated humanely" and prohibits the following acts "at any time and in any place whatsoever":

---

[352]    *Id.* art. 6.

[353]    The authoritative ICRC has not asserted that either Afghanistan after June 2002, or Iraq after June 2004, was occupied within the meaning of Geneva IV.

[354]    Detained civilians captured in situations of armed conflict governed by Additional Protocol I to the Geneva Conventions are also protected by article 75(2) of that instrument. *See* Protocol I Additional to the Geneva Conventions of Aug. 12, 1949, *opened for signature* Dec. 12, 1977, U.N. Doc. A/32/144, Annex I, *reprinted in* 1125 U.N.T.S. 3; 16 I.L.M. 1391 (Additional Protocol I), *available at* http://www.icrc.org/ihl.nsf/7c4d08d9b287a42141256739003e636b/f6c8b9fee14a77fdc125641e0052b079 (last visited Oct. 24, 2004). Although the United States is not a party to Additional Protocol I, it is generally acknowledged that relevant sections of Protocol I constitute either binding customary international law or good practice, in particular the minimum safeguards guaranteed by Article 75(2). *See* Michael J. Matheson, *Remarks on the United States Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions, reprinted in The Sixth Annual American Red Cross-Washington College of Law Conference on International Humanitarian Law: A Workshop on Customary International Law and the 1977 Protocols Additional to the 1949 Geneva Conventions,* 2 AM. U. J. INT'L L. & POL'Y 415, 425-6 (1987).

[355]    *See, e.g., Military and Paramilitary Activities in and against Nicaragua (Nicar. v. U.S.),* 1986 I.C.J. 14 (June 27, 1986) (*Nicaragua case*), paras. 218-20 (affirming that Common Article 3 is part of customary international law); *Prosecutor v. Tadic,* Case No. IT-94-1, Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction, (ICTY Appeals Chamber, Oct. 2, 1995) para. 98 ("[S]ome treaty rules have gradually become part of customary law. This holds true for common Article 3 of the 1949 Geneva Conventions. . . ."); *Prosecutor v. Kunarac et. al.,* Case Nos. IT-96-23 and IT-96-23/1, Judgement, (ICTY Appeals Chamber, June 12, 2002) para. 68 (Common Article 3 "is indeed regarded as being part of customary international law."); *Prosecutor v. Blaškic,* Case No. IT-95-14, Judgment, (ICTY Trial Chamber, March 3, 2000) para. 166 ("Common Article 3 must be considered a rule of customary international law."); *Prosecutor v. Naletilic and Martinovic,* Case No. IT-98-34, Judgment, (ICTY Trial Chamber, March 31, 2003) para. 228 ("It is . . . well established that [C]ommon Article 3 has acquired the status of customary international law."). *See also* Theodor Meron, *The Geneva Conventions as Customary Law,* 81 AM. J. INT'L L. 348 (1987).

"violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;" and "outrages upon personal dignity, in particular humiliating or degrading treatment."[356] Common Article 3 also provides that the "wounded and sick shall be collected and cared for."[357] Common Article 3 does not address the transfer of detainees.

### 4.   *The Geneva Conventions Require High Contracting Parties To Investigate and Prosecute Torture and Complicity to Torture as War Crimes*

Common Articles 50, 51, 130, and 147 of the Geneva Conventions define specific "grave breaches" of the Geneva Conventions as war crimes.[358] Included in the grave breaches provisions is "willful killing, torture or inhuman treatment" of POWs and civilians qualified as "protected persons."[359] Geneva IV, applicable to civilians, also includes as a "grave breach" the "unlawful deportation or transfer or unlawful confinement of a protected person."[360] States are required to investigate allegations of "grave breach" violations and to prosecute, or extradite to another state that will prosecute, perpetrators of "grave breaches."[361] The Geneva Conventions require criminal sanctions to be imposed on people who either directly commit "grave breaches," or order "grave

---

[356]   Geneva Conventions, *supra* note 169, art. 3. Additional Protocol I, *supra* note 354, article 75 also provides protection against ill-treatment in conflicts that are governed by that instrument:

The following acts are and shall remain prohibited at any time and in any place whatsoever, whether committed by civilians or by military agents:

(a)  Violence to the life, health or physical or mental well-being of persons, in particular:
  (i)  Murder;
  (ii)  Torture of all kinds, whether physical or mental;
  (iii)  Corporal punishments; and
  (iv)  Mutilations
(b)  Outrages on personal dignity, in particular, humiliating and degrading treatment, enforced prostitution, and any form of indecent assault.

[357]   Geneva Conventions, *supra* note 169, art. 3.

[358]   Article 85(2) of Additional Protocol I, *supra* note 354, also includes a "grave breaches" provision, and extends "grave breaches" protections beyond those in the Geneva Conventions to include, among others, "(1) Persons who have taken part in hostilities and have fallen into the power of an adverse Party (defined by Additional Protocol I as including combatants and prisoners of war); (2) Refugees and stateless persons in the power of an adverse Party; (3) The wounded, sick, and shipwrecked of the adverse Party; and (4) Medical or religious personnel, medical units or medical transports which are under the control of the adverse Party and protected under the Protocol (see Article 8 for definitions)."

[359]   Geneva I, art. 50; Geneva II, art. 51; Geneva III, art. 130;  Geneva IV, art. 147, *supra* note 169.  Geneva III Article 130 states: "Grave breaches . . . .shall be those involving any of the following acts, if committed against persons or property protected by the Convention: willful killing, torture or inhuman treatment, including biological experiments, willfully causing great suffering or serious injury to body or health, compelling a prisoner of war to serve in the forces of the hostile Power, or willfully depriving a prisoner of war of the rights of fair and regular trial prescribed in this Convention."

[360]   Geneva IV, *supra* note 169, art. 147. Geneva IV's grave breaches provision refers to "persons . . . protected by the present Convention," as opposed to "protected persons" The full text of the Article states: "Grave breaches . . . shall be those involving any of the following acts, if committed against persons or property protected by the present Convention: willful killing, torture or inhuman treatment, including biological experiments, willfully causing great suffering or serious injury to body or health, unlawful deportation or transfer or unlawful confinement of a protected person, compelling a protected person to serve in the forces of a hostile Power, or willfully depriving a protected person of the rights of fair and regular trial prescribed in the present Convention, taking of hostages and extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly."

[361]   Geneva I, art. 51, Geneva II, art. 52, Geneva III, art. 131, Geneva IV, art. 148, *supra* note 169.

breaches" to be committed.[362] The obligation to prosecute or extradite is absolute and non-derogable. It applies regardless of the nationality of the perpetrator or of the victim and also regardless of the place where the "grave breach" was committed.[363] "Grave breaches" of the Geneva Conventions are a part of customary international law.[364] Geneva Conventions Common Article 3 is also part of the customary international law, and violations of Common Article 3 have also been interpreted as requiring criminal sanctions.[365]

Recently, the statute for the ICTY incorporated the language of the Geneva Convention grave breaches provisions and authorized the tribunals to prosecute individuals "committing or ordering to be committed" crimes including torture or inhuman treatment as set out under the Geneva Conventions.[366] The statute for the ICTR reflects the fact that, unlike the war in the former Yugoslavia, the conflict in Rwanda was at all times a non-international armed conflict and criminalizes violations of Geneva Convention Common Article 3, including, specifically "violence to life, health and physical or mental well-being of persons, in particular murder as well as cruel treatment such as torture, mutilation or any form of corporal punishment."[367]

---

[362]  Geneva I, art. 49, Geneva II, art. 50, Geneva III, art. 129, Geneva IV, art. 146, *supra* note 169.

[363]  Geneva III, art. 129; Geneva IV, art. 146, *supra* note 169.

[364]  United Nations Secretariat, *Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808*, U.N. SCOR, 3175th mtg., U.N. Doc. S/25704 (1993), at 9, para. 35, *reprinted in* 32 I.L.M. 1163 (1993) (grave breaches of the Geneva Conventions, genocide, and other crimes against humanity are undoubtedly a part of customary international law). This Report was approved by the U.N. Security Council. S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg. at 6, U.N. Doc. S/RES/827 (1993), *reprinted in* 32 I.L.M. 1203 (1993).

[365]  *Prosecutor v. Tadic,* Case No. IT-94-1, Decision on the Defense Motion for Interlocutory Appeal on Jurisdiction, (ICTY Appeals Chamber, Oct. 2, 1995) para. 128-129 (individuals who violate the laws of war, including Common Article 3, may incur individual criminal responsibility under international law).; *Prosecutor v. Mucic et al.,* Case No. IT-96-21, Judgment, (Appeals Chamber, Feb. 20, 2001) para. 162, 171 ("[T]he fact that common Article 3 does not contain an explicit reference to individual criminal liability does not necessarily bear the consequence that there is no possibility to sanction criminally a violation of this rule. The [International Military Tribunal at Nuremberg] indeed followed a similar approach, as recalled in the *Tadic* Jurisdiction Decision when the Appeals Chamber found that a finding of individual criminal responsibility is not barred by the absence of treaty provisions on punishment of breaches. The Nuremberg Tribunal clearly established that individual acts prohibited by international law constitute criminal offences even though there was no provision regarding the jurisdiction to try violations. . . . The Appeals Chamber is unable to find any reason of principle why, once the application of rules of international humanitarian law came to be extended (albeit in an attenuated form) to the context of internal armed conflicts, their violation in that context could not be criminally enforced at the international level."); *Prosecutor v. Blaškic,* Case No. IT-95-14 (Trial Chamber), March 3, 2000, para. 176 ("[C]ustomary international law imposes criminal responsibility for serious violations of Common Article 3."); *see also* U.S. Dept. of Army, Field Manual 27-10, "Law of Land Warfare", art. 499 ("The term 'war crime' is the technical expression for a violation of the law of war by any person or persons, military or civilian. Every violation of the law of war is a war crime.") and 506 (1956); United Kingdom *Manual of Military Law, Part III* (1958), para. 626 ("all other violations of the [Geneva] Conventions, not amounting to "grave breaches", are also war crimes).

[366]  Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 2, May 25, 1993, S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., at 1-2, U.N. Doc. S/RES/827 (1993), *amended by* S.C. Res. 1166, U.N. SCOR, 53rd Sess., 3878th mtg., U.N. Doc. S/RES/1166 (1998), *amended further by* S.C. Res. 1329, U.N. SCOR, 55th Sess., 4240th mtg., U.N. Doc. S/RES/1329 (2000), *amended further by* S. C. Res. 1411, U.N. SCOR, 57th Sess., 4535th mtg., U.N. Doc. S/RES/1411 (2002), *available at* http://www.un.org/icty/basic/statut/stat2000.htm (last visited Oct. 25, 2004) (ICTY Statute).

[367]  Statute of the International Criminal Tribunal of Rwanda, art. 4, U.N. SCOR, 48th Sess., 3217th mtg., U.N. Doc. S/Res/955 (1994) *amended by* S.C. Res. 978, U.N. SCOR, 50th Sess., 3504th mtg., U.N. Doc. S/RES/978 (1995), *amended further by* S.C. Res. 1165, U.N. SCOR, 53rd Sess., 3877th mtg., U.N. Doc. S/RES/1165 (1998), *amended further by* S.C. Res. 1329, U.N. SCOR, 55th Sess., 4240th mtg., U.N. Doc. S/RES/1329 (2000), *available at* http://www.ictr.org/ENGLISH/Resolutions/955e.htm (last visited Oct. 25, 2004) (ICTR Statute).

### 5.    *The United States' Implementation of the Geneva Conventions*

The United States signed the Geneva Conventions on December 8, 1949 and ratified them on February 8, 1955.[368] The United States has applied the prohibitions and protections of the Geneva Conventions (and those of its predecessor treaties) since at least the Nuremberg Tribunals following the Second World War, including during the Vietnam War, and the Persian Gulf War of 1990. The provisions of the Geneva Conventions are also reflected in U.S. domestic statutes, including the Uniform Code of Military Justice, applicable to all military personnel.[369] However, it was not until 1996 that the Geneva Conventions were formally implemented into domestic legislation through the War Crimes Act of 1996. The War Crimes Act provides, in pertinent part:

> (a) Offense. – Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.
>
> (b) Circumstances. – The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).
>
> (c) Definition. – As used in this section the term "war crime" means any conduct: (1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;
>
> . . .
>
> (3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict.[370]

### D.    The Refugee Convention's Prohibitions of Extraordinary Renditions

Extraordinary Rendition may also, in the case of transfer of individuals who seek asylum in the United States, violate the provisions of the Refugee Convention.[371] Article 33(1) of the Refugee

---

[368]  Status of Ratification of the Geneva Conventions, United States, *available at* http://www.icrc.org/ihl.nsf/db8e9e8d3ba9d116f412567390003e6371·d6b53f5b5d14f35ae1256402003l9920?OpenDocument (last visited Oct. 25, 2004).

[369]  10 U.S.C. §§801-941 (1994 & Supp. IV 1999); *see* Section VIII.A.2. of this Report.

[370]  Pub. L. No. 104-192 (codified at 18 U.S.C. §§ 2401, 2441, Aug. 21, 1996, 110 Stat. 2104, Sec. 2401); renumbered Sec. 2441, Public Law 104-294, title VI, Sec. 605(p)(1), Oct. 11, 1996, 110 Stat. 3510; amended by Public Law 105-118, title V, Sec. 583, Nov. 26, 1997, 111 Stat. 2436.

[371]  Refugee Convention, *supra* note 170. Although the United States did not ratify the Refugee Convention, it is a party to it through its accession to the 1967 Protocol, *supra* note 170, which adopted and extended the Refugee Convention protections. Formal procedures for granting asylum and withholding of deportation in accordance with the Refugee Convention were first enacted into domestic law through amendments to the Immigration and Nationality Act, 8 U.S.C. §1101 *et seq.*, and by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). Subsequent U.S. legislation that contains provisions relating to Refugee Convention protections include: the Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978; the Illegal Immigration Reform and Immigrant

Convention prohibits the expulsion or *refoulement* of any person to a state "where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion."[372] The Refugee Convention does not refer to torture or to CID treatment or punishment, but rather applies to any person who "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable, or owing to such fear, is unwilling to avail himself to the protection of that country."[373] Thus the Refugee Convention's protections are both narrower and broader than those of CAT. CAT prohibits *refoulement* of *any* individual to *any* state where that individual faces the danger of torture, regardless of the reason for the danger or the purpose of the torture.[374] The Refugee Convention's protections extend only to individuals who face persecution in their home state (or state of habitual residence) on one of the five enumerated grounds. On the other hand, CAT applies to prohibit torture by state actors or individuals acting with the consent or acquiescence of state actors, while the Refugee Convention has been interpreted to include persecution by civilians, if the persecution is tolerated by state authorities or if state authorities are unable to prevent it.[375]

Also unlike CAT's *non-refoulement* prohibition, which is absolute and permits no exceptions, the Refugee Convention contains certain exceptions that prohibit a person from obtaining refugee status, or protection against *refoulement*, even if the person has a well-founded fear of persecution on one of the five enumerated grounds. Article 33(2) limits the *non-refoulement* protection by providing that a person who has been recognized as a refugee may not be protected against *refoulement* if "there are reasonable grounds for regarding [him] as a danger to the security of the country in which he is, or who, having been convicted . . . of a particularly serious crime, constitutes a danger to the community of that country."[376] Article 1F of the Refugee Convention also states that the Convention shall not be applicable to a person if:

(a)     He has committed a crime against peace, a war crime, or a crime against humanity . . .;

(b)     He has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(c)     He has been guilty of acts contrary to the purposes of the United Nations.[377]

---

Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (codified at 8 U.S.C.A. 1231(b)(3)); and the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132 (Apr. 24, 1996).

[372]  The *non-refoulement* obligation in the Refugee Convention is thus not limited to persons in danger of torture, as it is under CAT Article 3, but is concerned with the larger category of ill-treatment that constitutes "persecution" under the Refugee Convention.

[373]  Refugee Convention, *supra* note 170, art. 1(A)(2); *see also* 1967 Protocol, *supra* note 170, art. 1(2). In *I.N.S. v. Cardoza-Fonseca*, the Supreme Court held that the principal focus of the test of "well-founded fear" was on the applicant's subjective beliefs: as long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution; it is enough that persecution is a reasonable possibility. 480 U.S. 421, 107 S. Ct. 1207 (1987).

[374]  CAT Article 1, *supra* note 5, lists certain reasons that torture may be perpetrated, but this list is not exhaustive.

[375]  United Nations High Commissioner for Refugees, HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES, U.N. Doc. HCR/1P/4/Eng/REV.2 (1992) (UNHCR Handbook), para. 65.

[376]  Refugee Convention, *supra* note 170, art. 33(2).

[377]  *Id.*, art. 1F. The UNHCR has cautioned that application of this exclusion clause to a person who otherwise meets the definition of a "refugee" would only be justified if the crime was particularly severe, and that the authorities must balance the degree of persecution feared by the applicant against the severity of the crime. UNHCR Handbook,

The United States could seek to justify the *refoulement* of an asylum seeker to his or her home country based on these exceptions to applicability of the Refugee Convention. Still, to the extent that an individual seeking asylum to the United States is returned by the United States to his or her home state (or any another state) where that person is in danger of torture, U.S. obligations under CAT and the ICCPR would be violated.

### E.    Guidance Provided by International Law on Criminal Liability

Torture is universally proscribed. The community of states has recognized the egregiously transgressive nature of torture, and international human rights and humanitarian law treaties include provisions that either directly criminalize torture (for example, through the "grave breaches" provisions of the Geneva Conventions), or require that states party criminalize torture in their domestic legal regimes (for example CAT, or the ICCPR, as interpreted by the Human Rights Committee). Individuals acting either as agents of a state, or as private actors, can be held accountable for torture as an international crime.[378] Reflecting the seriousness of the offense of torture, an evolving body of international law also requires criminalization and prosecution of ancillary acts, such as complicity to, and aiding and abetting, torture. This body of law is reflected in multilateral treaties that set out legal standards and a basis for criminal sanctions, and also in the norms of customary international law.[379] Although not all of this body of law is directly binding on the United States, it offers useful guidance to the United States in interpreting its own obligations under the treaties to which it is party, and a set of principles, applied by international courts and tribunals, that the United States should follow in its domestic prosecutions of alleged acts of torture or conspiracy in torture.

In this Section, we look therefore to the International Criminal Court statute[380] and the statutes and decisions of the criminal tribunals for Yugoslavia[381] and Rwanda[382] for guidance and comparison to the bases for prosecution (and defenses) under international criminal law. The United States is not a party to the Rome Statute, but was actively involved in the negotiations of the provisions of that statute.[383] The provisions of the Rome Statute relating to the responsibility of

---

*supra* note 375, paras. 38 and 156. For a detailed discussion of these provisions, *see* Kathleen M. Keller, *A Comparative and International Law Perspective on the United States (Non) Compliance with its Duty of Non-Refoulement,* 2 YALE HUM. RTS. & DEV. L.J. 183, 190 (1999); Joan Fitzpatrick, *Rendition and the War Against Terrorism: Guantanamo and Beyond,* 25 LOY. L.A. INT'L & COMP. L. REV. 457, 473 (2003).

[378]    1 OPPENHEIM'S INTERNATIONAL LAW 148 (Robert Jennings & Arthur Watts eds., 9th ed. 1992); M. CHERIF BASSIOUNI, CRIMES AGAINST HUMANITY IN INTERNATIONAL LAW 514 (1999); JOHN W. BRIDGE, THE CASE FOR AN INTERNATIONAL COURT OF CRIMINAL JUSTICE AND THE FORMULATION OF INTERNATIONAL CRIMINAL LAW, IN INTERNATIONAL COURTS FOR THE TWENTY-FIRST CENTURY 213, 223 (Mark W. Janis ed., 1992); David Stoelting, *Status Report on the International Criminal Court,* 3 HOFSTRA L. & POL'Y SYMP. 233, 252 (1999).

[379]    *See, e.g., Filartiga v. Pena-Irala,* 630 F.2d 876, 880 (2d Cir. 1980) ("In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights. . . .").

[380]    Rome Statute of the International Criminal Court, July 17, 1998, U.N. Doc. A/CONF.183/9 (1998), 37 I.L.M. 999 (Rome Statute), *available at* http://www.un.org/law/icc/statute/romefra.htm (last visited Oct. 25, 2004).

[381]    ICTY Statute, *supra* note 366.

[382]    ICTR Statute, *supra* note 367.

[383]    *See generally,* the materials of the United Nations Preparatory Committee on the Establishment of an International Criminal Court, *available at* http://www.un.org/law/icc/prepcomm/prepfra.htm and http://www.iccnow.org/documents/prepcom/ (last visited Oct. 25, 2004).

civilian and military state actors for violations of international law reflect the most recent understanding by the community of states of the norms allowing for prosecutions of crimes under international law.[384] In the future, the decisions of the ICC (with or without U.S. participation) will form and further the development of international criminal law and provide guidance as to its interpretation and application. The United States was actively involved in the negotiation and drafting of the statutes of the ICTY and the ICTR. Although by their terms applicable only to the "armed conflict" in the former Yugoslavia[385] and the "widespread or systematic attack" in Rwanda,[386] both the statutes and the body of the tribunals' jurisprudence on prosecutions of numerous individual defendants reflect the most recent international jurisprudence on individual liability for "grave breaches" of the Geneva Conventions,[387] war crimes, including torture, and crimes against humanity, including systematic torture. A general discussion of certain key developments in international criminal law follows.

### 1.      Complicity, Conspiracy, and Aiding and Abetting

The requirement of criminalization of complicity under CAT is not unusual in international law. Accomplice liability has been recognized in international criminal law since at least the post-World War II Nuremberg Trials.[388] More recently, the ICTY and ICTR statutes have criminalized acts by individuals who plan, instigate, order, commit or otherwise aid or abet in the planning, preparation or execution of a crime.[389]

In a case involving complicity to torture, the ICTR undertook a comparative review of criminal civil and common law systems and held that an accomplice may be tried (i) for complicity in a crime even if the principal perpetrator is unidentified or if the principal perpetrator's guilt cannot be proven, and (ii) even if the accomplice has not "wished" that the principal offense be committed.[390] According to the Chamber, "anyone who knowing of another's criminal purpose, voluntarily aids him or her in it, can be convicted of complicity even though he regretted the

---

[384]   More that 120 states voted for the Rome Statute. Currently, 139 states have signed the Rome Statute, and 94 have ratified it. *See* http://untreaty.un.org ENGLISH bible englishinternetbible partI chapterXVIII treaty10.asp and http://www.iccnow.org/countryinfo/worldsigsandratifications.html (last visited Oct. 7, 2004).

[385]   ICTY Statute, *supra* note 366, art. 5.

[386]   ICTR Statute, *supra* note 367, art. 3 (the statute specifies that crimes for which individuals may be prosecuted must be "against any civilian population on national, political, ethnic, racial, or religious grounds").

[387]   ICTY Statute, *supra* note 366 art. 2 (including torture and inhumane treatment among the enumerated "grave breaches").

[388]   Report of the International Law Commission to the General Assembly, [1950] 2 Y.B. Int'l L. Comm'n 374-78, U.N. Doc. A/CN.4/SER.A/1950 (Nuremberg Principles), Principle VII (establishing complicity in the commission of a crime). The Nuremberg Principles were adopted by the U.N. General Assembly in 1950. *See* G.A. Res. 177(II)(a), U.N. GAOR, 2d Sess., Supp. No. 12, at 11-14, U.N. Doc. A/1316 (1950). *See also* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis (Charter of the International Military Tribunal), 58 Stat. 1544, E.A.S. No. 472, 82 U.N.T.S. 280 *entered into force* August 8, 1945 (Nuremberg Charter) art. 6 (accomplice liability for participation in formulation or execution of a common plan or conspiracy to commit a crime; liability of particular accomplice extends to acts performed by all other accomplices).

