**Feldman, Brian (USANYS)**

| | |
|---|---|
| From: | Kelliher, Brian [Brian.Kelliher@HQ.DHS.GOV] |
| Sent: | Wednesday, November 02, 2005 9:34 AM |
| To: | Baroukh, Nader; Rosenberg, Ron M |
| Subject: | Detainee articles |

**New York Times**

November 2, 2005

# Detainee Policy Sharply Divides Bush Officials

By TIM GOLDEN and ERIC SCHMITT

WASHINGTON, Nov. 1 - The Bush administration is embroiled in a sharp internal debate over whether a new set of Defense Department standards for handling terror suspects should adopt language from the Geneva Conventions prohibiting "cruel," "humiliating" and "degrading" treatment, administration officials say.

Advocates of that approach, who include some Defense and State Department officials and senior military lawyers, contend that moving the military's detention policies closer to international law would prevent further abuses and build support overseas for the fight against Islamic extremists, officials said.

Their opponents, who include aides to Vice President Dick Cheney and some senior Pentagon officials, have argued strongly that the proposed language is vague, would tie the government's hands in combating terrorists and still would not satisfy America's critics, officials said.

The debate has delayed the publication of a second major Pentagon directive on interrogations, along with a new Army interrogations manual that was largely completed months ago, military officials said. It also underscores a broader struggle among senior officials over whether to scale back detention policies that have drawn strong opposition even from close American allies.

Since Mr. Bush's second term began, several officials said, factions within the administration have clashed over the revision of rules for the military tribunals to be held at Guantánamo Bay, Cuba, the transfer of some prisoners held there, and aspects of the United States' detention operations in Afghanistan and Iraq.

"It goes back to the question of how you want to fight the war on terror," said a senior administration official who has advocated changes but, like others, would discuss the internal deliberations only on the condition of anonymity. "We think you do that most successfully by creating alliances."

The document under discussion, known as Department of Defense Directive 23.10, would provide broad guidance from Defense Secretary Donald H. Rumsfeld; while it would not spell out specific detention and interrogation techniques, officials said, those procedures would have to conform to its standards. It would not cover the treatment of detainees held by the Central Intelligence Agency.

The behind-the-scenes debate over the Pentagon directive comes more than three years after President Bush decided that the Geneva Conventions did not apply to the fight against terrorism. It mirrors a public battle between the Bush administration and Senator John McCain, Republican of Arizona, who is pressing a separate legislative effort to ban the "cruel, inhuman or degrading treatment" of any detainee in United States custody.

After a 90-to-9 vote in the Senate last month in favor of Mr. McCain's amendment to a $445 billion defense spending bill, the White House moved to exempt clandestine C.I.A. activities from the provision. A House-Senate conference committee is expected to consider the issue this week.

Mr. Cheney and some of his aides have spearheaded the administration's opposition to Senator McCain's amendment; they were also quick to oppose a draft of the detention directive, which began to circulate in the Pentagon in mid-September, officials said.

A central player in the fight over the directive is David S. Addington, who was the vice president's counsel until he was named on Monday to succeed I. Lewis Libby Jr. as Mr. Cheney's chief of staff. According to several officials, Mr. Addington verbally assailed a Pentagon aide who was called to brief him and Mr. Libby on the draft, objecting to its use of language drawn from Article 3 of the Geneva Conventions.

"He left bruised and bloody," one Defense Department official said of the Pentagon aide, Matthew C. Waxman, Mr. Rumsfeld's chief adviser on detainee issues. "He tried to champion Article 3, and Addington just ate him for lunch."

Despite his vehemence, Mr. Addington did not necessarily win the argument, officials said. They predicted that it would be settled by Mr. Rumsfeld after consultation with other agencies.

But while advocates of change within the administration have prevailed in a few skirmishes, some of those officials acknowledged privately that proponents of the status quo still dominate the issue - partly because of the bureaucratic difficulty of overturning policies that have been in place for several years and, in some cases, were either approved by Justice Department lawyers or upheld by the federal courts.

"A lot of the decisions that have been made are now difficult to get out of," one senior administration official said.

A spokesman for the vice president, Stephen E. Schmidt, said Mr. Addington would have no comment on his reported role in the policy debates. A Defense Department spokesman, Bryan Whitman, also would not discuss Mr. Waxman's role except to say it was "certainly an exaggeration" to characterize him as having been bloodied by Mr. Addington.

