UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMNESTY INTERNATIONAL USA, CENTER FOR CONSTITUTIONAL RIGHTS, INC. and WASHINGTON SQUARE LEGAL SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, DEPARTMENT OF STATE, AND THEIR COMPONENTS <br><br> Defendants. | ECF CASE <br><br> 07 CV 5435 (LAP) |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEPARTMENT OF HOMELAND SECURITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ........................................................................................................................1

I. DHS Failed to Conduct a Reasonable Search for Records Responsive to Plaintiffs' Request ...................................................................................................1

    A. DHS Adopted an Improperly Narrow Interpretation of Plaintiffs' Request ............1

    B. DHS Possesses Additional Responsive Records .....................................................7

    C. The Searches Performed by DHS Were Inadequate ...............................................8

        1. DHS Unreasonably Failed To Search For Records Related to Arar, El-Masri and Other Individuals Similarly Situated .....................................9

        2. DHS Failed To Search Its Office Of Inspector General ...........................10

        3. DHS Did Not Use Reasonable Search Methods ........................................11

    D. Plaintiffs Are Entitled To Summary Judgment Regardless of Whether DHS Acted in Bad Faith .......................................................................................13

II. DHS has Improperly Asserted a (B)(6) Privacy Exemption with Respect to the Heritage Foundation ..........................................................................................15

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases:**

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1999) .................................................................7

*Citizens for Responsibility & Ethics in Washington v. DOJ*, No. Civ. 05-2078, 2006 WL 1518964 (D.D.C. June 1, 2006) ..............................................................................14

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ...............................................................15

*Founding Church of Scientology of Washington v. NSA*, 610 F.2d 824 (D.C. Cir. 1979)............7, 9

*Gillin v. IRS*, 980 F.2d 819 (1st Cir. 1992) ......................................................................12

*Hemenway v. Hughes*, 601 F. Supp. 1002 (D.D.C. 1985) ...................................................5

*Krikorian v. Dep't of State*, 984 F.2d 461 (D.C. Cir. 1993) ...............................................13

*LaCedra v. Exec. Office of U.S. Att'ys*, 317 F.3d 345 (D.C. Cir. 2003) ............................4, 7

*Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993) ............................................................12, 14

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ............................1, 4

*Smyth v. Pillsbury Co.*, 914 F. Supp. 97 (E.D. Pa. 1996) ..................................................15

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ..................................................8, 14

*Valencia-Luna v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ................................9, 10

**Statutes and Rules:**

6 C.F.R. § 5.3(a)................................................................................................................11

6 C.F.R. § 5 app ................................................................................................................11

**Miscellaneous Sources:**

DHS, Privacy Office, 2006 Annual Freedom of Information Act Report, *available at* http://www.dhs.gov/xlibrary/assets/foia/privacy_rpt_foia_2006.pdf (last visited Feb. 15, 2008) ................................................................................................................14

*List of Issues To Be Considered During the Examination of the Second Periodic Report of the United States of America: Response of the United States of America*, available at http://www.state.gov/documents/organization/68662.pdf (last visited Feb. 15, 2008) ...................6

Although the DHS spends thirty-five pages in its Opposition Memorandum trying to complicate matters, the issue before the Court is a simple one: Whether DHS conducted a search reasonably calculated to uncover all documents responsive to Plaintiffs' FOIA request. The record clearly establishes that DHS failed to do so here.

Indeed, the key facts supporting Plaintiffs' motion for summary judgment are unchallenged: DHS does not deny that it failed to search for records related to Maher Arar, Khaled El-Masri and other individuals who have been secretly detained with United States involvement; DHS does not deny that it possesses records related to these individuals; DHS does not deny that it failed to search the Office of Inspector General ("OIG") and other locations that are likely to contain responsive records; DHS does not deny that its searches were based on varying applications of narrow search terms; and DHS does not deny that it failed to consult with Plaintiffs regarding the scope of their request. Instead, DHS argues that certain records sought by Plaintiffs are outside the scope of their FOIA request and that Plaintiffs should not be able to second guess the agency's searches. DHS's positions ignore the express language of Plaintiffs' request and disregard its legal obligations under the FOIA. Accordingly, this Court should grant Plaintiffs' cross-motion for summary judgment and order DHS to conduct a reasonable search for all records responsive to Plaintiffs' request.

