**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMNESTY INTERNATIONAL, et al.,  )
                                )
        Plaintiffs,             )
                                )
    v.                          ) Case No. 07 Civ. 5435 (LAP)
                                )
CENTRAL INTELLIGENCE AGENCY,    )
et al.,                         )
                                )
        Defendants.             )
_____)

**DECLARATION OF RALPH S. DIMAIO**
**INFORMATION REVIEW OFFICER**
**NATIONAL CLANDESTINE SERVICE**
**<u>CENTRAL INTELLIGENCE AGENCY</u>**

I, RALPH S. DIMAIO, hereby declare and say:

1.  I am the Information Review Officer (IRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA).  I was appointed to this position on 11 June 2007. I have held several senior level, operational, and administrative positions in the CIA since 1983.

2.  The NCS is the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting special activities, including covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting

clandestine technical collection; and coordinating CIA support to the Department of Defense.  Specifically, the NCS is responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources.

3.  As IRO for the NCS, I am responsible for the final review of documents containing information originated by offices organized under the NCS or otherwise implicating NCS equities which are the objects of requests for public disclosure.  I also task and coordinate records searches concerning files or documents reasonably likely to be maintained by the NCS.

4.  The CIA's Director of Information Management Services, under authority delegated to him by the Associate Deputy Director of the CIA, has appointed me Records Validation Officer (RVO) for the purpose of this litigation.  As RVO, I am authorized to have access to all CIA records on any subject relevant to this litigation, and am authorized to sign declarations on behalf of the CIA regarding searches of CIA records systems and the contents of records, including those located in, or containing information under the cognizance of, the NCS and CIA directorates other than the NCS.  For records containing information that does not originate in, or come under the cognizance of, the NCS, I make the following statements based on representations made to me in my capacity as Records Validation Officer for the purpose of this litigation.

5. As a senior CIA official and under a written delegation of authority pursuant to section 1.3(c) of Executive Order 12958, as amended ("Executive Order 12958"),[1] I hold original classification authority at the TOP SECRET level. I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions.

6. Through the exercise of my official duties, I am familiar with this civil action. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

7. The purpose of this declaration is to describe, to the greatest extent possible on the public record, the CIA's search for documents responsive to Plaintiffs' FOIA requests, the documents located, and the FOIA exemptions upon which the CIA relied to redact and withhold documents and information responsive to portions of Plaintiffs' FOIA requests.

8. For the Court's convenience, I have divided this declaration into three parts: (a) Plaintiffs' FOIA requests and subsequent proceedings; (b) CIA's records systems and search for documents responsive to all items listed in Plaintiffs' FOIA requests; and (c) applicable FOIA exemptions. Attached as

---

[1] Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12958, 3 C.F.R. § 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 187 (West Supp. 2007).

Exhibit A to this declaration, and incorporated by reference herein, is a Vaughn index which contains a detailed description of 250 records that were selected as a representative sample of the overall body of responsive records.[2]  The index describes, to the extent possible in an unclassified manner, the withheld information and states the applicable FOIA exemptions for those documents.  If the Court determines that it needs additional information about the withheld classified information in this litigation, I can provide a more detailed declaration.  However, that declaration would contain classified information and would have to be filed ex parte and under seal.

## I.  Plaintiffs' FOIA Requests and Subsequent Proceedings

9.  By letter dated 21 December 2004, Plaintiff Center for Constitutional Rights (CCR) submitted a FOIA request to the CIA with seventeen subparts, each of which seeks records pertaining to "unregistered," "CIA," or "Ghost" detainees (the "CCR FOIA Request").  A true and correct copy of the CCR FOIA Request is attached as Exhibit B.

---

[2] Pursuant to an agreement with the Plaintiffs, described in detail below, the CIA agreed to sample 250 of the more than 7000 responsive records that were withheld in full or in part for its Vaughn index.  The responsive records were first divided based on where they were found – Office of General Counsel records, Office of Inspector General records, and other records.  Those three categories were sub-divided into four additional categories:  Cables, E-mails, Reports/Memoranda, and Miscellaneous.  The Plaintiffs selected a certain number of records from each sub-category for the index.  The CIA then selected these records at random (that is, every second OGC memo, every 146th OIG Cable) and described the selected documents on its Vaughn index.  The CIA provided a draft of its Vaughn index to Plaintiffs on 31 March 2008.

10.  By letter dated 2 February 2005, the CIA acknowledged receipt of the CCR FOIA request, and denied the CCR requests for a fee waiver and expedited processing.  That letter also informed CCR that, to the extent its 21 December 2004 request was duplicative of prior CCR FOIA requests, the CIA would not search for records that were part of CCR's prior requests.  A true and correct copy of the 2 February 2005 letter is attached as Exhibit C.  CCR had submitted two prior FOIA requests for similar information, one dated 7 October 2003, and one dated 25 May 2004.[3]  A true and correct copy of CCR's 7 October 2003 and 25 May 2004 FOIA requests are attached as Exhibits D and E. Although the CIA informed CCR of its administrative appeal rights in the 2 February 2005 letter, the CCR did not appeal the denial of its request for a fee waiver to the Agency Release Panel, pursuant to 32 C.F.R. § 1900.42.

11.  By letters dated 25 April 2006, Plaintiffs Amnesty International and Washington Square Legal Services submitted two additional FOIA requests to the CIA.  The first of these

---

[3] CCR's 7 October 2003 request sought (1) "Records concerning the treatment of Detainees in United States custody," (2) "Records concerning the death of Detainees in United States custody," and (3) "Records related to the rendition of Detainees and other Individuals."  CCR's 25 May 2004 request sought "a) records concerning the treatment of Detainees in United States custody; b) records concerning the deaths of detainees in United States custody; and c) records related to the rendition of Detainees and other individuals to foreign powers known to employ torture or illegal interrogation techniques."  Those requests are currently the subject of litigation before Judge Alvin K. Hellerstein in the United States District Court for the Southern District of New York.  See American Civil Liberties Union v. Dep't of Defense, No. 04 Civ. 4151 (S.D.N.Y.) (AKH).

requests, entitled "Request Submitted Under the Freedom of
Information Act for Records Concerning Detainees, Including
'Ghost Detainees/Prisoners,' 'Unregistered Detainees/Prisoners,'
and 'CIA Detainees/Prisoners'" (the "First Amnesty Request"),
sought records "reflecting, discussing, or referring to the
policy and/or practice concerning (1) the apprehension,
detention, transfer, or interrogation of persons within the
Scope of Request . . . (2) current and former places of
detention where individuals within the Scope of the Request have
been or are currently held, . . . [and] (3) the names and
identities of detainees who fall within the scope of this
request."  The First Amnesty Request defined the "Scope of
Request" as "individuals who were, have been, or continue to be
deprived of their liberty by or with the involvement of the
United States and about whom the United States has not provided
public information."  The First Amnesty Request indicated that
individuals falling within the Scope of the Request have been
referred to as "ghost detainees/prisoners," "unregistered
detainees/prisoners," "CIA detainees/prisoners," "other
Government Agency Detainees," or "OGA Detainees."  A true and
correct copy of the First Amnesty Request is attached as Exhibit
F.

     12.  The second of these requests, entitled "Request under
the Freedom of Information Act for Records Concerning Ghost

Detainee Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees, and the Draft Convention on Enforced Disappearance" (the "Second Amnesty Request"), sought records relating to, among other things, "any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies . . . concerning the handling of ghost or unregistered detainees," as well as records reflecting communications regarding the United States' Second Periodic Report to the United Nations Committee Against Torture, the United States' Third Periodic Report to the U.N. Human Rights Committee, and the negotiation or drafting of a draft Convention on the Protection of all Persons from Enforced Disappearance, and records generated in connection with the Department of Defense's reporting requirements under Section 1093(c) of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005.  A true and correct copy of the Second Amnesty Request is attached as Exhibit G.

13.  By letter dated 5 May 2006, the CIA acknowledged receipt of the First Amnesty Request and the Second Amnesty Request, and denied Amnesty International and Washington Square Legal Services' request for expedited processing.  Amnesty International and Washington Square Legal Services filed an administrative appeal from the denial of their request for expedited processing by letter dated 3 July 2006.

14. This declaration and the attached <u>Vaughn</u> index concern the responsive records that the CIA located and deemed responsive, or potentially responsive, to the three above-mentioned FOIA requests (collectively, the "FOIA requests" or "Plaintiffs' FOIA Requests").

15. On 30 November 2007, the Government submitted a status report regarding its search and processing of documents in response to Plaintiffs' FOIA requests. On 5 December 2007, both parties submitted supplemental reports describing an agreement between Plaintiffs and the CIA regarding processing and scheduling. I understand that the CIA is filing a motion for summary judgment. This declaration is filed in support of CIA's motion for summary judgment.

## II. The CIA's Records Systems and Search for Records Responsive to Plaintiffs' FOIA Requests

### A. CIA Records Systems

16. The CIA's records systems are decentralized and compartmented due to the unique security risks that the CIA faces. An inherent drawback to this practice is that it creates inefficiencies in the records search and retrieval processes. These inefficiencies affect the process for responding to FOIA requests.

17. All FOIA requests come to the Information and Privacy Coordinator, Information Management Services (IMS), located

within the Office of the Chief Information Officer (OCIO).  Once
a FOIA request is received, and under the direction and
supervision of the CIA Information and Privacy Coordinator,
experienced IMS information management professionals analyze the
request and determine which CIA components reasonably might be
expected to possess responsive records.  IMS then transmits a
copy of the request to each relevant component.  When a request
is broad, it is quite common for IMS to transmit the request to
many components.  Because CIA's records are decentralized and
compartmented, each component must then devise its own search
strategy, which includes identifying which of its records
systems to search as well as what search tools, indices, and
terms to employ.

    18.  All CIA components are contained within one of five
directorates or office clusters:  the National Clandestine
Service (NCS), the Directorate of Intelligence (DI), the
Directorate of Science and Technology (DS&T), the Directorate of
Support (DS), and the Director of CIA Area (DIR Area).

