LEGAL DEPARTMENT

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

October 7, 2003

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2651
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ONY D. ROMERO
EXECUTIVE DIRECTOR

KENNETH B. CLARK
CHAIR, NATIONAL
ADVISORY COUNCIL

RICHARD ZACKS
TREASURER

Via Facsimile & U.S. Mail

Information and Privacy Coordinator
Central Intelligence Agency
Washington DC 20505

**Re: Request Submitted Under the Freedom of Information Act**

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the following organizations (collectively, "Requesters"):

American Civil Liberties Union (ACLU);
Center for Constitutional Rights (CCR);
Physicians for Human Rights (PHR);
Veterans for Common Sense (VCS); and
Veterans for Peace (VFP).

We are filing the Request simultaneously with the Department of Defense (including its components, the Departments of the Army, Navy, and Air Force, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, and the Central Intelligence Agency. In separate letters, we have applied for expedited processing pursuant to 5 U.S.C. § 552(a)(4)(E).

## Records Requested

Recent news reports indicate that individuals apprehended after September 11, 2001, and held by the United States at military bases or detention facilities outside the United States ("Detainees") have in some cases been tortured or subjected to interrogation techniques that are prohibited by international and United States law. News reports also

indicate that the United States has rendered[1] Detainees and other individuals to foreign powers known to employ torture and illegal interrogation techniques. The Request seeks records relating to the treatment of Detainees and the rendition of Detainees and other individuals.

Both international and United States law unequivocally prohibit the use of torture. The Convention Against Torture ("CAT"), which the United States has signed and ratified, prohibits the use of torture and the infliction of other cruel, inhuman or degrading treatment or punishment.[2] The prohibition against torture is also codified in United States law at 18 U.S.C. § 2340A.

The CAT further provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State whether there are

---

[1] In this Request, "rendition" means the transfer of a person by the United States to a "foreign power," as defined in 50 U.S.C. § 1801, without prior review by an immigration or Article III judge.

[2] In this Request, the terms "torture" and "cruel, inhuman or degrading treatment or punishment" have the meaning accorded them in the CAT, as interpreted by the United Nations Committee Against Torture. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 1, S. Treaty Doc. No. 100-20 (1998), 1465 U.N.T.S. 85. The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* The United Nations Committee Against Torture has held that the following techniques constitute "torture" as defined under the CAT: (1) restraining in very painful conditions, (2) hooding under special conditions, (3) sounding of loud music for prolonged periods, (4) sleep deprivation for prolonged periods, (5) threats, including death threats, (6) violent shaking, and (7) using cold air to chill. *See* Report of the Committee Against Torture, U.N. GAOR, 52d Sess., Supp. No. 44, at para 257, U.N. Doc. A/52/44 (1997). Our use of these terms also encompasses torture and/or "cruel inhuman or degrading treatment or punishment" under any other United States constitutional or statutory provision.

2

substantial grounds for believing that he would be in danger of being subjected to torture."[3] This provision is implemented in United States law by the Foreign Affairs Reform and Restructuring Act of 1998, which states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."[4]

After the release of news reports indicating abuse of Detainees, the President assured the public that "[t]he United States is committed to the world-wide elimination of torture and we are leading this fight by example."[5] William J. Haynes, General Counsel for the Department of Defense, has confirmed that "it is the policy of the United States to comply with all of its legal obligations in its treatment of detainees," including its obligations under the CAT.[6] Mr. Haynes has also asserted that "[i]f the war on terrorists of global reach requires transfer of detained enemy combatants to other countries for continued detention on our behalf, U.S. Government instructions are to seek and obtain appropriate assurances that such enemy combatants are not tortured."[7]

These assurances, while welcome, have failed to address the numerous credible reports recounting the torture and rendition of Detainees. Nor have they explained what measures, if any, the United States has taken to ensure compliance with its legal obligations with respect to the use of

---

[3] CAT, art. 3.

[4] Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681 (1999) (codified as Note to 8 U.S.C. § 1231).

[5] Statement by the President, United Nations International Day in Support of Victims of Torture, (June 26, 2003), *at* http://www.whitehouse.gov/news/releases/2003/06/20030626-3.html

[6] Letter from William J. Haynes II, General Counsel of the Department of Defense, to the Honorable Patrick J. Leahy, United States Senator (June 25, 2003), *at* http://www.hrw.org/press/2003/06/tortureday.htm.

