UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

AMNESTY INTERNATIONAL USA, CENTER
FOR CONSTITUTIONAL RIGHTS, INC., and
WASHINGTON SQUARE LEGAL SERVICES,
INC.,

                    Plaintiffs,

                v.

CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF HOMELAND SECURITY,
DEPARTMENT OF JUSTICE, DEPARTMENT
OF STATE, and THEIR COMPONENTS,

                    Defendants.

------------------------------------------------------------ x

     **ECF CASE**

     07 CV 5435 (LAP)


# MEMORANDUM OF LAW IN  SUPPORT OF THE
# CENTRAL INTELLIGENCE AGENCY'S MOTION FOR SUMMARY JUDGMENT


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Central Intelligence Agency
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2678
Fax: (212) 637-2702


JEANNETTE A. VARGAS,
BRIAN M. FELDMAN,
Assistant United States Attorneys,
EMILY E. DAUGHTRY,
Special Assistant United States Attorney,

    – Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.      The CIA Terrorist Detention and Interrogation Program . . . . . . . . . . . . . . . . . . . 2

    B.      The FOIA Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          1.      The CCR FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          2.      The Amnesty International and WSLS FOIA Requests . . . . . . . . . . . . . 3

    C.      The CIA's Search for, and Processing of, Responsive Records . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.       FOIA AND SUMMARY JUDGMENT STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.      THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO
        EXEMPTION 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO
        EXEMPTION 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.    THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO
        EXEMPTION 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.      The Deliberative Process Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.      Attorney Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    C.      Attorney Work Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    D.      Presidential Communications Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    E.      Privileged Witness Statements To OIG Investigators . . . . . . . . . . . . . . . . . . . . 31

V.     THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT
        TO EXEMPTION 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    A.      The CIA Has Properly Withheld Records Pursuant To Exemption 7(A) . . . . . . 33

B.     The CIA Has Properly Withheld Records Pursuant To
Exemption 7(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI.     THE CIA HAS PROPERLY WITHHELD PERSONAL IDENTIFYING
INFORMATION UNDER EXEMPTIONS 6 AND 7(C) . . . . . . . . . . . . . . . . . . . . . . . . 37

VII.     CIA INTERNAL INFORMATION IS EXEMPT UNDER EXEMPTION 2 . . . . . . . . . 39

VIII.     THE CIA HAS CONDUCTED AN ADEQUATE SEARCH FOR
RESPONSIVE RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TABLE OF AUTHORITIES

**Cases:**

A. Michael's Piano, Inc. v. FTC, 18 F.3d 138 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

ACLU v. U.S. Dep't of Defense, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . 10

AFGE v. Army, 441 F. Supp. 1308 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Ahearn v. U.S. Army Materials & Mechs. Research Ctr.,
    583 F. Supp. 1123  (D. Mass. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Arabian Shield Dev. Co. v. CIA, No. 3-98-CV-0624-BD,
    1999 WL 118796 (N.D. Tex. Feb. 26, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55
    (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Assassination Archives and Research Ctr. v. CIA, 720 F. Supp. 217
    (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Associated Press v. DOJ, No. 06 Civ. 1758 (LAP),
    2007 WL 737476 (S.D.N.Y. March 7, 2007), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Baker v. CIA, 580 F.2d 664 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bibles v. Or. Natural Desert Ass'n,519 U.S. 355 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Boyd v. Criminal Div., DOJ, 475 F. 3d 381 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 36

Carney v. DOJ, 19 F.3d 807 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Carter v. U.S. Dep't of Commerce, 307 F.3d 1084 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 21

CIA v. Sims, 471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854
    (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 27

Colon v. EOUSA,No. 98-0180, 1998 WL 695631 (D.D.C. Sept. 29, 1998) . . . . . . . . . . . . . . . 39

Crooker v. ATF, 670 F.2d 1051 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . 8, 33, 36

Davy v. CIA, 357 F. Supp. 2d 76 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Dep't of the Interior v. Klamath Water Users Protective Ass'n,
        532 U.S. 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21

Diamond v. FBI, 707 F.2d 75 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

DOJ v. Crancer, 999 F.2d 1302 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

DOJ v. Landano, 508 U.S. 165 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

DOJ v. Reporters Comm. for the Freedom of the Press,
        489 U.S. 749 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Dow Jones & Co., Inc. v. U.S. Dept. of Justice, No. 94 Civ. 0527 (SS),
        1995 WL 6155 (S.D.N.Y. Jan 09, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Tigue v. DOJ, 312 F.3d 70 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

Brinton v. Dep't of State, 636 F.2d 600 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ferguson v. FBI, 957 F.2d 1059 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fitzgibbon v. CIA, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

Fitzgibbon v. CIA, 578 F. Supp. 704 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Frugone v. CIA, 169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Garcia v. DOJ, OIP, 181 F. Supp. 2d 356 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . 37, 40

Gardels v. CIA, 689 F.2d 1100 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . passim

Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466
        (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Halperin v. CIA, 629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hardy v. New York News Inc., 114 F.R.D. 633 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . 29

Hogan v. Huff, 00 Civ. 6753 (VM), 2002 WL 1359722
        (S.D.N.Y. June 21, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Holland v. CIA, Civ. A. No. 92-1233, 1992 WL 233820
    (D.D.C. Aug. 31, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hopkins v. HUD, 929 F.2d 81  (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hornbostel v. DOI, 305 F. Supp. 2d 21 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hunt v. CIA, 981 F.2d 1116 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

In re Grand Jury Proceedings, No. M-11-189 (LAP),
    2001 WL 1167497 (S.D.N.Y. Oct. 3, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

In re Lindsey, 148 F.3d 1100 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Int'l Paper Co. v. Federal Power Comm'n, 438 F.2d 1349 (2d Cir. 1971) . . . . . . . . . . . . . . . . 25

John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Judicial Watch, Inc. v. DOJ, 365 F.3d 1108 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19
    (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Judicial Watch, Inc. v. FDA, 449 F.3d 141 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Keys v. DOJ, 830 F.2d 337 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kidd v. DOJ, 362 F. Supp. 2d 291 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kimmel v. U.S. Dep't of Defense, Civil Action 04-1551,
    2006 WL 1126812 (D.D.C. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Krikorian v. Dep't of State, 984 F.2d 461 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Lawyers Comm. for Human Rights v. INS, 721 F. Supp. 552
    (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Local 3, Int'l Brotherhood of Elec. Workers v. NLRB, 845 F.2d 1177
    (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 , 23

Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. GSA,
    No. 97 Civ. 8509 (LMM), 1998 WL 726000  (S.D.N.Y. Oct. 15, 1998). . . . . . . . . . 33, 35

Machin v. Zuckert, 316 F.2d 366 (D.C. Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Manna v. DOJ, 51 F.3d 1158 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mapother v. DOJ, 3 F.3d 1533 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Massey v. FBI, 3 F.3d 620 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Military Audit Project v. Casey, 656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Miscavige v. IRS, 2 F.3d 366 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Moorefield v. U.S. Secret Serv., 611 F.2d 1021 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 36

Moreland Properties, LLC v. City of Thornton, 07-cv-00716-EWN-MEH,
        2007 WL 2523385 (D. Colo. Aug. 31, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Morrison v. DOJ, Civ. A. No. 87-3394, 1988 WL 47662
        (D.D.C. Apr. 29, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.,
        376 F.3d 1270 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NAACP Legal Defense and Educ. Fund, Inc. v. U.S. Dep't of Housing,
         No. 07 Civ. 3378 (GEL), 2007 WL 4233008 (S.D.N.Y. Nov. 30, 2007) . . . . . . . . . . . 25

Nat'l Broadcasting Co. v. SBA, 836 F. Supp. 121 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . 27

Nat'l Council of La Raza v. DOJ, 339 F. Supp. 2d 572 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . 25

New York Public Interest Research Group v. EPA, 249 F. Supp. 2d 327
        (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

New York Times Co. v. U.S. Dep't of Defense, 499 F. Supp. 2d 501
        (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nixon v. Adm'r of Gen. Servs., 433 U.S. 425 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Oglesby v. Army, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ortiz v. HHS, 70 F.3d 729 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 37

Perry v. Block, 684 F.2d 121 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Prebena Wire Bending Mach. Co. v. Transit Worldwide Corp.,
        No. 97 Civ. 9336 (KMW) (HBP), 1999 WL 1063216 . . . . . . . . . . . . . . . . . . . . . . . . . 30

Providence Journal Co. v. Army, 981 F.2d 552 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 37

Public Citizen Health Research Group v. FDA, 704 F.2d 1280
        (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rabbitt v. Air Force, 401 F. Supp. 1206 (S.D.N.Y. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168 (1975) . . . . . . . . . 20, 22, 24

Rexford v. Olczak,
        176 F.R.D. 90 (W.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Riquelme v. CIA, 453 F. Supp. 2d 103 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Robert v. HHS, 217 Fed. Appx. 50 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Salisbury v. United States, 690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sherman v. Army, 244 F.3d 357 (5th 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

U.S. Dep't of State v. Washington Post Co., 456 U.S. 595 (1982) . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Adlman, 134 F.3d 1194 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Nixon, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen
        & Helpers of Am., AFL-CIO, 119 F.3d 210 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Weber Aircraft Corp., 465 U.S. 792 (1984) . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Upjohn Co. v. United States, 449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Van Aire Skyport Corp. v. FAA, 733 F.Supp. 316 (D.Colo.1990) . . . . . . . . . . . . . . . . . . . . . . 26

Vaughn v. Rosen, 523 F.2d 1136 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Weisberg v. DOJ, 745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Williams v. McCausland, 90 Civ. 7563 (RWS), 91 Civ. 7281 (RWS),
        1994 WL 18510  (S.D.N.Y. Jan. 18, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wolf v. CIA, 357 F. Supp. 2d 112, 116 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

Wolf v. CIA, 473 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

Wood v. FBI, 432 F.3d 78 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Wolfe v. HHS, 839 F.2d 768, 774 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes, Regulations, Executive Orders, and Rules**:

Intelligence Reform and Terrorism Prevention Act of 2004  Pub. L. No. 108-458 . . . . . . . . . . . 8

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 552(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

5 U.S.C. § 552(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 552(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 552(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5 U.S.C. § 552(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

5 U.S.C. § 552(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5 U.S.C. § 552(b)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

5 U.S.C. § 552(b)(7)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

50 U.S.C. § 403-3(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 431(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C.A. § 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C.A. § 403-1(i)(1) 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 U.S.C.A. § 404-4a(d)(1) (West Supp. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C.A. §§ 403-1(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C.A. § 403g (West Supp. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

50 U.S.C.A. § 403-3(c)(7) (West 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

3 C.F.R. 200 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

32 C.F.R. § 1900.22(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

68 Fed. Reg. 15315 (March 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Executive Order 12958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Executive Order 13292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## PRELIMINARY STATEMENT

Defendant the Central Intelligence Agency (the "CIA"), by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of the CIA's motion for summary judgment in this action brought under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

The three FOIA requests at issue in this litigation, by their terms, primarily seek information about the CIA's highly classified terrorist detention and interrogation program. High level Government officials, including the President of the United States, have repeatedly affirmed that the requested information – which includes, inter alia, details regarding the overseas locations at which the CIA has held detainees, the interrogation techniques used by the CIA, and the extent to which foreign governments have had access to these detainees – is classified at the highest levels. It is unsurprising, therefore, that the CIA has withheld in their entirety more than 7,000 classified records as exempt from disclosure under FOIA. The specific details contained in those records would, if released, jeopardize intelligence activities, expose intelligence sources and methods and negatively impact the United States' ability to conduct foreign relations. These records are therefore properly protected from public dissemination under FOIA. Should this information be released, it would inevitably be disclosed to the very terrorist organizations that are the targets of the CIA's program.

