0000001

**Subject:** Fw: Rendition Staff Briefing
**From:** "Allen, Michael" <Michael_Allen@nsc█████████
**Date:** Tue, 28 Nov 2006 21:18:39 -0500
**To:** ████████████████████████████████

-----Original Message-----
From: Dodin, Reema (Judiciary-Dem)
To: Butterfield, Jane (Judiciary-Rep); White, Brandi (Frist);
Looney, Andrea B.; Bacak, Brooke (RPC); Bellocchi, Luke (RPC); David
Best; Dunne, Dianna L.; Hicks, Allen (Frist); Hippe, Jim (Frist);
Jeri Gronewold; Mark Braswell; Allen, Michael; Moschella, William
(DOJ); Seidel, Rebecca (DOJ); Stacey Stout; Tiffany Kebodeaux (DHS);
Peterlin, Margaret (House); Abegg, John (McConnell); Sternhell,
Kristy (Reid); Hoy, Serena (Reid); Rice, Peggie (Conrad); Sundberg,
Melissa (Drug Caucus); Sebold, Linda (Secretary); Brown, Elizabeth
(Secretary); Dean, Ken (Secretary); Hauck, David (SAA); Wilson,
Alexis (Feinstein); Branca, Arlene (Kohl); Del'Aguila, Andrea
(Durbin); Dowd, John (Leahy); Fay, Scott (Kennedy); Kidera, Daniel
(Schumer); Magee, Kimberly (Schumer); McDonald, Kevin (Leahy);
Orloff, Nancy (Biden); Sebern, Will (Feingold); Smith, Michele
(Biden); trevor_miller@feingold.senate.gov; Underwood, Serena
(McConnell); Berwick, Sally (Brownback); Bradley, Ellen (L. Graham);
Chandler, Emily (DeWine); Cox, Courtney (Coburn); Duffield, Steven
(RPC); Griffin, Eleri (Brownback); Hollis, Kate (Sessions); Jafari,
Beth (Cornyn); Larrabee, Jill (Kyl); Lisa Dennis (Court Reporter);
Montoya, Ruth (Hatch); Nancy Truehart (Court Reporter); Plakoudas,
Maria (Specter); Shimp, Leah (Grassley); Stewart, Christine
(Cornyn); JudicSchumer; Hantman, David (Schumer); Alexander,
Elizabeth (Biden); JudicBiden; Upton, Marianne (Durbin);
JudicDurbin; Swanson, Daniel (Durbin); JudicFeingold;
JudicFeinstein; Pope, Amy (Judiciary-Dem); Wessel, Dan (Feinstein);
JudicKennedy; JudicKohl; Saunders, Chris (Leahy); Carle, David
(Leahy); Cota, Greg (Leahy); Ginsberg, Daniel (Leahy); JudicLeahy;
Pagano, Ed (Leahy); Bieniek, Lisa (Judiciary-Rep); Young, Gavin
(Judiciary-Rep); Singh, Seema (Specter); Mountain, Andrew (Specter);
Middleton, Stephanie (Judiciary-Rep); Kelly, Kate (Specter);
JudicSpecter; Hays, Elizabeth (Judiciary-Rep); Dower, Thomas
(Specter); Canino, Jill (Specter); Blum, Heather (Specter); Roehl,
Galen (Brownback); Blankenship, Amy (Brownback); JudicBrownback;
Tardibono, Timothy (Coburn); Blackburn, Matt (Coburn); Foster,
Roland (Coburn); JudicCoburn; Stewart, Christine (Cornyn);
JudicCornyn; Stevens, Amanda (DeWine); Franklin, Ben (DeWine);
JudicDewine; Nuebel, Kathy (Grassley); JudicGrassley; Knight,
Patricia (Hatch); Cobb, Susan (Hatch); Jipping, Tom (Hatch);
Johnson, Jace (Hatch); JudicHatch; Maier, Elizabeth (Kyl); JudicKyl;
JudicGraham; Burris, Scott (L. Graham); Galyean, James (L. Graham);
JudicSessions; Carpenter, Kevin (Specter); Cooper, Alison (Specter);
Hoeflich, Scott (Specter)

Sent: Tue Nov 28 10:38:08 2006
Subject: Rendition Staff Briefing

FYI, please see below for information on a staff briefing on
rendition tomorrow (Wednesday) at 2 p.m. in Dirksen 226.


SPECIAL BRIEFING FOR SENATE STAFF:


Khaled El-Masri Tells His Account of Suffering Caused by the
Administration's Rendition Policy


Presentation Will Focus on the Real-World Consequences of

the Federal Government's Rendition Policy


In his first visit to the United States, Khaled El-Masri, will
discuss his experiences as a victim of the federal government's
rendition policy.  Mr. El-Masri's case has received worldwide
attention as an example of how the federal government's rendition
policy has undermined American values and the rule of law.


BACKGROUND:  Khaled El-Masri is a German citizen, who lives in
Germany together with his wife and five young children.  He is a
carpenter by trade.


According to his account, on December 31, 2003, Mr. El-Masri was
removed from a bus while crossing the border into Macedonia while on
vacation.  He has said that, after being detained and questioned in
Macedonia by Macedonian officials for more than three weeks, he was
handed over to the custody of the CIA.  He said that CIA agents
stripped, beat, bound and blindfolded him, and then drugged him
before a flight to a secret CIA prison in Afghanistan.  He said that
he was beaten and held by the federal government in isolation in the
notorious "Salt Pit" prison for more than five months--which was
long after he said the federal government knew of his innocence.
Mr. El-Masri said that, on May 28, 2004, the CIA blindfolded and
flew him to Albania, where he was dropped on a hillside along a
deserted road.

Despite publicly acknowledging the existence of its rendition program in September, the federal government has never acknowledged its involvement with Mr. El-Masri nor explained the reason for its actions.

Mr. El-Masri is now seeking to end the federal government's rendition policy.  He has brought a lawsuit against former CIA Director George Tenet and the U.S.-based corporations that owned and operated the aircraft used in his rendition.  Mr. El-Masri is seeking an acknowledgment by the government of the fact of his rendition and an apology for the abuse that he suffered.

