# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

AMNESTY INTERNATIONAL USA, CENTER
FOR CONSTITUTIONAL RIGHTS, INC. and
WASHINGTON SQUARE LEGAL SERVICES,
INC.,

        Plaintiffs,

    v.

CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE, DEPARTMENT
OF HOMELAND SECURITY, DEPARTMENT
OF JUSTICE, DEPARTMENT OF STATE, AND
THEIR COMPONENTS

        Defendants.

**CIVIL ACTION DOCKET
No. 07-CV-5435**

**<u>AMENDED COMPLAINT</u>**

## <u>PRELIMINARY STATEMENT</u>

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552

*et seq.,* for injunctive and other appropriate relief, and seeking the immediate processing

and release of agency records requested by Plaintiffs from Defendants Central

Intelligence Agency ("CIA"), Department of Defense ("DOD"), Department of

Homeland Security ("DHS"), Department of Justice ("DOJ"), Department of State

("DOS"), and their components.

2.      Since 2001, the United States Government has orchestrated the rendition and

secret detention of individuals in connection with the "War on Terror."

3.      Rendition and secret detention typically involve the apprehension of individuals

by local security forces, often with the help of U.S. agents, followed by stripping,

handcuffing, shackling, blindfolding, and hooding of the detainees in preparation for flights by which they are transferred to foreign destinations such as Syria, Jordan or Egypt for detention and interrogation, sent to secret U.S. facilities, or a combination of both. Detention in both foreign destinations and secret U.S. facilities involves interrogation techniques such as sleep deprivation, prolonged solitary confinement and sensory manipulation.

4.      The use of both rendition and secret detention has been officially acknowledged at the highest levels of the United States Government. On December 5, 2005, Secretary of State Condoleezza Rice stated that the United States uses "rendition" to transport terrorism suspects to third countries for interrogation, detention or to bring individuals "to justice." On September 6, 2006, President George W. Bush acknowledged that "a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program…" and revealed that this program had been reviewed and approved by the CIA and DOJ.

5.      Amnesty International USA ("Amnesty"), the Center for Constitutional Rights, Inc. ("CCR") and Washington Square Legal Services, Inc. ("WSLS") (collectively "Plaintiffs") have submitted FOIA requests ("Plaintiffs' Requests") to Defendants seeking records concerning rendition and secret detention of individuals in the "War on

Terror."[1] Plaintiffs' Requests seek records related to evaluations and authorizations, policies and procedures, identities of individuals and locations, activities of private contractors and non-governmental actors, and treatment of, and injuries sustained by, individuals transferred or detained.

6.    Despite official United States Government acknowledgment of the rendition and secret detention of individuals in connection with the "War on Terror," as well as widespread reporting on these practices by the media and other sources, Defendants refuse to release, and continue to unlawfully withhold, known documents that are clearly responsive to Plaintiffs' Requests. Defendants have refused to provide — and in some cases have failed to conduct adequate searches for — documents plainly within the categories of documents sought in Plaintiffs' Requests. Indeed, the CIA has not substantively responded to Plaintiffs' Requests in any way even though it has been more than two years since Plaintiff CCR filed its FOIA request.

7.    There is a compelling public interest in disclosure of the requested documents concerning the rendition and secret detention of individuals in the "War on Terror." To vindicate the public's right to information about government practices and policies, Plaintiffs seek an injunction requiring that Defendants immediately process Plaintiffs' Requests and release records that are and have been unlawfully withheld.

## JURISDICTION AND VENUE

---

[1] The CCR submitted a FOIA request in December 2004. Amnesty and WSLS submitted two FOIA requests in April 2006. Due to the similarity of the CCR Request and the Amnesty and WSLS Requests, CCR, Amnesty and WSLS (collectively "Plaintiffs") join in this single action for injunctive relief. The CCR Request to DOD Office of Freedom of Information/Security Review is attached as Exhibit A. CCR also filed identical requests with the CIA, DOD and its components, DOJ and its components, and DOS. Amnesty's and WSLS' Requests to the CIA are attached as Exhibits B and C. Amnesty and WSLS also filed identical requests with DOD and its components, DHS and its components, DOJ and its components, and DOS. A supplemental FOIA request to the CIA was submitted by WSLS on behalf of WSLS, Amnesty and CCR on December 28, 2007. This request is attached as Exhibit D.

8.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(E)(iii).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C. §§ 701-706.  Venue properly lies in this District pursuant to 5 U.S.C. § 552 (a)(4)(A) and (B).

## PARTIES

9.    Plaintiff Amnesty International USA ("Amnesty") is the United States Section of Amnesty International.  Amnesty is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. Amnesty is dedicated to bringing about a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. To accomplish this goal, Amnesty engages in research and action campaigns.  At the heart of every campaign is the dissemination of information about particular human rights abuses that Amnesty has documented. Amnesty expends extensive resources researching alleged abuses to generate reports and shape its campaigns.  Amnesty publishes reports, press briefings, newsletters, and urgent action requests informing the public about human rights, including the prohibition on torture and the prohibition on disappearances.  Amnesty also disseminates information through its website <www.amnestyusa.org>.

10.    Plaintiff Center for Constitutional Rights ("CCR") is a New York-based legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in fields of civil and international human rights, including extensive materials on detainees and others apprehended after September 11, 2001.  CCR publishes regular newsletters, know-your-rights handbooks, and other informational

- 4 -

materials for public dissemination. These materials are also available through CCR's

Development and Outreach Departments. CCR operates a website <www.ccr-ny.org>,

that addresses the issues on which the Center works. The CCR website includes material

on topical civil and human rights issues and material concerning CCR's work. All of this

material is freely available to the public.

11.    Plaintiff Washington Square Legal Services ("WSLS") is a not-for-profit

corporation that houses the clinical program of the New York University ("NYU")

School of Law, of which the International Human Rights Clinic is a part. The Clinic is

also a project of the Center for Human Rights and Global Justice ("CHRGJ") and an

official program at NYU School of Law, composed of students and directed by clinical

professors, who engage in research and advocacy on human rights issues. CHRGJ is a

research center at NYU School of Law. CHRGJ aims to advance human rights and

respect for the rule of law through advocacy, scholarship, education and training.

CHRGJ publishes reports and operates a website <www.chrgj.org> discussing human

rights issues.

12.    Defendant CIA is a Department of the Executive Branch of the United States

Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

13.    Defendant DOD is a Department of the Executive Branch of the United States

Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). Defense

Intelligence Agency ("DIA"), Department of the Army ("Army"), Department of the

Navy ("Navy"), and Department of the Air Force ("Air Force") are components of DOD.

14.    Defendant DHS is a Department of the Executive Branch of the United States

Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). U.S.

Immigration & Customs Enforcement, Office of Investigations ("ICE"), U.S. Citizenship & Immigration Services ("CIS"), U.S. Customs & Border Protection ("CBP"), U.S. Coast Guard, Office of Intelligence & Analysis ("OIA"), and Privacy Office are components of DHS.

15.    Defendant DOJ is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). Office of Information & Privacy ("OIP"), Criminal Division, "Federal Bureau of Investigation ("FBI"), Executive Office for U.S. Attorneys ("EOUSA"), Office of Inspector General ("OIG"), and Office of Intelligence Policy & Review ("OIPR") are components of DOJ.

16.    Defendant DOS is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

## I.    THE U.S. GOVERNMENT'S RENDITION AND SECRET DETENTION OF INDIVIDUALS IN THE "WAR ON TERROR"

17.    Since 2001, the United States Government has orchestrated the rendition and secret detention of individuals in connection with the "War on Terror."[2]

18.    Rendition and secret detention typically involve the apprehension of individuals by local security forces in a foreign country, often with the involvement of U.S. agents. After an initial interrogation by these local and/or U.S. agents, individuals are typically stripped naked; handcuffed, shackled, and blindfolded; have earplugs inserted in their

---

[2] As used in this complaint, the term "rendition" means the transfer of an individual from one government to another either (a) without the benefit of regular transfer procedures such as extradition or immigration proceedings, or (b) through the perversion of such regular procedures. The term "secret detention" means the detention of an individual in an unofficial or unknown place of custody, or the detention of an individual in an official or known place of custody where the fact of the individual's detention is kept hidden or concealed.

ears and their mouths covered, and are hooded. *See, e.g.,* Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Eur. Parl. Doc. 10957 (June 12, 2006); Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake: German Citizen Released After Months in Rendition*, Wash. Post, Dec. 4, 2005.

19.     Individuals are then typically transferred using a variety of aircraft, including civilian or military aircraft, to foreign destinations for further interrogation and detention. This has included transfer to third countries for foreign interrogation and detention (commonly known as "extraordinary rendition"), detention in secret U.S. facilities (e.g., "black site" detention), or a combination of both. *See id.*

### A. Transfer to Third Countries for Foreign Interrogation and Detention

20.     On December 5, 2005, Secretary of State Condoleezza Rice stated that the United States uses "rendition" to transport terrorism suspects apprehended abroad to third countries for interrogation, detention or to bring them "to justice." Secretary of State Condoleezza Rice, *Remarks Upon Her Departure for Europe*, Dec. 5, 2005. Secretary Rice further stated that "in conducting such renditions, it is the policy of the United States . . . to comply with its laws and comply with its treaty obligations…" and indicated that, "where appropriate, the United States seeks assurances that transferred persons will not be tortured." *Id.*

21.     As part of this practice, the United States Government transfers detainees for foreign interrogation and detention to third countries criticized for their poor treatment of prisoners (e.g. Syria, Jordan, or Egypt). Individuals transferred to third countries for foreign interrogation and detention have reportedly been subjected to ill treatment, such

as prolonged solitary confinement, beatings and other abuse — including in cases where assurances were sought by the United States. *See, e.g., Deneen L. Brown & Dana Priest, Deported Terror Suspect Details Torture in Syria; Canadian's Case Called Typical of CIA*, Wash. Post, Nov. 5, 2003; Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations*; *'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities*, Wash. Post, Dec. 26, 2002.

