UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X
                                   :
AMNESTY INTERNATIONAL USA, CENTER  :
FOR CONSTITUTIONAL RIGHTS, INC., & :
WASHINGTON SQUARE LEGAL            :
SERVICES, INC.,                    :
                                   :         07 Civ. 5435 (LAP)
               Plaintiffs,         :
                                   :         MEMORANDUM AND ORDER
                                   :
        v.                         :
                                   :
CENTRAL INTELLIGENCE AGENCY,       :
DEPARTMENT OF DEFENSE, DEPARTMENT  :
OF HOMELAND SECURITY, DEPARTMENT   :
OF STATE, & THEIR COMPONENTS,      :
                                   :
               Defendants.         :
                                   :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, U.S.D.J.

        Plaintiffs Amnesty International USA and Washington Square

Legal Services ("Plaintiffs") served a request for records ("the

Request") under the Freedom of Information Act ("FOIA"),

5 U.S.C. § 552, on the Department of Homeland Security ("DHS")

and several of its component offices (collectively, "Defendants"

or "the Government").[1]  Currently before the Court are

Plaintiffs' and DHS's cross-motions for partial summary judgment

that present the sole issue whether DHS adequately searched for

_____

[1] Plaintiffs served the Request on the Central Intelligence
Agency, the Department of Defense and the Department of State;
those Defendants are not parties to, nor are their responses to
the Request addressed in, the current cross-motions.

records responsive to the Request. (See Def.'s Mem. 1; Pls.'
Mem. 1.)[2]  For the reasons discussed below, I conclude that DHS's
searches were adequate and, therefore, that DHS's motion [dkt.
no. 21] is GRANTED and Plaintiffs' motion [dkt. no. 34] is
DENIED.


I.    BACKGROUND

        The Request at issue states the following as its "Scope of
Request:"

> Unless otherwise stated, this request refers to
> individuals who were, have been, or continue to be
> deprived of their liberty by or with the involvement
> of the United States and about whom the United States
> has not provided public information.  These
> individuals have been referred to, among other things,
> as "ghost detainees/prisoners," "unregistered
> detainees/prisoners," "CIA detainees/prisoners" and
> "Other Governmental Agency Detainees" ("OGA
> Detainees").
> . . . .
> Requested records pertain to persons apprehended since
> September 11, 2001.

---

[2] The parties have filed the following materials:  Memorandum of
Law in Support of the Department of Homeland Security's Motion
for Partial Summary Judgment ("Def.'s Mem."); Memorandum of Law
in Support of Plaintiffs' Cross Motion for Partial Summary
Judgment and Opposition to Department of Homeland Security's
Motion for Partial Summary Judgment ("Pls.' Opp'n"); Memorandum
of Law in Opposition to Plaintiffs' Cross Motion for Summary
Judgment and in Further Support of the Department of Homeland
Security's Motion for Partial Summary Judgment ("Def.'s Reply");
Memorandum of Law in Further Support of Plaintiffs' Cross-Motion
for Summary Judgment and Opposition to Department of Homeland
Security's Motion for Partial Summary Judgment ("Pls.' Reply").

(DeYoung Decl. Ex. 2 (FOIA Request Letter) at 2-3 (emphasis in original).)[3]   It requests any records:

> [R]eflecting, discussing or referring to the policy and/or practice concerning:
>
> 1.   The apprehension, transfer, detention, and interrogation of persons within the Scope of Request,
> . . . .
> 2.   Current and former places of detention where individuals within the Scope of Request have been or are currently held, [and]
> . . . .
> 3.   The names and identities of detainees who fall within the scope of this request.

(Id. at 4-5.)

By letter dated April 25, 2006, Plaintiffs served the Request on the following Department of Homeland Security components:   (1) Immigration and Customs Enforcement ("ICE"), (2) Customs and Border Patrol ("CBP"), (3) the Office of Policy, (4) the Office of Intelligence and Analysis ("I&A"), and (5) the Privacy Office at the Department of Homeland Security headquarters. (See DeYoung Decl. ¶ 2.)   The response of each is described below.

---

[3] Reference is to the Declaration of Kyle M. DeYoung, sworn to on January 4, 2008.   Plaintiffs originally served the Request on two additional DHS entities not named above, U.S. Citizen and Immigration Services and the U.S. Coast Guard, whose responses to the Request are not at issue here by stipulation of the parties. (See Declaration of Brian M. Feldman (sworn to Nov. 30, 2007) ("Feldman Decl.") Ex. A (November 30, 2007 Stipulation).)

3

1.   ICE

On March 8, 2006, the ICE FOIA Office received Plaintiffs'
Request on behalf of ICE (see Pavlik-Keenan Decl. ¶ 3)[4] and
initially tasked the Office of Detention and Removal Operations
("DRO") with searching for responsive records "because DRO is
regularly involved in the detention and removal of aliens." (Id.
¶ 5.)   That office comprises five divisions:   the Criminal Alien
Division, the Compliance Enforcement Division, the Removal
Management Division, the Detention Management Division, and the
Management Development Program. (See id. ¶ 6.)   Staff at the ICE
FOIA Office determined that, of DRO's divisions, the Office of
Intelligence Operations in the Criminal Alien Division was
identified as the most likely to have responsive documents
because it is "[t]he primary intelligence component of DRO,
which maintains all or nearly all of DRO's classified
information." (Id.)   "Based on his knowledge of DRO Intelligence
Operations and on discussions with personnel within his office,"
the Chief of Intelligence Operations determined that that office
would likely not have responsive documents (see id. ¶ 7) but
nevertheless personally searched the electronic files on the DRO
shared drive and the Intelligence Operations' classified safe
for any responsive documents (see id. ¶¶ 8-9).   Finding none, he

---

[4] Reference is to the Declaration of Catrina M. Pavlik-Keenan,
sworn to on November 30, 2007.

4

then forwarded Plaintiffs' FOIA request to each of the other four DRO divisions, except the Management Development Program. (See id. ¶ 10.)   The Deputy Assistant Directors of each of those divisions responded that, "based on their knowledge of the activities of their divisions, they knew their divisions" would not have any responsive records. (See id.)

