UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMNESTY INTERNATIONAL USA, CENTER FOR CONSTITUTIONAL RIGHTS, INC. and WASHINGTON SQUARE LEGAL SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, DEPARTMENT OF STATE, AND THEIR COMPONENTS <br><br> Defendants. | **ECF CASE** <br><br> 07 CV 5435 (LAP) |

**DECLARATION OF MARGARET L. SATTERTHWAITE IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO THE CENTRAL INTELLIGENCE AGENCY'S
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS' CROSS MOTION FOR PARTIAL
SUMMARY JUDGMENT**

I, **MARGARET L. SATTERTHWAITE**, under penalty of perjury, declare as follows,

pursuant to 28 U.S.C. § 1746:

1. I am a licensed attorney and Co-Director of the International Human Rights Clinic at

   New York University School of Law.  The International Human Rights Clinic is part of

   Washington Square Legal Services, Inc., under whose auspices I am co-counsel in this

   case.

2. I submit this declaration in support of Plaintiffs' Opposition to the Central Intelligence

   Agency's (CIA) Motion for Summary Judgment and Cross Motion for Partial Summary

Judgment.  Specifically, I submit this declaration to call to the Court's attention government statements and other publicly available information about the U.S. government's rendition, secret detention and interrogation program.[1]

## Government Statements About the Existence of the Post-9/11 Rendition, Secret Detention and Interrogation Program

3.  President George W. Bush, the Office of the Director of National Intelligence ("ODNI"), and General Michael Hayden, Director of the CIA ("CIA Director General Hayden"), have confirmed that after September 11, 2001, the CIA operated a "separate" CIA detention and interrogation program:

   a.  Attached hereto as Exhibit A is a true and correct copy of White House Office of the Press Secretary, *News Release: President Discusses Creation of Military Commissions to Try Suspected Terrorists*, Sept. 6, 2006 [hereinafter *White House News Release*] (President Bush stating that "In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency.").

   b.  Attached hereto as Exhibit B is a true and correct copy of Announcement, Office of the Director of National Intelligence, *Summary of the High Value Terrorist Detainee Program*, undated [hereinafter *ODNI Summary of the Program*] (ODNI providing an overview of the "CIA's detention and interrogation program" and noting that

---

[1] Documents reflecting government statements are attached as Exhibits. Websites are indicated for other publicly available documents that are available online and only those that are not readily available online are attached as Exhibits.

"[s]hortly after 11 September 2001" there were briefings on the "authorities" for the program).

c. Attached hereto as Exhibit C is a true and correct copy of Letter from Office of General Counsel, CIA to Melanca D. Clark, Gibbins [sic], Del Deo, Dolan, Griffinger & Vecchione, P.C., Nov. 10, 2006 (letter sent in connection with *ACLU et. al.* v. *DOD et. al.*, 04-Civ.-4151 (S.D.N.Y.), remanded 06-0205-cv (2nd Cir.) (CIA Associate General Counsel stating that the CIA has "located...one document responsive to Item No. 61" of the list of responsive records specifically identified by Plaintiffs. Item No. 61 is described by Plaintiffs as a directive signed by President Bush granting the CIA the authority to set up detention facilities outside the United States and/or outlining interrogation methods that may be used against detainees. The CIA describes the document located as responsive to Item No. 61 as "a memorandum from President Bush to the Director of the CIA.").

d. Attached hereto as Exhibit D is a true and correct copy of CIA Director General Hayden, *A Conversation with Michael Hayden*, Council on Foreign Relations, Sept. 7, 2007 [hereinafter *A Conversation with Michael Hayden*] (CIA Director General Hayden discussing "our rendition, detention and interrogation programs" and noting that "In 2007 to date, CIA officers have testified in 57 congressional hearings, and we're responding to 29 congressionally legislated requests for information. We have answered 1,140 QFRs -- that's Questions For the Record -- as well as 254 other letters, questions and requests. CIA experts have given more than 500 briefings to members of Congress and their staffs. We have issued some 100 congressional notifications about our sensitive programs. Everything is on the table. I personally

have briefed the Hill nine times since last September on renditions, detentions and interrogations.").

e. Attached hereto as Exhibit E is a true and correct copy of The Charlie Rose Show, *Transcript of Director Michael Hayden's Interview with Charlie Rose*, PBS television broadcast Oct. 22, 2007 [hereinafter *Director Michael Hayden's Interview with Charlie Rose*] (CIA Director General Hayden discussing the secret detention program, including its origins).

4. President George W. Bush, the Department of Defense, and CIA Director General Hayden, have confirmed that the secret detention and interrogation program continues to operate:

a. *White House News Release,* Exhibit A (President Bush stating "The current transfers mean that there are now no terrorists in the CIA program. But...having a CIA program for questioning terrorists will continue to be crucial ...").

b. Attached hereto as Exhibit F is a true and correct copy of U.S. Department of Defense, Office of the Assistant Secretary of Defense (Public Affairs), News Release, *Defense Department Takes Custody of a High-Value Detainee*, Apr. 27, 2007 [hereinafter *Defense Department Takes Custody of a High-Value Detainee* (2007)] (Office of the Assistant Secretary of Defense announcing that the Department of Defense had taken custody of Abd al-Hadi al-Iraqi and that "Prior to his arrival at Guantanamo Bay, he was held in CIA custody.").

c. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden noting the 2007 transfer of an individual, Abd al-Hadi al-Iraqi, out of CIA detention).

4

d. Attached hereto as Exhibit G is a true and correct copy of U.S. Department of Defense, Office of the Assistant Secretary of Defense (Public Affairs), News Release, *Defense Department Takes Custody of a High-Value Detainee*, Mar. 14, 2008 [hereinafter *Defense Department Takes Custody of a High-Value Detainee* (2008)] (Office of the Assistant Secretary of Defense announcing that the Department of Defense had taken custody of Muhammad Rahim al-Afghani and that "Prior to his arrival at Guantanamo Bay, he was held in CIA custody.").

5. President Bush, U.S. Secretary of State Condoleezza Rice, and CIA Director General Hayden, and other U.S. officials have all repeatedly acknowledged the use of rendition to transfer terrorism suspects to third countries:

a. Attached hereto as Exhibit H is a true and correct copy of White House Office of the Press Secretary, *President's Press Conference,* Mar. 16, 2005 (President Bush stating that in the "post-9/11 world" one technique of the United States is to "arrest people and send them back to their country of origin with the promise that they won't be tortured.").

b. Attached hereto as Exhibit I are true and correct copies of relevant portions of *Testimony of DCI Goss Before Senate Armed Services Committee*, 109th Cong. 4, (Mar. 17, 2005) (then-CIA Director Porter Goss testified on March 17, 2005, about "renditions" in an open session of the Senate Armed Services Committee).

c. Attached hereto as Exhibit J is a true and correct copy of White House Office of the Press Secretary, *Press Conference of the President*, Apr. 28, 2005 (President Bush stating that "…we send people to countries where they say they're not going to torture the people… ").

d.  Attached hereto as Exhibit K is a true and correct copy of U.S. Secretary of State Condoleezza Rice, *Remarks Upon Her Departure for Europe,* Andrews Air Force Base, Dec. 5, 2005 (Secretary of State Rice confirming that the U.S. uses the practice of "rendition").

e.  Attached hereto as Exhibit L is a true and correct copy of White House Office of the Press Secretary, *Press Briefing by Scott McClellan*, Dec. 6, 2005 (Scott McClellan discussing "renditions" of terrorism suspects).

f.  Attached hereto as Exhibit M is a true and correct copy of White House Office of the Press Secretary, *Press Gaggle by Tony Snow*, June 7, 2006 (Tony Snow providing "[s]everal points to make on rendition.").

g.  *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden describing "renditions—that's moving a terrorist from A to B –,").

h.  *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden confirming that there is a "group of people….on whom we've conducted renditions. We have moved them from one country to another.").

i.  Attached hereto as Exhibit N is a true and correct copy of Craig Whitlock, *Jordan's Spy Agency: Holding Cell for the CIA*, Wash. Post, Dec. 1, 2007 (recording statement of spokesman for the CIA, Paul Gimigliano, in response to questions about the CIA's liaison with Jordanian intelligence in the rendition program that "Setting aside the myths, rendition…has been used over the years on a very limited scale, and is designed to take terrorists off the street.").

**Other Publicly Available Information About the Existence of the Post-9/11 Rendition, Secret Detention and Interrogation Program**

6.  Media and other reports have also widely reported on the adoption of the CIA's secret detention, rendition and interrogation programs; the means by which they were authorized; and debates between the CIA and other agencies over the adoption of such measures:

    a.  Michael Hirsh, John Barry & Daniel Klaidman, *A Tortured Debate*, Newsweek, June 21, 2004, *available at* http://www.newsweek.com/id/54093?tid=relatedcl (last visited June 22, 2008) (identifying the handling of al-Libi as setting off a "bitter feud between the FBI and the CIA over how to interrogate terror suspects.")

    b.  Douglas Jehl & David Johnston, *Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails*, N.Y. Times, Mar. 6, 2005, *available at* http://www.nytimes.com/2005/03/06/politics/06intel.html?_r=1&oref=slogin (last visited June 22, 2008) (reporting that a presidential directive purportedly gave the CIA broad new authority to covertly transfer individuals to third countries solely for interrogation or detention purposes).

    c.  Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html (last visited June 22, 2008) (discussing in detail the "covert prison system set up by the CIA nearly four years ago" and noting that "Six days after the Sept. 11 attacks, President Bush signed a sweeping finding that gave the CIA broad authorization to disrupt terrorist activity,

including permission to kill, capture and detain members of al Qaeda anywhere in the world.").

d. Brian Ross & Richard Esposito, *Exclusive: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC News, Dec. 5, 2005, *available at* http://abcnews.go.com/WNT/Investigation/story?id=1375123 (last visited June 22, 2008) (noting that "CIA's secret prisons have existed since March 2002").

e. Douglas Jehl, *Qaeda-Iraq Link U.S. Cited Is Tied to Coercion Claim*, N.Y. Times, Dec. 9, 2005, *available at* http://www.nytimes.com/2005/12/09/politics/09intel.html (last visited June 22, 2008) (reporting that Ibn al-Shaykh al-Libi was rendered to Egypt in January 2002 "…because the White House had not yet provided detailed authorization for the C.I.A. to hold him" and noting that the CIA began to detain individuals itself later in 2002 with the apprehension of Abu Zubaydah).

f. James Risen, *State of War: The Secret History of the CIA and the Bush Administration* 28-29 (2006) (describing a "turf battle" between the FBI and the CIA over control of al Qaeda prisoners).

g. Eur. Parl. Ass., *Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, 17th Sitting, Doc. No. 10957 (2006) at 9-19, *available at* http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.pdf (last visited June 22, 2008) [hereinafter *Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states* (2006)] (describing the "global 'spider's web'" of rendition operations and secret detentions).

8

h. Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of Its Enemies Since 9/11* 111-15 (2006) (describing the protracted debate over the treatment of "high-value" al Qaeda suspects, their transfers, their location of detention, and whether they would be placed into the criminal justice system or held outside that system).

i. Eur. Parl. Ass., *Comm. on Legal Aff. and Hum. Rts., Secret detentions and illegal transfers of detainees involving Council of Europe member states: second report*, 23rd Sitting, Doc. No. 11302 (2007), at 10-14, *available at* http://assembly.coe.int/CommitteeDocs/2007/EMarty_20070608_NoEmbargo.pdf (last visited June 22, 2008) [hereinafter *Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states* (2007)] (describing the development of the "High-Value Detainee" (HVD) Program and the "evolution of specific 'black sites'" in the program).

7. Former officials have acknowledged the use of rendition to transfer terrorism suspects to third countries:

a. Spiegel Interview with CIA's Former Europe Director, "*We Probably Gave Powell the Wrong Speech*," Jan. 29, 2007, *available at* http://www.spiegel.de/international/spiegel/0,1518,462782,00.html (last visited June 22, 2008) (Tyler Drumheller, former chief of the CIA's Europe division, stating that "I once had to brief Condoleezza Rice on a rendition operation, and her chief concern was not whether it was the right thing to do, but what the president would think about it...This is no way to run a covert policy.").

9

b. Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations, Joint Hearing Before Subcomm. on International Organizations, Human Rights, and Oversight and Subcomm. on Europe of the Comm. on Foreign Affairs (Apr. 17, 2007), *available at* http://foreignaffairs.house.gov/110/34712.pdf (last visited June 22, 2008) (statement of Michael Scheuer, former Chief of the Bin Laden Unit at the CIA and an architect of the rendition program, who described the origins of the "Rendition Program" and its current manifestations).

8. Beginning in 2002, media and other accounts have quoted named and unnamed U.S. officials stating that the post 9/11 rendition program was aimed at coercive interrogation, including torture and cruel, inhuman and degrading treatment:

a. Duncan Campbell, *U.S. sends suspects to face torture*, Guardian (London), Mar. 12, 2002, *available at* http://www.guardian.co.uk/world/2002/mar/12/september11.usa (last visited June 22, 2008) (quoting an unnamed U.S. diplomat explaining that "[a]fter September 11, [renditions] have been occurring all the time...It allows us to get information from terrorists in a way we can't do on U.S. soil.").

b. Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations; 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities*, Wash. Post, Dec. 26, 2002, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/06/09/AR2006060901356.html (last visited June 22, 2008) (quoting an unnamed official who has been involved in rendering individuals explaining his understanding of the purpose of post-9/11 renditions as "We don't kick

the [expletive] out of them. We send them to other countries so *they* can kick the [expletive] out of them.") (emphasis in original).

c. Attached hereto as Exhibit O is a true and correct copy of DeNeen L. Brown & Dana Priest, *Deported Terror Suspect Details Torture in Syria; Canadian's Case Called Typical of CIA*, Wash. Post, Nov. 5, 2003 (quoting an unnamed official stating that "[t]he temptation is to have these folks in other hands because they have different standards").

d. *Transcript of "File on 4—Rendition,"* BBC, Feb. 8, 2005, at 6 *available at* news.bbc.co.uk/nol/shared/bsp/hi/pdfs/15_02_05_renditions.pdf (last visited June 22, 2008) (quoting Robert Baer, a former covert officer for the CIA, confirming that one goal of the rendition program is to employ harsh interrogation tactics: "If you send a prisoner, for instance, to Egypt, you will probably never see him again, the same way with Syria.").

