# EXHIBIT AA

**HEARING OF THE SENATE SELECT COMMITTEE ON INTELLIGENCE**

*ANNUAL WORLDWIDE THREAT ASSESSMENT*

WITNESSES:

MR. MICHAEL McCONNELL, DIRECTOR OF NATIONAL INTELLIGENCE;

GENERAL MICHAEL HAYDEN, DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY;

MR. ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION;

LIEUTENANT GENERAL MICHAEL MAPLES, DIRECTOR OF THE DEFENSE INTELLIGENCE AGENCY;

MR. RANDALL FORT, ASSISTANT SECRETARY OF STATE FOR INTELLIGENCE AND RESEARCH

*CHAIRED BY: SENATOR JOHN D. ROCKEFELLER, IV (D-WV)*

*LOCATION: 216 HART SENATE OFFICE BUILDING, WASHINGTON, D.C.*

TIME: 10:00 A.M. EST
DATE: TUESDAY, FEBRUARY 5, 2008

---

SEN. ROCKEFELLER: This hearing will come to order. I would severely hope that there would be a couple other members. I think it would be courteous and in their interest and in the national interest if several of our members showed up. If they're a few minutes late, that's okay. If they don't show up, that's not so okay. And we might have something more to say about that.

In any event, we're presented with the full array of our national intelligence structure. And the intelligence community (sic) meets to hear from this community, intelligence community, about security threats facing our nation. It is appropriate that we begin this annual threat hearing and that we do it in public. We do it every year. Sometimes they've gone on for a long time. And what we've done this is time is to ask each of you, with the exception of the director, to hold your comments to five minutes, which will be very interesting in the case of the CIA, to see if that can actually be done. (Laughter.)

But anyway, you're the folks that keep us safe. We in Congress authorize and appropriate funds for what you do. The American people have a right to know where our resources are going insofar as that's appropriate, what intelligence officials consider to be the greatest threats, and what actions our government is taking to prevent those threats.

And as we've learned many times, our intelligence programs will only be successful if the American people are informed. It's a relative statement, but they have to feel that they're a part of this equation, and that's what helps us get appropriations and gets bills passed, hopefully, and makes the process work.

Today the committee will want to hear how our intelligence community assesses the immediate threats from terrorist organizations. We do

The Army Field Manual describes a subset of that universe. I've heard no one claim that the Army Field Manual exhausts all the tools that could or should be legitimately available to our republic to defend itself when it comes to questioning people who would intend our republic harm. What I would say is the Army Field Manual meets the needs of America's Army and, you know, give that to you in maybe three or four different senses.

It meets the needs of America's Army in terms of who's going to do it, which in the case of the Army Field Manual would be a relatively large population of relatively young men and women who've received good training but not exhaustive training in all potential situations. So the population of who's doing it is different than the population that would be working for me inside the CIA interrogation program.

The population of who they do it to would also be different. In the life of the CIA detention program we have held fewer than a hundred people. And only -- actually, fewer than a third of those people have had any techniques used against them -- enhanced techniques -- in the CIA program. America's Army literally today is holding over 20,000 detainees in Iraq alone. And so again there's a difference in terms of who's doing it, against whom you're doing it, and then finally in the circumstances under which you're doing the interrogation.

And I know there can be circumstances in military custody that are as protected and isolated and controlled as in our detention facilities, but in many instances that is not the case. These are interrogations against enemy soldiers, who almost always will be lawful combatants, in tactical situations, from whom you expect to get information of transient and tactical value. None of that applies to the detainees we hold, to the interrogators we have, or the information we are attempting to seek.

And so I would subscribe and support -- in fact, CIA had a chance to comment on the Army Field Manual during its development -- that the Army Field Manual does exactly what it does -- exactly what it needs to do for the United States Army. But on the face of it it would make no more sense to apply the Army's field manual to CIA -- the Army Field Manual on interrogations, then it would be to take the Army Field Manual on grooming and apply it to my agency, or the Army Field Manual on recruiting and apply it to my agency, or for that matter, take the Army Field Manual on sexual orientation and apply to my agency.

This was built to meet the needs of America's Army. We should not confine our universe of lawful interrogation to a subset of those techniques that were developed for one purpose.

SEN. ROCKEFELLER: I'm way over my time, I apologize to my colleagues.

And I call on the vice chairman.

SEN. BOND: Thank you very much, Mr. Chairman.

Following up on that, I'd like to ask Director Hayden for his comments because we've spoken about this issue and your belief that the CIA's program was essential.

23

Now the attorney general has publicly said that the CIA is no longer using waterboarding as one of its techniques.

I'd like your views on -- from your professional perspective on why you think enhanced techniques are so critical in collecting intelligence and what you would say to those who think the Army Field Manual will be just as effective, because that provision that was added in conference is out of scope and when the conference comes, when the bill comes to the Senate, I intend to attempt to strike that.

What arguments, Director Hayden? Excuse me. I'm going to say -- I'm sorry. General Hayden's had the shot. Let me direct that to Director McConnell. My apologies. I want to get another view in the game.

MR. MCCONNELL: Senator Bond, I would associate myself with the comments just made by Director Hayden with regard to lawful techniques that could be used to protect the country under -- in the appropriate circumstances. You mentioned waterboarding. That is not currently in the program that we use. The question that's always asked, is that a lawful technique, and I think as you saw the reports or participated in the hearing that the attorney general participated in last week, if there was a reason to use such a technique, you would have to make a judgment on the circumstances and the situation regarding the specifics of the event, and if such a desire was generated on the part of -- in the interests of protecting the nation, General Hayden would have to first of all have a discussion with me and we would have a dialogue about whether we should go forward and seek legal opinion. Once we agreed to that, assuming we did, we would go to the attorney general who'd making a ruling on the specifics of the situation. At that point it would be taken to the president for a decision. If a decision was taken, then the appropriate committees of the Congress would be so notified.

