# EXHIBIT LL

~~TOP SECRET//HCS//ORCON/NOFORN//MR~~

NOV - 9 2007



**U.S. Department of Justice** ~~U.S. DISTRICT~~
**United States Attorney** ~~EXANDRIA, VIRGI~~
*Eastern District of Virginia*

2100 Jamieson Avenue          (703)299-3700
Alexandria, Virginia 22314

October 25, 2007

FILED WITH THE
COURT SECURITY OFFICER
CSO: *Macisso*
DATE: *10/26/07*

Hon. Karen J. Williams
Chief Judge
United States Court of Appeals
 for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219-3517

Hon. Leonie M. Brinkema
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314-5799

<u>Hand-delivered via Court Security Officer</u>

    Re:    <u>United States v. Zacarias Moussaoui</u>
           Fourth Circuit Docket Nos. 03-4792, 06-4494
           District Court Case No. 01-455-A

Dear Chief Judge Williams and Judge Brinkema:

        The Government respectfully submits this letter to inform the Court that two *ex parte*
declarations previously submitted by the Central Intelligence Agency ("CIA") in this case contain
factual errors concerning whether interrogations of certain enemy combatants were audio or
video recorded. The errors, described more fully below, do not prejudice the defendant in light
of his guilty plea, extensive admissions in the penalty phase, and the jury's decision not to
impose a death sentence. We advise both Courts because the declarations in question were filed
in the District Court and included in appendices filed in the Fourth Circuit.

~~Derived from: Multiple Sources~~
~~Declassify on: 25X1 Human~~

~~TOP SECRET//HCS//ORCON/NOFORN//MR~~

Recently, we learned that the CIA obtained three recordings (two video tapes and one short audio tape) of interviews of █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ We are unaware of recordings involving the other enemy combatant witnesses at issue in this case ████████████████████████████████████████████ Further, the CIA came into possession of the three recordings under unique circumstances involving separate national security matters unrelated to the Moussaoui prosecution.

On September 13, 2007, an attorney for the CIA notified us of the discovery of a video tape of the interrogation of ███████████████████████████████████████ On September 19, 2007, we viewed the video tape and a transcript █████████████████ of the interview. The transcript contains no mention of Moussaoui or any details of the September 11 plot. In other words, the contents of the interrogation have no bearing on the Moussaoui prosecution.[2] The existence of the video tape, however, is at odds with statements in two CIA declarations submitted in this case, as discussed in detail below.

After learning of the existence of the first video tape, we requested the CIA to perform an exhaustive review to determine whether it was in possession of any other such recordings for any of the enemy combatant witnesses at issue in this case. CIA's review, which now appears to be complete, uncovered the existence of a second video tape, as well as a short audio tape, both of which pertained to interrogations █████████████████████████████ On October 18, 2007, we viewed the second video tape and listened to the audio tape, while reviewing transcripts

---

[1]   ███████████ was one of the enemy combatant witnesses whom Moussaoui wanted to call to testify on his behalf; ████████████████████████████████████████████████ ████████████████████████████████████████████████

[2]   The recording from ████████████████████████████████████

[3]   ████████████████████████████████████████

███████████ Like the first video tape, the contents of the second video tape and the audio tape have no bearing on the Moussaoui prosecution — they neither mention Moussaoui nor discuss the September 11 plot. We attach for the Courts' review *ex parte* a copy of the transcripts for the three recordings.[5]

At our request, CIA also provided us with intelligence cables pertaining to the interviews recorded on the two video tapes. Because we reviewed these cables during our discovery review, we wanted to ensure that the cables accurately captured the substance of the interrogations. Based on our comparison of the cables to the ███████████ videotapes, and keeping in mind that the cables were prepared for the purposes of disseminating intelligence, we found that the intelligence cables accurately summarized the substance of the interrogations in question.

The fact that audio/video recording of enemy combatant interrogations occurred, and that the United States was in possession of three of those recordings is, as noted, inconsistent with factual assertions in CIA declarations dated May 9, 2003 (the "May 9 Declaration"), and November 14, 2005 (the "November 14 Declaration"). The May 9 Declaration arose after the Fourth Circuit directed the District Court to consider substitutions under the Classified Information Procedures Act ("CIPA") in lieu of enemy combatant testimony sought by the defendant. In an ensuing CIPA hearing, on May 7, 2003, Judge Brinkema ordered the Government to determine, *inter alia*, whether interrogations ███████████ were recorded. *See* 5/7/03 Tr. 11-13, 69. Two days later, the Government filed the May 9 Declaration, which was *ex parte* and accompanied by a motion under CIPA § 4 to make a limited disclosure to the defense of only the answers to the District Court's questions (but not the full explanations contained in the declaration). Judge Brinkema granted the § 4 motion, permitting the Government to make the following disclosure, among others, to the defense:

---

[4] The transcript of the audio tape previously existed and was contained within an intelligence cable.

[5] Although we have provided defense counsel with a copy of this letter, we have not provided them with a copy of the transcripts for two reasons. First, the interviews address other national security matters for which defense counsel lack a need to know. ███████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Derived from: Multiple Sources
Declassify on: 25X1 Human

Question:    Whether the interrogations █████ are being recorded in any format?

Answer:    No.

*See* Docket No. 905 (Attachment A).[6]

The November 14 Declaration arose after the Fourth Circuit published its decision in *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004), and after Moussaoui pleaded guilty. Following these events, and in anticipation of the penalty-phase trial, the District Court ordered the Government to disclose various information ███████████████████████ including whether interrogations █████ were recorded. *See* 5/2/05 Order (Docket No. 1275). Judge Brinkema subsequently reconsidered most of that order, at the Government's request (*see* Docket No. 1282), but still directed the Government to "confirm or deny that it has video or audio tapes of these interrogations," *see* 11/3/05 Order (Docket No. 1359), at 4. The November 14 Declaration ensued, in which a CIA executive stated that the "U.S. Government does not have any video or audio tapes of the interrogations of ████████████████████" *See* 11/14/05 Declaration (Docket No. 1369), at 3.

Unbeknownst to the authors of the declarations, the CIA possessed the three recordings at the time that the Declarations were submitted. We asked the CIA to ascertain the reason for such an error. ███████████████████████████ As best as can be determined, it appears that the authors of the Declarations relied on assurances of the component of the CIA that ████████████ unknowing that a different component of the CIA had contact with ███████████████

As noted above, the errors in the CIA declarations at issue, although unfortunate, did not prejudice Moussaoui, who pled guilty, reiterated his guilt in substantial admissions in the penalty phase, and ultimately received a life sentence after the jury declined to sentence him to death.

---

[6] This response was cited by the District Court in an opinion, dated May 15, 2003. *See* Docket No. 925, at 9. Both the response and the May 15 opinion were included in the classified Supplemental Joint Appendix filed with the Fourth Circuit. *See* SC 249, 273. The May 9 Declaration was included in the classified Supplemental *Ex Parte* Appendix filed with the Fourth Circuit on May 23, 2003, in docket number 03-4162. *See* SGX,
at 17-23.

~~Derived from: Multiple Sources~~
~~Declassify on: 25X1-Human~~

~~TOP SECRET//HCS//ORCON//NOFORN//MR~~

~~TOP SECRET//HCS//ORCON/NOFORN//MR~~                    Page 5 of 5

We bring the errors to the Court's attention, however, as part of our obligation of candor to the Court.

The Government will promptly apprise the Court of any further developments.

Sincerely,

Chuck Rosenberg
United States Attorney

By: 

David Novak
David Raskin
Assistant United States Attorneys


cc:    Justin Antonipillai, Esq.
       Barbara Hartung, Esq.
       Appellate Counsel for Zacarias Moussaoui
       (without transcripts)


~~Derived from: Multiple Sources~~
~~Declassify on: 25X1-Human~~
~~TOP SECRET//CRU-GST//HCS//ORCON/NOFORN//MR~~

# EXHIBIT MM

# THE 9/11
# COMMISSION
# REPORT

# CONTENTS

*List of Illustrations and Tables   ix*

*Member List    xi*

*Staff List    xiii–xiv*

*Preface   xv*

1. "WE HAVE SOME PLANES"   1
   1.1   Inside the Four Flights   1
   1.2   Improvising a Homeland Defense   14
   1.3   National Crisis Management   35

2. THE FOUNDATION OF THE NEW TERRORISM   47
   2.1   A Declaration of War   47
   2.2   Bin Ladin's Appeal in the Islamic World   48
   2.3   The Rise of Bin Ladin and al Qaeda (1988–1992)   55
   2.4   Building an Organization, Declaring
          War on the United States (1992–1996)   59
   2.5   Al Qaeda's Renewal in Afghanistan (1996–1998)   63

3. COUNTERTERRORISM EVOLVES   71
   3.1   From the Old Terrorism to the New:
          The First World Trade Center Bombing   71
   3.2   Adaptation—and Nonadaptation—
          in the Law Enforcement Community   73
   3.3   . . . and in the Federal Aviation Administration   82
   3.4   . . . and in the Intelligence Community   86

v

3.5 . . . and in the State Department and the Defense Department  93
3.6 . . . and in the White House  98
3.7 . . . and in the Congress  102

4. RESPONSES TO AL QAEDA'S INITIAL ASSAULTS  108
    4.1 Before the Bombings in Kenya and Tanzania  108
    4.2 Crisis: August 1998  115
    4.3 Diplomacy  121
    4.4 Covert Action  126
    4.5 Searching for Fresh Options  134

5. AL QAEDA AIMS AT THE AMERICAN HOMELAND  145
    5.1 Terrorist Entrepreneurs  145
    5.2 The "Planes Operation"  153
    5.3 The Hamburg Contingent  160
    5.4 A Money Trail?  169

6. FROM THREAT TO THREAT  174
    6.1 The Millennium Crisis  174
    6.2 Post-Crisis Reflection: Agenda for 2000  182
    6.3 The Attack on the USS Cole  190
    6.4 Change and Continuity  198
    6.5 The New Administration's Approach  203

7. THE ATTACK LOOMS  215
    7.1 First Arrivals in California  215
    7.2 The 9/11 Pilots in the United States  223
    7.3 Assembling the Teams  231
    7.4 Final Strategies and Tactics  241

8. "THE SYSTEM WAS BLINKING RED"  254
    8.1 The Summer of Threat  254
    8.2 Late Leads—Mihdhar, Moussaoui, and KSM  266

9. HEROISM AND HORROR  278
    9.1 Preparedness as of September 11  278
    9.2 September 11, 2001  285
    9.3 Emergency Response at the Pentagon  311
    9.4 Analysis  315

vi

10. WARTIME  325
    10.1  Immediate Responses at Home  326
    10.2  Planning for War  330
    10.3  "Phase Two" and the Question of Iraq  334

11. FORESIGHT—AND HINDSIGHT  339
    11.1  Imagination  339
    11.2  Policy  348
    11.3  Capabilities  350
    11.4  Management  353

12. WHAT TO DO? A GLOBAL STRATEGY  361
    12.1  Reflecting on a Generational Challenge  361
    12.2  Attack Terrorists and Their Organizations  365
    12.3  Prevent the Continued Growth of Islamist Terrorism  374
    12.4  Protect against and Prepare for Terrorist Attacks  383

13. HOW TO DO IT? A DIFFERENT WAY OF
    ORGANIZING THE GOVERNMENT  399
    13.1  Unity of Effort across the Foreign-Domestic Divide  400
    13.2  Unity of Effort in the Intelligence Community  407
    13.3  Unity of Effort in Sharing Information  416
    13.4  Unity of Effort in the Congress  419
    13.5  Organizing America's Defenses in the United States  423

*Appendix A: Common Abbreviations*  429
*Appendix B: Table of Names*  431
*Appendix C: Commission Hearings*  439
*Notes*  449

- The post-9/11 Afghanistan precedent of using joint CIA-military teams for covert and clandestine operations was a good one. We believe this proposal to be consistent with it. Each agency would concentrate on its comparative advantages in building capabilities for joint missions. The operation itself would be planned in common.

