# EXHIBIT
# AAA



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
October 17, 2006

# President Bush Signs Military Commissions Act of 2006
The East Room

- Fact Sheet: The Military Commissions Act of 2006
- In Focus: National Security
- En Español



VIDEO Multimedia

President's Remarks
view

9:35 A.M. EDT

THE PRESIDENT: Welcome to the White House on an historic day. It is a rare occasion when a President can sign a bill he knows will save American lives. I have that privilege this morning.

The Military Commissions Act of 2006 is one of the most important pieces of legislation in the war on terror. This bill will allow the Central Intelligence Agency to continue its program for questioning key terrorist leaders and operatives like Khalid Sheikh Mohammed, the man believed to be the mastermind of the September the 11th, 2001 attacks on our country. This program has been one of the most successful intelligence efforts in American history. It has helped prevent attacks on our country. And the bill I sign today will ensure that we can continue using this vital tool to protect the American people for years to come. The Military Commissions Act will also allow us to prosecute captured terrorists for war crimes through a full and fair trial.



Last month, on the fifth anniversary of 9/11, I stood with Americans who lost family members in New York and Washington and Pennsylvania. I listened to their stories of loved ones they still miss. I told them America would never forget their loss. Today I can tell them something else: With the bill I'm about to sign, the men our intelligence officials believe orchestrated the murder of nearly 3,000 innocent people will face justice.

I want to thank the Vice President for joining me today. Mr. Vice President, appreciate you. Secretary Don Rumsfeld, I appreciate your service to our country. I want to thank Attorney General Al Gonzales; General Mike Hayden, Director of the Central Intelligence Agency; General Pete Pace, Chairman of the Joint Chiefs of Staff.

I appreciate very much Senator John Warner, Chairman of the Senate Armed Services Committee, and Congressman Duncan Hunter, Chairman of the House Armed Services Committee, for joining us today. I want to thank both of these men for their leadership. I appreciate Senator Lindsey Graham, from South Carolina, joining us; Congressman Jim Sensenbrenner, Chairman of the House Judiciary Committee; Congressman Steve Buyer, of Indiana; Congressman Chris Cannon, of Utah. Thank you all for coming.

The bill I sign today helps secure this country, and it sends a clear message: This nation is patient and decent and fair, and we will never back down from the threats to our freedom.

One of the terrorists believed to have planned the 9/11 attacks said he hoped the attacks would be the beginning of the end of America. He didn't get his wish. We are as determined today as we were on the morning of the September the 12th, 2001. We'll meet our obligation to protect our people, and no matter how

long it takes, justice will be done.

When I proposed this legislation, I explained that I would have one test for the bill Congress produced: Will it allow the CIA program to continue? This bill meets that test. It allows for the clarity our intelligence professionals need to continue questioning terrorists and saving lives. This bill provides legal protections that ensure our military and intelligence personnel will not have to fear lawsuits filed by terrorists simply for doing their jobs.



This bill spells out specific, recognizable offenses that would be considered crimes in the handling of detainees so that our men and women who question captured terrorists can perform their duties to the fullest extent of the law. And this bill complies with both the spirit and the letter of our international obligations. As I've said before, the United States does not torture. It's against our laws and it's against our values.

By allowing the CIA program to go forward, this bill is preserving a tool that has saved American lives. The CIA program helped us gain vital intelligence from Khalid Sheikh Mohammed and Ramzi Binalshibh, two of the men believed to have helped plan and facilitate the 9/11 attacks. The CIA program helped break up a cell of 17 southeastern Asian terrorist operatives who were being groomed for attacks inside the United States. The CIA program helped us uncover key operatives in al Qaeda's biological weapons program, including a cell developing anthrax to be used in terrorist attacks.

The CIA program helped us identify terrorists who were sent to case targets inside the United States, including financial buildings in major cities on the East Coast. And the CIA program helped us stop the planned strike on U.S. Marines in Djibouti, a planned attack on the U.S. consulate in Karachi, and a plot to hijack airplanes and fly them into Heathrow Airport and Canary Wharf in London.

Altogether, information from terrorists in CIA custody has played a role in the capture or questioning of nearly every senior al Qaeda member or associate detained by the United States and its allies since this program began. Put simply, this program has been one of the most vital tools in our war against the terrorists. It's been invaluable both to America and our allies. Were it not for this program, our intelligence community believes that al Qaeda and its allies would have succeeded in launching another attack against the American homeland. By allowing our intelligence professionals to continue this vital program, this bill will save American lives. And I look forward to signing it into law.

The bill I'm about to sign also provides a way to deliver justice to the terrorists we have captured. In the months after 9/11, I authorized a system of military commissions to try foreign terrorists accused of war crimes. These commissions were similar to those used for trying enemy combatants in the Revolutionary War and the Civil War and World War II. Yet the legality of the system I established was challenged in the court, and the Supreme Court ruled that the military commissions needed to be explicitly authorized by the United States Congress.

And so I asked Congress for that authority, and they have provided it. With the Military Commission Act, the legislative and executive branches have agreed on a system that meets our national security needs. These military commissions will provide a fair trial, in which the accused are presumed innocent, have access to an attorney, and can hear all the evidence against them. These military commissions are lawful, they are fair, and they are necessary.

When I sign this bill into law, we will use these commissions to bring justice to the men believed to have planned the attacks of September the 11th, 2001. We'll also seek to prosecute those believed responsible for the attack on the USS Cole, which killed 17 American sailors six years ago last week. We will seek to prosecute an operative believed to have been involved in the bombings of the American embassies in Kenya and Tanzania, which killed more than 200 innocent people and wounded 5,000 more. With our actions, we will send a clear message to those who kill Americans: We will find you and

we will bring you to justice.

Over the past few months the debate over this bill has been heated, and the questions raised can seem complex. Yet, with the distance of history, the questions will be narrowed and few: Did this generation of Americans take the threat seriously, and did we do what it takes to defeat that threat? Every member of Congress who voted for this bill has helped our nation rise to the task that history has given us. Some voted to support this bill even when the majority of their party voted the other way. I thank the legislators who brought this bill to my desk for their conviction, for their vision, and for their resolve.

There is nothing we can do to bring back the men and women lost on September 11th, 2001. Yet we'll always honor their memory and we will never forget the way they were taken from us. This nation will call evil by its name. We will answer brutal murder with patient justice. Those who kill the innocent will be held to account.

With this bill, America reaffirms our determination to win the war on terror. The passage of time will not dull our memory or sap our nerve. We will fight this war with confidence and with clear purpose. We will protect our country and our people. We will work with our friends and allies across the world to defend our way of life. We will leave behind a freer, safer and more peaceful world for those who follow us.

And now, in memory of the victims of September the 11th, it is my honor to sign the Military Commissions Act of 2006 into law. (Applause.)

(The bill is signed.)

END 9:47 A.M. EDT

---

Return to this article at:
http://www.whitehouse.gov/news/releases/2006/10/20061017-1.html

CLICK HERE TO PRINT

# EXHIBIT BBB

[DOCID: f:publ366.109]

[[Page 2599]]

MILITARY COMMISSIONS ACT OF 2006

[[Page 120 STAT. 2600]]

Public Law 109-366
109th Congress

An Act

To authorize trial by military commission for violations of the law of
war, and for other purposes. <<NOTE: Oct. 17, 2006 -  [S. 3930]>>

    Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled, <<NOTE: Military
Commissions Act of 2006.>>

SECTION 1. <<NOTE: 10 USC 948a note.>> SHORT TITLE; TABLE OF CONTENTS.

    (a) Short Title.--This Act may be cited as the ``Military
Commissions Act of 2006''.
    (b) Table of Contents.--The table of contents for this Act is as
follows:

Sec. 1. Short title; table of contents.
Sec. 2. Construction of Presidential authority to establish military
          commissions.
Sec. 3. Military commissions.
Sec. 4. Amendments to Uniform Code of Military Justice.
Sec. 5. Treaty obligations not establishing grounds for certain claims.
Sec. 6. Implementation of treaty obligations.
Sec. 7. Habeas corpus matters.
Sec. 8. Revisions to Detainee Treatment Act of 2005 relating to
          protection of certain United States Government personnel.
Sec. 9. Review of judgments of military commissions.
Sec. 10. Detention covered by review of decisions of Combatant Status
          Review Tribunals of propriety of detention.

SEC. 2. <<NOTE: 10 USC 948a note.>> CONSTRUCTION OF PRESIDENTIAL
            AUTHORITY TO ESTABLISH MILITARY COMMISSIONS.

    The authority to establish military commissions under chapter 47A of
title 10, United States Code, as added by section 3(a), may not be
construed to alter or limit the authority of the President under the
Constitution of the United States and laws of the United States to
establish military commissions for areas declared to be under martial
law or in occupied territories should circumstances so require.

SEC. 3. MILITARY COMMISSIONS.

    (a) Military Commissions.--
            (1) In general.--Subtitle A of title 10, United States Code,
        is amended by inserting after chapter 47 the following new
        chapter:

``CHAPTER 47A--MILITARY COMMISSIONS

``Subchapter
``I. General Provisions.......................................... 948a
``II. Composition of Military Commissions......................... 948h
``III. Pre-Trial Procedure....................................... 948q
``IV. Trial Procedure........................................... 949a
``V. Sentences................................................. 949s

[[Page 120 STAT. 2601]]

``VI. Post-Trial Procedure and Review of Military Commissions..... 950a
``VII. Punitive Matters......................................... 950p

``SUBCHAPTER I--GENERAL PROVISIONS

``Sec.
``948a. Definitions.
``948b. Military commissions generally.
``948c. Persons subject to military commissions.
``948d. Jurisdiction of military commissions.
``948e. Annual report to congressional committees.

``Sec. 948a. Definitions

    ``In this chapter:
        ``(1) Unlawful enemy combatant.--(A) The term `unlawful
    enemy combatant' means--
                ``(i) a person who has engaged in hostilities or who
            has purposefully and materially supported hostilities
            against the United States or its co-belligerents who is
            not a lawful enemy combatant (including a person who is
            part of the Taliban, al Qaeda, or associated forces); or
                ``(ii) a person who, before, on, or after the date
            of the enactment of the Military Commissions Act of
            2006, has been determined to be an unlawful enemy
            combatant by a Combatant Status Review Tribunal or
            another competent tribunal established under the
            authority of the President or the Secretary of Defense.
        ``(B) Co-belligerent.--In this paragraph, the term `co-
    belligerent', with respect to the United States, means any State
    or armed force joining and directly engaged with the United
    States in hostilities or directly supporting hostilities against
    a common enemy.
        ``(2) Lawful enemy combatant.--The term `lawful enemy
    combatant' means a person who is--
                ``(A) a member of the regular forces of a State
            party engaged in hostilities against the United States;
                ``(B) a member of a militia, volunteer corps, or
            organized resistance movement belonging to a State party
            engaged in such hostilities, which are under responsible
            command, wear a fixed distinctive sign recognizable at a
            distance, carry their arms openly, and abide by the law
            of war; or
                ``(C) a member of a regular armed force who
            professes allegiance to a government engaged in such
            hostilities, but not recognized by the United States.
        ``(3) Alien.--The term `alien' means a person who is not a
    citizen of the United States.
        ``(4) Classified information.--The term `classified

regulations.--Section 836 (article 36) is amended--
       (A) in subsection (a), by inserting ``, except as
provided in chapter 47A of this title,'' after ``but
which may not''; and
       (B) in subsection (b), by inserting before the
period at the end ``, except insofar as applicable to
military commissions established under chapter 47A of
this title''.

