UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

AMNESTY INTERNATIONAL USA, CENTER
FOR CONSTITUTIONAL RIGHTS, INC. and
WASHINGTON SQUARE LEGAL SERVICES,
INC.,

          Plaintiffs,

      v.

CENTRAL INTELLIGENCE AGENCY,
DEPARTMENT OF DEFENSE, DEPARTMENT
OF HOMELAND SECURITY, DEPARTMENT
OF JUSTICE, DEPARTMENT OF STATE, AND
THEIR COMPONENTS,

          Defendants.

ECF CASE

07 CV 5435 (LAP)

**OPPOSITION TO THE CENTRAL INTELLIGENCE AGENCY'S MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

ABBREVIATIONS ..........................................................................................ii

TABLE OF AUTHORITIES ..........................................................................iii

PRELIMINARY STATEMENT ......................................................................1

PROCEDURAL HISTORY .............................................................................3

ARGUMENT ...................................................................................................4

I.   THE COURT SHOULD DENY THE CIA'S SUMMARY JUDGMENT
     MOTION BECAUSE ITS RESPONSE IS INADEQUATE TO AFFORD
     MEANINGFUL ADVERSARIAL TESTING AND *DE NOVO* REVIEW. .................5

     A.  The Court Should Apply FOIA Consistently with its Central Purpose of
         Government Disclosure and the Necessity for *De Novo* Review. ...........................5

     B.  The *Vaughn* Index and Declarations Offer Meaningless Descriptions of the
         Records. .................................................................................................8

     C.  The CIA Does Not Provide Sufficient Support to Justify its Withholdings. ...............10

         1.   Exemptions 1 and 3....................................................................10

         2.   Exemption 5..............................................................................13

         3.   Exemptions 7(A) and (D).............................................................19

         4.   Exemptions 7(C) and 6................................................................22

         5.   Exemption 2..............................................................................24

     D.  The CIA's Segregability Analysis is Inadequate. .......................................24

     E.  The CIA Has Failed to Demonstrate the Adequacy of its Search........................25

II.  PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
     SHOULD BE GRANTED AND THE CIA ORDERED TO REPROCESS
     RESPONSIVE DOCUMENTS AND SEGREGATE INFORMATION.....................26

     A.  The CIA Improperly Withheld Officially Acknowledged Information.......................26

     B.  The CIA Has Improperly Invoked Exemptions 1 and 3 to Withhold Information
         Related to Activities Outside the Agency's Mandate. .................................30

     C.  The CIA Has Improperly Invoked Exemption 3 and the NSA. ..........................34

     D.  The CIA Has Improperly Invoked the Presidential Communications Privilege
         Pursuant to Exemption 5..............................................................36

     E.  The CIA Improperly Asserts Exemptions 5 and 7(D) for Witness Statements to
         OIG Investigators that do not Raise Confidentiality Concerns. ......................37

     F.  The CIA Has Improperly Invoked Exemptions 7(C) and 6 for Document 249..........39

CONCLUSION ...............................................................................................40

# ABBREVIATIONS

| | |
|---|---|
| AIUSA | Amnesty International USA |
| CCR | Center for Constitutional Rights |
| CIA | Central Intelligence Agency |
| CIA Act | Central Intelligence Agency Act |
| DNI | Director of National Intelligence |
| DOJ | Department of Justice |
| FOIA | Freedom of Information Act |
| NSA | National Security Act |
| OGC | Office of General Counsel |
| OLC | Office of Legal Counsel |
| WSLS | Washington Square Legal Services |

## TABLE OF AUTHORITIES

**Cases**

*A. Michael's Piano, Inc., v. F.T.C.*, 18 F.3d 138 (2d Cir. 1994) ...................................................... 17

*ACLU v. DOD*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ........................................................... 31, 34

*ACLU v. DOD*, 351 F. Supp. 2d 265 (S.D.N.Y. 2005) ................................................................... 19

*ACLU v. DOD*, No. 04 Civ. 4151 (AKH) ...................................................................................... 31

*ACLU v. FBI*, 429 F. Supp. 2d 179 (D.D.C. 2006) ................................................................ *passim*

*Adamowicz v. International Revenue Serv.*, 2008 U.S. Dist. LEXIS
31497 (S.D.N.Y. Mar. 31, 2008) ...........................................................................................5, 6

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980) ................................................................... 7, 9, 13

*Asfar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983). .............................................................. 14

*Assoc. Press v. DOD*, 410 F. Supp. 2d 147 (S.D.N.Y. 2006) ......................................................... 40

*Bevis v. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986) ........................................................ 21, 22

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980) ............................................................. 16

*Carney v. DOJ*, 19 F.3d 807 (2d Cir. 1994) ................................................................................... 6

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367 (2004) ............................... 36

*Church of Scientology Int'l v. DOJ*, 30 F.3d 224 (1st Cir. 1994) ................................................. 18

*CIA v. Sims*, 471 U.S. 159 (1985) ........................................................................................... 7, 35

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 861 (D.C. Cir. 1980) ................. 14, 15, 16

*Cotton v. Adams*, 798 F. Supp. 22 (D.D.C. 1992) ........................................................................ 21

*Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64
(D.C. Cir. 1986) ......................................................................................................................22

*Dep't of Air Force v. Rose* 425 U.S. 352 (1976) .......................................................................... 40

*Dep't of State v. Ray*, 50 U.S. 164 (1991) .................................................................................... 24

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532
U.S. 1 (2001) .....................................................................................................................5, 6, 14

*Diamond v. FBI*, 707 F.2d 75 (2d Cir. 1983) .................................................................................. 7

*Doherty v. DOJ*, 775 F.2d 49 (2d Cir. 1985) ................................................................................ 20

*DOJ v. Landano*, 508 U.S. 165 (1993) ......................................................................................... 38

*DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ................................... 40

*Donovan v. FBI*, 625 F. Supp. 808 (S.D.N.Y. 1986) ................................................................... 10

*Donovan v. FBI*, 806 F.2d 55 (2d Cir. 1986) ................................................................. 7

*Elec. Privacy Info. Ctr. v. DOJ*, 511 Supp. 2d 56 (D.D.C. 2007) ........................... 10, 22, 25

*Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*, 958 F.2d
      503 (2d Cir. 1992) ............................................................................................... 23

*Ferguson v. FBI*, 83 F.3d 41 (2d Cir. 1996) ................................................................. 39

*Ferguson v. FBI*, 957 F.2d 1059 (2d Cir. 1992) ................................................... 19, 20, 21

*Fisher v. United States*, 425 U.S. 391 (1976) ............................................................... 16

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) .............................................. 7, 27, 30

*Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983) .................. 7

*Friends of Blackwater v. Dep't of Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005) ......... 25

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) .............................................................. 7

*Gould Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676 (2d Cir. 1987) ................. 18

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ...................... 5, 14, 15

*Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3 (D.D.C. 1998) ...................... 8, 14, 15

*Greenpeace, U.S.A., Inc. v. EPA*, 735 F. Supp. 13 (D.D.C. 1990) ............................ 21

*Halperin v. CIA*, 629 F.2d 144 (D.C. Cir. 1980) ............................................................ 7

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ...................................................... *passim*

*Hamdan v. Rumsfeld*, 548 U.S. 557, 126 S. Ct. 2749 (2006) .............................. 3, 29, 32

*Helt v. Metro. Dist. Comm'n*, 113 F.R.D. 7 (D. Conn. 1986) ..................................... 18

*In re Grand Jury Proceedings*, No. M-11-189 (LAP), 2001 WL
      1167497 (S.D.N.Y. Oct. 3, 2001) ......................................................................... 18

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ...................................................... 37

*Jefferson v. DOJ*, 284 F.3d 172 (D.C. Cir. 2002) ........................................................ 20

*Judicial Watch, Inc., v. F.D.A.*, 449 F.3d 141 (D.C. Cir. 2006) ........................ 6, 23, 37

*Kimberlin v. DOJ*, 139 F.3d 944 (D.C. Cir. 1998) ...................................................... 20

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987) .......................................................... 6, 10

*Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552 (S.D.N.Y. 1989) ........ *passim*

*Leadership Conf. on Civil Rights v. Alberto Gonzales*, 421 F. Supp.
      2d 104 (D.D.C. 2006) ........................................................................................... 40

*Local 3, Int'l Bd. of Elec. Workers v. NLRB*, 845 F.2d 1177 (2d Cir. 1988) ............... 6

*Maine v. Dep't of Interior*, 298 F.3d 60 (1st Cir. 2002) .............................................. 18

*Marks v. CIA*, 590 F.2d 997 (D.C. Cir. 1978) ............................................................... 8

*Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993) ........................................................... 27

*Mead Data Cent., Inc., v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ............... 16

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) .................................... 27

*Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981) ....................................................... 18, 19

*Morley v. CIA*, 508 F. 3d 1108 (D.C. Cir. 2007) ......................................................... 24

*Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157 (2004) ........................... 40

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d Cir. 2004) ............................... 14, 16

*Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ................................ 7

*New-Press Division of Multimedia Holdings Corp. v.Dep't of
    Homeland Security*, 2005 WL 2921952 (M.D. Fla. 2005) ..................................... 37

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ..................................... 5, 22

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ................................................ 14

*Oglesby v. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ............................................ 25

*Pearlman v. DOJ*, 312 F.3d 100 (2nd Cir. 2002) .................................................. 19, 23

*People for the Am. Way Found. v. Nat'l Park Service*, 503 F. Supp.
    2d 284 (D.D.C. 2007) ...................................................................................... 23

*Perlman v. DOJ*, 380 F.3d 110 (2d Cir. 2004) .......................................................... 40

*Phillipi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) ......................................................... 8

*Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982) ...................................................... 20

*Rashid v. DOJ*, No. 99-2461, slip op. (D.D.C. June 12, 2001) ..................................... 19

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) ......................................................... 7

*RTC v. Diamond*, 137 F.R.D. 634 (S.D.N.Y. 1991) .................................................... 17

*Schiller v. NLRB*, 964 F.2d 1205 (D.C. Cir. 1992) ................................................ 24, 25

*Schwaner v. Dep't of Air Force*, 898 F.2d 793 (D.C. Cir. 1990) ................................. 24

*Scott v. CIA*, 916 F. Supp. 42 (D.D.C. 1996) ......................................................... 9, 10

*Stern v. FBI*, 737 F.2d 84 (D.C. Cir. 1984) .......................................................... 21, 23

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 2002) .................................................. 16

*Thorstad v. CIA*, 494 F. Supp. 500 (S.D.N.Y. 1979) ................................................... 8

*United States v. Weber Aircraft Co.*, 465 U.S. 792 (1984) ......................................... 38

*Wash. Post v. DOD*, 766 F. Supp. 1 (D.D.C. 1991) .................................................... 27

*Wash. Post, v. Dep't of Agric.*, 943 F. Supp. 31 (D.D.C. 1996) ................................... 24

*Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir. 1980)..................................................26

*Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991).................................................7, 9, 12, 33

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007)........................................................7

*Wood v. FBI*, 432 F. 3d 78 (2d Cir. 2005)......................................................23, 24

## Statutes, Regulations, Executive Orders and Rules

18 U.S.C. § 2340A.......................................................................................32

18 U.S.C. § 2441(d).....................................................................................32

5 U.S.C. § 403q(e)(3)(B)...............................................................................39

5 U.S.C. § 522........................................................................................1, 24

5 U.S.C. § 552(b)(1)....................................................................................10

5 U.S.C. § 552(b)(2)....................................................................................24

5 U.S.C. § 522(b)(3)....................................................................................11

5 U.S.C. § 552(b)(6)....................................................................................22

5 U.S.C. § 552(b)(7)(C)................................................................................22

5 U.S.C. § 522(b)(7)(D)................................................................................38

50 U.S.C. § 403-1(i)(1) (West Supp. 2007)...........................................7, 11, 34, 36

50 U.S.C. § 403-1(i)(2)(C) (2005)....................................................................35

50 U.S.C. § 403-1(i)(3).................................................................................35

50 U.S.C. § 403-3(d) (1994)...........................................................................30

50 U.S.C. § 403g.........................................................................................11

50 U.S.C. § 403q(e).....................................................................................39

50 U.S.C.A. § 401 note..................................................................................30

Anti-Torture Statute, 18 U.S.C. §§ 2340-2340A.....................................................33

