# EXHIBIT A



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH


CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
September 6, 2006

## President Discusses Creation of Military Commissions to Try Suspected Terrorists
The East Room

    Fact Sheet: The Administration's Legislation to Create Military Commissions
     Myth/Fact: The Administration's Legislation to Create Military Commissions
      Fact Sheet: Bringing Terrorists to Justice
      In Focus: National Security
     en Español



VIDEO  Multimedia

President's Remarks
view

1:45 P.M. EDT

THE PRESIDENT: Thank you. Thanks for the warm welcome. Welcome to the White House. Mr. Vice President, Secretary Rice, Attorney General Gonzales, Ambassador Negroponte, General Hayden, members of the United States Congress, families who lost loved ones in the terrorist attacks on our nation, and my fellow citizens: Thanks for coming.

On the morning of September the 11th, 2001, our nation awoke to a nightmare attack. Nineteen men, armed with box cutters, took control of airplanes and turned them into missiles. They used them to kill nearly 3,000 innocent people. We watched the Twin Towers collapse before our eyes -- and it became instantly clear that we'd entered a new world, and a dangerous new war.



The attacks of September the 11th horrified our nation. And amid the grief came new fears and urgent questions: Who had attacked us? What did they want? And what else were they planning? Americans saw the destruction the terrorists had caused in New York, and Washington, and Pennsylvania, and they wondered if there were other terrorist cells in our midst poised to strike; they wondered if there was a second wave of attacks still to come.

With the Twin Towers and the Pentagon still smoldering, our country on edge, and a stream of intelligence coming in about potential new attacks, my administration faced immediate challenges: We had to respond to the attack on our country. We had to wage an unprecedented war against an enemy unlike any we had fought before. We had to find the terrorists hiding in America and across the world, before they were able to strike our country again. So in the early days and weeks after 9/11, I directed our government's senior national security officials to do everything in their power, within our laws, to prevent another attack.

Nearly five years have passed since these -- those initial days of shock and sadness -- and we are thankful that the terrorists have not succeeded in launching another attack on our soil. This is not for the lack of desire or determination on the part of the enemy. As the recently foiled plot in London shows, the terrorists are still active, and they're still trying to strike America, and they're still trying to kill our people. One reason the terrorists have not succeeded is because of the hard work of thousands of dedicated men and women in our government, who have toiled day and night, along with our allies, to stop the enemy from carrying out their plans. And we are grateful for these hardworking citizens of ours.

Another reason the terrorists have not succeeded is because our government has changed its policies -- and given our military, intelligence, and law enforcement personnel the tools they need to fight this enemy and protect

our people and preserve our freedoms.



The terrorists who declared war on America represent no nation, they
defend no territory, and they wear no uniform. They do not mass
armies on borders, or flotillas of warships on the high seas. They
operate in the shadows of society; they send small teams of
operatives to infiltrate free nations; they live quietly among their
victims; they conspire in secret, and then they strike without warning.
In this new war, the most important source of information on where
the terrorists are hiding and what they are planning is the terrorists,
themselves. Captured terrorists have unique knowledge about how
terrorist networks operate. They have knowledge of where their
operatives are deployed, and knowledge about what plots are
underway. This intelligence -- this is intelligence that cannot be found any other place. And our security depends
on getting this kind of information. To win the war on terror, we must be able to detain, question, and, when
appropriate, prosecute terrorists captured here in America, and on the battlefields around the world.

After the 9/11 attacks, our coalition launched operations across the world to remove terrorist safe havens, and
capture or kill terrorist operatives and leaders. Working with our allies, we've captured and detained thousands of
terrorists and enemy fighters in Afghanistan, in Iraq, and other fronts of this war on terror. These enemy -- these
are enemy combatants, who were waging war on our nation. We have a right under the laws of war, and we have
an obligation to the American people, to detain these enemies and stop them from rejoining the battle.

Most of the enemy combatants we capture are held in Afghanistan or in Iraq, where they're questioned by our
military personnel. Many are released after questioning, or turned over to local authorities -- if we determine that
they do not pose a continuing threat and no longer have significant intelligence value. Others remain in American
custody near the battlefield, to ensure that they don't return to the fight.

In some cases, we determine that individuals we have captured pose a significant threat, or may have intelligence
that we and our allies need to have to prevent new attacks. Many are al Qaeda operatives or Taliban fighters
trying to conceal their identities, and they withhold information that could save American lives. In these cases, it
has been necessary to move these individuals to an environment where they can be held secretly [sic],
questioned by experts, and -- when appropriate -- prosecuted for terrorist acts.



Some of these individuals are taken to the United States Naval Base
at Guantanamo Bay, Cuba. It's important for Americans and others
across the world to understand the kind of people held at
Guantanamo. These aren't common criminals, or bystanders
accidentally swept up on the battlefield -- we have in place a rigorous
process to ensure those held at Guantanamo Bay belong at
Guantanamo. Those held at Guantanamo include suspected bomb
makers, terrorist trainers, recruiters and facilitators, and potential
suicide bombers. They are in our custody so they cannot murder our
people. One detainee held at Guantanamo told a questioner
questioning him -- he said this: "I'll never forget your face. I will kill
you, your brothers, your mother, and sisters."

In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives
captured during the war have been held and questioned outside the United States, in a separate program
operated by the Central Intelligence Agency. This group includes individuals believed to be the key architects of
the September the 11th attacks, and attacks on the USS Cole, an operative involved in the bombings of our
embassies in Kenya and Tanzania, and individuals involved in other attacks that have taken the lives of innocent
civilians across the world. These are dangerous men with unparalleled knowledge about terrorist networks and
their plans for new attacks. The security of our nation and the lives of our citizens depend on our ability to learn
what these terrorists know.

Many specifics of this program, including where these detainees have been held and the details of their
confinement, cannot be divulged. Doing so would provide our enemies with information they could use to take
retribution against our allies and harm our country. I can say that questioning the detainees in this program has

given us information that has saved innocent lives by helping us stop new attacks -- here in the United States and across the world. Today, I'm going to share with you some of the examples provided by our intelligence community of how this program has saved lives; why it remains vital to the security of the United States, and our friends and allies; and why it deserves the support of the United States Congress and the American people.

Within months of September the 11th, 2001, we captured a man known as Abu Zubaydah. We believe that Zubaydah was a senior terrorist leader and a trusted associate of Osama bin Laden. Our intelligence community believes he had run a terrorist camp in Afghanistan where some of the 9/11 hijackers trained, and that he helped smuggle al Qaeda leaders out of Afghanistan after coalition forces arrived to liberate that country. Zubaydah was severely wounded during the firefight that brought him into custody -- and he survived only because of the medical care arranged by the CIA.

After he recovered, Zubaydah was defiant and evasive. He declared his hatred of America. During questioning, he at first disclosed what he thought was nominal information -- and then stopped all cooperation. Well, in fact, the "nominal" information he gave us turned out to be quite important. For example, Zubaydah disclosed Khalid Sheikh Mohammed -- or KSM -- was the mastermind behind the 9/11 attacks, and used the alias "Muktar." This was a vital piece of the puzzle that helped our intelligence community pursue KSM. Abu Zubaydah also provided information that helped stop a terrorist attack being planned for inside the United States -- an attack about which we had no previous information. Zubaydah told us that al Qaeda operatives were planning to launch an attack in the U.S., and provided physical descriptions of the operatives and information on their general location. Based on the information he provided, the operatives were detained -- one while traveling to the United States.

We knew that Zubaydah had more information that could save innocent lives, but he stopped talking. As his questioning proceeded, it became clear that he had received training on how to resist interrogation. And so the CIA used an alternative set of procedures. These procedures were designed to be safe, to comply with our laws, our Constitution, and our treaty obligations. The Department of Justice reviewed the authorized methods extensively and determined them to be lawful. I cannot describe the specific methods used -- I think you understand why -- if I did, it would help the terrorists learn how to resist questioning, and to keep information from us that we need to prevent new attacks on our country. But I can say the procedures were tough, and they were safe, and lawful, and necessary.

Zubaydah was questioned using these procedures, and soon he began to provide information on key al Qaeda operatives, including information that helped us find and capture more of those responsible for the attacks on September the 11th. For example, Zubaydah identified one of KSM's accomplices in the 9/11 attacks -- a terrorist named Ramzi bin al Shibh. The information Zubaydah provided helped lead to the capture of bin al Shibh. And together these two terrorists provided information that helped in the planning and execution of the operation that captured Khalid Sheikh Mohammed.

Once in our custody, KSM was questioned by the CIA using these procedures, and he soon provided information that helped us stop another planned attack on the United States. During questioning, KSM told us about another al Qaeda operative he knew was in CIA custody -- a terrorist named Majid Khan. KSM revealed that Khan had been told to deliver $50,000 to individuals working for a suspected terrorist leader named Hambali, the leader of al Qaeda's Southeast Asian affiliate known as "J-I". CIA officers confronted Khan with this information. Khan confirmed that the money had been delivered to an operative named Zubair, and provided both a physical description and contact number for this operative.

Based on that information, Zubair was captured in June of 2003, and he soon provided information that helped lead to the capture of Hambali. After Hambali's arrest, KSM was questioned again. He identified Hambali's brother as the leader of a "J-I" cell, and Hambali's conduit for communications with al Qaeda. Hambali's brother was soon captured in Pakistan, and, in turn, led us to a cell of 17 Southeast Asian "J-I" operatives. When confronted with the news that his terror cell had been broken up, Hambali admitted that the operatives were being groomed at KSM's request for attacks inside the United States -- probably [sic] using airplanes.

