# EXHIBIT E

Central Intelligence Agency
The Work of a Nation. The Center of Intelligence
Search

# Press Releases & Statements

# Transcript of Director Hayden's Interview with Charlie Rose

(Posted with permission from the Charlie Rose Show
watch the interview at www.charlierose.com/home [external link disclaimer])

**October 24, 2007**

*Director of the Central Intelligence Agency, General Michael V. Hayden, appeared on the
Charlie Rose show on October 22, 2007. Below is the transcript of their conversation.*

**CHARLIE ROSE (Host):** General Michael Hayden is here. He is the Director of the Central
Intelligence Agency. He was the first ever Deputy Director of National Intelligence. He was the
Director of the National Security Agency from 1999 to 2005. He has overseen some of the most
controversial national security programs--the NSA's warrantless eavesdropping on US citizens
and the CIA's rendition and enhanced interrogation programs. He has said he wants to use a full
authority allowed by law and that his spikes will have chalk on them. I am pleased to have
General Hayden at this table to talk about his sense of what the CIA's mission is, and how he puts
that within the framework of the constitutional framework of the United States, and the
challenge he sees from the rest of the world. So I say welcome, first.

**D/CIA:** Thank you. Thanks for the opportunity to be here.

**ROSE:** Tell me what you think the CIA's mission is.

**D/CIA:** In general, it's to defend the Republic, and you need to understand the Republic in the
broadest sense. It's to defend the security, the safety, the physical safety of the American people.
It's to defend the interests of the United States of America, and it's to defend a value system that
this nation represents.

**ROSE:** You have also said that it has to protect America and it has to help policymakers
understand the world around them.

**D/CIA:** Yes. Intelligence in any form, but particularly from my agency. If you know, Charlie,
we've got the largest group of analysts in the Intelligence Community, and the only group of
analysts that's not attached to some Cabinet-level department. So that autonomy gives us great
opportunity, but also creates some burdens for us as well in terms of the requirement for us to be
absolutely objective. And what I tried to describe--and I do this with our analysts--is that
intelligence exists in that nexus between the world as it is and the world as we want it to be. And
it's in that nexus that policy is formed. And the challenge for intelligence--but particularly for the

analysts of the CIA--is to be in that nexus, to be relevant to the policymakers' questions, while at the same time not being captured by the policymakers' preferences. That's really demanding. It's hard to do, but that's the space where we've got to work.

**ROSE:** That's one of the questions that has arisen within this Administration with the Vice President and his office--whether intelligence has been captured.

**D/CIA:** Captured? How do you mean captured?

**ROSE:** Well, captured, whether the Vice President has his own intelligence and whether the Vice President, you know, is a different figure in terms of--and you've seen this up close, because you were the deputy to John Negroponte when he was the Director of National Intelligence.

**D/CIA:** Right. No. I mean all policymakers come to the creation of policy with their own personal histories, with their own view of man, with their own view of the world, with their own view of the best possible approaches that the Republic could have. We're part of that mix. We bring a view of the world into that--into that conversation.

**ROSE:** The CIA brings a view of the world into that conversation.

**D/CIA:** That's correct.

**ROSE:** Without policy recommendations.

**D/CIA:** We have to be policy relevant. Otherwise we're spending an awful lot of your tax dollars just to be interesting. What we need to be is relevant, so we've got to answer the questions that policymakers put to us. And frankly, we've got to answer a few questions that they don't think to put to us as well. But the fact that a policymaker disagrees with us--or more frequently, a policymaker challenges us--makes us stand by our assumptions, makes us stand by our conclusions. That's the cost of doing business, and if you're a really good analyst, you actually welcome that. That's not something that should put you off.

**ROSE:** So if you see a policymaker question your view or your analyst with great enthusiasm, you welcome that?

**D/CIA:** We do.

**ROSE:** Because you want to know whether you're doing the right thing.

**D/CIA:** That's right. And that actually is one metric, one measure, of the relevance of what it is we're saying to the policymakers' formulation of policy.

**ROSE:** Here's the flip side of that.

**D/CIA:** Sure.

**ROSE:** Policymakers have made a decision about a certain policy, and they're just looking--they are out there looking for some intelligence that you'll give them that will support a point of view that they already have. That's the danger that some people worry about.

**D/CIA:** Of course. That exists in any human endeavor. That, you know, human nature being what it is. Anyone can go into a question, particularly a complex question with a preconceived point of view. And one can go through--there's massive amounts of data out there now. Let me step back and give you an example from people in my community. It's going to sound a little defensive, but, you know, in our conversation before we started, you said you wanted this to be a candid conversation. All right? It's pretty easy looking back after 9/11, looking into that vast

ocean of data that existed prior to 9/11, and pick out the threads that show you how one could have arrived at a conclusion that the attacks were imminent, that the attacks would be of this nature, that they would happen at this time, and so on. So there is so much data out there that the human mind has to come at that data with at least some hypotheses.

**ROSE:** Okay, but--

**D/CIA:** A policymaker can do that. But so can we, and their hypotheses and ours can legitimately bump up against one another.

**ROSE:** Do you accept all the conclusions of the 9/11 Commission?

**D/CIA:** Yes.

**ROSE:** That's a case where they looked at everything and made certain--

**D/CIA:** Conclusions in terms of the recommendations--

**ROSE:** Right.

**D/CIA:** --they made to our community. And by and large, almost all those recommendations have been enacted.

**ROSE:** When you look at this statement, "America needs something that arguably goes against our grain, a truly great intelligence service that can be operated powerfully, invisibly, legally"--

**D/CIA:** It actually states quite clearly and simply starkly the dilemma of a secret intelligence service inside of a free society. But a free society needs a secret intelligence service as much as, if not more than, other forms of government around the world. And that presents us with great challenges--not us as an Agency, but it presents us as a people with these kinds of great challenges.

**ROSE:** Do we have a great intelligence service?

**D/CIA:** I believe we do have a great intelligence service. Is it good enough in all circumstances? Of course not. We live in the human condition. We try to make it better each day. But one of the messages I feel compelled to give to the American public is that the CIA and the American Intelligence Community writ large is in a class by its own. If we were comparing our intelligence services to the intelligence services around the world, and we were grading on a curve, we'd have to give ourselves an A-plus.

**ROSE:** All right. Let me just--

**D/CIA:** But life and the American people don't grade on the curve. It's an absolute scale. And that demands that we be better at everything we do.

**ROSE:** So you are saying to us, "I don't know of any nation that has a better intelligence service, and I've seen many of them, because it is my job to have relationships with many of them."

**D/CIA:** It would be unfair of me to endorse precisely what you just said. But when you think of the scale of intelligence that our nation must have, and to give you that mix of both global coverage, which no one--no other nation--currently has, and excellence, you can see where the bar is for the American Intelligence Community. It's very demanding.

**ROSE:** When you came there, people said the following things. They said he's there to calm a troubled agency, to restore the luster and restore the professionalism. Have you done that? Have

you had to do that? Have you had to change a culture over there?

**D/CIA:** What you say roughly captures some of the things that we had to take on when I came there with Steve Kappes and Michael Morell.

**ROSE:** Who had quit?

**D/CIA:** That's right--who had left about 16 months ago. All right, the first thing we had to do, and I said this in my confirmation hearings, was to get the Agency out of the news as source or subject. There is no worse place for an intelligence service like CIA to be than on Page 1, above the fold in your daily newspaper. That's a distraction to the kind of work that the Agency has to do. So the first thing we wanted to do--this is really very simple. And Steve and Michael and I, my first message to the workforce was simply this: let's just go back to work. Let's just go what it is, go back and do what it is we know we have to do to defend America, to defend the Republic the way I described it a few minutes ago.

**ROSE:** Have you reached a point now where you think it's important to communicate something about the CIA? We asked you to come here, and it was not the first invitation. You appeared at the Council of Foreign Relations.

**D/CIA:** Yes.

**ROSE:** You made a speech, which was a candid and forceful speech about how you saw the CIA. Have you reached a point where you think it's important to communicate?

**D/CIA:** It is.

**ROSE:** Because you are bothered by something?

**D/CIA:** I am. And let me try to describe the narrative--

**ROSE:** Okay.

**D/CIA:** --that perhaps has gotten me, gotten the Agency to this point. As I said in my confirmation hearing, out of the press as source or subject. Settle down. Back to work. Do our mission. And I think we've been somewhat successful in doing that.

But there are other dynamics at work here as well. Many of the things this agency does on behalf of the American people have become controversial, have become controversial in a way that affects the workforce. I mean, these aren't people separated from the American political culture who come to work at Langley and our activities around the world. These people are fully, completely Americans. They are affected by what goes on in the broader political culture when it's discussing the kind of work that they do. I think that public discourse has not been well informed. And so I am here. I was at the Council on Foreign Relations last month to give our perspective on some of these critical questions about the Agency that are now out there in the public forum.

**ROSE:** All right. Let's talk about the idea that you cited in the Council on Foreign Relations, just to give you some sense of information and how you see the battle and what techniques and means that you use in the battle.

**D/CIA:** Right.

**ROSE:** You have said the United States is at war. There is a state of armed conflict, and that the CIA is a vital element of that war. Tell me about the war and what you think the challenge is, because you say that everybody--that there's a real danger, more so than any time since the Civil

War.

**D/CIA:** Right.

**ROSE:** And that everybody in America who lives in a major city is a possible target.

**D/CIA:** That's right. And that statement, you know, as I believe I put it, we believe we are in a state of armed conflict with al-Qaeda and its affiliates, that this conflict is global in scope, and that the only way we can win that war and to defend the Republic is to take that war to the enemy wherever he may be.

**ROSE:** Okay.

**D/CIA:** I recognize that I said it so starkly. I recognize that that is not a universally held view globally. And much to my disappointment, it is not a universally held view domestically. We had a meeting at--

**ROSE:** That we were at war or the nature of the enemy?

**D/CIA:** No, no. That this is a war.

**ROSE:** Right.

**D/CIA:** And that we must consider it a war, that it isn't a law enforcement problem or some other kind of approach to this particular problem that we're facing today, that this is an armed conflict. After the attacks on September 11th, we all learned lessons. You asked me about the 9/11 Commission and so on. One of the ones that I internalized personally because of my experience at that time as the Director of the National Security Agency was that this was not, in its essence, primarily a law enforcement issue. This was an armed conflict.

That is, again, not universally accepted by other governments in the world. And in March, I was invited to talk. The German ambassador asked me to come to his residence. Germany at that time was in the chair of the European Union. And he had this every-other-week meeting with the ambassadors to the United States from the countries of the European Union. And I went there at lunch to speak. It was a very good exchange of ideas. But I made that point precisely the way I said it: "We are in a state of armed conflict." And that's a view that I know is not held by many of the governments that are represented in that room.

**ROSE:** Well, it is said that the British have been successful because they believed it is a police effort, that that's why they've been able to roll up some of those people that they have in Britain.

**D/CIA:** Right. And the British are wonderful partners. And we share information with them intimately. And their success is our success and vice versa. Rolling up people on the verge of an attack in Great Britain is not a comforting measure of success in this war. You know, if we try to defeat this enemy at the moment of attack, and it may be just that. It may be the moment of attack.

**ROSE:** Right.

**D/CIA:** We may not be able to defeat him on the battlefield he has chosen, but that moment of attack has a trail. That trail goes back--it goes back in time. It goes back in space. It goes back in actors. And if we can attack back there against those people who are plotting, against those people who are planning, against those facilitators, I'd rather bet the safety of the Republic and the safety of our allies on that kind of an approach rather than--if you want to use a sports metaphor--playing a little offense rather than having a perpetual first down and goal on the

three-yard line in the homeland.

**ROSE:** I mean, is there anybody that doesn't think that this is a serious challenge to America's national security and we ought to take the battle to them and we ought to use--and be vigorous in our effort--to find out where the leadership is, what their targets are, what their means are, and whether they have the possibility in the United States, which you say you don't know--

**D/CIA:** Right.

**ROSE:** --to do damage to the United States in the homeland.

**D/CIA:** To clarify the last points that you made, what we don't know is whether or not they have operatives in the homeland. The other preconditions for attack we've stated pretty clearly. We think exist. But take your question and take it out of the abstract, and let's move it to the very practical, all right?

When I was at the Council on Foreign Relations, I said, you know, I have to act. I'm the head of the CIA. And I can't simply admire the problem or relish in its complexities. If I pick up someone who will do harm to America, if we're able to somehow get our hands on someone like that, I think I realistically have three options: I can detain him under the authorities the President has given us if he meets certain criteria. I can conduct a rendition. That is, taking that person to some other country, a third country. Or I can send that person to Guantanamo. And I said that very starkly at the Council on Foreign Relations to say those are the options that I have. Now I later learned, someone else had commented, well you could put him into a judicial process. That's the question that I see an awful lot on friction on.

