# EXHIBIT

# O

Copyright 2003 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

November 5, 2003 Wednesday
Correction Appended
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1068 words

**HEADLINE:** Deported Terror Suspect Details Torture in Syria;
Canadian's Case Called Typical of CIA

**BYLINE:** DeNeen L. Brown and Dana Priest, Washington Post Staff Writers

**DATELINE:** TORONTO Nov. 4

**BODY:**

A Canadian citizen who was detained last year at John F. Kennedy International Airport in New York as a suspected terrorist said Tuesday he was secretly deported to Syria and endured 10 months of torture in a Syrian prison.

Maher Arar, 33, who was released last month, said at a news conference in Ottawa that he pleaded with U.S. authorities to let him continue on to Canada, where he has lived for 15 years and has a family. But instead, he was flown under U.S. guard to Jordan and handed over to Syria, where he was born. Arar denied any connection to terrorism and said he would fight to clear his name.

U.S. officials said Tuesday that Arar was deported because he had been put on a terrorist watch list after information from "multiple international intelligence agencies" linked him to terrorist groups.

Officials, speaking on condition of anonymity, said that the Arar case fits the profile of a covert CIA "extraordinary rendition" -- the practice of turning over low-level, suspected terrorists to foreign intelligence services, some of which are known to torture prisoners.

Arar's case has brought repeated apologies from the Canadian government, which says it is investigating what information the Royal Canadian Mounted Police gave to U.S. authorities. Canada's foreign minister, Bill Graham, also said he would question the Syrian ambassador about Arar's statements about torture. In an interview on CBC Radio, Imad Moustafa, the Syrian chargé d'affaires in Washington, denied that Arar had been tortured.

Arar said U.S. officials apparently based the terrorism accusation on his connection to Abdullah Almalki, another Syrian-born Canadian. Almalki is being detained by Syrian authorities, although no charges against him have been reported. Arar said he knew Almalki only casually before his detention but encountered him at the Syrian prison where both were tortured.

Arar, whose case has become a cause celebre in Canada, demanded a public inquiry. "I am not a terrorist," he said. "I am not a member of al Qaeda. I have never been to Afghanistan."

He said he was flying home to Montreal via New York on Sept. 26, 2002, from a family visit to Tunisia.

"This is when my nightmare began," he said. "I was pulled aside by immigration and taken [away]. The police came and searched my bags. I asked to make a phone call and they would not let me." He said an FBI agent and a New York City police officer questioned him. "I was so scared," he said. "They told me I had no right to a lawyer because I was not an American citizen."

Arar said he was shackled, placed on a small jet and flown to Washington, where "a new team of people got on the plane" and took him to Amman, the capital of Jordan. Arar said U.S. officials handed him over to Jordanian authorities, who "blindfolded and chained me and put me in a van. . . . They made me bend my head down in the back seat. Then these men started beating me. Every time I tried to talk, they beat me."

Hours later, he said, he was taken to Syria and there he was forced to write that he had been to a training camp in Afghanistan. "They kept beating me, and I had to falsely confess," he said. "I was willing to confess to anything to stop the torture."

Arar said his prison cell "was like a grave, exactly like a grave. It had no light, it was three feet wide, it was six feet deep, it was seven feet high. . . . It had a metal door. There was a small opening in the ceiling. There were cats and rats up there, and from time to time, the cats peed through the opening into the cell."

Steven Watt, a human rights fellow at the Center for Constitutional Rights in Washington, said Arar's case raised questions about U.S. counterterrorism measures. "Here we have the United States involved in the removal of somebody to a country where it knows persons in custody of security agents are tortured," Watt said. "The U.S. was possibly benefiting from the fruits of that torture. I ask the question: Why wasn't he removed to Canada?"

A senior U.S. intelligence official discussed the case in terms of the secret rendition policy. There have been "a lot of rendition activities" since the Sept. 11, 2001, terrorist attacks in the United States, the official said. "We are doing a number of them, and they have been very productive."

Renditions are a legitimate option for dealing with suspected terrorists, intelligence officials argue. The U.S. government officially rejects the assertion that it knowingly sends suspects abroad to be tortured, but officials admit they sometimes do that. "The temptation is to have these folks in other hands because they have different standards," one official said. "Someone might be able to get information we can't from detainees," said another.

Syria, where use of torture during imprisonment has been documented by the State Department, maintains a secret but growing intelligence relationship with the CIA, according to intelligence experts.

"The Syrian government has provided some very useful assistance on al Qaeda in the past," said Cofer Black, former director of counterterrorism at the CIA who is now the counterterrorism coordinator at the State Department.

One senior intelligence official said Tuesday that Arar is still believed to have connections to al Qaeda. The Justice Department did not have enough evidence to detain him when he landed in the United States, the official said, and "the CIA doesn't keep people in this country."

With those limitations, and with a secret presidential "finding" authorizing the CIA to place suspects in foreign hands without due process, Arar may have been one of the people whisked overseas by the CIA.

In the early 1990s, renditions were exclusively law enforcement operations in which suspects were snatched by covert CIA or FBI teams and brought to the United States for trial or questioning. But CIA teams, working with foreign intelligence services, now capture suspected terrorists in one country and render them to another, often after U.S. interrogators have tried to gain information from them.

Renditions are considered a covert action. Congress, which oversees the CIA, knows of only the broad authority to carry out renditions but is not informed about individual cases, according to intelligence officials. Priest reported from Washington. Staff writers John Mintz and Glenn Kessler in Washington contributed to this report.

**CORRECTION-DATE:** November 6, 2003

**CORRECTION:**

A Nov. 5 article about the deportation of a Canadian citizen to Syria misstated the location of the Center for Constitutional Rights. It is based in New York.

**LOAD-DATE:** November 5, 2003

# EXHIBIT

# P

Search          

Press Releases & Statements

# Director's Statement on the CIA's Terrorist Interrogation Program

**Statement to Employees by Director of the Central Intelligence Agency, General Michael V. Hayden on the CIA's Terrorist Interrogation Program**

**October 5, 2007**

Yesterday, the press reported a classified Department of Justice opinion from May 2005 dealing with CIA's terrorist detention program. The story has sparked considerable comment, including claims that the opinion opened the door to more harsh interrogation tactics and that information about the interrogation methods we actually have used has been withheld from our oversight committees in Congress. Neither assertion is true.

As this issue continues to play out publicly, there are some important things you should bear in mind:

First, the CIA's terrorist interrogation effort has always been small, carefully run, and highly productive. Fewer than 100 hardened terrorists have gone through the program since it began in 2002, and, of those, less than a third have required any special methods of questioning. The Agency has over the years taken custody only of those terrorists thought to have information on potential attacks or unique insights into the workings of al-Qai'da and its affiliates. The United States and its allies have used the priceless intelligence from these men to disrupt plots, unravel networks, and save lives.

Second, this vital counter-terror initiative has been subject to multiple legal and policy reviews, inside CIA and beyond. The Agency has worked closely with the Department of Justice and others in our government to ensure that the interrogation program operates in strict accord with US law and takes full account of any changes to the law. We have been proactive in seeking opinions that anticipate new legislation or fresh interpretations of existing laws and treaties. We serve a democracy of laws, and we underscore our place in that democracy by acting in keeping with the law. As Director, I also have a special obligation to protect the skilled, seasoned, dedicated officers who have run this challenging effort. A clear, sustainable legal foundation for their work is the best way to do that.

Finally, a sustainable interrogation program requires not only direction and guidance from the Executive Branch, but support from Congress. Our oversight committees have been fully and repeatedly briefed on CIA's handling of detainees. They know the exceptional value that comes from the careful, lawful, and thorough questioning of key terrorists. They know what we do, and what we do not do—and we do not torture. They also know the lengths to which CIA, and our government as a whole, has gone to place and keep this source of intelligence collection, our most valuable in terms of al-Qai'da, on a sound and solid legal footing.

The American people expect us to meet threats to their safety and security, but to do so in keeping with the laws of our nation. That is something on which we as intelligence officers also insist, and something in which all of us can and should take pride.

Mike Hayden

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# EXHIBIT Q

Search ▶

Press Releases & Statements

# Director's Statement on the Taping of Early Detainee Interrogations

**Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations**

**December 6, 2007**

The press has learned that back in 2002, during the initial stage of our terrorist detention program, CIA videotaped interrogations, and destroyed the tapes in 2005. I understand that the Agency did so only after it was determined they were no longer of intelligence value and not relevant to any internal, legislative, or judicial inquiries—including the trial of Zacarias Moussaoui. The decision to destroy the tapes was made within CIA itself. The leaders of our oversight committees in Congress were informed of the videos years ago and of the Agency's intention to dispose of the material. Our oversight committees also have been told that the videos were, in fact, destroyed.

If past public commentary on the Agency's detention program is any guide, we may see misinterpretations of the facts in the days ahead. With that in mind, I want you to have some background now.

CIA's terrorist detention and interrogation program began after the capture of Abu Zubaydah in March 2002. Zubaydah, who had extensive knowledge of al-Qa'ida personnel and operations, had been seriously wounded in a firefight. When President Bush officially acknowledged in September 2006 the existence of CIA's counter-terror initiative, he talked about Zubaydah, noting that this terrorist survived solely because of medical treatment arranged by CIA. Under normal questioning, Zubaydah became defiant and evasive. It was clear, in the President's words, that "Zubaydah had more information that could save innocent lives, but he stopped talking."

That made imperative the use of other means to obtain the information—means that were lawful, safe, and effective. To meet that need, CIA designed specific, appropriate interrogation procedures. Before they were used, they were reviewed and approved by the Department of Justice and by other elements of the Executive Branch. Even with the great care taken and detailed preparations made, the fact remains that this effort was new, and the Agency was determined that it proceed in accord with established legal and policy guidelines. So, on its own, CIA began to videotape interrogations.

The tapes were meant chiefly as an additional, internal check on the program in its early stages.

At one point, it was thought the tapes could serve as a backstop to guarantee that other methods of documenting the interrogations—and the crucial information they produced—were accurate and complete. The Agency soon determined that its documentary reporting was full and exacting, removing any need for tapes. Indeed, videotaping stopped in 2002.

As part of the rigorous review that has defined the detention program, the Office of General Counsel examined the tapes and determined that they showed lawful methods of questioning. The Office of Inspector General also examined the tapes in 2003 as part of its look at the Agency's detention and interrogation practices. Beyond their lack of intelligence value—as the interrogation sessions had already been exhaustively detailed in written channels—and the absence of any legal or internal reason to keep them, the tapes posed a serious security risk. Were they ever to leak, they would permit identification of your CIA colleagues who had served in the program, exposing them and their families to retaliation from al-Qa'ida and its sympathizers.

