# EXHIBIT RR

REPORT OF THE JOINT INQUIRY INTO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001 –
BY THE HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE AND THE
SENATE SELECT COMMITTEE ON INTELLIGENCE

S. Rept. No. 107- 351          107ᵀᴴ Congress, 2ᴅ Session          H. Rept. No. 107-792

# JOINT INQUIRY INTO
# INTELLIGENCE COMMUNITY ACTIVITIES
# BEFORE AND AFTER THE TERRORIST ATTACKS OF
# SEPTEMBER 11, 2001

## REPORT

### OF THE

## U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

### AND

## U.S. HOUSE PERMANENT SELECT COMMITTEE ON
## INTELLIGENCE

TOGETHER WITH  ADDITIONAL VIEWS

DECEMBER 2002

[page 130] network against the United States, but largely without the benefit of an alert, mobilized and committed American public. Despite intelligence information on the immediacy of the threat level in the spring and summer of 2001, the assumption prevailed in the U.S. Government that attacks of the magnitude of September 11 could not happen here. As a result, there was insufficient effort to alert the American public to the reality and gravity of the threat.

<u>Discussion</u>: The record of this Joint Inquiry indicates that, prior to September 11, 2001, the U.S. Intelligence Community was involved in fighting a "war" against Bin Ladin largely without the benefit of what some would call its most potent weapon in that effort: an alert and committed American public. Senior levels of the Intelligence Community, as well as senior U.S. Government policymakers, were aware of the danger posed by Bin Ladin. Information that was shared with senior U.S. Government officials, but was not made available to the American public because of its national security classification, was explicit about the gravity and immediacy of the threat posed by Bin Ladin. For example:

- In December 1998, as noted earlier, the DCI wrote: "We must now enter a new phase in our effort against Bin Ladin...We are at war...I want no resources or people spared in this effort, either inside CIA or the [Intelligence] Community."

- A classified document signed by the President in December 1998 read in part: "The Intelligence Community has strong indications that Bin Ladin intends to conduct or sponsor attacks inside the United States"; and

- A classified document signed by the President in July 1999 characterized a February 1998 statement by Bin Ladin statement as a "de facto declaration of war" on the United States.

In addition, numerous classified intelligence reports were produced and disseminated by the Intelligence Community prior to September 11, based upon information obtained from a variety of sources, about possible terrorist attacks being planned by Usama Bin Ladin's terrorist network. Some of this information was summarized and released, in declassified form, in the Joint Inquiry's September 18, 2002 hearing, including: [page 131]

- In June 1998, the Intelligence Community obtained information from several sources that Usama Bin Ladin was considering attacks in the United States, including against Washington, D. C. and New York;

# EXHIBIT SS

# TOO MANY SECRETS: OVERCLASSIFICATION AS A BARRIER TO CRITICAL INFORMATION SHARING

# HEARING

BEFORE THE

## SUBCOMMITTEE ON NATIONAL SECURITY, EMERGING THREATS AND INTERNATIONAL RELATIONS

OF THE

## COMMITTEE ON GOVERNMENT REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTH CONGRESS

SECOND SESSION

AUGUST 24, 2004

## Serial No. 108–263

Printed for the use of the Committee on Government Reform



Available via the World Wide Web: http://www.gpo.gov/congress/house
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE

98–291 PDF                     WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON GOVERNMENT REFORM

TOM DAVIS, Virginia, *Chairman*

DAN BURTON, Indiana
CHRISTOPHER SHAYS, Connecticut
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
JOHN L. MICA, Florida
MARK E. SOUDER, Indiana
STEVEN C. LaTOURETTE, Ohio
DOUG OSE, California
RON LEWIS, Kentucky
TODD RUSSELL PLATTS, Pennsylvania
CHRIS CANNON, Utah
ADAM H. PUTNAM, Florida
EDWARD L. SCHROCK, Virginia
JOHN J. DUNCAN, JR., Tennessee
NATHAN DEAL, Georgia
CANDICE S. MILLER, Michigan
TIM MURPHY, Pennsylvania
MICHAEL R. TURNER, Ohio
JOHN R. CARTER, Texas
MARSHA BLACKBURN, Tennessee
PATRICK J. TIBERI, Ohio
KATHERINE HARRIS, Florida

HENRY A. WAXMAN, California
TOM LANTOS, California
MAJOR R. OWENS, New York
EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
CAROLYN B. MALONEY, New York
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
DANNY K. DAVIS, Illinois
JOHN F. TIERNEY, Massachusetts
WM. LACY CLAY, Missouri
DIANE E. WATSON, California
STEPHEN F. LYNCH, Massachusetts
CHRIS VAN HOLLEN, Maryland
LINDA T. SANCHEZ, California
C.A. "DUTCH" RUPPERSBERGER, Maryland
ELEANOR HOLMES NORTON, District of
     Columbia
JIM COOPER, Tennessee
BETTY McCOLLUM, Minnesota

BERNARD SANDERS, Vermont
(Independent)

MELISSA WOJCIAK, *Staff Director*
DAVID MARIN, *Deputy Staff Director/Communications Director*
ROB BORDEN, *Parliamentarian*
TERESA AUSTIN, *Chief Clerk*
PHIL BARNETT, *Minority Chief of Staff/Chief Counsel*

SUBCOMMITTEE ON NATIONAL SECURITY, EMERGING THREATS AND INTERNATIONAL
RELATIONS

CHRISTOPHER SHAYS, Connecticut, *Chairman*

MICHAEL R. TURNER, Ohio
DAN BURTON, Indiana
STEVEN C. LaTOURETTE, Ohio
RON LEWIS, Kentucky
TODD RUSSELL PLATTS, Pennsylvania
ADAM H. PUTNAM, Florida
EDWARD L. SCHROCK, Virginia
JOHN J. DUNCAN, JR., Tennessee
TIM MURPHY, Pennsylvania
KATHERINE HARRIS, Florida

DENNIS J. KUCINICH, Ohio
TOM LANTOS, California
BERNARD SANDERS, Vermont
STEPHEN F. LYNCH, Massachusetts
CAROLYN B. MALONEY, New York
LINDA T. SANCHEZ, California
C.A. "DUTCH" RUPPERSBERGER, Maryland
JOHN F. TIERNEY, Massachusetts
DIANE E. WATSON, California

EX OFFICIO

TOM DAVIS, Virginia

HENRY A. WAXMAN, California

LAWRENCE J. HALLORAN, *Staff Director and Counsel*
ROBERT A. BRIGGS, *Clerk*
ANDREW SU, *Minority Professional Staff Member*

(II)

# CONTENTS

|  | Page |
|---|---|
| Hearing held on August 24, 2004 ........................................................................ | 1 |

Statement of:

Leonard, J. William, Director, Information Security Oversight Office, National Archives and Records Administration; Carol A. Haave, Deputy Under Secretary of Defense, Counterintelligence and Security, U.S. Department of Defense; Steven Aftergood, Federation of Concerned Scientists; and William P. Crowell, the Markle Foundation Task Force on National Security in the Information Age ............................................ **22**

Letters, statements, etc., submitted for the record by:

Aftergood, Steven, Federation of Concerned Scientists, prepared statement of ...................................................................................................... **43**

Crowell, William P., the Markle Foundation Task Force on National Security in the Information Age, prepared statement of ............................ **61**

Haave, Carol A., Under Secretary of Defense for Intelligence, U.S. Department of Defense, prepared statement of ............................................. **36**

Kucinich, Hon. Dennis J., a Representative in Congress from the State of Ohio, prepared statement of ....................................................................... **9**

Leonard, J. William, Director, Information Security Oversight Office, National Archives and Records Administration, prepared statement of ........ **25**

Shays, Hon. Christopher, a Representative in Congress from the State of Connecticut, prepared statement of ........................................................... **3**

# TOO MANY SECRETS: OVERCLASSIFICATION AS A BARRIER TO CRITICAL INFORMATION SHARING

---

## TUESDAY, AUGUST 24, 2004

House of Representatives,
Subcommittee on National Security, Emerging
Threats and International Relations,
Committee on Government Reform,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 2154, Rayburn House Office Building, Hon. Christopher Shays (chairman of the subcommittee) presiding.

Present: Representatives Shays, Platts, Kucinich, Ruppersberger, and Tierney.

Staff present: Lawrence Halloran, staff director and counsel; Thomas Costa, professional staff member; Jean Gosa, minority assistant clerk; and Andrew Su, minority professional staff member.

Mr. SHAYS. A quorum being present, the Subcommittee on National Security, Emerging Threats, and International Relations hearing entitled, "Too Many Secrets: Overclassification is a Barrier to Critical Information Sharing," is called to order.

An old maxim of military strategy warns, "He who protects everything, protects nothing."

Nevertheless, the United States today attempts to shield an immense and growing body of secrets using an incomprehensibly complex system of classifications and safeguard requirements. As a result, no one can say with any degree of certainty how much is classified, how much needs to be declassified, or whether the Nation's real secrets can be adequately protected in a system so bloated, it often does not distinguish between the critically important and the economically irrelevant.

This much we know: There are too many secrets. Soon after President Franklin Roosevelt's first executive order on classification in 1940, the propensity to overclassify was noted. Since then, a long and distinguished list of committees and commissions has studied the problem. They all found it impossible to quantify the extent of overclassification because no one even knows the full scope of the Federal Government's classified holding at any given time. Some estimate 10 percent of current secrets should never have been classified. Others put the extent of overclassification as high as 90 percent.

During the cold war, facing a monolithic foe determined to penetrate our national secrets, overclassification may have provided a

2

needed security buffer. But the risk/benefit calculation has changed dramatically. Against a stateless, adaptable enemy, we dare not rely on organizational stovepipes to conclude, in advance, who should have access to one piece of an emerging mosaic. Connecting the dots is now a team sport. The cold war paradigm of "need to know" must give way to the modern strategic imperative, "the need to share."

The National Commission on Terrorist Attacks Upon the United States, referred to as the 9/11 Commission, concluded that, "Current security requirements nurture overclassification and excess compartmentation of information among agencies. Each agency's incentive structure opposes sharing, with risks—criminal, civil, and internal administrative sanctions—but few rewards for sharing information. No one has to pay the long-term costs of overclassifying information, though these costs—even in literal financial terms—are substantial."

The National Archives' Information Security Oversight Office, ISOO, reported that in 2003, more than 14 million documents were classified by the 3,978 Federal officials authorized to do so. They classified 8 percent more information than the year before. But recently declassified documents confirm the elaborate and costly security applied to some information is simply not worth the effort or expense. A former dictator's cocktail preferences and a facetious plot against Santa Claus are not threats to national security in the public domain, yet both were classified.

The most recent ISOO report correctly concludes "allowing information that will not cause damage to national security to remain in the classification system or to enter that system in the first instance, places all classified information at needless increased risk."

Current classification practices are highly subjective, inconsistent and susceptible to abuse. One agency protects what another releases. Rampant overclassification often confuses national security with bureaucratic, political or a diplomatic convenience.

The dangerous, if natural, tendency to hide embarrassing or inconvenient facts can mask vulnerabilities and only keeps critical information from the American people. The terrorists know their plans. Fewer people classifying fewer secrets would better protects national security by focussing safeguards on truly sensitive information, while allowing far wider dissemination of the facts and analysis, the 9/11 Commission says, must be shared.

Any discussion of intelligence reform must include a new approach to classification, one that sheds cold war shackles and serves the strategic needs to share information. Our witnesses this morning bring impressive experience and insight to this important issue and we look forward to their testimony. I welcome each of them.

At this time, the Chair would recognize the ranking member of the committee, Mr. Kucinich.

[The prepared statement of Hon. Christopher Shays follows:]

# EXHIBIT TT

TOM DAVIS, VIRGINIA
CHAIRMAN

HENRY A. WAXMAN, CALIFORNIA
RANKING MINORITY MEMBER

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6143

Majority (202) 225-5074
Minority (202) 225-5051

SUBCOMMITTEE ON NATIONAL SECURITY, EMERGING THREATS,
AND INTERNATIONAL RELATIONS
Christopher Shays, Connecticut
Chairman
Room B-372 Rayburn Building
Washington, D.C. 20515
Tel: 202 225-2548
Fax: 202 225-2382

# MEMORANDUM

To:        Members of the Subcommittee on National Security,
           Emerging Threats, and International Relations

From:      Lawrence J. Halloran

Subject:   Briefing Memorandum for the hearing, *Emerging Threats:
           Overclassification and Pseudo-classification*, scheduled for
           Wednesday, March 2, 1:00 p.m., 2154 Rayburn House Office
           Building.

Date:      February 24, 2005

# PURPOSE OF THE HEARING

The purpose of this hearing is to examine the proliferation of categories of
information that are not classified but are withheld from public disclosure.

# HEARING ISSUES

1. **To what extent do current policies and practices permit the
   excessive or abusive classification, or delayed declassification, of
   federal materials?**

Case 1:07-cv-05435-LAP    Document 75-17    Filed 06/25/2008    Page 13 of 63

*Briefing Memorandum*
*Emerging Threats: Overclassification and Pseudo-classification*
*February 24, 2005*
*Page 2 of 10*

2. **What is the impact of current classification policies and practices on efforts to enhance interagency and intergovernmental information sharing?**

## BACKGROUND

The Final Report of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission Report") found that information security policies and practices impede the robust forms of information sharing required to meet the threat of terrorism. The Report states:

> Current security requirements nurture overclassification and excessive compartmentation of information among agencies. Each agency's incentive structure opposes sharing, with risks (criminal, civil, and internal administrative sanctions) but few rewards for sharing information. No one has to pay the long-term costs of over-classifying information, though this costs— even in literal financial terms— are substantial. There are no punishments for *not* sharing information. Agencies uphold a "need-to-know" culture of information protection rather than promoting a "need-to-share" culture of integration.[1]

The Commission endorsed creation of a decentralized, technologically advanced "trusted information network" to make threat information more widely accessible and to reverse Cold War paradigms and cultural biases against information sharing. The Commission noted such a network had been described in a task force report commissioned by the Markle Foundation **(Web Resources 1)**, but the concept "has not yet been converted into action."[2]

---

[1] The 9/11 Commission Report, *Final Report of the National Commission on Terrorist Attacks Upon the Unites States*, p. 417.

