# Exhibit H

WILMERHALE

July 3, 2006

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

**By Certified U.S. Mail, Facsimile, and E-mail**

Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC 20505

Re: *Freedom of Information Act Appeal - Case Numbers F-2006-00994 and F-2006-01014*

Dear Sir or Madam::

On April 25, 2006 Amnesty International USA[1] ("Amnesty") and Washington Square Legal Services ("WSLS") filed two requests for information under the Freedom of Information Act regarding detainees secretly held by the United States Government, including "Ghost Detainees/Prisoners," "Unregistered Detainees/Prisoners" and "CIA Detainees/Prisoners" ("the Requests"). Your agency, the Central Intelligence Agency ("CIA"), assigned the Requests case numbers F-2006-00994 and F-2006-01014. Although the Department of Justice's Office of Public Affairs granted our request for expedited processing for identical requests, you denied our request for expedited processing on May 5, 2006. Copies of the Requests and the denial letters are attached. *See* Exhibits A-D.

Amnesty and WSLS hereby appeal the CIA's denial of expedited processing of the Requests. As set forth in 5 U.S.C. § 552(a)(6)(E)(i)(I) and 32 C.F.R. § 1900.34, information requests qualify for expedited processing where (1) the failure to obtain the requested information on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of at least one individual, or (2) where the requestor is primarily engaged in disseminating information and the information requested here is relevant to a matter of public urgency concerning an actual or alleged Federal government activity. As demonstrated in our original requests, and elaborated upon below, the Requests qualify for expedited treatment under both standards.

---

[1] Amnesty International USA is the U.S. Section of Amnesty International. *See* http://www.amnestyusa.org/about/.

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 2

1.  **Amnesty is primarily engaged in disseminating information and there is a clear "urgency to inform the public concerning actual or alleged government activity"**

    a.  **Amnesty is primarily engaged in disseminating information**[2/]

      Amnesty plainly qualifies as an entity primarily engaged in disseminating information. As a human rights organization, Amnesty's primary activity involves disseminating information to the public regarding human rights. According to its governing statute, Amnesty's human rights mission is accomplished by *disclosing* human rights abuses accurately, quickly and persistently. It researches individual cases as well as patterns of human rights abuses and then "*these findings are publicized, and members, supporters and staff mobilize public pressure on governments and others to stop the abuses.*"[3/] As it explains on its website: "We search out the facts. We send experts to talk with victims, observe trials and interview local human rights activists and officials. We monitor thousands of media outlets and maintain contact with reliable sources of information all over the world. We publish detailed reports. We inform the news media. We publicize our concerns in leaflets, posters, advertisements, newsletters and websites."[4/]

      Amnesty disseminates this information through its heavily subscribed website, <www.amnestyusa.org>, and directs e-mails to its more than 330,000 members in the United States.[5] The website addresses human rights issues in depth, provides features on human rights issues in the news, and contains an online library containing thousands of documents and articles relating to the issues addressed by Amnesty -- including information and documents obtained on issues covered by the Requests.[6/] Amnesty also conducts news briefings, issues press releases,

---

[2/] As explained in the Requests, WSLS is also an entity primarily engaged in disseminating information. However, because Amnesty clearly meets this requirement, the Requests qualify for expedited treatment regardless of whether WSLS also qualifies. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 30 n5 (2004) ("as long as one of the plaintiffs qualifies as an entity 'primarily engaged in disseminating information' the requirement is satisfied") (citing *Al-Fayed v. CIA*, 254 F.3d 300, 309 (D.C. Cir. 2001)).

[3/] Statute of Amnesty International, *Methods*, *available at* http://web.amnesty.org/pages/aboutai-statute-eng (as amended by the 27th International Council, meeting in Morelos, Mexico, 14 to 20 August 2005).

[4/] "How Does Amnesty International carry out its work?" *available at* http://www.amnestyusa.org/about/faq.html. *See also* http://www.amnestyusa.org for feature articles, in-depth reports, and current news concerning human rights.

[5] *See* http://www.amnestyusa.org/about/aiusa_annualreport.pdf p3.

[6/] *See e.g.*, Amnesty International, Public Statement (with Human Rights Watch, the International Commission of Jurists and the Association for the Prevention of Torture), *Twelve Steps to End Renditions and Secret Detentions in*

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 3

and publishes newsletters, annual country reports, a quarterly magazine and other materials.[7] Indeed, Amnesty's mission fundamentally depends on disseminating information to its members, governments and the public. Thus, "the publicizing of human rights abuses is a core component of Amnesty International's mission and is central to all of its activities."[8]

Courts have determined that entities similar to Amnesty are primarily engaged in dissemination of information for the purpose of receiving expedited processing of their FOIA requests. *See e.g., Leadership Conference on Civil Rights v. Gonzales,* 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (determining that the Leadership Conference on Civil Rights, a coalition of national organizations whose mission is to promote civil rights legislation and policy, was primarily engaged in dissemination of information for the purpose of expediting its FOIA requests); *ACLU,* 321 F. Supp. 2d at 29 n5 (determining that the Electronic Privacy Information Center (EPIC), a public interest research organization, was primarily engaged in dissemination of information for the purposes of expediting its request); *Electronic Privacy Info. Center v. DOD,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003) (determining that EPIC was a representative of the news media for the purposes of a fee waiver). In making this determination, the critical question is whether the entity in question "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience." *EPIC,* 241 F. Supp. 2d at 11. While the EPIC Court discussed this standard in the context of whether or not the EPIC met the "representative of the news media" requirement for a fee waiver, the analysis applies with equal force to the very similar "primarily engaged in disseminating information" requirement for expedited processing. *See ACLU,* 321 F. Supp. 2d at 29 n5 (relying on the same language from *EPIC,* 241 F. Supp. 2d at 11, in

---

*Europe,* June 27, 2006, IOR 10/001/2006; Amnesty International, Public Statement, *Council of Europe: PACE calls for an end to rendition and secret detention,* June 27, 2006, IOR 10/002/2006; Amnesty International, Press Release, *USA: Front companies used in secret flights to torture and "disappearance,"* May 4, 2006, AMR 51/054/2006; Amnesty International, Press Release, *US: Government creating "climate of torture,"* May 3, 2006, AMR 51/070/2006; Amnesty International, *Europe: Partners in crime: Europe's role in US renditions,* June 14, 2006, EUR 01/008/2006; Amnesty International, *Below the radar: Secret Flights to torture and 'disappearance,'* April 5, 2006, AMR 51/051/2006; Amnesty International, *Secret Detention in CIA "Black Sites,"* Nov. 8, 2005, AMR 51/177/2005. All of these documents are available on <www.amnestyusa.org>.

