# Exhibit I

## INTERNATIONAL HUMAN RIGHTS CLINIC
### WASHINGTON SQUARE LEGAL SERVICES, INC.

245 SULLIVAN STREET, 5th FLOOR, NEW YORK, NY 10012, USA
TEL: +1-212 998-6431 - FAX: +1-212- 995-4031

MARGARET L. SATTERTHWAITE
*Clinic Director*

SMITA NARULA
*Clinic Director*

December 28, 2007

<u>Via Facsimile and U.S. Mail:</u>

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505
(Ph.) 703-613-1287
(Fax) 703-613-3007

<u>*Re: Request Under the Freedom of Information Act for Specific Records Concerning Information on Secret Detention And Rendition*</u>

Dear Freedom of Information Act Officer:

       This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The request is submitted by the International Human Rights Clinic of Washington Square Legal Services[1] ("WSLS"), on behalf of WSLS, Amnesty International ("AI"), and the Center for Constitutional Rights ("CCR"). We are currently engaged in litigation with your agency concerning two requests filed on April 25, 2006 by WSLS and AI, and one request filed on December 21, 2004 by CCR, all of which seek records pertaining to rendition and secret detention in connection with the U.S. Government's anti-terrorism efforts.[2] The attorneys representing the U.S. Government in this litigation are being sent copies of this request.

       We seek the opportunity to inspect and copy, if necessary, the specific records listed below, or, in the event that any of the specified records have been destroyed, any records which are integrally related to, summarize, or are interchangeable with said records. We seek records in the possession of the Central Intelligence Agency, including any officers, divisions, or bureaus thereof. We further request that you expedite processing pursuant to 5 U.S.C. § 552(a)(6)(e)(i).

### Records Requested

       For the purpose of this request, the term "records" includes any and all reports, statements, examinations, memoranda, correspondence, designs, maps, photographs, microfilms, computer tapes or disks, audio or videotapes or transcripts thereof, rules, regulations, codes, handbooks, manuals, or guidelines.

       Please disclose the following records, or, in the event that they have been destroyed, any records that are integrally related to, summarize, or are interchangeable with said records.

---

[1] WSLS is the corporation that supports the International Human Rights Clinic ("the Clinic") of the New York University School of Law. The Clinic is a project of NYU School of Law's Center for Human Rights and Global Justice.

[2] Amnesty International USA et al. v. CIA, No. 07-cv-5435 (S.D.N.Y.).

1. The spring 2004 report by the Office of the Inspector General (OIG) on the CIA's compliance with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The existence of this document was publicly revealed in October 2007 by the *New York Times*.
   o "A report by Mr. Helgerson's office completed in the spring of 2004 warned that some C.I.A.-approved interrogation procedures appeared to constitute cruel, inhuman and degrading treatment, as defined by the international Convention Against Torture." Mark Mazzetti and Scott Shane, *C.I.A. Watchdog Becomes Subject Of C.I.A. Inquiry*, N.Y. Times, October 12, 2007, at A1.

2. The list of "erroneous renditions" compiled by the CIA's OIG. This list was described by several intelligence officials in a December 2005 article in the *Washington Post*.
   o "The CIA inspector general is investigating a growing number of what it calls 'erroneous renditions,' according to several former and current intelligence officials. One official said about three dozen names fall in that category; others believe it is fewer. The list includes several people whose identities were offered by al Qaeda figures during CIA interrogations, officials said." Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, Wash. Post, December 4, 2005, at A1.

3. The fax sent by the CIA to the Royal Canadian Mounted Police Criminal Intelligence Directorate (RCMP CID) in the afternoon or evening of Oct. 3, 2002, asking a number of questions about Maher Arar. The existence of this document was publicly acknowledged in the official report of the Canadian Government's inquiry into the rendition of Mr. Arar.
   o "Late in the afternoon of October 3, the CIA sent a fax to RCMP CID, asking a number of questions about Mr. Arar." Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Report of the Events Relating to Maher Arar, Addendum: Disclosure of Information Authorized by the Federal Court of Canada in accordance with Sections 38.04 and 38.06 of the *Canada Evidence Act* 157 (2006) (based on 2005 testimony of Gar Pardy, Director General of the Consular Affairs Bureau of Foreign Affairs and International Trade Canada (DFAIT )) (Transcripts of Testimony available at http://www.ararcommission.ca/eng/14b.htm).

