# EXHIBIT CC

# REDACTED

FILED WITH
COURT SECURITY OFFICER
12/4/07 _ C. Campbell
DATE

[ORAL ARGUMENT NOT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

```
———————————————————— x
                              :
MAJID KHAN,                   :
                              :
            Petitioner,       :
                              :
      v.                      :   No. 07-1324
                              :
ROBERT M. GATES,              :
                              :
            Respondent.       :
                              :
———————————————————— x
```

## MOTION TO DECLARE INTERROGATION METHODS APPLIED AGAINST PETITONER CONSTITUTE TORTURE

Petitioner Majid Khan ("Petitioner" or "Majid"), a prisoner at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"), who seeks review under the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45, moves by and through his undersigned counsel for an order declaring that the interrogation methods applied against him by U.S. personnel constitute torture and other forms of impermissible coercion.[1]

---

[1] Counsel for Respondents do not consent to this motion seeking a declaration that Petitioner's interrogations by U.S. personnel while in secret CIA detention and elsewhere constitute torture.

# REDACTED

## PRELIMINARY STATEMENT

Unlike other Guantánamo prisoners, Majid Khan has long had legal resident status in the United States and strong voluntary ties to this country. Majid is a twenty-seven-year-old U.S. resident and asylee-holder and a citizen of Pakistan, an ally of the United States. [2] He grew up in the suburbs of Baltimore, Maryland, and has had political asylum in this country since 1998. He graduated from Owings Mills High School in 1999, purchased a home near Baltimore, opened a bank account, and worked for the State of Maryland and Electronic Data Systems. He paid thousands of dollars in taxes to the Internal Revenue Service. His family still resides legally near Baltimore; and some of his family members are U.S. citizens. Majid's only home is in this country.

On March 5, 2003, Majid ███████████████████████ in Karachi, Pakistan, ███████████████████████████████████████████. Notwithstanding his substantial, voluntary ties to this country, Petitioner was ███████████████████████████████████████████ ███████████████ to CIA custody for detention and interrogation at secret prisons overseas. Majid was forcibly disappeared by the CIA. He did not reemerge until September 6, 2006, when he was transferred to the U.S. Naval

---

[2] Petitioner's background, secret detention and interrogation are set forth in detail in the Declaration of Gitanjali S. Gutierrez ("Gutierrez Declaration"), attached hereto as Exhibit 1.

Station at Guantánamo Bay, Cuba, where he remains imprisoned without charge or trial.

Majid then filed a petition for a writ of habeas corpus in the U.S. District Court for the District of Columbia on September 29, 2006, challenging his indefinite detention in military custody. *See Khan v. Bush*, No. 06-1690 (RBW) (D.D.C.). In April 2007, he appeared before a CSRT and was subsequently found to be properly detained as an "enemy combatant." On August 14, 2007, a few days after the CSRT determination was announced, Majid filed this DTA action challenging that determination and preserving all other legal claims, including his right to habeas relief.

### Majid's Secret Detention and Interrogations Using Torture and Cruel, Inhuman and Degrading Treatment, and Other Impermissible Forms of Coercion

From March 2003 until the present day, the United States has imprisoned and interrogated Petitioner Majid Khan and other individuals in secret detention using methods that include torture, cruel, inhuman and degrading treatment, or other unlawful coercion to extract confessions and other incriminating information from them. U.S. interrogators applied techniques against Majid long-viewed as abhorrent by our Nation and our Anglo-American jurisprudence, ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████

Further, these incidents were not isolated acts of rouge CIA agents or contractors. Rather, the secret detention and interrogation regime to which U.S. personnel subjected Majid was a carefully developed program ███████████ ████████████████████ calculated and designed deliberately to apply techniques euphemistically referred to as "enhanced interrogation methods" or "alternative interrogation methods" under conditions of careful monitoring by █████████████████ It was, by all accounts, a program of U.S. government torture ████████████████████████████████████ ████████████

### CSRT Consideration of Information Related to Petitioner Extracted By Torture or Other Forms of Impermissible Coercion

Respondents have refused to product any "government information" in this case. Rather, on September 27, 2007, they filed a pending omnibus Motion to

---

[3] Further details of this program and the interrogation techniques CIA agents applied against other individuals are set forth in the Declaration of J. Wells. Dixon ("Dixon Declaration"), attached hereto as Exhibit 2.

Stay Orders to File Certified Index to Record, and have not made any further submissions to the record.    Despite Respondents' failure to produce the government information, however, Petitioner Khan hereby submits documents he prepared and presented during his CSRT proceeding that confirm that the tribunal and reviewing authorities were presented with evidence that U.S. personnel extracted information from Petitioner Khan during his imprisonment in U.S. custody that was obtained through torture, cruel, inhuman or degrading treatment, and unlawful coercion.[4]

Because this Court must determine whether Petitioner's CSRT complied with its own regulations – including the requirement that the CSRT assess whether any statements were obtained through coercion and the probative value of such information – and whether these regulations are consistent with the Constitution and laws of the United States, this Court should grant the requested relief and declare that the interrogation methods applied against Petitioner Khan constitute torture and other forms of impermissible coercion.

---

[4] *See, e.g.*, Khan CSRT Exhibit D-b, Majid Khan written statement of Torture for Combatant Status Review Tribunal taken Mar 2007 by PR 3, attached hereto as Exhibit 3, and Khan CSRT Exhibit D-c, Majid Khan Oral Statement of Torture for Combatant Status Review Tribunal taken Mar/Apr 2007 by PR 3, attached hereto as Exhibit 4.

# ARGUMENT

I.    **Information Related to Petitioner Indisputably Was Obtained Through Torture, Cruel, Inhuman and Degrading Treatment and Unlawful Coercion**

A.    **Torture is Clearly Defined Under U.S. Law**

Under the applicable definitions, the tactics used against Majid constitute torture and unlawful coercion. The Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, prohibits torture and cruel, inhuman and degrading treatment if it inflicts "severe physical or mental pain or suffering." The MCA incorporates by reference the definitions of 18 U.S.C. § 2340(2), which provide, *inter alia*, that:

> "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from –
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> \*       \*       \*
>
> (C) the threat of imminent death; or
>
> (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering . . . .

Although the MCA does not provide further guidance concerning the standard to be used to define torture or impermissible coercion, military and federal court decisions have categorized many of the various methods of interrogation and

coercion used against Petitioner as torture or impermissible coercion.[5]

**B.    U.S. Personnel Tortured Petitioner and Other Detainees to Obtain Information Related to Petitioner's Status**

Information related to Petitioner that U.S. interrogators obtained from Petitioner Khan and other detainees ▮▮▮▮▮▮▮ was indisputably extracted through torture, cruel, inhuman and degrading treatment and unlawful coercion. During Petitioner's most shocking period of interrogations, he was submitted to ▮ ▮▮▮▮▮▮ interrogation tactics that have long been prohibited by U.S. civil and military law.

Most notably, for example, Petitioner Khan ▮▮▮▮▮▮▮▮▮▮



---

[5] *See, e.g., United States v. Lee*, 744 F.2d 1124 (5th Cir. 1984) (affirming conviction for "water torture" perpetrated against criminal defendants by a county sheriff and two deputies); *United States of America v. Chinsaku Yuki*, Manilla (1946) (military commission convened by Commanding General Phillipines-Ryukus Command convicted Sergeant-Major Chinsaku Yuki of the Kempentai of using "water torture" against individuals in his custody), NARA NND 775011 Record Group 331 Box 1586.







In addition to these extreme tactics, throughout his imprisonment, Respondents and other government agencies have subjected Petitioner Khan to a variety of other forms of torture, cruel, inhuman and degrading treatment, and other lesser forms of impermissible coercion. These methods have included:



Petitioner seeks a declaratory ruling from this Court that each of these methods



constitute torture in violation of the MCA and other federal law.

C.    Petitioner's CSRT Considered Information Obtained By Or Derived From Torture or Other Impermissible Forms of Coercion

Petitioner placed before his CSRT panel credible and detailed information concerning the torture used against him while in U.S. custody, including the



No question arises that the CRST panel and reviewing authorities were aware of this information. Yet, a serious risk exists that Majid's CSRT, in reaching its final determination, relied in whole or in part upon information obtained unlawfully from Majid or other individuals ███████████████ Furthermore, information acquired through torture and other unlawful techniques led interrogators to discover additional information that was likely produced in Petitioner's CSRT as part of the government information affirming Petitioner's "enemy combatant" classification.

Finally, other individuals detained in the ██████ secret detention and interrogation program include Ammar al Baluchi, Guantanamo Detainee ISN #10018, Mohd Farik bin Amin Zubair, Guantanamo Detainee ISN #10021, and Khalid Sheikh Mohammed, Guantanamo Detainee ISN #10024, whom Respondents have publicly alleged have information related to Petitioner's status

determination[6] and upon whose statements Petitioner's CSRT may have relied upon in whole or in part.

### III.  THIS COURT SHOULD DECLARE PETITIONER'S INTERROGATION CONSTITUE TORTURE

#### A.  The CSRT Regulations and the MCA Prohibit Reliance Upon Information Obtained By Torture

It is unsettled to what extent the fundamental concerns underlying judicial reliance on torture and other impermissible forms of coercion are embodied within the judicial review available under the DTA.[7]  The Court should, however, rule whether or not the tactics applied to Petitioner constitute torture or impermissible coercion in order to conduct the review required even under the narrowest reading of the DTA.[8]

This Court must determine whether the CSRT panel followed the procedures

---

[6] *See, e.g.*, Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10018 (Al Baluchi, Ammar), at 23-24; Unclassified Summary of Evidence for Combatant Status Review Tribunal – Mohd Farik Bin Amin (Zubair), at 2.

[7] To the extent that the DTA prohibits this Court from holding that Petitioner is unlawfully detained because the CSRT justified his enemy combatant status and detention pursuant to statements extracted through torture or other impermissible forms of coercion, the DTA review is an inadequate substitute for the writ of habeas corpus.

[8] To the extent the Court requires further information prior to ruling on this motion concerning the interrogation tactics applied to Petitioner, discovery and an evidentiary hearing should be scheduled under appropriate procedures that afford Petitioner a meaningful opportunity to pursue his DTA claims and that safeguard national security concerns, if any, related to the interrogation methods applied in the CIA secret detention program.

set forth in the July 2006 Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants, attached hereto as Exhibit 5,[9] in reaching its conclusion that Petitioner is properly detained as an "enemy combatant." Pursuant to these regulations, the CSRT panel must have assessed "whether any statement derived from or relating to evidence regarding the status of Petitioner was obtained as a result of coercion and the probative value, if any, of such statement." *See* Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants, at 30; *see also* DTA at § 1005(b)(1). It cannot be disputed that this Court has the authority to order the requested relief pursuant to the DTA, as well as the All Writs Act, 28 U.S.C. § 1651.

**B.    The Prohibition Against Judicial Reliance upon Information Obtained by or Derived From Torture and Other Lesser Unlawful Coercion is Deeply-Rooted**

Our Nation's fundamental traditions prohibit judicial reliance upon statements extracted through torture and other lesser forms of impermissible coercion to justify imprisonment of an individual.[10] Torture has been illegal under

---

[9] The government conducted Petitioner's CSRT on or around April 15-19, 2007, and the CSRT panel's decision was finalized on or around August 9, 2007. Consequently, CSRT regulations promulgated in July 2006 were applicable to his proceeding.

[10] To the extent that the DTA prohibits this Court from holding that Petitioner is unlawfully detained because the CSRT justified his enemy combatant status and detention pursuant to statements extracted through torture or other impermissible forms of coercion, the DTA review is an inadequate substitute for the writ of habeas corpus.

English common law for more than 350 years.[11] Common law judges did not consider evidence against a defendant that investigators extracted through torture and unlawful coercion because the judges considered this information inherently unreliable and viewed judicial acquiescence in these practices as degrading the dignity of justice.[12]

Our Founders shared this revulsion of judicial reliance upon statements extracted by torture or impermissible coercion and embodied protections against this practice within the Constitution.[13] Our criminal law also prohibits acts of

---

[11] *See, e.g.,* James Heath, *Torture and English Law*, 178 (1982).

[12] Although the rare use of torture had a brief appearance in English Common Law during the period of the infamous Star Chamber, 5 William S. Holdworth, *A History of English Common Law*, 184-85 (1924), it was used even under these universally condemned circumstances solely for purposes of investigation. At no point in English common law history were statements obtained through torture or other inhumane treatment used against criminal defendants. *See, e.g.,* Michael Foster, *A Report of Some Proceedings on the Commission for the Trial of Rebels in the Year 1746, in County of Surry; and of Other Crown Cases: To Which Are Added Discourses upon a Few Branches of the Crown Law* 244 (2d ed. Corrected, London, W. Strahan & M. Woodfall 1776) (spelling modernized).