[389]   ICTY Statute, *supra* note 366, art. 7(1); ICTR Statute, *supra* note 367, art. 6(1) (same). *See also* Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277, *entered into force* Jan. 12, 1951, (Genocide Convention) *available at* http://www.ohchr.org english/law/genocide.htm (last visited Oct. 24, 2004) art. III(e) (complicity in genocide). *See also* International Law Commission, *Draft Code of Crimes Against the Peace and Security of Mankind: Texts of and Commentaries to Articles 1-20*, U.N. GAOR, 51st. sess., Supp. No. 10, U.N. Doc. A/51/10 (1996), *reprinted in* 18 HUM. RTS. L.J. 96 (1997) (ILC Draft Code of Crimes) (liability under article 2(3)(d) (liability for knowingly aiding, abetting or otherwise assisting, directly and substantially, in the commission of such a crime, including providing the means for its commission).

[390]   *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgment, (ICTR Trial Chamber Sept. 2, 1998).

outcome of the offence."[391] Accomplice liability does require the predicate showing that the accused's actions had a "direct and substantial effect" on the commission of the offense. According to the ICTY, a substantial effect is shown "if the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed."[392]

Liability for planning or conspiring to commit acts that violate international criminal law as set out in treaties or customary international law has also long been a basis for prosecution beginning during the Nuremberg tribunals and culminating in the recent case law of the ICTY and the ICTR.[393] More recently, however, the Rome Statute provisions governing co-perpetrator liability do not expressly include conspiracy as a basis for prosecution.[394] A basis for prosecution on grounds similar to conspiracy may be Rome Statute Article 25(3)(d) which establishes criminal liability for an individual who "contributes to the commission or attempted commission of ... a crime by a group of persons acting with a common purpose."[395] The contribution must be intentional and must either: (a) be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the court; or (b) be made in the knowledge of the intention of the group to commit the crime.

Aiding and abetting liability has also been recognized under customary international law.[396] In the *Tadic* case, the ICTY laid out the basis for accomplice liability for aiding and abetting an international crime:

> The most relevant sources for such a determination are the Nuremberg war crimes trials, which resulted in several convictions for complicitous conduct. While the judgments generally failed to discuss in detail the criteria upon which guilt was determined, a clear pattern does emerge upon an examination of the relevant cases. First, there is a requirement of intent, which involves awareness of the act of participation coupled with a conscious decision to participate by planning, instigating, ordering, committing, or otherwise aiding and abetting in the commission of a crime. Second, the prosecution must prove that there was participation in that the conduct of the accused contributed to the commission of the illegal act.[397]

*Tadic* recognized three types of joint activity that could subject a perpetrator to liability for the acts of others: (i) co-defendants, acting pursuant to a common design, who possess the same criminal

---

[391]  *Id.* para. 539.

[392]  *Prosecutor v. Tadic*, Case No. IT-94-1-T, Judgment, (ICTY Chamber II May 7, 1997) para. 688, *aff'd*, Case No. IT-94-1-A, (ICTY Appeals Chamber July 15, 1999).

[393]  Nuremberg Charter, *supra* note 388, art. 6; Nuremberg Principles, *supra* note 388, Principle VI ( liability for conspiracy to commit an offense); *see also* Genocide Convention, *supra* note 389, Art. III (b) (conspiracy to commit genocide); ICTY Statute, *supra* note 366, art. 7 (1) (liability for planning); ICTR Statute, *supra* note 367, art. 6 (1) (same); ILC Draft Code of Crimes, *supra* note 389, art. 2(3)(e) (liability for direct participation in planning or conspiracy to commit a crime that actually occurs).

[394]  Article 25 of the Rome Statue does not specifically include conspiracy, although it creates liability for committing a crime individually or jointly; ordering, soliciting, or inducing "the commission of such a crime which in fact occurs or is attempted"; and, aiding, abetting, or otherwise assisting in the commission of a crime "or its attempted commission, including providing the means for its commission." Rome Statute, *supra* note 380, art. 25(3)(a)-(c).

[395]  *Id.* art. 25(3)(d).

[396]  *Prosecutor v. Tadic*, Case No. IT-94-1-T, Judgment, (ICTY Chamber, May 7, 1997) paras. 662 and 669 (aiding and abetting liability is "beyond any doubt customary law").

[397]  *Id.* para. 674.

Association of the Bar of the City of New York                                                                73

intention;[398] (ii) members of military or administrative units acting pursuant to a joint plan[399] and with "knowledge of the nature of the system of ill-treatment and intent to further the common design of ill-treatment;"[400] (iii) where the accused possesses "the intention to take part in a joint criminal enterprise and to further ... the criminal purposes of that enterprise" and the offenses committed by members of the group are foreseeable.[401] According to the ICTY, intent in instances of action pursuant to a joint plan may be shown "either directly or as a matter of inference from the nature of the accused's authority within the camp or organizational hierarchy."[402]

In the *Furundzija* judgment, the ICTY considered torture as a crime against humanity even in the absence of an armed conflict and suggested that the mere presence of a superior may be enough to constitute participation by that superior for complicity and also aiding and abetting liability:

> [P]resence, when combined with authority, can constitute assistance in the form of moral support, that is, the actus reus of the offence. The supporter must be of a certain status for this to be sufficient for criminal responsibility. . . . In sum, the Trial Chamber holds the legal ingredients of aiding and abetting in international criminal law to be the following: the actus reus consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime. The mens rea required is the knowledge that these acts assist the commission of the offence. This notion of aiding and abetting is to be distinguished from the notion of common design, where the actus reus consists of participation in a joint criminal enterprise and the mens rea required is intent to participate.[403]

Prosecution for accomplice and co-conspirator liability for international crimes such as torture is clearly established in international law.

### 2.    *Status of Certain Defenses to Criminal Liability under International Law*

Just as the evolving body of international criminal law provides guidance on criminalization and prosecution of acts of torture and complicity to torture, so too does it provide guidance on the status of certain defenses to criminal liability under international law. It is clear that the Bush Administration is cognizant of and concerned about the availability of defenses to prosecutions for violations of CAT and U.S. laws that either implement CAT or otherwise include prohibitions against torture and complicity to torture. The Bush Administration's memos concerning the possible use of torture in interrogations include a focus on the possible defenses that

---

[398]   *Prosecutor v. Tadic*, Case No. IT-94-1A, Judgment, (ICTY Appeals Chamber, July 15, 1999) para. 196.

[399]   *Id.* para. 202.

[400]   *Id.* para. 220.

[401]   *Id. See also Prosecutor v. Krstic*, Case No. IT-98-33-T, Judgment, (ICTY Trial Chamber Aug 2, 2001) paras. 601-613 (summarizing jurisprudence of ICTY and ICTR on individual criminal liability and co-perpetrator crimes as follows: "Planning" means that one or more persons design the commission of a crime at both the preparatory and execution phases; "Instigating" means prompting another to commit an offense; "Aiding and abetting" means rendering a substantial contribution to the commission of a crime; and "Joint criminal enterprise" liability is a form of criminal responsibility ... implicitly included Article 7(1) of the Statute. It entails individual responsibility for participation in a joint criminal enterprise to commit a crime.)

[402]   *Prosecutor v. Tadic*, Case No. IT-94-1A, Judgment, (ICTY Appeals Chamber, July 15, 1999) para. 220.

[403]   *See Prosecutor v. Furundzija*, Case No. IT-95-17/1, Judgment, (ICTY Trial Chamber Dec. 10, 1998) paras. 207, 209, 235 (footnotes omitted).

may be asserted, including the superior orders defense, and the defenses of duress and necessity.[404] Although U.S. domestic criminal and military law will govern any prosecution of, and defenses available to, individual involvement in Extraordinary Renditions,[405] it is important to note that certain of the defenses that the Bush Administration memos argue may be asserted are unavailable under international law. To provide comparison and guidance for future prosecutions of alleged Extraordinary Renditions, therefore, it useful to describe briefly the status of certain defenses to the crime of torture and complicity to torture, under international law.

### (a)     The Doctrine of Command Responsibility

Criminal liability under international law has been interpreted to expand beyond those individuals who directly take part in the action and includes individuals throughout the chain of command. The doctrine of command responsibility has been recognized since the International Military Tribunal at Nuremberg, which held that persons in *de facto* or *de jure* control are responsible for the acts of those under their power.[406] Codified in Articles 86 and 87 of Protocol 1 of the Geneva Conventions (1977), the doctrine has since been cemented in the decisions of the ICTY and ICTR. Under the doctrine, military superiors who ordered or planned international crimes, and those who knew or should have known that they were occurring may be held criminally liable for the crimes. As discussed below, a civilian superior may also be held criminally responsible for international crimes, depending on the individual's position in the chain of command and the individual's ability to prevent and punish the offense.

#### (i)     Individual criminal responsibility of commanders

As a preliminary matter, any superior who was involved in the commission of a criminal act may be individually liable. Thus any official who planned, ordered,[407] instigated, committed or otherwise aided and abetted in the planning, preparation or execution of a crime is individually responsible for that crime. This principle is recognized in the Geneva Conventions,[408] and the attribution of liability is codified in Article 7(1) of the ICTY Statute, Article 6(1) of the ICTR Statute, and Article 25(3)(b) of the Rome Statute.[409] Both the Rome Statute, in Article 27(1), and the ICTR Statute, in Article 6(2), further state that individual criminal responsibility shall apply to

---

[404]    *See, e.g.,* Bybee Memorandum, *supra* note 130, at 39-44.

[405]    *See* Section VIII.A. of this Report.

[406]    In an early case applying the doctrine of command responsibility, the U.S. Supreme Court held that a military commander could be liable for crimes by his troops even if he possessed only *de jure* control and had ceded or delegated *de facto* control. *Yamashita v. U.S.*, 327 U.S. 1, 16, 35 (1946). *See also United States v. Von Leeb*, 11 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL LAW NO. 10, 1, 462 (1950); *United States v. List*,11 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL LAW NO. 10, 759, 1230 (1951); *United States v. von Weizsaecker*, 11 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL LAW NO. 10, 308 (1952).

[407]    "Ordering" entails a person in a position of authority using that position to convince or instruct another to commit the offense. *See Prosecutor v. Krstic,* Case No. IT-98-33, Judgment, (ICTY Trial Chamber, Aug. 2, 2001) para. 601; *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Judgment, (ICTR Trial Chamber, Sept. 2, 1998) para. 483. An order may be explicit or implicit and need not be given directly to the person who performs the offense. *Prosecutor v. Blaškic*, Case No. IT-95-14, Judgment, (ICTY Trial Chamber, Mar. 3, 2000) para. 281-82. No formal or legal superior-subordinate relationship need exist so long as the accused possessed the authority to order. *Prosecutor v. Kordic and Cerkez,* Case No. IT-95-14/2, Judgment, (ICTY Trial Chamber, Feb. 26, 2001).

[408]    Geneva I, art 49, Geneva II, art. 50; Geneva III, art. 129; Geneva IV, art. 146, *supra* note 169.

[409]    ICTY Statute, *supra* note 366; ICTR Statute, *supra* note 367; Rome Statute, *supra* note 380.

all persons regardless of any official capacity.[410] The position of an individual as Head of State or as a responsible government official is irrelevant in prosecutions before international courts or tribunals.[411]

### (ii)   Command responsibility

Both civilian and military superiors may be held responsible for the criminal acts of subordinates even if they did not actually order the subordinate to commit the acts. Article 28 of the Rome Statute, Article 6(3) of the ICTR Statute, and Article 7(3) of the ICTY statute make clear that superiors may be held criminally liable under the doctrine of command responsibility.[412] The doctrine extends to civilian leaders to the extent they have a degree of effective control[413] similar to military commanders such that the exercise of de facto authority has the trappings of de jure authority.[414] Under the decisions of the ICTY and the ICTR, the main factors in determining a civilian superior's liability are (a) whether there is a *de jure* or *de facto* chain of command;[415] and (b) whether the superior has the *material ability* to prevent and punish the offenses.[416]

The three elements international criminal tribunals have held are necessary for a military superior to be held responsible for crimes committed by subordinates are: (1) the existence of a superior-subordinate relationship of effective control between the accused and the perpetrator of the crime, (2) the knowledge, or constructive knowledge, of the accused that the crime was about to

---

[410]   *See also* ILC Report, art. 2(3)(b) and art. 6 ("The fact that a crime against the peace and security of mankind was committed by a subordinate does not relieve his superiors of criminal responsibility if they knew or had reason to know, in the circumstances at the time, that the subordinate was committing or was going to commit such a crime and if they did not take all necessary measures within their power to prevent or suppress the crime.").

[411]   Nuremberg Principles, *supra* note 388, Principle III ("The fact that a person who committed an act which constitutes a crime under international law acted as Head of State or responsible Government official does not relieve him from responsibility under international law."). *See also Prosecutor v. Milosovic*, Case No. IT-99-37, Indictment of May 22, 1999 paras. 55-89 (responsibility for crimes as head of state based on allegations of *de jure* and *de facto* position of command); *Prosecutor v. Milosovic*, Case No. IT-99-37-I, Amended Indictment of June 29, 2001 , paras. 27-34 (same); *Prosecutor v. Taylor*, Case No. SCSL-03-I, Indictment of March 3, 2003; *R v. Bow Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte* (No. 3), 2 W.L.R. 827 (H.L. 1999) (holding that General Augusto Pinochet could not claim official immunity for torture after Chile had signed the UN Convention Against Torture); *see also Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)* 441 I.L.M. 536 (2002) (holding that, under customary international law, heads of state and other senior ministers may be immune from prosecution in domestic courts, but may be prosecuted at an international criminal tribunal with jurisdiction).

[412]   ICTY Statute, *supra* note 366; ICTR Statute, *supra* note 367; Rome Statute, *supra* note 380. The Human Rights Committee has also interpreted the nature of the legal obligation of ICCPR Article 2 to include a prohibition on the recognition of official immunity: "no official status justifies persons who may be accused of responsibility for [ICCPR] violations being held immune from legal responsibility." HRC General Comment 31, *supra* note 9, para. 15.

[413]   *Prosecutor v. Delalic*, Case No. IT-96-21-T, Judgment, (ICTY Trial Chamber, Nov. 16, 1998) para. 346; *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Judgment (ICTR Trial Chamber, Sept. 2, 1998) para. 491.

[414]   *Prosecutor v. Mucic et al.,* Case No. IT-96-21, Judgment, (ICTY Appeals Chamber Feb. 20, 2001), paras. 192-94, 256; *Prosecutor v. Blaškic*, Case No. IT-95-14, Judgment, (ICTY Trial Chamber Mar. 3, 2000), paras. 300-302; *Prosecutor v. Kayishema and Ruzindana,* Case No. ICTR-95-1-T, Judgment, (ICTR Trial Chamber May 21, 1999), paras. 217-231; *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Judgment, (ICTR Trial Chamber June 7, 2001) para. 39; *Prosecutor v. Delalic*, Case No. IT-96-21-T, Judgement, (ICTY Trial Chamber Nov. 16, 1998), paras. 355-57, 363; *Prosecutor v. Aleksovski*, Case No. IT-95-14/1, Judgement, (ICTY Trial Chamber June 25, 1999), paras. 75, 78.

[415]   See I. Bantekas, *The Contemporary Law of Superior Responsibility*, 93 AJIL 580, 581, 584 (1999).

[416]   *Prosecutor v. Delalic*, Case No. IT-96-21-T, Judgement, (ICTY Trial Chamber Nov. 16, 1998), para. 378; *Prosecutor v. Aleksovski*, Case No. IT-95-14/1, Judgement (ICTY Trial Chamber June 25, 1999), para. 81; *Prosecutor v. Blaškic*, Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), paras. 302, 325.

be committed or had been committed, and (3) the failure of the accused to take the necessary and reasonable measures to prevent or stop the crime or to punish the perpetrator.[417]

An accused may argue that a superior-subordinate relationship did not exist since such a relationship is an essential element if an individual is to be held responsible under command responsibility.[418] However, the concept of a superior-subordinate relationship is not limited to a formal military command structure in international criminal prosecutions, and international tribunals look at both *de jure* and *de facto* power to control.[419] What is determinative is effective control to prevent or punish the criminal acts.

The second element for showing command responsibility requires that the superior either knew or had reason to know that subordinates were about to commit or had committed a crime.[420] Actual knowledge may be proven through direct or circumstantial evidence, and the evidence required may differ based on the position of authority and distance from the crimes. While responsibility is not based on strict liability, an individual's command position *per se* is a significant indication that the individual knew about the crimes.[421] It is not necessary to prove actual knowledge if the superior "had some general information in his possession which would put him on notice."[422] Further, it is not required that the superior acquainted himself with the information, but just that it was provided or available to him.[423] Ignorance arising from the negligent failure to carry out a duty to inform oneself of the actions of subordinates will not constitute a defense.[424] Superiors who know or should have known about a crime have a duty to prevent or punish that crime using all necessary and reasonable measures that are feasible and use every means in their power. The degree of effective control over subordinates will determine what is required.[425]

---

[417]  *Prosecutor v. Kordic and Cerkez,* Case No. IT-95-14/2, Judgment, (ICTY Trial Chamber Feb. 26, 2001), para. 401, *Prosecutor v. Blaškic,* Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), para. 294; *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Judgment, (ICTR Trial Chamber June 7, 2001), para. 38.

[418]  *Prosecutor v. Kunarac et al.,* Case Nos. IT-96-23 and IT-96-23/11, Judgment, (ICTY Trial Chamber Feb. 22, 2001), para. 369.

[419]  *Prosecutor v. Mucic et al.,* Case No. IT-96-21, Judgment, (ICTY Appeals Chamber Feb. 20, 2001), paras. 192-94, 256; *Prosecutor v. Kayishema and Ruzindana,* Case No. ICTR-95-1-T, Judgment, (ICTR Trial Chamber May 21, 1999), paras. 217-231; *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Judgment, (ICTR Trial Chamber June 7, 2001), para. 39.

[420]  *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Judgment (ICTR Trial Chamber Sept. 2, 1998), para. 476; *Prosecutor v. Blaškic,* Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), para. 307.

[421]  *Prosecutor v. Blaškic,* Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), para. 308; *Prosecutor v. Kordic and Cerkez,* Case No. IT-95-14/2, Judgment (ICTY Trial Chamber Feb. 26, 2001), para. 428; *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Judgment, (ICTR Trial Chamber June 7, 2001), paras. 44-46.

[422]  *Prosecutor v. Mucic et al.,* Case No. IT-96-21, Judgment, (ICTY Appeals Chamber Feb. 20, 2001), para. 222.

[423]  *Id,* paras. 222-241.

[424]  *Prosecutor v. Blaškic,* Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), para. 332; *Prosecutor v. Kayishema and Ruzindana,* Case No. ICTR-95-1-T, Judgment, (ICTR Trial Chamber May 21, 1999); *see also* Additional Protocol I, *supra* note 354, art. 86(2) (imposing "penal or disciplinary responsibility" on superiors who "knew or had information which should have enabled them to conclude in the circumstances at the time, that a subordinate was committing or was going to commit such a breach of the Conventions or of this Protocol and if they did not take all feasible measures within their powers to prevent or repress the breach.").

[425]  *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Judgment, (ICTR Trial Chamber June 7, 2001), paras. 47-50; *Prosecutor v. Blaškic,* Case No. IT-95-14-T, Judgment, (ICTY Trial Chamber Mar. 3, 2000), paras. 294, 335; *Prosecutor v. Kordic and Cerkez,* Case No. IT-95-14/2, Judgment (ICTY Trial Chamber Feb. 26, 2001), paras. 441, 445.

### (iii)    Superior orders defense

Under the superior orders defense, a subordinate who is legally obligated to follow the orders of his or her superiors is not liable for carrying out those orders. This defense is unavailable in customary international law and given the absolute prohibition against torture, would not likely excuse conspiracy to commit torture.

Article 8 of the London Charter establishing the Nuremberg International Military Tribunal explicitly prohibited the superior orders defense, and this prohibition has generally become accepted in international law.[426] The defense was clearly rejected in the trial of Adolf Eichmann, where the court noted that such an approach had "become general in all civilized nations."[427] More recently, international instruments have explicitly required that states exclude the defense from their criminal law. Article 2(3) of CAT states that, "An order from a superior officer or a public authority may not be invoked as a justification of torture."[428] The Human Rights Committee has also recommended that states party to the ICCPR revoke the superior orders defense for violations of the ICCPR.[429] Similarly, Article 6(4) of the ICTR Statute and Article 7(4) of the ICTY Statute state that, "the fact that an accused person acted pursuant to an order of a Government or of a superior shall not relieve him or her of criminal responsibility."[430] While superior orders may be taken into account as a mitigating factor when considering punishment, these instruments make clear that they do not absolve an individual of criminal responsibility.[431]

Unlike other instruments, the Rome Statute does leave open the possibility of a defense of superior orders, but not one that would apply in cases of torture or complicity to torture. Article 33 of the Rome Statute provides that the defense is not available for offenses that are commonly known to be unlawful.[432] Thus the superior orders defense is available only when the individual was legally bound to obey the orders and the person did not know that the orders were unlawful. Further, the orders must not have been manifestly unlawful. Torture is manifestly unlawful and, like murder and genocide, it is a crime that every individual must be presumed to know is illegal and thus cannot be excused by superior orders.

---

[426]    Nuremberg Judgment, at 42 ("The provisions of this article are in conformity with the law of all nations. That a soldier was ordered to kill or torture in violation of the international law of war has never been recognized as a defense to such acts of brutality."); *see also* Nuremberg Principles, *supra* note 388, Principle IV ("The fact that a person acted pursuant to order of his Government or of a superior does not relieve him from responsibility under international law, provided a moral choice was in fact possible to him").

[427]    *A.G. of the Government of Israel v. Adolf Eichmann*, (Dec. 12, 1961) 36 INTERNATIONAL REVIEW 18, 20 (1968).

[428]    CAT, *supra* note 5.

[429]    HRC General Comment 31, *supra* note 9, para. 15. ("impediments to the establishment of legal responsibility should also be removed, such as the defense of obedience to superior orders").

[430]    ICTR Statute, *supra* note 366; ICTY Statute, *supra* note 367.

[431]    *Prosecutor v. Erdemovic,* Case No. IT-96-22, Judgment, (ICTY Appeals Chamber Nov. 29, 1996), para. 54.

[432]    Article 33 states:

    1.    The fact that a crime within the jurisdiction of the Court has been committed by a person pursuant to an order of a Government or of a superior, whether military or civilian, shall not relieve that person of criminal responsibility unless:
        (a)    The person was under a legal obligation to obey orders of the Government or the superior in question;
        (b)    The person did not know that the order was unlawful; and
        (c)    The order was not manifestly unlawful.

### (b)    Duress and Necessity

Duress and necessity are related defenses where the accused argues that criminal acts are justified because the accused faced an imminent threat to his or her life. Under common law, necessity is seen as a defense when the accused is required to choose between two evils and must choose the lesser evil. Duress under common law is seen as an excuse.