Mr. Whitman confirmed that the Pentagon officials were revising four major documents - including the two high-level directives on detention operations and interrogations and the Army interrogations manual - as part of its response to the 12 major investigations and policy reviews that followed the Abu Ghraib abuse scandal.

The four documents "are nearing completion or are either undergoing final editing or are in some stage of final coordination," Mr. Whitman said. But he would not comment on their contents or on the internal discussions, beyond saying it was important "to allow and encourage a wide variety of views to come to the surface."

The administration's policies for the detention, interrogation and prosecution of terrorism suspects have long been a source of friction within the government.

Even some supporters of those policies have acknowledged that the tensions stem in part from the way they were pushed through after the Sept. 11 attacks, by a handful of administration lawyers who circumvented international-law experts, military lawyers and even some cabinet-level officials who might have objected.

Many officials said Mr. Addington, who helped create the legal framework after 9/11, remains a bulwark in support of those policies, deftly blocking or weakening proposed changes. Nonetheless, the internal politics of those issues have begun to shift in Mr. Bush's second term.

Several architects of the original policies have left the government. Some other senior officials, who had challenged aspects of the policy with limited success, have gained stronger voices in new posts.

Condoleezza Rice, who occasionally questioned the Pentagon's management of Guantánamo when she was national security adviser, has called more forcefully for a reconsideration of some detention policies as secretary of state, a stance generally backed by her successor at the White House, Stephen J. Hadley, administration officials said. The new deputy defense secretary, Gordon R. England, has also been an influential advocate for reviewing the detention policies within the Pentagon, officials said.

"The results may not be very different, but the discussions have changed," a senior military lawyer said. "And there are more discussions."

Since President Bush's decision in February 2002 to set aside the Geneva Conventions in fighting terrorists, government lawyers have debated what legal framework should apply to combatants in a struggle that the administration argues does not fit into the categories of international violence contemplated by the 1949 conventions.

Lawyers at the State Department raised the issue repeatedly, officials said. But because the department opposed the president's original decision to put aside the conventions, the efforts of its lawyers were largely dismissed as attempts to revive a question that had already been decided, they added.

Beginning late last year, Defense Department lawyers took up the issue as they revised Directive 23.10, the "DoD Program for Enemy Prisoners of War and Other Detainees." A roughly 12-page draft of the directive, which began circulating in the Pentagon in mid-September, received strong support from lawyers for the armed services, the military vice chiefs and some civilian defense officials, several officials said.

"The uniformed service lawyers are behind the rewrite because it brings the policy into line with Geneva," one senior defense official said. "Their concern was that we were losing our standing with allies as well as the moral high ground with the rest of the world."

Following one of the recommendations of the Sept. 11 commission, the draft, written by officials in Mr. Waxman's office and military lawyers, lifted directly from Article 3 of the Geneva accords in setting out new rules for the treatment of terrorism suspects, three officials who have reviewed the document said.

Common Article 3, as the provision is known, sets out minimum standards for the treatment of captured fighters and others in "armed conflicts not of an international character." Although President Bush determined in February 2002 that the article was not relevant to Al Qaeda or the Taliban because of its international focus, the Sept. 11 panel noted that it "was specifically designed for those cases in which the usual laws of war did not apply."

The draft Pentagon directive adopted the language of Common Article 3 "as a matter of policy rather than law," one defense official said. Even so, the Geneva reference was opposed by two senior Pentagon officials, Stephen A. Cambone, the under secretary of defense for intelligence policy, and, William J. Haynes, the department's general counsel, defense officials said.

Mr. Addington, who has been a close bureaucratic ally of both defense officials, soon called Mr. Waxman to the Old Executive Office Building to brief him and Mr. Libby on the directive. Two defense officials who were told about the meeting said Mr. Addington objected to phrases taken from Article 3 - which proscribes "cruel treatment and torture," and "outrages upon personal dignity, in particular murder of all kinds, mutilation, humiliating and degrading treatment" - as problematically vague.

"We may know what they mean in the United States," one senior administration official familiar with the debate said of the Geneva terms. "But views around the world may differ from ours. Having a female interrogator even asking questions of a male might be humiliating to some parts of the Muslim faith."