## ARGUMENT

### I. DHS FAILED TO CONDUCT A REASONABLE SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' REQUEST

#### A. DHS Adopted an Improperly Narrow Interpretation of Plaintiffs' Request

DHS does not dispute that, consistent with the underlying purposes of FOIA, an agency "has a duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995); *see also* DOJ, OIP, *Determining the Scope of a FOIA Request*,

FOIA Update, Vol. 16, No. 3 (1995), DeYoung Decl. Ex. 37 ("[F]ederal agencies should go as far as they reasonably can to ensure that they include what requesters want to have included within the scope of their FOIA requests. Agencies can best do that through liberal interpretations of FOIA requests . . . ."). Yet DHS has done just the opposite, insisting that certain clearly responsive documents, in particular those concerning Arar and El-Masri, are not within the scope of Plaintiffs' request and therefore need not be searched for or disclosed. *See* DeYoung Decl. Ex. 36. The agency's position ignores the express language of Plaintiffs' request and disregards its legal obligations under the statute.

Plaintiffs' request asks, in unmistakable terms, for records concerning individuals who have been detained under secret and irregular conditions pursuant to the U.S. government's anti-terrorism efforts. Because this class of individuals is by its very nature somewhat difficult to describe, Plaintiffs chose inclusive language to convey the scope of their request. Specifically, the request refers to "individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." DeYoung Decl. Ex. 2, at 2. In an effort to provide as much clarity as possible, the request listed some of the terms used by media and other sources to characterize these secret and irregular detainees, including "ghost detainees" and "CIA detainees." *Id*. The request also cited no fewer than twelve articles and two advocacy group reports discussing the activities and individuals in question. Arar and El-Masri were mentioned by name in these materials, as were some two dozen other individuals who had been or were believed to be in custody. *See* DeYoung Decl. Ex. 2, at 3 n.1, 5 n.3 (citing Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake: German Citizen Released After Months in Rendition*, Wash. Post, Dec. 4, 2005, at A1 (discussing El-Masri's transfer to and detention at a

CIA prison in Afghanistan); Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror,"* at 2 (2005) (describing Arar as a "victim[] of extraordinary rendition")).

In an effort to ensure that their request would not be construed unnecessarily narrowly by DHS, Plaintiffs chose not to name specific individuals within the text of the request itself, but rather drafted their request so that it covered all individuals involved in the government's program. Plaintiffs were concerned that the government might restrict its search to such named individuals and thus fail to disclose information about other similarly situated individuals whose identities were unknown. To guard against this possibility, the request expressly stated that persons mentioned in the cited materials were merely "*examples*" of individuals who had been or were believed to be secretly detained and that "*[t]he scope of the request extends far beyond these examples.*" DeYoung Decl. Ex. 2, at 5 n.3. Plaintiffs did not believe that DHS would read their request so restrictively as to exclude even their expressly contemplated "examples."

Having ignored Plaintiffs' clearly stated intentions, DHS now asserts that it is Plaintiffs who have "attempt[ed] to rewrite their FOIA request." DHS Opp. at 9. Plaintiffs have done nothing of the kind. To the contrary, Plaintiffs' opening brief discussed Arar and El-Masri as examples of individuals who have come into contact with DHS and who plainly fall within the scope of the request as written. Indeed, DHS offers nothing to contradict Plaintiffs' account of the circumstances surrounding the detentions of Arar and El-Masri, which, as described, unmistakably constitute "depriv[ations] of liberty by or with the involvement of the United States" about which the United States did not "provide[] public information." Plaintiffs explained that the United States transferred El-Masri from Macedonia to Afghanistan in late

2003 and secretly detained him there for several months.[1] Meanwhile, the United States, without public disclosure, transferred Arar to Syria in 2002, where he was secretly detained.[2]

That DHS refuses to formally acknowledge these events is immaterial. The fact remains that it was improper for DHS to construe Plaintiffs' request to exclude records concerning Arar and El-Masri. Given that Plaintiffs' request cited materials referring to Arar and El-Masri by name, and given that the request explicitly declared its broad scope, it was unreasonable for DHS to conclude that records pertaining to these individuals are not responsive to Plaintiffs' request. At a minimum, the request is "reasonably susceptible" to a reading that included Arar, El-Masri and other similarly situated individuals. *LaCedra v. Exec. Office of U.S. Att'ys*, 317 F.3d 345, 348 (D.C. Cir. 2003).[3]