    19.  The NCS is the organization within the CIA responsible
for the clandestine collection of foreign intelligence from
human sources.  The NCS's records system contains information on
persons who are of foreign intelligence or counterintelligence
interest to CIA and other U.S. Government agencies.
Appropriately trained personnel conduct FOIA and Privacy Act

searches of the NCS records system as part of their normal
responsibilities.  NCS operational files are exempted from FOIA
search and review pursuant to the CIA Information Act, 50 U.S.C.
§ 431.

20.  The DI is the CIA component that analyzes, interprets,
and forecasts foreign intelligence issues and world events of
importance to the United States.  The DI is also responsible for
the production of finished intelligence reports for
dissemination to policymakers in the U.S. Government.
Appropriately trained personnel regularly conduct FOIA and
Privacy Act searches of the DI records system as part of their
normal responsibilities.

21.  The DS&T is the CIA component responsible for creating
and applying technology to fulfill intelligence requirements.
Appropriately trained personnel regularly conduct FOIA and
Privacy Act searches of the DS&T records system as part of their
normal responsibilities.

22.  The DS provides the CIA with mission-critical
services, including the protection of CIA personnel, security
matters generally, facilities, communications, logistics,
training, financial management, medical services, and human
resources.  It maintains records on all current and former CIA
employees, whether employed in a contract or staff capacity, as
well as other individuals for whom security processing or

evaluation has been required.  Appropriately trained personnel regularly conduct FOIA and Privacy Act searches of the DS records system as part of their normal responsibilities.

23.  The DIR Area is a cluster of offices directly responsible to the Director of CIA, such as the Office of General Counsel, the Office of Inspector General, and the Office of Congressional Affairs, and is distinct from the Agency's four main directorates (NCS, DI, DS, and DS&T).  Appropriately trained DIR Area personnel regularly conduct FOIA searches of the DIR Area systems of records as part of their normal responsibilities.

24.  After a tasked component within one of the directorates described above initially locates a set of documents in response to a FOIA request, officers must review the documents to determine whether they, in fact, respond to the request.  Because of the nature of a particular records system -- or the search tools, indices, or terms employed -- an initial search may locate many documents that are not responsive to the request.  In fact, it is quite common for the number of non-responsive documents to far exceed the number of responsive documents.

25.  After officers remove the non-responsive documents, they must then review the remaining documents to determine which, if any, FOIA exemptions apply, and whether they can

reasonably segregate non-exempt information from exempt information.  If officers determine that no segregable, non-exempt portions of documents could be released without potentially compromising classified information, information concerning intelligence sources and methods, or other information protected by FOIA exemptions, then such documents may be denied in full.  In evaluating responsive documents, officers must segregate exempt information to avoid the inadvertent disclosure of classified information or intelligence sources and methods.  This process is laborious and time-consuming.

26.   In the course of reviewing documents for exempt information and segregability, a component frequently identifies information that it must coordinate with or refer to another CIA component or another agency because the other component or agency originated the information or otherwise has an interest in it.[4]  This coordination and referral process itself can be quite time-consuming because other components and agencies have their own missions and FOIA/Privacy Act priorities.

27.   When all of the components and agencies complete their respective reviews, IMS professionals and other CIA employees under the direction and supervision of the CIA Information and Privacy Coordinator, incorporate all of their recommendations

---

[4] See Exec. Order No. 12958, § 3.7(b).

regarding exemption, segregation, redaction, and release.  CIA professionals then conduct a review from a corporate perspective on behalf of the entire CIA.  In this review, CIA professionals resolve conflicting recommendations, ensure that the release or withholding determinations comply with law and published CIA regulations, identify additional exempt information that reflects overall CIA interests, produce the integrated final record copy of each document, and respond to the requestor.

28.  During the corporate review, the CIA Information and Privacy Coordinator may withhold additional information in order to protect overall CIA equities.  In response to a broad FOIA request, the searches may locate many documents in many components.  When considered individually, a particular document may not indicate on its face that it contains exempt information.  Nevertheless, when reviewers consider all responsive documents in total, it frequently becomes apparent that, considered collectively, the documents reveal information exempt from release.  For this reason, the CIA cannot make final release determinations with respect to any particular document until it reviews all responsive documents.

29.  In this case, the CIA employees who performed the necessary FOIA searches:  (a) have access to the pertinent intelligence, operational, and administrative records; (b) are

qualified to search those records; and (c) regularly search those records in the course of their professional duties.

**B.  The CIA's Search for Records Responsive to Plaintiffs' FOIA Requests**

30.  On or about April 21, 2008, the Parties entered into a Stipulation and Order between Plaintiffs and the Central Intelligence Agency Regarding Procedures for Adjudicating Summary Judgment Motions (the "Stipulation"), which governed the CIA's processing of documents responsive to the FOIA requests and the issues to be litigated in the instant summary judgment motion.  A true and correct copy of the Stipulation is attached to this declaration as Exhibit H.

31.  In the Stipulation, the Parties agreed that the CIA's withholding of records that have been or currently are being litigated in American Civil Liberties Union v. Dep't of Defense, 04 Civ. 4151 (S.D.N.Y.) (AKH), will not be litigated in the instant action.  Accordingly, the CIA's search for responsive records was limited to those records that were not litigated in that prior action.

32.  The Parties further agreed that, pursuant to the Central Intelligence Agency Information Act of 1984, 50 U.S.C. § 431, the CIA would limit its search to non-operational files of components within the CIA.[5]  The search of non-operational

---

[5] Many of the records responsive to Plaintiffs' FOIA Requests implicate covert operations. Records regarding covert operations are maintained by the NCS,

files included NCS records to the extent those records were found in other non-exempt files, for instance, OIG investigation files.

33.  The CIA's search of non-exempt files for documents responsive to Plaintiffs' FOIA Requests focused on the CIA directorate determined by IMS to be the most likely to have records responsive to the Plaintiffs' requests:  the DIR Area.

34.  The search for documents responsive to Plaintiffs' FOIA Requests took place within the DIR Area for two reasons. First, at the time the search was conducted, the President and the Director of the CIA had acknowledged the existence of a CIA detention program.  Thus, as the Director had made statements about the program, the Director's Area was likely to contain responsive records.  Second, the requests ask for records "reflecting, discussing or referring to . . . policy" and records discussing the "legality" or "treatment" of CIA or ghost detainees, as well as records regarding any violations of those policies.  Records responsive to these requests are likely to be found in the cluster of components in the DIR Area, such as the Office of General Counsel and Office of Inspector General (OIG).

---

and fall within the "operational file exemption" codified by the CIA Information Act of 1984, 50 U.S.C. § 431.  Because NCS operational files are exempt from search under the CIA Information Act, the NCS did not search its operational files for responsive records.

Thus, IMS determined that the CIA components reasonably likely to contain responsive records would be in the DIR Area.[6]

35.  Professionals in the relevant components searched their records systems for responsive records.  For instance, the Office of Inspector General identified all its case files that concerned detainees or rendition, including records analyzing the legality of these practices and records identifying the identities of any persons subject to detention or rendition. Where the reviewer could not determine whether a record regarding detention or detainees was responsive to the request, CIA deemed it responsive.  Other DIR Area components searched for records using search terms that were reasonably calculated to reveal responsive records, such as the terms "ghost detainee" and "rendition."[7]

36.  As provided in the Stipulation, however, the CIA has not processed any records contained in OIG Investigation Files where the underlying OIG investigation was still on-going as of 1 December 2007.  Moreover, with respect to records contained in OIG Investigation Files for which the underlying OIG

---

[6] IMS determined that the DI's record systems were unlikely to contain responsive records.  The DI's records systems primarily contain finished intelligence reports and intelligence for analysis.  They do not contain information on the conduct of covert operations.  Thus, IMS determined that the DI was not reasonably likely to have records responsive to Plaintiffs' FOIA Requests.

[7] This is not an exhaustive list of the search terms used by each component. As explained previously, each component devises its own search strategy based on its own records systems.

investigation was still on-going as of June 7, 2007,[8] but that

closed as of December 1, 2007, pursuant to the Stipulation,

those records will be addressed at a later date.

37.  The CIA's initial search located more than 7000

responsive records.  Of those records, approximately 224 were

located in the Office of General Counsel.  Approximately 89 were

located in DIR Area components other than the Office of General

Counsel and Office of the Inspector General.  The remaining

responsive records were found in the investigation files of the

Office of Inspector General.[9]  Many of the records that were

found in the OIG Investigation files originated in the NCS.

38.  On April 15, 2008, the CIA released in whole or in

part 104 records, each of which contained segregable, non-exempt

information.  The 104 released records that are described in the

attached Vaughn index are attached to this declaration as

Exhibit I.  The CIA also processed a number of documents that

will be referred to other federal agencies for direct response

to the requestor, in accordance with 32 C.F.R. § 1900.22(b).

The CIA withheld the remaining records in their entirety

---

[8] 7 June 2007 is the date that Plaintiffs filed their complaint.

[9] The breakdown of the 12 different categories of documents is as follows:  10 Office of General Counsel Cables; 59 Office of General Counsel Memoranda; 53 Office of General Counsel E-mails; 102 Miscellaneous Office of General Counsel records; 3644 Office of Inspector General Cables; 2534 Office of Inspector General E-mails; 549 Office of Inspector General Reports; 1232 Miscellaneous Office of Inspector General records; 2 Non-OIG Non-OGC Cables; 2 Non-OIG Non-OGC E-mails; 31 Non-OIG Non-OGC Memoranda, and 69 Miscellaneous Non-OIG Non-OGC Records.

pursuant to 5 U.S.C. § 552(b).  In determining whether to withhold information obtained by or belonging to other federal agencies in documents described on the attached <u>Vaughn</u> index, the CIA coordinated its response with the relevant agency in accordance with 32 C.F.R. § 1900.22(b).

39.  Pursuant to the Stipulation, this declaration and the attached indices describe a representative sample of 250 of the records withheld in full or in part.  The representative sample was selected using the procedure outlined in paragraphs 7 through 9 of the Stipulation.[10]

40.  I have been informed by our counsel that, pursuant to the Stipulation, and after the CIA presented the Plaintiffs with a draft of its <u>Vaughn</u> index, counsel for the CIA met and conferred with counsel for the Plaintiffs in order to ascertain whether the issues to be presented to the Court for litigation could be narrowed.  I understand that Plaintiffs would not agree to narrow the issues to be litigated in this motion, and are challenging all of the CIA's withholdings and exemptions.