[7] Letter from William J. Haynes II, General Counsel of the Department of Defense, to Kenneth Roth, Executive Director, Human Rights Watch (April 2, 2003), *at* http://www.hrw.org/press/2003/04/dodltr040203.pdf

torture and the infliction of cruel, inhuman or degrading treatment or punishment.

To determine whether the United States is honoring its obligations under domestic and international law, Requesters seek the release of agency records as described in the numbered paragraphs below:

### I. Records concerning the treatment of Detainees in United States custody

Discussing the treatment of individuals detained by the United States at Bagram Airbase in Afghanistan, a December 2002 article from the Washington Post reports:

> Those [detainees] who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights – subject to what are known as "stress and duress" techniques. . . .
>
> According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subject to loud noises and deprived of sleep.

Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations*, Washington Post, Dec. 26, 2002, at A01. A March 2003 article from The New York Times reports:

> Two former prisoners [at Bagram], Abdul Jabar and Hakkim Shah . . . said the conditions to which they themselves were subjected at the time included standing naked, hooded and shackled, being kept immobile for long periods and being deprived of sleep for days on end.

> Such accounts appear to raise troubling questions about the conditions of detention and the interrogation of prisoners in the fight against terror . . . .
>
> Mr. Jabar and Mr. Shah said they had been made to stand hooded, their arms raised and chained to the ceiling, their feet shackled, unable to move for hours at a time, day and night.
>
> Mr. Jabar said he endured this treatment for 13 days. The prisoners, he said, were freed from their standing position only to eat, pray and go to the bathroom.
>
> Mr. Shah said he had spent 16 days in the upstairs rooms, standing for 10 of them until his legs became so swollen that the shackles around his ankles tightened and stopped the blood flow.
>
> He said he was naked the entire time and allowed to dress only when he was taken for interrogation or to the bathroom. Mr. Shah said the cold kept him awake, as did the American guards, who kicked and shouted at him to stop him falling asleep.
>
> None of four former prisoners interviewed said they had been beaten. But some said they had been kicked by their guards and interrogators, either to prevent them from sleeping or during their interrogations.

Carlotta Gall, *Death of an Afghan in Custody*, N.Y. Times, Mar. 4, 2003, at A14.

The Washington Post article cited above suggests that the maltreatment of detainees may be accepted and even encouraged by senior officials:

> "If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA." . . . .

> At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

Priest & Gellman, *supra*.

Please disclose the following records:

1. All records setting forth or discussing the legality or appropriateness of subjecting Detainees to torture or other cruel, inhuman or degrading treatment or punishment. Please include all records discussing the legality or appropriateness of the following methods: using "stress and duress" techniques on Detainees; using force against them; subjecting them to physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; using cold air to chill them; or threatening harm to them or other individuals.

2. All records setting forth or discussing policies, procedures or guidelines[8] relating to the torture or other cruel, inhuman or degrading treatment or punishment of Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed in Paragraph 1, above.

---

[8] In this Request, the phrase "policies, procedures or guidelines" means policies, procedures or guidelines that were in force on September 11, 2001 or that have been put in place since that date.

6

3. All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

4. All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above.

5. All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

6. All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Detainee.

7. All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

8. All records relating to medical, psychiatric or psychological assessment of any Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Detainee.

9. All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Detainees, including but not limited to records related to particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.

10. All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.

## II. Records concerning the death of Detainees in United States custody

News reports indicate that a number of Detainees have died while held at Bagram Air Base in Afghanistan. A March 2003 article from The New York Times reports:

> The United States military has begun a criminal investigation into the death of an Afghan man in American custody in December, a death described as a "homicide" by an American pathologist.
>
> A death certificate, dated Dec. 13 and signed by Maj. Elizabeth A. Rouse, a pathologist with the Armed Forces Institute of Pathology, based in Washington, says the man died as a result of "blunt force injuries to lower extremities complicating coronary artery disease."
>
> The Afghan, known by the single name Dilawar, a 22-year-old farmer and part-time taxi driver from this village in eastern Afghanistan, died in December while being held in the main United States air base at Bagram, north of Kabul. . .
>
> Chris Kelly, public affairs director at the Armed Forces Institute of Pathology, speaking from Washington, said Major Rouse had taken part in the autopsies of two Afghan men who died in custody at Bagram last year, one of whom was Mr. Dilawar. . . .
>
> [Another] Afghan man also died in American custody on Dec. 3. He was Mullah Habibullah, brother of a former Taliban commander. He was about 30, from the southern province of Oruzgan, and was held in the same detention center at Bagram.