Aside from these important national security concerns, release of these records would reveal the Executive Branch's internal deliberations; compromise the confidentiality of legal advice provided to client agencies; disclose presidential communications; reveal the identities of confidential sources; threaten law enforcement investigations and operations; or jeopardize privacy interests.

The CIA has submitted eight declarations and hundreds of pages of exhibits describing its

review process, the documents at issue, and the bases for its withholdings. As these declarations are afforded a presumption of good faith, the Court should grant the CIA's summary judgment motion.

### STATEMENT OF FACTS

**A.    The CIA Terrorist Detention and Interrogation Program**

On September 6, 2006, President George W. Bush delivered a speech in which he disclosed that key terrorist leaders had been secretly captured, detained and interrogated outside the United States in a program operated by the CIA. <u>See</u> Declaration of Ralph S. DiMaio, dated April 21, 2008 ("DiMaio Decl."), at ¶¶ 111-13; <u>see also</u> <u>www.whitehouse.gov/news/releases/2006/09/print/20060906-3.html</u> (transcript of President George W. Bush's September 6, 2006 speech). In the September 6, 2006 speech, President Bush disclosed that fourteen individuals formerly in CIA custody had been transferred to the custody of the Department of Defense at the United States Naval Station at Guantanamo Bay. DiMaio Decl. at ¶ 113.

President Bush explicitly stated that the specifics of the program, including where the detainees had been confined, the details of their confinement, the employment of alternative interrogation methods, and other operational details, could not be divulged and remained classified. <u>Id.</u> at ¶ 114. Indeed, records describing the details of the CIA's terrorist detention and interrogation program remain highly classified, and have been placed in a Top Secret, Sensitive Compartmented Information special access program to enhance their protection from unauthorized disclosure. <u>See</u> <u>id.</u> at ¶¶ 114-16.

**B.    The FOIA Requests**

*1.    The CCR FOIA Request*

By letter dated December 21, 2004, plaintiff the Center for Constitutional Rights ("CCR")

submitted a FOIA request to the CIA.  See id. at Ex. B ("CCR FOIA Request").  The CCR FOIA

Request seeks 17 categories of records.  See id. at 4-6.  Each of the 17 requests seeks records

pertaining to "Unregistered, CIA, and/or 'Ghost' Detainees," including, inter alia, records that

"propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding

Unregistered, CIA, and/or 'Ghost' Detainees"; records indicating "every location from September

11, 2001 to the present at which the CIA or any other governmental agency has been or is now

holding Unregistered, CIA, or 'Ghost' Detainees"; "a list of techniques used for interrogation at each

facility"; and "records indicating whether and to what extent any other non-governmental

organizations or foreign government had, has, or will have access to Unregistered, CIA, and/or

'Ghost' Detainees."  Id.

2.    The Amnesty International and WSLS FOIA Requests

By letters dated April 25, 2006, plaintiffs Amnesty International, USA ("Amnesty") and

Washington Square Legal Services ("WSLS") submitted two FOIA requests to the CIA.  See

DiMaio Decl. at ¶ 11.  The first of these requests is entitled "Request Submitted Under the Freedom

of Information Act for Records Concerning Detainees, Including 'Ghost Detainees/Prisoners,'

'Unregistered Detainees/Prisoners,' and 'CIA Detainees/Prisoners.'"  See id. at Ex. F (the "First

Amnesty FOIA Request").  The First Amnesty FOIA Request defines the "Scope of Request" as

"individuals who were, have been, or continue to be deprived of their liberty by or with the

involvement of the United States and about whom the United States has not provided public

information."  Id. at 2.

The First Amnesty FOIA Request specifically seeks three categories of records: "records

reflecting, discussing or referring to the policy and/or practice concerning (1) [t]he apprehension,

transfer, detention, and interrogation of persons within the Scope of the Request, . . . (2) current and former places of detention where individuals within the Scope of the Request have been or are currently held, . . . [and] (3) the names and identities of detainees who fall within the scope of this request." Id. at 4-5.

The second of the April 25, 2006, FOIA requests is entitled "Request under the Freedom of Information Act for Records Concerning Ghost Detainee Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees, and the Draft Convention on Enforced Disappearance." DiMaio Decl. at Ex. G  (the "Second Amnesty FOIA Request"). The Second Amnesty FOIA Request seeks records relating to, inter alia, "any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies . . . concerning the handling of ghost or unregistered detainees," as well as records reflecting communications regarding the United States' drafting of reports to the United Nations. See id. at 3-7.

## C.    The CIA's Search for, and Processing of, Responsive Records

On April 21, 2008, the plaintiffs and the CIA entered into a Stipulation and Order Between Plaintiffs and the Central Intelligence Agency Regarding Procedures for Adjudicating Summary Judgment Motions. See DiMaio Decl. at Ex. H (the "Stipulation"). The terms of the Stipulation, which had previously been agreed to in principle by the parties, have governed in part the CIA's search for, and processing of, documents responsive to the FOIA Requests. Id. at ¶¶ 30-32.

Consistent with the Central Intelligence Information Act, 50 U.S.C. § 431(a), the Stipulation provides that the CIA would limit its search to non-operational files of components within the CIA, yet include within the ambit of its search those records originating in operational files that were contained in the OIG's case files with respect to investigations related to the subject matter of the

FOIA Requests ("OIG Investigation Files").  See Stipulation at ¶ 4.  The Stipulation further provides that the CIA's withholding of records that have been or currently are being litigated in <u>ACLU v. Dep't of Defense</u>, 04 Civ. 4151 (AKH), will not be relitigated in the instant action.[1]  <u>See</u> Stipulation at ¶ 1.  Accordingly, for purposes of the instant litigation, the CIA has not searched for or processed records that were litigated, or are currently being litigated, in that action.  <u>See</u> DiMaio Decl. at ¶ 31.

The CIA determined that the non-operational files within the CIA that were most likely to possess records responsive to Plaintiffs' three FOIA requests were located within the Director of CIA Area ("Dir. Area").  <u>See</u> id. at ¶ 33.  The Dir. Area includes those offices within the CIA that report directly to the Director of the CIA, including the Office of General Counsel ("OGC"), the Office of the Inspector General ("OIG") and the Office of Congressional Affairs.  <u>Id.</u> at ¶ 23.  CIA information management professionals therefore searched the records systems of the Dir. Area for responsive records.  <u>Id.</u> at ¶¶ 33-34.  Electronic record systems were searched using the terms "ghost detainee" and "rendition" among other search terms.  <u>Id.</u> at ¶ 35.  In order to locate responsive records within the OIG, the OIG identified all of its closed case files that concerned issues related

---

[1]  The subject matter of the three FOIA requests in the instant suit substantially overlaps with FOIA requests submitted to the CIA that have been the subject of protracted litigation in this District.  By letter dated October 7, 2003, plaintiff CCR, along with the ACLU and other advocacy groups, submitted a FOIA request to the CIA in which they sought 21 categories of records related to the treatment of detainees in United States custody and the rendition of detainees.  <u>See</u> DiMaio Decl. at Ex. D.  Many of the specific requests for documents contained in CCR's October 7, 2003 FOIA request were repeated verbatim in the CCR FOIA Request, except that the term "Detainee" was used instead of the terms "Unregistered, CIA, and/or 'Ghost' Detainee."  <u>Compare</u> CCR Request at 4-6 <u>with</u> DiMaio Decl. at Ex D at 6-10, 9.  Subsequently, by letter dated May 25, 2004, the same group of requestors submitted another FOIA request to the CIA seeking, <u>inter alia</u>, "records concerning the treatment of Detainees in United States custody."  DiMaio Decl. at Ex. E.  The CIA's processing of this FOIA request, and its withholding of documents responsive to this FOIA request, has been the subject of extensive litigation before Judge Hellerstein.  <u>See</u> <u>ACLU v. Dep't of Defense</u>, 04 Civ. 4151 (S.D.N.Y.).

to detainees or rendition.  Id.

The CIA's search identified almost 8,000 records that were responsive, or potentially responsive, to the FOIA Requests.  Id. at ¶ 37 & n.9.  Of those records, the vast majority were located in the OIG's files, including a number that originated in the operational files of the National Clandestine Service of the CIA ("NCS").  Id. at ¶ 37.  This number, however, does not include records from OIG case files where the underlying OIG investigation was still ongoing as of June 7, 2007.  Id. at ¶ 36.[2]  Pursuant to the Stipulation, the CIA has not processed records from open OIG investigation files.  See Stipulation at ¶¶ 4-5.  Instead, the CIA has categorically withheld all such documents pursuant to FOIA Exemption 7(A).  Id.

On April 15, 2008, the CIA released in whole or in part 104 records, each of which contained segregable, non-exempt information.  DiMaio Decl. at ¶ 38.  The CIA will also refer a number of documents that originated with other federal agencies to those agencies for direct response to the requestor, in accordance with the applicable CIA regulation, 32 C.F.R. § 1900.22(b).  Id.  The CIA has withheld the remaining records in their entirety pursuant to 5 U.S.C. § 552(b).  Id.  Specifically, the CIA has withheld records pursuant to FOIA Exemptions 1, 2, 3, 5, 6, 7(A), 7(C) and 7(D).  Id. at ¶¶ 41-171.

Pursuant to the Stipulation, the CIA has prepared an index pursuant to Vaughn v. Rosen, 523 F.2d 1136 (D.C. Cir. 1975) ("the Vaughn index"), which describes a representative sample of 250 of the approximately 7,800 records withheld in full by the CIA.  See DiMaio Decl. at ¶ 39;

---

[2]  Between June 7, 2007, and December 1, 2007, several additional OIG investigations related to detention or rendition issues were completed.  See DiMaio Decl. at ¶ 36.  The records from those files are currently being processed, and will be addressed by the parties separately, in the manner provided by the Stipulation.  Id.; Stipulation at ¶¶ 12-15.

Stipulation at ¶ 8.  In order to select documents for sampling, the documents first were sorted into three categories, based upon the component in which the record was located: the OGC, the OIG, and all other offices of the Dir. Area.  See DiMaio Decl. at ¶ 39; Stipulation at ¶ 7.  The documents were further sorted into four subcategories — emails, reports/memoranda, cables and miscellaneous — and each document was assigned a number.  See DiMaio Decl. at ¶ 39; Stipulation at ¶ 7.  Plaintiffs then selected documents from each of the twelve subcategories by their assigned numbers.  See DiMaio Decl. at ¶ 39; Stipulation at ¶ 8.