WHERE:                          226 Dirksen Senate Office Building


WHEN:                           2:00 - 3:00 p.m.

                                Wednesday, November 29


If you have questions, please contact Christopher Anders, ACLU Legislative Counsel, at

202-675-2308 or canders@dcaclu.org.

MORI DOCID: 1529548

**DOC 59**

③

0000003

OCA 02255-04

DCI/OCA/LIAISON, [                    ]: ext. [        ]     9/16/04
**OCA 2004-1323**
File: [                              ] The Honorable Edward J. Markey.doc

Distribution:
    Original - Addressee
        1 - D/OCA
        1 - EXO/OCA
        1 - [              ] Chron File
        1 - DAC (Official OCA File)

(b)(3)
(b)(5)

APPROVED FOR RELEASE
DATE: APR 2008

Central Intelligence Agency



Washington, D.C. 20505

23 September 2004

The Honorable Edward J. Markey
House of Representatives
Washington, D.C.  20515-2107

Dear Mr. Markey:

I appreciate your interest in and concerns about the important issue of terrorist renditions as reflected in your letter to the Acting Director of Central Intelligence dated 15 July 2004.

Your concerns about renditions and the questions about them raised in your letter are matters that are subject to the regular and necessary oversight functions of the various congressional oversight committees, as well as to the applicable laws and conventions of the United States.  I can assure you that it remains the policy and practice of this Agency to be fully and promptly compliant with these authorities as they apply to the matter of renditions.

Thank you again for your concerns and attention to this issue.

Sincerely,

Stanley M. Moskowitz
Director of Congressional Affairs

DOC 79



**RECEIVED**
22 Sep 06

Classification *Top Secret Codeword*



## U.S. Senate
## Select Committee on Intelligence

### Fax Cover Sheet

**To:** JOHN NEGROPONTE

**From:** SENATOR ROCKEFELLER

**SSCI#:** 2006.3664

**Date:** 9/22/2006

**Time:** 1426

**Page 1 of** 4

**Prepared by:** LShepard

<u>Note to Recipient:</u>
**If you did not receive every page of the facsimile, please call
(202) 224-1771.**

Classification *Top Secret Codeword*

SEP. 22. 2006  2:42PM    SSCI                                    NO. 731    P. 2

PAT ROBERTS, KANSAS, CHAIRMAN
JOHN D. ROCKEFELLER IV, WEST VIRGINIA, VICE CHAIRMAN

ORRIN G. HATCH, UTAH                CARL LEVIN, MICHIGAN
MIKE DEWINE, OHIO                   DIANNE FEINSTEIN, CALIFORNIA
CHRISTOPHER S. BOND, MISSOURI       RON WYDEN, OREGON
TRENT LOTT, MISSISSIPPI             EVAN BAYH, INDIANA
OLYMPIA J. SNOWE, MAINE             BARBARA A. MIKULSKI, MARYLAND
CHUCK HAGEL, NEBRASKA               RUSSELL D. FEINGOLD, WISCONSIN
SAXBY CHAMBLISS, GEORGIA

BILL FRIST, TENNESSEE, EX OFFICIO
HARRY REID, NEVADA, EX OFFICIO

JAMES D. HENSLER, JR., STAFF DIRECTOR AND CHIEF COUNSEL
ANDREW W. JOHNSON, MINORITY STAFF DIRECTOR
KATHLEEN P. MCGHEE, CHIEF CLERK

# United States Senate

SELECT COMMITTEE ON INTELLIGENCE

## TOP SECRET CODEWORD

SSCI #2006-3664

September 22, 2006

The Honorable John Negroponte
Director of National Intelligence
Office of the Director of National Intelligence
Washington, D.C. 20511

Dear Director Negroponte:

  The Senate will likely consider legislation next week relating to the Central Intelligence Agency's (CIA) detention and interrogation program. President Bush disclosed the existence of the CIA program in his September 6th White House statement. Since this disclosure, the President and senior Administration officials, including yourself, have publicly disclosed details about the past and current operation of the CIA program, including representations about why the program was suspended and the lawfulness of interrogation techniques following the Supreme Court's *Hamdan* decision.

  As the Senate prepares to debate legislation in this area, I will need confirmation from your office that the enclosed statements are unclassified. I have carefully reviewed what the President and others have said publicly about the CIA program in recent weeks and I believe these statements will provide important context to the debate without divulging national security information. As a measure of caution, however, I have classified the enclosure.

  Given the urgency of this matter, I ask that your office complete its classification review no later than 5 p.m. on Monday, September 25th. Please contact Mr. Andy Johnson, the Minority Staff Director, at 202-224-1732, if you have questions about this request.

Sincerely,

John D. Rockefeller IV
Vice Chairman

Enclosure

Downgrade to UNCLASSIFIED when detached from the enclosure

## TOP SECRET CODEWORD



**TOP SECRET CODEWORD**

TOP SECRET CODEWORD



TOP SECRET CODEWORD

MORI DocID: 1529551

**DOC 85**

**0000055**



**THE DIRECTOR**
**CENTRAL INTELLIGENCE AGENCY**
WASHINGTON, D.C. 20505

16 January 2007

The Honorable John D. Rockefeller IV
Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C.  20510-2202

Dear Mr. Chairman:

I am writing concerning the President's nomination of
John Rizzo to be the Central Intelligence Agency's (CIA)
General Counsel.  As you know, I fully support John's
nomination and look forward to his confirmation.

Since your August 23, 2006 letter, which, among other
things, requested information concerning the legal basis
for the CIA's detention program, I have provided
comprehensive briefings to the Senate Select Committee on
Intelligence regarding the details of the CIA's detention
program.  In those briefings, I made it clear that the
CIA's detention program had been, and would continue to be,
in full compliance with the Constitution, U.S. law, and
U.S. treaty obligations.  I also informed the Committee
that I would work with the Administration to provide you
additional information about the program, to include its
legal foundation.

After discussions with the Attorney General and others
within the Administration, and in keeping with my previous
statements to the Committee, I am offering your Committee a
briefing by officials from the CIA's Office of General
Counsel and the Department of Justice's Office of Legal
Counsel on the legal bases for CIA's detention program.  By
doing so, we can address the Committee's outstanding
concerns about the program, as well as address the issues

The Honorable John D. Rockefeller IV


in your August 23 letter.  My Office of Congressional
Affairs will contact your staff to schedule this briefing.