22.    Rendition to third countries for foreign interrogation and detention reportedly involves all Defendants. *Id.*

### B. Transfer to Detention in Secret U.S. Facilities

23.    Prior to September 6, 2006, numerous news articles and other reports had disclosed the existence of a U.S. secret detention program. *See, e.g.*, Amnesty International, *United States of America: Below the radar: Secret flights to torture and 'disappearance,'* Apr. 5, 2006; Brian Ross & Richard Esposito, *Exclusive: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC News, Dec. 5, 2005; Human Rights Watch, *List of "Ghost Prisoners" Possibly in CIA Custody* (last updated Dec. 1, 2005); Amnesty International, *United States of America/Yemen: Secret Detention in CIA "Black Sites,"* Nov. 8, 2005. The secret detention program was reportedly authorized by President Bush in a Presidential Directive or Finding signed on or about September 17, 2001. *See, e.g.*, Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005.

24.    On September 6, 2006, President Bush acknowledged that "a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central

Intelligence Agency." White House Office of the Press Secretary, *News Release: President Discusses Creation of Military Commissions to Try Suspected Terrorists*, Sept. 6, 2006. On the same day, the Office of the Director of National Intelligence ("DNI") released a "Summary of the High Value Terrorist Detainee Program" and "Biographies of High Value Terrorist Detainees Transferred to the US Naval Base at Guantánamo Bay" and acknowledged that planning for the program began shortly after September 11, 2001, and that by 2002, its implementation was already underway.

25.     In these disclosures, President Bush and the Office of the DNI officially provided selective additional details about secret detention, including the following:

- thousands of people, besides the fourteen whose names have been disclosed, have been captured in connection with the "War on Terror," yet never sent to Guantánamo;

- the names and biographical information collected from some specific individuals held in the secret detention program;

- individuals have been released from the program, with "many" being "returned to their home countries for prosecution or detention," and fourteen high-level detainees held in the program were transferred to the U.S. Naval Base at Guantánamo Bay, Cuba on or around September 6, 2006;

- the United States Government has shared information produced by the secret detention program with entities outside the CIA, including allies in the "War on Terror";

- detainees held in secret detention have been subjected to an "alternative set of interrogation techniques"; and

- the CIA's Office of the Inspector General has investigated and audited the secret detention program.

26.     President Bush also stated that the program "has been subject to multiple legal reviews by the Department of Justice and CIA lawyers" and that the "alternative set of procedures" used for interrogation in the program were "extensively" reviewed and approved by the DOJ. The Office of the DNI twice confirmed that the DOJ had provided

legal advice on the procedures used in the program. *See* Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

27.    Other reports have identified the role of other agencies and their components in the secret detention program. For example, it is reported that in June 2005, Gordon R. England, then Acting Deputy Secretary of Defense, and Philip D. Zelikow, counselor of the Department of State, co-authored a nine-page memo urging Congressional approval for the secret detention program. *See* Tim Golden, *Detainee Memo Created Divide in White House*, N.Y. Times, Oct. 1, 2006. It is similarly reported that by "the end of 2005," military lawyers began review of the "C.I.A.'s evidentiary files on the high-value detainees" to determine the feasibility of prosecution of the detainees by military commissions at Guantánamo Bay. *Id.*

28.    Individuals interrogated in the secret detention program reportedly have been subject to ill treatment including "waterboarding" (a form of mock execution, wherein the detainee is strapped to a board inclined so that the detainee's head is below his feet, cellophane is wrapped over the detainee's face and water is poured over the detainee to simulate drowning), sensory deprivation and beatings. *See, e.g.*, Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described*, ABC News, Nov. 18, 2005.

## II. THE REQUESTS

29.    Plaintiffs' Requests seek information regarding five aspects of the rendition and secret detention of individuals by the U.S. in connection with the "War on Terror":[3]

---

[3] Plaintiffs' Requests do not seek records pertaining to detainees previously or currently held at Guantánamo Bay unless they were secretly and/or irregularly transferred to a third country from Guantánamo, or at some point held in a secret United States facility, including the secret facility reportedly within Guantánamo.

I.   Records that analyze the legality of rendition and/or secret detention under domestic and international law, consider the legal basis for, appropriateness of, or propose, authorize, approve, report on, describe, reject, and/or evaluate rendition and/or secret detention. Such records include, for example:

- The Presidential Directive or Finding signed on or about September 17, 2001.

- DOJ records concerning the legality of the secret detention program, including interrogation procedures.

- Records concerning the CIA Office of the Inspector General's investigation and audit of the secret detention program.

- The June 2005 memorandum drafted by Gordon R. England and Philip D. Zelikow, urging the Bush Administration to obtain Congressional approval for the secret detention program, and a draft of this memorandum, prepared by England, Zelikow, Matthew C. Waxman (then Deputy Assistant Secretary of Defense for Detainee Affairs) and John B. Bellinger III (Legal Advisor to the Secretary of State).

II.  Records that set out standards, policies, procedures, and/or rules concerning conduct, and records concerning derogations from those policies, procedures, and/or rules on rendition and/or secret detention. Such records include, for example:

- Records reflecting the "multiple safeguards" that have been "built into the program to ensure its professionalism." Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

- Records reflecting the approval or non-approval by "specific senior CIA officers" and the Director of the CIA of the use of interrogation procedures in connection with specific detainees. *Id.*

- Records reflecting instances in which interrogation sessions were terminated by "non-participant" observers authorized to halt sessions when "anything unauthorized is occurring," including records concerning referrals to the CIA's Office of Inspector General and/or the DOJ. *Id.*

- Records concerning rules or policies governing who is eligible for rendition, including criteria for determining when "traditional extradition is not a good option." Secretary of State Condoleezza Rice, *Remarks Upon Her Departure for Europe*, Dec. 5, 2005.

- Records setting forth procedures and policies used to ensure that the United States "compl[ies] with its treaty obligations, including those under the Convention Against Torture," and to guarantee respect for "the sovereignty of other countries" when carrying out a rendition. *Id.*

III.    Records concerning the identities of individuals subjected to rendition and/or secret detention; the locations of their apprehension, transfer, and detention; and information about their fate and whereabouts. Such records include, for example:

- Records confirming the existence, locations, and arrangements concerning the facilities used to detain individuals.

- Records concerning the apprehension, transfer, and detention, and identities, fate and whereabouts of the detainees, including the fourteen "high-value" detainees transferred to Guantánamo Bay prior to September 6, 2006 and others whose custody has been acknowledged by the United States Government.

- Records concerning communications with foreign governments regarding the rendition and/or secret detention of individuals, including the names of the approximately 86 individuals in respect of whom the program allegedly yielded intelligence, half of whom the United States and its allies claimed to have "removed from the battlefield," and records concerning the return of individuals to home countries for detention or prosecution. Announcement, DNI, *Summary of the High Value Terrorist Detainee Program*, Sept. 6, 2006.

- Records relating to communications with foreign governments regarding the rendition and/or secret detention of individuals, including those concerning arrangements for transfer, handover of custody, interrogation plans, and assurances concerning detention and/or treatment.

IV.    Records reflecting communications with or about the activities of private contractors and non-governmental actors, including non-governmental organizations, contractors, and companies in relation to rendition and/or secret detention. Such records include, for example:

- Records indicating whether and to what extent the International Committee of the Red Cross and/or other humanitarian or human rights organizations had, have, or will have access to detainees, including but not limited to records related to particular decisions to grant or deny such groups access to any detainee or group of detainees.

- 12 -

- Records concerning contracts, invoices, and payments, or other arrangements with private companies or individuals providing food, utilities, provisions, supplies, and other goods and materials, or providing services such as transportation, translation and interpretation, interrogation and incarceration, security, construction, food provision and/or preparation, utilities such as water, electricity and fuel, and medical, dental and psychological and/or psychiatric services.

V.    Records concerning the treatment of, injuries to, and illnesses and deaths of individuals subject to rendition and/or secret detention. Such records include, for example:

- Records concerning investigations, inquiries, disciplinary proceedings, and other actions taken in relation to injuries, illnesses or deaths of detainees.

- Records concerning policies and rules about the treatment of, injuries to, and illnesses and deaths of detainees.

- Records reflecting the actions of medical, dental, and psychological and/or psychiatric personnel in relation to specific detainees, including death certificates and autopsy records.

- Records concerning the involvement of medical and/or psychological and/or psychiatric personnel in the interrogation of detainees.

30.    On December 21, 2004, Plaintiff CCR submitted its FOIA request to CIA; DOD, including its components DIA, Army, Navy, and Air Force; DOJ, including its components FBI and OIPR; and DOS. The CCR Request contains a request for expedited processing under 5 U.S.C. § 552(a)(6)(E)(v)(I)[4] and a request for a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A).[5]

31.    In April 2006, plaintiffs Amnesty and WSLS submitted two FOIA requests to Defendants DOD, including its components DIA Army, Navy, and Air Force; DOJ, its components OIP, FBI, and OIPR; DOS; DHS and its components ICE, CIS, CBP, OIA,

---

[4] The DIA, a component of DOD, the Office of Information and Privacy, a component of the DOJ, and the FBI granted CCR's request for expedited processing.