The ICE FOIA Office then sent the Request to the following other ICE offices:  the Office of Investigations "because that office conducts criminal investigations into threats to national security," the Office of Intelligence "because that office analyzes intelligence information for ICE," and the Office of International Affairs "because that office supports ICE with intelligence relating to criminal investigations, DRO-related investigations and officer safety." (See id. ¶ 11.)   The ICE FOIA Office determined that the only division likely to have responsive documents in the Office of Investigations was its National Security Division, whose Acting Deputy Assistant Director responded that, "based on his knowledge of the activities of the National Security Division, . . . the division would not have any records responsive to the FOIA Request." (Id. ¶ 12.)   With respect to the Office of Intelligence and the Office of International Affairs, the Deputy Assistant Director in charge of each likewise determined that, "based on their knowledge of the activities of their divisions, they knew their

5

divisions would not have any records responsive to the FOIA
Request." (See id. ¶ 13.)  They reached this conclusion because
their divisions "do not have any programs that involve detaining
individuals 'about whom the United States has not provided
public information'" and because they "do not engage in
apprehension, transfer, detention, or interrogation operations."
(See id. ¶ 14.)  Nevertheless, the Operations Deputy Assistant
Director for the Office of International Affairs conducted a
hand search of his classified records and found no responsive
documents. (See id. ¶ 15.)

    The ICE FOIA Office also tasked the Office of
Investigations to search the Treasury Enforcement Communications
System ("TECS") database (see id. ¶ 16), which compiles
information on known criminal law violators and wanted persons
and which is used by ICE's Office of Investigations, Office of
Intelligence and Office of International Affairs (see id. ¶¶ 16-
17).  The TECS database was queried for any document containing:
(1) "ghost" with "prisoner," "prisoners," "imprisonment,"
"imprisoned," "imprison," "detainee," "detainees" and
"detention"; (2) "unregistered" with "prisoner," "prisoners,"
"imprisonment," "imprisoned," "imprison," "detainee,"
"detainees" and "detention"; or (3) "CIA" with "prisoner,"
"prisoners," "imprisonment," "imprisoned," "imprison,"

"detainee," "detainees" and "detention." (See id. ¶ 19.)  The
TECS search returned no responsive records. (Id.)


2.    CBP

Upon receipt of the Request, the CBP FOIA Office determined
that CBP would likely not have responsive documents "because CBP
does not have any programs . . . which involve detaining
individuals 'about whom the United States has not provided
public information.'" (Suzuki Decl. ¶ 6.)[5]  Nevertheless, it
forwarded the Request to the following five CBP components: the
Office of International Affairs "because that office focused on,
inter alia, global security and counter-terrorism;" the Office
of Field Operations "because that office handled CBP
inspections, interdiction, and security at ports of entry;" the
Office of Anti-Terrorism "because that office was the leader in
CBP's anti-terrorism efforts;" the Office of Intelligence
"because that office was the central intelligence branch of
CBP;" and the Office of Public Affairs "because that office
interacted with the public regarding activities at CBP and,
therefore, might have received complaints regarding the issues
presented in the FOIA Request." (Id. ¶ 7.)

---

[5] Reference is to the Declaration of Shari Suzuki, sworn to on
November 30, 2007.

7

The FOIA Processor for the Office of International Affairs initially determined that, "based on her knowledge of the operations of [that office]," only its Training and Assistance Division was likely to have responsive documents. (Id. ¶¶ 8-9.) The Director of that Division responded that "the division did not maintain any programs related to the issues covered by the FOIA request and would not have responsive documents." (Id. at ¶ 10.)

The Office of Field Operations maintains its files primarily in TECS, which database was searched by ICE personnel. (Id. ¶¶ 12-13.) Nevertheless, the Request was presented to the Executive Director of the Office of Admissibility Requirements and Migration Control -- one of four divisions within the Office of Field Operations -- because that division "handles issues regarding admissibility into the United States," and thus might have responsive documents. (Id. ¶ 14.) The Executive Director stated that, "based on his knowledge of the operations of the division, there were no documents in his division responsive to the FOIA Request." (Id. ¶ 15.) He did produce one record, however, from his tenure at the Immigration and Naturalization Service, a partially-redacted copy of which was produced to

Plaintiffs. (Id.)[6]

The FOIA Processor for the Office of Anti-Terrorism
performed an electronic search of its Enterprise Program
Management Office ("ePMO"), a database containing "all
correspondence received by, all working documents of, and all
documents issued by the Office of Anti-Terrorism." (Id. ¶ 17.)
The FOIA Processor also searched the office's shared network
files where office staff saved documents before the office used
ePMO. (Id. ¶ 20.)  Both electronic searches were performed using
the following terms:  "Ghost Detainees," "Ghost Prisoners,"
"Unregistered Detainees," "Unregistered Prisoners," "CIA
Detainees," "CIA Prisoners," "Other Governmental Agency
Detainees," and "Other Governmental Agency Prisoners." (Id.
¶ 18.)  Neither search returned any responsive documents. (Id.
¶¶ 18, 20.)  A search of the office's hard copy files,
comprising the incoming correspondence and outgoing final
products signed by the Assistant Commissioner of the Office of
Anti-Terrorism, also produced no responsive documents. (Id.
¶ 19.)

---

[6] The Government states that the Executive Director produced the
document out of an "erroneous belief" that it was responsive.
(Suzuki Decl. ¶ 15.)  That document comprises two "Significant
Incident Reports" from the "Norfolk Sub-Office" that the
Government partially redacted and which mention the transfer in
U.S. custody of Yasser Esam Hamdi and the media attention
focused on that transfer. (See Suzuki Decl. Ex. C (June 1, 2006
CBP Letter With Attachments) at 2-5.)

9

The Office of Intelligence comprises six divisions, each of which received a copy of the Request. (Id. ¶ 22.)  Each division director responded, "based on their knowledge of the operations of their division, that they knew their division did not have any responsive documents" because the Office of Intelligence "was not responsible for detainees of the type described in the FOIA request . . . ." (Id. ¶ 23.)[7]

The FOIA Processor for the Office of Public Affairs, the final division of CBP tasked with responding to the Request, determined that the Customer Service Center was the only component likely to have responsive documents because it "handles general inquiries about CBP requirements and procedures." (Id. ¶ 25.)  The head of the Customer Service Center searched its records by "calling up a report for the 'emerging issues' category of questions for the past year[, which] include[s] new questions that are not covered by existing categories . . . ." (Id. ¶ 26.)  She scanned those categories for such terms as "Ghost Detainees," "Ghost Prisoners," "Unregistered Detainees," "Unregistered Prisoners," "CIA Detainees," "CIA Prisoners" and "transit of prisoners of

---

[7] One division director noted further that records from the Office of Intelligence were primarily stored in the TECS database, a search of which was conducted by ICE officials. (See Suzuki Decl. ¶ 24.)

war." (Id. ¶ 26.)  That search produced no responsive records.
(Id.)