**Government Statements About the Number and Identities of Individuals Rendered, Secretly Detained, and Interrogated by the CIA**

9. According to CIA Director General Hayden, the CIA secretly detained and interrogated "fewer than 100" prisoners:

a. *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden stating that "Fewer than 100 people had been detained at CIA's facilities.").

b. Attached hereto as Exhibit P is a true and correct copy of *Statement to Employees by Director of the Central Intelligence Agency, General Michael V. Hayden on the CIA's Terrorist Interrogation Program*, Oct. 5, 2007 [hereinafter *General Hayden Statement to CIA Employees on the CIA's Terrorist Interrogation Program*] (CIA

Director General Hayden stating that "Fewer than 100…have gone through the program since it began in 2002").

   c. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden stating that "The total number of people detained by the CIA is fewer than a hundred").

10. President Bush, the ODNI and CIA Director General Hayden have confirmed that the first individual detained in the CIA's program was Abu Zubaydah and that the program began with his apprehension in 2002:

   a. *White House News Release,* Exhibit A (President Bush referring to the apprehension of Abu Zubaydah and stating that the "CIA used an alternative set of procedures" against him).

   b. *ODNI Summary of the Program,* Exhibit B (ODNI noting the apprehension of Zubaydah in March 2002 by the CIA and its partners and stating that "Over the ensuing months, the CIA designed a new interrogation program…" to question Zubaydah).

   c. *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden stating that the CIA's detention and interrogation program "…began with the capture of Abu Zubaydah in the spring of 2002.").

   d. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden referring to the number of individuals detained in the "life of the program, since the capture of Abu Zubaydah in March of 2002.").

   e. Attached hereto as Exhibit Q is a true and correct copy of *Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of*

*Early Detainee Interrogations* (Dec. 6, 2007) [hereinafter *General Hayden Statement on the Taping of Early Detainee Interrogations*] (CIA Director General Hayden stating that the "CIA's terrorist detention and interrogation program began after the capture of Abu Zubaydah in March 2002.").

11. The U.S. government has confirmed by name at last 19 individuals secretly detained by the CIA. Those who have been named by the U.S. government include: (1) Muhammad Rahim al-Afghani (Mohammed Rahim); (2) Ali Abdul-Hamid al-Fakhiri (Ali Abd-al-Hamid al-Fakhiri, Ibn al-Shaykh al-Libi); (3) Ali Abd al-Rahman al-Faqasi al-Ghamdi (Abu Bakr al Azdi); (4) Mustafa al-Hawsawi (Hashim 'Abd al-Rahman, Zahir, Ayyub, Muhammad Adnan); (5) Abd al-Hadi al-Iraqi  (Abu Abdullah, Abdal Hadi al Iraqi); (6) Abu Faraj al-Libi (Mustafa al-'Uzayti, Mahfuz, 'Abd al-Hafiz, Abu Hamada, Tawfiq); (7) Abd al-Rahim al-Nashiri (Abd al-Rahim Hussein Muhammad Abdu, Mulla Bilal, Bilal, Abu Bilal al-Makki, Khalid al-Safani, Amm Ahmad ("Uncle Ahmad")); (8) Ramzi bin al-Shibh (Abu Ubaydah, 'Umar Muhammad 'Abdallah Ba' Amar); (9) Ali Abdul Aziz Ali ('Ammar al-Baluchi); (10) Mohamed Farik Amin (Zubair); (11) Waleed Muhammad bin Attash  (Khallad Bin 'Attash, Silver); (12) Gouled Hassan Dourad (Guleed Hassan Ahmad, Hanad); (13) Ahmed Khalfan Ghailani (Haytham al-Kini); (14) Hassan Ghul; (15) Riduan Isamudin (Hambali) (Riduan bin Isomuddin, Encep Nurjaman); (16) Majid Khan (Yusif); (17) Mohammed Nazir Bin Lep (Lillie, Lilie, Li-Li); (18) Khalid Sheikh Mohammed (Mukhtar); (19) Abu Zubayda (Hani, Tariq, Zayn al-'Abidin Abu Zubaydah):

a. *White House News Release,* Exhibit A (President Bush stating that "…Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay").

b. Attached hereto as Exhibit R is a true and correct copy of Office of the Director of National Intelligence, *Biographies of High Value Terrorist Detainees Transferred to the US Naval Base at Guantánamo Bay*, Sept. 6, 2006 (ODNI identifying names and detailed biographical information on the fourteen detainees transferred from CIA secret custody to Guantánamo Bay on or around September 6, 2006).

c. *Defense Department Takes Custody of a High-Value Detainee* (2007), Exhibit F (Department of Defense announcing that it had taken custody of Abd al-Hadi al-Iraqi and that "…he was held in CIA custody.").

d. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden describing the transfers of the fourteen secret detainees to Guantánamo Bay in September 2006 and of Abd al-Hadi al-Iraqi in 2007).

e. *Defense Department Takes Custody of a High-Value Detainee* (2008), Exhibit G (Department of Defense announcing that it had taken custody of Muhammad Rahim al-Afghani and that "…he was held in CIA custody.").

f. Attached hereto as Exhibit S is a true and correct copy of Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations, 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities*, Wash. Post, Dec. 26, 2002 (National Director and Deputy National Security Adviser for combating terrorism, Wayne A. Downing, quoted as stating on the record about the

interrogations of Zubaydah, that "The interrogations of Abu Zubaida drove me nuts at times.").

g. Attached hereto as Exhibit T is a true and correct copy of relevant pages from the National Commission on Terrorist Attacks Upon The U.S., *9-11 Commission Report* (2004) [hereinafter *9-11 Commission Report*] at 434-436 (9/11 Commission stating that the following individuals are "currently in U.S. custody": Ramzi Binalshibh, Waleed Mohammed bin Attash (Tawfiq bin Attash, Tawfiq Attash Khallad); Hassan Ghul; Hambali; Khalid Sheikh Mohammed; Abu Zubaydah; Ali Abd al Rahman al Fakasi al Ghamdi; and Abd al Rahim al-Nashiri).

h. Attached hereto as Exhibit U is a true and correct copy of relevant pages from *United States* v. *Paracha*, 2006 U.S. Dist. LEXIS 1, *11-12 (S.D.N.Y. 2006) (In the criminal case of *United States* v. *Paracha*, the U.S. government provided unclassified summaries of statements by Majid Khan, Ammar al Baluchi (Ali Abdul Aziz Ali), and Khalid Sheik Mohammed).

i. Attached hereto as Exhibit V are relevant pages from Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Exhibit 941, *United States* v. *Moussaoui*, (E.D. VA. 2003), Cr. No. 01-455-A, at 1 (Statement submitted by government that "Sheikh Mohammed was captured in March 2003, and has been interrogated over the course of years on multiple occasions since his capture" and is "not available to testify either in person or by video for national security reasons"); Substitution for the Testimony of Mustafa Ahmed al-Hawsawi, Defendant's Exhibit 943, United States v. Moussaoui, (E.D. VA. 2003), Cr. No. 01-455-A,  at 1 (Statement submitted by government that "Hawsawi was captured in March 2003, and has been interrogated

over the course of years on multiple occasions since his capture" and is "not available

to testify either in person or by video for national security reasons"); Substitution for

the Testimony of Walid Muhammad Salih Bin Attash ("Khallad"), Defendant's

Exhibit 945, United States v. Moussaoui, (E.D. VA. 2003), Cr. No. 01-455-A, at 1-2

(Statement submitted by government that "Khallad was captured in April 2003, and

has been interrogated over the course of years on multiple occasions since his

capture" and is "not available to testify either in person or by video for national

security reasons"); Substitution for the Testimony of Riduan Isamuddin ("Hambali"),

Defendant's Exhibit 946, United States v. Moussaoui, (E.D. VA. 2003), Cr. No. 01-

455-A, at 2 (Statement submitted by government that "Hambali was captured in

August 2003, and has been interrogated over the course of years on multiple

occasions since his capture", and is "not available to testify either in person or by

video for national security reasons")

j.  Attached hereto as Exhibit W are relevant pages from Report of the Senate Select

    Committee on Intelligence, *Postwar Findings About Iraq's WMD Programs and*

    *Links to Terrorism and How They Compare with Prewar Assessments*, Sept. 6, 2006,

    at 79-82 (report citing to CIA operational cables, dated February 4, 5, and 19, 2004,

    recording information given by detainee Ibyn al-Shaykh al-Libi to CIA debriefers).

12. In addition to confirming the number of individuals held by the CIA in secret U.S.

    facilities, the U.S. government has officially acknowledged the scope of its post-9/11

    rendition program:

    a.  *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden

        stating "And I mentioned renditions, the number of renditions -- that's moving a

terrorist from A to B -- apart from that 100 that we've detained, the number of renditions is actually even a smaller number, mid-range two figures.").

b. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden stating that the number of individuals rendered is "Mid-range, two figures since September 11, 2001")

**Other Publicly Available Information About the Number and Identities of Individuals Rendered, Secretly Detained, and Interrogated by the CIA**

13. The media and human rights organizations have reported on the number of detainees subject to the practice of U.S. secret detention and have identified many of these individuals by name:

a. Human Rights Watch, *The United States' "Disappeared," The CIA's Long-Term "Ghost Detainees"* (2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (last visited June 22, 2008) (discussing 11 named detainees in undisclosed locations).

b. Priest, *CIA Holds Terror Suspects in Secret Prisons*, *supra* para. 6(c) ("More than 100 suspected terrorists have been sent by the CIA into the covert system, according to current and former U.S. intelligence officials and foreign sources.").

c. Jehl, *Qaeda-Iraq Link U.S. Cited Is Tied to Coercion Claim*, *supra* para. 6(e) ("The agency currently holds between two and three dozen high-ranking terrorist suspects in secret prisons around the world.").

d. Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"* (New York: NYU School of Law, 2005), *available*

*at* http://www.chrgj.org/docs/Whereabouts%20Unknown%20Final.pdf (last visited June 22, 2008) (presenting the stories of 28 named individuals believed to have been "disappeared" by the U.S. government).

e.  Amnesty International et. al., *Off the Record, U.S. Responsibility for Enforced Disappearances in the "War on Terror"* (2007), *available at* http://www.chrgj.org/docs/OffRecord/OFF_THE_RECORD_FINAL.pdf (last visited June 22, 2008) (identifying and providing biographic information about 39 individuals—most identified by name—believed to have been held at some point by the United States in secret sites, all of whom at the time of the report remained missing; this 39 includes the cases specific individuals whose detention by the United States has been officially acknowledged but whom the United States has never disclosed as being in any known place of detention[2]).

14. The media and human rights organizations have also reported on the number of individuals who were subject to post-9/11 renditions:

a.  Human Rights Watch, *Double Jeopardy: CIA Renditions to Jordan* (2008), *available at* http://www.hrw.org/reports/2008/jordan0408/jordan0408web.pdf (last visited June 22, 2008) (detailing the cases of 14 non-Jordanian prisoners who were rendered by the CIA to Jordan, which "served as a proxy jailer for the US Central Intelligence Agency (CIA), holding prisoners that the CIA apparently wanted out of circulation, and later handing some of them back to the CIA" (at 1)).

b.  Peter Bergen & Katherine Tiedemann, *Disappearing Act: Rendition by the Numbers*, Mother Jones, Mar. 3, 2008, *available at* http://www.motherjones.com/cgi-

---

[2] These individuals are: Hassan Ghul, Ali Abd al-Rahman al-Faqasi al-Ghamdi, and Ali Abdul-Hamid al-Fakhiri (Ali Abd-al-Hamid al-Fakhiri, Ibn al-Shaykh al-Libi).

bin/print_article.pl?url=http://www.motherjones.com/news/feature/2008/03/disappear ing-act.html (last visited June 22, 2008) (noting "We found information on 117 renditions that have occurred since September 11, 2001. When we excluded renditions to Afghanistan, CIA secret prisons (or 'black sites'), Guantanamo, or American custody, we found 53 cases of extraordinary rendition" and setting out the cases of these individuals who were rendered to countries including Jordan, Egypt, Syria, Libya, Morocco, and Pakistan).

15. Former CIA detainees have provided information about the number of individuals with whom they were held and their identities, reportedly because their fellow prisoners sought to make known their names and identifying information:

   a. Craig S. Smith & Souad Mekhennet, *Algerian Tells of Dark Term in U.S. Hands*, N.Y. Times, July 7, 2006, *available at* http://www.nytimes.com/2006/07/07/world/africa/07algeria.html (last visited June 22, 2008) (explaining that while they were in CIA custody, Khaled el-Masri and Laid Saidi, along with a "...collection of prisoners spent night after night repeating their telephone numbers to one another from within the dark and dirty cells where they were being held in Afghanistan. Anyone who got out, they said they agreed, would use the numbers to contact the families of the others to let them know that they were still alive").

   b. Amnesty International, *USA: A case to answer: From Abu Ghraib to secret CIA custody: The case of Khaled al-Maqtari* 19-25 (2008), *available at* http://www.amnesty-eu.org/static/documents/2008/AMR51_013_2008al-Maqtari_final.pdf (last visited June 22, 2008) [hereinafter *The case of Khaled al-*

*Maqtari*] (listing the names and/or identifying information, and cell numbers of 20 prisoners who made their identities known to one another while they were held in a CIA "black site" in Afghanistan between January and April 2004).

c. Human Rights Watch, *Ghost Prisoner: Two Years in Secret CIA Detention* 15-16 (2007), *available at* http://www.hrw.org/reports/2007/us0207/us0207webwcover.pdf (last visited June 22, 2008) [hereinafter *Ghost Prisoner*] (reporting on the names of detainees that former CIA detainee Marwan Jabour recalls seeing on the wall of his cell, inscribed below his cell sink, written on a mattress, and written on a shirt).

16. The media has reported the names of certain CIA officials involved in the rendition and secret detention program; some of these officials have openly spoken to the media about their part in the program:

a. Richard Esposito & Brian Ross, *Coming in From the Cold: CIA Spy Calls Waterboarding Necessary But Torture, Former Agent Says the Enhanced Technique Was Used on Al Qaeda Chief Abu Zubaydah*, ABC News, Dec. 10, 2007, *available at* http://abcnews.go.com/Blotter/Story?id=3978231&page=1 (last visited June 22, 2008) (interviewing on camera former CIA agent John Kiriakou about his activities within the CIA's secret detention program).

b. Michael Scheuer, Op-Ed., *A Fine Rendition*, N.Y. Times, Mar. 11, 2005 , *available at* http://www.nytimes.com/2005/03/11/opinion/11scheuer.html?pagewanted=print&pos ition= (last visited June 22, 2008) (author identifying himself "as head of the C.I.A.'s bin Laden desk" and stating that "I started the Qaeda detainee/rendition program and ran it for 40 months").

c.  Scott Shane, *Inside a 9/11 Mastermind's Interrogation*, N.Y. Times, June 22, 2008,
    *available                                                            at*
    http://www.nytimes.com/2008/06/22/washington/22ksm.html?partner=rssnyt&emc=r
    ss&pagewanted=all (last visited June 24, 2008) (naming one of Khalid Sheikh
    Mohamed's interrogators in the CIA program as Deuce Martinez).