So in managing the process there is a universe of lawful techniques. They should be considered in defense of the nation and appropriately administered, given that we would have to use such a technique.

GEN. HAYDEN: Can I add to that, Mr. Vice Chairman?

SEN. BOND: Please.

GEN. HAYDEN: Just to put this into scale -- and I know this is -- look, this is a very difficult issue not just for the committee, but for the Senate, for the government, for my agency and for the people in my agency and for the nation at large. But let me just try to frame the discussion by pointing out a few facts.

I mentioned just a minute or two ago that in the life of the CIA detention program we've detained fewer than a hundred people. Of the people detained, fewer than a third have had any of what we call the enhanced interrogation techniques used against them. Let me make it very clear and to state so officially in front of this committee that waterboarding has been used on only three detainees. It was used on Khalid Sheikh Mohammed, it was used on Abu Zubaydah, and it was used on Nashiri. The CIA has not used waterboarding for almost five years. We used it against these three high-value detainees because of the circumstances of the time.

Very critical to those circumstances was the belief that additional catastrophic attacks against the homeland were imminent. In addition to

24

that, my agency and our community writ large had limited knowledge about al Qaeda and its workings.

Those two realities have changed. None of us up here are going to make the claim -- and I'm sure we'll get this question before we're done this morning -- "Is America safe?" And we will answer, "It is safer, but it is not yet safe." So this will never get to zero. But the circumstances under which we're operating, we believe, are, frankly, different than they were in late 2001 and early 2002.

We also have much more extensive knowledge of al Qaeda. And I've told this to the committee in other sessions. Our most powerful tool in questioning any detainee is our knowledge, that we are able to bring that knowledge to bear.

SEN. BOND: General, excuse me for interrupting. In the eight seconds I have left, I wanted to fire off a question to you and Director Mueller. We're debating retroactive immunity. People keep telling me it's wrong. I used to be a lawyer. I believe that the private parties did nothing wrong. The committee approved 13-to-2 supporting civil liability reform. How important is the support of the private parties to your agencies in getting the operational successes?

MR. MUELLER: Well, I would say, in protecting the homeland it's absolutely essential. In this -- it's absolutely essential we have the support, willing support of communication carriers. In this day and age, our ability to gain intelligence on the plans, the plots of those who wish to attack us is dependent upon us obtaining information relating to cell phones, the Internet, e-mail, wire transfers, all of these areas. My concern is that if we do not have this immunity, we will not have that willing support of the communication carriers.

I know there has been some discussion of having the government substituted as a party, but I do think that that includes -- if that were passed, it would be a disincentive still to the communication carriers to give us the support we need to do our jobs. It would entail depositions. It would entail public hearings. And there would be a substantial disincentive to corporations, communication carriers, to assist us willingly at a time when we need it more than ever. And consequently, I strongly support the provision for giving immunities to -- immunity to the communication carriers so that we do have the support of those carriers and remove the disincentives.   GEN. HAYDEN: Mr. Vice Chairman, I'd support it in two jobs, the current one and one -- job once removed at NSA, strongly support what Director Mueller has just stated with regard to carriers. But there are other relationships that we have that enable American intelligence that I'm more familiar with in my current job at the CIA.

And let me reinforce one thing that Director Mueller pointed out.

These are very fragile relationships. We lost industrial cooperation, at CIA, with partners on the mere revelation of the SWIFT program in public discourse. Not because they were doing anything related to that program whatsoever but just the fear that the vulnerability they would have to their smooth functioning of their business had caused people, who are otherwise patriotic and committed, to back away from their totally lawful cooperation with our agency.

SEN. BOND:  Thank you.

My apologies, Mr. Chairman, but I thought that was important to get that in.

SEN. ROCKEFELLER:  You bet, it's very important.  I appreciate it.

And going on the early bird rule, as we always do, Senator Feinstein.

SEN. DIANNE FEINSTEIN (D-CA):  Thank you very much, Mr. Chairman.

General Hayden, I wasn't going to discuss this but since it was raised, it is true that you have briefed the Intelligence Committee on the interrogation techniques which are called enhanced, which I call coercive.  And they have changed and they have been reduced in number.

I'd like to ask this question.  Who carries out these techniques?  Are they government employees or contractors?

GEN. HAYDEN:  At our facilities during this, we have a mix of both government employees and contractors.  Everything is done under, as we've talked before, ma'am, under my authority and the authority of the agency.  But the people at the locations are frequently a mix of both.  We call them bluebaggers and greenbaggers.

SEN. FEINSTEIN:  And where do you use only contractors?

GEN. HAYDEN:  I'm not aware of any facility in which there were only contractors.

And this came up, and I know --

SEN. FEINSTEIN:  (Off mike) -- anywhere in the world?    GEN. HAYDEN:  Oh, I mean, I'm talking about our detention facilities.

And I want to make something very clear because I don't think it was quite crystal clear in the discussion you had with Attorney General Mukasey.  We are not outsourcing this.  This is not where we would turn to Firm X, Y or Z and say, this is what we would like you to accomplish; go achieve that for us and come back when you're done.  That is not what this is.  This is a governmental activity under governmental direction and control, in which the participants may be both government employees and contractors, but it's not outsourced.

SEN. FEINSTEIN:  I understand that.

GEN. HAYDEN:  Okay, good.

SEN. FEINSTEIN:  Is not the person that carries out the actual interrogation -- not the doctor or the psychologist or the supervisor or anybody else but the person that carries out the actual interrogation -- a contractor?

GEN. HAYDEN:  Again there are times when the individuals involved are contractors, and there are times when the individuals involved have been government employees.  It's been a mix, ma'am.