- The CIA has a reputation for agility in operations. The military has a reputation for being methodical and cumbersome. We do not know if these stereotypes match current reality; they may also be one more symptom of the civil-military misunderstandings we described in chapter 4. It is a problem to be resolved in policy guidance and agency management, not in the creation of redundant, overlapping capabilities and authorities in such sensitive work. The CIA's experts should be integrated into the military's training, exercises, and planning. To quote a CIA official now serving in the field: "One fight, one team."

**Recommendation: Finally, to combat the secrecy and complexity we have described, the overall amounts of money being appropriated for national intelligence and to its component agencies should no longer be kept secret. Congress should pass a separate appropriations act for intelligence, defending the broad allocation of how these tens of billions of dollars have been assigned among the varieties of intelligence work.**

The specifics of the intelligence appropriation would remain classified, as they are today. Opponents of declassification argue that America's enemies could learn about intelligence capabilities by tracking the top-line appropriations figure. Yet the top-line figure by itself provides little insight into U.S. intelligence sources and methods. The U.S. government readily provides copious information about spending on its military forces, including military intelligence. The intelligence community should not be subject to that much disclosure. But when even aggregate categorical numbers remain hidden, it is hard to judge priorities and foster accountability.

## 13.3 UNITY OF EFFORT IN SHARING INFORMATION

### Information Sharing

We have already stressed the importance of intelligence analysis that can draw on all relevant sources of information. The biggest impediment to all-source analysis—to a greater likelihood of connecting the dots—is the human or systemic resistance to sharing information.

The U.S. government has access to a vast amount of information. When databases not usually thought of as "intelligence," such as customs or immigra-

tion information, are included, the storehouse is immense. But the U.S. gov-
ernment has a weak system for processing and using what it has. In interviews
around the government, official after official urged us to call attention to frus-
trations with the unglamorous "back office" side of government operations.

In the 9/11 story, for example, we sometimes see examples of information
that could be accessed—like the undistributed NSA information that would
have helped identify Nawaf al Hazmi in January 2000. But someone had to ask
for it. In that case, no one did. Or, as in the episodes we describe in chapter 8,
the information is distributed, but in a compartmented channel. Or the infor-
mation is available, and someone does ask, but it cannot be shared.

What all these stories have in common is a system that requires a demon-
strated "need to know" before sharing. This approach assumes it is possible to
know, in advance, who will need to use the information. Such a system implic-
itly assumes that the risk of inadvertent disclosure outweighs the benefits of
wider sharing. Those Cold War assumptions are no longer appropriate. The cul-
ture of agencies feeling they own the information they gathered at taxpayer
expense must be replaced by a culture in which the agencies instead feel they
have a duty to the information—to repay the taxpayers' investment by making
that information available.

Each intelligence agency has its own security practices, outgrowths of the
Cold War. We certainly understand the reason for these practices. Counterin-
telligence concerns are still real, even if the old Soviet enemy has been replaced
by other spies.

But the security concerns need to be weighed against the costs. Current
security requirements nurture overclassification and excessive compartmenta-
tion of information among agencies. Each agency's incentive structure opposes
sharing, with risks (criminal, civil, and internal administrative sanctions) but few
rewards for sharing information. No one has to pay the long-term costs of over-
classifying information, though these costs—even in literal financial terms—
are substantial. There are no punishments for *not* sharing information. Agencies
uphold a "need-to-know" culture of information protection rather than pro-
moting a "need-to-share" culture of integration.[15]

**Recommendation: Information procedures should provide incentives
for sharing, to restore a better balance between security and shared
knowledge.**

Intelligence gathered about transnational terrorism should be processed,
turned into reports, and distributed according to the same quality standards,
whether it is collected in Pakistan or in Texas.

The logical objection is that sources and methods may vary greatly in dif-
ferent locations. We therefore propose that when a report is first created, its data
be separated from the sources and methods by which they are obtained. The

report should begin with the information in its most shareable, but still mean-
ingful, form. Therefore the maximum number of recipients can access some
form of that information. If knowledge of further details becomes important,
any user can query further, with access granted or denied according to the rules
set for the network—and with queries leaving an audit trail in order to deter-
mine who accessed the information. But the questions may not come at all
unless experts at the "edge" of the network can readily discover the clues that
prompt to them.[16]

We propose that information be shared horizontally, across new networks
that transcend individual agencies.

- The current system is structured on an old mainframe, or hub-and-
  spoke, concept. In this older approach, each agency has its own data-
  base. Agency users send information to the database and then can
  retrieve it from the database.

- A decentralized network model, the concept behind much of the
  information revolution, shares data horizontally too. Agencies would
  still have their own databases, but those databases would be searchable
  across agency lines. In this system, secrets are protected through the
  design of the network and an "information rights management"
  approach that controls access to the data, not access to the whole net-
  work. An outstanding conceptual framework for this kind of "trusted
  information network" has been developed by a task force of leading
  professionals in national security, information technology, and law
  assembled by the Markle Foundation. Its report has been widely dis-
  cussed throughout the U.S. government, but has not yet been con-
  verted into action.[17]

**Recommendation: The president should lead the government-wide
effort to bring the major national security institutions into the infor-
mation revolution. He should coordinate the resolution of the legal,
policy, and technical issues across agencies to create a "trusted infor-
mation network."**

- No one agency can do it alone. Well-meaning agency officials are
  under tremendous pressure to update their systems. Alone, they may
  only be able to modernize the stovepipes, not replace them.

- Only presidential leadership can develop government-wide concepts
  and standards. Currently, no one is doing this job. Backed by the Office
  of Management and Budget, a new National Intelligence Director
  empowered to set common standards for information use throughout
  the community, and a secretary of homeland security who helps

extend the system to public agencies and relevant private-sector data-
bases, a government-wide initiative can succeed.

- White House leadership is also needed because the policy and legal
  issues are harder than the technical ones. The necessary technology
  already exists. What does not are the rules for acquiring, accessing,
  sharing, and using the vast stores of public and private data that may
  be available. When information sharing works, it is a powerful tool.
  Therefore the sharing and uses of information must be guided by a
  set of practical policy guidelines that simultaneously empower and
  constrain officials, telling them clearly what is and is not permitted.

"This is government acting in new ways, to face new threats," the most
recent Markle report explains. "And while such change is necessary, it must be
accomplished while engendering the people's trust that privacy and other civil
liberties are being protected, that businesses are not being unduly burdened
with requests for extraneous or useless information, that taxpayer money is
being well spent, and that, ultimately, the network will be effective in protect-
ing our security." The authors add: "Leadership is emerging from all levels of
government and from many places in the private sector. What is needed now
is a plan to accelerate these efforts, and public debate and consensus on the
goals."[18]

## 13.4 UNITY OF EFFORT IN THE CONGRESS

### Strengthen Congressional Oversight of Intelligence and Homeland Security

Of all our recommendations, strengthening congressional oversight may be
among the most difficult and important. So long as oversight is governed by
current congressional rules and resolutions, we believe the American people
will not get the security they want and need. The United States needs a strong,
stable, and capable congressional committee structure to give America's
national intelligence agencies oversight, support, and leadership.

Few things are more difficult to change in Washington than congressional
committee jurisdiction and prerogatives. To a member, these assignments are
almost as important as the map of his or her congressional district. The Amer-
ican people may have to insist that these changes occur, or they may well not
happen. Having interviewed numerous members of Congress from both par-
ties, as well as congressional staff members, we found that dissatisfaction with
congressional oversight remains widespread.

The future challenges of America's intelligence agencies are daunting. They
include the need to develop leading-edge technologies that give our policy-

# EXHIBIT
# NN

**U.S. Department of Justice**
Office of the Inspector General

# A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq



Oversight and Review Division
Office of the Inspector General
May 2008

UNCLASSIFIED

The OIG also interviewed more than 230 witnesses and reviewed over 500,000 pages of documents provided by the FBI, other components of the Department of Justice (DOJ), and the Department of Defense (DOD). OIG employees made two trips to GTMO to tour the detention facilities, review documents, and interview witnesses, including five detainees held there. We also interviewed one released detainee by telephone.[3]

Our review focused primarily on the activities and observations of FBI agents deployed to military facilities under the control of the Department of Defense between 2001 and 2004. With limited exceptions, we were unable to and did not investigate the conduct or observations of FBI agents regarding detainees held at CIA facilities for several reasons. First, we were unable to obtain highly classified information about CIA-controlled facilities, what occurred there, and what legal authorities governed their operations. Second, during the course of our review we learned that in January 2003 the CIA Inspector General had initiated a review of the CIA terrorist detention and interrogation program. Therefore, our review focused mainly on the conduct and observations of the approximately 1,000 FBI employees related to detainee interviews in military zones.

## A.     Organization of Report

The OIG's complete report, which contains the full results of our review, has been classified by the relevant government agencies at the Top Secret/SCI level. The full report contains 12 chapters. The first three chapters provide introductory and background information, including a description of the role of the FBI in the military zones and the various FBI interrogation policies in place at the time of the September 11 attacks. Chapter Four discusses the FBI's involvement in the joint interrogation of a "high value detainee," Zayn Abidin Muhammed Hussein Abu Zubaydah, shortly after his capture, and the subsequent deliberations within the FBI regarding the participation of its agents in joint interrogations with agencies that did not follow FBI interview policies.[4] Chapter Five examines the dispute between the FBI and the

---

as DOD or CIA personnel, who would have been necessary to make such a determination.

[3] In addition, the OIG examined prior reports addressing the issue of detainee treatment in the military zones. Among the most significant of those reports were the *Church Report*, a review of DOD interrogation operations conducted in 2004 and 2005 by the DOD, and the *Schmidt-Furlow Report*, a DOD investigation in 2005 into allegations of detainee abuse at GTMO.