    (b) Punitive Article of Conspiracy.--Section 881 of title 10, United
States Code (article 81 of the Uniform Code of Military Justice), is
amended--
       (1) by inserting ``(a)'' before ``Any person''; and
       (2) by adding at the end the following new subsection:

    ``(b) Any person subject to this chapter who conspires with any
other person to commit an offense under the law of war, and who
knowingly does an overt act to effect the object of the conspiracy,
shall be punished, if death results to one or more of the victims, by
death or such other punishment as a court-martial or military commission
may direct, and, if death does not result to any of the victims, by such
punishment, other than death, as a court-martial or military commission
may direct.''.

SEC. 5. <<NOTE: 28 USC 2241 note.>> TREATY OBLIGATIONS NOT ESTABLISHING
          GROUNDS FOR CERTAIN CLAIMS.

    (a) In General.--No person may invoke the Geneva Conventions or any
protocols thereto in any habeas corpus or other civil action or
proceeding to which the United States, or a current or former officer,
employee, member of the Armed Forces, or other agent of the United
States is a party as a source of rights in any court of the United
States or its States or territories.

[[Page 120 STAT. 2632]]

    (b) Geneva Conventions Defined.--In this section, the term ``Geneva
Conventions'' means--
       (1) the Convention for the Amelioration of the Condition of
the Wounded and Sick in Armed Forces in the Field, done at
Geneva August 12, 1949 (6 UST 3114);
       (2) the Convention for the Amelioration of the Condition of
the Wounded, Sick, and Shipwrecked Members of the Armed Forces
at Sea, done at Geneva August 12, 1949 (6 UST 3217);
       (3) the Convention Relative to the Treatment of Prisoners of
War, done at Geneva August 12, 1949 (6 UST 3316); and
       (4) the Convention Relative to the Protection of Civilian
Persons in Time of War, done at Geneva August 12, 1949 (6 UST
3516).

SEC. 6. <<NOTE: 18 USC 2441 note.>> IMPLEMENTATION OF TREATY
          OBLIGATIONS.

    (a) Implementation of Treaty Obligations.--
       (1) In general.--The acts enumerated in subsection (d) of
section 2441 of title 18, United States Code, as added by
subsection (b) of this section, and in subsection (c) of this
section, constitute violations of common Article 3 of the Geneva
Conventions prohibited by United States law.
       (2) Prohibition on grave breaches.--The provisions of

section 2441 of title 18, United States Code, as amended by this section, fully satisfy the obligation under Article 129 of the Third Geneva Convention for the United States to provide effective penal sanctions for grave breaches which are encompassed in common Article 3 in the context of an armed conflict not of an international character. No foreign or international source of law shall supply a basis for a rule of decision in the courts of the United States in interpreting the prohibitions enumerated in subsection (d) of such section 2441.

    (3) Interpretation by the president.--

        (A) As provided by the Constitution and by this section, the President has the authority for the United States to interpret the meaning and application of the Geneva Conventions and to promulgate higher standards and administrative regulations for violations of treaty obligations which are not grave breaches of the Geneva Conventions.

        (B) <<NOTE: President. Federal Register, publication.>> The President shall issue interpretations described by subparagraph (A) by Executive Order published in the Federal Register.

        (C) Any Executive Order published under this paragraph shall be authoritative (except as to grave breaches of common Article 3) as a matter of United States law, in the same manner as other administrative regulations.

        (D) Nothing in this section shall be construed to affect the constitutional functions and responsibilities of Congress and the judicial branch of the United States.

    (4) Definitions.--In this subsection:

        (A) Geneva conventions.--The term ``Geneva Conventions'' means--

            (i) the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, done at Geneva August 12, 1949 (6 UST 3217);

[[Page 120 STAT. 2633]]

            (ii) the Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, done at Geneva August 12, 1949 (6 UST 3217);

            (iii) the Convention Relative to the Treatment of Prisoners of War, done at Geneva August 12, 1949 (6 UST 3316); and

            (iv) the Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516).

        (B) Third geneva convention.--The term ``Third Geneva Convention'' means the international convention referred to in subparagraph (A)(iii).

  (b) Revision to War Crimes Offense Under Federal Criminal Code.--

    (1) In general.--Section 2441 of title 18, United States Code, is amended--

        (A) in subsection (c), by striking paragraph (3) and inserting the following new paragraph (3):

  ``(3) which constitutes a grave breach of common Article 3

# EXHIBIT
# CCC

[Federal Register: July 24, 2007 (Volume 72, Number 141)]
[
Presidential Documents]
[Page 40705-40709]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr24jy07-167]

[[Page 40705]]

-----------------------------------------------------------------------

Part III

The President

-----------------------------------------------------------------------

Executive Order 13440--Interpretation of the Geneva Conventions Common
Article 3 as Applied to a Program of Detention and Interrogation
Operated by the Central Intelligence Agency

Presidential Documents

Title 3--
The President

[[Page 40707]]

Executive Order 13440 of July 20, 2007

Interpretation of the Geneva Conventions Common
Article 3 as Applied to a Program of Detention and
Interrogation Operated by the Central Intelligence
Agency

By the authority vested in me as President and
Commander in Chief of the Armed Forces by the
Constitution and the laws of the United States of
America, including the Authorization for Use of
Military Force (Public Law 107-40), the Military
Commissions Act of 2006 (Public Law 109-366), and
section 301 of title 3, United States Code, it is
hereby ordered as follows:

Section 1. General Determinations. (a) The United
States is engaged in an armed conflict with al Qaeda,
the Taliban, and associated forces. Members of al Qaeda

were responsible for the attacks on the United States of September 11, 2001, and for many other terrorist attacks, including against the United States, its personnel, and its allies throughout the world. These forces continue to fight the United States and its allies in Afghanistan, Iraq, and elsewhere, and they continue to plan additional acts of terror throughout the world. On February 7, 2002, I determined for the United States that members of al Qaeda, the Taliban, and associated forces are unlawful enemy combatants who are not entitled to the protections that the Third Geneva Convention provides to prisoners of war. I hereby reaffirm that determination.

(b) The Military Commissions Act defines certain prohibitions of Common Article 3 for United States law, and it reaffirms and reinforces the authority of the President to interpret the meaning and application of the Geneva Conventions.

Sec. 2. Definitions. As used in this order:

(a) ``Common Article 3'' means Article 3 of the Geneva Conventions.

(b) ``Geneva Conventions'' means:

(i) the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, done at Geneva August 12, 1949 (6 UST 3114);

(ii) the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, done at Geneva August 12, 1949 (6 UST 3217);

(iii) the Convention Relative to the Treatment of Prisoners of War, done at Geneva August 12, 1949 (6 UST 3316); and

(iv) the Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516).

(c) ``Cruel, inhuman, or degrading treatment or punishment'' means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

Sec. 3. Compliance of a Central Intelligence Agency Detention and Interrogation Program with Common Article 3. (a) Pursuant to the authority of the President under the Constitution and the laws of the United States, including the Military Commissions Act of 2006, this order interprets the meaning and application of the text of Common Article 3 with respect to certain detentions and interrogations, and shall be treated as authoritative for all

[[Page 40708]]

purposes as a matter of United States law, including satisfaction of the international obligations of the United States. I hereby determine that Common Article 3 shall apply to a program of detention and interrogation operated by the Central Intelligence Agency as set forth in this section. The requirements set forth in this section shall be applied with respect to detainees in such program without adverse distinction as to their

race, color, religion or faith, sex, birth, or wealth.

(b) I hereby determine that a program of detention and interrogation approved by the Director of the Central Intelligence Agency fully complies with the obligations of the United States under Common Article 3, provided that:

(i) the conditions of confinement and interrogation practices of the program do not include:

(A) torture, as defined in section 2340 of title 18, United States Code;

(B) any of the acts prohibited by section 2441(d) of title 18, United States Code, including murder, torture, cruel or inhuman treatment, mutilation or maiming, intentionally causing serious bodily injury, rape, sexual assault or abuse, taking of hostages, or performing of biological experiments;

(C) other acts of violence serious enough to be considered comparable to murder, torture, mutilation, and cruel or inhuman treatment, as defined in section 2441(d) of title 18, United States Code;

(D) any other acts of cruel, inhuman, or degrading treatment or punishment prohibited by the Military Commissions Act (subsection 6(c) of Public Law 109-366) and the Detainee Treatment Act of 2005 (section 1003 of Public Law 109-148 and section 1403 of Public Law 109-163);

(E) willful and outrageous acts of personal abuse done for the purpose of humiliating or degrading the individual in a manner so serious that any reasonable person, considering the circumstances, would deem the acts to be beyond the bounds of human decency, such as sexual or sexually indecent acts undertaken for the purpose of humiliation, forcing the individual to perform sexual acts or to pose sexually, threatening the individual with sexual mutilation, or using the individual as a human shield; or

(F) acts intended to denigrate the religion, religious practices, or religious objects of the individual;

(ii) the conditions of confinement and interrogation practices are to be used with an alien detainee who is determined by the Director of the Central Intelligence Agency:

(A) to be a member or part of or supporting al Qaeda, the Taliban, or associated organizations; and

(B) likely to be in possession of information that:

(1) could assist in detecting, mitigating, or preventing terrorist attacks, such as attacks within the United States or against its Armed Forces or other personnel, citizens, or facilities, or against allies or other countries cooperating in the war on terror with the United States, or their armed forces or other personnel, citizens, or facilities; or

(2) could assist in locating the senior leadership of al Qaeda, the Taliban, or associated forces;

(iii) the interrogation practices are determined by the Director of the Central Intelligence Agency, based upon professional advice, to be safe for use with each detainee with whom they are used; and

(iv) detainees in the program receive the basic necessities of life, including adequate food and water, shelter from the elements, necessary clothing, protection from extremes of heat and cold, and essential medical care.

(c) The Director of the Central Intelligence Agency

shall issue written policies to govern the program, including guidelines for Central Intelligence Agency personnel that implement paragraphs (i)(C), (E), and (F) of subsection 3(b) of this order, and including requirements to ensure:

[[Page 40709]]

(i) safe and professional operation of the program;

(ii) the development of an approved plan of interrogation tailored for each detainee in the program to be interrogated, consistent with subsection 3(b)(iv) of this order;

(iii) appropriate training for interrogators and all personnel operating the program;

(iv) effective monitoring of the program, including with respect to medical matters, to ensure the safety of those in the program; and

(v) compliance with applicable law and this order.