Executive Order 12333..................................................................................30

Executive Order 12958............................................................................*passim*

Executive Order 13292..................................................................................10

Executive Order 13440, 72 Fed. Reg. 40707.........................................................32

Foreign Affairs and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242(a), 112
    Stat. 2681..........................................................................................32

## Other Authorities

150 Cong. Rec. E2209-01 (Dec. 20, 2004)............................................................36

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. a/39/51 (1984), *entered into force* June 26, 2987 ..................................................................................................... 33

Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949 (Fourth Geneva Convention), 6 U.S.T. 3516.................................................................................. 33

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (Third Geneva Convention), 6 U.S.T. 3316.............................................................................................. 32, 33

Mark Mazzetti, *Letters Give C.I.A. Tactics a Legal Rationale*, NY Times, Apr. 27, 2008 .......... 17

## PRELIMINARY STATEMENT

This case turns on the public's right under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, to information related to the government's program of rendition, secret detention and "enhanced interrogation techniques" and the potential violations of domestic and international law that inhere in that program. Questions about the nature and implementation of the Central Intelligence Agency ("CIA") rendition, secret detention and "enhanced interrogation" program, as well as the authorization for these acts, are some of the most important legal issues of our time. Indeed, the CIA's program has been the focus of legal and policy analyses prepared by the Department of Justice ("DOJ").[1] Congress has conducted hearings and is calling for the appointment of an independent special counsel to investigate the CIA's activities.[2] At least one Article III court is considering whether information extracted from individuals in the CIA program was obtained through torture and, if so, whether this information can be admitted as evidence.[3] The CIA itself has addressed illegalities within the CIA program.[4]

Regardless of the ultimate merits of the Administration's defense of the program, it is indisputable that information concerning the program's authorization, scope and implementation is essential to ongoing discourse. Despite the government's prior attempts to immunize this program from scrutiny, congressional oversight, public attention and judicial review have compelled the Administration, and the CIA, to make numerous admissions about the program. For example, in an unprecedented revelation on September 6, 2006, the President officially acknowledged what many have known for years: the United States has been operating a network

---

[1] *See* Declaration of Margaret L. Satterthwaite ("Satterthwaite Declaration"), ¶ 53, attached hereto as Exhibit 3.

[2] *Id.* ¶ 63.

[3] *Id.* ¶ 25

[4] *Id.* ¶¶ 55, 59-61; *see also* Declaration of Ralph S. DiMaio ("DiMaio Declaration"), ¶¶ 139-42; Defs. Mot. for Summ. J. at 29-30.

of secret detention facilities into which individuals have been disappeared and where they have been subjected to coercive interrogation.[5] Subsequent public attention has forced the President, or the CIA, to confirm, *inter alia*, the names of some individuals held in the program, the CIA's use of waterboarding, the destruction of evidence of interrogations, and the clandestine use of at least one foreign site.[6] The CIA's efforts to withhold further information related to the program impede vital public debate and implicate the fundamental purpose of FOIA to ensure that the public has access to information necessary for it to assess the government's activities.

To prevail on summary judgment, the CIA must submit declarations and a *Vaughn* index containing sufficient detail for the court to engage in *de novo* review of the adequacy of the its search, reasonableness of its segregability analysis and propriety of its claimed exemptions. Moreover, although FOIA takes into account legitimate national security concerns, it does not exist to protect the government from embarrassment or to facilitate the concealment of misconduct. To the contrary: FOIA exists precisely to enable oversight of government activity, especially when it may be embarrassing or improper. If the government is permitted to assert FOIA exemptions without sufficient evidentiary support to allow for judicial review and adversarial testing, FOIA's statutory guarantee of broad disclosure will be undermined.

The Court should compel the government to fulfill its statutory obligations in order to avoid defeating the purpose of FOIA. Accordingly, in light of the grave issues raised in these requests and the government's failure to provide adequate justification for its near-blanket reliance upon exemptions, the Court should deny the CIA's motion for summary judgment. Additionally, the Court should grant Plaintiffs' partial summary judgment motion and order the CIA to reprocess Plaintiffs' FOIA requests, conduct a reasonable segregability analysis and

---

[5] *See* Satterthwaite Decl. ¶ 3.
[6] *Id.* ¶¶ 11, 22-24, 28, 41.

2

release information when required, and provide an adequately detailed *Vaughn* index to permit adversarial testing and *de novo* judicial review of withheld information.

## PROCEDURAL HISTORY

Shortly after September 11, 2001, the CIA initiated a program to secretly detain and interrogate individuals overseas in CIA facilities and proxy detention.[7] The CIA established this unprecedented program without congressional approval or public debate. The program reportedly allowed the CIA to transfer forcibly, or "render," individuals to foreign countries for interrogation.[8] Under these measures, the CIA subjected individuals to coercive interrogation techniques referred to as an "alternative set of procedures" or "enhanced interrogation techniques."[9] Despite assertions by the President and the Office of the Director of National Intelligence ("DNI") that these measures were subjected to multiple legal reviews by DOJ as well as the CIA,[10] the Supreme Court rejected the underlying legal argument that purportedly justified the program.[11] Specifically, the Supreme Court's ruling in *Hamdan v. Rumsfeld*—in which the Court determined that all U.S. detainees were protected by basic guarantees of humane treatment—reportedly prompted those involved in the program to conclude that the CIA's detention and interrogation program was likely impermissible and should immediately cease.[12] Yet, since *Hamdan*, the President has repeatedly attempted to re-create a legal foundation for the

---

[7] *See id.* ¶¶ 3(b), 6(c).

[8] *See id.* ¶¶ 5, 7.

[9] *See id.* ¶ 8.

[10] *See id.* ¶ 53.

[11] *Hamdan v. Rumsfeld*, 548 U.S. 557, 126 S. Ct. 2749 (2006). One of two erroneous legal premises upon which the President and the CIA's legal justification for the program turned was that the CIA could operate outside the Geneva Conventions' fundamental protections of detainees in U.S. custody. In *Hamdan*, the Supreme Court unambiguously rejected this assumption as violating existing law and made clear that all detainees held in the "conflict with al Qaeda" are protected by the Conventions. 126 S. Ct. at 2795.

[12] *See* Satterthwaite Decl. ¶¶ 49-50.

program while simultaneously insulating its authorization, and the improprieties inherent in it, from congressional, judicial and public scrutiny. Plaintiffs' FOIA requests are particularly important because the public debate involves an ongoing program.[13]

Prompted by concerns that improper government conduct was being concealed from the public, Plaintiffs filed the four FOIA requests at issue in this case. On December 21, 2004, Plaintiff Center for Constitutional Rights ("CCR") filed the first request, and Plaintiffs Amnesty International ("AIUSA") and Washington Square Legal Services ("WSLS") sent the second and third requests. Plaintiffs sought records concerning rendition and secret detention of individuals in the "War on Terror," including records related to, *inter alia*, evaluations and authorizations, policies and procedures, identities of individuals and locations, activities of private contractors and non-governmental actors, and treatment of, and injuries sustained by, individuals transferred or detained.[14] After exhausting administrative remedies, Plaintiffs filed their complaint on June 7, 2007, and eventually agreed to a use a representative sample set for *Vaughn* purposes.[15] After the CIA refused to provide a *Vaughn* index for a list of specific documents known to exist and likely to be in the CIA's possession, Plaintiffs filed a fourth FOIA request on December 28, 2007 ("Specific Documents Request").[16] After receiving no substantive response, Plaintiffs filed their Amended Complaint on June 6, 2008 to incorporate this request into the litigation.[17]

## ARGUMENT

---

[13] *See, e.g., id.* ¶ 4.

[14] *See* Declaration of Gitanjali S. Gutierrez ("Gutierrez Declaration"), ¶ 3, attached hereto as Exhibit 1. Plaintiffs' FOIA requests are attached as Exhibits A, D and E to the Gutierrez Declaration, respectively.

[15] *See* Gutierrez Decl.¶¶ 13-16.

[16] *See id.* ¶ 18. Co-Plaintiffs' Specific FOIA request is attached as Exhibit I to the Gutierrez Declaration.

[17] *See id.* ¶ 20.

I.    **THE COURT SHOULD DENY THE CIA'S SUMMARY JUDGMENT MOTION BECAUSE ITS RESPONSE IS INADEQUATE TO AFFORD MEANINGFUL ADVERSARIAL TESTING AND *DE NOVO* REVIEW.**

In support of its motion, the CIA urges the Court to afford substantial deference to its *Vaughn* index descriptions and declarations supporting its claimed exemptions. *See* Defs. Mot. Summ. J. at 8-9. Yet, the CIA's submissions fall far short of what is required by FOIA and preclude meaningful judicial review and adversarial testing. The CIA makes no effort to describe the particularized substance of the documents withheld; offers only a theoretical discussion of any exemption ground; and fails to demonstrate a reasonable relationship between the generalized ground and the record or requests. Accordingly, the Court should deny the motion for summary judgment and order the CIA to reprocess the FOIA requests, conduct a segregability analysis, and provide a more detailed *Vaughn* index and declarations that include the requisite information to allow both meaningful adversarial challenge and *de novo* review.

A.    **The Court Should Apply FOIA Consistently with its Central Purpose of Government Disclosure and the Necessity for *De Novo* Review.**

Congress enacted FOIA "to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quotation omitted); *Adamowicz v. International Revenue Serv.*, 2008 U.S. Dist. LEXIS 31497, at *6-7 (S.D.N.Y. Mar. 31, 2008). FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). The exemptions, *see* 5 U.S.C. §§ 522 (a)(4)(B) & (b)(1)-(9), "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001). Consequently, "the exemptions are narrowly construed with doubts resolved in favor of disclosure" and the government bears

the burden of proving that an exemption applies. *Halpern*, 181 F.3d at 287 (quotation omitted).[18]

Meaningful judicial enforcement of FOIA through *de novo* review of detailed *Vaughn* indices

and declarations, 5 U.S.C. § 522(b), is critical when, as set forth below, the agency has

overstated secrecy claims.

The use of a *Vaughn* index and declarations are an essential part of FOIA litigation. In

*Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973), the court held that an agency must justify

its withholdings under FOIA by submitting a declaration and index that describe the documents

"in adequate specificity" and set forth a "proper justification" for its exemption claims. "The

declarations must, at the very least, establish a logical connection between the information

withheld and the exemption claimed." *Adamowicz*, 2008 U.S. Dist. LEXIS 31497 at *16.[19] The

requirement for specificity "forces the government to analyze carefully any material withheld,"

"enables the trial court to fulfill its duty," and "enables the adversary system to operate by giving

the requester as much information as possible." *Judicial Watch, Inc., v. F.D.A.*, 449 F.3d 141,

146 (D.C. Cir. 2006).[20] Summary judgment under Rule 56 of the Federal Rules of Civil

Procedure is inappropriate when the agency's evidentiary showing is insufficient because it

leaves material doubt about its search, segregability analysis or withholdings.[21]

---

[18] *See also Klamath*, 532 U.S. at 8 (exemptions should be given a "narrow compass"); *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 560 (S.D.N.Y. 1989) ("These exemptions are intended to be narrowly construed to ensure that Government agencies do not develop a rubber stamp, 'top secret' mentality behind which they can shield legitimately disclosable documents."); *Local 3, Int'l Bd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988).

[19] *King v. DOJ*, 830 F.2d 210, 219 (D.C. Cir. 1987) (the agency must "specifically identify[] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply").

[20] *Halpern*, 181 F.3d at 295 ("Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned by FOIA litigation cannot function.").