During questioning, KSM also provided many details of other plots to kill innocent Americans. For example, he described the design of planned attacks on buildings inside the United States, and how operatives were directed to carry them out. He told us the operatives had been instructed to ensure that the explosives went off at a point that was high enough to prevent the people trapped above from escaping out the windows.

KSM also provided vital information on al Qaeda's efforts to obtain biological weapons. During questioning, KSM

admitted that he had met three individuals involved in al Qaeda's efforts to produce anthrax, a deadly biological agent -- and he identified one of the individuals as a terrorist named Yazid. KSM apparently believed we already had this information, because Yazid had been captured and taken into foreign custody before KSM's arrest. In fact, we did not know about Yazid's role in al Qaeda's anthrax program. Information from Yazid then helped lead to the capture of his two principal assistants in the anthrax program. Without the information provided by KSM and Yazid, we might not have uncovered this al Qaeda biological weapons program, or stopped this al Qaeda cell from developing anthrax for attacks against the United States.

These are some of the plots that have been stopped because of the information of this vital program. Terrorists held in CIA custody have also provided information that helped stop a planned strike on U.S. Marines at Camp Lemonier in Djibouti -- they were going to use an explosive laden water tanker. They helped stop a planned attack on the U.S. consulate in Karachi using car bombs and motorcycle bombs, and they helped stop a plot to hijack passenger planes and fly them into Heathrow or the Canary Wharf in London.

We're getting vital information necessary to do our jobs, and that's to protect the American people and our allies.

Information from the terrorists in this program has helped us to identify individuals that al Qaeda deemed suitable for Western operations, many of whom we had never heard about before. They include terrorists who were set to case targets inside the United States, including financial buildings in major cities on the East Coast. Information from terrorists in CIA custody has played a role in the capture or questioning of nearly every senior al Qaeda member or associate detained by the U.S. and its allies since this program began. By providing everything from initial leads to photo identifications, to precise locations of where terrorists were hiding, this program has helped us to take potential mass murderers off the streets before they were able to kill.

This program has also played a critical role in helping us understand the enemy we face in this war. Terrorists in this program have painted a picture of al Qaeda's structure and financing, and communications and logistics. They identified al Qaeda's travel routes and safe havens, and explained how al Qaeda's senior leadership communicates with its operatives in places like Iraq. They provided information that allows us -- that has allowed us to make sense of documents and computer records that we have seized in terrorist raids. They've identified voices in recordings of intercepted calls, and helped us understand the meaning of potentially critical terrorist communications.

The information we get from these detainees is corroborated by intelligence, and we've received -- that we've received from other sources -- and together this intelligence has helped us connect the dots and stop attacks before they occur. Information from the terrorists questioned in this program helped unravel plots and terrorist cells in Europe and in other places. It's helped our allies protect their people from deadly enemies. This program has been, and remains, one of the most vital tools in our war against the terrorists. It is invaluable to America and to our allies. Were it not for this program, our intelligence community believes that al Qaeda and its allies would have succeeded in launching another attack against the American homeland. By giving us information about terrorist plans we could not get anywhere else, this program has saved innocent lives.

This program has been subject to multiple legal reviews by the Department of Justice and CIA lawyers; they've determined it complied with our laws. This program has received strict oversight by the CIA's Inspector General. A small number of key leaders from both political parties on Capitol Hill were briefed about this program. All those involved in the questioning of the terrorists are carefully chosen and they're screened from a pool of experienced CIA officers. Those selected to conduct the most sensitive questioning had to complete more than 250 additional hours of specialized training before they are allowed to have contact with a captured terrorist.

I want to be absolutely clear with our people, and the world: The United States does not torture. It's against our laws, and it's against our values. I have not authorized it -- and I will not authorize it. Last year, my administration worked with Senator John McCain, and I signed into law the Detainee Treatment Act, which established the legal standard for treatment of detainees wherever they are held. I support this act. And as we implement this law, our government will continue to use every lawful method to obtain intelligence that can protect innocent people, and stop another attack like the one we experienced on September the 11th, 2001.

The CIA program has detained only a limited number of terrorists at any given time -- and once we've determined that the terrorists held by the CIA have little or no additional intelligence value, many of them have been returned to their home countries for prosecution or detention by their governments. Others have been accused of terrible crimes against the American people, and we have a duty to bring those responsible for these crimes to justice. So

we intend to prosecute these men, as appropriate, for their crimes.

Soon after the war on terror began, I authorized a system of military commissions to try foreign terrorists accused of war crimes. Military commissions have been used by Presidents from George Washington to Franklin Roosevelt to prosecute war criminals, because the rules for trying enemy combatants in a time of conflict must be different from those for trying common criminals or members of our own military. One of the first suspected terrorists to be put on trial by military commission was one of Osama bin Laden's bodyguards -- a man named Hamdan. His lawyers challenged the legality of the military commission system. It took more than two years for this case to make its way through the courts. The Court of Appeals for the District of Columbia Circuit upheld the military commissions we had designed, but this past June, the Supreme Court overturned that decision. The Supreme Court determined that military commissions are an appropriate venue for trying terrorists, but ruled that military commissions needed to be explicitly authorized by the United States Congress.

So today, I'm sending Congress legislation to specifically authorize the creation of military commissions to try terrorists for war crimes. My administration has been working with members of both parties in the House and Senate on this legislation. We put forward a bill that ensures these commissions are established in a way that protects our national security, and ensures a full and fair trial for those accused. The procedures in the bill I am sending to Congress today reflect the reality that we are a nation at war, and that it's essential for us to use all reliable evidence to bring these people to justice.

We're now approaching the five-year anniversary of the 9/11 attacks -- and the families of those murdered that day have waited patiently for justice. Some of the families are with us today -- they should have to wait no longer. So I'm announcing today that Khalid Sheikh Mohammed, Abu Zubaydah, Ramzi bin al-Shibh, and 11 other terrorists in CIA custody have been transferred to the United States Naval Base at Guantanamo Bay. (Applause.) They are being held in the custody of the Department of Defense. As soon as Congress acts to authorize the military commissions I have proposed, the men our intelligence officials believe orchestrated the deaths of nearly 3,000 Americans on September the 11th, 2001, can face justice. (Applause.)

We'll also seek to prosecute those believed to be responsible for the attack on the USS Cole, and an operative believed to be involved in the bombings of the American embassies in Kenya and Tanzania. With these prosecutions, we will send a clear message to those who kill Americans: No longer -- how long it takes, we will find you and we will bring you to justice. (Applause.)

These men will be held in a high-security facility at Guantanamo. The International Committee of the Red Cross is being advised of their detention, and will have the opportunity to meet with them. Those charged with crimes will be given access to attorneys who will help them prepare their defense -- and they will be presumed innocent. While at Guantanamo, they will have access to the same food, clothing, medical care, and opportunities for worship as other detainees. They will be questioned subject to the new U.S. Army Field Manual, which the Department of Defense is issuing today. And they will continue to be treated with the humanity that they denied others.

As we move forward with the prosecutions, we will continue to urge nations across the world to take back their nationals at Guantanamo who will not be prosecuted by our military commissions. America has no interest in being the world's jailer. But one of the reasons we have not been able to close Guantanamo is that many countries have refused to take back their nationals held at the facility. Other countries have not provided adequate assurances that their nationals will not be mistreated -- or they will not return to the battlefield, as more than a dozen people released from Guantanamo already have. We will continue working to transfer individuals held at Guantanamo, and ask other countries to work with us in this process. And we will move toward the day when we can eventually close the detention facility at Guantanamo Bay.

I know Americans have heard conflicting information about Guantanamo. Let me give you some facts. Of the thousands of terrorists captured across the world, only about 770 have ever been sent to Guantanamo. Of these, about 315 have been returned to other countries so far -- and about 455 remain in our custody. They are provided the same quality of medical care as the American service members who guard them. The International Committee of the Red Cross has the opportunity to meet privately with all who are held there. The facility has been visited by government officials from more than 30 countries, and delegations from international organizations, as well. After the Organization for Security and Cooperation in Europe came to visit, one of its delegation members called Guantanamo "a model prison" where people are treated better than in prisons in his own country. Our troops can take great pride in the work they do at Guantanamo Bay -- and so can the American people.

As we prosecute suspected terrorist leaders and operatives who have now been transferred to Guantanamo, we'll continue searching for those who have stepped forward to take their places. This nation is going to stay on the offense to protect the American people. We will continue to bring the world's most dangerous terrorists to justice -- and we will continue working to collect the vital intelligence we need to protect our country. The current transfers mean that there are now no terrorists in the CIA program. But as more high-ranking terrorists are captured, the need to obtain intelligence from them will remain critical -- and having a CIA program for questioning terrorists will continue to be crucial to getting life-saving information.

Some may ask: Why are you acknowledging this program now? There are two reasons why I'm making these limited disclosures today. First, we have largely completed our questioning of the men -- and to start the process for bringing them to trial, we must bring them into the open. Second, the Supreme Court's recent decision has impaired our ability to prosecute terrorists through military commissions, and has put in question the future of the CIA program. In its ruling on military commissions, the Court determined that a provision of the Geneva Conventions known as "Common Article Three" applies to our war with al Qaeda. This article includes provisions that prohibit "outrages upon personal dignity" and "humiliating and degrading treatment." The problem is that these and other provisions of Common Article Three are vague and undefined, and each could be interpreted in different ways by American or foreign judges. And some believe our military and intelligence personnel involved in capturing and questioning terrorists could now be at risk of prosecution under the War Crimes Act -- simply for doing their jobs in a thorough and professional way.

This is unacceptable. Our military and intelligence personnel go face to face with the world's most dangerous men every day. They have risked their lives to capture some of the most brutal terrorists on Earth. And they have worked day and night to find out what the terrorists know so we can stop new attacks. America owes our brave men and women some things in return. We owe them their thanks for saving lives and keeping America safe. And we owe them clear rules, so they can continue to do their jobs and protect our people.