**ROSE:** Okay, let me just tell you who argues the judicial process--Colin Powell. Colin Powell says we have nothing to fear from putting them in a judicial process.

**D/CIA:** That--I don't think we have anything to fear by putting them into a judicial process, if that is possible, but that cannot be our only approach to this problem. There are many people about whom I have more than sufficient intelligence to know that they intend to do great harm to the United States, but it's the kind of information that may not be admissible in a court of law, or it may be the kind of information that I cannot submit to a judicial process because of the threat it would impose to sources and methods. Back to the premise, this is a war, this is not a law enforcement activity.

**ROSE:** You think that's true about Khalid Sheikh Mohammed?

**D/CIA:** It was true for a while.

**ROSE:** That you--before you captured him or after you captured?

**D/CIA:** No--

**ROSE:** That you didn't have the evidence to put him on trial?

**D/CIA:** No, no. Remembering that the premise here is that this is a war.

**ROSE:** Right.

**D/CIA:** That the safety of the nation for a period of time was better served by keeping him in a dentition facility with the Central Intelligence Agency where our access to him had no filter, had no interruption, so that we could develop from him all the information that we did develop from him that prevented future attacks. At some point, and I realize, a captured al-Qaeda senior like Khalid Sheikh Mohammed--his intelligence value never bleeds off to zero. But at some point, at

some point, the intelligence value has to be measured against the other tools that the nation has at its disposal, and in this case, the summer of last year and the summer of 2006, the decision was made for KSM and for the 13 other people who were in custody at that time that the intelligence value had aged off to such a point that they could be moved to the next step of the process and that they can be prosecuted. Now the difficulty of prosecution--and that's not in my inbox. You read the press and the coverage as closely as I, and you can see all the complications that we have to work through as a society to prosecute.

**ROSE:** Let's separate two things. One, General Powell I think was talking about Guantanamo primarily. Now, are you making the same distinction? I mean KSM is now in Guantanamo, yes?

**D/CIA:** Yes.

**ROSE:** So should he have judicial process now, or do you think that as long as you think he is an asset that might tell you something, you should not give him and put him into some recognized judicial process?

**D/CIA:** We have made the judgment that the intelligence value of those individuals, the 14 that we moved there last September and the one additional person that we moved there this past year, Abd al-Hadi al-Iraqi, that the intelligence value of those people have degraded to a point that these other needs now take dominance. And we can't put them through a judicial process.

**ROSE:** I think what most Americans--

**D/CIA:** And I should add, okay, we are not the nation's jailers. We are the nation's intelligence service. We hold these people because they have intelligence value, and when they don't have intelligence value, other agencies, other arms of the US government have to step up. It could be a legal process. It could be indefinite detention as a combatant at Guantanamo.

**ROSE:** I want to get to torture and all that and interrogation in just a moment, but let me just stay with the argument where you are: rendition. Rendition is where you take somebody and you transport them to another country.

**D/CIA:** Correct.

**ROSE:** Correct?

**D/CIA:** Right.

**ROSE:** How many people have you done this to?

**D/CIA:** Mid-range, two figures since September 11, 2001. A pace somewhat behind the number of renditions conducted in the 1990s.

**ROSE:** Who was renditioned in the 1990s?

**D/CIA:** There were a whole variety of people that were moved between countries.

**ROSE:** Are we talking about a hundred people since 9/11?

**D/CIA:** No, mid-range, two figures.

**ROSE:** Two figures. So 50, 60. Whatever. Doesn't matter. Have been renditioned to somewhere.

**D/CIA:** Right.

**ROSE:** When you take them there, what happens? Who is in charge of the interrogation? What role does the CIA play? How much can the CIA do or does the CIA want to look the other way, is the impression of many people, as you know.

**D/CIA:** No, I understand. And that's--you've asked me, why did I want to come on the show now? It's these kind of impressions that need to be corrected. Let me scale this. I'm sorry. This maybe a slightly longer answer than you--

**ROSE:** Go ahead.

**D/CIA:** --bargained for. All right. The total number of people detained by the CIA is fewer than a hundred. In the life of the program, since the capture of Abu Zubaydah in March of 2002. Of these people detained, the number against whom we have used any kind of enhanced interrogation techniques is fewer than a third of the fewer than a hundred.

**ROSE:** Okay.

**D/CIA:** All right. Beyond those people, okay, that we've actually detained, there is another group of people, as you've described, on whom we've conducted renditions. We have moved them from one country to another.

**ROSE:** Why do you do that? Why is that necessary?

**D/CIA:** In order to take them off the battlefield. Now you ask me why don't I just detain them? The reason is that under the authorities--the authorities under which we operate have clear criteria for people to be detained by the Central Intelligence Agency, and it's not run-of-the-mill al-Qaeda. For people who want to do us harm, who may not meet the criteria of detention, but whom everyone would agree have to be taken off the battlefield.

**ROSE:** And you say under--without equivocation, that you do not go turn them over to foreign intelligence services because they have means and methods that you would be uncomfortable using. That is a fact?

**D/CIA:** That is a fact. And that is US law. Let me talk just for a moment about the requirements that we have to meet when we conduct a rendition. We have to believe that mistreatment of that individual is less rather than more likely, and we talked about this at the Council in Foreign Relations as you've described--

**ROSE:** That's the test.

**D/CIA:** And the overall history of the receiving government is obviously something that we have to take into account. But the law requires us to make an independent judgment on this individual. And the criteria that exists in the legislative history of our treaty ratification that creates this requirement for us is less rather than more likely. Now you may argue, and some have, that's a relatively low bar. And I've said in other audiences, we're not looking to do this 49/51. When we seek assurances from the receiving nation, we want assurances, we want them to mean those assurances and we have a responsibility, we, plural--the United States government, including its intelligence services--that the United States government as a whole, to do our very best to ensure that the receiving government lives up to those promises.

**ROSE:** Is there a CIA person always there in terms of interrogation?

**D/CIA:** No, of course not.

**ROSE:** So you don't know. You just have a promise from that government, from the leadership

of that government that that's what they're going to do?

**D/CIA:** We have a promise and a commitment from that government. Clearly, in most instances, you would assume, I think, that we have a relationship with that government and with that service. For them to do something beyond their promised behavior for us is not something they would take lightly. We rely on that and all the tools at our disposal to ensure that they've lived up to their commitment.

**ROSE:** You have--I'll come back to this later. You have said there are two things. There is a close battle and a deep battle.

**D/CIA:** Yes.

**ROSE:** The close battle is what we have been talking about. The deep battle is trying to influence hearts and minds--

**D/CIA:** Right.

**ROSE:** --trying to prevent people or provide an alternative so they don't go joining groups that wish us harm. Do you also agree that how you do the close battle may very well influence, so if, in fact, you're doing things--

**D/CIA:** Yes, absolutely. I agree.

**ROSE:** And--or if your reputation is doing things, then you're in trouble, because it hurts your effort, and there are many people today that believe, around the world, that that's the reality, and they're saying America is not what it represents itself to be.

**D/CIA:** Right, right.

**ROSE:** I'm not telling you anything--

**D/CIA:** And let me agree as strongly as I humanly can that the close battle and how we fight it is connected to the deep battle. The close battle being taking off the battlefield those who would kill or harm America or its allies. And the deep battle being that long-term war of ideas in which that which seems to motivate those folks we now have a problem with in the close fight, that which seems to motivate them is muted and changed--a change in belief or an attitude or in the causes. The underlying causes that create those who seem to want to act against us. They are absolutely connected. But one of the reasons we're talking here today, one of the reasons I talked to the Council on Foreign Relations, is to try to describe, to the best of our ability--and it's really hard for a secret intelligence service to talk about things that are secret--but to describe to the best of our ability what it is we are really doing, rather than the phrase you used a minute ago, the appearance or the assumption or some other word that describes--what's the right word, Charlie? Propaganda, of what it is my agency is actually trying to do. When I tell audiences that want to be thoughtful, that in the life of this program it's fewer than a hundred, with regard to interrogation techniques it's fewer than a third, and the number of renditions is actually smaller than that, mid-range, two figures. Now we can begin to have something of a reasonable conversation about reality rather than image.

**ROSE:** I need some help with terms here. What does enhanced technique mean? The President has come back and said enhanced technique executive order, okay. You have changed--you have added to that, I think, or maybe the President did, that there can be no enhanced technique that you haven't approved.

**D/CIA:** That's correct.

**ROSE:** All right. What is enhanced technique? What are we talking about here?

**D/CIA:** Well--

**ROSE:** Is it something close to torture?

**D/CIA:** No. First of all, as you know, I'm not going to talk about any specific techniques.

**ROSE:** Right.

**D/CIA:** All right?

**ROSE:** Whether it's waterboarding or anything else, you can't qualify it as an enhanced technique or not.

**D/CIA:** That's correct. And I can't comment on--

**ROSE:** Sleep deprivation or--

**D/CIA:** And I can't comment on any of the techniques we may or may not have used. That's right. All right?

**ROSE:** But you can't tell me whether those are acceptable or whether those are enhanced techniques? In other words, a lot of us want to know, what's your definition of torture, and how does it differ from what might be a conventional definition of torture? Is sleep deprivation torture, you know, is waterboarding torture? What is torture, regardless of whether you've used it or not?

**D/CIA:** Amongst that you've asked me for a personal opinion.

**ROSE:** Right.

**D/CIA:** All right. And let me put that up on the table and then move beyond it. My personal opinion isn't of great value to this conversation. What matters is US law. But before leaving personal opinion, let me tell you that the actions I've asked our officers to do, in my time as Director, my personal conscience is very content with what it is I've asked them to do. Okay--

**ROSE:** Whether it had to do with--KSM, or even the people who have plotted 9/11?

**D/CIA:** Right.

**ROSE:** And they were the ones who plotted 9/11, two of them.

**D/CIA:** Right. I'm talking about--

**ROSE:** Your conscience is clear--

**D/CIA:** In terms of my conscience--

**ROSE:** Your conscience clear as to whatever was done to those people during your time as Director of the CIA.

**D/CIA:** Absolutely. Absolutely.

**ROSE:** What about before?

**D/CIA:** Well, let me get to the earlier question you asked. You said what are enhanced

techniques?

**ROSE:** Right.

**D/CIA:** And I'm going to have to work backwards a little bit from this, all right? But the other document that's out there, all right, the other document that people point to and say, why can't you follow this document?

**ROSE:** Right.

**D/CIA:** Is the Army Field Manual. And what I will describe for you is that enhanced techniques, all right, are in that range between the Army Field Manual, okay, and the limits of what US law and US treaty obligations allow. No one has ever claimed that the Army Field Manual exhausts all the lawful interrogation techniques that the American Republic can use to defend itself.

**ROSE:** Just for the benefit of--the Army Field Manual is what the military and the Department of Defense uses as its standard.

**D/CIA:** That's correct. And I think it's a powerful document for America's Army and for the Department of Defense.

**ROSE:** What's at the other end, so I can understand what's in between? What is it that American Constitution and the American law allow?

**D/CIA:** Well, now we're getting into--talk much longer, we'll be getting into very specific techniques. Let me build from the Army Field Manual forward to give you some sense as to what that range might be between the limits of the Field Manual and the limits of US law and US treaty obligation. The Army Field Manual was written to develop and describe a set of techniques that the US Department of Defense--and by the way, that's a friendly institution for me. That's where I have my roots.

**ROSE:** Your career.

**D/CIA:** Right. That America's Army is confident that you can teach 20, 21, 22-year-old interrogators to do, in battlefield circumstances, in fast-moving situations, sometimes with minimal supervision in order to get tactically relevant information from captured enemy combatants in almost all cases who will be lawful combatants under the Geneva Convention. Why anyone would think a document that meets that description should be the document that controls the activities of the Central Intelligence Agency, I don't understand. There are other things that are perfectly lawful that are within the limits of our treaty obligations--the Convention Against Torture, Common Article 3 of the Geneva Convention.

**ROSE:** Why can't anybody define to me what's lawful, though, between the Army Field Manual and the American Constitution? Just define for me what's lawful.

**D/CIA:** Because--because--and this point, if you were in my office at Langley, and we were talking, I'd probably hit a button and have three or four lawyers come down and back-stop me.