These decisions were made years ago. But it is my responsibility, as Director today, to explain to you what was done, and why. What matters here is that it was done in line with the law. Over the course of its life, the Agency's interrogation program has been of great value to our country. It has helped disrupt terrorist operations and save lives. It was built on a solid foundation of legal review. It has been conducted with careful supervision. If the story of these tapes is told fairly, it will underscore those facts.

Mike Hayden

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# EXHIBIT R

| | |
|---|---|
| **NAME** | 'Ali 'Abd al-'Aziz 'Ali |
| **PHONETICS** | ah-Lee ahbd-al-ah-ZEEZ ah-LEE |
| **KEY ALIAS** | 'Ammar al-Baluchi |
| **AFFILIATION** | Al-Qa'ida |
| **NATIONALITY** | Baluchi born and raised in Kuwait |

Pakistan-based al-Qa'ida operative 'Ammar al-Baluchi is a member of an extended family of extremists that has spawned such notorious terrorists as his detained uncle and 11 September mastermind Khalid Shaykh Muhammad (KSM) and cousin and incarcerated World Trade Center bomber Ramzi Yousef. 'Ammar served as a key lieutenant for KSM during the operation on 11 September and subsequently assisted his uncle on various plots against the United States and United Kingdom.

'Ammar, who is 29 years old, spent most of his teen years in Iran before moving to the United Arab Emirates (UAE) to work as a computer programmer in Dubai in 1998. Even before this move, he was gradually being influenced by his extremist relatives to become involved in terrorism; his chief mentor was Ramzi Yousef, who taught him in the early 1990s in Iran about the importance of war against the West. 'Ammar volunteered his services to KSM in 1997, and during 2000-2001 played an important role helping facilitate the operation on 11 September by transferring money to US-based operatives and acting as a travel facilitator to hijackers transiting the UAE on their way from Pakistan to the United States.

After the collapse of the Taliban in Afghanistan in late 2001, 'Ammar assisted KSM in organizing the movement of al-Qa'ida operatives and their families to safehouses in Pakistan. KSM also directed him at the forefront of planning for a variety of terrorist plots against the West, including:

* In late 2001 in Afghanistan, KSM directed 'Ammar to be the communications intermediary between al-Qa'ida and "shoe bombers" Richard Reid and Saajid Badat. In early 2002 in Pakistan, 'Ammar helped KSM prepare operatives for travel to the United States, ostensibly to carry out attacks.

* During 2002-2003 'Ammar also worked with KSM to prepare Majid Khan and others for travel to the United States to conduct terrorist operations. 'Ammar also sent Khan in late 2002 to Thailand to deliver $50,000 to finance plotting by Jemaah Islamiya leader Hambali against US and Israeli targets in Southeast Asia.

* From late 2002, 'Ammar began plotting to carry out simultaneous attacks in Karachi against the US Consulate, Western residences, and Westerners at the local airport. After KSM's detention, 'Ammar assumed responsibility for the plot to carry out hijacking attacks from Heathrow Airport but decided to delay that plot until after the bombings in Karachi occurred. He was within days of completing preparations for the Karachi plot when he was captured.

* In 2002, 'Ammar directed Aafia Siddiqui—a US-educated neuroscientist and al-Qa'ida facilitator—to travel to the United States to prepare paperwork to ease Majid Khan's deployment to the United States. 'Ammar married Siddiqui shortly before his detention.

| NAME | Ahmed Khalfan Ghailani |
| --- | --- |
| PHONETICS | geh-LAH-nee |
| KEY ALIAS(ES) | Haytham al-Kini |
| AFFILIATION(S) | Al-Qa'ida |
| NATIONALITY | Tanzanian |

An al-Qa'ida document forger and travel facilitator, Ahmed Khalfan Ghailani—known in al-Qa'ida circles as Haytham al-Kini—rose in stature after 11 September 2001 to become one of al-Qa'ida's top forgers. Although Ghailani was not directly involved in operational planning, he worked for the now-deceased Hamza Rabi'a—then al-Qa'ida's chief of external operations—and forged or altered passports for many al-Qa'ida members. Most of his work involved substituting photos in passports and modifying visa stamps.

* Ghailani lived at various houses in North and South Waziristan in 2003 and 2004, which in conjunction with his forgery work, allowed him to meet many high- and low-level al-Qa'ida operatives.

Ghailani, born around 1974 in Zanzibar, Tanzania, is one of the FBI's Most Wanted terrorists and has been indicted for his role in the East Africa Embassy bombings on 7 August 1998. Ghailani, who knew many of the Africans involved in the attacks, originally met one of the operatives, Fahid Muhammad Ali Msalem, through a mutual friend; he later befriended the rest of the group after he began traveling between Dar es Salaam, Tanzania, and Mombasa, Kenya, transporting and selling various items and doing odd jobs. Msalem asked Ghailani at various times to help the group purchase a truck, gas cylinders, and TNT that would later be used to construct a car bomb; requests Ghailani fulfilled.

* Ghailani and several other operatives moved to Afghanistan—which Ghailani had wanted to do for several years—the day before the Embassy bombings.

* After arriving in Afghanistan, Ghailani attended regular training at one of al-Qa'ida's camps and served as a rank-and-file soldier. Ghailani eventually became a cook for Usama Bin Ladin before joining a group of fellow Africans in 2001 who ran al-Qa'ida's document forgery office in Kandahar, Afghanistan.

* Ghailani fled to Karachi, Pakistan, after the fall of the Taliban, but high-profile arrests in Karachi in April 2003 convinced him to move to South Waziristan.

| NAME | Hambali |
|------|---------|
| PHONETICS | HAM-bali |
| KEY ALIAS(ES) | Riduan bin Isomuddin (true name), Encep Nurjaman |
| AFFILIATION(S) | Jemaah Islamiya and al-Qa'ida |
| NATIONALITY | Born in Indonesia, ethnically Sundanese |

Indonesian-born Riduan bin Isomuddin—best known among extremists as Hambali—was an operational mastermind in the Southeast Asia–based Islamic extremist group Jemaah Islamiya (JI) and also served as the main interface between JI and al-Qa'ida from 2000 until his capture in 2003. Hambali helped plan the first Bali bombings in 2002 that killed more than 200 persons and facilitated al-Qa'ida financing for the Jakarta Marriott Hotel bombing the following year. In late 2002, he also directed his subordinates Lillie and Zubair to case the British High Commission in Phnom Penh, Cambodia. Hambali was previously involved in the attempted assassination of the Philippine Ambassador to Indonesia in August 2000 and the bombings on Christmas Eve that year of some 30 churches across the archipelago. Hambali had longstanding ties to al-Qa'ida external operations chief Khalid Shaykh Muhammad (KSM). Before returning to Southeast Asia in December 2001, Hambali discussed operations with senior al-Qa'ida leaders regarding post–11 September attacks against US interests.

Hambali in 1999 established a cell of young JI operatives in Karachi, Pakistan—dubbed al-Ghuraba—which provided its members with advanced doctrinal and operational training, including at al-Qa'ida training camps in Afghanistan. Hambali tapped his younger brother, Rusman "Gun Gun" Gunawan, as deputy Ghuraba cell leader.

Hambali was born on 4 April 1964 in Cianjur, West Java, and is the eldest male of 11 children. His great-grandfather founded a local Islamic school, which Hambali attended during his early adolescence. Hambali was a devout Muslim youth who, at age 20, left Indonesia for Malaysia, ostensibly to seek work. While there, he met JI cofounders Abdullah Sungkar and Abu Bakar Bashir—fellow Indonesians who had fled the Suharto regime for Malaysia—and through them was exposed to radical Islamic teachings. Hambali tried unsuccessfully to get a scholarship to an Islamic school in Malaysia, before traveling in the mid-1980s to Afghanistan, where he fought alongside many of al-Qa'ida's future leaders. During his three-year stint in Afghanistan, he forged strong ties to Usama Bin Ladin and KSM. After returning to Malaysia in the early 1990s, Hambali and JI spiritual leader Bashir further developed their relationship and became close friends.

| | |
|---|---|
| NAME | Mustafa Ahmad al-Hawsawi |
| PHONETICS | moo-STAH-fah ahl-hah-SOW-ee |
| KEY ALIAS(ES) | Hashim 'Abd al-Rahman, Zahir, Ayyub, Muhammad Adnan |
| AFFILIATION(S) | Al-Qa'ida |
| NATIONALITY | Saudi |

Mustafa Ahmad al-Hawsawi was one of two key financial facilitators entrusted by 11 September mastermind Khalid Shaykh Muhammad (KSM) to manage the funding for the hijackings. As a trusted, respected financial facilitator known to the leadership, al-Hawsawi separately met with Usama Bin Ladin, his deputy Ayman al-Zawahiri, and al-Qa'ida spokesman Sulayman Bu Ghayth soon after the attacks on 11 September and had contact with many of al-Qa'ida's most senior managers.

Various reports suggest that al-Hawsawi had direct ties to several of the hijackers and to other operatives, including Ramzi Bin al-Shibh—who delivered some money from al-Hawsawi to the hijackers. In addition, al-Hawsawi and Bin al-Shibh served as a communications link between KSM and the hijackers. He shared a United Arab Emirates (UAE)–based financial account with one hijacker—an account that funded the hijackers' activities in the month before the attacks on 11 September. Four hijackers returned money directly to al-Hawsawi in the week before the attacks, which al-Hawsawi then redeemed in the UAE. Al-Hawsawi also wired thousands of dollars to Bin al-Shibh in the summer of 2001, per KSM's instructions. KSM also maintained his own financial links to al-Hawsawi. In 2001, KSM held a supplemental credit card linked to an al-Hawsawi account based in the UAE.

- Al-Hawsawi worked in the al Qa'ida media center in Afghanistan from 2000—while it was under the direction of KSM—until he departed for the UAE in early 2001.

After the attacks on 11 September, al-Hawsawi fled the UAE and traveled to Afghanistan and to Pakistan, where he hid until his capture in 2003. KSM reportedly had been providing a safehouse and other logistic support to guarantee al-Hawsawi's security after he arrived in Pakistan.

- Hawsawi facilitated other operatives' travel, including Muhammad al-Qahtani, who was denied entry into the United States in the summer of 2001.