[2] Ibid., p.418.

Since 1940, classification of official secrets has been governed by policies and procedures flowing from executive orders of the President. Current security requirements are mandated by E.O. 12958 as amended by E.O. 13292. **(Attachment 1)** Successive executive directives reflect Cold War counterespionage concerns as well as persistent tension between the need for secrecy the public access to government information. By varying degrees, Presidents sought to protect national secrets through broader or narrower delegation of classification authority, by expanding or contracting categories of classifiable information and by endorsing or opposing the use of automatic declassification deadlines.

The first post-Cold War policy on classification was issued by President Clinton in 1995. E.O. 12356 reset previous default settings, directing classifiers *not* to shield information of doubtful value and to classify information at the *lowest* rather than the highest possible level. With some exceptions, the order sets a ten year limit on classification markings and provides broadened opportunities for declassification of official materials. Reclassification is prohibited if the material has otherwise been properly put in the public domain. A new Interagency Security Classification Appeals Panel was established to make final decisions on certain classification challenges and declassification exemptions. **(Attachment 1, p5)** President Bush issued E.O. 13292, amending E.O. 12958, that reverts to a "when in doubt, classify" standard, expands classification authorities and categories and postponed automatic declassification of some records.

Security concerns after the September 11th attacks prompted some departments and agencies to increase the type and volume of information shielded from public view by *Confidential, Secret* or *Top Secret* markings. But executive classification of significant portions of congressional investigative reports revived the debate over the objectivity of information security standards and the potential for excessive, abusive or politically motivated classification. Some have called for appointment of an independent panel to review and settle disputes over classification and declassification. **(Attachment 2, p. 2)**

The Information Security Oversight Office (ISOO) within the National Archives and Records Administration is responsible for executive branch oversight of security classification matters.  The ISOO 2003 Report to the President noted that 3,978 separate offices or individuals made 238,030 classification decisions in FY03 affecting more than 14 million documents.   Agencies reported an eight percent increase in original classifications over the previous year, with most of the increase attributable to the Departments of Defense and Justice.  **(Web Resources 2)**

The report acknowledged that, "many senior officials will candidly acknowledge that the government classifies too much information, although oftentimes the observation is made with respect to the activities of agencies other than their own.  The potential use of excessive classification is supported, in part, by agency input indicating that overall classification activity is up over the past several years."  The report goes on to note the inevitable tendency to protect more information in times of war but notes the easy propensity to "err on the side of caution" concedes more error than a balanced system should tolerate, concluding that,  "Too much classification unnecessarily impedes effective information sharing."

# DISCUSSION OF HEARING ISSUES

1. **To what extent do current policies and practices permit the excessive or abusive classification, or delayed declassification, of federal materials?**

Most concede it is impossible to quantify the extent of overclassification, noting it is difficult enough to determine how much information remains classified at any given time. The problem of assessing the true scope of what is classified or overclassified is compounded by the proliferation of information media. One classification decision may affect one page, one thousand pages, or one thousand computer discs each containing one thousand pages.

According to a 1997 report, "Given this uncertainty, it should not be surprising that there is little agreement on the extent of overclassification. For over a decade the ISOO has estimated that between one and ten percent of all classified documents are unnecessarily classified. In 1995, a White Paper prepared by the DoD Inspector General concluded that the classification process at the DoD is "fundamentally sound" and that "the present size of classified holdings is not the result of too much information being needlessly classified." In contrast, a 1985 preliminary study prepared by the staff of two House subcommittees proposed a classification system in which "roughly nine-tenths of what is now classified" would no longer qualify for classification. More recently, former NSC Executive Secretary Rodney B. McDaniel estimated that only ten percent of classification was for "legitimate protection of secrets." Given the uncertainty surrounding the breadth of classification, however, efforts to quantify with any precision the extent of unnecessary classification not only may be futile, but are unlikely to help in understanding its causes or possible remedies." **(Web Resources 3)**

The report further noted that despite being required to mark documents to indicate which portions are classified and which are not, employees in some agencies continue to mark materials "Entire Text

Case 1:07-cv-05435-LAP    Document 75-17    Filed 06/25/2008    Page 17 of 63

*Briefing Memorandum*
*Emerging Threats: Overclassification and Pseudo-classification*
*February 24, 2005*
*Page 6 of 10*

Classified," increasing the difficulty of distinguishing which parts truly need protection and which might later be declassified.

The creation of classification safe harbors, or sacred cows, also contributes to the volume of information put into those categories and the set of documents that often remain beyond declassification review. Intelligence sources and methods, personnel levels and budgets have become classification icons into which very remotely related information can be secreted. The Cold War nuclear doctrine of "born classified, always classified" also encourages overclassification. **(Web Resources 4)**

Over-classification is viewed by some as an inevitable political and cultural bureaucratic response to an exclusive "need to know" security standard. Such an environment breeds what has been called "the cult of classification" whose members have every incentive to increase their own importance by increasing the volume of information only they can see. **(Attachment 3)**

## 2. What is the impact of current classification policies and practices on efforts to enhance interagency and intergovernmental information sharing?

A far more horizontal world - characterized by transnational terrorism and the need to respond using multinational military coalitions – challenges Cold War paradigms and policies designed to protect official secrets in vertical organizational structures. The 9/11 Commission concluded that inability to integrate the intelligence in hand – both classified and unclassified – across agency lines contributed to the failure to detect or deter the attacks.

As an example, according to recently declassified 9/11 Commission staff reports, the Federal Aviation Administration (FAA) reviewed numerous intelligence reports that warned about al-Qaeda's interest in airline hijackings and suicide operations prior to the New York World Trade Center

and Pentagon attacks. Although the FAA warned airport security officials about the possibility of suicide hijackings, the warnings "did not stimulate significant increases in security procedures." **(Web Resources 5) (Attachment 4, p. 62)** Some are questioning whether the Administration abused the classification process to improperly withhold the 9/11 Commission findings from Congress and the public until now based on political rather then purely security considerations.

Homeland Security has become a national priority and as a result, there has been a proliferation of categories of information that are not classified but held from public disclosure. These categories include *Sensitive Homeland Security Information*, *Sensitive Security Information*, and *Critical Information* among others. These categories are not well understood and may be misused causing damage to homeland security, freedom of information and government transparency. The Congressional Research Service (CRS) witness will testify about the basis for such designations and the criteria the information must meet in order to be so designated.

Overclassification makes integration of federal agency watch lists and other data bases more complex and more expensive given the need to maintain separate systems and protocols for secure information.

Classified information is also more difficult to include in alerts to state and local officials since many do not have required clearances and cannot justify committing to costly responsive actions based only on scrubbed, generic information. In testimony before the Government Reform Committee on August 3, Comptroller General David Walker noted that the federal government did not generally consider the role of state and local officials in national security matters but that September 11th and the continuing threat of terrorism create a compelling "need to share" intelligence information at that level. **(Web Resources 6)**

In 1970, the Defense Science Board concluded that overclassification also undermines the credibility of government security decisions. **(Web Resource 4, Note 2)** Indiscriminate and

excessive classification also tends to mask the volume and utility of information now available from open sources.

Overclassification ultimately incurs avoidable fiscal costs and compromises national security. Adversarial, versus automatic, declassifications procedures are cumbersome and time consuming. Safeguards for voluminous classified material require costly security measures. And government officials confronted with dizzyingly complex rules for numerous categories of classified information often cannot or do not distinguish truly significant security matters from routine material market secret out of an excess of caution or zeal. It is often observed in this regard "he who defends everything defends nothing."

## ATTACHMENTS

1. CRS Report, *Security Classification Policy and Procedures: E.O. 12958, as Amended*, 97-771, January 7, 2005.

2. CRS Report, *Secrecy Versus Openness: Arrangements for Balancing Competing Needs,* RS21895, August 4, 2004.

3. "I Could Tell You, But I'd Have to Kill You:  The Cult of Classification in Intelligence," STRATFOR Analysis, September 18, 2000.

4. 9/11 Commission staff report, August 26, 2004, *Part2. Civil Aviation Security and the 9/11 Attacks*

## WEB RESOURCES

1. http://www.markle.org/downloadable_assets/nstf_report2_full_report.pdf

2. http://www.archives.gov/isoo/reports/2003_annual_report.html

3. http://www.fas.org//sgp/library/moynihan/

4. http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB90/index.htm

5. http://www.democrats.reform.house.gov/Documents/2005021016212 8-39627.pdf

6. http://reform.house.gov/UploadedFiles/GAO%20-%20Walker%209- 11%20Testimony.pdf

## WITNESS LIST

### *Panel One*

**Mr. J. William Leonard**, Director
Information Security Oversight Office
National Archives and Records Administration

**RADM Christopher A. McMahon**, USMS
Acting Director, Departmental Office of Intelligence, Security, and
Emergency Response
Department of Transportation

**Mr. Harold Relyea**
Specialist in American National Government
Congressional Research Service (CRS)
Library of Congress

### *Panel Two*

**The Honorable Richard Ben-Veniste**, Commissioner
National Commission on Terrorist Attacks Upon the United States

### *Panel Three*

**Mr. Thomas Blanton**, Executive Director
National Security Archive
George Washington University

**Mr. Harry A. Hammitt**, Editor and Publisher
Access Reports: Freedom of Information
Lynchburg, Virginia

# EXHIBIT UU

# EMERGING THREATS: OVERCLASSFICATION AND PSEUDO-CLASSIFICATION

# HEARING

BEFORE THE

## SUBCOMMITTEE ON NATIONAL SECURITY, EMERGING THREATS, AND INTERNATIONAL RELATIONS

OF THE

## COMMITTEE ON GOVERNMENT REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

FIRST SESSION

MARCH 2, 2005

## Serial No. 109–18

Printed for the use of the Committee on Government Reform



Available via the World Wide Web: http://www.gpo.gov/congress/house
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE
20–922 PDF                WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON GOVERNMENT REFORM

TOM DAVIS, Virginia, *Chairman*

CHRISTOPHER SHAYS, Connecticut
DAN BURTON, Indiana
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
JOHN L. MICA, Florida
GIL GUTKNECHT, Minnesota
MARK E. SOUDER, Indiana
STEVEN C. LATOURETTE, Ohio
TODD RUSSELL PLATTS, Pennsylvania
CHRIS CANNON, Utah
JOHN J. DUNCAN, JR., Tennessee
CANDICE S. MILLER, Michigan
MICHAEL R. TURNER, Ohio
DARRELL E. ISSA, California
GINNY BROWN-WAITE, Florida
JON C. PORTER, Nevada
KENNY MARCHANT, Texas
LYNN A. WESTMORELAND, Georgia
PATRICK T. McHENRY, North Carolina
CHARLES W. DENT, Pennsylvania
VIRGINIA FOXX, North Carolina

HENRY A. WAXMAN, California
TOM LANTOS, California
MAJOR R. OWENS, New York
EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
CAROLYN B. MALONEY, New York
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
DANNY K. DAVIS, Illinois
WM. LACY CLAY, Missouri
DIANE E. WATSON, California
STEPHEN F. LYNCH, Massachusetts
CHRIS VAN HOLLEN, Maryland
LINDA T. SANCHEZ, California
C.A. DUTCH RUPPERSBERGER, Maryland
BRIAN HIGGINS, New York
ELEANOR HOLMES NORTON, District of
   Columbia
———

BERNARD SANDERS, Vermont
(Independent)

MELISSA WOJCIAK, *Staff Director*
DAVID MARIN, *Deputy Staff Director/Communications Director*
ROB BORDEN, *Parliamentarian*
TERESA AUSTIN, *Chief Clerk*
PHIL BARNETT, *Minority Chief of Staff/Chief Counsel*

SUBCOMMITTEE ON NATIONAL SECURITY, EMERGING THREATS, AND INTERNATIONAL
RELATIONS

CHRISTOPHER SHAYS, Connecticut, *Chairman*

KENNY MARCHANT, Texas
DAN BURTON, Indiana
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
STEVEN C. LATOURETTE, Ohio
TODD RUSSELL PLATTS, Pennsylvania
JOHN J. DUNCAN, JR., Tennessee
MICHAEL R. TURNER, Ohio
JON C. PORTER, Nevada
CHARLES W. DENT, Pennsylvania

DENNIS J. KUCINICH, Ohio
TOM LANTOS, California
BERNARD SANDERS, Vermont
CAROLYN B. MALONEY, New York
CHRIS VAN HOLLEN, Maryland
LINDA T. SANCHEZ, California
C.A. DUTCH RUPPERSBERGER, Maryland
STEPHEN F. LYNCH, Massachusetts
BRIAN HIGGINS, New York

Ex Officio

TOM DAVIS, Virginia

HENRY A. WAXMAN, California

LAWRENCE J. HALLORAN, *Staff Director and Counsel*
J. VINCENT CHASE, *Chief Investigator*
ROBERT A. BRIGGS, *Clerk*
ANDREW SU, *Minority Professional Staff Member*

# CONTENTS

|  | Page |
|---|---|
| Hearing held on March 2, 2005 ................................................................ | 1 |