[7] The fact that Amnesty publishes these periodicals alone is sufficient to establish that Amnesty is a representative of the media, *see EPIC,* 241 F. Supp. 2d at 11-14 (concluding that EPIC is a news media entity because it publishes periodicals); *National Security Archive v. DOD,* 880 F.2d 1381, 1386 (D.C. Cir. 1989), and therefore to meet the "primarily engaged in disseminating information" standard. *See ACLU v. DOJ,* 321 F. Supp. 2d 24, 29 n5 (D.D.C. 2004).

[8] Declaration of Curt Goering, Senior Deputy Executive Director for Policy and Programs, Amnesty International, USA, ¶ 5 (attached as Exhibit E).

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 4

concluding that EPIC was primarily engaged in dissemination of information for the purposes of expediting its request).[9]

Given the extent of Amnesty's disclosure of human rights information and publishing activities, the organization easily satisfies the "primarily engaged in disseminating information" requirement for expedited processing of the Requests.

**b.    There is "urgency to inform the public" about secret or irregular apprehension, transfer or detention**

There is also clear urgency to inform the public on the issues of secret detention, ghost detainees, and extraordinary rendition. Courts have consistently recognized that ongoing media attention to an issue is an indicator of urgency. *See Al-Fayed v. CIA*, 254 F.3d 300, 308 (2001) (recognizing fact that an issue "is the subject of current news coverage" is an important factor in deciding whether compelling need exists); *ACLU of Northern Cal. v. DOD*, 2006 WL 1469418, *7 (N.D. Cal. May 25, 2006) ("If anything, extensive media interest usually is a fact *supporting* not *negating* urgency in the processing of FOIA request.") (emphasis in original); *ACLU*, 321 F. Supp. 2d at 29-31 (newspaper articles reflecting public concern a factor supporting finding of urgency).

The Requests clearly relate to a subject of general public interest and ongoing media attention. As explained in the original Requests, media sources around the world have avidly covered news related to these matters, but much pertinent information concerning rendition and ghost detainees is not yet known to the public. Indeed, media interest in secret detention, ghost detainees, and extraordinary rendition has only increased since the filing of the original Requests.[10]

---

[9] *See also* 32 C.F.R. § 286.4(d)(3)(ii) (Department of Defense Regs) ("Representatives of the news media . . . would normally qualify as individuals primarily engaged in disseminating information.").

[10] *See e.g.*, Jan Sliva, *EU concedes rendition flights took place*, The Herald, (June 28, 2006); Ike Seamans, *Above the law*, The Miami Herald, (June 25, 2006); *MIDDLE EAST: Region still lacks support for torture victims, say observers*, Reuters Foundation, (June 25, 2006); *The Detention Dilemma*, The Washington Post, (June 19, 2006); Barrie Dunsmore, *Ugly portrait emerges dot by dot*, Times Argus, (June 18, 2006); Josh White, *Bad Advice Blamed For Banned Tactics*, The Washington Post, (June 17, 2006); Anemona Hartocollis, *Judges Press CIA Lawyer Over Withheld Documents*, The New York Times, (June 13, 2006); *Court Weighs ACLU Request on CIA Terror Documents*, New York Sun, (June 13, 2006); Larry Neumeister, *Court Urges to Protect CIA Detention Info*, Guardian Unlimited (June 13, 2006); *Euro MP's to Extend Probe Into CIA Activities*, Expatica, (June 13, 2006); *Court Will Investigate Alleged CIA Flights*, Los Angeles Times, (June 13, 2006); Jeremy Smith, *EU Lawmakers Back Report on CIA Terror Kidnappings*, Reuters, (June 12, 2006); Jan Sliva, *Probe of CIA Prisons Implicates EU Nations*, Forbes, (June 7, 2006).

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 5

In addition, the urgency to inform the public is further underscored here by the fact that the European Union and the Council of Europe are conducting official investigations into the practice of rendition and the involvement of European countries in extraordinary rendition and secret detention. [11] In the last month alone, each of the investigations has produced a report, thereby further heightening public interest in these topics. [12] These European investigations have encountered difficulties in obtaining information about these practices [13] and have highlighted the extent to which there is a lack of information about the system. [14] Where public debate and

---

[11] In the Council of Europe there is an investigation by Secretary General Terry Davis pursuant to Article 52 of the European Convention and an inquiry by Senator Dick Marty for the Parliamentary Assembly of the Council of Europe: *see generally* http://www.coe.int/T/E/Com/Files/Events/2006-cia/. The European Parliament has a Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners: *see generally* http://www.europarl.europa.eu/activities/expert/committees/presentation.do?committee =2073&language=EN. *See generally* Craig Whitlock, *European Inquiry Fails to Confirm Secret CIA Prisons; But U.S. Tactics Called 'Appalling,'* WASH. POST, Jan. 25, 2006, at A16.

[12] Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June 2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf; Secretary General, *Secretary General's supplementary report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies*, SG/Inf (2006)13, 14 June 2006, *available at* http://www.coe.int/t/E/Com/Press/Source/SG_Inf(2006).doc; Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners, Interim report on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners, 15 June 2006, *available at* http://www.europarl.europa.eu/omk/sipade3?PUBREF=- //EP//NONSGML+REPORT+A6-2006-0213+0+DOC+PDF+V0//EN&L=EN&LEVEL=2&NAV=S&LSTDOC=Y..

[13] Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June 2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf para. 23; Council of Europe, Parliamentary Assembly, Resolution 1507 *Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states* (2006), *available at* http://assembly.coe.int/Main.asp?link=/Documents/AdoptedText/ta06/Eres1507.htm, para. 11 (noting that "Attempts to expose the true nature and extent of these unlawful operations have invariably faced obstruction or dismissal, from the United States and its European partners alike. The authorities of most Council of Europe member States have denied their participation, in many cases without actually having carried out any inquiries or serious investigations."); Secretary General, *Secretary General's report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies*, SG/Inf (2006) 5, Feb. 28, 2005, *available at* https://wcd.coe.int/ViewDoc.jsp?Ref=SG/Inf(2006)5&Sector=secPrivateOffice&Language=lanEnglish&Ver=origin al&BackColorInternet=9999CC&BackColorIntranet=FFBB55&BackColorLogged=FFAC75 paras. 16 – 19.

[14] *See, e.g.*, Committee on Legal Affairs and Human Rights, *Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states*, Draft report – Part II (Explanatory memorandum), 7 June

WilmerHale

Central Intelligence Agency
July 3, 2006
Page 6

investigations are ongoing, there is a particular value to the disclosure of information, in order to accurately frame the debate or conclude the investigation.