4. The document sent by the CIA to the RCMP CID, the Canadian Security Intelligence Service (CSIS), and Project A-O Canada on Nov. 5, 2002 in response to requests for information on the whereabouts of Mr. Arar. The existence of this document was publicly acknowledged in the official report of the Canadian Government's inquiry into the rendition of Maher Arar.
   o "On November 5, the CIA sent CSIS and Project A-O Canada a written response to CSIS' [*sic*] October 10 request for information about the circumstances of Mr. Arar's removal." Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Report of the Events Relating to Maher Arar, Addendum: Disclosure of Information Authorized by the Federal Court of Canada in accordance with Sections 38.04 and 38.06 of the *Canada Evidence Act* 307 (2006). "An identical reply was also sent to RCMP Headquarters." *Id.* at 180

(based on testimony of Dan Livermore of the Security and Intelligence Branch of DFAIT).

5. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen Mohamed Hussein). The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007.

   o "There was discussion: 'Should we slap him? What's to be gained if we slap him?' . . . The Deputy Director for Operations says, 'Yes, you can slap him.' The cable goes out. They slap him." *"CIA – Abu Zubaydah": Interview with John Kiriakou* (ABC News broadcast Dec. 10, 2007), *available at* http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript1_blotter0712 10.pdf and http://abcnews.go.com/images/Blotter/brianross_kiriakou_transcript2_blotter0712 10.pdf

6. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of a slap on detainee Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

7. The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007.

   o "[W]e had these trained interrogators who were sent to his location-- to use the enhanced techniques as necessary to get him to open up... [T]hese enhanced techniques included everything from-- what was called an attention shake where you grab the person by their lapels and sha[ke] them." *Id.*

8. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

9. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) to the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

10. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Khalid Sheikh Mohammed. The existence of such cables was

acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

11. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Abu Zubaydah. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

    o "Two people were water boarded, Abu Zubaydah being one." *Id.*

12. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Khalid Sheikh Mohammed. The existence of such cables was acknowledged by former CIA employee John Kiriakou during an ABC News program on Dec. 10, 2007. *Id.*

    o "It's my understanding that he [Khalid Sheikh Mohammed] was—that he was also water boarded." *Id.*

13. Video tapes, audio tapes, and transcripts of materials related to interrogations of detainees that were acknowledged to exist during the case of *United States v. Zacharias Moussaoui* and described in a letter from United States Attorney Chuck Rosenberg to Chief Judge Karen Williams, United States Court of Appeals for the Fourth Circuit, and Judge Leonie Brinkema, United States District Court, Eastern District of Virginia, dated October 25, 2007, including, but not limited to two video tapes and one audio tape of interrogations of detainees, the transcripts of those tapes submitted for the court's review in the *Moussaoui* case, and the intelligence cables summarizing the substance of those tapes.

    o Letter from Chuck Rosenberg, U.S. Attorney, to the Honorable Karen J. Williams and the Honorable Leonie Brinkema, (Oct. 25, 2007), *available at* http://graphics8.nytimes.com/packages/pdf/world/20071207_intel_letter.pdf.

14. The Sept. 13, 2007 notification (described in a letter from Chuck Rosenberg to Judges Williams and Brinkema, dated October 25, 2007) from the attorney for the CIA informing the United States Attorney for the Eastern District of Virginia that the CIA had obtained a video tape of an interrogation of one or more detainees. *Id.*

15. The communications between the CIA and the U.S. Embassy in Sana'a, Yemen, relating to the apprehension, transfer and/or detention of Mohamed Farag Ahmad Bashmilah (Muhammad Bashmilah). These communications likely occurred on or around March 5, 2005, and were preparatory to a communication between the U.S. Embassy in Sana'a and the Government of Yemen that has been acknowledged by the Government of Yemen.

    o "On March 5, 2005, the United States, through the Liaison Officer in Sanaa [sic], informed the Central Organization for Political Security in Yemen that Mr. Mohamed Bashmilah was being held in their custody." Letter from the Embassy of the Republic of Yemen in France to Mr. Dick Marty, Council of Europe (Mar. 27, 2006) (filed as Exhibit G to Declaration of Mohamed Farag Ahmad Bashmilah in *Mohamed et al. v. Jeppesen Dataplan, Inc.*, No. 5:07-cv-02798 (N.D.Cal. Dec. 14, 2007)).