[13] The Fifth Amendment's protection against self-incrimination was a direct response to the historical experience of the Star Chamber and intended to prohibit judicial reliance upon statements extracted through unlawful cruelty or coercion, including torture. *See Michigan v. Tucker*, 417 U.S. 433, 440 (1974) ("The privilege against compulsory self-incrimination was developed by painful opposition to a course of ecclesiastical inquisitions and Star Chambers proceedings occurring several centuries ago."). Further, constitutional prohibitions against unreasonable searches and seizures, cruel and unusual punishments, and the guarantee of due process, reflect the Founders' antipathy to government cruelty and undue coercion within our Nation's justice system. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 169-170 (1976) ("The American draftsmen, who adopted the English phrasing in drafting the Eighth Amendment, were primarily concerned

torture during wartime and peacetime,[14] as well as the introduction of statements obtained through torture or other impermissible coercion against criminal defendants.[15]  The government's apparent reliance upon information extracted using such tactics in the present case threatens the common law and constitutional prohibitions designed to protect individual liberty, to guard against tyranny, and to preserve the balance between the state and the individual that rests at the core of our Anglo-American legal traditions.

## Conclusion

For the reasons set forth above, Petitioner respectfully urges the Court to grant Petitioner's motion and issue an order declaring that the interrogation methods applied against him by U.S. personnel constitute torture and other forms of impermissible coercion.

---

. . with proscribing 'tortures' and other 'barbarous' methods of punishment.") (citation omitted).

[14] *See* 18 U.S.C. § 2340.  Further, in *Hamdan v. Rumsfeld*, 542 U.S. 507 (2006), the Supreme Court found that Common Article 3 of the 1949 Geneva Conventions is applicable to detainees in Guantanamo.  Common Article 3 expressly prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" against detainees in military custody at Guantanamo.  *See also* MCA. Pub. L. No. 109-366, 120 Stat. 2600.

[15] *See, e.g., Brown v. Mississippi*, 297 U.S. 278 (1936).

15

Dated:  December 6, 2007          Respectfully submitted,

_____
Gitanjali S. Gutierrez [Bar No. 51177]

J. Wells Dixon [Bar No. 51138]
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6485
Fax:  (212) 614-6499

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2007, I caused the foregoing Petitioner's Motion to Declare Interrogation Methods Applied Against Petitioner Constitute Torture, with exhibits, to be filed and served on counsel listed below by causing an original and six copies to be delivered to the Court Security Office.

Robert M. Loeb, Esq.
U.S. Department of Justice
Civil Division, Room 7268
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

Gitanjali S. Gutierrez

# EXHIBIT DD

**Other Document #85**

Document #85

(FOIA DOC 4)

PAGE 1

# Denied in Full



**Permissible Interrogation Techniques**

Unless otherwise approved by Headquarters, CIA officers ▮▮▮▮▮▮▮▮▮▮▮▮▮ may use only Permissible Interrogation Techniques, which comprise the (a) Standard Techniques and (b) Enhanced Techniques.

Enhanced Techniques ▮▮▮▮▮▮▮▮▮▮ the water board;

*CTCL 234-1*



In each instance the use of Enhanced Techniques must be approved by Headquarters in advance,

2

Document #85

(FOIA DOC 4)

PAGES 4 TO 8

# Denied in Full

# EXHIBIT EE

Search ▶

Press Releases & Statements

# Director's Statement on the Past Use of Diego Garcia

**Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Past Use of Diego Garcia**

**February 21, 2008**

---

The British Government announced today that the United States recently provided information on rendition flights through Diego Garcia—a UK territory in the Indian Ocean—that contradicted earlier data from us. Our government had told the British that there had been no rendition flights involving their soil or airspace since 9/11. That information, supplied in good faith, turned out to be wrong.

In fact, on two different occasions in 2002, an American plane with a detainee aboard stopped briefly in Diego Garcia for refueling. Neither of those individuals was ever part of CIA's high-value terrorist interrogation program. One was ultimately transferred to Guantanamo, and the other was returned to his home country. These were rendition operations, nothing more. There has been speculation in the press over the years that CIA had a holding facility on Diego Garcia. That is false. There have also been allegations that we transport detainees for the purpose of torture. That, too, is false. Torture is against our laws and our values. And, given our mission, CIA could have no interest in a process destined to produce bad intelligence.

In late 2007, CIA itself took a fresh look at records on rendition flights. This time, the examination revealed the two stops in Diego Garcia. The refueling, conducted more than five years ago, lasted just a short time. But it happened. That we found this mistake ourselves, and that we brought it to the attention of the British Government, in no way changes or excuses the reality that we were in the wrong. An important part of intelligence work, inherently urgent, complex, and uncertain, is to take responsibility for errors and to learn from them. In this case, the result of a flawed records search, we have done so.

Mike Hayden

- Privacy

- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act

# EXHIBIT FF

**UNITED
NATIONS**



**A**

 **General Assembly**

Distr.
GENERAL

A/HRC/4/40/Add.1
2 February 2007

ENGLISH
Original:  ENGLISH/FRENCH/
SPANISH

HUMAN RIGHTS COUNCIL
Fourth regular session
Item 2 of the provisional agenda

## IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

### Opinions adopted by the Working Group on Arbitrary Detention

The present document contains the Opinions adopted by the Working Group on Arbitrary Detention at its forty-fourth, forty-fifth and forty-sixth sessions, held in November 2005, May 2006 and August 2006, respectively.  A table listing all the opinions adopted by the Working Group and statistical data concerning these opinions is included in the report of the Working Group to the Human Rights Council at its fourth regular session (A/HRC/4/40).