The defenses should not be available for violations of CAT.[433] CAT Article 2(2) makes clear that, "no exceptional circumstances whatsoever, whether a state of war or a threat or war, internal political instability or any other public emergency, may be invoked as a justification of torture."[434] The prohibition against torture is a norm that is not derogable even in times of public emergency.[435] This provision makes clear that there can be no threat compared to which torture is a lesser harm. Moreover, the harm that is caused by torture is definite whereas the benefits gained by torture are difficult to measure and often negligible. Torture is carried out to collect information, but often fails to produce actionable intelligence. The criminal laws of most nations prohibit the use of information obtained from torture or abusive interrogation.[436]

Moreover, torture is rarely, if ever, carried out in an attempt to avoid a truly imminent threat. Under international law, an imminent harm must be known and specific[437] and an assertion that an individual may have information about a possible future attack is unlikely to fulfill this requirement. Legal interrogation, surveillance and intelligence techniques may be employed to gather the same information that officials hope to gather through torture.

Finally, duress and necessity are clearly inapplicable in cases where an individual is rendered to face torture as a form of punishment for past actions or to gather information related to previously committed attacks. The defenses require that the crime be committed with the intent of avoiding future harm. Any torture where the focus is on past events is clearly missing the required mental element.

### (c)    Self-Defense

While self-defense is recognized in international law, it applies narrowly, to excuse illegal conduct carried out to protect oneself or another person against an imminent unlawful use of force.[438] International law excuses reasonable acts to protect oneself as long as they are proportionate to the degree of danger, but an individual's involvement in a defensive operation does not constitute a ground for the excuse. The doctrine is most clearly laid out in Article 31(1)(c) of the Rome Statute, which states:

---

[433]   *See also* Rome Statute, *supra* note 380, art. 31(1)(d):

    The conduct which is alleged to constitute a crime within the jurisdiction of the Court has been caused by duress resulting from a threat of imminent death or of continuing or imminent serious bodily harm against that person or another person, and the person acts necessarily and reasonably to avoid this threat, provided that the person does not intend to cause a greater harm than the one sought to be avoided. Such a threat may either be: (i) Made by other persons; or (ii) Constituted by other circumstances beyond that person's control.

[434]   CAT, *supra* note 5.

[435]   *See* discussion *supra* at Section V.F.2.

[436]   *See, e.g., Haynes v. Washington*, 373 U.S. 503, 514-515 (1963) (involuntary confession inadmissible).

[437]   Rome Statute, *supra* note 380, art. 31(1)(d).

[438]   WAYNE R. LAFAVE, CRIMINAL LAW (3d ed. 2000), §5.7. (LAFAVE)

> A person shall not be criminally responsible if, at the time of that person's conduct … The person acts reasonably to defend himself or herself or another person or, in the case of war crimes, property which is essential for the survival of the person or another person or property which is essential for accomplishing a military mission, against an imminent and unlawful use of force in a manner proportionate to the degree of danger to the person or the other person or property protected. The fact that the person was involved in a defensive operation conducted by forces shall not in itself constitute a ground for excluding criminal responsibility under this subparagraph.[439]

The ICTY has also emphasized that "involvement of a person in a defensive operation does not, in itself, constitute a ground for excluding criminal responsibility."[440] These sources make clear that it is not a defense to argue, for example, that in conspiring to commit torture, an individual is protecting his or her state from terrorist attack.

### F.      Extraordinary Renditions in the Context of the "War on Terror" Violate International Law

There is an inherent tension between the need to obtain potentially life-saving information through interrogation of terrorist suspects and the legal requirement of upholding the anti-torture standards in the treaties to which the United States is a party. Still, "condoning torture under any circumstances erodes one of the most basic principles of international law and human rights and contradicts our values as a democratic state."[441] Torture harms not only the detainees, but also interrogators and our society. The universal condemnation of the abuses that have come to light at Abu Ghraib prison and other U.S. detention facilities in Iraq and Afghanistan have damaged this nation's standing in the community of nations, and have served to fuel the enmity of those who seek to harm U.S. citizens and U.S. interests domestically and abroad. Extraordinary Renditions may be one step removed from the direct torture of detainees by U.S. agents, but to condone any level of U.S. involvement in the interrogation by torture of detainees remains wrong and immoral. This position is reflected in international law, which, as discussed above, prohibits both torture and complicity to torture, including, as discussed below, in the context of terrorism and national security emergencies.

### 1.      The Prohibition Against Torture is Absolute and Non-Derogable

Article 2(2) of CAT provides that "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture."[442] The absolute nature of this prohibition was specifically included in CAT to distinguish freedom from torture as one of "the few fundamental rights of the individual" from which no derogation is permitted under international law, even in times of war or other emergency.[443] After the terror attacks of September 11, 2001, as the United States geared up

---

[439]   Rome Statute, *supra* note 380.

[440]   *Prosecutor v. Kordic and Cerkez,* Case No. IT-95-14/2 (Trial Chamber, February 26, 2001), paras. 448-452.

[441]   HR Standards Report, *supra* note 193, at 10.

[442]   CAT, *supra* note 5.

[443]   BURGERS & DANELIUS , *supra* note 179, at 124.

its "War on Terror," the CAT Committee issued a statement in which it condemned the terror attacks, expressed "profound condolences to the victims, who were nationals of some 80 countries, including many States parties to [CAT]," but reminded states of the non-derogable nature of CAT obligations.[444] The CAT Committee highlighted the obligations contained in article 2 (prohibition of torture under all circumstances), article 15 (prohibiting confessions extorted by torture being admitted in evidence, except against the torturer), and article 16 (prohibiting CID treatment or punishment). The Committee added that these provisions must be observed in all circumstances, and expressed confidence that "whatever responses to the threat of international terrorism are adopted by States parties, such responses will be in conformity with the obligations undertaken by them in ratifying the Convention against Torture."[445]

Unlike CAT, each of the ICCPR, the European Convention and the American Convention contains provisions permitting certain derogations from human rights obligations in specific circumstances.[446] Each of these conventions is clear, however, that certain rights are always non-derogable. Paradigmatic among these is the prohibition against torture.[447] Even derogation from other rights is only permitted in the special circumstances and according to the specified limits defined in each of the three treaties. Under the ICCPR, any such measures must be of exceptional character,[448] strictly limited in time[449] and to the extent required by the exigencies of the

---

[444]    Committee against Torture, UN Doc. No. CAT/C/XXVII/Misc.7, Nov. 22, 2001; *see also* Committee Against Torture U.N. Doc. No. A/52/44, para. 258 (1997) ("[A] State party to the Convention [against Torture] ... is precluded from raising before [the] Committee [against Torture] exceptional circumstances as justification for acts prohibited by article 1 of the Convention. This is plainly expressed in article 2 of the Convention."); Committee Against Torture, U.N. Doc. No. A/51/44, paras.180-222 (1997), Inquiry under Article 20 (same).

[445]    Committee against Torture, UN Doc. No. CAT/C/XXVII/Misc.7, Nov. 22, 2001. Similarly, although not binding under international law, a resolution specifically focusing on the need to protect human rights and fundamental freedoms while countering terrorism was adopted for the first time by the General Assembly on 18 December 2002 (UN Doc. No. A/RES/57/219). It affirmed that states must ensure that any measure taken to combat terrorism complies with their obligations under international law, in particular international human rights, refugee and humanitarian law.

[446]    ICCPR, *supra* note 5, art. 4(1); European Convention, *supra* note 186, art. 15; American Convention, *supra* note 181, art. 27(1). The most common exception is for conditions of "public emergency," such as in Article 4 of the ICCPR, *supra* note 5, which states:

          In time of public emergency which threatens the life of the nation and the existence of which is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations . . . to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with their other obligations under international law. . . .

[447]    European Convention, *supra* note 186, art. 15(2); American Convention, *supra* note 181, art. 27(2); ICCPR, *supra* note 5, art. 4 (limits on derogation); HRC Comment 20, *supra* note 303, para. 3, ("The text of article 7 allows of no limitation. The Committee also reaffirms that, even in situations of public emergency such as those referred to in article 4 of the Covenant, no derogation from the provision of article 7 is allowed and its provisions must remain in force."); Human Rights Committee, General Comment 29, *States of Emergency (article 4)*, U.N. Doc. CCPR/C/21/Rev.1/Add.11 (2001) (HRC General Comment 29) para. 7 ("Article 4, paragraph 2, of the Covenant explicitly prescribes that no derogation from the following articles may be made: . . . article 7 (prohibition of torture or cruel, inhuman or degrading punishment, or of medical or scientific experimentation without consent) . . ."); *see also Aksoy v. Turkey*, ECHR, 18 December 1996 (para. 62) ("Article 3, as the Court has observed on many occasions, enshrines one of the fundamental values of democratic society. Even in the most difficult of circumstances, such as the fight against organised terrorism and crime, the Convention prohibits in absolute terms torture or inhuman or degrading treatment or punishment. Unlike most of the substantive clauses of the Convention..., Article 3 makes no provision for exceptions and no derogation from it is permissible under Article 15 even in the event of a public emergency threatening the life of the nation.").

[448]    CCPR/C/79/Add.76, para. 25 (1997) ("The Committee ... expresses its concern that the resort to declarations of states of emergency is still frequent and seldom in conformity with article 4, paragraph 1, of the Covenant, which provides that such declaration may be made only when the life and existence of the nation is threatened").

[449]    CCPR/CO/76/EGY, para. 6 (2002); CCPR/CO/71/SYR, para. 6 (2001); CCPR/C/79/Add.93, para. 11 (1998) ("The Committee is disturbed by the fact that the state of emergency proclaimed ... in 1981 is still in effect, meaning that

situation,[450] subject to regular review,[451] consistent with other obligations under international law, and must not involve discrimination.[452] Each of the three treaties further requires that formal notice be given to the secretary-general of the United Nations or the relevant regional organization, detailing which provisions a state has derogated from and the reasons for such derogation.[453] Thus, in 2001, when its anti-terrorism legislation was adopted, the United Kingdom filed notices of derogation under the ICCPR[454] and the European Convention.[455] The United States has filed no such notice of derogation under the ICCPR or any other human rights or humanitarian law treaty to which it is a party.

Like CAT's non-derogability provision, the Geneva Conventions' obligation to investigate and prosecute individuals who are alleged to have committed "grave breaches" of the Geneva Conventions is not derogable. Thus Geneva III's prohibition against torture and inhumane treatment of POWs and Geneva IV's prohibition against torture, inhumane treatment and unlawful transfers of civilians to states where they may be subject to Geneva Convention violations apply during war – surely the greatest of national security emergencies.[456] Moreover, even though Geneva IV contains a national security exception to the applicability of "protected person" status,[457] in no circumstance does this exception permit a High Contracting Party to commit "grave breaches" as defined in Art. 147, which includes torture or inhuman treatment and willfully causing

---

the State party has been in a semi-permanent state of emergency ever since. The State party should consider reviewing the need to maintain the state of emergency.").

[450] CCPR/C/79/Add.42, para. 9 (1995)(" The Committee deplores the lack of clarity of the legal provisions governing the introduction and administration of the state of emergency … which would permit derogations contravening the State party's obligations under article 4, paragraph 2, of the Covenant.").

[451] CCPR/C/79/Add.76, para. 38 (1997) ("Constitutional and legal provisions should ensure that compliance with article 4 of the Covenant can be monitored by the courts"); CCPR/C/79/Add.56, para. 13 (1995) ("[The Human Rights Committee] is … concerned that courts do not have the power to examine the legality of the declaration of emergency and of the different measures taken during the state of emergency").

[452] The European Court of Human Rights has interpreted Article 15 of the European Convention (which contains language almost identical to ICCPR Article 4(1)'s national emergency exception) to hold that, to qualify as a public emergency, the danger must be actual or imminent, the effects must involve the whole nation, the danger must threaten the continuance of the organized life of the community, and that the danger must be so exceptional that normal measures under the Convention that permit maintenance of public safety, health and order, are inadequate. *The Greek Case*, 1969 Y.B. EUR. CONV. ON HUM. RTS. 511, P153 (Eur. Comm'n on Hum. Rts.) (resolution).

[453] CCPR/CO/72/GTM, para. 11 (2001) ("The state party should ensure that its constitutional provisions for emergency situations are compatible with article 4 of the Covenant. It should also comply with the obligation to notify the other states parties through the intermediary of the secretary-general of the United Nations in all cases when an emergency situation is declared and to inform them of the provisions from which it has derogated and of the reasons for the derogation"); ICCPR, *supra* note 5, art. 4(3); European Convention, *supra* note 186, art. 15(3); American Convention, *supra* note 181, art. 27(3).

[454] United Kingdom, *Notice of Derogation from the ICCPR, available at* http://www.bayefsky.com/./html/uk_t2_ccpr.php (last visited October 27, 2004).

[455] United Kingdom, *Notice of Derogation from the ECHR, available at* http://www.legislationline.org/view.php?document_55973 (last visited October 27, 2004).

[456] Geneva III, arts. 2, 130 and 131; Geneva IV, arts. 2, 146 and 147, *supra* note 169.

[457] Article 5 of Geneva IV provides: "Where in the territory of a Party to the conflict, the latter is satisfied that an individual protected person is definitely suspected of or engaged in activities hostile to the security of the State, such individual person shall not be entitled to claim such rights and privileges under the present Convention as would, if exercised in the favour of such individual person, be prejudicial to the security of such State." Geneva IV, *supra* note 169, art. 5.

As drafted (*i.e.*, the use of the words "the latter"), it would appear that the national security derogation is available only to the State on whose territory the conflict is occurring (*i.e.*, in the War in Afghanistan, only Afghanistan would be able to take a national security derogation under Article 5). The ICRC has not made a definitive statement on whether this provision would be interpreted to apply to any party to the conflict.

great suffering or serious injury to body or health.[458] To the extent that any physical or moral coercion (otherwise prohibited by Article 31 of Geneva IV) might fall below the level of "grave breach," the ICRC commentary to the derogations contained in Article 5 of Geneva IV, involving persons engaged in activities hostile to the security of the state, notes that:

> [W]idespread application of the Article may eventually lead to the existence of a category of civilian internees who do not receive the normal treatment laid down by the Convention but are detained under conditions which are almost impossible to check. It must be emphasized most strongly, therefore, that Article 5 can only be applied in individual cases of an exceptional nature, when the existence of specific charges makes it almost certain that penal proceedings will follow. This Article should never be applied as a result of mere suspicion.[459]

### 2. Application of the Prohibition Against Torture and Refoulement in the Context of Terrorism or National Security Risk

The CAT Committee has specifically addressed the *non-refoulement* of asylum seekers and other foreigners in the context of a state party's concerns that a claimant may present a security risk:

> [T]he test of article 3 of the Convention is absolute. Whenever substantial grounds exist for believing that an individual would be in danger of being subjected to torture upon expulsion to another State, the State party is under obligation not to return the person concerned to that State. The nature of the activities in which the person concerned engaged cannot be a material consideration when making a determination under article 3 of the Convention.[460]

The CAT Committee's holding is echoed by the Human Rights Committee's comment on the link between removal, expulsion or *refoulement* of non-nationals and torture, in its General Comment No. 20 on article 7 of the ICCPR:

> States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or *refoulement*.[461]

The Human Rights Committee has acknowledged "the difficulties that the State Party faces in its prolonged fight against terrorism, but recalls that no exceptional circumstances whatsoever can be invoked as a justification for torture, and expresses concern at the possible restrictions of human rights which may result from measures taken for that purpose."[462]

The European Court of Human Rights has also addressed the principle of *non-refoulement* to the danger of torture in the context of terrorism and national security, and determined that the prohibition against *refoulement* is based on "one of the most fundamental values of democratic

---

[458]  *See* Geneva IV, *supra* note 169, art. 146.

[459]  ICRC, COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR, 51 (J.S. Pictet ed., 1958).

[460]  *Paez v. Sweden*, Communication No. 39/1996, Committee Against Torture, U.N. Doc. CAT/C/18/D/39/1996 (1997).

[461]  HRC General Comment No. 20, *supra* note 303, para. 9.

[462]  Conclusions and recommendations of the Committee against Torture, Egypt, U.N. Doc. CAT/C/CR/29/4 (2002), para. 4.

society,"[463] and may not be violated even on national security grounds.[464] In *Chahal v. United Kingdom*,[465] The government of the United Kingdom claimed that the petitioner was a threat to the United Kingdom's national security, refused his claim for asylum and issued a deportation order. The Court found that Chahal would be in danger of ill-treatment if sent to India, and stated that the absolute nature of Article 3 applied to expulsion cases. With respect to the United Kingdom's claim that the petitioner posed a threat to its national security, the Court stated that:

> The Court is well aware of the immense difficulties faced by States in modern times in protecting their communities from terrorist violence. However, even in these circumstances, the Convention prohibits in absolute terms torture or inhuman or degrading treatment or punishment, irrespective of the victim's conduct. . . . The prohibition provided by Article 3 against ill-treatment is equally absolute in expulsion cases. Thus, whenever substantial grounds have been shown for believing that an individual would face a real risk of being subjected to treatment contrary to Article 3 if removed to another State, the responsibility of the Contracting State to safeguard him or her against such treatment is engaged in the event of expulsion . . . . In these circumstances, the activities of the individual in question, however undesirable or dangerous, cannot be a material consideration.[466]

The Inter-American Court of Human Rights has similarly held that the prohibition against torture is a *jus cogens* norm, which prohibits an individual from return to a country where that person is likely to be tortured, even if the individual is suspected of terrorist activities.[467]

These cases provide guidance to the United States in its necessary task of striking a balance between the need to address the threat of terrorism and the "fundamental values of democratic society." International law uniformly provides that regardless of whether the transfer of a person occurs as part of an extradition request and regardless of any exceptional circumstances such as efforts to combat terrorism or another threat against national security, the anti-torture and *non-refoulement* principles would be violated if, as a result of such transfer, the person could be subjected to torture or other ill-treatment.

## VI.    DIPLOMATIC ASSURANCES

Despite the prohibitions against torture and *refoulement* to torture under CAT and the ICCPR, so-called "diplomatic assurances" have been used by the United States as well as certain European states and Canada as a basis for the transfer of alien detainees or asylum seekers to states

---

[463]    *Chahal v. United Kingdom*, 23 Eur. Ct. H.R. 413 (ser. A) (1996), para. 79.

[464]    *Tomasi v. France*, 15 Eur. Ct. H.R. 1 (Ser. A) (1992), para. 115 ("The requirements of the investigation and the undeniable difficulties inherent in the fight against crime, particularly with regard to terrorism, cannot result in limits being placed on the protection to be afforded in respect of the physical integrity of individuals.").

[465]    23 Eur. Ct. H.R. 413 (ser. A) (1996)..

[466]    *Id.* paras. 79-80. *See also Ahmed v. Austria*, 24 Eur. H.R. Rep. 278, 287 and 291 (1997) (even individuals that a transferring state classifies as "undesirable or dangerous" may not be extradited or transferred to a state "where substantial grounds have been shown for believing that the person concerned faces a real risk of being subjected to torture.").

[467]    Inter-Am. Court H.R., OEA/Ser.L/V/II.106, Doc. 40 rev., February 28, 2000 (para. 154). ("[T]he prohibition of torture as a norm of *jus cogens* – as codified in the American Declaration generally, and Article 3 of the UN Convention against Torture in the context of expulsion – applies beyond the terms of the 1951 [Refugee] Convention. The fact that a person is suspected of or deemed to have some relation to terrorism does not modify the obligation of the State to refrain from return where substantial grounds of a real risk of inhuman treatment are at issue.").

where the individual faces the risk or danger of torture.[468] Specifically in the United States, regulations implementing CAT provide that if assurances are obtained by the secretary of state from the government of a specific state "that an alien would not be tortured there if the alien were removed to that country" and such assurances are forwarded to the attorney general or the secretary of the Department of Homeland Security, the official to whom this information is forwarded shall determine, in consultation with the secretary of state, whether such assurances are "sufficiently reliable" to permit the alien's removal to that state without violating U.S. obligations under Article 3 of CAT.[469] Diplomatic assurances were apparently obtained by the United States in at least one case of alleged Extraordinary Rendition (the Maher Arar case, discussed below). It is not clear whether they have been obtained in other cases because the U.S. State and Justice Departments and the Department of Homeland Security are not required to make public their use of diplomatic assurances.

In this Section, we examine the legality of diplomatic assurances under international and U.S. law and conclude that although diplomatic assurances arguably fall under a "grey area" – neither envisioned nor prohibited by the international treaties to which the United States is a party – as currently implemented, they violate the strict letter and the object and purpose of these treaties. We also briefly consider examples of the use of diplomatic assurances to determine their effectiveness. We conclude that diplomatic assurances, as implemented, are inadequate safeguards against torture for two fundamental reasons: (i) diplomatic assurances are unilaterally employed by the Executive Branch without judicial or administrative review or any opportunity for the transferred detainee to challenge their basis, and (ii) they are tools of diplomacy without means of effective monitoring and enforcement.

## A.    Legality of Diplomatic Assurances under International and Domestic Law

### 1.    *International Law Applicable to Diplomatic Assurances*

Use of diplomatic assurances as a permissible basis for the transfer of an individual to another state falls into a grey area under international law. CAT (and other treaties containing the torture prohibition) neither envisions nor prohibits the use of diplomatic assurances. Arguably, a receiving state's diplomatic assurance could be one of the "relevant conditions" to be taken into account under CAT Article 3 in the determination of whether there are substantial grounds to believe that an individual is "in danger of" torture upon transfer to a receiving state. On the other hand, the prohibition against torture under the strict letter of CAT, the ICCPR, the Geneva Conventions and under customary international law is absolute and non-derogable. CAT, the ICCPR and, as applicable in specific contexts, the Geneva Conventions and the Refugee Convention also prohibit the *refoulement* of an individual to a state where the person faces the risk or danger of torture.

Diplomatic assurances are most likely used where conditions in the proposed receiving state present a risk of torture to the individual to be transferred: otherwise, diplomatic assurances would be unnecessary. The United States, along with other states party to CAT, the ICCPR, the Geneva Conventions and the Refugee Convention, must interpret and implement its obligations under these treaties "in accordance with the ordinary meaning to be given to the terms of the treaty

---

[468]    Diplomatic assurances are used in other contexts as guarantees against ill-treatment, such as an agreement made by a receiving state to a transferring state that an individual extradited or otherwise removed will not be subject to the death penalty. *See* HRW Diplomatic Assurances Report, *supra* note 21, at 3, fn.2. A discussion of the broader uses of diplomatic assurances is beyond the scope of this Report, which focuses on what Human Rights Watch has described as the "novel practice" of using diplomatic assurances in the context of torture. *Id.*

[469]    8 C.F.R. §235.8(c)(1), (2).

in their context and in light of its object and purpose."[470] If a risk or danger of *refoulement* to torture exists, then the use of diplomatic assurances is a circumvention of the absolute prohibition against torture and *refoulement* to torture – the creation of "an island of legality, in a sea of illegality."[471]

Diplomatic assurances were addressed by the UN Special Rapporteur on Torture in a July 2002 interim report to the UN General Assembly. Specifically focusing on the prohibition of torture in the context of counter-terrorism measures, the Special Rapporteur called on states not to extradite any individual "unless the Government of the receiving country has provided an unequivocal guarantee to the extraditing authorities that the persons concerned will not be subjected to torture or any other forms of ill-treatment upon return, and that a system to monitor the treatment of the persons in question has been put into place with a view to ensuring that they are treated with full respect for their human dignity."[472] The Special Rapporteur recommended a two-pronged test to assess the reliability of diplomatic assurances. First, according to the Special Rapporteur, diplomatic assurances must be "unequivocal" before the transfer of an individual took place – the diplomatic assurances must leave no doubt that torture or ill-treatment will not occur. Second, the Special Rapporteur required a "monitoring" system, agreed upon in advance between the transferring state and the state offering assurances, to ensure that, upon return, the individual contined to be protected from torture or CID treatment. As described below, however, the monitoring mechanism has, in practice, proved to be an inadequate safeguard.