Another official said Mr. Addington and others also argued that Mr. Bush had specifically rejected the Article 3 standard in 2002, setting out a different one when he ordered that military detainees "be treated humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

Only when the dispute is resolved, defense officials said, would the Pentagon conclude the drafting of the second directive, known as 31.15, on the interrogation of prisoners including terrorism suspects. That document, in turn, would make possible the publication of a roughly 200-page Army manual for interrogations that was virtually completed last spring, officials said.

"If we don't resolve this soon," one defense official said, referring to the overlapping debate over Senator McCain's proposal, "Congress is going to do it for us."

washingtonpost.com

# CIA Holds Terror Suspects in Secret Prisons
Debate Is Growing Within Agency About Legality and Morality of Overseas System Set Up After 9/11

By Dana Priest
Washington Post Staff Writer
Wednesday, November 2, 2005; A01

The CIA has been hiding and interrogating some of its most important al Qaeda captives at a Soviet-era compound in Eastern Europe, according to U.S. and foreign officials familiar with the arrangement.

The secret facility is part of a covert prison system set up by the CIA nearly four years ago that at various times has included sites in eight countries, including Thailand, Afghanistan and several democracies in Eastern Europe, as well as a small center at the Guantanamo Bay prison in Cuba, according to current and former intelligence officials and diplomats from three continents.

The hidden global internment network is a central element in the CIA's unconventional war on terrorism. It depends on the cooperation of foreign intelligence services, and on keeping even basic information about the system secret from the public, foreign officials and nearly all members of Congress charged with overseeing the CIA's covert actions.

The existence and locations of the facilities -- referred to as "black sites" in classified White House, CIA, Justice Department and congressional documents -- are known to only a handful of officials in the United States and, usually, only to the president and a few top intelligence officers in each host country.

The CIA and the White House, citing national security concerns and the value of the program, have dissuaded Congress from demanding that the agency answer questions in open testimony about the conditions under which captives are held. Virtually nothing is known about who is kept in the facilities, what interrogation methods are employed with them, or how decisions are made about whether they should be detained or for how long.

While the Defense Department has produced volumes of public reports and testimony about its detention practices and rules after the abuse scandals at Iraq's Abu Ghraib prison and at Guantanamo Bay, the CIA has not even acknowledged the existence of its black sites. To do so, say officials familiar with the program, could open the U.S. government to legal challenges, particularly in foreign courts, and increase the risk of political condemnation at home and abroad.

But the revelations of widespread prisoner abuse in Afghanistan and Iraq by the U.S. military -- which operates under published rules and transparent oversight of Congress -- have increased concern among lawmakers, foreign governments and human rights groups about the opaque CIA system. Those concerns escalated last month, when Vice President Cheney and CIA Director Porter J. Goss asked Congress to exempt CIA employees from legislation already endorsed by 90 senators that would bar cruel and degrading treatment of any prisoner in U.S. custody.

Although the CIA will not acknowledge details of its system, intelligence officials defend the agency's approach, arguing that the successful defense of the country requires that the agency be empowered to hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantanamo Bay.

The Washington Post is not publishing the names of the Eastern European countries involved in the covert program, at the request of senior U.S. officials. They argued that the disclosure might disrupt counterterrorism efforts in those countries and elsewhere and could make them targets of possible terrorist retaliation.

The secret detention system was conceived in the chaotic and anxious first months after the Sept. 11, 2001, attacks, when the working assumption was that a second strike was imminent.

Since then, the arrangement has been increasingly debated within the CIA, where considerable concern lingers about the legality, morality and practicality of holding even unrepentant terrorists in such isolation and secrecy, perhaps for the duration of their lives. Mid-level and senior CIA officers began arguing two years ago that the system was unsustainable and diverted the agency from its unique espionage mission.

"We never sat down, as far as I know, and came up with a grand strategy," said one former senior intelligence officer who is familiar with the program but not the location of the prisons. "Everything was very reactive. That's how you get to a situation where you pick people up, send them into a netherworld and don't say, 'What are we going to do with them afterwards?' "

It is illegal for the government to hold prisoners in such isolation in secret prisons in the United States, which is why the CIA placed them overseas, according to several former and current intelligence officials and other U.S. government officials. Legal experts and intelligence officials said that the CIA's internment practices also would be considered illegal under the laws of several host countries, where detainees have rights to have a lawyer or to mount a defense against allegations of wrongdoing.