It is no answer for DHS to assert that it read Plaintiffs' request to exclude Arar and El-Masri because Plaintiffs were already aware of these individuals and thus could have referred to them by name. DHS is essentially claiming that Plaintiffs could not possibly have meant for their request to apply to the very individuals in whom Plaintiffs had previously shown interest. This reasoning is entirely backward. Indeed, DHS not only knew that Plaintiffs were interested

---

[1] *See* Scott Shane, *German Held in Afghan Jail Files Lawsuit*, N.Y. Times, Dec. 7, 2005, at A25, DeYoung Decl. Ex. 12; *see also* Glenn Kessler, *U.S. Said to Admit German's Abduction Was an Error*, Wash. Post, Dec. 7, 2005, at A18, DeYoung Decl. Ex. 13.

[2] Contrary to the government's assertion otherwise, DHS Opp. at 24 n. 14, the sources cited by Plaintiffs expressly note that Arar was detained entirely "incommunicado" in Syria for some two weeks before Syrian officials informed Canadian officials of his presence there. *See* Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report of the Events Relating to Maher Arar: Analysis and Recommendations*, at 32 (2006), DeYoung Decl. Ex. 6. Regardless, Plaintiffs' request encompasses individuals who were detained "with the involvement of the United States . . . about whom *the United States* has not provided public information." Neither at the time of his transfer to Syria nor subsequently has the United States publicly acknowledged the details of Arar's transfer and detention.

[3] DHS's attempt to distinguish *LaCedra* and other cases applying FOIA's liberal construction rule (DHS Opp. at 11) is unavailing. In those cases, as in this one, courts rejected agencies' attempts to construe broadly or ambiguously worded requests to exclude a portion of the records requested. *See, e.g., LaCedra*, 317 F.3d at 348 (holding that agency erred by adopting the narrower of two possible constructions of a request); *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (holding that agency erred by construing a request for records "pertaining to" an individual to cover only those records indexed under the individual's name).

in Arar and El-Masri; it also had every reason to know that Plaintiffs viewed Arar and El-Masri as examples of secret detainees subject to their request. Moreover, Plaintiffs' repeated mention of both men in their administrative appeals left no doubt that Plaintiffs were seeking records pertaining to them. DHS simply does not, and cannot, point to any statement in the request or any subsequent events suggesting that Plaintiffs, having used inclusive language to identify the class of individuals at issue, intended to exclude Arar and El-Masri from the class.[4]

DHS is similarly wrong to suggest that Plaintiffs' use of the word "rendition" in their opening brief represents an attempt to broaden the request. Plaintiffs decided not to use the term "rendition" in their request precisely because they feared that DHS would argue, as it now has, see DHS Opp. at 9 n.5, that rendition has no accepted definition and the term, as DHS construes it, does not describe what happened to some or all of the individuals about whom Plaintiffs have sought information.[5] In order to avoid such debates, Plaintiffs chose more inclusive language and requested "any records reflecting, discussing or referring to the policy and/or practice concerning . . . [t]he apprehension, transfer, detention, and interrogation of persons within the Scope of Request." By any reasonable definition, rendition involves one or more of these apprehension, transfer, detention, and interrogation activities. It follows that records referring to the "rendition" of individuals who come within the scope of the request are necessarily

---

[4] The analysis in *Hemenway v. Hughes*, 601 F. Supp. 1002 (D.D.C. 1985), is instructive. The requester in that case sought a "list" of accredited media and their citizenship. The agency construed the request to ask for "a single list of accredited persons complete with citizenship information"—something the agency did not possess. *Id.* at 1005. The agency argued that it was inappropriate to read the request more broadly—to include "a list of accredited persons *and* any additional information the agency might have dealing with citizenship"—because the requester knew that the agency possessed separate "application forms containing citizenship information" but did not expressly ask for them. *Id.* The court concluded that these records were within the scope of the request: "One need not get involved in a semantic debate over the meaning of the word 'list' to understand what information plaintiff wanted." *Id.*