---

[10] Due to a miscalculation in an Excel spreadsheet, there was one exception to this sampling procedure.  The CIA erroneously selected the 25 miscellaneous records in the OIG subcategory by selecting documents number 1, 62, 122, and thereafter every sixtieth document.  This discrepancy was due entirely to inadvertence, and without any foreknowledge of which records would be selected.

## III.  Applicable FOIA Exemptions

### A.  Exemption (b)(1)

41.  FOIA Exemption (b)(1) provides that FOIA does not require the production of records that are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

> (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1).

42.  The authority to classify information is derived from a succession of Executive orders, the most recent of which is Executive Order 12958.  IMS professionals and other CIA employees have reviewed the documents responsive to Plaintiffs' FOIA Requests under the criteria established by Executive Order 12958 and have described to me the information contained therein, as outlined in the chart attached as Exhibit J.  I have determined that the information described on Exhibit J is in fact properly classified pursuant to the Order.

### 1.  Procedural Requirements

43.  Section 6.1(h) of the Executive Order defines "classified national security information" or "classified information" as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its

classified status when in documentary form." Section 6.1(y) of the Order defines "national security" as the "national defense or foreign relations of the United States."

44. Section 1.1(a) of the Executive Order provides that information may be originally classified under the terms of this order only if all of the following conditions are met:

> (1) an original classification authority is classifying the information;

> (2) the information is owned by, produced by or for, or is under the control of the United States Government;

> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

45. *Original classification authority* – Section 1.3(a) of the Executive Order provides that the authority to classify information originally may be exercised only by the President and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the *Federal Register*; and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order. Section 1.3(b) of the Executive Order provides that

original TOP SECRET classification authority includes the
authority to classify information originally as SECRET and
CONFIDENTIAL.  Section 1.3(c)(2) provides that TOP SECRET
original classification authority may be delegated only by the
President; in the performance of executive duties, the Vice
President; or an agency head or official designated pursuant to
section 1.3(a)(2) of the Executive Order.

46.  In accordance with section 1.3(a)(2), the President
designated the Director of the CIA as an official who may
classify information originally as TOP SECRET.[11]  Under the
authority of section 1.3(c)(2), the Director of the CIA has
delegated original TOP SECRET classification authority to me.
With respect to the information described in section III(A)(2)
of this declaration relating to CIA sources, methods, and
activities, I have determined that this information is properly
classified TOP SECRET, SECRET, and/or CONFIDENTIAL by an
original classification authority.

47.  *U.S. Government information* - Information may be
originally classified only if the information is owned by,
produced by or for, or is under the control of the United States

---

[11] Order of President, Designation under Executive Order 12958, 70 Fed. Reg.
21,609 (Apr. 21, 2005), reprinted in 50 U.S.C.A. § 435 note at 192 (West
Supp. 2006).  This order succeeded the prior Order of President, Officials
Designated to Classify National Security Information, 60 Fed. Reg. 53,845
(Oct. 13, 1995), reprinted in 50 U.S.C.A. § 435 note at 486 (West 2006), in
which the President similarly designated the Director of the CIA as an
official who may classify information originally as TOP SECRET.

Government.  With respect to the information relating to CIA sources, methods, and activities as described in section III(A)(2) of this declaration for which FOIA Exemption (b)(1) is asserted in this case, that information is owned by the U.S. Government, was produced by the U.S. Government, and is under the control of the U.S. Government.

48.  *Categories in Section 1.4 of the Executive Order* - With respect to the information relating to CIA sources, methods, and activities described in section III(A)(2) of this declaration for which FOIA Exemption (b)(1) is asserted in this case, that information falls within the following classification categories in the Executive Order: "foreign government information" [§ 1.4(b)]; "information  . . . concern[ing] . . . intelligence activities . . . [and] intelligence sources or methods" [§ 1.4(c)]; and "foreign relations or foreign activities of the United States" [§ 1.4(d)].  I describe this information and its relation to the national security below.

49.  *Damage to the national security* - Section 1.2(a) of the Executive Order provides that information shall be classified at one of three levels if the unauthorized disclosure of the information reasonably could be expected to cause damage to the national security, and the original classification authority is able to identify or describe the damage. Information shall be classified TOP SECRET if its unauthorized

disclosure reasonably could be expected to result in *exceptionally grave damage* to the national security; SECRET if its unauthorized disclosure reasonably could be expected to result in *serious damage* to the national security; and CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to result in *damage* to the national security.

50.  With respect to the information relating to CIA sources, methods, and activities described in section III(A)(2) of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that much of this information is classified TOP SECRET because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in exceptionally grave damage to the national security. I have also determined that much of this information is classified SECRET, because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in serious damage to the national security.  Some information is classified CONFIDENTIAL because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in damage to the national security.  The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below.

51.  *Proper purpose* - With respect to the information relating to CIA sources, methods, and activities described in section III(A)(2) of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

52.  *Marking* – With respect to the information in the sampled documents for which FOIA Exemption (b)(1) is asserted in this case, as indicated in the attached <u>Vaughn</u> index, IMS professionals and other CIA employees have reviewed the documents and have determined that they are properly marked in accordance with section 1.6 of the Executive Order.  Each document bears on its face one of the three classification levels defined in section 1.2 of the order; the identity, by name or personal identifier and position, of the original classification authority or the name or personal identifier of the person derivatively classifying the document in accord with section 2.1 of the order; the agency and office of origin, if not otherwise evident; declassification instructions; and a

concise reason for classification that, at a minimum, cites the

applicable classification categories of section 1.4.[12]

    53.    *Proper classification* – With respect to the

information in the sampled documents for which FOIA Exemption

(b)(1) is asserted in this case, as indicated in the attached

<u>Vaughn</u> index, the CIA has reviewed the documents and has

determined that they have been classified in accordance with the

substantive and procedural requirements of Executive Order 12958

and that, therefore, they are currently and properly classified.

### 2.    Substantive Requirements

    54.    In processing the documents for this litigation, IMS

professional and other CIA employees have reviewed the records

identified as exempt under exemption (b)(1) in the attached

<u>Vaughn</u> index and determined that they contain information that

is currently and properly classified.  These records contain

myriad classified facts and categories of classified

information, including information regarding cover, the location

of CIA field installations, and the CIA's foreign intelligence

relationships.  As a general matter, however, and in the

aggregate, they concern information regarding interrogation, the

CIA terrorist detention program, and rendition.  It is difficult

---

[12] Some of these documents also contain markings for "Special Access
Programs," also known as "Sensitive Compartmented Information" or "SCI."
Section 4.4 of Executive Order 12958 establishes the legal requirements for
establishing SCI.  Some of these markings are themselves classified, as
explained more fully below.

to discuss these activities in an unclassified manner.  However, I will attempt to describe, to the greatest extent possible on the public record, the damage to the national security that would result from the disclosure of this information.

### a.  Intelligence Sources

55.  Certain of the information in the documents at issue has been withheld because its disclosure could be expected to lead to the identification of intelligence sources of the CIA. The DCIA, as the official responsible for the conduct of foreign intelligence operations, has broad authority to protect intelligence sources from disclosure.

56.  One of the major functions of the CIA is to gather intelligence from around the world for the President and other United States Government officials to use in making policy decisions.  To accomplish this, the CIA must rely on information from knowledgeable sources that the CIA can obtain only under an arrangement of absolute secrecy.  Intelligence sources will rarely furnish information unless they are confident that they are protected from retribution or embarrassment by the absolute secrecy surrounding the source-CIA relationship.  In other words, intelligence sources must be certain that the CIA can and will do everything in its power to prevent the public disclosure of their association with the CIA.

57.   Intelligence sources include clandestine human intelligence sources, foreign intelligence and security services, and foreign governments generally.  I will explain each of these intelligence sources and the reasons for the protection of these sources in more detail below.

### (1)  Human Sources

58.   The CIA relies both on United States citizens and foreign nationals to collect foreign intelligence, and it does so with the promise that the CIA will keep their identities secret and prevent public disclosure.  This is because the CIA's revelation of this secret relationship could harm the individual.  In the case of a United States citizen, for example, a business executive who shares with the CIA information collected in the course of his everyday business conducted abroad could suffer serious consequences if his or her relationship with the CIA was disclosed.  If the business executive were to travel to certain parts of the world, disclosure of his or her relationship with the CIA could even place his or her life at risk.

59.   In the case of a foreign national abroad who cooperates with the CIA, almost always without the knowledge of his or her government, the consequences of the disclosure of this relationship are often swift and far-ranging, from economic reprisals to harassment, imprisonment, and even death.  In

addition, such disclosure places in jeopardy the lives of every
individual with whom the foreign national has had contact,
including his or her family and associates.

60.  In some cases, persons who are not even CIA sources
are at times subject to retribution merely because they are
suspected of cooperating with the CIA.  The information
requested in this case includes records referring to persons who
were in United States' custody at some point and records
relating to their interrogations.  Release of such records may
expose individuals who are no longer in United States' custody
to retribution merely because they were at one time held by the
United States.  In addition, even the appearance of cooperation
with the United States may expose these individuals or their
associates to harm.

61.  In many cases, the very nature of the information that
the source communicates necessarily tends to reveal the identity
of the human source because of the limited number of individuals
with access to the information.  This is dangerous for two
reasons.  First, if such information is disclosed, the source
may be perpetually vulnerable to discovery and retribution.
Second, such information is helpful to foreign intelligence
services and terrorist organizations.  If a human source of the
CIA is identified, foreign intelligence agencies and foreign
terrorist organizations will better understand what information

28

the CIA may have regarding their operations.  Understanding what

insights the CIA may have into the operations of foreign

terrorist organizations allows such organizations to take

measures to counteract the CIA's ability to collect vital

intelligence information.

62.  Moreover, the release of information that would or

could identify an intelligence source would damage seriously the

CIA's credibility with all other current intelligence sources

and undermine the CIA's ability to recruit future sources.  As

stated previously, most individuals will not cooperate with the

CIA unless they have confidence that their identities will

remain secret.  Additionally, the CIA itself has a primary

interest in keeping these identities secret, not only to protect

the sources, but also to demonstrate to other sources and future

sources that these sources can trust the CIA to preserve the

secrecy of the relationship.