8

> His family said no American official had given them any
> information or explanation about the death, which was
> learned from the International Committee of the Red Cross.

Gall, *supra*; *see also* Barbara Starr, *Afghan detainees' deaths ruled homicides*, CNN.com, Mar. 5, 2003 (noting that the "criminal investigation" into the deaths of two Afghan detainees was in its final stages, and relating the acknowledgement of one senior military official that "[t]his investigation may not go well for us."); April Witt, *U.S. Probes Death of Prisoner in Afghanistan*, Washington Post, June 24, 2003, at A18 (reporting the death of an Afghan man held at a United States holding facility near Asadabad, in the eastern province of Konar, Afghanistan).

Please disclose:

11. All records, including autopsy reports and death certificates, relating to any deaths of Detainees.

12. All records relating to investigations, inquiries, or disciplinary proceedings initiated as a result of any deaths of Detainees, including but not limited to records indicating the existence of such investigations, inquiries, or disciplinary proceedings.

### III. Records related to the rendition of Detainees and other individuals

News reports indicate that individuals have been rendered to foreign powers known to employ torture or illegal interrogation techniques. One news report states:

> In other cases, usually involving lower-level captives, the
> CIA hands them to foreign intelligence services – notable
> those of Jordan, Egypt, and Morocco – with a list of questions
> the agency wants answered. These "extraordinary renditions"
> are done without resort to legal process and usually involve
> countries with security services known for using brutal
> means. . . .
>
> According to one official who has been directly involved in
> rendering captives into foreign hands, the understanding is,
> "We don't kick the [expletive] out of them. We send them to
> other countries so they can kick the [expletive] out of them."

9

Priest & Gellman, *supra*; see also David E. Kaplan, Aamir Latif, Ilana Ozernoy, Laurie Lande, Monica M. Ekman, *Playing Offense: The inside story of how U.S. terrorist hunters are going after al Qaeda*, U.S. News & World Report, June 2, 2003 ("The CIA has helped move dozens of detainees not only to Jordan but also to Egypt, Morocco, and even Syria."). Statements of senior officials suggest that the United States may be complicit in the torture of rendered individuals:

> The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.
>
> "In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

*Id*. Another news report quotes Vince Cannistraro, former director of the CIA's counterterrorism center, on the treatment of a Guantanamo Bay Detainee who was sent to Egypt for "failing to cooperate": "They promptly tore his fingernails out and he started telling things." Tom Brune, *An Aggressive Interrogation*, Newsday, Mar. 4, 2003, at A05.

We are interested in obtaining records indicating the circumstances under which the United States has rendered Detainees or other individuals to foreign powers that are known or suspected to use torture or to inflict cruel, inhuman or degrading treatment or punishment.

Please disclose:

13. All records setting forth or discussing the legality or appropriateness of the rendition of individuals who may be tortured or subjected to cruel, inhuman or degrading treatment or punishment after their rendition.

14. All records setting forth or discussing policies, procedures or guidelines relating to the rendition of individuals who may be tortured or subjected to cruel, inhuman or degrading treatment or punishment after their rendition.

15. All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that rendered individuals were

not, are not, or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment after their rendition. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation, detention or rendition of individuals.

16. All records relating to actual or possible violations of, or deviations from the policies, procedures or guidelines referred to in Paragraph 14, above.

17. All records relating to the involvement of United States personnel in the interrogation of individuals after they have been rendered.

18. All records relating to investigations, inquiries or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 14, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

19. All records relating to the actual or alleged torture or cruel, inhuman or degrading treatment or punishment of any Detainee after his rendition.

20. All records related to assurances sought or obtained from foreign powers to whom individuals have been rendered regarding the treatment of those individuals.

21. All records indicating whether and to what extent the ICRC or other non-governmental organizations had, have, or will have access to individuals after they have been rendered.