## ARGUMENT

## I.    FOIA AND SUMMARY JUDGMENT STANDARDS

FOIA was enacted to "ensure an informed citizenry, . . . needed to check against corruption and hold the governors accountable to the governed."  NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978).  At the same time, FOIA exempts nine categories of information from disclosure, while providing that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  In accordance with FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass."  Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (citation and quotation marks omitted); see also Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999).  While narrowly construed, however, FOIA exemptions "are intended to have meaningful reach and application."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).  Indeed, Congress recognized that public disclosure is not always in the public interest.  Rather, "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."  Ctr. for Nat'l Sec.

Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing John Doe Agency, 493 U.S. at 152).

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is the procedural vehicle by which most FOIA actions are resolved. See, e.g., Miscavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993). "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994) (footnote omitted). The declarations submitted by the agency in support of its determination are "accorded a presumption of good faith." Id.

Moreover, "in the context of national security concerns, courts must accord substantial weight to an agency's affidavit concerning the details of the classified status" of a particular record. Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (quotation marks omitted); see also Diamond v. FBI, 707 F.2d 75, 79 (2d Cir. 1983). "The court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980); see Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) (disapproving the district court's use of "its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure"). Thus, absent evidence of bad faith, where the Court has enough information to understand why an agency classified information, it should not second-guess the agency's facially reasonable classification decisions. See Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security); Wolf v. CIA,

357 F. Supp. 2d 112, 116 (D.D.C. 2004) (in reviewing classification decision, "little more" is required "than a showing that the agency's rationale is logical"), aff'd in part, 473 F.3d 370 (D.C. Cir. 2007).

## II. THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 3

Pursuant to FOIA Exemption 3, the CIA has withheld, either in whole or in part, all but four of the documents described on the CIA's Vaughn index, attached as Exhibit A to the DiMaio Declaration.[3]  Exemption 3 permits the withholding of information as authorized by separate statute. See 5 U.S.C. § 552(b)(3).  In the instant case, the National Security Act of 1947, as amended ("NSA") and the Central Intelligence Agency Act of 1949, as amended (the "CIA Act"), provide the basis for the CIA's withholdings.  DiMaio Decl. at ¶ 130.

In examining an Exemption 3 claim, a court must determine whether 1) the claimed statute is a statute of exemption under FOIA, and 2) whether the withheld material satisfies the criteria of the exemption statute.  See CIA v. Sims, 471 U.S. 159, 167 (1985); A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 143 (2d Cir. 1994); Fitzgibbon, 911 F.2d at 761-62.  As the D.C. Circuit has explained, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." Fitzgibbon, 911 F.2d at 761-62; see also Krikorian v. Dep't of State, 984 F.2d 461, 465 (D.C. Cir. 1993).

It is well-established that Section 102A(i)(1) of the NSA and Section 6 of the CIA Act are both exempting statutes within the meaning of Exemption 3.  See, e.g., Sims, 471 U.S. at 167-68 (discussing prior version of the NSA); Baker v. CIA, 580 F.2d 664, 667 (D.C. Cir. 1978) (section

---

[3]  Documents 174, 247, 249 and 250 have not been withheld pursuant to Exemption 3.

6 of the CIA Act); <u>New York Times Co. v. U.S. Dep't of Defense</u>, 499 F. Supp. 2d 501, 512 (S.D.N.Y. 2007) (section 102A(i)(1) of the amended NSA). The current version of the NSA provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2007). Previously, the NSA conferred this same authority on the Director of Central Intelligence. 50 U.S.C.A. § 403-3(c)(7) (West 2003).[4] In this case, the DNI directed the Director of the CIA to prevent the unauthorized disclosure of intelligence sources and methods. DiMaio Decl. at ¶ 131.

Section 6 of the CIA Act similarly prohibits the unauthorized disclosure of intelligence sources and methods. Specifically, the CIA Act provides that the CIA shall be exempted from the provisions of any law that "require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C.A.

---

[4] The NSA was amended by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (December 17, 2004), which created the position of the DNI. The effective date of the Intelligence Reform and Terrorism Prevention Act of 2004 was "not later than six months" after the enactment date of December 17, 2004. Pub. L. No. 108-458, Title I, § 1097(a), 118 Stat. at 3698. Accordingly, although many of the pre-2004 cases discussed in the text <u>infra</u>, including <u>CIA v. Sims</u>, refer to the CIA's broad authority to "protect intelligence sources and methods" under the NSA, that authority is now vested in the DNI under the amended statute.

Ordinarily, it is "the withholding statute in effect at the time of plaintiffs' requests" that governs the requests. <u>ACLU v. U.S. Dep't of Defense</u>, 389 F. Supp. 2d 547, 559 n.8 (S.D.N.Y. 2005); <u>see also</u> <u>Public Citizen Health Research Group v. FDA</u>, 704 F.2d 1280, 1284 (D.C. Cir. 1983). As the CCR Request is dated December 21, 2004, and predates the effective date of the Intelligence Reform and Terrorism Protection Act of 2004, it is governed by the prior version of the NSA, while the First Amnesty Request and Second Amnesty Requests, which were submitted to the CIA in April 2006, would be governed by the amended NSA. In the present case, however, this is a distinction without a difference, as the CIA is acting under the express direction of the DNI in protecting information regarding "intelligence sources and methods" with respect to all three of the FOIA requests that are at issue in this litigation. DiMaio Decl. at ¶ 131. Thus, for purposes of clarity, this brief shall refer solely to the CIA's authority to protect intelligence sources and methods under the NSA.

§ 403g (West Supp. 2007) (emphasis added). One of the CIA's primary functions is to "collect intelligence through human sources and by other appropriate means." 50 U.S.C.A. § 404-4a(d)(1) (West Supp. 2007). Accordingly, the CIA relies on the CIA Act to withhold any information that would reveal the functions of the CIA, including the collection of foreign intelligence through intelligence sources and methods. DiMaio Decl. at ¶ 135.[5]

To establish Exemption 3's second prong—that the information at issue falls within the scope of the withholding statutes—the CIA must demonstrate that the "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." Phillippi v. CIA, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976). As the Supreme Court held in Sims, the CIA's discretion in determining what would constitute an unauthorized disclosure of intelligence sources and methods is "very broad." 471 U.S. at 169-70. The Court thus made clear that the judiciary must defer to the CIA's judgments with respect to whether disclosures affect intelligence sources and methods: "[I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." Id. at 180; see also Hunt v. CIA, 981 F.2d 1116, 1120 (9th Cir. 1992) (describing CIA's discretion to withhold information under Exemption 3 as "a near-blanket FOIA exemption"); Arabian Shield Dev. Co. v. CIA, No. 3-98-CV-0624-BD, 1999 WL 118796, at *4 (N.D. Tex. Feb. 26, 1999) (the CIA's determination of what would "lead to the unauthorized disclosure of intelligence sources and methods" is "almost unassailable"). Such broad discretion

---

[5] The CIA also invokes the CIA Act as justification for its withholding of CIA employee names, titles, signatures, initials, and employee numbers, as well as internal file numbers and internal organizational data. Id. at ¶ 135.

is justified because even "superficially innocuous information" might reveal valuable intelligence

sources and methods.  <u>Sims</u>, 471 U.S. at 178; <u>see also</u> <u>Fitzgibbon</u>, 911 F.2d at 762.

In <u>Sims</u>, the Supreme Court gave a broad reading to "intelligence sources and methods"

under the NSA.  471 U.S. at 169-74.  The Supreme Court held that "[t]he plain meaning of the

statutory language, as well as the legislative history of the National Security Act, . . . indicates that

Congress vested in the Director of Central Intelligence very broad authority to protect all sources

of intelligence information from disclosure."  471 U.S. at 168-69.  In reaching this conclusion, the

Court noted that with the NSA, Congress granted the CIA "sweeping power" to shield its activities

from public disclosure:

> Section 102(d)(3) specifically authorizes the Director of Central Intelligence
> to protect "intelligence sources and methods" from disclosure.  Plainly the
> broad sweep of this statutory language comports with the nature of the
> Agency's unique responsibilities. . . . [T]he Director must have the authority
> to shield those Agency activities and sources from any disclosures that would
> unnecessarily compromise the Agency's efforts.

<u>Id.</u> at 169.  The Court emphasized that the "plain meaning" of the statute "may not be squared with

any limiting definition that goes beyond the requirement that the information fall within the

Agency's mandate to conduct foreign intelligence."  <u>Id.</u>  Congress, the Court observed, did not limit

the scope of "intelligence sources and methods" in any way.  <u>Id.</u>  Rather, it "simply and pointedly

protected all sources of intelligence that provide, or are engaged to provide, information the Agency

needs to perform its statutory duties with respect to foreign intelligence."  <u>Id.</u> at 169-70.

Moreover, to claim the protections available under the NSA and CIA Act, the CIA need not

meet the procedural requirements for the classification of national security information under

Executive Order ("E.O.") 12958, as amended.[6] Cf. Gardels v. CIA, 689 F.2d 1100, 1107 (D.C. Cir. 1982) (executive order governing classification of documents not designed to incorporate into its coverage the CIA's full statutory power to protect all of its "intelligence sources and methods"). For example, unlike Section 1.1(a)(4) of E.O. 12958, the NSA and the CIA Act do not require a determination that the disclosure of information would be expected to result in damage to national security.  Compare 50 U.S.C.A. §§ 403-1(i)(1) and 403g with 68 Fed. Reg. at 15315.  The NSA and the CIA Act also do not require the CIA to identify or explain the damage to intelligence sources and methods that would result from a disclosure, as is required by Section 1.1(a)(4) of E.O. 12958. Compare 50 U.S.C.A. §§ 403-1(i)(1) and 403g with 68 Fed. Reg. at 15315.  Accordingly, the CIA's mandate to protect intelligence sources and methods under the NSA, as authorized by the DNI, and the CIA Act is broader than its ability to classify information in accordance with E.O. 12958.[7]

Here, Mr. DiMaio has explained that the information withheld under Exemption 3 concerns a wide range of CIA intelligence sources and methods, including the use of human sources for intelligence gathering, see DiMaio Decl. at ¶¶ 58-64, 135; the collection of information from foreign liaisons and governments, see id. at ¶¶ 65-75, 135; the use of cover identities for its employees and

---

[6]  Executive Order 12958 was amended by Executive Order 13292.  See Executive Order No. 13292, 68 Fed. Reg. 15315 (March 28, 2003).  All citations to Executive Order 12958 are to the order as amended by Executive Order No. 13292.