                    Sincerely,


                    Michael V. Hayden
                    General, USAF


cc:  The Honorable Christopher Bond, Vice Chairman, SSCI

The Honorable John D. Rockefeller IV


DCI/OGC/FO                 (12 January 07)
S:\DCI\OGC\Front_Office_Users
Rockefeller Letter re Rizzo n

OGC-FO-2007-50003

Distribution:
    Orig - Addressee
      1 - ADDCIA
      1 - DDCIA
      1 - D/OCA
      1 - OGC FO
      1 - DAC

MORI DocID: 1529551

**TOP SECRET//** █████████████████

PAT ROBERTS, KANSAS, CHAIRMAN
JOHN D. ROCKEFELLER IV, WEST VIRGINIA, VICE CHAIRMAN

ORRIN G. HATCH, UTAH
MIKE DEWINE, OHIO
CHRISTOPHER S. BOND, MISSOURI
TRENT LOTT, MISSISSIPPI
OLYMPIA J. SNOWE, MAINE
CHUCK HAGEL, NEBRASKA
SAXBY CHAMBLISS, GEORGIA

DIANNE FEINSTEIN, CALIFORNIA
RON WYDEN, OREGON
EVAN BAYH, INDIANA
BARBARA A. MIKULSKI, MARYLAND
RUSSELL D. FEINGOLD, WISCONSIN

BILL FRIST, TENNESSEE, EX OFFICIO
HARRY REID, NEVADA, EX OFFICIO

JAMES D. HENSLEE, JR. STAFF DIRECTOR AND CHIEF COUNSEL
ANDREW W. JOHNSON, MINORITY STAFF DIRECTOR
KATHLEEN P. MCGHEE, CHIEF CLERK

# United States Senate

SELECT COMMITTEE ON INTELLIGENCE
WASHINGTON, DC 20510-6475

August 23, 2006

SSCI# 2006-3305

General Michael V. Hayden
Director of the Central Intelligence Agency
Central Intelligence Agency
Washington, D.C. 20505

Dear Director Hayden:

(U) John Rizzo's nomination to be General Counsel of the Central Intelligence Agency is one of the Select Committee on Intelligence's important remaining items of business this Congress.

(U) I very much hope that the hearing on the nomination will achieve two objectives. It should provide a fair opportunity for Mr. Rizzo to present to the Committee his long experience at the CIA, with a special focus on his leadership role in the General Counsel's office since September 11. It should also provide the Committee with a fair opportunity to assess Mr. Rizzo's performance of that responsibility. To that end, I urge you to facilitate the provision to the Committee of the documentary record that will make it possible to attain both objectives. I have spoken to Director Negroponte about the importance of providing to the Committee key documents. Because the nomination is to a high position at your Agency, I thought I should also communicate directly to you and request that you take the necessary steps to ensure that the Members of the Committee receive what they require.

(U) Mr. Rizzo served as CIA Acting General Counsel from November 2001 to November 2002. During that time fundamental decisions were made about the legal rules for the Nation's counterterrorism efforts. Since that time, as Senior Deputy General Counsel and again as Acting General Counsel, he has continued to have a leadership role in formulating and implementing CIA legal policy. For

**TOP SECRET//** █████████████████

**TOP SECRET/**

most nominations, the Senate's task is to project how a nominee will perform new responsibilities. In Mr. Rizzo's case, he has held the job for which he has been nominated. It is essential to carefully examine what he has done.

**(U) 1.** <u>The Nominee's Writings</u>

**(TS//**⬛⬛⬛⬛**)** The nominee has been employed in the Office of CIA General Counsel for thirty years. He does not have published writings. In addition to his answers and supplementary response to our prehearing questions, the Committee has received one document authored by Mr. Rizzo, the nominee's response to the draft CIA IG report on nonregistration of detainees ⬛⬛⬛ ⬛⬛⬛ In order to be able to fully and fairly understand the work he has done, it is important to review other documents he may have written or for which he had major supervisory responsibility.

**(TS//**⬛⬛⬛⬛**)** As is clear from the nominee's written answers to the Committee's prehearing questions, one of his major responsibilities has been to present to DOJ's Office of Legal Counsel requests for legal opinions. In his July 18, 2006 letter to Committee counsel, Mr. Rizzo described OGC's role as providing OLC with "an objective, complete, detailed factual presentation of our proposed activity."

**(TS//**⬛⬛⬛⬛**)** As I will reiterate below, the Committee should receive for the consideration of all Members the opinions of the Office of Legal Counsel that constitute (in Mr. Rizzo's words) "final, definitive" determinations of law for the CIA. But even apart from access to OLC's opinions, the documentary record of OGC presentations to OLC that were authored by or with the nominee's participation form a key part of his work. Any OGC memoranda to OLC setting forth the presentation that led to the Second Bybee Memo should be among the documents provided to the Committee. Also, based on Mr. Rizzo's submission to

**TOP SECRET//**⬛⬛⬛⬛

**TOP SECRET//** █████████████████████████████

us and as discussed below, OLC has provided written guidance applicable to CIA counterterrorist activities █████████████ Once a list of those is provided, it may be possible to identify other OGC documents, written by Mr. Rizzo or for which he had responsibility, that should be provided to the Committee.

(TS// █████████ ) The Committee requested that the nominee identify documents authored or reviewed by him, or to which he had made a significant contribution, that conveyed to CIA personnel directions or guidance for actions that they could or could not take on detention, interrogation, or rendition matters. He answered that since September 11, OGC has regularly provided guidance to the field consistent with OLC legal guidance. We are interested in the best documentary evidence of that.