[5] The DOD and FBI granted CCR's requests for a fee waiver.

and Privacy Office; and the CIA. The Amnesty and WSLS Requests contain requests for expedited processing under 5 U.S.C. § 552(a)(6)(E)[6] and requests for a waiver of applicable fees under 5 U.S.C. § 552(a)(4)(A).[7]

32.    On December 28, 2007, plaintiff WSLS, on behalf of co-Plaintiffs WSLS, Amnesty, and CCR filed a supplemental FOIA request with the CIA seeking seventeen specific records or categories of records acknowledged by government officials or reported in the media and related to secret detention and/or rendition. Included within was a request for a fee waiver and expedited processing under 5 U.S.C. § 552.[8]

## III.    AGENCY RESPONSES

33.    No defendant timely responded to Plaintiffs' Requests.

34.    Since filing the Requests, Plaintiffs have spent significant time and effort attempting to obtain responsive documents from Defendants without resorting to litigation. These efforts included written correspondence and numerous telephone calls with the Defendants and their components, as well as filing administrative appeals with agencies that determined they would not provide Plaintiffs documents responsive to the Requests. In these communications and appeals, Plaintiffs presented evidence of the Defendants' involvement in the rendition and/or secret detention of individuals in connection with the "War on Terror" and identified documents responsive to the

---

[6] The "OIPR", a component of the DOJ, purportedly granted Amnesty and WSLS' request for expedited processing in September 2006. OIPR responded to Amnesty and WSLS in October 2006, and Amnesty and WSLS appealed the OIPR's response in December 2006. OIPR has not responded to the appeal.

[7] United States Immigration and Customs Enforcement, a component of DHS, granted Amnesty and WSLS' request for a fee waiver.

[8] The CIA granted co-plaintiffs' request for a fee waiver, denied co-plaintiffs' request for expedited processing and did not at the time of filing of this amended complaint provide a substantive response to the December 28, 2007 FOIA request.

Requests that are likely possessed by each Defendant. These efforts have been to no avail.

35.    In total, Plaintiffs have only received five documents from all of the Defendants combined. These records consist of four pages of a redacted document from DHS, three documents from DOS (two of which are redacted), one redacted document from the DOJ Office of Information and Privacy, and one highly-redacted document from the FBI. None of the other agencies has released a single record in response to Plaintiffs' Requests. Despite the fact that more than two years has passed since CCR filed its Request and a year has passed since Amnesty and WSLS filed their Requests, the CIA has not substantively responded to Plaintiffs' Requests in any way. Despite the clear responsiveness of the documents listed above to Plaintiffs' Requests, none of the Defendants has produced any of these documents to either CCR or Amnesty and WSLS.

36.    Defendants have also denied Plaintiffs' requests for expedited processing of the Requests and Plaintiffs' requests for a waiver of applicable fees.

## CAUSES OF ACTION

### First Cause of Action:
### Violation of FOIA for Failure to Expedite the Processing of Plaintiffs' Requests Against All Defendants

37.    Plaintiffs repeat and reallege paragraphs 1-36.

38.    Defendants' failure to expedite the processing of Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a)(6)(E)(iii), and Defendants' own regulations promulgated thereunder.

### Second Cause of Action:
### Violation of FOIA for Failure to Make Promptly Available the Records Sought Against All Defendants

39.    Plaintiffs repeat and reallege paragraphs 1-38.

40.    Plaintiffs are informed and believe, and therefore allege, that the requested information is in the possession of the Defendants and came into their possession in the course of their official duties.

41.    Defendants' failure to make promptly available the records sought by Plaintiffs' Requests violates FOIA, 5 U.S.C. § 552(a)(3)(A).

### Third Cause of Action:
### Violation of FOIA for Failure to Timely Respond to Plaintiffs' Requests Against All Defendants

42.    Plaintiffs repeat and reallege paragraphs 1-41.

43.    Defendants' failure to timely respond to Plaintiffs' December 2004 and April 2006 Requests violates FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and Defendants' own regulations promulgated thereunder.

### Fourth Cause of Action:
### Violation of FOIA for Failure to Release Records Sought by Plaintiffs' Requests Against All Defendants

44.    Plaintiffs repeat and reallege paragraphs 1-43.

45.    Plaintiffs are informed and believe, and therefore allege, that the requested information is in the possession of the Defendants and came into their possession in the course of their official duties.

46.    Defendants' failure to release records sought by Plaintiffs' Requests violates the FOIA, 5 U.S.C. § 552(a)(1)-(3).

### Fifth Cause of Action:
### Violation of FOIA for Failure to Allow Fee Waiver Against CIA, DHS, DOJ and DOS, By Plaintiffs Amnesty and WSLS Against DOD

47.    Plaintiffs repeat and reallege paragraphs 1-46.

48.    Defendants' failure to allow the fee waiver sought by Plaintiffs' requests violates

the FOIA, 5 U.S.C. § 552(a)(4)(A)(iii).

**Sixth Cause of Action:**
**Violation of FOIA for Improperly Withholding Agency Records Sought**
**Against DOD, DOJ, DOS and DHS**

49.    Plaintiff repeats and realleges paragraphs 1-48.

50.    Plaintiffs are informed and believe, and therefore allege, that the requested

information is in the possession of the Defendants and came into their possession in the

course of their official duties.

51.    Defendants' improper withholding of agency records sought by Plaintiffs'

Requests violates FOIA, 5 U.S.C. § 552(a)(1)-(3).

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a) ORDER Defendants immediately and expeditiously to process Plaintiffs' FOIA

requests and disclose the requested records;

b) EXPEDITE this proceeding as provided for in 28 U.S.C. § 1657;

c) SET a schedule for producing requested records to Plaintiff;

d) AWARD Plaintiffs their costs and reasonable attorneys fees incurred in this action;

and

e) GRANT such other relief as the Court may deem just and proper.

Respectfully submitted,

Gitanjali Gutierrez (GG-0122)
Emilou MacLean (EM-0121)
Shayana Kadidal (SK-1278)

Center for Constitutional Rights, Inc.
666 Broadway, 7th floor
New York, NY 10012
Tel:  (212) 614-6424
Fax:  (212) 614-6499
E-mail: ggutierrez@ccrjustice.org

*Attorneys for Center for Constitutional Rights*


Margaret L. Satterthwaite (MS-3953)
Martha J. Johnstone (MJ-0979)
Washington Square Legal Services, Inc.
International Human Rights Clinic
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

*Attorney for Amnesty International USA and*
*Washington Square Legal Services, Inc.*


Dated: June 6, 2008

# Exhibit A

# centerforconstitutionalrights

666 broadway new york, ny 10012
212.614.6464 www.ccr-ny.org

December 21, 2004

<u>Via Facsimile & U.S. Mail</u>

Office of Freedom of Information/Security Review
Room 2C757
1155 Defense Pentagon
Washington, D.C. 20301-1155
fax number: (703) 693-7341

Re: Request Submitted Under the Freedom of Information Act

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the Center for Constitutional Rights ("Requester").

We are filing this Request simultaneously with the Department of Defense (including its components, the Departments of the Army, Navy, and Air Force, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, and the Central Intelligence Agency. By this letter, we also request expedited processing pursuant to 5 U.S.C. § 552(a)(4)(E).

## Background on Records Requested

Recent news reports indicate that the Central Intelligence Agency "CIA") has been secretly operating a holding and interrogation center ("CIA Guantánamo Center" or "Center") within the larger American military-run prison at Guantánamo Bay, Cuba ("Guantánamo"). The reports further indicate that individuals apprehended after September 11, 2001, and held by the United States at Guantánamo ("Detainees") in the CIA Guantánamo Center have been separately interrogated by CIA agents.[1]

News reports also indicate that the CIA Guantánamo Center is "related to a network of holding centers operated by the CIA at undisclosed locations around the world"[2] since United States authorities began capturing individuals after the attacks of September 11, 2001.

---

[1] *See* David Johnston and Neil A. Lewis, "Officials Describe Secret C.I.A. Center at Guantánamo Bay," New York Time, December 17, 2004.
[2] *Id.*



Other news reports state that the "buildings used by the CIA are shrouded by high fences covered with thick green mesh plastic and ringed with floodlights . . . [t]hey sit within the larger Camp Echo complex, which was erected to house the Defense Department's high value detainees and those awaiting military trials on terrorism charges."[3] According to one military official, the "CIA's [Guantánamo] facility has been 'off-limits to nearly everyone on the base.'"[4]

        According to a report by the Washington Post, in contrast to the majority of detainees held at Guantánamo, the CIA detainees "are held under separate rules and far greater secrecy."[5] Under a presidential decree and policies approved by Administration attorneys, "the CIA is allowed to capture and hold certain classes of suspects without accounting for them in any public way and without revealing the rules for their treatment."[6] According to other news reports, these detainees have not and will not receive review of their status through the Combatant Status Review Tribunals.[7]

        In addition to the secret CIA Guantánamo Center, there have been numerous media reports during the last two years confirming the existence of CIA detention facilities located around the world, including one in an off-limits corner of the Bagram Airbase in Afghanistan, at Camp Cropper, a detention center on the outskirts of Baghdad International Airport,[8] on ships at sea,[9] on Britain's Diego Garcia Island in the Indian Ocean,[10] in a secret facility in Jordan,[11] and in secret locations outside of Iraq.[12] According to a report by Human Rights Watch, detainees are being held in more than 24 secret detention facilities across the globe.[13] Furthermore, government officials have admitted that even within known facilities, CIA officials have employed a policy under which "ghost prisoners" captured in Iraq and Afghanistan have been interrogated by CIA agents and have had their "identities and locations withheld from relatives, the International Red Cross and even Congress."[14] Finally,

[3] Dana Priest and Scott Higham, "At Guantánamo, A Prison Within A Prison; CIA Has Run a Secret Facility for Some Al Qaeda Detainees, Officials Say," Washington Post, December 17, 2004, at A01.