3.  Office of Policy

The DHS FOIA Office initially forwarded the Request to the
Acting Chief of Staff for the Office of Policy, who searched for
responsive documents and, finding none, responded by letter to
Plaintiffs that the Office of Policy possessed no responsive
documents. (See Bertucci Decl. ¶¶ 7-8.)[8]  Because that search is
not described in any detail in the records maintained by the
Acting Chief of Staff, who subsequently ceased her employment
with DHS, the Office of Policy conducted a second search. (Id.
¶ 9.)  Pursuant to standard office procedures for responding to
a FOIA search, the Request was distributed to each of the Office
of Privacy's seven components. (Id. ¶ 11.)  Each component
"distributed a copy of the FOIA Request to those employees most
likely to have responsive documents," and the head of each
component then compiled his or her answers. (Id. ¶ 12.)  No
responsive documents were returned. (Id. ¶ 13.)  Moreover, a
hand search of the Office's classified records also returned no
responsive documents. (Id. ¶¶ 14-15.)

_____

[8] Reference is to the Declaration of Nicole Bertucci, sworn to on
November 30, 2007.

11

4.   I&A

Staff in I&A determined that that office likely would not
have responsive records "because I&A does not have any programs,
known to our FOIA staff, which involve detaining individuals
'about whom the United States has not provided public
information.'" (Page Decl. ¶ 6.)[9]  Nevertheless, each of that
office's eight divisions performed an electronic search of their
classified and unclassified records because "almost all
documents are maintained in electronic form, [and] where hard
copy documents exist, they are generally scanned to be
maintained in an electronic form." (Id. ¶ 8.)  Specifically,
each division searched I&A's shared drives, containing "I&A's
e-mails and electronic records at all classification levels," as
well as "raw intelligence information and associated products
. . . ." (Id. ¶ 9.)  Those electronic searches sought records
containing the following terms:  "detainees" or "prisoner" and
"ghost," "unregistered detainees" and "ghost" or "prisoners,"
"CIA detainees" and "prisoners" or "ghost," and "US Government"
and "ghost detainees" or "prisoners." (Id. ¶ 10.)  In addition,
the I&A FOIA Processor duplicated those searches with the same
search terms. (Id. ¶ 12.)  Neither search produced any
responsive documents. (Id. ¶¶ 10, 12.)  Finally, I&A searched

---

[9] Reference is to the Declaration of Sandy Ford Page, sworn to on
November 30, 2007.

the Intelligence Fusion Database and the National Terrorist
Database; the former comprises "finished intelligence products,
e-mails associated with those products, and the I&A Library,"
while the latter comprises "products and e-mails associated with
the Current Intelligence/Watch & Warning Branch." (Id. ¶ 11.)
Neither search produced responsive documents. (Id.)


5.   Privacy Office, DHS Headquarters

According to the Government, most DHS offices have
independent FOIA processing capabilities and requesters are
directed to write directly to those offices. If a requester
cannot determine where to send a request, he or she may send the
request to the Privacy Office at DHS Headquarters, which will
forward it to any office that Privacy Office staff deem likely
to have responsive documents. (See Lockett Decl. ¶¶ 4-5.)[10]

Staff in the Privacy Office initially determined that no
DHS office was likely to have responsive documents because "DHS
does not have any programs, known to our staff, which involve
detaining individuals 'about whom the United States has not
provided public information.'" (Id. ¶ 10.) Nevertheless,
Privacy Office staff decided that, if DHS did possess responsive
documents, they most likely would reside in the following DHS

---

[10] Reference is to the Declaration of Vania T. Lockett, sworn to
on November 29, 2007.

13

offices:  ICE, the Coast Guard or CBP "because those are the DHS
offices primarily involved in the detention of aliens;" I&A
"because that office is the central intelligence arm of DHS;"
and the Office of Policy "because that office considers wide-
ranging policy issues involving DHS." (Id.)[11]  In addition, staff
decided that a search of the Office of the Executive Secretariat
would be helpful in identifying other DHS offices that may have
responsive documents because "the Executive Secretariat
functions as a document clearinghouse for senior leadership" and
"coordinates and disseminates certain significant classified
communications of the Secretary and the Deputy Secretary of the
Department." (Id. ¶ 11.)

        The search of the Executive Secretariat actually comprised
three searches.  First, employees searched the unclassified
e-mails of the Deputy Executive Secretary because that position
"facilitates communications and clearance reviews between the
various DHS components, is copied on nearly all interagency
communications at the DHS Secretary or Deputy Secretary level,
and serves as the point of contact for communications between
DHS and the White House." (Id. ¶ 15.)  Further, the DHS
Secretary is copied on "emergency declarations for approval by

_____

[11] The Privacy Office took no further action with respect to
those Offices because each was served with the Request
independently. (See Lockett Decl. ¶ 10.)

the DHS Secretary for transmittal to the White House,
arrangements with the White House for policy meetings, and
communications between DHS components and outside agencies
. . . ." (Id.)  Those e-mails were searched with the following
terms:  "detainees," "ghost detainees," "unregistered
detainees," "unregistered prisoners," "CIA detainees," "CIA
prisoners," "rendition," "ghosting" and "ghost." (Id. ¶ 16.)
That search produced no responsive documents. (Id.)

Second, the Executive Secretariat's shared network drive
was searched because "[a]ll the DHS Secretary and Deputy
Secretary briefing materials are stored on the shared drive."
(Id. ¶ 17.)  Similarly, employees searched the IQ/Executive
Tracking System, a "tasking/archiving tool that is used to track
all of the DHS Secretary and the Deputy Secretary's
correspondence, action and information memoranda and directives
from the DHS Secretary and Deputy Secretary." (Id. ¶ 18.)  The
titles, texts and subjects of documents in each database were
searched for the terms "detainees," "ghost detainees,"
"unregistered detainees," "unregistered prisoners," "CIA
detainees," "CIA prisoners," "rendition," "ghosting" and
"ghost." (Id. ¶¶ 17-18.)  Neither search produced responsive
documents. (Id.)

Finally, an employee conducted a hand search of the
Executive Secretariat's classified materials. (Id. ¶ 19.)  That

employee "examined the title and/or subject line of each classified document" for potentially responsive documents and read all documents where there was potential ambiguity as to that document's responsiveness. (Id. ¶ 20.)  That search produced no responsive documents. (Id.)

6.    Further Searches

While processing another FOIA request submitted by Plaintiffs, DHS officials found several documents responsive to the instant Request in DHS offices not previously searched in connection therewith; specifically, the Office of General Counsel ("OGC") and the Office of Civil Rights and Civil Liberties ("CRCL"). (See Supp. Lockett Decl. ¶ 4.)[12]  In light of those discoveries, the Privacy Office tasked those Offices with responding to the Request. (See id.)

The OGC comprises four divisions with 77 attorneys. (See id. ¶ 5.)  Each attorney in the office was "asked to search [his or her] own hard copy and electronic files, emails and classified materials and to respond indicating a positive or negative result." (Id. ¶ 6.)  Those searches produced 13 responsive documents, four of which were released unredacted and six of which were released partially redacted pursuant to FOIA

---

[12] Reference is to the Supplemental Declaration of Vania T. Lockett, sworn to on February 4, 2008.