## Government Statements About Apprehension, Transfer and Interrogation in the Rendition, Secret Detention and Interrogation Program

17. President Bush, the ODNI, and other U.S. officials have officially confirmed that the
    United States, working with foreign partners, has been responsible for the apprehension
    of individuals rendered and detained in the CIA's program:

    a.  *White House News Release,* Exhibit A (President Bush stating that "Working with our
        allies, we've captured and detained thousands of terrorists and enemy fighters in
        Afghanistan, in Iraq, and other fronts of this war on terror.").

    b.  *ODNI Summary of the Program,* Exhibit B (ODNI stating that "In March 2002, the
        CIA and our Coalition partners captured Abu Zubaydah..." and  "Detainees have
        provided names [sic] approximately 86 individuals...Nearly half of these individuals
        have been removed from the battlefield by the US and its allies.").

    c.  Attached hereto as Exhibit X is a true and correct copy of White House Office of the
        Press Secretary, *Press Gaggle with Scott McClellan and a Senior Administration
        Official,* Aug. 14, 2003 (A "senior administration official" announcing and describing
        the capture of "Ryuduan bin Isomuddin," (Hambali) as a "joint operation. . . [that] did
        involve others" and Scott McClellan and the senior administration official both stated

21

that Hambali was now in the "custody of the United States government" but the senior administration official refused to "get into . . . details at this point" regarding where Hambali was being held).

18. President Bush has officially confirmed that individuals held by the CIA in its program are secretly detained and have been kept outside regular judicial processes, stating in reference to the transfer of individuals from secret CIA custody to Guantánamo Bay on or around September 6, 2006 that "…we have largely completed our questioning of the men -- and to start the process for bringing them to trial, we must bring them into the open" and that after their transfer to Guantánamo Bay, "The International Committee of the Red Cross is being advised of their detention, and will have the opportunity to meet with them." *See White House News Release,* Exhibit A.

19. The ODNI has confirmed that in 2002 a "new interrogation program," involving what President Bush confirmed to be an "alternative set of procedures," was authorized for use against individuals in the CIA's secret detention and interrogation program:

    a. *White House News Release,* Exhibit A (President Bush referring to the questioning of Abu Zubaydah and stating that "And so the CIA used an alternative set of procedures.").

    b. *ODNI Summary of the Program,* Exhibit B (ODNI discussing the capture of Abu Zubaydah in March 2002 and stating that "Over the ensuing months, the CIA designed a new interrogation program...").

20. In April 2008, President Bush stated that he "approved" the enhanced interrogation techniques used by the CIA. Attached hereto as Exhibit Y is a true and correct copy of Jan Crawford Greenberg, Howard L. Rosenberg & Ariane de Vogue, *Bush Aware of*

*Advisers' Interrogation Talks*, ABC News, Apr. 11, 2008 (last visited June 24, 2008) (quoting President Bush stating his awareness that the National Security Council Principal's Committee met and approved "enhanced interrogation techniques" for use against CIA secret detainees: "Well, we started to connect the dots in order to protect the American people...And yes, I'm aware our national security team met on this issue. And I approved.").

21. In September and October 2007, CIA Director General Hayden specified that such "special methods of questioning" or "enhanced interrogation techniques" had been used against "less than a third" of the individuals secretly detained by the CIA:

   a. *General Hayden Statement to CIA Employees on the CIA's Terrorist Interrogation Program*, Exhibit P (CIA Director General Hayden stating that "[f]ewer than 100" have gone through the program and "of those, less than a third have required any special methods of questioning").

   b. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden stating that "Of these people detained, the number against whom we have used any kind of enhanced interrogation techniques is fewer than a third of the fewer than a hundred").

22. At the end of January 2008, John Negroponte, former Director of National Intelligence and current U.S. Deputy Secretary of State confirmed that waterboarding had been used in interrogations.  Attached hereto as Exhibit Z is a true and correct copy of Q&A: John Negroponte, *No Hand-Wringing, Please*, National Journal, Jan. 25, 2008.

23. In February 2008, during questioning before the Senate Select Committee on Intelligence, CIA Director General Hayden confirmed the use of waterboarding as an

interrogation technique for CIA detainees and also disclosed that the CIA had subjected three named detainees—Abu Zubaydah, Khalid Sheikh Mohammed, and Abd al-Rahim al-Nashiri—to waterboarding in 2002 and 2003. Attached hereto as Exhibit AA is *Senate Select Committee on Intelligence Holds a Hearing on the Annual Threat Assessment: Hearing Before the S. Select Comm. on Intelligence*, 110th Cong. 23 (2008) (CIA Director General Hayden stating "Let me make it very clear and to state so officially in front of this committee that waterboarding has been used on only three detainees. It was used on Khalid Sheikh Mohammed. It was used on Abu Zubaydah. And it was used on Nashiri.").

24. Official U.S. documents released pursuant to Freedom of Information Act (FOIA) litigation have confirmed that the CIA uses "enhanced techniques" for interrogation; that these techniques include waterboarding or "the waterboard"; and that the CIA waterboarded three named individuals: Khalid Sheikh Mohamed, Abu Zubaydah and Abd al-Rahim al-Nashiri. Attached hereto as Exhibit BB are Other Documents Nos. 3, 7, 25, 29, 45, 65, 67, 85, 87, 101, 103, 119, 129, 131, 169; Interview Report No. 103; Cable No. 333; and Special Review (documents released in connection with *ACLU et. al.* v. *DOD et. al.*, 04 Civ. 4151 (S.D.N.Y.), remanded 06-0205-cv (2nd Cir.).

25. At least one Article III court is currently considering whether evidence was obtained from those detained by the CIA through torture. Attached hereto as Exhibit CC is a true and correct copy of Motion to Declare Interrogation Methods Applied Against Petitioner Constitute Torture, Dec. 6, 2007, Khan v. Gates, 07-1324 (D.C. Cir.) (heavily redacted motion seeking judicial ruling that interrogation methods used by CIA constituted

impermissible torture and that any evidence derived from interrogations should not be considered by the court).

26. In addition to information about the nature of techniques and which detainees were subjected to them, the U.S. government has provided information about CIA interrogators, their training, and their average age:

   a. *White House News Release,* Exhibit A; *ODNI Summary of the Program,* Exhibit B (President Bush and the ODNI both explaining that interrogators must be screened and that they must also complete more than 250 hours of specialized training.)

   b. *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden stating that "The amount of training for this specific activity is 240 hours.").

   c. *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden specifying that the average age of CIA interrogators is 43).

27. A released U.S. government document specifies that individual interrogators did not make independent decisions about which techniques to use, but instead sought specific authorities from officials in the United States. Attached hereto as Exhibit DD is a true and correct copy of *Other Document No. 85*, (undated) (released in connection with *ACLU et. al.* v. *DOD et. al.*, 04 Civ. 4151 (S.D.N.Y.), remanded 06-0205-cv (2nd Cir.)) (stating that "In each instance the use of Enhanced Techniques must be approved by Headquarters in advance").

28. In February 2008, CIA Director General Hayden acknowledged that the U.S. government had erroneously assured the government of the United Kingdom that British soil or airspace had not been used for rendition operations since 9/11. Correcting the record, he revealed that the British Island territory of Diego Garcia had been used for rendition

flights. Attached hereto as Exhibit EE is a true and correct copy of CIA Director General Hayden, *Director's Statement on the Past Use of Diego Garcia*, Feb. 21, 2008 (CIA Director General Hayden acknowledging that "In late 2007, CIA itself took a fresh look at records on rendition flights. This time, the examination revealed the two stops in Diego Garcia.").

**Other Publicly Available Information About Apprehension, Transfer and Interrogation in the Rendition, Secret Detention and Interrogation Program**

29. Former U.S. government officials state that authorization for the use of specific techniques came from officials in the United States:

   a. Scott Shane, David Johnston, & James Risen, *Secret U.S. Endorsement of Severe Interrogations*, N.Y. Times, Oct. 4, 2007, *available at* http://www.nytimes.com/2007/10/04/washington/04interrogate.html (last visited June 22, 2008) (Paul C. Kelbaugh, deputy legal counsel at the CIA's Counterterrorist Center from 2001 to 2003 quoted as publicly recalling that interrogators sent lawyers questions from the "black sites" about the legal limits on their interrogation techniques and stating that "We were getting asked about combinations—'Can we do this and this at the same time?'").

   b. Richard Esposito & Brian Ross, *Coming in From the Cold: CIA Spy Calls Waterboarding Necessary But Torture, Former Agent Says the Enhanced Technique Was Used on Al Qaeda Chief Abu Zubaydah*, ABC News, Dec. 10, 2007, Part 1 of Transcript at 20-21, *available at* http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter071210.

pdf (last visited June 22, 2008) [hereinafter *Coming in From the Cold:* Part 1 of Transcript] (quoting former CIA agent John Kiriakou stating that "It wasn't up to individual interrogators to decide, 'Well, I'm gonna slap him' Or, 'I'm going to shake him.' Or, 'I'm gonna make him stay up for 48 hours.' Each one of these steps, even though they're minor steps, like the intention shake, or the open-handed belly slap, each one of these had to have the approval of the deputy director for operations..." and "The cable traffic back and forth was extremely specific... it was extremely deliberate.").

30. Additionally, U.S. intelligence sources have provided detailed information about the six "enhanced interrogation techniques" instituted in 2002 for use against secret CIA detainees. These techniques have been described as: "the attention grab;" "the attention slap;" "the belly slap;" "longtime standing;" "the cold cell;" and waterboarding:

   a. Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described*, ABC News, Nov. 18, 2005, *available at* http://abcnews.go.com/WNT/Investigation/story?id=1322866 (last visited June 22, 2008) (reporting that harsh interrogation techniques were "first authorized in mid-March 2002, ABC News has been told by former and current intelligence officers and supervisors" and describing the six techniques).

   b. Shane, Johnston, & Risen, *Secret U.S. Endorsement of Severe Interrogations*, *supra* para. 29(a) (reporting that techniques "... included slaps to the head; hours held naked in a frigid cell; days and nights without sleep while battered by thundering rock music; long periods manacled in stress positions; or the ultimate, waterboarding.").

31. Current and former CIA officials have also provided details of the waterboarding of
    Khalid Sheikh Mohamed and Abu Zubaydah, including how long the technique was
    applied against each individual:

    a. Brian Ross & Richard Esposito, *Exclusive: Only Three Have Been Waterboarded by
       CIA*, ABC News, Nov. 2, 2007, *available at*
       http://blogs.abcnews.com/theblotter/2007/11/exclusive-only-.html (last visited June
       22, 2008) ("The most effective use of waterboarding, according to current and former
       CIA officials, was in breaking Khalid Sheikh Mohammed" and "'KSM lasted the
       longest under waterboarding, about a minute and a half, but once he broke, it never
       had to be used again,' said a former CIA official familiar with KSM's case.").

    b. Esposito & Ross, *Coming in From the Cold: Part 1 of Transcript, supra* para. 29(b) at
       16 (quoting former CIA agent John Kiriakou revealing that Zubaydah "was able to
       withstand the water boarding for quite some time. And by that I mean probably 30, 35
       seconds--").

32. Public information demonstrates that before transfer either to a third country for
    interrogation or to a secret CIA "black site," or in some cases, both, detainees are
    typically stripped naked; handcuffed, shackled, and blindfolded; have earplugs inserted in
    their ears and their mouths covered, and are hooded, before being bundled onto a plane
    and rendered:

    a. Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, Wash. Post, Dec. 4,
       2005, *available at* http://www.washingtonpost.com/wp-
       dyn/content/article/2005/12/03/AR2005120301476.html (last visited June 22, 2008)
       ("Members of the Rendition Group follow a simple but standard procedure: Dressed

head to toe in black, including masks, they blindfold and cut the clothes off their new captives, then administer an enema and sleeping drugs. They outfit detainees in a diaper and jumpsuit for what can be a day-long trip. Their destinations: either a detention facility operated by cooperative countries in the Middle East and Central Asia, including Afghanistan, or one of the CIA's own covert prisons -- referred to in classified documents as 'black sites,' which at various times have been operated in eight countries, including several in Eastern Europe.").

b. *Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states* (2006), *supra* para. 6(g) at 20-23 (describing the procedure used by the CIA to process detainees).

c. Smith & Mekhennet, *Algerian Tells of Dark Term in U.S. Hands, supra* para. 15(a) ("After being held for a week in a prison in the mountains of Malawi, Mr. Saidi said, a group of people arrived in a sport utility vehicle: a gray-haired Caucasian woman and five men dressed in black wearing black masks revealing only their eyes. The Malawians blindfolded him, and his clothes were cut away, he said. He heard someone taking photographs. Then, he said, the blindfold was removed and the agents covered his eyes with cotton and tape, inserted a plug in his anus and put a disposable diaper on him before dressing him. He said they covered his ears, shackled his hands and feet and drove him to an airplane where they put him on the floor.").

d. Human Rights Watch, *Ghost Prisoner, supra* para. 15(c), at 29 ("All of these accounts had certain common characteristics, including descriptions of interrogators and prison directors who spoke American-accented English, black uniformed and

masked guards, flights in which the detainee was placed in diapers and wrapped up like a package, and various forms of physical and mental abuse.").

e.  Amnesty International, *The Case of Khaled Al-Maqtari*, *supra* para. 15(b), at 12-13 ("In a procedure which has also been described to Amnesty International by other detainees transported by the CIA, a three- or four-person removal team, dressed completely in black, with black gloves and facemasks, came to prepare Khaled al-Maqtari for his departure. They put him in a diaper, socks, short trousers, and a shirt without buttons, then covered his eyes and stuffed his ears with cotton, taped firmly into place, before hooding him and topping it off with noise-reducing headphones." (at 12)).