[4] When the OIG investigative team was preparing for its trip to GTMO in early 2007, we asked the DOD for permission to interview several detainees, including

(Cont'd.)

DOD regarding the treatment of another detainee held at GTMO, Muhammad Al-Qahtani. The dispute regarding Al-Qahtani arose from the tension between the differing interrogation techniques employed by the FBI and the military. This dispute was elevated to higher-level officials and eventually resolved in favor of the DOD's approach.

Chapter Six examines the FBI's response to the public disclosure of detainee mistreatment at Abu Ghraib prison in Iraq and related concerns expressed by FBI agents in the military zones. These responses included issuance of the FBI's May 2004 Detainee Policy, which reminded FBI agents not to use force, threats, or abuse in detainee interviews and instructed FBI agents not to participate in joint interviews in which other agencies were using techniques that were not in compliance with FBI rules. The FBI also conducted an internal review to determine the extent of the FBI's knowledge regarding detainee mistreatment. The seventh chapter discusses the communication of FBI policies to FBI employees who were deployed in military zones, including the FBI's efforts to provide training and guidance to its agents on appropriate interrogation techniques.

Chapters Eight, Nine, and Ten detail the results of the OIG's survey and investigation into what FBI agents saw, heard about, and reported with respect to detainee interrogations in GTMO, Afghanistan, and Iraq.

---

Zubaydah. The DOD agreed, stating that our interviews would not interfere with their attempts to obtain any intelligence from the detainees, including Zubaydah. However, the CIA Acting General Counsel objected to our interviewing Zubaydah. ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  In addition, the CIA Acting General Counsel asserted that the OIG had not persuaded him that the OIG had a "demonstrable and immediate need to interview Zubaydah at that time" given what the Acting General Counsel understood to be the OIG's "investigative mandate." In addition, the CIA Acting General Counsel asserted that Zubaydah could make false allegations against CIA employees. We believe that none of these reasons were persuasive or warranted denying us access to Zubaydah. First, neither the FBI nor the DOD objected to our access to Zubaydah at that time. In addition, neither the FBI nor the DOD stated that an OIG interview would interfere with their interviews of him. Second, at GTMO we were given access to other high value detainees. Third, we did have a demonstrable and immediate need to interview Zubaydah at that time, as well as the other detainees who we were given access to, notwithstanding the CIA Acting General Counsel's position that we had not persuaded him. Finally, the fact that Zubaydah could make false allegations against CIA employees – as could other detainees – was not in our view a legitimate reason to object to our access to him. In sum, we believe that the CIA's reasons for objecting to OIG access to Zubaydah were unwarranted, and its lack of cooperation hampered our investigation.

# EXHIBIT OO

UNCLASSIFIED

**Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10015**

## OPENING

REPORTER:        On the record.

RECORDER:        All rise.

PRESIDENT:       Remain seated and come to order.  Proceed, Recorder.

RECORDER:        This Tribunal is being conducted at 0813, 14 March 2007 on board U.S. Naval
                 Base Guantanamo Bay, Cuba. The following personnel are present:
                 Captain [REDACTED], United States Navy, President
                 Lieutenant Colonel [REDACTED], United States Air Force, Member
                 Lieutenant Colonel [REDACTED], United States Marine Corps, Member
                 Lieutenant Commander [REDACTED], United States Navy, Personal
                 Representative
                 [REDACTED], Translator
                 Gunnery Sergeant [REDACTED], United States Marine Corps, Reporter
                 Lieutenant Commander [REDACTED], United States Navy, Recorder
                 Captain [REDACTED] is the Judge Advocate member of the Tribunal.

## OATH SESSION 1

RECORDER:        All Rise.

PRESIDENT:       The Recorder will be sworn.  Do you, Lieutenant Commander [REDACTED],
                 solemnly swear to carry out the duties as Recorder assigned in this Tribunal so
                 help you God?

RECORDER:        I do.

PRESIDENT:       The Reporter will now be sworn.  The Recorder will administer the oath.

RECORDER:        Do you, Gunnery Sergeant [REDACTED], swear that you will faithfully
                 discharge your duties as assigned in this Tribunal so help you God?

REPORTER:        I do.

PRESIDENT:       The Translator will be sworn.

RECORDER:        Do you swear or affirm that you will faithfully perform the duties of Translator in
                 the case now in hearing, so help you God?

ISN #10015<br>
Enclosure (3)<br>
Page 1 of 36

UNCLASSIFIED

**UNCLASSIFIED**

TRANSLATOR:      (TRANSLATION OF ABOVE).

PRESIDENT:      You stated that you were tortured into confession by your captors.  And, that you made certain statements in order to stop the torture?

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): Yes.

PRESIDENT:      Alright.  I need some more details about that.

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): I have a lot of information.

PRESIDENT:      Alright.  I'll ask questions and then please respond to them.

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): Okay.

PRESIDENT:      Do you know, the ah, who your captors were?

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): No.  I do not.

PRESIDENT:      Were they Americans, Yemenis?

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): They were Americans.

PRESIDENT:      And ah.  When did this occur?

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): From the time I was arrested five years ago, they have been torturing me.  It happened during interviews.  One time they tortured me one way and another time they tortured me in a different way.

ISN #10015
Enclosure (3)
Page 15 of 36

**UNCLASSIFIED**

UNCLASSIFIED

PRESIDENT:          Please describe the methods that were used.

TRANSLATOR:         (TRANSLATION OF ABOVE).

DETAINEE
(through translator):  [REDACTED].  What else do I want to say?  . [REDACTED] Many things
                    happened.  There were doing so many things.  What else did they did?

                    [REDACTED].  They do so many things.  So so many things.  What else did they
                    did?

                    [REDACTED].  After that another method of torture began.  [REDACTED] They
                    used to ask me questions and the investigator after that used to laugh.  And, I used
                    to answer the answer that I knew.  And, if I didn't reply what I heard, he used to
                    [REDACTED].  So many things happened.  I don't in summary, that's basically
                    what happened.

PRESIDENT:          Alright.  Let me ask.  So then since the time of capture 2002 until you came to
                    Guantanamo you experienced these types of events?

TRANSLATOR:         (TRANSLATION OF ABOVE).

DETAINEE
(through translator):  Yes.

PRESIDENT:          Are you under any pressure or duress today?

TRANSLATOR:         (TRANSLATION OF ABOVE).

DETAINEE
(through translator):  No.  Not today.

PRESIDENT:          You mentioned in your statement that there were seven things you admitted to.
                    The French Merchant Vessel Limburg incident and the rest.

TRANSLATOR:         (TRANSLATION OF ABOVE).

PRESIDENT:          Do you have that there in front of you?

TRANSLATOR:         (TRANSLATION OF ABOVE).

DETAINEE
(through translator):  Yes.

PRESIDENT:          You admitted to these seven things.  You're telling us because the treatment you
                    received?

ISN #10015
Enclosure (3)
Page 16 of 36

UNCLASSIFIED

**UNCLASSIFIED**

DETAINEE
(through translator): I also about the USS COLE. They took lot of information from me during the
investigation about this incident. The business was about fishing not uh, not uh
bombings. And, I spent a lot of time with people who I had fishing project with.
And the people who where involved with, in the project, died because of a natural
incident. And after that I got to know the people who were involved in the
explosion. We were also, we were planning to be involved in a fishing project. I
left the thing, I left the project and left. They are the ones who were involved in
those things. I'm not responsible for them or what they have in their heads.

PRESIDENT:          What did you say to your interrogators about your involvement in the *COLE*
bombing?

TRANSLATOR:      (TRANSLATION OF ABOVE).

DETAINEE
(through translator): From what I remember in simple details. For example, I was in Afghanistan.
When I knew that two people were going to Yemen to be involved in a fishing
project. And, I took about five or ten thousand dollars from Usama bin Laden.
He used to help all people. He used to help people get married and so forth. So I
just I get help from him too. So I went to Yemen to get involved with those
people but during the investigation that's not what was explained. In the
investigation they think that I took the money to be involved in a military
incident. And, they used to [REDACTED]. So, I use to say yes, yes; I went
there. I took money from Usama bin Laden. I was planning this and that. After
that they used to ask me how many times did I go to Usama bin Laden, and take
money and went back continue planning and explosions. I just make up I don't
know how many times. I used to stop by Usama bin Laden and take some money.
Also regarding the explosions in Sa'ada because this is not connected it had
nothing to do with *COLE* bombing. It's the truth that during the investigation I
admitted to. I told them that I took some money then I gave it to somebody to
buy, to buy explosives. That's, this, this thing news in general is true. But during
the investigation I told them yes I took this money and to get involved in some
bombings. But in reality I took them and I gave them to my friend and I gave
them to my friend Rhibay. For Herdada. It was simple. I don't recall. Maybe
three or four boxes, fifty kilograms. I gave it to him. In Yemen they use that to
dig wells. So buying explosives is a common thing. That's in general what
happen. I still told them a lot of thing. A lot of details like how to buy a boat or a
new boat that boat. Things like that.

PRESIDENT:          So, you took money from Usama bin Laden in order to get married? To get
married and because he was being generous to you?

TRANSLATOR:      (TRANSLATION OF ABOVE).

ISN #10015
Enclosure (3)
Page 19 of 36

**UNCLASSIFIED**

UNCLASSIFIED

DETAINEE
(through translator): Yes. I took a lot of money from him.

PRESIDENT:     And, you gave explosives to friends but that was to dig wells?

TRANSLATOR:     (TRANSLATION OF ABOVE).

DETAINEE
(through translator): Yes. But during the investigation I told them those things were used to bomb, to
bomb the *COLE*.

PRESIDENT:     And, you're involvement with the people, who did bomb the *COLE* or involved in
the Limburg, was because of your fishing business and not because of the
bombing?

TRANSLATOR:     (TRANSLATION OF ABOVE).

DETAINEE
(through translator): Yes. It was business relationship, like fishing projects.

PRESIDENT:     Going back to the seven items that are in your statement.

TRANSLATOR:     (TRANSLATION OF ABOVE).

PRESIDENT:     It, ah. You said you made statements about bombing American ships or about
planning to attack ships. And about Usama bin Laden having a nuclear bomb and
a plan to hijack a plane.

TRANSLATOR:     (TRANSLATION OF ABOVE).

DETAINEE
(through translator): I just this, I just said those things to make the people happy. They were very
happy when I told them those things. But when they freed me, I told them all I
only told you these things to make you happy.

PRESIDENT:     So what your telling us today is those statements, those statement are not true?

TRANSLATOR:     (TRANSLATION OF ABOVE).