Sec. 4. Assignment of Function. With respect to the program addressed in this order, the function of the President under section 6(c)(3) of the Military Commissions Act of 2006 is assigned to the Director of National Intelligence.

Sec. 5. General Provisions. (a) Subject to subsection (b) of this section, this order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

(b) Nothing in this order shall be construed to prevent or limit reliance upon this order in a civil, criminal, or administrative proceeding, or otherwise, by the Central Intelligence Agency or by any individual acting on behalf of the Central Intelligence Agency in connection with the program addressed in this order.

(Presidential Sig.)

THE WHITE HOUSE,

July 20, 2007.

[FR Doc. 07-3656
Filed 7-23-07; 10:16 am]

Billing code 3195-01-P

# EXHIBIT DDD

| Search | ⮞ |
|---|---|

Press Releases & Statements

# Director's Statement on Lawful Interrogation

**Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on Lawful Interrogation**

**February 13, 2008**

In Congressional testimony last week, I confirmed publicly that waterboarding had been used on three hardened terrorists in our high-value interrogation program. That tactic, which has not been employed since 2003, was deemed legal by the Department of Justice when it was used. Beyond those two facts, I also shared with the Congress my view of changes in the legal landscape over the past five years, and the need to take those changes into account should waterboarding ever be considered for use again.

My testimony attracted a fair amount of public attention and comment, not all of it accurate. Before both the Senate and the House, I emphasized that our program has operated within a strict legal framework, subject to review and oversight. Indeed, CIA has over time and at its own initiative modified the methods it has applied, in keeping with—or in anticipation of—modifications to the law.

The Agency's decision to employ waterboarding in the wake of 9/11 was not only lawful, it reflected the circumstances of the time.  In reply to a question at the Senate hearing, I said: "Very critical to those circumstances was the belief that additional catastrophic attacks against the homeland were imminent. In addition to that, my Agency and our Community writ large had limited knowledge about al-Qa'ida and its workings. Those two realities have changed."

Two days later, at the House hearing, I was asked whether waterboarding is prohibited under current law. My response was: "It's not a technique that I've asked for. It is not included in the current program, and in my own view, the view of my lawyers and the Department of Justice, it is not certain that the technique would be considered lawful under current statute." Put bluntly, I could not—and would not—presume to prejudge the outcome of a legal assessment that has not
even been requested. It was as simple as that.

CIA's terrorist interrogation program, lawful and effective, was born of necessity. As President Bush told the nation in September 2006, the Agency applied its methods of questioning when other techniques did not work and when a captured terrorist "had more information that could save innocent lives." Unlike traditional law enforcement, the CIA's chief objective in interrogations is not forensics on past events, but actionable, forward-looking intelligence.

My testimony was in accord with recent statements from the White House and Department of Justice. The Attorney General, in particular, told Congress that his Department had authorized the Agency's use of specific interrogation methods and that there is a process in place to review the legality of any technique that might in the future be proposed for inclusion in the CIA program. As befits a Republic of laws, this vital counter-terror initiative rests on a strong legal foundation.

Mike Hayden

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# EXHIBIT EEE

**U.S. Department of Justice**
Office of the Inspector General

# A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq



Oversight and Review Division
Office of the Inspector General
May 2008

UNCLASSIFIED

# CHAPTER FOUR
# THE EARLY DEVELOPMENT OF FBI POLICIES REGARDING DETAINEE INTERVIEWS AND INTERROGATIONS

In this chapter we describe the early development of the FBI's policies governing the conduct of its agents who participated in interviews or interrogations in foreign military zones. This process began in 2002, when FBI Director Mueller decided that the FBI would not participate in interrogations involving aggressive techniques that were approved for other agencies in military zones. The issue came to a head when the FBI sought to participate in the interrogation of a high value detainee, Abu Zubaydah, who was under the control of the CIA.

## I.    The Interrogation of Abu Zubaydah

The first major incident involving the use of aggressive interrogation techniques on a detainee that was reported to senior executives at FBI Headquarters was the case of a detainee known as Abu Zubaydah. Zubaydah was suspected of being a principal al Qaeda operational commander. In late March 2002, he was captured in Faisalabad, Pakistan. There was a gunfight during the arrest operation and Zubaydah was severely wounded. He was then taken to a secret CIA facility for medical treatment and interrogation.

Initially, the FBI and the CIA planned a joint effort to obtain intelligence from Zubaydah regarding potential future terrorist attacks. The FBI selected SSAs Gibson and Thomas to travel to the CIA facility to interview Zubaydah.[41] Gibson and Thomas were selected for the assignment because they were familiar with al-Qaeda and the Zubaydah investigation, were skilled interviewers, and spoke Arabic.

### A.    FBI Agents Interview Zubaydah and Report to FBI Headquarters on CIA Techniques

Gibson and Thomas were instructed by their FBI supervisor, Charles Frahm (Acting Deputy Assistant Director for the section that later became the Counterterrorism Division), that the CIA was in charge of the Zubaydah matter and that the FBI agents were there to provide assistance. Frahm told the agents that Zubaydah was not to be given any *Miranda* warnings. Frahm told the OIG that he instructed Thomas and Gibson to leave the

---

[41] Thomas and Gibson are pseudonyms.

facility and call Headquarters if the CIA began using techniques that gave the agents discomfort.

Gibson said that he and Thomas initially took the lead in interviewing Zubaydah at the CIA facility because the CIA interrogators were not at the scene when Zubaydah arrived. Gibson said he used relationship-building techniques with Zubaydah and succeeded in getting Zubaydah to admit his identity. When Zubaydah's medical condition became grave, he was taken to a hospital and Gibson assisted in giving him care, even to the point of cleaning him up after bowel movements. Gibson told us he continued interviewing Zubaydah in the hospital, and Zubaydah identified a photograph of Khalid Sheik Muhammad as "Muktar," the mastermind of the September 11 attacks.

Within a few days, CIA personnel assumed control over the interviews, although they asked Gibson and Thomas to observe and assist. Gibson told the OIG that the CIA interrogators said Zubaydah was only providing "throw-away information" and that they needed to diminish his capacity to resist.

Thomas described for the OIG the techniques that he saw the CIA interrogators use on Zubaydah after they took control of the interrogation. ███████████████████████████████████████████████████████████ Thomas said he raised objections to these techniques to the CIA and told the CIA it was "borderline torture."[42] He stated that Zubaydah was responding to the FBI's rapport-based approach before the CIA assumed control over the interrogation, but became uncooperative after being subjected to the CIA's techniques.

During his interview with the OIG, Gibson did not express as much concern about the techniques used by the CIA as Thomas did. Gibson stated, however, that during the period he was working with the CIA, █████████████████████████████████████████████████████



42 ████

68

[REDACTED] Gibson said that the CIA personnel assured him that the procedures being used on Zubaydah had been approved "at the highest levels" and that Gibson would not get in any trouble. [REDACTED]

Thomas communicated his concerns about the CIA's methods to FBI Counterterrorism Assistant Director Pasquale D'Amuro by telephone. D'Amuro and Thomas told the OIG that D'Amuro ultimately gave the instruction that Thomas and Gibson should come home and not participate in the CIA interrogation. However, Gibson and Thomas provided the OIG differing accounts of the circumstances of their departure from the CIA facility where Zubaydah was being interrogated. Thomas stated that D'Amuro instructed the agents to leave the facility immediately and that he complied.

However, Gibson said he was not immediately ordered to leave the facility. Gibson said that he remained at the CIA facility until some time in early June 2002, several weeks after Thomas left, and that he continued to work with the CIA and participate in interviewing Zubaydah. Gibson stated that he kept Frahm informed of his activities with the CIA by means of several telephone calls, which Frahm confirmed. Gibson stated the final decision regarding whether the FBI would continue to participate in the Zubaydah interrogations was not made until after Gibson returned to the United States for a meeting about Zubaydah.

Gibson stated that after he returned to the United States he told D'Amuro that he did not have a "moral objection" to being present for the CIA techniques because the CIA was acting professionally and Gibson himself had undergone comparable harsh interrogation techniques as part of U.S. Army Survival, Evasion, Resistance, and Escape (SERE) training. Gibson said that after a meeting with the CIA, D'Amuro told him that he would not be returning to the Zubaydah interview.

## B.    FBI Assistant Director D'Amuro Meets with DOJ Officials Regarding the Zubaydah Interrogation

D'Amuro said he discussed the Zubaydah matter with Director Mueller and later met with Michael Chertoff (then the Assistant Attorney General for the Criminal Division), Alice Fisher (at the time the Deputy Assistant Attorney General for the Criminal Division), and possibly David Kelley (who was then the First Assistant U.S. Attorney for the Southern

District of New York), in Chertoff's office in the Justice Department. D'Amuro said his purpose was to discuss how the FBI could "add value" by participating in the interviews of "highvalue detainees" because the FBI already knew the subjects so well. D'Amuro told the OIG that during the meeting he learned that the CIA had obtained a legal opinion from DOJ that certain techniques could legally be used, including ███████████████ ███████████████████████████████████████. D'Amuro stated that Chertoff and Fisher made it clear that the CIA had requested the legal opinion from Attorney General Ashcroft.

Based on DOJ and CIA documents, we believe that the meeting that D'Amuro described took place in approximately late July or August 2002. DOJ documents indicated that the CIA requested an opinion from the DOJ Office of Legal Counsel (OLC) regarding the proposed use of



Fisher told the OIG that it is possible that she attended a meeting in Chertoff's office with Kelley, D'Amuro, and Chertoff, which concerned who would take the lead (FBI versus another agency) on the interviews of a high value detainee. However, she said she had no specific recollection of such a meeting. Fisher also stated that she did not recall discussing with the FBI specific techniques for use with detainees. Fisher said she vaguely remembered a meeting with then FBI General Counsel Kenneth Wainstein in which they discussed the FBI not being present at CIA interrogations, and she stated that the meeting would have related to interrogation tactics, but she said she did not recall any specific techniques being discussed.[43] Wainstein, who joined the FBI in July 2002, told us he recalled a number of discussions relating to the issue of FBI participation in CIA interrogations,

---

[43] Fisher stated that at some point she became aware that the CIA requested advice regarding specific interrogation techniques, and that OLC had conducted a legal analysis. She also said she was aware of two OLC memoranda on that topic, but they did not relate to the FBI. Fisher also told the OIG that Chertoff was very clear that the Criminal Division was not giving advice on which interrogation techniques were permissible and was not "signing off" in advance on any techniques.

but he did not recall this issue arising in connection with a particular detainee.

Kelley told the OIG that he had numerous conversations with Fisher, Nahmias, and other DOJ attorneys about topics relating to the September 11 investigation, but that he could not recall any specific meetings or conversations regarding the interrogation methods to be used on high value detainees. Kelley stated that D'Amuro was present during one or more of these discussions.