[21] *See, e.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (summary judgment inappropriate when agency's insufficient evidentiary showing fails to give "reasonably detailed explanations

The "burden remains on the agency to justify its nondisclosure" even in the national security context. *Lawyers Comm.*, 721 F. Supp. at 561; *see also ACLU v. FBI*, 429 F. Supp. 2d 179, 186 (D.D.C. 2006); *Wiener v. FBI*, 943 F.2d 972, 983 (9th Cir. 1991); *Allen v. CIA*, 636 F.2d 1287, 1294 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983). In enacting FOIA, Congress accepted "that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security." *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (*per curiam*).[22] *See, e.g., Donovan v. FBI*, 806 F.2d 55, 59-60 (2d Cir. 1986) (ordering the release of

---

why any withheld documents fall within an exemption"); *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (explaining that summary judgment is not appropriate unless an agency proves its case "beyond material doubt"); *Lawyers Comm.*, 721 F. Supp. at 560 (affidavits are insufficient "if they are conclusory, merely reciting statutory standards, or if they are too vague and sweeping") (internal quotation marks omitted).

[22] The CIA fails to reference the *de novo* standard of review and, instead, urges the Court to afford substantial deference to the agency claims. Defs. Mot. Summ. J. at 8-9. However, even the cases cited by the government affirm the principle that, even in the national security context, courts must conduct *de novo* review and allow plaintiffs to challenge the government's adequately detailed affidavits and specified justifications for exemptions. *See Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) (carefully reviewing detailed claims of specified harms set forth in agency's affidavits and affirming certain withholdings and remanding for further proceedings in light of the CIA's official acknowledgments); *Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) (affirming district court's *de novo* review of CIA's *Glomar* response after CIA submitted affidavit describing the specific consequences of an acknowledgement in this instance); *Diamond v. FBI*, 707 F.2d 75, 78-79 (2d Cir. 1983) (affirming district court's *de novo* review of affidavit containing "numerous detailed justifications" and *in camera* review of each document); *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980) (reviewing affidavits and deposition by CIA officials in support of withholding and upholding Exemption 3 based upon CIA's "very convincing" detailed showing of specific potential harms); *Fitzgibbon v. CIA*, 911 F.2d 755, 757-759 (D.C. Cir. 1990) (describing the district court's rejection, prior to *CIA v. Sims*, 471 U.S. 159 (1985), of the CIA's *Vaughn* index as insufficient for *de novo* review; selection of a sample set of records for which the CIA had to submit new affidavits with "as much specificity as possible"; and detailed consideration of the propriety of the claimed exemptions for each set of information). Moreover, in *Fitzgibbon*, the appellate court relied upon an interpretation of *Sims* since superseded by amendments to the National Security Act ("NSA"), 50 U.S.C. § 403-1(i)(1) (West Supp. 2007), *see infra* II.C. *See also Halperin*, 629 F.2d at 146-148 (applying NSA prior to its 2004 amendment to affirm Exemption 3 withholdings); *Wolf*, 473 F.3d at 377 n. 6 (noting that the court applied the provisions of the NSA prior to the 2004 amendment).

certain documents withheld on national security grounds); *Phillipi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (requiring CIA to submit "public affidavit explaining in as much detail as it possible the basis for [its] claim that [in the interest of national security] it can be required neither to confirm nor deny the existed of the requested records"); *Marks v. CIA*, 590 F.2d 997, 1011 (D.C. Cir. 1978) (remanding for determination pursuant to *de novo* review of whether portions of *Vaughn* index documents could be segregated and disclosed). Indeed, courts have long recognized that meaningful *de novo* review is a critical component in challenging overclassification decisions and have exercised judicial authority to compel the production of more detailed declarations and indices consistent with FOIA's statutory scheme, including when national security information is at issue.[23] Here, similar relief is required.

**B.    The *Vaughn* Index and Declarations Offer Meaningless Descriptions of the Records.**

Rather than provide a statutorily adequate description of the documents at issue, the agency's *Vaughn* index here relies entirely upon "meaningless phrases to describe the withheld information without clarifying what types of activities, events or policy matters are actually discussed in the documents" and, as a result, provides insufficient information for *de novo* review and adversarial testing. *See Lawyers Comm.*, 721 F. Supp. at 567 (finding insufficient detail when the CIA did not clarify "what types of activities, events or policy matters are actually discussed in the documents").[24] Using repetitive and formulaic language, the agency's *Vaughn*

---

[23] *See, e.g., Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3 (D.D.C. 1998) (finding agency affidavits to be insufficiently detailed and ordering production of supplemental *Vaughn* index); *Lawyers Comm.*, 721 F. Supp. at 567 (criticizing agency for not submitting more detailed public affidavits to support its assertion of Exemption 1); *see also Halpern*, 181 F.3d at 295 (finding government evidence insufficient and remanding for district court to order supplemental affidavits, *in camera* review and/or discovery).

[24] *See also Thorstad v. CIA*, 494 F. Supp. 500, 504 (S.D.N.Y. 1979) (stating that sufficient descriptions "give the court some clue as to the nature of the information withheld, *i.e.*, whether

index simply notes each document's type,[25] its date,[26] its classification (*e.g.*, secret, top secret), and the applicable exemption. Words such as "detention" and "rendition" are entirely absent from the index's description of individual documents.[27] Of the 250 entries, nine of them do not even identify a general subject matter.[28] The vast remainder of the records list only a generic category as the subject and give no specific indication of the nature of the document's content.[29] But an agency cannot simply assert that a document addresses "intelligence operations" or pertains to "an OIG investigation." Rather, courts have emphatically rejected agencies' use of such "expansive phrases" and "boilerplate language" in their *Vaughn* indices as lacking the "reasonable specificity" required to survive summary judgment. *See Allen*, 636 F.2d at 1292-93; *Lawyers Comm.*, 721 F. Supp. at 567. In fact, the CIA has as much as admitted the deficiency of its descriptions in this case—the DiMaio Declaration states plainly that the CIA can provide more information. DiMaio Decl. ¶ 8. Although the CIA suggests that such detail can only be submitted in a classified declaration, courts have repeatedly rejected this argument from the CIA in other national security cases and ordered the agency to submit supplementary affidavits with more detailed descriptions and justifications on the public record. *See, e.g., Lawyers Comm.*, 721 F. Supp. at 567-68; *Scott v. CIA*, 916 F. Supp. 42, 48 (D.D.C. 1996).[30]

___

the information consists of names, places, subjects of discussions and how the information could identify the source").
[25] For example, there are 82 "memos," 42 "cables," 29 "letters," 24 "emails," and 22 "interview reports" identified as the subject matter. *See* Chart of Repetitive and Missing Information Examples in *Vaughn* Index ("*Vaughn* Chart"), ¶ 1, attached hereto as Exhibit 2.
[26] Sixteen entries are missing any date reference. *See Vaughn* Chart ¶ 2.
[27] *See Wiener*, 943 F.2d at 981 (finding it "[r]emarkable" that, in response to a request for records pertaining to John Lennon, the agency's index did not mention Lennon by name).
[28] *See Vaughn* Chart ¶ 3.
[29] For example, the subject matter for 45 documents is simply "intelligence operations" and for 41 is only an "OIG Investigation." *See id.* ¶¶ 4, 5.
[30] Even in the national security context, it is the CIA's burden to provide the most thorough public explanation possible to justify its withholdings in order to enhance the adversarial process

**C.    The CIA Does Not Provide Sufficient Support to Justify its Withholdings.**

The *Vaughn* index and declarations contain no detailed descriptions and prevent the Court and Plaintiffs from understanding the nature of the withheld information. The CIA does little more than recite the statutory language and proffer a theoretical argument as to the grounds for exemption—ranging from abstract, irrelevant discussions of speculative national security harms to concerns about confidentiality that are not relevant to the subjects of Plaintiffs' requests. At best, when combined with nearly unidentifiable documents, these alleged theoretical harms from disclosure show only an irrational relationship between the grounds for exemption and the specific information at issue.[31] At worst, they create a record for which *de novo* review and adversarial challenge are impossible. Both violate the CIA's obligations under FOIA.

1.    *Exemptions 1 and 3.*

Exemption 1 authorizes an agency to withhold certain classified national security information. *See* 5 U.S.C. § 552(b)(1) (exempting materials "specifically authorized under criteria established by an Executive order" to be classified for national security or foreign policy reasons and that are properly classified). Executive Order 12958, modified by Executive Order 13292, sets out classification criteria and protects information concerning "intelligence sources and methods" or "foreign relations," the disclosure of which reasonably could be expected to damage national security. Exec. Order 12958, § 1.4(c), (d). To withhold information under

---

and focus the Court's inquiry for decision and appellate review. *Lawyers Comm.*, 721 F. Supp. at 568; *Elec. Privacy Info. Ctr. v. DOJ*, 511 Supp. 2d 56, 74 (D.D.C. 2007) (holding that "the government must submit to the court a detailed, document-by-document *Vaughn* index regarding these documents, along with further, significantly more-detailed declarations justifying the various departments' withholding decisions" regarding the warrantless surveillance program); *Scott*, 916 F. Supp. at 48.

[31] *See, e.g., King*, 830 F.2d at 223-24 ("[F]or *each* withholding [the agency] must discuss the consequences of disclosing the sought-after information."); *Halpern*, 181 F.3d at 293 (criticizing the agency for "barely pretending to apply [its analysis] to the specific facts"); *Donovan v. FBI*, 625 F. Supp. 808, 810 (S.D.N.Y. 1986) (agencies are required to "state the exemption claimed for each deletion and explain why the exemption is applicable to that deletion").

Exemption 3, 5 U.S.C. § 522(b)(3), the CIA relies upon Section 102A(i)(i) of the National Security Act ("NSA"), 50 U.S.C. § 403-1(i)(1) (West Supp. 2007), which provides that the DNI "shall protect intelligence sources and methods from unauthorized disclosure." DiMaio Decl. ¶¶ 131-32. The CIA also invokes Section 6 of the Central Intelligence Agency Act of 1949 ("CIA Act"), codified at 50 U.S.C. § 403g, providing that the DNI "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure" and exempting the CIA from laws that "require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." *See* DiMaio Decl. ¶¶ 133-35.

While some information withheld on national security grounds may be legitimately withheld upon an adequate evidentiary showing, the current *Vaughn* index and declarations do not provide sufficient information to support the CIA's summary judgment motion on these exemptions. The *Vaughn* entries contain identical or nearly identical justifications accompanied by a check-the-box list attached to the DiMaio Declaration, Ex. J, which designates the generalized harm implicated by the document. Read together, these entries and the declarations offer no specific details explaining the basis for withholding any document, precluding *de novo* judicial review and adversarial challenge. For Exemption 1, 118 out of 250 entries simply quote Executive Order 12958 and use the phrase below to describe the proffered harm:

> This document contains information that has been classified in accordance with Sections 1.4(c) and (d) of Executive Order 12958, and is protected from disclosure by exemption (b)(1) because it would reveal intelligence sources and methods, as well as foreign relations [and/or foreign activities] of the United States Government, whose disclosure reasonably could be expected to cause exceptionally grave damage to the national security.[32]

---

[32] *See Vaughn* Chart ¶ 6.

Another 115 entries use the same phrase, but allege "serious damage."[33] Any additional information concerning Exemption 1 listed is equally generic and meaningless.[34] Further discussion of harms in the DiMaio Declaration and Exhibit J offers only theoretical exploration of national security concerns. Phrases in Exhibit J such as "human sources," "intelligence activities," or "detention and interrogation program," provide too little detail to review the withholding for a specific document.

The entry for Document 234 is typical. It is an undated, handwritten page of notes from an unidentified CIA employee with no identified subject matter, withheld under Exemption 1 as it "tends to reveal certain intelligence sources, methods, and activities," including cryptonyms, and the location and activities of CIA stations.[35] This is so vague as to preclude meaningful adversarial challenge and certainly prohibits *de novo* review. As a result, the CIA improperly offers "only a generalized, theoretical discussion of the possible harms" that would allegedly accompany further disclosure. *Weiner v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991). Even if the CIA could assert broad Exemption 3 withholdings, which it cannot, *see infra* II.C, the boilerplate recitation of the Exemption 3 language is equally devoid of the details FOIA requires.[36]

To the extent that the DiMaio Declaration does address the agency's rendition and secret detention activities, its analysis remains impermissibly divorced from any factual context and

---

[33] *See id.* ¶ 8.

[34] *See, e.g.,* Doc. 53 (providing additional generalized and conclusory description that "the document tends to reveal certain intelligence methods and activities" and "also reveals CIA cryptonyms and foreign activities of the CIA"); *see also Vaughn* Chart ¶ 7, 9.