So today, I'm asking Congress to pass legislation that will clarify the rules for our personnel fighting the war on terror. First, I'm asking Congress to list the specific, recognizable offenses that would be considered crimes under the War Crimes Act -- so our personnel can know clearly what is prohibited in the handling of terrorist enemies. Second, I'm asking that Congress make explicit that by following the standards of the Detainee Treatment Act our personnel are fulfilling America's obligations under Common Article Three of the Geneva Conventions. Third, I'm asking that Congress make it clear that captured terrorists cannot use the Geneva Conventions as a basis to sue our personnel in courts -- in U.S. courts. The men and women who protect us should not have to fear lawsuits filed by terrorists because they're doing their jobs.

The need for this legislation is urgent. We need to ensure that those questioning terrorists can continue to do everything within the limits of the law to get information that can save American lives. My administration will continue to work with the Congress to get this legislation enacted -- but time is of the essence. Congress is in session just for a few more weeks, and passing this legislation ought to be the top priority. (Applause.)

As we work with Congress to pass a good bill, we will also consult with congressional leaders on how to ensure that the CIA program goes forward in a way that follows the law, that meets the national security needs of our country, and protects the brave men and women we ask to obtain information that will save innocent lives. For the sake of our security, Congress needs to act, and update our laws to meet the threats of this new era. And I know they will.

We're engaged in a global struggle -- and the entire civilized world has a stake in its outcome. America is a nation of law. And as I work with Congress to strengthen and clarify our laws here at home, I will continue to work with members of the international community who have been our partners in this struggle. I've spoken with leaders of foreign governments, and worked with them to address their concerns about Guantanamo and our detention policies. I'll continue to work with the international community to construct a common foundation to defend our nations and protect our freedoms.

Free nations have faced new enemies and adjusted to new threats before -- and we have prevailed. Like the struggles of the last century, today's war on terror is, above all, a struggle for freedom and liberty. The adversaries are different, but the stakes in this war are the same: We're fighting for our way of life, and our ability to live in freedom. We're fighting for the cause of humanity, against those who seek to impose the darkness of tyranny and terror upon the entire world. And we're fighting for a peaceful future for our children and our grandchildren.

May God bless you all. (Applause.)

END 2:22 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html

CLICK HERE TO PRINT

# EXHIBIT
# B

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC 20511

## Summary of the High Value Terrorist Detainee Program

*Since 9/11, we have been engaged in a struggle against an elusive enemy; terrorists work in the shadows, relying on secrecy and the element of surprise to maximize the impact of their attacks. Timely and accurate intelligence is crucial to success in the War on Terrorism. One of the key tools in this war has been the information we have gleaned from the terrorists themselves. Detainees who have been in the inner circle of al-Qa'ida, occupying some of the most important positions in that organization, hold information that simply cannot be obtained from any other source.*

- *In the last five years, reporting from terrorist detainees has become a crucial pillar of US counterterrorism efforts, representing the single largest source of insight into al-Qa'ida for the US and its CT partners.*

- *Detainees have confirmed that al-Qa'ida continues to work on operations against the US and its CT allies; a fact underscored by the recent foiled plot in the United Kingdom. Detainee reporting will remain a critical tool if we and our allies are to continue to protect ourselves against these terrorists.*

### A Program with Safeguards and Oversight

In March 2002, the CIA and our Coalition partners captured Abu Zubaydah—a terrorist leader and trainer and a key associate of Usama Bin Ladin. A dedicated terrorist, Abu Zubaydah was wounded in the capture operation and likely would have died had it not been for the medical attention arranged by the CIA. During initial interrogation, Abu Zubaydah gave some information that he probably viewed as nominal. Some was important, however, including that Khalid Shaykh Mohammad (KSM) was the 9/11 mastermind and used the moniker "Mukhtar." This identification allowed us to comb previously collected intelligence for both names, opening up new leads to this terrorist plotter—leads that eventually resulted in his capture. It was clear to his interrogators that Abu Zubaydah possessed a great deal of information about al-Qa'ida; however, he soon stopped all cooperation. Over the ensuing months, the CIA designed a new interrogation program that would be safe, effective, and legal.

- The CIA sought and obtained legal guidance from the Department of Justice that none of the new procedures violated the US statutes prohibiting torture. Policymakers were also briefed and approved the use of the procedures.

- The procedures proved highly effective. Abu Zubaydah soon began providing accurate and timely actionable intelligence, including information that led to the capture of 9/11 plotter Ramzi bin al-Shibh.

CIA's interrogation program is designed to ensure that intelligence is collected in a manner that does not violate the US Constitution, any US statute, or US treaty obligations.

- Shortly after 11 September 2001, the majority and minority leaders of the Senate, the Speaker and the minority leader of the House, and the chairs and ranking members of the intelligence committees were briefed on the authorities for CIA's detention and interrogation program, in accordance with established procedures for sensitive intelligence programs. Within weeks of that time, the authorities were also briefed to the full intelligence committee.

- As CIA's efforts to implement these authorities got underway in 2002, the chairs, ranking members, and majority and minority staff directors of the intelligence committees were fully briefed on the interrogation procedures. Briefings to the chairs, ranking members, and majority an minority staff directors have been given on multiple occasions since that time, and in the fall of 2005, in connection with discussion on the Detainee Treatment Act, several other Members were briefed on the program, including the interrogation procedures.

- The Department of Justice has reviewed procedures proposed by the CIA on more than one occasion and determined them to be lawful.

- The program has been investigated and audited by the CIA's Office of the Inspector General (OIG), which was given full and complete access to all aspects of the program.

Multiple safeguards have been built into the program to assure its professionalism. All those involved in the questioning of detainees are carefully chosen and screened for demonstrated professional judgment and maturity; the average age of officers interrogating detainees is 43. Once selected, they must complete more than 250 hours of specialized training before they are allowed to come face-to-face with a terrorist. Additional fieldwork under the direct supervision of an experienced officer is required before they can direct an interrogation.

- Specific senior CIA officers, and currently only the Director of the CIA, must approve—prior to use—each and every one of the lawful interrogation procedures to be used. No deviation from the approved procedures and methods is permitted.

- All interrogation sessions in which one of these lawful procedures is authorized for use must be observed by non-participants to ensure the procedures are applied appropriately and safely. These observers are authorized to terminate an interrogation immediately should they believe anything unauthorized is occurring.

- Any deviations from approved program procedures and practices are to be immediately reported and immediate corrective action taken, including referral to CIA's Office of the Inspector General and the Department of Justice, as appropriate.

2

Another key to the success of CIA's program is the involvement of CIA's substantive terrorism experts, who work together with the full spectrum of CIA's operations officers. In addition to interrogators, detainees are questioned by subject matter experts with years of experience studying and tracking al-Qa'ida members and plots whose expertise contributed to the capture of the detainees. These debriefers are also carefully selected and trained before being permitted to come face-to-face with a detainee. Their expertise helps to maintain a fast pace of questions and answers: they know the detainee's history and what information he should know; they can direct the questions to obtain the most critical information a detainee possesses; and they can quickly verify the truthfulness of a response.

- Debriefers with in-depth knowledge of al-Qa'ida are able to confront the terrorists with multiple sources of information about their activities, including reporting from other detainees. Debriefers use all source information not only to develop questions for detainees but to corroborate the information the detainees supply.

**Proven Effectiveness**

Captured al-Qa'ida training manuals indicate that al-Qa'ida operatives receive counter-interrogation training; detainees in CIA's program have provided valuable information despite their efforts to apply this training. **Detainees have provided lead information that has aided the US and its allies in capturing al-Qa'ida operatives who pose a serious threat.**

- **Unraveling the network of Jemaah Islamiyah (JI) leader and al-Qa'ida's South Asia representative Hambali and foiling future US operations.** This network's unraveling is an example of how detainees all held by CIA can be more effectively debriefed than if they were held by a variety of different governments. Quickly using information from one detainee in the questioning of another would be practically impossible if the detainees were in the custody of multiple foreign states. In March 2003, al-Qa'ida operations chief KSM provided the first information on his use of the Hambali network for Western operations, setting off a chain of detentions and reporting that ultimately led to the capture not only of Hambali, but of his brother and a cell of JI operatives. **Hambali admitted that the cell was intended for KSM's future US operations.**

Terrorists taken off the street with the help of detainee reporting include some who were involved in casing targets in the US:

1. **US Government and Tourist Sites:** In 2003 and 2004, an individual was tasked by al-Qa'ida to case important US Government and tourist targets within the United States. He is in the custody of a foreign state.

2. **Iyman Faris and the Brooklyn Bridge:** In 2003, a senior al-Qa'ida plotter described an Ohio based truck driver who had taken operational tasking from al-

3

Qa'ida and who the FBI identified as Iyman Faris. Faris was located and acknowledged discussing the destruction of the Brooklyn Bridge in New York. Faris ultimately pled guilty to providing material support to al-Qa'ida and is now in a federal corrections facility.

3. **Financial Institutions:** KSM and other detainees provided key leads to an elusive operative who had been tasked prior to 9/11 to case financial buildings in major cities along the East Coast. He is in the custody of a foreign state.

**Other Operatives for Attacks Against the US and Its Allies.** Detainees have provided names approximately 86 individuals—many of whom we had never heard of before—that al-Qa'ida has deemed suitable for Western operations. We have shared these names broadly within the US intelligence and law enforcement communities and with key partners overseas. Nearly half these individuals have been removed from the battlefield by the US and its allies.