**ROSE:** Right.

**D/CIA:** But for the GI director of Central Intelligence Agency, I am familiar enough with US law to know that that limit up here is tied into the Army Field Manual, a limit beyond which CIA cannot go. It's tied into a body of US law, a body of US precedent. It's tied to how we have articulated domestically our requirements under the 5th, 8th, and 14th Amendments to the US Constitution. And my lawyers tell me that the sum total of law tied to those constitutional

amendments is summarized by the standard of "shock the conscience." And shock the conscience--

**ROSE:** If you shock the conscience, it's illegal.

**D/CIA:** That's right.

**ROSE:** Unconstitutional.

**D/CIA:** It would be a violation of--depending on how badly it's shocked the conscience, one could consider it torture. One could also consider it to be cruel, inhuman, and degrading activity, all of which are equally forbidden inside of US law.

**ROSE:** What do you say to somebody who says, if you captured somebody that planned, let's say you captured Osama Bin Laden tomorrow, who may very well know what plans there are. All--whatever is necessary, do. What do you say to those Americans who say the reverse? I'm not worried about the Constitution.

**D/CIA:** Yeah.

**ROSE:** I'm worried about protecting--

**D/CIA:** Protecting America.

**ROSE:** --the homeland.

**D/CIA:** That's correct.

**ROSE:** And this person may know things that will kill Americans. Go to it, General.

**D/CIA:** There are absolute standards. Those standards are embodied in our law. They're in the Military Commissions Act, for example. They're in how we ratify the Convention Against Torture. They're in domestic US law that forbid different aspects of torture. Some things are just absolutely forbidden. Some things are just wrong. And they're mentioned very specifically.

**ROSE:** It would shock the conscience.

**D/CIA:** It's beyond--

**ROSE:** Beyond shock the conscience.

**D/CIA:** And it's--and they would shock the conscience to such a degree, okay, that American jurisprudence cannot imagine circumstances when they would not shock the conscious, all right? But then are a whole bunch other activities. I read an interesting piece in today's Wall Street Journal, and I'm paraphrasing here, and I probably won't get it perfectly right. But they were talking about the shock the conscience standard, all right? And they pointed out that if they took you and me, all right, people of our age, and put us, you and me, through what Marine Corps recruits go through at Paris Island and forced us to do that, that would probably shock the conscience. But it's not illegal to do it to Marine Corps recruits, all right? That same behavior is not absolutely wrong--

**ROSE:** Are you talking about things like sleep deprivation, cold and extreme, and--

**D/CIA:** All the things, all the stresses that we put these recruits through, all right? But we don't think that's torture or cruel, inhuman, and degrading--

**ROSE:** But I don't think when people think about torture that's what they're talking about. You know? This leads to another--

**D/CIA:** Well, that's a wonderful point because maybe that is what I'm talking about.

**ROSE:** So we're saying we do--do that it's torture. If we do that, it's not torture, that's what you're saying?

**D/CIA:** Again, I'm not going to talk about--

**ROSE:** I know that, but what you just said to me. But there is--I mean, if--I--you would say to me, clearly the United States does not torture.

**D/CIA:** Right.

**ROSE:** The President said that. The United States does not torture.

**D/CIA:** That's right.

**ROSE:** And under no circumstance would we do it because no information is worth violating our DNA. Is that what you'd say?

**D/CIA:** I've actually talked about conducting this war in a way that does not change our DNA as a people. That's a phrase I've actually used. That's right.

**ROSE:** What do we know about interrogations? What do we know about what works because I read a range of people say that those people who think beating someone up is the way to get them to talk have gotten it wrong.

**D/CIA:** Right.

**ROSE:** The way time after time it's proven that you get information is over process that has more to do with psychology than it does with force.

**D/CIA:** Right.

**ROSE:** Is that right or wrong?

**D/CIA:** Well, first of all, just a footnote in our conversation. We don't beat anybody up.

**ROSE:** All right.

**D/CIA:** Let's move on from that.

**ROSE:** No matter what they've done?

**D/CIA:** That's right. I mean, again, I said earlier, we're not the nation's jailers.

**ROSE:** Right.

**D/CIA:** And we're not out there to punish either. We're out there to learn. We're out there--

**ROSE:** And get information.

**D/CIA:** We're out there to get information. That's right. We have found universally, and I can say this without qualification the most powerful tool we have in gaining information from a captured detainee is our knowledge. We had one instance where we had a detainee. We took him

into our custody. We told him who we were and we also told him who he was.

**ROSE:** Show him you knew a lot about him?

**D/CIA:** That's correct. And in that case, proved to be sufficient.

**ROSE:** Because? What was at work?

**D/CIA:** Well, what was at work was that we knew more about him than he expected. In many ways, we knew more about him than he knew himself.

**ROSE:** So he had assumed he had no reason not to disclose?

**D/CIA:** Well, we were, again, the purpose of this is to get information from him. And if you can challenge his misleading stories, if you can deconstruct his cover story, those things allow us to take information and to gain that information. Now you talked earlier-- and I need to come back to this--because the belief out there is that torture does not work. All right?

**ROSE:** Some believe that.

**D/CIA:** I believe that. All right? And let me turn that syllogism on its head. Right? This does work. These fewer than a hundred detainees that we've had have created just under nine thousand intelligence reports. They comprise some of the most critical information we've ever gained on al-Qaeda. If you accept the premise that torture doesn't work, then you have to accept the fact that this did work. It provided us with very reliable, massive amounts of information.

**ROSE:** Okay, let me just ask this, just for the benefit of this. You have learned important things from those people who were in rendition, very important things that have enabled you to do better in the fight against terrorism, al-Qaeda, whatever you might perceive to be the enemy.

**D/CIA:** Right.

**ROSE:** And you're saying I'd be happy for anybody to know what techniques we used in order to get them to give us this vital information? I would have no problem if being on the front page of the New York Times what techniques we used because we don't torture, because I don't believe torture works. What works is psychology, what works is giving them information that we know about them, what works is--

**D/CIA:** I am unable to tell a quarter billion Americans what it is we're doing on their behalf.

**ROSE:** Because?

**D/CIA:** Because that information would become available to our enemies, and would become the table of contents of their training manual against us. Having said that, I wish I could tell a quarter billion Americans what we're doing on their behalf. I believe the vast majority of the American people would be quite comfortable with what their secret intelligence service is doing.

**ROSE:** And that's your message?

**D/CIA:** Yeah.

**ROSE:** When you look at the information, just help me understand how valuable the information has been from people like KSM, Abu Zubaydah--

**D/CIA:** Right. Detainees writ large. Those al-Qaeda members we have captured have been historically the single greatest source of information we've had on al-Qaeda. To use a metaphor

Transcript of Director Hayden's Interview with Charlie Rose — Centr...    https://www.cia.gov/news-information/press-releases-statements/pres...

that may explain what we're about, intelligence is often described as putting the pieces of a puzzle together. In almost all circumstances, our analysts have pieces of the puzzle incomplete, never all the pieces. And they've never seen the picture on the top of the box. A detainee very frequently has a lot of pieces, and the detainee has seen the picture on the top of the box. That kind of information is invaluable.

The people we have in our program are not run-of-the-mill al-Qaeda. These are high value detainees. There are criteria which I unfortunately cannot describe. There are criteria which must be met before people can be detained in this program by the Central Intelligence Agency. So we are talking about people whom we have every expectation, have seen the tops of quite a few puzzle boxes.

**ROSE:** It is said that the CIA is studying the effectiveness and retaining a jettison techniques on a sliding scale. Now I assume what that means is that if you're getting a lot of information with a certain technique, that it becomes a much more valuable technique. Can you help me understand this?

**D/CIA:** Yeah. There is kind of a myth out there, and I'm going to be too flippant, maybe irreverent in describing it. That somehow, you know, it's Tuesday, we go in, meet the detainee, and say it's Tuesday, let's use number 12 or number 6. I mean that's not what this is about. We work very hard to get into a relationship with this detainee that CIA, the United States Army, or any other interrogator would describe as "debriefing." A conversation with someone who is now sitting there talking to you about the things you're interested in. So that's, I think, the first thing I need to point out. Secondly, the way you phrased your question, Charlie, accused us of being a learning organization. Guilty.

**ROSE:** Okay.

**D/CIA:** We are a learning organization. And clearly, we have developed experience over the years in which this program has--

**ROSE:** Tell me what's the most important thing you've learned.

**D/CIA:** I don't mean to dodge the question, but I'm going to tell you what I think the most important thing we've learned is this. And we have adjusted the program based upon these realities. It was our belief last summer, if you recall, we had the detainee treatment Act. We had the Hamdan decision. We had these 14 individuals in CIA custody, even though we had a belief--and some of them in our custody for years. Even though we had a belief that we were not the nation's jailers. And that we had to move on. We had to move forward. We believed this program, you can probably tell from some of my comments, we believe this program was appropriate, lawful and effective. But we needed it to move forward inside the broader American political culture. So we made a conscious decision inside CIA, and we worked this decision, this belief inside the Administration, that this program, if it were to go forward, had to go forward on something more than just a definition of its lawfulness. That it had to go forward with not just a definition of its lawfulness, but it had to have I guess what I'd call both policy and political legs. So that this was not the CIA's program, that this was America's program. And so what we did, beginning last September, was actually the day the president spoke in the White House announcing that the 14 had been brought to Guantanamo. I began to dialogue with Congress. I briefed all members of both of our oversight committees on all aspects of the detention and interrogation program, sought their thoughts on techniques that we may want to use going forward, and only after we had had that dialogue--now, to be fair, so that no one misunderstands here, we didn't ask the committees to vote on anything. But we laid out what it was we were doing. We had pretty rich dialogue. Their views informed my judgment, and that at the end of the day, and actually in 2007, we went forward to the President, to the Department of Justice, with a program. I can't describe that program to you, but I would suggest to you that it would be wrong

to assume that the program of the past is necessarily the program moving forward into the future.

**ROSE:** There is also this. It would seem to me you would less and less need it as you go forward. And I still don't understand, and I hear you but I don't understand why it's necessary to take it to foreign countries where nobody can see, nobody knows anything, but, again, you say that's because you have nowhere else to bring them.

**D/CIA:** My choices are limited.

**ROSE:** Right.

**D/CIA:** All right?

**ROSE:** But you have nowhere else you can take them, other than to some foreign country where you turn it over to some foreign government.

**D/CIA:** Well, I'm open to ideas. I can keep them. That's detention. I can move them to a foreign government. That's rendition. We can move them to Guantanamo.

**ROSE:** I think most Americans would prefer detention or Guantanamo, I think, because you're putting people in the hands of other people and you're just going on just a promise --

**D/CIA:** It's more than just a promise. I told you that the care we're required to take, and in many cases, these people are actually criminals, wanted, in their--

**ROSE:** In their countries--

**D/CIA:** In their countries--

**ROSE:** And that's why the regions you choose--I know that argument. Here is another argument that you make. There is this thing called a space that you say, the space is to give the CIA space to do what it needs to do, because it's engaged in a war, and in this space, it's been given it by the Constitution. You believe that certain kinds of things happening in our country, or in part of what's happening, one is media, influenced and tighten the space. You believe that press coverage in some ways limits your maneuverability and restricts your space. Right?

**D/CIA:** I'm tempted to say yes, but I'm reluctant to, because I know the importance of a free press. I know what it means to me as a citizen. I know what it means to CIA officers because they're all American citizens as well. I guess what I'm looking for--what puzzles me is not that we're the subject of many stories. I'd rather we weren't the subject of so many, but that happens. What puzzles me is to why there seems to be this temptation--almost irresistible--temptation to take any story about us and move it into the darkest corner of the room.

**ROSE:** Tell me what you mean by that. You've said that before.

**D/CIA:** Let me give you an example.

**ROSE:** What's the darkest corner of the room?

**D/CIA:** There was a story about 10 days ago from a rather large newspaper up the street.

**ROSE:** Right. This would be the New York Times.

**D/CIA:** It would be. That talked about--they claimed that there had been a Department of Justice opinion in the spring of 2005, that --and if you read the article, you would seem to get the

impression that it expanded the authorities of CIA, or expanded the number of techniques that would be used. And all of us at the Agency looked at the story and maybe this is our narrow perspective. I mean we all kind of have a point of view depending on what it is we do day in and day out. We were looking at the story, something of a narrative disbelief. Number one, and I can't get too far in detail about this, which I truly do regret. The opinion that Justice gave the CIA in the spring of 2005 was the result of a request from our Agency for greater clarity on the program, legal clarity, on a program that was already existing. That's one fact. Number two, that's history. Since the time of the decision that the New York Times reported on in the spring of 2005, we had the Detainee Treatment Act in December of 2005, we had the Hamdan decision in the summer of 2006, we had the Military Commissions Act in the fall of 2006. They have all changed the legal landscape under which CIA's program is operated.