- Hawsawi's close relationship with KSM and the latter's active participation in providing for his security following 11 September suggests Hawsawi was key to KSM's operational team.

| NAME | Lillie |
|------|--------|
| PHONETICS | LIL-lee |
| KEY ALIAS(ES) | Mohammed Nazir Bin Lep (true name), Bashir Bin Lep |
| AFFILIATION(S) | Jemaah Islamiya and al-Qa'ida |
| NATIONALITY | Malaysian |

Malaysian-born Mohammed Nazir Bin Lep (a.k.a. Bashir Bin Lap)—better known as Lillie—was one of Hambali's key lieutenants and had considerable operational experience. Lillie facilitated the transfer of al-Qa'ida funds used for the Jakarta Marriott Hotel bombing in 2003 and knew of the Jemaah Islamiya's (JI) targets and plans to launch attacks elsewhere in Southeast Asia. He was involved in 2002 in the JI plot against the British High Commission in Phnom Penh, Cambodia, and in mid-2002 cased targets in Bangkok and Pattaya, Thailand, at Hambali's direction. Lillie was particularly interested in the ideas of martyrdom and was slated to be a suicide operative for an al-Qa'ida "second wave" attack targeting Los Angeles. Lillie also had links to now-deceased JI bombmaker Dr. Azahari bin Husin and in 2002 received bombmaking tutorials from Azahari. Lillie spent time in Kandahar, Afghanistan, in 2000, where he trained at al-Qa'ida's al-Faruq camp in weaponry and explosives. Lillie attended Polytechnic University Malaysia in the mid-1990s, where he earned a degree in architecture.

| NAME | Majid Khan |
|---|---|
| PHONETICS | MAH-jid KAHN |
| KEY ALIAS(ES) | Yusif |
| AFFILIATION(S) | Al-Qa'ida |
| NATIONALITY | Pakistani |

Before his 2003 capture, Pakistani national Majid Khan was an al-Qa'ida operative with direct connections to the United States. In 1996, Khan moved to the United States with his family and settled in Baltimore, Maryland, but never obtained US citizenship. After graduating from high school in 1999, Khan became involved in a local Islamic organization and, in early 2002, returned to Pakistan. In Pakistan, Khan's uncle and cousin, who were al-Qa'ida operatives, introduced Khan to senior al-Qa'ida operational planner Khalid Shaykh Muhammad (KSM), who selected Khan as an operative for a possible attack inside the United States. KSM selected Khan because of his excellent English and extensive knowledge of the United States.

- During his stay in the United States, Khan worked at his family's gas station and was, therefore, able to assist KSM with his research into the feasibility of a plan to blow up gas stations in the United States. In support of this plot, Khan attended a training course at which he learned how to construct explosive timing devices.

- KSM further tasked Khan to conduct research on poisoning US water reservoirs and considered Khan for an operation to assassinate Pakistani President Musharraf. In addition, Khan passed a test that KSM orchestrated which showed that Khan was committed to being a suicide operative.

- In the fall of 2002 Khan also delivered money to Zubair, an operative who worked directly for Jemaah Islamiya (JI) leader and al-Qa'ida's South Asia representative Hambali. The money was to support terrorist attacks against Western targets.

Khan and detained al-Qa'ida operative and facilitator 'Ammar al-Baluchi discussed with Uzair Paracha's father, Saifullah, a plan to use the New York office of Saifullah's Karachi-based textile import/export business to smuggle explosives into the United States for use with various al-Qa'ida attacks. Khan also had links to al-Qa'ida operatives and facilitators, most notably, Aafia Siddique, a US-educated neuroscientist and al-Qa'ida facilitator, who assisted Majid with documents to hide his travel to Pakistan from US authorities to reenter the United States.

In early 2003, Khan tapped Uzair Paracha, a US permanent resident alien he met in Pakistan through 'Ammar, to impersonate Khan in the United States to make it appear as if Khan had never left the United States and obtain immigration documents that would enable Khan to illegally reenter. Uzair Paracha was convicted and recently sentenced to 30 years imprisonment in the United States for material support to terrorism.

Khan recommended to KSM that Iyman Faris, a naturalized US citizen, be tasked for an al-Qa'ida operation. In 2003, Faris was convicted and sentenced to 20 years imprisonment in the United States on two counts pertaining to material support to terrorism. In 2002, Faris researched, at KSM's request, suspension bridges in New York and looked into obtaining the tools that would be necessary to cut bridge suspension cables.

| NAME | 'Abd al-Rahim al-Nashiri |
| PHONETICS | AHbd al-Rah-HEEM ah-NASH-er-REE |
| KEY ALIAS(ES) | Abd al-Rahim Hussein Muhammad Abdu (true name), Mullah Bilal, Bilal, Abu Bilal al-Makki, Khalid al-Safani, Amm Ahmad ("Uncle Ahmad") |
| AFFILIATION(S) | Al-Qa'ida |
| NATIONALITY | Saudi National of Yemeni descent |

'Abd al-Rahim al-Nashiri was al-Qa'ida's operations chief in the Arabian Peninsula until his capture in 2002. Trained in explosives, Nashiri honed his expertise in suicide attacks and maritime operations. He led cells in Qatar, Saudi Arabia, the UAE, and Yemen, and he was the mastermind and local manager of the bombing in October 2000 of the USS Cole. The success of the USS Cole operation appeared to have propelled Nashiri into a role of greater responsibility.

Born in Mecca on 5 January 1965, Nashiri ended his formal education after intermediate school and eventually followed in the footsteps of his uncles and cousins to become an extremist. He participated in Ibn al-Khattab's Chechen and Tajik insurgencies and became a trainer at al-Qa'ida's Khaldan camp in Afghanistan in 1992. After returning from Tajikistan, Nashiri, accompanied by al-Qa'ida operative Khallad bin 'Attash, first met Usama Bin Ladin in 1994. In 1997, Nashiri fought with the Taliban in Kabul and Jalalabad. The following year, Nashiri and his cousin, Jihad Muhammad Abu Ali, were implicated in a Bin Ladin–sponsored operation to smuggle Sagger missiles into Saudi Arabia for use against an unspecified US military target. Nashiri was the leader of the plot and a major player in the Saudi cell at that time.

Nashiri was tasked by Bin Ladin in a private meeting in Afghanistan in 1998 to attack a US or Western oil tanker off the coast of Yemen. This original objective was subsequently modified by Bin Ladin in 1999 to target a US military ship in the Port of Aden. Nashiri's operatives' first attempt was unsuccessful when their boat laden with explosives sank in January 2000—they were probably targeting the USS The Sullivans. On Bin Ladin's instructions to try again, his suicide operatives successfully attacked the USS Cole in October; Nashiri was in Afghanistan at the time of the attack.

At the time of his arrest, Nashiri was arranging funding for a plot to crash a small airplane into the bridge of a Western navy vessel in Port Rashid, UAE, an operation he had hoped to execute in November or December 2002. He also was orchestrating additional attacks, one targeting a US housing compound in Riyadh, Saudi Arabia, which he had planned for mid-2003. Nashiri abandoned a plot that he was involved in earlier in 2002 to attack warships in the Strait of Hormuz, but his operatives—on orders from Bin Ladin—in October 2002 rammed the French tanker MV Limburg off the coast of Yemen with a small boat. Other plots that Nashiri was involved in included a car bomb attack against a Saudi military installation at Tabuk aimed at killing US military personnel, attacks on oil tankers in the Strait of Gibraltar and Western warships passing through the Port of Dubai, and attacks against land-based targets in Morocco, Qatar, and Saudi Arabia. Nashiri was convicted and sentenced to death by a Yemeni court, in absentia, for his part in the USS Cole bombing.

| | |
|---|---|
| **NAME** | Abu Faraj al-Libi |
| **PHONETICS** | AH-boo FAH-raj ahl-LEE-bee |
| **KEY ALIAS(ES)** | Mustafa al-'Uzayti (probable true name), Mahfuz, 'Abd al-Hafiz, Abu Hamada, Tawfiq |
| **AFFILIATION** | Al-Qa'ida |
| **NATIONALITY** | Libyan |

Veteran paramilitary commander and facilitator in the Pakistan-Afghanistan theater Abu Faraj took on more direct operational responsibilities following the arrest in 2003 of former al-Qa'ida external operations chief and 11 September mastermind Khalid Shaykh Muhammad (KSM). He was the organization's general manager subordinate only to Usama Bin Ladin and Ayman al-Zawahiri beginning in mid-2003, while being heavily involved in financing operatives and their families.

Abu Faraj was a communications conduit for al-Qa'ida managers to Bin Ladin from August 2003 until his capture in 2005. He was the recipient of couriered messages and public statements from Bin Ladin and passed messages to Bin Ladin from both senior lieutenants and rank-and-file members. Some of his work almost certainly required personal meetings with Bin Ladin or Zawahiri, a privilege reserved since 2002 for select members of the group.

Abu Faraj had frequent contact with now-deceased senior operational planner Hamza Rabi'a, and other senior managers involved with al-Qa'ida's external operations and paramilitary efforts. Abu Faraj searched for operatives on Rabi'a's behalf, including those who could travel to the United States for attacks, and he also asked now-deceased al-Qa'ida in Iraq leader Abu Mus'ab al-Zarqawi to target US interests outside of Iraq.

- Abu Faraj was suspected of involvement in plots to assassinate Pakistani President Musharraf.

- Abu Faraj served as a trainer in the early 1990s and later helped to administer al-Qa'ida's training camps in Afghanistan.

| NAME | Zayn al-'Abidin Abu Zubaydah |
|---|---|
| PHONETIC | AH-Boo Zoo-BAY-duh |
| KEY ALIASES | Hani, Tariq |
| AFFILIATIONS | Al-Qa'ida |
| NATIONALITY | Palestinian, raised in Saudi Arabia |

Zayn al-'Abidin Abu Zubaydah was a leading extremist facilitator who operated in the Afghanistan-Pakistan region from the mid-1990s. Bin Ladin recruited him to be one of al-Qa'ida's senior travel facilitators following Abu Zubaydah's success in 1996 at securing safe passage of al-Qa'ida members returning from Sudan to Afghanistan. In November 2001, Abu Zubaydah helped smuggle now-deceased al-Qa'ida in Iraq leader Abu Mus'ab al-Zarqawi and some 70 Arab fighters out of Kandahar, Afghanistan, into Iran.

- At the time of his capture, Abu Zubaydah was trying to organize a terrorist attack in Israel and he had enlisted the help of Zarqawi in finding a smuggling route into Israel for moving persons and materials.

- Although not believed to be directly linked to the attacks on 11 September 2001, the $50,000 that Abu Zubaydah received from Saudi donors and passed to al-Qa'ida's senior leadership for his Israel plot may have been used for the attacks. Moreover, three of the hijackers received basic training at al-Qa'ida's Khaldan camp in Afghanistan, which was part of the "Khaldan group" of camps and guesthouses that he oversaw between 1995 and 2000.