Statement of:
Ben-Veniste, Richard, Commissioner, National Commission on Terrorist
Attacks Upon the United States ...................................................... 88
Blanton, Thomas, executive director, National Security Archive, George
Washington University; Harry A. Hammitt, editor and publisher, Ac-
cess Reports: Freedom of Information; Sibel Edmonds, former Contract
Linguist, Federal Bureau of Investigation ................................................ 109
    Blanton, Thomas ............................................................................ 109
    Edmonds, Sibel .............................................................................. 147
    Hammitt, Harry A. .......................................................................... 128
Leonard, J. William, Director, Information Security Oversight Office, Na-
tional Archives and Records Administration; Rear Admiral Christopher
A. McMahon, U.S. Maritime Service, Acting Director, Departmental
Office of Intelligence, Security and Emergency Response, Department
of Transportation; and Harold C. Relyea, Specialist in National Govern-
ment, Congressional Research Service, Library of Congress ..................... 44
    Leonard, J. William ........................................................................ 44
    McMahon, Rear Admiral Christopher A. ........................................... 53
    Relyea, Harold C. ............................................................................ 66
Letters, statements, etc., submitted for the record by:
Ben-Veniste, Richard, Commissioner, National Commission on Terrorist
Attacks Upon the United States:
    Letters dated February 11 and March 1, 2005 ................................ 107
    Prepared statement of .................................................................... 93
Blanton, Thomas, executive director, National Security Archive, George
Washington University, prepared statement of ..................................... 114
Edmonds, Sibel, former Contract Linguist, Federal Bureau of Investiga-
tion:
    Letters dated June 19, 2002 and August 13, 2002 ......................... 149
    Prepared statement of .................................................................... 186
    Report dated January 2005 ............................................................ 154
Hammitt, Harry A., editor and publisher, Access Reports: Freedom of
Information, prepared statement of ...................................................... 130
Higgins, Hon. Brian, a Representative in Congress from the State of
New York, prepared statement of ........................................................ 42
Kucinich, Hon. Dennis J., a Representative in Congress from the State
of Ohio, prepared statement of ........................................................... 9
Leonard, J. William, Director, Information Security Oversight Office, Na-
tional Archives and Records Administration, prepared statement of ....... 47
Maloney, Hon. Carolyn B., a Representative in Congress from the State
of New York, prepared statement of .................................................... 33
McMahon, Rear Admiral Christopher A., U.S. Maritime Service, Acting
Director, Departmental Office of Intelligence, Security and Emergency
Response, Department of Transportation, prepared statement of ........... 55
Relyea, Harold C., Specialist in National Government, Congressional Re-
search Service, Library of Congress, prepared statement of .................. 68
Shays, Hon. Christopher, a Representative in Congress from the State
of Connecticut, prepared statement of ................................................. 3
Waxman, Hon. Henry A., a Representative in Congress from the State
of California:
    Letter dated March 1, 2005 ............................................................ 15
    Prepared statement of .................................................................... 27

25

Mr. WAXMAN. Many of these new designations have been created out of thin air by the administration. They do not have a basis in Federal statute, and there are no criteria to guide their application. It appears that virtually any Federal employee can stamp a document "sensitive but unclassified" and there do not appear to be uniform procedures for removing these designations. The examples we discovered are alarming. The executive branch has been using these novel designations to withhold information that is potentially embarrassing, not to advance national security.

Last year I wrote a letter to Secretary Powell that revealed that the State Department's annual terrorism report was grossly inaccurate. This Government report claimed that terrorist attacks reached an all-time low in 2003. In fact, exactly the opposite was true. Significant attacks by terrorists actually reached an all-time high.

To his credit, Secretary Powell admitted that mistakes were made and required the issuance of a new report. Several months later, the inspector general prepared a report that examined what went wrong. The report was released to the public in one version. And another version, a "sensitive but unclassified" version, was sent to certain offices in Congress. My staff compared the two versions. They were identical except for one difference. The "sensitive but unclassified" version reported that the CIA played a significant role in preparing the erroneous report. This information was redacted in the public version.

I have a message for the administration. Admitting that the CIA made a mistake is not a national security secret. Another example involves the role that Under Secretary of State John Bolton played in preparing an infamous fact sheet that erroneously alleged that Iraq tried to import uranium from Niger. The State Department wrote me in September 2003 that Mr. Bolton "did not play a role in the creation of this document." But a "sensitive but unclassified" chronology, which has never been released to the public, shows that actually Mr. Bolton did direct the preparation of the fact sheet and received multiple copies of the draft.

Apparently, sensitive but unclassified is also a code word for embarrassing to senior officials. And here's an ironic example. The Department of Homeland Security used the sensitive but unclassified designation to withhold the identity of the ombudsman that the public is supposed to contact about airline security complaints. I suggested to Chairman Shays that this subcommittee should investigate the mis-use of these designations, and I am glad to report that he has agreed. In fact, we are signing letters today seeking information from several agencies about the way they use these new designations. With his support, I hope we can impose some restraints on this new form of government secrecy.

There are other issues I hope we can examine today. One involves the process that was used to declassify important 9/11 Commission documents. Last month, we learned about long delays in the declassification and release of key documents that called into question statements made by now-Secretary of State Condoleezza Rice and other senior administration officials. These embarrassing documents were not released until after the Presidential elections and 48 hours after Ms. Rice's confirmation as Secretary of State.

26

Today I hope we can learn more about the delay in the release of these documents and whether politics played any role.

Another important topic is the case of Sibel Edmonds, who will testify on the third panel. Ms. Edmonds joined the FBI in 2001 as a linguist. But she was fired just a few months later for warning her superiors about potential espionage occurring with the Bureau. Last month, the Justice Department Inspector General released an unclassified report that vindicated Ms. Edmonds, finding that her core allegations were clearly corroborated. Yet the Justice Department has repeatedly sought to prevent inquiries into her case by citing secrecy concerns. Indeed, government lawyers even argued that her legal efforts to obtain redress should be thrown out of court to avoid the risk of disclosing sensitive information.

Mr. Chairman, let me close by thanking you for holding this hearing, for investigating the problematic, sensitive but unclassified designation and for including Ms. Edmonds in the hearing. This hearing and your actions demonstrate that openness in government is not a partisan issue. The fact is, there is bipartisan concern in Congress that the pendulum is swinging too far toward secrecy. I look forward to the testimony of the witnesses today.

[The prepared statement of Hon. Henry A. Waxman follows:]

27

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. MCHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LATOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
GINNY BROWN-WAITE, FLORIDA
JON C. PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA

ONE HUNDRED NINTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6143

Majority (202) 225-5074
FacsIMiL (202) 225-3974
Minority (202) 225-5051
TTY (202) 225-6852

http://reform.house.gov

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT,
INDEPENDENT

Statement of Rep. Henry A. Waxman, Ranking Minority Member
Committee on Government Reform
Subcommittee on National Security, Emerging Threats, and International Relations
Hearing on
"Overclassification and Pseudo-classification"

March 2, 2005

Thank you, Mr. Chairman, for holding this hearing, and for your leadership in addressing the issue of government secrecy.

Incredibly, it seems necessary to state the obvious today — the government belongs to the people. The American people understand that some information must be kept secret to protect the public safety. But when the government systematically hides information from the public, government stops belonging to the people.

Unfortunately, there have been times in our nation's history when this fundamental principle of openness has come under direct attack. The Watergate era of the Nixon Administration was one of those times. We are now living through another.

Over the last four years, the executive branch has engaged in a systematic effort to limit the application of the laws that promote open government and accountability. Key open government laws such as the Freedom of Information Act, the Presidential Records Act, and the Federal Advisory Committee Act have been narrowed and misconstrued. At the same time, the Administration has greatly expanded its authority to classify documents, to conduct secret investigations, and to curtail Congress's access to information.

Last fall, I released a report entitled "Secrecy in the Bush Administration" that detailed many of these threats to the principle of open government. I ask unanimous consent that this report be made part of today's hearing record.

Yesterday, I wrote a letter to Chairman Shays that described a new threat to openness in government: the Administration's misuse of rapidly proliferating designations such as "sensitive but unclassified" and "for official use only" to block the release of important information. And I ask unanimous consent that this letter also be made part of today's hearing record.

30

Mr. SHAYS. I thank the gentleman for his statement and for the work of his staff. You have done a lot of work that you have reason to be very concerned about.

At this time the Chair would recognize Mr. Turner, the former vice chairman of the committee, now chairman of?

Mr. TURNER. Federalism and Census. Thank you, Mr. Chairman, and thank you for your leadership on this issue, and for your assistance in my continuing on this subcommittee. This obviously is a very important issue. Just this week I believe we had a reminder of the issue of classification when we were all receiving information from our news media about the possible communication between Osama bin Ladin and Moussaoui, and looking to possible potential attacks on the United States. I think we all heard, as we looked at the news, and read the news accounts, that we were informed that the Homeland Security Department issued a classified bulletin to officials over the weekend about the intelligence, which spokesman Brian—I'm not even going to guess at that one—described as credible but not specific. The indulgence was obtained over the past several weeks, officials said.

Clearly, we've gotten to the point where we have become desensitized to what is either classified or not. One of the dangers of overclassification is that people no longer handle the information sensitively. In this instance, within I believe a day or two of it being issued, it's national news on CNN and all of our newspapers, which of course means that our adversaries, in addition to our friends, are reading it.

This is an important hearing that you are holding, in that it will assist us in identifying what really is important and needs to be protected information and hopefully assist us in keeping it classified and confidential.

Thank you.

Mr. SHAYS. I thank the gentleman for his statement. At this time, the Chair would recognize the gentlelady from New York City.

Mrs. MALONEY. Clearly, for me, nothing highlights better the overclassification of government documents than the 9/11 Commission staff report dealing with civil aviation. The release of this report was delayed for months beyond all documents of the 9/11 Commission report, and is heavily redacted. It is the only document that the 9/11 Commission members received that had one word covered in ink. Every other document that they received in their investigation was not redacted, just the civil aviation one.

Not only is it ironic that the underlying 9/11 Commission report spoke to the need to move from a need to know environment to a need to share environment. I think it is absolutely an outrage that large portions and parts of this report are being kept from the American people, including the September 11 families who fought so very, very hard to get answers on why September 11 happened, and how we could work to prevent it in the future, another future attack.

Although the 9/11 Commission staff completed its report on August 26, 2004, the Bush administration refused to declassify the findings until January 28, 2005, less than 48 hours after Condoleezza Rice was confirmed as Secretary of State. During the

31

period between August 26th and January 28th, the Commission was reportedly reviewing the Commission's report to determine whether it contained any information that should be classified in the interest of national security.

Problems with this process have been raised previously by the 9/11 Commission. On February 9th, the New York Times reported that the monograph had been turned over to the National Archives nearly 2 weeks before it had been heavily redacted. No notice was provided to me or any of the 25 Members of Congress who had written the Justice Department for its release. To say the least, the contents of the monograph were troubling. It states that,

> In the months before September 11, Federal aviation officials reviewed dozens of intelligence reports that warned about Osama bin Ladin and Al-Qaeda, some of which specifically discussed airline hijackings and suicide operations.
>
> Fifty-two intelligence reports from the FAA mentioned bin Ladin or Al-Qaeda from April to September 10, 2001. Five of the intelligence reports specifically mentioned Al-Qaeda's training or capability to conduct hijackings. And two mentioned suicide operations, although not connected to aviation. Despite these warnings, the FAA, lulled into a false sense of security and intelligence that indicated a real and growing threat leading up to 9/11, did not stimulate significant increase in security procedures.

This is what we know from public parts of the report. That day Chairman Shays and I called on the Justice Department to release the full, unredacted report, just like all previous documents of the 9/11 Commission. The delayed release, the ultimate timing of the release, the contents and the heavy redactions raise very serious concerns to me. That is why I was so pleased to join with the full committee ranking member, Henry Waxman, calling for hearings on this matter. I look very much forward to hearing from 9/11 Commissioner Richard Ben-Veniste, who will be testifying on this, along with the other witnesses.

In our letter, we raise concerns on whether the administration mis-used the classification process to withhold, possibly for political reasons, and it questions the veracity of statements, briefings and testimony by then National Security Advisory Condoleezza Rice, regarding this issue. I have concerns that the administration abused the classification process to improperly withhold the 9/11 Commission findings from Congress and the public, until after the November elections and the confirmation of Condoleezza Rice as Secretary of State.

I really want to learn today what were the specific rationales for each redaction in the report, and were these redactions appropriate. I have one example that is on display right now, where no one can argue that it is not over-classification. On this board you can clearly see the public testimony of Mike Canavan, a top FAA official before the 9/11 Commission on May 23, 2003. On this board is the same testimony partially redacted. The testimony that is blacked out reads, "We are hearing this, this, and this from this organization. It was just a gain in the chatter piece, so to speak."

So I truly do not understand why public testimony that is released to the public could ever end up covered by black ink and officially redacted.

With regard to our questions surrounding Secretary Rice, during her tenure as President Bush's national security advisor, she made several categorical statements asserting that there were never any

32

warnings that terrorists might use airplanes and suicide attacks. One possibility is that Secretary Rice was unaware of the extensive FAA warnings when she appeared before the press and testified before the 9/11 Commission. This would raise serious questions about her preparation.

Another possibility is that Secretary Rice knew about the FAA warnings but provided misleading information to the Commission. Neither of these possibilities would reflect well on Secretary Rice. Perhaps there are other, more innocent explanations for these seeming inconsistencies.

I look forward to the testimony of our witnesses, and I hope to find out how, when and why this document was classified. Finally, I would like to thank Chairman Shays, in accommodating our request for including Sibel Edmonds as a witness. I would like to welcome her. She will be testifying publicly for the first time ever before Congress, despite the fact that she was wrongly fired by the FBI 3 years ago for trying to do her patriotic duty by raising concerns with possible espionage within the FBI.

Even though the Justice Department Inspector General found that her claims had merit, the administration to this day has not fully investigated these serious issues, and amazingly, has still not made Ms. Edmonds whole. I hope that this situation will change, and I look forward to understanding how new designations that have no basis in Federal law or statute came into existence. Secrecy in government, particularly on public policy issues, ones from which we want to learn in order to prevent such actions in the future, are very, very serious, and I welcome the chairman and the ranking member's efforts. I'm glad to join them in this effort.

Thank you.