Finally, the urgent need to inform the public about secret detention, ghost detainees, and extraordinary rendition is further supported by the fact that these alleged government practices are ongoing. As a result, the alleged program's details and the potential violation of individuals' human rights are of immediate concern to Amnesty and the general public. *See ACLU*, 321 F. Supp. 2d at 30 ("Because the records that plaintiffs seek relate to current surveillance efforts, the potential invasion of the public's privacy interests is of immediate concern, weighing in favor of a finding of expediency").

In short, given the widespread and continuing interest that surrounds these issues, the fact that both the controversy and the alleged government programs are ongoing, and that fundamental components of the alleged program are still unknown, it is clear that there is urgency to inform the public about the information sought by the Requests.

2.  **"Failure to obtain the records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual"**

Amnesty and WSLS have requested information regarding the government's program for secretly or irregularly apprehending, transferring or detaining individuals, which allegedly involves the ongoing unlawful detention and abuse of individuals by or with the involvement of U.S. agents. There are publicly reported allegations that individuals are being abused as part of the government's secret detention programs. The Requests therefore satisfy the requirement that denying a request for expedited processing "could reasonably be expected to pose an imminent threat to the life or physical safety of at least one individual."

For example, *ABC News* reported that ten detainees held by the U.S. in secret sites were subjected to "enhanced interrogation techniques," including waterboarding.[15] The *Washington Post* reported that one suspect held in custody by the U.S. Government was held incommunicado for nearly five months, and subjected to threats of violence and physical harm. The captive was reportedly told "You are in a country where no one knows about you, in a country where there is no law. If you die, we will bury you, and no one will know." He was kicked and beaten, and

---

2006, *available at* http://assembly.coe.int/CommitteeDocs/2006/20060606_Ejdoc162006PartII-FINAL.pdf, para. 16.

[15] Brian Ross & Richard Esposito, *Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC News, Dec. 5, 2005, *available at* http://abcnews.go.com/WNT/Investigation/story?id=1375123.

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 7

analysis of his hair after he was released revealed he was malnourished during his captivity. [16] In addition, there have been reports of torture of CIA "ghost detainees" in Afghanistan[17] and in Iraq[18], including, in at least one case, the death of a prisoner, Manadel al-Jamadi.[19] Amnesty International's research shows that other individuals secretly detained suffered mistreatment,[20] and that torture and other forms of ill-treatment is typical of the experience of those subjected to extraordinary rendition.[21] It has further been reported that the United States' secret detention system has been designed to facilitate the gathering of intelligence unhindered by the due process

---

[16] Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, WASH. POST, Déc. 4, 2005, at A1.

[17] HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* 2 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (detailing the ill-treatment of one "ghost" detainee in the Salt Pit resulting in death).

[18] Press Release, American Civil Liberties Union, Newly Released Army Documents Point to Agreement Between Defense Department and CIA on "Ghost" Detainees, ACLU Says: Declassified Annexes to Fay Report, Which Denied Link, Contain Further Evidence of Brutal Army Abuses (Mar. 10, 2005), *available at* http://www.aclu.org/safefree/general/17597prs20050310.html. Many of the documents released by the Department of Defense pursuant to the ACLU's FOIA request, *available at* http://www.aclu.org/torturefoia/released/030905/, describe torture and mistreatment of "ghost" detainees. See, e.g., Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SGT, 372nd MP, Camp Victory, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SPC/E4, B Co., 66th MI Group, 202nd MI BN, Annex to Fay/Jones/Kern Report (May 24, 2004); Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of SGT, 372nd MP, Annex to Fay/Jones/Kern Report (May 7, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004). *See also* Center for Human Rights and Global Justice, Human Rights First, Human Rights Watch, *By the Numbers: Findings of the Detainee Abuse and Accountability Project* (2006) *available at* http://www.nyuhr .org/docs/By_The_Numbers.pdf.

[19] Douglas Jehl & Tim Golden, *C.I.A. is Likely to Avoid Charges in Most Prisoner Deaths*, N.Y. TIMES, Oct. 23, 2005, at 6; Jane Mayer, *A Deadly Interrogation: Can the C.I.A. legally kill a prisoner?*, NEW YORKER, Nov. 14, 2005, at 44.

[20] *See* Amnesty International, BELOW THE RADAR: SECRET FLIGHTS TO TORTURE AND "DISAPPEARANCE," Apr. 5, 2006, *available at* http://web.amnesty.org/library/Index/ENGAMR510512006?open&of=ENG-USA.

[21] "Amnesty International has interviewed several victims of rendition. Their testimonies were coherent and plausible when checked against factual data such as flight information. Also consistent was the description, by every single one, of incidents of torture and other ill-treatment." Press Release, *Exposing Renditions*, AMNESTY INTERNATIONAL EU OFFICE, Apr. 5 2006, *available at* http://web.amnesty.org/library/Index/ENGAMR 510572006?open&of=ENG-344.

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 8

rights that normally guard against this abuse.[22] Finally, it is widely recognized that secret detention is conducive to torture and other forms of human rights violations.[23]

If these reports are accurate, there plainly is an immediate threat to the life and physical safety of a number of individuals.[24] Expedited processing of records is therefore required to prevent further harm to individuals currently detained and those likely to be detained in the future.

*       *       *

---

[22] Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, at A1 ("…intelligence officials defend the agency's approach, arguing that the successful defense of the country requires that the agency be empowered to hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantanamo Bay."); HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* ii (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (discussing the rationale of U.S. security policy on detentions which views detention as a means of intelligence gathering); HUMAN RIGHTS WATCH, THE UNITED STATES' DISAPPEARED: THE CIA'S LONG-TERM "GHOST DETAINEES" 5-15 (2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (noting the intelligence gathering functions of interrogating persons in secret detention and raising concerns about the reliability of such information).

[23] For example, the U.N. Committee Against Torture "note(d) with concern that the State party does not always register persons detained in territories under its jurisdiction outside the United States, depriving them of an effective safeguard against acts of torture (article 2)." The Committee also expressed concern at "allegations that the State party has established secret detention facilities, which are not accessible to the International Committee of the Red Cross…The Committee is also concerned by allegations that those detained in such facilities could be held for prolonged periods and face torture or cruel, inhuman or degrading treatment." Committee Against Torture, *Conclusions and Recommendations of the Committee Against Torture: United States of America*, CAT/C/USA/CO/2, 18 May 2006, *available at* <http://www.ohchr.org/english/bodies/cat/docs/AdvanceVersions/CAT.C.USA.CO.2.pdf>, para. 16.