16. The communications between the U.S. Government and the Government of Yemen, and/or any documents pertaining to the transfer of Mohamed Farag Ahmad Bashmilah from U.S. custody to the custody of the Government of Yemen on or near May 5, 2005. The Government of Yemen has acknowledged the existence of communications between the U.S. Government and the Government of Yemen concerning Mr. Bashmilah's transfer. *Id.*

17. A copy of the files relating to Salah Nasser Salim Ali and Mohamed Farag Ahmad Bashmilah provided to the Government of Yemen on Nov. 10, 2005 by the United States Government. The Government of Yemen has acknowledged the existence of these files.
    o Letter from Ghalib Mathar al-Qamish, Chief of the Central Department of Political Security, Yemen, to the Special Rapporteur on the question of Torture and the Special Rapporteur on the question of Human Rights and Counter-Terrorism (Dec. 20, 2005) (filed as Exhibit V to Declaration of Mohamed Farag Ahmad Bashmilah in *Mohamed et al. v. Jeppesen Dataplan, Inc.*, No. 5:07-cv-02798 (N.D.Cal. Dec. 14, 2007)).

## Fee Waiver

The requesters qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

The International Human Rights Clinic of WSLS is a project of the Center for Human Rights and Global Justice ("CHRGJ") and an official program of NYU School of Law, composed of students and directed by clinical professors who engage in research and advocacy on human rights issues. CHRGJ is a research center at NYU School of Law. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education, and training. CHRGJ publishes reports and also disseminates information through its website, www.chrgj.org.

Amnesty International is a non-governmental organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters, and urgent action requests informing the public about human rights, including torture and disappearances. AI also disseminates information through its website, www.amnesty.org.

The Center for Constitutional Rights is a legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. These materials are available through CCR's Development and Education & Outreach Departments. CCR also operates a website, www.ccr-ny.org, that addresses the issues on which CCR works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

The requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above. This Request aims generally to further public understanding of government conduct; and particularly to contribute to the current debate around the rendition and secret detention policies and programs put in place by the CIA.

### Expedited Processing

Expedited processing is warranted under 5 U.S.C. § 552(a)(6)(E)(i)(I), as there is a "compelling need" for the records sought in this request: the requesters are primarily engaged in "disseminating information" and there is an "urgency to inform the public concerning the actual or alleged Federal Government Activity" under 5 U.S.C. § 552(a)(6)(E)(v)(II). There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I).

CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CCR disseminates information through newsletters, publications, handbooks, and through its website. All three organizations seek the documents listed in this request to educate the public about the CIA's secret detention and rendition program, which is currently the subject of high-profile debate.[3]

Moreover, failure to obtain the records can reasonably be expected to pose an imminent threat to the physical safety of individuals undergoing or at risk of undergoing ongoing unlawful detention and abuse with the involvement of or at the behest of U.S. agents abroad. 5 U.S.C. § 552(a)(6)(E)(v)(I). Allegations of torture and ill-treatment have surrounded the secret detention and rendition program. Failure to publicly expose and thereby halt the practices prompting this Request could reasonably be expected to pose an imminent threat to the physical safety and lives of at least one individual. CIA director Michael Hayden recently admitted that the secret detention and rendition program remains in operation.[4]

---

[3] *See, e.g.,* Joby Warrick & Dan Eggen, *Waterboarding Recounted: Ex-CIA Officer Says It 'Probably Saved Lives' but Is Torture,* Wash. Post., Dec. 11, 2007, at A1; Pamela Hess, *Congress Wants Answers on CIA Tapes,* Wash. Post., Dec. 11, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/10/AR2007121000087.html; Mark Mazetti, CIA Destroyed Two Tapes Showing Interrogations, N.Y. Times, Dec. 7, 2007, at A1; CENTER FOR HUMAN RIGHTS AND GLOBAL JUSTICE, SURVIVING THE DARKNESS: TESTIMONY FROM THE U.S. "BLACK SITES" (2007), *available at* http://www.chrgj.org/projects/docs/survivingthedarkness.pdf.

[4] CIA Director Hayden recently discussed the secret detention and rendition program on the *Charlie Rose Show,* explaining that as of 2007, the U.S. program of "rendition" and CIA detention continued. *The Charlie Rose Show: Interview with Director Michael Hayden* (PBS television broadcast Oct. 22 & 23, 2007) *(transcript available at* https://www.cia.gov/news-information/press-releases-statements/interview-with-charlie-rose.html).