GE.07-10604  (E)    090307    160307

A/HRC/4/40/Add.1
page 2

# CONTENTS

| *Opinion* | *Page* |
|---|---|
| No. 38/2005 (China) | 4 |
| No. 39/2005 (Cambodia) | 6 |
| No. 40/2005 (France) | 10 |
| No. 41/2005 (Tunisia) | 14 |
| No. 42/2005 (Colombia) | 19 |
| No. 43/2005 (China) | 20 |
| No. 44/2005 (Iraq and United States of America) | 24 |
| No. 45/2005 (Iraq and United States of America) | 27 |
| No. 46/2005 (Iraq and United States of America) | 34 |
| No. 47/2005 (Yemen) | 41 |
| No. 48/2005 (Namibia) | 45 |
| No. 1/2006 (Uzbekistan) | 48 |
| No. 2/2006 (Egypt) | 49 |
| No. 3/2006 (United Kingdom of Great Britain and Northern Ireland) | 49 |
| No. 4/2006 (Myanmar) | 50 |
| No. 5/2006 (Iraq and United States of America) | 52 |
| No. 6/2006 (Japan) | 52 |
| No. 7/2006 (Yemen) | 53 |
| No. 8/2006 (Libyan Arab Jamahiriya) | 53 |
| No. 9/2006 (Saudi Arabia) | 54 |
| No. 10/2006 (Algeria) | 55 |
| No. 11/2006 (China) | 59 |
| No. 12/2006 (Saudi Arabia) | 63 |

## CONTENTS (*continued*)

| Opinion | Page |
|---|---|
| No. 13/2006 (United Kingdom of Great Britain and Northern Ireland) | 65 |
| No. 14/2006 (Islamic Republic of Iran) | 70 |
| No. 15/2006 (Syrian Arab Republic) | 74 |
| No. 16/2006 (Syrian Arab Republic) | 76 |
| No. 17/2006 (Lebanon) | 82 |
| No. 18/2006 (Libyan Arab Jamahiriya) | 87 |
| No. 19/2006 (Islamic Republic of Iran) | 88 |
| No. 20/2006 (Gabon) | 90 |
| No. 21/2006 (Syrian Arab Republic) | 90 |
| No. 22/2006 (Cameroon) | 91 |
| No. 23/2006 (Qatar) | 94 |
| No. 24/2006 (Colombia) | 94 |
| No. 25/2006 (Romania) | 95 |
| No. 26/2006 (Islamic Republic of Iran) | 95 |
| No. 27/2006 (China) | 98 |
| No. 28/2006 (Uruguay) | 102 |
| No. 29/2006 (United States of America) | 103 |
| No. 30/2006 (Colombia) | 111 |
| No. 31/2006 (Iraq and United States of America) | 114 |

and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violations, as such welcomed by the Working Group, shall scrupulously respect the rules and standards drawn up and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the present case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the justice system of the newly emerging democratic Iraq.

39.    The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to see to it that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

40.    On the basis of what precedes, the Opinion of the Working Group is that:

> (a)    It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

> (b)    It will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17 (c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.

## OPINION No. 47/2005 (YEMEN)

**Communication: addressed to the Government on 9 August 2005.**

**Concerning: Messrs. Walid Muhammad Shahir Muhammad al-Qadasi; Salah Nasser Salim`Ali and Muhammad Faraj Ahmed Bashmilah.**

**The State is a party to the International Covenant on Civil and Political Rights.**

1.    (Same text as paragraph 1 of Opinion No. 38/2005.)

2    The Working Group conveys its appreciation to the Government for having forwarded the requisite information in good time.

3.    (Same text as paragraph 3 of Opinion No. 38/2005.)

4.    In the light of the allegations made, the Working Group welcomes the cooperation of the Government. The Working Group transmitted to the source the reply provided by the Government. The Working Group believes that it is in a position to render an Opinion on the facts and circumstances of the cases, in the context of the allegations made and the response of the Government thereto, as well as the observations by the source.

A/HRC/4/40/Add.1
page 42

5.    The source reports that Mr. Walid Muhammad Shahir Muhammad al-Qadasi, a citizen of
Yemen, was arrested in the Islamic Republic of Iran in late 2001. He was held there for about
three months before being handed over, with other detained foreign nationals, to the authorities
in Afghanistan, who in turn handed them over to the custody of the United States of America.
He was held in a prison in Kabul, where he was blindfolded, interrogated, threatened with death
and accused of belonging to Al-Qaida. Walid Muhammad Shahir Muhammad al-Qadasi and his
fellow detainees were kept in underground cells, 10 of them in a cell measuring approximately
two by three metres, and constantly exposed to loud music. After three months in detention in
Kabul, he was transferred to a detention centre of the United States military forces at Baghram
Air Base, outside Kabul. After a month there, Walid Muhammad Shahir Muhammad al-Qadasi
was taken to the United States military base at Guantánamo Bay, Cuba.

6.    Walid Muhammad Shahir Muhammad al-Qadasi was transferred from Guantánamo Bay
to Yemen at the beginning of April 2004. On his arrival, he was detained in the Political
Security Prison in Sana'a. He was denied access to a lawyer and not brought before a court.
Walid Muhammad Shahir Muhammad al-Qadasi was visited in detention by representatives of
the source in mid-April 2004. The prison staff informed the source that Walid Muhammad
Shahir Muhammad al-Qadasi was under investigation and would be released as soon as the
investigation was completed. Subsequently, he was transferred to Ta'iz prison, where a lawyer
from the United States non-governmental organization Centre for Constitutional Rights met with
him on 21 June 2005. He currently remains in detention there. He has not been charged with a
criminal offence, nor been given the opportunity to challenge the legality of his detention. The
Head of the Political Security Department in Sana'a informed the source that Walid Muhammad
Shahir Muhammad al-Qadasi and other detainees who returned from Guantánamo Bay were
being held at the request of the United States authorities and would remain detained in Yemen
pending receipt of their files from these authorities for investigation.

7.    With regard to Mr. Salah Nasser Salim 'Ali, the source reports that he is a 27-year-old
Yemeni citizen who lived in Jakarta until 19 August 2003. On that day he was detained in
Jakarta by agents of the Indonesian police and taken to an immigration centre. After four days of
detention, during which his passport expired, Salah Nasser Salim 'Ali was told that he would be
deported to Yemen, via Jordan. Upon arrival at the airport in Amman, however, he was taken to
a detention facility of the Jordanian intelligence service, where he was interrogated about a past
stay in Afghanistan and tortured repeatedly for four days.

8.    As to Mr. Muhammad Faraj Ahmed Bashmilah, aged 37, the source reports that he is a
Yemeni citizen, who also lived in Indonesia. In October 2003, he travelled to Jordan with his
wife. On arrival at Amman airport, Jordanian immigration authorities took his passport. Three
days later, on 19 October 2003, he was arrested by the Jordanian Da'irat al-Mukhabarat
al-'Amah (General Intelligence Department, who kept him in custody for four days. During this
period he was allegedly repeatedly tortured.