### 2.    *U.S. Law Applicable to Diplomatic Assurances*

Under U.S. law, if diplomatic assurances satisfactory to the attorney general are provided, an alien detainee's claims for protection under CAT Article 3 "shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer" and the alien may be removed.[473] The detainee has no opportunity to challenge the attorney general's determination, and the attorney general's decision is not subject to any judicial or administrative review.

Deferral of removal may also be terminated on the basis of diplomatic assurances following the same procedure. The regulations specifically provide that "[a]t any time while deferral of removal is in effect the Attorney General may determine whether it should be terminated based on diplomatic assurances forwarded by the secretary of state pursuant to the procedures in 8 C.F.R. §208.18(c)."[474]

There is no mention of diplomatic assurances in the section of the regulations dealing with CAT claims made in the context of summary exclusion.[475] The process and standards for determining a CAT claim in summary exclusion proceedings are unclear, and the only restriction articulated is the prohibition of removal where it would violate CAT Article 3. Given the broad discretion granted to the Executive Branch, and the extent to which removal in this context is

---

[470]  Vienna Convention, *supra* note 178, art. 31(1);

[471]  Interview of Julia Hall, Counsel and Senior Researcher, Europe and Central Asia Division, Human Rights Watch, June 14, 2004, Notes on file with the ABCNY International Human Rights Commitee.

[472]  Interim report of the Special Rapporteur on Torture, Theo van Boven, to the General Assembly A/57/173, July 2, 2002. The Special Rapporteur subsequently submitted a report to the General Assembly in July 2003, report to the reaffirming the absolute nature of the principle of *non-refoulement*. Report by the Special Rapporteur on Torture, Theo van Boven, to the United Nations General Assembly, U.N. Doc. No. A/58/120, July 3, 2003.

[473]  8 C.F.R. §208.18(c)(3).

[474]  8 C.F.R. §208.17(f).

[475]  8 C.F.R. §235.8; *see also* Section IV.A.5.c.i. of this Report.

shielded from review or any form of judicial scrutiny, it is unclear and probably unlikely that the U.S. government even seeks to obtain diplomatic assurances in summary exclusion cases. Even assuming there are procedures for considering the CAT claim of a summarily removable individual suspected of terrorist activities, there is a danger that an immigration officer may simply determine that it is unlikely that the individual would be tortured upon his or her return.

Although there is also no mention of diplomatic assurances in the regulations dealing with the application of CAT in the context of extradition,[476] C.F.R. section 95.3(b) provides that once the secretary of state has received "review and analysis" from relevant policy and legal offices in relation to a CAT claim, he or she may decide "to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive *subject to conditions*" (emphasis added). Such conditions would appear to include diplomatic assurances and other executive agreements between states.

## B.    Examples of Uses of Diplomatic Assurances

In the United States, the use of diplomatic assurances is not made public and it is not possible to determine how many people have been transferred to other states from the United States, or from territories or detention facilities under its jurisdiction, on the basis of diplomatic assurances. As the case of Maher Arar demonstrates, however, diplomatic assurances have recently been used in the context of at least one reported Extraordinary Rendition from the United States.[477]

Arar, a Syrian-born Canadian citizen, was allegedly detained by U.S. officials while in transit at John F. Kennedy Airport to Canada.[478] He was not seeking to enter the United States.[479] Without any apparent authority, Arar was held in U.S. detention for two weeks and interrogated during this time about his alleged affiliation with terrorist groups, including Al Qaeda.[480] During his detention, Arar was informed that he had been designated by the secretary of state as a member of a foreign terrorist organization.[481] Arar was given no meaningful opportunity to challenge this designation.[482] Apparently without notification to his lawyer, Arar was then flown to Jordan, where he was interrogated and beaten by Jordanian authorities.[483] The Jordanian authorities then turned him over to Syria, where he was held in prison for ten months.[484] The United States reportedly received diplomatic assurances from Syria that he would not be tortured.[485] During the time he

---

[476]    22 C.F.R. §95.

[477]    *See Arar v. Ashcroft, supra* note 33; *see also* Brown & Priest, *supra* note 43. Diplomatic assurances were also reportedly requested by the United States from Saudi Arabia, in the 1999 case of Hani Abdel Rahim Sayegh, suspected of involvement in the Khobar Towers bombing in Saudi Arabia. *Oversight hearing on "Immigration Relief Under the Convention Against Torture for Serious Criminals and Human Rights Violators": Hearing Before the Subcommittee on Immigration, Border Security, and Claims of the House Judiciary Committee,* 108th Cong. (July 11, 2003) (statement of Regina Germain, Esq.) *available at* http://www.house.gov/judiciary/germain071103.htm (last visited Oct. 25, 2004). Sayegh was returned to face trial and possible execution if convicted. *Id*

[478]    *Arar v. Ashcroft, supra* note 33, paras. 11, 25-26.

[479]    *Arar v. Ashcroft, supra* note 33, para. 26.

[480]    *Arar v. Ashcroft, supra* note 33, paras. 31, 33.

[481]    *Arar v. Ashcroft, supra* note 33, para. 38.

[482]    *Id.*

[483]    *Arar v. Ashcroft, supra* note 33, para. 49.

[484]    *Arar v. Ashcroft, supra* note 33, para. 50.

[485]    DeNeen L. Brown, *Canadian Sent to Middle East Files Suit,* WASHINGTON Post, Nov. 25, 2003, at A25.

spent in Syria, Arar alleges that he was tortured: "Syrian authorities regularly beat him on the palms, hips, and lower back, using a two-inch thick electric cable."[486] Arar alleges that, as a result of torture, he made and signed false confessions about his participation in terrorist training in Afghanistan; Arar states that, in fact, he has never been to Afghanistan.[487]

Although Arar was visited by Canadian consular officials during his detention in the Syrian prison, Syrian security officers reportedly threatened him with additional torture if he complained about his treatment.[488] Arar reportedly kept silent from October 23, 2002 to August 14, 2003, when apparently "unable to bear the mistreatment any longer, Mr. Arar yelled out to a Canadian Consular official that he had been tortured and was being kept in a grave."[489] Arar was released to Canadian authorities in October 2003, without charges brought against him.[490]

According to a Syrian diplomat in Washington, after extensive investigation, Syrian authorities found no link between Arar and Al Qaeda.[491] Arar was released, according to this official, as a gesture of goodwill to Canada, and because Syrian officials could not substantiate any allegations against him.[492] Of note, Canada has begun a public inquiry to determine what role, if any, Canadian officials played in his transfer to Syria.

The Arar case and media reports raise concern that even if the United States is obtaining diplomatic assurances, it may not be doing so in good faith. Arar alleges that U.S. authorities provided Syrian authorities with suggested topics to be covered during interrogation, and that Syrian authorities provided the United States with information coerced from him.[493] Similarly, at least one media report indicates that U.S. intelligence and law enforcement officials have seized and rendered purported terror subjects from one foreign state to another state that the United States knows to employ torture as an interrogation technique. The United States has reportedly provided to these intelligence forces lists of questions that it wants answered.[494] In the context of such alleged practices, diplomatic assurances from countries that the United States knows to practice torture do not appear to be a good faith compliance by the Executive Branch towards U.S. obligations under international and domestic law.

In a detailed report on diplomatic assurances, Human Rights Watch provides a number of examples of the use of diplomatic assurances in Europe.[495] The report shows, among other things, the inadequacy of the post-assurance monitoring mechanism used by European states as a safeguard against torture. For example, in the case that was the subject of *Shamayev and 12 Others v. Georgia and Russia*,[496] the Russian government offered diplomatic assurances to the European Court of Human Rights itself, after thirteen Chechens were extradited to Russia by Germany. These diplomatic assurances included the right to access to the detainees by the European Court.[497]

---

[486]   *Arar v. Ashcroft, supra* note 33, para. 51.

[487]   *Arar v. Ashcroft, supra* note 33, paras. 53 and 62.

[488]   *Arar v. Ashcroft, supra* note 33, para. 61.

[489]   *Id.*

[490]   *Arar v. Ashcroft, supra* note 33, para. 64.

[491]   *Arar v. Ashcroft, supra* note 33, para. 65.

[492]   *Id.*

[493]   *Arar v. Ashcroft, supra* note 33, paras. 55-56.

[494]   Priest & Geilman, *supra* note 53.

[495]   HRW Diplomatic Assurances Report, *supra* note 21, at 21-36.

[496]   Application No. 36378/02, Oct. 4, 2002.

[497]   HRW Diplomatic Assurances Report, *supra* note 21, at 24.

In violation of these assurances, the Russian government subsequently denied access to the detainees to a fact-finding mission from the European Court.[498]

Another instructive example in the Human Rights Watch report is the case of Ahmed Agiza and Mohammed al-Zari. Agiza and al-Zari were Egyptians seeking asylum in Sweden. Both were expelled from Sweden to Egypt in December 2001, despite the Swedish authorities' reported acknowledgement that they had a well-founded fear of persecution in Egypt.[499] Before expulsion, Swedish authorities reportedly obtained diplomatic assurances from Egypt that the men would not be subjected to torture or ill-treatment, would receive a fair trial, and would not be sentenced to death.[500] After return, Swedish representatives did not visit the men for five weeks, and they were reportedly held "in incommunicado detention" during that time.[501] Although visits subsequently occurred, Swedish authorities were always accompanied by Egyptian authorities.[502] Based on subsequent investigation, Human Rights Watch and Swedish journalists report there is credible evidence that the men were tortured in Egypt.[503] Significantly, Swedish journalists found that the men had been transported to Egypt on a U.S.-registered plane, with the involvement of U.S. agents.[504] After Swedish journalists reported the allegations of torture by Egyptian authorities, the Swedish vice foreign minister stated "[t]his is so ominous that we have prepared a visit to Cairo, on a high political level from the Swedish side, to take up this question with representatives of the Egyptian security service. And of the Egyptian government."[505] The vice foreign minister acknowledged that Egypt had not acted in accordance with its diplomatic assurances.[506]

Finally, in the one known case in which the United States reportedly obtained diplomatic assurances, involving Maher Arar's transfer to Syria, there is no indication that the United States sought to monitor Syria's compliance with its assurances. To the contrary, Arar alleges that the United States suggested to Syrian security agents topics to be covered during interrogation, and that Syrian security agents provided to U.S. agents information obtained from Arar as a result of torture.[507]

## C.    In Practice, Diplomatic Assurances are Inadequate Safeguards Against Torture

Even if diplomatic assurances are permissible under international law, their implementation in practice raises significant doubts about their reliability as a means of safeguarding against the danger or risk of torture to an individual.

First, the use of diplomatic tools as a means of compliance with the prohibition against torture is limited. Although U.S. foreign service officers often perform valuable work monitoring and advocating against human rights violations in the states to which they are posted, their role is

---

[498]    *Id.* at 25.

[499]    *Id.* at 34.

[500]    *Id.*

[501]    *Id.* at 35.

[502]    *Id.*

[503]    *Id.*; TV4 Kalla Fakta Broadcast, *supra* note 20.

[504]    TV4 Kalla Fakta Broadcast, *supra* note 20.

[505]    *Id.*

[506]    *Id.*

[507]    *Arar v. Ashcroft*, *supra* note 33, paras. 55-56.

of necessity restricted by the need to maintain diplomatic, trade, and commercial relations of significance to the United States. In turn, the danger exists that the Executive Branch will seek diplomatic assurances in return for other concessions, such as military or economic assistance. Diplomats, including the secretary of state, are subject to political pressure and are able in turn to exert it.

Second, monitoring mechanisms have been shown to be inadequate. In large part, this is because torture is conducted in secret and regimes that use torture have become adept at hiding it. As the Human Rights Watch report on diplomatic assurances notes, in countries where torture is widespread and systematic, it is practiced within the walls of prisons and detention facilities rarely open to scrutiny by independent, well-trained monitors.[508] Prison guards and other prison personnel are trained in torture methods that leave few external marks and are also trained to intimidate prisoners into silence.[509] In addition, prison medical personnel are often complicit in covering up torture.[510] Moreover, the HRW Diplomatic Assurances report notes, in such countries governments routinely deny access to independent monitors or experts in detecting signs of torture, and in many instances state authorities may not have effective control over the forces perpetrating acts of torture.[511] Indeed, governmental authorities in countries where torture is systematic routinely deny the existence of torture at all.[512] In those circumstances, the dangers of relying on diplomatic assurances as a safeguard against torture are apparent. As the Human Rights Watch report notes, "[w]here governments routinely deny that torture is practiced, despite the fact that it is systematic or widespread, official assurances cannot be considered reliable."[513]

The inadequacies inherent in current monitoring mechanisms are apparent from the United States' own internal investigations. As the investigation into the Abu Ghraib torture scandal by U.S. Army Major General Antonio Taguba revealed, military guards at the prison moved a group of detainees around the prison to hide them from a visiting ICRC delegation.[514] Recent investigatory reports by General Paul A. Kern and former Secretary of Defense James R. Schlesinger, have raised congressional concern about so-called ghost detainees held by the CIA.[515] Unlike some of the states to which it has allegedly Extraordinarily Rendered individuals, the United States does not have a history and practice of systemic torture. Still, these examples reveal the relative ease by which the monitoring mechanism may be circumvented.

Third, even if diplomatic assurances themselves are permissible under international law, the unfettered discretion the Executive Branch exercises in seeking diplomatic assurances and making the unilateral decision to transfer an individual pursuant to those assurances leaves the individual with no due process protection or the safeguard of judicial oversight. This procedural shortcoming likely violates international law. The United States has an obligation to provide detainees in its custody an effective opportunity to challenge the reliability and adequacy of diplomatic assurances. This obligation is grounded in CAT Article 3 (prohibiting torture and CID) and Article 2 (requiring state parties to implement judicial and administrative measures to prevent

---

[508]    HRW Diplomatic Assurances Report, *supra* note 21, at 4.

[509]    *Id.*

[510]    *Id.*

[511]    *Id.*

[512]    *Id.*

[513]    *Id.*

[514]    Taguba Report, *supra* note 3.

[515]    Graham & White, *supra* note 90; *see also* HRW Report, *supra* note 6; Dana Priest, *Memo Lets CIA Take Detainees Out of Iraq; Practice Is Called Serious Breach of Geneva Conventions*, WASHINGTON POST, Oct. 24, 2004, at A1.

torture); and ICCPR Article 7 (prohibiting torture and CID) and Article 2(1) (interpreted by the Human Rights Committee as requiring state parties "to respect and to ensure" ICCPR protections through prevention and provision of judicial or administrative review).

CAT requires each state party to enact legislative and administrative measures to prevent torture.[516] Interpreting these obligations, the CAT Committee has expressed particular concern about instances in which individuals are transferred to third states without the right of appeal.[517] In *Arana v. France*, an individual was convicted in France for links to the Basque separatist group ETA and sought by Spanish police on suspicion that he was an ETA leader. Spain sought deportation from France through an administrative procedure, whereby the detainees would be exchanged between the two nations' police forces, without judicial oversight or intervention. The CAT Committee found violations of CAT Article 3, as well as violations of due-process rights because the handover of the detainee by the French police to the Spanish police was not subject to judicial oversight:

> The deportation was effected under an administrative procedure, which the Administrative Court of Pau had later found to be illegal, entailing a direct handover from police to police.... At the time of the consideration of the [previous] report..., the Committee expressed its concern at the practice whereby the police hand over individuals to their counterparts in another country ...without the intervention of a judicial authority and without any possibility for the author to contact his family or his lawyer. That meant that a detainee's rights had not been respected and had placed the author in a situation where he was particularly vulnerable to possible abuse. The Committee recognizes the need for close cooperation between States in the fight against crime and for effective measures to be agreed upon for that purpose. It believes, however, that such measures must fully respect the rights and fundamental freedoms of the individuals concerned.[518]

Although U.S. regulations governing diplomatic assurances include a determination by the Executive Branch, there is no similar oversight or intervention by a neutral judicial authority.

In a 2002 case,[519] the Canadian Supreme Court examined the adequacy of procedural safeguards in the use of diplomatic assurances in light of CAT Article 3(1)'s, and held that, "[g]iven Canada's commitment to the CAT, we find that ... the phrase 'substantial grounds' raises a duty to afford an opportunity to demonstrate and defend those grounds."[520] The court further added that "[w]here the Minister is relying on written assurances from a foreign government that a person would not be tortured, the refugee must be given an opportunity to present evidence and make submissions as to the value of such assurances."[521] While this case is of course not legally

---

[516] *See* CAT, *supra* note 5, art. 2(1) ("Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction") *and* Article 2(2) ("No exceptional circumstances whatsoever . . . may be invoked as a justification of torture.").

[517] Committee Against Torture, *Concluding Observations*, Sweden, U.N. Doc. CAT/C/XXVIII/CONCL.1, para. 6 (2002) ("The Committee [against Torture] ... records its concern at the following: ... (b) The Special Control of Foreigners Act, known as the anti-terrorism law, allows foreigners suspected of terrorism to be expelled under a procedure which might not be in keeping with the Convention, because there is no provision for appeal.").

[518] *Arana v. France*, Case No. 63/1997, Committee Against Torture, views adopted on 9 November 1999, para. 11.5.

[519] *Manickavasagam Suresh v. The Minister of Citizenship and Immigration and the Attorney General of Canada (Suresh v. Canada)*, 2002, SCC 1. File No. 27790, January 11, 2002 *available at* http://www.lexum.umontreal.ca/csc-scc/en/pub/2002/vol1/html/2002scr1_0003.html (last visited Oct. 25, 2004).

[520] *Id.* para. 119.

[521] *Id.* para. 123.

binding on the United States, it offers useful guidance on the interpretation of U.S. CAT obligations.

Article 2 of the ICCPR defines the scope of the legal obligations undertaken by the United States as a party to the ICCPR.[522] The Human Rights Committee has interpreted Article 2's "respect and ensure" language as incorporating the obligation on a state to provide judicial or administrative review.[523] Moreover, paragraph 1 of Article 2(3) of the ICCPR requires that an individual claiming a remedy for violation of his rights under the ICCPR shall have an accessible and effective remedy determined by competent judicial, administrative or legislative authorities.[524] At no stage in the U.S. diplomatic assurance process is there any opportunity for an individual to present evidence to a judicial or administrative authority that diplomatic assurances may be inadequate, or to seek a remedy for rendition. Moreover, it does not appear that there is any mechanism for the United States to seek the return of an individual who, in violation of diplomatic assurances, is tortured by the receiving state.

## VII.  STATE RESPONSIBILITY

As discussed in detail in this Report, Extraordinary Renditions violate numerous provisions of CAT, the ICCPR, and the Geneva Conventions.[525] The United States is a party to all of these treaties and, as such, is bound by them as a matter of international law.[526] In the Extraordinary Rendition context, the United States has three major obligations: the duty to refrain from engaging in or facilitating torture, the duty to refrain from transferring an individual when there is a risk that the individual may face torture (the *non-refoulement* obligation), and the duty to prevent such violations and remedy them once they have occurred.

---

[522]  Article 2 provides, in pertinent part:

   2(1): Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

   2(2): Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

   2(3): Each State Party to the present Covenant undertakes:
   1. To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; to ensure that any person claiming such a remedy shall have his rights thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy[.]

[523]  HRC General Comment 31, *supra* note 9, para. 12.

[524]  The Human Rights Committee has interpreted ICCPR Article 2(1) as applicable both to persons within a state's territory and also within the state's "power or effective control." HRC General Comment 31, *supra* note 9, para. 10; *see also id.* para. 15.

[525]  *See* Sections V.A, B, and C of this Report.

[526]  *See Sosa v. Alvarez-Machain* at *74 ("the [ICCPR] does bind the U.S. as matter of international law…"). Article 26 of the Vienna Convention, which codifies the fundamental international law principle of *pacta sunt servanda*, that is, that agreements must be observed, states that "[e]very treaty in force is binding upon the parties to it and must be performed by them *in good faith.*" Vienna Convention, *supra* note 179, art. 26 (emphasis added).

The Articles on State Responsibility for Internationally Wrongful Acts (ILC Articles)[527] establish the "basic rules of international law concerning the responsibility of states for their internationally wrongful acts."[528] The ILC Articles are secondary rules of international law – that is, they do not speak to or interpret the content of states' primary obligations, which are contained in treaties and customary law; rather, they "provide the framework for determining whether the consequent obligations of each State have been breached, and with what legal consequences...."[529] For a wrongful act to result in some form of international liability on the part of a state, two elements must be established: (i) the conduct must constitute a breach of an international legal obligation in force for that state at that time, and (ii) the conduct in question must be attributable to the state.[530] In this Section of the Report, we first consider the actions that would amount to breaches of U.S. obligations with respect to Extraordinary Renditions under the treaties to which it is a party. We then discuss the standards under which conduct is attributable to the United States.

### A.    U.S. Conduct in Relation to Extraordinary Renditions Constitutes a Breach of International Law

This subsection of the Report outlines the types of U.S. conduct that could amount to a breach of international law in relation to Extraordinary Renditions under CAT, the ICCPR, and the Geneva Conventions. These obligations are binding even though the United States has ratified both CAT and ICCPR with the express understanding that they are not self-executing. The United States is in fact under a binding international obligation to give effect to any international agreement to which it is a party.[531] Failure to enact or enforce such legislation or other procedures will itself amount to a violation of the treaties to which the United States is a party, and provides no excuse for the additional violations flowing from that failure.[532]

#### 1.    *Refoulement Constitutes a Breach of International Law*

The United States' involvement in the process of Extraordinary Rendition directly violates its *non-refoulement* obligations as set out in CAT and the ICCPR.[533] CAT explicitly prohibits the transfer or *refoulement* of a person to a country where the individual may be in danger of torture.[534] The ICCPR includes a similar prohibition: the Human Rights Committee has interpreted ICCPR Article 7 to include a prohibition against *refoulement* to states where the individual may be at risk

---

[527]  The ILC Articles were adopted by the International Law Commission on August 9, 2001, commended to governments by a resolution of the General Assembly on December 12, 2001, and are reproduced in full, together with the International Law Commission's Commentaries in JAMES CRAWFORD, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002) (ILC Articles and Commentaries). For the text of the articles and their commentaries without a critical introduction, *see* http://www.un.org/law/ilc/texts/State_responsibility/responsibilityfra.htm (last visited Oct. 25, 2004).

[528]  ILC Articles and Commentaries, *supra* note 527, at 74.

[529]  *Id,*, at 75.

[530]  ILC Articles and Commentaries, *supra* note 527, art. 2, at 81.

[531]  Vienna Convention, *supra* note 179, at arts. 26 and 27.

[532]  *Id.*

[533]  *See* Sections V.A. and B. of this Report. Of course, the United States would also face liability for any torture directly committed by its military or intelligence personnel.

[534]  CAT, *supra* note 5, art. 3(1).

of torture or CID treatment.[535] The wrongful act of *refoulement* is the transfer itself in the face of risk:[536] state responsibility attaches even if the individual is never tortured or subject to CID treatment.