Host countries have signed the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as has the United States. Yet CIA interrogators in the overseas sites are permitted to use the CIA's approved "Enhanced Interrogation Techniques," some of which are prohibited by the U.N. convention and by U.S. military law. They include tactics such as "waterboarding," in which a prisoner is made to believe he or she is drowning.

Some detainees apprehended by the CIA and transferred to foreign intelligence agencies have alleged after their release that they were tortured, although it is unclear whether CIA personnel played a role in the alleged abuse. Given the secrecy surrounding CIA detentions, such accusations have heightened concerns among foreign governments and human rights groups about CIA detention and interrogation practices.

The contours of the CIA's detention program have emerged in bits and pieces over the past two years. Parliaments in Canada, Italy, France, Sweden and the Netherlands have opened inquiries into alleged CIA operations that secretly captured their citizens or legal residents and transferred them to the agency's prisons.

More than 100 suspected terrorists have been sent by the CIA into the covert system, according to current and former U.S. intelligence officials and foreign sources. This figure, a rough estimate based on information from sources who said their knowledge of the numbers was incomplete, does not include prisoners picked up in Iraq.

The detainees break down roughly into two classes, the sources said.

About 30 are considered major terrorism suspects and have been held under the highest level of secrecy at black sites financed by the CIA and managed by agency personnel, including those in Eastern Europe and elsewhere, according to current and former intelligence officers and two other U.S. government officials. Two locations in this category -- in Thailand and on the grounds of the military prison at Guantanamo Bay -- were closed in 2003 and 2004, respectively.

A second tier -- which these sources believe includes more than 70 detainees -- is a group considered less important, with less direct involvement in terrorism and having limited intelligence value. These prisoners, some of whom were originally taken to black sites, are delivered to intelligence services in Egypt, Jordan, Morocco, Afghanistan and other countries, a process sometimes known as "rendition." While the first-tier black sites are run by CIA officers, the jails in these countries are operated by the host nations, with CIA financial assistance and, sometimes, direction.

Morocco, Egypt and Jordan have said that they do not torture detainees, although years of State Department human rights reports accuse all three of chronic prisoner abuse.

The top 30 al Qaeda prisoners exist in complete isolation from the outside world. Kept in dark, sometimes underground cells, they have no recognized legal rights, and no one outside the CIA is allowed to talk with or even see them, or to otherwise verify their well-being, said current and former and U.S. and foreign government and intelligence officials.

Most of the facilities were built and are maintained with congressionally appropriated funds, but the White House has refused to allow the CIA to brief anyone except the House and Senate intelligence committees' chairmen and vice chairmen on the program's generalities.

The Eastern European countries that the CIA has persuaded to hide al Qaeda captives are democracies that have embraced the rule of law and individual rights after decades of Soviet domination. Each has been trying to cleanse its intelligence services of operatives who have worked on behalf of others -- mainly Russia and organized crime.

**Origins of the Black Sites**

The idea of holding terrorists outside the U.S. legal system was not under consideration before Sept. 11, 2001, not even for Osama bin Laden, according to former government officials. The plan was to bring bin Laden and his top associates into the U.S. justice system for trial or to send them to foreign countries where they would be tried.

"The issue of detaining and interrogating people was never, ever discussed," said a former senior intelligence officer who worked in the CIA's Counterterrorist Center, or CTC, during that period. "It was against the culture and they believed information was best gleaned by other means."

On the day of the attacks, the CIA already had a list of what it called High-Value Targets from the al Qaeda structure, and as the World Trade Center and Pentagon attack plots were unraveled, more names were added to the list. The question of what to do with these people surfaced quickly.

The CTC's chief of operations argued for creating hit teams of case officers and CIA paramilitaries that would covertly infiltrate countries in the Middle East, Africa and even Europe to assassinate people on the list, one by one.

But many CIA officers believed that the al Qaeda leaders would be worth keeping alive to interrogate about their network and other plots. Some officers worried that the CIA would not be very adept at assassination.

"We'd probably shoot ourselves," another former senior CIA official said.

The agency set up prisons under its covert action authority. Under U.S. law, only the president can authorize a covert action, by signing a document called a presidential finding. Findings must not break U.S. law and are reviewed and approved by CIA, Justice Department and White House legal advisers.