[5] DHS attempts to use this tactic with Arar: Although a multitude of governmental and media sources -- including documents produced by DHS in this case—have referred to Arar's transfer to Syria as a "rendition," DHS cites a lone statement by former Attorney General Alberto Gonzales at a press conference to argue that Arar was not formally "rendered." DHS Opp. at 24.

responsive.[6] Plaintiffs have therefore sometimes used "rendition" as shorthand to describe a process that was clearly covered by the terms of their original request in part because government officials often use the term themselves,[7] even as they refuse to commit to a precise definition. Accordingly, even if DHS does not consider what Arar experienced to be a "rendition," DHS does not, and cannot, argue that Arar was not *apprehended* and *detained* by U.S. immigration officials and then *transferred* to and *detained* and *interrogated* in Syria.

DHS does not deny that if it had any doubt about the intended scope of Plaintiffs' request, the proper course would have been to consult with Plaintiffs.[8] Instead, DHS says that it had no duty to consult because it "did not have difficulty understanding the Request's scope." DHS Opp. at 10 n.7. It is hard to fathom that DHS could have concluded that Plaintiffs' inclusively worded request unambiguously excluded records pertaining to individuals about

---

[6] The government attempts to confuse the issue by arguing that "'rendition' does not necessarily involve 'individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information." DHS Opp. at 9 n.5. That may well be true, but it is entirely beside the point. Plaintiffs have never asserted that "rendition" defines the scope of their request. Instead, Plaintiffs' position is simply that their request pertains to the "rendition" of those individuals who fall within the scope of the request—*i.e.*, those "individuals who were . . . deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information."

[7] For example, in response to Plaintiffs' request for certain memoranda and reports, DHS produced the "Response of the United States of America" to a list of queries from the United Nations Committee Against Torture. One of the Committee's questions read as follows: "According to information before the Committee, the State party has adopted a policy to send, or to assist in the sending of persons to third countries, either from the State party's territory or from areas under its jurisdiction, for purposes of detention and interrogation. How many persons have been affected by this policy, to which countries were they sent, and what measures have been adopted to ensure that they will not be subjected to torture?" *List of Issues To Be Considered During the Examination of the Second Periodic Report of the United States of America: Response of the United States of America*, at 43, *available at* http://www.state.gov/documents/organization/68662.pdf (last visited February 15, 2008). The Committee never used the word "rendition." However, in its response, the United States wrote, "The United States and other countries . . . long have used *renditions* to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice." *Id*. at 44 (emphasis added, internal quotation marks omitted).

[8] *See* DOJ, OIP, *Determining the Scope of a FOIA Request*, FOIA Update, Vol. 16, No. 3 (1995), DeYoung Decl. Ex. 37 (stating that agencies should give the requester "the opportunity to address [scope-related issues] as a participant in the agency's administrative process").

- 6 -

whom Plaintiffs had a clear and avowed interest. At the very least, DHS must have considered the possibility that Plaintiffs wanted documents pertaining to Arar and El-Masri, and to the "rendition" of other individuals within the scope of the request.[9] Yet, rather than asking Plaintiffs to confirm or disclaim their interest in these subjects, DHS unilaterally decided to interpret the request to exclude them. In doing so, DHS acted contrary to the terms of Plaintiffs' request and to FOIA's well established rule of liberal construction.

### B. DHS Possesses Additional Responsive Records

DHS contends that there is no basis for ordering new searches because "Plaintiffs utterly fail to show DHS has additional responsive records." DHS Opp. at 22. This argument is perplexing. Not only have Plaintiffs shown "positive indications of overlooked materials" by pointing to DHS activities that necessarily would have generated responsive records, *Founding Church of Scientology*, 610 F.2d at 837, Plaintiffs have also referenced specific documents in the possession of DHS that have not been uncovered by DHS's searches. At a minimum, DHS possesses additional records regarding Arar, El-Masri and Hamdi. This undoubtedly establishes a "sufficient predicate" for requiring DHS to search further. *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1999).