63.  If a potential source has any doubts about the ability

of the CIA to preserve secrecy, that is, if he or she were to

learn that the CIA had disclosed the identity of another source,

his or her desire to cooperate with the CIA would likely

diminish.  In other words, sources, be they present or future,

usually will not work for the CIA if they are convinced or

believe that the CIA may not protect their identities.  The loss

of such intelligence sources, and the accompanying loss of the

critical intelligence that they provide, would seriously and adversely affect the national security of the United States.

64.  For the foregoing reasons, the CIA has determined that certain of the records described on the attached Vaughn index contain information that reasonably could be expected to lead to the identification of human intelligence sources and is properly classified SECRET or TOP SECRET pursuant to the criteria of Executive Order 12958, because the unauthorized disclosure of this information could reasonably be expected to cause serious or exceptionally grave damage to the national security of the United States.  Attached as Exhibit J, and incorporated fully herein, is an index specifying which of the records described on the attached Vaughn index contain human source information.  As a result, this information has been withheld in full because it is exempt from disclosure pursuant to FOIA Exemption (b)(1).

### (2) Foreign Liaison and Government Information

65.  Another kind of intelligence source upon which the CIA relies and therefore must protect from unauthorized disclosure is foreign liaison and foreign government information.  Foreign liaison information is information that the CIA obtains clandestinely from foreign intelligence and security services. In this way, the foreign service itself functions as an intelligence source.

66.  Similarly, foreign government information is information that the CIA obtains clandestinely from officials of foreign governments with whom the CIA maintains an official liaison relationship.  In this way, the official of the foreign government functions as the intelligence source.

67.  Both foreign liaison services and individual foreign government officials provide sensitive information in strict confidence to the CIA on issues of importance to United States foreign relations and national security.  These services and officials of such services convey information to the CIA with the CIA's express agreement that the content of the information, as well as the mere fact of the relationship through which they have provided the information, will remain secret.

68.  If the CIA were to violate this express agreement, internal or external political pressure on the foreign government could cause the foreign liaison service or foreign government official to limit or even end the CIA relationship, causing the United States Government to lose valuable foreign intelligence.  In fact, this political pressure could compel the foreign government to take defensive actions against the CIA, such as reducing the approved CIA presence in that country, which would further damage CIA's ability to collect intelligence about other countries or persons operating in that country.

69.  Like the revelation of information provided by
individual human sources, in many cases, the very nature of the
information that the foreign liaison service or foreign
government official provides necessarily tends to reveal the
identity of the source of the information and, therefore, the
relationship itself.

70.  In this way, disclosing the fact of the relationship
or the information itself would suggest to other foreign liaison
services and foreign government officials that the CIA is unable
or unwilling to observe an express agreement of absolute
secrecy.  This perception could cause the liaison services and
government officials to limit their provision of information to
the CIA or even to end the relationship altogether, thus causing
the United States Government to lose valuable foreign
intelligence.

71.  Moreover, this perception could discourage foreign
governments from entering into any kind of relationship with the
CIA, thus preventing altogether the collection of information
from these sources.

72.  As such, any official acknowledgment by the CIA of a
past or current liaison relationship, or any revelation of
information by the CIA that implicates a past or current
relationship, with a foreign intelligence service or a foreign
government official could cause serious damage to relations with

that foreign government and possibly other relationships with
other governments as well.  This could result in a significant
loss of intelligence information for the United States
Government and thereby cause serious damage to national
security.

73.  Liaison relationships with foreign intelligence
services offer the United States a force-multiplier for its
intelligence collection activities, especially in the global war
on terrorism.  Intelligence services with which the CIA has a
close or robust liaison relationship will provide the CIA with
the intelligence reported by many of its own intelligence
sources.  Such services may even task their own sources to
gather information at the request of the CIA.  Therefore,
through liaison relationships, CIA can gather and provide
intelligence information to United States national security and
foreign policy decision-makers that is critical to informed
decision making.  Harm to these relationships can be
particularly damaging to the fight against terrorism.

74.  Therefore, the CIA has determined that certain of the
records described on the attached Vaughn index, as specified on
the chart attached as Exhibit J, contain information that
reveals the fact or the nature of a CIA liaison relationship and
is currently and properly classified SECRET or TOP SECRET
pursuant to the criteria of Executive Order 12958 because its

unauthorized disclosure reasonably could be expected to cause serious or exceptionally grave damage to the national security of the United States.  As a result, this information has been withheld in full because it is exempt from disclosure pursuant to FOIA exemption (b)(1).

75.  Information provided by foreign liaison services and foreign government officials is also properly classified SECRET or TOP SECRET pursuant to Executive Order 12958, because it falls within two other protected categories of information: foreign government information provided to the United States Government, § 1.4(b), and information that, if disclosed, could reasonably be expected to cause damage to the foreign relations or foreign activities of the United States, § 1.4(d).  Section 1.1(c) of Executive Order 12958 stresses the importance and sensitivity of foreign government information, stating that "[t]he unauthorized disclosure of foreign government information is presumed to cause damage to the national security."  As such, for these additional reasons, this information is exempt from disclosure pursuant to FOIA Exemption (b)(1).

### b.  Intelligence Methods

76.  Some of the information requested by Plaintiffs has been withheld because the information would tend to reveal intelligence methods.  Generally, intelligence methods are the means by which the CIA accomplishes its mission.  I will

describe some specific intelligence methods as examples in further detail below. (Other intelligence methods may not be described on the public record.) Like the DCIA's authority for protecting intelligence sources, the DCIA also has broad authority for protecting intelligence methods.

77. In exercising this authority, the DCIA protects not only references to intelligence methods but also the information produced by those intelligence methods. One of the primary missions of foreign intelligence services is to discover the particular methods that the CIA uses. To this end, foreign intelligence services scour open sources for officially released intelligence information. These foreign intelligence services are capable of gathering information from myriad sources, analyzing this information, and deducing means to defeat CIA collection efforts from disparate and seemingly unimportant details. What may seem trivial to the uninformed may, in fact, be of great significance, and may put a questioned item of information in its proper context. As such, it is the fact of the use of a particular intelligence method in a particular situation, in addition to the method itself, that the DCIA must protect.

78. A particular intelligence method is effective only so long as it remains unknown and unsuspected to its target. When an intelligence method is revealed, this causes the target of

35

the method to take countermeasures.  Once the target discovers the nature of an intelligence method or the fact of its use in a certain situation, the method usually ceases to be effective.

79.  As such, the DCIA must protect the full spectrum of intelligence methods from disclosure because such information would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States.  Knowledge of or insights into specific intelligence collection methods would be of invaluable assistance to those who wish to detect, penetrate, counter, or evaluate the activities of the CIA.  In fact, without legal protection against the public release of intelligence methods, the CIA would likely become impotent.

80.  When a particular intelligence method ceases to be effective, the United States endures a significant loss.  This is because the cost of developing and validating an intelligence method is hugely disproportionate to the cost of destroying that method via public disclosure.  A single intelligence method can cost many millions of dollars, but a single newspaper story generated by a single disclosure can often end the utility of the method.  Moreover, the actual damage and loss to the United States from the loss of the intelligence method is not only the cost of the method itself but also the loss of intelligence during the time it takes to fund and field a replacement method.

81.  Detailed knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States.  The result of disclosure of a particular method leads to the neutralization of that method, whether the method is used for the collection of intelligence information, the conduct of clandestine activities, or the analysis and evaluation of intelligence information.

82.  For the foregoing reasons, the CIA has determined that certain of the records described on the attached Vaughn index, as specified in the chart attached as Exhibit J, contain information pertaining to intelligence methods that could reasonably be expected to cause serious or exceptionally grave damage to the national security and therefore that information is currently and properly classified SECRET or TOP SECRET pursuant to the criteria of Executive Order 12958.  As a result, this information has been withheld from release because it is exempt from disclosure pursuant to FOIA Exemption (b)(1).

83.  Specifically, IMS professionals and other CIA employees have determined that the information relating to intelligence methods contained in the records described in the attached Vaughn index includes information regarding cover, field installations, cryptonyms and pseudonyms, foreign

intelligence relationships, and dissemination control markings. These methods are described below. Moreover, the chart attached as Exhibit J specifies which records contain information pertaining to these specific intelligence methods.

### (1) Cover

84. One specific intelligence method used by the CIA is cover. In order to carry out its mission of gathering and disseminating intelligence information, the CIA places individual CIA employees under cover to protect the fact, nature, and details of the CIA's interest in foreign activities and the intelligence sources and methods employed to assist those activities. The CIA considers the cover identities of individual employees and cover mechanisms both to be intelligence methods.

85. The purpose of cover is to provide a believable, non-threatening reason for a CIA officer to move around and meet individuals of intelligence interest to the United States, and to do so without attracting undue attention.

86. Disclosing the identity of an undercover employee could expose the intelligence activities with which the employee has been involved, the sources with whom the employee has had contact, and other intelligence methods used by the CIA. Compromise of an officer's cover not only reveals his or her intelligence officer status, but also allows hostile

intelligence services and terrorist organizations to find out precisely the location in which that person works.  In fact, disclosing the identity of an undercover employee could jeopardize the life of the employee, his or her family, his or her sources, and even innocent individuals with whom he or she has had contact.

87.  Disclosing cover mechanisms used by the CIA would expose and officially confirm those mechanisms, hindering the effectiveness of the cover for current and future undercover employees, as well as current and future intelligence operations.

88.  Therefore, the CIA has determined that certain of the records described on the Vaughn index, as specified on the chart attached as Exhibit J, contain information pertaining to cover, the unauthorized disclosure of which reasonably could be expected to cause damage, and in some cases, serious damage, to the national security of the United States, and thus this information is currently and properly classified CONFIDENTIAL and, in some cases, SECRET.  As such, this information has been withheld from disclosure pursuant to FOIA exemption (b)(1).