### Fee Waiver

The ACLU, CCR, PHR and VFP qualify as "representatives of the news media" and the records are not sought for commercial use. Accordingly, fees associated with the processing of the Request should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II). These organizations are "entit[ies] that gather . . . information of potential interest to a segment of the public, use . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute . .

11

. that work to an audience." *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a nationwide, not-for-profit, non-partisan organization with over 400,000 members dedicated to the principles of liberty and equality. It has long believed that our nation's commitment to civil liberties values is enhanced by adherence to appropriate international human rights norms, including the prohibition against torture.

The ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.,* www.aclu.org/patriot_foia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[9]

CCR is a legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. These materials are available through CCR's

---

[9] The following are recent examples of requests in which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Office of Science and Technology Policy in the Executive Office of the President has told the ACLU that it will waive the fees associated with a FOIA request submitted by the ACLU in August 2003; (2) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (3) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; and (4) The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

Development and Education & Outreach Departments. CCR also operates a website, www.ccr-ny.org, that addresses the issues on which the Center works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

PHR is a not-for-profit organization whose mission is to promote health by protecting human rights. It uses scientific methods and clinical medical skills to investigate allegations of human rights violations. PHR has conducted medical investigations of torture throughout the world and played a lead role in developing the principal international instrument for the medical evaluation of torture, the Istanbul Protocol. PHR publishes newsletters, reports, and informational materials for the public, many of which are available on its website, www.phrusa.org. The website contains a section on torture and the means for preventing it. PHR also distributes an email newsletter free of charge to the public.

VCS, a Washington D.C. based, non-profit, United States veterans' organization, is committed to providing a voice of reason on issues of war and national security from the unique perspective of those who have served their country in uniform. VCS stands firm on the principal that our nation's precious youth should only be committed to battle under the gravest of circumstances and therefore seek to return our country to a time when war is truly the policy of last resort. To this purpose, it informs fellow citizens of the terrible costs of war, by challenging policies that abuse the trust of military service members and by speaking out in defense of the values espoused in their oath to support and defend the Constitution of the United States. VCS disseminates information through its website, www.veteransforpeace.org, news briefings, media interviews, published editorials and direct contact through email to the general membership.

VFP is a not-for-profit, non-partisan organization of United States war veterans who served from World War II through Gulf War I. There are 85 VFP chapters across the nation, from Alaska to Florida. VFP consists of men and women who, having dutifully served their nation, now embrace a greater responsibility to serve the cause of world peace. To this end they work with others to: (1) increase public awareness of the costs of war; (2) restrain the United States government from intervening, overtly and covertly, in the internal affairs of other nations; (3) end the arms race and reduce and eventually eliminate nuclear weapons; (4) seek justice for veterans and victims of war, and (5) abolish war as an instrument of national policy. VFP disseminates information through its website,

www.veteransforpeace.org, listserves to the general on-line membership, chapter contacts, and a quarterly newsletter.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

We also request a waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether or not the government's commitment to domestic and international proscriptions against torture is honored in practice.

As indicated above, numerous news articles reflect the significant public interest in the records we seek. *See* articles cited *supra*; *see also Answers about Torture*, Washington Post, Mar. 16, 2003, at B06 ("The Bush administration has categorically denied that it is torturing people. But it has offered no details regarding its policies toward interrogations. . . . The secrecy surrounding U.S. policy makes any objective assessment of these allegations impossible. . . . The public is entitled to a fuller understanding."). Disclosure of the requested records will contribute significantly to the public's understanding of government conduct.

\*   \*   \*

If our request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying in a separate letter for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(i).

Thank you for your prompt attention to this matter.

Please respond to Amrit Singh, Staff Attorney, American Civil Liberties Union Foundation, 125 Broad Street, 18th Floor, New York, NY 10004, telephone (212) 549-2609.

Signed by:

| | |
|---|---|
| STEVEN WATT<br>BARBARA OLSHANSKY<br>MICHAEL RATNER<br>Center for Constitutional Rights<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>Tel: (212) 614-6464<br>Fax: (212) 614-6499 | AMRIT SINGH<br>OMAR C. JADWAT<br>JAMEEL JAFFER<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2609<br>Fax: (212) 549-2654 |