[7]  The Court may thus resolve the CIA's withholding of documents under Exemption 3 without ever considering the separate question of whether the withheld information meets all the criteria for classification under E.O. 12958, and are therefore is also exempt from disclosure pursuant to Exemption 1.  See Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55, 58 n.3 (D.C. Cir. 2003) ("Because we conclude that the Agency easily establishes that the records AARC seeks are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1."); Hunt, 981 F.2d at 1118 ("We need not decide in this case whether exposure of the Agency's 'sources and methods' equals 'damage to the national security' under Exemption 1" because "Exemption 3 provides sufficient grounds to hold in favor of the Agency").

the mechanisms used protect those cover activities, see id. at ¶¶ 84-88, 135; information regarding the CIA's operation of covert field installations abroad, see id. at ¶¶ 89-92, 135; the use of cryptonyms and pseudonyms, see id. at ¶¶ 93-97, 135; dissemination control markings, see id. at ¶¶ 101-04, 135; clandestine intelligence collection operations, see id. at ¶¶ 105-08, 135; the CIA's terrorist detention and interrogation program, see id. at ¶¶ 118-19, 135; and interrogations, see id. at ¶¶ 109, 135, including the use of alternative interrogation procedures, see id. at ¶¶ 119-21, 135.[8]

Records describing these sources and methods, including records describing the CIA's terrorist detention and interrogation program, plainly fall within the protections of the NSA and the CIA Act. See, e.g., Riquelme v. CIA, 453 F. Supp. 2d 103, 110-11 (D.D.C. 2006) (human source information protected under Exemption 3); Davy v. CIA, 357 F. Supp. 2d 76, 86 (D.D.C. 2004) (cryptonyms, CIA employee names, identifiers, titles, filing instructions and organizational data properly withheld under Exemption 3); Fitzgibbon v. CIA, 578 F. Supp. 704, 723 (D.D.C. 1983) (cryptonyms properly withheld under Exemption 3); Holland v. CIA, Civ. A. No. 92-1233, 1992 WL 233820, at *9-*10 (D.D.C. Aug. 31, 1992) (location of covert CIA field installation properly withheld under Exemption 3); Assassination Archives and Research Ctr. v. CIA, 720 F. Supp. 217, 222 (D.D.C. 1989) (cryptonyms, locations of covert field installations, foreign intelligence activities, CIA employee names, official titles, and organizational data properly withheld under Exemption 3).

The CIA also acted well within the scope of its broad authority in determining that its detention activities are likewise "intelligence sources and methods" that must be protected from disclosure under the NSA and the CIA Act. The CIA was authorized to set up terrorist detention

---

[8]   The chart annexed to the DiMaio Declaration as Exhibit J specifies which of these intelligence methods and sources are referenced in each of the documents described on the Vaughn index.

facilities outside the United States by the President for the purpose of gathering intelligence to prevent future terrorist attacks. See DiMaio Decl. at ¶ 111. The CIA's detention activities thus fall within its statutory mandate. See 50 U.S.C. § 403-3(d) (1994); E.O. 12333, 3 C.F.R. 200 (1982), reprinted as amended in 50 U.S.C.A. § 401 note at 21 (providing statutory authority for CIA to collect foreign intelligence). The CIA thereby has "sweeping power" to protect the unauthorized disclosure of those activities under the NSA and the CIA Act. See Sims, 471 U.S. at 168-70; see also the CIA Act, 50 U.S.C.A. § 403g (exempting disclosure of CIA "functions").

For example, as Mr. DiMaio explained, "interrogation is one means the CIA uses to collect vital intelligence." DiMaio Decl. at ¶ 109. Through interrogations of terrorist operatives, including interrogations using alternative interrogation procedures, the CIA has gained invaluable information regarding "probable targets and likely methods for attacks on the United States," information about al Qaeda's organization, financing, communications and logistics, and information that led to the capture of other al Qaeda operatives. Id. at ¶¶ 119-20. Accordingly, "the conditions of confinement and interrogation methods used by the CIA, the locations of CIA intelligence activities overseas, and the assistance provided by certain foreign governments in furtherance of these activities are all . . . intelligence sources and methods." Id. at ¶ 112.

The CIA's determination that the disclosure of the withheld documents would reveal information regarding these particular intelligence sources and methods is entitled to substantial weight from this Court. See, e.g., Wolf, 473 F.3d at 374. The CIA has explained, with reasonable specificity, the intelligence sources and methods that are discussed in the documents, and provided the Court with sufficient detail to demonstrate the logical connection between the information contained in the documents and the CIA's decision to withhold the documents from the FOIA

requestors.  Accordingly, the withheld documents, which contain information regarding intelligence sources and methods, including interrogation methods and authorized detention activities, were properly withheld under Exemption 3.

## III.    THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 1

Pursuant to Exemption 1, the CIA has likewise withheld, in whole or in part, all but thirteen of the documents on the Vaughn index.[9]  Exemption 1 protects records that are: "(A) specifically authorized under criteria established by an [E.O.] to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to [an E.O.]."  5 U.S.C. § 552(b)(1). An agency can demonstrate that it has properly withheld information under Exemption 1 if it shows that the records at issue logically fall within the exemption (i.e., that an E.O. authorizes the classification of the information at issue), and that it followed the proper procedures in classifying the information.  See Salisbury v. United States, 690 F.2d 966, 970-73 (D.C. Cir. 1982); Military Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981).

E.O. 12958 governs the classification of national security information.  68 Fed. Reg. at 15315-34.  Section 1.1 lists four requirements for the classification of national security information: (1) an "original classification authority" classifies the information; (2) the information "is owned by, produced by or for, or [is] under the control of the United States Government;" (3) the information must fall within one of eight protected categories of information listed in Section 1.4 of the order; and (4) an original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national

---

[9]  Documents 31, 42, 59, 88, 125, 127, 152, 158, 174, 175, 240, 247 and 249, although properly withheld, were not withheld pursuant to Exemption 1.

- 16 -

security"[10] and be "able to identify or describe the damage." Id. at 15315. Documents which contain classified information must be marked in accordance with Section 1.6(b), or, if derivatively classified, in accordance with Section 2.1. Furthermore, Section 1.7(a) prohibits the classification of information for the purpose of concealing violations of law, inefficiency, or administrative error; preventing embarrassment to a person, organization, or agency; restraining competition; or preventing or delaying the release of information that does not require protection in the interest of the national security. Id. at 15318.

Here, Mr. DiMaio's declaration establishes that E.O. 12958 authorized the classification of the information at issue in this case and that such information is in fact properly classified pursuant to each of the four criterion of E.O. 12958. First, Mr. DiMaio is an original classification authority who has determined that information pertaining to the various intelligence sources, methods and activities he describes in Section III.A.2 of his declaration is currently and properly classified within the meaning of E.O. 12958. DiMaio Decl. ¶ 46. Second, Mr. DiMaio affirms that this information is owned by, produced by or for, or is under the control of the United States Government. Id. at ¶ 47.

Third, Mr. DiMaio's declaration establishes that the withheld information falls within one or more of the categories of information set forth in Section 1.4 of E.O. 12958. DiMaio Decl. at ¶ 48; see also 68 Fed. Reg. at 15317. Specifically, Mr. DiMaio has determined that the information falls within three general categories: "foreign government information" as specified in Section 1.4(b); "information concerning intelligence activities (including special activities) and intelligence sources or methods" as specified in Section 1.4(c); and "foreign relations or foreign activities of the

---

[10] Pursuant to Section 1.1(c), the "unauthorized disclosure of foreign government information is presumed to cause damage to the national security." Id. at 15315.

United States, including confidential sources" as specified in Section 1.4(d). <u>See</u> DiMaio Decl. at ¶ 48. As discussed <u>supra</u> in the context of Exemption 3, the DiMaio declaration extensively describes the intelligence sources and methods, as well as the foreign relations or foreign activities, that are reflected in the withheld documents. <u>See</u> DiMaio Decl. at Section III.A.2. Just as the withheld information falls within the scope of "intelligence sources and methods" under the NSA, so too it is properly classified under Section 1.4 of the Executive Order.

Fourth, Mr. DiMaio details at great length the damage to the national security that reasonably could be expected to result from the unauthorized disclosure of the each of the specific subcategories of classified information contained in the documents. <u>Id.</u> at ¶ 50. For example, with respect to alternative interrogation procedures, Mr. DiMaio states that "[t]he U.S. Government is aware that al Qaeda and other terrorists train in counter-interrogation methods. Public disclosure of the methods used by the CIA would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques in the future." <u>Id.</u> at ¶ 121. Similarly, Mr. DiMaio explains that disclosing the details of CIA interrogations of detainees in the custody of other governmental agencies would identify the CIA's intelligence targets, reveal what information the CIA knows and does not know about that target, and identify the information in which the CIA has a particular interest. <u>Id.</u> at ¶ 109. "This information would greatly benefit a foreign terrorist organization or intelligence service, as it would disclose gaps in the CIA's intelligence collection, identify areas of vital concern to the United States, and allow the foreign intelligence service or terrorist organization to take countermeasures." <u>Id.</u> at ¶ 109.

Mr. DiMaio also describes the harm to foreign relations that could result from the disclosure

of documents describing the terrorist detention and interrogation program. <u>See</u> DiMaio Decl. at ¶¶

122-27.  He explains that

> foreign governments have provided critical assistance to CIA
> counterterrorism operations, including but not limited to hosting of foreign
> detention facilities, under the condition that their assistance be kept secret.
> If the United States demonstrates that it is unwilling or unable to stand by its
> commitments to foreign governments, they will be less willing to cooperate
> with the United States on counterterrorism activities.

<u>Id.</u> at ¶ 123.  Indeed, Mr. DiMaio points to an instance where the CIA's relationship with a foreign

government was damaged as a result of a leak of its role in the CIA program.  <u>Id.</u> at ¶ 125.

Finally, Mr. DiMaio affirms that CIA employees have reviewed the documents included on

the CIA's <u>Vaughn</u> index and determined that they are all properly marked, <u>see id.</u> at ¶ 52, and,

moreover, that the information withheld pursuant to Exemption 1 was not classified for an improper

purpose, as prohibited by Section 1.7(a) of the E.O.:

> With respect to the information relating to CIA sources, methods, and
> activities described in Section III(A)(2) of this declaration . . . I have
> determined that this information has not been classified in order to conceal
> violations of law, inefficiency, or administrative error; prevent
> embarrassment to a person, organization or agency; restrain competition; or
> prevent or delay the release of information that does not require protection
> in the interests of national security.

<u>Id.</u> at ¶ 51.

Where, as here, the CIA has satisfied the conditions of Section 1.1 of E.O. 12958, courts

have repeatedly endorsed the CIA's ability to classify its intelligence sources and methods.  <u>See,</u>

<u>e.g.</u>, <u>Hogan v. Huff</u>, 00 Civ. 6753 (VM), 2002 WL 1359722, at *8 (S.D.N.Y. June 21, 2002)

(information properly withheld under Exemption 1 where disclosure of the information "would

potentially harm the agency by exposing its methods"); <u>Wolf</u>, 357 F. Supp. 2d at 116 (classification

warranted where "disclosure could reveal general CIA methods of information gathering").

Accordingly, the CIA has properly withheld documents under Exemption 1.