(TS// █████████ ) Mr. Rizzo has told the Committee that neither he nor other OGC lawyers produced legal opinions or memoranda "per se" about detention, interrogation, or rendition issues, but that those matters were addressed case-by-case through operational cables. He related that typically this review and approval was done by OGC lawyers assigned to operational components rather than by the General Counsel or Acting General Counsel personally. However, as Acting General Counsel, the nominee, in his words, ██████████████████████████████

(TS// █████████ It is important for the Committee to assess how the nominee applied OLC guidance. ████████████████████████████████████████████████████████████████████████████████████████████████████████

(TS// █████████ With respect to ████████ please provide documentation of the OGC's participation in the formulation of ██████████ Further, the entire Committee, and the members of our staff who have responsibility to assist in the nominee's hearing, should have access to ████████

**TOP SECRET//** ████████████████████████

**TOP SECRET//** ███████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

(TS//████████████) The focus of the requests described above concerns matters relating to and following the August 2002 Second Bybee Memo. There were also important decisions about U.S. legal policies related to counterterrorism, including on such matters as the application of the Geneva Conventions, that preceded the Bybee Memos. It is my understanding that the nominee had a role in that process, both within the CIA and outside of it. It will therefore be important to assess his participation in the formulation of those policies. Accordingly, in addition to documents relating directly to the Second Bybee Memo, please provide documents authored by the nominee, or prepared under his supervision, that set forth the nominee's contribution to the development of U.S. legal policy after the September 11 attacks.

(U) 2. IG Reports

(TS//████████████) In his answer to a prehearing question about reports of the CIA Inspector General, the nominee identified the OIG Special Review of Counterterrorism Detention and Interrogation Activities (May 7, 2004) as a report that was critical of the Office of General Counsel. In his subsequent letter to Committee counsel, the nominee explained that the Special Review was critical of the Agency generally and that he construed that criticism as including OGC. The copies of the IG report that are at the Committee are restricted to the Chairman and Vice Chairman; also three staff members have been able to read it – our Staff Directors and the Chairman's Senior Policy Advisor. In preparing for the hearing on Mr. Rizzo's nomination, all Members of the Committee and the members of our staff who have responsibility for the hearing should have access to it.

**TOP SECRET//** ███████████████████

**TOP SECRET//**███████████████████████

(TS//█████████████) If the Inspector General has any other report commenting on the Office of General Counsel, or a report in progress (such as on any rendition) that discusses the work of the OGC, your assistance would be appreciated in making the necessary arrangements for the provision to the Committee of completed reports or a briefing by the IG about reports in progress.

(U) 3. OLC Opinions

(TS//█████████████) The Committee requested that the nominee provide a list of all opinions and memoranda of the Office of Legal Counsel that have been provided to the CIA, either directly or through another office or officer of the Executive Branch, that set forth legal guidance for the CIA, or applicable to the CIA, on detention, interrogation, or rendition. For each, the Committee requested the date, the author, the addressee, the title or subject, and the classification.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

(TS//█████████████) One value of a list is that it would enable the Committee to discuss with you whether particular items on it should be provided for this nomination proceeding. It is hard to imagine a justification for not providing a classified list. Accordingly, it should be provided. But even as that is being resolved, we all know about one item that is on it, namely, the Second Bybee Memo. For that opinion, the question is not whether it should be delivered here, for it is here, but whether all Members of the Committee and the staff assisting them in preparing for the hearing may read it. The Senate has referred the nomination to the full Committee, not to the Chairman and Vice Chairman alone. Each Member must decide how to vote. In doing that, each should be able to ask those questions that he or she deems necessary for an informed vote. The memo was requested from OLC for the CIA by the nominee and he had responsibility for implementing it. Members may therefore wish to question him about it.

**TOP SECRET//**███████████████████████

TOP SECRET//█████████████████████

\* \* \* \* \*

(U) We have received strong words of support from people who have worked with Mr. Rizzo. I am committed to a process that is fair to him. But that process also needs to be a fully informed one. To the extent that decisions in the White House are necessary for this to happen, I urge you to be a strong advocate along with the DNI and to advise us as soon as possible about the results of your effort.

Sincerely,

John D. Rockefeller IV
Vice Chairman

cc: The Honorable John D. Negroponte

TOP SECRET//█████████████████████

MORI DOCID: 1529549

APPROVED FOR RELEASE   (b)(2)     **0000061**
DATE: APR 2008              (b)(3)
                           (b)(5)     **DOC 88**

UNCLASSIFIED



THE DIRECTOR
CENTRAL INTELLIGENCE AGENCY
WASHINGTON, D.C. 20505

4 January 2007

The Honorable Carl Levin
United States Senate
Washington, D.C.  20510-2202

Dear Senator Levin:

Thank you for your letter of December 14, 2006 regarding the detention of high value terrorists.  As you know, on September 6, 2006, all 14 of the high value terrorists held by the Central Intelligence Agency (CIA) were transferred to custody of the Department of Defense at Guantanamo Bay, Cuba.  I was pleased to brief you and the other members of the Senate Select Committee on Intelligence in advance of the President's public announcement regarding the transfer because it served as an excellent opportunity to discuss a wide range of issues related to these detainees, including their previous conditions of confinement and the critically important intelligence information obtained from them.

As you are also aware, on November 16, 2006, consistent with my obligations under the National Security Act, I provided a comprehensive briefing to the Senate Select Committee on Intelligence regarding detainees and also briefed the House Permanent Select Committee for Intelligence and House and Senate leadership as well.  I hope you would agree that the questions posed in your letter, as well as many other issues, have been fully briefed to the members of both Committees.  During these briefings, I made it clear that the CIA's detention program had been, and would continue to be, in full compliance with the Constitution, U.S. law, and U.S. obligations under international treaties.  I also committed to provide additional briefings to the Committees on these issues when the need arises.  That commitment remains true today.

MORI DocID: 1529549

The Honorable Carl Levin


       Again, thank you for your letter.  I look forward to
speaking to you and the other members of the Intelligence
Oversight Committees on these issues in the future.

                          Sincerely,

                          Michael V. Hayden
                          General, USAF

The Honorable Carl Levin


DCI/OGC/FO/ [                    ] (3 January 07)
[                                                    ]
Levin Ltr re detainees.doc

OGC-FO-2007-50001

Distribution:
   Orig - Addressee
      1 - D/OCA
      1 - OGC FO
      1 - DAC



Central Intelligence Agency

Washington, D.C. 20505

0000064

**DOC 89**

Inspector General ██████

5 April 2006

The Honorable John D. Rockefeller IV
Vice Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C. 20510-6475

Dear Mr. Vice Chairman:

(TS//█████)  This letter responds to your correspondence of 10 March 2006 concerning the status of significant recommendations identified in the Office of Inspector General (OIG) Special Review, entitled "Counterterrorism Detention and Interrogation Activities (September 2001 - October 2003)," (█████████).  This Report was issued on 7 May 2004.  Your letter asked for a description of the corrective actions that have been taken by CIA in respect to each recommendation and the Inspector General's evaluation of whether the corrective actions adequately resolved the issues addressed in the Report.