[4] Id.

[5] Id.

[6] Id.

[7] Suzanne Goldenberg, " 'Ghost Detainees' at Camp Delta: Pentagon Accused of Planning To Exclude Some Guantánamo Prisoners from Review," The Guardian, July 10, 2004 at 18.

[8] Eric Schmitt, "Abuse Inquiry Says Official Exercised Little Oversight," The New York Times, Dec. 4, 2004 at A10.

[9] Eric Schmitt & Douglas Jehl, "Army Says CIA hid More Iraqis than it Claimed," The New York Times, Sept. 9, 2003 at A1.

[10] Id.

[11] Inigo Gilmore & Robin Gedye, "Jordan Ghost Jail 'holds al-Qa'eda men' Israeli Intelligence Expert Claims to have Solved Mystery of Missing Terrorist Leaders Captured by American Forces in Past Three Years," The Daily Telegraph, Oct. 14, 2004 at 16.

[12] See Dave Goldiner, "Saddam's Pals on Hunger Strike," Daily News, December 13, 2004 at 20.

[13] Human Rights Watch, "The United States Disappeared: The CIA's Long Term 'Ghost Detainees'" October, 2004.

[14] Editorial, The Washington Post, "The CIA's Disappeared," October 26, 2004.

2

reports have stated that CIA agents have spirited detainees in Iraq to third countries for interrogation under conditions which might violated the requirements of international humanitarian law.[15]

The Washington Post reports that other detainees captured during the war in Iraq are being held under the custody of an Army task force, "Task Force 6-26, in a secret facility in Iraq. According to that report, the Pentagon does not officially acknowledge the existence of the unit.[16]

The Request seeks records relating to the identity of, transport and location(s) of, authority over, and treatment of all unregistered, CIA, and "ghost" Detainees interdicted, interrogated, and detained by any agency or department of the United States.

Both international and United States law unequivocally prohibit hiding individuals in such a manner even during wartime. The Geneva Conventions require the registration of all detainees with the Red Cross. They also prohibit "forcible transfers as well as deportations" of individuals, and ban all "physical or moral coercion . . . in particular to obtain information." The Convention Against Torture ("CAT"), which the United States has signed and ratified, prohibits the use of torture and the infliction of other cruel, inhuman or degrading treatment or punishment.[17] The prohibition against torture is also codified in United States law at 18 U.S.C. § 2340A.

The CAT further provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he

---

[15] Eric Schmitt & Douglas Jehl, "Army Says CIA hid More Iraqis than it Claimed," The New York Times, Sept. 9, 2003 at A1.
[16] Barton Gellman & R. Jeffrey Smith, "Report to Defense Alleged Abuse by Prison Interrogation Teams; Intelligence Official Informed Defense Dept. in June," The Washington Post, Dec, 8, 2004 at A1.
[17] In this Request, the terms "torture" and "cruel, inhuman or degrading treatment or punishment" have the meaning accorded them in the CAT, as interpreted by the United Nations Committee Against Torture. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 1, S. Treaty Doc. No. 100-20 (1998), 1465 U.N.T.S. 85. The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id. The United Nations Committee Against Torture has held that the following techniques constitute "torture" as defined under the CAT: (1) restraining in very painful conditions, (2) hooding under special conditions, (3) sounding of loud music for prolonged periods, (4) sleep deprivation for prolonged periods, (5) threats, including death threats, (6) violent shaking, and (7) using cold air to chill. See Report of the Committee Against Torture, U.N. GAOR, 52d Sess., Supp. No. 44, at para 257, U.N. Doc. A/52/44 (1997). Our use of these terms also encompasses torture and/or "cruel inhuman or degrading treatment or punishment" under any other United States constitutional or statutory provision.

would be in danger of being subjected to torture."[18] This provision is implemented in United States law by the Foreign Affairs Reform and Restructuring Act of 1998, which states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."[19]

To determine whether the United States is honoring its obligations under domestic and international law, Requesters seek the release of agency records as described in the numbered paragraphs below:

## RECORD REQUESTS

Please disclose the following records:

1. All records that propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding Unregistered, CIA, and/or "Ghost" Detainees in special CIA or other agency facilities for purposes of interrogation.

2. All records that discuss the creation, use and/or closure of the various centers at which the CIA and/or any other agency of the federal government has held, and/or continues to hold Unregistered, CIA, and/or "Ghost" Detainees.

3. All records reflecting the use of any private companies, other U.S. officials or citizens, and/or officials or citizens of any foreign governments regarding the interdiction, arrest, transfer, detention, questioning, interrogation, and/or other treatment of any Unregistered, CIA, or "Ghost" Detainee

4. All records reflecting standards or policies governing who may be held as an Unregistered, CIA, and/or "Ghost" Detainee and what procedural protections or guidelines, if any, are used to review the arrest, detention, and treatment of these Detainees.

5. Every location from September 11, 2001 to the present at which the CIA or any other governmental agency has been or is now holding Unregistered, CIA, or "Ghost" Detainees, the dates of operation of each such facility, whether the facility remains open at this time, the purpose of the facility, a complete list of the Detainees held at the facility (both past and current with indications as to this status), a list of

---

[18] CAT, art. 3.

[19] Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681 (1999) (codified as Note to 8 U.S.C. § 1231).

4

techniques used for interrogation at each facility, and a list of personnel who have worked and those who continue to work at each Center.

6. All records concerning the treatment of the Unregistered Detainees held in any CIA or other governmental facility in the world. Please include all records discussing the following interrogation methods at such facilities, including but not limited to records discussing their legality or appropriateness: using "stress and duress" techniques on Detainees; using force against them; subjecting them to physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; subjecting them to heat or cold; or threatening harm to them or other individuals.

7. All records setting forth or discussing policies, procedures or guidelines[20] relating to the detention, questioning, interrogation, transfer, and treatment (including, but not limited to the interrogation with the use of torture or other cruel, inhuman or degrading treatment or punishment) of the Unregistered, CIA, and "Ghost" Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed above.

8. All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that CIA Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are, or will be, communicated to personnel involved in the interrogation or detention of CIA Detainees.

9. All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above.

10. All records indicating or discussing serious injuries, illnesses, and/or deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

11. All records, including autopsy reports and death certificates, relating to the deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

---

[20] In this Request, the phrase "policies, procedures or guidelines" means policies, procedures or guidelines that were in force on September 11, 2001 or that have been put in place since that date.

12. All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

13. All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Unregistered, CIA, and/or "Ghost" Detainee.

14. All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

15. All records relating to medical, psychiatric or psychological assessment of any Unregistered, CIA, and/or "Ghost" Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Unregistered, CIA, and/or "Ghost" Detainees..

16. All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.

17. All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.

<u>Fee Waiver</u>

The Requester qualifies as "representatives of the news media" and the records are not sought for commercial use. Accordingly, fees associated with the processing of the Request should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II). These organizations are "entit[ies] that gather . . . information of potential interest to a segment of the public, use . . . [their] editorial skills to turn the raw

6

materials into a distinct work, and distribute . . . that work to an audience." *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The CCR is a legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. These materials are available through CCR's Development and Education & Outreach Departments. CCR also operates a website, www.ccr-ny.org, that addresses the issues on which the Center works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

We also request a waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether or not the government's commitment to domestic and international proscriptions against torture is honored in practice.

As indicated above, numerous news articles reflect the significant public interest in the records we seek. *See* articles cited *supra*; *see also Answers about Torture*, Washington Post, Mar. 16, 2003, at B06 ("The Bush administration has categorically denied that it is torturing people. But it has offered no details regarding its policies toward interrogations. . . . The secrecy surrounding U.S. policy makes any objective assessment of these allegations impossible. . . . The public is entitled to a fuller understanding."). Disclosure of the requested records will contribute significantly to the public's understanding of government conduct.

\*    \*    \*

If our request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter.

7

Please respond to Barbara Olshansky, Deputy Legal Director, Center for Constitutional Rights, 666 Broadway, 7th Floor, New York, New York 10012.

Signed by:

BARBARA OLSHANSKY
RACHEL MEEROPOL
MICHAEL RATNER
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

8.

# Exhibit B

## WILMERHALE

April 25, 2006

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

Via Facsimile, Email and U.S. Mail

Information and Privacy Coordinator
Central Intelligence Agency
Washington D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

Re:    *Request Under the Freedom of Information Act for Records Concerning Ghost Detainee Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees, and the Draft Convention on Enforced Disappearance*

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The Request is submitted on behalf of Amnesty International ("AI") and Washington Square Legal Services, Inc. ("WSLS"). AI is a non-government organization and a world-wide movement of members who campaign for internationally-recognized human rights. WSLS is the corporation that houses the International Human Rights Clinic ("the Clinic") of the New York University School of Law ("NYU Law School"). The Clinic is a project of NYU Law School's Center for Human Rights and Global Justice ("CHRGJ").