16

Exemption 6 and "5 U.S.C. § 552(b)(2)(low)."[13]  Discussing only
one of the redacted documents (see Supp. Lockett Decl. Ex. C
(February 1, 2007 Letter and Attachments)), the Supplemental
Lockett Declaration states that the Government withheld
"information regarding [Department of Defense] employees and []
the private e-mail address of a Department of State contractor"
and concluded that, "whatever public interest there might be, if
any, in knowing the [redacted information] did not outweigh the
privacy interests of said individuals." (Supp. Lockett Decl.
¶ 15.)

At CRCL, an attorney tasked with responding to FOIA
requests made inquiries with "senior staff familiar with the
operations and records of the office" to identify "every
individual and office within CRCL that could reasonably be
expected to have responsive documents . . . ." (McNeely Decl.
¶ 6.)[14]  As a result of those inquiries, CRCL decided to task the
following four individuals with responding to the Request:  the
CRCL Administrator, the Deputy Officer for Programs and
Compliance, the Director of the Review and Compliance Section,
and the Director of Civil Liberties Programs. (Id.)  It was

---

[13] The remaining three were forwarded to other governmental
agencies "for direct response to Plaintiffs." (Supp. Lockett
Decl. ¶¶ 9-12.)

[14] Reference is to the Declaration of James W. McNeely, sworn to
on February 4, 2008.

17

suggested that those individuals use search terms like "ghost detainees/prisoners," "unregistered detainees/prisoners," "CIA detainees/prisoners," "Other Governmental Agency detainees" and "OGA Detainees," and further that they ask any of their staff who might have responsive records to search also. (Id. ¶ 7.) Finally, the Director of the Civil Liberties Programs was tasked with searching CRCL's classified files. (Id.)

The CRCL is headed by the Officer for Civil Rights and Civil Liberties ("CRCL Officer"). (Id. ¶ 4.)  The CRCL Administrator, who tracks all materials incoming to the CRCL Officer, searched her own e-mail account as well as that of the CRCL Officer. (Id. ¶ 8.)  She also searched the "CRCL Executive Correspondence Tracking system account, which tracks items referred to CRCL for action through the Executive Secretariat . . . ." (Id.)  Both searches used the search terms suggested above, and neither returned any responsive documents. (Id.)

The Deputy Director for Programs and Compliance initially concluded that CRCL would not have responsive documents because "CRCL had neither handled any complaints nor advised Department leadership on any issues related to the FOIA Request . . . ." (Id. ¶ 9.)  Nevertheless, he searched his e-mail account with the search terms suggested above, and that search returned no responsive documents. (Id.)

18

The Director of the Review and Compliance Section also concluded that her section would have no responsive documents because "neither she nor her section had ever worked on any complaints related to 'ghost detainees' or to any of the issues included in the FOIA Request." (Id. ¶ 10.)  Nevertheless, she conducted a search of her e-mail account, hard copy files and electronic files using the suggested terms, which searches returned no responsive documents. (Id.)  Additionally, one of her staff used the suggested terms to search the section's automated records system, which "contains both tracking information and documents received and generated during the course of investigations of alleged violations of civil rights, civil liberties, and human rights, and other alleged abuses by DHS personnel." (Id.)  That search also produced no responsive documents. (Id.)

Using the search terms suggested above, the Director of Civil Liberties Programs conducted searches of his e-mail account, hard copy files and electronic records, and of CRCL's classified documents. (Id. ¶ 11.)  Those searches produced no responsive documents. (Id.)  In addition, the Director tasked staff members to respond to the Request. (Id.)  Only one staff member identified any responsive documents; of the seven documents identified by that employee, three were released with redactions under FOIA Exemption 6 and "5 U.S.C.

19

§ 552(b)(2)(low)." (Id.)[15]  Again only discussing the
requirements of Exemption 6, the McNeely Declaration states that
the Government withheld "the name and other private information
of the one private third party mentioned in" the responsive
records, concluding that, "whatever public interest there might
be, if any, in knowing the [redacted information] did not
outweigh the privacy interests of said individual." (Id. ¶ 17.)

*                           *

The parties dispute the adequacy of the searches described
above and have filed the instant cross-motions for partial
summary judgment to resolve that dispute. As a remedy,
Plaintiffs ask this Court to "order DHS to conduct a reasonable
search for all records responsive to Plaintiffs' request."
(Pls.' Reply 1.)  DHS asks this Court to conclude that it
"conducted an adequate search for documents responsive to the
Request" and, therefore, that it "faithfully discharged its
obligations under FOIA." (Def.'s Mem. 2.)

---

[15] The remaining four documents were referred to other Government
agencies for "direct response to Plaintiffs." (McNeely Decl.
¶ 11.)

II.   DISCUSSION

A.   FOIA Standards

Congress enacted FOIA "to promote honest and open
government and to assure the existence of an informed citizenry
to hold the governors accountable to the governed." Grand Cent.
P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999)
(quotation omitted).  In so doing, it "intended to advance 'a
general philosophy of full agency disclosure,'" id. at 478
(quoting FLRA v. U.S. Dep't of Veterans Affairs, 958 F.2d 503,
508 (2d Cir. 1992)), and, as a result, FOIA "adopts as its most
basic premise a policy strongly favoring public disclosure of
information in the possession of federal agencies." Halpern v.
FBI, 181 F.3d 279, 286 (2d Cir. 1999) (citing FLRA, 958 F.2d at
508, and Donovan v. FBI, 806 F.2d 55, 57-58 (2d Cir. 1986)).

Summary judgment is the preferred procedural vehicle for
resolving FOIA disputes. See Evans v. U.S. Office of Personnel
Mgmt., 276 F. Supp. 2d 34, 37 (D.D.C. 2003).  On such a motion,
"the defending agency has the burden of showing that its search
was adequate and that any withheld documents fall within an
exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d
807, 812 (2d Cir. 1994).  In so doing, the agency may rely on
declarations "indicating that the agency has conducted a
thorough search and giving reasonably detailed explanations" for
its non-disclosures. See id. (citing Maynard v. CIA, 986 F.2d

21

547, 560 (1st Cir. 1993)).  Such declarations must be
"relatively detailed and non-conclusory." See, e.g., SafeCard
Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991);
Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C.
Cir. 1984).  Thus, a "satisfactory agency affidavit should, at a
minimum, describe in reasonable detail the scope and method by
which the search was conducted" and should "'describe at least
generally the structure of the agency's file system which makes
further search difficult.'" Maynard, 986 F.2d at 559-60 (quoting
Church of Scientology of Cal. v. IRS, 792 F.2d 146, 151
(D.C.Cir. 1986) (Scalia, J.)).