33. Legal filings and public reports show that throughout the period of their detention, CIA secret detainees are not able to contact lawyers, humanitarian organizations such as the International Committee of the Red Cross, their families or their governments, and are instead detained for prolonged periods without acknowledgement or charge:

a.  Human Rights Watch, *U.S. Holding at Least Twenty-Six "Ghost Detainees,"* Dec. 1, 2005, *available at* http://hrw.org/english/docs/2005/11/30/usdom12113.htm (last visited June 22, 2008) (reporting that "[t]he detainees are being held indefinitely and incommunicado, without legal rights or access to counsel.").

b.  Complaint and Demand for Jury Trial, *Arar* v. *Ashcroft*, 414 F. Supp. 2d 250 (E.D.N.Y 2006) (No. 04-cv-0249), *available at* http://ccrjustice.org/files/Arar Complaint_FINAL.pdf (last visited June 22, 2008) (alleging that Maher Arar was denied access to counsel while held in the United States and then transported to Syria, against his will, where he was held incommunicado and tortured for ten months).

c. *El-Masri* v. *Tenet*, 437 F. Supp. 2d 530 (E.D. Va. 2006), *available at* http://www.aclu.org/safefree/torture/27015lgl20060512.html (last visited June 25, 2008) (alleging that Khaled El-Masri was denied access to counsel, consular officials, or his family for nearly half a year without charge or explanation).

d. Declaration of Mohamed Farag Ahmad Bashmilah in Support of Plaintiffs' Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment, *Mohamed et. al.* v. *Jeppesen Dataplan, Inc.*, No. 5:07-cv-02798 (N.D. Cal. filed Aug. 1, 2007), paras. 47-164, *available at* http://www.chrgj.org/projects/docs/declarationofbashmilah.pdf (last visited June 22, 2008) [hereinafter *Mohamed et. al.* v. *Jeppesen Dataplan, Inc.*, Bashmilah Declaration] (Bashmilah describes his nineteen months in CIA custody without contact with family, lawyers, government representatives, or humanitarian organizations).

34. Released detainees have detailed the treatment they and others experienced in secret detention, or after rendition to a foreign country. That treatment has included beatings with a cable on palms, hips and lower back; sleep deprivation; bombardment with loud music or other noises; genital mutilation; threats of confinement in a "dog box" (approximately 1 cubic meter in size); threats of rape, electrocution, and death; painful shackling; and being hung from a pole:

a. *Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Report of Professor Stephen J. Toope, Fact Finder*, Oct. 14, 2005, at 13-19, *available at* http://www.ararcommission.ca/eng/ToopeReport_final.pdf (last visited

June 22, 2008) (concluding, based on testimony of released detainees, that 17 that the techniques used against Maher Arar in Far Falestin, Syria "constituted torture.").

b.  Complaint and Demand for Jury Trial, *Arar* v. *Ashcroft, supra* para. 33(b), paras. 49-63 (describing the detention, interrogation and torture of Maher Arar in Jordan and Syria after being rendered by the United States).

c.  Human Rights Watch, *Ghost Prisoner, supra* para. 15(c), at 15-16 (describing the detention and treatment of Marwan Jabour during his detention in a CIA "black site").

d.  First Amended Complaint, *Mohamed et al.* v. *Jeppesen Dataplan, Inc.*, 539 F. Supp. 2d 1128 (N.D. Cal. 2008) (No. 5:07-cv-02798), at 21, paras. 69-72, *available at* http://www.aclu.org/safefree/torture/31164lgl20070801.html (last visited June 22, 2008) [hereinafter First Amended Complaint, *Mohamed et al.* v. *Jeppesen Dataplan, Inc.*] (describing the detention, interrogation and torture of Binyam Mohamed after being rendered by the United States to Morocco).

e.  Amnesty International, *The Case of Khaled Al-Maqtari, supra* para. 15(b), at 16-18 (detailing the treatment of Khaled al-Maqtari during his detention in a secret CIA facility in Afghanistan).

35. The media, human rights organizations, and inter-governmental organizations have named specific countries that reportedly hosted CIA "black sites," or CIA secret facilities including Afghanistan, Iraq, Poland, Romania, Thailand.

a.  Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, N.Y. Times, Mar. 11, 2005, available        at        http://www.washingtonpost.com/ac2/wp-dyn/A25239-2005Mar10?language=printer (last visited June 24, 2008) (reporting that "Top military intelligence officials at the Abu Ghraib prison came to an agreement with the

CIA to hide certain detainees at the facility without officially registering them, according to documents obtained by The Washington Post.").

b.  Priest, *CIA Holds Terror Suspects in Secret Prisons*, *supra* para. 6(c) (reporting that the "covert prison system set up by the CIA" included "sites in eight countries, including Thailand, Afghanistan and several democracies in Eastern Europe, as well as a small center at the Guantanamo Bay prison in Cuba, according to current and former intelligence officials and diplomats from three continents.").

c.  Human Rights Watch, *Human Rights Watch Statement on U.S. Secret Detention Facilities in Europe*, Nov. 7, 2005, *available at* http://www.hrw.org/english/docs/2005/11/07/usint11995.htm (last visited June 24, 2008) ("Human Rights Watch has conducted independent research on the existence of secret detention locations that corroborates the Washington Post's allegations that there were detention facilities in Eastern Europe. Specifically, we have collected information that CIA airplanes traveling from Afghanistan in 2003 and 2004 made direct flights to remote airfields in Poland and Romania.").

d.  *Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states* (2007), *supra* para. 6(i), at §§ II, III, IV (providing evidence that the CIA operated secret prisons in Poland and Romania during the period 2002-2005).

e.  Shane, *Inside a 9/11 Mastermind's Interrogation*, *supra* para. 16(c) (noting that Khalid Sheikh Mohamed was secretly detained in Poland, "where the most important of the C.I.A.'s black sites had been established," and that Thailand was host to the first CIA "black site").

33

36. Former CIA detainees who have been released following prosecution or detention by their governments have provided comprehensive and credible public accounts of the day-to-day operation of secret U.S. prisons, including showering schedules; diet; encounters with medical personnel, psychiatrists and dentists; descriptions of interrogators and interpreters; and sketches of cells and facilities:

a. Amnesty International, *USA/Jordan/Yemen: Torture and secret detention: Testimony of the "disappeared" in the "war on terror,"* Aug. 4, 2005, *available at* http://archive.amnesty.org/library/Index/ENGAMR511082005?open&of=ENG-YEM (last visited June 22, 2008) [hereinafter *Testimony of the "disappeared" in the "war on terror,"*]; Amnesty International, *USA/Yemen: Secret Detention in CIA "Black Sites,"* Nov. 7, 2005, *available at* http://www.amnesty.org/en/library/info/AMR51/177/2005 (last visited June 22, 2008) [hereinafter *Secret Detention in CIA "Black Sites"*]; Amnesty International, *United States of America: Below the radar: Secret flights to torture and "disappearance,"* Apr. 5, 2006, at 9-17, *available at* http://www.amnestyusa.org/stoptorture/pdf/below_the_radar_full_report.pdf (last visited June 22, 2008) [hereinafter *Below the radar: Secret flights to torture and "disappearance"*] (describing the cases of former CIA detainees Mohammed al-Asad, Salah Naser Salem Ali Darwish and Mohamed Farag Ahmad Bashmilah, who have described in detail their prolonged experience in CIA secret detention in Afghanistan and unknown locations).

b. Declaration of Khaled El-Masri in Support of Plaintiff's Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment, *El-Masri* v.

*Tenet*, 437 F. Supp. 2d 530 (E.D. Va. 2006) (No. 1:05cv1417), *aff'd sub nom. El-Masri* v. *U.S.*, 479 F.3d 296 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 373 (2007), *available at* http://www.aclu.org/pdfs/safefree/elmasri_decl_exh.pdf (last visited June 24, 2008) (25-page Declaration by former CIA detainee Khaled El-Masri describing his experience in CIA detention).

c. Human Rights Watch, *Ghost Prisoner, supra* para. 15(c) (describing Marwan Jabour's experience during his detention in a CIA "black site").

d. *Mohamed et. al.* v. *Jeppesen Dataplan, Inc.*, Bashmilah Declaration, *supra* para. 33(d) (60-page Declaration outlining Mohamed Bashmilah's apprehension, transfer and detention, including with respect to the secret CIA facilities in which he was held).

e. Amnesty International, *The Case of Khaled Al-Maqtari*, *supra* para. 15(b) (outlining Khaled al-Maqtari's recollection of the secret CIA facilities in which he was held).

37. Media, foreign governments, human rights organizations and inter-governmental entities, have reported on the use of "proxy detention," or detention by foreign authorities at the behest of the United States. Such reports include information about cases of former CIA detainees who were held in proxy detention after being transferred out of CIA secret detention or following rendition:

a. Dana Priest & Dan Eggen, *Terror Suspect Alleges Torture: Detainee Says U.S. Sent Him to Egypt before Guantanamo,* Wash. Post, Jan. 6, 2005, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A51726-2005Jan5?language=printer (last visited June 24, 2008) (reporting that Australian citizen Mamdouh Habib was

held at the behest of the United States in Egypt after being rendered from Pakistan and before being sent to Guantánamo).

b. Amnesty International, *Testimony of the "disappeared" in the "war on terror," supra* para. 36(a); Amnesty International, *Secret Detention in CIA "Black Sites," supra* para. 36(a); Amnesty International, *Below the radar: Secret flights to torture and "disappearance," supra* para. 36(a) (describing how three Yemeni nationals, Mohammed al-Asad, Salah Naser Salem Ali Darwish and Mohamed Farag Ahmad Bashmilah, were sent to Yemen for continued detention at the behest of the United States after being released from CIA secret detention).

c. Attached hereto as Exhibit FF is a true and correct copy of United Nations Working Group on Arbitrary Detention Opinion 47/2005, A/HRC/4/40/Add.1, Feb. 2, 2007, 41-44 (stating with respect to the detention of Mohamed Bashmilah and Salah Nasser Salim 'Ali, that in official communications, the government of Yemen confirmed that these two individuals were handed over to Yemen by the United States and detained "...pending receipt of their [the persons'] files from the United States of America authorities in order to transfer them to the Prosecutor." (para. 15)).

d. Attached hereto as Exhibit GG is a true and correct copy of Letter from The Permanent Mission of the Republic of Yemen to the United Nations Office and Other International Organizations, to the United Nations Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism, and the United Nations Special Rapporteur On Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Dec. 20, 2005) (with English translation) (confirming that former secret CIA detainees Mohamed

Bashmilah and Salah Nasser Salim 'Ali were handed over to Yemen by the United States, that were detained by the Yemeni authorities for questioning and to verify the allegations made against them by the United States, and that on November 10, 2005, the Yemeni authorities received files on the individuals from the United States authorities.).

e.  Human Rights Watch, *Ghost Prisoner, supra* para. 15(c) (describing the transfer of former CIA detainee, Marwan Jabour from U.S. custody into Jordanian and then Israeli custody).

f.  Amnesty International et. al., *Off the Record, U.S. Responsibility for Enforced Disappearances in the "War on Terror", supra* para. 13(e), at 8, 11, 13 (describing the cases of a number of individuals once held by the CIA who had been returned to Libya for continued detention).

g.  Bergen & Tiedemann, *Disappearing Act: Rendition by the Numbers, supra* para. 14(b) (setting out the cases of a number of individuals who remained in the custody of their home governments after being returned from secret detention by the CIA).

h.  Amnesty International, *The Case of Khaled Al-Maqtari, supra* para. 15(b) (describing the transfer of former CIA detainee Khaled al-Maqtari to detention in Yemen and his subsequent release).

i.  Complaint and Demand for Jury Trial, *Arar* v. *Ashcroft, supra* para. 33(b), paras. 49-63 (describing the detention, interrogation and torture of Maher Arar in proxy detention in Syria after being rendered by the United States).

j.  First Amended Complaint, *Mohamed et al.* v. *Jeppesen Dataplan, Inc., supra* para. 34(d), at 21, paras. 69-72 (describing the detention, interrogation and torture of

Binyam Mohamed in proxy detention in Morocco after being rendered by the United
States).

## Government Statements About Attempts to Shield from Scrutiny the Rendition, Secret Detention and Interrogation Program

38. From the inception of the CIA's secret detention, interrogation and rendition activities,
those few members of Congress aware of the CIA's program, or elements of it, have
expressed frustration at the lack of information provided by the CIA:

   a. Attached hereto as Exhibit HH is a true and correct copy of Letter from Porter Goss
   and Jane Harman, U.S. House of Representatives, Permanent Select Committee on
   Intelligence, to The Honorable George Tenet, Director of Central Intelligence (Oct.
   10, 2003) ("On Thursday, October 16th, 2003, the committee will hold a full
   committee briefing on the information being obtained from terrorist detainees,
   including but not limited to, information from three of the most noticeable terrorists
   in detention, Khalid Sheik Mohammed, Abu Zubaida and [REDACTED].   The
   Committee requests that you send senior-level briefers who can provide the
   Committee a full and detailed account on this subject.  Some recent briefings to the
   Committee have been disappointing and the Committee has been frustrated with the
   quality of the information being provided.").

   b. Attached hereto as Exhibit II is a true and correct copy of Letter from Senator Patrick
   Leahy to The Honorable George Tenet, Director of Central Intelligence gency [sic]
   (Jan. 27, 2004) (stating that "On October 8, 2003, I wrote to inquire about the
   standards the Central Intelligence Agency applies to the treatment of detainees in its

custody around the world. I am afraid that the reply I received to that letter dated November 3, 2003 from General Counsel Scott Muller did not answer the specific question I posed, namely, whether the policies and practices relating to the interrogation of detainees stated in a June 25, 2003 letter to me from Defense Department Counsel William Haynes apply in full to the CIA.").

    c. Attached hereto as Exhibit JJ is a true and correct copy of Letter from Senator John D. Rockefeller IV, then Vice Chairman of the Senate Select Committee on Intelligence, to John Negroponte, Director of National Intelligence (Sept. 22, 2006), DOC 79 (seeking "confirmation," in an abundance of "caution," from the Director of National Intelligence that certain statements regarding the CIA secret prison program were unclassified, after asserting that the statements provided "important context . . . without divulging national security information"; all the statements were nevertheless classified).

39. On May 31, 2007, the Senate Select Committee on Intelligence issued its report on the fiscal year 2008 intelligence reauthorization bill, in which it expressed its concern about the lack of Congressional oversight of the CIA's detention and interrogation program, noting that "...the Administration's decision to withhold the program's existence from the full Committee membership for five years was unfortunate in that it unnecessarily hindered congressional oversight of the program" (at 36). Attached hereto as Exhibit KK is a true and correct copy of relevant pages of U.S. Senate, Select Committee on Intelligence, Report, together with additional views [To accompany S. 1538], May 31, 2007 [hereinafter *Senate Select Committee on Intelligence Report*].