DETAINEE
(through translator): For example the rockets in Saudi Arabia. In general it the truth there was a man
who took rockets from Yemen to Saudi Arabia. But I know nothing about things.
I only know the person only. But doing the investigation they [REDACTED] and
tortured. And I said yes I know these things. I used to say yeah, yeah we did
those things to hit you in the peninsula. And this person in prison right now in
Saudi Arabia right now. He cannot say I help them in the planning, because I

ISN #10015
Enclosure (3)
Page 20 of 36

UNCLASSIFIED

UNCLASSIFIED

don't know about that thing. That is the reason why my mom, my father, my brother, and my family are in prison. The people in Saudi Arabia they want me to surrender. That's the reason why I left Saudi Arabia and went to Pakistan. That's one point. Regarding point number four, which talks about which talks about the plan to bomb the American ship in the Gulf, I had a project in Dubai regarding a ship. A business project. But I took money from Usama bin Laden to do this project. And at the end, Usama bin Laden asked me if I can use those things in military actions. But when I went to Dubai I ended the whole project. I sold the boat and I let the people go. I was able to do this project if I wanted to with the people on the boat and put the explosives on the boat and send them to Yemen and bomb anything. But I ended the project. I wasn't planning anything. I worked for about six or seven months on the project as a business project. At the end I knew that Usama bin Laden was able to use this project as the military tool. But I stopped everything and I let the people go. And what I had on my mind is to get married and live in Dubai. In regarding point number five. A relationship with people committing bombings in Saudi Arabia. They tortured me. [REDACTED]. They used to call me the "commander of the sea". The used to call me the "commander of the Gulf". He was in charge of the people there. When everything happened in Saudi Arabia or whenever explosions occurred. They use to tell me what relation do I have with those things and they used to torture me. And I have nothing to do with these things. Five years they weren't able to get anything from me. I don't know. Like now to admit what. Yes, I know those people. I know a lot of people in Saudi Arabia who do not want a military presence in Saudi Arabia. They will move against you in a natural way. I know some people in Saudi Arabia who I have helped financially. Some of them to get married and some of them to do other stuff. But I'm not responsible if they take the money and they go and fight or do something else. Number six. Usama bin Laden having a nuclear bomb. [REDACTED]. Then they used to laugh. Then they used to tell me you need to admit to those information. So I used to invent some of the stuff for them to say Usama bin laden had a, had a nuclear bomb. And they use to laugh and they were very happy. They were extremely happy because of this news. Then after that I told them, listen. He has no bomb. After a month of playing games and doing this and that. I understood at one time I talk to Hilad. We were walking in the street. I was joking with him and I told him we had nuclear missiles or bombs and to hit the Americans. Like in the movies, like in a movies that contain talk about the nuclear weapons. [REDACTED]. So when you used to lie to them, they used to get very hard, they use to get happy. One time Mukhtar told me about a point which is, which is not listed here. General talk. Maybe we should find somebody to kill him and get rid of him. So I used to say okay. Do, do whatever you want. I was traveling during that time. [REDACTED]. I really didn't understand what they were getting at. They want you to admit that you are planning. General stuff that everybody was talking about. I use to take a ride in a taxi cab. And he use to say that it was important for the Americans to leave. And if I find an American I will hit them

ISN #10015
Enclosure (3)
Page 21 of 36

UNCLASSIFIED

UNCLASSIFIED

## Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016

### OPENING

PRESIDENT:     This hearing shall come to order.

RECORDER:     This Tribunal is being conducted at 1334 hours on 27 March 2007 on board U.S. Naval Base Guantanamo Bay, Cuba. The following personnel are present:
Colonel [REDACTED], United States Air Force, President,
Lieutenant Colonel [REDACTED], United States Air Force, Member,
Lieutenant Commander [REDACTED], United States -- Commander [REDACTED], United States Navy, Member,
Lieutenant Colonel [REDACTED], United States Air Force, Personal Representative,
Language Analyst[1], [REDACTED],
Sergeant First Class [REDACTED], United States Army, Reporter,
Lieutenant Colonel [REDACTED], United States Army, Recorder,
Colonel [REDACTED] is the Judge Advocate member of the Tribunal.

### OATH SESSION 1

RECORDER:     All rise.

PRESIDENT:     Standby, we'll correct the record on that. Lieutenant Colonel [REDACTED] is the Judge Advocate member of this Tribunal. Recorder, you may proceed. All rise. The Recorder will be sworn. Do you, Lieutenant Colonel [REDACTED], swear or affirm that you will faithfully perform the duties as Recorder assigned in this Tribunal so help you God?

RECORDER:     I do.

PRESIDENT:     The Reporter will now be sworn. The Recorder will administer the oath.

RECORDER:     Do you, Sergeant First Class [REDACTED], swear or affirm that you will faithfully discharge your duties as Reporter assigned in this Tribunal so help you God?

REPORTER:     I do.

---

[1] Language Analyst, Translator, and Linguist are used interchangeably.

UNCLASSIFIED

UNCLASSIFIED

Representative to speak on my behalf. I hope from you justice, and I know that is what you seek. [REDACTED] They did this to me because they thought I was [REDACTED] a partner to USAMA BIN LADEN, as is mentioned in the unclassified Summary of Evidence against me. [REDACTED] After this, I started feeling the symptoms of my 1992 injury to my head, including the complete loss of my memory and an inability to speak, read, or write. But, these abilities slowly came back to me although I still have shrapnel in my head. Also, another form of torture was when they-- when they-- excuse me, I'll repeat this sentence. Also, another form of torture was when they wouldn't give me my diary, which caused me to have nearly 40 seizures. The mental anguish that came from broken promises in which they said that they would give me my diary back contributed to the seizures. Most importantly, my diary can refute the accusations against me and it can show that I am personally against the sort of acts that were committed. Dear Members of the Tribunal. I am saying all of this-- excuse me. In saying all of this, I am not trying to gain your pity. I am only trying for you to see the big picture, the true picture not the picture, depicted by the media, which the CIA found out too late. Therefore, I would like you to know this truth before you make your decision. I know this is not a criminal trial, as you say, but all I hope from you is that you try me for something that I am proud of having done, not something I didn't do or am against, nor something that would shame me before the world. I am not here to lie to you, or cheat you, or to lie to myself by saying that I am not an enemy of your injustice. I have been an enemy of yours since I was a child because of your unjust acts against my people, the Palestinians, through your help and partnership with Israel in occupying our land and by killing our men and raping our women and kicking out our people and turning them into refugees for more than 60 years. Until now, half of my people are refugees in refugee camps. I can not deny that, since back when I was a child, I liked a lot of things in your country and your history and your culture. I am not lying by saying that, but it is the truth. My moral position is not against the American people or America, but against the government which I see as a partner in oppression. A partner of a killer is also a killer. I also resent the military that is used by this government to inflict this oppression. In other words, dear members of the military, I am against you. My words are not hypocrisy, and I do respect you. I believe that even my enemy should be respected. I don't deny that I am an enemy of your injustice, but I deny that I am an enemy combatant. I never conducted nor financially supported, nor helped in any operation against America. Yes, I write poetry against America and, yes, I feel good when operations by others are conducted against America but only against military targets such as the U.S.S Cole. But, I get angry if they target civilians, such as those in the World Trade Center. This I am completely against [REDACTED] My diary will prove that some of our accusations

**UNCLASSIFIED**

were not my plans. How can I plan for operations that I don't believe in? What you call plans about what BIN LADEN did on 9/11, I wrote in my diary in response to BIN LADEN's action, noting that he had many choices on how to conduct war which are wrong in Islam, such as race war, killing civilians, burning cities, and targeting civilians in markets. This is what people of war do, and I am sorry you are one of them. This is the truth. If someone reads my diary with a biased mind, he will misinterpret my meaning. Dear Members, this is what I have for you. As you have noticed, it wasn't a defense that contained much evidence [REDACTED]. I also do not have a lawyer to defend me in front of this Tribunal. Take notice that if a lawyer was present, he would not have allowed me to say what I said because I said the truth without reservation. And I am willing to be hung for it for something I have done. I am not a lawyer to defend myself. I can't even speak clearly, temporarily, God willing. It is only to demonstrate to you."

PRESIDENT:      ZAYN AL ABIDIN MUHAMMAD HUSAYN, do you have anything to add to that statement?

DETAINEE:       No.

PRESIDENT:      No. Thank you. In your statement, you mentioned months of torture. Has anything that you provided us today regarding your written statements related to those times that you have been tortured?

DETAINEE:       No. [conversation between Detainee and Language Analyst discussing the President's question] Actually, most of what they say I did in first months they take against me even for some things or like this they take I was--I was nearly before half die plus what they do torture me.--it--There I was not afraid from die because I do believe I will be shahid [Language Analyst translates] martyr, but as God make me as a human and I weak, so they say yes, I say okay, I do I do, but leave me. They say no, we don't want to. You to admit you do this, we want you to give us more information. This part I can't because I don't know. I say, "yes, I was partner of BIN LADEN. [REDACTED] and I'm his partner of RESSAM." I say okay but leave me. So they write but they want what's after, more information about more operations, so I can't. They keep torturing me, tell me why them self they discover you are not torturing. So some, not all, some what you have here even me say of me here in the paper, it is from FBI. But I don't know of the dealing; I was in the hands of FBI or CIA. But FBI people when I met them in the last month, [REDACTED] And they have my part--four part of my diary and the origin is with them. So who's torture me and taking over information. Maybe they are FBI, maybe are CIA; I don't know, 'till now. So here they say FBI-- FBI, they not talk about the CIA, so I don't know.

ISN # 10016
Enclosure (3)
Page 23 of 27

**UNCLASSIFIED**

## UNCLASSIFIED

**PRESIDENT:** So you did make statements during that treatment?

**DETAINEE:** A lot.

**PRESIDENT:** And what you said, was it correct, was it incomplete or was it not correct or untrue in any way?

**DETAINEE:** [REDACTED] This first part the second part, okay. What is the operation? I not have the specifics; I talk about open idea. So most of this here the CIA, they admitted that I admitted too. [REDACTED] They start asking me again and again about this thing. I tell them no. [REDACTED] I was like this, I was like this, I want to finish this. And something they not believe all what I do, say in that time. Some they believe, some they not believe. I don't know what they need or not need. They only ask and I answer.

**PRESIDENT:** In your previous statement, you were saying specific treatments. Can you describe a little bit more about what those treatments were?

**DETAINEE:** [REDACTED]

**PRESIDENT:** I understand.

**DETAINEE:** And they not give me chance all this, [REDACTED]

**PRESIDENT:** So I understand that during this treatment, you said things to make them stop and then those statements were actually untrue, is that correct?

**DETAINEE:** Yes.

**PRESIDENT:** Ok. Regarding your statements that you have made here today at this Tribunal session, have they been completely voluntary of your own free will?

**DETAINEE:** Yes.

**PRESIDENT:** Very well. What you have told us will be included in the record of these proceedings and will also be reported for any appropriate investigation. Also, we will carefully consider what you have told us as we make our determination as to your enemy combatant status. I understand it was difficult for you to provide that information to us and I appreciate your time in providing it as well as all the information you provided us today.