Chertoff told us that he could not recall specific conversations about Zubaydah, but that he did generally recall discussions about whether the FBI could preserve the admissibility of detainee statements by interviewing detainees some period after other agencies had completed their interrogations using non-FBI techniques. Chertoff also told us that he did not think this approach would successfully prevent the statement from being "tainted" by any prior enhanced interview techniques.

## C.    D'Amuro Meets with the FBI Director, Who Decides that the FBI Will Not Participate

D'Amuro told the OIG that after his meeting at Chertoff's office he met with Director Mueller and recommended that the FBI not get involved in interviews in which aggressive interrogation techniques were being used. He stated that his exact words to Mueller were "we don't do that," and that someday the FBI would be called to testify and he wanted to be able to say that the FBI did not participate in this type of activity. D'Amuro said that the Director agreed with his recommendation that the FBI should not participate in interviews in which these techniques were used. Based on D'Amuro's description of events and the dates of contemporaneous documents relating to the CIA's request for a legal opinion from the OLC, we believe that D'Amuro's meeting with Mueller took place in approximately August 2002. This time frame is also consistent with Gibson's recollection that the final decision regarding whether the FBI would participate in the Zubaydah interrogations occurred some time after Gibson left the location where Zubaydah was being held and returned to the United States in June 2002.

D'Amuro gave several reasons to the OIG for his recommendation that the FBI refrain from participating in the use of these techniques. First, he said he felt that these techniques were not as effective for developing accurate information as the FBI's rapport-based approach, which he stated had previously been used successfully to get cooperation from al-Qaeda members. He explained that the FBI did not believe these techniques would provide the intelligence it needed and the FBI's proven techniques would. He said the individuals being interrogated came from parts of the world

where much worse interview techniques were used, and they expected the United States to use these harsh techniques. As a result, D'Amuro did not think the techniques would be effective in obtaining accurate information. He said what the detainees did not expect was to be treated as human beings. He said the FBI had successfully obtained information through cooperation without the use of "aggressive" techniques. D'Amuro said that when the interrogator knows the subject matter, vets the information, and catches an interviewee when he lies, the interrogator can eventually get him to tell the truth. In contrast, if "aggressive" techniques are used long enough, detainees will start saying things they think the interrogator wants to hear just to get them to stop.

Second, D'Amuro told the OIG that the use of the aggressive techniques failed to take into account an "end game." D'Amuro stated that even a military tribunal would require some standard for admissibility of evidence. Obtaining information by way of "aggressive" techniques would not only jeopardize the government's ability to use the information against the detainees, but also might have a negative impact on the agents' ability to testify in future proceedings. D'Amuro also stated that using the techniques complicated the FBI's ability to develop sources.

Third, D'Amuro stated that in addition to being ineffective and short-sighted, using these techniques was wrong and helped al-Qaeda in spreading negative views of the United States. In contrast, D'Amuro noted the East Africa bombing trials were public for all the world to see. He said they were conducted legally and above board and the world saw that the defendants killed not only Americans but also innocent Muslims. D'Amuro said he took some criticism from FBI agents who wanted to participate in interviews involving "aggressive" techniques, but he felt strongly that they should not participate, and the Director agreed.

Andrew Arena, the Section Chief of the FBI's International Terrorism Operations Section 1 (ITOS-1), confirmed that D'Amuro argued against the use of aggressive procedures. Arena told the OIG that he attended a meeting involving Mueller, D'Amuro, and other FBI employees in 2002 regarding the FBI's participation in aggressive interrogation techniques. Arena stated that the issue arose when FBI agents became aware that another government agency was using specific techniques on high value detainees. Arena stated that there were discussions within the FBI regarding "should we also go down that track?" Arena told the OIG that during the meeting D'Amuro predicted that the FBI would have to testify before Congress some day and that the FBI should be able to say that it did not participate. Arena said he was present when Director Mueller stated

that the FBI was not going to get involved with other agencies in using these techniques at any location.[44]

We interviewed Director Mueller, who recalled that the FBI wanted to interrogate someone held by the CIA because the FBI's agents were knowledgeable about the detainee from prior investigations. Director Mueller told us he did not know what techniques the CIA would be using but that he understood they would go beyond techniques that FBI agents were authorized to use. He stated that he and D'Amuro discussed the fact that the FBI could not control the interrogation, and they decided that the FBI would not participate under these circumstances. Director Mueller told the OIG that although his decision initially did not contemplate other detainee interrogations, it was carried forward as a bright-line rule when the issue arose again.

Director Mueller's former Chief of Staff, Daniel Levin, told the OIG that in the context of the Zubaydah interrogation, he attended a meeting at the National Security Council (NSC) at which CIA techniques were discussed. Levin stated that a DOJ Office of Legal Counsel (OLC) attorney gave advice at the meeting about the legality of CIA interrogation techniques. Levin stated that in connection with this meeting, or immediately after it, FBI Director Mueller decided that FBI agents would not participate in interrogations involving techniques the FBI did not normally use in the United States, even though OLC had determined such techniques were legal. Levin stated he agreed with this decision because FBI agents were not trained to use such techniques, using such techniques might create problems for FBI agents who needed to testify in court, and other agencies were available to do it.

D'Amuro also described another meeting after the Zubaydah incident among himself, Director Mueller, a CIA agent, and CIA Director George Tenet. D'Amuro said that during this meeting, an effort was made to find a solution that would permit the FBI to interview detainees in CIA custody. D'Amuro proposed that the FBI be permitted to interview the detainees first, before the CIA would use its "special techniques." D'Amuro said that the FBI recognized that it would have a "taint problem" if the FBI conducted its interviews after the CIA had used the more aggressive techniques. However, no agreement was reached with the CIA at that time. Director Mueller told us that he did not specifically recall such a meeting, but that such a

---

[44] Arena stated that FBI Deputy Director Bruce Gebhardt also attended this meeting. Gebhardt told us he did not recall specific discussions regarding the use of non-FBI interview methods but stated that neither he nor the Director would have ever allowed agents to use such techniques.

discussion may have happened in connection with some lower-level detainees.

## II.    Subsequent Decisions Regarding FBI Involvement with High Value Detainees

The issue of whether the FBI would participate in interviews in which other agencies used non-FBI interrogation techniques arose again repeatedly, as new high value detainee were captured. For example, D'Amuro said that the FBI wanted to participate in the interrogations of these detainees because its agents had been investigating them for a long time and had a lot of knowledge and experience that would be useful in gaining information from the detainees. Each time, however, the result was the same: the FBI decided that it would not participate.

We determined that the issue arose again in late 2002 and early 2003, in connection with efforts to gain access to Ramzi Binalshibh. Binalshibh was captured in September 2002. According to the, Assistant Chief for the FBI's Counterterrorism Operational Response Section (CTORS), he and several agents, including Thomas, traveled to a CIA-controlled facility to conduct a joint interview of Binalshibh  with the CIA.

According to the notes of FBI General Counsel Valerie Caproni, Deputy Assistant Director T.J. Harrington told her that the FBI agents who went to the CIA site saw Binalshibh

The ▮▮▮▮▮ matter indicates that a "bright line rule" against FBI participation in or assistance to interrogations in which other investigators used non-FBI techniques was not fully established or followed as of September 2002. FBI agents assisted others to question ▮▮▮▮▮ during a period when he was being subjected to interrogation techniques that the FBI agents would not be allowed to use. According to former FBI General

74

Counsel Wainstein, the FBI ultimately decided that its agents could not interview detainees without a "clean break" from other agencies' use of non-FBI techniques. Wainstein told us he thought this conclusion was reached in 2003.



    As discussed in subsequent chapters of this report, the FBI continued to wrestle with interpreting the mandate not to "participate" in interrogations involving non-FBI techniques, particularly with respect to the circumstances under which FBI agents wanted to interview detainees who had previously been subjected to coercive interrogations by other agencies. The disagreements between the FBI and the military focused in particular on the treatment of another high value detainee, Muhammad Ma'ana Al-Qahtani, which we describe in the next chapter.

# EXHIBIT FFF

**U.S. Department of Justice**
Office of the Inspector General

# A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq



Oversight and Review Division
Office of the Inspector General
May 2008

UNCLASSIFIED

the OSC at GTMO at the time or describe it in his FD-302 interview summaries for Al-Shihri.[147]

Other FBI employees told us they heard rumors of the use of women's clothing on detainees. An FBI Investigative Support Specialist said that while at GTMO he heard rumors that a detainee was forced to wear women's clothing and makeup during an interrogation and that this same detainee was also given a "lap-dance" by a female guard. An FBI Intelligence Analyst told us that while at a social function at GTMO she was told that a female military interrogator placed women's undergarments on a detainee during an interrogation. The analyst said that it was obvious to her that this was done to humiliate and demean the detainee. The analyst was also told that the female military interrogator performed a lap dance on this same detainee during the same interrogation.[148]

### O.     Transfer to Another Country for More Aggressive Interrogation

A few FBI agents who served at GTMO reported hearing about claims that detainees had been sent to another country for more aggressive interrogation by foreign interrogators.[149] However, it appears that these agents were likely describing an allegation relating to the same detainees.

One agent stated in his survey response that detainees Mohamadou Ould Slahi (#760) and Mahmdouh Habib (#661) told him that they had been sent to different countries before they were sent to GTMO: Slahi from Mauritania to Jordan, and Habib from Afghanistan to Egypt.[150] Another agent told the OIG that Habib told her that when he was in Afghanistan he was turned over to Egyptian authorities. The agent said that although Habib had been born in Egypt, he was a citizen of Australia. Habib told her that prior to his transfer to Egypt he met with both Australian and U.S. Government officials, and that while he was in Egypt he was subjected to several forms of torture. A third agent described hearing a second-hand report about an Australian detainee (likely Habib) who had been sent to

---

[147] Another detainee told us that an FBI agent made him put on a woman's coat that had perfume on it, and that when he took it off he smelled like the perfume. We address this matter in Part IV of Chapter Eleven.

[148] As noted in Chapter Five and confirmed in the *Schmidt-Furlow Report*, in late 2002 military interrogators forced Al-Qahtani to wear women's clothing in an attempt to humiliate and embarrass him.

[149] The military policies for GTMO did not explicitly address actual or threatened rendition.

[150] Military and FBI documents indicate that Slahi was arrested in Mauritania and interrogated in Jordan for several months before he was transferred to GTMO.

Egypt and interrogated by the Egyptian intelligence service prior to being transferred to GTMO.

### P.    Threatened Transfer to Another Country

Several FBI agents told the OIG that they had information about threats to send detainees to another country for detention or more aggressive interrogation. According to the *Church Report*, threat of transfer to another country was never specifically listed as a pre-approved interrogation technique under military policy for GTMO, and beginning in January 2003 prior notice to the Secretary of Defense was required before using it. The Church investigators identified one incident involving the use of this technique in a June 2003 interrogation of a high value detainee. *Church Report* at 168-69, 173.