[35] *See also* Doc. 73 (undated draft of questions and answers created by unknown person about a "particular issue" withheld under Exemption 1 "because it would reveal intelligence sources and methods, as well as foreign activities of the United States government, whose disclosure reasonably could be expected to cause exceptionally grave damage to the national security").

[36] For example, 221 documents share identical recitations of the NSA and CIA Act's statutory language, with little additional information and no particularized details. *See Vaughn* Chart ¶ 11. Another 23 cite either the NSA or CIA Act's statutory language with no further description. *See id.* ¶¶ 13, 14. The DiMaio Declaration adds no specified details. *See* DiMaio Decl. ¶¶ 130-35.

essentially comes down to the claim that "disclosure of such information is reasonably likely to degrade the CIA's ability to effectively question terrorist detainees and elicit information necessary to protect the American people." DiMaio Decl. ¶ 116. As the Second Circuit has recognized, this sort of "conclusory statement completely fails to provide the kind of fact-specific justification that either (a) would permit appellant to contest the affidavit in an adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the [agency's] redactions." *Halpern*, 181 F.3d at 293.[37]

For example, the CIA has withheld 74 documents on the basis of protected human source information. Neither the declaration nor the *Vaughn* index matches any of these documents to any particular "human source" scenario; yet, the case for withholding would certainly differ significantly from one context to the next. Moreover, the discussions of the need for confidentiality of voluntary human sources makes no reference whatsoever to the actual subject matter of Plaintiffs' request—the rendition, secret detention and interrogation of individuals. Instead, the agency's "explanations read more like a policy justification for" national security exemptions that fail to provide a meaningful record for review. *See Halpern*, 181 F.3d at 293.

   2.   *Exemption 5.*

The CIA declarations and index do not explain the majority of the government's specific withholdings under Exemption 5, which allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). A document is not protected from

---

[37] *See also Allen*, 636 F.2d at 1293-94 ("The affidavit's reliance on such expansive phrases as 'intelligence sources and methods,' 'sequences of events,' and 'process' falls far short of providing the 'reasonable specificity' that this court has held is required for summary judgment without *in camera* inspection."); *Lawyers Comm.*, 721 F. Supp. at 569-70 ("The affidavits' conclusory statements, such as '[it would] reveal sensitive sources,' and accompanying vague arguments for protecting intelligence and confidential sources do not provide enough specificity to determine whether to release the information in question.") (internal citation omitted).

disclosure under Exemption 5 unless its source is a government agency and it is "within the ambit of privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. The CIA has failed to provide sufficient information to permit judicial review of its assertion of the privileges invoked here—including the deliberative process, attorney-client and work product privileges.[38]

     a.    **Deliberative Process Privilege.**

The deliberative process privilege applies only to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). The agency needs to show that a document is "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually . . . related to the process by which policies are formulated." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2004). As the CIA concedes, Defs. Mot. Summ. J. at 23, the agency must describe how the material in question actually "bear[s] on the formulation or exercise of policy oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted). Moreover, information cannot be withheld if it is "merely peripheral to actual policy formation,"[39] ultimately incorporated as final agency policy[40] or purely factual.[41]

Despite the CIA's claim that the deliberative process privilege "plainly" encompasses the records withheld under the deliberative process privilege, Defs. Mot. Summ. J. at 22, neither Plaintiffs nor the Court can possibly ascertain whether the agency has satisfied these statutory

---

[38] As discussed *infra*, II.D & II.E, the CIA also improperly asserts Exemption 5 withholdings pursuant to the Presidential Communications and OIG Witness Statements privileges.

[39] *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted); *Greenberg*, 10 F. Supp. 2d at 16-17.

[40] *Sears, Roebuck & Co.*, 421 U.S. at 161; *Nat'l Council of La Raza*, 411 F.3d at 356; *Asfar v. Dep't of State*, 702 F.2d 1125, 1142 (D.C. Cir. 1983).

[41] *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 861, 867 (D.C. Cir. 1980).

requirements. In conclusory fashion, the DiMaio Declaration simply states that certain records are protected by the privilege because they "reflect[] the pre-decisional deliberations of CIA and other executive branch officials." DiMaio Decl. ¶ 145. For many of these records, the CIA offers no factual basis for its assertion that the information was predecisional or actually related to a deliberative process.[42] See Greenberg, 10 F. Supp. 2d at 15 (government made no effort to "identify the deliberative process involved and the role played by each document in the course of that process") (emphasis added). Further, even when the CIA alleges that a document actually related to a deliberative process, it does little more than recite the statutory language without providing details about the nature or topic of the decision.[43] These details are critical for de novo review and an adversarial process. Without knowing the topic under consideration, the nature of the deliberative process and further details about the record, it is impossible to ascertain whether the CIA has improperly withheld information that is peripheral to decisionmaking,[44] incorporated into agency policy[45] or purely factual.[46]

---

[42] The CIA, for example, makes no claim that Doc. 127 pertains to a policy decisions. See Stearns Decl. ¶ 10 (stating that Document 127 "reflect[s] discussions regarding the process of an ongoing criminal investigation" without any reference to a policy decision).

[43] The CIA makes vague assertions such as: "This document contain [sic] the recommendations, analyses, and assessments of senior Administration officials, and it was prepared to inform the deliberations of senior Administration officials." See Doc. 23. This sort of description is "patently inadequate to permit a court to decide whether the exemption was properly claimed." Coastal States, 617 F.2d at 861.

[44] Grand Cent. P'ship, 166 F.3d at 482. For instance, some Vaughn entries only state that the author "discusses" an issue or policy under consideration without further asserting that the record is deliberative, i.e., actually related to the decisionmaking process. See, e.g., Docs. 61 and 183.

[45] See DiMaio Decl. ¶ 147 (stating that documents do not indicate whether or not the recommendation itself or the underlying reasoning was ever adopted). The CIA cannot invoke the deliberative process privilege to withhold the agency's working law. Instead, documents or information that provide statements of agency policy, explain or implement agency decisions, or bind agency actors—including an agency's "working law" or "secret law"—are subject to release. See Sears, Roebuck & Co., 421 U.S. at 151, 161. Office of Legal Counsel ("OLC") legal memoranda, for example, that have been incorporated into agency policy, cannot be withheld under the attorney work product privilege pursuant to Exemption 5.

b.     **Attorney-Client Privilege.**

The attorney-client privilege protects an agency's confidential communications with its attorneys only when made for the purposes of securing legal advice. *See Coastal States*, 617 F.2d at 862. The privilege "is narrowly construed and is limited to those situations in which its purposes will be served"—that is, it "'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" *Coastal States*, 617 F.2d at 862 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *see also Brinton v. Dep't of State*, 636 F.2d 600, 603-04 (D.C. Cir. 1980) (explaining that the privilege does not protect factual information obtained from sources outside the agency). Moreover, to the extent that information is shared with third parties, *see Mead Data Cent., Inc., v. Dep't of Air Force*, 566 F.2d 242, 263 (D.C. Cir. 1977), or factual information is obtained from sources outside the agency, *see Brinton*, 636 F.2d at 607-04, the privilege does not apply. "Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." *Nat'l Council of La Raza*, 411 F.3d at 360; *see also Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 2002) (holding that the privilege cannot be used to withhold secret or working law). Relatedly, the privilege does not apply to purportedly "neutral, objective analyses" of law or policy. *Coastal States*, 617 F.2d at 863.

The Court and Plaintiffs cannot meaningfully evaluate the CIA's withholdings on attorney-client privilege grounds based upon the meager information the CIA submits. The records of communications between the CIA and Office of Legal Counsel ("OLC"), as well as

---

[46] For example, the DiMaio Declaration makes the sweeping claim that because CIA personnel engaged in a decision to select certain facts for inclusion in these records, that factual information is protected under the deliberative process privilege. DiMaio Decl. ¶ 146. Under this reasoning, factual information would always come within the privilege. This is, of course, not the law. *Coastal States*, 617 F.2d at 867; *Lawyers Comm.*, 721 F. Supp. at 569-69 (requiring the agency "to release such segregable factual data to the public"); *ACLU*, 429 F.Supp.2d at 193.

16

from or among attorneys at the CIA's Office of General Counsel ("OGC"), fail to describe the subject matter of the communications, and precluding consideration of whether, for example, the information was actually kept confidential.[47] Moreover, the CIA has not submitted justification for the withholding of facts contained within these communications beyond stating that the facts were "provided by the CIA."[48] DiMaio Decl. ¶ 143. Nor does the CIA provide sufficiently detailed information for the Court or Plaintiffs to evaluate whether these withholdings are "neutral, objective analyses," or whether the advice was incorporated into agency policy. Final OLC legal memorandum, for example, may have been adopted into agency policy. Absent more specific information, however, about the memorandum's subject matter, author and recipient, the question of such incorporation cannot be resolved.

c.    **Attorney Work Product.**

The attorney work product privilege only protects the mental processes of attorneys reflected in materials prepared "in anticipation of litigation," *see A. Michael's Piano, Inc., v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994). The privilege is "modest" in scope and "does not extend to every written document generated by an attorney." *RTC v. Diamond*, 137 F.R.D. 634, 644 (S.D.N.Y. 1991). The agency bears the burden of showing that the materials withheld were prepared in anticipation of litigation. *See Helt v. Metro. Dist. Comm'n*, 113 F.R.D. 7, 12 (D. Conn. 1986). This requires that, "at a minimum, an agency . . . must identify the litigation for which the document was created (either by name or through factual description) and explain why

---

[47] Agency employees may publicly reveal the content of legal advice and subject matter of attorney-client communications or agencies may disclose this information to congressional committees, raising questions concerning the waiver of attorney-client confidentiality. *See, e.g.*, Mark Mazzetti, *Letters Give C.I.A. Tactics a Legal Rationale*, NY Times, Apr. 27, 2008 (describing subject matter and content of legal advice provided by the DOJ OLC to the CIA, and shared with Congress and the media, that might otherwise be privileged).

[48] For example, the deliberative process and attorney-client communications privileges are inapplicable to the information expressly described in the *Vaughn* index as "facts" that the CIA provided to its legal counsel. *See, e.g.*, Docs. 67, 71, 80, 84 and 99.

the work product privilege applies to all portions of the document." *Church of Scientology Int'l v. DOJ*, 30 F.3d 224, 237 (1st Cir. 1994). An agency may not rely on "speculative concerns that the thought processes of . . . counsel in relation to pending or anticipated litigation would be exposed." *Gould Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676, 680 (2d Cir. 1987); *see also In re Grand Jury Proceedings*, No. M-11-189 (LAP), 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001). Moreover, the privilege cannot shield the unprofessional practices of an attorney from disclosure. *Moody v. IRS*, 654 F.2d 795, 801 (D.C. Cir. 1981).