- Jafar al-Tayyar was described by Abu Zubaydah who named him as one of the most likely individuals to be used by al-Qa'ida for operations in the United States or Europe. Other detainees added more details, helping us confirm that he is an al-Qa'ida operative and uncover his true name. As a result, a $5 million reward has been posted for information leading to the capture of Adnan El Shukrijumah, who remains at large.

**The detention of terrorists disrupts—at least temporarily—the plots they were involved in, saving the lives not only of Americans but also of countless of men, women, and children around the globe:**

1. **The West Coast Airliner Plot:** In mid-2002, thanks to leads from a variety of detainees, the US disrupted a plot by 9/11 mastermind KSM to attack targets on the West Coast of the United States using hijacked airplanes.

2. **The 2004 UK Urban Targets Plot:** In mid-2004, the US and its counterterrorism partners disrupted a plot that involved attacking urban targets in the United Kingdom with explosive devices. Some of the key leads to these plotters came from detainees.

3. **The 2003 Karachi Plot:** In the spring of 2003, the US and a partner detained key al-Qa'ida operatives who were in the advanced stages of plotting an attack against several targets in Karachi, Pakistan that would have killed hundreds of innocent men, women, and children.

4. **The Heathrow Airport Plot:** In 2003, the US and several partners—acting on information from several detainees—disrupted a plot to attack Heathrow Airport using hijacked commercial airliners. KSM and his network were behind the planning for this attack.

4

5. **The 2002 Arabian Gulf Shipping Plot:** In late 2002 and early 2003, the work of the US and partner nations to detain two senior al-Qa'ida operatives thwarted these operatives' plot to attack ships in the Arabian Gulf.

6. **The Straits of Hormuz Plot:** One of the Arabian Gulf shipping plotters was also working on a plot to attack ships transiting the Straits of Hormuz. His detention disrupted this plot.

7. **The Tall Buildings Plot.** Working with information from detainees, the US disrupted a plot to blow up tall buildings in the United States. KSM later described how he had directed operatives to ensure the buildings were high enough to prevent the people trapped above from escaping out of the windows, thus ensuring their deaths from smoke inhalation.

8. **Camp Lemonier Plot:** In early 2004, shortly after his capture, al-Qa'ida facilitator Gouled Hassan Dourad revealed that in mid-2003 al-Qa'ida East Africa cell leader Abu Talha al-Sudani sent him from Mogadishu to Djibouti to case the US Marine base at Camp Lemonier, as part of a plot to send suicide bombers with a truck bomb into the base. His information—including identifying operatives associated with the plot—helped us to enhance the security at the camp.

**In the years since 9/11, successive detainees have helped us and our allies gauge our progress in the fight against al-Qa'ida by providing updated information on the changing structure and health of the organization.** They also have given the US and its CT partners context to understand new threat information as it becomes available—insights that illuminate activity we and our allies see in reporting on current threats and plotting. In addition, detainees have provided us locational information on al-Qa'ida managers and operatives.

- **As a result, we have been able to provide leads to our CT partners around the world that have helped them root out al-Qa'ida safehavens. Subsequent detainees have reported that attempts to mount additional attacks in the US Homeland have been set back by these counterterrorism operations.**

# EXHIBIT C



# UNITED STATES ATTORNEY'S OFFICE
## SOUTHERN DISTRICT OF NEW YORK
### 86 Chambers Street, 5th Floor
### New York, New York 10007

**To:**     (following distribution list)

| Name | Office | Fax Number |
| --- | --- | --- |
| Lawrence S. Lustberg | Gibbons, Del Deo | (973) 639-6285 |
| Melanca D. Clark | Gibbons, Del Deo | (973) 639-8341 |
| Amrit Singh | ACLU Foundation | (212) 549-2654 |

**Date:**                         November 9, 2006

**No. Pages (including cover):**     3

---

**From:**                    **PETER M. SKINNER, AUSA**

**Phone No.:**               (212) 637-2601

**Fax Number:**              (212) 637-2730

**Remarks:**

**FOR OFFICIAL USE U.S. ATTORNEY FACSIMILE COMMUNICATION**

The information contained in this facsimile message, and any and all accompanying documents, constitute "FOR OFFICIAL USE ONLY" information. This information is the property of the U.S. Attorney's Office. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this information in error, please notify us immediately by telephone at the above number and destroy the information.

NOV-09-2006  17:53        US ATTORNEY'S OFFICE                        212      P.02/04



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

86 Chambers Street, 5th Floor
New York, New York 10007

November 9, 2006

BY FACSIMILE
Lawrence S. Lustberg, Esq.
Melanca D. Clark, Esq.
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, N.J. 07102

Amrit Singh
Staff Counsel
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, N.Y. 10004

> Re:  ACLU, et al., v. Department of Defense, et al.,
>       No. 04 Civ. 4151 (AKH)

Dear Mr. Lustberg, Ms. Clark and Ms. Singh:

      We are enclosing an administrative response from the Central Intelligence Agency ("CIA") with respect to Items 29 and 61 of Plaintiffs' August 16, 2004 List. The CIA will provide a Vaughn declaration with respect to these documents by November 30, 2006. Thank you for your attention to this matter.

      Very truly yours,

      MICHAEL J. GARCIA
      United States Attorney

By:

      SEAN H. LANE
      HEATHER K. McSHAIN
      PETER M. SKINNER
      Assistant United States Attorneys
      Telephone: (212) 637-2737

Encl.

Central Intelligence Agency



Washington, D.C. 20505

Office of General Counsel                    10 November 2006

VIA FACSIMILE

Melanca D. Clark
Gibbins, Del Deo, Dolan,
  Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 07102-5496

        Re:  ACLU v. DOD, 04 Civ. 4151 (S.D.N.Y.), remanded
             06-0205-cv (2nd Cir.)

Dear Ms. Clark:

        Pursuant to the court of appeals' 12 and 22 September 2006
orders and 25 September 2006 mandate in the referenced case, the
Central Intelligence Agency (CIA) hereby responds to Items No.
29 and 61 of the list enclosed with Plaintiffs' 16 August 2004
letter.

        On remand, the CIA processed Plaintiffs' requests for Items
No. 29 and 61 in accordance with the Freedom of Information Act
(FOIA), 5 U.S.C. § 552, as amended, for records not exempt from
search, review, and disclosure under the Central Intelligence
Agency Information Act, 50 U.S.C. § 431, as amended.  After
conducting a diligent search of relevant systems of records that
was reasonably calculated to discover any responsive records,
the CIA has located one document responsive to Item No. 29 and
one document responsive to Item No. 61.

        The document responsive to Item No. 29 is a legal
memorandum from the Office of Legal Counsel of the Department of
Justice to the Office of General Counsel of the CIA.  The
document is withheld in its entirety on the bases of FOIA
Exemptions b(1), b(3) (National Security Act of 1947 and CIA Act
of 1949), and b(5) (deliberative process and attorney-client
privileges).

Melanca D. Clark

    The document responsive to Item No. 61 is a memorandum from President Bush to the Director of the CIA.  The document is withheld in its entirety on the bases of FOIA Exemptions b(1), b(3) (National Security Act of 1947 and CIA Act of 1949), and b(5) (presidential communications, deliberative process, and attorney-client privileges).

    The documents are withheld in their entirety because there is no meaningful non-exempt information that can be reasonably segregated from the exempt information.

                Sincerely,

                John L. McPherson
          Associate General Counsel

2

# EXHIBIT
# D

Home | Site Index | FAQs | Contact | RSS | Podcast

# COUNCIL ON FOREIGN RELATIONS
### A Resource for Nonpartisan Information and Analysis

home > by publication type > transcripts > A Conversation with Michael Hayden [Rush Transcript; Federal News Service]

✉ Email

## Transcript

### A Conversation with Michael Hayden [Rush Transcript; Federal News Service]

**Speaker:** Michael V. Hayden, U.S. Air Force (Retired), Director of the Central Intelligence Agency
**Presider:** Stephen Friedman, Chairman, Stone Point Capital

September 7, 2007
Council on Foreign Relations
New York, NY

♫ Audio

Council on Foreign Relations, New York City, New York

September 7, 2007

STEPHEN FRIEDMAN:  (Off mike) -- line-up for the next 30 days or so of council events:  on September 25th, Stephen Harper, the prime minister of Canada; on the 26th, Foreign Minister D'Alema of Italy; on the 26th, President Karzai of Afghanistan; on the 27th, Prime Minister Erdogan of Turkey; and on the 27th, President Uribe of Colombia; on October 1st, Foreign Minister Mukherjee of India -- a stellar cast.

Now it's going to be my pleasure to introduce the general.  First let me just give you the normal council ground rules for this type of meeting.  Please turn off your cellphones and BlackBerries and any other wireless devices.  Remember this meeting is very much on the record.  In fact, it is being teleconferenced.

Now just brief words about Mike Hayden:

Anyone here who's had the privilege of working with senior leadership in our uniformed military knows the talent that we're fortunate as a nation to have.  Mike Hayden is one of the few people in the -- in our military history who's attained his fourth star as an intel pro, which is a measure of the esteem in which he's held by people who deal with him and by his leaders.

For those who worry about the importance of truth being spoken to power, when it is in Hayden's watch, I think you have no need to fear.  He is a very direct person, and today you'll all benefit from that.  So let me just introduce General Mike Hayden.  (Applause.)

GENERAL MICHAEL V. HAYDEN:  Thank you, Steve.  That's very kind.  I'm almost overwhelmed by that line-up you had there.  I assure you, I'm the lead-off hitter, and my only purpose is to just get on base for the folks who are coming behind me.  (Laughter.)

Thanks for the opportunity to be here, and it's a pleasure to be in New York, to spend some time with such a distinguished group -- I'm looking out here, seeing a lot of familiar faces and old friends -- and an opportunity to talk about the organization I actually have the privilege to lead, the Central Intelligence Agency.