**ROSE:** Made it more restrictive.

**D/CIA:** It changed the legal framework and so--that to look at an opinion Justice offered in the spring of 2005--that simply has no relevance to the lawfulness or the legal opinion under which CIA is operating in the fall of 2007.

**ROSE:** Okay. But you also mean that, for example, there was reporting by the New York Times, too, about Swiss bank accounts. I've forgotten exactly the details. But Bill Keller, the editor, they went ahead with the story.

**D/CIA:** This is a Swift story.

**ROSE:** Did you know beforehand the story was coming?

**D/CIA:** Yes. And--

**ROSE:** Was there any effort by anybody to talk to Bill Keller of the New York Times and say, "This will do damage to us if you run this story?"

**D/CIA:** This is largely handled by the Department of Treasury because it's more in their lane than in ours.

**ROSE:** Right, right.

**D/CIA:** And the answer is yes, we viewed this story that it would do damage. And I--

**ROSE:** And they listened and then went ahead with printing because they believed you were wrong, or somebody--they believed that it did not damage national security and that there were other means to find out, or whatever their rationalization was, or whatever their decision making was.

**D/CIA:** Yeah. That's correct.

**ROSE:** Okay. You also believe that, in fact, if somebody within the CIA leaks a story, and a mainstream publication, in this case, publishes it, they are, in a sense, culpable.

**D/CIA:** The CIA officer?

**ROSE:** No. No. You know, that--that's not even a question, right.

**D/CIA:** Okay. Good.

**ROSE:** Culpable in the sense that he may violate some CIA regulation or something. But if the mainstream media publishes it, they are, too. They have some--

**D/CIA:** Yes. Let me choose my words carefully, all right? And give me a minute or two to talk about this because this is very important because I don't want, me personally or my agency especially, okay, to be characterized as having a view against the free press. All right? That's simply not true. What I have said in the past, that someone who willingly breaks the trust we have given them in terms of their oath of office with regard to protecting classified information.

**ROSE:** People who leak to the press.

**D/CIA:** That's correct. They are guilty of a crime, all right? But I've also said those who pursue that information, those who decide to print that information are not without their responsibilities, right? I never said it was a crime, okay? I never said, in all cases, they must not print. But I did say there are real responsibilities here. It can erode the ability of the nation to defend itself. And so in the case of the Swift program, it does have an impact on what it is we can do.

**ROSE:** How would you solve this issue?

**D/CIA:** That's a very difficult question. And you know this may not be a problem to be solved. This may be a condition that we have to manage.

**ROSE:** But you do believe it reduces your space. You just said as much.

**D/CIA:** I did. No--it--

**ROSE:** That in as much in the Council on Foreign Relations Speech.

**D/CIA:** It does, all right? And therefore, it's my role in this debate to point that out, okay? I did not say in my Council on Foreign Relations speech, any action should be taken against the press.

**ROSE:** But you did simply said it damages our efforts to--

**D/CIA:** It does.

**ROSE:** --do our jobs.

**D/CIA:** What I was trying to do--

**ROSE:** --is what you're saying.

**D/CIA:** What I was trying to do was to call the attention of the press and folks like yourself and others to this issue. This is not a free ride. America is made less safe when these kinds of stories are made public. Now, there may be--there may be other concerns --

**ROSE:** Would you accept the idea that there are people--reasonable people can disagree over that?

**D/CIA:** I can. But let me add, all right? We haven't talked about it. But I was going to say, but I was at NSA when we began and continued with the president identified later as the Terrorist Surveillance Program.

**ROSE:** Right, right.

**D/CIA:** All right? Even I--by the way, very comfortable with the lawfulness of the program and incredibly comfortable with the scrupulousness with which it was carried out--even I can see that there is a civil liberties issue there.

**ROSE:** Right.

**D/CIA:** What is the civil liberties issue with the Swift program?

**ROSE:** I don't know that there's a civil liberties issue there.

**D/CIA:** So, so, what would be--

**ROSE:** In other words, those--

**D/CIA:** What was the major compelling public--

**ROSE:** --debates the question you would ask is whose civil liberties are we damaging, you know, by--

**D/CIA:** By this program.

**ROSE:** By this program.

**D/CIA:** Okay, which--

**ROSE:** Which you're using to get information about the flow of funds.

**D/CIA:** Right. Which was briefed to Congress. Which did have external oversight.

**ROSE:** Right.

**D/CIA:** All the things, all the sins that were alleged in the NSA program.

**ROSE:** All right. Let me just to a couple of other things. Recently there was information about the al-Qaeda web site. Was that a big deal?

**D/CIA:** I don't know enough specifically to give you a judgment. I really don't know. I'm going to dodge the question.

**ROSE:** They fear that that got out in the public and they shut it down.

**D/CIA:** I'm familiar with the narrative, I've read the press accounts with it, but I just don't know enough about it internally to give you a judgment.

**ROSE:** All right. Let me go to wiretapping for a second. I mean, you were at the NSA before you came over here. I've heard people who work within NSA and work with the CIA say to friends of mine, not to me, but to say to people who cover those agencies, a lot of very good people, strong, patriotic people, believe that wiretapping gave them information that was important in fighting the battle against America's enemies. However, each of them said, I would have just felt better if we'd gotten a warrant. I just felt better and it didn't seem to me that that is the issue, you know, with a program for getting a warrant. That that's what ought to have happened and when that was violated, then you got into problems.

**D/CIA:** All right. Getting out of my current lane.

**ROSE:** Yeah, but your previous lane.

**D/CIA:** If history--two jobs back, as a matter of fact, in the literal meaning of that word, okay? Based on the facts of the case, until the story broke in the New York Times in December of 2005, no one who was asked to be part of this program inside the National Security Agency expressed

any reservations about being part of this program. After the story broke, people who were not part of the program quite understandably concerned about what might be going on, they then had went to the NSA IG to ask questions about it. No one in the history of the program pushed back on participating in it. They believed very strongly that what they were doing was both lawful and effective and appropriate.

**ROSE:** They might have had objections, but not said it.

**D/CIA:** Well, now you have to understand, NSA is actually a very conservative culture. In fact, the core of NSA is--

**ROSE:** With a bigger budget than CIA.

**D/CIA:** I can't talk about that. NSA is a very conservative culture legally. Our lawyers at NSA were notorious for their conservatism up through the morning of September 11th, 2001. The single most consistent criticism of the NSA legal office by our congressional oversight committee was that our legal office was too conservative. Now you've talked about warrants and why didn't you go get a warrant and so on, and it's a long issue. It's one that I wish we could lay out in great detail, but let me tell you what I said to anyone who'd care to listen during the life of this program when I briefed them on this program. And I made dozens of briefings on this program prior to the December 2005 story in the New York Times. Simple version that I gave is that FISA as currently crafted--

**ROSE:** Where you go to get the warrant?

**D/CIA:** That's correct. FISA, as currently crafted and implemented, could not give the nation the same degree of protection that was afforded by operating under the President's Article II authorities, which was what we were doing.

**ROSE:** Several questions that come up about the CIA. Your inspector general had an inquiry as to things that had happened.

**D/CIA:** Inquiry is the big and wrong word.

**ROSE:** Okay, what should it be?

**D/CIA:** Management review.

**ROSE:** A management review?

**D/CIA:** Mm-hmm.

**ROSE:** It is said, you weren't happy with that because he suggested or at least was considering the idea there might have been some criminal conduct--

**D/CIA:** No, no, no.

**ROSE:** Not true?

**D/CIA:** No, no, no, no.

**ROSE:** Not true. So were you unhappy with the results of his investigation or management review?

**D/CIA:** No. This is--

**ROSE:** Then why did we appoint somebody to look into the review? Mr. Deitz [inaudible]

**D/CIA:** The CIA IG, according to law--

**ROSE:** Right.

**D/CIA:** --operates under the overall direction of the Director of the CIA.

**ROSE:** That'd be you.

**D/CIA:** That's me. I am as responsible for the effective functioning of the IG's office as I am with any other office in the Central Intelligence Agency--

**ROSE:** And you weren't happy with it?

**D/CIA:** There are questions. There are questions about everything we do. We started this hour, yes, we do have a great intelligence service. I said yeah, we do, but we got to do a lot of things better. Well there are some things that I had questions about with regard with the IG, in terms--I had a couple reports on my desk, I looked at, said, these raise some questions in my mind. So I kept this as low key as I possibly could. I went to Bob Deitz, who was my general counsel at NSA who I brought into CIA, not as general counsel, but as a special advisor. All right? We didn't make this a federal case, almost in the literal meaning of the word. I asked Bob to organize a small team, and it was. He's got three people on it, okay. And to work with our Inspector General, John Helgerson, and to look at some of these questions that had been raised by the reports that I had in front of me. None of them were pushing back on the findings of the reports.

**ROSE:** That's the point--in no case--

**D/CIA:** In each case I acted on the findings in the report. But I wanted Bob to look at these questions and to work with John, John Helgerson, the Inspector General, to see if there was any merit in some of my concerns, and if there were, what we could do to improve the functioning of the IG, just like we want to improve the functioning of the DI, or have our National Clandestine Service or anything else. This was designed to be low key and it was low key for about five months. Bob has been doing this since April. He's doing a report out in the next week or so, not just to me, but to the IG.

**ROSE:** This conversation began with the great war that we're in, and we have to fight that war, and you want it clear, because it would hinder your effectiveness if there was misunderstanding about the CIA.

**D/CIA:** Right.

**ROSE:** That was part of the conversation at the beginning of this. With respect to the war, and with respect to al-Qaeda, what is--what is your--what can you tell us about al-Qaeda in Iraq and al-Qaeda outside of Iraq?

**D/CIA:** Al-Qaeda in Iraq, to borrow a phrase from my British friends, is at least on its back foot--

**ROSE:** Back foot. Wielding--

**D/CIA:** And may be back on another part of his body. All right? Now I don't want to overstate that, and I don't want to say it's irreversible. And I don't want to say this battle is won. We need to move on. I don't want to say any of those things. But we have had remarkable success against al-Qaeda in Iraq over the past six to twelve months, and has a telling effect on the battlefield, an effect that is statistically recognizable in what's being reported out of MNFI, General Petraeus' headquarters in Baghdad.

**ROSE:** How about al-Qaeda outside of Iraq?

**D/CIA:** Al-Qaeda outside of Iraq is a learning, adaptive organization. It is a very difficult--

**ROSE:** Regenerating is the term you used.

**D/CIA:** It is. And it's a term I'd share with you now. All right? It's been advantaged by a couple of things. Okay? The most is its ability to use that [inaudible] border region between Afghanistan and Pakistan as a safe haven to regenerate. Our National Intelligence Estimate from about three months ago said that they had leadership, a safe haven, and what we call operational lieutenants, the kind of operational leadership that were present in the FATA, in the federally administered tribal area. So that has allowed them, in some measure, to regenerate, yes. That's true.

**ROSE:** Protected in these tribal areas which is a bafflement to a lot of people, but nevertheless, we understand the nature of that terrain.

**D/CIA:** Exactly. The terrain, the culture, the fact that no central government has exercised control over--

**ROSE:** Exactly.

**D/CIA:** Ever.

**ROSE:** There is also this. If al-Qaeda would leave Iraq tomorrow, all of them, by some means, would we still have an Iraqi war?

**D/CIA:** It would be difficult--

**ROSE:** Sectarian violence, Shia versus Sunni, because there's not a government in Baghdad that can control it or is willing to control it?

**D/CIA:** I wouldn't simplify it to that degree, all right? Al-Qaeda in Iraq has been a pernicious accelerant to the conflict. There and the fact that we have been able to put them on their back foot or somewhere else has had a remarkable effect on the level of violence throughout the country. Because we have been able to do that, because the Sunni tribes have looked into the future and they don't like it, with an al-Qaeda dominated Islamic state there. Because they have done what they have done in terms of forming alliance with us and growingly, with the government in Baghdad, we have begun to see political relationships, sectarian, inter-sectarian relationships at the local level that we probably thought were impossible.

**ROSE:** You're talking about Anbar Province and places like that.

**D/CIA:** Beyond Anbar.

**ROSE:** But it's now moving beyond--

**D/CIA:** Yes.

**ROSE:** --but it doesn't say anything, because as you know, Bob Woodward reported in his book that you were in a meeting in which others who were there have, in a sense, confirmed to Bob Woodward, accordingly, that you had a very, very negative assessment of the government and their ability, certainly over the short term, to govern, to engage in any kind of political reconciliation. No confidence. The head of the CIA.

**D/CIA:** You actually characterize my remarks better than the story in the Washington Post did. Two observations, all right? Number one, we talked about the press and responsibility and so on.