Abu Zubaydah's early work as an extremist facilitator in the mid-1990s focused on recruiting Arabs in Pakistan and arranging their travel for various training camps in Afghanistan and the frontlines of Bosnia and Chechnya. Between 1994 and early 2000, he often smuggled both persons and chemicals—such as cyanide and nitrates for use by al-Qa'ida in making weapons—from Pakistan into Afghanistan. He learned document forgery and trained in explosives at the Khaldan camp, where he advanced to become instructor and then administrative director. In his role as a senior mujahidin facilitator and Khaldan camp director, he assisted Western-based trained extremists, including Americans.

- Abu Zubaydah established a document forgery network in Pakistan that supported al-Qa'ida and other extremist groups. In the late 1990s, he procured funds from donors in Kuwait, Saudi Arabia, and the United Arab Emirates, which he doled out to various contacts in Pakistan-based extremist networks for their terrorist activities.

- Abu Zubaydah also assisted US Millennium Plot operative Ahmad Ressam to enter Afghanistan to attend a training camp in the late 1990s and to travel to Canada via the United States at the end of 1998. He facilitated the travel and training of the Jordanian cell that was involved in Jordan's Millennium Plot.

| NAME | Ramzi Bin al-Shibh |
|------|---------------------|
| PHONETICS | Rahm-zee bihn-uhl-SHEEB |
| KEY ALIASES | Abu Ubaydah, 'Umar Muhammad 'Abdallah Ba' Amar |
| AFFILIATION | Al-Qa'ida |
| NATIONALITY | Yemeni |

Ramzi Bin al-Shibh, a key facilitator for the attacks on 11 September 2001, was a lead operative—until his capture in 2002—in the post-11 September plot conceived of by 11 September mastermind Khalid Shaykh Muhammad (KSM) to hijack aircraft and crash them into Heathrow Airport in the United Kingdom.

Bin al-Shibh was born in 1972 in southern Yemen. He noted that he was religious from the age of 12 and fought briefly in Yemen's civil war in 1994. After two attempts to immigrate to the United States failed, Bin al-Shibh traveled to Germany, where he applied for political asylum under an assumed name and as a Sudanese citizen. Denied his request for asylum in January 1996, he left Germany and returned to Yemen, where he applied for a visa in his true name. In December 1997, he returned to Germany, where he became a student. In Hamburg, he met hijackers Muhammad Atta, Marwan al-Shehhi, and Ziad Jarrah.

Bin al-Shibh, Atta, al-Shehhi, and Jarrah traveled to Afghanistan in 1999. In Afghanistan, the four men met Usama Bin Ladin, pledged their loyalty to him, and readily accepted Bin Ladin's proposal to martyr themselves in an operation against the United States. Bin al-Shibh was slated to be one of the 11 September hijacker pilots. He and Atta traveled to Karachi, where they met with KSM.

- After returning to Germany in early 2000, Bin al-Shibh obtained a new passport but was unable to obtain a US visa, despite four attempts. Bin al-Shibh said that in late 2000 he tried to convince a US citizen in San Diego via e-mail to marry him to gain entry into the United States, but Atta convinced him to abandon the idea.

During the eight months before the attacks, Bin al-Shibh was the primary communications intermediary between the hijackers in the United States and al-Qa'ida's leadership in Afghanistan and Pakistan. He relayed orders from al-Qa'ida senior operatives to Atta via e-mail or phone, and he met with Atta in Germany in January 2001 and in Spain in July 2001 for in-depth briefings from Atta on the progress of the plot. He also made travel plans to the United States for some of the 11 September terrorists and facilitated the transfer of money to the 11 September terrorists, including convicted terrorist Zacharias Moussaoui. After learning from Atta in late August 2001 of the date of the hijacking attacks, Bin al-Shibh passed the information to KSM.

- A week before the 11 September attacks, Bin al-Shibh left Germany and arrived in Afghanistan three or four days after the attacks. In late 2001, he fled Afghanistan after the collapse of the Taliban and began working with KSM on follow-on plots against the West, particularly the Heathrow plot. He was tasked by KSM to recruit operatives in Saudi Arabia for an attack on Heathrow Airport, and, as of his capture, Bin al-Shibh had identified four operatives for the operation.

| | |
|---|---|
| NAME | Zubair |
| PHONETICS | zoo-BEAR |
| KEY ALIAS(ES) | Mohd Farik bin Amin (true name), Zaid |
| AFFILIATION(S) | Jemaah Islamiya and al-Qa'ida |
| NATIONALITY | Malaysian |

Al-Qa'ida and Jemaah Islamiya (JI) member Mohd Farik Bin Amin—best known as Zubair—served directly under JI operational planner Hambali. As one of Hambali's trusted associates, Zubair assisted in Hambali's operations, which included casing targets for JI planned attacks, until his capture in 2003. Hambali in November 2001 tapped Zubair to be a suicide operative for an al-Qa'ida attack targeting Los Angeles. Zubair played a role in transferring funds used to finance terrorist attacks in Southeast Asia from al-Qa'ida operations chief Khalid Shaykh Muhammad to Hambali. Zubair received small arms and combat tactics training at al-Qa'ida's al-Faruq Camp in Afghanistan in 2000 and again in 2001. While earning his degree in electronics telecommunications in Malaysia, Zubair met fellow student Bashir Bin Lap (a.k.a. Lillie), who also later became one of Hambali's lieutenants and was captured with Hambali in 2003.

| | |
|---|---|
| **NAME** | Walid Bin 'Attash |
| **PHONETICS** | wah-LEED bin AH-tush |
| **KEY ALIASES** | Khallad Bin 'Attash, Silver |
| **AFFILIATION** | Al-Qa'ida |
| **NATIONALITY** | Yemeni, born and raised in Saudi Arabia |

Walid Bin 'Attash, best known as Khallad, was a key al-Qa'ida operative from 1998 until his capture in 2003. Khallad, who is 27, is the scion of a prominent terrorist family: his father, Muhammad, was close to Usama Bin Ladin, and several of Khallad's brothers went to Afghanistan to train and fight in the 1990s; two of these brothers were killed—including one during US airstrikes in Afghanistan in late 2001—and another, Hassan, has been detained at Guantanamo Bay since 2004.

Khallad arrived in Afghanistan in about 1995 and trained at a number of camps. In 1996, after Bin Ladin's return to Afghanistan from Sudan, Khallad alternated between serving as a bodyguard for the al-Qa'ida leader and participating in combat against the Northern Alliance; he lost his right leg during a battlefield accident in 1997. In 1998, Bin Ladin began using Khallad operationally, first as the al-Qa'ida leader's intermediary to al-Qa'ida Arabian Peninsula network chief 'Abd al-Rahim al-Nashiri; together during 1998 and 1999, Khallad and Nashiri worked together on the maritime plot that culminated in the bombing of the USS Cole in October 2000. In early 1999, Bin Ladin reportedly selected him to become a hijacker in the operation on 11 September 2001, but he was arrested in Yemen in April of that year while attempting to obtain a US visa because local authorities suspected he was a different extremist. Although his brief imprisonment blocked his travel to the United States, Khallad otherwise assisted in the operation, including helping Bin Ladin select additional hijackers and traveling to Kuala Lumpur and Bangkok during December 1999-January 2000 to meet with hijackers Nawaf al-Hazmi and Khalid al-Mihdhar and to take two flights on a US-flagged airliner to assess in-flight security procedures.

- In late 1999, Bin Ladin asked him to help select about two-dozen experienced and reliable operatives for special training at the Mes Aynak camp in Afghanistan; Khallad supervised the training at the camp; many of these operatives went on to participate in prominent operations: one became a suicide bomber in the Cole operation; two were later 11 September hijackers; another was a cell leader who was killed during the suicide bombings in Riyadh in May 2003; and yet another gained renown for his involvement in the bombing of the Limburg in October 2002 and for his plot to assassinate the US Ambassador to Yemen.

After the attacks on 11 September, Khallad helped prepare al-Qa'ida's defenses around Tora Bora, then fled Afghanistan after the collapse of the Taliban in late 2001. In early January 2002, Khallad arrived in Karachi, where he served as a communications link between al-Qa'ida's senior leadership and the network in Saudi Arabia—particularly after the detention of al-Nashiri in late 2002—and assisted in the movement of operatives from South and Southeast Asia to the Arabian Peninsula. He also aided efforts by Khalid Shaykh Muhammad (KSM) to recruit Saudi hijackers for the al-Qa'ida plot to hijack airliners to attack Heathrow Airport.

- In the months before his arrest, Khallad and KSM's nephew 'Ammar al-Baluchi were organizing a plot to carry out simultaneous attacks in Karachi against the US Consulate, Western travelers at the airport, and Westerners residing in the Karachi area. The plot was close to execution when he was detained.

| NAME | Khalid Shaykh Muhammad |
|------|------------------------|
| PHONETICS | HAH-lid SHAKE moo-HAH-mud |
| KEY ALIAS | Mukhtar |
| AFFILIATION | Al-Qa'ida |
| NATIONALITY | Baluchi born and raised in Kuwait |

Khalid Shaykh Muhammad (KSM) is one of history's most infamous terrorists, and his capture in 2003 deprived al-Qa'ida of one of its most capable senior operatives. He devoted most of his adult life to terrorist plotting, specifically against the United States, and was the driving force behind the attacks on 11 September 2001 as well as several subsequent plots against US and Western targets worldwide.

After graduating from North Carolina A&T State University in 1986 with a degree in mechanical engineering, KSM traveled to Afghanistan to participate in the anti-Soviet fighting there. KSM joined Yousef in the Philippines in 1994 to plan the "Bojinka" plot—the simultaneous bombings of a dozen US-flagged commercial airliners over the Pacific. After the plot was disrupted and Yousef was caught in early 1995, KSM was indicted for his role in the plot and went into hiding. By 1999, he convinced Usama Bin Ladin to provide him with operatives and funding for a new airliner plot, which culminated in the attacks on 11 September two years later.

- KSM headed al-Qa'ida's Media Committee from 2000 and he helped build close operational ties between al-Qa'ida and the Jemaah Islamiya (JI) terrorist group that was plotting against US and Israeli targets in Southeast Asia.

By late 2001, with the collapse of the Taliban regime and the dispersal of al-Qa'ida's leadership, the prestige associated with engineering the attacks on 11 September propelled KSM into the role of external operations chief for al-Qa'ida.