[The prepared statement of Hon. Carolyn B. Maloney follows:]

# EXHIBIT
# VV

JUN. 17. 2004  2:27PM     LEGAL                                              NO. 499    r.  2

UNCLASSIFIED

## THE WHITE HOUSE
### WASHINGTON

February 7, 2002

MEMORANDUM FOR THE VICE PRESIDENT
            THE SECRETARY OF STATE
            THE SECRETARY OF DEFENSE
            THE ATTORNEY GENERAL
            CHIEF OF STAFF TO THE PRESIDENT
            DIRECTOR OF CENTRAL INTELLIGENCE
            ASSISTANT TO THE PRESIDENT FOR NATIONAL
                SECURITY AFFAIRS
            CHAIRMAN OF THE JOINT CHIEFS OF STAFF

SUBJECT:        Humane Treatment of al Qaeda and Taliban Detainees

1.  Our recent extensive discussions regarding the status
    of al Qaeda and Taliban detainees confirm that the appli-
    cation of the Geneva Convention Relative to the Treatment
    of Prisoners of War of August 12, 1949 (Geneva) to the
    conflict with al Qaeda and the Taliban involves complex
    legal questions.  By its terms, Geneva applies to conflicts
    involving "High Contracting Parties," which can only be
    states.  Moreover, it assumes the existence of "regular"
    armed forces fighting on behalf of states.  However, the
    war against terrorism ushers in a new paradigm, one in
    which groups with broad, international reach commit horrific
    acts against innocent civilians, sometimes with the direct
    support of states.  Our Nation recognizes that this new
    paradigm -- ushered in not by us, but by terrorists --
    requires new thinking in the law of war, but thinking that
    should nevertheless be consistent with the principles of
    Geneva.

2.  Pursuant to my authority as Commander in Chief and Chief
    Executive of the United States, and relying on the opinion
    of the Department of Justice dated January 22, 2002, and on
    the legal opinion rendered by the Attorney General in his
    letter of February 1, 2002, I hereby determine as follows:

    a.  I accept the legal conclusion of the Department of
        Justice and determine that none of the provisions
        of Geneva apply to our conflict with al Qaeda in
        Afghanistan or elsewhere throughout the world because,
        among other reasons, al Qaeda is not a High Contracting
        Party to Geneva.

    b.  I accept the legal conclusion of the Attorney General
        and the Department of Justice that I have the authority
        under the Constitution to suspend Geneva as between
        the United States and Afghanistan, but I decline to

Reason:  1.5  (d)
Declassify on:  02/07/12

NSC DECLASSIFICATION REVIEW [E.O. 12958 as amended]
DECLASSIFIED IN FULL ON 6/17/2004
by R.Soubers

UNCLASSIFIED

JUN. 17. 2004  2:27PM    LEGAL

NO. 499    P. 3

UNCLASSIFIED

2

exercise that authority at this time.  Accordingly, I
determine that the provisions of Geneva will apply to
our present conflict with the Taliban.  I reserve the
right to exercise this authority in this or future
conflicts.

   c.    I also accept the legal conclusion of the Department of
Justice and determine that common Article 3 of Geneva
does not apply to either al Qaeda or Taliban detainees,
because, among other reasons, the relevant conflicts
are international in scope and common Article 3 applies
only to "armed conflict not of an international
character."

   d.    Based on the facts supplied by the Department of
Defense and the recommendation of the Department of
Justice, I determine that the Taliban detainees are
unlawful combatants and, therefore, do not qualify as
prisoners of war under Article 4 of Geneva.  I note
that, because Geneva does not apply to our conflict
with al Qaeda, al Qaeda detainees also do not qualify
as prisoners of war.

3.    Of course, our values as a Nation, values that we share with
many nations in the world, call for us to treat detainees
humanely, including those who are not legally entitled to
such treatment.  Our Nation has been and will continue to
be a strong supporter of Geneva and its principles.  As
a matter of policy, the United States Armed Forces shall
continue to treat detainees humanely and, to the extent
appropriate and consistent with military necessity, in
a manner consistent with the principles of Geneva.

4.    The United States will hold states, organizations, and
individuals who gain control of United States personnel
responsible for treating such personnel humanely and
consistent with applicable law.

5.    I hereby reaffirm the order previously issued by the
Secretary of Defense to the United States Armed Forces
requiring that the detainees be treated humanely and,
to the extent appropriate and consistent with military
necessity, in a manner consistent with the principles
of Geneva.

6.    I hereby direct the Secretary of State to communicate my
determinations in an appropriate manner to our allies, and
other countries and international organizations cooperating
in the war against terrorism of global reach.

UNCLASSIFIED

# EXHIBIT WW

LEXSEE 548 U.S. 557

**SALIM AHMED HAMDAN, Petitioner v. DONALD H. RUMSFELD, SECRETARY OF DEFENSE, et al.**

**No. 05-184**

**SUPREME COURT OF THE UNITED STATES**

*548 U.S. 557; 126 S. Ct. 2749; 165 L. Ed. 2d 723; 2006 U.S. LEXIS 5185; 19 Fla. L. Weekly Fed. S 452*

**March 28, 2006, Argued**
**June 29, 2006, Decided**

**NOTICE:**

   [***1]  The LEXIS pagination of this document is subject to change pending release of the final published version.

**SUBSEQUENT HISTORY:** Writ of habeas corpus denied *In re Hamdan, 126 S. Ct. 2981, 165 L. Ed. 2d 990, 2006 U.S. LEXIS 5239 (U.S., 2006)*
On remand at *Hamdan v. Rumsfeld, 2006 U.S. App. LEXIS 20943 (D.C. Cir., Aug. 11, 2006)*

**PRIOR HISTORY:**   ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
   *Hamdan v. Rumsfeld, 367 U.S. App. D.C. 265, 415 F.3d 33, 2005 U.S. App. LEXIS 14315 (2005)*

**DISPOSITION:**   Reversed and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner, a Yemeni national in custody at an American prison in Guantanamo Bay, Cuba, filed petitions for writs of habeas corpus and mandamus to challenge the Executive Branch's intended means of prosecuting a charge of conspiracy to commit offenses triable by military commission. The United Court of Appeals for the District of Columbia Circuit reversed a decision granting a writ of habeas corpus. Certiorari was granted.

**OVERVIEW:** The government's motion to dismiss was denied because Pub. L. No. 109-148, § 1005(e)(1), 119 Stat. 2739, 2740 (2005), did not repeal federal jurisdiction over pending habeas actions. Abstention was not warranted as petitioner was not an Armed Forces member and the tribunal convened to try him was not part of the integrated system of military courts established by Congress. Review of the commission's procedures in advance of a final decision was appropriate as petitioner had no automatic right to review of the commission's decision before a federal court under the Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2739 (2005). The fact that petitioner already had been excluded from his own trial provided a basis to presume that the procedures employed would violate the law. On the merits, the military commission convened to try petitioner lacked power to proceed as its structure and procedures violated the Uniform Code of Military Justice. The President's practicability determination was insufficient to justify variances from the procedures governing courts-martial. The procedures also violated the Geneva Conventions as they did not meet common article 3's requirements.

**OUTCOME:** The judgment was reversed and the case was remanded for further proceedings.

**LexisNexis(R) Headnotes**

*Military & Veterans Law > Military Justice > Appeals & Reviews > General Overview*
[HN1] See Pub. L. No. 109-148, § 1005(e), 119 Stat. 2739, 2740 (2005).

*Military & Veterans Law > Military Justice > Appeals & Reviews > General Overview*
[HN2] Pub. L. No. 109-148, § 1005(e)(2), 119 Stat. 2739, 2740 (2005), vests in the United States Court of Appeals for the District of Columbia Circuit the exclusive jurisdiction to determine the validity of any final decision of a combatant status review tribunal that an

The Court of Appeals relied on *Johnson v. Eisentrager, 339 U.S. 763, 70 S. Ct. 936, 94 L. Ed. 1255 (1950),* to hold that Hamdan could not invoke the Geneva Conventions to challenge the Government's plan to prosecute him in accordance with Commission Order No. 1. *Eisentrager* involved a challenge by 21 German nationals to their 1945 convictions for war crimes by a military tribunal convened in Nanking, China, and to their subsequent imprisonment in occupied Germany. The petitioners argued, *inter alia,* that the 1929 Geneva Convention rendered illegal some of the procedures [***120] employed during their trials, which they said deviated impermissibly from the procedures used by courts-martial to try American soldiers. See *id., at 789, 70 S. Ct. 936, 94 L. Ed. 1255.* We rejected that claim on the merits because the petitioners (unlike Hamdan here) had failed to [**775] identify any prejudicial disparity "between the Commission that tried [them] and those that would try an offending soldier of the American forces of like rank," and in any event could claim no protection, under the 1929 Geneva Convention, during trials for crimes that occurred before their confinement as prisoners of war. *Id., at 790, 70 S. Ct. 936, 94 L. Ed. 1255.*[56]

56  As explained in Part VI-C, *supra,* that is no longer true under the 1949 Conventions.

[*2794] Buried in a footnote of the opinion, however, is this curious statement suggesting that the Court lacked power even to consider the merits of the Geneva Convention argument:

"We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, [***121] by the Geneva Convention of July 27, 1929, 47 Stat. 2021, concluded with forty-six other countries, including the German Reich, an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection. It is, however, the obvious scheme of the Agreement that responsibility for observance and enforcement of these rights is upon political and military authorities. Rights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention." *Id., at 789, n. 14, 70 S. Ct. 936, 94 L. Ed. 1255.*

The Court of Appeals, on the strength of this footnote, held that "the 1949 Geneva Convention does not confer upon Hamdan a right to enforce its provisions in court." *415 F.3d at 40.*

Whatever else might be said about the *Eisentrager* footnote, it does not control this case. We may assume that "the obvious scheme" of the 1949 Conventions is identical in all relevant respects to that of the 1929 Geneva Convention, [57] and even that that scheme would, absent some other provision of law, preclude Hamdan's invocation of the Convention's [***122] provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right. [58] For, [HN22] regardless of the nature of the rights conferred on Hamdan, cf. *United States v. Rauscher, 119 U.S. 407, 7 S. Ct. 234, 30 L. Ed. 425 (1886),* they are, as the Government does not dispute, part of the law of war. See *Hamdi, 542 U.S., at 520-521, 124 S. Ct. 2633, 159 L. Ed. 2d 578* (plurality opinion). And compliance with the law of war is the condition upon which the authority set forth in *Article 21* is granted.

57  But see, *e.g.,* 4 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War 21 (J. Pictet gen. ed. 1958) (hereinafter GCIV Commentary) (the 1949 Geneva Conventions were written "first and foremost to protect individuals, and not to serve State interests"); GCIII Commentary 91 ("It was not . . . until the Conventions of 1949 . . . that the existence of 'rights' conferred on prisoners of war was affirmed").

58  But see generally Brief for Louis Henkin et al. as *Amici Curiae;* 1 Int'l Comm. of Red Cross, Commentary: Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field 84 (1952) ("It should be possible in States which are parties to the Convention . . . for the rules of the Convention . . . to be evoked before an appropriate national court by the protected person who has suffered the violation"); GCIII Commentary 92; GCIV Commentary 79.

[***123] ii

For the Court of Appeals, acknowledgment [**776] of that condition was no bar to Hamdan's trial by commission. As an alternative to its holding that Hamdan could not invoke the Geneva Conventions at all, the Court of Appeals concluded that the Conventions did not in any event apply to the armed conflict during which Hamdan was captured. The court accepted the Executive's assertions that Hamdan was captured in connection with the United States' war with al Qaeda and that that war is distinct from the war with the Taliban in Afghani-

548 U.S. 557; 126 S. Ct. 2749, *;
165 L. Ed. 2d 723, **; 2006 U.S. LEXIS 5185, ***

stan. It further reasoned [*2795] that the war with al Qaeda evades the reach of the Geneva Conventions. See *415 F.3d at 41-42*. We, like Judge Williams, disagree with the latter conclusion.

The conflict with al Qaeda is not, according to the Government, a conflict to which the full protections afforded detainees under the 1949 Geneva Conventions apply because Article 2 of those Conventions (which appears in all four Conventions) renders the full protections applicable only to "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." 6 U. S. T., at 3318. [59] Since Hamdan was [***124] captured and detained incident to the conflict with al Qaeda and not the conflict with the Taliban, and since al Qaeda, unlike Afghanistan, is not a "High Contracting Party"--*i.e.*, a signatory of the Conventions, the protections of those Conventions are not, it is argued, applicable to Hamdan. [60]

> 59   For convenience's sake, we use citations to the Third Geneva Convention only.
>
> 60   The President has stated that the conflict with the Taliban is a conflict to which the Geneva Conventions apply. See White House Memorandum, Humane Treatment of Taliban and al Qaeda Detainees 2 (Feb. 7, 2002), available at http://www.justicescholars.org/pegc/archive/White_House/bush_memo_20020207_ed.pdf.

We need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not one between signatories. [61] [HN23] Article 3, often referred to as Common Article 3 because, like Article 2, it appears in [***125] all four Geneva Conventions, provides that in a "conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party [62] to the conflict shall be bound to apply, as a minimum," certain provisions protecting "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by . . . detention." *Id.*, at 3318. One such provision prohibits "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted [**777] court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.*, at 3320.

> 61   Hamdan observes that Article 5 of the Third Geneva Convention requires that if there be "any doubt" whether he is entitled to prisoner-of-war protections, he must be afforded those protections until his status is determined by a "competent tribunal." 6 U. S. T., at 3324. See also Headquar-

ters Depts. of Army, Navy, Air Force, and Marine Corps, Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees (1997), App. 116. Because we hold that Hamdan may not, in any event, be tried by the military commission the President has convened pursuant to the November 13 Order and Commission Order No. 1, the question whether his potential status as a prisoner of war independently renders his trial by military commission illegal may be reserved.

[***126]

> 62   The term "Party" here has the broadest possible meaning; a Party need neither be a signatory of the Convention nor "even represent a legal entity capable of undertaking international obligations." GCIII Commentary 37.