[24] The exact number of persons subjected to secret or irregular apprehension, transfer or detention is unknown. Estimates of the number of persons rendered vary from around one hundred to several thousand. Center for Human Rights and Global Justice, *Beyond Guantánamo: Transfers to Torture One Year After Rasul v. Bush* (New York: NYU School of Law, 2005) at 3. With respect to secret detention, human rights organizations have identified by name 29 individuals who they believe are held in secret detention and have stated that there is likely many more. *See* WITNESS, *Outlawed: Extraordinary Rendition, Torture and Disappearances in the 'War on Terror'*, http://www.witness.org/index.php?option=com_rightsalert&Itemid=178&task=view&alert_id=49, released June 26, 2006. *See also* Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"* (New York: NYU School of Law, 2005) *available at* http://www.nyuhr .org/docs/Whereabouts%20Unknown%20Final.pdf; Human Rights Watch, List of "Ghost Prisoners" Possibly in CIA Custody, http://hrw.org/english/docs/2005/11/30/usdom12109.htm (last updated Dec. 1, 2005).

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 9

Amnesty International USA and Washington Square Legal Services, Inc., certify that the foregoing statements regarding the bases for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi); 32 C.F.R. 286.4(d)(3)(iii)-(iv). We look forward to your reply to this appeal **within ten (10) days,** as required under 5 U.S.C. § 552(a)(6)(E)(ii)(II), 32 C.F.R. 286.4(d)(3), and 32 C.F.R. 286.4(d)(3)(v).

Thank you for your prompt attention. Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

If you need to reach someone by telephone or email, you may also contact Kyle DeYoung at WilmerHale at (202) 663-6785 or at kyle.deyoung@wilmerhale.com.

Sincerely,

Curt Goering
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

WILMERHALE

Central Intelligence Agency
July 3, 2006
Page 10

Margaret L. Satterthwaite
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York, NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-Mail: margaret.satterthwaite@nyu.edu

Catherine K. Ronis
WilmerHale
1875 Pennsylvania Avenue
Washington, DC 20006
Tel: (202) 663-6380
Fax: (202) 663-6363
E-Mail: catherine.ronis@wilmerhale.com

# TAB A

WILMERHALE

April 25, 2006

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

Via Facsimile, Email and U.S. Mail

Information and Privacy Coordinator
Central Intelligence Agency
Washington D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

Re:    *Request Submitted Under the Freedom of Information Act for Records Concerning
Detainees, including "Ghost Detainees/Prisoners," "Unregistered Detainees/Prisoners," and
"CIA Detainees/Prisoners"*

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act,
5 U.S.C. § 552 ("FOIA"). The Request is submitted on behalf of Amnesty International ("AI")
and Washington Square Legal Services, Inc. ("WSLS"). AI is a non-government organization
and a world-wide movement of members who campaign for internationally-recognized human
rights. WSLS is the corporation that houses the International Human Rights Clinic ("the Clinic")
of the New York University School of Law ("NYU Law School"). The Clinic is a project of
NYU Law School's Center for Human Rights and Global Justice ("CHRGJ").

We are filing this request simultaneously with the Department of Defense (including its
components, the Department of the Army, Navy and Air Force, the Marine Corps, and the
Defense Intelligence Agency), the Department of Justice (including its components, the Federal
Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State,
the Central Intelligence Agency, and the Department of Homeland Security (including its
components the Office of Intelligence and Analysis, the Directorate for Policy, U.S. Immigration
and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Coast Guard, and
U.S. Customs and Border Protection). By this letter, we also request expedited processing
pursuant to 5 U.S.C. § 552(a)(6)(E).

We are seeking the opportunity to inspect and copy, if necessary, all records in the
possession of the Department, including any officers, divisions or bureaus thereof, on the topics
listed below.

Wilmer Cutler Pickering Hale and Dorr LLP, 2445 M Street, NW, Washington, DC 20037

Baltimore    Beijing    Berlin    Boston    Brussels    London    Munich    New York    Northern Virginia    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

FOIA Request
April 25, 2006
Page 2

## Definitions

For purposes of this request, the following terms shall be understood as described below:

The term "records" includes any and all reports, statements, examinations, memoranda, correspondence (including electronic mail), designs, maps, photographs, microfilms, computer tapes or disks, rules, regulations, codes, handbooks, manuals, or guidelines.

The term "government official" includes any U.S. government employee, and any person providing services to any agency of the United States government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the U.S. government.

The term "foreign official" includes any foreign government employee, and any person providing services to any agency of a foreign government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the foreign government.

The term "communication" means the giving, receiving, transmitting, or exchanging of information, including, but not limited to, any and all written, printed, telephonic, electronic, and in-person conversations by and with any person, and/or talk, gestures, or documents which memorialize or refer to any communications.

The term "detainee" means any person deprived of their liberty by one or more individuals or agencies who is prevented by any means from leaving the place in which he or she is being held. The term "detention" means depriving any person of their liberty such that they are prevented by any means from leaving the place in which they are held.

The term "place of detention" means any place or facility in which a "detainee" is kept, inside or outside the United States, regardless of whether it is officially recognized as a place of detention.

## Scope of Request

Unless otherwise stated, this request refers to *individuals who were, have been, or continue to be deprived of their liberty by or with the involvement of the United States and about whom the United States has not provided public information. These individuals have been referred to, among other things, as "ghost detainees/prisoners," "unregistered detainees/prisoners," "CIA detainees/prisoners" and "Other Governmental Agency Detainees" ("OGA Detainees").* These individuals have reportedly been held in various locations, including regular and irregular detention facilities, ships, aircraft, and military bases.

WILMERHALE

FOIA Request
April 25, 2006
Page 3

Although not limited to any specific geographic area, this request pertains particularly to the following places:

| | | | |
|---|---|---|---|
| Afghanistan | Azerbaijan | Bulgaria | Djibouti |
| Egypt | Germany | Indonesia | Iraq |
| Jordan | Kosovo | Macedonia | Morocco |
| Pakistan | Poland | Romania | Syria |
| Thailand | Turkey | Ukraine | |

United Kingdom (including Diego Garcia)
United States (including all territories under the S.M.T.J.)
Uzbekistan     Yemen

This Request does not seek records related to the formal extradition of individuals.

Requested records pertain to persons apprehended since September 11, 2001.