\*      \*      \*

If this request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information.

We look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

Thank you for your prompt attention. Should you have any questions in this matter, please contact Margaret L. Satterthwaite, International Human Rights Clinic, Washington Square Legal Services, Inc., New York University School of Law, 245 Sullivan Street, New York, NY 10012; tel.: (212) 998-6657.

Sincerely,

Margaret L. Satterthwaite
Director, International Human Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street
New York, NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

Copies to:        Jeannette Vargas, Esq., Assistant United States Attorney
                  Brian Feldman, Esq., Assistant United States Attorney
                  Emily E. Daughtry, Esq., Special Assistant United States Attorney
                  Kyle DeYoung, Esq., WilmerHale
                  Emi Maclean, Esq., Center for Constitutional Rights

# Exhibit J



Central Intelligence Agency

Washington, D.C. 20505

Ms. Margaret L. Satterthwaite                                    JAN 3 0 2008
Director, International Human Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street
New York, NY 10012

Reference: F-2008-00611

Dear Ms. Satterthwaite:

   On 28 December 2007, the Information and Privacy Coordinator received your
Freedom of Information Act (FOIA) request of the same date. Specifically, you request
copies of the following records:

1. The spring 2004 report by the Office of the Inspector General (OIG) on the
   CIA's compliance with the Convention Against Torture and Other Cruel,
   Inhuman, or Degrading Treatment or Punishment.
2. The list of "erroneous renditions" compiled by the CIA's OIG.
3. The fax sent by the CIA to the Royal Canadian Mounted Police Criminal
   Intelligence Directorate (RCMP CID) in the afternoon or evening of Oct. 3,
   2002, asking a number of questions about Maher Arar.
4. The document sent by the CIA to RCMP CID, the Canadian Security
   Intelligence Service (CSIS), and Project A-O Canada on Nov. 5, 2002 in
   response to requests for information on the whereabouts of Mr. Arar.
5. The cables between the Deputy Director of Operations (or other agency
   official(s)) at the CIA and the operative(s) in the field discussing and/or
   approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen
   Mohamed Hussein).
6. The cables between the Deputy Director of Operations at the CIA (or other
   agency official(s)) and the operative(s) in the field discussing and/or approving
   the use of a slap on detainee Khalid Sheikh Mohammed.
7. The cables between the Deputy Director of Operations (or other agency
   official(s)) at the CIA and the operative(s) in the field discussing and/or
   approving the use of an "attention shake" on Abu Zubaydah.
8. The cables between the Deputy Director of Operations at the CIA (or other
   agency official(s)) and the operative(s) in the field discussing and/or approving
   the use of an "attention shake" on Khalid Sheikh Mohammed.

9. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah.

10. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of sleep deprivation on Khalid Sheikh Mohammed.

11. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Abu Zubaydah.

12. The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of waterboarding on Khalid Sheikh Mohammed.

13. Video tapes, audio tapes, and transcripts of materials related to interrogations of detainees that were acknowledged to exist during the case of *United States v. Zacharias Moussaoui* and described in a letter from United States Attorney Chuck Rosenberg to Chief Judge Karen Williams, United States Court of Appeals for the Fourth Circuit, and Judge Leonie Brinkema, United States District Court, Eastern District of Virginia, dated October 25, 2007, including but not limited to two video tapes and one audio tape of interrogations of detainees, the transcripts of those tapes submitted for the court's review in the *Moussaoui* case, and the intelligence cables summarizing the substance of those tapes.

14. The Sept. 13, 2007 notification (described in a letter from Chuck Rosenberg to Judges Williams and Brinkema, dated October 25, 2007) from the attorney for the CIA informing the United States Attorney for the Eastern District of Virginia that the CIA had obtained a video tape of an interrogation of one or more detainees.

15. The communications between the CIA and the U.S. Embassy in Sana'a, Yemen, relating to the apprehension, transfer and/or detention of Mohamed Farag Ahmad Bashmilah (Muhammad Bashmilah).

16. The communications between the U.S. Government and the Government of Yemen, and/or any documents pertaining to the transfer of Mohamed Farag Ahmad Bashmilah from U.S. custody to the custody of the Government of Yemen on or near May 5, 2005.