9.    The source further states that from detention in Jordan, Messrs. Salah Nasser Salim
'Ali and Muhammad Farah Ahmed Bashmilah were transferred to a detention centre under
United States control. They were taken blindfolded to this detention centre by a several hours'
long plane flight and detained underground, and are therefore not able to identify the location

of the detention centre. Both the forces in charge of transferring them thereto and those in charge of the detention centre were, however, from the United States. They were subsequently transferred, again blindfolded, by plane and helicopter, to a second detention centre under United States control. They are therefore not able to identify the location of the facility. In both places, the two men were interrogated about their activities in Afghanistan and Indonesia, and about their knowledge of other persons suspected of terrorist activities.

10.     According to the source, Messrs. Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were kept in United States custody for 20 and 18 months, respectively. During this period, they were held in solitary confinement and incommunicado, without contact with anyone other than the prison guards, interrogators and interpreters. Western music was piped into their cells uninterruptedly, 24 hours a day. In the second facility they were given books, including the Koran, and videos, and had an opportunity to exercise. Salah Nasser Salim 'Ali was visited by a doctor twice a month.

11.     On or around 5 May 2005, without explanation, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali were transferred to Yemen, where they were detained in the central prison of Aden. They were subsequently briefly taken to Sana'a and back to Aden. They are currently detained at the Fateh political security facility in Aden, where they have received visits by their family.

12.     The source states that neither Muhammad Farah Ahmed Bashmilah nor Salah Nasser Salim 'Ali have been charged or tried with any offence, nor have they been informed of the reason for their continued detention. Representatives of the Yemeni authorities have told the source that the reason for their detention is that their transfer from United States detention was conditional upon them being held in Yemen.

13.     According to the source, the detention of Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali is devoid of any legal basis and thus arbitrary. In particular, the three above-mentioned persons were released from United States custody without charges and were never charged with any criminal offence in Yemen, where they have been detained for 18 months (Walid Muhammad Shahir Muhammad al-Qadasi) and three months (Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali), respectively. No decision concerning their detention and or statement setting forth the grounds therefor has been issued by any Yemeni authority. They have not been informed of any charges against them, have not been provided with legal assistance, have not had the right to challenge the lawfulness of their detention, and have not had a single hearing in their case.

14.     The source adds that the detention of Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim'Ali is in violation of Yemeni domestic law, as well, because, according to it, suspects have the right to see a judge or prosecutor within 24 hours of being detained, the right to challenge the legal basis of their detention and the right to seek prompt legal assistance. Furthermore, Yemeni law provides that detention is not permitted except for acts punishable by law.

A/HRC/4/40/Add.1
page 44

15.    In its reply to these allegations, the Government confirms that Messrs. Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali were handed over to Yemen by the United States. They are held in a security police facility because of their alleged involvement in terrorist activities related to Al-Qaida. The Government of Yemen adds that the "competent authorities are still dealing with the case pending receipt of their [the persons'] files from the United States of America authorities in order to transfer them to the Prosecutor".

16.    In replying to the Government's observations, the source informs that, as of 8 November 2005, the three men remain in detention, while the Government continues to state that it is awaiting the files concerning their cases from the United States authorities.

17.    The Working Group, based on the above information provided by the source and the Government, which coincide, is in the position to render an Opinion.

18.    The Government states that Messrs. Al-Qadasi, Bashmila and Salim were handed over to Yemen by the United States. It is waiting for the files from the American authorities so as to transfer them to the prosecutor. This clearly shows that the Yemen authorities do not currently have any files on them.

19.    The Working Group notes with concern that the transfers that the three persons experienced before being detained in Yemen occurred outside the confines of any legal procedure, such as extradition, and do not allow the individuals access to counsel or to any judicial body to contest the transfers.

20.    No charges have been made by the Government of Yemen against these three men. They have not been informed of any accusation against them, nor have been brought before any judicial authority. No legal procedure has been followed to accuse them. Their deprivation of liberty is, as such, devoid of any legal basis.

21.    In the light of the foregoing, the Working Group renders the following Opinion:

The deprivation of liberty of Messrs. Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim'Ali, is arbitrary, being in contravention of article 9 of the Universal Declaration of Human Rights, and article 9 of the International Covenant on Civil and Political Rights, and falls within category I of the categories applicable to the consideration of the cases submitted to the Working Group.

22.    Consequent upon the Opinion rendered, the Working Group requests the Government:

To release the three above-mentioned persons, or otherwise subject them to a competent judicial authority, bringing these cases in conformity with the standards and principles set forth in the International Covenant on Civil and Political Rights.

Adopted on 30 November 2005.

# EXHIBIT GG



**MISSION DE LA RÉPUBLIQUE DU YÉMEN**

الوفد الدائم للجمهورية اليمنية

No. 758
OI/ 68

The Permanent Mission of the Republic of Yemen to the United Nations Office and Other International Organizations presents its compliments the Special Rapporteur on the question of Torture and to the Special Rapporteur on Human Rights and Terrorism and has the honor to attach herewith,

Our country's reply to the note verbale Ref. ALG/So214 (53-02) YEM12/2005 on the case of the two Yemeni citizens, **Salah Nasser Ali** (27 years old) and **Muhammad Farah Ahmed Bashmilah** (37 years old).

The Permanent Mission hopes that constructive dialogue and cooperation continue between our government and your Special Rapporteurs in a positive atmosphere so as to understand the conditions and circumstances of each case separately.

And as you all know, the cases related to international terrorism and its relation with external factors are extremely sensitive and it is difficult to settle them quickly and to come to clear facts.

The Permanent Mission of the Republic of Yemen avails itself of this opportunity to renew to the Special Rapporteur on the question of Torture and the Special Rapporteur on Human Rights and Terrorism the assurances of its highest consideration.

Geneva, December 20ᵗʰ 2005

OHCHR REGISTRY

2 7 DEC 2005

Recipients : S.P.R.



CHEMIN DU JONC 19 - 1216 COINTRIN (GENÈVE) - TÉL. (022) 798 53 33 - FAX (022) 798 04 65

18/12 2005 09:15 FAX +967 1 276 616   ALKHARJIH.   → GENEVA   ☑002/005

بسم الله الرحمن الرحيم

الرقم ........................
التاريخ ......./....../2005م
الموافق ........................ 1426هـ
المرفقات ........................