### 2.    *Complicity in Torture Constitutes a Breach of International Law*

Participation in Extraordinary Rendition may amount to a breach of the United States' international obligations to refrain from engaging in acts that amount to complicity or participation in torture. The prohibition against torture is absolute and enshrined in both CAT and the ICCPR.[537] CAT requires states to criminalize complicity or participation in torture.[538] Under CAT Article 4, states must ensure that both "an attempt to commit torture" and "an act by any person which constitutes complicity or participation in torture" is a criminal offense.[539] State actors who are complicit in torture engage the responsibility of the state.

### 3.    *The Failure to Prevent or Remedy Torture or CID Treatment Constitutes a Breach of International Law*

The failure of the United States to prevent torture or *refoulement* and to remedy these abuses once they have occurred amounts to a violation of international law. Under CAT, the United States is required to train civil or military personnel involved in the custody, interrogation and treatment of any detainees in the prohibition against torture.[540] The United States must ensure that any allegation of torture or CID treatment by U.S. officials is fully and impartially investigated by a competent authority.[541] The United States must also criminalize and assert mandatory jurisdiction over direct, complicitous, or other participation in torture by state actors.[542] Victims of torture by U.S. actors must have access to redress and compensation through the U.S. legal system.[543] Failure to train, investigate, prosecute, and provide redress and compensation could, by the terms of CAT, constitute a violation by the United States.

Article 2 of the ICCPR requires states party "to respect and to ensure" to all individuals the rights set out in the ICCPR, "to give effect to" those rights through legislation, and to provide "an

---

[535]    HRC General Comment 20, *supra* note 303. As demonstrated in Section V. above, the different treaties contain slightly different standards concerning the level of risk that must be present to trigger the obligation not to transfer an individual who fears torture or CID.

[536]    The CAT standard requires the presence of "substantial grounds for believing [the individual] would be in danger of being subjected to torture" upon transfer. CAT, *supra* note 5, at art. 4(1). The Human Rights Committee has interpreted the ICCPR to prohibit transfer in cases where there are "substantial grounds for believing that there is a real risk of irreparable harm." HRC General Comment No. 31, *supra* note 9, para. 12. The United States has codified a standard that is more stringent, requiring that it be "more likely than not" that an individual will face torture upon transfer. *See* Section V.A.5. of this Report. Under international law, the United States is responsible for violations of the treaty standards, regardless of federal law. *See* Vienna Convention, *supra* note 179, at arts. 26 and 27.

[537]    CAT, *supra* note 5, arts. 1, 2(2); ICCPR, *supra* note 5, arts. 7, 4(2).

[538]    CAT, *supra* note 5, art. 4(1).

[539]    CAT, *supra* note 5.

[540]    *Id.* arts. 10, 11 and 12.

[541]    *Id.* arts. 10, 11, 12 and 16.

[542]    *Id,* arts. 4.1, 6 and 7.

[543]    *Id.* art. 14.

effective remedy" for those rights.[544] The Human Rights Committee's authoritative General Comments on the ICCPR have interpreted the "respect and ensure" language, the "give effect to" language, and the "effective remedy" language of ICCPR Article 2 to require the criminalization of violations of Article 7's prohibitions against torture, by (i) state actors acting in their official capacity, or outside their official capacity or in a private capacity,[545] and (ii) private parties, which could include contractors determined to be non-state actors or agents.[546] In addition, according to the Human Rights Committee, both the failure to investigate allegations of violations of the ICCPR and the failure to bring perpetrators to justice could amount to a breach of the ICCPR by a state party.[547]

---

[544]   Article 2 of the ICCPR *supra* note 5 provides:

   1.   Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

   2.   Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

   3.   Each State Party to the present Covenant undertakes:

      (a)  To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

      (b)  To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

      (c)  To ensure that the competent authorities shall enforce such remedies when granted.

[545]   ICCPR, *id.* art. 2(3)(a) (ensuring that a person whose rights have been violated is entitled to an effective remedy "notwithstanding that the violation has been committed by persons acting in an official capacity."). HRC General Comment 20, *supra* note 303, para. 2 ("The aim of the provisions of article 7 of the International Covenant on Civil and Political Rights is to protect both the dignity and the physical and mental integrity of the individual. It is the duty of the State party to afford everyone protection through legislative and other measures as may be necessary against the acts prohibited by article 7, whether inflicted by people acting in their official capacity, outside their official capacity or in a private capacity. The prohibition in article 7 is complemented by the positive requirements of article 10, paragraph 1, of the Covenant, which stipulates that 'All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.'")

[546]   HRC General Comment 31, *supra* note 9, para. 8 ("The article 2, paragraph 1, obligations are binding on States Parties and do not, as such, have direct horizontal effect as a matter of international law. The Covenant cannot be viewed as a substitute for domestic criminal or civil law. However the positive obligations on States Parties to ensure Covenant rights will only be fully discharged if individuals are protected by the State, not just against violations of Covenant rights by its agents, but also against acts committed by private persons or entities that would impair the enjoyment of Covenant rights in so far as they are amenable to application between private persons or entities . . . . It is also implicit in article 7 that States Parties have to take positive measures to ensure that private persons or entities do not inflict torture or cruel, inhuman or degrading treatment or punishment on others within their power."); *see also* HRC General Comment 20, *supra* note 303, para. 13 ("States parties should indicate when presenting their reports the provisions of their criminal law which penalize torture and cruel, inhuman and degrading treatment or punishment, specifying the penalties applicable to such acts, whether committed by public officials or other persons acting on behalf of the State, or by private persons. Those who violate article 7, whether by encouraging, ordering, tolerating or perpetrating prohibited acts, must be held responsible.").

[547]   HRC General Comment 31, supra note 9, para. 15. ("There may be circumstances in which a failure to ensure Covenant rights as required by article 2 would give rise to violations by States Parties of those rights, as a result of States Parties' permitting or failing to take appropriate measures or to exercise due diligence to prevent, punish, investigate or redress the harm caused by such acts by private persons or entities. States are reminded of the interrelationship between the positive obligations imposed under article 2 and the need to provide effective remedies in the event of breach under article 2, paragraph 3. The Covenant itself envisages in some articles certain areas where there are positive obligations on States Parties to address the activities of private persons or entities").

The Human Rights Committee has applied these interpretations in cases arising under the ICCPR's individual complaints mechanism, the First Optional Protocol. In the seminal case of *Irene Bleier Lewenhoff & Rosa Valino de Bleier v. Uruguay* concerning arbitrary arrests, torture, and disappearances in Uruguay in the late 1970s, the Human Rights Committee found that Uruguay had a duty to investigate allegations including violations of ICCPR Article 7 (prohibiting torture), Article 9 (arbitrary detention), and Article 10(1) (humane treatment of prisoners), to prosecute those responsible for ICCPR violations, and to pay reparation.[548] Similarly, the Human Rights Committee has found that in response to allegations of torture, Zaire was "under a duty to ... conduct an inquiry into the circumstances of [the victim's] torture, to punish those found guilty of torture and to take steps to ensure that similar violations do not occur in the future."[549]

The Geneva Conventions require the United States to investigate allegations of "grave breach" violations of the Geneva Conventions and to prosecute or extradite to another state that will prosecute, perpetrators of "grave breaches."[550] Common Articles 50, 51, 130, and 147 of the Geneva Conventions define specific "grave breaches" as war crimes. Included in the "grave breaches" provisions is "willful killing, torture or inhuman treatment" of POWs and civilians qualified as "protected persons."[551] Geneva IV, applicable to civilians, also includes as a "grave breach" the "unlawful deportation or transfer or unlawful confinement of a protected person."[552] The obligation to prosecute "grave breaches" is absolute and non-derogable. It applies regardless of the nationality of the perpetrator or of the victim and also regardless of the place where the "grave breach" was committed.[553] Thus, in the Extraordinary Rendition context, the United States would be in breach of the Geneva Conventions if it fails to investigate and prosecute (i) the torture or complicity to torture of POWs and civilian detainees by U.S. actors or those acting at their direction, and (ii) the unlawful transfer of civilian detainees to third states where those detainees will be subject to torture.

---

[548] *Irene Bleier Lewenhoff and Rosa Valiño de Bleier v. Uruguay*, Communication No. 30/1978, Human Rights Committee, U.N. Doc. CCPR/C/OP/1 at 109, para. 13.3 (1985); *see also Alberto Grille Motta v. Uruguay*, Communication No. 11/1977, Human Rights Committee, U.N. Doc. CCPR/C/OP/1 at 54, para. 14 (1984); *William Torres Ramirez v. Uruguay*, Communication No. 4/1977 (26 January 1978), Human Rights Committee, U.N. Doc. CCPR/C/OP/1 at 4, para. 16 (1984); *Edgardo Dante Santullo Valcada v. Uruguay*, Communication No. 9/1977, Human Rights Committee, U.N. Doc. CCPR/C/OP/1 at 43, para. 11 (1984); *Anthony McLeod v. Jamaica*, Communication No. 734/1997, U.N. Doc. CCPR/C/59/D/734/1997 (3 June 1998).

[549] *Tshitenge Muteba v. Zaire*, Communication No. 124/1982 (25 March 1983), Human Rights Committee, U.N. Doc. Supp. No. 40 (A/39/40) at 182 (1984); *see also John Khemraadi Baboeram at al. v. Suriname*, Communication No. 146/1983 and 148 to 154/1983, Human Rights Committee, U.N. Doc. Supp. No. 40 (A/40/40) at 187, para. 13.2 (1985) (same with respect to extra-judicial executions); *Maria del Carmen Almeida de Quinteros and Elena Quinteros Almeida v. Uruguay*, Communication No. 107/1981, U.N. Doc. Supp. No. 40 (A/38/40) at 216 (1983) (same with respect to forced abductions by state agents). Regional courts have also interpreted similar "ensure and respect" and "right to remedy" language in regional conventions and treaties to incorporate a state's obligation to investigate and prosecute conventional violations. For example, the Inter-American Commission on Human Rights has interpreted the American Convention's Article 1(1) duty to "ensure and respect" and Article 25 "right to a remedy" duty to include the obligation to investigate and prosecute responsible individuals in cases of torture or disappearance. Case No. 6586 Inter-Am. C.H.R. 91, OEA/ser.L./V/II/61, doc. 22 rev. 1 (1983), at 93; *see also Gary Hermosilla et. al.*, Case No. 10.843, Inter-Am C.H.R. (1988). The European Court of Human Rights has also interpreted the "right to a remedy" language of Article 13 of the European Convention to include the obligation to investigate and prosecute. *See McCann and others v. United Kingdom*, 324 Eur. Ct. H.R. 31 (ser. A) (1995). *See* European Convention, supra note 186, art. 13, which provides that "[e]veryone whose rights and freedoms as set forth in this Convention are violated shall have an effective remedy before a national authority notwithstanding that the violation has been committed by persons acting in an official capacity."

[550] Geneva I, art. 51, Geneva II, art. 52, Geneva III art. 131, Geneva IV, art. 148, *supra* note 169.

[551] Geneva I, art. 50, Geneva II, art. 51, Geneva III, art. 130, Geneva IV, art. 147, *supra* note 169.

[552] Geneva IV, *supra* note 169, art. 147,

[553] Geneva III, art. 129, Geneva IV, art. 146, *supra* note 169.

### B.      Acts Attributable to the United States in the Context of Extraordinary Rendition

The second part of the state responsibility analysis asks whether or not a particular act is attributable to the state; in other words, what constitutes an "'act of state' for the purposes of state responsibility."[554] While the United States might intend to shield itself from liability by "outsourcing" torture, under international law, the U.S. may be held responsible for acts of torture committed by private actors and even by a third state subsequent to rendering.

### 1.      *The United States is Liable for the Authorized and Unauthorized Actions of its Officials, including the Armed Forces, CIA, and FBI*

Under the general rules of attribution, a state faces responsibility for an alleged wrongful act if that act was carried out by the state through its many organs and officials. Article 4 explains that:

> The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.

Thus, involvement of the U.S. military, the CIA, and the FBI in violations of international law would render the United States itself liable for such violations. The ILC Articles specify that a state cannot elude responsibility by demonstrating that the act in question was not authorized. The state can still be held responsible for the conduct of "an organ of a State or of a person or entity empowered to exercise elements of the governmental authority" even if the entity "exceed[ed] its authority or contravene[d] instructions."[555] Arguments that "rogue" CIA officers are behind Extraordinary Renditions, for example, would not shield the United States from responsibility under international law.

### 2.      *The United States is Liable for the Actions of Individuals or Groups Acting under its Instructions, Direction, or Control, including Private Actors*

ILC Article 8 provides that:

> The conduct of a person or group of persons shall be considered an act of State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of that State in carrying out the conduct.[556]

The commentary to this article indicates that there are two main circumstances in which the conduct of private entities may be attributable to the state: (a) "where State organs supplement their own action by recruiting or instigating private persons or groups who act as 'auxiliaries' while

---

[554]   *See* ILC Articles and Commentaries, *supra* note 527, at 82 (art. 2, cmt. 5). Chapter II of the ILC Articles sets out the general rules by which a wrongful act might be attributed to a state.

[555]   ILC Articles and Commentaries, *supra* note 527, at 106 (art. 7.)

[556]   ILC Articles and Commentaries, *supra* note 527, at 110 (art. 8).

remaining outside the official structure of the State," or (b) "where private persons act under the State's direction or control."[557]

In discussing the applicable test regarding the degree of control necessary to attribute the acts of private entities to a state, the commentaries to the ILC Articles examine the standard articulated in the International Court of Justice's (ICJ) judgment in *Military and Paramilitary Activities in and against Nicaragua v. United States*.[558] That case concerned the covert and overt involvement of the United States in supporting the *contra* rebel forces in Nicaragua in the 1980s. The ICJ held that by training, arming, financing, and supplying the *contras*,[559] the United States had breached a number of its customary international law obligations, including its obligation not to use force against another state and its obligation not to intervene in the affairs of another state.[560] However, the ICJ rejected Nicaragua's claim that, for legal purposes, the *contras* should be considered an organ or agent of the U.S. government such that the United States should be held responsible for violations, including the murder of non-combatants, committed by the *contras*.[561] The ICJ stated:

> The Court does not consider that the assistance given by the United States to the *contras* warrants the conclusion that these forces are subject to the United States to such an extent that any acts they have committed are imputable to that State. It takes the view that the *contras* remain responsible for their acts, and that the United States is not responsible for the acts of the *contras*, but for its own conduct vis-à-vis Nicaragua, including conduct related to the acts of the contras.[562]

The ICJ refused to attribute the actions of the *contras* to the United States absent a finding of *effective control* (as opposed to "general control," which was held by the court to be present) by the United States of the *contra* forces at the specific times that the violations were committed.[563]

In *Prosecutor v. Tadic,* the ICTY carved out an exception to the standard enunciated by the ICJ in the *Nicaragua* case. Distinguishing two kinds of cases encompassed by the *Nicaragua* test, the *Tadic* court concluded that the *Nicaragua* test was applicable to inquiries about individuals or groups of individuals, but inappropriate when examining the actions of an organized armed faction. When examining organized paramilitary groups, the Court set out the following test:

> In order to attribute the acts of a military or paramilitary group to a State, it must be proved that the State wields overall control over the group, not only by equipping and financing the group, but also by coordinating or helping in the general planning of its military activity. Only then can the State be held internationally accountable for any misconduct of the group. However, it is not necessary that, in addition, the State should also issue, either to the head or to

---

[557] ILC Articles and Commentaries, *supra* note 527, at 110 (art. 8, cmts. 1 & 2).

[558] *Nicaragua case, supra* note 355; ILC Articles and Commentaries, *supra* note 527, at 110-111 (art.8, cmt 4).

[559] *Id.* para. 108.

[560] *Id.* para. 211, 238.

[561] *Id.* para 115.

[562] *Id.* para 116.

[563] *Id.* para 115. Some commentators have suggested that by not holding the United States responsible for the acts of the *contras*, the ICJ set the legal standard for attribution too high. *See, e.g.*, Mark Gibney, Katarina Tomasevski and Jens Vedsted-Hansen, *Transnational State Responsibility for Violations of Human Rights*, 12 HARV. HUM. RTS. J. 267, 285-87 (Spring 1999). The article argues that the "ICJ's notion of 'control' is premised on very transitional notions of state-sovereignty and power relations between nation-states, where one country attempts to rule or dominate another. This approach, however, will miss most of what presently governs relations between and among states." *Id.* at 286.

members of the group, instructions for the commission of specific acts contrary to international law.[564]

The ICTY thus limited the use of the ICJ's standard of effective control during a particular act to situations where the "issue is whether a *single* private individual or a *group that is not militarily organized* has acted as a *de facto* State organ when performing a specific act."[565]

Under either the ICJ's *Nicaragua* test for effective control or the ICTY's subsequent formulation of that test in *Tadic*, the United States could be held liable for Extraordinary Renditions carried out by private individuals (or groups) acting under its direction and control. Private contractors who have been hired by various organs of the United States to perform functions on behalf of those organs (*e.g.*, investigation or interrogation of detainees, transfer or transport of detainees) may incur the responsibility of the United States to the extent that they act under the direction and control of the agencies by which they are employed.[566] While the United States would also be responsible for the acts of armed groups acting under its overall control, this scenario is less applicable in the context of Extraordinary Renditions.[567]

### 3.    *The United States May Be Liable for the Actions of Organs of a Foreign State Acting under its Direction and Control*

ILC Article 6 states that:

The conduct of an organ placed at the disposal of a State by another State shall be considered an act of the former State under international law if the organ is acting in the exercise of elements of the governmental authority of the State at whose disposal it is placed.

According to the commentaries to the ILC Articles, the condition that the organs of the third state be "placed at the disposal" of a state is a strictly construed requirement. The organs of the third state must be acting under the "exclusive direction and control" of the former state, not just acting "on instructions."[568] The commentaries further state that "mere aid or assistance offered by organs of one State to another" would not give rise to liability under this article.[569] Accordingly, the United States may be liable for acts of torture or mistreatment committed by foreign officials in the country to which an individual is rendered if such officials are acting under the exclusive direction and control of U.S. actors. The level of control the United States may have over foreign officials in the context of Extraordinary Renditions is a factual inquiry that may only be

---

[564]    *Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, (ICTY Trial Chamber, July 15, 1999), paras. 131, 137.

[565]    *Id.* (emphasis added).

[566]    Possible liability of civilian contractors is discussion in Sections V.E. and VIII.A. of this Report.

[567]    Some commentators have suggested that the threshold for attribution of the acts of private parties to a state appears to have been lowered significantly post-September 11, 2001. Subsequent to the attacks in New York, Washington, and Pennsylvania, the United States asserted the right to act in self-defense against Afghanistan because the Taliban regime had *supported and harbored* leaders of the Al Qaeda terrorist network. D. Jinks, *State Responsibility for Sponsorship of Terrorists and Insurgent Groups: State Responsibility for the Acts of Private Armed Groups,* 4 CHI. J. INT'L L. 83. The Bush Administration did not allege that Al Qaeda acted on behalf of the Taliban, or that the Taliban played any direct role in, or had any direct knowledge of, the planning or execution of the attacks; instead it attributed the acts of Al Qaeda to Taliban simply because the Taliban had *harbored and supported* the group. *Id.* The attribution was without regard to whether Afghanistan in fact exercised "effective control" (or "overall control") over the group. The UN Security Council, North Atlantic Treaty Organization, and the OAS expressly or tacitly endorsed the U.S. position. *Id.*

[568]    ILC Articles and Commentaries, *supra* note 527, at 103 (art. 6, cmt. 2).

[569]    ILC Articles and Commentaries, *supra* note 527, at 103 (art. 6., cmt. 3).

conclusively determined after the United States conducts investigations of alleged renditions in accordance with its international law obligations. Given reports of the existence of U.S. secret detention facilities abroad, and the possible use of foreign officials as agents in U.S.-directed interrogations, there is reason to believe that the requisite direct control may exist in the context of Extraordinary Renditions.

### 4.    *The United States May Be Liable for Knowingly Assisting in the Unlawful Acts of a Foreign State*

ILC Articles 16 and 17 establish ways in which a state might be derivatively responsible for the acts of another state. As the commentaries to the ILC Articles note, "the essential principle is that a State should not be able to do through another what it could not do itself."[570]

Article 16 establishes responsibility for aiding or assisting in the commission of an internationally wrongful act:

> A State which aids or assists another State in the commission of an internationally wrongful act by the latter is internationally responsible for doing so if: (a) that State does so with knowledge of the circumstances of the internationally wrongful act; and (b) the act would be internationally wrongful if committed by that State.[571]

Under this article, a state is responsible to the extent of the aid or assistance given.[572] While the text of the article itself provides two conditions for attribution, namely awareness of the act and that the act constitute a violation of an international obligation of the aiding state, the commentaries appear to add an intent requirement.[573] The aid or assistance need not have been essential to the performance of the wrongful act, but the assistance must have "contributed significantly" to that act.[574]

The commentary for Article 16 lists "facilitating the abduction of persons on foreign soil" as an example of a situation where state responsibility for the acts of another state would attach.[575] More generally, the commentaries are clear that liability could arise from the provision of material aid to a state for the purpose of facilitating a human rights violation. In such a situation, the commentaries advise that a fact-intensive inquiry is needed to determine whether the aiding state was "aware of and intended to facilitate the commission of the internationally wrongful act."[576] Thus, for example, liability may attach to the United States for Extraordinary Rendition (to the extent of its assistance) in situations where the United States provided intelligence, personnel, or, as in the Swedish case,[577] the aircraft that facilitated the illegal abduction of detainees with the intent to aid in violation either of the principle of *non-refoulement* (*e.g.*, in the Swedish case) or any other provision of CAT, the ICCPR, Geneva Conventions, or customary international law.

---

[570]    ILC Articles and Commentaries, *supra* note 527, at 154 (art. 17, cmt. 8).

[571]    ILC Articles and Commentaries, *supra* note 527, at 148 (art. 16).

[572]    ILC Articles and Commentaries, *supra* note 527, at 148 (art. 16).

[573]    *See, e.g.,* ILC Articles and Commentaries, *supra* note 527, at 149 (art. 16, cmt. 3) ("the aid or assistance must be given with a view to facilitating the commission of that act"), cmt. 5 ("A State is not responsible for aid or assistance under article 16 unless the relevant State organ *intended*, by the aid or assistance given, to facilitate the occurrence of the wrongful conduct....")(emphasis added).

[574]    ILC Articles and Commentaries, *supra* note 527, at 149 (art. 16, cmt. 5).

[575]    ILC Articles and Commentaries, *supra* note 527, at 148 (art. 16, cmt. 1).

[576]    ILC Articles and Commentaries, *supra* note 527, at 150 (art. 16, cmt. 9).

[577]    *See* Sections IV.A. and VI. of this Report.

Finally, the United States may be found internationally responsible under ILC Article 17, which provides:

> A State which directs and controls another State in the commission of an internationally wrongful act by the latter is internationally responsible for that act if: (a) that State does so with knowledge of the circumstances of the internationally wrongful act; and (b) the act would be wrongful if committed by that State.[578]

While under ILC Article 16 a state is liable only to the extent of the assistance offered, under ILC Article 17, a state that directs and controls another state in the commission of a wrongful act is responsible for the act itself.[579] State responsibility under Article 17 is historically associated with international dependency relationships between imperial and colonial states.[580] In modern times, Article 17 may apply in a situation where a state controls the activities of another state as a result of occupation, or through a treaty or other, less formal, international agreement. In the context of Extraordinary Renditions, this provision could apply to the extent that the United States has directed or controlled interrogations in, for example, Afghanistan or Iraq (both nations that the United States has occupied, and that have historically practiced torture as a means of interrogation by security forces) or other states that resort to torture or CID treatment. In such situations, the United States may derive responsibility for acts of torture or mistreatment committed during those interrogations.