Six days after the Sept. 11 attacks, President Bush signed a sweeping finding that gave the CIA broad authorization to disrupt terrorist activity, including permission to kill, capture and detain members of al Qaeda anywhere in the world.

It could not be determined whether Bush approved a separate finding for the black-sites program, but the consensus among current and former intelligence and other government officials interviewed for this article is that he did not have to.

Rather, they believe that the CIA general counsel's office acted within the parameters of the Sept. 17 finding. The black-site program was approved by a small circle of White House and Justice Department lawyers and officials, according to several former and current U.S. government and intelligence officials.

**Deals With 2 Countries**

Among the first steps was to figure out where the CIA could secretly hold the captives. One early idea was to keep them on ships in international waters, but that was discarded for security and logistics reasons.

CIA officers also searched for a setting like Alcatraz Island. They considered the virtually unvisited islands in Lake Kariba in Zambia, which were edged with craggy cliffs and covered in woods. But poor sanitary conditions could easily lead to fatal diseases, they decided, and besides, they wondered, could the Zambians be trusted with such a secret?

Still without a long-term solution, the CIA began sending suspects it captured in the first month or so after Sept. 11 to its longtime partners, the intelligence services of Egypt and Jordan.

A month later, the CIA found itself with hundreds of prisoners who were captured on battlefields in Afghanistan. A short-term solution was improvised. The agency shoved its highest-value prisoners into metal shipping containers set up on a corner of the Bagram Air Base, which was surrounded with a triple perimeter of concertina-wire fencing. Most prisoners were left in the hands of the Northern Alliance, U.S.-supported opposition forces who were fighting the Taliban.

"I remember asking: What are we going to do with these people?" said a senior CIA officer. "I kept saying, where's the help? We've got to bring in some help. We can't be jailers -- our job is to find Osama."

Then came grisly reports, in the winter of 2001, that prisoners kept by allied Afghan generals in cargo containers had died of asphyxiation. The CIA asked Congress for, and was quickly granted, tens of millions of dollars to establish a larger, long-term system in Afghanistan, parts of which would be used for CIA prisoners.

The largest CIA prison in Afghanistan was code-named the Salt Pit. It was also the CIA's substation and was first housed in an old brick factory outside Kabul. In November 2002, an inexperienced CIA case officer allegedly ordered guards to strip naked an uncooperative young detainee, chain him to the concrete floor and leave him there overnight without blankets. He froze to death, according to four U.S. government officials. The CIA officer has not been charged in the death.

The Salt Pit was protected by surveillance cameras and tough Afghan guards, but the road leading to it was not safe to travel and the jail was eventually moved inside Bagram Air Base. It has since been relocated off the base.

By mid-2002, the CIA had worked out secret black-site deals with two countries, including Thailand and one Eastern European nation, current and former officials said. An estimated $100 million was tucked inside the classified annex of the first supplemental Afghanistan appropriation.

Then the CIA captured its first big detainee, in March 28, 2002. Pakistani forces took Abu Zubaida, al Qaeda's operations chief, into custody and the CIA whisked him to the new black site in Thailand, which included underground interrogation cells, said several former and current intelligence officials. Six months later, Sept. 11 planner Ramzi Binalshibh was also captured in Pakistan and flown to Thailand.

But after published reports revealed the existence of the site in June 2003, Thai officials insisted the CIA shut it down, and the two terrorists were moved elsewhere, according to former government officials involved in the matter. Work between the two countries on counterterrorism has been lukewarm ever since.

In late 2002 or early 2003, the CIA brokered deals with other countries to establish black-site prisons. One of these sites -- which sources said they believed to be the CIA's biggest facility now -- became particularly important when the agency realized it would have a growing number of prisoners and a shrinking number of prisons.

Thailand was closed, and sometime in 2004 the CIA decided it had to give up its small site at Guantanamo Bay. The CIA had planned to convert that into a state-of-the-art facility, operated independently of the military. The CIA pulled out when U.S. courts began to exercise greater control over the military detainees, and agency officials feared judges would soon extend the same type of supervision over their detainees.

In hindsight, say some former and current intelligence officials, the CIA's problems were exacerbated by another decision made within the Counterterrorist Center at Langley.