DHS itself concedes that records pertaining to Arar "may indeed exist." DHS Opp. at 25. After all, it is undisputed that Arar was apprehended and detained by DHS immigration officials in New York and subsequently transferred to and detained in Syria. It is also undisputed that the DHS OIG has been investigating the Arar case and that DHS officials have been in contact with

---

[9] Indeed, the facts show at least some uncertainty within DHS about the scope of Plaintiffs' request. Customs and Border Protection located and disclosed a document pertaining to Yasser Hamdi. DHS has subsequently taken the position that the records it produced and others it likely possesses are not responsive. *See* Suzuki Decl. ¶ 15. At least one DHS official, however, did consider Hamdi to be a secret detainee and considered documents pertaining to his case to be responsive. For DHS now to insist that Plaintiffs' request does not apply to Hamdi is at odds with its obligation to construe requests liberally as long as they are "reasonably susceptible" to the broader reading. *LaCedra*, 317 F.3d at 348.

Canadian officials concerning Arar's appearance on a DHS watch list. Yet, despite the fact that it has now produced documents that refer to Arar by name, DHS insists that any additional Arar documents "are unresponsive to the Request." DHS Opp. at 25. As discussed above in Section I.A, this position is simply untenable. Consequently, all documents pertaining to Arar's apprehension, transfer, detention, and interrogation are responsive.

Without denying that El-Masri was subject to secret detention, DHS asserts that it is "pure speculation" that it possesses documents pertaining to him. *Id.* DHS does not deny, however, that El-Masri was turned away at the border in 2005 because his name was on a DHS watch list and that he was subsequently allowed to enter the United States after DHS reviewed his case.[10] Surely it is not "pure speculation" for Plaintiffs to say that, as a matter of course, DHS must generate records when such incidents occur. Plaintiffs have also cited two specific El-Masri documents in the possession of DHS that have not been produced. The first is a letter from El-Masri's counsel to DHS Secretary Chertoff dated December 8, 2005, which discusses his secret detention and his denial of entry into the United States. DeYoung Decl. Ex. 14. The second is a letter from DHS to El-Masri's counsel, which states that DHS "recently completed [its] review of this matter" and then goes on to discuss El-Masri's denial of entry. DeYoung Decl. Ex. 42. These, and any other documents in DHS' possession regarding El-Masri, are responsive.

C.  **The Searches Performed by the DHS Were Inadequate**

After construing Plaintiffs' request to exclude relevant records, DHS made matters worse by performing inadequate searches. The legal standard is undisputed: An agency must undertake "a search reasonably calculated to uncover *all* relevant documents." *Truitt v. Dep't of*

---

[10] *See* DeYoung Decl. Exs. 12, 13.

*State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (emphasis added, internal quotation marks omitted). An agency may not rely on "perfunctory searches" or decline "to follow through on obvious leads to discover requested documents." *Valencia-Luna v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). An agency may not use substandard search techniques when "further search procedures [a]re available and within the agency's ability to utilize without expending a whit more than reasonable effort." *Founding Church of Scientology of Washington v. NSA*, 610 F.2d 824, 835 (D.C. Cir. 1979); *see also id.* at 837.

### 1. DHS Unreasonably Failed To Search For Records Related to Arar, El-Masri and Other Individuals Similarly Situated

Plaintiffs' request seeks documents pertaining to members of a class of individual detainees. Yet DHS admits that it made no effort whatsoever to search for records pertaining to these individuals by name. DHS argues that this choice was reasonable because "DHS had no obligation to conduct a government-wide investigation, across any number of federal agencies, to learn the names of 'individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information.'" DHS Opp. at 13. DHS is attacking a straw man. Plaintiffs have never suggested that DHS should have launched a government-wide investigation. Instead, Plaintiffs' position is that these records are plainly responsive to their request and that it was unreasonable for DHS to fail to search for records regarding individuals who were known to DHS at the time it conducted its search.

As discussed above, Plaintiffs' request explicitly referred DHS to two reports listing "examples of individuals that the United States has acknowledged detaining, but about whom the United States has not provided public information." DeYoung Decl. Ex. 2, at 5 n.3. Although it would have taken DHS mere minutes to extract names from these lists, DHS failed to do so. Nor

is there any indication that DHS ever examined any of the media reports cited in Plaintiffs' request, some of which also discuss individual detainees by name. Further, Plaintiffs specifically discussed Arar and El-Masri in administrative appeals filed with the DHS in July 2006.