### (2) Field Installations

89.  Another intelligence method used by the CIA is to operate covert installations abroad.

90.  Official acknowledgment that the CIA maintains an installation in a particular location abroad would likely cause the government of the country in which the installation is located to take countermeasures, either on its own initiative or in response to public pressure, in order to eliminate the CIA presence within its borders, or otherwise to retaliate against the United States Government, its employees, or agents. Revelation of this information also could result in terrorists and foreign intelligence services targeting that installation and persons associated with it.

91.  Additionally, in some cases, the disclosure of information concerning a covert CIA installation would, in and of itself, reveal another specific intelligence method for which the CIA uses the installation.

92.  For the foregoing reasons, the CIA has determined that certain of the records described on the Vaughn index, as specified on the chart attached as Exhibit J, contain information pertaining to covert CIA installations abroad that reasonably could be expected to cause serious damage to the national security of the United States and therefore that this information is currently and properly classified SECRET pursuant to Executive Order 12958.  As such, this information has been withheld from release pursuant to FOIA exemption (b)(1).

### (3) Cryptonyms and Pseudonyms

93. The use of cryptonyms and pseudonyms is an intelligence method whereby words and letter codes are substituted for actual names, identities, or programs in order to protect intelligence sources and other intelligence methods. Specifically, the CIA uses cryptonyms in cables and other correspondence to disguise the true name of a person or entity of operational intelligence interest, such as a source, foreign liaison service, or a covert program. The CIA uses pseudonyms, which are essentially code names, solely for internal CIA communications.

94. When obtained and matched to other information, cryptonyms and pseudonyms possess a great deal of meaning for someone able to fit them into the proper framework. For example, the reader of a message is better able to assess the value of its contents if the reader can identify a source, an undercover employee, or an intelligence activity by the cryptonym or pseudonym. By using these code words, the CIA adds an extra measure of security, minimizing the damage that would flow from an unauthorized disclosure of intelligence information.

95. In fact, the mere use of a cryptonym or pseudonym in place of plain text to describe a program or person is an important piece of information in a document. Use of such code

41

words may signal to a reader the importance of the program or person signified by the codeword.  By disguising individuals or programs, cryptonyms and pseudonyms reduce the seriousness of a breach of security if a document is lost or stolen.

96.  Although release or disclosure of isolated code words may not in and of itself necessarily create serious damage to the national security, their disclosure in the aggregate or in a particular context could permit foreign intelligence services to fit disparate pieces of information together and to discern or deduce the identity or nature of the person or project for which the cryptonym or pseudonym stands.

97.  For the foregoing reasons, the CIA has determined that certain of the documents described on the Vaughn index, as specified on the chart attached as Exhibit J, contain information that would reveal a cryptonym or a pseudonym that could reasonably be expected to cause damage or serious damage to the national security of the United States and therefore that this information is properly classified CONFIDENTIAL or SECRET pursuant to the Executive Order 12958.  As such, this information has been withheld from release pursuant to FOIA exemption (b)(1).

### (4)  Foreign Intelligence Relationships

98.  Another intelligence method used by the CIA is, as previously discussed, to obtain foreign intelligence and

42

assistance through liaison relationships with foreign intelligence and security services and foreign government officials.  The DCIA must protect these relationships both as intelligence sources and methods.

99.  Each relationship constitutes a specific method for the collection of intelligence, and the fact of the use of each relationship in a given circumstance must be protected.  As previously discussed under the category of intelligence sources, divulging information concerning a particular liaison relationship could compromise the relationship and thereby destroy this specific intelligence method.

100.  For the foregoing reasons, CIA has determined that certain of the records described on the Vaughn index, as specified on the chart attached as Exhibit J, contain information that pertains to a CIA relationship with a foreign intelligence service or foreign government officials that could reasonably be expected to cause serious or exceptionally grave damage to the national security and therefore that this information is therefore currently and properly classified SECRET or TOP SECRET pursuant to Executive Order 12958.  As such, the information has been withheld from release pursuant to FOIA exemption (b)(1).

### (5)  Dissemination-Control Markings

101.   Additional intelligence methods used by CIA are those concerned with the protection and dissemination of information. These methods include procedures for marking documents to indicate procedures for and indicators restricting dissemination of particularly sensitive information contained in the documents.  This also includes markings for Sensitive Compartmented Information.

102.   Although such markings, standing alone, may sometimes be unclassified, when placed in the context of specific intelligence collection or analysis they may reveal or highlight areas of particular intelligence interest, sensitive collection sources or methods, or foreign sensitivities.  To avoid highlighting information that reveals such matters, the CIA withholds dissemination control markings and markings indicating the classification levels and controls of individual paragraphs or specific bits of information. Otherwise, if the CIA were to withhold dissemination control and classification markings only in cases where the accompanying information indicates a special intelligence interest, a particularly sensitive method, or a foreign liaison relationship, the CIA would focus public attention on those sensitive cases.

103.   Additionally, as a practical matter, deleting dissemination control markings (other than the overall

classification level) rarely deprives a requester of the
information he or she is actually seeking.

104.  For the foregoing reasons, the CIA has determined
that certain of the records described on the <u>Vaughn</u> index, as
specified on the chart attached as Exhibit J, contain
information that concerns dissemination-control markings that
reasonably could be expected to cause damage or serious damage
to the national security of the United States and therefore that
this information is currently and properly classified
CONFIDENTIAL or SECRET pursuant to Executive Order 12958.  Thus,
this information has been withheld from release pursuant to
Exemption (b)(1).  In addition, such dissemination markings when
not classified are properly withheld under exemption (b)(3), as
explained below.

### c.  Intelligence Activities

#### (1)  General Intelligence Activities

105.  Intelligence activities refer to the actual
implementation of intelligence sources and methods in the
operational context.  Intelligence activities are highly
sensitive because their disclosure often would reveal details
regarding specific intelligence collection activities.  The CIA
is charged with both foreign intelligence and
counterintelligence collection and analysis responsibilities.
Although it is obviously widely acknowledged that the CIA is

responsible for performing activities in support of this mission for the United States, the CIA cannot confirm or deny the existence of any specific intelligence collection or disclose the target of such intelligence gathering activities.

106.  To disclose the existence (or non-existence) of a particular intelligence collection activity would reveal U.S. intelligence needs, priorities, and capabilities to a foreign intelligence service or hostile organization seeking to take advantage of any national security weakness.  The damage that would be caused by such an admission is clear.  Foreign government services and hostile organizations would be advised that their activities and information had been targeted by the CIA; future intelligence collection activities would be made more difficult by such a revelation; and, as a result, the conduct of such operations would become even more dangerous.

107.  Similarly, the CIA's clandestine intelligence interest in a specific individual or organization represents an intelligence activity, source and/or method.  If, for example, the CIA admits that it possesses clandestine intelligence information about a particular individual who may be an intelligence operative of a foreign intelligence service or a member of a terrorist organization, the CIA essentially admits to that operative that his or her intelligence or terrorist activities have been detected by the CIA.  Such an

acknowledgment alerts this operative that he or she must take countermeasures to make his or her future intelligence activities undetectable by the CIA.  If the operative's countermeasures are successful, the CIA loses its ability to monitor his or her activities.  Moreover, others who may be collaborating with the operative also will soon cease engaging in these detectable activities with similar results.  In a case where the targeted operative is no longer active, the foreign intelligence service or terrorist organization for which he or she worked is still alerted to the fact that his or her intelligence or terrorist activities may have been detected by the CIA.  This benefits the hostile organization because it will be alerted to that fact that any information gained from that operative's missions may be compromised to the CIA.

108.  In general, the monitoring of a terrorist or intelligence organization of potential intelligence interest to the CIA is a very costly enterprise with significant resource and national security implications.  At present, these costs are, in a sense, shared by both the CIA (which attempts to monitor foreign intelligence services' and terrorist organizations' sources, operatives, and activities) and the foreign intelligence service or terrorist organization (which attempt to conceal from the CIA the identities of their sources, operatives and activities).  The CIA sometimes may expend

resources monitoring a particular organization or individual which is not, in fact, a foreign intelligence or terrorist source or operative, while foreign intelligence or terrorist organizations may sometimes undertake elaborate precautions because they believe they are being monitored by the CIA when, in fact, they are not. If the CIA's intelligence interest in a given individual or organization is known, such a revelation would provide the foreign intelligence or terrorist organization with information concerning which intelligence sources or types of intelligence activities the CIA can and cannot monitor. It may also indicate which are potential CIA sources. It will at a minimum indicate CIA interest in identified individuals or organizations. These admissions may greatly benefit a foreign intelligence service or terrorist organization by enabling it to redirect its resources to identify potential CIA sources, circumvent the CIA's monitoring efforts, and generally enhance its intelligence or deception activities at the expense of the United States. As a result, the CIA's efforts may be thwarted or made more difficult, reducing the CIA's effectiveness, requiring a diversion of CIA resources, and resulting in a loss of valuable intelligence information.

109. Similar concerns apply to the CIA's interrogation of prisoners in the custody of other government agencies. Interrogation is one means the CIA uses to collect vital

intelligence.  However, revealing the substance of these
interrogations would reveal many of the issues discussed
previously.  It would identify an intelligence target of the
CIA.  It would reveal the information that the CIA knows about
that target, the information it does not know, and the
information in which the CIA has an interest.  This information
would greatly benefit a foreign terrorist organization or
intelligence service, as it would disclose gaps in the CIA's
intelligence collection, identify areas of vital concern to the
United States, and allow the foreign intelligence service or
terrorist organization to take counter-measures.

110.  For the foregoing reasons, the CIA has determined
that certain of the records described on the Vaughn index, as
specified on the chart attached as Exhibit J, contain
information that concerns intelligence activities that
reasonably could be expected to cause serious damage or
exceptionally grave damage to the national security of the
United States and therefore that this information is currently
and properly classified SECRET or TOP SECRET pursuant to
Executive Order 12958.

### (2)  Terrorist Detention and Interrogation

111.  A large number of the documents at issue in this case
relate to a highly classified CIA program to capture, detain,

and interrogate key terrorist leaders and operatives in order to help prevent terrorist attacks (the "Program"). As part of this program, the President has authorized the CIA to set up terrorist detention facilities outside the United States. This program includes a number of the intelligence sources and methods I have previously described. In addition, the details of the program remain classified. However, I will attempt to provide, to the extent possible on the public record, more detail regarding these specific intelligence activities of the CIA, and how these document relate to the classified sources and methods described previously.