## IV.    THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 5

Pursuant to Exemption 5, the CIA also has withheld documents either in whole or in part. Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5). "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges."  Hopkins v. HUD, 929 F.2d 81, 84 (2d Cir. 1991); see also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975). "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (e.g., attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5 . . . ." Tigue v. DOJ, 312 F.3d 70, 76 (2d Cir. 2002) (citation omitted).  The exemption protects both "intra-" and "inter-agency" records.  5 U.S.C. § 552(b)(5).  "While 'intra-agency' documents are those that remain inside a single agency, and 'inter-agency' documents are those that go from one governmental agency to another, they are treated identically by courts interpreting FOIA."  Tigue, 312 F.3d at 77.

As described on the attached Vaughn index, the CIA has withheld documents, in whole or in part, under the deliberative process privilege, the attorney-client privilege, the attorney work product doctrine, the presidential communication privilege, and the privilege protecting witness statements to OIG investigators.

### A.    The Deliberative Process Privilege

In enacting Exemption 5, "[o]ne privilege that Congress specifically had in mind was the 'deliberative process' or 'executive' privilege, which protects the decisionmaking processes of the

- 20 -

executive branch in order to safeguard the quality and integrity of governmental decisions."

Hopkins, 929 F.2d at 84; see also H.R. Rep. No. 89-1497, at 10 (1966) reprinted in 1966

U.S.C.C.A.N. 2418, 2427 (recognizing that "a full and frank exchange of opinions would be

impossible if all internal communications were made public" and that "advice from staff assistants

and the exchange of ideas among agency personnel would not be completely frank if they were

forced to 'operate in a fishbowl.'").

      As the Supreme Court has explained,

> the deliberative process privilege rests on the obvious realization that
> officials will not communicate candidly among themselves if each
> remark is a potential item of discovery and front page news, and its
> object is to enhance the quality of agency decisions by protecting
> open and frank discussion among those who make them . . . .

Klamath, 532 U.S. at 8-9 (citations and quotation marks omitted); see also NLRB v. Sears, Roebuck

& Co., 421 U.S. 132, 150-51 (1975) ("[H]uman experience teaches that those who expect public

dissemination of their remarks may well temper candor with a concern for appearances . . . to the

detriment of the decisionmaking process.  Manifestly, the ultimate purpose of this long-recognized

privilege is to prevent injury to the quality of agency decisions.") (citation, footnote and quotation

marks omitted) (alteration in original); Carter v. U.S. Dep't of Commerce, 307 F.3d 1084, 1089 (9th

Cir. 2002) ("The purpose of this privilege is to allow agencies freely to explore possibilities, engage

in internal debates, or play devil's advocate without fear of public scrutiny." (citation and quotation

marks omitted)); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)

(deliberative process privilege protects documents the release of which would "stifle honest and

frank communication within the agency").

      The deliberative process privilege serves this purpose in three important ways:  first, by

assuring that "subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations;" second, by protecting "against premature disclosure of proposed policies before they have been finally formulated or adopted;" and finally, by protecting "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons of the agency's action." Grand Central P'ship, 166 F.3d at 481 (citations and quotation marks omitted).

An agency record must satisfy two criteria to qualify for the deliberative process privilege: it "must be both 'predecisional' and 'deliberative.'" Id. at 482 (citations omitted); see also Hopkins, 929 F.2d at 84; Local 3, Int'l Brotherhood of Elec. Workers v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988). A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." Renegotiation Bd., 421 U.S. at 184, quoted in Hopkins, 929 F.2d at 84, and Grand Central P'ship, 166 F.3d at 482. This category of material includes "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Grand Central P'ship, 166 F.3d at 482 (citation and quotation marks omitted).

While a document is necessarily predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates," see id., the government need not "point to a specific decision" made by the agency in establish the predecisional nature of a particular record, Tigue, 312 F.3d at 80. Rather, so long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional. Id. at 80; see also Moye, O'Brien, O'Rourke, Hogan, & Pickert v. National R.R. Passenger Corp., 376 F.3d 1270, 1280 (11th Cir. 2004) ("Amtrak need not cite to a specific policy decision in connection with which the audit work papers and internal memoranda

were prepared in order for these documents to be protected from disclosure by the deliberative process privilege."). As the Supreme Court explained, the "emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." Sears, Roebuck & Co., 421 U.S. at 151 n.18.

"A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." Grand Central P'ship, 166 F.3d at 482 (citation and quotation marks omitted; alteration in original); see also New York Public Interest Research Group v. EPA, 249 F. Supp. 2d 327, 337 (S.D.N.Y. 2003) ("A record is deliberative when 'it reflects the give-and-take of the consultative process.'") (quoting Wolfe v. HHS, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)) (citation and quotation marks omitted). The Second Circuit has defined "deliberative" as "indicative of the agency's thought processes." Local 3, 845 F.2d at 1180. In determining whether a document is deliberative, courts inquire as to whether it "formed an important, if not essential, link in [the agency's] consultative process," Grand Central P'ship, 166 F.3d at 483, whether it reflects the opinions of the author rather than the policy of the agency, id. at 483; Hopkins, 929 F.2d at 84, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," Grand Central P'ship, 166 F.3d at 483.

The vast majority of the documents for which the deliberative process privilege is claimed are predecisional recommendations and proposals, see, e.g., Documents 3-5, 17, 18, 23, 32-37, 40,

- 23 -

48, 62-63, 82-83, 101-09, 111, 123, 126-29, 131-40, 142-46, 149-51, 154-55, 157, 159, 162-71, 173, 176, 179, 185-86, 191-92, 194, 198, 200, 202, 204, 214, 223, 225, 230-33 and 242, and records reflecting internal discussions regarding policy issues that were under consideration within the Executive Branch, see, e.g., Documents 24, 41-43, 45-47, 61, 79, 92, 110, 113-14, 116-17, 127, 130, 148, 152, 161, 183-84, 229 and 244.  See DiMaio Decl. at ¶ 145 & Ex. A; Declaration of Margaret P. Grafeld, dated April 18, 2008 ("Grafeld Decl."), at ¶¶ 12-15, 17-20; Declaration of John F. Hackett, dated April 18, 2008 ("Hackett Decl.") at ¶¶ 11-21; Declaration of Dione Jackson Stearns, dated April 11, 2008 ("Stearns Decl.") at ¶¶ 7, 9-10; Declaration of Karen L. Hecker, dated April 21, 2008 ("Hecker Decl."), at ¶¶ 4-5, 11-12.  The deliberative process privilege plainly encompasses such documents because they "reflect[] advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated." Hopkins, 929 F.2d at 84-85 (citation and quotation marks omitted); see also Grand Central P'ship, 166 F.3d at 482 ("The privilege protects recommendations . . . proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy for the agency.").  This is true regardless of whether the recommendations or proposals originated from subordinate employees within a particular agency, or instead were part of interagency discussions with respect to a particular policy issue.  See, e.g., Renegotiation Bd., 421 U.S. at 188 ("Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency.").  Accordingly, these documents are properly exempt under Exemption 5.

The CIA properly withheld Documents 6, 7, 16, 33-35, 41, 51, 70, 75, 78 and 86-87 because

they contain legal advice provided from CIA counsel and Department of Justice Office of Legal Counsel ("OLC") attorneys to the CIA, as well as Documents 67, 69, 71-72, 76, 80, 81, 84, 93 and 99 because they constitute the CIA's requests for legal advice from OLC. See DiMaio Decl. at ¶ 145 & Ex. A; Declaration of Paul P. Colborn, dated April 21, 2008 ("Colborn Decl.") at ¶¶ 10-14; see also Grafeld Decl. at ¶¶ 15-16, 20 (Documents 82, 103). Legal advice, no less than other types of advisory opinions, "fits exactly within the deliberative process rationale for Exemption 5." Brinton v. Dep't of State, 636 F.2d 600, 604 (D.C. Cir. 1980); see also, e.g., Int'l Paper Co. v. Federal Power Comm'n, 438 F.2d 1349, 1358-59 (2d Cir. 1971); Nat'l Council of La Raza v. DOJ, 339 F. Supp. 2d 572, 582 (S.D.N.Y. 2004), aff'd by 411 F.3d 350 (2d Cir. 2005); Morrison v. DOJ, Civ. A. No. 87-3394, 1988 WL 47662, at *1-2 (D.D.C. Apr. 29, 1988).

The CIA further withheld draft documents, and comments on draft documents, pursuant to the deliberative process privilege. See, e.g., DiMaio Decl. at ¶ 145 & Ex. A (Documents 1, 8-14, 19-20, 25, 30, 36, 65-66, 68, 73, 77, 82, 103, 112, 115, 158, 160, 226, 228, 235-38, 241); Colborn Decl. at ¶¶ 4, 12 (Documents 1, 8-13, 19, 25, 30, 65, 68 and 86); Grafeld Decl. at ¶¶ 13-15, 19-22 (Documents 82 and 103); Hackett Decl. at ¶ 20;  Hecker Decl. at ¶¶ 3, 9-10 (Document 20). It is well-established that "draft documents, by their very nature, are typically predecisional and deliberative." NAACP Legal Defense and Educ. Fund, Inc. v. U.S. Dep't of Housing, No. 07 Civ. 3378 (GEL), 2007 WL 4233008, at *11 (S.D.N.Y. Nov. 30, 2007); see also, e.g., Coastal States, 617 F.2d at 866 (recognizing that draft documents fall within scope of deliberative process privilege); Grand Central P'ship, 166 F.3d at 482; Moreland Properties, LLC v. City of Thornton, 07-cv-00716-EWN-MEH, 2007 WL 2523385, at *3 (D. Colo. Aug. 31, 2007); Van Aire Skyport Corp. v. FAA, 733 F.Supp. 316, 321 (D.Colo.1990). Further, suggested revisions, comments, or opinions expressed

- 25 -

about a draft are no less predecisional and deliberative than the actual text of the draft. Robert v. HHS, 217 Fed. Appx. 50 (2d Cir. 2007), aff'g No. 01-CV-4778 (DLI), 2005 WL 1861755 (E.D.N.Y. Aug. 1, 2005).

Finally, the privilege attaches to the talking points and briefing papers that the CIA has withheld under Exemption 5. See, e.g., DiMaio Decl. at ¶ 145 & Ex. A (Documents 22, 96, 98, 100, 120, 182, 243, 248); Hackett Decl. at ¶ 20. The disclosure of "work plans, status reports, briefings, opinion papers, and proposals" would "stifle the candor necessary in an agency's policy making process." Hornbostel v. DOI, 305 F. Supp. 2d 21, 31 (D.D.C. 2003).

In sum, the CIA has properly withheld records reflecting predecisional deliberations within the Executive Branch pursuant to Exemption 5.

### B.    Attorney Client Privilege

The CIA has likewise properly supported its assertion of the attorney client privilege with respect to 60 documents described on the Vaughn index. See DiMaio Decl. at ¶ 143 & Ex. A. The attorney-client privilege is designed "to encourage full and frank communication between attorneys and their clients," and thereby encourage "the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). It is one of the oldest recognized privileges for confidential communications. Id. The Second Circuit has defined the privilege as applying "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (quotation marks omitted).