(TS//█████)  The following list provides the status of actions taken in response to the ██ recommendations in the Report.  The recommendations are briefly summarized; the full text of each recommendation is contained on pages 106-109 of the Report.

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

TOP SECRET/ ████████████████

The Honorable John D. Rockefeller IV



TOP SECRET/

The Honorable John D. Rockefeller IV



TOP SECRET//

The Honorable John D. Rockefeller IV



(U//FOUO)  Given the classification and sensitive issues discussed in this letter, I would ask that you handle it in the same restrictive way the Committee has handled the OIG report of May 2004 to which it refers. Thank you for your support as we continue to examine Agency activities concerning detentions, renditions, and interrogations.  If you have any questions about these matters, please contact me or Assistant Inspector General for Investigations ████████████████.

Sincerely,

John L. Helgerson

cc:  Chairman, Senate Select Committee on Intelligence
     Director of National Intelligence
     Director, Central Intelligence Agency

4

TOP SECRET

UNCLASSIFIED

**DCI ACTION CENTER**
**ROUTING SLIP**

**DOC 125**



UNCLASSIFIED

DAC-84037-05



# * * COMMITTEE ON ARMED SERVICES * *

## FAX COVER SHEET

| 8m |

| TO: *MR. JOHN HELGERSON* *c/o MR. STAN MOSKOWITZ* | FAX NUMBER: 703-482-0672 |
|---|---|
| | PHONE NUMBER: |

**COMMENTS:**

*Please see the attached letter*
*from Senator Levin.*

| FROM: *BILL MONAHAN* | THIS TRANSMISSION CONSISTS OF |
| Committee on Armed Services | *5* PAGES, |
| United States Senate | |
| Room 228 Russell Senate Office Building | INCLUDING THIS COVER SHEET |
| Washington, D.C. 20510-6050 | |
| PHONE NUMBER: 202-224-*9353* | |

JOHN WARNER, VIRGINIA, CHAIRMAN

JOHN McCAIN, ARIZONA
JAMES M. INHOFE, OKLAHOMA
PAT ROBERTS, KANSAS
JEFF SESSIONS, ALABAMA
SUSAN M. COLLINS, MAINE
JOHN ENSIGN, NEVADA
AMES M. TALENT, MISSOURI
SAXBY CHAMBLISS, GEORGIA
LINDSEY O. GRAHAM, SOUTH CAROLINA
ELIZABETH DOLE, NORTH CAROLINA
JOHN CORNYN, TEXAS
JOHN THUNE, SOUTH DAKOTA

CARL LEVIN, MICHIGAN
EDWARD M. KENNEDY, MASSACHUSETTS
ROBERT C. BYRD, WEST VIRGINIA
JOSEPH I. LIEBERMAN, CONNECTICUT
JACK REED, RHODE ISLAND
DANIEL K. AKAKA, HAWAII
BILL NELSON, FLORIDA
E. BENJAMIN NELSON, NEBRASKA
MARK DAYTON, MINNESOTA
EVAN BAYH, INDIANA
HILLARY RODHAM CLINTON, NEW YORK

CHARLES S. ABELL, STAFF DIRECTOR
RICHARD D. DeBOBES, DEMOCRATIC STAFF DIRECTOR

## United States Senate

COMMITTEE ON ARMED SERVICES
WASHINGTON, DC 20510–6050

October 24, 2005

Mr. John Helgerson
Office of the Inspector General
Central Intelligence Agency
2X30 NHB
Washington, DC 20505

Dear Mr. Helgerson:

Congress and the public have yet to receive an accounting of the role Central Intelligence Agency (CIA) personnel have played in the mistreatment of detainees in U.S. custody in Afghanistan, Iraq, Guantanamo Bay and elsewhere. I request that the Office of Inspector General report on its efforts to assess the responsibility of the CIA and its personnel for alleged abuses of detainees.

Senators have sought information on a number of occasions about the CIA's role in alleged detainee abuses and the steps the CIA has taken to investigate these allegations. For example, in February of this year, I asked Director of Central Intelligence (DCI) Goss about the Inspector General's efforts to look into incidents of detainee abuse involving CIA personnel. At that time, DCI Goss was unable to say when the Inspector General would be completing his review of abuse allegations. More recently, Senator Reed asked Secretary of Defense Rumsfeld at a Senate Armed Services Committee hearing on September 29, 2005, for any information he might have regarding the status of the CIA Inspector General's investigation into the "ghost detainee" matter. Secretary Rumsfeld testified that he had no information about that CIA investigation.

The nearly a dozen reviews conducted by the Department of Defense have shed little light on how CIA personnel may have contributed to detainee abuse. On September 9, 2004, Generals Kern and Fay testified to the Senate Armed Services Committee that, in meetings with the CIA's Inspector General, the CIA denied their request for information relating to detainee abuses, but that the CIA Inspector General agreed to conduct his own investigation. The Schlesinger Panel report states that it "did not have full access to information involving the role of the Central Intelligence Agency in detention operations" and recommended further investigation and review. The Church report states that the CIA's cooperation with his investigation was limited to providing "information only on

activities in Iraq." The lack of CIA cooperation with the investigations to date has left significant omissions in the record.

General Kern also testified in September 2004 that both the Defense Department Inspector General and the CIA Inspector General had undertaken an investigation into "ghost detainee" policy, whereby detainees were held unregistered and hidden from monitoring by the International Committee of the Red Cross (ICRC). To date, the Committee has received no information on the progress of either of these investigations. There have also been press reports of numerous covert CIA-operated detention facilities where detainees are being held incommunicado and outside ICRC monitoring.