We are filing this request simultaneously with the Department of Defense (including its components, the Department of the Army, Navy and Air Force, the Marine Corps, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, the Central Intelligence Agency, and the Department of Homeland Security (including its components the Office of Intelligence and Analysis, the Directorate for Policy, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Coast Guard, and U.S. Customs and Border Protection). By this letter, we also request expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).

We are seeking the opportunity to inspect and copy, if necessary, all records in the possession of the Department, including any officers, divisions or bureaus thereof, on the topics listed below.

WILMERHALE

FOIA Request
April 25, 2006
Page 2

## Definitions

For purposes of this request, the following terms shall be understood as described below:

The term "records" includes any and all reports, statements, examinations, memoranda, correspondence (including electronic mail), designs, maps, photographs, microfilms, computer tapes or disks, rules, regulations, codes, handbooks, manuals, or guidelines.

The term "government official" includes any U.S. government employee, and any person providing services to any agency of the United States government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the U.S. government.

The term "foreign official" includes any foreign government employee, and any person providing services to any agency of a foreign government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the foreign government.

The term "communication" means the giving, receiving, transmitting, or exchanging of information, including, but not limited to, any and all written, printed, telephonic, electronic, and in-person conversations by and with any person, and/or talk, gestures, or documents which memorialize or refer to any communications.

The term "detainee" means any person deprived of their liberty by one or more individuals or agencies who is prevented by any means from leaving the place in which he or she is being held. The term "detention" means depriving any person of their liberty such that they are prevented by any means from leaving the place in which they are held.

The term "place of detention" means any place or facility in which a "detainee" is kept, inside or outside the United States, regardless of whether it is officially recognized as a place of detention.

Unless otherwise specified, this request relates to all records generated between September 11, 2001 and the present.

WILMERHALE

FOIA Request
April 25, 2006
Page 3

<u>Memoranda of Understanding</u>

The practice of persons being kept as "off-the-record" detainees in military prisons has been well documented.[1] In this context, "ghost" or "unregistered" detainees are understood to refer to those detainees who were at some point during their detention, or remain: not "officially" registered at military facilities; "kept off the books"; and/or denied access to the International Committee of the Red Cross (ICRC).[2] Documents produced by the Department of Defense on March 3, 2005 pursuant to an ACLU FOIA request[3] and a media report in the

_____

[1] *See* Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16. *See also* Jane Mayer, *A Deadly Interrogation: Can the C.I.A. Legally Kill a Prisoner?*, NEW YORKER, Nov. 14, 2005, at 44 (discussing the practice, particularly with respect to the death of Manadel al-Jamadi). *See also* the following Department of Defense documents released to the American Civil Liberties Union (ACLU) pursuant to a *Freedom of Information Act* request, all available at http://www.aclu.org/torturefoia/released/030905/: Transcript of deposition of Brig. Gen. Janis L. Karpinski, Appendix to Fay/Jones/Kern Report (July 18, 2004); Statement of MNF-I, C2, IMIR CW2, Annex to Fay/Jones/Kern Report (June 16, 2004); Sworn Statement of E-5, 519th MI Bn, Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report, Camp Victory, Annex to Fay/Jones/Kern Report; Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report; Sworn Statement of SGT, 372nd MP, Camp Victory, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SPC/E4, B Co., 66th MI Group, 202nd MI BN, Annex to Fay/Jones/Kern Report (May 24, 2004); Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of CW2, A/519th MI Bn, Annex to Fay/Jones/Kern Report (May 19, 2004); Sworn Statement of SGT, 372nd MP Co, Annex to Fay/Jones/Kern Report (May 7, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004). *See further* HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO ENDING SECRET DETENTIONS 6 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (providing overview of the practice of ghosting in military facilities); HUMAN RIGHTS WATCH, THE UNITED STATES' DISAPPEARED: THE CIA'S LONG-TERM "GHOST DETAINEES" 5-15 (2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (outlining practice of keeping CIA prisoners in military detention generally).

[2] *Id.*

[3] *See* Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000719-000725, *available at* http://www.aclu.org/torturefoia/released/030905/ ("OGA and TF-121 routinely brought in detainees for a short period of time. The A/519th soldiers initiated the term 'ghost.' They stated they used this term as the detainees were not in-processed in the normal way via the MP database and were not yet categorized. It was difficult to track these particular detainees and I and other officers recommended that a Memorandum of Understanding be written up between OGA, the 205th MI BDE and the 800th MP BDE to establish procedures for a ghost detainee"); Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000726-000729, *available at* http://www.aclu.org/torturefoia/released/030905/ ("…in reference to Ghost detainees, OGA would bring in detainees for a short period of time. [REDACTED] brought them in. These particular ghost detainees were not yet categorized and OGA was working on that. It was very difficult keeping track of these OGA because they were not processed until OGA decided to turn them over to us. COL PAPPAS was not happy with that procedure.

WILMERHALE

FOIA Request
April 25, 2006
Page 4

*Washington Post* dated March 11, 2005[4] indicate that this arrangement for "ghosting" was not "ad hoc" but was embodied in a Memorandum of Understanding (MOU) between military officials and the CIA.[5]  The exact contours of this arrangement are not publicly known as a copy of this MOU was not included in the documents released by the Department of Defense.[6]

## Records Requested

We seek the following records relating to the arrangement described above:

1.  Any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies, or between any agency and any subdivision or official, concerning the handling of ghost or unregistered detainees.  This includes but is not limited to:

    (a)  Any record reflecting communications about whether or not to draft any memorandum of understanding or agreement regarding unregistered or ghost detainees.

    (b)  Any record reflecting communications about the content of any memorandum of understanding or agreement regarding unregistered or ghost detainees.

2.  Any record reflecting a policy, whether formal or informal, about the reception, detention, or movement of unregistered or ghost detainees.

3.  Any memorandum of understanding, or other record reflecting an agreement between any agencies, or between any subdivision or official or any other agency, regarding the transfer of detainees from the custody of one agency to that of another.

---

[REDACTED] recommended that a Memorandum of Understanding be written up between OGA and MI on the procedures to drop off a ghost detainee. COL PAPPAS met with OGA and TF-121 and the memorandum on procedures for dropping ghost detainees was signed").

[4] Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16.

[5] *Id.*

[6] Press Release, American Civil Liberties Union, Newly Released Army Documents Point to Agreement Between Defense Department and CIA on "Ghost" Detainees, ACLU Says: Declassified Annexes to Fay Report, Which Denied Link, Contain Further Evidence of Brutal Army Abuses (Mar. 10, 2005), *available at* http://www.aclu.org/safefree/general/17597prs20050310.html.

WILMERHALE

FOIA Request
April 25, 2006
Page 5

## Department of Defense Detainee Reporting

The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811 (2004) ("the Act"), requires the Department of Defense to submit an annual report regarding certain detainees.

### Records Requested

4.  Any record generated in connection with the reporting requirement under Section 1093(c) of the Act, regardless of whether or not such record was actually submitted in the final report, and any record submitted to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives pursuant to Section 1093(c) of the Act.[7] This includes but is not limited to records reflecting:

(a)  Any notice of investigation into any violation of international obligations or laws of the United States regarding the treatment of individuals detained by the U.S. Armed Forces or by a person providing services to the Department of Defense on a contractual basis.

(b)  Any discussions regarding whether any investigation described in Request 4(a) should be reported.

(c)  The number of detainees held in Department of Defense custody, or released from Department of Defense custody during the time period covered by the report, broken down into the greatest number of time intervals for which such information is available.

(d)  The number of detainees detained by the Department of Defense as "enemy prisoners of war," "civilian internees," and "unlawful combatants," broken down into the greatest number of time intervals for which such information is available.

(e)  The number of detainees detained by the Department of Defense under any status other than "enemy prisoners of war," "civilian internees," and "unlawful combatants," broken down into the greatest number of time intervals for which such information is available.

---

[7]  Section 1093(e) of the Act mandates that the reports "be submitted, to the extent practicable, in unclassified form, but may include a classified annex as necessary to protect the national security of the United States." To the extent any records or portions of records responsive to this request are classified, please provide basic information as to the date, sender, recipient, and subject matter of the classified records.

WILMERHALE

FOIA Request
April 25, 2006
Page 6

(f)   The transfer or proposed transfer of detainees by the Department of Defense to the jurisdiction of other countries, and the countries to which those detainees were transferred.

(g)   Any communications regarding decisions to include or not include information in the Department of Defense's report under Section 1093(c) of the Act and decisions as to whether to submit any information in unclassified or classified form pursuant to Section 1093(d) of the Act.

### United States Report to the Committee Against Torture

On May 6, 2005, the U.S. submitted its Second Periodic Report to the United Nations ("U.N.") Committee Against Torture, as required by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

### Records Requested

All records reflecting:

5.   Communications regarding the United States' Second Periodic Report to the Committee Against Torture, including but not limited to:

(a)   Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Committee Against Torture.

(b)   Communications with a foreign government, or agency of a foreign government, regarding any provision of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment relating to apprehension, transfer and detention, (including Articles 1, 3, 5, 16), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

(c)   Proposed language or earlier drafts of the report to the Committee Against Torture.

### United States Report to the Human Rights Committee

On November 28, 2005, the U.S. submitted its Third Periodic Report to the U.N. Human Rights Committee, as required by the International Covenant on Civil and Political Rights.

WILMERHALE

FOIA Request
April 25, 2006
Page 7

## Records Requested

All records reflecting:

6. Communications regarding the United States' Third Periodic Report to the Human Rights Committee, including but not limited to:

    (a)    Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Human Rights Committee.