    Government declarations will be afforded a presumption of
good faith, see Carney, 19 F.3d at 812 (quoting SafeCard Servs.,
926 F.2d at 1200), which may be rebutted only by "a showing of
bad faith sufficient to impugn the affidavits," Triestman v.
U.S. Dep't of Justice, 878 F. Supp. 667, 672 (S.D.N.Y. 1995)
(citing Carney, 19 F.3d at 812).  Thus, if the face of the
affidavits demonstrates an adequate search, "the FOIA requester
can rebut the agency's affidavit only by showing that the
agency's search was not made in good faith." Maynard, 986 F.2d
at 560; see also Pub. Citizen v. U.S. Dep't of State, 276 F.3d
634, 645 (D.C. Cir. 2002) (subsequent disclosure of documents
initially withheld not evidence of bad faith); Grand Cent.
P'ship, 166 F.3d at 489-90 (delay producing documents not

evidence of bad faith); Safecard Servs., 926 F.2d at 1200

("purely speculative claims about the existence and

discoverability of other documents" does not establish bad

faith).

A search will be considered adequate if it was "reasonably

calculated to uncover all relevant documents." Truitt v. U.S.

Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990) (citations

omitted); see also Garcia v. U.S. Dep't of Justice, 181 F. Supp.

2d 356, 368 (S.D.N.Y. 2002) (search must be "reasonably designed

to identify and locate responsive documents") (citations

omitted).  This includes an agency's decisions about which

offices or databases to search, which must also be "reasonably

calculated to uncover all relevant documents." Oglesby v. U.S.

Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (an agency

"cannot limit its search to only one [office] if there are

others that are likely to turn up the information requested.");

see also Schrecker v. U.S. Dep't of Justice, 217 F. Supp. 2d 29,

35 (D.D.C. 2002) (Government's declarations adequately described

rationale for searching certain offices by stating such offices

had the "greatest possibility of containing responsive documents

because the investigations [at issue] began there or individuals

who worked on the investigations had worked in these offices").

Reasonableness does not demand perfection, and failure to return

all responsive documents is not necessarily inconsistent

therewith:  an agency "is not expected to take extraordinary
measures to find the requested records, but only to conduct a
search reasonably designed to identify and locate responsive
documents." Garcia, 181 F. Supp. 2d at 368.  Thus, the question
is whether "the search was reasonably calculated to discover the
requested documents, not whether it actually uncovered every
document extant . . . ." Grand Cent. P'ship, 166 F.3d at 489.
Reasonableness must be evaluated in the context of each
particular request. See Davis v. U.S. Dep't of Justice, 460 F.3d
92, 103 (D.C. Cir. 2006); Weisberg, 745 F.2d at 1485.

       As noted above, the sole question presented by these cross-
motions is whether, as it is described above, DHS's search was
adequate. (Compare Def.'s Mem. 1, and Pls.' Mem. 1.)  Plaintiffs
challenge nearly every aspect of the Government's searches and
declarations.  I conclude that the Government's declarations
should be afforded the presumption of good faith; that the
Government's declarations reasonably describe its decisions
about which DHS components to search and those decisions were
reasonable; and that the Government's declarations reasonably
describe its searches and those searches were reasonable.


B.    Presumption of Good Faith

       Contrary to Plaintiffs' argument (see Pls.' Reply 14), I
perceive no reason to set aside the presumption of good faith

afforded to the Government's declarations, see Carney, 19 F.3d
at 812.  First, as discussed below in greater detail, the
Government did not narrowly construe the Request.  Second, it is
unclear whether the Government failed to consult with Plaintiffs
in the manner alleged by Plaintiffs (see Transcript of Oral
Argument 56:14-57:12, Amnesty Int'l USA et al. v. CIA et al., 07
Civ. 5435 (argued May 22, 2008) (hereinafter "Trans.")), and
even less clear whether such conduct would constitute bad faith
sufficient to impugn the affidavits.  Plaintiffs point to no law
requiring such consultation, and the Government states, in any
event, that it "did not have difficulty understanding the
Request's scope." (Def.'s Reply 10 n.7.)  Nor is the
Government's delay in responding to the Request evidence of bad
faith. See Meeropol v. Meese, 790 F.2d 942, 952 (D.C. Cir.
1986).  Indeed, Plaintiffs' accusation that the "delay in this
case was wholly out of proportion with the agency's minimal
exertions" (Pls.' Reply 14) altogether ignores the breadth of
DHS's search. Contra Citizens for Responsibility & Ethics in
Washington v. U.S. Dep't of Justice, 05 Civ. 2078, 2006 WL
1518964, at *4-5 (D.D.C. June 01, 2006) (finding unreasonable
delay where Government prolonged two-hour search over course of
several months).

## C.   Decisions About Where to Search

The declarations in this case clearly contain sufficient specificity to allow this Court to judge the reasonableness of its decisions about where to search. Moreover, reviewing those declarations and affording them the presumption of good faith, I conclude that they were reasonable. For example, employees at ICE decided to task DRO initially "because DRO is regularly involved in the detention and removal of aliens" (Pavlik-Keenan Decl. ¶ 5) and, within DRO, to task the Criminal Alien Division because it is "[t]he primary intelligence component of DRO, which maintains all or nearly all of DRO's classified information" (Id. ¶ 6). The same is true of the Government's decisions about which other ICE offices to search (see id. ¶ 11) and which offices to search within CBP (see Suzuki Decl. ¶ 7). Indeed, the Privacy Office decided to search the Executive Secretariat at least in part to identify additional DHS offices that may contain responsive documents. (See Lockett Decl. ¶ 11.)

Nevertheless, Plaintiffs argue that the Government's decisions about which offices to search are unreasonable because there exist "'positive indications of overlooked materials.'" (Pls.' Reply 7 (quoting Church of Scientology v. NSA, 610 F.2d 824, 837 (D.C. Cir. 1979).) They allege that the Office of the Inspector General ("DHS-OIG") likely possesses responsive documents generated as a result of an investigation into the

case of Maher Arar (see Pls.' Reply 10) and that the Office of
Legislative Affairs possesses a letter sent to it by U.S.
Senators Patrick Leahy (D-VT) and Arlen Specter (R-PA) on the
subject of Arar and Khaled El-Masri (see Trans. 43:24-44:16).
They also assert that the Government possesses but did not
produce correspondence from 2005 between DHS Secretary Michael
Chertoff and El-Masri's counsel that references El-Masri's
secret detention. (See Pls.' Reply 8.)   Plaintiffs further
allege that DHS must have documents related to El-Masri
generated as a result of his travels across the U.S. border.
(See id. ("[A]s a matter of course, DHS must generate records
when such incidents occur.").)   Plaintiffs argue that the
existence of these documents undermines the adequacy of the
Government's search efforts generally (see id. 7-8), and at the
least requires further searches at DHS-OIG (see Pls.' Mem. 19;
Pls.' Reply 10-11).[16]

None of these documents, however, undermines the
reasonableness of the Government's efforts or otherwise provides
a basis for ordering searches of other components.   First,

---

[16] Plaintiffs initially argued that DHS should be required to
perform further searches in the Office of Operations
Coordination and the Office of Legislative Affairs. (See Pls.'
Opp'n 19.)   They appear to have abandoned that argument (see
Pls.' Reply 10), and, in any event, I conclude that Plaintiffs
have not produced any evidence to undermine the reasonableness
of DHS's decision not to search there.