40. U.S. Attorneys have admitted that CIA declarations submitted in U.S. federal court have contained inaccurate information about CIA activities when they asserted falsely that no audio/video recordings of interrogations of certain detainees had been made, and that the U.S. did not posses any such recordings. Attached hereto as Exhibit LL is a true and correct copy of Letter from Chuck Rosenberg, U.S. Attorney, to the Honorable Karen J. Williams and the Honorable Leonie Brinkema (Oct. 25, 2007) (stating that "The fact that audio/video recording of enemy combatant interrogations occurred, and that the United States was in possession of three of those recordings is, as noted, inconsistent with factual assertions in CIA declarations...").

41. CIA Director General Hayden has acknowledged that the interrogations of two individuals in the CIA program, identified separately as Abu Zubaydah and Abd al-Rahim al-Nashiri, were taped and subsequently destroyed by the CIA. *General Hayden Statement on the Taping of Early Detainee Interrogations,* Exhibit Q (CIA Director General Hayden stating that "The press has learned that back in 2002, during the initial stage of our terrorist detention program, CIA videotaped interrogations, and destroyed the tapes in 2005."). *See also* Mark Mazzetti & David Johnston, *Inquiry Begins Into Destruction of Tapes,* N.Y. Times, Dec. 9, 2007, *available at* http://www.nytimes.com/2007/12/09/washington/09zubaydah.html (last visited June 24, 2008) (referring to "new questions about which officials inside the C.I.A. were involved in the decision to destroy the videotapes, which showed severe interrogation methods used on two Qaeda suspects, Abu Zubaydah and Abd al-Rahim al-Nashiri.").

40

42. Other U.S. agencies or bodies have complained about the extent to which the CIA has denied other U.S. agencies access to information about rendition, secret detention, and interrogation:

    a. Attached hereto as Exhibit MM is a true and correct copy of the relevant pages of the *9-11 Commission Report* at 416-419 ("Current security requirements nurture over classification and excessive compartmentation of information among agencies. Each agency's incentive structure opposes sharing, with risks (criminal, civil and internal administrative sanctions) but few rewards for sharing information. No one has to pay the long-term costs of over-classifying information, though those costs – even in literal financial terms – are substantial. There are no punishments for *not* sharing information. Agencies uphold a 'need-to-know' culture of information protection rather than promoting a 'need-to-share' culture of integration." (at 417)); *see also Id.* at 103 ("The Intelligence committees [adhering to CIA classification requirements] cannot take advantage of democracy's best oversight mechanism: public disclosure.").

    b. Attached hereto as Exhibit NN is a true and correct copy of relevant passages of U.S. Dep't of Justice, Office of the Inspector General, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq,* 2008 [hereinafter DOJ OIG, *FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq*] at iii, n.4 (noting that the CIA denied the OIG access to a particular detainee and that the CIA's reasons for doing so were "unwarranted, and its lack of cooperation hampered our investigation").

43. The U.S. government is preventing former CIA detainees who were transferred to Guantánamo Bay on or around September 6, 2006 from publicly describing their own interrogation and detention by the CIA; their lawyers are also prevented from publicly discussing the CIA's treatment of these individuals:

   a. Attached hereto as Exhibit OO is a true and correct copy of relevant passages from Verbatim Transcript of Open Session Combatant Status Review Tribunal Hearing for ISN 10015 (Abd Al Rahim Hussein Mohammed Al Nashiri), Mar. 14, 2007, at 15-16, 19-21; Verbatim Transcript of Open Session Combatant Status Review Tribunal Hearing for ISN 10016 (Zayn Al Abidin Muhammad Husayn (AKA Zubaydah)), Mar. 27, 2007, at 22-26; Verbatim Transcript of Open Session Combatant Status Review Tribunal Hearing for ISN 10020 (Majid Khan) Apr. 15, 2007, at 21-22, 26, 28, 35 (redacting portions of transcript that appear to pertain to the treatment to which the detainee was subject while in the custody or control of the CIA).

   b. Attached hereto as Exhibit PP is Emergency Stipulation to Immediate Entry of Interim Guantanamo SCI Protective Order, *Khan* v. *Gates*, No. 07-1324 (D.D.C. filed Oct. 12, 2007) (U.S. Court of Appeals for the District of Columbia Circuit) (the Department of Justice's terms providing an attorney with conditional access to a former CIA detainee client provided that counsel treat all information learned from the clients as presumptively top secret/sensitive compartmentalized information and make all filings under seal pending classification review by the government).

   c. Attached hereto as Exhibit QQ is Center for Constitutional Rights (CCR), Press Release, *CCR Attorney Gives Unprecedented Classified Briefing to Senate Intelligence Committee on Details of CIA Torture Program*, Mar. 14, 2008,

(recording that on March 14, 2008, an attorney from the Center for Constitutional Rights provided the Senate Select Committee on Intelligence with a classified briefing on the operation of the CIA's secret detention and interrogation program with respect to CCR's client Majid Khan).

44. Congress has conducted hearings on the issue of over-classification and undue withholding of documents in connection with "War on Terror" activities, and Members of Congress have expressed grave concern over the CIA's withholding of information in its briefings to Congress and in otherwise obstructing access to information:

   a. Attached hereto as Exhibit RR is a true and correct copy of relevant portions of *Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, Report of the U.S. Senate Select Committee on Intelligence and U.S. House Permanent Select Committee on Intelligence*, S. Rep. No. 107-351 & H.R. Rep. No. 107-792, at xv, xvii, 124 (2002) ("prior to September 11, 2001, the U.S. Intelligence Community was involved in fighting a 'war' against Bin Ladin largely without the benefit of what some would call its most potent weapon in that effort: an alert and committed American public").

   b. Attached hereto as Exhibit SS is a true and correct copy of relevant portions of *Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing: Hearing Before the Subcomm. on Nat'l Sec., Emerging Threats, and Int'l Relations of the H. Comm. on Gov't Reform*, 108th Cong. 2 (2004) [hereinafter *Hearing on Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing*] (Christopher Shays, Chairman, stated: "Against a stateless, adaptable enemy, we dare not rely on organizational stovepipes to conclude, in advance, who should have

access to one piece of an emerging mosaic...The cold war paradigm of 'need to know' must give way to the modern strategic imperative, 'the need to share...The dangerous, if natural, tendency to hide embarrassing or inconvenient facts can mask vulnerabilities and only keeps critical information from the American people.")

c.  Attached hereto as Exhibit TT is a true and correct copy of relevant portions of Briefing Memorandum for the hearing, *Emerging Threats: Overclassification and Pseudo-Classification*, Feb. 24, 2005 (explaining that the "purpose of this hearing is to examine the proliferation of categories of information that are not classified but are withheld from public disclosure" and noting the national security challenges this presents).

d.  Attached hereto as Exhibit UU is a true and correct copy of relevant portions of *Emerging Threats: Overclassification and Pseudo-Classification: Hearing Before the Subcomm. on National Security, Emerging Threats, and International Relations of the H. Comm. on Government Reform*, 109th Cong. (2005).

**Other Publicly Available Information About Attempts to Shield from Scrutiny the Rendition, Secret Detention and Interrogation Program**

45. Former and current U.S. officials, including Frederick P. Hitz, a former CIA Inspector General from 1990 to 1998 have said that the CIA's tapes of detainee interrogations were destroyed in part to prevent legal scrutiny.

a.  Mark Mazzetti & Scott Shane, *Tapes' Destruction Hovers Over Detainee Cases*, N.Y. Times, Mar. 28, 2008, *available at* http://www.nytimes.com/2008/03/28/washington/28intel.html (last visited June 22, 2008) (quoting Hitz as saying "They thought they were saving themselves from legal

scrutiny, as well as possible danger from Al Qaeda if the tapes became public," and reporting more generally that "...in interviews in recent months with several officers involved in the decision, they said that a primary factor was the legal risks that officers shown on the tape might face.").

b. Scott Shane & Mark Mazzetti, *Tapes by C.I.A. Lived and Died To Save Image*, N.Y. Times, Dec. 30, 2007, *available at* http://www.nytimes.com/2007/12/30/washington/30intel.html (last visited June 22, 2008) (discussing the decision by the CIA to destroy tapes of detainees' interrogations).

46. Media reports have recorded the extent to which the CIA has taken steps to limit internal and external oversight of its rendition, secret detention and interrogation activities:

a. Priest, *CIA Holds Terror Suspects in Secret Prisons*, *supra* para. 6(c) (reporting that the "CIA and the White House, citing national security concerns and the value of the program, have dissuaded Congress from demanding that the agency answer questions in open testimony about the conditions under which captives are held.").

b. David Johnston & Scott Shane, *CIA Fires Senior Officer Over Leaks*, N.Y. Times, Apr. 22, 2006, *available at* http://www.nytimes.com/2006/04/22/washington/22leak.html?pagewanted=print (last visited June 22, 2008) (reporting on the dismissal of a senior career officer for disclosing information about the CIA's secret detention program and stating that "Several former veteran C.I.A. officials said the dismissal of an agency employee over a leak was rare and perhaps unprecedented.").

c.  Shane Harris, *CIA Tightens Limits on Former Employees' Ability to Speak Out*, National        Journal,        Apr.        28,        2006,        *available*        *at* http://www.govexec.com/dailyfed/0406/042806nj1.htm (last visited June 22, 2008) (stating that "The CIA has imposed new and tighter restrictions on the books, articles, and opinion pieces published by former employees who are still contractors with the intelligence agency. According to several former CIA officials affected by the new policy, the rules are intended to suppress criticism of the Bush administration and of the CIA.").

d.  Mark Mazzetti & Scott Shane, *C.I.A. Chief Orders Internal Inquiry*, Int'l Herald Trib.,        Oct.        11,        2007,        *available*        *at* http://www.iht.com/articles/2007/10/12/america/12intel.php (last visited June 22, 2008) (reporting that CIA Director General Hayden "has ordered an unusual internal inquiry into the work of the agency's inspector general, whose aggressive investigations of the CIA's detention and interrogation programs and other matters have created resentment among agency operatives.").

47. Several media organizations have sought access to the sealed statements of former CIA detainee Majid Khan describing his experience in the CIA secret detention program. Motion of the New York Times Company, the Associated Press and USA Today to Unseal, Mar. 6, 2008, Khan v. Gates, 07-1324 (D.C. Cir.), *available at http://ccrjustice.org/ourcases/current-cases/khan-v.-bush-/-khan-v.-gates* (last visited June 25, 2008) (motion by news agencies to unseal Petitioner's declarations describing his experience in the CIA secret detention and coercive interrogation program).

48. Government officials have estimated that a large proportion of classified information is improperly overclassified due to the tremendous incentives to overclassification and few for proper declassification, and Members of Congress have expressed concern about overclassification.

   a. *Report of Comm'n on Reducing and Protecting Gov't Secrecy*, S. Doc. No. 105-2, at 36 (1997) (statement of Rodney B. McDaniel) ("Moynihan Report"), *available at* http://www.gpo.gov/congress/commissions/secrecy/index.html (President Reagan's National Security Council Executive Secretary reported that he suspected only ten percent of classification was for "legitimate protection of secrets").

   b. *Hearing on Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing*, at 75, 82, 83, *available at* http://www.fas.org/sgp/congress/2004/082404transcript.pdf (last visited June 24, 2008) (Carol A. Haave, Pentagon's Deputy Under Secretary of Defense for Counter-Intelligence and Security, estimated that fifty percent of the Pentagon's documents are classified as a result of overclassification; J. William Leonard, Director, Information Security Oversight Office, noted that an inter-agency appeals panel recommended declassification against agency claims of secrecy "60-some-odd percent of the time").

   c. Cox News Service, *Lawmakers Frustrated by Delays in Declassifying Documents*, July 21, 2004, *available at* http://coxnews.com/cox/news/Rebecca_Carr/story/7003 (statement of Thomas H. Kean, Chair, 9/11 Commission) (Chair of the 9/11 Commission estimated that "three-quarters of what [he] read that was classified shouldn't have been").

47

d. Douglas Jehl, *The Reach of War: Intelligence; C.I.A. Classifies Much of a Report on Its Failings*, N.Y. Times, June 16, 2004, *available at* http://query.nytimes.com/gst/fullpage.html?res=9801E4D81E30F935A25755C0A962 9C8B63 (last visited June 22, 2008) (discussing Congressional disappointment that the CIA had redacted between 30 and 40 percent of the Senate Intelligence Committee's report on pre-war intelligence and quoting Senator Pat Roberts as saying "I feel very strongly that the great majority of this report should be made public…the American people certainly deserve to see it").

e. Editorial, *Credible Classifications*, Wash. Post, July 13, 2004, *available at* http://www.washingtonpost.com/wp-dyn/articles/A45384-2004Jul12.html (last visited June 22, 2008) (discussing the intelligence community's redactions in the Senate Intelligence Committee's report on prewar intelligence and noting the Senators' outrage, as described by Senator Trent Lott "it would be laughable if it wasn't so insulting, because they redacted half of what we had. A lot of it was to redact a word that revealed nothing.").

**Government Statements About Illegality and Improper Acts in the Rendition, Secret Detention and Interrogation Program**

49. Shortly after the decision of the U.S. Supreme Court in *Hamdan* v. *Rumsfeld* on June 29, 2006—holding that Common Article 3 of the Geneva Conventions applies to U.S. detainee operations in the "War on Terror"—the United States government had to reverse its previous analysis that Common Article 3 did not apply to "War on Terror" detainees:

a. Attached hereto as Exhibit VV is a true and correct copy of President George W. Bush, *Memorandum: Humane Treatment of al Qaeda and Taliban Detainees* (2002), *reprinted in The Torture Papers: The Road to Abu Ghraib* (2005) (containing the Administration's previous position that "I also accept the legal conclusion of the Department of Justice and determine that common Article 3 of Geneva does not apply to either al-Qaida or Taliban detainees, because, among other reasons, the relevant conflicts are international in scope and common Article 3 applies only to 'armed conflict not of an international character.'").

b. Attached hereto as Exhibit WW is a true and correct copy of relevant passages of *Hamdan* v. *Rumsfeld*, 126 S. Ct. 2749 (2006), where the Supreme Court expressly rejects the view "that the war with al Qaeda evades the reach of" (at 2795) of Common Article 3. *See id.* at 2795 - 2797 (determining that the government's position that Common Article 3 does not apply to the conflict with Al-Qaeda is "erroneous" and finding that "Common Article 3, then, is applicable here").

c. Attached hereto as Exhibit XX is a true and correct copy of Memorandum by U.S. Deputy Secretary of Defense Gordon R. England, Office of the Secretary of Defense, *Application of Common Article 3 of the Geneva Conventions to the Treatment of Detainees in the Department of Defense,* July 7, 2006 (recording that "The Supreme Court has determined that Common Article 3 to the Geneva Conventions of 1949 applies as a matter of law to the conflict with Al Qaeda" and reminding officials to "ensure that all DoD personnel adhere to these standards").

d. Attached hereto as Exhibit YY is a true and correct copy of Mark Mazzetti & Kate Zernike, *White House Says Terror Detainees Hold Basic Rights*, N.Y. Times, July 12,

2006 (quoting a July 11, 2006, White House statement that because of the Supreme Court decision, a portion of the February 7, 2002 executive order no longer applies and "The Supreme Court has clarified what the law is, and the executive branch will comply.").