**RECORDER:** Sir, may I ask for one point of clarification?

**PRESIDENT:** Please. Continue Recorder.

ISN # 10016
Enclosure (3)
Page 24 of 27

## UNCLASSIFIED

## UNCLASSIFIED

| | |
|---|---|
| RECORDER: | ZAYN AL ABIDIN MUHAMMAD, have you been mistreated at any time since you have been in U.S. military custody here at Guantanamo Bay? |
| DETAINEE: | The truth, no. But small things. Here I discover they have rules, strict rules for detainees, but they do not care about the [Via Language Analyst] sick. From some side I appreciate what the doctors they do for me even here. But see [points to his leg] the problem of my leg and knee. I need to cover my-- this thing, I used the, what this [Detainee removes his left shoe and extracts a prayer cap] what we use it for pray to, I request them give me socks; this is too much cold I feel twenty four hours even in the very hot time since I have the injury. They say socks in this not allowed in this area in this place. Sometime I appreciate what you do; sometime I say maybe they mean it because they look for me as enemy. Ok, me myself, I am not big group; I am small group. I was having rules for my group if we can catch anybody, even if he Israeli my enemy. I am Palestinian. you should trust--uh respect him completely and take--we finish his case if we make [Via Language Analyst] an Islamic trial. Or if he is not army or something me myself I will send him to his country. It was small group. But this big country, we have rules, they make small things really, its affect person same me from his half- -half body my eyes, my hole in my head, my problem all is from this side sorry again and again, I have one testicle; I lost it even and this problem here is all this part it is not complete. [Indicating his left thigh] This part-- still good, still strong. [Indicating his right thigh] I tried to adjust myself as I can with this but small problems; socks make big problems. Small socks as much I request I need to cover it by my head [Via Language Analyst]. The prayer hat I had to use it in my socks, as socks. |
| PRESIDENT: | And-- and during the session, you did remove your prayer hat from your shoe that you have been using to keep your feet warm. We understand that. |
| DETAINEE: | At least twenty--twenty years hours I ask. And one of this big problem is it is my diary. Not my diary only, it is my papers. I do believe this seizure not came only here before sixteen years I have this big problem the holes or injury which I lost my memory. I not have seizure when I came here because angry because I don't know thinking about my paper diary [REDACTED] When I came here I ask about it again and again. I do not whose take it; [REDACTED]. I was only thinking--thinking I found myself I found myself fell down. They not believe in the beginning but the specialist doctor they tell me yes most of the seizure he have he bring it for himself by that think. And I know I try to escape but I can't. Thinking-- thinking sixteen years, I have these paper with me as my child  Maybe it is too [Via Language Analyst] it's emotional. But I try to be practical mind but I find myself too weak in front of these things because I write and everything happen for me so when they take it I feel they take my child. The child his age is sixteen or seventeen years. So I think if you ask |

UNCLASSIFIED

anybody outside they say this not torturing this is ordinary. For me, it is bigger than what CIA for me. [REDACTED] What they do on my body I will forget it, plus now taking the paper, my paper. Maybe not the army take, it but the army, I think, is responsible about making me suffer. In these two fingers or three fingers, [Pointing to his feet.] it's too cold I didn't know what how to say it in English Twenty Four Hours. And small things, really, it's not too important thing but its affect person as me is--uh I don't like to admit I'm a sick person. I try to be good Muslim person but the truth is almost half of my body is not good.

RECORDER:       Thank you for your response.

PRESIDENT:      Okay.

DETAINEE:       I will. [Tries to return prayer cap to his left shoe]  I will use it after.

PRESIDENT:      Okay, we will see that your shoe is tended to at the end of this hearing; if we can proceed.

## CLOSING UNCLASSIFIED SESSION

PRESIDENT:      All unclassified evidence having been provided to the Tribunal, this concludes the open tribunal session. ZAYN AL ABIDIN MUHAMMAD HUSAYN shall be notified of the Tribunal decision upon completion of the review of these proceedings by the Combatant Status Review Tribunal Convening Authority in Washington, D.C. If the Tribunal determines that you should not be classified as an enemy combatant, you will be released to your home country as soon as arrangements can be made. If the Tribunal determines you're classified as an enemy combatant, you may be eligible for an Administrative Review Board hearing at a future date. The Administrative Review Board will make an assessment of whether there is continued reason to believe that you pose a threat to the United States or its coalition partners in the ongoing armed conflict against terrorist organizations, such as al Qaida and its affiliates and supporters, or whether there are other factors bearing upon the need for continued detention. You will have the opportunity to be heard and to present relevant information to the Administrative Review Board. You can present information from your family and friends that might be of help to you at the Board. You are encouraged to contact them as soon as possible to begin to gather information that may help you. A military officer will be assigned at a later date to assist you in the Administrative Review Board process.

## ADJOURN OPEN SESSION

PRESIDENT:      The open session of this Tribunal hearing is adjourned.

UNCLASSIFIED

UNCLASSIFIED

## Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10020

### OPENING

PRESIDENT:  This hearing shall come to order.

RECORDER:  This Tribunal is being conducted at 08:42 on 15 April 2007 on board U.S. Naval Base Guantanamo Bay, Cuba. The following personnel are present: Colonel [REDACTED], United States Air Force, President, Commander [REDACTED], United States Navy, Member, Lieutenant [REDACTED], United States Air Force, Member, Major [REDACTED], United States Air Force, Personal Representative, Sergeant First Class [REDACTED], United States Army, Reporter, Major [REDACTED], United States Air Force, Recorder. Lieutenant Colonel [REDACTED] is the Judge Advocate member of the Tribunal.

### OATH SESSION 1

RECORDER:  All rise.

PRESIDENT:  The Recorder will be sworn. Do you, Major [REDACTED], swear or affirm that you will faithfully perform the duties as Recorder assigned in this Tribunal, so help you God?

RECORDER:  I do.

PRESIDENT:  The Reporter will now be sworn. The Recorder will administer the oath.

RECORDER:  Do you, Sergeant First Class [REDACTED], swear that you will faithfully discharge your duties as Reporter assigned in this Tribunal, so help you God?

REPORTER:  I do.

PRESIDENT:  We'll take a brief recess while the Detainee is brought into the room.

RECORDER:  The time is 08:43 on 15 April 2007. This Tribunal is now in recess. All rise. [All personnel depart the room.]

### CONVENING AUTHORITY

RECORDER:  [All personnel return into the room at 08:48.] All rise.

PRESIDENT:  This hearing will come to order. You may be seated. Good morning.

DETAINEE:  Good morning. How are you guys doing?

UNCLASSIFIED

**UNCLASSIFIED**

I would like to make a few quick comments regarding the questioning of my witnesses. The CSRT refused to show me exactly what type of questions they were going to ask my witnesses until they were answered by my witnesses. But overall, we talked in general about what kind of questions were going to be asked. I did see the exact questions that were presented to SAIFULLAH PARACHA prior to him seeing them.

I am not fully satisfied with this whole tribunal process, but my Personal Representative has done a fine job guiding me through the whole process. Special thanks to my Personal Representative.

Before the end of these proceedings, I would like to present to you "my after arrest report" and I even call it "torture report." It has some facts about how the CIA, [REDACTED], and DoD abused me.

If you don't want to hear the entire report, then at least allow me to present you the summary of this report which is very short and to the point. This report is directly related to the Summary of Evidence due to the Summary of Evidence coming from a combination of both classified and unclassified sources. [REDACTED]. These are the same people who tortured me. Please read it before believing the government sources. These are my words and truth as I know it.

PRESIDENT: Thank you. There are a few more statements that I believe Mister McK-- Mister KHAN would like to be read in. Is that correct?

PERSONAL REP: Yes, Sir. I just want to confer with the Detainee regarding this statement.

PRESIDENT: Please.

PERSONAL REP: MAJID, do you want the entire statement read or the summary statement?

DETAINEE: Two things I ask you. The, if the President allows, the entire statement is about twelve pages and the summary is to the point. But the summary doesn't really explain what really happened. I would prefer, if you can allow it, to read the whole report. It is more Intel but it's not to the point, but I think it have to do with ah--it have to do the whole thing because it has to do with the CIA and FBI and everything. So, I would prefer the whole report. And it's up to the President if he allows it or not.

PRESIDENT: We are certainly going to read everything that's provided to us and I will allow to have the whole thing read in. It would save us a little time as far as all three of us hearing it at one time. And again, we will also read all this material that is provided to us carefully and consider the matters regarding your determination as an enemy combatant status. So at this point, Personal

UNCLASSIFIED

Representative, when you are ready, you may proceed with the ah--I believe the written statement regarding his treatment.

PERSONAL REP:   Exhibit D-b.  MAJID KHAN written Statement of Torture for Combatant Status Review Tribunal taken March 2007 by PR3.  [REDACTED].

For me, things got better [REDACTED], and [REDACTED] I am brought to Guantanamo Bay, Cuba.  I swear to God this place in some sense worst than CIA jails.  I am being mentally torture here, [REDACTED].

[REDACTED].

Since I got here, I have tried to cut my artery which goes through my elbow, on January 12th, 07, and again on February 22nd, 07.  I went on hunger strike for four weeks on January 2nd, 07, and lost almost thirty pounds.  And I have already spent two and half month in disciplinary status without comfort, incentive items, and sometimes even without basic items.  On 28 November 2006, I wrote on my walls, "Stop torturing to me-- stop torturing me; I need newspaper, my lawyer and my mail, etc."  I don't cooperate with them until they would treat me as human and until they would stop mentally torturing me.

[REDACTED]

My real problem with this administration where I am staying right now, that they are corrupt and some of guards, supervisors, and manager who may be DoD contractor today, [REDACTED].

Since these guards managers hate me [REDACTED], that what caused me to do or they call it act out.  They are getten-- getting even with me here under DoD, and making me suffer by mentally torturing me.  They know my weaknesses--what drive me crazy and what doesn't.  [REDACTED].  In following paragraph, I am writing some facts about DoD and how they are abusing their powers, and there is no check and balance system.  Even the doctor, medic, and Naval people are in this together, meaning that they are manipulators and corrupt.  There is extensive torture even for the smallest of infractions.

[REDACTED].

On October 6th, 06, ICRC gave me my only daughter pictures which was born after my abduction.  I left my wife pregnant but didn't know the sex of the baby until ICRC told me about her.  So anyway, when I took this picture and came back to my camp building, the guard forcibly took it from me.  Then I went crazy and yelled for one hour and they ignored me as if they

UNCLASSIFIED

**UNCLASSIFIED**

February 22, 07, I chewed my artery again. Medic cleaned my wound.

February 2-- February 23rd, 2007, I got my stuff back after six weeks.

February 26th, 07, they took some of incentive and comfort items, telling me that they are afraid as if I am going to hurt myself and they returned them on March 3rd, 2007. But never put me in disciplinary status.