SSA Lyle stated in his OIG survey response that military interrogators threatened Al-Qahtani using this technique.[151] Lyle said that at some point during the military's interrogation of Al-Qahtani at Camp X-Ray military interrogators threatened to send him to another country. Lyle believes that the country they threatened him with was Jordan. Lyle paraphrased what the interrogators said to Al-Qahtani as "we are going to send you to a place where the people aren't as nice as we are."

An SSA who served at GTMO in 2002 told the OIG that he was present at a GTMO staff meeting where this technique was discussed concerning Al-Qahtani and other detainees. The SSA said that the military wanted to handcuff Al-Qahtani, put a hood over his head, and fly him around in a helicopter and then an airplane. The plan was to return Al-Qahtani to GTMO but completely isolate him so that he would believe he was somewhere else. The agent said the goal was to make Al-Qahtani believe that they were just about to turn him over to officials from another country. We believe that this SSA may have in fact have been referring to interrogation plan for Slahi (#760) rather than Al-Qahtani. This plan is discussed in Section XV of Chapter Five. The SSA said that after he objected to this plan, he was not invited to any more staff meetings.

Another FBI agent who served at GTMO from December 2003 until September 2004 said that some detainees at GTMO were threatened with the prospect of being returned to their home countries which could go badly for the detainee. She indicated that this could be threatening to some detainees depending on where they were from, and that she probably used this technique herself. She stated that she did not consider this a threat because it was a real possibility for some of the detainees. As an example,

---

[151] Lyle is a pseudonym.

she said that the Russian detainees did everything they could to be as valuable as possible in order to avoid returning to Russia. However, the agent stated that eventually these detainees were repatriated to Russia despite their cooperation.

Another FBI agent stated in his survey response that he asked certain uncooperative detainees if they would like to be sent back to their home countries for interrogation. He stated that some of the detainees may have perceived this as a threat and that some of them acknowledged that they were being treated better at GMTO than they would be in their home countries.

Other agents reported that they heard about the use of this technique from others. One agent reported that he heard that some detainees were threatened with being sent to Israel for interrogation. In addition, a Detective from the Phoenix Police Department who was deployed to GTMO as part of the FBI's Joint Terrorism Task Force stated in his survey response that a New York City Detective posed as an Egyptian Intelligence Officer, and the detainee involved was told that he would go back to Egypt with this Intelligence Officer unless he was cooperative.

## Q. Threatening a Detainee's Family

Four agents told the OIG that they were aware of threats to take action against a detainee's family. According to the *Church Report*, threatening harm to others was a prohibited technique for military interrogators at GTMO. The Church investigators found one incident of threats made against the family of detainee Slahi (#760). *Church Report* at 174.

A police officer from California who served at GTMO as a member of the FBI's Joint Terrorism Task Force stated in his survey response that detainee Ahmed Esmatullah Fedah refused to give truthful answers in his interviews and that the officer told Fedah that he would attempt to deport any of Fedah's relatives living illegally in the United States.

Several FBI agents indicated that they had second-hand information about threats to detainees' families. Two FBI employees reported that they read or heard from others that military interrogators threatened detainee Slahi (#760) with the possible mistreatment of his family, including his mother, unless he cooperated with interrogators.[152]

---

[152] The military's use of threats with Slahi is discussed in more detail in Section XV of Chapter Five.

# EXHIBIT GGG

TAB 7

Counter Resistance Strategy Meeting Minutes                                     Page 1 of 5

## Rhodes, Barry A

**From:** Zolper, Peter C
**Sent:** Wednesday, August 27, 2003 4:02 PM
**To:** Fallon, Mark
**Cc:** Rhodes, Barry A
**Subject:** (U) RE: Counter Resistance Strategy Meeting Minutes

Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY

Barry

  -----Original Message-----
  **From:** Fallon, Mark
  **Sent:** Wednesday, August 27, 2003 12:46 PM
  **To:** Zolper, Peter C
  **Subject:** FW: Counter Resistance Strategy Meeting Minutes


  R/Mark Fallon
  Deputy Commander/SAC



  -----Original Message-----
  **From:** Fallon Mark
  **Sent:** Monday, October 28, 2002 4:52 PM
  **To:** McCahon Sam
  **Cc:** Mallow Brittain; Thomas Blaine; Johnson Scott; Smith David
  **Subject:** RE: Counter Resistance Strategy Meeting Minutes

Sam:
  We need to ensure seniors at OGC are aware of the 170 strategies and how it might impact CITF and Commissions. This looks like the kinds of stuff Congressional hearings are made of. Quotes from LTC Beaver regarding things that are not being reported give the appearance of impropriety. Other comments like "It is basically subject to perception. If the detainee dies you're doing it wrong" and "Any of the techniques that lie on the harshest end of the spectrum must be performed by a highly trained individual. Medical personnel should be present to treat any possible accidents." seem to stretch beyond the bounds of legal propriety. Talk of "wet towel treatment" which results in the lymphatic gland reacting as if you are suffocating, would in my opinion; shock the conscience of any legal body looking at using the results of the interrogations or possibly even the interrogators. Someone needs to be considering how history will look back at this.

R/Mark Fallon
Deputy Commander
Criminal Investigation Task Force

TAB 7

Counter Resistance Strategy Meeting Minutes

-----Original Message-----
From: Thomas Blaine
Sent: Thursday, October 24, 2002 7:57 PM
To: McCahon Sam; Johnson Scott; Fallon Mark
Subject: FW: Counter Resistance Strategy Meeting Minutes

Sam,

Very interesting reading on how detainees are being treated for info.

Scott, Mark,

FYI

Blaine

## Counter Resistance Strategy Meeting Minutes

Persons in Attendance:

COL Cummings, LTC Phifer, CDR Bridges, LTC Beaver, MAJ Burney, MAJ Leso, Dave Becker, John Fredman, 1LT Seek, SPC Pimentel

The following notes were taken during the aforementioned meeting at 1340 on October 2, 2002. All questions and comments have been paraphrased:

BSCT Description of SERE Psych Training (MAJ Burney and MAJ Leso)

- Identify trained resisters
  - Al Qaeda Training
- Methods to overcome resistance
  - Rapport building (approach proven to yield positive results)
  - Friendly approach (approach proven to yield positive results)
  - Fear Based Approaches are unreliable, ineffective in almost all cases
- What's more effective than fear based strategies are camp-wide, environmental strategies designed to disrupt cohesion and communication among detainees.
  - Environment should foster dependence and compliance

| LTC Phifer | Harsh techniques used on our service members have worked and will work on some, what about those? |
| MAJ Leso | Force is risky, and may be ineffective due to the detainees' frame of reference. They are used to seeing much more barbaric treatment. |
| Becker | Agreed |

→ At this point a discussion about ISN 63 ensued, recalling how he has responded to certain types of deprivation and psychological stressors. After short discussion the BSCT continued to address the overall manipulation of the detainees' environment.

BSCT continued:

- Psychological stressors are extremely effective (ie, sleep deprivation, withholding food, isolation, loss of time)

COL Cummings        We can't do sleep deprivation
LTC Beaver          Yes, we can - with approval.

- Disrupting the normal camp operations is vital. We need to create an environment of "controlled chaos"

LTC Beaver          We may need to curb the harsher operations while ICRC is around. It is better not to expose them to any controversial techniques. We must have the support of the DOD.

Becker              We have had many reports from Bagram about sleep deprivation being used.

LTC Beaver          True, but officially it is not happening. It is not being reported officially. The ICRC is a serious concern. They will be in and out, scrutinizing our operations, unless they are displeased and decide to protest and leave. This would draw a lot of negative attention.

COL Cummings        The new PSYOP plan has been passed up the chain

LTC Beaver          It's at J3 at SOUTHCOM.

Fredman             The DOJ has provided much guidance on this issue. The CIA is not held to the same rules as the military. In the past when the CIA has made a big deal about certain detainees, the DOD has "moved" them away from the attention of ICRC. Upon questioning from the ICRC about their whereabouts, the DOD's response has repeatedly been that the detainee merited no status under the Geneva Convention. The CIA has employed aggressive techniques on less than a handful of suspects since 9/11.
                    Under the Torture Convention, torture has been prohibited by international law, but the language of the statutes is written vaguely. Severe mental and physical pain is prohibited. The mental part is explained as poorly as the physical. Severe physical pain described as anything causing permanent damage to major organs or body parts. Mental torture described as anything leading to permanent, profound damage to the senses or personality. It is basically subject to perception. If the detainee dies you're doing it wrong. So far, the techniques we have addressed have not proven to produce these types of results, which in a way challenges what the BSCT paper says about not being able to prove whether these techniques will lead to permanent damage. Everything on the BSCT white paper is legal from a civilian standpoint.[ Any questions of severe weather or temperature conditions should be deferred to medical staff.] Any of the techniques that lie on the harshest end of the spectrum must be performed by a highly trained individual. Medical personnel should be present to treat any possible accidents. The CIA operates without military intervention. When the CIA has wanted to use more aggressive techniques in the past, the FBI has pulled their personnel from theatre. In those rare instances, aggressive techniques have proven very helpful.

LTC Beaver          We will need documentation to protect us

| | |
|---|---|
| Fredman | Yes, if someone dies while aggressive techniques are being used, regardless of cause of death, the backlash of attention would be severely detrimental. Everything must be approved and documented. |
| Becker | LEA personnel will not participate in harsh techniques |
| LTC Beaver | There is no legal reason why LEA personnel cannot participate in these operations |

→At this point a discussion about whether or not to video tape the aggressive sessions, or interrogations at all ensued.

| | |
|---|---|
| Becker | Videotapes are subject to too much scrutiny in court. We don't want the LEA people in aggressive sessions anyway. |
| LTC Beaver | LEA choice not to participate in these types of interrogations is more ethical and moral as opposed to legal. |
| Fredman | The videotaping of even totally legal techniques will look "ugly". |
| Becker | (Agreed) |
| Fredman | The Torture Convention prohibits torture and cruel, inhumane and degrading treatment. The US did not sign up on the second part, because of the 8th amendment (cruel and unusual punishment), but we did sign the part about torture. This gives us more license to use more controversial techniques. |
| LTC Beaver | Does SERE employ the "wet towel" technique? |
| Fredman | If a well-trained individual is used to perform this technique it can feel like you're drowning. The lymphatic system will react as if you're suffocating, but your body will not cease to function. It is very effective to identify phobias and use them (ie, insects, snakes, claustrophobia). The level of resistance is directly related to person's experience. |
| MAJ Burney | Whether or not significant stress occurs lies in the eye of the beholder. The burden of proof is the big issue. It is very difficult to disprove someone else's PTSD. |
| Fredman | These techniques need involvement from interrogators, psych, medical, legal, etc. |
| Becker | Would we get blanket approval or would it be case by case? |
| Fredman | The CIA makes the call internally on most of the types of techniques found in the BSCT paper, and this discussion. Significantly harsh techniques are approved through the DOJ. |
| LTC Phifer | Who approves ours? The CG? SOUTHCOM CG? |
| Fredman | Does the Geneva Convention apply? The CIA rallied for it not to. |
| LTC Phifer | Can we get DOJ opinion about these topics on paper? |
| LTC Beaver | Will it go from DOJ to DOD? |
| LTC Phifer | Can we get to see a CIA request to use advanced aggressive techniques? |
| Fredman | Yes, but we can't provide you with a copy. You will probably be able to look at it. An example of a different perspective on torture is Turkey. In Turkey they say that interrogation at all, or anything you do to that results in the subject betraying his comrades is torture. |
| LTC Beaver | In the BSCT paper it says something about "imminent threat of death", ... |
| Fredman | The threat of death is also subject to scrutiny, and should be handled on a case by case basis. Mock executions don't work as well |

as friendly approaches, like letting someone write a letter home, or providing them with an extra book.