The CIA's boilerplate and conclusory entries describing its withholding of 47 documents on work product grounds violate *Vaughn* and frustrate the purpose of FOIA. The CIA entirely fails to identify and describe the pending or anticipated litigation to which the documents pertain. The DiMaio Declaration merely notes the "very likely" prospect of litigation concerning its detention, interrogation and rendition program. DiMaio Decl. ¶ 139. The *Vaughn* index is equally conclusory.[49] But the CIA must explain the specific nature and topic of *anticipated* litigation and other particularized details in order for Plaintiffs and the Court to determine the propriety of invoking the privilege. *See Maine v. Dep't of Interior*, 298 F.3d 60, 69 (1st Cir. 2002) (holding that the agency's "conclusory" statements failed to "make the [requisite] correlation between each withheld document and the litigation for which the document was created"). Moreover, the *Vaughn* index does not offer details about the nature of any legal advice concerning the rendition, secret and proxy detention, or "use of an alternative set of interrogation procedures."[50] This although the government concedes that it knew these activities might expose personnel to criminal liability and that it sought legal advice from counsel.[51] The lack of further

---

[49] *See Vaughn* Chart ¶ 16.
[50] *See* Defs. Mot. Summ. J. at 29.
[51] DiMaio Decl. ¶¶ 139-41.

details concerning such legal advice prevents the Court and Plaintiffs from determining whether the communications implicate the crime-fraud exception to attorney-client, work product and deliberative process privileges.[52]

### 3.   Exemptions 7(A) and (D).

Exemptions 7(A) and (D) only protect records "compiled for a law enforcement purpose" which would, if released, "interfere with enforcement proceedings," 5 U.S.C. § 522(b)(7)(A), or "disclose the identity of a confidential source," 5 U.S.C. § 522(b)(7)(D).[53] The CIA asserts that Exemption 7(A) protects from disclosure all "open OIG investigations,"[54] DiMaio Decl. ¶¶ 163-64, and that Exemption 7(D) protects from disclosure 28 "witness statements."[55] DiMaio Decl. ¶¶ 166-170. Yet, the CIA fails to satisfy either the threshold test of demonstrating that the information is "compiled for a law enforcement purpose," or the requirement of showing that the requisite specific harms would result from disclosure of part or all of these records.[56]

---

[52] The attorney-client and work product privilege withholdings pursuant to Exemption 5 may be vitiated, as is the deliberative process privilege, if the withholding would shield from disclosure the unprofessional practices of an attorney by whom or under whose direction the material was prepared. See Moody, 654 F.2d at 801 (remanding to the district court for an evaluation of the attorney's conduct and, "if it is found [to be] in violation of professional standards, a determination of whether his breach of professional standards vitiated the work product privilege" otherwise applicable to the withheld material); see also Rashid v. DOJ, No. 99-2461, slip op. at 7-8 (D.D.C. June 12, 2001) (acknowledging "cases in which a lawyer's conduct may render inapplicable the work-product privilege"). The CIA's record does not afford the Court nor Plaintiffs sufficient information to consider this issue.

[53] See Pearlman v. DOJ, 312 F.3d 100, 105 (2nd Cir. 2002), vacated, 514 U.S. 970 (2004), reaffirmed, 380 F.3d 110 (2nd Cir. 2004); Ferguson v. FBI, 957 F.2d 1059 (2d Cir. 1992).

[54] The court held in ACLU, and the CIA concedes here, April 21, 2008 Stipulation, ¶ 5, that the CIA's operational files exemption does not apply to operational files that are the subject of an investigation, whether that investigation is open or closed. See ACLU v. DOD, 351 F. Supp. 2d 265, 276 (S.D.N.Y. 2005) ("The requirement to search and review does not turn on whether the investigation continues or has ended.").

[55] Documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231 and 242.

[56] The CIA also invokes Exemption 7(A) for a portion of Document 18. Stearns Decl. ¶¶ 6, 14. Although the CIA asserts that Document 18 relates to a law enforcement investigation, the Court must still review de novo whether disclosure would result in the interference with an investigation and whether segregable information exists. See supra at 25-26.

First, the lack of details in the CIA submissions prevents the Court from determining whether the withheld documents were "compiled for a law enforcement purpose."[57] The agency must explain "how and under what circumstances the requested files were compiled,"[58] which it has not done here. For the open OIG records, there is only an unsupportable summary assertion that they "all relate to pending law enforcement proceedings." DiMaio Decl. ¶ 172. This ignores the fact that many OIG investigations are conducted for purposes of employee oversight, a point which the CIA concedes, and for which Exemption 7 would be inapplicable. *See* DiMaio Decl. ¶¶ 162, 169.[59] Similarly, the DiMaio Declaration simply states in a conclusory fashion that the CIA's 28 withheld witness statements were from "criminal investigations or national security intelligence investigations." DiMaio Decl. ¶ 169. Nothing describes the alleged legal violations or national security breaches to which the investigations purportedly relate.[60] The OIG's dual

---

[57] *See Pearlman*, 312 F.3d at 105; *Ferguson*, 957 F.2d at 1059.

[58] *Jefferson v. DOJ*, 284 F.3d 172, 176-77 (D.C. Cir. 2002); *see also Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982) (stating that the agency must "identify a particular individual or a particular incident as the object of its investigation" and specify "the connection between that individual or incident and a possible security risk or violation of federal law"); *Doherty v. DOJ*, 775 F.2d 49, 52 (2d Cir. 1985).

[59] *See also* 50 U.S.C. § 403(q)(c) (the CIA Inspector General's duties are, *inter alia*, to conduct inspections, investigations, and audits of CIA programs and operations, and to inform the Director of "violations of laws and regulations, fraud and other serious problems, abuses, and deficiencies that may occur in such programs"). The CIA has also not provided sufficient information to allow the Court to review whether the withheld information results from an investigation of "wrongdoing" focused upon a specific violation of federal law, which could be protected from disclosure, rather than information compiled in the course of internal agency monitoring that "might reveal evidence that later could give rise to a law enforcement investigation," which would *not* be subject to withholding under Exemption 7(C). *Kimberlin v. DOJ*, 139 F.3d 944, 947 (D.C. Cir. 1998).

[60] The CIA only expressly asserts that 3 of the 29 documents withheld pursuant to Exemptions 7(A) and (D) relate to criminal investigations. *See* Documents 18, 131, 136. Even with respect to these documents, the CIA does not state the general subject of the investigation, as required. For the remaining documents, the index merely notes that withheld documents were prepared in the course of an unidentified "intelligence investigation." *See* Docs. 126, 133-135, 138-140, 143-146, 149-151, 164-171, 173, 230-231 and 242.

role requires that the agency provide greater specificity to allow the Court and Plaintiffs to evaluate the threshold question.[61]

Second, the CIA has not satisfied its burden of demonstrating that disclosure would result in a statutorily cognizable harm.[62] The CIA has not shown that the disclosure of records from open OIG investigations would "interfere with enforcement proceedings," and even less how merely processing those records would result in that harm. A categorical withholding under Exemption 7(A) does not relieve an agency of its obligations; the categories and descriptions must be "sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if disclosed, would interfere with the investigation,'" *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986), and "must be 'functional'—'allowing the court to trace a rational link between the nature of the document and the alleged likely interference,'" *ACLU*, 429 F. Supp. 2d at 191 (quoting *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986)).[63] Here, specific document categories are not linked to an identifiable, particularized

---

[61] Courts have required that when an Inspector General both provides general oversight and conducts investigations into potential illegal acts, the agency must "distinguish between those investigations conducted 'for a law enforcement purpose,' and those in which an agency, acting as the employer, simply supervises its own employees." *Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984); *Cotton v. Adams*, 798 F. Supp. 22 (D.D.C. 1992) (denying summary judgment on Exemption 7(C) grounds because an agency's assertion that the Inspector General conducted an investigation was insufficient to establish that the investigation was conducted for law enforcement purposes); *Greenpeace, U.S.A., Inc. v. EPA*, 735 F. Supp. 13, 15 (D.D.C. 1990); *Phillips v. ICE*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005).

[62] *See Pearlman*, 312 F.3d at 105; *Ferguson*, 957 F.2d at 1059. OIG policy, on which the CIA relies, provides no support for an assertion that disclosure of the withheld witness statements would result in an improper breach of confidentiality. With regard to these documents, partial summary judgment should be granted to the Plaintiffs. *See infra* § II.E.

[63] The agency must "conduct a document-by-document review of all responsive documents to assign documents to the proper category and explain to the court how the release of each category would interfere with enforcement proceedings." *Bevis*, 801 F.2d at 1389-90 (concluding that categories such as "teletypes" or "letters" related to an investigation provide no basis for a judicial assessment of the agency's assertion that disclosure would lead to interference with law enforcement investigations); *see also Robbins Tire & Rubber Co.*, 437 U.S. at 235.

interference. Rather, the CIA provides only a non-exhaustive list of categories of information in the open OIG files, and asserts that the confidentiality of all the information in all categories is protected by Exemption 7(A) and would thus be "reasonably likely to harm the OIG's pending law enforcement investigations" by revealing details of the investigation or hindering OIG control over the investigation. DiMaio Decl. ¶ 164. The CIA also claims that processing open OIG investigation records would compromise confidentiality, DiMaio Decl. ¶ 163, without explaining how, if at all, that risk would exist if there were, for example, search assistance from a small number of the CIA's processors subject to nondisclosure requirements. This is precisely the kind of speculative and unsupported assertion of harm that courts have repeatedly rejected.[64]

    4.    *Exemptions 7(C) and 6.*

Exemption 7(C) permits the withholding of information compiled for law enforcement purposes if it "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 6 similarly protects from disclosure personnel, medical or similar files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The CIA and Department of Defense ("DOD") have claimed Exemptions 6 and/or 7(C) to withhold identifying information about government personnel, persons interviewed by the CIA OIG, and a detainee. The FOIA statute, however, "does not categorically exempt individuals' identities." *People for the Am. Way Found. v. Nat'l Park Service*, 503 F. Supp. 2d 284, 304 (D.D.C. 2007) (citing *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006)). Instead, whether information is properly withheld under Exemptions 6 and 7(C) is a two step inquiry. *Wood v. FBI*, 432 F. 3d 78, 86 (2d Cir. 2005). Here,

---

[64] *See ACLU*, 429 F. Supp. 2d at 191 (conducting *in camera* review of 14 documents to determine whether Exemption 7(A) was properly invoked for each category of records); *Elec. Privacy Info. Ctr. ("EPIC"), v. DOJ*, 511 F. Supp. 2d 56 (D.D.C. 2007) (requiring *Vaughn* index and further details, including whether segregable information exists, with respect to assertion of categorical exemptions).

the government has not provided sufficient information for the court or Plaintiffs to determine whether the agency has upheld its burden of proof under this inquiry.

First, the threshold inquiry is whether the personal information is contained in a personnel, medical or similar file (Exemption 6) or in "law enforcement records" that were "compiled for law enforcement purposes" (Exemption 7(C)). Here, as with the CIA's boilerplate descriptions for Exemptions 7(A) and (D), the descriptions of the vast majority of CIA records withheld based on Exemption 7(C) merely state in a conclusory manner that the records were compiled "during the course of an OIG investigation."[65] Nowhere do the descriptions link these putative investigations to particular criminal acts or civil infractions. *See Pearlman*, 312 F.3d at 105; *Stern*, 737 F.2d at 89. This is plainly insufficient.[66]

Second, the agency must demonstrate that disclosure would constitute either a "clearly unwarranted" (Exemption 6) or "unwarranted" (Exemption 7(C)) invasion of personal privacy. The disclosure will not be "clearly unwarranted" or "unwarranted" when the public interest in disclosure outweighs the privacy interest. *Fed. Labor Relations Auth. v. Dep't of Veterans Affairs*, 958 F.2d 503, 505 (2d Cir. 1992). Whether the disclosure of names threatens a significant privacy interest depends on the specific consequences likely to ensue from disclosure. *Wood*, 432 F.3d at 88 (*citing Dep't of State v. Ray*, 50 U.S. 164, 177 n.12 (1991). The CIA has failed to provide enough information about government personnel and non-identified "persons"

---

[65] *See Vaughn* index entries for Documents 133-135, 138-140, 143-146, 149-151, 159, 164-171, 173, 230-231, and 242; and DiMaio Decl. ¶ 165. The *Vaughn* index for Documents 131 and 136 indicate that the records withheld were compiled in connection with a criminal CIA OIG investigation, but fail to describe the general subject of the investigation, as required to invoke Exemption 7. *See supra* notes 60-61. Although Document 249, which originated with DOD's Criminal Investigation Command, is a "law enforcement record" "compiled for law enforcement purposes," the purported privacy claim is outweighed by the public interest. *See infra* II.F.

[66] *See supra* I.C.3, and *infra* II.E.

interviewed as part of an OIG investigation[67] to allow the Court to assess the consequences that would follow from disclosure of identifying information or to allow Plaintiffs to present a substantive argument responding to the CIA withholdings.[68]

     5.    *Exemption 2.*

Exemption 2 permits CIA withholdings of "internal personnel rules and practices." 5 U.S.C. § 522(b)(2). The agency must prove that withheld information "relates to trivial administrative matters of no genuine public interest," *Schwaner v. Dep't of Air Force*, 898 F.2d 793, 794 (D.C. Cir. 1990) (internal quotations and citations omitted), and it has not done so.[69]

**D.    The CIA's Segregability Analysis is Inadequate.**

FOIA unambiguously requires an agency to release "[a]ny reasonably segregable portion of a record" after deleting otherwise exempt portions. 5 U.S.C. § 552(b). A district court cannot "simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Schiller v. NLRB*, 964 F.2d 1205, 1209-10 (D.C. Cir. 1992). Here, the CIA has provided a conclusory segregability determination but no meaningful segregability analysis. Referring to thousands of documents in a single paragraph in the DiMaio Declaration, the agency states in boilerplate fashion that "those records that have been withheld in full contained no reasonably segregable, non-exempt information." DiMaio Decl. ¶ 172.