We're an organization with a clear objective:  to protect the American people.  We have a number of missions that feed into that, to protect America, and one of those missions we share with the council, which is to help our

### Related Materials

Letter from Lt. Gen. Michael Hayden to Rep. Nancy Pelosi regarding NSA surveillance
By Michael V. Hayden
Essential Documents
October 18, 2001

A Conversation with Michael V. Hayden (Video)
Video
September 7, 2007

A Conversation with Michael V. Hayden (Audio)
Audio
September 7, 2007

MI5 Director General's Speech on Intelligence, Counter-Terrorism and Trust
Essential Documents
November 5, 2007

The ISI and Terrorism: Behind the Accusations
By Eben Kaplan, Associate Editor
Backgrounder
Updated: October 19, 2007

### See Also

Intelligence, Terrorism

policymakers make sense of global events.

And the range of issues before us both are as wide as the world we both study:  nuclear proliferation, emerging security threats, the rise of new economic centers, scramble for natural resources, and the list goes on.

Our nation counts on us to have the expertise and the insight to flag the risks and the opportunities that lie ahead, and to keep our eye on all the critical international concerns that face our nation right now.

But of the subjects we cover, none commands more attention than terrorism.  I think it's very unlikely that there will ever come a time when a CIA director visits New York and his or her thoughts aren't shaped by 9/11.  We're at war, and this city, still strong and vibrant, has been a battlefield in that war.

Now, I don't make a lot of public speeches.  That's probably the way it should be for someone in my line of work.  But I actually asked Richard and the council to be able to speak to you today.

Like anyone who feels deeply about the safety and well-being of his countrymen, and the value and the integrity of his colleagues, I believe there are some things that need to be said.

Let me repeat that.  Like anyone who feels deeply about the safety and well-being of his countrymen, and the value and integrity of his colleagues, there are things that should be said.  And sometimes our citizens should hear them from the person who's running their Central Intelligence Agency.

So this afternoon, I want to talk to you about the agency, the new kind of war that our nation has asked us to fight, and something I'm going to call the question of space.  If you take nothing else from what I say here this afternoon, I hope it will be this.  Our agency, the CIA, operates only within the space given to us by the American people.  That's how we want it to be, and that's how it should be.

That space is defined by the policymakers that we all elect and by the laws our representatives pass.  But once the laws are passed and the boundaries are set, the American people expect CIA to use every inch we're given to protect our fellow citizens.

So let's talk a little bit about that space.  The intelligence services of free societies operate within strict limits.  To my way of thinking, those boundaries here in America reflect the principles of the republic that are most worth defending.  We at CIA work very hard to live up to them, even as we operate in the shadow world of espionage.

That sets up a natural tension, but frankly, for us, that's simply the cost of doing business.  Our agency is convinced, absolutely convinced, that it's our obligation to conform to the needs of our free society and not vice versa.

That's the society that we all signed up to defend.  So no matter what the external threat is, we at CIA feel just as strongly as any American that our DNA as a nation must not, cannot be altered.

But unlike most Americans, it's also our responsibility to confront that external threat unceasingly, every minute of every hour.  And that, too, is an obligation that we at CIA feel very acutely.

So let me make very clear how my agency views the fight at hand.  I think it speaks to what a lot of Americans believe, as well.  But here's how we see it.

Our nation is in a state of armed conflict with al Qaeda and its affiliates.  It's a conflict that is global in scope, and a precondition for winning that conflict is to take the fight to the enemy wherever he may be.  From my vantage point, measured by the required intensity of effort or the profound nature of the threat, it's very hard to see this thing as anything less than war.  I've seen public references to, quote, "the so-called war on terrorism" or, quote, "the Bush's administration's war on terrorism," but for us it's simply war.  It's a word we use commonly without ambiguity in the halls of the Pentagon and at Langley.

We who study and target this enemy see a danger more real than anything our citizens at home have confronted since our Civil War.  And even when you consider the Cold War and mutually assured destruction, in which the potential danger was actually catastrophic, the fact is the destruction never came.  This war is different.  In a very real sense, anyone who lives or works in a major city is as much a potential target as the victims of 9/11 or of the London subway bombings or the strikes in Madrid or any of the other operations we've seen in Morocco, Jordan, Indonesia, Algeria, Pakistan, Kenya and elsewhere.

That's my take on the strategic threat we face, and that's without the precise language of a National Intelligence Estimate.  But the National Intelligence Council did publish its findings on that threat to the homeland earlier this

summer. You had analysts in CIA and from throughout the intelligence community engage in a very careful, meticulous study of the issues based on their expertise and based on both open and classified sources. And I think they did a good job and I have tremendous respect for their work, and for us here this afternoon, I'd like to draw from their judgments to the extent I can in this public setting.

First, our analysts assess with high confidence that al Qaeda's central leadership is planning high-impact plots against the American homeland.

Second, those same analysts assess -- again, with high confidence -- that al Qaeda has protected or regenerated key elements of its homeland attack capability. That means safe haven in the tribal areas of Pakistan. That means operational lieutenants. That means a top leadership engaged in planning. Al Qaeda's success with that last remaining element, which is planning operatives in this country, is less certain.

And third, we assess -- once again, with high confidence -- that al Qaeda is focusing on targets that would produce mass casualties, dramatic destruction and significant economic aftershocks.

I want to be as clear as I can about the danger we face. I want to do that for two reasons. First, I'm the CIA director, and warning about foreign threats to our security is actually part of my job. But second, in discussing the operational space available to my agency, I want to explain to you, and through you to the American people, exactly why we feel so strongly about using every inch we have been given.

We bear responsibility for standing watch on this threat. That fact alone has the very distinctive effect of focusing the mind. But we bear an additional responsibility, as well. We're charged with prosecuting an expeditionary campaign to actually help capture or kill those behind the threat. And this, this is a form of warfare unlike any other in our country's history.

It's an intelligence war as much as a military one. Actually, maybe it's an intelligence war more than it's a military one. In the post-9/11 era, intelligence is more crucial to the security of the republic than ever before. Now, that's, I recognize, a pretty sweeping assertion, so let me try to spell out what I mean with maybe an historical analogy.

I mentioned mutually assured destruction in the Cold War. If that war ever came, the Soviet Union's most deadly forces -- ICBMs, tank armies -- they were actually relatively easy to find, but they were very hard to kill. Intelligence was important, don't get me wrong, but intelligence was overshadowed by the need for raw, shear fire power.

Today the situation is reversed. We're now in an age in which our primary adversary is easy to kill, he's just very hard to find. So you can understand why so much emphasis in the last five years has been placed on intelligence. Moreover, the moment of an enemy's attack may be just that, a moment, a split second, the time it takes for an airliner to crash or a bomb to detonate. There can be little or no time to defeat him on the battlefield he's chosen.

But behind that point of attack, behind that battlefield he's picked is a trail, a trail of planning, travel, communications, training and all of the other elements that go into a large scale terrorist operation. This is where there are secrets we can steal, operatives we can capture and interrogate, plots we can and must disrupt. That's the theater of operations for your -- for America's clandestine intelligence service. That's where the American people expect us to fight, and in this fight, we've leveraged every inch of the space, the space we've been given to operate.

I want to briefly discuss two important aspects of our post-9/11 operations to put them into proper perspective, and they have to do with that space question. First is our rendition, detention and interrogation programs, and then I want to talk a little bit about our close collaboration with allied intelligence services.

Now, the first thing you need to know about those renditions, detentions and interrogations programs, which, I should add, are very carefully controlled and lawfully conducted, is that although I'm talking about them today, they are hardly the centerpiece of our effort, nor are they nearly as big as some think. But the intelligence they've produced is absolutely irreplaceable, and that intelligence has been used not only by this nation's national security agencies, but by our fellow members of the Atlantic alliance and other allies. It's been crucial in giving us a better understanding of the enemy we face as well as leads on taking other terrorists off the battlefield.

Intelligence is sometimes described as an analogist to putting the pieces of a puzzle together, except we hardly ever get to see the picture on the top of the box. The individuals that we detain provide us with a bunch of new

puzzle pieces, but most importantly, very often they have seen the picture on the top of the box. For example, that National Intelligence Estimate I mentioned earlier about threats to the homeland, in terms of its judgments and assumptions, is actually informed by the intelligence we've obtained from our detention program. More than 70 percent of the human intelligence reporting used in that estimate is based on information from detainees.

A year and a day ago, the president publicly acknowledged the existence of CIA's detention and interrogation program. It began with the capture of Abu Zubaydah in the spring of 2002. Fewer than 100 people had been detained at CIA's facilities. And I mentioned renditions, the number of renditions -- that's moving a terrorist from A to B -- apart from that 100 that we've detained, the number of renditions is actually even a smaller number, mid-range two figures. These programs are targeted and they are selective. They were designed only for the most dangerous terrorists and those believed to have the most valuable information, such as knowledge of planned attacks, but they've also been the subject of wild speculation both here and overseas.

A case and point, a European parliament temporary committee has claimed that -- and I'm quoting now -- "at least 1,245 flights operated by the CIA flew into European airspace and stopped over at European airports between the end of 2001 and the end of 2005." And the report said so in a context that implied that many or even most of these were rendition flights. The actual number of rendition flights ever flown by CIA is a tiny fraction of that. And the suggestion that even a substantial number of those 1,245 flights were carrying detainees is frankly absurd on its face.

What did some of these flights carry? Could be equipment to support our people in the field, could be documents that we're sharing with our allies, could be me. Flights like the ones I take to visit our allies are actually a good thing. They're signs of our close cooperation.