I was promised confidentiality in my remarks in front of that commission. Okay? It has a chilling effect on good government when someone who is promised confidentiality has that confidentiality broken. That's fact one--put that aside. Now, let's talk about what it was I said. And I think Bob, whom I actually have talked to in the past and consider a friend, Bob quoted a metaphor that I had used in the book which was running a marathon.

**ROSE:** Right.

**D/CIA:** And what he said was I saw no break in the future that would cause this thing to self-correct. This is a danger in relying on someone else's notes apparently for a meeting. What I said was there were no natural breaks in the future that I could see that would cause this to self-correct. Like if you recall, in the preceding years we were saying if we could just get to the Constitution, if we could just get to the national elections. It will cause a change in the political circumstances and we can expect things to get better. I said there were no longer any natural breaks. And I actually compared it--I used a lengthy metaphor at the time. I actually compared it to running the Pittsburgh marathon. It's my hometown. I ran it a couple years back. It's a hilly city.

**ROSE:** Yeah.

**D/CIA:** And I went out and drove the course the day before the race. And I noticed that at about mile 22, you had a mile and a half downhill. You get--

**ROSE:** If you got it there, you'd finish the race.

**D/CIA:** If I got it there and got to the bottom, I had three miles left of the finish, and I've run that before church on Sunday.

**ROSE:** But you're saying at that time when you--

**D/CIA:** That's a natural break.

**ROSE:** But at that time, you said you don't see the natural break, and you don't see a way to the finish at that time.

**D/CIA:** That's--I said there was no natural break. What has happened--

**ROSE:** Exactly my question.

**D/CIA:** We have created a national break with the injection of more American forces, five additional brigades into the combat equation there.

**ROSE:** You believe that?

**D/CIA:** I believe it. It is cause and effect. Now, you know, the plan that the president came up with, the plan that General Petraeus suggested was informed by the intelligence we had, all right? And we were part and parcel of the development of this strategy that led--that led to the surge. If you want to extend my marathon metaphor, just for one more round, it's as if we had a Gatorade station at Mile 22 rather than a hill. We've injected something from the outside into the process. And although we have not gotten some of the things we've talked about in the benchmarks, the oil wall, the debaath--change in the debaathification procedures and so on, there are other things happening, particularly at the local level, we discussed a few minutes ago.

**ROSE:** [inaudible] and things like that.

**D/CIA:** Exactly. At the national level, we are actually seeing some capacity growth inside the

Transcript of Director Hayden's Interview with Charlie Rose — Centr...     https://www.cia.gov/news-information/press-releases-statements/pres...

central government.

**ROSE:** I could go on and on and on, but I'm out of my time and your time as well. I thank you very much. I hope we can do this again, and this table is here for these kinds of conversations with you and your colleagues.

**D/CIA:** Thank you, thanks for the opportunity. These are serious questions. And I know that honest men can differ about some of the policies that we judge appropriate for the nation to have in the global war on terrorism, but they have to be reasoned discussions with as many facts on the table as possible.

**ROSE:** I would only add to that that it's important, I think, for policymakers and people who are in charge of the destiny of this country to engage in a dialogue with the country, and I encourage others to do what you have done, whether it's with me or someone else. It's an important part of the process, to understand beyond just policy statements and beyond just speeches, to see people, you know, because in a sense, I believe that, you know, there are a lot of people that you can disagree with, but they see and operate on the facts as they see them, and we don't necessarily have to, in all cases, question their motivation.

**D/CIA:** Yeah.

**ROSE:** But I thank you very much for coming.

**D/CIA:** Thank you.

**ROSE:** Michael Hayden, Director of the CIA. He's had a long and distinguished career in the military. He has served as head of NSA and then was the number two person next to John Negroponte as the Director of National Intelligence and now runs the CIA. Thank you for joining us. See you next time.

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# EXHIBIT
# F



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/releases/release.aspx?releaseId=10792
Media contact: +1 (703) 697-5131/697-5132

Public contact:
http://www.defenselink.mil/faq/comment.html
or +1 (703) 428-0711 +1

---

**IMMEDIATE RELEASE**

No. 494-07
April 27, 2007

---

### Defense Department Takes Custody of a High-Value Detainee

The Department of Defense announced today that it took custody Abd al-Hadi al-Iraqi, a high-level member of al-Qaida captured in the War on Terror and placed him under control of the Joint Task Force at Guantanamo Bay, Cuba.

Prior to his arrival at Guantanamo Bay, he was held in CIA custody.

Abd al-Hadi al-Iraqi was one of al-Qaida's highest-ranking and experienced senior operatives at the time of his detention. Abd al-Hadi associated with leaders of extremist groups allied with al-Qaida in Afghanistan and Pakistan, including the Taliban. Abd al-Hadi worked directly with the Taliban to determine responsibility and lines of communication between Taliban and al-Qaida leaders in Afghanistan, specifically with regard to the targeting of U.S. Forces. More details of his background and activities are available at http://www.defenselink.mil/news/Apr2007/d20070427hvd.pdf .

Abd al-Hadi al-Iraqi is now under DoD custody and control and will be treated appropriately and in accordance with policy and procedures for other DoD detainees at Guantanamo. He will be treated in accordance with U.S. law and international obligations under treaties to include the Convention Against Torture, Common Article 3 of the Geneva Conventions, the Detainee Treatment Act, the Military Commissions Act, and applicable Department of Defense directives and instructions governing detainee operations.

Just like previous detainees who have arrived at Guantanamo, he will undergo a period of in-processing to help him adjust to detention rules and procedures. He will be given an internment serial number and will undergo a combatant status review tribunal. The International Committee of the Red Cross will be granted access to this detainee.

As a result of this latest transfer, there are now approximately 385 detainees at Guantanamo Bay, Cuba.

# EXHIBIT G



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/releases/release.aspx?releaseid=11758
Media contact: +1 (703) 697-5131/697-5132

Public contact:
http://www.defenselink.mil/faq/comment.html
or +1 (703) 428-0711 +1

---

**IMMEDIATE RELEASE**

No. 205-08
March 14, 2008

---

### Defense Department Takes Custody Of A High-Value Detainee

The Department of Defense announced today that it has custody of Muhammad Rahim al-Afghani, a high-level member of al-Qaida captured in the War on Terror and placed him under control of the Joint Task Force at Guantanamo Bay, Cuba.

Prior to his arrival at Guantanamo Bay, he was held in CIA custody.

Muhammad Rahim al-Afghani was a close associate of Usama bin Ladin and had ties to al-Qaida organizations throughout the Middle East. He became one of bin Ladin's most trusted facilitators and procurement specialists prior to his detention.

Muhammad Rahim al-Afghani is now under DoD custody and control and will be treated appropriately and in accordance with policy and procedures for other DoD detainees at Guantanamo. He will be treated in accordance with U.S. law and international obligations under treaties to include the Convention Against Torture, Common Article 3 of the Geneva Conventions, the Detainee Treatment Act, the Military Commissions Act, and applicable Department of Defense directives and instructions governing detainee operations.

Just like previous detainees who have arrived at Guantanamo, he will undergo a period of in-processing to help him adjust to detention rules and procedures. He will be given an internment serial number and will undergo a combatant status review tribunal. The International Committee of the Red Cross will be granted access to this detainee.

As a result of this latest transfer, there are now approximately 280 detainees at Guantanamo Bay, Cuba.

# EXHIBIT H

President's Press Conference



For Immediate Release
Office of the Press Secretary
March 16, 2005

## President's Press Conference

James S. Brady Briefing Room

10:15 A.M. EST



THE PRESIDENT: Thank you for giving me a chance to come by and say hello. I'm preparing for my trip out of town for Easter -- the Easter week, and I thought I'd share some thoughts with you and answer some questions.

VIDEO Multimedia

President's Remarks

view

I am looking forward to continuing my dialogue with the people on Social Security. It's important for the American people to understand that I believe the Social Security system has worked well, that Franklin Roosevelt did a positive thing when he created the Social Security system, but that I am deeply concerned about the Social Security system for younger Americans. And I believe we're making progress on convincing the American people of two things: One, nothing will change for seniors, those who have retired or near retirement; and secondly, that we must work together to make sure the system works for a younger generation of Americans. That's progress.



As I said -- I think I told you all earlier that one of my missions in the Social Security debate was to set that issue before the people so the people fully understand why I was addressing it, in other words, why -- I fully understand some in Washington are saying, why would the President bring this up, it's a difficult issue, it may cause us to have to make a tough vote. I'm making that case to the people, and will continue to do so -- in Florida on Friday, and then we'll head out West from Crawford and then back to Crawford for my meetings with Prime Minister Martin and President Fox.

I urge the members to go out and, when they go home, to talk to their constituents not only about the problem, but about solutions. I urge members to start talking about how we're going to permanently fix Social Security. Members, I hope, would not talk about a Band-Aid solution, but I think it's important for them to talk about a permanent fix, something that will last forever. I think the voters will appreciate people who come up with constructive suggestions, not statements merely in opposition of some ideas.

And so this is -- part of what I wanted to share with you is that I'm -- I'm actually enjoying myself on these trips. I hope you're enjoying traveling with me. It's -- I like to get out of Washington, I like to discuss big issues, I like to remind people that my job is to confront problems, and I will continue to talk about Social Security for the next period of time.

Iraq had a meeting today of its transitional national assembly. It's a bright moment in what is a process toward the writing of a constitution, the ratification of the constitution, and elections. And I want to congratulate the Iraqis for their assembly. And it's -- we've always said this is a process, and today was a step in that process. And it's a hopeful moment, I thought.

I am looking forward to seeing you down there in Crawford, those of you lucky enough to be able to travel with me. I wish you all a happy Easter. And I'll be glad to answer some questions.

Q Mr. President, the U.S.-led coalition in Iraq once had 38 countries contributing troops. And now that number has fallen to 24. And yesterday, Italy said that it was going to start pulling out some forces



Case 1:07-cv-05435-LAP     Document 75-9     Filed 06/25/2008     Page 32 of 47

in September. How can you keep the coalition from crumbling? And is
it time to think about a timetable for pulling out some U.S. troops, given that the Iraqi parliament was seated
today, and you're making progress in training some forces?

THE PRESIDENT: Well, actually I called Silvio Berlusconi on another matter, which may or may not come up
during this press conference. It's -- I'll give you a hint. I called him about the World Bank, and -- (laughter) -- and
discussed my nominee, and -- but he brought up the issue of Italian troops in Iraq and said, first of all, he wanted
me to know that there was no change in his policy, that, in fact, any withdrawals would be done in consultation
with allies and would be done depending upon the ability of Iraqis to defend themselves. And I said, are you sure I
can say this to the press corps that will be wanting to know what took place in our conversation? He said,
absolutely.

So I think what you're going to find is that countries will be willing -- anxious to get out when Iraqis have got the
capacity to defend themselves. And that's the position of the United States. Our troops will come home when Iraq
is capable of defending herself. And that's generally what I find to be the case, Terry, when I've talked to other
allies on this issue.

And we're making progress. I've talked to General Casey quite frequently. And he keeps us abreast of the
progress being made. One of the things -- one of the issues in terms of Iraqi troops being able to defend their
country is the ability to stand up chains of command. I think I've shared this with you before, and it's still an issue
that they're working on. There's officer training schools, plus the ability for a command to go from a civilian
government to a military chain of command, down to the lower ranks of troops. And there's positive signs that
have taken place in the development of the Iraqi security forces, and there's still work to be done. Our allies
understand that.

But I say "anxious to come home," every -- nobody -- people want their troops home, but they don't want their
troops home if it affects the mission. We've gone -- we've made a lot of progress. It's amazing how much progress
has been made, thanks in large part to the courage of the Iraqi people. And when I talk to people, most
understand we need to complete the mission. And completing the mission means making sure the Iraqis can
defend themselves.

Q So you don't think it's crumbling, the coalition?

THE PRESIDENT: No, quite -- quite to the contrary, I think the
coalition is -- has been buoyed by the courage of the Iraqi people. I
think they've been pleased and heartened by the fact that the Iraqis
went to the polls and voted and they're now putting together a
government, and they see progress is being made. And I share that
sense of enthusiasm about what's taking place in Iraq.



Yes, Steve.

Q Yes, sir. The Iranians have dismissed the European incentive as insignificant. Should more incentives be
offered? How long do they have until you take their case to the Security Council?

THE PRESIDENT: Well, I -- first of all, I want to thank our European friends for taking the lead on this issue,
telling the Iranians that they should permanently abandon any enrichment or reprocessing to make sure that Iran
does not develop a nuclear weapon.