- In addition to plots targeting Britain, KSM launched several plots targeting the US Homeland, including a plot in late 2001 to have JI suicide operatives hijack a plane over the Pacific and crash it into a skyscraper on the US West Coast; a plan in early 2002 to send al-Qa'ida operatives to conduct attacks in the U.S.; and a plot in early 2003 to employ a network of Pakistanis—including Majid Khan—to smuggle explosives into New York and to target gas stations, railroad tracks, and a bridge in New York.

| | |
|---|---|
| **NAME** | Gouled Hassan Dourad |
| **PHONETICS** | Goo-LED HAH-san Door-AHD |
| **KEY ALIAS(ES)** | Guleed Hassan Ahmad, Hanad |
| **AFFILIATION(S)** | al-Qa'ida, al-Ittihad al-Islami |
| **NATIONALITY** | Somali |

Gouled Hassan Dourad was the head of a Mogadishu-based facilitation network of al-Ittihad al-Islami (AIAI) members that supported al-Qa'ida members in Somalia. Gouled was a member of a small, selective group of AIAI members who worked for the East African al-Qa'ida cell led by Abu Talha al-Sudani—Gouled's responsibilities included locating safehouses, assisting in the transfer of funds, and procuring weapons, explosives, and other supplies.

• Reporting suggests that Gouled carried out one operational mission for Abu Talha during September–October 2003, he cased the US military base in Djibouti—Camp Lemonier—as part of Abu Talha's plot to conduct a suicide truck-bombing attack. He also was tasked by Abu Talha to purchase two rocket-propelled grenades, five AK-47 assault rifles and four 9mm pistols, which he delivered to Abu Talha in mid-2003.

• Gouled was privy to several terrorist plots under consideration by his AIAI cell, including shooting down an Ethiopian jetliner landing at an airport in Somalia in 2003 and kidnapping Western workers of nongovernmental organizations in Hargeysa, Somalia, in 2002 as a means to raise money for future AIAI operations. Following Gouled's arrest, AIAI terrorists on 19 March 2004 tried unsuccessfully to kidnap a German aid worker and murdered a Kenyan contract employee in Hargeysa.

Gouled was born in Mogadishu in 1974; when the Somali civil war erupted in 1991, his parents sent him to Germany, where he lived in a refugee camp. He traveled to Sweden and gained asylum there in 1993. In 1994, he attempted travel to the United States but was turned back in Iceland because of his fraudulent passport.

• While in Sweden, Gouled attended a Somali mosque, whose imam arranged for Gouled and his friend, future AIAI bombmaker Qasim Mohamed, to train in Afghanistan before joining the Somali war effort. Gouled trained at Khaldan camp in weapons and explosives from January through October 1996 and at another camp in Khowst in assassination techniques for several months. By late 1996, he returned to Somalia.

Gouled became a member of AIAI in 1997 out of a commitment to support the Somali war against Ethiopia and to win the Ogaden region of Ethiopia back for Somalia. He fought against the Ethiopians in Ogaden off and on from 1997 to 2002 and trained AIAI fighters. He allegedly became associated with al-Qa'ida because its members were in Somalia and his AIAI cell supported al-Qa'ida.

• Gouled was introduced to Abu Talha al-Sudani—who came to Mogadishu to hide following the Mombasa attacks in November 2002—in early 2003 by his AIAI cell leader. Gouled was recruited to work for Abu Talha, in part, because he had trained in Afghanistan; spoke Arabic, English, some Swedish, and Somali; and had a high-school education.

# EXHIBIT S

Copyright 2002 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

December 26, 2002 Thursday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2838 words

**HEADLINE:** U.S. Decries Abuse but Defends Interrogations;
'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities

**BYLINE:** Dana Priest and Barton Gellman, Washington Post Staff Writers

**BODY:**

Deep inside the forbidden zone at the U.S.-occupied Bagram air base in Afghanistan, around the corner from the detention center and beyond the segregated clandestine military units, sits a cluster of metal shipping containers protected by a triple layer of concertina wire. The containers hold the most valuable prizes in the war on terrorism -- captured al Qaeda operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights -- subject to what are known as "stress and duress" techniques.

Those who cooperate are rewarded with creature comforts, interrogators whose methods include feigned friendship, respect, cultural sensitivity and, in some cases, money. Some who do not cooperate are turned over -- "rendered," in official parlance -- to foreign intelligence services whose practice of torture has been documented by the U.S. government and human rights organizations.

In the multifaceted global war on terrorism waged by the Bush administration, one of the most opaque -- yet vital -- fronts is the detention and interrogation of terrorism suspects. U.S. officials have said little publicly about the captives' names, numbers or whereabouts, and virtually nothing about interrogation methods. But interviews with several former intelligence officials and 10 current U.S. national security officials -- including several people who witnessed the handling of prisoners -- provide insight into how the U.S. government is prosecuting this part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of dubious human rights reputation, in which the traditional lines between right and wrong, legal and inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security officials interviewed for this article defended the use of violence against captives as just and necessary. They expressed confidence that the American public would back their view. The CIA, which has primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA.."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or

manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services -- notably those of Jordan, Egypt and Morocco -- with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members.

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members have come in recent months," he said.

Many of these successes have come as a result of information gained during interrogations. The capture of al Qaeda leaders Ramzi Binalshibh in Pakistan, Omar al-Faruq in Indonesia, Abd al-Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

Time, rather than technique, has produced the most helpful information, several national security and intelligence officials said. Using its global computer database, the CIA is able to quickly check leads from captives in one country with information divulged by captives in another.

"We know so much more about them now than we did a year ago -- the personalities, how the networks are established, what they think are important targets, how they think we will react," said retired Army general Wayne Downing, the Bush administration's deputy national security adviser for combating terrorism until he resigned in June.

"The interrogations of Abu Zubaida drove me nuts at times," Downing said. "He and some of the others are very clever guys. At times I felt we were in a classic counter-interrogation class: They were telling us what they think we already knew. Then, what they thought we wanted to know. As they did that, they fabricated and weaved in threads that went nowhere. But, even with these ploys, we still get valuable information and they are off the street, unable to plot and coordinate future attacks."

In contrast to the detention center at Guantanamo Bay, where military lawyers, news reporters and the Red Cross received occasional access to monitor prisoner conditions and treatment, the CIA's overseas interrogation facilities are off-limits to outsiders, and often even to other government agencies. In addition to Bagram and Diego Garcia, the CIA has other secret detention centers overseas, and often uses the facilities of foreign intelligence services.

Free from the scrutiny of military lawyers steeped in the international laws of war, the CIA and its intelligence service allies have the leeway to exert physically and psychologically aggressive techniques, said national security officials and U.S. and European intelligence officers.

Although no direct evidence of mistreatment of prisoners in U.S. custody has come to light, the prisoners are denied access to lawyers or organizations, such as the Red Cross, that could independently assess their treatment. Even their names are secret.

This month, the U.S. military announced that it had begun a criminal investigation into the handling of two prisoners who died in U.S. custody at the Bagram base. A base spokesman said autopsies found one of the detainees died of a pulmonary embolism, the other of a heart attack.

Al Qaeda suspects are seldom taken without force, and some suspects have been wounded during their capture. After apprehending suspects, U.S. take-down teams -- a mix of military special forces, FBI agents, CIA case officers and local allies -- aim to disorient and intimidate them on the way to detention facilities.

According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subjected to loud noises and deprived of sleep. The tone of intimidation and fear is the beginning, they said, of a process of piercing a prisoner's resistance.

The take-down teams often "package" prisoners for transport, fitting them with hoods and gags, and binding them to stretchers with duct tape.

Bush administration appointees and career national security officials acknowledged that, as one of them put it, "our guys may kick them around a little bit in the adrenaline of the immediate aftermath." Another said U.S. personnel are scrupulous in providing medical care to captives, adding in a deadpan voice, that "pain control [in wounded patients] is a very subjective thing."

The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.

"In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S. official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

The official added: "We're not aware of any torture or even physical abuse."

Tenet acknowledged the Saudis' role in his Dec. 11 speech. "The Saudis are proving increasingly important support to our counterterrorism efforts -- from making arrests to sharing debriefing results," he said.

But Saudi Arabia is also said to withhold information that might lead the U.S. government to conclusions or policies that the Saudi royal family fears. U.S. teams, for that reason, have sometimes sent Saudi nationals to Egypt instead.

Jordan is a favored country for renditions, several U.S. officials said. The Jordanians are considered "highly professional" interrogators, which some officials said meant that they do not use torture. But the State Department's 2001 human rights report criticized Jordan and its General Intelligence Directorate for arbitrary and unlawful detentions and abuse.

"The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions and extended solitary confinement," the 2001 report noted. Jordan also is known to use prisoners' family members to induce suspects to talk.

Another significant destination for rendered suspects is Morocco, whose general intelligence service has sharply stepped up cooperation with the United States. Morocco has a documented history of torture, as well as longstanding ties to the CIA..

The State Department's human rights report says Moroccan law "prohibits torture, and the government claims that the use of torture has been discontinued; however, some members of the security forces still tortured or otherwise abused detainees."

In at least one case, U.S. operatives led the capture and transfer of an al Qaeda suspect to Syria, which for years has been near the top of U.S. lists of human rights violators and sponsors of terrorism. The German government strongly protested the move. The suspect, Mohammed Haydar Zammar, holds joint German and Syrian citizenship. It could not be learned how much of Zammar's interrogation record Syria has provided the CIA.

The Bush administration maintains a legal distance from any mistreatment that occurs overseas, officials said, by denying that torture is the intended result of its rendition policy. American teams, officials said, do no more than assist in the transfer of suspects who are wanted on criminal charges by friendly countries. But five officials acknowledged, as one of them put it, "that sometimes a friendly country can be invited to 'want' someone we grab." Then, other officials said, the foreign government will charge him with a crime of some sort.

One official who has had direct involvement in renditions said he knew they were likely to be tortured. "I . . . do it with my eyes open," he said.

According to present and former officials with firsthand knowledge, the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries.

"Based largely on the Central American human rights experience," said Fred Hitz, former CIA inspector general, "we don't torture, and we can't countenance torture in terms of we can't know of it." But if a country offers information gleaned from interrogations, "we can use the fruits of it."

Bush administration officials said the CIA, in practice, is using a narrow definition of what counts as "knowing" that a suspect has been tortured. "If we're not there in the room, who is to say?" said one official conversant with recent reports of renditions.

The Clinton administration pioneered the use of extraordinary rendition after the bombings of U.S. embassies in Kenya and Tanzania in 1998. But it also pressed allied intelligence services to respect lawful boundaries in interrogations.

After years of fruitless talks in Egypt, President Bill Clinton cut off funding and cooperation with the directorate of Egypt's general intelligence service, whose torture of suspects has been a perennial theme in State Department human rights reports.

"You can be sure," one Bush administration official said, "that we are not spending a lot of time on that now."