The Court of Appeals thought, and the Government asserts, that Common Article 3 does not apply to Hamdan because the conflict with al Qaeda, being "'international in scope,'" does not qualify as a "'conflict not of an international character.'" *415 F.3d at 41*. That reasoning is erroneous. [HN24] The term "conflict not of an international character" is used here in contradistinction to a conflict between nations. So much is demonstrated by the "fundamental logic [of] the Convention's provisions on its [*2796] application." *Id., at 44* (Williams, J., concurring). Common Article 2 provides that "the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." 6 U. S. T., at 3318 (Art. 2, P 1). High Contracting Parties (signatories) also must abide by all [***127] terms of the Conventions vis-a-vis one another even if one party to the conflict is a nonsignatory "Power," and must so abide vis-a-vis the nonsignatory if "the latter accepts and applies" those terms. *Ibid.* (Art. 2, P 3). Common Article 3, by contrast, affords some minimal protection, falling short of full protection under the Conventions, to individuals associated with neither a signatory nor even a nonsignatory "Power" who are involved in a conflict "in the territory of" a signatory. The latter kind of conflict is distinguishable from the conflict described in Common Article 2 chiefly because it does not involve a clash between nations (whether signatories or not). In context, then, the phrase "not of an international character" bears its literal meaning. See, *e.g.*, J. Bentham, Introduction to the Principles of Morals and Legislation 6, 296 (J. Burns & H. Hart eds. 1970) (using the term "international law" as a "new though not inexpressive appellation" meaning "betwixt nation and nation"; defining "international" to include "mutual transactions between sovereigns as such"); Int'l Comm. of Red Cross Commentary on the Additional Protocols to the Geneva Conventions of 12 August 1949, p 1351 (1987) [***128] ("[A] non-

international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other").

[HN25] Although the official commentaries accompanying Common Article 3 indicate that an important purpose of the provision was to furnish minimal protection to rebels involved in one kind of "conflict not of an international character," *i.e.*, a civil war, see GCIII Commentary 36-37, the commentaries also make clear "that the scope of application of the Article must be as wide as possible," *id.*, at 36. [63] In fact, limiting language that would have rendered Common Article 3 applicable "especially [to] cases of civil war, colonial conflicts, or wars of religion" was omitted from the final version of the Article, which coupled broader scope of [**778] application with a narrower range of rights than did earlier proposed iterations. See *Id.* at 42-43.

> 63    See also *id.*, at 35 (Common Article 3 "has the merit of being simple and clear . . . Its observance does not depend upon preliminary discussions on the nature of the conflict"); GCIV Commentary 51 ("[N]obody in enemy hands can be outside the law"); U.S. Army Judge Advocate General's Legal Center and School, Dept. of the Army, Law of War Workshop Deskbook 228 (June 2000)(reprint 2004) (Common Article 3 "serves as a 'minimum yardstick of protection 'in all conflicts, not just internal armed conflicts" (quoting *Nicaragua* v. *United States*, 1986 I. C. J. 14, P 218, 25 I. L. M. 1023)); *Prosecutor* v. *Tadic*, Case No. IT-94-1, Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction, P 102 (ICTY App. Chamber, Oct. 2, 1995) (stating that "the character of the conflict is irrelevant" in deciding whether Common Article 3 applies).

[***129] iii

[HN26] Common Article 3, then, is applicable here and, as indicated above, requires that Hamdan be tried by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 6 U. S. T., at 3320 (Art. 3, P 1(*d*)). While the term "regularly constituted court" is not specifically defined in either Common Article 3 or its accompanying commentary, other sources disclose its core meaning: The commentary accompanying a provision of the Fourth Geneva Convention, for example, defines "'regularly constituted' tribunals to include "ordinary military courts" and "definitely exclud[e] all special [*2797] tribunals." GCIV Commentary 340 (defining the term "properly constituted" in Article 66, which the commentary treats as identical to "regularly constituted"); [64] see also *Yamashita, 327 U.S.*, at 44, 66 S. Ct.

*340, 90 L. Ed. 499* (Rutledge, J., dissenting) (describing military commission as a court "specially constituted for the particular trial"). And one of the Red Cross' own treatises defines "regularly constituted court" as used in Common Article 3 to mean "established and organized in accordance with the laws and procedures already in force in [***130] a country." Int'l Comm. of Red Cross, 1 Customary Int'l Humanitarian Law 355 (2005); see also GCIV Commentary 340 (observing that "ordinary military courts" will "be set up in accordance with the recognized principles governing the administration of justice").

> 64    The commentary's assumption that the terms "properly constituted" and "regularly constituted" are interchangeable is beyond reproach; the French version of Article 66, which is equally authoritative, uses the term "regulierement constitues" in place of "properly constituted." 6 U. S. T., at 3559.

The Government offers only a cursory defense of Hamdan's military commission in light of Common Article 3. See Brief for Respondents 49-50. As Justice Kennedy explains, that defense fails because "[t]he regular military courts in our system are the courts-martial established by congressional statutes." *Post, at ___, 165 L. Ed. 2d, at 785* (opinion concurring in part). [HN27] At a minimum, a military commission "can be 'regularly constituted' by the standards of our military justice system only if some [***131] practical need explains deviations from court-martial practice." *Post, at ___, 165 L. Ed. 2d, at 786.* As we have explained, see Part VI-C, *supra*, no such need has been demonstrated here. [65]

> 65    Further evidence of this tribunal's irregular constitution is the fact that its rules and procedures are subject to change midtrial, at the whim of the Executive. See Commission Order No. 1, § 11 (providing that the Secretary of Defense may change the governing rules "from time to time").

iv

Inextricably intertwined with the question of regular constitution is the evaluation of the procedures governing the tribunal and whether they afford "all the judicial guarantees which are recognized as indispensable by civilized peoples." 6 U. S. T., at 3320 (Art. 3, P 1(*d*)). Like the phrase "regularly constituted court," this phrase is not defined in the text of the Geneva Conventions. But it must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many [***132] of these are [**779] described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 (Protocol

# EXHIBIT

# XX



**OFFICE OF THE SECRETARY OF DEFENSE**
WASHINGTON, DC 20301

JUL   7 2006

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
CHAIRMAN OF THE JOINT CHIEFS OF STAFF
UNDER SECRETARIES OF DEFENSE
COMMANDERS OF THE COMBATANT COMMANDS
ASSISTANT SECRETARIES OF DEFENSE
GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
DIRECTOR, OPERATIONAL TEST AND EVALUATION
INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
ASSISTANTS TO THE SECRETARY OF DEFENSE
DIRECTOR, ADMINISTRATION AND MANAGEMENT
DIRECTOR, PROGRAM ANALYSIS AND EVALUATION
DIRECTOR, NET ASSESSMENT
DIRECTOR, FORCE TRANSFORMATION
DIRECTORS OF THE DEFENSE AGENCIES
DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT:   Application of Common Article 3 of the Geneva Conventions to the
Treatment of Detainees in the Department of Defense

The Supreme Court has determined that Common Article 3 to the Geneva
Conventions of 1949 applies as a matter of law to the conflict with Al Qaeda.  The Court
found that the military commissions as constituted by the Department of Defense are not
consistent with Common Article 3.

It is my understanding that, aside from the military commission procedures,
existing DoD orders, policies, directives, execute orders, and doctrine comply with the
standards of Common Article 3 and, therefore, actions by DoD personnel that comply
with such issuances would comply with the standards of Common Article 3.  For
example, the following are consistent with the standards of Common Article 3:  U.S.
Army Field Manual 34-52, "Intelligence Interrogation," September 28, 1992; DoD
Directive 3115.09, "DoD Intelligence Interrogation, Detainee Debriefings and Tactical
Questioning," November 3, 2005; DoD Directive 2311.01E, "DoD Law of War
Program," May 9, 2006; and DoD Instruction 2310.08E, "Medical Program Support for
Detainee Operations," June 6, 2006.  In addition, you will recall the President's prior
directive that "the United States Armed Forces shall continue to treat detainees
humanely," humane treatment being the overarching requirement of Common Article 3.

You will ensure that all DoD personnel adhere to these standards.  In this regard, I
request that you promptly review all relevant directives, regulations, policies, practices,
and procedures under your purview to ensure that they comply with the standards of
Common Article 3.



OSD 10735-06

7/7/2006 4:37:09 PM

Your reply confirming completion of this review should be submitted by a Component Head, General/Flag Officer, or SES member, including a reply of "reviewed and no effect" where applicable, to the Deputy Assistant Secretary of Defense (DASD) for Detainee Affairs, Office of the Under Secretary of Defense for Policy, no later than three weeks from the date of this memorandum. The DASD for Detainee Affairs may be reached at (703) 697-4602.

The text of Common Article 3 follows:

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

    (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
    (b) taking of hostages;
    (c) outrages upon personal dignity, in particular, humiliating and degrading treatment;
    (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for.

An impartial humanitarian body, such as the International Committee of the Red Cross, may offer its services to the Parties to the conflict.

The Parties to the conflict should further endeavour to bring into force, by means of special agreements, all or part of the other provisions of the present Convention.

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

# EXHIBIT YY

Case 1:07-cv-05435-LAP    Document 75-17    Filed 06/25/2008    Page 44 of 63

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


July 12, 2006

# White House Says Terror Detainees Hold Basic Rights

By MARK MAZZETTI and KATE ZERNIKE

WASHINGTON, July 11 — The White House conceded on Tuesday for the first time that terror suspects held by the United States had a right under international law to basic human and legal protections under the Geneva Conventions.

The statement reverses a position the White House had held since shortly after the Sept. 11 attacks, and it represents a victory for those within the administration who argued that the United States' refusal to extend Geneva protections to Qaeda prisoners was harming the country's standing abroad.

It said the White House would withdraw a part of an executive order issued by President Bush in 2002 saying that terror suspects were not covered by the Geneva Conventions.

The White House said the change was in keeping with the Supreme Court decision two weeks ago that struck down the military tribunals Mr. Bush established. A Defense Department memorandum made public earlier Tuesday concluded that the court decision also meant that terror suspects in military custody had legal rights under the Geneva Convention.

The new White House interpretation is likely to have sweeping implications, because it appears to apply to all Qaeda and Taliban terror suspects now in the custody of the Central Intelligence Agency or other American intelligence organizations around the world. From the outset, Mr. Bush declared that the battle against Al Qaeda would be a war like no other, but his administration has been forced to back away from its most forceful efforts to deny rights to terror suspects.

Mr. Bush's order of Feb. 7, 2002, issued shortly after American-led forces toppled the Taliban government in Afghanistan, specifically said that critical aspects of the Geneva Conventions do "not apply to either Al Qaeda or Taliban detainees."

In response to a question, the White House issued a statement late Tuesday, saying: "As a result of the Supreme Court decision, that portion of the order no longer applies. The Supreme Court has clarified what the law is, and the executive branch will comply."

Case 1:07-cv-05435-LAP    Document 75-17    Filed 06/25/2008    Page 45 of 63

The Pentagon memorandum, dated July 7, offered an unexpectedly conciliatory interpretation of the justices' ruling 12 days ago that struck down White House rules for military tribunals that would have granted detainees the barest of rights. Until late Tuesday, the White House and the C.I.A. had been silent on whether detainees in the custody of intelligence agencies must also be granted those rights.

The memorandum, written by Deputy Defense Secretary Gordon R. England, summarized the Supreme Court findings and reminded officials to "ensure that all D.o.D. personnel adhere to these standards."

The Pentagon currently holds approximately 1,000 Qaeda and Taliban detainees at the military prison at Guantánamo Bay, Cuba, and at bases in Afghanistan. An estimated three dozen additional terror suspects, including Khalid Sheikh Mohammed, who is considered the mastermind of the Sept. 11 attacks, are believed to be held by the C.I.A. at secret sites around the world.

Jennifer Millerwise Dyck, a C.I.A. spokeswoman, declined to comment on questions posed before the White House issued its statement.

Despite the new statements by the White House and the Pentagon, administration lawyers appearing on Capitol Hill on Tuesday urged Congress to approve military commissions similar to those that the court said the president did not have authority to set up on his own. The lawyers played down the Pentagon announcement as representing not a policy shift but simply an announcement of the Supreme Court decision.

"We would ask this body to render its approval for the system as currently configured," said Daniel J. Dell'Orto, the Pentagon's principal deputy general counsel. "It would be a very expeditious way to move these trials forward."

But the tribunal approach ran up against fierce resistance among Republicans as well as Democrats. Some lawmakers argued that the best way to set up a system to bring detainees to trial would be to start with the existing code of military justice, which grants wider rights to detainees, and adjust it to reflect the demands of prosecuting terrorists.

"If you fight that approach, it's going to be long hot summer," said Senator Lindsey Graham, Republican of South Carolina and a former military lawyer who is expected to play a leading role in the debate over bringing detainees to trial.

The new Bush administration statement addresses questions surrounding a key provision of

the 1949 Geneva Conventions known as Common Article 3, which prohibits cruel and inhumane treatment of prisoners and requires that detainees receive "all the judicial guarantees which are recognized as indispensable by civilized peoples." Mr. Bush's 2002 order came after a fierce debate about the rules for what the administration was calling a "different kind of war."

In the new memorandum, Mr. England asserted that "the Supreme Court has determined that Common Article 3 to the Geneva Conventions of 1949 applies as a matter of law to the conflict with Al Qaeda."

The memorandum by Mr. England was first reported in Tuesday's online editions of The Financial Times.

Pentagon officials have long said that detainees in military custody are treated in accordance with Common Article 3, yet Mr. England's memorandum went further in acknowledging that the court's decision made mandatory what the Pentagon had said it was doing voluntarily.

The memorandum also appears to settle continuing battles within the administration over a long-awaited Pentagon directive on the treatment of detainees.

The directive, called "D.o.D. Program for Enemy Prisoners of War and Other Detainees," has been held up for months because of wrangling over the types of treatment that ought to be prohibited.

In the past, Vice President Dick Cheney's chief of staff, David S. Addington, pressed Pentagon officials to eliminate specific language from the document that cited the Geneva Conventions in prohibiting cruel and degrading treatment.