### Background

Numerous media reports indicate that the United States is involved in the secret or irregular apprehension, transfer, and detention of individuals on foreign territory.[1] These reports suggest that the government secretly detains and transports individuals on U.S. ships, military bases, and U.S.-chartered planes, as well as in foreign states.[2]

---

[1] *See, e.g.,* Dana Priest, *CIA Holds Terror Suspects in Secret Prisons,* WASH. POST, Nov. 2, 2005, at A1; Jan Cienski, Christopher Condon, Caroline Daniel, Guy Dinmore, Andrei Postelnicu, & Demetri Sevastopulo, *Evidence CIA Has Secret Jails in Europe,* FINANCIAL TIMES (LONDON), Nov. 3, 2005, at 1; Siobhan Gorman & Tom Bowman, *Reports of Secret CIA Prisons Prompt Concern,* L.A. TIMES, Nov. 3, 2005, at A4; Douglas Jehl & David Johnston, *CIA Now Acting Independently to Move Prisoners,* INT'L HERALD TRIB., Mar. 7, 2005, at 4; Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake: German Citizen Released After Months in Rendition,* WASH. POST., Dec. 4, 2005; Brian Ross and Richard Esposito, *Exclusive: Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons,* ABC NEWS, Dec. 5, 2005, *at* http://abcnews.go.com/WNT/Investigation/story?id=1375123.; Eric Schmitt and Thom Shanker, *Rumsfeld Issued an Order to Hide Detainee in Iraq,* N.Y. Times, June 17, 2004, at A1; *US bars access to terror suspects,* BBC NEWS, Dec. 9, 2005; Josh White, *Army, CIA Agreed on 'Ghost' Prisoners,* WASH. POST, Mar. 11, 2005, at A16; *White House Mum on Secret CIA Prisons,* AGENCE FRANCE PRESSE ENGLISH WIRE, Nov. 2, 2005; *Yemen says U.S. sent prisoners to Europe,* UNITED PRESS INT'L (UPI), Dec. 11, 2005, *at* http://www.upi.com/InternationalIntelligence/view.php?StoryID=20051211-051738-9694r.

[2] *See, id. and further e.g.,* Craig Whitlock, *Europeans Probe Secret CIA Flights; Questions Surround Possible Illegal Transfer of Terrorism Suspects,* WASH. POST, Nov. 17, 2005, at A22; Eric Schmitt & Carolyn Marshall, *In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse,* N.Y. TIMES, Mar. 19, 2006.

WILMERHALE

FOIA Request
April 25, 2006
Page 4

<u>Records Requested</u>

Please disclose any records reflecting, discussing or referring to the policy and/or practice concerning:

1. The apprehension, transfer, detention, and interrogation of persons within the Scope of Request, including but not limited to:

(a) The transfer of intelligence by one or more U.S. agencies or government officials to one or more foreign agencies or officials, in connection with the apprehension or detention of a person.

(b) A request or direction by one or more U.S. agencies or government officials to one or more foreign agencies or officials regarding the apprehension of any person, and any related agreement concerning such apprehension.

(c) The apprehension of a person in a foreign country by, with the involvement of, or in the presence of one or more U.S. officials.

(d) The transfer of a person from any country to any other country for the purpose of detention and/or interrogation, at the direction or request or with the knowledge of one or more U.S. agencies or officials.

(e) The transfer of a person from one place of detention to another within the same country at the direction or request or with the knowledge of one or more U.S. agencies or officials.

(f) The detention of a person in a foreign country at the direction or request of one or more U.S. agencies or officials, including any agreement concerning the detention.

(g) One or more U.S. agencies or officials seeking and/or being granted access to a foreign national detained in a foreign country.

(h) One or more U.S. agencies or officials being present in a place of detention in a foreign country. This does not include visits to U.S. citizens by U.S. officials pursuant to the Vienna Convention on Consular Relations.

(i) One or more U.S. agencies having control, direction, or administration of a subdivision, portion, or "cell" of a place of detention in a foreign country.

---

WILMERHALE

FOIA Request
April 25, 2006
Page 5

2. Current and former places of detention where individuals within the Scope of Request have been or are currently held, including but not limited to:

(a) Any place of detention in a foreign country being under the control, direction, or administration of one or more U.S. agencies.

(b) Any place of detention that is not under the control, direction or administration of one or more U.S. agencies, where a detainee is held at the request or instruction of one or more U.S. agencies or officials.

(c) Any subdivision, portion, or "cell" of a place of detention in a foreign country under the control, direction, or administration of one or more U.S. agencies.

(d) Any agreement between the U.S. government or one or more U.S. agencies or officials, and a foreign government or one or more foreign agencies or officials, in relation to a place of detention in a foreign country, regardless of whether that place of detention is foreign or U.S.—controlled.

3. The names and identities of detainees who fall within the scope of this request.[3]

## Fee Waiver

The requestors qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

Amnesty International is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters and urgent action requests informing the public about human rights, including torture and disappearances. AI also disseminates information through its website www.amnesty.org.

---

[3] Because of the nature of their detention, the requesters do not know the names or identities of those within the scope of this request. For examples of individuals that the United States has acknowledged detaining, but about whom the United States has not provided public information, see Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"*(2005), *available at* http://www.nyuhr.org/docs/Whereabouts%20Unknown%20Final.pdf; and Human Rights Watch, "List of 'Ghost Prisoners' Possibly in CIA Custody (2005), *available at* http://hrw.org/english/docs/2005/11/30/usdom12109.htm. The scope of this request extends far beyond these examples.

WILMERHALE

FOIA Request
April 25, 2006
Page 6

The Center for Human Rights and Global Justice is a research center at NYU Law School. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website www.nyuhr.org discussing human rights issues.

The International Human Rights Clinic is a project of CHRGJ and an official program at NYU Law School, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues.

Washington Square Legal Services is a not-for-profit corporation that houses the clinical program of NYU Law School.

The requesters plan to disseminate the information disclosed as a result of this Request through the channels described above.

### Expedited Processing

Expedited processing is warranted as there is a "compelling need" for the records sought in this Request. 5 U.S.C. § 552(a)(6)(E)(i)(I). This need arises because the requesters are "primarily engaged in disseminating information" and there is an "urgency to inform the public concerning actual or alleged Federal Government Activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 32 C.F.R. § 286.4(d)(3)(ii) (DOD); 6 C.F.R. § 5.5(d)(1)(ii) (DHS); 28 C.F.R. § 16.5(d)(1)(ii) (DOJ); 22 C.F.R. § 171.12(b)(2) (DOS).

AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. As reflected in the media articles cited above, there is an urgent need to provide the public with information relating to the U.S. government's practices concerning unregistered or ghost detainees.

There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I). *See also* 32 C.F.R. § 286.4(d)(3)(i) (DOD); 6 C.F.R. § 5.5(d)(1)(i) (DHS); 28 C.F.R. § 16.5(d)(1)(i) (DOJ); 22 C.F.R. § 171.12(b)(1) (DOS). This Request arises in the context of allegations of ongoing unlawful detention and abuse of individuals with the involvement of U.S. agents abroad. Failure to publicly expose and thereby halt any such practices could reasonably be expected to pose an imminent threat to the physical

WILMERHALE

FOIA Request
April 25, 2006
Page 7

safety and lives of individuals whose identities we are unable to ascertain without the records sought herein.

AI and WSLS certify that the foregoing statements regarding the basis for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). *See also* 32 C.F.R. § 286.4(d)(3)(iii) (DOD); 6 C.F.R. § 5.5(d)(3) (DHS); 28 C.F.R. § 16.5(d)(3) (DOJ); 22 C.F.R. § 171.12(b) (DOS).