17. A copy of the files relating to Salah Nasser Salim Ali and Mohammed Farag Ahmad Bashmilah provided to the Government of Yemen on Nov. 10, 2005 by the United States Government.

The CIA Information Act, 50 U.S.C. § 431, as amended, exempts CIA operational files from the search, review, publication, and disclosure requirements of the FOIA. To the extent your request seeks information that is subject to the FOIA, we accept your request and will process it in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, and, unless you object, search only for CIA-originated records existing through the date of this acceptance letter. As a matter of administrative discretion, we have waived any fees associated with the processing of your FOIA request.

You have requested expedited processing. We handle all requests in the order we receive them: that is, "first-in, first-out". We make exceptions to this rule only when a requester establishes a compelling need under the standards in our regulations. A "compelling need" exists: 1) when the matter involves an imminent threat to the life or physical safety of an individual, or 2) when a person primarily engaged in disseminating information makes the request and the information is relevant to a subject of public urgency concerning an actual or alleged Federal government activity. We have reviewed your request and determined that it does not demonstrate a "compelling need" under these criteria and, therefore, we deny your request for expedited processing.

Sincerely,

Scott Koch
Information and Privacy Coordinator

# Exhibit K

1

81G6ALCA

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   AMERICAN CIVIL LIBERTIES
3   UNION, ET AL,
4
4                    Plaintiffs,
5
5           v.                          04 CV 04151 (AKH)
6
6   DEPARTMENT OF DEFENSE, ET AL,
7
7                    Defendants.
8
8   ------------------------------x
                                        New York, N.Y.
9                                       January 16, 2008
9                                       3:20 p.m.
10
10
11  Before:
11
12              HON. ALVIN K. HELLERSTEIN,
12
13                                      District Judge
13
14                    APPEARANCES
14
15  AMERICAN CIVIL LIBERTIES UNION
15       Attorneys for Plaintiffs
16  BY:  AMRIT SINGH
16       ALEXA KOLBI-MOLINAS
17       -AND-
17  GIBBONS, P.C.
18  BY:  LAWRENCE S. LUSTBERG
18       MELANCA D. CLARK
19
19  MICHAEL J. GARCIA
20       United States Attorney for the
20       Southern District of New York
21  SEAN H. LANE
21  PETER M. SKINNER
22       Assistant United States Attorneys
22
23  ALSO PRESENT:  JAMEEL JAFFER, ACLU
23                 ARTHUR EISENBERG, NYCLU
24
25

81G6ALCA

1        THE COURT:  I understand that I can look at the
2 effects of techniques that are considered abuse and from that
3 reason backwards.  But let's say that we are not talking about
4 categories of abuse now, but we are talking about other kinds
5 of documents that theoretically could exist.
6        What would you want me to look for?  I don't think you
7 want me to look at a memorandum discussing various potential
8 techniques and then measure that against my field manual and
9 make my own conclusions whether they are lawful or not lawful.
10        MS. SINGH:  Your Honor, you can do that.  Because that
11 is the purpose of field manual.  It sets out all the
12 interrogation methods.
13        THE COURT:  It doesn't do it with the kind of
14 specificity that would enable me to compare a method.
15        MS. SINGH:  But the Defense Department can do that.
16 They can tell you which of the methods that it is withholding
17 fall into current methods that are currently listed in the Army
18 field manual and which methods are not.
19        THE COURT:  What you want me to do is look or have the
20 government look for any memorandum that comment on deviations
21 from the Army field manual?
22        MS. SINGH:  That's correct.
23        THE COURT:  Mr. Lane.
24        MR. LANE:  Your Honor, as we set forth in our brief
25 and tried to explain earlier, we have released, and again as we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