**الجمهورية اليمنية**
رئاسة الجمهورية
الجهاز المركزي للأمن السياسي

**الأخ الدكتور/ أبو بكر عبدالله القربي**

**وزير الخارجيــــــــــــــــــة**     المحترم

**بعد التحية :**

ردا على مــذكرتكم رقـم 10/214/10 بتـاريخ 2005/12/7م بخصوص مذكرة الوفد الدائم بجنيف بناء على بلاغ المقرر الخاص بالتعذيب والمقرر الخاص بحقوق الإنسان والإرهاب بشأن المواطنين /صلاح ناصر سالم علي ومحمد فرج أحمد باشميله .. وبناء عليــــه :-

نود إفادتكـــــــــــم بما يـــــلي :-

أولا :

فيما يتعلق بصحة الوقائع الوارده في البلاغ حول تعرضهما (المذكوران آنفا) للضرب والإهانه والتعذيب والتهديد بالتحرش والاحتجاز السري بمعزل عن العالم ، من قبل السلطات الاندونيسيه والأردنيه والأمريكيه كمــا ورد فــي البلاغ ، فهي من مسئولية المقرر الخاص بالتعذيب والمقرر الخاص بحقوق الإنسان والإرهاب بمتابعة السلطات في البلدان المذكوره حول صحة الوقائع الوارده في البلاغ ..

ثانيا :

حول مزاعم التعرض للتعذيب أشار المذكوران آنفا من خلال التحقيق معهما إلا انهما قد تعرضا للتعذيب من قبل السلطات المشار اليها آنفا ..

ثالثا :

المسوغات القانونية :

تؤكد السلطات اليمنية بأنه لم يجري اعتقال المذكوران وانما سلما للسلطات اليمنية من السلطات الامريكية تحت تهمة التعامل مع ما يسمى بتنظيم

18/12 2005 SUN 07:00   [TX/RX NO 8192]   ☑002

18/12 2005 09:13 FAX +967 1 276 616    ALKHARJIH.    → GENEVA    ☑003/005



الجمهورية اليمنية
رئاسة الجمهورية
الجهاز المركزي للأمن السياسي

الرقم ......... ٨٣٦٧ ........
التاريخ ...٢٠٠٥..١٠..٢٣...م
الموافق ................ ١٤هـ
المرفقات ....................

— ٢ —

القاعده ، وقد قامت السلطات اليمنية باحتجازهما وفقاً لقانون الاجراءات
الجزائيه رقم (١٣) لسنة ٩٤م للتحقيق معهما والتأكد من صحة مانسب
اليهما من جانب السلطات الامريكية ، وقد جرى احتجازهما بناء على
مسوغات قانونية وفقاً للقانون المشار اليه انفاً ويخضع موضوعهما
للمراجعه القانونيه للتأكد من سلامة الاجراءات القانونية من قبل النيابة
العامة ومدى ملائمة ومطابقة هذه الاجراءات للقانون وقد تسلمت السلطات
اليمنية ملفاتهما من السلطات الامريكية بتاريخ ١٠/نوفمبر/٢٠٠٥م ، ويجرى
استكمال الاجراءات القانونية لاحالتهما إلى القضاء .

رابعاً :

الرعاية الصحية وبرامج اعادة التأهيل :

يحظى المحتجزون على ذمة قضايا بالرعاية الصحية وكذلك برامج اعادة
التأهيل وفقاً للقانون سوى كان ذلك في مراكز الاحتجاز أو في السجون
بناءً على قانون تنظيم السجون في حالة الادانة والحكم بالحبس ، وهناك
لوائح داخلية تنظم وتقرر مثل هذه الرعاية ، ويجري متابعتها والاشراف
عليها من قبل النيابة العامة .

للاطلاع واجراءاتكم ..

وتقبلوا تحياتنا ،،

اللواء/ غالب مطهر القمش
رئيس الجهاز المركزي للأمن السياسي

نسخه للاخ/مدير مكتب رئاسة الجمهورية .
نسخه للاخ/وزير الداخلية .
نسخه للاخت/وزيرة حقوق الإنسان .

18/12 2005 SUN 07:00  [TX/RX NO 8192] ☑003

*(Translated from Arabic)*

## Republic of Yemen

## Office of the President

### Central Political Security Department

Sir,

In response to your note No. 10/214/10, dated 7 December 2005, regarding a note from the Permanent Mission in Geneva about a report from the Special Rapporteur on torture and the Special Rapporteur on Human Rights and counter terrorism concerning Yemeni citizens Salah Nasser Salim Ali and Muhammad Faraj Ahmed Bashmilah, we should like to provide you with the following information:

1.    With regard to the accuracy of the facts alleged in the report, namely, that the two men were beaten, verbally abused, tortured, threatened with sexual abuse and held in incommunicado detention by the Indonesian, Jordanian and United States authorities, it is up to the Special Rapporteur on torture and the Special Rapporteur on Human Rights and terrorism to check with the authorities of the countries concerned whether the facts alleged in the report are accurate.

2.    With regard to the allegations about torture, both of the above-mentioned persons stated, when questioned, that they had not been tortured by any of the authorities mentioned above.

3.    Legal basis:

The Yemeni authorities confirm that the two men were not arrested but rather were handed over to them by the United States authorities after having been accused of being members of the organization known as Al-Qaʻida. The Yemeni authorities detained them under

Mr. Abubakr Abdallah Al-Qirbi
Minister for Foreign Affairs

CHR/NONE/2005/426
GE.05-16867 (E)   240106   240106

- 2 -

the Code of Criminal Procedures No. 13 of 1994, with a view to questioning them and verifying the allegations made by the United States authorities. The legal basis on which they were held was the aforementioned Code. The lawfulness of detention is subject to judicial review. Steps are taken to verify that the Department of Public Prosecutions has followed the proper legal procedures and that the procedures are consistent with the law. The Yemeni authorities received the files on these two men from the United States authorities on 10 November 2005, and the legal procedures are being completed pending their arraignment before the courts.

4.      Medical treatment and rehabilitation programmes:

Under the Prisons Act, detainees awaiting trial are legally entitled to access to medical treatment and rehabilitation programmes, whether at a detention centre or, if they have been convicted and sentenced to imprisonment, at a prison. There are internal rules that regulate and establish the parameters for such treatment. The Department of Public Prosecutions oversees the implementation of these rules.

Accept, Sir etc.