## C.    A Note on Adjudicating State Responsibility

A full discussion of the process by which a state may be found liable by a court for internationally wrongful acts attributable to it is beyond the scope of this Report. Even though the venues for bringing suit against the United States may be limited, the United States, as a matter of international law, remains bound by its treaty obligations and may be considered responsible for violating the prohibition of *non-refoulement* and the rule against torture when it extraordinarily renders a suspected terrorist.[581] A breach of an international obligation, regardless of whether it results in litigation, has serious consequences for the victims of that violation, for the standing of the United States in the international community, and for the development of international human rights generally.

In brief, a state may be found liable though a suit brought either by another state, or by an individual.[582] For actions by states suing other states, suits may be brought at the International Court of Justice or through a relevant system of arbitration, provided that jurisdictional requirements are met. The ICJ may only adjudicate a dispute when the states concerned have consented to its jurisdiction.[583] The United States revoked its general consent to ICJ jurisdiction in

---

[578]    ILC Articles and Commentaries, *supra* note 527, at 152 (art. 17).

[579]    ILC Articles and Commentaries, *supra* note 527, at 152 (art. 17, cmt. 1).

[580]    ILC Articles and Commentaries, *supra* note v, at 152 (art. 17, cmt. 2.)

[581]    *Cf. Armed Activities on the Territory of the Congo* (New Application: 2002) (*Democratic Republic of the Congo v. Rwanda*), 2002 I.C.J. 126 (July 10, 2002) ("whether or not States accept the jurisdiction of the Court, they remain in any event responsible for acts attributable to them that violate international law").

[582]    In reality, states rarely resort to lawsuits for resolving international disputes. The more common modes of recourse include protests or claims and negotiations through diplomatic channels. *See* John F. Murphy, Civil *Liability for the Commission of International Crimes as an Alternative to Criminal Prosecution*, 12 HARV. HUM. RTS. J. 1 (1999).

[583]    Statute of the International Court of Justice, Oct. 24, 1945, 59 Stat. 1031, T.S. No. 993 (ICJ Statute), art. 36. States may manifest their consent in three ways: through special agreement relating to the single case at issue; through a clause in a treaty (known as a "jurisdictional clause") giving the ICJ authority to adjudicate a dispute relating to the interpretation or application of a given treaty; or through a unilateral declaration recognizing the jurisdiction of the

Association of the Bar of the City of New York                                    101

the 1980s, and the ICJ only has jurisdiction to adjudicate a claim involving the United States if the United States grants it permission in that case, or if the case involves a dispute over a treaty to which the United States is a party and which contains a clause granting the ICJ jurisdiction over disputes arising from that treaty.[584] Of the treaties discussed in this Report – CAT, the ICCPR, the Refugee Convention and the Geneva Conventions – only CAT contains such a clause;[585] however, the United States, in its reservations to CAT, declared that it does not consider itself bound by that clause.[586] The United States did reserve the right to permit ICJ jurisdiction or some other dispute resolution mechanism in a given case. Thus, for any nation to bring a claim at the ICJ under one of these treaties against the United States, the United States would have to consent to the jurisdiction of the ICJ to adjudicate that particular dispute. Considering that the United States has historically been reluctant to submit to the jurisdiction of the ICJ, such permission would be unlikely.[587] In the absence of jurisdiction, the ICJ may issue a non-binding advisory opinion "on any legal question at the request of whatever body may be authorized by or in accordance with the Charter of the United Nations to make such a request."[588]

For an *individual* who has suffered torture as a result of Extraordinary Rendition seeking to sue the United States for international law claims, the only possible international forum would be the Inter-American Commission and Court on Human Rights because the United States has not accepted the jurisdiction of the international treaty-monitoring bodies established under the ICCPR or CAT to hear individual claims under those treaties. The Inter-American Commission on Human Rights is the principal organ created under the OAS Charter to promote the observance and protection of human rights in the Americas.[589] The United States has signed but not ratified the American Convention on Human Rights. Nevertheless, the United States is a member of the OAS, and Article 44 of the American Convention allows the Inter-American Commission on Human Rights to hear complaints by individuals against states if those states are members of the OAS.[590] If a state (such as the United States) has not ratified the American Convention, the Commission will examine any such claims under the American Declaration of the Rights and Duties of Man.[591]

---

Court as compulsory, in relation to any other State accepting the same obligation (known as an "optional clause.") *See also* the website of the ICJ, *at* http://www.icj-cij.org/icjwww/ibasicdocuments/ibasictext/ibasic_whobringcases.html (last visited Oct. 25, 2004).

[584]    J. G. Merrills, INTERNATIONAL DISPUTE SETTLEMENT 126-129 (1998).

[585]    CAT, *supra* note 5, art. 30(1).

[586]    *See* Declarations and Reservations of the United States of America, *available at* http://www.ohchr.org/english/law_cat-reserv.htm (last visited Oct. 25, 2004).

[587]    For an overview of the efforts of the U.S. government to insulate itself from liability in international fora, *see, e.g.*, John Quigley, *American Style in International Human Rights Adjudication*, 19 OHIO ST. J. ON DISP. RESOL. 249 (2003).

[588]    ICJ Statute, *supra* note 571, art. 65.

[589]    Dinah L. Shelton, *The Inter-American Human Rights System*, in GUIDE TO INTERNATIONAL HUMAN RIGHTS PRACTICE, 119 (Hurst Hannum ed., 2d ed. 1992).

[590]    By ratifying the Charter of the OAS, the United States accepted the competence of the Inter-American Commission on Human Rights to hear petitions concerning its alleged violations of human rights. *See* Charter of the Organization of American States, 119 U.N.T.S. 3, *entered into force* December 13, 1951; amended by Protocol of Buenos Aires, 721 U.N.T.S. 324, O.A.S. Treaty Series, No. 1-A, *entered into force* Feb. 27, 1970; amended by Protocol of Cartagena, O.A.S. Treaty Series, No. 66, 25 I.L.M. 527, *entered into force* Nov. 16, 1988; amended by Protocol of Washington, 1-E Rev. OEA Documentos Oficiales OEA/Ser.A/2 Add. 3 (SEPF), 33 I.L.M. 1005, *entered into force* September 25, 1997; amended by Protocol of Managua, 1-F Rev. OEA Documentos Oficiales OEA/Ser.A/2 Add.4 (SEPF), 33 I.L.M. 1009, *entered into force* January 29, 1996.

[591]    O.A.S. Res. XXX, adopted by the Ninth International Conference of American States (1948), reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992).

The possibility of bringing a suit against a U.S. official in a U.S. court for torture that occurred overseas seems to have been foreclosed by the recent Supreme Court ruling in the case of *United States v. Alvarez-Machain*.[592] In that case, a Mexican doctor alleged that the United States was liable for false arrest after the Drug Enforcement Administration (DEA) arranged for other Mexican nationals to abduct him and bring him to the United States to face charges for the murder of a DEA agent.[593] After the doctor was acquitted, he brought suit against the United States under the Federal Tort Claims Act (FTCA), which authorizes suit "for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."[594] The Supreme Court held that the case fell under an exception to the FTCA which precludes a claim "arising in a foreign country."[595] More broadly, the court ruled that the "FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country...."[596] In the Extraordinary Rendition context, the alleged torture occurs in a foreign state, and so suit under the FTCA may be barred.[597]

## VIII. INDIVIDUAL LIABILITY UNDER DOMESTIC LAW

The following Section discusses the parameters of individual liability for commission or participation in torture. This Section does not focus on the actions of individuals that amount to illegal *refoulement*, since the conduct amounting to *refoulement* has not in itself been made the subject of criminal penalties. Instead, the focus is on legal accountability for indirect participation in torture, including by way of *refoulement*.

### A.    Participation in Extraordinary Renditions May Result in Criminal Liability

Acts of Extraordinary Renditions may be sanctioned by the Torture Act of 2000[598] and the Uniform Code of Military Justice.[599] Moreover, the Military Extraterritorial Jurisdiction Act of 2000[600] provides a jurisdictional basis for prosecution of military and certain civilian personnel for acts committed outside the United States that would be criminal if committed in the United States.

---

[592]  *Sosa v. Alvarez-Machain, U.S. v. Alvarez-Machain*, 124 S. Ct. 2739 (2004).

[593]  *Id.*

[594]  28 U.S.C. §1346(b)(1).

[595]  *Alvarez-Machain*, 124 S. Ct. 2739 at 16, 36, *referring to* 28 U.S.C. § 2690(k). In its opinion, the Supreme Court rejected the so-called "headquarters doctrine" that the Ninth Circuit had applied when it ruled on the case. Under the headquarters doctrine, the U.S. may be liable for an act that took place in another country if the wrongdoing originated in the U.S. but had its "operative effect in another country." *Alvarez-Machain* at *17, citing *Sami v. U.S.*, 617 F.2d 755, 762 (CADC 1979) (refusing to apply § 2680(k) where a communique sent from the United States by a federal law enforcement officer resulted in plaintiff's wrongful detention in Germany).

[596]  *Alvarez-Machain*, 124 S. Ct at 36.

[597]  The FTCA might still provide a cause of action in instances where the torture occurred in a U.S. facility overseas, such as in the Guantánamo detention facility. *See Rasul et al. v. Bush*, 159 L. Ed. 2d 548 (2004). *See* Section VIII.B., for a discussion of possible claims under Alien Tort Claims Act of 1789 and the Torture Victim Protection Act of 1991.

[598]  18 U.S.C. §§2340, 2340A, and 2340B.

[599]  Pub. L. No. 81-506, 64 Stat. 107-49 (*as subsequently amended*), 10 U.S.C. §801 *et seq.*

[600]  Pub. L. No. 106-523, 18 U.S.C. § 3261, 114 Stat. 2488.

### 1.    *Acts of Extraordinary Rendition May Amount To Conspiracy to Commit Torture and /or Aiding and Abetting in the Commission of Torture pursuant to the Torture Act of 2000*

#### (a)    Jurisdiction

In order to comply with CAT's provisions requiring each ratifying country to criminalize acts of torture (including attempts to commit torture and complicity in torture), the United States enacted into U.S. Code sections 2340 and 2340A.[601] Section 2340A(a) makes it a criminal offense for any person "outside the United States [to] commit… or attempt…to commit torture." In addition, section 2340A, as amended by the USA Patriot Act,[602] codifies the offense of conspiracy to commit torture.

Section 2340A extends jurisdiction to military members, civilian employees of the United States, as well as contract employees, and generally applies to acts committed by U.S. nationals "outside of the United States."[603] The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 amends section 2340(3) to define the "United States" as "the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States."[604]

#### (b)    Offense

In addition to criminalizing direct acts of torture, section 2340A(c) provides that "a person who *conspires* to commit [torture] shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy." (emphasis added) Torture is defined as an "act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."[605] "Severe mental pain or suffering" is defined as the prolonged mental harm caused by or resulting from –

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the sense or the personality;

(C) the threat of imminent death, or

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering

---

[601]    18 U.S.C. §§2340 and 2340A. The Senate Committee on the Judiciary acknowledged the relationship of 18 U.S.C. §2340 to CAT and the Torture Victim Protection Act in a 2002 report. *See* S. REP. NO. 107-44 (2002), 10-11.

[602]    Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001) (USA Patriot Act).

[603]    U.S.C. §§2340A(a). Section 2340(3) defined the "United States" as including "all areas under the jurisdiction of the United States including any of the places described in sections 5 and 7 of this title and section 46501(2) of title 49." The USA Patriot Act broadened the scope of section 7, extending jurisdiction under that section to foreign diplomatic, military and other facilities.  By cross-reference, these places would have been excluded from the reach of section 2340A. *But see* note 604.

[604]    H.R.4200, 108th Cong. §1089 (2004).

[605]    18 U.S.C. §2340.

substances or other procedures calculated to disrupt profoundly the sense or personality. [606]

This definition of torture was intended to track the definition set forth in CAT, taking into account the reservations, understandings and declarations made by the United States as part of its ratification. [607]

No cases have been brought to date under section 2340. However, guidance as to the meaning of "torture" under U.S. law can be gleaned from cases interpreting the Alien Tort Claims Act of 1789 (ATCA), [608] and the Torture Victim Protection Act of 1991 (TPA).[609] Thus, for example, courts have found that the following acts constitute torture: subjecting detainees to interrogation sessions lasting 14 hours,[610] beating with hands,[611] threatening with death,[612] and using techniques to exacerbate pain or injury. [613]

Section 2340 requires that the act must be "specifically intended" to inflict severe physical or mental pain or suffering. Generally, if specific intent is required, the prosecution must show that the defendant intended the illegal consequences of his actions. In *United States v. Newiswender*,[614] the Court noted that in order to establish that the defendant had "specific intent to obstruct justice" "the defendant need only have had knowledge or notice that success [in his act] would have likely resulted in an obstruction of justice. Notice is provided by the reasonable foreseeability of the natural and probable consequences of one's acts."[615] The Court further added that this rule "is grounded upon sound policy for ... a rule focusing on foreseeable, rather than intended consequences operates in sensible and fair fashion to deter the conduct sought to be avoided and to

---

[606]   18 U.S.C. §2340.

[607]   *See* Sen. Rep. 103-107; for a discussion of the legality under international law of the United States' reservation, understanding and declarations with respect to ratification of CAT, *see supra* note 5.

[608]   28 U.S.C. §1350. ATCA states that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

[609]   Torture Victim Protection Act of 1991, Mar. 12, 1992, P.L. 102-256, 106 Stat. 73, *enacted* as a note to 28 U.S.C. §1350.  The TPA provides that: "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation – (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." *Id.* §2(a). *See also* S. REP. No. 102-249 (1991) (stating that the TPA would "carry out the intent of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which was ratified by the U.S. Senate on October 27, 1990").

[610]   *Xuncax v. Gramajo*, 886 F. Supp. 162, 170 (D. Mass 1995).

[611]   *Tachiona v. Mugabe*, 234 F. Supp.2d 401, 420-423 (S.D.N.Y. 2002); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1191, 1196 (S.D.N.Y. 1996); *Abebe-Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir. 1996).

[612]   *Abebe-Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir. 1996).

[613]   *Id.*

[614]   590 F.2d 1269 (4ᵗʰ Cir. 1979).

[615]   Deliberate avoidance of knowledge does not preclude a finding of intent with respect to the conspiracy. *See, e.g., United States v. Richardson*, 14 F.3d 666, 671-72 (1ˢᵗ Cir. 1994) (willful blindness instruction to the jury is appropriate when defendant intentionally avoids gaining knowledge of the obvious); *United States v. Mancuso*, 42 F.3d 836, 846 (4ᵗʰ Cir. 1994) (knowledge of a fact may be inferred from willful blindness to existence of that fact); *United States v. Whittington*, 26 F.3d, 456, 463 (4ᵗʰ Cir. 1994) (willful blindness instruction to the jury is appropriate when defendants go to "great lengths to insulate [themselves] from the fraud perpetrated"); *United States v. Faulkner*, 17 F.3d, 745, 767-78 (5ᵗʰ Cir. 1994) (deliberate ignorance instruction is appropriate when defendant claims lack of guilty knowledge but evidence supports inference of deliberate indifference); *United States v. Gonzalez*, 933 F.2d 417, 422 (7ᵗʰ Cir. 1991) (same).

punish those whose actions are blameworthy, even though undertaken for purposes that may or may not be culpable."[616]

As will be demonstrated below, in certain circumstances, acts of Extraordinary Rendition may amount to a crime of conspiracy to commit torture and/or to the crime of aiding and abetting in the commission of torture. [617]

### (i)    Conspiracy

Section 2340A has not been litigated before the courts. As a result, there is no jurisprudence on the scope of the crime of conspiracy to commit torture. Guidance, however, can be gleaned from the general federal conspiracy statute (18 U.S.C. §371), the Model Penal Code, and state jurisprudence. The following analysis draws on each of these sources.

(A)    *Federal Conspiracy Statute.* Under 18 U.S.C. §371 (the crime of defrauding the United States), the government must establish beyond a reasonable doubt: 1) that two or more people agreed to pursue an unlawful objective; 2) that the defendant voluntarily agreed to join the conspiracy; and 3) that one or more members of the conspiracy committed an overt act in

---

[616] *See also, People v. Lauria,* 59 Cal. Rptr. 628, 623 (Cal. Ct. App., 1967), (inferring intent from knowledge: the "element of intent may be proved either by direct evidence, or by evidence of circumstances from which an intent to further a criminal enterprise by supplying lawful goods or services may be inferred. Direct evidence of participation, such as advice from the supplier of legal goods or services to the user of those goods or services on their use for illegal .... But in cases where direct proof of complicity is lacking, intent to further the conspiracy must be derived from the sale itself and its surrounding circumstances in order to establish the supplier's express or tacit agreement to join the conspiracy."); *See generally,* LAFAVE, *supra* note LAFAVE, §5.7.

[617] Syria, Egypt, Saudi Arabia, and other states to which the United States is alleged to have Extraordinarily Rendered individuals are known to employ interrogation techniques that unequivocally amount to torture. *See, e.g.,* U.S. DEP'T. OF STATE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001: SYRIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8298.htm (last visited Oct. 25, 2004) ("there was credible evidence that security forces continued to use torture. During the year, ... numerous cases of torture in custody [were reported], including the case of two Kurdish leaders, Marwan Uthman and Hasan Saleh, who were arrested in December 2002 for organizing a demonstration .... Former prisoners and detainees, as well as the SHRC, reported that torture methods included administering electrical shocks; pulling out fingernails; forcing objects into the rectum; beating, sometimes while the victim is suspended from the ceiling; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; and using a chair that bends backwards to asphyxiate the victim or fracture the victim's spine. Torture was most likely to occur while detainees were being held at one of the many detention centers run by the various security services throughout the country, particularly while the authorities were attempting to extract a confession or information "); U.S. DEPARTMENT OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2003: LEBANON, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27932.htm (last visited Oct. 26, 2004) ("The Government acknowledged that violent abuse usually occurred during preliminary investigations conducted at police stations or military installations, in which suspects were interrogated without an attorney. Such abuse occurred despite laws that prevented judges from accepting any confession extracted under duress"); U.S. DEPARTMENT OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2003: EGYPT, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27926.htm (last visited Oct. 26, 2004) ('there were numerous, credible reports that security forces tortured and mistreated detainees. Human rights groups believed that the SSIS, police, and other Government entities continued to employ torture. Torture was used to extract information, coerce the victims to end their oppositionist activities, and to deter others from similar activities. Reports of torture and mistreatment at police stations remained frequent."); U.S. DEPARTMENT OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2003: SAUDI ARABIA, *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27937.htm (last visited Oct. 26, 2004) ("there were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners.... Canadian and British prisoners that were released during the year reported that they had been tortured during their detention.")

furtherance of the conspiracy.[618] With respect to the third requirement, however, courts have held that where a statute does not provide for a requirement of an overt act (as is the case in section 2340A), no proof of an overt act for the conspiratorial objective is required.[619] In addition, an overt act may not be required if the contemplated crime is serious, likely of completion, or likely to encourage future criminal activity.[620] Even where an overt act is required, it is generally viewed merely as evidence of the offense and not an element of proof.[621]

(B)      *The Model Penal Code.* The Model Penal Code[622] provides that a person is guilty of conspiracy with another person to commit a crime if "with the purpose of promoting or facilitating its commission he: (a) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime, or (b) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime."[623] An agreement is an essential element of conspiracy. However, the agreement does not need to be written, nor is it necessary that an oral agreement be made.[624] Mere tacit understanding suffices.[625] As the Supreme Court stated in *Iannelli v. United States*,[626] "[t]he agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case." [627]

Under U.S. law, the crime of conspiracy usually requires intent to conspire as well as intent to achieve an unlawful or criminal result.[628] The latter intent need not be so particular that the conspirator has in mind a particular time, place, victim, etc., but at least must relate to a particular type of criminal activity.[629] Where the objective of conspiracy is itself a crime, it has been held that "at least the degree of criminal intent necessary for the substantive offense itself" is required to prove the conspiracy charge.[630] Intent may be inferred from circumstantial evidence. Thus, for example, a supplier who furnishes equipment which he *knows* will be use to commit a serious

---

[618]    *United States v. Loe*, 262 F.3d 427 (5th Cir. 2001).

[619]    *United States v. Sassi*, 966 F.2d 283 (7th Cir. 1992) (while general federal conspiracy statute specifically requires overt act, several specific conspiracy statutes, including 21 U.S.C.A. § 846, do not so specify, and as to them proof of overt act unnecessary); *State v. D'Ingianni*, 47 So. 2d 731 (1950); *Martin v. State*, 19 So. 2d 488 (Miss.1944); *State v. Condrey*, 562 S.E.2d 320 (S.C. 2002). Even those statutes that do contain an overt act requirement provide that an act need not be done by all conspirators and the act need not be criminal or unlawful in itself. *Braverman v. United States*, 317 U.S. 49 (1942); *Castro v. United States*, 296 F.2d 540 (5th Cir. 1961); *State v. Heitman*, 629 N.W.2d 542 (2001); *McCann v. State*, 606 S.W.2d 897 (Tex. Ct. App. 1980).

[620]    LAFAVE, *supra* note 438, §6.5(c); American Law Institute Model Penal Code Official Draft, 1962, §5.03(5) (Model Penal Code).

[621]    *Yates v. United States*, 354 U.S. 298 (1957); LAFAVE, *supra* note 438, §6.5(c).

[622]    The Model Penal Code is not binding law. However, it has been very influential and numerous court opinions cite to the Model Penal Code as persuasive authority for the interpretation of an existing statute or in the exercise of a court's occasional power to formulate a criminal law doctrine. *See, e.g., U.S. v. Crowley*, 318 F.3d 401 (2nd Cir. 2003); *United States v. Bussey*, 507 F.2d 1096, 1098 (9th Cir. 1974).

[623]    Model Penal Code, *supra* note 604, §5.03(1).

[624]    *American Tobacco Co. v. United States*, 328 U.S. 781 (1946); *United States v. Amiel*, 95 F.3d 135 (2d Cir. 1996); *State v. Gillespie*, 336 S.W.2d 677 (Mo. 1960); *Burk v. State*, 848 P.2d 225 (Wyo. 1993).

[625]    *United States v. Hartley*, 678 F.2d 961 (11th Cir. 1982); *State v. Mapp*, 585 N.W. 2d 746 (Iowa 1998); *O'Neill v. State*, 296 N.W. 96 (Wisc. 1941); *Martinez v. State*, 943 P.2d 1178 (Wyo. 1997).

[626]    420 U.S. 770 (1975).

[627]    *See also*, LA FAVE, *supra* note 438, §6.4(d).

[628]    *Id.* at 275-276.

[629]    LAFAVE, *supra* note 438, §6.4(e).