The CIA program's original scope was to hide and interrogate the two dozen or so al Qaeda leaders believed to be directly responsible for the Sept. 11 attacks, or who posed an imminent threat, or had knowledge of the larger al Qaeda network. But as the volume of leads pouring into the CTC from abroad increased, and the capacity of its paramilitary group to seize suspects grew, the CIA began apprehending more people whose intelligence value and links to terrorism were less certain, according to four current and former officials.

The original standard for consigning suspects to the invisible universe was lowered or ignored, they said. "They've got many, many more who don't reach any threshold," one intelligence official said.

Several former and current intelligence officials, as well as several other U.S. government officials with knowledge of the program, express frustration that the White House and the leaders of the intelligence

community have not made it a priority to decide whether the secret internment program should continue in its current form, or be replaced by some other approach.

Meanwhile, the debate over the wisdom of the program continues among CIA officers, some of whom also argue that the secrecy surrounding the program is not sustainable.

"It's just a horrible burden," said the intelligence official.

*Researcher Julie Tate contributed to this report.*

© 2005 The Washington Post Company

washingtonpost.com

# Rumsfeld Defends Policy on U.N., Detainees

The Associated Press
Tuesday, November 1, 2005; 4:32 PM

WASHINGTON -- Defense Secretary Donald H. Rumsfeld on Tuesday defended the government's decision not to permit United Nations human rights investigators to meet with detained terror suspects at Guantanamo Bay.

Last week the Pentagon invited three U.N. experts to visit the detention facilities in Cuba. But while the experts said they were happy the invitation finally came after more than three years of requests, they said they would not go if they could not interview prisoners.

"It makes no sense (to go)," Manfred Nowak, special investigator on torture and other cruel treatment, told reporters at U.N. headquarters in New York on Monday. "You cannot do a fact-finding mission without talking to the detainees."

Rumsfeld told a Pentagon news conference that it was not appropriate to give U.N. investigators the same extensive access at Guantanamo that has been granted to officials of the International Committee of the Red Cross.

"There has to be a limit to how one does that," Rumsfeld said. He added that the decision not to provide full access to the U.N. officials was made not by the Pentagon but by the U.S. government as a whole.

Rumsfeld also was asked why he believes some of the detainees have been conducting a hunger strike.

"What they're trying to do is capture press attention, obviously, and they've succeeded," he replied.

Seven of the detainees on the hunger strike are hospitalized and being force-fed, according to the government.

Many of the nearly 500 prisoners at Guantanamo Bay have been held more than 3 1/2 years without charge or access to lawyers. Most were captured in the Afghanistan war, suspected of ties to the al-Qaida terrorist network or the Taliban regime ousted by U.S. forces in late 2001.

washingtonpost.com

# Guantanamo Desperation Seen in Suicide Attempts

One Incident Was During Lawyer's Visit

By Josh White
Washington Post Staff Writer
Tuesday, November 1, 2005; A01

Jumah Dossari had to visit the restroom, so the detainee made a quick joke with his American lawyer before military police guards escorted him to a nearby cell with a toilet. The U.S. military prison at Guantanamo Bay, Cuba, had taken quite a toll on Dossari over the past four years, but his attorney, who was there to discuss Dossari's federal court case, noted his good spirits and thought nothing of his bathroom break.

Minutes later, when Dossari did not return, Joshua Colangelo-Bryan knocked on the cell door, calling out his client's name. When he did not hear a response, Colangelo-Bryan stepped inside and saw a three-foot pool of blood on the floor. Numb, the lawyer looked up to see Dossari hanging unconscious from a noose tied to the ceiling, his eyes rolled back, his tongue and lips bulging, blood pouring from a gash in his right arm.

Dossari's suicide attempt two weeks ago is believed to be the first such event witnessed by an outsider at the prison, and one of several signs that lawyers and human rights advocates contend point to growing desperation among the more than 500 detainees there. Lawyers believe Dossari, who has been in solitary confinement for nearly two years, timed his suicide attempt so that someone other than his guards would witness it, a cry for help meant to reach beyond the base's walls.

Two dozen Guantanamo Bay detainees are currently being force-fed in response to a lengthy hunger strike, and the detainees' lawyers estimate there are dozens more who have not eaten since August. Military officials say there are 27 hunger strikers at Guantanamo Bay, all of whom are clinically stable, closely monitored by medical personnel and receiving proper nutrition.