Moreover, consistent with its duty to consult with Plaintiffs, DHS simply could have asked Plaintiffs for examples of individuals falling within the scope of the request. Yet DHS made no attempt to engage in "full and open communication" with Plaintiffs and gave Plaintiffs no opportunity to participate cooperatively in the administrative process.[11]

Finally, after locating documents in its possession that named specific individuals within the scope of Plaintiffs' request, DHS failed to conduct any follow-up searches whatsoever. The documents DHS has now disclosed discuss, by name, Arar, Khalid Sheikh Mohammed, Abu Zubaida, and at least a dozen other individuals.[12] These are just the sort of "obvious leads" that DHS should have pursued in order "to discover requested documents." *Valencia-Luna*, 180 F.3d at 325.

### 2. DHS Failed To Search Its Office Of Inspector General

DHS insists that it need not search the OIG because (1) "Plaintiffs have demonstrated no reason to believe that DHS-OIG is an office likely to have responsive records, and (2) Plaintiffs did not submit their request directly to OIG. DHS Opp. at 14-15. Neither argument is availing.

First, DHS does not deny that OIG has been investigating the Arar case for more than three years.[13] This more than suffices to show that OIG is certain to have responsive records

---

[11] DOJ, OIP, *Determining the Scope of a FOIA Request*, FOIA Update, Vol. 16, No. 3 (1995), DeYoung Decl. Ex. 37.

[12] *See, e.g.*, Lockett Supp. Decl. Exs. A(2), A(3), B(4), B(5), B(6)

[13] *See, e.g.*, DHS, OIG, Fiscal Year 2007 Annual Performance Plan (Rev. Apr. 2007), at 52, DeYoung Decl. Ex. 10 (noting that OIG is investigating Arar's case).

pertaining to Arar and is highly likely to have other records pertaining to the rendition of secret detainees.

Second, DHS regulations state, "Your request should be sent to the component's FOIA office at the address listed in appendix A to part 5." 6 C.F.R. § 5.3(a). Appendix A, in turn, expressly states that requests involving "Headquarters components," including OIG, "should be sent to the Departmental Disclosure Office," a.k.a., the central Privacy Office. 6 C.F.R. § 5 app. A. That is precisely what Plaintiffs did. In any event, the regulations also say that the Privacy Office "will forward your request to the component(s) it believes most likely to have the records that you want." 6 C.F.R. § 5.3(a). Accordingly, the Privacy Office did forward Plaintiffs' request to OGC and OCRCL, even though Plaintiffs had not submitted their requests directly to those entities.[14] And, in fact, both those offices have discovered responsive records. In light of this, DHS's continued refusal to search the OIG is plainly unreasonable.[15]

### 3.   DHS Did Not Use Reasonable Search Methods

DHS does not dispute Plaintiffs' observation that "very little searching has actually taken place." Plaintiffs' Opp. at 5. Instead, DHS simply takes the position that its efforts, though minimal, are nevertheless sufficient. DHS's position is without merit.

---

[14] DHS is wrong to state that "Plaintiffs' demand for a DHS-OIG search appears for the very first time in their Opposition Brief." DHS Opp. at 9. In fact, Plaintiffs conveyed their desire to have DHS search for responsive documents in the DHS's Headquarters offices, including OIG, by the very act of submitting their request to the Office of Privacy, which itself is a Headquarters office. Indeed, until receiving DHS's declarations and summary judgment brief, Plaintiffs did not realize that DHS had declined to search OIG. Contrary to DHS's suggestion (DHS Opp. at 15 n.9), the letter Plaintiffs received from the Privacy Office on May 3, 2006, did not put Plaintiffs on notice that DHS did not intend to search OIG.

[15] Plaintiffs' arguments about the OIG apply equally to the Office of Legislative Affairs ("OLA"), which is also a Headquarters office. Because members of Congress have been in contact with DHS about the Arar case, OLA also possesses records responsive to Plaintiffs' request. *See* Press Release, Office of Senator Patrick Leahy, *Leahy, Specter Press DOJ, DHS on Investigations into Rendition of Canadian Citizen Maher Arar to Syria* (Feb. 28, 2007), DeYoung Decl. Ex. 11.