112. The CIA documents at issue in this case contain highly classified information that would disclose additional intelligence sources and methods used as part of the Program. Specifically, the conditions of confinement and interrogation methods used by the CIA, the locations of CIA intelligence activities overseas, and the assistance provided by certain foreign governments in furtherance of these activities are all properly classified intelligence sources and methods, and are included in the documents at issue in this case.

113. On September 6, 2006, President George W. Bush delivered a speech in which he disclosed the existence of the Program. President Bush also disclosed that fourteen

individuals formerly in CIA custody had been transferred to Guantanamo Bay.[13]

114.  While the President publicly disclosed that the fourteen individuals were detained and questioned outside the United States in a program operated by the CIA, he also explicitly stated that many specifics of the program, including where the detainees had been held, the details of their confinement, the employment of alternative interrogation methods, and other operational details could not be divulged and would remain classified.  In fact, such details constitute TOP SECRET, Sensitive Compartmented Information (SCI).

115.  I have already described the levels of classification outlined in Executive Order 12958.  In addition to those levels of classification, Executive Order 12958, section 4.3, provides that specified officials may create special access programs upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure.  The CIA is authorized to establish special access programs relating to intelligence activities, sources, and methods.  These special

---

[13] Since the President's September 6, 2006 speech, the Government has disclosed that two additional individuals were transferred to Guantanamo Bay.

access programs relating to intelligence are called Sensitive
Compartmented Information (SCI) programs.

116.  Information relating to the CIA terrorist detention
program has been placed in a TOP SECRET//SCI program to enhance
protection from unauthorized disclosure.  The unauthorized
disclosure of the intelligence sources and methods relating to
the Program reasonably could be expected to cause exceptionally
grave damage to national security.  Specifically, disclosure of
such information is reasonably likely to degrade the CIA's
ability to effectively question terrorist detainees and elicit
information necessary to protect the American people.

117.  The President made clear in his speech that operation
of the CIA detention program will continue.  The continued
effectiveness of the CIA detention program requires the
cooperation of foreign governments and the use of effective
interrogation techniques.  Unauthorized disclosure of the
details of the program would undermine both of these
requirements.

118.  Unauthorized disclosure of details regarding the
conditions of detention and specific alternative interrogation
procedures reasonably could be expected to result in
exceptionally grave damage to the national security.  Many
terrorist operatives are specifically trained in counter-
interrogation techniques.  If specific alternative techniques

were disclosed, it would permit terrorist organizations to adapt their training to counter the tactics that CIA can employ in interrogations.  If detainees in the CIA program are more fully prepared to resist interrogation, it could prevent the CIA from obtaining vital intelligence that could disrupt future attacks.

### (a) Alternative questioning procedures

119.  The CIA's detention program has provided the U.S. Government with one of the most useful tools in combating terrorist threats to the national security.  It has shed light on probable targets and likely methods for attacks on the United States, and has led to the disruption of terrorist plots against the United States and its allies.  For example, information obtained through the Program thwarted a plot to fly a plane into the tallest building in Los Angeles.  Additional plots that were disrupted include hijacking passenger planes to fly into Heathrow Airport and the Canary Wharf in London and attacking the U.S. consulate in Karachi, Pakistan, using car bombs and motorcycle bombs.

120.  Additionally, information obtained through the program has played a vital role in the capture and questioning of additional senior al Qaeda operatives.  For example, interrogations of detainees produced information that provided initial leads to the locations of al Qaeda operatives, which led to their capture.  In addition, the United States gained

53

valuable information that explained previously unknown details
of al Qaeda, such as its organization, financing,
communications, and logistics.

121.  The U.S. Government is aware that al Qaeda and other
terrorists train in counter-interrogation methods.  Public
disclosure of the methods used by the CIA would allow al Qaeda
and other terrorists to more effectively train to resist such
techniques, which would result in degradation in the
effectiveness of the techniques in the future.

### (b)  Foreign Relations

122.  Disclosure of the classified information regarding
the Program contained in the classified documents is also
reasonably likely to damage foreign relations.  Among the most
critical sources and methods in the collection of foreign
intelligence are the relationships that the United States
maintains with the intelligence and security services of foreign
countries.  Through these intelligence liaison relationships,
the CIA can collect intelligence and provide to U.S. national
security and foreign policy officials information that is
critical to informed decision making -- information that the CIA
cannot obtain through other sources and methods.

123.  In this case, foreign governments have provided
critical assistance to CIA counterterrorism operations,
including but not limited to hosting of foreign detention

facilities, under the condition that their assistance be kept secret.  If the United States demonstrates that it is unwilling or unable to stand by its commitments to foreign governments, they will be less willing to cooperate with the United States on counterterrorism activities.

124.  The damage to national security that could result through public disclosure of the information regarding liaison assistance contained in the documents at issue is not merely conjectural.  Just prior to the President's 6 September 2006 speech announcing the transfer of detainees to Guantanamo Bay, the CIA provided certain foreign governments specific assurances that the CIA would protect the fact of their cooperation from disclosure.  These liaison partners expressed their deep appreciation and highlighted that their continued cooperation was conditioned on the CIA's commitment and ability to keep their assistance strictly confidential.

125.  Specifically, one particular foreign government reduced its cooperation with the CIA when its role in the terrorist detention program leaked to a third country whose national had been detained within the program.  The foreign government lost the trust and cooperation of that third country in matters of their own national security.  Repair of the CIA's relationship with this foreign government came only through the senior-level intervention of the CIA Director personally

apologizing for the leak.  Despite this significant effort, to this day the damage this one incident has caused to the CIA's relationship with the foreign government is incalculable, as the CIA can never be sure to what extent the foreign government is withholding vital intelligence necessary to the national security of the United States.

126.  For the foregoing reasons, the CIA has determined that certain of the records described on the attached Vaughn index, as specified in the chart attached as Exhibit J, concern the details of CIA intelligence activities that would cause serious or exceptionally grave damage to the national security of the United States and therefore that this information is currently and properly classified SECRET or TOP SECRET pursuant to Executive Order 12958.  Therefore, this information has been withheld from release pursuant to Exemption (b)(1).

127.  In sum, the CIA has determined that unauthorized disclosure of information which reasonably could be expected to lead to the identification of intelligence activities, sources and methods, foreign government information, or information that would harm foreign relations or foreign activities of the United States, is currently and properly classified pursuant to the criteria of Executive Order 12958, as its disclosure could reasonably be expected to cause damage, serious damage, or exceptionally grave damage to the national security of the

United States, and is thus exempt from disclosure pursuant to FOIA Exemption (b)(1). Coextensively, information that could lead to the revelation of an intelligence activity, source, or method falls precisely within the scope of 50 U.S.C.A. §§ 403-1(i), 403g, and is also exempt from disclosure pursuant to FOIA Exemption (b)(3).

**B. Exemption (b)(2)**

128. FOIA Exemption (b)(2) states that FOIA does not apply to matters that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Exemption (b)(2) encompasses two distinct categories of information: (a) internal information of a less significant nature, such as administrative routing notations and agency rules and practices, sometimes referred to as "low 2" information; and (b) more substantial internal information, the disclosure of which would risk circumvention of a legal requirement, sometimes referred to as "high 2" information.

129. CIA has invoked Exemption (b)(2) in this case to withhold the following "low 2" information: administrative, routing, and handling notations. As specified in the attached Vaughn index, this information appears in many of the documents responsive to Plaintiffs' FOIA Requests. For example, many of those records contain routing and distribution slips attached to memoranda. For instance, document 58 includes two cover sheets.

These cover sheets merely describe the classification of the
underlying documents.  In addition, document 58 includes a one-
page distribution slip.  This page simply states where the
record was electronically stored and which CIA components
received a copy of the record for their files.  There is no
public interest in the release of this internal, clerical
information.  The CIA is not withholding any information on the
basis of (b)(2) "high 2" information.[14]

**C.  Exemption (b)(3)**

130.  FOIA Exemption (b)(3) provides that the FOIA does not
apply to matters that are:

> specifically exempted from disclosure by statute (other
> than section 552b of this title), provided that such
> statute
>
>> (A) requires that the matters be withheld from
>> the public in such a manner as to leave no discretion
>> on the issue, or
>>
>> (B) establishes particular criteria for
>> withholding or refers to particular types of matters
>> to be withheld . . .

5 U.S.C. § 552(b)(3).  The CIA has reviewed the documents
responsive to Plaintiffs' FOIA Requests and determined that
there are two relevant withholding statutes:  the National
Security Act of 1947 and the Central Intelligence Agency Act of
1949.

---

[14] Most routing information would be meaningless even if released because the
names of CIA employees would be withheld under exemption b(3) pursuant to
Section 6 of the CIA Act of 1949, as explained below.

131.  *National Security Act of 1947* – Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2007), provides that the Director of National Intelligence (DNI) shall protect intelligence sources and methods from unauthorized disclosure.  The CIA has reviewed the documents identified as classified on the attached Vaughn index, and has determined that they contain information that if disclosed would reveal intelligence sources and methods. The DNI authorized the Director of the CIA to take all necessary and appropriate measures in this case to ensure that intelligence sources and methods are protected from disclosure. The CIA, therefore, relies on the National Security Act of 1947 to withhold any information that would reveal intelligence sources and methods.

132.  In contrast to Executive Order 12958, the National Security Act's statutory requirement to protect intelligence sources and methods does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure.  In any event, the information relating to intelligence sources and methods in these documents that is covered by the National Security Act is the same as the information relating to intelligence sources and methods that is covered by the Executive Order for classified information.  Therefore, the

damage to national security that reasonably could be expected to result from the unauthorized disclosure of such information relating to intelligence sources and methods is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information.  This damage is described above in the section of this declaration describing the classified information on the documents included on the attached <u>Vaughn</u> index.