The CIA satisfied the prerequisites for claiming the privilege for each of the documents. First, with respect to Documents 6, 7, 16, 67, 69, 70, 71, 72, 75, 76, 78, 80, 81, 84, 86, 87, 93 and 99, for example, the CIA established that these records constitute communications between a client, the CIA, and its attorneys, attorneys at OLC, relating to matters for which CIA sought OLC's legal advice, based upon facts provided confidentially to OLC by the CIA. DiMaio Decl. at ¶ 143 & Ex. A; Colborn Decl. at ¶¶ 2-3, 10-14. OLC is, moreover, "a professional legal advisor, acting in its capacity as such." In re Lindsey, 148 F.3d 1100, 1106 (D.C. Cir. 1998); see also Colborn Decl. at ¶ 2-3, 5. The record establishes that this advice was intended to be kept confidential and was in fact kept confidential. DiMaio Decl. at ¶ 143; Colborn Decl. at ¶ 6.

In short, the communications at issue were understood to be confidential communications between a government attorney and his client at the time they were made for the purpose of seeking legal advice, and have not been disclosed to anyone else. Because CIA officials were dealing with their "attorneys as would any private party seeking advice," Coastal States Gas Corp. v. DOE, 617 F.2d 854, 863 (D.C. Cir. 1980), these communications fit squarely within the protection of the attorney-client privilege, see Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 36 (D.D.C. 2000); Nat'l Broadcasting Co. v. SBA, 836 F. Supp. 121, 124-25 (S.D.N.Y. 1993). Thus, in addition to being protected by the deliberative process privilege, the withheld documents are attorney-client privileged, and on that basis have also properly been withheld under Exemption 5.

Second, documents reflecting communications to, from or among attorneys with the CIA's OGC, which reflect the legal advice, analysis or opinions provided by those attorneys to its client, the CIA, have also properly been withheld under the attorney-client privilege. DiMaio Decl. at ¶ 143

- 27 -

& Ex. A (Documents 18, 28, 29, 33-35, 41, 43, 44, 49, 51, 53, 66, 102, 137, 148, 176, 177, 184, 186,

191, 192, 194, 199, 200); <u>see also</u> Hecker Decl. at ¶ 14 (Department of Defense legal advice

contained in Documents 20, 103, and 192); Grafeld Decl. at ¶¶ 10, 16, 21 (State Department legal

advice contained in Documents 103 and 82).  In the governmental context, the client may be the

agency itself, and the attorney may be an agency lawyer.  <u>See, e.g.</u>, <u>In re Lindsey</u>, 148 F.3d 1100,

1104 (D.C. Cir. 1998).

### C.      Attorney Work Product Doctrine

The CIA has also properly invoked the work product privilege in withholding 47 of the

documents described on the <u>Vaughn</u> index.  The attorney work product doctrine exempts from

disclosure "mental impressions, conclusions, opinions, or legal theories of an attorney or other

representative of a party concerning the litigation," <u>see</u> Fed. R. Civ. P. 26(b)(3), prepared "in

anticipation of litigation," <u>A. Michael's Piano</u>, 18 F.3d at 146.  The "anticipation of litigation"

element has been read in the Second Circuit to be satisfied where, "in light of the nature of the

document and the factual situation in the particular case, the document can fairly be said to have been

prepared or obtained <u>because of</u> the prospect of litigation."  <u>United States v. Adlman</u>, 134 F.3d 1194,

1202 (2d Cir. 1998).

In adopting the "because of" formulation, the Second Circuit rejected the requirement that

documents be prepared "primarily or exclusively to assist in litigation," <u>id.</u> at 1198, holding instead

that materials created to assist a business decision may qualify so long as litigation was the

motivating cause and the material "analyz[es] the likely outcome of that litigation."  <u>Id.</u> at 1202.

Material that would have been created in the ordinary course of business, whether or not litigation

existed or was expected, does not fall under the privilege—the question for such material is whether

it "would have been created in essentially similar form irrespective of the litigation." Id. The determination thus turns on the primary motivation behind the creation of the purportedly privileged material. See Hardy v. New York News Inc., 114 F.R.D. 633, 644 (S.D.N.Y. 1987); see also Rexford v. Olczak, 176 F.R.D. 90, 91 (W.D.N.Y. 1997) (courts look to whether, at the time the materials were created, the party asserting the privilege believed that "litigation was likely and whether that belief was reasonable") (quotation omitted); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 475 (S.D.N.Y. 2003) (same).

For example, Documents 67, 69, 71, 72, 76, 80, 81, 84, 93 and 99 "are letters written by CIA attorneys to their legal advisors at [OLC], soliciting legal advice, analysis and opinions regarding the use of an alternative set of interrogation procedures with respect to detainees." DiMaio Decl. at ¶ 138. Similarly, Documents 1, 6-13, 16, 19, 25, 30, 32, 49, 51, 65, 68, 70, 75, 78, 86 and 87 contain legal advice, analysis and opinions prepared by OLC attorneys in response to requests from the CIA. Id. And Documents 33, 35, 43, 53, and 66 "each reflect CIA attorneys' analysis, thoughts, opinions, mental impressions, and/or advice regarding the legal implications of certain operational aspects of the Program." Id. at ¶ 140.

Both the requests for legal advice and the legal advice provided to the CIA were prepared in contemplation of criminal, civil and administrative proceedings that the CIA viewed as "virtually inevitable." Id. at ¶ 139. Mr. DiMaio made clear that this legal advice "was not solicited in the ordinary course of business," nor would it have been prepared but for the CIA's concern about future litigation. Id. Moreover, the CIA's concern regarding the prospect of future litigation was eminently reasonable given that, at the time the CIA requested and received this legal advice, proceedings had already commenced in a number of fora with respect to the CIA's terrorist detention and interrogation

- 29 -

program.  See id. at ¶¶ 139, 141.  Given the CIA's subjective and reasonable belief that litigation would follow from the use of alternative interrogation procedures, it has established that these documents are protected by the attorney work product doctrine.  See Prebena Wire Bending Mach. Co. v. Transit Worldwide Corp., No. 97 Civ. 9336 (KMW) (HBP), 1999 WL 1063216, at *4 (S.D.N.Y. Nov. 23, 1999) ("Since Universal has submitted unrebutted evidence that it had a subjective belief that litigation would follow and that its subjective belief was reasonable, . . . [the] emails are protected by the attorney work-product doctrine."); see also In re Grand Jury Proceedings, No. M-11-189 (LAP), 2001 WL 1167497, at *14 (S.D.N.Y. Oct. 3, 2001) ("[A] document may be protected even if it was 'created prior to the event giving rise to litigation' because '[i]n many instances, the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred.'").

Accordingly, the CIA has properly relied upon the attorney work product doctrine to withhold these documents.

### D.    Presidential Communications Privilege

Exemption 5 also exempts from disclosure information protected by the presidential communications privilege.  See Judicial Watch, Inc. v. DOJ, 365 F.3d 1108, 1113 (D.C. Cir. 2004). The Supreme Court has recognized a "presumptive privilege for Presidential communications" that is "fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution."  United States v. Nixon, 418 U.S. 683, 708 (1974).  The presidential communications privilege protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'"  Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting U.S. v. Nixon, 418

U.S. at 708, 711, 713).   It is justified in part because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." U.S. v. Nixon, 418 U.S. at 708.  The presidential communications privilege "covers final and post-decisional materials as well as pre-deliberative ones." In re Sealed Case, 121 F.3d at 745; see also Judicial Watch, Inc., 365 F.3d at 1113-14.

In addition to protecting communications directly with the President, the privilege protects communications involving senior presidential advisers, including "both [] communications which these advisers solicited and received from others as well as those they authored themselves," in order to ensure that such advisers investigate issues and provide appropriate advice to the President. In re Sealed Case, 121 F.3d 729, 752 (D.C. Cir. 1997).

Pursuant to the presidential communications privilege, the CIA has properly withheld information from eight documents, and the Office of the DNI ("ODNI") has properly withheld information from 11 documents. See DiMaio Decl. ¶¶ 151-56 & Ex. A (Documents 14, 17, 24, 29, 62, 98, 100, 152); Hackett Decl. ¶¶ 11-17, 24-27 (Documents 3-4, 103-104, 107-11, 130, 243).  All 19 documents reflect communications between senior presidential advisers and other United States government officials, including CIA and ODNI officials, where presidential advisers solicited and received information and/or recommendations in the course of gathering information related to detainee policies, including the CIA terrorist detention and interrogation program, in connection with decisions, or potential decisions, to be made by the President. See id.

### E.    Privileged Witness Statements To OIG Investigators

Courts have long recognized that witness statements made in confidence in the course of

agency inspector general investigations are privileged in civil discovery.  See, e.g., United States v. Weber Aircraft Corp., 465 U.S. 792, 796, 802-03 (1984); Machin v. Zuckert, 316 F.2d 366, 339 (D.C. Cir. 1963); Ahearn v. U.S. Army Materials & Mechs. Research Ctr., 583 F. Supp. 1123, 1124 (D. Mass. 1984); AFGE v. Army, 441 F. Supp. 1308, 1313 (D.D.C. 1977); Rabbitt v. Air Force, 401 F. Supp. 1206, 1208-09 (S.D.N.Y. 1974).  Likewise, such statements are exempt from disclosure under FOIA Exemption 5.  See, e.g. Weber Aircraft Corp., 465 U.S. at 798-804; Ahearn, 583 F. Supp. at 1124.  This privilege is necessary to "ensure frank and open discussion and hence efficient governmental operations."  Weber Aircraft Corp., 465 U.S. at 802.  This privilege is especially important in the context of internal investigations by agencies, like the CIA, the operations of which are vital to the national defense.  See Machin, 316 F.2d at 339; Rabbitt, 401 F. Supp. at 1209.

The witness statements contained within Documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231, and 242 were made in the course of investigations by the CIA's Office of Inspector General.  See DiMaio Decl. at  ¶¶ 149-50 & Ex. A.  "Office of Inspector General regulations state that [witness statements] will be held in confidence, subject to the other duties of the Office."  DiMaio Decl. at ¶ 150.  "[C]ommon sense dictates that a warning to witnesses that their testimony will be generally disclosable under FOIA would discourage candor and would severely limit the effectiveness of Inspector General investigations."  AFGE, 441 F. Supp. at 1314.  Here, "releasing these documents would undermine the assurances of confidence and decrease employees' willingness to cooperate with Office of Inspector General Investigations."  DiMaio Decl. at ¶ 150.  Accordingly, the witness statements were properly withheld under Exemption 5.  See, e.g., Weber Aircraft Corp., 465 U.S. at 798-804; Ahearn, 583 F. Supp. at 1124; AFGE, 441 F. Supp. at 1313.