Public reports indicate that CIA personnel were involved in numerous abuse incidents, including several involving detainee deaths:

- Manadel Al Jamadi died on November 4, 2003, while under CIA interrogation in a shower stall in Tier 1B of the Abu Ghraib detention facility in Baghdad. At the time of the report of Major General George Fay on the role of military intelligence in the Abu Ghraib abuses, the incident remained under CIA investigation.

- Iraqi Major General Abed Hamed Mowhoush died on November 26, 2003 at the Al Qaim facility. While General Mowhoush appears to have died from suffocation during an interrogation by military intelligence personnel after being stuffed head-first in a sleeping bag, according to news reports a classified Army report found that "the circumstances surrounding the death are further complicated due to Mowhoush being interrogated and reportedly beaten by members of a Special Forces team and other government agency (OGA) employees two days earlier." Your office reportedly initiated an investigation of at least one CIA operative in connection with this incident.

- Abdul Wali died on June 21, 2003 near Asadabad, Afghanistan, after being interrogated for two days by a CIA contractor, David Passaro, who punched, kicked and hit Wali with a large flashlight. The CIA referred the case to the Department of Justice, which has brought criminal charges in connection with this death.

- Iraqi Lt. Col. Abdul Jaleel died on January 9, 2004 at Forward Operating Base (FOB) Rifles, Al Asad, Iraq. Jaleel was reportedly beaten during interrogation by special operations forces, and died later after being tied to the top of his cell door and gagged. A detainee autopsy summary released under a FOIA request lists an early January 2004 death of a detainee at FOB Rifles as a homicide by "blunt force

-2-

injuries & asphyxia." News reports indicate possible involvement of CIA personnel in this incident.

- According to news reports, an Afghan detainee died of "hypothermia" in November 2002 after a CIA case officer ordered the detainee to be stripped naked, chained to the floor, and left overnight in an abandoned warehouse known as the Salt Pit. The Salt Pit case was reportedly under investigation by your office.

Finally, the CIA has failed to respond to allegations that the Agency is engaging in a policy of rendition, reportedly resulting in dozens of individuals being secretly transferred for interrogation to foreign countries, including countries with a track record of engaging in torture. An FBI document recently released by the Justice Department suggests that military intelligence at Guantanamo may also have been considering the use of rendition as part of interrogation plans for resistant detainees. The document, entitled "Legal Analysis of Interrogation Techniques" and dated November 27, 2002, includes among the categories of "coercive interrogation techniques" under consideration at Guantanamo the following:

"Category IV–
    1. Detainee will be sent off GTMO, either temporarily or permanently, to Jordan, Egypt, or another third country to allow these countries to employ interrogation techniques that will enable them to obtain the requisite information."

The report of Generals Schmidt and Furlow on their investigation of FBI allegations of detainee abuse at Guantanamo failed to address the question of whether U.S. officials at Guantanamo were engaging in or threatening the rendition of detainees as an interrogation technique.

The American people need answers. It is insufficient to say that the Chairman and Vice Chairman of the congressional oversight committee have been briefed on these matters. There must be a forthright accounting of both the CIA's involvement in the treatment of detainees and what steps the CIA has taken to address the policies and practices that may have contributed to alleged detainee abuse.

I request that you provide answers to the following questions:

- Have you completed your investigation into the "ghost detainee" policy referred to by General Kern in his testimony before the Committee? If so, what were the

-3-

findings of your investigation?  Have you cooperated with the DoD Inspector General in his investigation into the "ghost detainee" policy?

• How many cases of alleged detainee abuse have you investigated?  Have you completed your review of these cases?  If not, what is the timeline for completing the review of these cases?

• How many cases of detainee abuse involving CIA personnel have been referred to the Justice Department for their review?  How many CIA operatives have been named in the cases referred to the Justice Department?  To what office within the Justice Department have these cases been referred?  How many of these cases does the Justice Department plan to prosecute?

• Is the CIA cooperating fully with the Army's investigations into the allegations raised by Army Captain Ian Fishback and two non-commissioned officers of having witnessed and heard about detainee abuse in Afghanistan and Iraq, including abuse carried out by Other Government Agency, i.e., CIA, personnel?

• Have you investigated cases of individuals alleged to have been subjected to rendition, resulting in their being transferred to foreign countries for interrogation?  If so, did you find any case in which these transfers resulted in detainees being subjected to treatment that violated U.S. obligations under the Convention Against Torture and Cruel, Inhuman, or Degrading Treatment or Punishment?

• Did the CIA receive any requests for information from Generals Schmidt or Furlow in connection with their investigation into FBI allegations of detainee abuse at Guantanamo Bay, and if so, was the requested information provided?  Have you looked into whether CIA personnel at Guantanamo Bay used rendition or the threat of rendition as an interrogation technique or cooperated with military intelligence in their doing so?

I look forward to receiving your responses.  Should you have any questions, please have your staff contact Bill Monahan of my staff at (202) 224-9353.

Sincerely,

Carl Levin
Ranking Member

-4-

MORI DocID: 1530032

**DOC 174**

(b)(2)
(b)(6)

APPROVED FOR RELEASE
DATE: APR 2008

00529

## DEPARTMENT OF THE ARMY
### 1st Squadron, 3rd Armored Cavalry Regiment
### TIGER BASE, IRAQ 38S FT 985940

AFZC-R-I-S-3

03 NOVEMBER 2003

MEMORANDUM FOR RECORD

SUBJECT: Standard Operating Procedures for Tiger Base Detention Center

1. Bringing detainee to Base compound/ entering Base compound
   a. Notify Tiger X-Ray immediately when detainees are picked up.
   b. Always utilize the 5 S's (search, segregate, silence, speed, secure)
   c. Have detainees blindfolded and zip tied for movement:
   d. Capturing unit will conduct a thorough search of all detainees.
   e. Capturing unit will complete two copies of DA form 5976. One form is worn by the detainee, the other form will be given to the S2 representative.
   f. Notify Tiger X-Ray when detainees are inbound.
   g. Tiger X-Ray will notify S-2, and the guard force NCOIC.
   h. All personal items and captured weapons will be handed over to the S-2 with a detailed description of who, what, where, and how the items were confiscated.
   i. A representative from the capturing unit will remain with the detainees until released by the guard NCOIC.