    (b)    Communications with a foreign government, or agency of a foreign government, regarding any provision of the International Covenant on Civil and Political Rights relating to apprehension, transfer and detention, (including Articles 6, 7, 9), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

    (c)    Proposed language or earlier drafts of the report to the Human Rights Committee.

## The Convention on the Protection of all Persons from Enforced Disappearance

On September 23, 2005, a U.N. working group concluded the draft text of the Convention on the Protection of all Persons from Enforced Disappearance. In 2006, the draft convention will be submitted to the U.N. Commission on Human Rights and the U.N. General Assembly, before being opened for signature and ratification.

## Records Requested

7. Any record reflecting communications regarding the negotiation or drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

8. Any record reflecting communications with a foreign government, or an agency or official of a foreign government, regarding the drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

WILMERHALE

FOIA Request
April 25, 2006
Page 8

### Fee Waiver

The requestors qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

Amnesty International is a non-government organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters and urgent action requests informing the public about human rights, including the prohibition on torture and the prohibition on disappearances. AI also disseminates information through its website www.amnesty.org.

The Center for Human Rights and Global Justice is a research center at NYU Law School. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website www.nyuhr.org discussing human rights issues.

The International Human Rights Clinic is a project of CHRGJ and an official program at NYU Law School, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues.

Washington Square Legal Services is a not-for-profit corporation that houses the clinical program of NYU Law School.

The requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

### Expedited Processing

Expedited processing is warranted as there is a "compelling need" for the records sought in this request. 5 U.S.C. § 552(a)(6)(E)(i)(I). The requesters are primarily engaged in "disseminating information" and there is an "urgency to inform the public concerning the actual or alleged Federal Government Activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 32 C.F.R. § 286.4(d)(3)(ii) (DOD); 6 C.F.R. § 5.5(d)(1)(ii) (DHS); 28 C.F.R. § 16.5(d)(1)(ii) (DOJ); 22 C.F.R. § 171.12(b)(2) (DOS).

AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal

WILMERHALE

FOIA Request
April 25, 2006
Page 9

Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. As reflected in the media reports discussed above, there is an urgent need to provide the public with information relating to the U.S. government's practices concerning unregistered or ghost detainees.

There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I). *See also* 32 C.F.R. § 286.4(d)(3)(i) (DOD); 6 C.F.R. § 5.5(d)(1)(i) (DHS); 28 C.F.R. § 16.5(d)(1)(i) (DOJ); 22 C.F.R. § 171.12(b)(1) (DOS). This Request arises in the context of allegations of ongoing unlawful detention and abuse of individuals with the involvement of U.S. agents abroad. Failure to publicly expose and thereby halt the practices prompting this Request could reasonably be expected to pose an imminent threat to the physical safety and lives of such individuals.

AI and WSLS certify that the foregoing statements regarding the basis for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). *See also* 32 C.F.R. § 286.4(d)(3)(iii) (DOD); 6 C.F.R. § 5.5(d)(3) (DHS); 28 C.F.R. § 16.5(d)(3) (DOJ); 22 C.F.R. § 171.12(b) (DOS).

\*     \*     \*

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

WILMERHALE

FOIA Request
April 21, 2006
Page 10

Thank you for your prompt attention. Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
2445 M Street Washington, D.C. 20037
Tel: (202) 663-6380
Fax: (202) 663-6363
E-mail: catherine.ronis@wilmerhale.com

If you need someone to reach by telephone or email, you may also contact Kyle DeYoung at WilmerHale at (202) 663-6785.

Sincerely,

CURT GOERING
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

MARGARET L. SATTERTHWAITE
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

# Exhibit C

WILMERHALE

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

April 25, 2006

Via Facsimile, Email and U.S. Mail

Information and Privacy Coordinator
Central Intelligence Agency
Washington D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

Re:    *Request Submitted Under the Freedom of Information Act for Records Concerning Detainees, including "Ghost Detainees/Prisoners," "Unregistered Detainees/Prisoners," and "CIA Detainees/Prisoners"*

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The Request is submitted on behalf of Amnesty International ("AI") and Washington Square Legal Services, Inc. ("WSLS"). AI is a non-government organization and a world-wide movement of members who campaign for internationally-recognized human rights. WSLS is the corporation that houses the International Human Rights Clinic ("the Clinic") of the New York University School of Law ("NYU Law School"). The Clinic is a project of NYU Law School's Center for Human Rights and Global Justice ("CHRGJ").

We are filing this request simultaneously with the Department of Defense (including its components, the Department of the Army, Navy and Air Force, the Marine Corps, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, the Central Intelligence Agency, and the Department of Homeland Security (including its components the Office of Intelligence and Analysis, the Directorate for Policy, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Coast Guard, and U.S. Customs and Border Protection). By this letter, we also request expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).

We are seeking the opportunity to inspect and copy, if necessary, all records in the possession of the Department, including any officers, divisions or bureaus thereof, on the topics listed below.

Wilmer Cutler Pickering Hale and Dorr LLP, 2445 M Street, NW, Washington, DC 20037

Baltimore  Beijing  Berlin  Boston  Brussels  London  Munich  New York  Northern Virginia  Oxford  Palo Alto  Waltham  Washington

WILMERHALE

FOIA Request
April 25, 2006
Page 2

## Definitions

For purposes of this request, the following terms shall be understood as described below:

The term "records" includes any and all reports, statements, examinations, memoranda, correspondence (including electronic mail), designs, maps, photographs, microfilms, computer tapes or disks, rules, regulations, codes, handbooks, manuals, or guidelines.

The term "government official" includes any U.S. government employee, and any person providing services to any agency of the United States government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the U.S. government.

The term "foreign official" includes any foreign government employee, and any person providing services to any agency of a foreign government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the foreign government.

The term "communication" means the giving, receiving, transmitting, or exchanging of information, including, but not limited to, any and all written, printed, telephonic, electronic, and in-person conversations by and with any person, and/or talk, gestures, or documents which memorialize or refer to any communications.

The term "detainee" means any person deprived of their liberty by one or more individuals or agencies who is prevented by any means from leaving the place in which he or she is being held. The term "detention" means depriving any person of their liberty such that they are prevented by any means from leaving the place in which they are held.

The term "place of detention" means any place or facility in which a "detainee" is kept, inside or outside the United States, regardless of whether it is officially recognized as a place of detention.

## Scope of Request

Unless otherwise stated, this request refers to *individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information. These individuals have been referred to, among other things, as "ghost detainees/prisoners," "unregistered detainees/prisoners," "CIA detainees/prisoners" and "Other Governmental Agency Detainees" ("OGA Detainees").* These individuals have reportedly been held in various locations, including regular and irregular detention facilities, ships, aircraft, and military bases.

WILMERHALE

FOIA Request
April 25, 2006
Page 3

Although not limited to any specific geographic area, this request pertains particularly to the following places:

| | | | |
|---|---|---|---|
| Afghanistan | Azerbaijan | Bulgaria | Djibouti |
| Egypt | Germany | Indonesia | Iraq |
| Jordan | Kosovo | Macedonia | Morocco |
| Pakistan | Poland | Romania | Syria |
| Thailand | Turkey | Ukraine | |

United Kingdom (including Diego Garcia)
United States (including all territories under the S.M.T.J)
Uzbekistan     Yemen

This Request does not seek records related to the formal extradition of individuals.

Requested records pertain to persons apprehended since September 11, 2001.

### Background

Numerous media reports indicate that the United States is involved in the secret or irregular apprehension, transfer, and detention of individuals on foreign territory.[1] These reports suggest that the government secretly detains and transports individuals on U.S. ships, military bases, and U.S.-chartered planes, as well as in foreign states.[2]

---

[1] See, e.g., Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, at A1; Jan Cienski, Christopher Condon, Caroline Daniel, Guy Dinmore, Andrei Postelnicu, & Demetri Sevastopulo, *Evidence CIA Has Secret Jails in Europe*, FINANCIAL TIMES (LONDON), Nov. 3, 2005, at 1; Siobhan Gorman & Tom Bowman, *Reports of Secret CIA Prisons Prompt Concern*, L.A. TIMES, Nov. 3, 2005, at A4; Douglas Jehl & David Johnston, *CIA Now Acting Independently to Move Prisoners*, INT'L HERALD TRIB., Mar. 7, 2005, at 4; Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake: German Citizen Released After Months in Rendition*, WASH. POST., Dec. 4, 2005; Brian Ross and Richard Esposito, *Exclusive: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC NEWS, Dec. 5, 2005, at http://abcnews.go.com/WNT/Investigation/story?id=1375123.; Eric Schmitt and Thom Shanker, *Rumsfeld Issued an Order to Hide Detainee in Iraq*, N.Y. Times, June 17, 2004, at A1; *US bars access to terror suspects*, BBC NEWS, Dec. 9, 2005; Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16; *White House Mum on Secret CIA Prisons*, AGENCE FRANCE PRESSE ENGLISH WIRE, Nov. 2, 2005; *Yemen says U.S. sent prisoners to Europe*, UNITED PRESS INT'L (UPI), Dec. 11, 2005, at http://www.upi.com/InternationalIntelligence/view.php?StoryID=20051211-051738-9694r.

[2] See, id. and further e.g., Craig Whitlock, *Europeans Probe Secret CIA Flights; Questions Surround Possible Illegal Transfer of Terrorism Suspects*, WASH. POST, Nov. 17, 2005, at A22; Eric Schmitt & Carolyn Marshall, *In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse*, N.Y. TIMES, Mar. 19, 2006.