27

Plaintiffs' assertion that certain documents "must" exist is too speculative to require further searches. See SafeCard Servs., 926 F.2d at 1201 ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."); Gearbulk, Ltd. v. U.S. Customs Serv., 90 Civ. 4443, 1991 WL 719, at *1 (S.D.N.Y. Jan. 2, 1991) ("Mere assertions that certain other documents 'must' exist do not raise a genuine issue of material fact"). More fundamentally, the documents specifically referenced by Plaintiffs are not responsive to the Request. As described below in greater detail, to be responsive, a document itself must reference the "secret detention" concept; the documents provided by Plaintiffs do not. Thus, while DHS may have "been investigating the Arar case for more than three years" (Pls.' Reply 10), there is no reason to believe that such an investigation examined the circumstances of his alleged "secret detention." Moreover, the letter to the Office of Legislative Affairs (see DeYoung Decl. Ex. 11 (Press Release and Attached Letters)) and the letters to and from Secretary Chertoff (see id. Exs. 14 (Letter from ACLU to Secretary Chertoff), 42 (Letter from Ann Beeson to ACLU)) clearly do not reference that concept. In sum, Plaintiffs have not produced positive indications of additional responsive documents, and,

therefore, I reject this as a ground for requiring further searches.

D.    The Searches

1.    The Adequacy of the Declarations

As the description above reflects, the Government's declarations set forth with a reasonable degree of detail the function and structure of the offices tasked, the nature of the databases searched and the various search protocols employed. For that reason, I initially conclude that they are "relatively detailed and non-conclusory" in the manner required by FOIA. See SafeCard Servs., 926 F.2d at 1200; see also Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) ("[A]ffidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA.").

Plaintiffs also challenge the sufficiency of the Government's declarations inasmuch as they employ ipse dixit assertions that certain offices would not possess documents. (See Pls.' Opp'n 19; see also Pavlik-Keenan Decl. ¶¶ 10, 12-14; Suzuki Decl. ¶¶ 10, 15, 23.) That argument fails because FOIA does not demand a search that would be futile. See Am.-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.

29

("AADC"), 516 F. Supp. 2d 83 (D.D.C. 2007).[17]  The request in
AADC sought certain records pertaining to the race, ethnicity,
religion and gender of ICE arrestees. See id. at 86.  An ICE
official responded that, based on his experience and on
conversations with ICE Counsel and several ICE Supervisory and
Senior Special Agents, his office would not have responsive
documents because it did not collect the kind of information
requested. See id. at 87.  Though calling the question a "close
call," the AADC court nonetheless held that the statements were
sufficient, "if not exactly to show the adequacy of the search,
then to explain why a search would be futile and is
unnecessary." Id. at 88.

     The same is true of the statements offered by the
Government in this case.  In each instance, the government
officer stated that, based on his knowledge of his
division, it would not contain documents responsive to the
Request.  The directors of each division in the CBP Office
of Intelligence based their conclusion on the fact that
that office "was not responsible for detainees of the type

---

[17] Plaintiffs cite Defenders of Wildlife v. U.S. Department of
Agriculture, 311 F. Supp. 2d 44, 52 (D.D.C. 2004), for the
proposition that "the bare assertion that [an agency official]
saw the FOIA request and . . . stated that he had no responsive
documents is inadequate because it does not indicate that he
performed any search at all."  Where, as here, the Government's
declarations establish that a search would be futile, however,
the reasonable search required by FOIA may be no search at all.

described in the FOIA request, i.e., 'individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information.'" (Suzuki Decl. ¶ 23.)   The Director of the Training Assistance Division in the CBP Office of International Affairs relied on a similar basis for his conclusion (see id. ¶ 10), as did the Deputy Assistant Directors for Operations in the ICE Office of Intelligence and the ICE Office of International Affairs (see Pavlik-Keenan Decl. ¶ 14).   In sum, I conclude that the Government's declarations reasonably describe why a search would be futile and, therefore, decline to require further searches.

2.    The Adequacy of the Searches

a.    Scope of the Request

To assess the adequacy of a search, courts must first "ascertain the scope of the request itself." Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 889 (D.C. Cir. 1995).   That request must "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3), so as "to enable the searching agency to determine precisely what records are being requested," Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 27 (D.D.C. 2000); see also Assassination Archives & Res. Ctr., Inc.

31

v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989) ("FOIA was not
intended to reduce government agencies to full-time
investigators on behalf of requesters"). Indeed, an agency is
not "obliged to look beyond the four corners of the request for
leads to the location of responsive documents." Kowalczyk v.
U.S. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996); see
also Allnutt v. Dep't of Justice, 98 Civ. 901, 98 Civ. 1722,
2000 WL 852455, at *12 (D.Md. Oct. 23, 2000) (agency need not
conduct research in response to FOIA request). Nor is it
required to "create a document in response to a request," NLRB
v. Sears, Roebuck & Co., 421 U.S. 132, 161-62 (1975), or "answer
questions disguised as a FOIA request," Hudgins v. IRS, 620 F.
Supp. 19, 21 (D.D.C. 1985).

    Nevertheless, an agency may not "read the request so
strictly that the requester is denied information the agency
well knows exists in its files, albeit in a different form from
that anticipated by the requester." Hemenway v. Hughes, 601 F.
Supp. 1002, 1005 (D.D.C. 1985). Thus, courts have stated that
an agency has a duty to "construe a FOIA request liberally,"
see, e.g., LaCedra v. Executive Office for U.S. Attorneys, 317
F.3d 345, 348 (D.C. Cir. 2003); Nation Magazine, 71 F.3d at 890;
The Wilderness Soc'y v. Bur. of Land Mgmt., 01 Civ. 2210, 2003
WL 255971, at *4 (D.D.C. Jan. 15, 2003), and the Department of
Justice has reiterated that mandate:  "[A]ll federal agencies

should go as far as they reasonably can to ensure that they
include what requesters want to have included within the scopes
of their FOIA requests." Department of Justice ("DOJ"), Office
of Information Privacy ("OIP"), OIP Guidance:  Determining the
Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3, at 4
(1995), available at http://www.usdoj.gov/oip/foi-upd.htm (last
visited May 15, 2008); see also DOJ, OIP, Freedom of Information
Act Guide 959 (March 2007) ("It is incumbent upon an agency, of
course, not to interpret the scope of a FOIA request too
narrowly."), available at
http://www.usdoj.gov/oip/foia_guide07.htm (last visited May 15,
2008).