50. President Bush and other U.S. officials have described the U.S. Supreme Court's decision as undermining the ability of the CIA to continue its secret detention and interrogation activities:

a. *White House News Release,* Exhibit A (President Bush noting that the decision had "…put in question the future of the CIA program" and "As we work with Congress to pass a good bill, we will also consult with congressional leaders on how to ensure that the CIA program goes forward in a way that follows the law,").

b. Attached hereto as Exhibit ZZ is a true and correct copy of White House Office of the Press Secretary, *News Release: Press Conference of the President*, Sept. 15, 2006 (stating "Now, the Court said that you've got to live under Article III of the Geneva Convention, and the standards are so vague that our professionals won't be able to carry forward the program, because they don't want to be tried as war criminals" and announcing his intention for the CIA's secret detention program to continue, but indicating that this would require a new legal foundation, stating that the "…program is not going to go forward if our professionals do not have clarity in the law" and "If Congress passes a law that does not clarify the rules…the program is not going forward").

51. Since the decision in *Hamdan* rejected the legal basis for the CIA's program, President Bush has sought to enact new measures to authorize the CIA's detention and interrogation activities:

   a. Attached hereto as Exhibit AAA is a true and correct copy of White House Office of the Press Secretary, *President Bush Signs Military Commissions Act of 2006*, Oct. 17, 2006 (quoting President Bush, envisaging that the Military Commissions Act of 2006 would provide the CIA with needed authority to operate its secret detention program, stating that "When I proposed this legislation, I explained that I would have one test for the bill Congress produced: Will it allow the CIA program to continue? This bill meets that test.").

   b. Attached hereto as Exhibit BBB is a true and correct copy of relevant provisions of the *Military Commissions Act of 2006*, Pub. L. No. 109-366, 120 Stat. 2600 (Oct. 17, 2006), enacting Chapter 47A of title 10 of the United States Code (as well as amending section 2241 of title 28), sec. 6(a)(3)(A) (statute stipulating that "As provided by the Constitution and by this section, the President has the authority for the United States to interpret the meaning and application of the Geneva Conventions and to promulgate higher standards and administrative regulations for violations of treaty obligations which are not grave breaches of the Geneva Conventions.").

   c. Attached hereto as Exhibit CCC is a true and correct copy of Exec. Order 13440, 72 C.F.R. 40707 (2007) (President Bush finding, in Sec. 3, that "I hereby determine that Common Article 3 shall apply to a program of detention and interrogation operated by the Central Intelligence Agency as set forth in this section" and that "I hereby determine that a program of detention and interrogation approved by the Director of

the Central Intelligence Agency fully complies with the obligations of the United States under Common Article 3, provided that:..." and setting out certain such conditions).

52. CIA Director General Hayden, the Department of Justice, Congress, CIA agents and other U.S. officials have identified concerns—either their own or concerns within the U.S. government generally—about the legal basis of the CIA's secret detention, rendition, and interrogation practices, and that these activities involved illegal acts:

   a. *Senate Select Committee on Intelligence Report*, Exhibit KK (U.S. Senate, Select Committee on Intelligence noting its expectation that it would receive a legal review of the program "...as part of its ongoing oversight of the program" and stating that "Both Congress and the Administration must continue to evaluate whether having a separate CIA detention program that operates under different interrogation rules than those applicable to military and law enforcement officers is necessary, lawful, and in the best interests of the United States.").

   b. *A Conversation with Michael Hayden*, Exhibit D (CIA Director General Hayden stating that the Military Commissions Act is insufficient to assuage the CIA's concerns about the legal basis for going forward with the program.)

   c. Attached hereto as Exhibit DDD is a true and correct copy of *Statement to Employees by Director of the Central Intelligence Agency, General Michael V. Hayden on Lawful Interrogation*, Feb. 13, 2008 [hereinafter *General Hayden Statement to CIA Employees on Lawful Interrogation*] (CIA Director General Hayden reporting to CIA employees that, he had affirmed, in testimony to Congress, that waterboarding "is not included in the current program, and in my own view, the view of my lawyers and the

52

Department of Justice, it is not certain that the technique would be considered to be lawful under current statute").

d. Attached hereto as Exhibit EEE is a true and correct copy of relevant passages of DOJ OIG, *FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* at 67-75 (FBI Office of the Inspector General reporting on grave concerns about the CIA's aggressive interrogation techniques against Abu Zubaydah).

e. A number of FBI agents reported that detainees at Guantánamo Bay reported that, before they were transferred to Guantánamo, they had been sent by the United States to foreign countries "for more aggressive interrogation by foreign interrogators." The destination countries included Egypt and Jordan, two countries cited year after year by the Department of State for the systemic practice of torture.[3]  Several agents also reported that they were aware of cases of threatened rendition.  Attached hereto as Exhibit FFF is a true and correct copy of relevant passages of DOJ OIG, *FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq*, at 196-198.

---

[3] *See, e.g., U.S. Dep't. of State  Country Reports on Human Rights Practices 2007: Egypt, available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100594.htm (last visited June 22, 2008); *U.S. Dep't. of State Country Reports on Human Rights Practices 2006: Egypt, available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78851.htm (last visited June 22, 2008); *U.S. Dep't. of State  Country Reports on Human Rights Practices 2005: Egypt, available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61687.htm (last visited June 22, 2008) ; *U.S. Dep't. of State Country Reports on Human Rights Practices 2007: Jordan, available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100598.htm (last visited June 22, 2008); *U.S. Dep't. of State  Country Reports on Human Rights Practices 2006: jordan, available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78855.htm(last visited June 22, 2008); *U.S. Dep't. of State Country Reports on Human Rights Practices 2005: jordan, available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61691.htm (last visited June 22, 2008).

53. President Bush, the ODNI and CIA Director General Hayden and other U.S. officials have stated that these measures were subject to multiple legal reviews by the Department of Justice as well as the CIA:

   a. Attached hereto as Exhibit GGG is a true and correct copy of Counter-Resistance Strategy Meeting Minutes, Oct. 2, 2002 (recording John Fredman, stating in relation to the CIA's use of coercive techniques that "Significantly harsh techniques are approved through the DOJ"). *See US interrogation policy condemned*, BBC News, June 18, 2008, *available at* http://news.bbc.co.uk/2/hi/americas/7460444.stm (last visited June 22, 2008) (noting that Fredman was "then chief counsel to the CIA's counter-terrorism centre.").

   b. *White House News Release,* Exhibit A (President Bush stating that "The Department of Justice reviewed the authorized methods extensively" and "This program has been subject to multiple legal reviews by the Department of Justice and CIA lawyers").

   c. *ODNI Summary of the Program,* Exhibit B (ODNI stating that "The Department of Justice has reviewed procedures proposed by the CIA on more than one occasion…").

   d. *General Hayden Statement on the Taping of Early Detainee Interrogations*, Exhibit Q (CIA Director General Hayden stating that the "…CIA designed specific, appropriate interrogation procedures. Before they were used, they were reviewed and approved by the Department of Justice and by other elements of the Executive Branch.").

   e. *General Hayden Statement to CIA Employees on Lawful Interrogation*, Exhibit DDD (CIA Director General Hayden discussing waterboarding and noting that "That tactic, which has not been employed since 2003, was deemed legal by the Department of Justice when it was used.").

54. Members of Congress have repeatedly expressed concern over the illegality and impropriety of CIA rendition, secret detention and interrogation activities, and have taken action seeking to limit such activities:

   a. In late 2005, Congressional concern over the interrogation tactics employed in the rendition and secret detention program, including waterboarding, lead to the drafting and ultimate passage of the McCain amendment, which was incorporated into the Detainee Treatment Act ("DTA") 42 U.S.C.A. § 2000dd, and signed into law. The DTA prevents anyone in the custody or physical control of the United States from being "subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C.A. § 2000dd(a). Attached hereto as Exhibit HHH is a true and correct copy of relevant provisions of the Detainee Treatment Act. *See also* Eric Schmitt, *President Backs McCain Measure on Inmate Abuse*, N.Y. Times, Dec. 16, 2005, *available at* http://www.nytimes.com/2005/12/16/politics/16detain.html (last visited June 22, 2008).

   b. Attached hereto as Exhibit III is a true and correct copy of Letter from Jan Schakowsky, John Conyers et al (56 Members of Congress) to The Honorable Michael Mukasey (June 6, 2008) (requesting that a special counsel be appointed to "investigate whether the Bush Administration's policies regarding the interrogation of detainees have violated federal criminal laws. There is mounting evidence that the Bush Administration has sanctioned enhanced interrogation techniques against detainees under the control of the United States that warrant an investigation.")

55. U.S. officials have acknowledged that several aspects of the CIA's rendition, secret detention and interrogation activities have been, or are being, subjected to internal and

external investigation into alleged impropriety and illegality, by the CIA Office of Inspector General and the Department of Justice.

a. President Bush and the ODNI have disclosed that the CIA's Inspector General has conducted oversight and investigations into the rendition and secret detention program:

   i. *White House News Release,* Exhibit A (President Bush stating that "This program has received strict oversight by the CIA's Inspector General").

   ii. *ODNI Summary of the Program,* Exhibit B (ODNI stating that "The program has been investigated and audited by the CIA's Office of the Inspector General (OIG), which was given full and complete access to all aspects of the program.").

b. The Department of Justice has also launched investigations into aspects of the CIA's program, including the CIA's destruction of videotapes of detainee interrogations. Attached hereto as Exhibit JJJ is a true and correct copy of U.S. Dep't of Justice, *Statement by Attorney General Michael B. Mukasey Regarding the Opening of an Investigation Into the Destruction of Videotapes by CIA Personnel,* Jan. 2, 2008, (announcing the initiation of a criminal investigation into the destruction of videotapes by the CIA).

56. In addition to concerns within the U.S. government about the legality of rendition and secret detention, Members of Congress have expressed other types of concerns about the CIA's activities. *Senate Select Committee on Intelligence Report,* Exhibit KK at 36 (U.S. Senate, Select Committee on Intelligence noting that "...the Committee believes that consideration should be given to whether it is the best means to obtain a full and reliable intelligence debriefing of a detainee" and that "Both Congress and the Administration

must continue to evaluate whether having a separate CIA detention program that operates under different interrogation rules than those applicable to military and law enforcement officers is necessary, lawful, and in the best interests of the United States. Moreover, the Committee believes that the demonstrated value of the program should be weighed against both the complications it causes to any ultimate prosecution of these terrorists, and the damage the program does to the image of the United States abroad.").

57. U.S. officials have also acknowledged that there is a high level of concern by the public regarding CIA activities of rendition, secret detention and interrogation:

    a. Attached hereto as Exhibit KKK is a true and correct copy of Representative Edward Markey, Press Release, *Congress Passes Markey Amendment to Prevent Funds for Torture*, Mar. 16, 2005 (noting that "[t]e resounding bipartisan support for this amendment comes in the wake of public outrage at the CIA practice of sending suspects to prisons in countries around the world that are known to violate human rights").

    b. Attached hereto as Exhibit LLL is a true and correct copy of Nat Hentoff, *Torture doublespeak Secret orders and 'renditions' cast their shadow*, Wash. Times, Mar. 21, 2005 (quoting Rep. Markey as saying: "The more the American people find out we are allowing other countries to torture in our name, there is going to be an outcry in this country.").

    c. *Director Michael Hayden's Interview with Charlie Rose*, Exhibit E (CIA Director General Hayden acknowledging the public interest in the CIA's rendition and secret detention programs and noting that "[m]any of the things this agency does on behalf of the American people have become controversial" and that CIA employees "aren't

people separated from the American political culture" and are therefore "affected by what goes on in the broader political culture when it's discussing the kind of work that they do").

## Other Publicly Available Information About Illegality and Improper Acts in the Rendition, Secret Detention and Interrogation Program

58. The media has reported on statements by U.S. officials concerning the Supreme Court's rejection of the U.S. government's determination that Common Article 3 of the Geneva Conventions did not apply to the "War on Terror":

a.  David Stout & John O'Neil, *In Big Shift, U.S. to Follow Geneva Treaty for Detainees*, N.Y. Times, July 11, 2006, *available at* http://www.nytimes.com/2006/07/11/world/11cnd-detain.html?hp&ex=1152676800&en=e36adb8e22b9523a&ei=5094&partner=homepage (last visited June 22, 2008) (referencing statements of U.S. officials and noting that "Before the court's ruling, the administration repeatedly denied that suspects held at Guantánamo Bay fell under Common Article 3.").

b.  Tim Golden, *Detainee Memo Created Divide in White House*, N.Y. Times, Oct. 1, 2006, *available at* http://www.nytimes.com/2006/10/01/washington/01detain.html?pagewanted=all (last visited June 24, 2008) (recording, in relation to the U.S.' detention policy that "Many officials said the most important factor in forcing a new approach was the Supreme Court's ruling in June that the military commissions set up by the administration

could not proceed. That decision…some officials said, left the C.I.A.'s interrogation program on even more tenuous ground.").