Some Facts How They Are Mentally Torturing Us:

They them self use the best kind of stuff but they give us cheap branded, unscented deodorant soap to wash ourselves with. Also, same goes for shampoo, toothpaste, and deodorant, etc.

This camp gives us only twelve to fourteen pages of newsletter only once week. Most of the stuff is crap; only few pages are worth of reading it.

In main rec no weight lifting machine, no toilet, no sink, no hoops, and even balls them self have little air in them; they hardly bounce.

In end of January 2007, they brought a big fan which makes noise, which makes more noise than produce air in main hall. It drives us crazy. They have since turned the fan off and I have been moved to A19 on 6 April 2007. The fan itself is still there.

They know how we feel about family members. They intentionally make our ICRC mails delay- very,very delay in so call censorship issues.

We only get one hour of communal rec and only one hour of main rec per day, 2 books per week, and that's it. No mind stimulations, no solitary games, no DVD players, no entertainment, and you know how small and cozy our cells are in size. It has been seven months like this, no improvement.

[REDACTED] So please, before making any decision on me, please read this report of torture and then think yourself if these people can go that far and how hard it is for them to make something up, [REDACTED] I affirm these are my words and the truth as I know it.

PRESIDENT:          Personal Representative, thank you.

PERSONAL REP:    There is one additional statement, Sir.

PRESIDENT:          Okay. Before we continue, I have a question. The title of this document says it was taken on March 2007. There's no specific date. And then at the end, it was certified as dated the 15th of April, which I would assume,

**UNCLASSIFIED**

**UNCLASSIFIED**

PERSONAL REP:    Just to reiterate, there are points in the oral summary that are not contained
in the written summary.  So the written report that was just read, there are
additional points in the in the oral statement.  [SCI[1]].

PRESIDENT:    Yes.  I am looking forward to hearing those, yes.

PERSONAL REP:    Exhibit D-c.  MAJID KHAN Oral Statement of Torture for Combatant
Status Review Tribunal taken March/April 2007 by PR3.  Mister President
and Members of the Combatant Status Review Tribunal, thank you for
letting me make a statement regarding the torture I received after my
kidnapping [REDACTED].

[REDACTED]

After my arrest, Allah blessed me with only one beautiful daughter, but I
have still been unable to talk to her.

Since my arrival at Guantanamo Bay I have been without communal
recreation for eleven weeks all together.

I have had my beard forcibly shaven twice.

On two occasions I choed-- chewed my artery and three times they have
made me wear the protective suicide prevention smock for days.

For three weeks, I was without basic, incentive, or comfort items.

For nine weeks, I was without incentive or comfort items.

Four weeks without sunlight and fresh air.

Four weeks straight I went on hunger strike and lost twenty-five pounds.
They put nine bags of IVs of sodium, potassium, and glucose mix forcibly
in my arm.  It left big bruises on my arms for weeks.  I was threatened by
the medic with nose feeding where they would strap me in a special chair
that allows nose-- no movement at all-- at all for more than ten straight
hours each feeding.

There are many more abuses.  Please read tort-- the report of torture that my
Personal Representative has provided to the Board.  My statements are
100% true.  I can take a lie detector test and I tried to prove in my reports
from the fact that these statements are 100% true.  I affirm these are my
words and the truth as I know it.

---

[1] Simultaneous Communication Interruption

**UNCLASSIFIED**

UNCLASSIFIED

DETAINEE:      There was always statement, [REDACTED].

PRESIDENT:     Statements that you made.

DETAINEE:      Statement that I made, even written.

PRESIDENT:     Understood.

DETAINEE:      [REDACTED]

PRESIDENT:     Well I was just using the terminology that you had in your statement where you said you-- you [SCI] did not cooperate.

DETAINEE:      [REDACTED]

PRESIDENT:     Well, and I'd like to ask about those statements. Were those statements true or incorrect?

DETAINEE:      Definitely not true.

PRESIDENT:     That's all I am looking for and- [SCI]

DETAINEE:      Okay. [SCI]

PRESIDENT:     -first direct statement on that.

DETAINEE:      Definitely not true. Most of the stuff, yes.

PRESIDENT:     Very well. Okay, that completes the questions I had. I will make an-a statement here regarding what we've heard here today. Ah-What you have told us will be included in the record, obviously. We'll also be reported to appropriate authorities for any investigation that's necessary. As you know, we will carefully consider what you have said to us today, as we make our determination regarding your enemy combatant status. [We] consider this a very important matter. You've heard us take our oath and ah-- you know we won't ah-- consider these-- this evidence that you provided as well as we received, very carefully. [*Tribunal President's post-hearing note: The previous sentence is a direct transcript of my statement; however, it is incomplete and disjointed as I attempted to transition to receiving the Detainee's final statement. As directly stated previously, I intended to reiterate that the Tribunal would carefully consider the Detainee's statements.*] At this point in the hearing, we've received all the unclassified information [Detainee acknowledges with "ah ha."] and, ah, we're now about to complete this portion by providing you an opportunity to provide a final statement. Would you like to make a final statement at this time?

DETAINEE:      I have few questions of what we talked about today.

# EXHIBIT PP

[ORAL ARGUMENT NOT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| MAJID KHAN and RABIA KHAN, as Next Friend, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) | No. 07-1324 |
| ROBERT M. GATES, Secretary of Defense, | ) ) ) | |
| Respondent. | ) ) ) | |

**EMERGENCY STIPULATION TO IMMEDIATE ENTRY
OF INTERIM GUANTANAMO SCI PROTECTIVE ORDER**

The undersigned counsel for Petitioners Majid Khan and Rabia Khan, and for

Respondent Robert M. Gates, hereby move on an emergency basis to entry in this

action, without prejudice, of an interim Guantanamo SCI Protective Order in the form

of the Exhibit A hereto. Petitioners' counsel are scheduled to travel to Guantanamo on

Saturday, October 13 and seek to meet with petitioner Majid Khan next week. The

parties therefore request that this stipulation be considered on an emergency basis and

that the interim Guantanamo SCI Protective Order be entered immediately.

The attached order is based on the order this Court entered in in *Bismullah v.*

*Gates,* ___ F.3d ___, 2007 WL 2067938 (D.C. Cir. 2007), modified in accordance with

the government's Unopposed Motion To Amend Protective Order, filed in *Bismullah*

on August 20, 2007.[1] But the attached proposed interim Guantanamo SCI Protective Order also includes additional provisions the government believes are necessary because this case involves information classified at a level higher than that involved in *Bismullah*. A redline of the proposed interim Guantanamo SCI Protective Order compared to this Court's Bismullah order ( with proposed modifications sought on August 20, 2007) is attached as Exhibit B.

The stipulated order agreed to hereby is an interim measure designed to enable Petitioner's counsel to communicate with Petitioner Majid Khan during resolution of any issues that may arise regarding an appropriate protective order. Accordingly, both parties consider this proposal to be an interim measure during resolution of all issues regarding the appropriate Guantanamo SCI Protective Order and both parties retain all right to seek modifications to this order upon further consideration. Additionally, the parties hereby apprise the Court that the parties may by further joint motion seek modifications of the interim Guantanamo SCI Protective Order entered by the Court. This order should remain in effect until further order of this Court. The stipulated order

---

[1] The government has challenged the *Bismullah* decision, including the protective order entered on July 30, 2007, and reserves the right to challenge any protective order entered in this case based on that decision. Petitioners also reserve the right to challenge any protective order entered in this case based on that decision.

agreed to hereby is an interim measure designed to enable Petitioners' counsel to

communicate with Petitioner Majid Khan during resolution of all issues regarding the

appropriate protective order. The parties retain their right to seek modification of this

Order or to challenge it before this Court or the Supreme Court.

## CONCLUSION

For the foregoing reasons, the parties stipulate to this Court's immediate entry of

a Guantanamo SCI Protective Order in the form of Attachment A, hereto.

Respectfully submitted,

PETER D. KEISLER
*Assistant Attorney General*

DOUGLAS N. LETTER
*Terrorism Litigation Counsel*

ROBERT M. LOEB
(202) 514-4332

J. WELLS DIXON
GITANJALI GUTIERREZ
(212) 614-6464
Center for Constitutional Rights
666 Broadway
Seventh floor
New York, NY 10012

AUGUST E. FLENTJE
(202) 514-4212
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530*

—3—

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2007, I served the foregoing "EMERGENCY STIPULATION TO IMMEDIATE ENTRY OF INTERIM GUANTANAMO SCI PROTECTIVE ORDER" upon counsel of record by e-mail and by causing copies to be sent by regular mail to:

J. Wells Dixon
Gitanjali S. Gutierrez
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012

August E. Flentje

—4—

# Exhibit A

## 1. General Provisions

A.  The court finds that this case involves classified national security
    information or documents, the storage, handling and control of which
    require special security precautions, and access to which require a
    security clearance and a "need to know." This case may also involve
    other protected information or documents, the storage, handling and
    control of which may require special precautions in order to protect the
    security of United States personnel and facilities, and other significant
    interests.

B.  The purpose of this Protective Order is to establish the procedures that
    must be followed by a Petitioner, Petitioner's Counsel, and all other
    individuals who receive access to classified information or documents, or
    other protected information or documents, in connection with this case,
    including the Department of Defense (DoD) Privilege Team.

C.  The procedures set forth in this Protective Order will apply to all aspects
    of this case, and may be modified by further order of the court *sua sponte*
    or upon application by any party. The court will retain continuing
    jurisdiction to enforce or modify the terms of this Order.

D.  Nothing in this Order is intended to or does preclude the use of classified
    information by the Government as otherwise authorized by law outside of
    this action under the Detainee Treatment Act.

E.  Petitioner's counsel of record is responsible for advising his or her
    partners, associates, and employees, the petitioner, and others of the
    contents of this Protective Order, as appropriate or needed.

F.  All documents marked as classified, and information contained therein,
    remain classified unless the documents bear a clear indication that they
    have been declassified or determined to be unclassified by the agency or
    department that is the original classification authority of the document or
    of the information contained therein.

G.  Any violation of this Protective Order may result in a sanction for
    contempt.

## 2. Designation of Court Security Officer

The Court designates Christine E. Gunning as Court Security Officer for these cases, and Jennifer H. Campbell, Erin E. Hogarty, Joan B. Kennedy, Charline A. DaSilva, Nathaniel A. Johnson, Daniel O. Hartenstine, Michael P. Macisso, James P. Londergan, Barbara J. Russell and Miguel A. Ferrer as Alternate Court Security Officers, for the purpose of providing security arrangements necessary to protect from unauthorized disclosure of any classified documents or information, or protected documents or information, to be made available in connection with these cases. Petitioners' counsel shall seek guidance from the Court Security Officer with regard to appropriate storage, handling, transmittal, and use of classified documents or information.