Becker                    I like the part about ambient noise.

→At this point a discussion about ways to manipulate the environment ensued, and the following ideas were offered:

- Medical visits should be scheduled randomly, rather than on a set system
- Let detainee rest just long enough to fall asleep and wake him up about every thirty minutes and tell him it's time to pray again
- More meals per day induce loss of time
- Truth serum; even though it may not actually work, it does have a placebo effect.

**Meeting ended at 1450.**

Classification: UNCLASSIFIED//FOR OFFICIAL USE ONLY

# EXHIBIT
# HHH

FOR EDUCATIONAL USE ONLY
42 U.S.C.A. § 2000dd

United States Code Annotated Currentness
Title 42. The Public Health and Welfare
ⁱ▣Chapter 21D. Detainee Treatment
➡§ 2000dd. Prohibition on cruel, inhuman, or degrading treatment or punishment
of persons under custody or control of the United States Government

(a) In general

No individual in the custody or under the physical control of the United States
Government, regardless of nationality or physical location, shall be subject to cruel,
inhuman, or degrading treatment or punishment.

(b) Construction

Nothing in this section shall be construed to impose any geographical limitation on the
applicability of the prohibition against cruel, inhuman, or degrading treatment or
punishment under this section.

(c) Limitation on supersedure

The provisions of this section shall not be superseded, except by a provision of law
enacted after January 6, 2006, which specifically repeals, modifies, or supersedes the
provisions of this section.

(d) Cruel, inhuman, or degrading treatment or punishment defined

In this section, the term "cruel, inhuman, or degrading treatment or punishment" means
the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth,
and Fourteenth Amendments to the Constitution of the United States, as defined in the
United States Reservations, Declarations and Understandings to the United Nations
Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment
or Punishment done at New York, December 10, 1984.

CREDIT(S)

(Pub.L. 109-148, Div. A, Title X, § 1003, Dec. 30, 2005, 119 Stat. 2739; Pub.L. 109-163,
Div. A, Title XIV, § 1403, Jan. 6, 2006, 119 Stat. 3475.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

2005 Acts. House Conference Report No. 109-359, see 2005 U.S. Code Cong. and Adm.

1

News, p. 1446.

Statement by President, see 2005 U.S. Code Cong. and Adm. News, p. S50.

2006 Acts. House Conference Report No. 109-360, see 2005 U.S. Code Cong. and Adm. News, p. 1678.

Statement by President, see 2005 U.S. Code Cong. and Adm. News, p. S54.

References in Text

January 6, 2006, referred to in subsec. (c), originally read "the date of enactment of this Act", probably meaning the date of enactment of the Detainee Treatment Act of 2005, Pub.L. 109-163, Div. A, Title XIV, § 1401 et seq., which was enacted as part of the National Defense Authorization Act for Fiscal Year 2006, both of which were approved Jan. 6, 2006.

Codifications

Pub.L. 109-163, § 1403, re-enacted this section without reference to prior identical enactment by Pub.L. 109-148, Div. A, Title X. § 1003, Dec. 30, 2005, 119 Stat. 2739. See 2006 Amendments note under this section.

Amendments

2006 Amendments. Pub.L. 109-163, § 1403, re-enacted this section without substantive change. Prior thereto, section read:

**"§ 2000dd. Prohibition on cruel, inhuman, or degrading treatment or punishment of persons under custody or control of the United States Government**

**"(a) In general**

"No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

**"(b) Construction**

"Nothing in this section shall be construed to impose any geographical limitation on the applicability of the prohibition against cruel, inhuman, or degrading treatment or punishment under this section.

**"(c) Limitation on supersedure**

"The provisions of this section shall not be superseded, except by a provision of law

enacted after December 30, 2005, which specifically repeals, modifies, or supersedes the provisions of this section.

**"(d) Cruel, inhuman, or degrading treatment or punishment defined**

"In this section, the term 'cruel, inhuman, or degrading treatment or punishment' means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984."

Short Title

2006 Acts. Pub.L. 109-163, Div. A, Title XIV, § 1401, Jan. 6, 2006, 119 Stat. 3474, provided that: "This title [re-enacting this section and 42 U.S.C.A. § 2000dd-1, amending 28 U.S.C.A. § 2241, and enacting provisions set out as a note under 10 U.S.C.A. § 801] may be cited as the "Detainee Treatment Act of 2005". Pub.L. 109-148, Title X, § 1001, also enacted a "Detainee Treatment Act of 2005", see Short Title note under this section and Tables.

2005 Acts. Pub.L. 109-148, Div. A, Title X, § 1001, Dec. 30, 2005, 119 Stat. 2739, provided that: "This title [enacting this chapter, amending 28 U.S.C.A. § 2241, and enacting provisions set out as notes under this section and 10 U.S.C.A. § 801] may be cited as the 'Detainee Treatment Act of 2005'." Pub.L. 109-163, Div. A, Title XIV, § 1401, also enacted a "Detainee Treatment Act of 2005", see Short Title note under this section and Tables.

United States Policy Toward Detainees

Pub.L. 110-53, Title XX, § 2034, Aug. 3, 2007, 121 Stat. 517, provided that:

**"(a) Findings.**--Congress finds the following:

**"(1)** The National Commission on Terrorist Attacks Upon the United States (commonly referred to as the '9/11 Commission') declared that the United States 'should work with friends to develop mutually agreed-on principles for the detention and humane treatment of captured international terrorists who are not being held under a particular country's criminal laws' and recommended that the United States engage its allies 'to develop a common coalition approach toward the detention and humane treatment of captured terrorists'.

**"(2)** A number of investigations remain ongoing by countries that are close United States allies in the war on terrorism regarding the conduct of officials, employees, and agents of the United States and of other countries related to conduct regarding detainees.

**"(3)** The Secretary of State has launched an initiative to try to address the differences between the United States and many of its allies regarding the treatment of detainees.

3

"**(b) Sense of Congress.**--It is the sense of Congress that the Secretary, acting through the Legal Adviser of the Department of State, should continue to build on the Secretary's efforts to engage United States allies to develop a common coalition approach, in compliance with Common Article 3 of the Geneva Conventions and other applicable legal principles, toward the detention and humane treatment of individuals detained during Operation Iraqi Freedom, Operation Enduring Freedom, or in connection with United States counterterrorist operations.

"**(c) Reporting to Congress.**--

"**(1) Briefings.**--The Secretary of State shall keep the appropriate congressional committees fully and currently informed of the progress of any discussions between the United States and its allies regarding the development of the common coalition approach described in subsection (b) [of this note].
"**(2) Report.**--Not later than 180 days after the date of the enactment of this Act [Aug. 3, 2007], the Secretary of State, in consultation with the Attorney General and the Secretary of Defense, shall submit to the appropriate congressional committees a report on any progress towards developing the common coalition approach described in subsection (b) [of this note].

"**(d) Definition.**--In this section [this note], the term 'appropriate congressional committees' means--

"**(1)** with respect to the House of Representatives, the Committee on Foreign Affairs, the Committee on Armed Services, the Committee on the Judiciary, and the Permanent Select Committee on Intelligence; and
"**(2)** with respect to the Senate, the Committee on Foreign Relations, the Committee on Armed Services, the Committee on the Judiciary, and the Select Committee on Intelligence."

LAW REVIEW COMMENTARIES

The future of Lou Henkin's human rights movement. Harold Hongju Koh, 38 Colum. Hum. Rts. L. Rev. 487 (2007).

NOTES OF DECISIONS

Judicial review 1

1. Judicial review

Possibility that, if motion pending in lower courts were granted, or if certain other actions were taken by lower courts, then this might have adverse effect on review otherwise available to parties under the Detainee Treatment Act was insufficient basis for suspending prior order of the Supreme Court denying parties' petition for writ of certiorari, pending disposition of petition for rehearing. (Per Chief Justice Roberts, as

Circuit Justice.) Boumediene v. Bush, U.S.2007, 127 S.Ct. 1725. Federal Courts ⟨⇒462

42 U.S.C.A. § 2000dd, 42 USCA § 2000dd

Current through P.L. 110-244 (excluding P.L. 110-234) approved 6-6-08

Copr. (C) 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT
                    (C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT

# III

# Congress of the United States
## Washington, D.C. 20515

June 6, 2008

The Honorable Michael Mukasey
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Dear Mr. Attorney General:

We are writing to request that you appoint a special counsel to investigate whether the Bush Administration's policies regarding the interrogation of detainees have violated federal criminal laws. There is mounting evidence that the Bush Administration has sanctioned enhanced interrogation techniques against detainees under the control of the United States that warrant an investigation.

Congress is already aware of the pattern of abuse against detainees under the control of the United States and the Bush Administration. In 2004, prisoners being held at Abu Ghraib prison were subjected to abuse, sexual exploitation and torture. At the Guantanamo Bay Detention facility, prisoners have been held indefinitely, subjected to sleep deprivation, and drugged against their will. An independent investigation by the International Committee of the Red Cross documented several instances of acts of torture against detainees, including soaking a prisoner's hand in alcohol and lighting it on fire, subjecting a prisoner to sexual abuse, and forcing a prisoner to eat a baseball. In October 2005, the New York Times reported that three detainees were killed during interrogations in Afghanistan and Iraq by CIA agents or CIA contractors.

We believe that these events alone warrant action, but within the last month additional information has surfaced that suggests the fact that not only did top Administration officials meet in the White House and approve the use of enhanced techniques including waterboarding against detainees, but that President Bush was aware of, and approved of the meetings taking place. This information indicates that the Bush Administration may have systematically implemented, from the top down, detainee interrogation policies that constitute torture or otherwise violate the law. We believe that these serious and significant revelations warrant an immediate investigation to determine whether actions taken by the President, his Cabinet, and other Administration officials are in violation of the War Crimes Act (18 U.S.C. 2441), the Anti-Torture Act, (18 U.S.C. 2340-2340A), and other U.S. and international laws.

Despite the seriousness of the evidence, the Justice Department has brought prosecution against only one civilian for an interrogation-related crime. Given that record, we believe that it is necessary to appoint a special counsel in order to ensure that a thorough and impartial investigation occurs, and that the prosecution of anyone who violated federal criminal statutes prohibiting torture and abuse is pursued if warranted by the facts.

Again, we strongly urge that you act in a timely manner to appoint a special counsel. We look forward to hearing from you in response to our request.