---

[67] Additionally, it is not clear whether such "persons" are corporations and other entities that do not have protectable privacy interests under FOIA. *See, e.g., Wash. Post, v. Dep't of Agric.*, 943 F. Supp. 31, 37 n. 6 (D.D.C. 1996).

[68] For example, critical details about personnel's roles in OIG investigations are entirely absent from the CIA's submissions. Moreover, the CIA has not provided information to support an assertion that the detainee whose name is withheld would not want his name disclosed, and Plaintiffs offer contrary facts. *See* Satterthwaite Decl. ¶ 15.

[69] *See, e.g.*, Documents 118, 243 (withholding the cover and routing slips of an "Agenda for a Meeting" sent from the "Executive Secretary of the NSC to Senior Officials" despite the evident public interest in knowing about any notification to "Senior Officials" of secret detention and rendition). *See* Satterthwaite Decl. ¶ 20. *Morley v. CIA*, 508 F. 3d 1108, 1125 (D.C. Cir. 2007) (statements that "[t]here is no public interest in the disclosure of such internal procedures and clerical information" insufficient to carry the CIA's burden).

Similarly, the *Vaughn* index description for 233 of the fully withheld records includes a perfunctory closing line: "There is no meaningful, reasonably segregable portion of the document that can be released."[70] The "conclusory nature of [the agency's] segregability determination prevents the court from conducting a meaningful review of the withholdings in that regard." *Elec. Privacy Info. Ctr ("EPIC"), v. DOJ*, 511 F. Supp. 2d 56, 70-71 (D.D.C. 2007), citing *Schiller*, 964 F.2d at 1209; *ACLU*, 429 F. Supp. 2d at 187-88.

### E.    The CIA Has Failed to Demonstrate the Adequacy of its Search.

The CIA cannot satisfy the summary judgment standard with respect to the adequacy of its search. It has not demonstrated that "all files likely to contain responsive materials . . . were searched," *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), because the search was limited to the "DIR area," the "cluster of offices directly responsible to the Director the CIA" and "distinct from the Agency's four main directorates." DiMaio Decl. ¶¶ 33, 23. "[F]ailure by one [] office to refer a FOIA request to another that is 'likely to have' responsive documents is sufficient by itself to render the agency's search inadequate." *Friends of Blackwater v. Dep't of Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005).[71] Further, the agency's vague and conclusory description of its searches is confined to one paragraph of the DiMaio Declaration with generalized language and sample terms for only a portion of the search. DiMaio Decl. ¶ 35.[72]

---

[70] *See Vaughn* Chart ¶ 19.  Of the remaining *Vaughn* index entries, thirteen documents were partially released and contain different boilerplate language and the entries for four documents fail to indicate that any segregability determination was conducted.

[71] The DiMaio Declaration affirms that it is common for FOIA requests to be transmitted to "many components." DiMaio Decl. ¶ 17.

[72] The fact that the details vary by component does not relieve the CIA of its obligation to describe the searches undertaken by each component in reasonable detail. *See, Weisberg v. DOJ*, 627 F.2d 365, 371 (D.C. Cir. 1980) (criticizing agency affidavits that "d[id] not denote which files were searched, or by whom, d[id] not reflect any systematic approach to document location, and d[id] not provide information specific enough to enable [the requester] to challenge the procedures utilized"). The CIA acknowledges that its "decentralized and compartmented" records system has caused "inefficiencies" in its search. DiMaio Decl. ¶ 16.

In sum, the failure to provide declarations and a *Vaughn* index that permit Plaintiffs the opportunity to test the CIA's claims eviscerates the Plaintiffs' opportunity to challenge the CIA's withholdings, impedes the court's ability to conduct *de novo* review and cannot justify the CIA's assertion of exemptions. In order to stem the CIA's overly broad withholdings of information from the public and to ensure that the purpose of FOIA is fulfilled, the Court should require the CIA to provide adequately detailed and unclassified indices and declarations in support of its withholdings and promptly segregate releasable information. The Court should not prematurely permit the Agency to invoke exemptions in a manner that defeats the purpose of FOIA.

## II. PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AND THE CIA ORDERED TO REPROCESS RESPONSIVE DOCUMENTS AND SEGREGATE INFORMATION.

Although the Court lacks sufficient information to grant the CIA's summary judgment motion, the record establishes that the CIA improperly invoked Exemptions 1, 3, 5, 7(D), 7(C) and 6 for certain information in the withheld records. The Court should grant Plaintiffs' cross-motion for partial summary judgment and compel the CIA to reprocess responsive records and release certain information improperly withheld.

### A. The CIA Improperly Withheld Officially Acknowledged Information.

To withhold nearly all of the documents in the *Vaughn* index, the CIA principally relies upon Exemptions 1 and 3, claiming that it is withholding records to protect information about intelligence sources and methods.[73] While attempting to justify its withholdings on national security grounds, the CIA fails to address the extensive official acknowledgments about its rendition, secret detention and enhanced interrogation practices that compel the agency to

---

[73] Although the burden upon the agency differs for invoking these two exemptions, *see supra* at I.C.1, there is no practical difference, as the CIA concedes, DiMaio Decl. ¶¶ 132, 135, between those intelligence sources and methods protected by Exemption 1 and those covered by Exemption 3. *See, e.g., Maynard v. CIA*, 986 F.2d 547, 555 (1st Cir. 1993); *Military Audit Project v. Casey*, 656 F.2d 724, 736-37 n. 19 (D.C. Cir. 1981).

segregate and disclose the acknowledged information without further delay. *See, e.g.,* *Fitzgibbon,* 911 F.2d at 765 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."). Once a plaintiff "point[s] to specific information in the public domain that appears to duplicate that being withheld," the agency "bear[s] the burden of comparing the proffered information with the information being withheld, determining whether the information is identical, and, if it is not, determining whether release of the perhaps only slightly different information being withheld would harm national security." *Wash. Post v. DOD,* 766 F. Supp. 1, 12 (D.D.C. 1991) (as amended) (internal quotation marks omitted). The CIA is aware of its obligation to release this information, and to do so even with respect to the precise program at issue here.[74] The CIA's failure to segregate and disclose this same and other officially acknowledged information in records responsive to Plaintiffs' request in this case raises concern that the CIA seeks "to delay the release of information" that does not require protection on national security grounds, in violation of FOIA. *See* Exec. Order 12958, § 1.7(a).

Here, despite profuse claims that releasing any information, even innocuous information, about its rendition, secret detention and interrogation program would be harmful to national security, the government has made extensive disclosures about the existence of the CIA program as well as many of its surrounding facts and documents.[75] For example, the government's official

---

[74] *See* Letter from Sean H. Lane, Assistant United States Attorney for the Southern District of New York, to Alvin K. Hellerstein, U.S. District Court Judge (Feb. 5, 2008), and Letter from Sean H. Lane, Assistant United States Attorney for the Southern District of New York, to Melanca D. Clark, Gibbons Del Deo Attorney for the plaintiffs in *ACLU v. DOD,* attached as Exs. L & M to Gutierrez Declaration; Satterthwaite Decl. ¶ 21.

[75] *See infra.* The CIA's selective disclosure substantially undermines its assertion that virtually all of the information about the CIA's program, if released, would harm national security.

acknowledgments reveal, *inter alia*, the following information, which can no longer be withheld from responsive records on the basis of national security, or any other basis:

- The existence, Satterthwaite Decl. ¶ 3, and continued operation, of the CIA's secret detention and enhanced interrogation program, *Id.* ¶ 4;
- The existence of the government's extraordinary rendition program, and its use to transfer terrorism suspects to third countries, *Id.* ¶ 5;
- The CIA's use of and "alternative set of procedures," a "new interrogation program," "enhanced interrogation techniques" or "special methods of questioning" on detainees in CIA custody, *Id.* ¶¶ 19, 21, 22-24;
- The approximate number of individuals detained in the program ("fewer than 100"), *Id.* ¶ 9, and subject to enhanced interrogation techniques ("less than a third" of the "fewer than 100"), *Id.* ¶ 21;
- The approximate number of extraordinary renditions performed by the CIA ("mid-range," "two figures"), *Id.* ¶ 12;
- That the US worked with foreign partners to apprehend, render and detain individuals in the CIA program, *Id.* ¶ 17;
- The location of at least one site, the British Island territory of Diego Garcia, where individuals were transferred in rendition flights, *Id.* ¶ 28;
- The role of "Headquarters" in approving the use of "enhanced interrogation techniques" by individual interrogators, *Id.* ¶ 27;
- The role of the National Security Council (NSC) Principals Committee in meeting and approving "enhanced interrogation techniques" for use against CIA detainees, *Id.* ¶ 20;
- The role of lawyers in approving the use of "enhanced interrogation techniques" by individual interrogators, in "review[ing] the authorized methods extensively," "conducting multiple legal reviews," "review[ing] procedures proposed by the CIA," and "deem[ing waterboarding] legal," *Id.* ¶ 53;
- The training ("240" or "250" hours), *Id.* ¶¶ 26(a), 26(b), and average age ("43"), *Id.* ¶ 26(c), of the interrogators in the CIA program;
- The names of certain individuals rendered, secretly detained or interrogated using enhanced techniques while in the program, including fourteen transferred from secret CIA prisons to Guantánamo on September 6, 2006, Khalid Sheikh Mohammed, Zayn al-Abidin Abu Zubaydah, Ramzi bin al-Shibh, Waleed Mohammed bin Attash (Tawfiq bin Attash, Tawfiq Attash Khallad), Hambali (Riduan Isamuddin), Abd al Rahim al-Nashiri, Ali Abd al-Aziz Ali (Ammar al Baluchi), Ahmed Khalfan Ghailani, Mustafa Ahmad al-Hawsawi, Lillie (Mohammed Nazir Bin Lep), Majid Khan, Abu Faraj al-Libi, Zubair, Gouled Hassan Dourad, *Id.* ¶¶ 11(a)-(b), 11(d), 11(f)-(i); and four others, Ali Abd al Rahman al Fakasi al Ghamdi, *Id.* ¶ 11(g); Hassan Ghul, *Id.*; Ibyn al-Shaykh al-Libi, *Id.* ¶ 11(j); Abd al-Hadi al-Iraqi, *Id.* ¶¶ 4(b), 4(c), 11(a), 11(d); and Muhammad Rahim al-Afghani, *Id.* ¶¶ 4(d), 11(e);
- Details regarding the detention and interrogation of certain individuals in the program, including that Abu Zubaydah was the first individual detained in secret CIA facilities, after his apprehension in March 2002, *Id.* ¶ 10; that Khalid Sheikh

Mohammed was captured in March 2003, *Id.* ¶ 11(i); that Hawsawi was captured in March 2003, *Id.*; that Walid Muhammad Salih Bin Attash ("Khallad") was captured in April 2003, *Id.*; and that Riduan Isamuddin ("Hambali") was captured in August 2003, *Id.*;

- The CIA's use of waterboarding on three men, Abu Zubaydah, Khalid Sheikh Mohammed, and Abd al-Rahim al-Nashiri, in 2002 and 2003, *Id.* ¶¶ 22-24;
- The U.S. providing the right of access to the International Committee of the Red Cross (ICRC) for prisoners when they were transferred from CIA to DOD custody, *Id.* ¶ 18;
- The engagement of some members of Congress in briefings about the CIA program, *Id.* ¶ 38;
- The expression of concern by some members of Congress about the CIA's secret detention, interrogation and rendition practices, and the withholding of information about the CIA's practices, *Id.* ¶¶ 38, 39, 54, 56;
- The expression of concern by CIA Director General Hayden and others about the legal basis of the CIA's detention, rendition and interrogation practices, *Id.* ¶ 52;
- The creation of audio/video recordings of interrogations of certain "enemy combatant[s]" and the continued possession of three recordings of "enemy combatant interrogations," *Id.* ¶ 40;
- The creation of recordings of interrogation sessions of CIA detainees in 2002, and the subsequent destruction of those videotapes by the CIA in 2005, *Id.* ¶ 41;
- The denial by the CIA to other government agencies of access to information about the CIA program of secret detention, interrogation and rendition, *Id.* ¶ 42;
- The acknowledgement by the President that the Supreme Court's decision in *Hamdan v. Rumsfeld* signified that Common Article 3 of the Geneva Conventions applied to U.S. detainee operations in the "War on Terror," and this jeopardized the continuance of the secret detention and interrogation program, *Id.* ¶¶ 49, 50;
- The effect of the Supreme Court's decision in *Hamdan v. Rumsfeld* in undermining the ability of the CIA to continue its secret detention and interrogation activities, *Id.* ¶¶ 49(c), 49(d), 50; and
- The internal OIG and external DOJ investigations into several aspects of the CIA detention, rendition and interrogation activities, including the DOJ investigation with the CIA OIG into the destruction of videotapes of interrogations in 2005, and general oversight and auditing, *Id.* ¶ 55.