As a method used against the most dangerous terrorists, there's nothing new about renditions also, by the way, for either America or its allies. Consider the cases of Carlos the Jackal or Abdullah Ocalan, both of whose renditions were upheld by European courts. Renditions before and since 9/11 share some basic features. They have been conducted lawfully, responsibly and with a clear and single purpose: Get terrorists off the street and gain intelligence on those still at large.

Our detention and interrogation programs flow from the same inescapable logic. And a lot of what you hear about our interrogation and debriefing techniques is not only false, it actually tends to obscure a point that we and our officers understand very well. When face to face with a detained terrorist, the most effective tool bar none is knowledge. That means things like familiarity with the subject's background, knowing the right questions to ask, countering lies with facts.

We had one detainee, for example, who became quite cooperative in his briefing, when he arrived at a site and we told him not only who we were, we also told him who he was. And then we added where he came from and a great deal of his operational history. If CIA with all of our expertise in counterterrorism had not stepped forward to hold and interrogate men like Abu Zubaydah and Khalid Sheikh Mohammed, people in America, people in Europe, people elsewhere would be right to ask why. We shouldered that responsibility for just one reason: to learn all we can about our nation's most deadly enemies, so that our operations to undermine them are as effective as possible.

Now, I know serious people in free societies are still grappling with how best to address the fight against terrorists in a way that's both effective in protecting our people and consistent with our liberal democratic principles and traditions. The exchange of ideas between our societies is actually building a stronger consensus on the way forward. And it's not hard to see some signs of this cross-pollination and a growing realization that we are all confronting a distinctly new type of threat.

Germany's interior ministry, Wolfgang Schauble, recently cast the situation in these terms, and I'm quoting him now. "The fact is that the old categories no longer apply. The fight against international terrorism cannot be mastered by the classic methods of the police. We have to clarify whether our constitutional state is sufficient for confronting the new threats."

While the dialogue continues on how best to conduct this fight, we and our partners do stand united on its larger purpose. And this much is certain: America cannot win this war without allies. Steve Kappes is my deputy. Steve and I have gone to literally dozens of countries in our first year as head of the agency. Many of these countries we've visited more than once.

I cannot overstate how vital these relationships are to our overall effort. For when I'm talking about winning this war, I do so in full knowledge. It's a highly complex struggle, a long-term struggle, and it's fought on two levels:

what I call the close battle and the deep battle. And our foreign partners are pivotal to success on both those fronts.

Close fight -- that's the one I've been referring to until now -- is pretty straightforward. It's about people who want to kill us. They can't be stopped unless we kill or capture them. And on this front, our foreign partners extend our reach, and they help us across the spectrum of our operations. The efforts of multiple services are often coordinated against a terrorist or group that has regional or global affiliations and doesn't respect the boundaries of nation-states.

Our collaboration has disrupted attacks that could have been on the same scales as those of 9/11 -- the U.K. airliner plot, the takedowns of Khalid Sheikh Mohammed, Mullah Dadullah and many, many others show what can be accomplished by close teamwork among allies. We've used the teamwork in every lawful tactic at our disposal, every inch of the space we've been given to protect all of our citizens from terrorist brutality. With that strong success in the close fight, we face an adaptive and resilient enemy who poses a heightened threat, as I mentioned earlier.

I talked recently with a reporter friend of mine about my hard-to-find/easy-to-kill model. And with his usual insight, my friend added -- once again, contrasting it to the Cold War -- that al Qaeda, in addition to being hard to find, was actually quick to regenerate. And al Qaeda has compensated for losing its Afghan safe haven and key operational lieutenants by regrouping in Pakistan's tribal areas, where they've recruited from a ready pool of adherents. And therein lies what I described a minute ago, the deep battle: Blunting the jihadists' appeal to disenchanted young Muslim men and, increasingly, young Muslim women as well. The deep fight requires discrediting and eliminating the jihadist ideology that motivates this hatred and violence. It requires winning what is essentially a war of ideas.

And I recognize that some of the actions required by the close fight can make fighting the deep fight even more complicated. But it's actually very rare in life that doing nothing is a legitimate or a morally acceptable course of action. Responsibility demands action, and dealing with the immediate threat must naturally be a top priority.

Killing, capturing terrorists keeps them at bay and protects our people, but defeating the world view responsible for producing those terrorists diminishes the threat itself. Winning the war of ideas actually defines the long-term victory that we seek.

I need to be very clear about this -- this conflict is not about religion. This war of ideas is not about Islam; it's about fanatics whose victims have most often been other Muslims. The terrorists must be exposed for the scourge they are, reviled for the horror and suffering they inflict; only then can they be uprooted at their very source.

The deep fight, I should add, is a fight that our whole society has to wage. This war of ideas is something that CIA can contribute to, but we are not the decisive factor. And that deep fight requires that jihadists' ideas of violence and extremism and intolerance be countered by ideas of peace, moderation and inclusion. It requires a tireless global campaign by a broad coalition of nations and societies. But, frankly, it's our friends in the Islamic world, repulsed by al Qaeda's savage distortion of their faith, who must take a leading role.

Any discussion of war and particularly the war of ideas would be incomplete without reference to global media. It is indeed one of the decisive battlegrounds in the post-9/11 era. It's where al Qaeda can attempt to spread its grand illusion of a noble struggle, or it can be where its operatives can be revealed as murderers who try to justify their atrocities with a violent, bankrupt ideology.

The duty of a free press is to report the facts as they are found. By sticking to that principle, journalists accomplish a great deal in exposing al Qaeda and its inherents for what they truly are. And just as they report on terrorists, it's the job of journalists to report on how the war against terrorism is being fought. And when their spotlight is cast on intelligence activities, sound judgment and a thorough understanding of all the equities at play are critically important.

Revelations of sources and methods or what seems to me to be an impulse to drag anything CIA does to the darkest corner of the room can make it very difficult for us to perform our vital work. When our operations are exposed -- you know, the legal, authorized operations overseen by Congress? -- when those operations are exposed, it reduces the space and it damages the tools we use to protect Americans.

After the press report on how banking records in the international Swiss network could be monitored, I read a claim that this leak -- and I'm quoting now -- "bears no resemblance to security breaches" -- why disclosure of

troop locations that would clearly compromise the immediate safety of specific individuals -- I could not disagree more strongly. In a war that largely depends on our success on collecting intelligence on the enemy, publishing information on our sources and methods can be just as damaging as revelations of troop or ship movements have been in the past. Now the compromise to safety can be both immediate and lasting, and it extends beyond specific individuals. Each revelation of our methods in tracking terrorists, tracking WMD, tracking other threats allows our enemies to cover their tracks and change their practices. We'll respond, but it takes us valuable time to readjust.

Now, some are out there who say there's no evidence that leaks of classified information have actually harmed national security. As CIA director, I'm telling you there is and they have. Let me give you just two examples. In one case, leaks provided ammunition for a government to prosecute and imprison one of our sources whose family was also endangered. The revelations had an immediate chilling affect on our ability to collect against a top priority target. In another, a spade of media reports cost us several promising counterterrorism and counterproliferation assets. Sources not even involved in the operation that was exposed lost confidence that their relationship with us could be kept secret and so they stopped reporting.

I mentioned earlier how our liaison relationships with our foreign partners are critical to the war effort. Several years before the 9/11 attacks, a press leak of liaison intelligence prompted a country's service to stop cooperating with us on counterterrorism for two years. More recently, more than one foreign service has told us that because of public disclosures they had to withhold intelligence they otherwise would have shared with us, and that gap of information puts Americans at risk.

Look, I know those who are entrusted with America's secrets and break that trust by divulging those secrets are guilty of a crime, but those who seek such information and then choose to publish it are not without responsibilities. I've got a deep respect for journalists and for their profession. Many of them, especially since 9/11, have actually given their lives in the act of keeping our citizens and our society informed. They're smart, they're dedicated, they're courageous men and women. I count many of them in -- and let me choose my words carefully -- I count many of them as callings. We each have an important role to play in the defense of the republic, but my point is, there are times when life and death issues are at stake when intelligence activities is a subject of press reports.

On their own journalists often simply don't have all the facts needed to make the call on whether the information can be released without harm. I've heard some justify a release based on their view of the sensitivity of their story's content with no understanding of the affect the release have -- may have on the -- the release may have on the intelligence source at the heart of the story. As I said, journalists and intelligence officers have important roles to play in the defense of the republic. A free press is critical to good government. But when the media claims an oversight role on clandestine operations, it moves that clandestine operation into an arena where we cannot clarify, we cannot explain, we cannot defend our actions without doing even further damage to our national security.

It's important -- as I say this, it's important to bear in mind that my agency is subject to another oversight mechanism that has full access to our operations and takes our security requirements into account, it's your representatives in Congress.

The CIA has asked for robust authorities -- remember, the space -- so that we can better fulfill our responsibility to prevent another attack like 9/11, but we have not asked for those authorities without congressional oversight. Close interaction with Congress -- it is an essential part of our -- the agency's social contract with the American people.

Let me give you some statistics -- all of them are for this calendar year, all right; it's 2007 -- that underscore how we vigorously support the oversight we have from the elected representatives in Congress.

In 2007 to date, CIA officers have testified in 57 congressional hearings, and we're responding to 29 congressionally legislated requests for information. We have answered 1,140 QFRs -- that's Questions For the Record -- as well as 254 other letters, questions and requests. CIA experts have given more than 500 briefings to members of Congress and their staffs. We have issued some 100 congressional notifications about our sensitive programs. Everything is on the table. I personally have briefed the Hill nine times since last September on renditions, detentions and interrogations.

I mention all this because, contrary to some of the things you might read in a book, glean from a movie or read in the newspaper, we actually act at CIA within a strong framework of law and oversight. We are responsive to

both ends of Pennsylvania Avenue.