Let me review the bidding on this, if I might, just kind of the history, right quick. Iran has concealed its -- a nuclear
program. That became discovered, not because of their compliance with the IAEA or NPT, but because a
dissident group pointed it out to the world, and -- which raised suspicions about the intentions of the program. You
can understand why. It's a non-transparent regime, they're run by a handful of people. And so suspicions were
raised. And as a result of those suspicions, we came together with friends and allies to seek a guarantee that they
wouldn't use any nuclear program to make weapons. A lot of people understand that if they did have a weapon, it
would create incredible instability; it wouldn't be good for world peace.

And so the best way to do that -- and this is where we are in the talks -- was to say to the Iranians that they must

permanently abandon enrichment and reprocessing. And the EU 3 meant it. And now we're waiting for an Iranian response.

Q So how long do you -- how long do you wait? When do you go to the Security Council?

THE PRESIDENT: The understanding is we go to the Security Council if they reject the offer. And I hope they don't. I hope they realize the world is clear about making sure that they don't end up with a nuclear weapon.

David.

Q Mr. President, you say you're making progress in the Social Security debate. Yet private accounts, as the centerpiece of that plan, something you first campaigned on five years ago and laid before the American people, remains, according to every measure we have, poll after poll, unpopular with a majority of Americans. So the question is, do you feel that this is a point in the debate where it's incumbent upon you, and nobody else, to lay out a plan to the American people for how you actually keep Social Security solvent for the long-term?

THE PRESIDENT: First of all, Dave, let me, if I might correct you, be so bold as to correct you, I have not laid out a plan yet, intentionally. I have laid out principles, I've talked about putting all options on the table, because I fully understand the administration must work with the Congress to permanently solve Social Security. So one aspect of the debate is, will we be willing to work together to permanently solve the issue.

Personal accounts do not solve the issue. But personal accounts will make sure that individual workers get a better deal with whatever emerges as a Social Security solution.

And the reason why is because a personal account would enable a worker to, voluntarily, by the way -- this is a voluntary program, you can choose to join or choose not to join. The government is not making you do that, it's your option, and you can decide whether or not you want to put some of your own money aside in a conservative mix of stocks and bonds to earn a better rate of return than that which you would earn -- your money would earn inside the Social Security system. And over time, that compounds, it grows, and you would end up with a nest egg you could call your own.

And so I think it's an interesting idea, and one that people ought to discuss to make sure the system works better for an individual worker. But it's very important for people to understand that the permanent solution will require Congress and the administration working together on a variety of different possibilities.

Q But, sir, but Democrats have made it pretty clear that they're not interested in that. They want you to lay it out. And so, what I'm asking is, don't --

THE PRESIDENT: I'm sure they do. The first bill on the Hill always is dead on arrival. I'm interested in coming up with a permanent solution. I'm not interested in playing political games. (Laughter.) I'm interested in working with members of both political parties.

Q Would you say if you're specifically supportive of an income test for the slowing of future benefits? Could that get some kind of bipartisan consensus going?

THE PRESIDENT: David, there's some interesting ideas out there. One of the interesting ideas was by the fellow -- by a Democrat economist name of Posen. He came to visit the White House -- he didn't see me, but came and tossed some interesting ideas out, talking about making sure the system was progressive. We're open for ideas. And I -- look, I can understand why people say, make -- force the President to either negotiate with himself, or lay out his own bill. I want to work with members of both political parties.

And I stood up in front of the Congress and said, bring your ideas forward. That's how the process works. I'm confident we'll get something done. See, the American people want something done. They don't like partisan politics; they don't like people saying, I'm not going to accept so-and-so's idea because it happens to come from a particular political party. What they want is people coming together to solve this problem.

John.

Q Mr. President, the price of oil is at record levels, well above the $28 price point that you would prefer. The price of gasoline is projected to go above $2.50 this spring. How concerned are you that this could start to affect the American economy? Is there more you could do to talk with oil-producing nations to get the price at the wellhead down? And is there more you could do, since part of the problem is refining capacity, to encourage oil companies who haven't built a new refinery in 20 years to start increasing their capacity domestically?

THE PRESIDENT: No, I am concerned about the price of energy. I'm concerned about what it means to the average American family when they see the price of gasoline going up. I'm concerned what it means to small businesses. I'm worried about the price of natural gas, particularly given the sense that because a lot of utilities now rely upon natural gas to provide electricity for their consumers. And I have been worried about this since 2001, when I first showed up in Washington, D.C.

I'm concerned about the relationship between the demand for oil -- our growing economy's demand for oil, but more particularly, the demand for oil from -- or energy, in general, from countries like China, fast-growing countries that are consuming a lot of raw materials and natural resources. And it is of concern, John. And that's why I went to the Congress and asked them to join in a comprehensive energy plan, which they have yet to do. I would hope that when members go back to their districts and hear the complaints of people about the rising price of gasoline, or complaints from small business owners about the cost of energy, that they will come back and, in the spirit of -- in a proper spirit, get a bill to my desk that encourages conservation and continue to find alternative sources of energy.

The -- and by the way, the modernization of the electricity grid is an important part of the energy bill. I, frankly, don't think we need a lot of incentives for energy companies in the energy bill. The incentive is price. That's plenty of incentive for people to go out and find additional resources. I hope Congress passes ANWR. There's a way to get some additional reserves here at home on the books.

In terms of world supply, I think if you look at all the statistics, demand is outracing supply, and supplies are getting tight. And that's why you're seeing the price reflected. And hopefully, there will be more conservation around the world, better conservation around the world, as well as additional supplies of energy.

One thing is for certain; we've got to use our technology to, over time, evolve away from reliance upon oil and gas, and at the same time use our technologies to make sure we can use our plentiful resources like coal in an environmentally friendly way. I went to Columbus, Ohio the other day and talked to the person responsible for the FutureGen plant, which is an innovative use of technology for there to be emissions-free coal-burning plants. That would not only be helpful to the United States, it would be helpful for the world -- developing nations to be able to use this technology.

This is going to be a subject, by the way -- was a subject of interest in my trip to Europe. In the councils of the EU, we talked about how we can work together on technological developments to change habits and change supply of the energy mix for the world. And this will be a topic of -- at the G8, as well.

Yes.

Q Mr. President, could I follow up? Everybody else has had a chance to follow up.

THE PRESIDENT: I know, I'm trying to break the habit. (Laughter.) Sorry, it's not you, Roberts. Don't take it personally. (Laughter.)

Q I never do, sir.

THE PRESIDENT: That's good. Neither do I.

Q Mr. President, can you explain why you've approved of and expanded the practice of what's called rendition, of transferring individuals out of U.S. custody to countries where human rights groups and your own State Department say torture is common for people under custody?

THE PRESIDENT: The post-9/11 world, the United States must make sure we protect our people and our friends from attack. That was the charge we have been given. And one way to do so is to arrest people and send them back to their country of origin with the promise that they won't be tortured. That's the promise we receive. This country does not believe in torture. We do believe in protecting ourselves. We don't believe in torture. And --

Q As Commander-in-Chief --

THE PRESIDENT: Sorry, what -- make Roberts feel terrible.

Q That's all right.

THE PRESIDENT: No, no, you shouldn't make --

Q It doesn't bother me at all. (Laughter.)

THE PRESIDENT: Elisabeth.

Q As Commander-in-Chief, what is it that Uzbekistan can do in interrogating an individual that the United States can't?

THE PRESIDENT: We seek assurances that nobody will be tortured when we render a person back to their home country.

Elisabeth.

Q Paul Wolfowitz, who was the -- a chief architect of one of the most unpopular wars in our history --

THE PRESIDENT: (Laughter.) That's an interesting start. (Laughter.)

Q -- is your choice to be the President of the World Bank. What kind of signal does that send to the rest of the world?

THE PRESIDENT: First of all, I think people -- I appreciate the world leaders taking my phone calls as I explained to them why I think Paul will be a strong President of the World Bank. I've said he's a man of good experiences. He helped manage a large organization. The World Bank is a large organization; the Pentagon is a large organization -- he's been involved in the management of that organization. He's a skilled diplomat, worked at the State Department in high positions. He was Ambassador to Indonesia where he did a very good job representing our country. And Paul is committed to development. He's a compassionate, decent man who will do a fine job in the World Bank. And that's why I called leaders of countries and that's why I put him up.

I was pleased to see that Jim Wolfensohn, earlier today, made a very strong comment about Paul's candidacy. Jim Wolfensohn has done a fine job in leading the World Bank. He's represented the World Bank with a lot of class and a lot of dignity, and I think his comments are very important comments for -- for people to get to know Paul better before the -- before the vote is taken.

Jim.

Q Tom DeLay, the House Majority Leader, has been admonished three times by the House Ethics Committee, is currently embroiled in several controversies involving a lobbyist who happened to be a pretty big fundraiser for your two campaigns. Do you have the full confidence in Tom DeLay, his tactics and his leadership role in the Republican Party?

THE PRESIDENT: I have confidence in Tom DeLay's leadership, and I have confidence in Tom DeLay. And I am -- we've worked closely with Tom DeLay and the leaders in the House to get a lot done during the last four years, and I'm looking forward to working with him to get a lot done during the next four years. We've got a big agenda. We've got to get an energy bill out of the House; we've got to get more legal reform out of the House; we've got to

get a Social Security reform package out of the House; got to get a budget out of the House. There's a lot going on. And Speaker Hastert and Leader DeLay and Whip Blunt are close allies and people with whom we're working to get a lot done.

Q Mr. President, you have spoken out about the need for owners, coaches and players in all sports to stop steroid use. And you've also voiced reservations about government getting too involved in that. And as you know, Congress is issuing subpoenas to Major League baseball players during spring training. Do you think that that's an abuse of power, or is it appropriate, in your view?

THE PRESIDENT: Well, Congress generally has an independent mind of its own. I spoke out and was pleased to see that baseball responded, and they've got a testing policy in place for the first time ever -- a firm testing policy in place. And it's very important that baseball then follow through and implement the testing and, obviously, deal with those who get caught cheating in the system.

And the hearings will go forward, I guess. I guess that's the current status. But I'm wise enough not to second-guess the intentions of the United States Congress. I do appreciate the public concern about the use of steroids in sports, whether it be baseball or anywhere else, because I understand that when a professional athlete uses steroids, it sends terrible signals to youngsters. There's -- we've had some stories in my own state, one of the newspapers there pointed out that they thought there was steroid use in high schools as a result of -- in order to make sure these kids, at least in the kid's mind, could be a better athlete. It's a bad signal. It's not right. And so I appreciate the fact that baseball is addressing this, and I appreciate the fact that the Congress is paying attention to the issue. This first started, of course, with Senator McCain, who basically said, get your house in order. And baseball responded, and my hope is the system will work.

Q You have no problem with the subpoenas?

THE PRESIDENT: No.

Carl.

Q Mr. President, your judicial nominees continue to run into problems on Capitol Hill. Republicans are discussing the possibility of ending the current Democratic filibuster practice against it. And Democrats yesterday, led by Minority Leader Harry Reid, went to the steps of the Capitol to say that if that goes forward, they will halt your agenda straight out. What does that say about your judicial nominees, the tone on Capitol Hill? And which is more important, judges or your agenda?

THE PRESIDENT: Both. I believe that I have an obligation to put forth good, honorable people to serve on the bench, and have done so. And I expect them to get a up or down vote on the floor of the Senate. This isn't a new position for me, or the -- I've been saying this for the last several years. And they ought to get a vote. They're getting voted out of committee, but they're not getting a vote on the floor. And I don't think it's fair to the candidates, and I don't think it's fair to the administration for this policy to go forward. And so, hopefully, the Senate will be able to conduct business and also get my nominees a vote -- an up or down vote on the floor of the Senate.

Yes, sir. John.

Q Sir, on Social Security, what is the time line that you want to see for action by Congress on a bill? When do you start to get worried about not getting something done this year? And also, if I can add, would you be willing to drop personal accounts in order to get a bill?

THE PRESIDENT: Personal accounts are very important for the individuals. It's a -- you know, it's interesting -- David quoted some poll -- there's all kinds of polls. For every poll you quote, I'll quote another one. It's kind of the way Washington works these days. They poll everything. The one I read the other day said people like the idea of personal accounts.

I think people like the idea of being able to take some of their own money -- in other words, government says, you can decide, as opposed to, we'll decide for you, you get to decide if this is in your interest. And you get to decide

whether you want to set some of your money aside in an account that will earn a better rate of return than that which will be earned in the Social Security system. That's an important part of making sure the system works for the individual.

I repeat, personal accounts do not permanently fix the solution. They make the solution more attractive for the individual worker. And that's important for people for understand, John, and that's why it's very important for Congress to discuss this issue.