Staff writers Bob Woodward, Susan Schmidt and Douglas Farah, and correspondent Peter Finn in Berlin, contributed to this report.

**LOAD-DATE:** December 26, 2002

# EXHIBIT
# T

# THE 9/11
# COMMISSION
# REPORT

# CONTENTS

*List of Illustrations and Tables   ix*

*Member List   xi*

*Staff List   xiii–xiv*

*Preface   xv*

1. "WE HAVE SOME PLANES"   1
   1.1   Inside the Four Flights   1
   1.2   Improvising a Homeland Defense   14
   1.3   National Crisis Management   35

2. THE FOUNDATION OF THE NEW TERRORISM   47
   2.1   A Declaration of War   47
   2.2   Bin Ladin's Appeal in the Islamic World   48
   2.3   The Rise of Bin Ladin and al Qaeda (1988–1992)   55
   2.4   Building an Organization, Declaring
         War on the United States (1992–1996)   59
   2.5   Al Qaeda's Renewal in Afghanistan (1996–1998)   63

3. COUNTERTERRORISM EVOLVES   71
   3.1   From the Old Terrorism to the New:
         The First World Trade Center Bombing   71
   3.2   Adaptation—and Nonadaptation—
         in the Law Enforcement Community   73
   3.3   . . . and in the Federal Aviation Administration   82
   3.4   . . . and in the Intelligence Community   86

v

3.5    . . . and in the State Department and the Defense Department   93
3.6    . . . and in the White House   98
3.7    . . . and in the Congress   102

4.  RESPONSES TO AL QAEDA'S INITIAL ASSAULTS   108
4.1    Before the Bombings in Kenya and Tanzania   108
4.2    Crisis: August 1998   115
4.3    Diplomacy   121
4.4    Covert Action   126
4.5    Searching for Fresh Options   134

5.  AL QAEDA AIMS AT THE AMERICAN HOMELAND   145
5.1    Terrorist Entrepreneurs   145
5.2    The "Planes Operation"   153
5.3    The Hamburg Contingent   160
5.4    A Money Trail?   169

6.  FROM THREAT TO THREAT   174
6.1    The Millennium Crisis   174
6.2    Post-Crisis Reflection: Agenda for 2000   182
6.3    The Attack on the USS *Cole*   190
6.4    Change and Continuity   198
6.5    The New Administration's Approach   203

7.  THE ATTACK LOOMS   215
7.1    First Arrivals in California   215
7.2    The 9/11 Pilots in the United States   223
7.3    Assembling the Teams   231
7.4    Final Strategies and Tactics   241

8.  "THE SYSTEM WAS BLINKING RED"   254
8.1    The Summer of Threat   254
8.2    Late Leads—Mihdhar, Moussaoui, and KSM   266

9.  HEROISM AND HORROR   278
9.1    Preparedness as of September 11   278
9.2    September 11, 2001   285
9.3    Emergency Response at the Pentagon   311
9.4    Analysis   315

10. WARTIME  325
    10.1  Immediate Responses at Home  326
    10.2  Planning for War  330
    10.3  "Phase Two" and the Question of Iraq  334

11. FORESIGHT—AND HINDSIGHT  339
    11.1  Imagination  339
    11.2  Policy  348
    11.3  Capabilities  350
    11.4  Management  353

12. WHAT TO DO? A GLOBAL STRATEGY  361
    12.1  Reflecting on a Generational Challenge  361
    12.2  Attack Terrorists and Their Organizations  365
    12.3  Prevent the Continued Growth of Islamist Terrorism  374
    12.4  Protect against and Prepare for Terrorist Attacks  383

13. HOW TO DO IT? A DIFFERENT WAY OF
    ORGANIZING THE GOVERNMENT  399
    13.1  Unity of Effort across the Foreign-Domestic Divide  400
    13.2  Unity of Effort in the Intelligence Community  407
    13.3  Unity of Effort in Sharing Information  416
    13.4  Unity of Effort in the Congress  419
    13.5  Organizing America's Defenses in the United States  423

*Appendix A: Common Abbreviations*  429
*Appendix B: Table of Names*  431
*Appendix C: Commission Hearings*  439
*Notes*  449

434                              APPENDIX

| | |
|---|---|
| Ali Abdul Aziz Ali | (a.k.a. Ammar al Baluchi) Pakistani; KSM's nephew; financial and travel facilitator for 9/11 plot |
| Ahmad Khalil Ibrahim Samir al Ani | Iraqi intelligence officer who allegedly met with Atta in Prague, Czech Republic; currently in U.S. custody |
| Mohamed Atta | Egyptian; tactical leader of 9/11 plot; pilot/hijacker (AA 11) (deceased) |
| Mohammed Atef | (a.k.a. Abu Hafs al Masri) Egyptian; al Qaeda military commander (deceased) |
| Tawfiq bin Attash | (a.k.a. Khallad, Waleed bin Attash) Yemeni; senior al Qaeda operative connected to the U.S. embassy bombings, the USS *Cole* attack, and the 9/11 attacks; currently in U.S. custody |
| Anwar Aulaqi | U.S. citizen; Imam at Rabat mosque (San Diego, CA) and later at Dar al Hijra mosque (Falls Church, VA), who associated with two 9/11 hijackers |
| Abdullah Azzam | Palestinian; founder of the Maktab al Khidmat, which provided logistical support to mujahideen in Afghanistan (deceased) |
| Jamal al Badawi | Yemeni; co-conspirator arrested in Yemen for the USS *Cole* attack |
| Said Bahaji | German son of Moroccan immigrant; Hamburg cell associate |
| Saeed al Baluchi | Saudi; candidate 9/11 hijacker |
| Fayez Banihammad | Emirati; 9/11 hijacker (UA 175) (deceased) |
| Abu Ubaidah al Banshiri | Egyptian; al Qaeda military commander until 1996 (deceased) |
| Abu Bara al Yemeni | (a.k.a. Abu al Bara al Ta'izi, Suhail Shurabi, and Barakat) Yemeni; potential suicide bomber in original 9/11 plot |
| Ramzi Binalshibh | Yemeni; Hamburg cell member; coordinator for 9/11 plot; currently in U.S. custody |
| Omar Hassan Ahmed al Bashir | President of Sudan, 1989– |
| Abu Bakar Bashir | Indonesian; spiritual leader and founder of Jemaah Islamiya, al Qaeda–affiliated terrorist group in Southeast Asia |
| Omar al Bayoumi | Saudi; assisted two 9/11 hijackers in San Diego, CA |
| Khalil Deek | U.S. citizen; created electronic version of *Encyclopedia of Jihad*; believed to be involved in millen- |

APPENDIX                                                    435

|  |  |
|---|---|
|  | nium plot to destroy tourist landmarks in Jordan |
| Caysan Bin Don | (a.k.a Isamu Dyson, a.k.a Clayton Morgan) U.S. citizen; met two 9/11 hijackers in Los Angeles and San Diego, CA |
| Zakariya Essabar | Moroccan; Hamburg cell associate |
| Jamal Ahmed Mohamed al Fadl | Sudanese; al Qaeda member who defected to the United States in 1996 |
| Ahmed al Ghamdi | Saudi; 9/11 hijacker (UA 175) (deceased) |
| Ali Abd al Rahman al Faqasi al Ghamdi | (a.k.a. Abu Bakr al Azdi) Saudi; candidate 9/11 hijacker; currently in U.S. custody |
| Hamza al Ghamdi | Saudi; 9/11 hijacker (UA 175) (deceased) |
| Saeed al Ghamdi | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Saeed ("Jihad") al Ghamdi | Saudi; candidate 9/11 hijacker |
| Hassan Ghul | Pakistani; al Qaeda facilitator; currently in U.S. custody |
| Abu Hafs al Masri | *see* Mohammed Atef |
| Abu Hafs al Mauritani | Mauritanian; senior al Qaeda theologian |
| Wadi al Hage | U.S. citizen; al Qaeda operative; Bin Ladin's personal assistant; convicted in embassy bombings trial |
| Mushabib al Hamlan | Saudi; candidate 9/11 hijacker |
| Hani Hanjour | Saudi; 9/11 pilot/hijacker (AA 77) (deceased) |
| Mustafa al Hawsawi | Saudi; al Qaeda media committee member; financial and travel facilitator for 9/11 plot |
| Nawaf al Hazmi | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Salem al Hazmi | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Ahmad al Haznawi | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Gulbuddin Hekmatyar | Afghani; founder and leader of the Hizb-e-Islami, a Taliban opposition group; Prime Minister of Afghanistan, 1993–1994; 1996 |
| Saddam Hussein | President of Iraq, 1979–2003 |
| Zein al Abideen Mohamed Hussein | (a.k.a. Abu Zubaydah) Palestinian; al Qaeda associate; currently in U.S. custody |
| Abu Hajer al Iraqi | *see* Mamdouh Mahmud Salim |
| Riduan Isamuddin | (a.k.a. Hambali) Indonesian; operational leader of Jemaah Islamiya; currently in U.S. custody |
| Ziad Jarrah | Lebanese; 9/11 pilot/hijacker (UA 93) (deceased) |
| Abderraouf Jdey | (a.k.a. Faruq al Tunisi) Tunisian/Canadian; candidate 9/11 hijacker |

436                              APPENDIX

| | |
|---|---|
| Mohamed al Kahtani | Saudi; candidate 9/11 hijacker; currently in U.S. custody |
| Mir Amal Kansi | Pakistani; extremist who killed two CIA employees at CIA headquarters in Virginia in 1993 (executed) |
| Hamid Karzai | Interim Leader and later President of Afghanistan, Dec. 2001– |
| Younis Khalis | Afghani; leader of Hizb-e-Islami; hosted UBL upon his return to Afghanistan in 1996 |
| Khallad | *see* Tawfiq bin Attash |
| Wali Khan Amin Shah | (a.k.a. Osama Asmurai) Turkmen; early associate of Usama Bin Ladin; convicted in Manila air (Bojinka) plot |
| Ibn al Khattab | Saudi; mujahid leader in Chechnya |
| L'Houssaine Kherchtou | (a.k.a. Joe the Moroccan, Abu Talal) Moroccan; former al Qaeda member who broke with Bin Ladin and became a U.S. government informant |
| Usama Bin Ladin | (UBL) Saudi; head of al Qaeda |
| Ibn al Shaykh al Libi | Libyan; head of jihadist training camp in Afghanistan |
| Ahmed al Nami | Saudi; 9/11 hijacker (UA 93) (deceased) |
| Sheikh Saeed al Masri | Egyptian; head of al Qaeda finance committee |
| Ahmed Shah Massoud | Leader of Afghanistan's Northern Alliance, a Taliban opposition group (assassinated Sept. 9, 2001) |
| Khalid al Mihdhar | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Khalid Sheikh Mohammed | (KSM) (a.k.a. Mukhtar) Pakistani; mastermind of 9/11 attacks; currently in U.S. custody |
| Majed Moqed | Saudi; 9/11 hijacker (AA 77) (deceased) |
| Mounir el Motassadeq | Moroccan; Hamburg cell associate |
| Zacarias Moussaoui | French; arrested in the U.S. in connection with the 9/11 attacks |
| Hosni Mubarak | President of Egypt, 1981– |
| Pervez Musharraf | Leader of Pakistan, 1999– |
| Abdelghani Mzoudi | Moroccan; Hamburg cell associate |
| Qutaybah al Najdi | Saudi; candidate 9/11 hijacker |
| Abd al Rahim al Nashiri | (a.k.a. Mullah Bilal) Saudi; mastermind of USS *Cole* attack; currently in U.S. custody |
| Mullah Mohammed Omar | Leader of Afghanistan's Taliban, which ruled most of the country from 1996 to 2001 |
| Abdul Aziz al Omari | Saudi; 9/11 hijacker (AA 11) (deceased) |
| Muammar Qadhafi | Leader of Libya, 1970– |

# EXHIBIT
# U

LEXSEE 2006 U.S. DIST. LEXIS 1

UNITED STATES OF AMERICA -against- UZAIR PARACHA, Defendant.