Since becoming the Pentagon's No. 2 official in 2005, Mr. England has repeatedly expressed concerns about the detention of enemy combatants and has told colleagues that he advocates closing the military prison at Guantánamo Bay because of the negative impact it has on the United States' reputation.

In a sign of the seriousness with which Mr. England took these issues, his memorandum reprinted the entire text of Common Article 3 and required military commanders to review all the directives and policies under their purview and report back to him within three weeks.

On Capitol Hill, Mr. Dell'Orto played down the England memorandum, testifying before the Senate Judiciary Committee that it was merely intended to "get the word out" about the court

decision.

"It doesn't indicate a shift in policy," Mr. Dell'Orto said. "It just announces the decision of the court and with specificity as to the decision as it related to the commission process."

The hearing today, the first of three this week, formally opened the debate about how to bring Guantánamo detainees to trial, and it quickly showed the stark divide between the White House and Congress.

The White House believes the court did not so much rule out the military commissions as indicate that Mr. Bush should seek approval of them from Congress, administration officials have said.

Under such a system, the defendant could be excluded from the courtroom and could be denied the right to see some of the evidence against him. The military commission rules also allow evidence that is typically excluded from courts, including hearsay and statements obtained through coercion.

Many in Congress, including some Republican leaders who are expected to guide the debate in the Senate, believe that the court will strike down any new arrangement approved by Congress if it does not allow detainees broader rights.

But Mr. Dell'Orto said "it would be ludicrous" to go so far as allowing detainees protections like those granted in court-martial proceedings.

But Senator Graham told the administration lawyers they would be "well served to forget about" the commissions the president wanted.

*David Sanger contributed reporting for this article.*

Copyright 2006 The New York Times Company

# EXHIBIT
# ZZ



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

 CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
September 15, 2006

## Press Conference of the President
The Rose Garden

11:15 A.M. EDT

THE PRESIDENT: It's always a pleasure to be introduced into
the Rose Garden. Thank you, Wendell. Thank you for coming.
I'm looking forward to answering some of your questions.



VIDEO Multimedia

President's Remarks
 view

This week our nation paused to mark the 5th anniversary of the 9/11 attacks. It was a tough day for a lot
of our citizens. I was so honored to meet with family members and first responders, workers at the
Pentagon, all who still had heaviness in their heart. But they asked me a question, you know, they kept
asking me, what do you think the level of determination for this country is in order to protect ourselves, is
what they want to know.

You know, for me, it was a reminder about how I felt right after
9/11. I felt a sense of determination and conviction about doing
everything that is necessary to protect the people. I'm going to
go back to New York to address the United Nations General
Assembly. I'm going to talk to world leaders gathered there
about our obligation to defend civilization and liberty, to support
the forces of freedom and moderation throughout the Middle
East. As we work with the international community to defeat the
terrorists and extremists, to provide an alternative to their
hateful ideology, we must also provide our military and
intelligence professionals with the tools they need to protect our
country from another attack. And the reason they need those
tools is because the enemy wants to attack us again.



Right here in the Oval Office, I get briefed nearly every morning about the nature of this world, and I get
briefed about the desire of an enemy to hurt America. And it's a sobering experience, as I'm sure you
can imagine. I wish that weren't the case, you know. But it is the case. And, therefore, I believe it is vital
that our folks on the front line have the tools necessary to protect the American people.

There are two vital pieces of legislation in Congress now that I think are necessary to help us win the
war on terror. We will work with members of both parties to get legislation that works out of the
Congress. The first bill will allow us to use military commissions to try suspected terrorists for war
crimes. We need the legislation because the Supreme Court recently ruled that military commissions
must be explicitly authorized by Congress. So we're working with Congress. The Supreme Court said,
you must work with Congress; we are working with Congress to get a good piece of legislation out.

The bill I have proposed will ensure that suspected terrorists will receive full and fair trials, without
revealing to them our nation's sensitive intelligence secrets. As soon as Congress acts on this bill, the
man our intelligence agencies believe helped orchestrate the 9/11 attacks can face justice.

The bill would also provide clear rules for our personnel involved in detaining and questioning captured
terrorists. The information that the Central Intelligence Agency has obtained by questioning men like
Khalid Sheikh Mohammed has provided valuable information and has helped disrupt terrorist plots,

including strikes within the United States.

For example, Khalid Sheikh Mohammed described the design of planned attacks of buildings inside the U.S. and how operatives were directed to carry them out. That is valuable information for those of us who have the responsibility to protect the American people. He told us the operatives had been instructed to ensure that the explosives went off at a high -- a point that was high enough to prevent people trapped above from escaping.



He gave us information that helped uncover al Qaeda cells' efforts to obtain biological weapons.

We've also learned information from the CIA program that has helped stop other plots, including attacks on the U.S. Marine base in East Africa, or American consulate in Pakistan, or Britain's Heathrow Airport. This program has been one of the most vital tools in our efforts to protect this country. It's been invaluable to our country, and it's invaluable to our allies.

Were it not for this program, our intelligence community believes that al Qaeda and its allies would have succeeded in launching another attack against the American homeland. Making us -- giving us information about terrorist plans we couldn't get anywhere else, this program has saved innocent lives. In other words, it's vital. That's why I asked Congress to pass legislation so that our professionals can go forward, doing the duty we expect them to do. Unfortunately, the recent Supreme Court decision put the future of this program in question. That's another reason I went to Congress. We need this legislation to save it.

I am asking Congress to pass a clear law with clear guidelines based on the Detainee Treatment Act that was strongly supported by Senator John McCain. There is a debate about the specific provisions in my bill, and we'll work with Congress to continue to try to find common ground. I have one test for this legislation, I'm going to answer one question as this legislation proceeds, and it's this: The intelligence community must be able to tell me that the bill Congress sends to my desk will allow this vital program to continue. That's what I'm going to ask.

The second bill before Congress would modernize our electronic surveillance laws and provide additional authority for the terrorist surveillance program. I authorized the National Security Agency to operate this vital program in response to the 9/11 attacks. It allows us to quickly monitor terrorist communications between someone overseas and someone in the United States, and it's helped detect and prevent attacks on our country.

The principle behind this program is clear: when an al Qaeda operative is calling into the United States or out of the country, we need to know who they're calling, why they're calling, and what they're planning. Both these bills are essential to winning the war on terror. We will work with Congress to get good bills out. We have a duty, and we have a duty to work together to give our folks on the front line the tools necessary to protect America. Time is running out. Congress is set to adjourn in just a few weeks. Congress needs to act wisely and promptly so I can sign good legislation.



And now I'll be glad to answer some questions. Terry.

Q Thank you, Mr. President. Mr. President, former Secretary of State Colin Powell says the world is beginning to doubt the moral basis of our fight against terrorism. If a former Chairman of the Joint Chiefs of Staff and former Secretary of State feels this way, don't you think that Americans and the rest of the

world are beginning to wonder whether you're following a flawed strategy?

THE PRESIDENT: If there's any comparison between the compassion and decency of the American people and the terrorist tactics of extremists, it's flawed logic. I simply can't accept that. It's unacceptable to think that there's any kind of comparison between the behavior of the United States of America and the action of Islamic extremists who kill innocent women and children to achieve an objective, Terry.

My job, and the job of people here in Washington, D.C., is to protect this country. We didn't ask for this war. You might remember the 2000 campaign. I don't remember spending much time talking about what it might be like to be a Commander-in-Chief in a different kind of war. But this enemy has struck us and they want to strike us again. And we will give our folks the tools necessary to protect the country; that's our job.

It's a dangerous world. I wish it wasn't that way. I wish I could tell the American people, don't worry about it, they're not coming again. But they are coming again. And that's why I've sent this legislation up to Congress, and that's why we'll continue to work with allies in building a vast coalition, to protect not only ourselves, but them. The facts are, is that after 9/11, this enemy continued to attack and kill innocent people.

I happen to believe that they're bound by a common ideology. Matter of fact, I don't believe that, I know they are. And they want to impose that ideology throughout the broader Middle East. That's what they have said. It makes sense for the Commander-in-Chief, and all of us involved in protecting this country to listen to the words of the enemy. And I take their words seriously. And that's what's going to be necessary to protect this country, is to listen carefully to what they say and stay ahead of them as they try to attack us.

Steve.

Q Can I just follow up?

THE PRESIDENT: No, you can't. Steve. If we follow up, we're not going to get -- I want Hillman to be able to ask a question. It's his last press conference -- not yet, Hillman. (Laughter.) Soon. You and Wendell seem --

Q Thank you very much, sir. What do you say to the argument that your proposal is basically seeking support for torture, coerced evidence and secret hearings? And Senator McCain says your plan will put U.S. troops at risk. What do you think about that?

THE PRESIDENT: This debate is occurring because of the Supreme Court's ruling that said that we must conduct ourselves under the Common Article III of the Geneva Convention. And that Common Article III says that there will be no outrages upon human dignity. It's very vague. What does that mean, "outrages upon human dignity"? That's a statement that is wide open to interpretation. And what I'm proposing is that there be clarity in the law so that our professionals will have no doubt that that which they are doing is legal. You know, it's -- and so the piece of legislation I sent up there provides our professionals that which is needed to go forward.

The first question that we've got to ask is, do we need the program? I believe we do need the program. And I detailed in a speech in the East Room what the program has yield -- in other words, the kind of information we get when we interrogate people, within the law. You see, sometimes you can pick up information on the battlefield; sometimes you can pick it up through letters; but sometimes you actually have to question the people who know the strategy and plans of the enemy. And in this case, we questioned people like Khalid Sheikh Mohammed, who we believe ordered the attacks on 9/11, or Ramzi Binalshibh, or Abu Zabeda -- cold-blooded killers who were part of planning the attack that killed 3,000 people. And we need to be able to question them, because it helps yield information, the information necessary for us to be able to do our job.

Now, the Court said that you've got to live under Article III of the Geneva Convention, and the standards are so vague that our professionals won't be able to carry forward the program, because they don't want to be tried as war criminals. They don't want to break the law. These are decent, honorable citizens who are on the front line of protecting the American people, and they expect our government to give them clarity about what is right and what is wrong in the law. And that's what we have asked to do.

And we believe a good way to go is to use the amendment that we worked with John McCain on, called the Detainee Treatment Act, as the basis for clarity for people we would ask to question the enemy. In other words, it is a way to bring U.S. law into play. It provides more clarity for our professionals. And that's what these people expect. These are decent citizens who don't want to break the law.

Now, this idea that somehow we've got to live under international treaties, you know -- and that's fine, we do, but oftentimes the United States passes law to clarify obligations under international treaty. And what I'm concerned about is if we don't do that, then it's very conceivable our professionals could be held to account based upon court decisions in other countries. And I don't believe Americans want that. I believe Americans want us to protect the country, to have clear standards for our law enforcement intelligence officers, and give them the tools necessary to protect us within the law.

It's an important debate, Steve. It really is. It's a debate that really is going to define whether or not we can protect ourselves. I will tell you this, I've spent a lot of time on this issue, as you can imagine, and I've talked to professionals, people I count on for advice -- these are people that are going to represent those on the front line of protecting this country. They're not going forward with the program. They're not going -- the professionals will not step up unless there's clarity in the law. So Congress has got a decision to make: Do you want the program to go forward or not?

I strongly recommend that this program go forward in order for us to be able to protect America.

Hillman. This is Hillman's last press conference, so -- sorry, sorry, about that.

Q Thank you, Mr. President. On another of your top priorities, immigration, leaders of both parties have indicated that any chance of comprehensive immigration reform is dead before the election. Is this an issue you would like to revisit in a lame duck session after the election? Or would it be put off until the new Congress?

THE PRESIDENT: Bob, I strongly believe that in order to protect this border, Congress has got to pass a comprehensive plan that on the one hand provides additional money to secure the border, and on the other hand recognizes that people are sneaking in here to do jobs Americans aren't doing. It would be better that they not sneak in, that they would come on a temporary basis, in an orderly way to do work Americans aren't doing and then go home. And I will continue to urge Congress to think comprehensively about this vital piece of legislation.

I went up to the Hill yesterday, and of course this topic came up. It's exactly what I told the members of Congress. They wanted to know whether or not we were implementing border security measures that they had funded last January, and the answer is, we are. One of the key things I told them was we had ended what's called "catch and release." That was a -- you know, a Border Patrol agent would find somebody, particularly from -- not from Mexico, and would say, well, we don't have enough detention space, so why don't you come back and check in with the local person you're supposed to check in with, and then they'd never show back up. And that, of course, frustrated the Border Patrol agents, it frustrates American citizens, it frustrates me, and we ended it, because Congress appropriated money that increased the number of beds available to detain people when we get them sneaking into our country illegally.

The border has become modernized. And Secretary Chertoff here, later on this month, will be announcing further modernizations, as he had led a contract that will use all kinds of different technologies to make the border more secure. But in the long run, to secure this border, we've got to have a rational work plan.

And, finally, we're going to have to treat people with dignity in this country. Ours is a nation of immigrants, and when Congress gets down to a comprehensive bill, I would just remind them, it's virtually impossible to try to find 11 million folks who have been here, working hard -- and, in some cases, raising families -- and kick them out. It's just not going to work. But granting automatic citizenship won't work either. To me, that would just provide an additional incentive for people to try to sneak in, and so therefore there is a rational way forward. I'll continue working -- I don't know the timetable. My answer is, as soon as possible, that's what I'd like to see done.

Thank you. Let's see, Wendell. Coming your way. Everybody is going to get one.

Q My apologies, Mr. President, for talking too long at the start.

THE PRESIDENT: Don't worry. I'm not going to apologize for talking too long to your answer. (Laughter.)

Q Talk as long as you'd like, sir. (Laughter.)