\*      \*      \*

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

WILMERHALE

FOIA Request
April 21, 2006
Page 8

Thank you for your prompt attention.  Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
2445 M Street Washington, D.C. 20037
Tel: (202) 663-6380
Fax: (202) 663-6363
E-mail: catherine.ronis@wilmerhale.com

If you need someone to reach by telephone, you may also contact Kyle DeYoung at
WilmerHale at (202) 663-6785.

Sincerely,

CURT GOERING
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

MARGARET L. SATTERTHWAITE
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

# TAB B

WILMERHALE

April 25, 2006

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

<u>Via Facsimile, Email and U.S. Mail</u>

Information and Privacy Coordinator
Central Intelligence Agency
Washington D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

<u>Re:     Request Under the Freedom of Information Act for Records Concerning Ghost Detainee
Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees,
and the Draft Convention on Enforced Disappearance</u>

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act,
5 U.S.C. § 552 ("FOIA"). The Request is submitted on behalf of Amnesty International ("AI")
and Washington Square Legal Services, Inc. ("WSLS"). AI is a non-government organization
and a world-wide movement of members who campaign for internationally-recognized human
rights. WSLS is the corporation that houses the International Human Rights Clinic ("the Clinic")
of the New York University School of Law ("NYU Law School"). The Clinic is a project of
NYU Law School's Center for Human Rights and Global Justice ("CHRGJ").

We are filing this request simultaneously with the Department of Defense (including its
components, the Department of the Army, Navy and Air Force, the Marine Corps, and the
Defense Intelligence Agency), the Department of Justice (including its components, the Federal
Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State,
the Central Intelligence Agency, and the Department of Homeland Security (including its
components the Office of Intelligence and Analysis, the Directorate for Policy, U.S. Immigration
and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Coast Guard, and
U.S. Customs and Border Protection). By this letter, we also request expedited processing
pursuant to 5 U.S.C. § 552(a)(6)(E).

We are seeking the opportunity to inspect and copy, if necessary, all records in the
possession of the Department, including any officers, divisions or bureaus thereof, on the topics
listed below.

WILMERHALE

FOIA Request
April 25, 2006
Page 2

## Definitions

For purposes of this request, the following terms shall be understood as described below:

The term "records" includes any and all reports, statements, examinations, memoranda, correspondence (including electronic mail), designs, maps, photographs, microfilms, computer tapes or disks, rules, regulations, codes, handbooks, manuals, or guidelines.

The term "government official" includes any U.S. government employee, and any person providing services to any agency of the United States government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the U.S. government.

The term "foreign official" includes any foreign government employee, and any person providing services to any agency of a foreign government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the foreign government.

The term "communication" means the giving, receiving, transmitting, or exchanging of information, including, but not limited to, any and all written, printed, telephonic, electronic, and in-person conversations by and with any person, and/or talk, gestures, or documents which memorialize or refer to any communications.

The term "detainee" means any person deprived of their liberty by one or more individuals or agencies who is prevented by any means from leaving the place in which he or she is being held. The term "detention" means depriving any person of their liberty such that they are prevented by any means from leaving the place in which they are held.

The term "place of detention" means any place or facility in which a "detainee" is kept, inside or outside the United States, regardless of whether it is officially recognized as a place of detention.

Unless otherwise specified, this request relates to all records generated between September 11, 2001 and the present.

WILMERHALE

FOIA Request
April 25, 2006
Page 3

## Memoranda of Understanding

The practice of persons being kept as "off-the-record" detainees in military prisons has been well documented.[1] In this context, "ghost" or "unregistered" detainees are understood to refer to those detainees who were at some point during their detention, or remain:  not "officially" registered at military facilities; "kept off the books"; and/or denied access to the International Committee of the Red Cross (ICRC).[2]  Documents produced by the Department of Defense on March 3, 2005 pursuant to an ACLU FOIA request[3] and a media report in the

---

[1] *See* Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16. *See also* Jane Mayer, *A Deadly Interrogation: Can the C.I.A. Legally Kill a Prisoner?*, NEW YORKER, Nov. 14, 2005, at 44 (discussing the practice, particularly with respect to the death of Manadel al-Jamadi). *See also* the following Department of Defense documents released to the American Civil Liberties Union (ACLU) pursuant to a *Freedom of Information Act* request, all available at http://www.aclu.org/torturefoia/released/030905/: Transcript of deposition of Brig. Gen. Janis L. Karpinski, Appendix to Fay/Jones/Kern Report (July 18, 2004); Statement of MNF-I, C2, IMIR CW2, Annex to Fay/Jones/Kern Report (June 16, 2004); Sworn Statement of E-5, 519th MI Bn, Annex to Fay/Jones/Kern Report (June 4, 2004);  Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report; Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report; Sworn Statement of SGT, 372nd MP, Camp Victory, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SPC/E4, B Co., 66th MI Group, 202nd MI BN, Annex to Fay/Jones/Kern Report (May 24, 2004); Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of CW2, A/519th MI Bn, Annex to Fay/Jones/Kern Report (May 19, 2004); Sworn Statement of SGT, 372nd MP Co, Annex to Fay/Jones/Kern Report (May 7, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004). *See further* HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* 6 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (providing overview of the practice of ghosting in military facilities); HUMAN RIGHTS WATCH, THE UNITED STATES' DISAPPEARED: THE CIA'S LONG-TERM "GHOST DETAINEES" 5-15 (2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (outlining practice of keeping CIA prisoners in military detention generally).

[2] *Id.*

[3] *See* Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000719-000725, *available at* http://www.aclu.org/torturefoia/released/030905/ ("OGA and TF-121 routinely brought in detainees for a short period of time. The A/519th soldiers initiated the term 'ghost.' They stated they used this term as the detainees were not in-processed in the normal way via the MP database and were not yet categorized. It was difficult to track these particular detainees and I and other officers recommended that a Memorandum of Understanding be written up between OGA, the 205th MI BDE and the 800th MP BDE to establish procedures for a ghost detainee"); Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000726-000729, *available at* http://www.aclu.org/torturefoia/released/030905/ ("...in reference to Ghost detainees, OGA would bring in detainees for a short period of time. [REDACTED] brought them in. These particular ghost detainees were not yet categorized and OGA was working on that. It was very difficult keeping track of these OGA because they were not processed until OGA decided to turn them over to us. COL PAPPAS was not happy with that procedure.