81G6ALCA

1    explained in the Church report that we attached --
2        THE COURT:  No.  If you already released it, it is not
3    a problem.  The problem is that which has not been released.
4        MR. LANE:  The next step in terms of what has been
5    withheld as a classified document, plaintiffs are seeking to
6    put labels on things to say this is unlawful.
7        THE COURT:  I have changed the gloss.  I don't want to
8    draw conclusions, but where the Army has drawn conclusions or
9    suspects a conclusion of deviation, Ms. Singh says those
10   documents should be at least given to me for in camera review.
11       MR. LANE:  Your Honor, I don't profess to understand
12   how the line that Ms. Singh just identified could actually be
13   done in --
14       THE COURT:  I will give you an example.
15       MR. LANE:  -- in application.
16       THE COURT:  I will give you an example.  It has been
17   reported that such and such interrogation technique deviates
18   from the field manual.  Then the memorandum goes on to describe
19   and discuss that.  That would be a kind of memorandum she would
20   be interested at least for me to look at.
21       MR. LANE:  Your Honor, what I can tell you is --
22       THE COURT:  I don't want to look at the various
23   categories of techniques and draw my own conclusion whether or
24   not it deviates.  I don't want to do that.  I don't have the
25   expertise to do that.

81G6ALCA

1       MR. LANE:  What I think, your Honor, we have tried to
2 do something that is that, although maybe we have called it
3 something else.  What we have tried to do, as I have said
4 before, the Army and DoD has released tons of documents
5 relating to allegations of mistreatment, and the allegations of
6 mistreatment boil down to somebody did something to me that
7 they shouldn't have done, which would be something that is
8 beyond the scope of what is authorized.  That is what all those
9 Army CID reports that we have been releasing for more than
10 three years are.
11       THE COURT:  If you have released it, there is nothing
12 further to do.  Ms. Singh --
13       MR. LANE:  I thought she was going further than that,
14 your Honor, and essentially saying doctrinally we have to get
15 into weeds and look into where to draw lines.
16       THE COURT:  I have narrowed it, Mr. Lane.  I have
17 narrowed it.  I think her remarks are acceptable to that, but I
18 am not even going that far.  I don't like to go through weeds.
19       MR. LANE:  I can appreciate that, your Honor.
20       Certainly what DoD has tried to do in this case is
21 release allegations of mistreatment or abuse including entire
22 reports that deal with those things as well as individual
23 investigations that are now closed that address individual
24 allegations of mistreatment.
25       What DoD has also done is where those are allegations

31

81G6ALCA

1   that are made by a detainee may be intertwined with other
2   information about interrogation doctrine techniques and various
3   information that would be sensitive that we have released what
4   we can release and redacted what we can redact.
5           THE COURT:  You are slipping off of the point.  There
6   is a third category.  We have two categories so far:  Analyses
7   of causes of deaths and analyses of complaints of abuse.
8           Here is the third category:  Documents that make
9   reference to deviations from Army-authorized investigative
10  techniques.
11          In other words, someone has got to put down their
12  conclusion deviation or something equivalent in the memorandum
13  for it to be spotted.
14          I am not looking to make conclusions of what is or
15  what is not a deviation.  I am only drawing upon Ms. Singh's
16  request of what already has been labeled as such a document or
17  for you to find out if there is such a deviation.  In other
18  words, someone has to say "deviation."
19          MR. LANE:  Your Honor, I confess the documents weren't
20  processed that way, but what I can tell you is I think that we
21  are talking about the same thing to be honest with you.  I
22  think when we are talking about allegations of mistreatment
23  what we are talking about is whether somebody makes a claim,
24  whether it is investigated as group in a large report like the
25  Church report, or it investigated individual in an request --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

81G6ALCA

```
 1              THE COURT:  Analysis of mistreatments whether it is
 2   called abuse or deviations from recognized or authorized
 3   interrogation techniques.
 4              MR. LANE:  Your Honor, one thing I would point out,
 5   however, is when your Honor was referring earlier to the chart
 6   exemption, the Aly chart Exhibit 1 and some of these documents,
 7   you can see that a lot of these documents really just simply
 8   don't fall into even Ms. Singh's own category in the sense
 9   that --
10              THE COURT:  She is giving up a lot of those claims.
11              MR. LANE:  Well, your Honor, I am not sure that is the
12   case.  I haven't heard that yet from plaintiff's standing here.
13   So that is why I am pointing --
14              THE COURT:  I haven't heard it yet, but it is coming
15   because we just discussed it.
16              MR. LANE:  That is fine, your Honor.
17              THE COURT:  So, look, I have two areas I want to
18   pursue -- two or three depending on how you categorize them.
19   One is analyses of causes of death to prisoners and the second
20   is allegations of either abuse of prisoners or deviations from
21   recognized Army methods of interrogation.
22              MR. LANE:  Just to make clear, your Honor, you are not
23   talking about getting into the weeds on essentially detention
24   interrogation policy and its nuances?
25              THE COURT:  Already aware there has been a label of
```