(*Signed*):        Ghalib Mathar al-Qamish
                         Chief
           Central Department of Political Security

cc.:  Director, Office of the President of the Republic
       Minister for Internal Affairs
       Minister for Human Rights

# EXHIBIT HH

MORI DocID: 1529655

OCT.10.2003  4:10PM                                    NO.646  P.1

~~TOP SECRET~~
~~CLASSIFICATION~~

DA C-06125-03



## U.S. HOUSE OF REPRESENTATIVES

Permanent Select Committee on Intelligence
H-405, U.S. Capitol
Washington, DC 20515-6415

Secure Fax No: (202) 225-8624

| Control No: | Date: 10/10/03 | Number of Pages 1+COVER |
|---|---|---|
| **TRANSMITTED TO** | | **TRANSMITTED FROM** |
| Name THE HONORABLE GEORGE J. TENET | | Name: GOSS/HARMAN |
| Organization DCI/CIA | | |
| Phone No: | | |
| **PLEASE SIGN AND SEND BACK IMMEDIATELY** | | |
| Signature: | | |

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AT: (202) 225-4121 OR -7690

~~TOP SECRET~~
~~CLASSIFICATION~~

MORI DocID: 1529655

OCT.10.2003    4:10PM                                                                          NO.640    P.2

PORTER J. GOSS, FLORIDA, CHAIRMAN

DOUGLAS K. BEREUTER, NEBRASKA, VICE CHAIRMAN
SHERWOOD L. BOEHLERT, NEW YORK
JIM GIBBONS, NEVADA
RAY LAHOOD, ILLINOIS
RANDY "DUKE" CUNNINGHAM, CALIFORNIA
PETER HOEKSTRA, MICHIGAN
RICHARD M. BURR, NORTH CAROLINA
TERRY EVERETT, ALABAMA
ELTON GALLEGLY, CALIFORNIA
MAC COLLINS, GEORGIA

JANE HARMAN, CALIFORNIA, RANKING DEMOCRAT
ALCEE HASTINGS, FLORIDA
SILVESTRE REYES, TEXAS
LEONARD L. BOSWELL, IOWA
COLLIN C. PETERSON, MINNESOTA
ROBERT E. (BUD) CRAMER, JR., ALABAMA
ANNA G. ESHOO, CALIFORNIA
RUSH D. HOLT, NEW JERSEY
C.A. DUTCH RUPPERSBERGER, MARYLAND

EX-OFFICIO MEMBERS
J. DENNIS HASTERT, SPEAKER
NANCY PELOSI, DEMOCRATIC LEADER

TOP SECRET

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE
WASHINGTON, DC 20515-6415

ROOM H-405, U.S. CAPITOL
(202) 225-4121

PATRICK B. MURRAY, STAFF DIRECTOR
L. CHRISTINE HEALEY, DEMOCRATIC COUNSEL

October 10, 2003

The Honorable George Tenet
Director of Central Intelligence
Washington, D. C. 20505

Dear Director Tenet:

Since September 11, 2001, the Intelligence Community has been successful in deterring, disrupting and capturing numerous key terrorists. The potential information that could be gleaned from these terrorists is vital to protecting U.S. persons, facilities and interests located worldwide. Therefore, the Committee is intensely interested in ensuring that the Intelligence Community maximizes the opportunity to collect information from these terrorists in order to prevent future terrorist attacks.

On Thursday, October 16th, 2003, the committee will hold a full committee briefing on the information being obtained from terrorist detainees, including but not limited to, information from three of the most noticeable terrorists in detention, Khalid Sheik Mohammed, Abu Zubaida and [redacted] The Committee requests that you send senior-level briefers who can provide the Committee a full and detailed account on this subject. Some recent briefings to the Committee have been disappointing and the Committee has been frustrated with the quality of the information being provided.

The Committee also requests that the briefers provide details relating to the efforts by the Executive branch to utilize and disseminate the information gathered as a result of the detention of these individuals. The Committee requests a description of the analytical backdrop currently used to corroborate or reject the obtained information, as well as examples of operational activities that have already used and benefited from detainee provided information.

The Committee appreciates your efforts to provide this information. Any questions regarding this request should be directed to Mr. Mike Kostiw at (202) 225-4121.

Sincerely,

Porter Goss
Chairman

Jane Harman
Ranking Democrat

**HPSCI 2003-1600**

TOP SECRET

# EXHIBIT
# II

MORI DocID: 1529654

☒002

PATRICK LEAHY
VERMONT

DAC-00438-04

COMMITTEE:
AGRICULTURE, NUTRITION, AND
FORESTRY
APPROPRIATIONS
JUDICIARY

# United States Senate
WASHINGTON, DC 20510-4502

APPROVED FOR RELEASE     (b)(2)
DATE: APR 2008          (b)(3)

January 27, 2004

The Honorable George Tenet
Director of Central Intelligence gency
Central Intelligence Agency
Washington, DC 20505

Dear George,

On October 8, 2003, I wrote to inquire about the standards the Central Intelligence Agency applies to the treatment of detainees in its custody around the world. I am afraid that the reply I received to that letter dated November 3, 2003 from General Counsel Scott Muller did not answer the specific question I posed, namely, whether the policies and practices relating to the interrogation of detainees stated in a June 25, 2003 letter to me from Defense Department General Counsel William Haynes apply in full to the CIA.

Mr. Haynes' letter acknowledged that the United States has an obligation under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment not to engage in torture and to "undertake . . . to prevent other acts of cruel, inhuman, or degrading treatment or punishment which do not amount to torture." He further stated that the United States interprets the term "cruel, inhuman, or degrading treatment or punishment" as treatment or punishment that would be prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution. And he pledged that "United States policy is to treat all detainees and conduct all interrogations, wherever they may occur, in a manner consistent with this commitment."

Are all interrogations of detainees in CIA custody overseas conducted in a manner that is consistent with Mr. Haynes' statements?

I raise this concern in part because I wonder whether the rules under which CIA interrogators operate may deviate from those followed by the U.S. military, which, as you know, are highly developed and transparent. For example, U.S. Army Field Manual 34-52 prohibits "the use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind." It also rightly stresses that "the use of force is a poor technique, as it yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear."

MORI DocID: 1529654

01/28/2004 WED 01:37 FAX 2022280260                                    Ø003

I hope you can assure me that interrogations conducted by the CIA or any persons working on its behalf are governed by the same guidelines as the Department of Defense. If CIA guidelines differ, could you clarify how, and why? I would also be interested in the results of the CIA's investigation into the matter referred to in the October 4, 2003 article in *The Guardian*.

Thank you for your assistance.

With best regards,

PATRICK LEAHY
United States Senator

*George – all the best*

# EXHIBIT JJ

0000043

SEP. 22. 2006  2:42PM    SSCI                          NO. 731   P. 1

 **RECEIVED**   **DOC 79**
22 Sep 06

---

Classification *Top Secret Codeword*



## U.S. Senate
## Select Committee on Intelligence

### Fax Cover Sheet

**To:** John Negroponte

**From:** Senator Rockefeller

**SSCI#:** 2006-3664

**Date:** 9/22/2006

**Time:** 1420

**Page 1 of** 4

**Prepared by:** LShepard

<u>Note to Recipient:</u>
If you did not receive every page of the facsimile, please call
(202) 224-1771.