[630]    *U.S. v. Lichenstein*, 610 F.2d 1272 (5th Cir. 1980); *McDonald v. State*, 454 So. 2d 488 (Miss. 1984).

crime may be deemed from that knowledge alone to have intended to produce the result.[631]
Although some courts have allowed for a defense of "good faith" to be a defense to conspiracy,[632]
other courts have rejected this defense, usually by resort to the general rule that ignorance of the
criminality of one's conduct is no defense.[633]

### (ii)    Accomplice Liability

Section 2 of Title 18, provides that

(a) Whoever commits an offense against the United States or aids, counsels,
commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him
or another would be an offense against the United States, is punishable as a
principal.[634]

The Courts have generally accepted that section 2 applies to the entire U.S. criminal code.[635]
Accordingly, section 2 is applicable to the crime of torture codified in section 2340.

Generally, one may become an accomplice by acting to induce another through threats or
promises,[636] by words or gestures of encouragement,[637] or by providing others with the plan for the
crime.[638] Thus, for example, furnishing of weapons,[639] supplies,[640] or instrumentalities[641] to be used
in committing the crime has been considered rendering of assistance. As the court in *State ex rel.
Martin v. Tally*[642] stated:

The assistance given…need not contribute to the criminal result in the sense that
but for it the result would not have ensued. It is quite sufficient if it facilitated a
result that would have transpired without it. It is quite enough if the aid merely
renders it easier for the principal actor to accomplish the end intended by him and

---

[631]    *People v. Lauria*, 59 Cal. Rptr. 628, 623 (Cal. Ct. App. 1967) (dictum).

[632]    *People v. Powell*, 63 N.Y. 88 (NY 1875); *Commonwealth v. Gormley*, 77 Pa. Super. 298 (1921); *Landen v. United States*, 299 F. 75 (6th Cir. 1924).

[633]    *See generally,* LAFAVE, *supra* note 438, §6.4

[634]    18 U.S.C. §2.

[635]    *Breeze v. United States*, 398 F.2d 178 (10th Cir. 1968) (holding that 18 U.S.C. §2 is applicable to entire U.S. criminal code, so that 18 U.S.C. §1381, relating to harboring, concealment, protection or assistance of deserter from Armed Forces of United States should be read and construed in like manner as if 18 U.S.C. §2 were part of it); *United States v. Mucciante*, 21 F.3d 1228, 1234 (2nd Cir. 1994) ("an aiding and abetting charge is arguably implicit in every indictment….The Federal aiding and abetting statute, 18 U.S.C. 2, does not penalize conduct apart from the substantive crime with which it is coupled."); *see also United States. v. Sabatino*, 943 F.2d 94 (1st Cir. 1991) (same effect).

[636]    *State v. Scott*, 68 A. 258 (1907).

[637]    *United States v. Whitney*, 229 F.2d 1296 (10th Cir. 2000); *Alonzi v. People*, 597 P.2d 560 (Colo. 1979).

[638]    *State v. Haddad*, 456 A.2d 316 (Conn. 1983); *Commonwealth v. Richards*, 293 N.E. 2d 854 (Mass. 1973).

[639]    *Commonwealth v. Richards*, 293 N.E. 2d 854 (Mass.1973).

[640]    *Malatkofski v. United States*, 179 F.2d 905 (1st Cir. 1950 ) (supplying money for bribe).

[641]    *United States v. Eberhardt*, 417 F.2d 1009 (4th Cir. 1969) (provided own blood to be poured on selective service files).

[642]    15 So. 722 (Ct. 1893) *, 86-87.

108                                          Center for Human Rights and Global Justice

the aider and abetter, though in all human probability the end would have been
attained without it.

Although mere presence at the scene of the crime is not enough,[643] it is sufficient assistance that the
accomplice is standing by at the scene of the crime ready to give some aid if needed,[644] provided
that the principal is aware of the accomplice's intentions.[645]

The accomplice must intentionally encourage or assist the commission of the crime, in the
sense that his purpose is to encourage or assist another in the commission of a crime as to which
the accomplice has the requisite mental state.[646] Thus, for example, an accomplice is not guilty of
first degree murder unless he acted with premeditation and deliberation (because first degree
murder requires a deliberate and premeditated killing).[647] However, there is some authority to
support the proposition that an individual may become an accomplice by giving encouragement or
assistance *with the knowledge* that it will promote or facilitate a crime.[648] As a practical matter, in a
case of a completed act of torture, the same mental state that supports the crime of conspiracy (*see*
Section VIII.A.1.b.i. above) will also support the offense of complicity.

According to media and off-the record statements by officials, some Extraordinary
Renditions to states like Syria, Egypt, Saudi Arabia, Yemen, and Morocco may have the purpose of
subjecting the rendered person to interrogations with harsh methods that amount to torture or to
CID treatment. According to some reports, U.S. officials may provide transportation, supply
interrogation questions, and may even be present during the interrogation. Information obtained
during such interrogations is allegedly relayed back to the U.S. officials. Under such
circumstances, it is possible to contend that U.S. officials implicated in the Extraordinary Rendition
could be charged under section 2340A(a) and/or (c). Thus, for example, under the *Newiswender*
rule, a deliberate transfer of an individual to a state where it is reasonably foreseeable that the
individual would be tortured, could result in criminal liability on the grounds of conspiracy in the
commission of torture under section 2340A(c) and an accomplice liability to the commission of
torture under sections 2 and 2340A(a).

In circumstances where diplomatic assurances that rendered individuals will not be tortured
are used, it could be argued that U.S. officials lack the intent to conspire to commit, or to aid in the
commission of, torture. However, the Department of State reports on human rights practices have
consistently revealed systematic uses of torture in detentions and interrogations by states to which
individuals have allegedly been Extraordinarily Rendered. The reliability of diplomatic assurances
in the face of such systemic use of torture is suspect.[649] Thus, Extraordinary Renditions to such
states may demonstrates deliberate avoidance of knowledge, potentially allowing for prosecution
under the theory of willful blindness.

---

[643]  The defendant was not an accomplice where he "stood by" while the mother killed the child but neither actually
aided the mother in the acts of abuse nor "counsel[ed], command[ed] or encourage[d] her." *Pope v. State*, 396 A.2d
1054 (Md. 1979).

[644]  *Commonwealth v. Morrow*, 296 N.E. 2d 468 (Mass.1973); *Skidmore v. State*, 115 N.W. 288 (Neb. 1908).

[645]  LA FAVE, *supra* note 438, §6.7(a).

[646]  *Id.* §6.7(b).

[647]  *Id.* §6.7(c).

[648]  *Id.* §6.7(d); *see also Backun v. United States*, 112 F.2d 635 (4th Cir. 1940); *United States v. Giovannetti*, 919 F.2d
1223 (7th Cir. 1990) (willful blindness suffices as a mental state for accomplice liability). *Cf. United States v. Peoni*,
100 F.2d 401 (2d Cir. 1938).

[649]  For a more detailed discussion of unreliability of diplomatic assurances, *see* Section VI. of this Report.

### 2.    *The Uniform Code of Military Justice (UCMJ) May Be Used as a Sanction Against Extraordinary Renditions*

#### (a)    **Jurisdiction**

The UCMJ[650] regulates the conduct of all persons serving in the U.S. Armed Forces and certain civilians accompanying such personnel.[651] Its purpose is to "promote justice, to assist in maintaining good order and discipline in the armed forces, to promote efficiency and effectiveness in the military establishment, and thereby to strengthen the national security of the United States."[652]

As a jurisdictional matter, the UCMJ applies worldwide,[653] and persons subject to the UCMJ include any U.S. service member[654] as well as certain civilians "[i]n time of war ... serving with or accompanying an armed force in the field"[655] and POWs.[656] The scope of the applicability of the UCMJ to civilians has been narrowed by the courts over the years. Although courts' interpretations of the terms "serving," "accompanying," and "in the field" suggest a broad application, the "time of war" requirement is construed narrowly when applied to civilians.[657] Thus, for example, the Supreme Court held that during peacetime the UCMJ does not apply to discharged personnel.[658] The UCMJ also cannot be used to try dependents of military personnel in noncapital cases.[659] Nor can the UCMJ be used to try civilian employees (either in capital or noncapital cases).[660] As recently as 1998, the Court of Appeals for the Armed Forces[661] analyzed the propriety of the application of the UCMJ to civilians and stated:

> As a matter of constitutional law, the Supreme Court has held that Congress may not extend court-martial jurisdiction to cover civilians who have no military status in peacetime, even if they are accompanying United States forces overseas as employees or dependents.[662]

---

[650]    10 U.S.C. §§801-941 (1994 & Supp. IV 1999).

[651]    10 U.S.C.A. §802 (1994). The term "armed forces" is defined in section 101(a)(4) to mean the "Army, Navy, Air Force, Marine Corps, and Coast Guard," 10 U.S.C. §101(a)(4) (1994).

[652]    MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.) (The Manual). The Manual is issued by the President as a regulation under authority granted by Congress under Article 3 of the UCMJ.

[653]    10 U.S.C. §805.

[654]    10 U.S.C. §802.

[655]    10 U.S.C. §802(a)(10).

[656]    10 U.S.C. §802(a)(9). The UCMJ does not define the term POW. Thus it is uncertain whether "POW" in the UCMJ has the same meaning as in Geneva III.

[657]    *United States v. Averette*, 19 U.S.C.M.A. 363, 365-66, 41 C.M.R. 363, 365-66 (1970) (the phrase "in time of war" is limited to "a war formally declared by Congress"; even though the Vietnam conflict "qualified as a war as that word is generally used and understood[,] ... such a recognition should not serve as a shortcut for a formal declaration of war, at least in the sensitive area of subjecting civilians to military jurisdiction"). *Cf. United States v. Anderson*, 17 U.S.C.M.A. 588, 589, 38 C.M.R. 386, 387 (1968) (U.S. involvement in Vietnam conflict "constitutes a 'time of war' ... within the meaning of" Article 43(a) of the UCMJ, which provides that there is no statute of limitations over certain offenses committed "in time of war").

[658]    *United States ex rel Toth v. Quarles*, 350 U.S. 11 (1955).

[659]    *Kinsella v. Singleton*, 361 U.S. 234, 248 (1960).

[660]    *Grisham v. Hagen*, 361 U.S. 278, 279 (1960); *McElroy v. Guagliardo,* 361 U.S. 281, 286 (1960)

[661]    The Court of Appeals for the Armed Forces (formerly the Court of Military Appeals) is a civilian Article I court hearing appeals from the intermediate appellate courts for each of the Army, Navy (and Marines) and Air Force, subject to possible appeal to the U.S. Supreme Court.

[662]    *Willenbring v. Neurauter*, 48 M.J. 152, 157, 1998 CAAF LEXIS 43 (C.A.A.F. 1998)

Jurisprudence in this area generally focuses on the application of the UCMJ to civilian contractors and civilian dependents of service members.[663] No cases directly address whether CIA operatives (other than military personnel detailed to the CIA) conducting para-military operations with the regular armed forces or interrogations within a military base are considered civilians for purposes of UCMJ application. However, in *Reid v. Covert*, the Supreme Court stated, "[e]ven if it were possible, we need not attempt here to precisely define the boundary between 'civilians' and members of the 'land and naval Forces.' We recognize that there might be circumstances where a person could be 'in' the armed services . . . even though he had not formally been inducted into the military or did not wear a uniform."[664]

### (b)    Offense

The UCMJ comprises a set of criminal laws, which include many crimes punished under civilian law (*e.g.*, assault, manslaughter, murder, rape, etc.). It also provides procedures for courts martial and for matters relating to detention and questioning of persons subject to the UCMJ. Article 55 of the UCMJ provides that:

> Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.[665]

Article 55 is unique in its specific definition of "cruel or unusual punishment" as a standard for treatment.[666] While most military courts have followed the Supreme Court's analytical framework of protections under the Eighth Amendment as they pertain to cruel and unusual punishment,[667] several military courts have found that Article 55 provides greater protections than those given under the Eighth Amendment.[668] It is notable that Article 55 applies at least the equivalent of the protection afforded by the Eighth Amendment even if the victim is not otherwise entitled to constitutional rights (*e.g.,* a non-citizen apprehended and detained outside the United States and arguably not entitled to such rights).[669]

---

[663]  *See, e.g., Robb v. United States*, 456 F.2d 768 (Ct. Cl. 1972) (civilian engineer employed by U.S. Navy in Vietnam was not subject to the UCMJ); *Reid v. Covert*, 354 U.S. 1 (1957) (no jurisdiction over civilian dependents of service members stationed overseas in peacetime for capital offenses).

[664]  *Reid v. Covert*, 354 U.S. 1, 22 (1957). As described below, the Military Extraterritorial Jurisdiction Act of 2000 eliminated some of the gap in jurisdiction resulting from *Reid v. Covert* by conferring jurisdiction on federal courts over certain civilians accompanying the armed forces abroad.

[665]  10 U.S.C. §855. The protections of Article 55 apply to "any person subject to" the UCMJ. As stated previously, the UCMJ applies to "prisoners of war," at least as defined in the Geneva Conventions, which probably includes persons whose status is in doubt pending resolution by a competent tribunal, and would apply to unlawful combatants charged with offenses under the UCMJ under 10 U.S.C. § 818.

[666]  The Articles of War preceding the UCMJ prohibited "cruel and unusual punishment," but the phrase was changed to "cruel *or* unusual punishment" in Article 55 (emphasis added). *See* Articles of War 41, Manual for Courts-Martial, U.S. Army, 1929 at 212, and 1949 at 284. The legislative history of Article 55 provides no rationale why the word "and" was changed to "or." *United States v. White*, 54 M.J. 469, 2001 CAAF LEXIS 497 (C.A.A.F. 2001).

[667]  *See United States v. Kinsch*, 54 M.J. 641, 2000 CCA LEXIS 237 (A.C.C.A. 2000). *See also* HR Standards Report, *supra* note 193.

[668]  *See United States v. Wappler*, 2 C.M.A. 393, 9 C.M.R. 23, 1953 CMA LEXIS 897 (C.M.A. 1953); *United States v. White*, 54 M.J. 469, 473 2001 CAAF LEXIS 497 (C.A.A.F. 2001); *United States v. Avila*, 53 M.J. 99, 2000 CAAF LEXIS 569 (C.A.A.F. 2000).

[669]  Compare the federal criminal civil rights statutes, 18 U.S.C. §§241 and 242, and the civil statute 42 U.S.C. §1983, all of which apply only where the victim is entitled to constitutional rights.

Other potentially relevant provisions include the offenses of cruelty and maltreatment (10 U.S.C. §893) and offenses under punitive articles corresponding to the normal criminal definitions of murder (10 U.S.C. §918), manslaughter (10 U.S.C. §919) and assault. Also of particular interest are the offenses of dereliction of duty (10 U.S.C. §892), which applies to personnel who know of offenses by others and fail to report them, and failure to obey orders and dereliction of duty (separate offenses under 10 U.S.C. §892). Such offenses have been the basis of investigations and charges in connection with the conduct at Abu Ghraib and other recently alleged abuses of military detainees.

In addition, section 934 of Article 134 provides that

> Though not specifically mentioned in this chapter, all disorders and neglects to the
> prejudice of good order and discipline in the armed forces, all conduct of a nature
> to bring discredit upon the armed forces, and crimes and offenses not capital, of
> which persons subject to this chapter may be guilty, shall be taken cognizance of
> by a general, special, or summary court-martial, according to the nature and degree
> of the offense, and shall be punished at the discretion of that court.

Article 134 makes punishable acts in three categories of offenses not specifically covered in any other article of the UCMJ: Clause 1 offenses involving disorders and neglect to the prejudice of good order and discipline; Clause 2 offenses involving conduct of a nature to bring discredit upon the armed forces; and Clause 3 offenses entailing non-capital crimes or offenses that violate Federal law. Thus, the UCMJ effectively provides a basis for the prosecution of military personnel in courts-martial for the offense of torture in violation of 18 U.S.C. § 2340.

In order to successfully charge an individual under Clauses 1 and 2 of this Article, the government must show: (i) that the accused did or failed to do certain acts; and (ii) that, under the circumstances, the accused's conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[670] Under Clause 1, the acts must be directly prejudicial to good order and discipline, rather than remotely so. Under Clause 2, discredit is interpreted to mean "injure the reputation of," and encompasses conduct that brings the service "into disrepute or which tends to lower it in public esteem."[671] With respect to Clause 3 offenses, as a general rule, any offense created by Federal statute may be prosecuted as an Article 134 offense.[672] Thus, a service member whose conduct is alleged to violate 18 U.S.C. § 2340A could be prosecuted under Article 134 of the UCMJ, as a Clause 3 violation, although charges in courts martial are usually brought under the UCMJ's punitive offenses rather than generally applicable criminal statutes. Moreover, multiple counts alleging Article 134 violations also could be brought in such a situation, because such conduct could be construed as prejudicial to good order and discipline and/or of a nature to bring discredit upon the armed forces.[673]

The UCMJ also provides for an offense of conspiracy by any person subject to the UCMJ "with any other person to commit an offense under [UCMJ]" "if one or more of the conspirators

---

[670] The Manual, *supra* note 652, para. 60.b (1- 2).

[671] *Id.* para. 60.c (3).

[672] *United States v. Perkins*, 47 C.M.R. 259 (Ct. of Mil. Rev. 1973). According to the Manual, however, the doctrine of preemption "prohibits application of Article 134 to conduct covered by Articles 80 through 132. For example, larceny is covered in Article 121, and if an element of that offense is lacking – for example, intent – there can be no larceny or larceny type offense, either under Article 121 or, because of preemption, under Article 134." The Manual, para. 60.c (5)(a). In effect, Article 134 may not be employed to salvage a charge where the charge could not be sustained under the substantive offense provisions of the UCMJ or Federal statute. Accordingly, conduct which violated Article 55 discussed above or any other substantive provision of the UCMJ could not be charged under Article 134. These remain alternative, not cumulative provisions.

[673] *United States v. Perkins*, 47 C.M.R. 259, 263-264 (Ct. of Mil. Rev. 1973); HR Standards Report, *supra* note 193.

does an act to effect the object of the conspiracy."[674] Conspiracy is punishable by a court-martial. Accordingly, the UCMJ can be used to prosecute conspiracy to commit the prohibited acts, including both acts of torture and cruelty, making its scope potentially larger than the federal torture statute.

### 3. *The Military Extraterritorial Jurisdiction Act (MEJA) May Provide Jurisdiction for Prosecution of Involvement in Extraordinary Renditions*

To date there have been virtually no cases that rely on MEJA.[675] In February 2004, proposed regulations under MEJA were issued for comment, but, to date, they have not become final. The first case filed under MEJA, in June 2004, involved an alleged murder by a spouse of an Air Force officer stationed abroad.[676] The case resulted in a conviction.[677]

#### (a)    Jurisdiction

Section 3261(a) of MEJA provides that

> Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States –
>
> (1) while employed by or accompanying the Armed Forces outside the United States; or
>
> (2) while a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice),
>
> shall be punished as provided for that offense.

The provisions of MEJA do not apply if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting the person for the offense; however, the United States may nonetheless prosecute such person under MEJA if approval for the prosecution is granted by the attorney general or the deputy attorney general.[678]

The report analyzing MEJA prepared by the House of Representatives' Judiciary Committee makes it clear that the reference to "the special maritime and territorial jurisdiction of the United States" includes those "acts that would be a Federal crime regardless of where they are committed in the United States, such as the drug crimes in title 21."[679] The term "employed by the

---

[674] 10 U.S.C.A. §881.

[675] The Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106-553; 18 U.S.C.S. § 3261, added Nov. 22, 2000, P.L. 106-523, §2(a), 114 Stat. 2488.

[676] Jessica Ioigo, *In first use of jurisdiction act, USAF spouse to be tried in husband's death,* STARS AND STRIPES (EUROPEAN EDITION), June 5, 2003, *available at* http://endyorks.gn.apc.org/caab/articles/usafspousetobetried.htm (last visited Oct. 25, 2004).

[677] *Californian convicted of killing husband at U.S. base in Turkey,* ASSOCIATED PRESS, Oct. 15, 2004, *available at* http://www.mercurynews.com/mld/mercurynews/news/local/states/california/the_valley/9930855.htm?1c (last visited Oct. 25, 2004). No details of the case are available as of the time of this writing.

[678] 18 U.S.C.S. §3261(b).

[679] H.R. REP. No. 106-788, pt. 1, at 19 (2000), 14-15 & n.27, *available at* http://thomas.loc.gov/cgi-bin/cpquery/T?&report=hr778p1&dbname=cp106& (House Report) (last visited Oct. 25, 2004).

Armed Forces outside the United States" means "(A) employed as a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department), as a Department of Defense contractor (including a subcontractor at any tier), or as an employee of a Department of Defense contractor (including a subcontractor at any tier); (B) present or residing outside the United States in connection with such employment; and (C) not a national of or ordinarily resident in the host nation."[680] The term "accompanying the Armed Forces outside the United States" means

(A)     a dependent of (i) a member of the Armed Forces, (ii) a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department), or (iii) a Department of Defense contractor (including a subcontractor at any tier) or an employee of a Department of Defense contractor (including a subcontractor at any tier)

(B)     residing with such member, civilian employee, contractor, or contractor employee outside the United States; and

(C)     not a national of or ordinarily resident in the host nation. [681]

The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, amends section 3267(1)(A) to extend MEJA jurisdiction to –

(i) a civilian employee of –

(I)  the Department of Defense…; or

(II) any other Federal agency, or any provisional authority, to the extent that such employment relates to supporting the mission of the Department of Defense overseas;

(ii) a contractor (including a subcontractor at any tier) of –

(I)  the Department of Defense…; or

(II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas; or

(iii) an employee of a contractor (or a subcontractor at any tier) of –

(I)  the Department of Defense…; or

(II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas.[682]

MEJA does not apply to members of the Armed Forces who are subject to the UCMJ, unless such individuals cease to be subject to UCMJ (for example, if they had been discharged from the Armed Forces after commission of the act in question but before charges were brought) or unless they have committed an offense with one or more other defendants, at least one of whom is not subject to the relevant chapter.[683]

[680]   18 U.S.C.S., §3267.

[681]   18 U.S.C.S., §3267.

[682]   H.R. 4200, 108th Cong. §1088 (2004).

[683]   18 U.S.C.S. §3261(d). Retired personnel, as distinguished from discharged personnel, remain subject to the UCMJ and may be recalled to active duty for purposes of being tried by court martial.

Where conduct violates both section 3261 and another federal statute having extraterritorial application (other than the UCMJ), "the Government may proceed under either statute."[684] In cases where conduct violates both section 3261 and the UCMJ, the Department of Defense has the exclusive right to prosecute, provided that the offender is not part of a conspiracy or other illegal activity with civilians. If a military member is indicted with a civilian, MEJA allows the government to prosecute the military member in federal court.[685] This remains the case even if a federal judge later orders that the military and civilian defendants be tried separately.[686]

### (b)    Offense

MEJA was intended to be broad in scope and to cover crimes found in Titles 18 and 21 of the U.S. Code (*e.g.*, murder, rape, assault, etc.) as well as crimes under other federal statutes that provide for criminal liability.[687] Even though many of these statutes refer to crimes that take place within the United States, the language used in the MEJA includes these crimes within its scope. Accordingly, MEJA can be used to prosecute individuals for conspiracy to commit torture under section 2340A as well as for common law crimes such as conspiracy to commit, or aiding and abetting in commission of, assault, sexual assault, manslaughter, and murder.

As explained above, with the requisite *mens rea*, instances of Extraordinary Renditions may amount to aiding and abetting in the commission of torture, assault, sexual assault, and, where death results, manslaughter or murder. Accordingly, those officials who fall within the jurisdiction of MEJA can be prosecuted for participation in these crimes under the appropriate MEJA provisions.