The hunger strikers are protesting their lengthy confinements in the island prison, where some have been kept for nearly four years and most have never been charged with a crime. The most recent hunger strike came after detention officials allegedly failed to honor promises made during a previous hunger strike.

Military authorities do not publicly discuss individual detainees and declined to comment on Dossari. Lt. Col. Jeremy Martin, spokesman for Joint Task Force Guantanamo, said yesterday that there have been a total of 36 suicide attempts by 22 different detainees, including three in the past 20 months. Martin said all detainees are treated humanely and "any threat of injury or suicide" is taken seriously.

He added that rapid intervention in suicide attempts has prevented deaths. No detainee has died at the military prison, he said.

The protests come amid rising international concern about the treatment of detainees at Guantanamo Bay. Human rights organizations and the United Nations have complained about the lack of access to the detainees and voiced concern about allegations of physical and psychological abuse, including prolonged solitary confinement.

U.S. officials are trying to return many of the detainees to their home countries, but the process has been fraught with delays and diplomatic wrangling.

Three U.N. experts said yesterday that they would not accept a U.S. government invitation to tour Guantanamo unless they are granted private access to detainees, a concession the U.S. has not been willing to make, citing the ongoing war on terror and security concerns. Last week, the United States invited the U.N. representatives

on torture and arbitrary detention to the facility, and the experts said yesterday that they hope to visit in early December. But they described their demand for access to the detainees as "non-negotiable."

"They said they have nothing to hide," Manfred Nowak, U.N. special rapporteur on torture, said yesterday at a news conference in New York. "If they have nothing to hide, why should we not be able to talk to detainees in private?"

Colangelo-Bryan said he fears that many detainees would rather die than be held indefinitely. He said he was shocked but not surprised by Dossari's Oct. 15 suicide attempt, given his "horrible ordeal."

He said he knows only that medical personnel apparently were able to revive Dossari, he had surgery and is in stable condition.

Detainees "see it as the only means they have of exercising control over their lives," Colangelo-Bryan said in publicly describing the incident for the first time. "Their only means of effective protest are to harm themselves, either by hunger strike or doing something like this."

Martin said claims that hunger strikers are near death are "absolutely false." He said the latest protest began on Aug. 8 and at one point had 131 participants but is now much smaller.

"This technique, hunger striking, is consistent with the al Qaeda training, and reflects the detainees' attempts to elicit media attention and bring pressure on the United States government," Martin said. The military also has long argued that terrorist groups have instructed fighters to invent claims of abuse if incarcerated.

Dossari has told Colangelo-Bryan that he has endured abuse and mistreatment on par with some of the worst offenses discovered at any U.S. detention facility over the past four years. In declassified notes recording the meetings, Dossari describes abuse and torture that stretches back to his arrest in Pakistan in December 2001, through the time he was turned over to U.S. forces in Kandahar, Afghanistan, and ultimately to his stay in Guantanamo Bay.

Dossari, 26, said U.S. troops have put out cigarettes on his skin, threatened to kill him and severely beat him. He told his lawyer that he saw U.S. Marines at Kandahar "using pages of the Koran to shine their boots," and was brutalized at Guantanamo Bay by Immediate Response Force guards who videotaped themselves attacking him.

The military says the IRF squads are sent into cells to quell disturbances.

Dossari told his lawyers that he had been wrapped in Israeli and U.S. flags during interrogations -- a tactic recounted in FBI allegations of abuse at Guantanamo -- and said interrogators threatened to send him to countries where he would be tortured.

Dossari maintains that he is not connected to terrorism and does not hate the United States. A fellow detainee said that he saw Dossari at an al Qaeda training camp, his lawyer said.

Colangelo-Bryan is a private New York lawyer with the Center for Constitutional Rights, which represents some of the detainees. The group plans a "Fast for Justice" rally today in Washington to bring attention to the Guantanamo Bay hunger strike.

Colangelo-Bryan said Dossari has tried to commit suicide before. Prolonged solitary confinement has given him almost no contact with others and access to only a Koran and his legal papers.

"In March, he looked at me in the eye and said, 'How can I keep myself from going crazy?'" Colangelo-Bryan said.

*Researcher Julie Tate contributed to this report.*

© 2005 The Washington Post Company

Brian D. Kelliher
Office of the General Counsel
U.S. Department of Homeland Security
(b)(2)(low) Tel: ███████████████████
brian.kelliher1@dhs.gov