DHS's claim that its searches were adequate because they relied on "the terms appearing in the very title of their Request," DHS Opp. at 19, is decisively refuted by the Declaration of Daniel Regard. First, Plaintiffs' request does not use phrases like "ghost detainees/prisoner" as "an actual or exclusive list of search terms." Regard Decl. ¶ 8. Instead, the request uses such phrases to convey the secret detention concept so that the agency, which knows more than Plaintiffs about its activities and its files, can apply reasoned judgment to identify responsive records. Regard Decl. ¶ 8. Yet, rather than applying such judgment, DHS erroneously used the request's "illustrative labels as an exclusive finite list of search terms." *Id.* ¶ 10. As a result, DHS unreasonably failed to search for records that, despite not containing the precise exemplary terms used in the request, nevertheless pertained to individuals and activities clearly contemplated by Plaintiffs' request.

Second, even if searches based on these keywords could be reasonable when properly executed, DHS's searches were inadequate as executed here. In many instances, DHS searched only for a subset of the terms appearing in Plaintiffs' request, excluding other terms with no apparent justification. *See id.* ¶ 11. Moreover, DHS relied primarily on the "ineffective strategy" of using compound phrases rather than more flexible search terms. *Id.* ¶¶ 12-13.[16] As the Regard declaration points out, using search tools that enhance flexibility is "common

---

[16] DHS (Opp. at 19) cites *Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993), for the proposition that "there is no general requirement that an agency search secondary references or variant spellings." *Id.* at 560. However, *Maynard* does not support DHS's position. To the contrary, *Maynard* suggests that, because "[t]he adequacy of an agency's search is measured by the reasonableness of the effort in light of [the] specific request," there may well be instances in which it would be unreasonable not to use flexible search terms. *Id.* (quoting *Gillin v. IRS*, 980 F.2d 819, 822 (1st Cir. 1992) (internal quotation marks omitted). Failing to use variant spellings was not unreasonable in *Maynard* because [the request] "was limited to 'information pertaining to Robert Thompson.'" *Id.* By contrast, given the inclusive language of Plaintiffs' request and the likelihood that responsive records will contain alternative phrasing, it was unreasonable for DHS to fail to use more flexible search terms.

industry practice" and could have been done with virtually no additional effort on the part of DHS. Regard Decl. ¶ 15.[17]

Third, "[i]f a system's search capabilities are limited, or if a search tool does not reach certain documents in a system, then an electronic search alone may not be adequate to locate responsive records." *Id.* In such cases, hand searches may be necessary. Plaintiffs have not, as DHS asserts (DHS Opp. at 21), criticized the concept of hand searches. To the contrary, Plaintiffs agree with DHS that a hand search is often "the most comprehensive search solution." DHS Opp. at 21. This is precisely why DHS's heavy reliance on rigid electronic searches is so problematic. Moreover, to the extent that hand searches were conducted, DHS's declarations indicate that they were as inadequate as the electronic searches because the searchers, rather than using reasoned judgment to identify responsive documents, merely "scann[ed] the files" for the same rigid search terms. Suzuki Decl. ¶ 19.

### D. Plaintiffs Are Entitled to Summary Judgment Regardless of Whether DHS Acted in Bad Faith

DHS is incorrect to imply that it is entitled to prevail on summary judgment as to the adequacy of its search unless Plaintiffs can establish that DHS acted in bad faith. "A finding of no bad faith does not necessarily equate to a finding that the search was adequate." *Krikorian v. Dep't of State*, 984 F.2d 461, 468 (D.C. Cir. 1993). Instead, there are two parts to the adequacy of search inquiry. First, courts evaluate the agency's search efforts, taking the contents of its affidavits at face value. If the agency's search efforts, as set out in the affidavits, are unreasonable or insufficient, then the court's inquiry is at end, and the requester, not the agency, is entitled to summary judgment. If the agency's affidavits "demonstrate[] that [the agency] has

---

[17] Without denying that Plaintiffs' "proposed search terms could have been used 'with virtually no additional effort,'" DHS observes that "the searches have been completed at this point." DHS Opp. at 20. Of course, that is entirely beside the point. DHS cannot suggest that it be excused from conducting a reasonable search because it has already completed an unreasonable one.