133.  *Central Intelligence Agency Act of 1949* – Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2007), provides that in the interests of the security of the foreign intelligence activities of the United States and in order to further implement section 403-1(i) of Title 50, which provides that the DNI shall be responsible for the protection of intelligence sources and methods from unauthorized disclosure, the CIA shall be exempted from the provisions of any law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA. As a result, CIA employees' names and personal identifiers (for example, employee signatures, employee numbers or initials), titles, file numbers, and internal organizational data are absolutely protected from disclosure by law.

134.  Section 17A(e)(3) of the Central Intelligence Agency
Act, 50 U.S.C.A. § 403q (West Supp. 2007), states that the
Office of Inspector General, upon receiving information from any
person during the course of an authorized investigation, "shall
not disclose the identity of that employee without the consent
of the employee" unless such disclosure is "unavoidable during
the course of the investigation or the disclosure is made to an
official of the Department of Justice responsible for
determining whether a prosecution should be undertaken."  As a
result, the identities of persons who provide information to the
Inspector General are protected from disclosure by law.

135.  With respect to the documents at issue, as described
in the attached Vaughn index, IMS professionals and other CIA
employees have reviewed these documents and determined that many
of them contain information regarding the organization,
functions, names, and official titles of personnel employed by
the CIA, as well as internal organizational information such as
file numbers.  In addition, many of them contain the identities
of persons who provided information to the Office of Inspector
General.  Again, the CIA Act's statutory requirement to further
protect intelligence sources and methods by protecting CIA
functions does not require the CIA to identify or describe the
damage to national security that reasonably could be expected to
result from their unauthorized disclosure.  In any event, with

respect to the documents responsive to Plaintiffs' FOIA Requests that are properly classified, the information relating to CIA functions and intelligence sources and methods that is covered by the CIA Act's statutory requirement is the same as the information relating to intelligence sources and methods that is covered by the Executive Order for classified information. Therefore, the damage to national security that reasonably could be expected to result from the unauthorized disclosure of CIA functions and intelligence sources and methods is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information, which is described in the relevant paragraphs above in the sections identifying these documents.

**D.    Exemption (b)(5)**

136.   FOIA Exemption (b)(5) provides that FOIA does not apply to inter-agency or intra-agency memoranda or letters that would not be available by law to a private party in litigation with the agency.   IMS professionals and other CIA employees have reviewed the documents identified as exempt under Exemption (b)(5) on the attached Vaughn index, and determined that they are intra-agency or inter-agency records that contain information that is protected from disclosure by four privileges.

137.  *Attorney work-product* – The attorney work product privilege protects information, mental impressions, legal analysis, conclusions, and opinions prepared by attorneys or other representatives of a party in anticipation of criminal, civil, or administrative proceedings.  Those documents for which the work product privilege has been asserted, as specified in the attached <u>Vaughn</u> index, contain information prepared by CIA attorneys and attorneys at the Department of Justice in anticipation of criminal, civil, and administrative proceedings, as described both in the <u>Vaughn</u> index and in more detail below.

138.  For example, documents 67, 69, 71, 72, 76, 80, 81, 84, 93 and 99 are letters written by CIA attorneys to their legal advisors at the Department of Justice Office of Legal Counsel (OLC), soliciting legal advice, analysis and opinions regarding the use of an alternative set of interrogation procedures with respect to detainees.  In turn, documents 1, 6-13, 16, 19, 25, 30, 32, 49, 51, 65, 68, 70, 75, 78, 86 and 87 reflect the legal advice rendered by OLC on these issues in response to requests from CIA.

139.  The CIA's purpose in requesting advice from OLC was the very likely prospect of criminal, civil, or administrative litigation against the CIA and CIA personnel who participate in the Program.  The CIA requested OLC's legal advice both because the CIA and its personnel anticipated that these issues would

continue to be the subject of litigation and, for some of these documents, because the CIA and its personnel had been subject to criminal, civil, or administrative proceedings concerning the Program. This advice was not solicited in the ordinary course of business. Rather, the requests for advice were solicited in order to prepare the CIA to defend against future criminal, civil, and administrative proceedings that the CIA considered to be virtually inevitable.

140. Similarly, documents 33, 35, 43, 53 and 66 each reflect CIA attorneys' analysis, thoughts, opinions, mental impressions, and/or advice regarding the legal implications of certain operational aspects of the Program. These documents similarly were prepared in recognition of existing litigation concerning the Program, and in preparation for future anticipated civil, criminal and administrative proceedings.

141. The CIA's concerns regarding the potential for litigation regarding detention and interrogation activities was not unfounded. Indeed, at the time some of these documents were prepared, criminal, civil and administrative proceedings regarding the detention and interrogation activities were already proceeding in a number of forums. For example, the CIA OIG conducted a criminal investigation of CIA personnel who questioned Iraqi detainee Manadel al-Jamadi, who died in Army custody at Abu Ghraib. Several U.S. military personnel were

charged with crimes relating to the interrogation of Al-Jamadi. Furthermore, a number of civil lawsuits had been brought for alleged complicity in renditions.

142.  Those records described on the attached Vaughn index for which the CIA has asserted the work product privilege were prepared in contemplation of specific litigation and reflect attorneys' tactical and strategic thinking.  Those records were created with the expectation that they would be held in confidence, and they have been held in confidence.  Accordingly, they are properly withheld pursuant to the attorney work product privilege.

143.  *Attorney-client* – The attorney-client privilege protects confidential communications between a client and his attorney relating to a matter for which the client has sought legal advice.  The CIA has reviewed the records described on the attached Vaughn index for which the CIA has asserted the attorney-client privilege.  Those records contain confidential communications between CIA staff and the CIA's legal advisors, including both attorneys within the CIA's Office of General Counsel and attorneys with the Department of Justice, acting in their capacity as legal advisors to the CIA.  These communications relate to matters for which the attorneys provided legal advice to the CIA.  This legal advice was based upon, and reflects, facts provided by the CIA to its attorneys.

These documents were prepared by and at the direction of the
CIA's attorneys, with the joint expectation of the attorneys and
CIA staff that they would be held in confidence.  Moreover,
these documents have been held in confidence.

144.  *Deliberative process* – Exemption (b)(5) has been
construed to incorporate the civil discovery concept that
information or documents of pre-decisional, deliberative process
are exempt from disclosure.  The deliberative process privilege
protects the internal deliberations of the government by
exempting from release those recommendations, analyses and
discussions – both factual and legal – prepared to inform or in
anticipation of decision-making.  The integrity of the
government's deliberative process, not just the documents
themselves, is protected by this privilege.

145.  The records specified on the attached Vaughn index
are protected by the deliberative process privilege because they
each contain information that reflects the pre-decisional
deliberations of CIA and other executive branch officials.  For
example, as described on the attached Vaughn index, these
records reflect pre-decisional discussions between executive
branch officials regarding possible approaches to take with
respect to outstanding policy issues, candid internal
discussions between CIA staff regarding policy issues, non-final
drafts, working papers, briefing papers, recommendations, legal

advice, briefing papers, requests to DOJ OLC for legal advice, and recommendations for actions to policymakers from staff members. These records were all solicited, received or generated as part of the process by which policy is formulated, either by the CIA or by other executive branch officials. Disclosure of this information would therefore reveal the pre-decisional deliberations of executive branch officials.

146.  The deliberative process privilege also protects the factual information contained in these documents. The particular facts contained in these drafts, working papers, briefing papers, recommendations, requests for advice, and other similar documents were identified, extracted, and highlighted out of other potentially relevant facts and background materials by the authors, in the exercise of their judgment. Accordingly, the disclosure of the facts that were selected for inclusion in drafts, briefing materials, recommendations, advice or other such documents would themselves tend to reveal the author's and the agency's deliberative process.

147.  To the extent that some of the documents on the attached Vaughn index contain specific policy recommendations, these documents do not indicate that either the recommendation itself or the underlying reasoning in support of such recommendation was ever adopted by the appropriate decision-maker.

67

148.  Because the officials involved in these pre-decisional deliberations expected that their candid discussions and recommendations regarding sensitive national security issues would remain confidential, release of these records would discourage open and frank discussions among executive branch officials in the future, thereby threatening the confidence needed to ensure the candor of future CIA deliberations.  Such information is therefore properly exempt from disclosure under exemption (b)(5).

149.  *Privilege protecting statements made to the Office of Inspector General* - Exemption (b)(5) has also been construed to protect the confidential statements made by persons during the course of Office of Inspector General investigations.  The purpose of this privilege is to protect statements made under an expectation of confidence.  This is necessary to protect the integrity of Office of Inspector General investigations and to ensure that employees freely cooperate with any such investigations.  This information is contained in OIG Interview Reports and memoranda, identified as documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231, and 242 on the attached Vaughn index.

150.  As described in the attached Vaughn index, many of the documents responsive to Plaintiffs' FOIA Requests contain statements made to Office of Inspector General investigators

during the course of investigations.  Office of Inspector
General regulations state that these statements will be held in
confidence, subject to the other duties of the Office.
Releasing these documents would undermine the assurances of
confidence and decrease employees' willingness to cooperate with
Office of Inspector General Investigations.

151.  *Presidential communications privilege* – Exemption
(b)(5) also exempts from disclosure information protected by the
presidential communications privilege.  The presidential
communications privilege protects confidential communications
that relate to potential presidential decision-making and that
involve the President, his senior advisors, or staff working for
senior presidential advisors.  The privilege protects
communications in connection with the performance of the
President's responsibilities of his office and made in the
process of shaping policies and making decisions.  In addition
to communications directly involving the President, the
privilege protects communications involving presidential
advisors, including both communications which these advisors
solicited and received from others as well as those they
authored themselves.  Protecting the frank and candid
deliberations of ideas and expression of views is essential in
order to ensure that advisors are able to thoroughly examine
issues, formulate opinions and recommendations, and provide

appropriate advice to the President.  This privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-decisional documents.

152.  The CIA, in consultation with White House Counsel and the Legal Advisor to the National Security Council, has invoked the presidential communications privilege, as incorporated under exemption 5, to withhold eight documents: 14, 17, 24, 29, 62, 98, 100, and 152.  The documents for which the presidential communication privilege has been asserted, as specified in the attached Vaughn index, contain information reflecting communications solicited and received by senior presidential advisors from CIA officials as well as communications authored by senior presidential advisors in the course of discussing issues related to formulating recommendations and advice for Presidential decision-making.