V.    **THE CIA HAS PROPERLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 7**

Exemption 7 exempts from disclosure "records or information compiled for law enforcement purposes" that meet the criteria of any of six enumerated subsections, including subsection 7(A), which applies to information that "could reasonably be expected to interfere with enforcement proceedings," and subsection 7(D), which applies to confidential source identities and materials. See 5 U.S.C. § 552(b)(7).  A record is compiled for law enforcement purposes if the activity that gives rise to the documents is related to the enforcement of federal laws or the maintenance of national security, and the nexus between the activity and one of the agency's law enforcement duties is based on information sufficient to support at least a "colorable claim" of its rationality.  Keys v. DOJ, 830 F.2d 337, 340 (D.C. Cir. 1987); Lawyers Comm. for Human Rights v. INS, 721 F. Supp. 552, 563, 564 (S.D.N.Y. 1989); see also Ctr. for Nat'l Sec'y Studies, 331 F.3d at 926.  It is well established that "[a]n Inspector General of a federal government agency engages in law enforcement activities within the meaning of FOIA."  Ortiz v. HHS, 70 F.3d 729, 732-33 (2d Cir. 1995); see also Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. GSA, No. 97 Civ. 8509 (LMM), 1998 WL 726000, at *7 (S.D.N.Y. Oct. 15, 1998).

A.    **The CIA Has Properly Withheld Records Pursuant To Exemption 7(A)**

Exemption 7(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  Pursuant to Exemption 7(A), the CIA has withheld information from open OIG investigations, as well as Document 18.

The CIA has properly withheld records from the open OIG investigations.  See DiMaio Decl.

- 33 -

at ¶¶ 163-65. "[T]he Supreme Court [has] encouraged the making of 'categorical decisions' in deciding whether material requested under FOIA is exempt," <u>Mapother v. DOJ</u>, 3 F.3d 1533, 1542 (D.C. Cir. 1993), and the Court has expressly held that Exemption 7(A) permits categorical exclusion of investigatory records, <u>see</u> <u>Robbins Tire</u>, 437 U.S. at 236 ("Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings.'"); <u>see also</u> <u>DOJ v. Reporters Comm. for the Freedom of the Press</u>, 489 U.S. 749, 779 (1989). Accordingly, where the Government can articulate a rationale applicable to an entire category of records, it need not describe the requested records on a document-by-document basis. <u>See</u> <u>Reporters Comm.</u>, 489 U.S. at 776 ("categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction"); <u>Robbins Tire</u>, 437 U.S. at 236; <u>Mapother</u>, 3 F.3d at1542; <u>DOJ v. Crancer</u>, 999 F.2d 1302, 1310-11 (8th Cir. 1993).

Here, the CIA OIG open investigations are categorically exempt under Exemption 7(A). As an initial matter, "[p]rocessing documents in the OIG's open investigatory files would interfere with those investigations because it might alert CIA components and individuals that they are under investigation." DiMaio Decl. at ¶ 163. "The confidentiality of [open OIG] investigations, among individuals and components within the CIA, is essential to the efficacy of those investigations." <u>Id.</u> "In order to process the open OIG investigations, however, OIG would require the assistance of CIA personnel [from] outside the OIG's office," including "the CIA Office of General Counsel, Information Management Officers, and Information Review Officers and their staffs" for the necessary tasks of FOIA processing and litigation. <u>Id.</u> "In so doing, those persons would discover

- 34 -

whom and what activities the OIG was investigating and what evidence had been collected, thus revealing the nature, scope, and targets of the OIG investigations." Id. In short, processing the open OIG investigatory files would compromise the confidentiality of OIG's ongoing investigations and thereby interfere with OIG's law enforcement proceedings. Id.

Moreover, the CIA has determined that the release of the information in the open OIG investigations to the public "could also reasonably be expected to harm the OIG's pending investigations." Id. at ¶ 164. The open investigatory files are comprised primarily of: (1) interview documentation; (2) correspondence of OIG investigators; (3) evidence collected; and (4) draft reports and working papers. Id. "Release of records from each of these categories of files could (a) reveal the course, nature, scope or strategy of an ongoing investigation; (b) prematurely reveal evidence in the ongoing investigation; (c) hinder OIG ability to control or shape the investigation; and (d) reveal investigative trends, emphasis, or targeting schemes." Id. "Revealing such information to the public would compromise the confidentiality of open OIG investigations and would be reasonably likely to harm the OIG's pending law enforcement investigations." Such disclosures, i.e., "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding," "was precisely the kind of interference that Congress . . . want[ed] to protect against." Robbins Tire, 437 U.S. at 247; see also Local 32B-32J, 1998 WL 726000, at *8-9 (holding 7(A) exempted entirety of inspector general's investigatory file, where the file consisted of "notes prepared by agents, memoranda summarizing witness interviews and other investigative activities, documents prepared by other sources . . . , and other materials"). For these reasons, the CIA has properly withheld the records contained in open OIG investigatory files under Exemption 7(A).

In addition, the CIA properly withheld the letter contained within document 18 under

Exemption 7(A).  The letter is a law enforcement record because it presents "possible violations of federal law" to a United States Attorney's Office.  See Stearns Decl. at ¶ 6.  Its disclosure "could reasonably be expected to interfere with enforcement proceedings" because the subject of the letter remains the subject of an ongoing criminal investigation and, if it "were released into the public domain, the information concerning the investigation could reach individuals, including the referenced subject, who remains under investigation." Id. at ¶ 14.  Accordingly, the CIA has properly withheld document 18 under Exemption 7(A).  See Boyd v. Criminal Div., DOJ, 475 F. 3d 381, 386 (D.C. Cir. 2007); Ctr. for Nat'l Sec'y Studies, 331 F.3d at 926-932; Moorefield v. U.S. Secret Serv., 611 F.2d 1021, 1026 (5th Cir. 1980); Dow Jones & Co., 1995 WL 6155, at *5.

## B.    The CIA Has Properly Withheld Records Pursuant To Exemption 7(D)

Exemption 7(D) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source . . . , and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  This provision protects the identities of confidential sources, as well as the confidential information they furnish in the course of investigations.  See Ferguson v. FBI, 957 F.2d 1059, 1069 (2d Cir. 1992); Garcia v. DOJ, OIP, 181 F. Supp. 2d 356, 375 (S.D.N.Y. 2002).

Here, Exemption 7(D) protects from disclosure the witness statements contained within Documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231, and 242. See DiMaio Decl. at  ¶¶ 166-169 & Ex. A.  Those statements were made in the course of OIG

criminal or national security intelligence investigations, pursuant to OIG regulations, which "require the OIG to maintain the confidentiality of the information that is provided to them during the course of an investigation." Id. at ¶ 168-70. The sources are therefore "confidential" within the meaning of Exemption 7(D). See DOJ v. Landano, 508 U.S. 165, 172 (1993); Ortiz, 70 F.3d at 733; Manna v. DOJ, 51 F.3d 1158, 1167 (3d Cir. 1995). Accordingly, the information provided by these confidential sources is exempt from disclosure under Exemption 7(D). See Providence Journal Co. v. Army, 981 F.2d 552, 563-565 (1st Cir. 1992); Ferguson, 957 F.2d at 1069.

## VI.   THE CIA HAS PROPERLY WITHHELD PERSONAL IDENTIFYING INFORMATION UNDER EXEMPTIONS 6 AND 7(C)

The CIA and DOD have withheld the names and email addresses of DOD employees, the names of CIA employees, the names of persons interviewed by the CIA OIG, a detainee's name, and personal identifying information such as dates of birth, social security numbers, and biographical information under Exemptions 6 and 7(C). See DiMaio Decl. at ¶¶ 157-60, 165-67 & Ex. A (Documents 126, 131, 133-136, 138-140, 143-146, 149-151, 159, 164-171, 173, 174, 187, 195, 227, 230); Declaration of Philip J. McGuire, dated April 11, 2008, at ¶¶ 8-11 (Document 249); Hecker Decl. at ¶¶ 18-20 (Documents 192, 250). "Exemption 7(C) and Exemption 6 are specifically aimed at protecting the privacy of personal information in government records." Associated Press v. DOJ, No. 06 Civ. 1758 (LAP), 2007 WL 737476, at *4 (S.D.N.Y. March 7, 2007). Exemption 6 exempts from disclosure information from personnel, medical, or other similar files that "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).[11] In contrast, Exemption

---

[11] Exemption 6 does not merely apply to "files 'about an individual,'" but more broadly to "bits of personal information, such as names and addresses," contained in otherwise releasable documents. Judicial Watch, Inc. v. FDA, 449 F.3d 141, 152 (D.C. Cir. 2006); see also, e.g., U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982).

7(C), which applies only to information contained in law enforcement records, "is more protective of privacy than Exemption 6, because [Exemption 7(C)] applies to any disclosure that 'could reasonably be expected to constitute' an invasion of privacy that is 'unwarranted.'" <u>Associated Press</u>, 2007 WL 737476 at *4.

In determining if personal information is exempt from disclosure under these provisions, the Court must balance the public's need for this information against the individual's privacy interest. <u>Wood v. FBI</u>, 432 F.3d 78, 86 (2d Cir. 2005); <u>see also</u> <u>Sherman</u>, 244 F.3d at 361 n.6 ("[T]he manner in which courts analyze the applicability of exemption 7(C) is the same as that used with respect to exemption 6."). "The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." <u>Wood</u>, 432 F.3d at 88 (quotation marks omitted).  For instance, "individuals, including government employees and officials, have privacy interests in the dissemination of their names."[12]  <u>Massey v. FBI</u>, 3 F.3d 620, 624 (2d Cir. 1993).  On the other side of the scale, "[t]he <u>only</u> relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." <u>Bibles v. Or. Natural Desert Ass'n</u>, 519 U.S. 355, 355-56 (1997) (quotation marks and citations omitted); <u>see also</u> <u>Hopkins</u>, 929 F.2d at 88.

It is impossible to conceive of any light that would be shed on the CIA's or DOD's performance of their statutory duties through the disclosure of the personal identifying information withheld in this case.  <u>Wood</u>, 432 F.3d at 89; <u>Massey</u>, 3 F.3d at 624; <u>Kimmel v. U.S. Dep't of Defense</u>, Civil Action 04-1551, 2006 WL 1126812, at *3 (D.D.C. Mar. 31, 2006).  Accordingly, this

---

[12]  DOD employees have a particularized interest in protecting their identities. <u>See</u> Declaration of William T. Kammer, dated February 4, 2008, at Exs. A, B.

personal information is properly withheld under Exemptions 6 and 7(C).

## VII.  CIA INTERNAL INFORMATION IS EXEMPT UNDER EXEMPTION 2

Exemption 2 applies to, among other things, "those rules and practices that affect the internal workings of an agency[,] and, therefore, would be of no genuine public interest," Massey, 3 F.3d at 622 (quotation marks omitted).  The CIA has invoked Exemption 2 to withhold its administrative, routing, and handling notations, which reflect the internal workings of the CIA and are routine matters of merely internal interest.  See DiMaio Decl. at ¶ 129; McGuire Decl. at ¶ 7.  The withheld information is "internal, clerical information," the release of which holds no public interest.  Id. Accordingly, the CIA has properly withheld materials pursuant to a low Exemption 2.  See, e.g., Massey, 3 F.3d at 622; Crooker v. ATF, 670 F.2d 1051, 1069 (D.C. Cir. 1981), Williams v. McCausland, 90 Civ. 7563 (RWS), 91 Civ. 7281 (RWS), 1994 WL 18510 at *10-11 (S.D.N.Y. Jan. 18, 1994); Colon v. EOUSA, No. 98-0180, 1998 WL 695631, at *3 (D.D.C. Sept. 29, 1998).