2. Guard Force Responsibilities
   a. Guards will do a thorough search of all detainees and vehicles.
   b. Guard detail will inventory personal items on DA 4137 (2 copies) and maintain proper accountability of items.
   c. One record of items will be placed in a sealed bag along with the items, the other record will be given to the S-2.
   d. The bag of personal items will be tagged with the detainees serial number.
   e. All detainees will be separated as the situation permits. They will not be allowed to speak to one another.
   f. The NCOIC in conjunction with the CI/Interrogator team will determine when the detainees are given food and water.

3. Detention Center Battle Rhythm
   a. The NCOIC will be overall responsible for ensuring each detainee is properly documented and serve as a liaison between the guard detail and S2/ CI sections.
   b. Capturing unit representative back briefs the Battle Captain, who then sends report to the S-2.
   c. Initial Screening of all detainees will be conducted by the guard force NCOIC.
   d. Detainee Screening reports are then sent to the S-2.
   e. The S-2 analyzes initial screening, then prepares INTREP for CI/Interrogator team.

f.  CI/Interrogator team conducts further Interrogation to collect intelligence from detainees.

g.  Interrogation report is sent back to S-2 for analysis.

h.  The S-2 determines further usefulness of detainee, and determines release time.

i.  Upon release of detainees, the NCOIC will verify the identity of the detainees and ensure they receive their personal belongings

j.  If detainees are to be released the NCOIC will escort them to their transportation, ensure they are properly logged out and notify the Battle Captain before they are released.

k.  If detainees are to be transferred to Al Asad detention center (OBJ Webster) the NCOIC will ensure the guard accompanying the detainee has the DA5976, DA4137 and a copy of the interrogators summary report.  He will also ensure that the guard has the detainee's personal belongings.  The NCOIC will keep originals of all reports.  He will ensure the detainees are properly logged out and notify the Battle Captain before they are released.

4.  Pesonnel Tasking and Logistical Support

a. The S-3 will ensure the detention center guard force is properly manned with a ratio of 5 detainees to one guard. The minimum is one NCO and one EM.

b. Guard shifts should be no longer that 6 hours.

c. The NCOIC will send a daily report to the S-3 of the number of detainees in the holding center.

d. The S-3 will coordinate with the S-4 to ensure that MREs and Water are being pushed to the Detention Center.

5. POC for this memorandum is Tiger S-2

MAJ, AR
Squadron XO

MORI DocID: 1529610

**DOC 175**

UNCLASSIFIED//FOR OFFICIAL USE ONLY    0000541

(b)(1)
(b)(2)
(b)(3)

RECEIVED

APPROVED FOR RELEASE
DATE: APR 2008

APR 12 2005

 INSPECTOR GENERAL

8 April 2005

MEMORANDUM FOR:  Inspector General

FROM:

Senior Deputy General Counsel

SUBJECT:    (U//FOUO)  Detention, Interrogation, and
Rendition Investigation Documents Produced by

1.  (U//FOUO)  _____ of this office reports that
our staff has asked him to produce to you certain documents
relating to detention, interrogation, and rendition.  My office
has reviewed these documents and determined that they include
information that is covered by executive privilege, deliberative
process privilege, attorney work product privilege, and attorney
client privilege.  Given this fact, I trust you will understand
that we can provide these documents to you only with the
understanding that OIG will not forward them to the Department
of Justice (DOJ), a United States Attorney's office, defense
counsel, or any other third party without further review and
discussion with my office.  Either through redaction or other
arrangement, it is OGC's responsibility to ensure that
production of these documents to DOJ or any other third party
does not operate as a waiver of these important legal
privileges.

2.  (U//FOUO)  Moreover, based on our review of _____
_____ documents, it appears that other documents provided to
OIG in this case also may contain "privileged" information as
described above that should not be provided outside of the
Agency without further review by OGC to determine if there is
any such information in them.  Accordingly, if OIG has already
provided documents relating to this investigation to DOJ or
another third party without the requisite OGC review, these

MORI DocID: 1529610

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SUBJECT:   (U//FOUO)   Detention, Interrogation, and Rendition
           Investigation Documents Produced By

documents need to be retrieved as soon as possible so that we
may review them.

    3.   (U//FOUO)   Please let me know if you have any
questions.  Thanks for your cooperation.



                            2

MORI DocID: 1530033

**DOC 247**

APPROVED FOR RELEASE
DATE: APR 2008

0001262

# ...ook at the 'Hard Site'

The abuse at Abu Ghraib took place at the "hard site," where valuable or violent prisoners were kept in buildings rather than tents like most of the detainees.



Abu Ghraib prison complex

0.75 MILES

HARD SITE

KITCHEN AND DINING

4B Women

4A Medical

3B Post-trial holds

MEDICAL

3B Juveniles

2B Felons

2A Felons

1A    1B

CHAMBER

Drawings are based on military diagrams from 2003 and 2004 and satellite images of the complex from 2002. Labels identify prison configuration when abuse took place.

Showers

Cells

Guards

1B Isolation, for "high-risk or trouble-making detainees"

1A Military intelligence holds

**Cellblock where abuse occurred**

The abuse is said to have occurred in Tier 1 of the "hard site." Each cell is about 6 by 10 feet with a bunk bed, a hole in the floor for a toilet and a tiny spigot. Most have no lights on the inside.

MORI DocID: 1530031

0001382

APPROVED FOR RELEASE
DATE: APR 2008

UNCLASSIFIED - FOR OFFICIAL USE ONLY

(b) (2)
(b) (6)
(b) (7) (c)

DATE:   12 AUG 2004

**DOC 249**

FROM:   SAC, DETAINEE ABUSE TASK FORCE, CAMP VICTORY, IZ
TO:     DIRECTOR, USACRC, USACIDC, FORT BELVOIR, VA
        CDR, HQUSACIDC ATTN: CIOP-ZA, FORT BELVOIR, VA
        CDR, 22ND MILITARY POLICE BATTALION (CID)(FWD)
        CDR, 3D MILITARY POLICE GROUP (CID)
        CDR, 391ST MILITARY POLICE BN, ABU GHRAIB, IZ
        CDR, 78TH MILITARY POLICE DET (CID)(FWD)
        MNF-I, CHIEF OF STAFF, DETAINEE OPS
        PROVOST MARSHAL, MNF-I
        LNO CID, MNF-I (FOR FURTHER DISTRIBUTION)

SUBJECT: CID REPORT OF INVESTIGATION -INITIAL/SSI - 0265-
04-CID259-80297-/5C1/5Y2E/5T1

DRAFTER : SA
RELEASER: SA

1.   DATES/TIMES/LOCATIONS OF OCCURRENCES:

     1.  16 JUL 2003/1600 HRS - 6 AUG 2003/2400 HRS; SMALL
ROOM IN AN UNKNOWN LOCATION, IZ.

2.   DATE/TIME REPORTED: 12 AUG 2004, 1630 HRS

3.   INVESTIGATED BY: SA          SA          SA
                                                        SA
                           SA

4.   SUBJECT:  1. UNKNOWN, CENTRAL INTELLIGENCE AGENCY (CIA),
NFI; [ASSAULT] [CRUELTY AND MALTREATMENT] [COMMUNICATING A
THREAT]

5.   VICTIM:  1.                                          CIV;
        IRAQ; ALKINDIST DZII/23/14, BAGHDAD-AL HARETHIS,
IRAQ, IZ, M; ZZ[ASSAULT][CRUELTY AND
MALTREATMENT][COMMUNICATING A THREAT]

6.   INVESTIGATIVE SUMMARY:  THE INFORMATION IN THIS REPORT
IS BASED UPON AN ALLEGATION OR PRELIMINARY INVESTIGATION
AND MAY CHANGE PRIOR TO THE COMPLETION OF THE
INVESTIGATION.

THIS IS AN "OPERATION IRAQI FREEDOM" INVESTIGATION.

UNCLASSIFIED - FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY

THIS INVESTIGATION WAS INITIATED UPON RECEIPT OF
INFORMATION RECEIVED FROM DETAINEE OPERATIONS, MULTI-
NATIONAL FORCES IRAQ (MNFI), CAMP VICTORY, IZ. THE
INFORMATION REFLECTED THAT MR. [          ] ALLEGED HE WAS TAKEN
INTO CUSTODY BY THE CIA FOR 16 DAYS, DURING WHICH HE WAS
PHYSICALLY AND MENTALLY ABUSED, AND HIS LIFE THREATENED.

PRELIMINARY REVIEW OF THE INFORMATION REVEALED MR. [          ]
ALLEGED THE CIA TOOK HIM INTO CUSTODY ON 22 JUL 03, AND
SUBSEQUENTLY HELD HIM FOR 16 DAYS.  DURING THE 16 DAY
PERIOD, MR. [          ] ALLEGED HE WAS PHYSICALLY AND MENTALLY
ABUSED, AND HIS LIFE WAS THREATENED.

EFFORTS ARE ON GOING TO LOCATE, FULLY IDENTIFY, AND
INTERVIEW THE UNKNOWN INDIVIDUAL(S) RESPONSIBLE FOR MR.
[          ] ABUSE.

MR. [          ] IS SCHEDULED TO BE INTERVIEWED BY THIS OFFICE ON
14 AUG 04 In an effort to obtain the details of his
allegation(S).

INVESTIGATION CONTINUES BY USACIDC.

7.  COMMANDERS ARE REMINDED OF THE PROVISIONS OF AR 600-8-2
PERTAINING TO SUSPENSION OF FAVORABLE PERSONNEL ACTIONS AND
AR 380-67 FOR THE SUSPENSION OF SECURITY CLEARANCES OF
PERSONS UNDER INVESTIGATION.

8.  CID REPORTS ARE EXEMPT FROM AUTOMATIC TERMINATION OF
PROTECTIVE MARKING IN ACCORDANCE WITH CHAPTER 3, AR 25-55.

UNCLASSIFIED - FOR OFFICIAL USE ONLY

MORI DocID: 1529942



0002414  **DOC 195**

(b)(1)    APPROVED FOR RELEASE
(b)(2)    DATE: APR 2008
(b)(3)
(b)(6)

10/24/03 09:26 AM

To: 
cc:
Subject: 2nd Tranche of Documents re: Detainees from

I have not yet caught up on my lotus notes so I don't know whether you already have the note below.  The first document is a set of interrogation guidelines approved by General Sanchez and apparently drafted by or approved by _____ the senior CENTCOM attorney in Iraq.  The senior CENTCOM attorneys in Tampa, _____ also approved the document. Yesterday, the General Counsel obtained DOJ's verbal concurrence for the CENTCOM document.

----- Forwarded by _____ on 10/24/03 09:22 AM -----

Office:

10/22/03 04:03 PM

To: 
cc: Scott W. Muller@DCI,
Subject: 2nd Tranche of Documents re: Detainees from

The first doc below is the Oct 12 document for DOJ
----- Forwarded by _____ on 10/22/03 04:02 PM -----

Office:

22 October 2003

To:

cc:

0008138

MORI DOCID: 1529942

UNCLASSIFIED//~~FOUO~~

Subject: 2nd Tranche of Documents re: Detainees from

**Reference:**
A couple more documents for you below...

*NOTE FOR:*
*FROM:*
*OFFICE:*
*DATE:*    10/22/2003 01:04:45 PM
*SUBJECT:*    *floppy docs*

Interrogation and Counter-Resistance Policy

*CC:*

*Sent on 22 October 2003 at 01:04:45 PM*

0008139

UNCLASSIFIED

0001442

SECRET

16 February 2006

FOR:   Office of the General Counsel ███████████
       J-5 Detainee Affairs Division ███████████
       Office of Detainee Affairs ███████████

FROM:  Defense Sensitive Support Activity
       Special Advisory Staff ███████████

Subject: Request for Security Review (SAS-D-060154)

(S) The attached is a HQDA request for a security review of an official statement. Specifically, the statement refers to CIA activities on pages 4, 15, and 17.

(U) Since this document will be introduced during a 27 Feb hearing and 11 March trial, request you provide us your review by 25 Feb. Please call me at ███████ if you have any questions.

SECRET

Classified by: DoDD 5210.36
Reason: 1.5 (a), (c)
Declassify on: 1 February 2031

UNCLASSIFIED