WILMERHALE

FOIA Request
April 25, 2006
Page 4

<u>Records Requested</u>

Please disclose any records reflecting, discussing or referring to the policy and/or practice concerning:

    1.  The apprehension, transfer, detention, and interrogation of persons within the Scope of Request, including but not limited to:

        (a)  The transfer of intelligence by one or more U.S. agencies or government officials to one or more foreign agencies or officials, in connection with the apprehension or detention of a person.

        (b)  A request or direction by one or more U.S. agencies or government officials to one or more foreign agencies or officials regarding the apprehension of any person, and any related agreement concerning such apprehension.

        (c)  The apprehension of a person in a foreign country by, with the involvement of, or in the presence of one or more U.S. officials.

        (d)  The transfer of a person from any country to any other country for the purpose of detention and/or interrogation, at the direction or request or with the knowledge of one or more U.S. agencies or officials.

        (e)  The transfer of a person from one place of detention to another within the same country at the direction or request or with the knowledge of one or more U.S. agencies or officials.

        (f)  The detention of a person in a foreign country at the direction or request of one or more U.S. agencies or officials, including any agreement concerning the detention.

        (g)  One or more U.S. agencies or officials seeking and/or being granted access to a foreign national detained in a foreign country.

        (h)  One or more U.S. agencies or officials being present in a place of detention in a foreign country.  This does not include visits to U.S. citizens by U.S. officials pursuant to the Vienna Convention on Consular Relations.

        (i)  One or more U.S. agencies having control, direction, or administration of a subdivision, portion, or "cell" of a place of detention in a foreign country.

    ———————————

WILMERHALE

FOIA Request
April 25, 2006
Page 5

2. Current and former places of detention where individuals within the Scope of Request have been or are currently held, including but not limited to:

(a) Any place of detention in a foreign country being under the control, direction, or administration of one or more U.S. agencies.

(b) Any place of detention that is not under the control, direction or administration of one or more U.S. agencies, where a detainee is held at the request or instruction of one or more U.S. agencies or officials.

(c) Any subdivision, portion, or "cell" of a place of detention in a foreign country under the control, direction, or administration of one or more U.S. agencies.

(d) Any agreement between the U.S. government or one or more U.S. agencies or officials, and a foreign government or one or more foreign agencies or officials, in relation to a place of detention in a foreign country, regardless of whether that place of detention is foreign or U.S.—controlled.

3. The names and identities of detainees who fall within the scope of this request.[3]

## Fee Waiver

The requestors qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

Amnesty International is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters and urgent action requests informing the public about human rights, including torture and disappearances. AI also disseminates information through its website www.amnesty.org.

---

[3] Because of the nature of their detention, the requesters do not know the names or identities of those within the scope of this request. For examples of individuals that the United States has acknowledged detaining, but about whom the United States has not provided public information, see Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"* (2005), *available at* http://www.nyuhr.org/docs/Whereabouts%20Unknown%20Final.pdf; and Human Rights Watch, "List of 'Ghost Prisoners' Possibly in CIA Custody (2005), *available at* http://hrw.org/english/docs/2005/11/30/usdom12109.htm. The scope of this request extends far beyond these examples.

WILMERHALE

FOIA Request
April 25, 2006
Page 6

The Center for Human Rights and Global Justice is a research center at NYU Law School. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website www.nyuhr.org discussing human rights issues.

The International Human Rights Clinic is a project of CHRGJ and an official program at NYU Law School, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues.

Washington Square Legal Services is a not-for-profit corporation that houses the clinical program of NYU Law School.

The requesters plan to disseminate the information disclosed as a result of this Request through the channels described above.

## Expedited Processing

Expedited processing is warranted as there is a "compelling need" for the records sought in this Request. 5 U.S.C. § 552(a)(6)(E)(i)(I). This need arises because the requesters are "primarily engaged in disseminating information" and there is an "urgency to inform the public concerning actual or alleged Federal Government Activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 32 C.F.R. § 286.4(d)(3)(ii) (DOD); 6 C.F.R. § 5.5(d)(1)(ii) (DHS); 28 C.F.R. § 16.5(d)(1)(ii) (DOJ); 22 C.F.R. § 171.12(b)(2) (DOS).

AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. As reflected in the media articles cited above, there is an urgent need to provide the public with information relating to the U.S. government's practices concerning unregistered or ghost detainees.

There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I). *See also* 32 C.F.R. § 286.4(d)(3)(i) (DOD); 6 C.F.R. § 5.5(d)(1)(i) (DHS); 28 C.F.R. § 16.5(d)(1)(i) (DOJ); 22 C.F.R. § 171.12(b)(1) (DOS). This Request arises in the context of allegations of ongoing unlawful detention and abuse of individuals with the involvement of U.S. agents abroad. Failure to publicly expose and thereby halt any such practices could reasonably be expected to pose an imminent threat to the physical

WILMERHALE

FOIA Request
April 25, 2006
Page 7

safety and lives of individuals whose identities we are unable to ascertain without the records sought herein.

AI and WSLS certify that the foregoing statements regarding the basis for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). *See also* 32 C.F.R. § 286.4(d)(3)(iii) (DOD); 6 C.F.R. § 5.5(d)(3) (DHS); 28 C.F.R. § 16.5(d)(3) (DOJ); 22 C.F.R. § 171.12(b) (DOS).

\*        \*        \*

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

WILMERHALE

FOIA Request
April 21, 2006
Page 8

Thank you for your prompt attention. Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
2445 M Street Washington, D.C. 20037
Tel: (202) 663-6380
Fax: (202) 663-6363
E-mail: catherine.ronis@wilmerhale.com

If you need someone to reach by telephone, you may also contact Kyle DeYoung at
WilmerHale at (202) 663-6785.

Sincerely,

CURT GOERING
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

MARGARET L. SATTERTHWAITE
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

# Exhibit D

# INTERNATIONAL HUMAN RIGHTS CLINIC
## WASHINGTON SQUARE LEGAL SERVICES, INC.

245 SULLIVAN STREET, 5th FLOOR, NEW YORK, NY 10012, USA
TEL: +1-212 998-6431 - FAX: +1-212- 995-4031

MARGARET L. SATTERTHWAITE
*Clinic Director*

SMITA NARULA
*Clinic Director*

December 28, 2007

Via Facsimile and U.S. Mail:

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

Re:  Request Under the Freedom of Information Act for Specific Records Concerning Information on Secret Detention And Rendition

Dear Freedom of Information Act Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  The request is submitted by the International Human Rights Clinic of Washington Square Legal Services[1] ("WSLS"), on behalf of WSLS, Amnesty International ("AI"), and the Center for Constitutional Rights ("CCR").  We are currently engaged in litigation with your agency concerning two requests filed on April 25, 2006 by WSLS and AI, and one request filed on December 21, 2004 by CCR, all of which seek records pertaining to rendition and secret detention in connection with the U.S. Government's anti-terrorism efforts.[2]  The attorneys representing the U.S. Government in this litigation are being sent copies of this request.

We seek the opportunity to inspect and copy, if necessary, the specific records listed below, or, in the event that any of the specified records have been destroyed, any records which are integrally related to, summarize, or are interchangeable with said records.  We seek records in the possession of the Central Intelligence Agency, including any officers, divisions, or bureaus thereof.  We further request that you expedite processing pursuant to 5 U.S.C. § 552(a)(6)(e)(i).

## Records Requested

For the purpose of this request, the term "records" includes any and all reports, statements, examinations, memoranda, correspondence, designs, maps, photographs, microfilms, computer tapes or disks, audio or videotapes or transcripts thereof, rules, regulations, codes, handbooks, manuals, or guidelines.

Please disclose the following records, or, in the event that they have been destroyed, any records that are integrally related to, summarize, or are interchangeable with said records.

---

[1] WSLS is the corporation that supports the International Human Rights Clinic ("the Clinic") of the New York University School of Law.  The Clinic is a project of NYU School of Law's Center for Human Rights and Global Justice.

[2] Amnesty International USA et al. v. CIA, No. 07-cv-5435 (S.D.N.Y.).

1.  The spring 2004 report by the Office of the Inspector General (OIG) on the CIA's compliance with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The existence of this document was publicly revealed in October 2007 by the *New York Times.*

    o "A report by Mr. Helgerson's office completed in the spring of 2004 warned that some C.I.A.-approved interrogation procedures appeared to constitute cruel, inhuman and degrading treatment, as defined by the international Convention Against Torture." Mark Mazzetti and Scott Shane, *C.I.A. Watchdog Becomes Subject Of C.I.A. Inquiry,* N.Y. Times, October 12, 2007, at A1.

2.  The list of "erroneous renditions" compiled by the CIA's OIG. This list was described by several intelligence officials in a December 2005 article in the *Washington Post.*

    o "The CIA inspector general is investigating a growing number of what it calls 'erroneous renditions,' according to several former and current intelligence officials. One official said about three dozen names fall in that category; others believe it is fewer. The list includes several people whose identities were offered by al Qaeda figures during CIA interrogations, officials said." Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake,* Wash. Post, December 4, 2005, at A1.

3.  The fax sent by the CIA to the Royal Canadian Mounted Police Criminal Intelligence Directorate (RCMP CID) in the afternoon or evening of Oct. 3, 2002, asking a number of questions about Maher Arar. The existence of this document was publicly acknowledged in the official report of the Canadian Government's inquiry into the rendition of Mr. Arar.

    o "Late in the afternoon of October 3, the CIA sent a fax to RCMP CID, asking a number of questions about Mr. Arar." Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Report of the Events Relating to Maher Arar, Addendum: Disclosure of Information Authorized by the Federal Court of Canada in accordance with Sections 38.04 and 38.06 of the *Canada Evidence Act* 157 (2006) (based on 2005 testimony of Gar Pardy, Director General of the Consular Affairs Bureau of Foreign Affairs and International Trade Canada (DFAIT )) (Transcripts of Testimony available at http://www.ararcommission.ca/eng/14b.htm).

4.  The document sent by the CIA to the RCMP CID, the Canadian Security Intelligence Service (CSIS), and Project A-O Canada on Nov. 5, 2002 in response to requests for information on the whereabouts of Mr. Arar. The existence of this document was publicly acknowledged in the official report of the Canadian Government's inquiry into the rendition of Maher Arar.

    o "On November 5, the CIA sent CSIS and Project A-O Canada a written response to CSIS' [*sic*] October 10 request for information about the circumstances of Mr. Arar's removal." Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Report of the Events Relating to Maher Arar, Addendum: Disclosure of Information Authorized by the Federal Court of Canada in accordance with Sections 38.04 and 38.06 of the *Canada Evidence Act* 307 (2006). "An identical reply was also sent to RCMP Headquarters." *Id.* at 180

(based on testimony of Dan Livermore of the Security and Intelligence Branch of DFAIT).

5. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen Mohamed Hussein). The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007.

   o "There was discussion: 'Should we slap him? What's to be gained if we slap him?' . . . The Deputy Director for Operations says, 'Yes, you can slap him.' The cable goes out. They slap him." *"CIA – Abu Zubaydah": Interview with John Kiriakou* (ABC News broadcast Dec. 10, 2007), *available at* http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter0712 10.pdf and http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript2_blotter0712 10.pdf

6. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of a slap on detainee Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

7. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007.

   o "[W]e had these trained interrogators who were sent to his location-- to use the enhanced techniques as necessary to get him to open up... [T]hese enhanced techniques included everything from-- what was called an attention shake where you grab the person by their lapels and sha[ke] them." *Id.*

8. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

9. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) to the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

10. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Khalid Sheikh Mohammed. The existence of such cables was

acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

11. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

    o "Two people were water boarded, Abu Zubaydah being one." *Id.*

12. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

    o "It's my understanding that he [Khalid Sheikh Mohammed] was—that he was also water boarded." *Id.*

13. Video tapes, audio tapes, and transcripts of materials related to interrogations of detainees that were acknowledged to exist during the case of *United States v. Zacharias Moussaoui* and described in a letter from United States Attorney Chuck Rosenberg to Chief Judge Karen Williams, United States Court of Appeals for the Fourth Circuit, and Judge Leonie Brinkema, United States District Court, Eastern District of Virginia, dated October 25, 2007, including, but not limited to two video tapes and one audio tape of interrogations of detainees, the transcripts of those tapes submitted for the court's review in the *Moussaoui* case, and the intelligence cables summarizing the substance of those tapes.

    o Letter from Chuck Rosenberg, U.S. Attorney, to the Honorable Karen J. Williams and the Honorable Leonie Brinkema, (Oct. 25, 2007), *available at* http://graphics8.nytimes.com/packages/pdf/world/20071207_intel_letter.pdf.

14. The Sept. 13, 2007 notification (described in a letter from Chuck Rosenberg to Judges Williams and Brinkema, dated October 25, 2007) from the attorney for the CIA informing the United States Attorney for the Eastern District of Virginia that the CIA had obtained a video tape of an interrogation of one or more detainees. *Id.*

15. The communications between the CIA and the U.S. Embassy in Sana'a, Yemen, relating to the apprehension, transfer and/or detention of Mohamed Farag Ahmad Bashmilah (Muhammad Bashmilah). These communications likely occurred on or around March 5, 2005, and were preparatory to a communication between the U.S. Embassy in Sana'a and the Government of Yemen that has been acknowledged by the Government of Yemen.

    o "On March 5, 2005, the United States, through the Liaison Officer in Sanaa [sic], informed the Central Organization for Political Security in Yemen that Mr. Mohamed Bashmilah was being held in their custody." Letter from the Embassy of the Republic of Yemen in France to Mr. Dick Marty, Council of Europe (Mar. 27, 2006) (filed as Exhibit G to Declaration of Mohamed Farag Ahmad Bashmilah in *Mohamed et al. v. Jeppesen Dataplan, Inc.*, No. 5:07-cv-02798 (N.D.Cal. Dec. 14, 2007)).

FOIA Request of December 28, 2007

16. The communications between the U.S. Government and the Government of Yemen, and/or any documents pertaining to the transfer of Mohamed Farag Ahmad Bashmilah from U.S. custody to the custody of the Government of Yemen on or near May 5, 2005. The Government of Yemen has acknowledged the existence of communications between the U.S. Government and the Government of Yemen concerning Mr. Bashmilah's transfer. *Id.*

17. A copy of the files relating to Salah Nasser Salim Ali and Mohamed Farag Ahmad Bashmilah provided to the Government of Yemen on Nov. 10, 2005 by the United States Government. The Government of Yemen has acknowledged the existence of these files.
    o Letter from Ghalib Mathar al-Qamish, Chief of the Central Department of Political Security, Yemen, to the Special Rapporteur on the question of Torture and the Special Rapporteur on the question of Human Rights and Counter-Terrorism (Dec. 20, 2005) (filed as Exhibit V to Declaration of Mohamed Farag Ahmad Bashmilah in *Mohamed et al. v. Jeppesen Dataplan, Inc.*, No. 5:07-cv-02798 (N.D.Cal. Dec. 14, 2007)).

## Fee Waiver

The requesters qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

The International Human Rights Clinic of WSLS is a project of the Center for Human Rights and Global Justice ("CHRGJ") and an official program of NYU School of Law, composed of students and directed by clinical professors who engage in research and advocacy on human rights issues. CHRGJ is a research center at NYU School of Law. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education, and training. CHRGJ publishes reports and also disseminates information through its website, www.chrgj.org.

Amnesty International is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters, and urgent action requests informing the public about human rights, including torture and disappearances. AI also disseminates information through its website, www.amnesty.org.

The Center for Constitutional Rights is a legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. These materials are available through CCR's Development and Education & Outreach Departments. CCR also operates a website, www.ccr-ny.org, that addresses the issues on which CCR works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

The requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above. This Request aims generally to further public understanding of government conduct; and particularly to contribute to the current debate around the rendition and secret detention policies and programs put in place by the CIA.

## Expedited Processing

Expedited processing is warranted under 5 U.S.C. § 552(a)(6)(E)(i)(I), as there is a "compelling need" for the records sought in this request: the requesters are primarily engaged in "disseminating information" and there is an "urgency to inform the public concerning the actual or alleged Federal Government Activity" under 5 U.S.C. § 552(a)(6)(E)(v)(II). There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I).

CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CCR disseminates information through newsletters, publications, handbooks, and through its website. All three organizations seek the documents listed in this request to educate the public about the CIA's secret detention and rendition program, which is currently the subject of high-profile debate.[3]

Moreover, failure to obtain the records can reasonably be expected to pose an imminent threat to the physical safety of individuals undergoing or at risk of undergoing ongoing unlawful detention and abuse with the involvement of or at the behest of U.S. agents abroad. 5 U.S.C. § 552(a)(6)(E)(v)(I). Allegations of torture and ill-treatment have surrounded the secret detention and rendition program. Failure to publicly expose and thereby halt the practices prompting this Request could reasonably be expected to pose an imminent threat to the physical safety and lives of at least one individual. CIA director Michael Hayden recently admitted that the secret detention and rendition program remains in operation.[4]

---

[3] *See, e.g.,* Joby Warrick & Dan Eggen, *Waterboarding Recounted: Ex-CIA Officer Says It 'Probably Saved Lives' but Is Torture,* Wash. Post., Dec. 11, 2007, at A1; Pamela Hess, *Congress Wants Answers on CIA Tapes,* Wash. Post., Dec. 11, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/10/AR2007121000087.html; Mark Mazetti, CIA Destroyed Two Tapes Showing Interrogations, N.Y. Times, Dec. 7, 2007, at A1; CENTER FOR HUMAN RIGHTS AND GLOBAL JUSTICE, SURVIVING THE DARKNESS: TESTIMONY FROM THE U.S. "BLACK SITES" (2007), *available at* http://www.chrgj.org/projects/docs/survivingthedarkness.pdf.

[4] CIA Director Hayden recently discussed the secret detention and rendition program on the *Charlie Rose Show,* explaining that as of 2007, the U.S. program of "rendition" and CIA detention continued. *The Charlie Rose Show: Interview with Director Michael Hayden* (PBS television broadcast Oct. 22 & 23, 2007) (*transcript available at* https://www.cia.gov/news-information/press-releases-statements/interview-with-charlie-rose.html).

*        *        *

If this request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information.

We look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

Thank you for your prompt attention. Should you have any questions in this matter, please contact Margaret L. Satterthwaite, International Human Rights Clinic, Washington Square Legal Services, Inc., New York University School of Law, 245 Sullivan Street, New York, NY 10012; tel.: (212) 998-6657.

Sincerely,

Margaret L. Satterthwaite
Director, International Human Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street
New York, NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

Copies to:           Jeannette Vargas, Esq., Assistant United States Attorney
                     Brian Feldman, Esq., Assistant United States Attorney
                     Emily E. Daughtry, Esq., Special Assistant United States Attorney
                     Kyle DeYoung, Esq., WilmerHale
                     Emi Maclean, Esq., Center for Constitutional Rights