     Plaintiffs argue that DHS interpreted the scope of the
Request too narrowly, principally because the Government did not
search for the names of certain individuals. (See Pls.' Reply
9.)  Under Plaintiffs' interpretation, the Request describes a
group of individuals who share the common characteristic of
having been subjected to "secret detention." (See Pls.' Reply
2.)  Because Plaintiffs do not know the identities of the
constituents of that class, the Request was drafted using broad

terms[18] and sought essentially any document referring to the
individuals in that class. (See, e.g., Transcript of Oral
Argument at 21:15-22:5, 31:18-23, Amnesty Int'l USA et al. v.
CIA et al., 07 Civ. 5435 (argued May 22, 2008) (hereinafter
"Transcript").)  Plaintiffs argue that, by searching only for
documents referencing the concept of "secret detention" (see
Def.'s Reply 12-13), DHS's searches excluded responsive
documents -- namely, documents referencing an individual who was
a subject of "secret detention" but that do not reference the
detention itself (see Trans. 23:11-20).

    Confronted with this Request, I conclude that the
Government's interpretation was the only reasonable approach
allowed under FOIA. Under Plaintiffs' interpretation, the
Government would be required to compile a list of individuals it
determined were subject to "secret detention" and search for
documents related to those individuals, whether or not the
documents contained words or phrases used in the Scope of
Request to identify the concept of "secret detention." This

_____

[18] For instance, the Request intentionally did not include names
for fear that "the government might restrict its search to such
named individuals and thus fail to disclose information about
other similarly situated individuals whose identities were
unknown." (Pls.' Reply 3.) Further, to avoid confusion and
controversy, the Request intentionally did not include the word
"rendition" but rather described the "secret detention" concept
in neutral terms:  "deprived of their liberty by or with the
involvement of the United States." (See id. at 5.)

government agencies to full-time investigators on behalf of requesters,'" Judicial Watch, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) (quoting Assassination Archives, 720 F. Supp. at 219), but also the more fundamental point that FOIA is a mechanism to obtain access to records, not answers to questions. See Landmark Legal Foundation v. EPA, 272 F. Supp. 2d 59, 64 (D.D.C. 2003); Hudgins v. IRS, 620 F. Supp. 19, 21 (D.D.C. 1985); see also Di Viao v. Kelley, 571 F.2d 538, 542-43 (10th Cir. 1978).   As understood by Plaintiffs, however, the Request seeks precisely that -- the Government's answer to the question:   "Who are the subjects of your secret detention program?"   It is unnecessary to pass on the propriety of that question to recognize that it is not something that may be resolved by way of a FOIA request.

Short of requiring it to populate a list, Plaintiffs argue that the Government should have searched for certain names -- Arar and El-Masri -- because the Government knew those individuals were members of the class defined by the Request. (See Pls.' Reply 9-10.) Of course, those names were not actually mentioned in the Request. Rather, they were mentioned in materials cited in a footnote of the Request. (See DeYoung Decl. Ex. 2 at 5 n.3.) While the two documents cited by Plaintiffs in that footnote list over twenty individuals "confirmed" or "suspected" of being detained by the U.S. Government, see Ctr. for Human Rights & Global Justice, Fate and

Whereabouts Unknown: Detainees in the "War on Terror," 7-18
(2005); Human Rights Watch, List of "Ghost Prisoners" Possibly
in CIA Custody (2005), they only mention Arar once in passing,
see Ctr. for Human Rights & Global Justice, supra, at 2.
Another footnote in the Request cites an article discussing El-
Masri. See Dana Priest, Wrongful Imprisonment: Anatomy of a CIA
Mistake; German Citizen Released After Months in "Rendition,"
Wash. Post, Dec. 4, 2005, at A1. Such is hardly sufficient to
put the Government on notice that it should include those names
in its searches. On its face, the Request included a non-
exclusive list of terms used to refer generally to "secret
detainees." As Plaintiffs conceded at oral argument, the
Request could also have included the names now advanced by
Plaintiffs but, as further conceded at oral argument, Plaintiffs
determined not to do so for strategic reasons.

Plaintiffs respond that, even if the Government lacked
notice that it should search for certain names from the face of
the Request, two letters sent to the Government after the
Request provided sufficient clarity on that point. (See Pls.'
Opp'n 15; Pls.' Reply 9-10; see also DeYoung Decl. Ex. 22 (July
6, 2006 Administrative Appeal Letter), 35 (October 24, 2007
Letter).) While communication between the Government and
requesters is certainly encouraged to resolve FOIA request
ambiguities, Plaintiffs cite no controlling authority obliging

it to do so. (See Pls.' Reply 10 (citing DOJ, OIP, Determining

the Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3

(1995)).  The Government does not admit to harboring any doubts

as to the meaning of the request (see Def.'s Reply 10 n.7), and

it is under no "obligation to search anew based upon a

subsequent clarification." Kowalczyk, 73 F.3d at 388.  As has

been noted before, "[i]t would be untenable to hold that, as the

litigation proceeds, a plaintiff, by continually adding new

requests . . . could command a priority based on the date of the

initial requests." Biberman v. FBI, 528 F. Supp. 1140, 1144

(S.D.N.Y. 1982).

　　　Nor is my conclusion disturbed by the argument, advanced by

Plaintiffs, that a search for names was necessary after the

Government uncovered responsive documents specifically naming

certain individuals.  Plaintiffs invoke Valencia-Lucena v. U.S.

Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999), calling such

documents "just the sort of 'obvious leads' that DHS should have

pursued in order 'to discover requested documents.'" (Pls.'

Reply 10.)  In Valencia-Lucena, the Government itself

acknowledged that there might be responsive documents in a

federal records center in Georgia that it declined to search.

See 180 F.3d at 235, 237.  Such "positive indications of

overlooked materials," see id. at 327 (quotation omitted), ran

afoul of the agency's obligation "to follow through on obvious

leads to discover requested documents," id. at 325, and rendered
the search inadequate. Likewise, in Campbell v. U.S. Department
of Justice, 164 F.3d 20 (D.C. Cir. 1998), the Court of Appeals
for the District of Columbia Circuit held that the Government's
search was inadequate where its own documents revealed that the
"search of another of its records system might uncover the
documents sought." Valencia-Lucena, 180 F.3d at 326 (discussing
Campbell).

Plaintiffs do not explain, however, how the documents
uncovered in this case constituted a "lead" to further documents
that would have prompted further searching. Indeed, the
documents relied on here are news articles or reports authored
by non-Government individuals and included either as attachments
in DHS personnel emails or otherwise retained by DHS. (See
Lockett Supp'l Decl. Exs. A(2) (Human Rights First Memorandum to
Members of the U.N. Human Rights Committee), A(3) (Ass'n Bar of
the City of New York, Torture By Proxy: International and
Domestic Law Applicable to 'Extraordinary Rendition'), B(4) (E-
mail including transcript of Oct. 15, 2004 DemocracyNow
interview of Maher Arar), B(5) (E-mail including Washington Post
editorial, entitled "The CIA's Prisoners"), B(6) (E-mail
including New York Times article, entitled "Detainee Policy
Sharply Divides Bush Officials").) Unlike in the cases
discussed above, the additional documents relied on in this case

do not indicate that there remain DHS documents that are
responsive to the Request and which have not been produced.  As
such, they do not constitute the "positive indications of
overlooked materials" that would necessitate further searching
for Government records about certain individuals.

b.  Computer Searches

     Plaintiffs also argue that the Government's electronic
searches in particular were unreasonable because they employed
unduly narrow search procedures. (See Pls.' Opp'n 13.)  They
offer the Declaration of Daniel L. Regard, which describes the
restrictive effect of an electronic search that does not employ
such mechanisms as Boolean operators and root expanders. (See
Regard Decl. ¶¶ 12-14.)  Mr. Regard concludes that "[i]t is
common industry practice to use such capabilities when they are
available and failing to do so would reflect unfavorably on the
adequacy of a search." (See id. ¶ 14.)  The Government
characterizes this as an attempt to "nitpick DHS's search
methods" (Def.'s Reply 8) and responds that "DHS's search
methods were reasonable, even if not designed by an expert" (id.
at 18).  Consequently, the Government asserts that "'there is no
general requirement that an agency search secondary references
or variant spellings'" (id. (citing Maynard, 986 F.2d at 560).)

According to the Suzuki Declaration, for example, the search of ePMO would have returned documents containing the phrase "CIA Detainees" but not documents containing the phrase "CIA Detainee" or "detainees of the CIA." (See Suzuki Decl. ¶¶ 17-21.)  Indeed, this and other of the searches described in the Government's declarations apparently relied on search protocols that might well exclude responsive documents. (See Lockett Decl. ¶ 16 (search of Deputy Executive Secretary's e-mails); see id. ¶¶ 17-18 (searches of DHS Secretary's and Deputy Secretary's briefing materials); Page Decl. ¶¶ 9-10 (search of I&A's shared drive).)  Simply stated, a search that is designed to return documents containing the phrase "CIA detainees" but not "CIA detainee" or "detainee of the CIA" is not "reasonably calculated to uncover all relevant documents." Truitt, 897 F.2d at 542 (emphasis supplied); see also LaCedra, 317 F.3d at 348 (Government acts unreasonably if it narrowly construes a FOIA request that is "reasonably susceptible to [a] broader reading").

Nevertheless, that failure does not render the Government's searches unreasonable in this case.  As explained at oral argument, any documents responsive to the Request inevitably will be highly classified. (See Dimaio Decl. ¶¶ 114-16; see also

Trans. 9:8-16.)[19]  Here, to the extent that classified document

databases were searched, the vast majority of them were searched

by hand (see Trans. 59:7-14), and such hand searches are not

tainted by any deficiencies in the Government's computerized

searches (see id. at 11:24-12:7).  Thus, while those

deficiencies might render another search unreasonable, they have

little real impact on whether this search is "reasonably

calculated" to uncover all relevant documents." Truitt, 897 F.2d

at 542 (emphasis supplied).


E.    Non-Disclosure Pursuant to FOIA Exemption 6

The parties dispute the Government's partial redaction of a

document found during the searches of DHS-OIG and CRCL. (See

Pls.' Reply 15.)  The Government redacted the name, phone number

and fax number of an employee of the Heritage Foundation, which

information was included in an e-mail sent to DHS employees.

(See Def.'s Reply 29.)  To justify the redaction, the Government

invokes Exemption 6, which allows non-disclosure of "personnel

and medical files and similar files the disclosure of which

would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6).  To determine whether a document

was properly withheld under Exemption 6, a court must (1)

---

[19] Reference is to the Declaration of Ralph S. Dimaio,
Information Review Officer, National Clandestine Service,
Central Intelligence Agency, sworn to on April 21, 2008.

41

"determine whether the personal information is contained in a file similar to a medical or personnel file," and (2) "balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a 'clearly unwarranted invasion of personal privacy.'" Wood v. FBI, 432 F.3d 78, 86 (2d Cir. 2005).

With respect to the first requirement, the Supreme Court has held that FOIA's protection of an individual's privacy interests "surely was not intended to turn upon the label of the file which contains the damaging information." Dep't of State v. Washington Post Co., 456 U.S. 595, 601 (1982). Instead, "all information which 'applies to a particular individual' meets the threshold requirement for Exemption (b)(6) protection." Voinche v. FBI, 940 F. Supp. 323, 329 (D.D.C. 1996) (quoting Washington Post, 456 U.S. at 602). Thus, Exemption 6 will apply to information, "such as names and addresses, the release of which would create a palpable threat to privacy." Judicial Watch, Inc. v. FDA, 449 F.3d 141, 152-153 (D.C. Cir. 2006). The information the Government seeks to withhold -- a name, phone number and fax number -- meets that standard.

In assessing the privacy interests at stake, courts have recognized that private individuals have a privacy interest in their identifying information that is contained in government records. See, e.g., Voinche, 940 F. Supp. at 330. On the other

hand, the public's interest consists solely of the FOIA aim "to open agency action to the light of public scrutiny." McErlean v. U.S. Dep't of Justice, 97 Civ. 7831, 1999 WL 791680, at *9 (S.D.N.Y. Sept. 30, 1999) (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 771 (1989)). Because I do not perceive how releasing the redacted information will shed light on the Government activity, I find the balance of interests weighs in favor of the individual's interests and conclude, therefore, that the non-disclosure was proper.

III. CONCLUSION

For the reasons set forth above, the search undertaken by DHS was adequate and its lone non-disclosure was proper under Exemption 6. Accordingly, Plaintiffs' cross-motion for partial summary judgment [dkt. no. 34] is DENIED, and Defendant DHS's motion for partial summary judgment [dkt. no. 21] is GRANTED.

SO ORDERED:

DATED:    New York, New York
          June 19, 2008

                         LORETTA A. PRESKA, U.S.D.J.

43