59. The media has reported that the CIA's Inspector General has conducted more than one investigation into the rendition and secret detention program:

a. CIA Secret Detention and Interrogation Program Shane & Mazzetti, *Tapes by C.I.A. Lived and Died to Save Image*, *supra* para. 45(b) (reporting that "Scrutiny of the C.I.A.'s secret detention program kept building. Later in 2003, the agency's inspector general, John L. Helgerson, began investigating the program, and some insiders believed the inquiry might end with criminal charges for abusive interrogations.").

b. Deaths of Detainees in CIA Custody.    Human Rights First, *Command's Responsibility: Detainee Deaths in U.S. Custody in Iraq and Afghanistan* 9 (2006), *available at* http://www.humanrightsfirst.info/pdf/06221-etn-hrf-dic-rep-web.pdf (last visited June 22, 2008) [hereinafter *Command's Responsibility*] (reporting that "Reports of internal efforts at the CIA to address detainee abuse by agents are less than encouraging. After completing a review in spring 2004 of CIA detention and interrogation procedures in Afghanistan and Iraq, the CIA Inspector General made 10 recommendations for changes, including more safeguards against abuse, to CIA Director Porter Goss. Eight of the 10 have been 'accepted,' but the changes did not apparently prevent consideration of a proposal for handling deaths of detainees in CIA custody. According to the *Washington Post* 'One proposal circulating among mid-level officers calls for rushing in a CIA pathologist to perform an autopsy and then quickly burning the body.''). *See also* Dana Priest, *CIA Avoids Scrutiny of Detainee Treatment: Afghan's Death Took Two Years to Come to Light; Agency Says*

*Abuse Claims Are Probed Fully*, Wash. Post, Mar. 3, 2005, *available at* http://www.washingtonpost.com/wp-dyn/articles/A2576-2005Mar2.html (last visited June 22, 2008) (Reporting that the "CIA's inspector general is investigating at least half a dozen allegations of serious abuse in Iraq and Afghanistan, including two previously reported deaths in Iraq, one in Afghanistan and the death at the Salt Pit, U.S. officials said.").

c. <u>Mistaken Renditions</u>.  Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, *supra* para. 32(a) (reporting that "The CIA inspector general is investigating a growing number of what it calls 'erroneous renditions,' according to several former and current intelligence officials.  One official said about three dozen names fall in that category; others believe it is fewer. The list includes several people whose identities were offered by al Qaeda figures during CIA interrogations, officials said.  One turned out to be an innocent college professor who had given the al Qaeda member a bad grade, one official said."); Associated Press, *CIA Watchdog Looks into 'Erroneous Renditions': Inspector General Investigates Cases of People Mistaken as Terror Suspects,* Dec. 27, 2005, *available at* http://www.msnbc.msn.com/id/10618427/ (last visited June 22, 2008) (reporting that "The CIA's inspector general, John Helgerson, is looking into fewer than 10 cases of potentially 'erroneous renditions,' according to a current intelligence official who spoke on condition of anonymity because the investigations are classified.").

d. <u>Drugging of CIA Prisoners</u>.  Joby Warrick, *Detainees Allege Being Drugged, Questioned: U.S. Denies Using Injections for Coercion*, Wash. Post, Apr. 22, 2008, *available* *at* http://www.washingtonpost.com/wp-

dyn/content/article/2008/04/21/AR2008042103399_pf.html (last visited June 22, 2008) (reporting that "However, the use of drugs by the CIA was discussed during a 2004 internal investigation conducted by the inspector general for coalition forces in Afghanistan.").

e. <u>Destruction of videotapes of interrogations of detainees</u>. Josh White, *Justice, CIA Begin Videotape Inquiry*, Wash. Post, Dec. 9, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/08/AR2007120800339.html (last visited June 22, 2008) (recording that in December 2007, the Department of Justice indicated that it would be working with the CIA's Inspector General's office to determine "whether a further investigation is warranted" into the agency's destruction of videotapes in 2005).

60. The media has reported that the CIA Inspector General and individual CIA agents have expressed concerns about the legal basis of the CIA's secret detention, rendition, and interrogation practices, and that these activities involved illegal acts:

a. Dana Priest, *CIA Puts Harsh Tactics on Hold, Memo on Methods Of Interrogation Had Wide Review*, Wash. Post, June 27, 2004, *available at* http://www.washingtonpost.com/wp-dyn/articles/A8534-2004Jun26.html (last visited June 22, 2008) (Reporting that by 2004, concerns had grown so intense that the CIA suspended use of certain techniques pending a legal review of the interrogation program. "Current and former CIA officers aware of the recent decision said the suspension reflects the CIA's fears of being accused of unsanctioned and illegal activities, as it was in the 1970s. The decision applies to CIA detention facilities, such as those around the world where the agency is interrogating al Qaeda leaders and their

supporters, but not military prisons at Guantanamo Bay, Cuba, and elsewhere. 'Everything's on hold,' said a former senior CIA official aware of the agency's decision. 'The whole thing has been stopped until we sort out whether we are sure we're on legal ground.'")

b.  Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at 106, *available at* http://www.newyorker.com/archive/2005/02/14/050214fa_fact6 (last visited June 22, 2008) (reporting that "Rendition was originally carried out on a limited basis, but after September 11th, when President Bush declared a global war on terrorism, the program expanded beyond recognition—becoming, according to a former C.I.A. official, 'an abomination.'")

c.  Priest, *CIA Holds Terror Suspects in Secret Prisons*, *supra* para. 6(c) (reporting that "Since [the secret detention system was conceived], the arrangement has been increasingly debated within the CIA, where considerable concern lingers about the legality, morality and practicality of holding even unrepentant terrorists in such isolation and secrecy, perhaps for the duration of their lives.").

d.  Douglas Jehl, *Report Warned C.I.A. on Tactics In Interrogation*, N.Y. Times, Nov. 9, 2005, *available at* http://www.nytimes.com/2005/11/09/politics/09detain.html (last visited June 22, 2008) (revealing that "A classified report issued last year by the Central Intelligence Agency's inspector general warned that interrogation procedures approved by the C.I.A. after the Sept. 11 attacks might violate some provisions of the international Convention Against Torture, current and former intelligence officials say. The previously undisclosed findings from the report, which was completed in

the spring of 2004, reflected deep unease within the C.I.A. about the interrogation procedures, the officials said.").

e.  R. Jeffrey Smith, *Worried CIA Officers Buy Legal Insurance*, Wash. Post, Sept. 11, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/09/10/AR2006091001286.html (last visited June 22, 2008) (noting with respect to secret CIA prisons that "some CIA officers have worried privately that they may have violated international law or domestic criminal statutes.").

f.  Suzanne Goldenberg, *CIA dissenters helped expose renditions, says inquiry chief*, Guardian, July 18, 2007, *available at* http://www.guardian.co.uk/world/2007/jul/18/usa.suzannegoldenberg (last visited June 22, 2008) (reporting that "Dick Marty, the Swiss senator who produced the Council of Europe's report on the hidden transport and detention of suspects, yesterday told a committee in the European parliament that he had received information about the secret programme from dissident officers within the upper reaches of the CIA. He said the officers were disturbed that the programme, known as renditions, led to the torture and mistreatment of detainees.").

g.  Shane, Johnston, & Risen, *Secret U.S. Endorsement of Severe Interrogations*, *supra* para. 29(a) (reporting that "From the secret sites in Afghanistan, Thailand and Eastern Europe where C.I.A. teams held Qaeda terrorists, questions for the lawyers at C.I.A. headquarters arrived daily. Nervous interrogators wanted to know: Are we breaking the laws against torture?").

h.  Mark Mazzetti & Scott Shane, *Watchdog of C.I.A. Is Subject of C.I.A. Inquiry*, N.Y.
Times,           Oct.           11,           2007,           *available*           *at*
http://www.nytimes.com/2007/10/11/washington/12intel.html (last visited June 22,
2008) (reporting that "A report by [CIA Inspector General John] Helgerson's office
completed in the spring of 2004 warned that some C.I.A.-approved interrogation
procedures appeared to constitute cruel, inhuman and degrading treatment, as defined
by the international Convention Against Torture.").

i.  Richard Esposito & Jason Ryan, *CIA Chief: We Waterboarded: Gen. Hayden
Confirms the Agency Waterboarded Three 'High-Value' Detainees*, ABC News, Feb.
5,                     2008,                     *available*                     *at*
http://abcnews.go.com/Blotter/TheLaw/story?id=4244423&page=1 (last visited June
22, 2008) (reporting that that the 2002 Presidential authorization of harsh
interrogation techniques was signed under protest by some in the intelligence
community: "[a]t the time a presidential finding was signed in 2002 approving the use
of harsh interrogation techniques including waterboarding, one of the CIA's most
senior officials registered his objections to the technique, which a senior intelligence
official failed to acknowledge today when he stated on the condition of anonymity
that the current debate over the use of the technique is troubling to intelligence
professionals. In fact, a number of intelligence professionals, current and former,
object to the use of the technique.").

j.  Scott Shane, *Waterboarding Focus of Inquiry by Justice Dept.*, N.Y. Times, Feb. 23,
2008, *available at* http://www.nytimes.com/2008/02/23/washington/23justice.html
(last visited June 22, 2008) ("The Justice Department revealed Friday that its internal

ethics office was investigating the department's legal approval for waterboarding of

Qaeda suspects by the Central Intelligence Agency and was likely to make public an

unclassified version of its report.").

k.  Associated Press, *Justice Department Opens Internal Investigation into Approval of*

*CIA        Waterboarding*,      Feb.     22,      2008,      *available      at*

http://www.foxnews.com/story/0,2933,331990,00.html?sPage=fnc/specialsections/wa

rronterror (last visited June 24, 2008) (quoting a letter dated Feb. 18, 2008, from

Marshall Jarrett, head of the Department of Justice Office of Professional

Responsibility, to Senators Durbin and Whitehouse as stating that "Among other

issues, we are examining whether the legal advice contained in those memoranda was

consistent with the professional standards that apply to Department of Justice

attorneys").

61. As of April 2006, it was reported that the CIA's Office of Inspector General had referred

a number of cases of detainee abuse to the Department of Justice for their investigation

and potential criminal prosecution. Information about these crimes is included in the

following documents:

a.  Jane Mayer, *A Deadly Interrogation: Can the CIA legally kill a prisoner?*, New

Yorker,       Nov.       14,       2005,       *available       at*

http://www.newyorker.com/archive/2005/11/14/051114fa_fact (last visited June 22,

2008) (detailing the death following CIA interrogation of "ghost detainee" Manadel

al-Jamadi and reporting that "[i]n a subsequent internal investigation, United States

government authorities classified Jamadi's death as a 'homicide,' meaning that it

resulted from unnatural causes.").

b. Human Rights First, *Command's Responsibility, supra* para. 59(b), at 1-3, 9 (reporting on numerous cases of detainee deaths in which the CIA was implicated and finding that "[d]eaths in which the CIA has been implicated (alone or jointly with Army Special Forces or Navy SEALS) have presented additional problems. Such deaths are required to be investigated by the CIA Inspector General and, if cause exists, referred to the Department of Justice for prosecution. Yet while five of the deaths in custody analyzed by Human Rights First appear to involve the CIA, only a contract worker associated with the CIA has to date faced criminal charges for his role in the death of detainees. Further, the CIA has sought to keep closed the courts-martial of Army personnel where CIA officers may be implicated, and has in military autopsies classified the circumstances of the death. These efforts have encumbered the investigation and prosecution of both CIA officials and military personnel.") (internal citations omitted).

c. Center for Human Rights and Global Justice et. al, *By the Numbers: Findings of the Detainee Abuse and Accountability Project* 16 (2006), *available at* http://chrgj.org/docs/By_The_Numbers.pdf (last visited June 22, 2008) (stating that "According to the Department of Justice, twenty cases have been referred to it by the Department of Defense or the CIA's Inspector General"; and "Justice Department officials told DAA Project researchers in April 2006 that one of the twenty persons referred to the Justice Department for prosecution was indicted: David Passaro, a CIA contractor indicted for assault in the case of an Afghan detainee beaten to death in eastern Afghanistan in June 2003. Officials said that seventeen other individuals were

still being investigated and that the department had decided not to prosecute two others."); *see also id.* at 3, 21, 26.

d. Errol Morris, *The Most Curious Thing*, N.Y. Times, May 19, 2008, *available at* http://morris.blogs.nytimes.com/2008/05/19/the-most-curious-thing/ (last visited June 22, 2008) (explaining that in the death of Manadel al-Jamadi, "It was only after the Abu Ghraib photographs were leaked to C.I.D. (the Criminal Investigation Division of the Army) that C.I.D., C.I.A., O.I.G. (Office of Inspector General) and the NCIS (Naval Criminal Investigative Service) started a joint investigation. Eventually the death of al-Jamadi was also taken up by the various military and civil commissions set up to investigate the abuses at Abu Ghraib.").

62. As with the secret detention program and CIA interrogation techniques, concerns that the post-9/11 rendition program involved illegal acts were raised very early within the U.S. government, most notably within the FBI:

a. On November 27, 2002, an FBI supervisory special agent wrote a memo analyzing the practice of sending detainees "to Jordan, Egypt, or another third country to allow those countries to employ interrogation techniques that will enable them to obtain the requisite information" under U.S. law. The agent concluded that this technique— rendition—amounted to a violation of federal criminal law: 18 U.S.C. § 2340, the federal torture statute. Further, the agent concluded that discussing a plan to render an individual "could be seen as a conspiracy to violate" the torture statute. Attached hereto as Exhibit MMM is a true and correct copy of the memo discussed in this paragraph.

b. Michael Isikoff, *Exclusive: Secret Memo – Send to be Tortured*, Newsweek, Aug. 8, 2005, *available at* http://www.newsweek.com/id/56347 (last visited June 22, 2008) (reporting on the memo discussed above).

63. The media has reported on the call by Members of Congress for the appointment of a special counsel to investigate whether the approval of harsh interrogation techniques involved the commission of crimes. *See* Joby Warrick, *Lawmakers Urge Special Counsel Probe of Harsh Interrogation Tactics,* Wash. Post, June 8, 2008, *available at* http://www.washingtonpost.com/wp-

dyn/content/article/2008/06/07/AR2008060701194_pf.html (last visited June 24, 2008) (reporting that "Nearly 60 House Democrats yesterday urged the Justice Department to appoint a special counsel to examine whether top Bush administration officials may have committed crimes in authorizing the use of harsh interrogation tactics against suspected terrorists."). *See also* Press Release, Rep. Jarrold Nadler, House Democrats Call for Investigation in the Bush Administration's Interrogation Techniques (June 9, 2008), *available                                                        at* http://www.house.gov/list/press/ny08_nadler/investiagtebushinterrogation_060908.html (last visited June 25, 2008) (quoting Rep. Nadler as saying that "It has become abundantly clear that an independent investigation into these matters is long overdue and that Justice Department lacks the political independence to conduct an impartial investigation," and that "[a] special counsel is the best way to investigate how the Bush Administration created interrogation policies that have resulted in the widespread abuse of detainees in U.S. custody and control.").

64. In addition to concerns about illegality, the media has reported that former officials have expressed additional concerns about the secret detention and rendition program:

   a. Greg Miller, *CIA Inquiry Targets Its Own Watchdog*, L.A. Times, Oct. 12, 2007, *available at* http://articles.latimes.com/2007/oct/12/nation/na-cia12 (last visited June 22, 2008) (reporting that "One former high-ranking CIA official said [CIA Inspector General John] Helgerson has not shied away from taking positions in heated internal policy debates. The former official recalled attending staff meetings in which Helgerson expressed opposition to agency involvement in handling detainees as part of the war on terrorism.").

   b. Attached hereto as Exhibit NNN is a true and correct copy of Colin Freeze, *'Extraordinary-rendition' procedure unreliable, says CIA vet who created it*, Globe and Mail, Apr. 14, 2008 (reporting that "The creator of the CIA's 'extraordinary-rendition' program says he has always distrusted interrogation intelligence flowing from the controversial practice, given that the admissions it produced were usually 'very tainted' by foreign agencies who jailed suspects at the behest of the United States.").

65. Concerns within the U.S. government about the legality of its post-9/11 rendition and secret detention policy were echoed by United Nations human rights institutions charged with monitoring compliance by countries with the human rights treaties that they ratify. Because the United States has ratified the Convention Against Torture and the International Covenant on Civil and Political Rights, the U.S. is subject to review by the U.N. Committee Against Torture and the U.N. Human Rights Committee on a periodic basis.  The U.N. Committee Against Torture (which monitors the Convention Against

Torture) and the U.N. Human Rights Committee (which monitors the International Covenant on Civil and Political Rights) have both found that the U.S. practices of rendition, secret detention, and "enhanced interrogation" were violations of these binding treaties:

a. In July 2006, the U.N. Committee Against Torture found that the U.S. policy of rendition was a violation of the Convention (paras. 20-21); determined that secret detention as practiced by the United States in the "War on Terror" was a "per se" violation of the treaty and amounted to enforced disappearance (paras. 18, 22); and stated that some of the interrogation techniques employed by the U.S. amounted to torture or to cruel, inhuman or degrading treatment or punishment (paras. 19, 24, 26). U.N. Committee Against Torture, *Consideration of Reports Submitted by States Parties Under Article 19 of Convention: Conclusions and Recommendations of the Committee Against Torture*, United States, CAT/C/USA/CO/2, July 25, 2006, *available                                                                           at* http://www.unhchr.ch/tbs/doc.nsf/898586b1dc7b4043c1256a450044f331/e2d4f5b2dc cc0a4cc12571ee00290ce0/$FILE/G0643225.DOC (last visited June 22, 2008).

b. In September 2006, the Human Rights Committee called on the United States to cease the rendition of individuals to countries where detainees face a risk of torture or cruel, inhuman or degrading treatment (para. 16); urged the United States to "immediately cease its practice of secret detention and close all secret detention facilities" (para. 12); and expressed concern that the U.S. government had "authorized for some time the use of enhanced interrogation techniques, such as prolonged stress positions and isolation, sensory deprivation, hooding, exposure to cold or heat, sleep and dietary

70

adjustments, 20-hour interrogations, removal of clothing and deprivation of all comfort and religious items, forced grooming, and exploitation of detainees' individual phobias." (para. 13) U.N. Human Rights Committee, *Consideration of Reports Submitted by States Parties Under Article 40 of the Covenant, Concluding observations of the Human Rights Committee,* United States, CCPR/C/USA/CO/3/Rev.1, Dec. 18, 2006, *available at* http://www.unhchr.ch/tbs/doc.nsf/898586b1dc7b4043c1256a450044f331/34d0a773a 44de02bc125725a0034cbdf/$FILE/G0645961.pdf (last visited June 22, 2008).

66. Several U.N. Experts responsible for monitoring specific human rights issues have criticized the U.S. rendition, secret detention, and interrogation program as practiced after 9/11, finding that it violates human rights standards binding on the United States:

    a. In August 2005, the U.N. Special Rapporteur on Torture submitted a report to the U.N. General Assembly that included an analysis of specific rendition cases and U.S. involvement therein. The report concludes that the renditions violated key provisions of the Convention Against Torture. *Interim report of Mr. Manfred Nowak, Special Rapporteur of the Commission on Human Rights on torture and other cruel, inhuman or degrading treatment or punishment,* A/60/316, Aug. 30, 2005, 9-13, *available at* http://daccessdds.un.org/doc/UNDOC/GEN/N05/476/51/PDF/N0547651.pdf?OpenEl ement (last visited June 22, 2008).

    b. In November 2007, the U.N. Special Rapporteur on the Promotion and Protection of Human Rights While Countering Terrorism submitted a report concerning his mission to the United States to the U.N. General Assembly that included an analysis of specific rendition cases and U.S. involvement therein. The report concludes that

information gathered during his mission "supports the suspicion that the CIA has been involved and continues to be involved in the extraordinary rendition of terrorism suspects and possibly other persons." (para. 38). The report calls for an end to extraordinary rendition and secret detention, and criticizes the CIA's interrogation techniques (paras. 61-63). *Report of the U.N. Special Rapporteur on the Promotion and Protection of Human Rights While Countering Terrorism, Prof. Martin Scheinin, Addendum, Mission to the United States of America,* A/HRC/6/17/Add.3, Nov. 22, 2007, *available at* http://ohchr.org/english/issues/terrorism/docs/A_HRC_6_17_add3.doc (last visited June 22, 2008).

67. Foreign governments commonly thought of as allies of the United States in the fight against terrorism also began to voice concern about the post-9/11 rendition program once reports of the practice were made public:

   a. Craig Whitlock, *New Swedish Documents Illuminate CIA Action: Probe Finds 'Rendition' Of Terror Suspects Illegal,* Wash. Post, May 21, 2005, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/05/20/AR2005052001605_pf.html (last visited June 22, 2008) (reporting on ten-month investigation into rendition of two Egyptian asylum seekers).

   b. Giles Tremlett, *Spanish Police Expose More CIA Links To Secret Flights Of Detainees,* Guardian, Nov. 15, 2005, *available at* http://www.guardian.co.uk/spain/article/0,,1642828,00.html (last visited June 22, 2008) (reporting that Spanish police have traced up to 42 suspected CIA operatives

believed to have taken part in secret flights carrying detained or kidnapped terror suspects to interrogation centers and jails in Afghanistan, Egypt, and elsewhere).

c. Craig Whitlock, *Europeans Probe Secret CIA Flights: Questions Surround Possible Illegal Transfer of Terrorism Suspects*, Wash. Post, Nov. 17, 2005, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/11/16/AR2005111602198.html (last visited June 22, 2008) (reporting that officials in Spain, Sweden, Norway and European Parliament had opened formal inquiries or demanded answers from U.S. officials about CIA rendition flights within their respective jurisdictions).

d. Éric Decouty, *La France Enquête Sur Les Avions de la CIA*, Le Figaro (France), Oct. 15,                    2007,                    *available*                    *at* http://www.lefigaro.fr/france/20060302.FIG000000200_la_france_enquete_sur_les_a vions_de_la_cia.html (last visited June 22, 2008) (reporting that officials had opened criminal investigation into use of Bourget airport by the CIA for rendition flights).

e. *Extraordinary Renditions: El Masri Testifies Before German Parliament,* Spiegel Online, June 23, 2006, *available at* http://www.spiegel.de/international/0,1518,druck-423199,00.html (last visited June 22, 2008) (reporting on German parliamentary inquiry into alleged kidnapping and secret detention of a German citizen of Lebanese descent by CIA).

f. Robert Marquand, *Europe's Rising Unease Over 'Terror War,'* Christian Sci. Monitor, Feb. 21, 2007, *available at* http://www.csmonitor.com/2007/0221/p06s01-woeu.html (last visited June 22, 2008) (reporting on European investigations into CIA

rendition flights, including inquiries in Germany, Italy, Portugal, Spain, and Switzerland).

68. Following public reports of European involvement in CIA activities, two major European inter-governmental organizations—the Council of Europe and the European Parliament—launched inquiries into CIA rendition and secret detention activities in Europe:

a. European Parliament, *Vote on Final Report on CIA Renditions in Europe*, Feb. 14, 2007, *available at* http://www.europarl.europa.eu/eplive/expert/shotlist_page/20070208SHL02914/defa ult_en.htm (last visited June 22, 2008) (reporting that the Temporary Committee on Alleged use of European countries by the CIA for the transport and illegal detention of prisoners (TDIP) concluded that "Over one thousand CIA-operated flights used European airspace from 2001 to 2005 and temporary secret detention facilities 'may have been located at US military bases' in Europe").[4]

b. Council of Europe, *'High-value' detainees were held in secret CIA detention centres in Poland and Romania, says PACE committee*, June 8, 2007, *available at* http://assembly.coe.int/ASP/Press/StopPressView.asp?ID=1924 (last visited June 22,

---

[4] *See also* TDIP Temporary (Rapporteur Giovanni Fava), Report on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners, (Jan. 30, 2007) *available at* http://www.europarl.europa.eu/comparl/tempcom/tdip/final_report_en.pdf (last visited June 22, 2008); *see also* Working Document No. 9 on Certain European Countries Analysed During the Work of the Temporary Committee, (Feb. 26, 2007) *available at* http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe382420_en.pdf (last visited June 22, 2008); Working Document No. 8 on the Companies Linked to the CIA, Aircraft Used by the CIA and the European Countries in which CIA Aircraft Have Made Stopovers, (Nov. 16, 2006) *available at* http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe380984_en.pdf (last visited June 22, 2008); Working Document No. 7 on 'Extraordinary Renditions,' (Nov. 16, 2006) *available at* http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe380593_en.pdf (last visited June 22, 2008).

2008) (reporting that the final report of the Council of Europe's Parliamentary Assembly inquiry into CIA activities in Europe "describes in detail the scope and functioning of the US's 'high-value detainees' programme, which it says was set up by the CIA 'with the co-operation of official European partners belonging to Government services' and kept secret for many years thanks to strict observance of the rules of confidentiality laid down in the NATO framework.").[5]

69. The volume of media reports on the CIA's rendition, secret detention and interrogation program, along with the reports themselves and other sources document the high level of public concern with the CIA's activities:

a. Dana Priest, *Transcript: National Security and Intelligence,* Wash. Post, Jan. 5, 2005, *available at* http://www.washingtonpost.com/wp-dyn/articles/A20184-2004Dec22.html (last visited June 22, 2008) (noting that the "so-called Torture Memo" was "withdrawn after public outcry and has recently been replaced by a new legal interpretation that is much narrower in scope and conventional in outlook").

b. Friends Committee on National Legislation: A Quaker Lobby in the Public Interest, *What are the U.S. Obligations to Prevent Torture?*, Dec. 9, 2005, *available at* http://www.fcnl.org/issues/item.php?item_id=1651&issue_id=70 (last visited June 22, 2008) (stating that "The public outcry against torture is strengthening the hand of those within the U.S. government who oppose torture and want to prohibit its use.").

c. World Public Opinion, *Americans Support Full Due-Process Rights for Terrorism Suspects: Majorities Oppose Rendition of Suspects to Countries that Practice*

---

[5] *See also Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states (2006), supra para. 6(g); and Comm. on Legal Aff. and Hum. Rts., Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states (2007), supra para. 6(i).*

*Torture,* July 17, 2006, *available at* http://www.worldpublicopinion.org/pipa/articles/home_page/228.php?nid=&id=&pnt =228&lb=hmpg1 (last visited June 22, 2008) (public opinion survey of Americans finding, among other things, that 57% of respondents believe that the U.S. "should not permit U.S. military and intelligence agencies to secretly send terrorism suspects to other countries that are known to use torture").

d. American Civil Liberties Union, Press Release, *CIA Provides Further Details on Secret Interrogation Memos,* Jan. 10, 2007, *available at* http://www.aclu.org/safefree/torture/27926prs20070110.html (last visited June 22, 2008) (discussing public outcry over the 2002 Bybee memorandum which stated that abuse does not rise to the level of torture under U.S. law unless it inflicts pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death" and noting that after such public outcry, that memorandum was rescinded by the administration in December, 2004).

e. Tommy Denton, *The Court's Continuing Challenge,* Roanoke Times, Feb. 25, 2007, *available at* http://www.roanoke.com/editorials/denton/wb/106081 (last visited June 22, 2008) (noting "public outcries against . . . travesties, including revelations of extraordinary rendition and torture").

70. By the end of 2005, as the stories of released CIA detainees emerged, the public learned about the propensity of the rendition and secret detention program to involve mistakes:

a. Scott Pelley, *CIA Flying Suspects to Torture?,* CBS News, Mar. 6, 2005, *available at* http://www.cbsnews.com/stories/2005/03/04/60minutes/main678155.shtml (last

visited June 22, 2008) (discussing the case of rendition, torture, and secret detention

victim Khaled El-Masri, who was imprisoned based on mistaken identity).

b.  Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, *supra* para. 32(a)

(recounting the evidence that the rendition and secret detention of Khaled El-Masri

was carried out by mistake).

c.  Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher

Arar, *Report of the Events Relating to Maher Arar, Analysis and Recommendations*

59 (2006), *available at* http://www.ararcommission.ca/eng/AR_English.pdf (last

visited June 22, 2008) (addressing the treatment of Maher Arar and stating that "there

is no evidence to indicate that Mr. Arar has committed any offence or that his

activities constitute a threat to the security of Canada.")

d.  Editorial, *Tortured by Mistake: The Case of Maher Arar shows why the Bush

Administration's secret detention program is wrong*, Wash. Post, Sept. 20, 2006,

*available            at*            http://www.washingtonpost.com/wp-

dyn/content/article/2006/09/19/AR2006091901547.html (last visited June 22, 2008)

(stating that "Mr. Arar's case vividly illustrates a couple of the points that veteran

military and diplomatic leaders have been trying to impress on Mr. Bush about the

dangers of the CIA program").

e.  Jane Mayer, *The Black Sites: A Rare Look Inside the CIA's Secret Interrogation

Program,* New Yorker, Aug. 13, 2007, *available at*

http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer (last visited

June 24, 2008) (reporting that Secretary of State Condoleezza Rice had conceded to

the German government that the rendition and secret detention of German citizen

77

Khaled El-Masri had been a mistake).

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of June 2008

Margaret L. Satterthwaite