### 3. Definitions

A.    "Detainee" means an alien detained by the DoD as an alleged enemy combatant at the U.S. Naval Base at Guantánamo Bay, Cuba.

B.    "Petitioner" means a Detainee or a "next friend" acting on his behalf.

C.    "Petitioner's Counsel" includes a lawyer who is employed or retained by or on behalf of a Detainee for purposes of representing the Detainee in this litigation, as well as co-counsel, interpreters, translators, paralegals, investigators, and all other personnel or support staff employed or engaged to assist in this litigation.

D.    As used herein, the words "documents" or "information" include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

   i.    papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intraoffice communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets; and drafts, alterations, modifications, changes and amendments of any kind thereto;

   ii.    graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

   iii.    electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail,

2

films, typewriter ribbons, word processing or other computer tapes or disks, and all manner of electronic data processing storage; and

iv.     information acquired or conveyed orally.

E.     The terms "classified information" and "classified documents" refer to:

i.     any document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

ii.     any document or information, regardless of its physical characteristics, now or formerly in the possession of a private party that has been derived from United States government information that was classified, regardless of whether such document or information has subsequently been classified by the Government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders, as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)" ;

iii.     oral or nondocumentary classified information known or reasonably should be known to be classified to the Petitioner or Petitioner's Counsel; or

iv.     any document or information as to which the Petitioner or Petitioner's Counsel has been notified orally or in writing that such document or information contains classified information.

F.     The terms "protected information" and "protected documents" refer to any document or information deemed by the court, either upon application by the Government or *sua sponte*, to require special precautions in storage, handling, and control, in order to protect the security of United States Government personnel or facilities, or other significant government interests.

G.     "Access to classified information" or "access to protected information" means having access to, reviewing, reading, learning, or otherwise coming to know in any manner any classified information or protected information.

3

H.     "Communication" means all forms of communication between Petitioner's Counsel and a Detainee, including oral, written, electronic, or by any other means.

I.     "Legal Mail" consists only of documents and drafts of documents that are intended for filing in this action and correspondence directly related to those documents that-

     i.     relate directly to the litigation of this action;

4

    ii.       address only (a) events leading up to the capture of the Detainee on whose behalf the petition in this action was filed, (b) events occurring between such Detainee's capture and any hearing before a Combatant Status Review Tribunal (CSRT) relating to such Detainee, and (c) the conduct of the CSRT proceeding relating to such Detainee; and

    iii.      do not include any of the following information, in any form, unless directly related to the litigation of this action:

          a.      information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency;

          b.      information relating to current political events in any country;

          c.      information relating to security procedures at the Guantánamo Naval Base (including names of United States government personnel and the layout of camp facilities) or the status of other Detainees;

          d.      publications, articles, reports, or other such material including newspaper or other media articles, pamphlets, brochures, and publications by nongovernmental or advocacy organizations, or any descriptions of such material.

J.     "Secure area" shall mean a physical facility accredited or approved for the storage, handling, and control of classified information.

## 4. Roles and Functions of the DoD Privilege Team and Special Litigation Team

A.     The "DoD Privilege Team" comprises one or more DoD attorneys and one or more intelligence or law enforcement personnel. If required, the DoD Privilege Team may include interpreters/translators. The DoD Privilege Team is charged with representing and protecting the interests of the United States Government related to security and threat information. The DoD Privilege Team is authorized to review all communications specified in this order, including written communications and other materials sent

5

from Petitioner's Counsel to the Detainee and communications from the Detainee to his counsel. The DoD Privilege Team may not disclose a communication from Petitioner's Counsel to the Detainee or from the Detainee to his counsel other than information provided in a filing with the court and served on government counsel, unless the disclosure of such information is authorized by this or another order of the court or by Petitioner's Counsel.

B.    The DoD Privilege Team may redact or screen out material not meeting the definition of "Legal Mail" in section 2(I) above.

C.    When the DoD Privilege Team proposes to redact or screen out material sent from Petitioner's Counsel to a Detainee, Petitioner's Counsel for that Detainee must be notified.

D.    With the consent of Petitioner's Counsel, the DOD Privilege Team may consult with an individual or individuals in appropriate federal agencies for the purpose of identifying classified information and marking the documents with the appropriate classification. If Petitioner's Counsel does not consent to such consultation, information for which consultation is required will remain classified. Any such consultation will not waive attorney client, attorney work product, or any other applicable privilege. Further, the individual consulted for such purposes will not share the information with other government lawyers and/or officers involved in the litigation of this or other matters involving the petitioner, and the information shall not be used as a result of the consultation in the interrogation or investigation of petitioner. If the individual consulted is involved in the classification review of other documents, that individual may have discussions concerning such documents with government lawyers and/or officers involved in this and other matters involving the petitioner on condition that such discussions be for the sole purpose of classification review of such documents.

E.    In the event a dispute regarding the screening and redaction of material from legal mail sent from Petitioner's Counsel to a Detainee cannot be resolved among the parties and Petitioner's Counsel seeks the intervention of this court, the DoD Privilege Team may disclose the material at issue to the Commander, JTF-Guantánamo Naval Base or his representatives, including counsel for the Government.

F.    A "Special Litigation Team" is authorized to represent the DoD Privilege Team with respect to execution of its duties. The Special Litigation Team will be composed of one or more attorneys from the Department of Justice, who may not take part or be involved in litigating the merits of this

6

action under the Detainee Treatment Act or any other case brought by or against the Detainee.

G.    The DoD Privilege Team may, through the Special Litigation Team (see § 3(H) below), inform the court of any issues or problems related to the release or processing of information related to this case.

H.    The Special Litigation Team may not disclose information provided by the DoD Privilege Team, or any information submitted by Petitioner's Counsel to the DoD Privilege Team for review, except as provided by this Order or as permitted by Petitioner's Counsel or by the court.

I.    Petitioner's Counsel or the Special Litigation Team may submit filings to the court concerning the DoD Privilege Team or actions taken by it.

J.    Until otherwise notified, potentially privileged information in such filings must be submitted to the court under seal and contain a conspicuous notation as follows: "Submitted Under Seal-Contains Privileged Information." To maintain such information under seal, an appropriate application must be made to the court. Such information must be maintained under seal unless and until the court determines the information should not be sealed. Such filings by Petitioner's Counsel or the Special Litigation Team may not be served on counsel for respondent, except as authorized by Petitioner's Counsel or the court. With respect to a submission made under seal, a redacted version suitable for filing in the public record must be provided. Unresolved disputes concerning such redacted versions may be presented to the court.

K.    Petitioner's Counsel may not convey to a Detainee information redacted or screened by the DoD Privilege Team or designated for such redaction or screening, absent consent from the DoD Privilege Team, the Special Litigation Team, or the Government, or authorization by this court.

## 5. Access to Classified Information and Documents

A.    Without authorization from the Government, neither Petitioner nor Petitioner's Counsel may have access to any classified information involved in this case.

B.    Petitioner's Counsel is presumed to have a "need to know" all the information in the Government's possession concerning the Detainee he represents. This presumption is overcome to the extent the Government seeks to withhold from Petitioner's Counsel highly sensitive information or information concerning a highly sensitive source that the Government

presents to the court *ex parte* and *in camera*. Except for good cause shown, the Government must provide notice to Petitioner's Counsel on the same day it files such information with the court *ex parte*.

C.     Petitioners' counsel to be provided access to classified information shall execute the MOU appended to this Protective Order, and shall file executed originals with the Court and submit copies to the Court Security Officer and counsel for the government.  The execution and submission of the MOU is a condition precedent for petitioners' counsel to have access to, or continued access to, classified information for the purposes of this proceeding.

D.     The substitution, departure, or removal of petitioners' counsel from this case for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

E.     Authorization from the Government to access classified information will not be granted to Petitioner's Counsel unless Petitioner's Counsel has first:

     i.     received the necessary security clearance as determined by the Department of Justice; and

     ii.     obtained written evidence of authority to represent the Detainee or obtained evidence of authority to represent the Detainee through the Detainee's next friend; and

     iii.     signed the Memorandum of Understanding ("MOU"), attached hereto as Exhibit A, agreeing to comply with the terms of this Protective Order.

F.     Prospective counsel for a Detainee may have up to two visits with a Detainee to obtain his authorization to seek review of the CSRT's determination of his status.

G.     The substitution, departure, or removal of Petitioner's Counsel from this case for any reason will not release that person from the provisions of this Protective Order.

H.     Except as provided herein, Petitioner's Counsel may not disclose any classified or protected information to any person including counsel in related cases brought by Guantanamo Bay detainees in this court or any other court.  Petitioner's Counsel may not disclose classified or protected information to a detainee, unless that same information has been previously provided to Petitioner's Counsel by the same detainee.

Counsel may not confirm or deny to the detainee the assertions made by the detainee based on knowledge counsel may have obtained from classified documents.

I.   A disclosure of classified information includes any knowing, willful, or negligent action that could reasonably be expected to result in a communication or physical transfer of classified information.

J.   Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed in connection with this case any information known or believed to be classified except as otherwise provided herein.

K.   At no time, including any time subsequent to the conclusion of this case, may Petitioner's Counsel make any public or private statements disclosing any classified information made available pursuant to this Protective Order, including the fact that any such information is classified.

L.   Petitioner's Counsel is required to treat all information learned from a Detainee, including any oral or written communication with a Detainee, as TS//SCI information, unless and until the information is submitted to the DoD Privilege Team or counsel for the Government and determined to be nonclassified. All classified material must be handled, transported, and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.  To the extent the handling, transportation, or storage restrictions imposed by this order are more restrictive than the Executive Order and regulations, this Protective Order shall govern.

M.   Petitioner's Counsel or the DoD Privilege Team must disclose to government counsel or Commander, JTF-Guantánamo Naval base any information learned from a Detainee involving any future event that threatens national security or is likely to involve violence. In such cases, the Privilege Team must provide contemporaneous notice to Petitioner's Counsel and retain for Petitioner's Counsel a copy of the material provided to government counsel or Commander, JTF-Guantánamo Naval Base.

N.   Petitioners' counsel shall not disclose the contents of any classified documents or information to any person, except those authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information.

O.   In the event that classified information enters the public domain, counsel is not precluded from making private or public statements about the

information already in the public domain, but only where the statements are not subject to the limitation set forth below. Counsel may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain. In an abundance of caution and to help ensure clarity on this matter, the Court emphasizes that counsel shall not be the source of any classified or protected information entering the public domain.

P.      The foregoing shall not prohibit petitioners' counsel from citing or repeating information in the public domain that petitioners' counsel does not know or have reason to believe to be classified information or a classified document, or derived from classified information or a classified document.

## 6. Secure Storage of Classified Information

A.      The Court Security Officer shall arrange for one appropriately secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case. Expenses for the secure area and its equipment shall be borne by the government.

B.      The Court Security Officer shall establish procedures to ensure that the secure area is accessible to the petitioners' counsel during normal business hours and at other times on reasonable request as approved by the Court Security Officer. The Court Security Officer shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information. The Court Security Officer or Court Security Officer designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all petitioners' counsel in this and other proceedings.

C.      All classified information provided by the government to counsel for petitioners, and all classified information otherwise possessed or maintained by petitioners' counsel, shall be stored, maintained, and used only in the secure area.

D.      No documents containing classified information may be removed from the

10

secure area unless authorized by the Court Security Officer or Court Security Officer designee supervising the area.

E.   Consistent with other provisions of this Protective Order, petitioners' counsel shall have access to the classified information made available to them in the secure area, and shall be allowed to take notes and prepare documents with respect to those materials only in the secure area.

F.   Petitioners' counsel shall not copy or reproduce any classified information in any form, except with the approval of the Court Security Officer or in accordance with the procedures established by the Court Security Officer for the operation of the secure area.

G.   All documents prepared by petitioners' counsel that do or may contain classified information (including without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Court) shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons who have received approval from the Court Security Officer for access to classified information.  Such activities shall take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the Court Security Officer.  All such documents and any associated materials containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) shall be maintained in the secure area unless and until the Court Security Officer advises that those documents or associated materials are unclassified in their entirety.  None of these materials shall be disclosed to counsel for the government unless authorized by the Court, by petitioners' counsel or as otherwise provided in this Protective Order.

H.   Petitioners' counsel shall discuss classified information only within the secure area or in another area authorized by the Court Security Officer, shall not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and shall not transmit or discuss classified information in electronic communications of any kind.

I.    The Court Security Officer or Court Security Officer designee shall not reveal to any person the content of any conversations she or he may hear by or among petitioners' counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the Court or to carry out their duties pursuant to this Order. In addition, the presence of the Court Security Officer or Court Security Officer designee shall not

11

operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.

J.   All documents containing classified information prepared, possessed or maintained by, or provided to, petitioners' counsel (except filings submitted to the Court and served on counsel for the government), shall remain at all times in the control of the Court Security Officer for the duration of these cases.

K.   As stated in more detail in SECTION 9 below, failure to comply with these rules may result in the revocation of counsel's security clearance as well as civil and/or criminal liability.

## 7. Access to Protected Information

A.   The Government may apply to the court to deem any information "protected," and if filed in this court to be maintained under seal. Such information must be maintained under seal unless and until the court determines the information should not be designated as "protected."

B.   Without authorization from the Government or the court, protected information may not be disclosed or distributed to any person or entity other than the following:

   i.    Petitioner's Counsel and counsel bound by the terms of this protective order in a case filed on behalf of another Detainee seeking review under the Detainee Treatment Act,

   ii.   the court and its support personnel, and

   iii.  a Detainee if the information was obtained in the first instance from the Detainee.

C.   Neither Petitioner nor Petitioner's Counsel may disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in this case except as otherwise provided herein.

D.   At no time, including any period subsequent to the conclusion of the proceedings, may Petitioner's Counsel make any public or private statements disclosing any protected information made available pursuant to this Protective Order, including the fact that any such information is protected.

12

E.    Protected information may be used only for purposes directly related to this case and not for any other litigation or proceeding, except by leave of the court. Photocopies of documents containing such information may be made only to the extent necessary to facilitate the permitted use hereunder.

F.    Nothing in this Protective Order prevents the Government from using for any purpose protected information it provides to a party. Nothing in this Protective Order entitles a nonparty to this case to protected information.

G.    Within ninety (90) days of the resolution of this action, and the termination of any certiorari review therefrom, all protected documents or information, and any copies thereof, provided to Petitioner's Counsel must be promptly destroyed, and Petitioner's Counsel must certify in writing that all designated documents and materials have been destroyed. Counsel for the government may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

H.    The Record on Review will be provided to Petitioner's Counsel upon a date established by order of the court.

### Procedures for Filing Documents

A.    Until further order of this Court, any pleadings or other document filed by a petitioner shall be filed under seal with the Court through the Court Security Officer unless the petitioner has obtained from the Court Security Officer permission, specific to a particular, non-substantive pleading or document (e.g., motions for extensions of time, continuances, scheduling matters, etc.) not containing information that is or may be classified or protected, to file the pleading or document not under seal. Petitioner's counsel will provide the original pleading and six copies thereof to the Court Security Officer. Two copies of an additional title page should accompany the filing provided to the CSO. This title page should only include the caption of the case, an unclassified title and should not include any classification markings. The Court shall direct the clerk to enter on

13

the docket sheet the title page, the date it was filed, and the fact that it has been filed under seal with the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall promptly examine the pleading or document and forward it to the appropriate agencies for their determination whether the pleading or document contains classified information. The CSO may consult with an individual or individuals in appropriate federal agencies for the purpose of identifying classified information and marking the documents with the appropriate classification markings. If it is determined that the pleading or document contains classified information, the Court Security Officer shall ensure that portion of the document, and only that portion, is marked with the appropriate classification marking and that the document remains under seal. If it is determined that the pleading or document contains protected information, the Court Security Officer shall ensure that portion of the document, and only that portion, remains under seal. Any document filed by petitioner that is determined not to contain classified information or protected information, and is not subject to any other restrictions on disclosure, shall immediately be unsealed by the Court Security Officer and placed in the public record. The Court Security Officer shall immediately deliver under seal to the Court and counsel for the government any pleading or document to be filed by petitioners that contains classified information or protected information.

B.    Any pleading or other document filed by the government containing classified information shall be filed under seal with the Court through the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall serve a copy of any classified pleadings by the government upon the Petitioner at the secure facility.

C.    Nothing herein shall require the government to disclose classified or protected information. Nor shall anything herein prohibit the government from submitting classified information or protected information to the Court *in camera* or *ex parte* in these proceedings, or entitle petitioners or petitioners' counsel access to such submissions or information. Except for good cause shown in the filing, the government shall provide counsel for the petitioner or petitioners with notice served on such counsel on the date of the filing.

### 9. Penalties for Unauthorized Disclosure

14

A. Any disclosure of classified information in violation of this order may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order shall be immediately brought to the attention of the Court and may result in a charge of contempt of Court and possible referral for criminal prosecution. *See, e.g.,* Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United States or may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could jeopardize the security of United States government personnel and facilities, and other significant government interests. This Protective Order is to ensure that those authorized to receive classified information and protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

B. The USG reserves the right to unilateral take protective measures to safeguard classified information if it concludes that any provision of the protective order has been violated and the result of such violation reasonably could be expect to lead to the unauthorized disclosure of classified information.

C. The termination of these proceedings shall not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.

15

Exhibit A

## MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO
## CLASSIFIED NATIONAL SECURITY INFORMATION

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421; 18 U.S.C. § 641; 50 U.S.C. § 783; 28 C.F.R. § 17 et seq.; and Executive Order 12958; I understand that I may be the recipient of information and documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States government. In consideration for the disclosure of classified information and documents:

(1) I agree that I shall never divulge, publish, or reveal either by word, conduct or any other means, such classified documents and information unless specifically authorized in writing to do so by an authorized representative of the United States government, or as expressly authorized by the Protective Order entered in the case captioned _____.

(2) I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.(3) I have received, read, and understand the Protective Order entered by the court in the case captioned _____, and I agree to comply with the provisions thereof.

16

# EXHIBIT
# QQ



# CCR Attorney Gives Unprecedented Classified Briefing to Senate Intelligence Committee on Details of CIA Torture Program

**CCR Calls for Congressional Oversight and Investigation Into CIA Torture Program and Destruction of Evidence**

**Contact:**

Jen Nessel, press@ccrjustice.org

*March 14, 2008, Washington, DC* – Today, an attorney from the Center for Constitutional Rights (CCR) provided the Senate Select Committee on Intelligence with an unprecedented classified briefing on details of the CIA's torture program. Gitanjali Gutierrez, CCR staff attorney, provided a thorough account of what was done to CCR client Majid Khan and of the on-the-ground implementation of the CIA's "enhanced interrogation" program. For the first time, Congress was briefed on details of the program by an individual independent from the Executive Branch and its official version of the CIA's practices.

The content of the briefing will be withheld from the public because the CIA deems the details classified. The government has required the attorneys for Mr. Khan to agree to a strict protective order to be able to meet with their client that has prevented them from publicly disclosing his treatment.

CCR represents former Baltimore resident and CIA ghost detainee Majid Khan, who spent three and half years in secret CIA prisons before reappearing at Guantanamo in September 2006. In court filings, CCR attorneys have asked a judge to order the preservation of all evidence relating to Majid's torture at CIA black sites and to declare that the interrogation methods used against Majid constitute torture. The declassified versions of the filings are heavily redacted, with any details of Majid's treatment censored.

*"Few outside of the Bush administration deny that the CIA has been operating a program of state-sanctioned torture,"* said **CCR attorney Gitanjali Gutierrez**. *"Yet the CIA seeks to avoid any accountability for its acts and, in fact, clings to its attitude that torture is 'business as usual.' As American citizens who learned details about the actual implementation of the torture program, we have turned to the Senate Committee to safeguard this country from an agency that is operating criminally, shamefully and dangerously."*

The Senate Intelligence Committee briefing was only open to members of the committee and their staff.. The briefing came les

Case 1:07-cv-05435-LAP    Document 74-15    Filed 06/25/2008    Page 63 of 63

than a week after President Bush vetoed an intelligence authorization bill passed by both houses of Congress that would have prohibited the coercive interrogation practices publicly believed to be part of the CIA ghost detention program. Last month, CIA Director Michael Hayden officially acknowledged for the first time that three men had been waterboarded by the United States. The White House subsequently defended the use of waterboarding, reserving the right to use it again and controversially reasserting that it does not violate any laws.

*"Majid Khan was disappeared and tortured for years by the U.S. government,"* said **CCR Executive Director Vincent Warren.** *"This was the first time any member of Congress has had the opportunity to hear what happened to him, but hearing second hand in a secret committee briefing is not enough. It is past time for Congress to intervene to stop torture and secret detention, and for the public to know what has been done in our name."*

CCR has led the legal battle over Guantanamo for the last six years – sending the first ever habeas attorney to the base and sending the first attorney to meet with a former CIA "ghost detainee" now held at Guantanamo. CCR has been responsible for organizing and coordinating a coalition of hundreds of pro-bono lawyers in order to defend the men at Guantanamo. On December 5, CCR represented the detainees along with co-counsel before the Supreme Court; the ruling is expected this spring.

For more information and documents relating to Majid Khan, go to http://ccrjustice.org/ourcases/current-cases/khan-v.-bush-/-khan-v.-gates.

*The Center for Constitutional Rights is dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR is a non-profit legal and educational organization committed to the creative use of law as a positive force for social change.*

- 30 -