Sincerely,

Jan Schakowsky
Member of Congress

John Conyers
Chairman
House Judiciary Committee

Jerrold Nadler
Chairman, Subcommittee on the
Constitution, Civil Rights and Civil Liberties

Barney Frank
Member of Congress

Jim Oberstar
Member of Congress

Sheila Jackson Lee
Member of Congress

Carolyn Maloney
Member of Congress

Peter DeFazio
Member of Congress

Ed Markey
Member of Congress

Maurice Hinchey
Member of Congress

Jim McGovern
Member of Congress

Lynn Woolsey
Member of Congress

Jim McDermott
Member of Congress

Bob Filner
Member of Congress

Tammy Baldwin
Member of Congress

Keith Ellison
Member of Congress

Steve Cohen
Member of Congress

John Olver
Member of Congress

Betty McCollum
Member of Congress

Sam Farr
Member of Congress

Jim Moran
Member of Congress

Betty Sutton
Member of Congress

Bobby Scott
Member of Congress

Dennis Kucinich
Member of Congress

Lois Capps
Member of Congress

José Serrano
Member of Congress

William Jefferson
Member of Congress

Michael Capuano
Member of Congress

Pete Stark
Member of Congress

Lucille Roybal-Allard
Member of Congress

John Tierney
Member of Congress

George Miller
Member of Congress

Luis Gutierrez
Member of Congress

Steven Rothman
Member of Congress

Rush Holt
Member of Congress

David Wu
Member of Congress

Paul Hodes
Member of Congress

Andre Carson
Member of Congress



Robert Wexler
Member of Congress

Lloyd Doggett
Member of Congress

Diana DeGette
Member of Congress

Raul Grijalva
Member of Congress

John Larson
Member of Congress

Rick Boucher
Member of Congress

Hilda Solis
Member of Congress

Linda Sanchez
Member of Congress

Danny Davis
Member of Congress

Rosa DeLauro
Member of Congress

Mike Honda
Member of Congress

Eleanor Holmes Norton
Member of Congress

Peter Welch
Member of Congress

Tim Ryan
Member of Congress

Barbara Lee
Member of Congress

Zoe Lofgren
Member of Congress

Chaka Fattah
Member of Congress

David Price
Member of Congress

# EXHIBIT

# JJJ



# Department of Justice

**FOR IMMEDIATE RELEASE**
**WEDNESDAY, JANUARY 2, 2008**
**WWW.USDOJ.GOV**

**OPA**
**(202) 514-2007**
**TDD (202) 514-1888**

## Statement by Attorney General Michael B. Mukasey Regarding the Opening of an Investigation Into the Destruction of Videotapes by CIA Personnel

"Following a preliminary inquiry into the destruction by CIA personnel of videotapes of detainee interrogations, the Department's National Security Division has recommended, and I have concluded, that there is a basis for initiating a criminal investigation of this matter, and I have taken steps to begin that investigation as outlined below.

"This preliminary inquiry was conducted jointly by the Department's National Security Division and the CIA's Office of Inspector General. It was opened on December 8, 2007, following disclosure by CIA Director Michael Hayden on December 6, 2007, that the tapes had been destroyed. A preliminary inquiry is a procedure the Department of Justice uses regularly to gather the initial facts needed to determine whether there is sufficient predication to warrant a criminal investigation of a potential felony or misdemeanor violation. The opening of an investigation does not mean that criminal charges will necessarily follow.

"An investigation of this kind, relating to the CIA, would ordinarily be conducted under the supervision of the United States Attorney for the Eastern District of Virginia, the District in which the CIA headquarters are located. However, in an abundance of caution and on the request of the United States Attorney for the Eastern District of Virginia, in accordance with Department of Justice policy, his office has been recused from the investigation of this matter, in order to avoid any possible appearance of a conflict with other matters handled by that office.

"As a result, I have asked John Durham, the First Assistant United States Attorney in the United States Attorney's Office for the District of Connecticut, to serve as Acting United States Attorney for the Eastern District of Virginia for purposes of this matter. Mr. Durham is a widely respected and experienced career prosecutor who has supervised a wide range of complex investigations in the past, and I am grateful to him for his willingness to serve in this capacity. As the Acting United States Attorney for purposes of this investigation, Mr. Durham will report to the Deputy Attorney General, as do all United States Attorneys in the ordinary course. I have also directed the FBI to conduct the investigation under Mr. Durham's supervision.

"Earlier today, the Department provided notice of these developments to Director Hayden and the leadership of the Judiciary and Intelligence Committees of the Congress."

### ###

08-001

# EXHIBIT
# KKK

# March 16, 2005- Congress Passes Markey Amendment to Prevent Funds for Torture



**WASHINGTON, D.C.-** Congress took a critical step towards ending the U.S. policy of outsourcing torture today, passing an amendment, offered by Representative Edward J. Markey (D-MA), prohibiting the use any funds included in the supplemental bill to be used to the contravention of legal obligations under the Convention Against Torture, with a virtually unanimous bipartisan vote (420-Yays, 2-Nays, 3-Present).

"Today, we moved one step closer to ending the U.S. practice of 'outsourcing torture.' The passage of this amendment reaffirms our commitment to upholding the Convention Against Torture," said Rep. Markey.

The resounding bipartisan support for this amendment comes in the wake of public outrage at the CIA practice of sending suspects to prisons in countries around the world that are known to violate human rights. Fifty three Members of Congress and numerous
human rights and law associations are endorsing H. R. 952, the Torture Outsourcing Prevention Act – authored by Rep. Markey, a bill that would permanently end the current practice of rendering prisoners to countries that have been determined by the U.S. State
Department to routinely engage in torture, and bar reliance on "diplomatic assurances" from countries that practice torture as the basis for rendering persons to that country.

Today's amendment offered by Rep. Markey only affects funding in the Supplemental Appropriations bill, a critical first step towards ending U.S. tacit endorsement of torture, but the next step would be to end the use of "diplomatic assurances" in order to send
prisoners into the hands of known torturers.

Amnesty International, Human Rights Watch and Human Rights First issued a joint statement supporting the Markey amendment opposing the outsourcing of torture.

"The current U.S. program to transfer detainees to countries outside of any lawful process through "renditions" places individuals in direct threat of torture and other forms of cruel, inhuman or degrading treatment in contravention of federal and international law. This practice is inhumane and unacceptable. Several individuals who were transferred by the United States into the hands of foreign officials were reportedly tortured during detention and interrogation and have since been released without charge. The passage of the Markey amendment is an important step in the process of ending torture, and we look forward to working with Representative Markey and Congress to pass the Torture Outsourcing Prevention Act."

This Congressional commitment to ending torture comes as the NY Times reported on U.S. failures to address torture in military prisons in several countries and new Bush Administration plans to render thousands of prisoners from Guantanamo Bay. Prisoners
rendered to other countries from Guantanamo Bay would be covered under the funding restrictions set forth in Rep. Markey's amendment, if supplemental appropriations funds were used for that purpose and would also be addressed by the standards set in the proposed under the Torture Outsourcing Prevention Act.

"The war against terrorism includes a war against those who engage in torture. If we fight our enemy using the same inhumane and morally bankrupt techniques that we are trying to stop, we will simply become what we have beheld. This amendment reaffirming our commitment to end the practice of torture is just the beginning. We are not going to stop until we have closed the hypocritical chapter in American history where we participate in torture by proxy. Torture is unacceptable and the U.S. has a responsibility to take the lead in ending this practice," said Rep. Markey.

Rep. Markey Floor Speech, March 15, 2005    [x] iss_human_rights_st050315.pdf    **iss_human_rights_st050315.pdf** (22.96 KB)

**FOR IMMEDIATE RELEASE**                                    CONTACT: Tara McGuinness
**March 16, 2005**                                           202.225.2836

**Close Window**

# EXHIBIT LLL

Copyright 2005 The Washington Times LLC
All Rights Reserved
The Washington Times

March 21, 2005 Monday

**SECTION:** OPED; SWEET LAND OF LIBERTY; Pg. A17

**LENGTH:** 891 words

**HEADLINE:** Torture doublespeak

**BYLINE:** by Nat Hentoff, THE WASHINGTON TIMES

**BODY:**

Secret orders and 'renditions' cast their shadow

This is the second in a series of columns on America's rendition of suspected terrorists to countries known for torturing prisoners.

The word "covert" has long been associated with the CIA's use of "extraordinary renditions" by which suspected terrorists, believed to have essential information, are sent to countries our own State Department condemns for torturing prisoners. This is no longer a secret, as shown March 6 on CBS -TV's "60 Minutes," which began with: "Witnesses tell the same story: masked men in an unmarked jet seize their target, cut off his clothes...Tranquilize him and fly him away."

The next night, on ABC-TV's "World News Tonight," chief investigative correspondent Brian Ross reported: "Flight logs shown to ABC News detail trips to Morocco, Egypt, Jordan, Iraq, Afghanistan and Uzbekistan." And on "60 Minutes," Scott Pelley had noted that one of these kidnapping planes "made at least 600 flights to 40 countries... after 9/11." And on March 7, on Fox News, a network not notable for criticizing the Bush administration, Senior Judicial Analyst Judge Andrew Napolitano emphasized that "the United States signed over four treaties prohibiting this practice of extraordinary rendition. And the treaties required that the signing countries enact criminal statutes prohibiting them.

"They carry 20-year penalties for anybody having anything to do with... planning it (and) supplying planes." Mr. Napolitano added: "The president... can't change a treaty, he can't change a law... the most he can say to his CIA operatives is: 'On my watch, you won't be prosecuted.' " But there is a growing disquiet among certain CIA operatives that despite the "special rules" the administration has given the CIA, there might be consequences for those agents who have broken both our laws and the international treaties we have signed.

On "60 Minutes," Mr. Pelley interviewed Michael Scheuer, who helped begin the rendition program under Bill Clinton and, until recently, was a senior CIA counterterrorist official. Mr. Scheuer said: "Basically, the National Security Council gave us the mission... take people off the streets so they can't kill Americans." Mr. Scheuer, who still believes these renditions are productive, characterizes them as "finding someone else to do your dirty work."

Or, as one Bush administration official told the Washington Post (Dec. 26, 2002): "If we're not there in the room, who is to say?" However, Mr. Scheuer candidly told Mr. Pelley: "Oh, I think from the first day we ever did it there was a certain macabre humor that said sooner or later this this this sword of Damocles is going to fall, because if something goes wrong, the policy maker, the politicians and the congressional committees aren't going to belly up to the bar and say, 'We authorized this.'" On March 6, in the House of Representatives, Rep. Edward Markey, Massachusetts Democrat, held the sword of Damocles over the head of President Bush when he declared that "the president needs to rescind his extraordinary rendition 'outsourcing torture' directive... I call on the President to declassify this secret order of his immediately.

"The war against terrorism," Mr. Markey continued, "is a war against those who engage in torture. If we fight our enemy using the same inhumane and morally bankrupt techniques that we are trying to stop, we will simply become

what we have beheld. I call on President Bush to stop the outsourcing of torture immediately, in deed as well as word." On ABC-TV's "World News Tonight," Mr. Markey said hopefully: "Like Abu Ghraib, it took a while for the outrage to build. The more the American people find out we are allowing other countries to torture in our name, there is going to be an outcry in this country."

I am listening hard, but I don't hear that outcry yet, certainly not among the Republican leadership in Congress, which refuses to authorize an independent investigation of the CIA's "renditions." One of the CIA's jets transporting suspected terrorists made 10 trips to Uzbekistan. Craig Murray, the former British ambassador to that country, told Mr. Pelley about the techniques of Uzbek interrogators: "drowning and suffocation, rape was used... also the insertion of limbs in boiling liquid... it's quite common." Mr. Murray also told Brian Ross of ABC News that he received photos of one prisoner who was actually boiled to death.

That corpse may not have been a person the CIA kidnapped, but how do we know? In a March 6 New York Times story on these horrifying renditions, a CIA official "would not discuss any legal directive under which the agency operated, but said that the CIA has existing authorities to lawfully conduct these operations."

The authority came directly from the president in a Sept. 17, 2001 "memorandum of notification." Then why doesn't the president let us and Congress see this directive? Meanwhile, Fox News reports that Attorney General Alberto Gonzales says "the United States would never send terrorism suspects to countries where they would be tortured." But he did admit that once they had been sent, "the U.S. government didn't have control over how they were tortured." Isn't this manipulation of words what George Orwell chillingly called "doublespeak"?

* Nat Hentoff's column for The Washington Times appears Mondays.

**LOAD-DATE:** March 21, 2005

# EXHIBIT
# MMM

P.02



Drafted by SSA [redacted] FBI (BAU) at Guantanamo Bay and forwarded to Marion Bowman, Legal Counsel, FBIHQ, on 11/27/2002.

## LEGAL ANALYSIS OF INTERROGATION TECHNIQUES:

### Interrogation Techniques

**Category I —**
1. Gagging with gauze.
2. Yelling at detainee.
3. Deception
   a. Multiple Interrogators
   b. Interrogator posing as an interrogator from a foreign nation with a reputation of harsh treatment of detainees.

**Category II -**
1. Use of stress positions (such as standing) for a maximum of 4 hrs.
2. Use of falsified documents or reports.
3. Isolation facility for 30 day increments.
4. Non-standard interrogation environment/booth.
5. Hooding detainee.
6. Use of 20-hour interrogation segments.
7. Removal of all comfort items (including religious items).
8. Switching detainee from hot rations to MRE's.
9. Removal of all clothing.
10. Forced grooming (shaving of facial hair etc...)
11. Use of individual phobias (such as fear of dogs) to induce stress.

**Category III -**
1. Use of scenarios designed to convince detainee that death or severe pain is imminent for him or his family.
2. Exposure to cold weather or water (with medical monitoring).
3. Use of wet towel and dripping water to induce the misperception of drowning.
4. Use of mild physical contact such as grabbing, light pushing and poking with finger.

**Category IV -**
1. Detainee will be sent off GTMO, either temporarily or permanently, to Jordan, Egypt, or another third country to allow those countries to employ interrogation techniques that will enable them to obtain the requisite information.

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE [illegible]    BY [illegible]

P.03

## Legal Analysis

The following techniques are examples of coercive interrogation techniques which are not permitted by the U.S. Constitution:

**Category I –**

3. b. Interrogator posing as an interrogator from a foreign nation with a reputation of harsh treatment of detainees.

**Category II –**

1. Use of stress positions (such as standing) for a maximum of 4 hrs.
2. Use of falsified documents or reports.
5. Hooding detainee.
6. Use of 20-hour interrogation segments.
9. Removal of all clothing.
11. Use of individual phobias (such as fear of dogs) to induce stress.

**Category III.**

1. Use of scenarios designed to convince detainee that death or severe pain is imminent for him or his family.
2. Exposure to cold weather or water (with medical monitoring).
3. Use of wet towel and dripping water to induce the misperception of drowning.

Information obtained through these methods will not be admissible in any Criminal Trial in the U.S. Although, information obtained through these methods might be admissible in Military Commission cases, the Judge and or Panel may determine that little or no weight should be given to information that is obtained under duress.

The following techniques are examples of coercive interrogation techniques which may violate 18 U.S.C. s. 1340, (Torture Statute):

**Category II.**

5. Hooding detainee.
11. Use of individual phobias (such as fear of dogs) to induce stress.

**Category III.**

1. Use of scenarios designed to convince detainee that death or severe pain is imminent for him or his family.
2. Exposure to cold weather or water (with medical monitoring).
4. Use of wet towel and dripping water to induce the misperception of drowning.

In 18 U.S.C. s. 2340, (Torture Statute), torture is defined as "an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering upon another person within his custody or control." The torture statute defines "severe mental pain or suffering" as "the prolonged mental harm caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering; or the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses of the personality; or the threat of imminent death; or the threat that another person will imminently be subject to death, severe physical pain or suffering, or the administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses of the personality."

Although the above interrogation techniques may not be per se violations of the United States Torture Statute, the determination of whether any particular use of these techniques is a violation of this statue will hinge on the intent of the user. The intent of the user will be a question of fact for the Judge or Jury to decide. Therefore, it is possible that those who employ these techniques may be indicted, prosecuted, and possibly convicted if the trier of fact determines that the user had the requisite intent. Under these circumstances it is recommended that these techniques not be utilized.

The following technique is an example of a coercive interrogation technique which appears to violate 18 U.S.C. s. 2340, (Torture Statute):

Category IV-
   1. Detainee will be sent off GTMO, either temporarily or permanently, to Jordan, Egypt, or another third country to allow those countries to employ interrogation techniques that will enable them to obtain the requisite information.

In as much as the intent of this category is to utilize, outside the U.S., interrogation techniques which would violate 18 U.S.C. s. 2340 if committed in the U.S., it is a per se violation of the U.S. Torture Statute. Discussing any plan which includes this category, could be seen as a conspiracy to violate 18 U.S.C. s. 2340. Any person who takes any action in furtherance of implementing such a plan, would inculpate all persons who were involved in creating this plan. This technique can not be utilized without violating U. S. Federal law.

# EXHIBIT NNN

The Globe and Mail (Canada)

April 14, 2008 Monday

# 'Extraordinary-rendition' procedure unreliable, says CIA vet who created it

**BYLINE:** COLIN FREEZE

**SECTION:** NATIONAL NEWS; TERRORISM: INTERROGATION; Pg. A7

**LENGTH:** 813 words

**DATELINE:** DURHAM, N.C.

The creator of the CIA's "extraordinary-rendition" program says he has always distrusted interrogation intelligence flowing from the controversial practice, given that the admissions it produced were usually "very tainted" by foreign agencies who jailed suspects at the behest of the United States.

Michael Scheuer, an outspoken anti-terrorism crusader, took part in a Duke University law-school panel on Friday. There, experts debated the future of the highly controversial snatch, jail and interrogate program that he created, and whether it should survive beyond the administration of U.S. President George W. Bush, which has often justified rendition as an intelligence gold mine.

In Canada, rendition has become synonymous with the process that resulted in Ottawa's Maher Arar spending a year in a Syrian jail, where he was beaten with electric cables during the first phases of his captivity. Canadian officials have apologized to the telecommunications engineer and compensated him with $10-million (U.S.), upholding that he was wrongly smeared in intelligence exchanges emanating from Canada, prior to the U.S. decision to render him.

The Bush administration has proven far less contrite in the Arar affair and similar cases, blocking lawsuits on the grounds that probing rendition would illegally spill state secrets.

An estimated 100 to 150 people have been rendered to foreign prisons by the U.S. program, of which Mr. Scheuer remains a big booster. Now retired, he created the program when he was a Central Intelligence Agency analyst tasked with hunting down Osama bin Laden. He said the program has been enormously valuable, at least in terms of taking high-level terrorists off the streets and seeing what documents they carried.

But he added that resulting interrogations proved dubious once suspects were sent to third-country prisons, such as Syria or Egypt. "You could bet on the testimony given to you, it was altered in a way that would serve the interests of the country that was giving it," he said. "So, it was very tainted, in the sense that if Country X or Country Y interrogated these people, you would really have some information, but it would be far from coupled with what was actually being said."

Mr. Scheuer didn't dispute that torture has occurred in foreign jails where the United States sent suspects - "You'd have to assume that 80 per cent [of prisoners rendered to Egypt] are not going to have a good time," he said - but said simply that he didn't particularly care. "I'm perfectly happy to do anything to defend the United States, so long as the lawyers sign off on it," he said.

After 9/11, the Bush administration decided to enhance Mr. Scheuer's pre-existing rendition program with international "black-site" prisons where U.S. officials would lead interrogations in secret CIA jails. "I am much less experienced in the Bush administration," Mr. Scheuer conceded. "I ran rendition operations from July '95 until June of '99."

Speaking at Duke, Mr. Scheuer did put some distance between the program he hatched in 1995 and events that occurred after 2001. "The bar was lowered after 9/11," he said.

'Extraordinary-rendition' procedure unreliable, says CIA vet who created it The Globe and Mail (Canada) April 14, 2008 Monday

In addition to Mr. Arar's case in Canada, high-profile renditions controversies have arisen in Germany and Italy. Mr. Scheuer made a point of saying he would personally put the German suspect back on a rendition plane, but did not say the same that about the other two cases. The program he conceived was restricted to targeting only the highest level terrorism suspects, he said.

Questioned about the Arar affair, Mr. Scheuer asserted that that rendition was not technically a CIA job, but rather an FBI initiative, by agents working in cahoots with unspecified agencies north of the border.

That prompted a response from Canadian lawyer Ron Atkey, who was in attendance to give a speech about the years he spent inside the Arar Commission battling government secrecy to reveal what Canada knew about the CIA rendition program.

Mr. Atkey pointed out Canadian agencies were found to have had no foreknowledge of the U.S. decision to put Mr. Arar on a Gulfstream jet and fly him to the Middle East, after his 2002 arrest in a New York airport.

"The biggest piece of baloney," Mr. Scheuer said. "They [the Canadians] were totally surprised like Captain Renault in *Casablanca*," he quipped.

The allusion referred to a scene in the 1942 film, where a duplicitous French gendarme shuts down an illegal casino operation in Morocco - saying "I'm shocked, shocked to find out that gambling is going on in here!" even as he is handed a big win from the roulette wheel.

Mr. Scheuer went on to describe certain U.S. newspaper reporters as "scurrilous" traitors for revealing details of the rendition program.

After the panel, however, he said he wasn't necessarily familiar with the domestic investigations that led to the Arar affair.

**LOAD-DATE:** April 14, 2008

**LANGUAGE:** ENGLISH

**GRAPHIC:** Illustration

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Globe and Mail, a division of CTVglobemedia Publishing Inc.
All Rights Reserved