The CIA is obligated to release officially acknowledged information within the responsive records. *Fitzgibbon*, 911 F.2d at 765. The Court should declare that the listed information constitutes official acknowledgements requiring disclosure and order the CIA promptly to reprocess responsive documents, conduct an adequate segregability analysis and release improperly withheld information.

**B.    The CIA Has Improperly Invoked Exemptions 1 and 3 to Withhold
Information Related to Activities Outside the Agency's Mandate.**

The CIA cannot assert any basis to use Exemption 1 or 3 to conceal information related
to activities outside the scope of the agency's mandate.[76] Much of the information that the CIA
seeks to protect relates to activities that fall outside the scope of the CIA's statutory authority and
were proscribed by law at the time the acts were committed. Such information is not validly
withheld under Exemption 1 or 3.[77]

*First*, as an initial matter, the Court should order disclosure of information within the
sampled records related to the CIA's *own* determination that its activities deviated from agency
practices and policies.[78] The majority of the documents that the CIA has identified as responsive

---

[76] In addition to defining the information eligible for classification and classification procedures,
Executive Order 12958, § 1.7(a), also prohibits classification in order to conceal "violations of
law, inefficiency, or administrative error," "prevent embarrassment," or "prevent or delay the
release of information that does not require protection in the interests of national security." *See
also* 50 U.S.C. § 403-3(d) (1994); Exec. Order 12333, 3 C.F.R. 200 (1982, reprinted as amended
in 50 U.S.C.A. § 401 note at 21. Plaintiffs note, however, that the CIA's invocation of
Exemption 3 is invalid in the first instance. *See infra* II.C.

[77] The government's claims that the CIA's rendition, secret detention and coercive interrogation
practices fall within its general statutory mandate to "collect foreign intelligence," Defs. Mot.
Summ. J. at 14-15, avoids the issue.  The agency's mandate plainly includes collecting foreign
intelligence; it may not, however, do so using unauthorized and unlawful means. *Cf.*, 471 U.S. at
169-70 (authorizing the CIA director to withhold legitimate intelligence activities and methods
that "fall within the Agency's mandate"); *Riquelme v. CIA*, 435 F. Supp. 2d 103 (D.D.C. 2006)
(protecting legitimate "human source" information related to individual's voluntary and
confidential assistance to the CIA); *Davy v. CIA*, 357 F. Supp. 2d 76, 86 (D.D.C. 2004)
(protecting lawful cryptonyms, CIA employee names, identifiers, titles, filing instructions and
organization data in FOIA case involving CIA program to provide security clearance and other
access to CIA information to nonemployees, a CIA propriety airline and other activities within
the agencies mandate); *Fitzgibbon v. CIA*, 578 F. Supp. 704, 723 (D.D.C. 1983) (protecting, *inter
alia*, lawful cryptonyms that were "minor" deletions "obscuring only individual words, letters
and symbols that would reveal employee names and details of internal structure that are of little
value to a layperson"); *Assassination Archives and Research Ctr. v. CIA*, 720 F. Supp. 217, 222
(D.D.C. 1989) (protecting cryptonyms, covert field location installations, foreign intelligence
activities, CIA employee names, official titles and organizational data related to lawful activity).

[78] *See, e.g., ACLU v. DOD*, No. 04 Civ. 4151 (AKH), Hr'g Tr. 1, 28-33, Jan. 16, 2008, attached
as Ex. K to Gutierrez Declaration; Satterthwaite Decl. ¶ 21. (district court highlighting for further

were located in files maintained by the agency's OIG. At least some of these OIG files concerned, for example, instances of detainee abuse and the death of detainees in custody. *See, e.g.,* DiMaio Decl. ¶ 141 (referencing the "criminal investigation of CIA personnel who questioned Iraqi detainee Manadel al-Jamadi, who died in Army custody in Abu Ghraib"). Exemptions 1 and 3 cannot be used to shield information pertaining to such incidents from disclosure simply because the incidents involve possibly improper or embarrassing conduct.[79] Yet with the single exception of documents related to the al-Jamadi case, the agency has failed to release information related to any other acknowledged deviations from agency policies.[80]

*Second,* and more fundamentally, the CIA's rendition, secret detention and interrogation program has, since its inception, rested upon faulty legal premises, and, as a consequence, many of the agency's past—and perhaps current—activities have been unlawful and have involved government officials' misconduct. The government cannot dispute that its understanding of the CIA's obligations under Common Article 3 of the Geneva Conventions[81] was erroneous and led to prohibited treatment and interrogations of detainees in the CIA program; the Administration has acknowledged as much. As demonstrated by President Bush's statements in the wake of *Hamdan,* the Supreme Court's decision forced the Administration to reverse its position that

review documents related to agency's own determination that a deviation from interrogation policies and practices had occurred).

[79] *See, e.g., ACLU v. DOD,* 389 F. Supp. 2d 547, 564 (S.D.N.Y. 2005) (holding that where the government provided insufficient information for the court to determine *de novo* whether the documents were improperly classified to conceal violations of law, the court must deny summary judgment).

[80] The CIA has repeatedly acknowledged deviations either publicly or internally, for example, involving the destruction of interrogation evidence, the deaths of CIA detainees in U.S. custody and "mistaken renditions." *See* Satterthwaite Decl. ¶¶ 55, 59

[81] Common Article 3 prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture," as well as "outrages upon personal dignity, in particular humiliating and degrading treatment." Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 ("Third Geneva Convention"), art. 3, 6 U.S.T. 3316 (same text in other three 1949 Conventions).

Common Article 3 did not apply to "war on terror" detainees.[82] *Hamdan* meant that the Administration needed a valid legal justification for the secret detention and coercive interrogation program.[83] On July 20, 2007, President Bush enacted Executive Order 13440, 72 Fed. Reg. 40707, confirming that Common Article 3 applied to the "program of detention and interrogation operated by the Central Intelligence Agency" and that the program would satisfy Common Article 3's requirement if the confinement and interrogation practices did not constitute torture as prohibited by 18 U.S.C. § 2340A or any of the acts prohibited by 18 U.S.C. § 2441(d).[84] *See* Exec. Order 13440. The U.S. government's admissions about the conditions of confinement and interrogation practices in the CIA program, *see infra* II.A., make plain that the CIA's prior program was not in compliance with Common Article 3 and, therefore, was outside the agency's mandate.

The CIA's acts were also prohibited under other federal and international law. The CIA's practice of extraordinary rendition violates both the Foreign Affairs and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681 (instructing agencies to implement U.S. policy barring the transfer "of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture"), and the Anti-Torture Statute, 18 U.S.C. §§ 2340-2340A (providing for prosecution of a U.S. national or anyone present in the United States who, while outside the United States, commits or attempts to commit torture).[85] Secret detention, including proxy detention as practiced by the

---

[82] Satterthwaite Decl. ¶¶ 49-50.

[83] *Id.* ¶¶ 49-50.

[84] Prohibited acts include "murder, torture, cruel or inhuman treatment, mutilation or maiming, intentionally causing serious bodily injury rape, sexual assault or abuse." 28 U.S.C. § 2441(d).

[85] In recognition of the prohibition against this practice, an FBI legal analysis concluded in 2002 that transferring a suspect to a foreign country for "enhanced" interrogation was a "per se" violation of the Anti-Torture Statute and that even discussing the possibility of transferring an

United States, similarly contravenes binding international law. *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. a/39/51 (1984), *entered into force* June 26, 2987; Third Geneva Convention, arts. 122 to 125; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949 (Fourth Geneva Convention), arts. 136 to 141, 6 U.S.T. 3516. It is also well established that the use of torture during interrogations is expressly prohibited by federal law, *see* 18 U.S.C. §§ 2340-2340A; 18 U.S.C. § 2441 (criminalizing war crimes by U.S. military personnel and U.S. nations, including grave breaches of Common Article 3), and by binding international law, *see, e.g.*, CAT. The CIA is not exempt from these laws.

To be clear, this Court need not rule on the legality of the CIA's activities in order to find that the agency has improperly withheld information "to conceal violations of law" or to avoid embarrassment. It is enough that the CIA's refusal to release records derives in part from its concern that the records contain information that points to improper or embarrassing conduct by the agency or its employees. *See, e.g., Wiener v. FBI*, 943 F.3d 972, 988 (9th Cir. 1991) (denying agency's summary judgment motion without addressing objective legality of agency's conduct because documents raised concerns about agency's intent); *see also ACLU v. DOD*, 389 F. Supp. 2d 547, 564-65 (S.D.N.Y. 2005) (suggesting that § 1.7 of Executive Order 12958 addresses "possible" violations of law). The DiMaio Declaration itself acknowledges the existence of proceedings against the agency in a number of forums as well as the "very likely prospect of [additional] criminal, civil, or administrative litigation against the CIA and CIA personnel who

---

individual for these purposes could be construed as conspiracy to commit torture. *See* Satterthwaite Decl. ¶ 62(a), Exhibit MMM, at 90-91, 94, 98, n.71, 106.

participate in the Program." DiMaio Decl. ¶¶ 139, 141.[86] Although the CIA may well prefer to avoid public scrutiny of its misdeeds, FOIA, which exists precisely to ensure governmental accountability, simply does not permit the agency to withhold information on that basis. *See ACLU v. DOD*, 389 F. Supp. 2d at 578 ("The fight to extend freedom has never been easy, and we are once again challenged, in Iraq and Afghanistan, by [individuals] who engage in violence to intimidate our will and force us to retreat. Our struggle to prevail must be without sacrificing the transparency and accountability of government and military officials. These are values FOIA was intended to advance, and they are at the very heart of the values for which we fight in Afghanistan and Iraq.").

### C.    The CIA Has Improperly Invoked Exemption 3 and the NSA.

The CIA has improperly invoked Section 102(d)(3) of the NSA to support the withholding of all but four of the documents in the *Vaughn* index. The Intelligence Reform and Terrorism Prevention Act of 2004, § 1011, Pub. L. No. 108-458, 118 Stat. 3638, 3651 (codified at 50 U.S.C. § 403-1(i)(1)) ("Intelligence Reform Act"), amended this provision to withdraw from the CIA Director the authority to "protect intelligence sources and methods from unauthorized disclosure," instead leaving this authority exclusively to the newly created Director of National Intelligence (DNI). *See id.* § 403-4a ("The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."). The legislative history of the Intelligence Reform Act weakens the authority of the Supreme Court's holding in *CIA v. Sims*, 471 U.S. 159 (1985), and the CIA's justification for its expansive withholding on Exemption 3 grounds. At the very least, it requires a DNI declaration not provided here.

Congress enacted the Intelligence Reform Act to streamline intelligence operations, to promote an informed public and to discourage improper secrecy in response to the failure of the

---

[86] *See also* Satterthwaite Decl. ¶¶ 45, 50(b), 59(a), 60(e), 61, 62(a).

intelligence community in general, and the CIA in particular, to protect the nation from the terrorist attacks of September 11, 2001.[87] In light of Congress's intent to encourage disclosure, it is clear that the DNI does not possess the same "sweeping power" granted the CIA in *Sims*.[88] *See* 50 U.S.C. § 403-1(i)(2) (2005) (tasking DNI with the duty "to *maximize* the dissemination of intelligence" consistent with the need to "protect intelligence sources and methods" (emphasis added)); 50 U.S.C. § 403-1(i)(2)(C) (2005) (requiring "preparation of intelligence products in such a way that source information is removed to allow for dissemination at the lowest level of classification possible or in unclassified form to the extent practicable").

The CIA, however, insists that § 403-1(i)(1) remains an Exemption 3 withholding statute for the agency because "the DNI directed the Director of the CIA to prevent the unauthorized disclosure of intelligence sources and methods." Defs. Mot. Summ. J. at 10; DiMaio Decl. ¶ 131. This argument ignores the plain language of the 2004 Act, which states that the DNI "may only delegate a duty or authority given the Director under [§ 403-1(i)] to the Principal Deputy Director of National Intelligence," 50 U.S.C. § 403-1(i)(3).[89] The legislative history of the statute confirms that this delegation provision should be read in strict accordance with its text. *See* 150 Cong. Rec. E2209-01 (Dec. 20, 2004) ("The nature of the authorities to be granted to the [DNI] .

---

[87] *See* Satterthwaite Decl. ¶¶ 42(a), 44(a).

[88] The Act introduces a paradigm shift from Cold War secrecy to a need for greater disclosure both within the intelligence community and to the public. *See id.* ¶ 44(b).

[89] Moreover, even if DNI's alleged delegation of authority in this case were sanctioned by the statute—which it is not—the agency offers nothing to support its claim that a delegation actually occurred. It offers only the bald assertion in its brief and one vague statement in its supporting papers, *see* DiMaio Decl. ¶ 131, which are both completely devoid of information regarding how or when any DNI authorization occurred. No such transfer of authority is indicated in the declaration from DNI's representative. *See* Hackett Decl. ¶ 8 (Director of Information Management Office for the Office of the DNI for the sole purpose of explaining why the DNI invokes Exemption 5 withholdings for twelve documents).

. . were delicate and precisely negotiated issues, with resulting agreements reflected in the legislative language of the conference report.") (statement of Rep. Hoekstra).

Further, the NSA eliminated the statutory authority for the CIA to withhold documents on an *ad hoc* basis. As the Hackett Declaration, ¶ 5, explains, the DNI fulfills its duty to protect sources and methods by establishing and implementing classification guidelines for the intelligence community at large under 50 U.S.C. § 401-1(i)(2). The NSA does not authorize any other method of decisionmaking regarding protected documents. Therefore, to the extent that the CIA points to § 401-1(i)(1) to justify withholding documents, it is limited to an Exemption 1 argument that its documents meet the DNI's classification requirements. For the reasons previously discussed, however, the agency is not entitled to invoke Exemption 1 for the requested documents. *See supra* sections I.C.1, II.A, II.B.[90]

### D.    The CIA Has Improperly Invoked the Presidential Communications Privilege Pursuant to Exemption 5.

The CIA's assertion that the presidential communications privilege protects eight of the withheld documents should be rejected because the CIA fails to meet the pertinent statutory requirements. *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 389 (2004) (describing this privilege as "an extraordinary assertion of power 'not to be lightly invoked'") (internal citation omitted). The privilege is "specific to the President," *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114 (D.D.C. 2004), and applies only to communications authored, solicited or received by the President or members of his immediate White House staff who hold broad and significant authority to advise the President. *See In re Sealed Case*, 121 F.3d 729, 744

---

[90] The amended provision applies to Plaintiffs' requests. The CIA conceded that § 403-1(i)(1) applies to the AIUSA/WSLS requests filed in 2006. Because the agency consolidated the requests for processing, Exemption 3 cannot be used to withhold documents from either AIUSA/WSLS or CCR.

(D.C. Cir. 1997); *see also Judicial Watch*, 365 F.3d at 1113. The privilege does not extend to officials outside the White House. *See Judicial Watch*, 365 F.3d at 1118.

In particular, the CIA is not the holder of the privilege. *See New-Press Division of Multimedia Holdings Corp. v. Dep't of Homeland Security*, 2005 WL 2921952, at *8 (M.D. Fla. 2005). Here, the CIA improperly maintains that it has invoked the privilege "in consultation with White House Counsel and the Legal Advisor to the National Security Council." DiMaio Decl. ¶ 152. But even if the CIA could invoke the privilege, it has not done so. First, the relevant "senior presidential advisors" have not submitted declarations affirming they relied on the documents to provide the President confidential advice. *See Judicial Watch*, 365 F.3d at 1118. Second, the declarations fail to match the individual documents to any particular presidential decisions. *See In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("The presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President."). Third, as the CIA concedes, several of the documents describe "policy decisions made by the President or by senior presidential advisors and communicated to the CIA." DiMaio Decl. ¶ 155; *see also* Hackett Decl. ¶ 24. These documents were not created while the President was "in the process of shaping policies and making decisions," and thus fall outside the scope of the privilege. *Judicial Watch*, 365 F.3d at 1113. The Court should reject the CIA's claim.

### E.    The CIA Improperly Asserts Exemptions 5 and 7(D) for Witness Statements to OIG Investigators that do not Raise Confidentiality Concerns.

The CIA maintains that because confidentiality concerns are implicated, information from statements made by witnesses to OIG investigators fall within Exemptions 5 (witness statements) and 7(D) (confidential sources). The CIA's claims are misguided. The applicable regulations and procedures do not create the asserted assurances of confidentiality.

With respect to Exemption 5, the CIA relies principally on *United States v. Weber Aircraft Co.*, 465 U.S. 792 (1984), which held that witness statements made during an Air Force safety investigation were exempt from disclosure. The investigators in *Weber* lacked the authority to compel witnesses to testify or take an oath and had to provide assurances that the witness statements would only be used for "accident prevention" in order to secure witnesses' cooperation. *Id.* at 795, 802. For its Exemption 7(D) withholdings, the CIA claims that the 28 witness statement-related records include statements from confidential sources.[91] Not all investigative "sources," however, are entitled to a presumption of confidentiality. The key question is not whether the document is treated as confidential, but "whether the particular source spoke with an understanding that the communication would remain confidential."[92] *DOJ v. Landano*, 508 U.S. 165, 172 (1993); *see also* § 522(b)(7)(D). The CIA does not properly invoke either exemption here because the witnesses and sources did not have the expectation of confidentiality required under FOIA.

*First*, the CIA's Inspector General ("IG"), unlike the investigator in *Weber*, has ample authority to assure that witnesses will provide necessary information. The IG has statutory subpoena power and is entitled to take testimony under oath. 50 U.S.C. §§ 403q(e)(4), (5). Agency employees who refuse to cooperate are subject to "appropriate administrative actions by

---

[91] Documents 126, 131, 133-136, 138-140, 143-146, 149-151, 164-171, 173, 230-231 and 242.

[92] Under *Landano*, the CIA must "proffer probative evidence" that the sources "did in fact receive an express promise of confidentiality" through, for example, submissions of declarations from agents who made express grants of confidentiality, contemporaneous documents from files reflecting the express grant, or evidence of a consistent policy of expressly granting confidentiality to this category of sources during the relevant time period. *Halpern v. FBI*, 181 F.3d 279, 298-99 (2d Cir. 1999) (citing *Landano*, 508 U.S. at 172). Agency declarations that make "bare assertions that express assurances were given to the sources in question, and that the information received was treated in a confidential manner" are insufficient. *Id.* at 299.

the Director," 50 U.S.C. § 403q(e)(2), and those employees who provide truthful information during the course of an OIG investigation are protected from any reprisals. *Id.* § 403q(e)(3)(B).

*Second,* the IG did not and cannot offer assurances of confidentiality similar to those provided in *Weber* and required under the plain language of 7(D). Witnesses are aware that, if the CIA IG uncovers evidence of impropriety, information will be disclosed to the appropriate authorities. Moreover, while the governing statute requires the IG to restrict the disclosure of a witness's identity, the statute includes no similar restriction with respect to the substance of the witness's testimony.[93] It is therefore unsurprising that the CIA fails to point to a single instance in which a court has held that an Exemption 5 witness statement privilege applies in the context of an OIG investigation. Similarly, the DiMaio Declaration addresses the OIG's nondisclosure policy but fails to address whether, for purposes of Exemption 7(D), the OIG procedures required an express assurance of confidentiality to these particular witnesses or whether, in fact, such assurances were provided so that an expectation of privacy was created.[94] *Halpern,* 181 F.3d at 298-99; *Ferguson v. FBI,* 83 F.3d 41, 42-43 (2d Cir. 1996) (*per curiam*). The CIA has not met its burden and the Court should order the OIG witness statement records reprocessed.

**F.     The CIA Has Improperly Invoked Exemptions 7(C) and 6 for Document 249.**

The CIA cannot withhold identifying information in Document 249 pursuant to Exemptions 7(C) and 6. Courts routinely require information to be released when the public's

---

[93] *See* 50 U.S.C. § 403q(e)(3)(A) ("[T]he Inspector General shall not disclose the identity of the employee without the consent of the employee, unless the Inspector General determines that such disclosure is unavoidable during the course of the investigation or the disclosure is made to an official of the Department of Justice responsible for determining whether a prosecution should be undertaken.").

[94] The DiMaio Declaration also makes no claim that the nature of the interview processes or investigations give rise to implied assurances of confidentiality with respect to any of the documents. *See Halpern,* 181 F.3d at 299.

interest in disclosure outweighs the relevant privacy interests,[95] measured by the extent to which disclosure serves FOIA's purpose "to open agency action to the light of public scrutiny." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989) (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)). The public interest in improper governmental conduct is significant. *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 173 (2004). The public interest in knowing who has been subjected to abuse, and the corrective actions taken, tips the balance strongly in favor of disclosure, especially where, as here, the government has failed to demonstrate that the release of identifying information would amount to an unwarranted invasion of personal privacy. *See* McGuire Decl. ¶ 11; Satterthwaite Decl. ¶ 57; *see also Assoc. Press v. DOD*, 410 F. Supp. 2d 147, 151 (S.D.N.Y. 2006), *reconsideration denied by* 410 F. Supp. 2d 147 (S.D.N.Y. 2006). The Court should order the CIA to disclose Document 249.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the CIA's motion for summary judgment and order the agency to (a) provide a *Vaughn* index and supporting declarations consisting of unclassified descriptions with adequate detail and specificity to enable *de novo* judicial review and adversarial challenge; (b) reprocess the responsive documents; (c) conduct a reasonable segregability analysis; and (d) release segregated information that was improperly withheld.

---

[95] *See Leadership Conf. on Civil Rights v. Alberto Gonzales*, 421 F. Supp. 2d 104, 108-109 (D.D.C. 2006); *Perlman v. DOJ*, 380 F.3d 110, 111 (2d Cir. 2004); *Rose*, 425 U.S. at 358, 381.

Respectfully submitted,

_/s/Gitanjali S. Gutierrez_

Margaret L. Satterthwaite (MS-3953)
Martha Johnstone (MJ-0979)
WASHINGTON SQUARE LEGAL
 SERVICES, INC.
International Human Rights Clinic
245 Sullivan Street
New York, NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
Email: margaret.satterthwaite@nyu.edu

*Attorneys for Amnesty International USA and
Washington Square Legal Services, Inc.*

Dated: June 25, 2008

Gitanjali S. Gutierrez (GG-0122)
Emilou MacLean (EM-0121)
Shayana Kadidal (SK-1278)
CENTER FOR CONSTITUTIONAL
 RIGHTS, INC.
666 Broadway, 7th floor
New York, NY 10012
Tel: (212) 614-6485
Fax: (212) 614-6499
Email: ggutierrez@ccrjustice.org

*Attorneys for Center for Constitutional
Rights, Inc.*

41