We have an Office of General Counsel. We have an Office of General Counsel that is actually larger than many of our foreign intelligence partners. And our OGC offices, our General Counsel Offices, have a defining say in how we conduct our operations.

We work hard to earn the public trust, because we need that public trust to do our job. It's especially important because the counterterrorism part of our global mission isn't going away any time soon. This war will define our priorities well into the future.

All of you here at the council play a special role in informing this public debate, this public debate on this and every other major issue of foreign policy and national security, so I want to thank you for giving me the opportunity to talk about the work we do at the agency and to help contribute to the broader public understanding of our effort.

I came here as a member of two organizations that mean a lot to me, and one's obvious, see -- the Air Force -- and CIA. And as luck would have it, this month marks the 60th anniversary of both -- both created by the same National Security Act. I've been with the Air Force for 38 of its 60 years; it really hurts me to say that. (Laughs, laughter.) That's a long time. Another harmful way would be something like 50 percent of the history of manned flight, but I don't want to go there. (Laughs, laughter.) I'm proud to be an airman, to wear the uniform, to be part of that great family.

I've been with the agency for about 16 months, but I've actually worked closely with its offices for much of my career. I have a much deeper familiarity with CIA than a 16-month tenure would suggest. We at CIA are no stranger to criticism, and that's been true throughout our history. Sometimes it's justified; often, it's not. Much of what I've seen in the press and read in some books simply doesn't square with the devotion and skill I see every day, whether I'm at Langley or I'm in a war zone. The men and women of CIA are among the most gifted, talented people I've ever had the good fortune to work with. And at the rate of 130,000 applications a year, we've had the opportunity to pick some exceptionally intelligent, creative officers.

America hasn't just been lucky, and it isn't as if the terrorists have been lazy or just aren't trying. Those notions fail to explain the lack of an attack inside our homeland for the last six years. Our nation's bulwark is that group of experts at CIA, the National Counterterrorism Center, across the entire intelligence community who help prosecute this war with their deep knowledge of the enemy and their tight collaboration against a shared target.

I've been out to visit our people in Iraq, Afghanistan, other places where the risk and hardship for CIA employees are greatest. I've seen them work seamlessly with their colleagues in the armed forces, participating in joint operations that have brought the fight directly to the enemy.

And I've seen our officers here at home take quiet satisfaction in seeing the photograph of a terrorist they've tracked for years show up on CNN after his capture. It might be a face and a name unrecognizable to most viewers but not to those who have written countless cables, drafted finished intelligence reports, briefed dozens of policymakers and congressmen on that one target. Each of those victories adds up to a safer America; each is testimony to the tireless dedication and resolve of our men and women for whom the memory of 9/11 is neither distant nor diminished.

At our headquarters building in counterterrorrism office that I get to go to a lot, you walk in, there's a bulk head there, you've got to break left or right when you come in, and there's a sign; there's a sign that's been up there for about six years. And at first glance it looks just like a convenience, but once you've actually read it, it never blends into the paperwork. The sign simply says, "Today's date is September 12th, 2001." That's how we approach this war with no apologies, and we do so knowing we must continue and earn the trust of the American people for that operational space we need to do what the nation has asked of us.

Thank you, and I'd be very happy to take your questions. (Applause.)

FRIEDMAN: Just to remind you of the ground rules, please wait for the microphone and speak directly into it. Please state your name and affiliation, and above all, please limit yourself to one question and make it as concise as you can.

Ma'am.

QUESTIONER: I'm Lucy Komisar. I'm a journalist. I wonder whether looking back a little bit in history you think there are any lessons to learn from the fact that the CIA, having overthrown Mossadeq in Iraq, set the stage for

the problems that we are facing now -- I'm sorry -- in Iran, but of course it extends to Iraq.

HAYDEN:  The refuge of all intelligence officers, that sounds like a policy question.  (Laughter.)

All I can tell you, all right, is that the Central Intelligence Agency within a framework of law carries out the foreign policy of the United States that is constructed by the people that we elect in both the executive and legislative branch.

Yeah, sir, please.

FRIEDMAN:  Okay, you'll go.  Okay, Kenny.

QUESTIONER:  One of the great -- thank you very much for your -- I'm Kenneth Bialkin, Skadden, Arps.  One of the great debates in America today is whether to say or go in Iraq.  You mentioned the war we have with al Qaeda.  Can you please give us the benefit of any assessment that you may have regarding the impact on al Qaeda, its ability to conduct that war here or elsewhere should we -- if I may use a pejorative phrase -- abandon the field?

HAYDEN:  Sure.  Complex question, and I'm going to give you far too brief an answer, and you've got Dave Petraeus and Ambassador Crocker coming back next week who will elaborate on the situation there.

Life and particularly this kind of slice of life is always complicated.  We had a National Intelligence Estimate in the past or so that actually said Iraq has become a cause celebre for jihadist recruitment and then that's a true fact, all right.  That reality exists.  On the other hand, we also have a letter from Ayman al-Zawahiri to then-Abu Musaab al-Zarqawi in Iraq that called Iraq the central front in the global war for al Qaeda and that their plans would be to create a caliphate beginning in the Sunni heartland of Iraq and spreading both west and east, into The Levant as well.  So you've got those realities as well.

If you look at what we need to achieve in Iraq -- and there are a whole list of things -- I've got to put at the top of my list it cannot become a safe haven for those who are threatening the United States.

FRIEDMAN:  Roland.

QUESTIONER:  General, my name is Roland Paul.  I'm a lawyer.  Some years ago I was in the government and had the pleasure and privilege of visiting Langley several times.

You mentioned in your remarks that al Qaeda has reconstituted itself in the tribal regions of Pakistan.  I know that President Musharraf has made some efforts to eliminate them.  But what do you think is necessary and appropriate to eliminate those bases of al Qaeda in Pakistan?

HAYDEN:  It's a very difficult challenge and it's hard to imagine a better ally we've had, tentatively, a better ally that we've had in the war than President Musharraf in Pakistan and his military intelligence services.

But you're talking about an area which historically no central government has had control over, and an area that has its own culture and its own traditions that actually make it readily comfortable for al Qaeda to establish a presence.  This has become a more serious question for us as al Qaeda has begun to reconstitute.  And we're working very closely with our allies in the region and, I should say, on both sides of the border, in Afghanistan, in Pakistan, to do everything we can to deny them this safe haven.

I mentioned earlier that a friend of mine pointed out that, you know, "easy to kill, hard to find, quick to regenerate."  And this is a very asymmetrical kind of war.  People with safe haven in the FATA, in the Federally Administered Tribal Area, or across the border in Afghanistan, only have to number in three figures, in the hundreds, for them to actually begin to constitute a source of a serious threat against the homeland.  Now compare that to 30 years ago and count up the number of Soviet troops and Group Soviet Forces Germany, and you get a sense of the challenge we have here.

So I think continue to work as closely as possible with all of our allies and work as aggressively as possible against the enemy.

FRIEDMAN:  Madam?

QUESTIONER:  Thank you.  Mary Boise (sp), Boise-McGuinness (sp) Law Firm.  General, thank you for your service.

A Conversation with Michael Hayden [Rush Transcript; Federal Ne...    http://www.cfr.org/publication/14162/conversation_with_michael_h...

HAYDEN:  Thank you.

QUESTIONER:  Using your terms, what space does the CIA not have that you think it should have and that you think is important for success in the close and the deep fight?

HAYDEN:  I'm going to give you an answer from the heart; it's going to be a little oblique, but I think it has a lot of truth to it as I see it.

Kept using the word operational space, or the space provided to us by the American people.  In one way, defining that -- and I mention it in the text -- was the laws that we have, but there's more to it than that.  All right.

The Central Intelligence Agency and the great Americans who work for CIA, in CIA, live in a larger political culture, and that political culture -- particularly I would use the word -- I mean, if you give me three minutes, I'd think of a better one -- but elite political culture, right, seems to be at the moment squeezing, at least psychically, that operational space; that the things that the nation has asked us to do and the things we are doing on behalf of the nation, its legitimacy is being questioned by certain segments of the population.

Let me be real harsh, and this is probably a bit unfair, all right.  I talked about going into the CTC, the Counterterrorism Center and saying today's date is September 12th, 2001.  And when I get in the car and get in Langley and drive down the GW Parkway, it's not long before it begins to feel like September 10th.  And I'm not talking about in terms of threat.  I'm talking about in the willingness of the broader political culture to be comfortable with the things we believe are both lawful and necessary for us to fight this war.  That's really what I'm talking about.

FRIEDMAN:  Let's just go way to the back.  This gentleman way back in the last row.

QUESTIONER:  Richard Esposito, ABC News.  General, in the past, al Qaeda's just released its tapes.  In the current one, they seem to be hyping and trying to create a buzz.  What's going on with al Qaeda?  Is there any real threat?  We gather there's a lot of chest thumping in the tape.

HAYDEN:  Yeah.  I'll come back to the NIE and then build from it.  You know, we don't get three or four things they need to have:  safe haven, leadership, to plan strategy, and then operational lieutenants to carry it out, and so on.  The NIE says that exists.

What we don't know that exists:  have they been able to move operatives inside the homeland.  We do see them -- and I have to be by necessity a bit incomplete here, but we do see them working to train people whom you and I wouldn't raise an eyebrow about if they were getting off the plane with us at Kennedy; people whose identity makes it easier -- whose persona makes it easier for them to come into America and to blend into American society.  That's going on, all right?  That's a reality.  And that's the picture we have of al Qaeda.  And that willingness to attack the homeland by all that we have, by every source and method, is no way diminished.

FRIEDMAN:  The gentleman there in the center.

QUESTIONER:  General, I'm Harrison Goldin.  thank you very much for your cogent and persuasive presentation, and thank you for your service.

In delineating the kind of oversight that the CIA has and welcomes, you didn't speak about the courts.  I wonder if you would care to say a word about your view as to what the limits are of judicial oversight over intelligence activity, as you see it.

HAYDEN:  Yeah.  To be fair, and primarily, certainly since the mid-1970s and what we put together then in terms of oversight, after Church, Pike and so on, it was the Congress who had that primary oversight function of the activities of intelligence agencies, and the members are cleared, fully cleared, and we can operate in a box in which classified information can be freely exchanged.

That said, the courts also affect what it is we can do as an agency.  Let me pick two examples.

I talked about detentions, interrogations, and how they've always been lawful.  But you know, to turn that page and to dig a bit deeper into that, "always lawful," but the law on which it's based has actually developed in the course of the last six years, whether it be the Detainee Treatment Act, the Military Commissions Act or the Hamdan decision, which, you know, created new realities to which we have to respond as an agency.  And we have, and that's the way it should be.

In my personal experience, the most robust judicial oversight that I've seen in my life as an intelligence officer

has been through the FISA Court and particularly in my job twice removed as the head of the National Security Agency. And there the court plays a very powerful and, I should say, on balance, a very, very productive role in enabling NSA to do what it needs to do to collect intelligence.

FRIEDMAN: Do you want to comment on e-mails coming through --

HAYDEN: No.

FRIEDMAN: (Inaudible.)

Okay. Sir, on the aisle.

QUESTIONER: I'm Mike Posner from Human Rights First. General Hayden, you spoke at the beginning of your remarks about the distinction between law and rules and then space. And I want to focus n the rules relating to interrogations.

Last year about this time, the president spoke, and he asked Congress for authority for the agency to be involved in what he called enhanced interrogation techniques. This is things like stress positions, use of dogs, hypothermia, mock drowning, waterboarding. The Congress said no to that, led by Senators McCain, Graham and Warner. The military's also said no to that, and all of the senior military lawyers have been very clear that those techniques violate Common Article 3 of the Geneva Conventions, in public testimony before Congress.

And yet a month -- six weeks ago, the administration passed an executive order seemingly allowing again the CIA to engage in these enhanced techniques.

From my perspective, it seems to me like this is more than asking for space; what you're really trying to do is change the rules. The question is, why do you need these enhanced techniques? Why shouldn't every U.S. agency operate by a single standard compliant with Common Article 3?

HAYDEN: First let me make comment on your listing of techniques and just frankly add that it's a pretty good example of taking something to the darkest corner of the room and not reflective of what my agency does.

Now let's talk about the history, last October. With the Hamdan decision, the Supreme Court extended the protection of Common Article 3 to the unlawful combatants of al Qaeda. I'm not a lawyer, but I'm frankly surprised by that aspect of the decision, in that Common Article 3 refers to conflicts not of an international character. And this one does certainly seem to be conflict of an international character.

Our problem was not that we wanted the Congress to approve any techniques. Our problem was, we didn't know what Common Article 3 meant in the context of American law. When the Senate ratified a variety of other portions of the Geneva Convention, the legislative history or specific statements of the Senate clarified the meaning of the international treaty in terms of American law. For example, the Convention Against Torture is carefully hooked in the legislative history to the prohibition in domestic law against cruel and inhuman punishment articulated by the 5th, 8th and 14th Amendments to the Constitution.

The Congress had made no clarifying language with regard to Common Article 3. And any, I think, fair reading of Common Article 3 would point out that it would be very hard for me to direct an officer of the agency to do things with the vagaries of the language in Common Article 3. So I wasn't looking for a carve out; I was looking for a definition.

One of the outs that was offered to the agency was that we in the -- it turns out to be the Military Commissions Act. We in the Military Commissions Act will criminalize certain kinds of activities. And as long as your officers don't do these activities, they won't be prosecuted. And therefore you'll be safe from -- well, you'll be safe from prosecution.

The agency as a whole and myself in particular rejected that solution. Because what it -- what it would put me in the position of doing would be to turn to an agency officer and say, I would like you to do this with regard to this detainee, okay; I have no idea whether or not it violates the Geneva Convention, because I don't know what it means, but I'm pretty sure you'll never go to court for it, so would you go do that for me? And that's about the worst locker room speech I can imagine giving to an agency employee.

So we insisted on clarity for Common Article 3. The Congress decided that they would not offer that clarity but they then would instead reinforce the already existent presidential right to define the meaning for treaties for the United States. And so there's actual language in the Military Commissions Act that has the president doing that,

and it requires him to publish his executive order in the Federal Register, which is what he did.

It's clear that what it is we do as agency is different from what is contained in the Army Field Manual. I don't know of anyone who has looked at the Army Field Manual who could make the claim that what's contained in there exhausts the universe of lawful interrogation techniques consistent with the Geneva Convention. The Army Field Manual was crafted to allow America's Army to train large numbers of young men and women to debrief and interrogate, for tactical purposes, transient prisoners on a fast-moving battlefield.

CIA handles a very small number of senior al Qaeda leaders. The average age of our interrogators is 43. The amount of training for this specific activity is 240 hours. So the reason we're not covered by the Army Field Manual is that we're not in the DOD. We weren't consulted about the Army Field Manual, and no one ever claimed that the Army Field Manual exhausted all the lawful tools that America could have to protect itself.

FRIEDMAN: Thank you.

Sir.

QUESTIONER: Thank you. Stephen Kass, Carter Ledyard & Milburn.

General, in view of the extensive training that you just referred to for the very highly qualified people who provide, I gather you said, 70 percent of the information that goes into the National Intelligence Estimate, in view of the critical nature of that information, what is the operating reason for sending people abroad to be interrogated by other countries with less qualified people, not under your control, when the information is so important, unless that reason is to circumvent the restrictions on U.S. operations?

HAYDEN: Thanks for the question, because it allows me to clarify the other half of detentions and renditions. And it's actually curious that it's not the first time it's happened where I've actually been told to -- why do you conduct renditions, because detentions are so good? Don't get that all the time, so -- (laughs/laughter). In many instances -- all right? -- both justice and intelligence is better served by the movement of the individual to a country against which the individual has committed a crime or a country of which that individual is a citizen. All right? And it's a judgment case.

Now, we do not do it -- we do not do it to circumvent any restrictions that we have on ourselves. There is a standard that we have to -- have to apply in each and every case. We have to receive assurances -- and we have to have confidence in the assurances -- that this individual will be handled in a way that is consistent with international law. And we are required to maintain awareness of how this individual is handled. Now, that's not an invasive right to go to an ally with a clip board and see how they're running day-to-day activity with a detainee, but as an intelligence agency, we have this broad responsibility that the assurances we receive at the beginning -- that we continue to have confidence that we should have in those assurances.

The standard we use is that -- and it's pretty straightforward -- it's more or less likely -- before you jump to conclusions, let me finish the explanation. We have to believe that it is less rather than more likely that the individual will be tortured. And I've had very well-informed people say, "Where did you get that standard?" And the answer is, from the Senate of the United States. That's in the legislative history for the Senate working to pass the International Convention Against Torture.

Clearly, we're not looking to shave this 49/51. All right? We want true assurances that the individual will be treated well. So we don't do it, as some have suggested, to circumvent.

FRIEDMAN: We've reached pretty much the allotted time. Let me take just one more, from that patient lady there.

QUESTIONER: Hi. I'm Carroll Bogert from Human Rights Watch. And just following on what you just said, I myself personally did research in Russia into the fate of some detainees who were rendered there under assurances from the Russian government that they would not be tortured. The State Department's own Human Rights Reports could not have been more clear that torture is very prevalent in Russia. And I wonder on what basis you think a country that conducts torture and is known to conduct torture can be trusted with -- by giving a bilateral assurance to the U.S. government that somehow the spots of their leopard have changed.

HAYDEN: As I said in the prepared remarks, life rarely gives you the opportunity to just observe and do nothing. If my agency has custody of somebody, we've got to do something. And let's walk through the options: detention, Guantanamo or renditions. And we've got to make a judgment based on the information we have available.

I should add that the statute that deals with renditions and the standards that we apply, clearly -- clearly the overall history of a state has to be considered. But the statute requires us to make the judgment based upon our belief specifically about the individual on which the rendition is being conducted.

FRIEDMAN: I ask you to join me in thanking Mike Hayden for a terrific -- (applause).

(C) COPYRIGHT 2007, FEDERAL NEWS SERVICE, INC., 1000 VERMONT AVE.

NW; 5TH FLOOR; WASHINGTON, DC - 20005, USA. ALL RIGHTS RESERVED. ANY REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION IS EXPRESSLY PROHIBITED.

UNAUTHORIZED REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION CONSTITUTES A MISAPPROPRIATION UNDER APPLICABLE UNFAIR COMPETITION LAW, AND FEDERAL NEWS SERVICE, INC. RESERVES THE RIGHT TO PURSUE ALL REMEDIES AVAILABLE TO IT IN RESPECT TO SUCH MISAPPROPRIATION.

FEDERAL NEWS SERVICE, INC. IS A PRIVATE FIRM AND IS NOT AFFILIATED WITH THE FEDERAL GOVERNMENT. NO COPYRIGHT IS CLAIMED AS TO ANY PART OF THE ORIGINAL WORK PREPARED BY A UNITED STATES GOVERNMENT OFFICER OR EMPLOYEE AS PART OF THAT PERSON'S OFFICIAL DUTIES.

FOR INFORMATION ON SUBSCRIBING TO FNS, PLEASE CALL JACK GRAEME AT 202-347-1400.

THIS IS A RUSH TRANSCRIPT.

-------------------------

Copyright 2008 by the Council on Foreign Relations. All Rights Reserved.