In terms of timetables, as quickly as possible -- whatever that means. No, I am going to -- one of the things that I think is very important for people to understand is that I believe that we have a duty to work on big problems in Washington, D.C., and so I'm going to continue working on this. And it's, I guess -- I'm not going to go away on the issue, because the issue is not going to go away. The longer we wait, the more difficult it is to solve the problem.

And, listen, I fully understand it's a difficult issue; otherwise it would have been solved a long time ago. And I understand some members don't -- view this as a tough vote. In other words, why did you bring it up, it's a tough vote? And -- but that's just not the way I think, John. I think we have a duty. I truly do. This is -- now is the time to get this solved. I remember 1983, we've got a 75-year solution. It wasn't a 75-year solution that they came up with. It was a -- I like the spirit of people coming together from both parties to sit down and see if they couldn't solve the immediate problem, but it wasn't a 75-year solution because we're talking about it now. And in 2018, the situation starts to get worse because more money is coming into the system -- I mean, more money is going out of the system than coming in.

You know, one thing about Social Security -- I'm sorry to blow on here, but now that you asked -- a lot of people in America think there is a trust: your money goes in, the government holds it, and then the government gives your money back when you retire. That's just not the way it works. And it's important for the American citizens to understand. It's a pay-as-you-go system. And right now, we're paying for a lot of programs other than Social Security with the payroll tax coming in, thereby leaving a pile of IOUs. And part of why I think a personal account is an attractive option for a younger worker is that there will be real assets in the system at this point in time.

I also will continue reminding people, when it comes to personal accounts, that the system oftentimes doesn't work for a widow. You know, if a wage-earner dies prior to 62, there are no spousal benefits available until 62. If the spouse -- both spouses work, the spouse that survives will get the higher of his or her Social Security benefits, or the death benefits, but not both. In other words, somebody's contribution to the system just goes away. And a personal account will enable somebody to leave behind an asset base to whomever he or she chooses. And that's an important concept for people to understand.

Peter.

Q Mr. President, your administration recently called on the Texas courts to review some death -- some death penalty cases down there.

THE PRESIDENT: Yes.

Q And during your State of the Union you talked about the importance of DNA evidence, and you talked about the possibility that maybe there were inequities in the system and the lawyers that represent death row inmates. I'm wondering if this represents a change in your feelings about the death penalty since you were governor of Texas. And if there are the possibilities -- the possibilities exist of problems, why not call on -- for a moratorium?

THE PRESIDENT: No, I still support the death penalty, and I think it's a deterrent to crime. But I want to make sure, obviously, that those subject to the death penalty are truly guilty. And that's why I talked about what I talked about, and why I made the decision I made. I think, regardless of your position on the issue, one of the things we got to make sure is that we use, in this case, technology, DNA technology, to make sure that we're absolutely certain about the innocence or guilt of a person accused.

Yes.

Case 1:07-cv-05435-LAP     Document 75-9     Filed 06/25/2008     Page 38 of 47

Q Mr. President, are you trying to send a message to the IRA by not inviting Gerry Adams and the other Northern Ireland politicians tomorrow?

THE PRESIDENT: I talked to Bertie Ahern about this and -- at the EU, and he just asked who was coming to the events, which -- I said, you are, for certain. And we wanted to make sure that we honored those in civil society in Ireland who are contributing positively to the peace process. And that's what we'll be doing on this particular trip.

It's very important that people understand that the parties must renounce violence. There's a -- the Good Friday Agreement laid out the way forward for peace in Northern Ireland, and this administration and our government strongly supports those steps. But tomorrow's message will be, we want to thank those in civil society who are working hard to achieve a peaceful resolution.

Q By inviting the widow -- the sisters, rather, of this man who was killed --

THE PRESIDENT: That's part of the statement -- a very strong part of the statement. And I'm looking forward to meeting these very brave souls. They've committed themselves to a peaceful solution. And hopefully, their loved one will not have died in vain. I mean, out of the -- hopefully, some good will come out of the evil perpetuated on this family.

Yes, sir.

Q Mr. President, yesterday you said that Hezbollah could prove it is not a terrorist organization by laying down arms and supporting peace. How willing and flexible, and under what conditions are you able to, as you promote democracy in the Middle East, encourage parties like Hezbollah to discontinue the use of terrorism as a tactic?

THE PRESIDENT: Yes, I think -- let me make sure that you put my answer into full context. I first said that Hezbollah is on the terrorist list for a reason: because they have killed Americans in the past, and they -- they're a violent organization. And the question was about Lebanon, and let me take a step back, if I might, on this question, because it's important for the American people to understand our policy.

Our policy is this: We want there to be a thriving democracy in Lebanon. We believe that there will be a thriving democracy, but only if -- but only if -- Syria withdraws not only her troops completely out of Lebanon, but also her secret service organizations, intelligence organizations -- not secret service, intelligence organizations. I am concerned, and the world should be concerned that the intelligence organizations are embedded in a lot of government functions in Lebanon, and there needs to be a complete withdrawal of those services in order for there to be a free election. And we will -- this government will work with a -- elected leaders of a free, truly free Lebanon, and looking forward to it.

I like the idea of people running for office. There's a positive effect when you run for office. Maybe some will run for office and say, vote for me, I look forward to blowing up America. I don't know, I don't know if that will be their platform or not. But it's -- I don't think so. I think people who generally run for office say, vote for me, I'm looking forward to fixing your potholes, or making sure you got bread on the table. And so -- but Hezbollah is on the terrorist list for a reason, and remain on the terrorist list for a reason. Our position has not changed on Hezbollah.

Judy.

Q President Bush, a court ruling in California this week has revived debate over same-sex marriage. You support a constitutional amendment to ban such marriages. But it's not something you talk about nearly as often as Social Security and many other issues. Will you put some muscle behind that effort this year? Or is it something you'd prefer not to deal with?

THE PRESIDENT: No, I haven't changed my position. And as a matter of fact, the court rulings are verifying why I took the position I took, and that is I don't believe judges ought to be deciding this issue. I believe this is an issue of particular importance to the American people and should be decided by the people. And I think the best way to do so is through the constitutional process. I haven't changed my mind at all. As a matter of fact, court rulings such as this strengthen my position it seems like to me. People now understand why I laid out the position I did.

President's Press Conference                                                                    Page 9 of 12

Q What can you do to promote action on that amendment?

THE PRESIDENT: Well, I -- the courts are going to promote a lot of the action by their very rulings. People will understand that -- the logic behind the decision I made. And no matter what your position is on the issue, this is an issue that should be decided by the people, not by judges. And the more that judges start deciding the issue, I'm confident the more the people will want to be involved in the issue. This is a very important issue for the country and one that obviously needs to be conducted with a great deal of sensitivity and concern about other people's feelings. But this is -- it's an issue I feel strongly about.

Yes, Stretch.

Q Mr. President, you faced a lot of skepticism in the run-up to the Iraq war, and a lot of criticism for miscalculating some of the challenges of postwar Iraq. Now that the Iraq elections seem to be triggering signs of democratization throughout the broader Middle East, do you feel any sense of vindication?

THE PRESIDENT: First of all, I fully understand that as long as I'm the President I will face criticism. It's like part of the job. Frankly, you wouldn't be doing your job if you didn't occasionally lay out the gentle criticism. I welcome constructive ideas as to how we might do our job better. So that doesn't bother me. And, therefore, since it doesn't bother me and I expect it, I don't then seek vindication.

Look, history -- shall I give you my talk on history and presidencies? Okay, thank you. I don't -- what's interesting is George Washington is now getting a second, or third, or fifth, or tenth look in history. I read the Ellis book, which is a really interesting book, and -- "His Excellency," it's called. And McCullough is writing a book on George Washington, as well. People are constantly evaluating somebody's standing in history, a President's standing in history, based upon events that took place during the presidency, based upon things that happened after the presidency, based upon -- like in my case, hopefully, the march of freedom continues way after my presidency. And so I just don't worry about vindication or standing.

The other thing, it turns out, in this job you've got a lot on your plate on a regular basis, you don't have much time to sit around and wander, lonely, in the Oval Office, kind of asking different portraits, how do you think my standing will be? (Laughter.) I've got a lot to do. And I like to make decisions, and I make a lot of them.

But, you know, look, the people who deserve the credit in Iraq are the Iraqi citizens that defied the terrorists. Imagine what it would be like to try to go vote thinking that there could be a suicide bomber standing next to you in line, or somebody would lob a shell or a mortar at you. The courage of the Iraqi citizens was just overwhelming, I thought. It's easy for us to vote. The question is, what it would be like to vote if you were fearful for your life. Parts of the country people were getting messages that said, if you vote we'll find somebody you love and take care of them. And yet they defied these terrorists. It was a powerful moment in the history of freedom. People in the world got to see what it means to -- for a group of people that have been downtrodden to rise up and say, I want to be free.

Now, there's a lot of work to be done, and I'm sure there will be some opinions about what takes place during the next nine months, as the constitution is written, and whether or not the elections move forward as smoothly as some think they should. Obviously, there's concern now I read about -- occasionally reading, I want you to know, in the second term -- that -- your stories, that is -- that they haven't formed a government yet. But I take a different look. First of all, obviously, there will be a government formed, but I think it is interesting and -- to watch the process of people negotiating and worrying about this and worrying about that, and people seeking out positions as to their stands on issues that will be relevant to the future of Iraq. It's a wholesome process. And it's being done in a transparent way. I mean, you've got the press corps all over them, watching every move, which is a positive example for others in the region.

And that's important. It's important for people in that region to see what is possible in a free society. And I firmly believe that the examples of Iraq and Afghanistan -- I believe there will be a Palestinian state; I believe we'll be able to convince Syria to fully withdraw, or else she'll be isolated -- fully withdraw from Lebanon, or else she'll be isolated -- I believe those examples will serve as examples for others over time. And that will lead to more peace. And that's what we want.

Yes, Carl.

Q Mr. President, do you also think it will lead to America's reputation being restored? Earlier this week you brought Karen Hughes back at ambassador rank to address the question of antipathy to America around the world --

THE PRESIDENT: Yes.

Q -- particularly the Muslim world. What does that entail?

THE PRESIDENT: Well, it entails a couple of things, Carl. It entails people understanding why we do things we do. You know, for example, there was -- I think we had the image of wanting to fight Muslims -- the United States stood squarely against a religion, as opposed to a society which welcomes all religions. And, in fact, we're fighting a handful of people relative to the Muslim population that wanted to -- I used to say -- hijack the religion.

People need to understand we're a compassionate nation and we care deeply about suffering, regardless of where people live. And the -- you know, President Clinton and President Bush 41 did a fine job of helping the world see the great compassion of America when they went on the -- went on their trips in the areas ravaged by the tsunamis.

It is very important for us to have a message that counteracts some of the messages coming out of some of the Arab media -- some of it coming out, partly, because of our strong and unwavering friendship with Israel. You know, Israel is an easy target for some of the media in the Middle East, and if you're a friend of Israel, you become a target. And since we're not going to abandon our alliance with Israel, there's a -- there was some churning in the press, and there was some unhelpful things being said. And so part of that is to make sure people understand the truth. And that is, in this particular issue, you bet we're going to stand by Israel. But we also believe the Palestinians have the capability of self-governance in a truly democratic state that will live side-by-side with the Israelis in peace.

And so Karen is going -- one, I want to thank her for coming back from Austin. It's very hard, if you're a Texan, to abandon Austin for anywhere else, and -- or Texas for anywhere else. Secondly, I applaud Secretary Rice's decision to include Karen in the process. I thought that was very wise of her to call upon Karen's talents. And Dina Powell, from my office, an Egyptian American, is also going over, leaving the White House compound to work with Karen, because she believes deeply in the American experience, in American values, and wants to share those values with people around the world.

And, you know, I think when people also see, Carl, that we do what we say we're going to do -- for example, that we helped feed the hungry and that we believe all folks should be free and that women should have an equal say in society. I think when people see we actually mean that, and then when it comes to fruition, it will help people around the world better understand our good hearts and good nature.

Yes, Ken.

Q Mr. President, earlier this year, you told us you wanted your administration to cease and desist on payments to journalists to promote your agenda. You cited the need for ethical concerns and the need for bright line between the press and the government. Your administration continue to make the use of video news releases, which is prepackaged news stories sent to television stations, fully aware that some -- or many of these stations will air them without any disclaimer that they are produced by the government. The Comptroller General of the United States, this week, said that raises ethical questions. Does it raise ethical questions about the use of government money to produce stories about the government that wind up being aired with no disclosure that they were produced by the government?

THE PRESIDENT: There is a Justice Department opinion that says these -- these pieces are within the law, so long as they're based upon facts, not advocacy. And I expect our agencies to adhere to that ruling, to that Justice Department opinion. This has been a longstanding practice of the federal government to use these types of videos. The Agricultural Department, as I understand it, has been using these videos for a long period of time. The Defense Department, other departments have been doing so. It's important that they be based on the guidelines set out by the Justice Department.

Now, I also -- I think it would be helpful if local stations then disclosed to their viewers that that's -- that this was

Case 1:07-cv-05435-LAP     Document 75-9     Filed 06/25/2008     Page 41 of 47

based upon a factual report, and they chose to use it. But evidently, in some cases, that's not the case. So, anyway.

Q The administration could guarantee that's happening by including that language in the pre-packaged report.

THE PRESIDENT: Yes, I don't -- oh, you mean a disclosure, "I'm George W. Bush, and I" --

Q Well, some way to make sure it couldn't air without the disclosure that you believe is so vital.

THE PRESIDENT: You know, Ken, there's a procedure that we're going to follow, and the local stations ought to -- if there's a deep concern about that, ought to tell their viewers what they're watching.

Q Mr. President, do you think there should be regime change in Iran? And if so, what are you prepared to do to see that happen?

THE PRESIDENT: Richard, I believe that the Iranian people ought to be allowed to freely discuss opinions, read a free press, have free votes, be able to choose amongst political parties. I believe Iran should adopt democracy; that's what I believe.

Q Mr. President --

THE PRESIDENT: Yes, ma'am.

Q Thank you, sir. Do you believe that nativity scenes and the Ten Commandments should continue to be displayed on federal property or in schools?

THE PRESIDENT: We had a display of the Ten Commandments on the statehouse grounds in Texas, and I supported that display.

Q Mr. President, back to Social Security, if I may. You said right at the top today that you urged members of Congress to go out and talk about the problem with their constituents.

THE PRESIDENT: About solutions to the problem.

Q But also to talk about solutions. It's that part of it I want to ask about. Aren't you asking them to do something that you really haven't been willing to do yet?

THE PRESIDENT: No, I'm interested in -- first of all, I have laid out, in the State of the Union address -- I haven't looked at all previous State of the Union addresses, but I think I'm the first President ever to say, all options are on the table, and named a series of options. I think. Now, maybe somebody could go back and find out -- if you've got some idle time on your hand, you might want to go read previous State of the Union addresses and see if that's true.

I don't believe members should go write a bill, but I do believe a member should start discussing ideas with constituencies about how to solve the problem, as opposed to blocking ideas -- to say, here are some ideas, and come back and present them. That's what's happening, by the way. There's a lot of members are talking about different concepts. I've called a lot of them into the White House compound, I've listened to them. There's a variety of ideas. And that's positive. I view that as a positive sign that members of Congress, one, take the problem seriously -- I thought it was helpful yesterday when the United States Senate said that Social Security is a serious problem that requires a permanent solution.

And now it's time for people, when they get back from Easter, having talked to different constituency groups, to come back and sit down and start sharing ideas about how to move the process forward. And my pledge is that I will not take somebody's idea and use it as a political weapon against them. That's what's changed in this debate. In other words, the Social Security -- they used to call it the third rail of American politics, because when you talked about it, you got singed, at the minimum. And it's now time to talk about it in a serious way, to come up with

a permanent solution.

Yes, Jackson.

Q Mr. President, you talked earlier about going —

THE PRESIDENT: I can't call on Herman and not on Jackson.

Q Thank you. You talked about going to the Security Council if Iran turns down this EU 3 deal. Iran says they're not making nuclear weapons. Are we looking at a potential military confrontation with Iran?

THE PRESIDENT: No, we've got a lot of diplomacy, you know. There's a lot of diplomacy on this issue. And that's why I was so pleased to be able to participate with our friends, France and Great Britain and Germany, to say to the Iranians, we speak with a common voice, and we share suspicions because of your past behavior. And the best way to ensure that you do not develop a nuclear weapon is for you to have no enrichment of plutonium — of - - have no highly enriched uranium program or plutonium program that could lead to a weapon. That's what we've said.

And we just started the process — we just had the discussion. How long ago was I in Europe? Maybe 10 days, or so? Two weeks? About two weeks? I mean, it takes a while for things to happen in the world, David. I mean, I know there's a certain impatience with a never-ending news cycle. But things don't happen on — necessarily overnight the way some would like them, you know, solve this issue and we go to the next issue. There's a certain patience required in order to achieve a diplomatic objective. And our diplomatic objective is to continue working with our friends to make it clear to Iran we speak with a single voice.

Listen, whoever thought about modernizing this room deserves a lot of credit. (Laughter.) Like, there's very little oxygen in here anymore. (Laughter.) And so, for the sake of a health press corps and a healthy President, I'm going to end the press conference. But I want to thank you for giving me a chance to come by and visit. I wish you all -- genuinely wish you all a happy Easter holiday with you and your family.

Thank you.

Q Can I get that follow-up now?

THE PRESIDENT: What?

Q Can I get that follow-up now? (Laughter.)

END 11:03 A.M. EST

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/03/20050316-3.html

 CLICK HERE TO PRINT

# EXHIBIT

# I

Search ▶

Speeches & Testimony

# Testimony of DCI Goss Before Senate Armed Services Committee

### Testimony of the Director of Central Intelligence
### The Honorable Porter J. Goss
### Before the
### Senate Armed Services Committee
### (as prepared for delivery)

**March 17, 2005**

---

I hope to accomplish a number of things during this time. I want to briefly share with you my thoughts relative to the threats facing the United States in the coming years. By virtue of the unclassified nature of this setting I will not go into great detail and look forward to more in-depth discussion of the threats with the Committee in closed session. I also want to discuss the broader issues of the capabilities the Intelligence Community requires to face these threats. The capabilities issue is one that fundamentally impacts the way we support policymakers and warfighters.

## Challenges and Changes We Face

The war on terrorism has presented the Intelligence Community with challenges unlike any before. We are facing small groups of terrorists and extremist rather than standing armies. They operate out of homes and caves rather than military bases and government entities. They don't wear uniforms, they don't use conventional ordnance, and they don't observe norms and standards of civilized society. And only a few individuals may know the complete plan of a given terrorist plot.

In response we changed the way we gather secrets. Professional interrogation has become a very useful and necessary way to obtain information to save innocent lives, to disrupt terrorist schemes, and to protect our combat forces. The USG had documented success protecting people and capturing terrorists with information. As I have said before, the USG does not engage in or condone torture.

- We will continue to be successful and take terrorists and extremists off the battlefield. But these are risky activities and I will be asking the men and women of the CIA to take more risks—justifiable risks—in the days and months to come. I would much rather explain why we did something than why we did nothing. I am asking your support.

## Processing What We Collect

The volume and scope of information that the Intelligence Community collects, processes and provides to policymakers and warfighters has grown tremendously. We face several issues here.

- First, I believe we have made great strides in improving the information flow between CIA, FBI, DHS, and others, yet we still face challenges. We all understand this and are working hard to improve the information sharing in all directions.

- Second, as we continually vet sources of threat information we need to do better at discerning what is a real threat, and what is wishful thinking, and to establish a threshold for devoting analytical and operational resources to track down a lead. Establishing this threshold is also critical to our ability to provide intelligence on options for strategic decisions, and to give the American public an accurate assessment of the threat facing the country.

- Third, for all of the successes we have had and advances we have made, serious and unnecessary damage is caused by media leaks. Unauthorized disclosures of classified information threatens the survivability of the sources and methods that we depend on. We have lost opportunity, if not capability, because of irresponsible leaks and we have made it easier for our enemies.

## Making Intelligence Actionable

Collecting secrets - and keeping them secret - is only half the battle. Having intelligence that is actionable and is acted upon through clearly defined mechanisms is just as critical. Terrorists started the war on our soil. We have taken the war to them. Sometimes this requires what we euphemistically call a "kinetic" solution on foreign soil. We have to be able to use all of the tools at our disposal and understand the consequences of how we use them. Dealing successfully with dangerous terrorists requires rapid application of the proper capabilities whether the USG is conducting planned strikes or exploiting targets of opportunity.

## Developing the Right Cadre

I welcome the President's directive to increase CIA's HUMINT and analytical capabilities by nearly half. The good news is that smart, eager, and talented people are applying for work in record numbers. Recruiting, training, equipping, and retaining the new more diverse workforce will be a growing endeavor. To do so, I want to help establish a National University of Intelligence, not just for the CIA, but for all agencies within the Intelligence Community. This will be one initiative I will bring to the DNI when he gets started. This will help define a new Intelligence Community culture, better coordinate the way we do business across the government, and enhance willing cooperation.

I look forward to the DNI's confirmation and leadership in bringing together the collective efforts of the Intelligence Community. He will be faced with decisions about how information is collected, prepared and delivered to the President and to other senior leaders and customers. I am ready to help the DNI marshal the efforts and resources of the domestic and international operations of IC agencies, not just in the war on terror but in our other necessary global endeavors. As I turn over the DCI Intelligence Community responsibilities, I am confident that the 15 agencies in the Intelligence Community will rally around the DNI and bring their unique abilities to bear on the joint mission of making America safer.

## Threat

Now, I turn to specific threats. I will not attempt to cover everything that could go wrong in the year ahead. We must, and do, concentrate our efforts, experience and expertise on matters that are most pressing: defeating terrorism; protecting the Homeland; stopping the proliferation of weapons of mass destruction and drugs; and fostering stability, freedom and peace in the most troubled regions of the world.

## Terrorism

Mr. Chairman, defeating terrorism will remain our top objective as widely dispersed terrorist networks present real danger to US national security interest at home and abroad.

- Our reporting indicates al-Qa'ida is intent on finding ways to circumvent US security enhancements to strike Americans and the Homeland. Their intent, perhaps passion, to harm us for being who we are is just as vital as ever.

- Our reporting that al-Qa'ida or another group wants to use chemical, biological, radiological, and/or nuclear weapons cannot be ignored.

- The threat from a broader Sunni jihadist movement is broad. We have witnessed this in Madrid, Bali, the Philippines, Saudi Arabia and many other places. It is worth noting that other groups in Pakistan, Southeast Asia, Central Asia, East Africa, and Europe, also pose a significant threat to our security.

- In Iraq, Zarqawi merged his organization with al-Qa'ida last year seeking to bring about the final victory of his vision of Islam over the "infidels" and "apostates."

## Proliferation

Let me start with Libya, a good news story, and one that shows that with the patient perseverance the Intelligence Community can tackle and achieve remarkable things.

- In 2004 Tripoli followed through with a range of steps to disarm itself of WMD and ballistic missiles. The US continues to work with Libya to clarify some discrepancies in the declaration, but all in all we are seeing some very helpful cooperation from Tripoli these days.

Looking to North Korea and Iran, we have different issues.

- P'yongyang has announced it has a nuclear weapon capability.

- Concern remains that Iran could utilize the uranium enrichment technology it is pursuing to achieve a nuclear weapon

## Other Areas of Concern

In CHINA, Beijing's military modernization and military buildup are posing new questions for us. Improved Chinese capabilities seemingly threaten US forces in the region. China's recent legislation on secession speaks for itself.

In RUSSIA, the attitudes and actions of the former KGB associates that Putin has placed in positions of authority throughout the Russian government may be critical determinants of the course Putin will pursue in the year ahead.

In the MIDDLE EAST, the election of Palestinian President Mahmud Abbas, of course, marks a welcome step forward. There, nevertheless, are hurdles ahead as the Palestinian leadership tries to rebuild the Palestinian Authority and to counter terrorist groups that could destabilized the current calm and derail talks.

In SOUTHEAST ASIA, the Philippines is struggling with prolonged radical Islamic and Communist rebellions and the presence of terrorists seeking safe haven and training bases. Thailand is plagued with an increasingly volatile Muslim separatist threat in its southeastern provinces, and the risk of escalation remains.

In AFRICA, chronic instability in countries such as Sudan and Nigeria, and in areas such as the Horn of Africa, will continue to hamper counterterrorism efforts and offer a potential sanctuary for terrorists.

In LATIN AMERICA, the region is entering a major electoral cycle in 2005/2006, when Brazil, Colombia, Costa Rica, Ecuador, Mexico, Nicaragua, Peru, Venezuela, and now Bolivia will hold presidential elections. Several key countries in the hemisphere are potential flashpoints in 2005, including Venezuela, Haiti, Colombia and Cuba.

Mr. Chairman, Senator Levin - again, thank you for this opportunity. There are an awful lot of sore spots out there. We of course are trying to stay on top of them so we are well informed and can take appropriate action. The help of your committee will be invaluable.

Thank you.

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act