03 Cr. 1197 (SHS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2006 U.S. Dist. LEXIS 1; 69 Fed. R. Evid. Serv. (Callaghan) 130*

January 3, 2006, Decided
January 3, 2006, Filed

**SUBSEQUENT HISTORY:** Affirmed by *United States v. Paracha, 2008 U.S. App. LEXIS 12937 (2d Cir., June 19, 2008)*

**PRIOR HISTORY:** *United States v. Paracha, 2004 U.S. Dist. LEXIS 16892 (S.D.N.Y., Aug. 24, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant was convicted by a jury on charges of, inter alia, providing material support to a terrorist organization (al Qaeda) in violation of *18 U.S.C.S. § 2339B*; the district court subsequently set forth with greater specificity the reasoning behind three of its evidentiary trial determinations.

**OVERVIEW:** Concerning the defendant's access to witnesses to take pretrial depositions to preserve testimony for trial of prospective defense witnesses held outside of the United States, the district court clarified that it rejected the Government's contention that separation of powers principles placed the witnesses beyond the court's compulsory process power but held that alternative means of presenting the witnesses' testimony to the jury would satisfy the defendant's *Sixth* and *Fifth Amendment* rights. Likewise, the court found that the Government sufficiently demonstrated the reliability of its proposed terrorism expert's peer review based "vetting" methodology in forming his opinions on al Qaeda's origins, leaders, and certain tradecraft. Finally, as to the court's jury instructions on the mens rea requirement for *18 U.S.C.S. § 2339B*, the court specified that to sustain a conviction the Government must prove that the defendant acted knowing that what he was providing could further the interests of al Qaeda as an organization, not simply the personal interests of its individual members and that

knowledge that what the defendant provided was, in fact, "material support" was not required.

**OUTCOME:** The district court set forth with greater specificity the reasoning behind its trial determinations related to defendant's conviction on charges of providing material support to a terrorist organization.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Discovery & Inspection > Depositions*
[HN1] *Fed. R. Crim. P. 15(a)* authorizes a party to move for the deposition of a prospective witness in order to preserve testimony for trial and authorizes a court to grant that motion because of exceptional circumstances and in the interest of justice. Exceptional circumstances generally exist if the testimony is material and the witness is unavailable.

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Compulsory Process*
[HN2] The *Sixth Amendment* guarantees that in all criminal prosecutions, the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor. *U.S. Const. amend. VI.* The United States Supreme Court has recognized that few rights are more fundamental than that of an accused to present witnesses in his own defense, indeed, this right is an essential attribute of the adversary system itself. At a minimum, the *Sixth Amendment* encompasses the right of criminal defendants to the Government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.

material and the witness is unavailable. *See United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984); see also United States v. Grossman, 2005 U.S. Dist. LEXIS 3135, No. S2 03 Cr. 1156, 2005 WL 486735, at *2 (S.D.N.Y. Mar. 2, 2005)* (quoting *United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001)).* Paracha asserted on information and belief that the three individuals were unavailable for trial because they were being held in the custody of the United States government in Afghanistan. (*See* Def's Mem. of Law in Support of Pretrial Motions, at 21).

On November 15, 2004, the Court denied that motion on the ground that Paracha had failed to establish that the witnesses were likely to provide material testimony. (Tr. of Nov. 15, 2004 Conf. at 11). [*9] The government did acknowledge that Saifullah Paracha was being held in the custody of the U.S. Department of Defense at the U.S. Naval Base in Guantanamo Bay, Cuba and subsequently disclosed statements made by him during a hearing before the Combatant Status Review Tribunal at Guantanamo Bay. Certain of those statements tended to exculpate Uzair Paracha from involvement in the charged crimes. Following the release of those statements to defendant, Paracha moved for reconsideration of the denial of his *Rule 15* motion.

In response to Paracha's motion, the government -- appropriately -- conceded that the declassified materials demonstrated the materiality of Saifullah Paracha's testimony to the defense of this action. (Tr. of Feb. 15, 2005 Conf. at p. 3-5). Thereafter, the parties reached agreement regarding procedures for a deposition of Saifullah Paracha at Guantanamo Bay and this Court ordered that a *Rule 15* deposition of Saifullah be taken in accordance with those procedures. (Stipulation and Order, dated May 20, 2005). Four months later, by letter dated September 16, 2005, Paracha's counsel informed the government that the defense had decided not to depose Saifullah [*10] Paracha, (*see* Letter from Edward D. Wilford to Karl Metzner, dated Sept. 16, 2005), despite the fact that a deposition had been scheduled to take place twelve days later. (*See* Letter from Karl Metzner to the Court, dated September 19, 2005, at 1). After declining to take the Court sanctioned *Rule 15* deposition of Saifullah Paracha, the defendant sought the issuance of a writ *ad testificandum* directing the government to produce Saifullah Paracha to testify at trial.

After the release of Saifullah's statements to the Combatant Status Review Tribunal, Paracha had also renewed his motion to depose Majid Khan and Khalid Sheik Mohammed, but asserted that his ability to demonstrate the materiality of their testimony continued to be hindered by his lack of access to those individuals or any statements attributed to them. The government indicated that an additional review of information in its possession was warranted to ensure that all exculpatory materials

regarding Khan and Mohammed were disclosed; resolution of defendant's motion for access to Khan and Mohammed was deferred until the government completed that review. (Tr. of Feb. 15, 2005 Conf. at 7-8, 11-12).

[*11] On June 13, 2005, the government filed, *ex parte* and under seal, a Motion for a Protective Order Pursuant to Section 4 of the Classified Information Procedures Act, 18 U.S.C. App. 3, § 4, and *Rule 16 of the Federal Rules of Criminal Procedure*, seeking an order from the Court authorizing disclosure of unclassified summaries of certain classified documents, in lieu of disclosure of the classified documents themselves, in connection with the government's disclosure obligations pursuant to *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*.

A week later, the government, appearing *ex parte*, provided the Court with the underlying classified materials for the Court's review. The Court reviewed those materials, asked for and received clarification regarding certain information and identified certain additional information that the government was required to include in the unclassified summaries to satisfy the government's *Brady* obligations. (Order, dated July 8, 2005). Pursuant to the Court's Order dated July 8, 2005, the government disclosed the unclassified summaries with the additions required by the Court to the defense. [*12] Those unclassified summaries consisted of statements attributed to three individuals: (1) Majid Khan; (2) an individual known to defendant as "Mustafa" who has subsequently been identified as Ammar al Baluchi and (3) an individual known to defendant as "Uzair," who has subsequently been identified as Khalid Sheik Mohammed.

Based on these summaries, the defense again moved pursuant to *Fed. R. Crim. P. 15(a)(1)* for access to Majid Khan and Khalid Sheik Mohammed for the purpose of securing and preserving their testimony for trial and for the first time also sought permission to depose Ammar al Baluchi. The government continued to oppose the request for access to Mohammed on grounds that his testimony would not be material to the defense and opposed the request for access to Khan or al Baluchi on national security grounds. In light of the conceded materiality of Khan and al Baluchi's testimony, however, the government proposed that the crafting of some substitution for their live testimony was warranted.

The Court first addresses Paracha's request for access to Mohammed, Khan and al Baluchi and then turns to the request for the trial writ for [*13] Saifullah Paracha.

**B. Access to Khalid Sheik Mohammed, Majid Khan and Ammar al Baluchi**

Page 8

2006 U.S. Dist. LEXIS 1, *; 69 Fed. R. Evid. Serv. (Callaghan) 130

Three of the witnesses to whom Paracha seeks access -- Khalid Sheik Mohammed, Majid Khan and Ammar al Baluchi -- are presumed to be al Qaeda associates (*see* Unclassified Summaries, Ex. A to Def's Notice of Mot. to Compel *Rule 15* Depositions of Certain Individuals & for Bail, "Unclassified Summaries") and are asserted by Paracha to be held in the custody of the United States government in undisclosed locations abroad in connection with the conflict against al Qaeda. Although the government takes the position that national security concerns prohibit it from confirming or denying that it has access to, or custody of, any of these three individuals, it agrees that *solely for the purposes of this motion* they may be presumed to be held in the custody of the United States abroad. (*See* Govt's Mem. in Opp. to Paracha's Pretrial Mots., at 15). Paracha asserts a right to compel the production of these individuals to testify in his defense at trial pursuant to the *Sixth Amendment's Compulsory Process clause* and the *Fifth Amendment's Due Process clause.* The government insists that even assuming [*14] that the individuals are in United States custody, separation of powers principles place them outside the Court's compulsory process power, and thus the *Sixth Amendment* affords Paracha no right of access to those individuals. The government concedes, however, that the *Fifth Amendment* may entitle defendant the right to present their testimony in some form. The questions the Court must resolve are (1) whether the individuals are within this Court's compulsory process power; (2) whether Paracha is entitled to an order compelling their production at trial or permitting access for a *Rule 15* deposition; and (3) whether some alternative means of presenting the witnesses' testimony to the jury will satisfy Paracha's *Sixth* and *Fifth Amendment* rights. The Court addresses each question in turn.

## 1. The Prospective Witnesses Are Within the Court's Process Power

[HN2] The *Sixth Amendment* guarantees that "in all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." *U.S. Const. amend. VI.* The United States Supreme Court has recognized that "few rights are more fundamental than that of an accused to present witnesses in his [*15] own defense," noting that "indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).* "'At a minimum,'" the *Sixth Amendment* encompasses the right of "'criminal defendants . . . to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" *Id.* (quoting *Pennsylvania v. Ritchie, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)).*

[HN3] The *Sixth Amendment* affords a right to compulsory process, however, "only where it is within the power of the federal government to provide it." *United States v. Greco, 298 F.2d 247, 251 (2d Cir. 1962).* Although the subpoena power of the Court -- the power generally invoked to compel the presence of witnesses at trial pursuant to *Fed. R. Crim. P. 17(b)* -- does not extend to foreign nationals outside the United States, *see United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir. 1988); see also United States v. Herbert, 2005 U.S. Dist. LEXIS 731, No. 03 Cr. 211, 2005 WL 106909, *1 (S.D.N.Y. Jan. 19, 2005),* [*16] when a prospective witness is held in custody -- as each of the prospective witnesses here is presumed to be only for purposes of this argument -- the proper procedure is for the defendant to seek the issuance of a writ *ad testificandum. See 28 U.S.C. § 2241(c)(5)* ("the writ of habeas corpus shall not extend to a prisoner unless . . . it is necessary to bring him into court to testify or for trial"); *United States v. Cruz-Jiminez, 977 F.2d 95, 99-100 (3rd Cir. 1992); United States v. Gotti, 784 F. Supp. 1011, 1012-13 (E.D.N.Y. 1992).* The proper analysis in this case is not whether the Court can reach the witness through its subpoena power, but whether the Court has the power to issue a writ of habeas corpus *ad testificandum* to the witnesses' custodian. *United States v. Moussaoui, 382 F.3d 453, 464 (4th Cir. 2004), cert. denied, 544 U.S. 931, 125 S. Ct. 1670, 161 L. Ed. 2d 496 (Mar. 21, 2005).*

[HN4] Ordinarily, a habeas writ must be served on a prisoner's immediate custodian. However, where, as here, the immediate custodian is unknown, a writ may properly be served on the [*17] prisoner's ultimate custodian. *See Demjanjuk v. Meese, 251 U.S. App. D.C. 310, 784 F.2d 1114, 1116 (D.C. Cir. 1986)* (cited in *Rumsfeld v. Padilla, 542 U.S. 426, 450, n. 18, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004)); see also Moussaoui, 382 F.3d at 465.* Here, as in *Moussaoui,* the Court assumes for the purposes of the motion that the three prospective witnesses are within the custody of the United States military; in such a case, the witnesses' ultimate custodian, the Secretary of Defense, would be "indisputably within the process power" of this Court and "thus a proper recipient of a testimonial writ directing production of the witnesses." *See Moussaoui, 382 F.3d at 465.* Moreover, even if it were necessary to serve the writ on an immediate custodian, the assumption that the witnesses are held abroad does not place them beyond this Court's compulsory process power because -- as several courts have recognized -- testimonial writs can be issued extraterritorially. *See Moussaoui, 382 F.3d at 465-66;* (citing *Carbo v. United States, 364 U.S. 611, 81 S. Ct. 338, 5 L. Ed. 2d 329 (1961)* [*18] and *Muhammad v. Warden, 849 F.2d 107, 114 (4th Cir. 1988)* (explaining why the Supreme Court's historical and statutory analysis in *Carbo* addressing the extraterritorial application of the writ *ad*

# EXHIBIT
# V

## SUBSTITUTION FOR THE TESTIMONY OF
## KHALID SHEIKH MOHAMMED

Khalid Sheikh Mohammed ("Sheikh Mohammed"), a.k.a. Mukhtar, was a

high-ranking member of al Qaeda, who served as the "emir" or "mastermind" of

the September 11, 2001, attacks. He was appointed to that role by Usama Bin

Laden ("Bin Laden"). Sheikh Mohammed was intimately involved in the planning

and execution of the September 11 attacks, as well as a central planner in al

Qaeda's post-September 11 terrorist plots.

Sheikh Mohammed was captured in March 2003, and has been interrogated

over the course of years on multiple occasions since his capture. None of the

attorneys for either the prosecution or defense have been allowed access to Sheikh

Mohammed, who is not available to testify either in person or by video for

national security reasons. However, the lawyers have been given numerous

written summaries of Sheikh Mohammed's oral statements made in response to

extensive questioning.

Listed below are some of the statements Sheikh Mohammed made in

response to questioning. You should assume that if Sheikh Mohammed were



DEFENDANT'S
EXHIBIT
U.S. v. Moussaoui
Cr. No. 01-455-A

Page 1 of 58

## SUBSTITUTION FOR THE TESTIMONY OF
## MUSTAFA AHMED AL-HAWSAWI

Hawsawi ("Hawsawi") is a named unindicted supporting conspirator in this

case.  Specifically, Hawsawi was a member of al-Qaeda who served as a

"financier" of the September 11 attacks, a role given to him by the "mastermind"

of the attacks, Khalid Sheikh Mohammed ("Sheikh Mohammed").  In that role,

Hawsawi provided funds to a "coordinator" of the September 11 attacks, Ramzi

Binalshibh, maintained bank and credit card accounts for at least one of the

September 11 hijackers, and arranged lodging for and purchased plane tickets to

the United States for some of the hijackers.

Hawsawi was captured in March 2003, and has been interrogated over the

course of years on multiple occasions since his capture.  None of the attorneys for

either the prosecution or defense have been allowed access to Hawsawi, who is not

available to testify either in person or by video for national security reasons.

However, the lawyers have been given numerous written summaries of Hawsawi's

oral statements made in response to extensive questioning.

Listed below are some of the statements Hawsawi made in response to

questioning.  You should assume that if Hawsawi were available to testify in this



DEFENDANT'S
EXHIBIT
945
U.S. v. Moussaoui
Cr. No. 04-455-A

Page 1 of 14

## UNITED STATES v. MOUSSAOUI (NO. 01-455)
## SUBSTITUTION FOR THE TESTIMONY OF
## WALID MUHAMMAD SALIH BIN ATTASH ("KHALLAD")

Walid Muhammad Salih Bin Attash, a.k.a. Khallad, was a senior al Qaeda operative who was trained by Khalid Sheikh Mohammed ("Sheikh Mohammed") and who assisted Usama Bin Laden, Sheikh Mohammed, and other high-ranking al Qaeda leaders with several terrorist plots. He has been connected with the August 1998 East African embassy bombings, and has been described as the purported mastermind of the October 2000 suicide attack on the USS *Cole*.

Khallad worked under Sheikh Mohammed's direction to formulate the plan and case the flights for the Southeast Asia component of Sheik Mohammed's "planes operation." The Southeast Asia component was to hijack and crash or destroy U.S.-flagged commercial airliners in Southeast Asia at the same time as the attacks that occurred in the U.S. With respect to the September 11 attacks on the U.S., Khallad, again working directly under Sheik Mohammed's control, personally assisted some of the September 11 hijackers. Khallad actually wanted to be part of the group sent to the U.S., but was unable to participate because of his inability to obtain a U.S. visa.

Khallad was captured in April 2003, and has been interrogated over the course of years on multiple occasions since his capture. None of the attorneys for



DEFENDANT'S
EXHIBIT
945
U.S. v. Moussaoui
Cr. No. 01-455-A

Page 1 of 4

either the prosecution or defense has been allowed access to Khallad, who is not available to testify either in person or by video for national security reasons. However, the lawyers have ben given numerous written summaries of Khallad's oral statements made in response to extensive questioning.

Listed below are some of the statements Khallad made in response to questioning.  You should assume that if Khallad were available to testify in this courtroom under oath and subject to perjury he would have said what is contained in these statements.

Although you do not have the ability to see the witness's demeanor as he testifies, you must approach these statements with the understanding that they were made under circumstances designed to elicit truthful statements from the witness.  In evaluating the truthfulness of these statements, you should consider all other evidence in this case, including all exhibits, regardless of which side may have produced the exhibit, and all other witness testimony including summarized statements of other enemy combatant witnesses, that tends to either corroborate or contradict the accuracy of this witness's statements.  It is solely up to the jury to decide how much, if any, of any witness's testimony to credit.

1.    Khallad said that Zacarias Moussaoui was nicknamed "Al-Sahrawi,"

Khallad saw Moussaoui several times in Afghanistan during 2000, both at

Page 2 of 4

## UNITED STATES v. MOUSSAOUI (NO. 01-455)
## SUBSTITUTION FOR THE TESTIMONY OF
## RIDUAN ISAMUDDIN ("HAMBALI")

Riduan Bin Isamudin, a.k.a. Hambali, was a member of Jemaah Islamiah ("JI"), a Southeast Asian terrorist organization whose goal was to establish a radical Islamist regime in that region. Hambali's role within JI was as operational leader for the Malaysia/Singapore region. He also was the key coordinator between JI and al Qaeda.

Because they shared a common goal in waging war against Christians and jews, JI and al Qaeda coordinated on many terrorist plans. For instance, JI and al-Qaeda arranged for JI members to receive training in Afghanistan at al Qaeda's camps. Al-Qaeda and JI also shared resources, such as when JI would perform the necessary casing activities and locate bomb-making materials and other supplies and al Qaeda would underwrite the operations, provide bomb-making expertise, and deliver suicide operatives.

In the relationship between JI and al-Qaeda, Hambali played the critical role of coordinator, and saw to it that al Qaeda's financial and technical strengths were married with JI's access to materials and local operatives.



DEFENDANT'S
EXHIBIT
946
U.S. v. Moussaoui
Cr. No. 01-455-A

Page 1 of 7

Hambali was captured in August 2003, and has been interrogated over the course of years on multiple occasions since his capture. None of the attorneys for either the prosecution or defense has been allowed access to Hambali, who is not available to testify either in person or by video for national security reasons. However, the lawyers have been given numerous written summaries of Hambali's oral statements made in response to extensive questioning.

Listed below are some of the statements Hambali made in response to questioning. You should assume that if Hambali were available to testify in this courtroom under oath and subject to perjury he would have said what is contained in these statements.

Although you do not have the ability to see the witness's demeanor as he testifies, you must approach these statements with the understanding that they were made under circumstances designed to elicit truthful statements from the witness. In evaluating the truthfulness of these statements, you should consider all other evidence in this case, including all exhibits, regardless of which side may have produced the exhibit, and all other witness testimony including summarized statements of other enemy combatant witnesses, that tends to either corroborate or contradict the accuracy of this witness's statements. It is solely up to the jury to decide how much, if any, of any witness's testimony to credit.