When you go to New York next week, it's our thinking that one of the things you'll be trying to do is to get more international support for taking a tough stance against Iran. I wonder how much that is frustrated by two things: one, the war in Iraq and world criticism of that; and the other, the Iraqi Prime Minister going to Iran and basically challenging your administration's claim that Iran is meddling in Iraqi affairs.

THE PRESIDENT: First, Wendell, my decision, along with other countries, to remove Saddam Hussein, has obviously created some concern amongst allies, but it certainly hasn't diminished the coalitions we put together to deal with radicalism. For example, there's 70 nations involved with the Proliferation Security Initiative, and that's an initiative to help prevent weapons of mass destruction and/or component parts from being delivered to countries that could use them to hurt us; or the broad war on terror, the intelligence sharing or financial -- sharing of financial information; or Afghanistan, where NATO troops are there now, along with ours.

In other words, there's a broad coalition. Most nations recognize the threat of Iran having a nuclear weapon in the middle of the Middle East. And there's common consensus that we need to work together to prevent the Iranian regime from developing that nuclear weapons program.

I am pleased that there is strong consensus. And now the objective is to continue reminding the Iranian regime that there is unanimity in the world, and that we will move forward together. And we expect them to come to the table and negotiate with the EU in good faith. And should they choose to verifiably suspend their program, their enrichment program, we'll come to the table. That's what we have said; offer still stands.

During the Hezbollah attacks on Israel, the United Nations did pass a resolution with our European friends and ourselves, and, of course, Russia and China voting for the resolution. I think it passed 14 to 1; one nation voted against the resolution toward Iran. So there is common consensus. And you've heard me lament oftentimes, it takes a while to get diplomacy working. There's one nation of Iran and a bunch of nations like us trying to kind of head in the same direction. And my concern is that they'll stall, they'll try to wait us out.

So part of my objective in New York is to remind people that stalling shouldn't be allowed. In other words, we need to move the process, and they need to understand we're firm in our commitment, and if they try to drag their feet or get us to look the other way, that we won't do that -- that we're firmly committed in our desire to send a common signal to the Iranian regime.

It is important for the Iranian people to also understand we respect them; we respect their history; we respect their traditions; we respect the right for people to worship freely, we would hope that people would be able to express themselves in the public square; and that our intention is to make the world safer. And we'll continue to do so.

Suzanne. And then Martha.

Q Thank you, Mr. President. If I could follow up on that question.

THE PRESIDENT: Yes.

Q Mahmoud Ahmadinejad, the Iranian President, will actually be in the same building as you next week, in Manhattan for the United Nations General Assembly. You say that you want to give the message to the Iranian people that you respect them. Is this not an opportunity, perhaps, to show that you also respect their leader? Would you be willing to, perhaps, meet face-to-face with Ahmadinejad, and would this possibly be a breakthrough, some sort of opportunity for a breakthrough on a personal level?

THE PRESIDENT: No, I'm not going to meet with him. I have made it clear to the Iranian regime that we will sit down with the Iranians once they verifiably suspend their enrichment program. I meant what I said.

Martha.

Q Mr. President, you have said throughout the war in Iraq and building up to the war in Iraq that there was a relationship between Saddam Hussein and Zarqawi and al Qaeda. A Senate Intelligence Committee report a few weeks ago said there was no link, no relationship, and that the CIA knew this and issued a report last fall. And, yet, a month ago you were still saying there was a relationship. Why did you keep saying that? Why do you continue to say that? And do you still believe that?

THE PRESIDENT: The point I was making to Ken Herman's question was that Saddam Hussein was a state sponsor of terror, and that Mr. Zarqawi was in Iraq. He had been wounded in Afghanistan, had come to Iraq for treatment. He had ordered the killing of a U.S. citizen in Jordan. I never said there was an operational relationship. I was making the point that Saddam Hussein had been declared a state sponsor of terror for a reason, and, therefore, he was dangerous.

The broader point I was saying -- I was reminding people was why we removed Saddam Hussein from power. He was dangerous. I would hope people aren't trying to rewrite the history of Saddam Hussein -- all of a sudden, he becomes kind of a benevolent fellow. He's a dangerous man. And one of the reasons he was declared a state sponsor of terror was because that's what he was. He harbored terrorists; he paid for families of suicide bombers. Never have I said that Saddam Hussein gave orders to attack 9/11. What I did say was, after 9/11, when you see a threat, you've got to take it seriously. And I saw a threat in Saddam Hussein -- as did Congress, as did the United Nations. I firmly believe the world is better off without Saddam in power, Martha.

Dave. He's back.

Q Sorry, I've got to get disentangled --

THE PRESIDENT: Would you like me the go to somebody else here, until you -- (laughter.)

Q Sorry.

THE PRESIDENT: But take your time, please. (Laughter.)

Q I really apologize for that. Anyway --

THE PRESIDENT: I must say, having gone through those gyrations, you're looking beautiful today, Dave. (Laughter.)

Q Mr. President, critics of your proposed bill on interrogation rules say there's another important test -- these critics include John McCain, who you've mentioned several times this morning -- and that test is

this: If a CIA officer, paramilitary or special operations soldier from the United States were captured in Iran or North Korea, and they were roughed up, and those governments said, well, they were interrogated in accordance with our interpretation of the Geneva Conventions, and then they were put on trial and they were convicted based on secret evidence that they were not able to see, how would you react to that, as Commander-in-Chief?

THE PRESIDENT: David, my reaction is, is that if the nations such as those you named, adopted the standards within the Detainee Detention Act, the world would be better. That's my reaction. We're trying to clarify law. We're trying to set high standards, not ambiguous standards.

And let me just repeat, Dave, we can debate this issue all we want, but the practical matter is, if our professionals don't have clear standards in the law, the program is not going to go forward. You cannot ask a young intelligence officer to violate the law. And they're not going to. They -- let me finish, please -- they will not violate the law. You can ask this question all you want, but the bottom line is -- and the American people have got to understand this -- that this program won't go forward; if there is vague standards applied, like those in Common Article III from the Geneva Convention, it's just not going to go forward. You can't ask a young professional on the front line of protecting this country to violate law.

Now, I know they said they're not going to prosecute them. Think about that: Go ahead and violate it, we won't prosecute you. These people aren't going to do that, Dave. Now, we can justify anything you want and bring up this example or that example, I'm just telling you the bottom line, and that's why this debate is important, and it's a vital debate.

Now, perhaps some in Congress don't think the program is important. That's fine. I don't know if they do or don't. I think it's vital, and I have the obligation to make sure that our professionals who I would ask to go conduct interrogations to find out what might be happening or who might be coming to this country, I got to give them the tools they need. And that is clear law.

Q But sir, this is an important point, and I think it depends --

THE PRESIDENT: The point I just made is the most important point.

Q Okay.

THE PRESIDENT: And that is the program is not going forward. David, you can give a hypothetical about North Korea, or any other country, the point is that the program is not going to go forward if our professionals do not have clarity in the law. And the best way to provide clarity in the law is to make sure the Detainee Treatment Act is the crux of the law. That's how we define Common Article III, and it sets a good standard for the countries that you just talked about.

Next man.

Q No, but wait a second, I think this is an important point --

THE PRESIDENT: I know you think it's an important point. (Laughter.)

Q Sir, with respect, if other countries interpret the Geneva Conventions as they see fit -- as they see fit -- you're saying that you'd be okay with that?

THE PRESIDENT: I am saying that I would hope that they would adopt the same standards we adopt; and that by clarifying Article III, we make it stronger, we make it clearer, we make it definite.

And I will tell you again, David, you can ask every hypothetical you want, but the American people have got to know the facts. And the bottom line is simple: If Congress passes a law that does not clarify the rules, if they do not do that, the program is not going forward.

Q This will not endanger U.S. troops, in your --

THE PRESIDENT: Next man.

Q This will not endanger U.S. troops --

THE PRESIDENT: David, next man, please. Thank you. It took you a long time to unravel, and it took you a long time to ask your question.

Q Morning, sir. I'd like to ask you another question about Iraq. It's been another bloody day there. The last several weeks have been 40, 50, 60 bodies a day. We've been talking for the last several months about Iraq being on the brink of a civil war. I'd like to ask you if it's not time to start talking about Iraq as being in a civil war, and if it's not, what's the threshold?

THE PRESIDENT: Well, it seems like it's pretty easy to speculate from over here about the conditions on the ground. And so what I do is I talk to people like our Ambassador and General Casey, which I just did this morning. And they, and the Iraqi government, just don't agree with the hypothesis it is a civil war. They believe that there's, no question, violence; they believe that al Qaeda is still creating havoc; they know there's people taking reprisal; they're confident there are still Saddamists who are threatening people and carrying out attacks.

But they also believe that the Baghdad security plan is making progress. There was a lot of discussion about al-Anbar province recently, and I spent some time talking with our commanders. No question it's a dangerous place. It's a place where al Qaeda is really trying to root themselves; it's a place from which they'd like to operate. You know, this business about al Qaeda -- al-Anbar's loss is just not the case; it's not what our commanders think.

So to answer your question, there's no question it's tough. What I look for is whether or not the unity government is moving forward, whether or not they have a political plan to resolve issues such as oil and federalism, whether or not they're willing to reconcile, and whether or not Iraqi troops and Iraqi police are doing their jobs.

Q But how do you measure progress with a body count like that?

THE PRESIDENT: Well, one way you do it is you measure progress based upon the resilience of the Iraqi people; do they want there to be a unity government, or are they splitting up into factions of people warring with the head leaders, with different alternatives of governing styles and different philosophies. The unity government is intact. It's working forward. They're making tough decisions. And we'll stay with them. We'll stay with them because success in Iraq is important for this country. We're constantly changing our tactics. We're constantly adapting to the enemy. We're constantly saying, here's the way forward, we want to work with you. But this is really the big challenge of the 21st century, whether or not this country and allies are willing to stand with moderate people in order to fight off extremists. It is the challenge.

I said the other night in a speech, this is like the ideological war of the 21st century, and I believe it. And I believe that if we leave that region, if we don't help democracy prevail, then our children and grandchildren will be faced with an unbelievable chaotic and dangerous situation in the Middle East. Imagine -- imagine an enemy that can't stand what we believe in getting a hold of oil resources and taking a bunch of oil off the market in order to have an economic punishment. In other words, they say, you go ahead and do this, and if you don't, we'll punish you economically. Or imagine a Middle East with an Iran with a nuclear weapon threatening free nations and trying to promote their vision of extremism through Hezbollah.

I find it interesting that young democracies are being challenged by extremists. I also take great hope in the fact that, by far, the vast majority of people want normalcy and want peace, including in Iraq; that there is a deep desire for people to raise their children in a peaceful world; the desire for mothers to

have the best for their child. And it's not -- there isn't -- you know, Americans -- you've got to understand, this is universal. And the idea of just saying, well, that's not important for us, to me, or the future of the country, it's just not acceptable.

And I know it's tough in Iraq. Of course it's tough in Iraq, because an enemy is trying to stop this new democracy, just like people are trying to stop the development of a Palestinian state, which I strongly support; or people trying to undermine the Lebanese democracy. And the reason why is because the ideologues understand that liberty will trump their dark vision of the world every time. And that's why I call it an ideological struggle. And it's a necessary struggle, and it's a vital struggle.

Richard.

Q Mr. President, as you prepare to go up to the United Nations next week to address the General Assembly, Secretary Kofi Annan has been critical of some of U.S. policies, particularly in Afghanistan lately. How would you characterize the relationship between the United States and the United Nations at this point?

THE PRESIDENT: First of all, my personal relationship with Kofi Annan is good. I like him. And we've got a good relationship, personal relationship. I think a lot of Americans are frustrated with the United Nations, to be frank with you. Take, for example, Darfur. I'm frustrated with the United Nations in regards to Darfur. I have said, and this government has said, there's genocide taking place in the Sudan. And it breaks our collective hearts to know that.

We believe that the best way to solve the problem is there be a political track, as well as a security track. And part of the security track was for there initially to be African Union forces, supported by the international community, hopefully to protect innocent lives from militia. And the AU force is there, but it's not robust enough. It needs to be bigger. It needs to be more viable.

And so the strategy was then to go to the United Nations and pass a resolution enabling the AU force to become blue-helmeted -- that means, become a United Nations peacekeeping force -- with additional support from around the world. And I suggested that there also be help from NATO nations in logistics and support, in order to make the security effective enough so that a political process could go forward to save lives.

The problem is, is that the United Nations hasn't acted. And so I can understand why those who are concerned about Darfur are frustrated; I am. I'd like to see more robust United Nations action. What you'll hear is, well, the government of Sudan must invite the United Nations in for us to act. Well, there are other alternatives, like passing a resolution saying, we're coming in with a U.N. force, in order to save lives.

I'm proud of our country's support for those who suffer. We've provided by far the vast majority of food and aid. I'm troubled by reports I hear about escalating violence. I can understand the desperation people feel for women being pulled out of these refugee centers and raped. And now is the time for the U.N. to act.

So you asked if there are levels of frustration -- there's a particular level of frustration. I also believe that the United Nations can do a better job spending the taxpayer -- our taxpayers' money. I think there needs to be better management structures in place, better accountability in the organization. I hope the United Nations still strongly stands for liberty. I hope they would support my call to end tyranny in the 21st century.

So I'm looking forward to going up there to -- it's always an interesting experience, Richard, for a West Texas fellow to speak to the United Nations. And I'm going to have a strong message, one that's -- hope, based upon hope, and my belief that the civilized world must stand with moderate reformist-minded people and help them realize their dreams. I believe that's the call of the 21st century.

Let's see, who else? The front row people have all asked. Hutch.

Q Good morning.

THE PRESIDENT: Good morning. Thank you.

Q On both the eavesdropping program and the detainee issues --

THE PRESIDENT: We call it the terrorist surveillance program, Hutch.

Q That's the one.

THE PRESIDENT: Yes.

Q You're working with Congress sort of after the fact, after you established these programs on your own authority. And federal courts have ruled in both cases, you overstepped your authority. Is your willingness to work with Congress now an acknowledgment that that is a fact?

THE PRESIDENT: First of all, I strongly believe that the district court ruling on the terrorist surveillance program was flawed. And there's a court process to determine whether or not my belief is true. That's why it's on appeal. We're working with Congress to add certainty to the program.

In terms of the Hamdan decision, I obviously believed that I could move forward with military commissions. Other Presidents had. The Supreme Court didn't agree, and they said, work with Congress. And that's why we're working with Congress.

McKinnon.

Q Thank you, sir. Polls show that many people are still more focused on domestic issues, like the economy, than on the international issues in deciding how to vote in November. And I'd just like to ask you if you could contrast what you think will happen on the economy if Republicans retain control of Congress versus what happens on the economy if Democrats take over?

THE PRESIDENT: If I weren't here -- first of all, I don't believe the Democrats are going to take over, because our record on the economy is strong. If the American people would take a step back and realize how effective our policies have been, given the circumstances, they will continue to embrace our philosophy of government. We've overcome recession, attacks, hurricanes, scandals, and the economy is growing -- 4.7 percent unemployment rate. It's been a strong economy. And I've strongly believed the reason it is because we cut taxes, and at the same time, showed fiscal responsibility here in Washington with the people's money. That's why the deficit could be cut in half by 2009, or before.

And so I shouldn't answer your hypothetical, but I will. I believe if the Democrats had the capacity to, they would raise taxes on the working people. That's what I believe. They'll call it tax on the rich, but that's not the way it works in Washington, see. For example, running up the top income tax bracket would tax small businesses. A lot of small businesses are subchapter-S corporations or limited partnerships that pay tax at the individual level. And if you raise income taxes on them, you hurt job creation. Our answer to economic growth is to make the tax cuts permanent, so there's certainty in the tax code, and people have got money to spend in their pockets.

I've always felt the economy is a determinate issue, if not the determinate issue in campaigns. We've had a little history of that in our family -- (laughter) -- you might remember. But it's a -- I certainly hope this election is based upon economic performance.

Let's see here, kind of working my way -- yes, Mark.

Q Thank you, Mr. President. I'd also like to ask an election-related question. The Republican Leader in

the House this week said that Democrats -- he wonders if they are more interested in protecting the terrorists than protecting the American people. Do you agree with him, sir? And do you think that's the right tone to set for this upcoming campaign, or do you think he owes somebody an apology?

THE PRESIDENT: I wouldn't have exactly put it that way. But I do believe there's a difference of attitude. I mean, take the Patriot Act, for example -- an interesting debate that took place, not once, but twice, and the second time around there was a lot of concern about whether or not the Patriot Act was necessary to protect the country. There's no doubt in my mind we needed to make sure the Patriot Act was renewed to tear down walls that exist so that intelligence people could serve -- could share information with criminal people. It wasn't the case, Mark, before 9/11.

In other words, if somebody had some intelligence that they thought was necessary to protect the people, they couldn't share that with somebody who's job it was to rout people out of society to prevent them from attacking. It made no sense. And so there was a healthy debate, and we finally got the Patriot Act extended after it was passed right after 9/11. To me it was an indication of just a difference of approach.

No on should ever question the patriotism of somebody who -- let me just start over. I don't question the patriotism of somebody who doesn't agree with me. I just don't. And I think it's unwise to do that. I don't think that's what leaders do. I do think that -- I think that there is a difference of opinion here in Washington about tools necessary to protect the country -- the terrorist surveillance program -- or what did you call it, Hutcheson, yes, the illegal eavesdropping program -- (laughter) -- IEP, as opposed to TSP. (Laughter.) There's just a difference of opinion about what we need to do to protect our country, Mark. I'm confident the Leader, you know, meant nothing personal. I know that he shares my concern that we pass good legislation to get something done.

Ken.

Q Thank you, sir. I'd be interested in your thoughts and remembrances about Ann Richards, and particularly what you learned in running against her 12 years ago.

THE PRESIDENT: Obviously, Laura and I pray for her family. I know this is a tough time for her children. She loved her children and they loved her a lot.

Running against Ann Richards taught me a lot. She was a really, really good candidate. She was a hard worker. She had the capacity to be humorous and, yet, make a profound point. I think she made a positive impact on the state of Texas. One thing is for certain, she empowered a lot of people to be -- to want to participate in the political process that might not have felt that they were welcome in the process.

I'll miss her. She was a -- she really kind of helped define Texas politics in its best way. And one of the things we have done is we've -- in our history we've had characters, people larger than life, people that could fill the stage; when the spotlight was on them, wouldn't shirk from the spotlight but would talk Texan and explain -- explain our state. And she was really good at that.

And so I'm sad she passed away, and I wish her family all the best, and all her friends. She had a lot of friends in Texas. A lot of people loved Ann Richards.

And as I understand, they're working on the deal and how to honor her, and she'll be lying in state in the capitol, and --

Q Will you be sending anybody to --

THE PRESIDENT: Yes, I will send somebody to represent me. I don't know who it is going to be yet. Well, we're trying to get the details. Before I ask somebody, I've got to find out the full details.

Thanks for asking the question. Let's see, New York Times, Sheryl.

Q Hi, Mr. President.

THE PRESIDENT: Fine. How are you doing?

Q I'm well today, thank you. (Laughter.)

THE PRESIDENT: Did you start with, hi, Mr. President?

Q Hello, Mr. President.

THE PRESIDENT: Okay, that's fine. Either way, that's always a friendly greeting, thank you.

Q We're a friendly newspaper.

THE PRESIDENT: Yes. (Laughter.) Let me just say, I'd hate to see unfriendly. (Laughter.)

Q Mr. President --

THE PRESIDENT: Want me to go on to somebody else, and you collect your -- (laughter.) Sorry, go ahead, Sheryl.

Q Mr. President, your administration had all summer to negotiate with lawmakers on the detainee legislation. How is it that you now find yourself in a situation where you have essentially an open rebellion on Capitol Hill led by some of the leading members of your own party, very respected voices in military affairs? And, secondly, would you veto the bill if it passes in the form that the Armed Services Committee approved yesterday?

THE PRESIDENT: First, we have been working throughout the summer, talking to key players about getting a bill that will enable the program to go forward, and was pleased that the House of Representatives passed a good bill with an overwhelming bipartisan majority out of their committee, the Armed Services Committee. And I felt that was good progress. And, obviously, we've got a little work to do in the Senate, and we'll continue making our case. But, no, we've been involved -- ever since the Supreme Court decision came down, Sheryl, we've been talking about both the military tribunals and this Article III of the Geneva Convention.

Article III of the Geneva Convention is hard for a lot of citizens to understand. Let's see if I can put it this way for people to understand -- there is a very vague standard that the Court said must kind of be the guide for our conduct in the war on terror and the detainee policy. It's so vague that it's impossible to ask anybody to participate in the program for fear -- for that person having the fear of breaking the law. That's the problem.

And so we worked with members of both bodies and both parties to try to help bring some definition to Common Article III. I really don't think most Americans want international courts being able to determine how we protect ourselves. And my assurance to people is that we can pass law here in the United States that helps define our treaty -- international treaty obligations. We have done that in the past. It is not the first time that we have done this. And I believe it's necessary to do it this time in order for the program to go forward.

Peter.

Q Thank you, Mr. President. Sheryl's second question was whether you would veto the bill as it passed yesterday.

THE PRESIDENT: Oh, I don't -- that's like saying, can you work with a Democrat Congress, when I don't think the Democrat Congress is going to get elected. I believe we can get a good bill. And there is -- as you know, there's several steps in this process. The House will be working on a bill next week, the

Senate will be. Hopefully we can reconcile differences. Hopefully we can come together and find a way forward without ruining the program.

So your question was Sheryl's question?

Q No, sir.

THE PRESIDENT: Oh, you were following up on Sheryl's question?

Q Yes, sir.

THE PRESIDENT: That's a first. (Laughter.)

Q We're a friendly paper, too. (Laughter.)

Mr. President, you've often used the phrase "stand up, stand down," to describe your policy when it comes to troop withdrawals from Iraq -- as Iraqi troops are trained and take over the fight, American troops will come home. The Pentagon now says they've trained 294,000 Iraqi troops and expect to complete their program of training 325,000 by the end of the year, but American troops aren't coming home, and there are more there now than there were previously. Is the goal post moving, sir?

THE PRESIDENT: No, no. The enemy is changing tactics, and we're adapting. That's what's happening. I asked General Casey today, have you got what you need? He said, yes, I've got what I need.

We all want the troops to come home as quickly as possible. But they'll be coming home when our commanders say the Iraqi government is capable of defending itself and sustaining itself and is governing itself. And, you know, I was hoping we would have -- be able to -- hopefully, Casey would come and say, you know, Mr. President, there's a chance to have fewer troops there. It looked like that might be the case -- until the violence started rising in Baghdad, and it spiked in June and July, as you know -- or increased in June and July.

And so they've got a plan now, they've adapted. The enemy moves; we'll help the Iraqis move. So they're building a berm around the city to make it harder for people to come in with explosive devices, for example. They're working different neighborhoods inside of Baghdad to collect guns and bring people to detention. They've got a "clear, build and hold" strategy.

The reason why there are not fewer troops there, but are more -- you're right, it's gone from 135,000 to about 147,000, I think, or 140,000 something troops is because George Casey felt

he needed them to help the Iraqis achieve their objective.

And that's the way I will continue to conduct the war. I'll listen to generals. Maybe it's not the politically expedient thing to do, is to increase troops coming into an election, but we just can't -- you can't make decisions based upon politics about how to win a war. And the fundamental question you have to ask -- and Martha knows what I'm about to say -- is: Can the President trust his commanders on the ground to tell him what is necessary? That's really one of the questions.

In other words, if you say, I'm going to rely upon their judgment, the next question is, how good is their judgment; or is my judgment good enough to figure out whether or not they know what they're doing? And I'm going to tell you I've got great confidence in General John Abizaid and General George Casey. These are extraordinary men who understand the difficulties of the task, and understand there is a delicate relationship between self-sufficiency on the Iraqis' part, and U.S. presence.

And this is not a science, but an art form in a way, to try to make sure that a unity government is able to defend itself, and at the same time not be totally reliant upon coalition forces to do the job for them. And the issue is complicated by the fact that there are still al Qaeda or Saddam remnants or militias that are

still violent. And so to answer your question, the policy still holds. The "stand up, stand down" still holds, and so does the policy of me listening to our commanders to give me the judgment necessary for troop levels.

Richard, and then Allen.

Q Thank you, Mr. President. Earlier this week, you told a group of journalists that you thought the idea of sending special forces to Pakistan to hunt down bin Laden was a strategy that would not work.

THE PRESIDENT: Yes.

Q Now, recently you've also --

THE PRESIDENT: Because, first of all, Pakistan is a sovereign nation.

Q Well, recently you've also described bin Laden as a sort of modern day Hitler or Mussolini. And I'm wondering why, if you can explain why you think it's a bad idea to send more resources to hunt down bin Laden, wherever he is?

THE PRESIDENT: We are, Richard. Thank you. Thanks for asking the question. They were asking me about somebody's report, well, special forces here -- Pakistan -- if he is in Pakistan, as this person thought he might be, who is asking the question -- Pakistan is a sovereign nation. In order for us to send thousands of troops into a sovereign nation, we've got to be invited by the government of Pakistan.

Secondly, the best way to find somebody who is hiding is to enhance your intelligence and to spend the resources necessary to do that; then when you find him, you bring him to justice. And there is a kind of an urban myth here in Washington about how this administration hasn't stayed focused on Osama bin Laden. Forget it. It's convenient throw-away lines when people say that. We have been on the hunt, and we'll stay on the hunt until we bring him to justice, and we're doing it in a smart fashion, Richard. We are. And I look forward to talking to President Musharraf.

Look, he doesn't like al Qaeda. They tried to kill him. And we've had a good record of bringing people to justice inside of Pakistan, because the Paks are in the lead. They know the stakes about dealing with a violent form of ideological extremists. And so we will continue on the hunt. And we've been effective about bringing to justice most of those who planned and plotted the 9/11 attacks, and we've still got a lot of pressure on them. The best way to protect the homeland is to stay on the offense and keep pressure on them.

Last question. Allen.

Q Thank you, Mr. President. It was reported earlier this week that in a meeting with conservative journalists, you said you'd seen changes in the culture, you referred to it as a Third Awakening. I wonder if you could tell us about what you meant by that, what led you to that conclusion? And do you see any contradictory evidence in the culture?

THE PRESIDENT: No, I said -- Mike, thanks. I was just speculating that the culture might be changing, and I was talking about when you're involved with making decisions of historic nature, you won't be around to see the effects of your decisions. And I said that when I work the ropelines, a lot of people come and say, Mr. President, I'm praying for you -- a lot. As a matter of fact, it seems like a lot more now than when I was working ropelines in 1994. And I asked them -- I was asking their opinion about whether or not there was a Third Awakening, I called it.

I'd just read a book on Abraham Lincoln, and his presidency was right around the time of what they called the Second Awakening, and I was curious to know whether or not these smart people felt like there was any historical parallels. I also said that I had run for office the first time to change a culture -- Herman and Hutch remember me saying, you know, the culture that said, if it feels good, do it, and, if

you've got a problem, blame somebody else -- to helping to work change a culture in which each of us are responsible for the decisions we make in life. In other words, ushering in a responsibility era. And I reminded people that responsibility means if you're a father, love your child; if you're corporate America, be honest with the taxpayers; if you're a citizen of this country, love your neighbor.

And so I was wondering out loud with them. It seems like to me that something is happening in the religious life of America. But I'm not a very good focus group, either. I'm encapsulated here. But I'm able to see a lot of people, and from my perspective, people are coming to say, I'm praying for you. And it's an uplifting part of being the President; it inspires me. And I'm grateful that a fellow citizen would say a prayer for me and Laura.

Anyway, thank you all very much.

END 12:14 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/09/20060915-2.html

 CLICK HERE TO PRINT