WILMERHALE

FOIA Request
April 25, 2006
Page 4

*Washington Post* dated March 11, 2005[4] indicate that this arrangement for "ghosting" was not "ad hoc" but was embodied in a Memorandum of Understanding (MOU) between military officials and the CIA.[5] The exact contours of this arrangement are not publicly known as a copy of this MOU was not included in the documents released by the Department of Defense.[6]

<u>Records Requested</u>

We seek the following records relating to the arrangement described above:

1. Any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies, or between any agency and any subdivision or official, concerning the handling of ghost or unregistered detainees. This includes but is not limited to:

   (a) Any record reflecting communications about whether or not to draft any memorandum of understanding or agreement regarding unregistered or ghost detainees.

   (b) Any record reflecting communications about the content of any memorandum of understanding or agreement regarding unregistered or ghost detainees.

2. Any record reflecting a policy, whether formal or informal, about the reception, detention, or movement of unregistered or ghost detainees.

3. Any memorandum of understanding, or other record reflecting an agreement between any agencies, or between any subdivision or official or any other agency, regarding the transfer of detainees from the custody of one agency to that of another.

---

[REDACTED] recommended that a Memorandum of Understanding be written up between OGA and MI on the procedures to drop off a ghost detainee. COL PAPPAS met with OGA and TF-121 and the memorandum on procedures for dropping ghost detainees was signed").

[4] Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16.

[5] *Id.*

[6] Press Release, American Civil Liberties Union, Newly Released Army Documents Point to Agreement Between Defense Department and CIA on "Ghost" Detainees, ACLU Says: Declassified Annexes to Fay Report, Which Denied Link, Contain Further Evidence of Brutal Army Abuses (Mar. 10, 2005), *available at* http://www.aclu.org/safefree/general/17597prs20050310.html.

WILMERHALE

FOIA Request
April 25, 2006
Page 5

## Department of Defense Detainee Reporting

The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811 (2004) ("the Act"), requires the Department of Defense to submit an annual report regarding certain detainees.

### Records Requested

4. Any record generated in connection with the reporting requirement under Section 1093(c) of the Act, regardless of whether or not such record was actually submitted in the final report, and any record submitted to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives pursuant to Section 1093(c) of the Act.[7] This includes but is not limited to records reflecting:

    (a)    Any notice of investigation into any violation of international obligations or laws of the United States regarding the treatment of individuals detained by the U.S. Armed Forces or by a person providing services to the Department of Defense on a contractual basis.

    (b)    Any discussions regarding whether any investigation described in Request 4(a) should be reported.

    (c)    The number of detainees held in Department of Defense custody, or released from Department of Defense custody during the time period covered by the report, broken down into the greatest number of time intervals for which such information is available.

    (d)    The number of detainees detained by the Department of Defense as "enemy prisoners of war," "civilian internees," and "unlawful combatants," broken down into the greatest number of time intervals for which such information is available.

    (e)    The number of detainees detained by the Department of Defense under any status other than "enemy prisoners of war," "civilian internees," and "unlawful combatants," broken down into the greatest number of time intervals for which such information is available.

---

[7] Section 1093(e) of the Act mandates that the reports "be submitted, to the extent practicable, in unclassified form, but may include a classified annex as necessary to protect the national security of the United States." To the extent any records or portions of records responsive to this request are classified, please provide basic information as to the date, sender, recipient, and subject matter of the classified records.

WILMERHALE

FOIA Request
April 25, 2006
Page 6

    (f)    The transfer or proposed transfer of detainees by the Department of Defense to the jurisdiction of other countries, and the countries to which those detainees were transferred.

    (g)    Any communications regarding decisions to include or not include information in the Department of Defense's report under Section 1093(c) of the Act and decisions as to whether to submit any information in unclassified or classified form pursuant to Section 1093(d) of the Act.

## United States Report to the Committee Against Torture

    On May 6, 2005, the U.S. submitted its Second Periodic Report to the United Nations ("U.N.") Committee Against Torture, as required by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

### Records Requested

    All records reflecting:

5.  Communications regarding the United States' Second Periodic Report to the Committee Against Torture, including but not limited to:

    (a)    Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Committee Against Torture.

    (b)    Communications with a foreign government, or agency of a foreign government, regarding any provision of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment relating to apprehension, transfer and detention, (including Articles 1, 3, 5, 16), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

    (c)    Proposed language or earlier drafts of the report to the Committee Against Torture.

## United States Report to the Human Rights Committee

    On November 28, 2005, the U.S. submitted its Third Periodic Report to the U.N. Human Rights Committee, as required by the International Covenant on Civil and Political Rights.

WILMERHALE

FOIA Request
April 25, 2006
Page 7

<u>Records Requested</u>

All records reflecting:

6.  Communications regarding the United States' Third Periodic Report to the Human Rights
Committee, including but not limited to:

    (a)  Communications regarding whether any individual, place of detention, or practice
should be mentioned or discussed in the report to the Human Rights Committee.

    (b)  Communications with a foreign government, or agency of a foreign government,
regarding any provision of the International Covenant on Civil and Political Rights
relating to apprehension, transfer and detention, (including Articles 6, 7, 9), or
whether any individual, place of detention, or practice should be mentioned or
discussed in the report.

    (c)  Proposed language or earlier drafts of the report to the Human Rights Committee.

### The Convention on the Protection of all Persons from Enforced Disappearance

On September 23, 2005, a U.N. working group concluded the draft text of the Convention
on the Protection of all Persons from Enforced Disappearance. In 2006, the draft convention will
be submitted to the U.N. Commission on Human Rights and the U.N. General Assembly, before
being opened for signature and ratification.

<u>Records Requested</u>

7.  Any record reflecting communications regarding the negotiation or drafting of the draft
Convention on the Protection of all Persons from Enforced Disappearance.

8.  Any record reflecting communications with a foreign government, or an agency or
official of a foreign government, regarding the drafting of the draft Convention on the Protection
of all Persons from Enforced Disappearance.

WILMERHALE

FOIA Request
April 25, 2006
Page 8

## Fee Waiver

The requestors qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

Amnesty International is a non-government organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters and urgent action requests informing the public about human rights, including the prohibition on torture and the prohibition on disappearances. AI also disseminates information through its website www.amnesty.org.

The Center for Human Rights and Global Justice is a research center at NYU Law School. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website www.nyuhr.org discussing human rights issues.

The International Human Rights Clinic is a project of CHRGJ and an official program at NYU Law School, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues.

Washington Square Legal Services is a not-for-profit corporation that houses the clinical program of NYU Law School.

The requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

## Expedited Processing

Expedited processing is warranted as there is a "compelling need" for the records sought in this request. 5 U.S.C. § 552(a)(6)(E)(i)(I). The requesters are primarily engaged in "disseminating information" and there is an "urgency to inform the public concerning the actual or alleged Federal Government Activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 32 C.F.R. § 286.4(d)(3)(ii) (DOD); 6 C.F.R. § 5.5(d)(1)(ii) (DHS); 28 C.F.R. § 16.5(d)(1)(ii) (DOJ); 22 C.F.R. § 171.12(b)(2) (DOS).

AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal

WILMERHALE

FOIA Request
April 25, 2006
Page 9

Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. As reflected in the media reports discussed above, there is an urgent need to provide the public with information relating to the U.S. government's practices concerning unregistered or ghost detainees.

There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I). *See also* 32 C.F.R. § 286.4(d)(3)(i) (DOD); 6 C.F.R. § 5.5(d)(1)(i) (DHS); 28 C.F.R. § 16.5(d)(1)(i) (DOJ); 22 C.F.R. § 171.12(b)(1) (DOS). This Request arises in the context of allegations of ongoing unlawful detention and abuse of individuals with the involvement of U.S. agents abroad. Failure to publicly expose and thereby halt the practices prompting this Request could reasonably be expected to pose an imminent threat to the physical safety and lives of such individuals.

AI and WSLS certify that the foregoing statements regarding the basis for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). *See also* 32 C.F.R. § 286.4(d)(3)(iii) (DOD); 6 C.F.R. § 5.5(d)(3) (DHS); 28 C.F.R. § 16.5(d)(3) (DOJ); 22 C.F.R. § 171.12(b) (DOS).

*    *    *

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

WILMERHALE

FOIA Request
April 21, 2006
Page 10

Thank you for your prompt attention.  Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
2445 M Street Washington, D.C. 20037
Tel: (202) 663-6380
Fax: (202) 663-6363
E-mail: catherine.ronis@wilmerhale.com

If you need someone to reach by telephone or email, you may also contact Kyle
DeYoung at WilmerHale at (202) 663-6785.

Sincerely,

CURT GOERING
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

MARGARET L. SATTERTHWAITE
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

# TAB C

Central Intelligence Agency



Washington, D.C. 20505

5 May 2006

Catherine Kane Ronis, Esq.
Counsel to Amnesty International USA
WilmerHale
2445 M Street, N.W.
Washington, D.C. 20037

Dear Ms. Ronis:

The office of the Information and Privacy Coordinator has received your 25 April 2006 Freedom of Information Act request. Our officers will review it, and will advise you should they encounter any problems or if they cannot begin the search without additional information.

I reviewed your request for expedited processing in accordance with Agency regulations. Your request does not meet the standards for expedited processing specified in Agency regulations and therefore is denied. The Agency will process your request in accordance with its standard procedures.

We have assigned your request Reference No. F-2006-01014. Please use this number when corresponding with us about this request so that we can identify it easily.

Sincerely,

Scott Koch
Information and Privacy Coordinator

# TAB D

Central Intelligence Agency



Washington, D.C. 20505

5 May 2006

Catherine Kane Ronis, Esq.
Counsel to Amnesty International USA
WilmerHale
2445 M Street, N.W.
Washington, D.C. 20037

Dear Ms. Ronis:

The office of the Information and Privacy Coordinator has received your 25 April 2006 Freedom of Information Act request. Our officers will review it, and will advise you should they encounter any problems or if they cannot begin the search without additional information.

I reviewed your request for expedited processing in accordance with Agency regulations. Your request does not meet the standards for expedited processing specified in Agency regulations and therefore is denied. The Agency will process your request in accordance with its standard procedures.

We have assigned your request Reference No. F-2006-00994. Please use this number when corresponding with us about this request so that we can identify it easily.

Sincerely,

Scott Koch
Information and Privacy Coordinator

# TAB E

DECLARATION OF CURT GOERING
IN SUPPORT OF REQUEST FOR EXPEDITED PROCESSING

I, Curt Goering, declare pursuant to 5 U.S.C. § 552 and 32 C.F.R. § 286.4 (d)(3)(iv):

1. I am the Senior Deputy Executive Director for Policy and Programs of Amnesty International USA (AIUSA). I submit this declaration in support of the Freedom of Information Act appeal of denial of expedited processing filed today on behalf of Amnesty International and Washington Square Legal Services, Inc.

2. I have been involved with Amnesty International in various capacities for twenty-five years. During that time, I have held positions at Amnesty International's international headquarters in London and at its government relations office in Washington, D.C. I currently work at the national section headquarters in New York City.

3. Amnesty International is dedicated to bringing about a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. To accomplish this goal, Amnesty engages in research and action campaigns. At the heart of every campaign is the dissemination of information about particular human rights abuses that Amnesty International has documented. Amnesty International expends extensive resources researching alleged abuses to generate reports and shape its campaigns.

4. In order to stop human rights violations, Amnesty International exposes them through meticulous, painstaking research and reporting which it discloses to the public, government officials, intergovernmental organizations, opinion leaders and shapers, as well as its members. Every year Amnesty International disseminates human rights information on approximately 150 countries around the world, as well as on abuses perpetrated by non-state actors. In addition, the organization distributes a large volume of information on a broad range of thematic human rights issues such as violence against women, abuses fuelled by military, security or police transfers, refugee and migrant issues, and information about human rights laws and treaties.

5. The publicizing of human rights abuses is a core component of Amnesty International's mission and central to all of its activities. For example, one of Amnesty International's primary action strategies is letter writing, an activity through which Amnesty International communicates its concerns to key decision-makers around the world while simultaneously educating the public and its membership about the issues involved. In addition to letter writing campaigns and reports on human rights issues around the world, Amnesty International engages in widespread education work, the purpose of which is also to disseminate information about human rights.

6. Based on my many years of experience with this organization and my familiarity with its goals and methods, as discussed in ¶¶1-5, I am certain that Amnesty International is primarily engaged in the dissemination of information.

7. It is also my opinion, based on Amnesty International's extensive involvement with the issues over the past forty-five years, that imminent threats to the physical safety and lives of many individuals could be prevented with information we have requested. Research shows that individuals who are held by governments that do not disclose information about their fate and whereabouts are at great risk of physical and psychological maltreatment, torture, and death. Additionally, it is well-established that the psychological impact of prolonged solitary detention in an unknown location may also lead to severe health consequences. For these reasons, I believe that failure to obtain the requested information will pose imminent and ongoing threats to the lives and physical safety of individuals.

8. I further certify that the disclosure of the requested information would serve a humanitarian need for at least two reasons. First, information about secret detention practices is essential for Amnesty International and other organizations to educate the public about these practices. So long as governments believe it is permissible to detain people secretly, without determinations of guilt or any other supervision, our basic human rights are at risk. Second, the information is needed to ensure that those being detained and transferred are not suffering the harms set out in ¶ 7. Disclosure of the fate and whereabouts of the individuals being held or transferred is required to alleviate these risks. The disclosure of this information will therefore promote the welfare and interest of humanity.

Curt Goering, Senior Deputy
Executive Director for Policy and
Programs of Amnesty International
USA