33

81G6ALCA

1  deviation already assigned in some fashion or already suspect
2  or the subject of inquiry.
3          I can't do any better than that because I haven't seen
4  the documents and I am trying to respond to arguments from both
5  of you finding some area where I think there is some room to
6  put in some definition.  These will be the subjects of in
7  camera inquires.
8          Does that conclude the DoD, Ms.  Singh.
9          MS. SINGH:  No, your Honor.  It is just Exemption 1,
10  unfortunately.  If you would rather move to another agency, I
11  would be glad to relinquish my spot to my colleagues.
12          THE COURT:  No, let's finish.
13          MS. SINGH:  Your Honor, with respect to Exemption 2,
14  we make a similar argument as we do for Exemption 1.  We
15  basically demonstrate in our brief that the government hasn't
16  demonstrated that documents relating to past interrogation
17  methods or abuse could significantly risk circumvention of
18  agency regulations or statute.  We make a similar argument with
19  Exemption 7E, which contains similar language to Exemption 2.
20          So I think that your rulings with respect to Exemption
21  1 would also apply to our argument.  On Exemption 2 there is
22  one more argument that we make --
23          THE COURT:  I think 1 and 2 are collapsing on the same
24  issue.
25          MS. SINGH:  There is one more argument that we make
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

# Exhibit L



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

February 5, 2008

BY FACSIMILE
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007-1312

       Re:    ACLU, et al., v. Department of Defense, et al., No. 04 Civ. 4151 (AKH)

Dear Judge Hellerstein:

      This morning, the Director of the Central Intelligence Agency made disclosures to the Senate Select Committee on Intelligence concerning the CIA's past use of an interrogation technique known as waterboarding. These disclosures may affect the CIA's positions in this litigation. We are examining the issue and will apprise the Court and Plaintiffs as soon as possible of any changes in the CIA's positions. We thank the Court for its attention to this matter.

                              Respectfully,

                              MICHAEL J. GARCIA
                              United States Attorney

          By:

                              SEAN H. LANE
                              PETER M. SKINNER
                              Assistant United States Attorneys
                              Telephone: (212) 637-2601

cc:    Melanca Clark, Esq.
       Amrit Singh, Esq.

# Exhibit M



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 5th Floor*
*New York, New York 10007*

May 23, 2008

BY FEDERAL EXPRESS
Melanca D. Clark, Esq.
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, N.J. 07102

      Re:    ACLU, et al., v. Department of Defense, et al., No. 04 Civ. 4151 (AKH);

Dear Ms. Clark:

      The CIA has re-reviewed the records that were the subject of the parties' Third Cross-Motion for Summary Judgment to determine whether there are documents, or portions of documents, that may be produced in light of the Director of the Central Intelligence Agency's February 5, 2008 disclosures to the Senate Select Committee on Intelligence concerning the CIA's past use of an interrogation technique known as waterboarding. We are enclosing redacted versions of those documents where the CIA determined that there is segregable information that can be produced. The cover sheet attached to the front of each redacted document identifies a document number, which corresponds to the numbers used for the document descriptions in the Seventh Dorn Declaration. The last document, which was not addressed in the Seventh Dorn Declaration, is a redacted version of the final report of the CIA's Office of Inspector General concerning its review of the CIA's interrogation and detention program.

      In addition, at the May 12, 2008 in camera presentation, the Court preliminarily overruled certain of the CIA's FOIA exemption invocations. The Court, however, is permitting the CIA to file a supplemental classified declaration further explaining those exemptions. The Court will review that classified declaration ex parte and in camera, on June 17, 2008, and will then finalize its preliminary rulings. If those rulings require the production of additional information, the CIA will request a stay while it determines whether to appeal those rulings.

      A court reporter transcribed those portions of the May 12, 2008 proceeding that did not concern classified information. With leave of the Court, the CIA has reviewed that transcript to verify that no classified information was inadvertently transcribed. We have notified the Court that the transcript is not classified. It is our understanding that the Court intends to file the transcript on the docket.

Melanca D. Clark, Esq.
May 23, 2008
Page 2

Thank you for your attention to these matters.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By:

SEAN H. LANE
PETER M. SKINNER
Assistant United States Attorneys
Telephone: (212) 637-2737

Enclosures