Classification *Top Secret Codeword*

SEP. 22. 2006  2:42PM    SSCI                                    NO. 731   P. 2

PAT ROBERTS, KANSAS, CHAIRMAN
JOHN D. ROCKEFELLER IV, WEST VIRGINIA, VICE CHAIRMAN

ORRIN G. HATCH, UTAH                    CARL LEVIN, MICHIGAN
MIKE DEWINE, OHIO                       DIANNE FEINSTEIN, CALIFORNIA
CHRISTOPHER S. BOND, MISSOURI           RON WYDEN, OREGON
TRENT LOTT, MISSISSIPPI                 EVAN BAYH, INDIANA
OLYMPIA J. SNOWE, MAINE                 BARBARA A. MIKULSKI, MARYLAND
CHUCK HAGEL, NEBRASKA                   RUSSELL D. FEINGOLD, WISCONSIN
SAXBY CHAMBLISS, GEORGIA

## United States Senate
SELECT COMMITTEE ON INTELLIGENCE

## TOP SECRET CODEWORD

SSCI #2006-3664

BILL FRIST, TENNESSEE, EX OFFICIO
HARRY REID, NEVADA, EX OFFICIO

JAMES D. HENSLER, JR., STAFF DIRECTOR AND CHIEF COUNSEL
ANDREW W. JOHNSON, MINORITY STAFF DIRECTOR
KATHLEEN P. MCGHEE, CHIEF CLERK

September 22, 2006

The Honorable John Negroponte
Director of National Intelligence
Office of the Director of National Intelligence
Washington, D.C.  20511

Dear Director Negroponte:

The Senate will likely consider legislation next week relating to the Central Intelligence Agency's (CIA) detention and interrogation program. President Bush disclosed the existence of the CIA program in his September 6th White House statement. Since this disclosure, the President and senior Administration officials, including yourself, have publicly disclosed details about the past and current operation of the CIA program, including representations about why the program was suspended and the lawfulness of interrogation techniques following the Supreme Court's *Hamdan* decision.

As the Senate prepares to debate legislation in this area, I will need confirmation from your office that the enclosed statements are unclassified. I have carefully reviewed what the President and others have said publicly about the CIA program in recent weeks and I believe these statements will provide important context to the debate without divulging national security information. As a measure of caution, however, I have classified the enclosure.

Given the urgency of this matter, I ask that your office complete its classification review no later than 5 p.m. on Monday, September 25th. Please contact Mr. Andy Johnson, the Minority Staff Director, at 202-224-1732, if you have questions about this request.

Sincerely,

John D. Rockefeller IV
Vice Chairman

Enclosure

Downgrade to UNCLASSIFIED when detached from the enclosure

## TOP SECRET CODEWORD



TOP SECRET CODEWORD

TOP SECRET CODEWORD

TOP SECRET CODEWORD

# EXHIBIT KK

110TH CONGRESS
*1st Session*

SENATE

REPORT
110-75

## INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 2008

MAY 31, 2007 – Ordered to be printed

Mr. ROCKEFELLER, from the Select Committee on Intelligence, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany S. 1538]

The Select Committee on Intelligence, having considered an original bill (S. 1538) to authorize appropriations for fiscal year 2008 for intelligence and intelligence-related activities of the United States Government, the Intelligence Community Management Account, and the Central Intelligence Agency Retirement and Disability System, and for other purposes, reports favorably thereon and recommends that the bill do pass.

### CLASSIFIED ANNEX TO THE COMMITTEE REPORT

The classified nature of United States intelligence activities precludes disclosure by the Committee of details of its budgetary recommendations. The Committee has prepared a classified annex to this report that contains a classified Schedule of Authorizations. The Schedule of Authorizations is incorporated by reference in the Act and has the legal status of public law. The classified annex is made available to the Committees of Appropriations of the Senate and the House of Representatives and to the President. It is also available for review by any Member of the Senate subject to the provisions of Senate Resolution 400 of the 94th Congress (1976).

### SECTION-BY-SECTION ANALYSIS AND EXPLANATION

The following is a section-by-section analysis and explanation of the Intelligence Authorization Act for Fiscal Year 2008 that is being reported by the Committee. Following that

*Section 509. Other technical amendments relating to the responsibilities of the Director of National Intelligence as head of the intelligence community.*

Section 509 makes several technical and conforming changes to the Public Interest Declassification Act of 2000 (50 U.S.C. 435 note) to substitute the "Director of National Intelligence" for the "Director of Central Intelligence."

## COMMITTEE COMMENTS

*CIA Detention and Interrogation Program*

The fiscal year 2008 intelligence authorization bill is the first passed by the Committee in which all members were briefed on the CIA's detention and interrogation program. While the program has been briefed from its outset to the Committee's Chairman and Vice Chairman, the Administration's decision to withhold the program's existence from the full Committee membership for five years was unfortunate in that it unnecessarily hindered congressional oversight of the program.

Significant legal issues about the CIA detention and interrogation program remain unresolved. The Department of Justice has not produced a review of aspects of the program since the Supreme Court's *Hamdan* decision and the passage into law of the Detainee Treatment Act in 2005 and the Military Commissions Act of 2006. The Committee urges prompt completion of such a legal review as soon as possible, regardless of whether the program is currently being used. The Committee expects that such review will be provided to the Committee as a part of its ongoing oversight of the program.

The Committee recognizes that the program was born in the aftermath of the attacks of September 11, when follow-on attacks were expected. The Committee acknowledges that individuals detained in the program have provided valuable information that has led to the identification of terrorists and the disruption of terrorist plots. More than five years after the decision to start the program, however, the Committee believes that consideration should be given to whether it is the best means to obtain a full and reliable intelligence debriefing of a detainee. Both Congress and the Administration must continue to evaluate whether having a separate CIA detention program that operates under different interrogation rules than those applicable to military and law enforcement officers is necessary, lawful, and in the best interests of the United States.

Moreover, the Committee believes that the demonstrated value of the program should be weighed against both the complications it causes to any ultimate prosecution of these terrorists, and the damage the program does to the image of the United States abroad.

*Foreign Intelligence Surveillance Act Modernization and Liability Defense*

-36-