### B.    Defenses to Criminal Liability Generally Are Inapplicable to Most Cases of Extraordinary Renditions

Under certain circumstances, the defenses of necessity, self-defense, or superior orders may be available to those charged in connection with Extraordinary Renditions. However, as explained in more detail below, such defenses are inapplicable to most instances of Extraordinary Renditions.

Necessity and self-defense are related defenses that involve admission to the illegal act but which seek to justify the act because the individual prevented greater harm by committing the crime. As a preliminary matter, it should be noted that the arguments set out below that seek to justify Extraordinary Rendition under the defenses of necessity and self-defense run counter to the right of the individual who has been Extraordinarily Rendered to be presumed innocent until proven guilty, and rest on the assumption that the person in custody has actionable information of

---

[684]    House Report, *supra* note 679, at 15 n.28 (citing *United States v. Batchelder*, 442 U.S. 114 (1979)).

[685]    *Id.*, at 16. The House Report stated that the provision "is designed to allow the Government to try the military member together with a non-military co-defendant in a United States Court." *Id.*

[686]    MEJA §3261, 114 Stat. 2488. Because section 3261(d)(2) only requires that the military member be indicted, or an information filed against him, together with another person, this element of the crime will be satisfied even if the judge approves a motion for separate trials. Of course, in such a situation, Justice could agree to dismiss the complaint against the military member so that the Department of Defense could proceed against him or her by court-martial, but nothing in the statute requires this.

[687]    G.R. Schmitt, *Closing the Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad--A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000*, 51 CATH. U.L. REV. 55 (2001).

an imminent terrorist attack. In reality, this scenario is far from guaranteed and in many cases those sent to face torture provide no information to confirm that they know of terrorist activity.

Both defenses have been historically applied whenever an individual's belief that his or her action will prevent future harm can be shown to have been reasonable. It could be argued that if the belief that the person in custody possessed information about a future attack was reasonable, then the fact that that person did not actually posses such information is not relevant. However, the change from a presumption of innocence standard to a reasonableness standard seems to disproportionately favor the state in this context given the extreme consequences of Extraordinary Rendition and the state action involved.

### 1.    *Necessity*

Necessity is a traditional defense to criminal liability that was raised by now-Judge Jay S. Bybee, formally Assistant Attorney General in the Justice Department, in a memo entitled *Re: Standards of Conduct for Interrogation under 18 U.S.C. §§2340-2340A*. Despite the memo's assertion to the contrary, it remains an open question as to whether federal courts have the authority to recognize a necessity defense that is not statutorily provided.

The Supreme Court has discussed the availability of the defense of necessity in the federal context without rejecting or accepting it, and has stated that the applicability of the defense to federal crimes is questionable since such crimes are defined by statute and not by common law. In *United States v. Bailey*,[688] the court rejected a claim of necessity on the grounds that a legal alternative existed. While the court noted that Congress legislates against the background of the common law and may have considered a necessity defense, it refused to balance harms as the defense would require, explaining that "we are construing an Act of Congress, not drafting it." In *United States v. Oakland Cannabis Buyers' Cooperative*,[689] the court again refused to decide whether necessity could ever be a defense when a federal statute did not provide for it. While the court admitted that it had discussed the possibility of the defense in *Bailey*, it made clear that the earlier case had not settled the question. The Court reiterated its view that, "whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference."[690]

Since sections 2340 and 2340A are silent on the issue of necessity, it is unclear whether the defense would apply. It could be argued that, given the gravity of torture, had Congress intended any exception to the blanket prohibition, it would have included the parameters of such an exception. Absent express intent, it could be argued that courts should not insert such a defense into the federal criminal statute.[691]

Whether the defense of necessity would be available to a member of the Armed Forces is even more questionable. Neither the UCMJ nor the Manual explicitly allow for the defense. The Manual only provides for a defense of "coercion or duress."[692] The U.S. Court of Appeals for the Armed Forces and its predecessor court have considered necessity but have yet to apply it or

---

[688]    444 U.S. 394, 415-416 (1980).

[689]    532 U.S. 483, 490 (2001).

[690]    *Id.* (quoting *United States v. Rutherford*, 442 U.S. 544, 559 (1979)).

[691]    Note that the Bybee Memorandum makes a similar argument but in reverse. Judge Bybee suggests that because Congress did not include provisions from CAT that explicitly prohibit the defense of necessity, Congress implicitly allowed the defense. Bybee Memorandum, *supra* note 130.

[692]    The Manual, *supra* note 652, Rule 916(h).

explicitly allow it. In *United States v. Rockwood*,[693] the court stated that there may be an unusual situation in which consideration might be given to the defense. In both *Rockwood* and *United States v. Washington*,[694] a more recent case in which the court also declined to recognize the defense, the court emphasized the importance of order, explaining that the essence of military duty is the subordination of individual interest and sacrifice. It implied that the defense of necessity would be less applicable in the military setting than in the civilian context.[695]

The defense of necessity could be available to individuals charged under MEJA.[696] However, in that context, the necessity defense would justify only illegal conduct that the actor believed was necessary to avoid harm to himself or to another. The defense of necessity has three general requirements, all of which must be satisfied: (i) the actor must have intended to avoid the greater harm, (ii) the harm avoided must be greater than the harm done, and (iii) there must have been no alternative which would have caused less harm than the harm actually caused. In principle, there is no limit to the type of harm that may be justified by the defense and, in general, it can apply even to intentional homicide.[697] It is for the trier of fact, not the defendant, to determine whether the harm done by the defendant was less than the harm that was avoided.[698]

The first requirement of the defense could be satisfied only if an Extraordinary Rendition was carried out in an attempt to avoid a terrorist attack. The intent requirement holds that a person may not commit a crime for an impermissible reason and then justify it afterwards by pointing to the fact that a greater harm just happened to be avoided. The intent to avoid future harm must be the reason why the crime was committed. Thus, the defense would be inapplicable in cases were an individual was rendered to face torture as a form of punishment for past actions or to gather information related to previously committed attacks.[699]

Moreover, to justify Extraordinary Rendition, the court would have to determine that the harm avoided by such practice is greater than the harm resulting from it. In this objective inquiry, the court acts as a legislature, balancing the two harms and deciding whether the individual's decision was consistent with societal values.[700] Accordingly, the defense is unavailable when the legislature has made the determination of values and has made clear that violation of a statute cannot be outweighed by the harm avoided. The memos produced for the Bush Administration have suggested that the harm avoided by preventing a future terrorist attack would outweigh the harm caused by torturous interrogation.[701] However, as demonstrated by the fact that the anti-torture norm is largely recognized to have achieved the status of *jus cogens*, a court is likely to find that torture is so inherently harmful that nothing can outweigh it. Both CAT and section 2340A make clear that society considers the harm caused by torture to be great, and the White House has

---

[693]    52 M.J. 58 (C.M.A. 1999).

[694]    57 M.J. 394 (C.M.A. 2002).

[695]    Note that in the context of military justice, the defense has traditionally been examined through the prism of a subordinate's refusal to follow a superior order. In the Extraordinary Rendition context the situation may be reversed however, and the accused might raise the defense to justify following the order.

[696]    Because MEJA incorporates crimes under Title 18 and 21, presumably it incorporates the applicable defenses as well.

[697]    LA FAVE, *supra* note 438, §5.4(d).

[698]    *See, e.g., United States v. Coupez*, 603 F.2d 1347 (9th Cir. 1979) and state statutes such as N.Y. Penal Law §35.05.

[699]    It may be assumed that the defense is likely to assert that individual's intent was to avoid future harm. However, only in the ticking bomb scenario where the purpose of an Extraordinary Rendition is to gather information to prevent an imminent future terrorist attack is it likely that this requirement of the defense will be met.

[700]    *See, e.g., People v. Gray*, 150 Misc. 2d 852, 856-857 (N.Y. Crim. Ct. 1991).

[701]    *See* Bybee Memorandum, *supra* note 130.

repeatedly reaffirmed that "United States stands against and will not tolerate torture and that the United States remains committed to complying with its obligations under [CAT]."[702] Moreover, the harm that is caused by torture is definite whereas the benefits gained by torture are difficult to measure and often negligible. U.S. officials themselves have acknowledged that torture is an ineffective means of producing reliable intelligence.[703] Accordingly, the harm alleged as being prevented as a result of Extraordinary Renditions is unlikely to outweigh the harm caused to the "rendered" individual.

Even if the purpose of Extraordinary Renditions was to avoid greater harm, the defense requires that there be no alternative to the action taken. Courts have interpreted this requirement strictly, holding the defense inapplicable when any legal or less harmful option was available.[704] Thus, this requirement will be satisfied only in the unlikely event that no alternative to Extraordinary Rendition is available.

Further, to rely on the necessity defense, the harm avoided must be known and specific. Some state statutes further require that the threatened harm be imminent and state that the defense only applies in emergency situations.[705] In this regard, courts have held that "the possibility of harm at an indeterminate date in the future is insufficient."[706] An assertion that an individual may have information about a possible future attack is unlikely to fulfill this requirement. It could be argued, however, that the "threatened harm is imminent" in a situation where U.S. officials are aware of a specific threat but unaware of its operational details. It could be further argued that the ongoing "War on Terror" adds further urgency to uncovering such details. However, while the current environment may be described as an ongoing emergency, the necessity defense is only available if all legal options for halting a known, specific, and imminent threat are taken before Extraordinary Rendition. Although terrorist groups may be continually plotting attacks, this does not satisfy the imminence requirement. Thus, unless U.S. officials are truly dealing with a "ticking bomb" scenario, the necessity defense is unlikely to be applicable to most instances of Extraordinary Renditions.[707] It is submitted that the purposes of the necessity defense are validly effected by appropriate use of prosecutorial discretion in those rare cases where it might apply.

## 2.    *Self-Defense and Defense of Others*

The doctrine of self-defense justifies the use of force to prevent unlawful bodily harm to oneself, provided that the force is necessary to avoid the bodily harm. The doctrine of defense of others is a related defense that allows for the use of force to protect another person and has the same requirements as self-defense.[708] Although self-defense and defense of others could be asserted against a charge of complicity to commit torture, it is doubtful whether these defenses can be used

---

[702]    Alberto Gonzalez, Counsel to the President, *The President's Stance on Torture*, The Washington Post, Oct. 5, 2004, A24, *available at* http://www.washingtonpost.com/wp-dyn/articles/A7245-2004Oct4.html?referrer=emailarticlepg (last visited Oct. 25, 2004).

[703]    *See, e.g.*, D. Filkins, *General Says Less Coercion of Captives Yields Better Data*, NEW YORK TIMES, Sept. 7, 2004.

[704]    *See e.g.*, *Bailey*, 442 U.S. at 635; *United States v. Arellano-Rivera*, 244 F.3d 1119 (9th Cir. 2001); *Regina v. Dudley & Stephens*, L.R. 14 Q.B.D. 273 (1884).

[705]    LAFAVE, *supra* note 438, §5.4(d); *see, e.g.*, N.Y. Penal Law §35.05.

[706]    *State v. Howley*, 128 Idaho 874 (Idaho 1996).

[707]    *See e.g.*, *Public Committee Against Torture in Israel et. al. v. The State of Israel*, HCJ 5100/94 (1999) (restricting the application of the defense of necessity in cases of torture during interrogation).

[708]    LA FAVE, *supra* note 438, §5.8.

as defenses against a charge of conspiracy.[709] In the context of military law, self-defense and the defense of others are allowable defenses only for charges of homicide or assaults.[710] Even if such defenses were available, because, like necessity, self-defense and defense of others are common law defenses, they raise the same issue of applicability to federal law. Thus, self-defense and defense of others are unlikely to be available as defenses against conspiracy charges. In any event, self-defense in the context of Extraordinary Renditions can be understood as a personalized version of the social defense of necessity and should be subject to the same limitations. Accordingly, neither self-defense nor the defense of others is likely to be a successful means for negating charges of participation in Extraordinary Renditions.

### 3.    *Superior Orders*

An individual charged with complicity (or conspiracy) to commit torture under sections 2340A(a) or (c), or for crimes under military law may argue that he or she should be immune from liability because a superior ordered the Extraordinary Rendition. This defense is not available to civilians or CIA contractors facing federal charges. Similarly, a person may not plead the defense of superior orders to avoid liability in tort. In holding that an unconstitutional order or practice is actionable under 42 U.S.C. §1983, Chief Justice Marshall laid down the principle that "instructions cannot change the nature of the transaction, nor legalize an act."[711]

The defense of superior orders, however, is available to a member of the Armed Forces charged under military laws. The rationale for this defense lies in the importance of order and discipline in the military setting. Indeed, for a subordinate to question an order may amount to insubordination for which the individual could be criminally charged. Accordingly, following superior orders provides a defense except in instances of palpable illegality, *i.e.,* where the order is so manifestly beyond the legal power of the commander as to give no doubt as to its illegality. The Manual for Courts-Martial formalizes the defense. It states "it is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful."[712]

The defense does not justify obviously illegal acts, such as a conduct that is obviously a war crime.[713] Indeed, the Department of the Army Field Manual states:

> The fact that the law of war has been violated pursuant to an order of a superior authority, whether military or civil, does not deprive the act in question of its character of a war crime, nor does it constitute a defense in the trial of an accused individual, unless he did not know and could not reasonably have been expected to know that the act ordered was unlawful. [714]

---

[709]   *State of Connecticut v. Robert Dejesus*, 260 Conn. 466 ("...defense counsel suggested that self-defense does apply to the mens rea element of the offense of conspiracy to commit murder. In any event, we are unaware of any authority that supports the defendant's request at trial for an instruction on self-defense as to the charge of conspiracy to commit murder...."); *Richmond v. Commonwealth*, 255 Ky. 758 (Whitley Circuit Court, 1934).

[710]   Manual, *supra* note 634, Rule 916(e).

[711]   *Little v. Barreme* 6 U.S. 170, 179 (1804).

[712]   Manual, *supra* note 634, Rule 916(d).

[713]   *See United States of America v. Otto Ohlendorf, et al.*, Case No. 9, IV Trials of War Criminals before the Nuremberg Military Tribunals, at 1,470.

[714]   ARMY FIELD MANUAL 27-10; THE LAW OF LAND WARFARE, July 1976.

The central issue is whether a person of ordinary sense and understanding would know that the order was illegal. In *U.S. v. Calley*,[715] the court upheld a finding that the order to kill non-combatant civilians in My Lai, Vietnam, was so clearly unlawful that it did not justify the murders. The court emphasized the "ordinary sense and understanding" standard and stated that Calley must be presumed to know that he could not lawfully kill the people involved.[716]

Because of their training, all U.S. soldiers have been informed of the Geneva Conventions, which make clear that the torture of individuals is illegal. In *Calley* the court stated that, "[w]hether Lieutenant Calley was the most ignorant person in the United States Army in Vietnam, or the most intelligent, he must be presumed to know that he could not kill the people involved here."[717] Like murder, torture is a crime that every soldier must be presumed to know is illegal and thus is a crime that cannot be excused by superior orders. However, not every soldier can be presumed to know whether a certain individual would be subjected to torture if transferred to a particularly country, or that a particular conduct constitutes torture. Accordingly, the defense may be available to those soldiers who have no reason to believe (and no knowledge suggesting otherwise) that the individual whom they were ordered to transfer to a third country is more likely than not to be tortured on there. On the other hand, defense of superior orders may be *un*available in circumstances of Extraordinary Rendition to a military official who knows that torture of the transferred individuals is foreseeable.

### C.   U.S. Officials Participating in Extraordinary Rendition May Face Civil Liability for their Involvement in the Practice

In certain circumstances, U.S. officials participating in Extraordinary Renditions may be subject to civil liability. The ability to bring a lawsuit against a U.S. official however, is subject to certain limitations. If the attorney general certifies that "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose…the United States shall be substituted as the party defendant."[718] This provision effectively removes "the potential personal liability of Federal employees for common law torts committed within the scope of their employment, and would instead provide that the exclusive remedy for such torts is through an action against the United States under the [FTCA]."[719]

Although generally, sovereign immunity precludes civil suits against the federal government, the Federal Tort Claims Act (FTCA) provides a limited waiver of the government's sovereign immunity, stating that the government can only be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[720] The federal government will not be liable for:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with

---

[715]   22 U.S.C.M.A. 534, 544 (U.S.C.M.A. 1973).

[716]   *See also*, *U.S. v. Griffen*, 39 C.M.R. 586, (A.B.R. 1968); *U.S. v. Kinder* 14 C.M.R. 742 (A.F.B.R. 1954) (superior orders did not provide defense to homicide when soldiers followed orders to shoot prisoners).

[717]   *Calley*, 22 U.S.C.M.A., at 544.

[718]   28 U.S.C. S 2679(d)(1).

[719]   H.R. Rep. No. 100-700, 100ᵗʰ Cong., at 4 (1988). According to the legislative history, the term "common law tort" "embraces not only those state law causes of action predicated on the 'common' or case law of the various states, but also encompasses traditional tort causes of action codified in state statutes that permit recovery for acts of negligence." *Id.* at 6.

[720]   28 U.S.C. §1346(b).

contract rights: *Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) this title shall apply* to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. [721]

An "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."[722] In certain circumstances, military officials (particularly the military police) may be considered "investigative or law enforcement officers."[723]

### 1.   *Alien Tort Claims Act (ATCA)*

ATCA extends the jurisdiction of U.S. district courts to "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The courts have consistently recognized that ATCA establishes a forum where plaintiffs can seek redress for violations of international law.[724] Most recently, in *Sosa v. Alvarez-Machain et al.*,[725] the Supreme Court stated that "[t]he jurisdictional grant [of ATCA] is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." The court noted, however, that any claim based on the present-day law of nations must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of [violation of safe conducts, infringement of the rights of ambassadors, and piracy.]"[726]

The tort pled under ATCA must be "definable, obligatory (rather than hortatory) and universally condemned."[727] To satisfy this specificity requirement, the following is required: (i) no state condones the act in question, and there is a recognizable "universal" consensus of prohibition against it; (ii) there are sufficient criteria to determine whether a given action amounts to the

---

[721] 28 U.S.C. §2680(h). FTCA is limited by other exceptions pursuant to which the government is not subject to suit, such as the discretionary function exception, which bars a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. S 2680(a).

[722] 28 U.S.C. §2680(h).

[723] *See, e.g., Kennedy v. United States*, 585 F. Suppl. 1119 (1984) (under 28 U.S.C.S. §2680(h), government is liable for tortuous conduct of the military police amounting to assault and battery and false arrest). *Contrast Solomon v. United States*, 559 F.2d 309 (5th Cir. 1977) (security employees of a military exchange are not investigative or law enforcement officers within the meaning of section 2680(h)); *DeLong v. United States*, 600 F.Supp. 331 (D. Alaska 1984) (marine guards are not law enforcement officers within the meaning of section 2680(h).) Section 2680(k) precludes liability for any " claim arising in a foreign country." However, an argument can be made that a claim for conspiracy and/or aiding and abetting in the commission of torture originates in the United States, even though "its operative effect" takes place in a foreign country. *See, e.g. Richard v. United States*, 369 U.S. 1 (1962). *But see* notes 592-597 and accompanying discussion.

[724] *Filartiga v. Pena-Irala*, 630 F.2d 876 (2nd Cir. 1980); *Abebe-Jira v. Negewo*, No. 93-9133 (10th Cir. 1996) ("the Alien Tort Claims Act establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law").

[725] *Sosa v. Alvarez-Machain, U.S. v. Alvarez-Machain*, 124 S. Ct. 2739 (2004).

[726] Reference to these three crimes stems from Supreme Court's analysis of legislative history of ATCA. The court looked to Blackstone's definition of the law of nations, which listed the three specific offenses. The Court stated that "[i]t was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on minds of the men who drafted [ATCA] with its reference to tort." *Id.* at 2756.

[727] *Fortin v. Suarez-Mason*, 672 F. Supp. 1531, 1539-41 (N.D. Cal. 1987).

prohibited act and thus violates the norm; and (iii) the prohibition against it is non-derogable and therefore binding at all times upon all actors.[728]

Torture is actionable under ATCA (as well as under TPA, discussed below)[729] and courts have allowed ATCA suits to proceed based on theories of conspiracy and aiding and abetting of torture.[730] Torture practices in countries of rendition, such as Egypt, Syria, Lebanon, Saudi Arabia, and Morocco, amount to egregious, universally condemnable acts, which are prohibited both by customary and statutory international law. Conspiracy to commit or aiding and abetting the commission of acts of torture in such countries through the rendition of individuals by U.S. officials could, therefore, give rise to civil liability under ATCA.

## 2.    *Torture Victims Protection Act (TPA)*

The Torture Victims Protection Act of 1991 (TPA) was signed into law in 1992 and was appended to the U.S. Code as a note to section 1350. The TPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation – (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." The Senate Judiciary Committee has stated that, consistent with international law, "responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts; anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them," thus evidencing that TPA is intended to apply to those complicit in acts of torture.[731] Moreover, U.S. courts have held that a private actor who conspires with a government official can be considered to act "under color of law."[732] By analogy, a U.S official who conspires with or aids a foreign perpetrator who acts under apparent authority of a foreign government may be considered to act "under color of foreign law" and thus may be held liable under the TPA.[733]

---

[728]    *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285 (D. Fla. 2003); *Xuncax v. Gramajo*, 886 F.Supp. 162, 184 (D. Mass. 1995).

[729]    *Filartiga v. Pena-Irala*, 630 F.2d 876 (2nd Cir. 1980); *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285 (D. Fla. 2003); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003).

[730]    Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003).

[731]    S. Rep. No. 249, 102d Cong., 1st Sess., at 4-5 (1991), at 8-9; see *also Estate of Ferdinand E. Marcos Human Rights Litigation*, MDL No. 840 (D. Haw.)

[732]    *See, e.g., Dennis v. Sparks*, 449 U.S. 24, 27-29 (1980) (nongovernmental witness could act "under color of law" by conspiring with the prosecutor or other state officials); *Adickes v. S.H. Cress & Co.*, 398 U.S. 144, 152 (1970) ("The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful); *Monroe v. Pape*, 365 U.S. 167 (1961); *see also United States v. Classic*, 313 U.S. 299, 326 (1941); *Screws v. United States,* 325 U.S. 91, 107-11 (1945); *Williams v. United States*, 341 U.S. 97, 99-100 (1951). Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. 'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents,' *United States v. Price*, 383 U.S. 787, 794 (1966).")

[733]    It should be noted that it is not clear whether TPA would apply to actions of U.S. armed forces. *See* President George H.W. Bush, Statement on Signing the Torture Victim Protection Act of 1991 (Mar. 12, 1992) ("I must note that I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad or law enforcement actions. …I do not believe it

## IX.    CONCLUSION

This Report concludes that both international and domestic law prohibits the practice of Extraordinary Rendition. Despite these clear standards, allegations of such transfers have surfaced repeatedly in the press and in the reports of human rights and humanitarian organizations. The United States should demonstrate its opposition to this practice by initiating formal inquiries into Extraordinary Renditions, investigating cases in which U.S. officials or their agents may have committed criminal acts, and implementing a moratorium on the use of diplomatic assurances in torture cases. Far from being an acceptable tool in the "War on Terror," Extraordinary Renditions are illegal and constitute a perversion of justice that must be exposed and brought to an end.

October 29, 2004

---

is the Congress' intent that H.R. 2092 should apply to United States Armed Forces or law enforcement operations, which are always carried out under the authority of United States law.")