- 13 -

conducted a reasonably thorough search," then the court proceeds to the second step of its inquiry and considers whether the FOIA requester has rebutted the presumptively valid affidavit "by showing that the agency's search was not made in good faith." *Maynard*, 986 F.2d at 560.[18]

Plaintiffs are entitled to summary judgment under both analyses. Even as described in its affidavits, DHS's searches are plainly insufficient. Based on the deficiency of DHS's response, as well as its cramped reading of Plaintiffs' request, Plaintiffs are entitled to summary judgment without any examination of the agency's good or bad faith.

There are, however, also ample indications that DHS did not act in good faith to conduct searches "reasonably calculated to uncover all relevant documents." *Truitt*, 897 F.2d at 542. First, as discussed above, DHS misconstrued Plaintiffs' request to exclude clearly responsive documents from search and disclosure. Second, DHS failed to consult with Plaintiffs at any point during the administrative process and, in fact, failed to provide any response whatsoever to the majority of Plaintiffs' administrative appeals. Third, DHS engaged in a pattern of delay. Although delay, in and of itself, may not be sufficient to show bad faith, the delay in this case was wholly out of proportion with the agency's minimal exertions and far exceeded DHS's usual processing times for other "complex" requests.[19] *See, e.g., Citizens for Responsibility & Ethics in Washington v. DOJ*, No. Civ. 05-2078, 2006 WL 1518964, at *4-5 (D.D.C. June 1, 2006).

Plaintiffs have now waited nearly two years for DHS to search for and produce responsive records. Yet DHS has refused to do so. Instead, DHS has chosen a strategy of obstruction and delay. DHS now takes the position that if Plaintiffs want what they asked for

---

[18] This rule prevents agencies from conducting purely perfunctory searches and then shifting the burden to requesters to tell the agency exactly what else the agency should have found.

[19] ICE, for example, had a median processing time of 90 days for "complex" requests in 2006, but inexplicably took nearly 500 days to respond to Plaintiffs' request. DHS, Privacy Office, 2006 Annual Freedom of Information Act Report, at 8, *available at* http://www.dhs.gov/xlibrary/assets/foia/privacy_rpt_foia_2006.pdf (last visited Feb. 15, 2008).

two years ago, they should start the process all over again. Such tactics make a mockery of FOIA's basic principles of openness and accountability. It is time for DHS to honor its obligations under FOIA and search for and disclose all records that fall within the scope of Plaintiffs' request.

## II. DHS HAS IMPROPERLY ASSERTED A (B)(6) PRIVACY EXEMPTION WITH RESPECT TO THE HERITAGE FOUNDATION

Even assuming that the e-mail from the Heritage Foundation ("Heritage") official was a personal message, DHS has not met its burden to show that disclosure here "would constitute a clearly unwarranted invasion of personal privacy." *Dep't of Air Force v. Rose,* 425 U.S. 352, 372 (1976). However, no privacy right exists here, and there is no need for a balancing test. The Heritage official whose name, phone number, and fax number were redacted does not have a privacy interest in an e-mail sent from his or her work e-mail address to government employees, discussing press activities around a policy issue. Employees have no reasonable expectation of privacy in e-mails sent over a network used by an entire organization. *Smyth v. Pillsbury Co.,* 914 F. Supp. 97, 101 (E.D. Pa. 1996).

## CONCLUSION

For the above-stated reasons, and those set forth in Plaintiffs' Memorandum of Law In Support of Plaintiffs' Cross Motion for Partial Summary Judgment and Opposition to DHS's Motion for Partial Summary Judgment, Plaintiffs respectfully request that the Court grant partial summary judgment to Plaintiffs.

        Respectfully submitted,

Margaret L. Satterthwaite (MS-3953)
Washington Square Legal Services, Inc.
International Human Rights Clinic
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

Kyle M. DeYoung
Shannon Rozner
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6785
Fax: (202) 663-6363
E-Mail Kyle.DeYoung@wilmerhale.com

*Attorneys for Amnesty International USA
and Washington Square Legal Services, Inc.*

Dated: February 15, 2008