153.  The withheld documents were among those relied on by senior presidential advisors for the purpose of providing confidential advice to the President regarding potential decisions related to the CIA Terrorist Detention and Interrogation Program.  Among the public decisions made by the President regarding detainee policies are his signing of the Detainee Treatment Act of 2005, the Military Commissions Act of 2006, and his presentation on September 6, 2006, announcing the transfer of detainees from CIA custody to Guantanamo Bay.

154.  Documents 62, 98, 100 were authored by CIA officials in preparation for NSC Principals and Deputies Committee meetings with senior presidential advisors where they would be called upon to provide information or recommendations on issues related to presidential decision-making.  These documents include information reflecting communications between senior presidential advisors and CIA officials where presidential advisors solicited and received information or recommendations in the course of gathering information for decisions, or potential decisions, to be made by the President.

155.  Document 14 was authored by the National Security Advisor and solicits comments on certain suggestions based on written orders signed by the President.  Document 152 was authored by the National Security Advisor, and circulates comments on a draft document to NSC principals, including the Director of Central Intelligence.  Documents 17, 24, and 29 summarize for the record policy decisions made by the President or by senior presidential advisors and communicated to the CIA on a particular issue.  All of these documents include information reflecting communications either solicited and received or authored by senior presidential advisors on issues related to decisions, or potential decisions, to be made by the President.

156.   The presidential advisors involved in these deliberations would have reasonably expected that their candid discussions and recommendations regarding sensitive national security issues would remain confidential.   Disclosure of these communications and deliberations would necessarily inhibit advisors from engaging in precisely the type of fully informed, candid advice necessary to address the types of issues raised in the withheld material, thereby threatening the confidence needed to ensure the candor of advice to the President.   Thus, all eight of these documents are properly withheld pursuant to the Presidential communication privilege.

**E.   Exemption (b)(6)**

157.   FOIA exemption (b)(6) provides that FOIA does not apply to "personnel and medical files" "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).   As described in the attached Vaughn index, CIA has withheld information in some documents responsive to Plaintiffs' FOIA Requests on the ground that, if disclosed, these documents would constitute a clearly unwarranted invasion of the personal privacy of individuals by revealing their names and other personal information.

158.   Information that applies to or describes a particular individual qualifies as "personnel," "medical," or "similar files" under FOIA Exemption (b)(6).   Here, the information at

issue identifies the names of, or identifying information about, CIA employees or persons interviewed by the CIA Office of Inspector General.  Therefore, the CIA has determined that the names of these persons and their identifying information, such as dates of birth, social security numbers, and biographical information, qualify as both "personnel" and "similar" files and are thus amenable to (b)(6) protection.

159.  Once the threshold issue of "personnel" and "similar" files has been met, the Agency is required to balance the interests between the safeguarding of an individual's private information from unnecessary public scrutiny against the public's interest in disclosure.  In this case, there is no overriding public interest that requires the disclosure of the names of, or identifying information about, the CIA employees and other persons interviewed by the CIA OIG at issue.

160.  Even if some minimal public interest could be found in disclosure of the personal information at issue, the balance would still tilt dramatically against disclosure.  Disclosure of this personal information would certainly violate the personal privacy of these persons.  Consequently, because the privacy interests involved outweigh the negligible public interest in disclosure, the CIA has determined that the information is properly withheld under exemption (b)(6).

### F.  Exemption (b)(7)(A)

161.  FOIA Exemption (b)(7) protects from mandatory disclosure certain records or information compiled for law enforcement purposes.  FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A), authorizes the withholding of

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings.

A determination to withhold information on this basis requires first a finding that a law enforcement proceeding is pending or prospective, and second that release of the information could reasonably be expected to harm the pending law enforcement action.

162.  The CIA's Office of Inspector General conducts investigations to uncover fraud and abuse as well as to determine CIA component and employee compliance with applicable law and regulations.  If the OIG uncovers evidence of violations of law, it may refer matters to the Department of Justice for prosecution.  The OIG's open investigatory files, which contain thousands of records, all relate to pending law enforcement proceedings. The files consist of documents OIG investigators have collected or created in the course of their investigations.

163.  Processing documents in the OIG's open investigatory files would interfere with those investigations because it might

alert CIA components and individuals that they are under investigation. The OIG's investigations are confidential. The confidentiality of the open investigations, among individuals and components within the CIA, is essential to the efficacy of those investigations. In order to process the open OIG investigations, however, OIG would require the assistance of CIA personnel outside the OIG's office. Specifically, OIG would require the assistance of the CIA Office of General Counsel, Information Management Officers, and Information Review Officers and their staffs, in order to review potentially responsive documents, to analyze the applicability of FOIA exemptions, to describe the withheld records for a Vaughn index, and to make litigation decisions regarding the records on behalf of the CIA. In so doing, those persons would discover whom and what activities the OIG was investigating and what evidence had been collected, thus revealing the nature, scope, and targets of the OIG investigations. Revealing the nature, scope, and targets of the open OIG investigations to non-OIG personnel at the CIA would compromise the confidentiality of the open OIG investigations and would be reasonably likely to harm the OIG's pending law enforcement investigations.

164. Release of this information to the public could also reasonably be expected to harm the OIG's pending investigations. The open investigatory files are comprised primarily of: (1)

interview documentation (e.g., handwritten notes of interviews and interview reports); (2) correspondence of OIG investigators (e.g., e-mails and letters); (3) evidence collected (e.g., intelligence cables, correspondence, reports); and (4) draft reports and working papers. Release of records from each of these categories of files could (a) reveal the course, nature, scope or strategy of an ongoing investigation; (b) prematurely reveal evidence in the ongoing investigation; (c) hinder OIG ability to control or shape the investigation; and (d) reveal investigative trends, emphasis, or targeting schemes. Revealing such information to the public would compromise the confidentiality of open OIG investigations and would be reasonably likely to harm the OIG's pending law enforcement investigations. Accordingly, the CIA has determined that this information is properly withheld under exemption 7(A).

**G.  Exemption (b)(7)(C)**

165.  FOIA Exemption (b)(7)(C), 5 U.S.C. § 552(b)(7)(C), authorizes the withholding of:

> records or information compiled for law enforcement
> purposes, but only to the extent that the production
> of such law enforcement records or information . . .
> could reasonably be expected to constitute an
> unwarranted invasion of personal privacy.

FOIA Exemption (b)(7)(C) has been invoked in this case for withholding personal identifying information contained in statements made during interviews with OIG. As described above,

the Office of Inspector General collects and generates records for law enforcement purposes.  These records include statements taken from persons interviewed during the course of OIG investigations, identified as documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231, and 242 on the attached Vaughn index.

166.  A determination to withhold information under this exemption necessitates a balancing of the individual's right to privacy against the public's right of access to information in government files.  As explained above in the discussion concerning FOIA Exemption (b)(6), the information at issue invades third party privacy interests, and advances no public interest.

167.  For the reasons set forth above, FOIA Exemption (b)(7)(C) has been properly invoked, in conjunction with FOIA Exemption 6, to withhold the names and identifying information about third parties, including CIA employees, mentioned in documents compiled during an investigation.  As stated above, the release of such information could reasonably be expected to constitute an unwarranted invasion of the personal privacy of numerous third parties.

**H.  Exemption (b)(7)(D)**

168.  FOIA Exemption (b)(7)(D), 5 U.S.C. § 552(b)(7)(D), authorizes the withholding of:

77

records or information compiled for law enforcement
purposes, but only to the extent that the production
of such law enforcement records or information . . .
could reasonably be expected to disclose the identity
of a confidential source . . . and, in the case of a
record or information compiled by criminal law
enforcement authority in the course of a criminal
investigation or by an agency conducting a lawful
national security intelligence investigation,
information furnished by a confidential source.

The records responsive to Plaintiffs' FOIA Requests contain the

identities of, and information furnished by, confidential

sources of the Office of Inspector General.  This information is

contained in OIG Interview Reports and memoranda, identified as

documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171,

173, 230-231, and 242 on the attached <u>Vaughn</u> index.

169.  The CIA Office of Inspector General is a criminal law

enforcement authority within the scope of Exemption (b)(7)(D).

As described previously, the Office of Inspector General

investigates fraud and abuse as well as violations of laws and

regulations applicable to the CIA.  The investigations of the

Office of Inspector General that generated responsive records in

this case were criminal investigations or national security

intelligence investigations within the meaning of Exemption

(b)(7)(D).

170.  Office of Inspector General regulations require the

OIG to maintain the confidentiality of the information that is

provided to them during the course of an investigation.  Agency

regulations state that, as a matter of policy, OIG does not disclose the identities of persons it interviews or the substance of their statements unless required to fulfill the responsibilities of OIG.  In addition, that regulation states that OIG is barred from releasing the identities of persons making statements to OIG, without that person's consent, unless it is unavoidable or the disclosure is made to the Department of Justice for the purpose of deciding whether a criminal prosecution should be undertaken.  This assurance of confidentiality is important in ensuring the full cooperation of persons who provide statements to the Office of Inspector General.

171.  For the reasons set forth above, the CIA invoked FOIA Exemption (b)(7)(D) to withhold the statements of persons to the Office of Inspector General that were taken in the course of criminal or national security intelligence investigations.

**H.  Segregability**

172.  As described previously, the CIA has released a number of records, in whole or in part, in response to Plaintiffs' FOIA Requests.  Those records that have been withheld in full contained no reasonably segregable, non-exempt information.  The unclassified and unprivileged information in these records is so inextricably intertwined with the classified and privileged information that the release of any non-exempt



information in the withheld documents would produce only incomplete, fragmented, unintelligible sentences and phrases that are devoid of any meaning. The unclassified and unprivileged information in the withheld records does not contain any meaningful information responsive to Plaintiffs' FOIA Requests.

**IV. Conclusion**

173. For the reasons described above, the records described in the attached Vaughn index were withheld in whole or in part on the basis of FOIA exemptions (b)(1), (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(D). The documents in open OIG Investigation files were withheld on the basis of exemption (b)(7)(A).

\* \* \* \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2008.

Ralph S. DiMaio
Information Review Officer
National Clandestine Service
Central Intelligence Agency