## VIII.  THE CIA HAS CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS

To demonstrate the adequacy of a search, an agency must "show that it made a good faith effort to search for the records requested, and that its methods were 'reasonably expected to produce the information requested.'"  Kidd v. DOJ, 362 F. Supp. 2d 291, 294 (D.D.C. 2005) (Kennedy, J.); see also Oglesby v. Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (an agency is not required to search every record system, only has to show "that it made a good faith effort to conduct a search . . . using methods which can be reasonably expected to produce the information requested").

The agency is required to conduct a search "reasonably 'designed to identify' and locate responsive documents," but need not "take extraordinary measures to find the requested records." Garcia, 181 F. Supp. 2d at 368 (quotation marks omitted).  The CIA can meets its burden of

showing a good faith search by supplying affidavits from appropriate officials setting forth facts indicating that a reasonable search was conducted. <u>Id.</u> at 366 (citing <u>Weisberg v. DOJ</u>, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). To establish the sufficiency of its search, the agency's affidavits need only explain the "scope and method of the search" in "reasonable detail." <u>Kidd</u>, 362 F. Supp. 2d at 295 (quoting <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982)). The presumption of good faith afforded to such declarations "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." <u>Grand Cent. P'ship</u>, 166 F.3d at 489 (quotation marks omitted).

Mr. DiMaio's declaration describing the CIA's search for responsive records establishes that the CIA conducted searches that were "reasonably calculated to discover the requested documents." <u>Id.</u>; <u>see also</u> DiMaio Decl. ¶¶ 33-37. Indeed, that the CIA found in excess of 7,000 responsive records indicates the breadth and scope of the CIA's search. <u>Id.</u> at ¶ 37 & n.9. Accordingly, the undisputed evidence establishes that the CIA has made a "good faith effort to search for the records requested," and its "methods were reasonably expected to produce the information requested." <u>Kidd</u>, 362 F. Supp. 2d at 294.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the CIA's motion for summary judgment.

Dated: New York, New York
      April 21, 2008

                                  Respectfully submitted,

                                  MICHAEL J. GARCIA
                                  United States Attorney for the
                                  Southern District of New York
                                  Attorney for the Central Intelligence Agency

                  By:    /s/ Jeannette A. Vargas
                                  JEANNETTE A. VARGAS
                                  BRIAN M. FELDMAN
                                  Assistant United States Attorneys
                                  EMILY E. DAUGHTRY
                                  Special Assistant United States Attorney
                                  86 Chambers Street, 3rd floor
                                  New York, N.Y.  10007
                                  Tel.:  (212) 637-2678/2777/1579

# ADDENDUM

For the Court's convenience, the following is a summary chart of the respective exemptions claimed for each document.  Parentheticals indicate where an agency other than the CIA is claiming an exemption.

## Exemption 1

| Documents 1 - 250, except: | | | | |
|---|---|---|---|---|
| 31 | 88 | 152 | 175 | 249 |
| 42 | 125 | 158 | 240 | |
| 59 | 127 | 174 | 247 | |

## Exemption 2

| | | | | |
|---|---|---|---|---|
| 3 | 55 | 104 | 156 | 211 |
| 8 | 56 | 105 | 157 | 212 |
| 14 | 57 | 106 | 158 | 213 |
| 15 | 58 | 107 | 161 | 214 |
| 18 | 59 | 108 | 163 | 215 |
| 21 | 60 | 109 | 174 | 216 |
| 24 | 67 | 110 | 175 | 217 |
| 26 | 69 | 111 | 196 | 218 |
| 27 | 72 | 112 | 197 | 219 |
| 28 | 75 | 114 | 198 | 220 |
| 29 | 76 | 118 | 199 | 221 |
| 31 | 79 | 119 | 200 | 222 |
| 33 | 80 | 125 | 201 | 223 |
| 41 | 81 | 129 | 202 | 224 |
| 42 | 84 | 130 | 203 | 225 |
| 48 | 85 | 132 | 204 | 232 |
| 49 | 88 | 137 | 205 | 240 |
| 50 | 93 | 141 | 206 | 243 |
| 51 | 99 | 152 | 207 | 247 |
| 52 | 101 | 153 | 208 | 249 (DOD) |
| 53 | 102 | 154 | 209 | |
| 54 | 103 | 155 | 210 | |

## Exemption 3

| Documents 1-250, except: | | | | |
|---|---|---|---|---|
| 174 | 247 | 249 | 250 | |

## Exemption 5 (Attorney-Client Privilege)

| | | | | |
|---|---|---|---|---|
| 1 (CIA, OLC) | 25 (CIA, OLC) | 56 | 81 | 177 |
| 6 (CIA, OLC) | 28 | 65 (CIA, OLC) | 82 (DOS) | 184 |
| 7 (CIA, OLC) | 29 | 66 | 83 (CIA, OLC) | 186 |
| 8 (CIA, OLC) | 30 (CIA, OLC) | 67 | 84 | 191 |
| 9 (CIA, OLC) | 33 | 68 (CIA, OLC) | 86 (CIA, OLC) | 192 (DOD) |
| 10 (CIA, OLC) | 34 | 69 | 87 (CIA, OLC) | 194 |
| 11 (CIA, OLC) | 35 | 70 (CIA, OLC) | 93 | 199 |
| 12 (CIA, OLC) | 41 | 71 | 99 | 220 |
| 13 (CIA, OLC) | 43 | 72 | 102 | |
| 16 (CIA, OLC) | 44 | 75 (CIA, OLC) | 103 (ODNI, DOD, DOS) | |
| 18 | 49 | 76 | 137 | |
| 19 (CIA, OLC) | 51 | 78 (CIA, OLC) | 148 | |
| 20 (DOD) | 53 | 80 | 176 | |

## Exemption 5 (Deliberative Process Privilege)

| | | | | | |
|---|---|---|---|---|---|
| 1 (CIA, OLC) | 37 | 79 (ODNI) | 115 | 151 | 186 |
| 3 (CIA,  ODNI) | 40 | 80 | 116 | 152 | 191 |
| 4 (CIA, ODNI) | 41 | 81 | 117 | 154 | 192 (CIA, DOD) |
| 5 | 42 | 82 (DOS) | 120 | 155 | 194 |
| 6 (CIA, OLC) | 43 | 83 (CIA, OLC) | 123 | 157 | 198 |
| 7 (CIA, OLC) | 45 | 84 | 126 | 158 | 200 |
| 8 (CIA, OLC) | 46 | 86 (CIA, OLC) | 127 (CIA, EOUSA) | 159 | 202 |
| 9 (CIA, OLC) | 47 | 87 (CIA, OLC) | 128 | 160 | 204 |
| 10 (CIA, OLC) | 48 | 92 | 129 | 161 | 214 |
| 11 (CIA, OLC) | 50 | 93 | 130 (ODNI) | 162 | 223 |
| 12 (CIA, OLC) | 51 | 96 | 131 | 163 | 225 |
| 13 (CIA, OLC) | 56 | 98 | 132 | 164 | 226 |
| 14 | 61 | 99 | 133 | 165 | 228 |
| 16 (CIA, OLC) | 62 | 100 | 134 | 166 | 229 |
| 17 | 63 | 101 | 135 | 167 | 230 |
| 18 | 65 (CIA, OLC) | 102 | 136 | 168 | 231 |
| 19 (CIA, OLC) | 66 | 103 (ODNI, DOD, DOS) | 137 | 169 | 232 |
| 20 (CIA, DOD) | 67 | 104 (ODNI) | 138 | 170 | 233 |
| 22 | 68 (CIA, OLC) | 105 (ODNI) | 139 | 171 | 235 |
| 23 | 69 | 106 | 140 | 173 | 236 |
| 24 | 70 (CIA, OLC) | 107 (ODNI) | 142 | 176 | 237 |
| 25 (CIA, OLC) | 71 | 108 (ODNI) | 143 | 177 | 238 |
| 30  (CIA, OLC) | 72 | 109 (ODNI) | 144 | 178 | 239 |
| 32 | 73 | 110 (ODNI) | 145 | 179 | 241 |
| 33 | 75 (CIA, OLC) | 111 (ODNI) | 146 | 182 | 242 |
| 34 | 76 | 112 | 148 | 183 | 243   (ODNI) |
| 35 | 77 | 113 | 149 | 184 | 244 |
| 36 | 78 (CIA, OLC) | 114 | 150 | 185 | 248 |

## Exemption 5 (Presidential Communications Privilege)

| 3 (ODNI) | 24 | 100 | 108 (ODNI) | 130 (ODNI) |
|---|---|---|---|---|
| 4 (ODNI) | 29 | 103  (ODNI) | 109 (ODNI) | 152 |
| 14 | 62 | 104 (ODNI) | 110 (ODNI) | 243 (ODNI) |
| 17 | 98 | 107 (ODNI) | 111 (ODNI) | |

## Exemption 5 (OIG-Witness Statements)

| 126 | 138 | 146 | 166 | 173 |
|---|---|---|---|---|
| 131 | 139 | 149 | 167 | 230 |
| 133 | 140 | 150 | 168 | 231 |
| 134 | 143 | 151 | 169 | 242 |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |

## Exemption 5 (Work Product Privilege)

| 1 | 18 | 51 | 72 | 87 |
|---|---|---|---|---|
| 6 | 19 | 53 | 75 | 93 |
| 7 | 25 | 56 | 76 | 99 |
| 8 | 30 | 65 | 78 | 102 |
| 9 | 32 | 66 | 80 | 127 (CIA, EOUSA) |
| 10 | 33 | 67 | 81 | 177 |
| 11 | 34 | 68 | 82 | 186 |
| 12 | 35 | 69 | 83 | |
| 13 | 43 | 70 | 84 | |
| 16 | 49 | 71 | 86 | |

## Exemption 6

| 126 | 139 | 150 | 168 | 192 (DOD) |
|-----|-----|-----|-----|-----------|
| 131 | 140 | 151 | 169 | 195 |
| 133 | 143 | 159 | 170 | 227 |
| 134 | 144 | 164 | 171 | 230 |
| 135 | 145 | 165 | 173 | 249 (DOD) |
| 136 | 146 | 166 | 174 | 250 (DOD) |
| 138 | 149 | 167 | 187 | |

## Exemption 7(a)

| 18 | | | | |
|-----|-----|-----|-----|-----|

## Exemption 7(c)

| 126 | 138 | 146 | 166 | 173 |
|-----|-----|-----|-----|-----------|
| 131 | 139 | 149 | 167 | 227 |
| 133 | 140 | 150 | 168 | 230 |
| 134 | 143 | 151 | 169 | 249 (DOD) |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |

## Exemption 7(d)

| 126 | 138 | 146 | 166 | 173 |
|-----|-----|-----|-----|-----|
| 131 | 139 | 149 | 167 | 230 |
| 133 | 140 | 150 | 168 | 231 |
| 134 | 143 | 151 | 169 | 242 |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |