# TAB B



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

MAY 18, 2006

MS. CATHERINE KANE RONIS
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M STREET NW
WASHINGTON, DC  20037

Subject: GHOST DETAINEES
FOIPA No. 1049374

Dear Requester:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a.  Deletions have been  made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision.  In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely.  The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

|  | Section 552 |  |  | Section 552a |
|---|---|---|---|---|
| ☐(b)(1) | | ☐(b)(7)(A) | | ☐(d)(5) |
| ☒(b)(2) | | ☐(b)(7)(B) | | ☐(j)(2) |
| ☐(b)(3)_____ | | ☒(b)(7)(C) | | ☐(k)(1) |
| _____ | | ☒(b)(7)(D) | | ☐(k)(2) |
| _____ | | ☐(b)(7)(E) | | ☐(k)(3) |
| _____ | | ☒(b)(7)(F) | | ☐(k)(4) |
| ☐(b)(4) | | ☐(b)(8) | | ☐(k)(5) |
| ☐(b)(5) | | ☐(b)(9) | | ☐(k)(6) |
| ☒(b)(6) | | | | ☐(k)(7) |

_____3_____ preprocessed pages are enclosed.  To expedite requests, preprocessed packages are released the same way they were originally processed.  Documents or information originating with  other Government agencies were not referred to those agencies as part of this release.

☒ You have the right to appeal any denials.  Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C.  20530-0001 within sixty days from receipt of this letter.  The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal."  Please cite the FOIPA number assigned to your request  that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.  Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).  Our experience is, when ident, references usually contain information similar to the information processed in the main file(s).  Because of our significant backlog, we have given priority to processing only the main investigative file(s).  If you want the references, you must submit a separate request for them in writing and they will be reviewed at a later date, as time and resources permit,

☐ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could be reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could be reasonably expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

(Rev 01-31-2003)

## FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                    Date:  05/25/2004

To:  Inspection

From:  Inspection
      Contact:                                          b2 -1

Approved By:                                         b6 -1

Drafted By:                                          b7C -1

Case ID #: 297-HQ-A1327669-E - 3

Title:    COUNTERTERRORISM DIVISION,
      INQUIRY REGARDING
      ACTIVITIES OF FBI PERSONNEL
      AT ABU GHURAYB PRISON (AGP) DURING
      OCTOBER 2003 - DECEMBER 2003

Synopsis: Forward 15 original investigative inserts and FD-540 1As
to file

Enclosures:  Enclosed are the following documents.

  (1)    Original investigative insert documenting 05/18/2004
        interview of SA                CJTS, and FD-540 1A
        envelope containing interview notes of Supervisory      b6 -1
        Special Agent (SSA)                Inspection              b7C -1
        Division

  (2)    Original investigative insert documenting 05/17/2004
        telephonic interview of SA                      Little Rock   b6 -1
        Division, and FD-540 1A envelope containing interview
        notes of SSA               Inspection Division            b7C -1

  (3)    Original investigative insert documenting 05/17/2004
        interview of SA                   Houston Division, SSA     b6 -1
        and FD-540 1A envelope containing interview notes of SSA
                        Inspection Division                        b7C -1

  (4)    Original investigative insert documenting 05/18/2004
        interview of LS                Houston Division, and FD-540  b6 -1
        1A envelope containing interview notes of SSA
                        Inspection Division                        b7C -1

  (5)    Original investigative insert documenting 05/17/2004
        interview of LS                San Francisco Division,       b6 -1
        and FD-540 1A envelope containing interview notes of SSA
                        Inspection Division                        b7C -1

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-07-2004 BY 61579/DMH/BCF/SSG 01-CV-4454

15 ENCLOSURE              DETAINEES-3460

297-HQ-A1327669-E-3
KBC:kc

1

The following investigation was conducted by AI [                ]    b6 -1
INSD, on 05/17/2004 in New York, NY:    b7C -1

SA [                    ] NYO, Squad CD-22,    b2 -1
DOB: [              ] SSAN: [              ] was interviewed. He was    b6 -1
advised of the identity of AI [                ] and the nature of the    b7C -1
interview. He provided the following information:

SA [          ] deployed to Iraq on or about 11/13/2003    b6 -1
through 01/16/2004. His primary duties while in Iraq consisted    b7C -1
of conducting FCI interviews at Camp Cropper in the vicinity of
Baghdad International Airport. He worked primarily with SA [          ]
[          ] He went to Abu Ghurayb prison on approximately five
occasions. On one occasion he was searching for a "ghost"
detainee through both cell blocks and the tent compound, but did
not locate him. He described a "ghost" detainee as someone
detained at the prison by intelligence personnel without any
record of the detainee's presence. He did not know how many such
detainees existed. On one occasion he processed for
fingerprinting and DNA approximately 25-50 detainees at the
prison. He also introduced a detainee whose name he could not
recall to the Iraqi Survey Group (ISG) because of the WMD
knowledge that detainee possessed. The ISG was U.S. military, to
the best of his recollection. He also dealt with Department of
Defense (DOD) personnel who were civilian clothes. He believed
they represented Defense Intelligence Agency.

Other than his search for the "ghost" detainee in the
cell blocks, he interviewed detainees in the stand alone
buildings known as "wood" and "steel," respectively. He actually
interviewed the "ghost" detainee prior to the search on one
occasion and saw no signs of abuse. The detainee was
subsequently released, and that is why SA [          ] could not locate    b6 -1,3,4
him during the search. These stand-alone buildings were located    b7C -1,3,4
outside the cell blocks. Those detainees were from the tent
compound, not the main cell blocks. He recalled interviewing    b7D -1
[                              ] with SA [                    ]    b7F -1
was a tent compound detainee. The detainee was delivered to the
stand alone building by MPs who did not participate in the
interview. The detainee was brought to the interview in hand
cuffs. He also saw detainees wearing hoods while they were
escorted on the prison grounds.

SA [          ] did not observe any misconduct or    b6 -1
mistreatment of prisoners at any time during his presence at Abu    b7C -1
Ghurayb prison. He conducted a thorough search of all the cells

DETAINEES-3471

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-07-2005 BY 65179 DMH/BCW/STS/CLF/CWJW

297-HQ-A13276697-E

<u>2</u>

in the prison for the "ghost" detainee and saw no evidence of any mistreatment or misconduct.

      SA [          ] had no reason to believe that any misconduct or mistreatment of detainees was occurring at the prison. While processing numerous (25-50) detainees for fingerprints and DNA samples, he noticed no marks or signs of abuse on the prisoners. He did not recall meeting the guards who were depicted in the media allegedly abusing prisoners in the prison.

b6 -1

b7C -1

b6 -1

b7C -1

      SA [          ] advised his interviews conducted at Camp Cropper and Abu Ghurayb prison were reported via EC  He did not advise detainees of their Miranda Warning rights, and could not recall why.  His interviews always took place in the stand alone buildings previously described and none of his interviewees were housed in units 1A or 1B.  He had no substantive contact with Military Police personnel in charge of the prison.  The only other member of his interview team at the prison was SA [          ] He did not recall a translator being present because the subject of the interview spoke English.

b6 -1

b7C -1

      During his interviews, no interviewee brought to his attention any acts of misconduct or mistreatment by U.S personnel  He was in possession of no pictures, video tapes, or notes of actions depicting misconduct or inappropriate behavior by U.S. personnel against detainees.  He was not aware of anyone in possession of such items.  He had no knowledge of DOD or DOJ authorization for the use of certain interrogation techniques. He and other interviewers, including the MI handlers, would discuss interview strategies as to whether or not the interview would use a positive, rapport building tone, or an accusatorial, negative tone  No discussion or thought was given to using physical interrogation techniques during any interview.  He had no knowledge of sleep deprivation or isolation used on detainees. He had no additional information relating to the abuse/mistreatment of detainees.

# TAB C

WILMERHALE

April 25, 2006

Catherine Kane Ronis

+1 202 663 6380 (t)
+1 202 663 6363 (f)
catherine.ronis@wilmerhale.com

<u>Via Facsimile, Email and US Mail</u>

FBI Records Management Division
Services Request Unit Room 6359
935 Pennsylvania Avenue, N.W.
Washington D.C. 20535-0001
(Ph.) 202-324-5520
(Fax) 202-324-3752

<u>Re:     Request Under the Freedom of Information Act for Records Concerning Ghost Detainee
Memoranda, Department of Defense Detainee Reporting, Reports to Certain U.N. Committees,
and the Draft Convention on Enforced Disappearance</u>

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act,
5 U.S.C. § 552 ("FOIA"). The Request is submitted on behalf of Amnesty International ("AI")
and Washington Square Legal Services, Inc. ("WSLS"). AI is a non-government organization
and a world-wide movement of members who campaign for internationally-recognized human
rights. WSLS is the corporation that houses the International Human Rights Clinic ("the Clinic")
of the New York University School of Law ("NYU Law School"). The Clinic is a project of
NYU Law School's Center for Human Rights and Global Justice ("CHRGJ").

We are filing this request simultaneously with the Department of Defense (including its
components, the Department of the Army, Navy and Air Force, the Marine Corps, and the
Defense Intelligence Agency), the Department of Justice (including its components, the Federal
Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State,
the Central Intelligence Agency, and the Department of Homeland Security (including its
components the Office of Intelligence and Analysis, the Directorate for Policy, U.S. Immigration
and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Coast Guard, and
U.S. Customs and Border Protection). By this letter, we also request expedited processing
pursuant to 5 U.S.C. § 552(a)(6)(E).

We are seeking the opportunity to inspect and copy, if necessary, all records in the
possession of the Department, including any officers, divisions or bureaus thereof, on the topics
listed below.

WILMERHALE

FOIA Request
April 25, 2006
Page 2

## Definitions

For purposes of this request, the following terms shall be understood as described below:

The term "records" includes any and all reports, statements, examinations, memoranda, correspondence (including electronic mail), designs, maps, photographs, microfilms, computer tapes or disks, rules, regulations, codes, handbooks, manuals, or guidelines.

The term "government official" includes any U.S. government employee, and any person providing services to any agency of the United States government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the U.S. government.

The term "foreign official" includes any foreign government employee, and any person providing services to any agency of a foreign government on a contractual basis, regardless of his or her rank or ability to speak or make decisions on behalf of the foreign government.

The term "communication" means the giving, receiving, transmitting, or exchanging of information, including, but not limited to, any and all written, printed, telephonic, electronic, and in-person conversations by and with any person, and/or talk, gestures, or documents which memorialize or refer to any communications.

The term "detainee" means any person deprived of their liberty by one or more individuals or agencies who is prevented by any means from leaving the place in which he or she is being held. The term "detention" means depriving any person of their liberty such that they are prevented by any means from leaving the place in which they are held.

The term "place of detention" means any place or facility in which a "detainee" is kept, inside or outside the United States, regardless of whether it is officially recognized as a place of detention.

Unless otherwise specified, this request relates to all records generated between September 11, 2001 and the present.

WILMERHALE

FOIA Request
April 25, 2006
Page 3

## Memoranda of Understanding

The practice of persons being kept as "off-the-record" detainees in military prisons has been well documented.[1] In this context, "ghost" or "unregistered" detainees are understood to refer to those detainees who were at some point during their detention, or remain: not "officially" registered at military facilities; "kept off the books"; and/or denied access to the International Committee of the Red Cross (ICRC).[2]  Documents produced by the Department of Defense on March 3, 2005 pursuant to an ACLU FOIA request[3] and a media report in the

---

[1] *See* Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16. *See also* Jane Mayer, *A Deadly Interrogation: Can the C.I.A. Legally Kill a Prisoner?*, NEW YORKER, Nov. 14, 2005, at 44 (discussing the practice, particularly with respect to the death of Manadel al-Jamadi). *See also* the following Department of Defense documents released to the American Civil Liberties Union (ACLU) pursuant to a *Freedom of Information Act* request, all available at http://www.aclu.org/torturefoia/released/030905/: Transcript of deposition of Brig. Gen. Janis L. Karpinski, Appendix to Fay/Jones/Kern Report (July 18, 2004); Statement of MNF-I, C2, IMIR CW2, Annex to Fay/Jones/Kern Report (June 16, 2004); Sworn Statement of E-5, 519th MI Bn, Annex to Fay/Jones/Kern Report (June 4, 2004);  Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of 372nd MP Co SPC, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report; Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report; Sworn Statement of SGT, 372nd MP, Camp Victory, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn Statement of SPC/E4, B Co., 66th MI Group, 202nd MI BN, Annex to Fay/Jones/Kern Report (May 24, 2004); Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of CW2, A/519th MI Bn, Annex to Fay/Jones/Kern Report (May 19, 2004); Sworn Statement of SGT, 372nd MP Co, Annex to Fay/Jones/Kern Report (May 7, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004). *See further* HUMAN RIGHTS FIRST, BEHIND THE WIRE: AN UPDATE TO *ENDING SECRET DETENTIONS* 6 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf (providing overview of the practice of ghosting in military facilities); HUMAN RIGHTS WATCH, THE UNITED STATES' DISAPPEARED: THE CIA'S LONG-TERM "GHOST DETAINEES" 5-15 (2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (outlining practice of keeping CIA prisoners in military detention generally).

[2] *Id.*

[3] *See* Sworn Statement of [UNREADABLE], Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000719-000725, *available at* http://www.aclu.org/torturefoia/released/030905/ ("OGA and TF-121 routinely brought in detainees for a short period of time. The A/519th soldiers initiated the term 'ghost.' They stated they used this term as the detainees were not in-processed in the normal way via the MP database and were not yet categorized. It was difficult to track these particular detainees and I and other officers recommended that a Memorandum of Understanding be written up between OGA, the 205th MI BDE and the 800th MP BDE to establish procedures for a ghost detainee"); Sworn Statement of Deputy CJ2, CJTF-7, Annex to Fay/Jones/Kern Report, *in* Department of Defense FOIA Release, at 000726-000729, *available at* http://www.aclu.org/torturefoia/released/030905/ ("...in reference to Ghost detainees, OGA would bring in detainees for a short period of time. [REDACTED] brought them in. These particular ghost detainees were not yet categorized and OGA was working on that. It was very difficult keeping track of these OGA because they were not processed until OGA decided to turn them over to us. COL PAPPAS was not happy with that procedure.

WILMERHALE

FOIA Request
April 25, 2006
Page 4

*Washington Post* dated March 11, 2005[4] indicate that this arrangement for "ghosting" was not "ad hoc" but was embodied in a Memorandum of Understanding (MOU) between military officials and the CIA.[5] The exact contours of this arrangement are not publicly known as a copy of this MOU was not included in the documents released by the Department of Defense.[6]

<u>Records Requested</u>

We seek the following records relating to the arrangement described above:

1.  Any memorandum of understanding, or other record reflecting an agreement or proposed agreement between agencies, or between any agency and any subdivision or official, concerning the handling of ghost or unregistered detainees. This includes but is not limited to:

   (a)   Any record reflecting communications about whether or not to draft any memorandum of understanding or agreement regarding unregistered or ghost detainees.

   (b)   Any record reflecting communications about the content of any memorandum of understanding or agreement regarding unregistered or ghost detainees.

2.  Any record reflecting a policy, whether formal or informal, about the reception, detention, or movement of unregistered or ghost detainees.

3.  Any memorandum of understanding, or other record reflecting an agreement between any agencies, or between any subdivision or official or any other agency, regarding the transfer of detainees from the custody of one agency to that of another.

---

[REDACTED] recommended that a Memorandum of Understanding be written up between OGA and MI on the procedures to drop off a ghost detainee. COL PAPPAS met with OGA and TF-121 and the memorandum on procedures for dropping ghost detainees was signed").

[4] Josh White, *Army, CIA Agreed on 'Ghost' Prisoners*, WASH. POST, Mar. 11, 2005, at A16.

[5] *Id.*

[6] Press Release, American Civil Liberties Union, Newly Released Army Documents Point to Agreement Between Defense Department and CIA on "Ghost" Detainees, ACLU Says: Declassified Annexes to Fay Report, Which Denied Link, Contain Further Evidence of Brutal Army Abuses (Mar. 10, 2005), *available at* http://www.aclu.org/safefree/general/17597prs20050310.html.

WILMERHALE

FOIA Request
April 25, 2006
Page 5

## Department of Defense Detainee Reporting

The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub.
L. No. 108-375, 118 Stat. 1811 (2004) ("the Act"), requires the Department of Defense to submit
an annual report regarding certain detainees.

### Records Requested

4.  Any record generated in connection with the reporting requirement under Section 1093(c)
of the Act, regardless of whether or not such record was actually submitted in the final report,
and any record submitted to the Committee on Armed Services of the Senate and the Committee
on Armed Services of the House of Representatives pursuant to Section 1093(c) of the Act.[7]
This includes but is not limited to records reflecting:

  (a)  Any notice of investigation into any violation of international obligations or laws of
       the United States regarding the treatment of individuals detained by the U.S. Armed
       Forces or by a person providing services to the Department of Defense on a
       contractual basis.

  (b)  Any discussions regarding whether any investigation described in Request 4(a)
       should be reported.

  (c)  The number of detainees held in Department of Defense custody, or released from
       Department of Defense custody during the time period covered by the report,
       broken down into the greatest number of time intervals for which such information
       is available.

  (d)  The number of detainees detained by the Department of Defense as "enemy
       prisoners of war," "civilian internees," and "unlawful combatants," broken down
       into the greatest number of time intervals for which such information is available.

  (e)  The number of detainees detained by the Department of Defense under any status
       other than "enemy prisoners of war," "civilian internees," and "unlawful
       combatants," broken down into the greatest number of time intervals for which such
       information is available.

---

[7]  Section 1093(e) of the Act mandates that the reports "be submitted, to the extent practicable, in unclassified form,
but may include a classified annex as necessary to protect the national security of the United States." To the extent
any records or portions of records responsive to this request are classified, please provide basic information as to the
date, sender, recipient, and subject matter of the classified records.

WILMERHALE

FOIA Request
April 25, 2006
Page 6

    (f)    The transfer or proposed transfer of detainees by the Department of Defense to the jurisdiction of other countries, and the countries to which those detainees were transferred.

    (g)    Any communications regarding decisions to include or not include information in the Department of Defense's report under Section 1093(c) of the Act and decisions as to whether to submit any information in unclassified or classified form pursuant to Section 1093(d) of the Act.

### United States Report to the Committee Against Torture

On May 6, 2005, the U.S. submitted its Second Periodic Report to the United Nations ("U.N.") Committee Against Torture, as required by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

#### Records Requested

All records reflecting:

5. Communications regarding the United States' Second Periodic Report to the Committee Against Torture, including but not limited to:

    (a)    Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Committee Against Torture.

    (b)    Communications with a foreign government, or agency of a foreign government, regarding any provision of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment relating to apprehension, transfer and detention, (including Articles 1, 3, 5, 16), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

    (c)    Proposed language or earlier drafts of the report to the Committee Against Torture.

### United States Report to the Human Rights Committee

On November 28, 2005, the U.S. submitted its Third Periodic Report to the U.N. Human Rights Committee, as required by the International Covenant on Civil and Political Rights.

WILMERHALE

FOIA Request
April 25, 2006
Page 7

<u>Records Requested</u>

All records reflecting:

6.  Communications regarding the United States' Third Periodic Report to the Human Rights Committee, including but not limited to:

 (a) Communications regarding whether any individual, place of detention, or practice should be mentioned or discussed in the report to the Human Rights Committee.

 (b) Communications with a foreign government, or agency of a foreign government, regarding any provision of the International Covenant on Civil and Political Rights relating to apprehension, transfer and detention, (including Articles 6, 7, 9), or whether any individual, place of detention, or practice should be mentioned or discussed in the report.

 (c) Proposed language or earlier drafts of the report to the Human Rights Committee.

## The Convention on the Protection of all Persons from Enforced Disappearance

On September 23, 2005, a U.N. working group concluded the draft text of the Convention on the Protection of all Persons from Enforced Disappearance. In 2006, the draft convention will be submitted to the U.N. Commission on Human Rights and the U.N. General Assembly, before being opened for signature and ratification.

<u>Records Requested</u>

7.  Any record reflecting communications regarding the negotiation or drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

8.  Any record reflecting communications with a foreign government, or an agency or official of a foreign government, regarding the drafting of the draft Convention on the Protection of all Persons from Enforced Disappearance.

## Fee Waiver

The requestors qualify as "representatives of the news media" and the records sought are not for commercial use. Moreover, this Request "is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii).

WILMERHALE

FOIA Request
April 25, 2006
Page 8

Amnesty International is a non-government organization and a world-wide movement of members who campaign for internationally recognized human rights. AI publishes reports, press-briefings, newsletters and urgent action requests informing the public about human rights, including the prohibition on torture and the prohibition on disappearances. AI also disseminates information through its website www.amnesty.org.

The Center for Human Rights and Global Justice is a research center at NYU Law School. CHRGJ aims to advance human rights and respect for the rule of law through advocacy, scholarship, education and training. CHRGJ publishes reports and operates a website www.nyuhr.org discussing human rights issues.

The International Human Rights Clinic is a project of CHRGJ and an official program at NYU Law School, composed of students and directed by clinical professors, who engage in research and advocacy on human rights issues.

Washington Square Legal Services is a not-for-profit corporation that houses the clinical program of NYU Law School.

The requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

### Expedited Processing

Expedited processing is warranted as there is a "compelling need" for the records sought in this request. 5 U.S.C. § 552(a)(6)(E)(i)(I). The requesters are primarily engaged in "disseminating information" and there is an "urgency to inform the public concerning the actual or alleged Federal Government Activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See also* 32 C.F.R. § 286.4(d)(3)(ii) (DOD); 6 C.F.R. § 5.5(d)(1)(ii) (DHS); 28 C.F.R. § 16.5(d)(1)(ii) (DOJ); 22 C.F.R. § 171.12(b)(2) (DOS).

AI is primarily engaged in disseminating information about human rights, through its reports, newsletters, press-briefings, urgent action requests, and on its website. CHRGJ is engaged in disseminating information about human rights, including in particular, the Federal Government's role in upholding human rights. As indicated above, this information is disseminated through published reports and CHRGJ's website. The Clinic actively supports this work, and WSLS houses the clinic. As reflected in the media reports discussed above, there is an urgent need to provide the public with information relating to the U.S. government's practices concerning unregistered or ghost detainees.

WILMERHALE

FOIA Request
April 25, 2006
Page 9

There is also a "compelling need" because failure to obtain the records on an expedited basis "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 5 U.S.C. § 552(a)(6)(E)(v)(I). *See also* 32 C.F.R. § 286.4(d)(3)(i) (DOD); 6 C.F.R. § 5.5(d)(1)(i) (DHS); 28 C.F.R. § 16.5(d)(1)(i) (DOJ); 22 C.F.R. § 171.12(b)(1) (DOS). This Request arises in the context of allegations of ongoing unlawful detention and abuse of individuals with the involvement of U.S. agents abroad. Failure to publicly expose and thereby halt the practices prompting this Request could reasonably be expected to pose an imminent threat to the physical safety and lives of such individuals.

Expedited processing is also warranted because this request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv).

AI and WSLS certify that the foregoing statements regarding the basis for expedited processing are true and correct to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). *See also* 32 C.F.R. § 286.4(d)(3)(iii) (DOD); 6 C.F.R. § 5.5(d)(3) (DHS); 28 C.F.R. § 16.5(d)(3) (DOJ); 22 C.F.R. § 171.12(b) (DOS).

\*        \*        \*

If this Request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect release of all segregable portions of otherwise exempt material. We also reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request **within twenty (20) days**, as required under 5 U.S.C. § 552(a)(6)(A)(i).

WILMERHALE

FOIA Request
April 21, 2006
Page 10

Thank you for your prompt attention.  Please direct all questions and future responses to:

CATHERINE K. RONIS
Counsel to Amnesty International USA
WilmerHale
2445 M Street Washington, D.C. 20037
Tel: (202) 663-6380
Fax: (202) 663-6363
E-mail: catherine.ronis@wilmerhale.com

If you need someone to reach by telephone or email, you may also contact Kyle
DeYoung at WilmerHale at (202) 663-6785.

Sincerely,

CURT GOERING
Deputy Director
Amnesty International USA
5 Penn Plaza
New York, NY 10001
Tel: (212) 807-8400
Fax: (212) 627-1451
E-mail: cgoering@aiusa.org

MARGARET L. SATTERTHWAITE
Washington Square Legal Services, Inc.
Co-Director, International Human Rights Clinic
Faculty Director, Center for Human Rights &
Global Justice
NYU School of Law
245 Sullivan Street
New York NY 10012
Tel: (212) 998-6657
Fax: (212) 995-4031
E-mail: margaret.satterthwaite@nyu.edu

# TAB D



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

MAY 18, 2006

MS. CATHERINE KANE RONIS
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M STREET NW
WASHINGTON, DC   20037

Subject: GHOST DETAINEES MEMORANDA
FOIPA No. 1049375

Dear Requester:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☒(b)(2) | ☐(b)(7)(B) | ☐(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C) | ☐(k)(1) |
| _____ | ☒(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☒(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) | | ☐(k)(7) |

_____3_____ preprocessed pages are enclosed. To expedite requests, preprocessed packages are released the same way they were originally processed. Documents or information originating with other Government agencies were not referred to those agencies as part of this release.

☒ You have the right to appeal any denials. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530-0001 within sixty days from receipt of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation. Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s). Our experience is, when ident, references usually contain information similar to the information processed in the main file(s). Because of our significant backlog, we have given priority to processing only the main investigative file(s). If you want the references, you must submit a separate request for them in writing and they will be reviewed at a later date, as time and resources permit,

☐ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
    Dissemination Section
Records Management Division

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could be reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could be reasonably expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

(Rev 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                    Date:  05/25/2004

To: Inspection

From:  Inspection
       Contact:

                                                         b2 -1
Approved By:                                             b6 -1

Drafted By:                                              b7C -1

Case ID #: 297-HQ-A1327669-E-3

Title:   COUNTERTERRORISM DIVISION,
         INQUIRY REGARDING
         ACTIVITIES OF FBI PERSONNEL
         AT ABU GHURAYB PRISON (AGP) DURING
         OCTOBER 2003 - DECEMBER 2003

Synopsis: Forward 15 original investigative inserts and FD-540 1As
to file

Enclosures:  Enclosed are the following documents.

(1)    Original investigative insert documenting 05/18/2004
       interview of SA                   CJIS, and FD-540 1A
       envelope containing interview notes of Supervisory     b6 -1
       Special Agent (SSA)                     Inspection      b7C -1
       Division

(2)    Original investigative insert documenting 05/17/2004
       telephonic interview of SA              Little Rock     b6 -1
       Division, and FD-540 1A envelope containing interview   b7C -1
       notes of SSA            Inspection Division

(3)    Original investigative insert documenting 05/17/2004
       interview of SA                   Houston Division,     b6 -1
       and FD-540 1A envelope containing interview notes of SSA   b7C -1
                          Inspection Division

(4)    Original investigative insert documenting 05/18/2004
       interview of LS              Houston Division, and FD-540   b6 -1
       1A envelope containing interview notes of SSA
                          Inspection Division                  b7C -1

(5)    Original investigative insert documenting 05/17/2004
       interview of LS                   San Francisco Division,   b6 -1
       and FD-540 1A envelope containing interview notes of SSA
                          Inspection Division                  b7C -1

15-ENCLOSURE            DETAINEES-3460

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-07-2004 BY 6154 DMH/MCR/SBS/ct-cv-5451

297-HQ-A1327669 ₁-E-3
KBC.kc

1

The following investigation was conducted by AI [REDACTED]    b6 -1
INSD, on 05/17/2004 in New York, NY:                          b7C -1

SA [REDACTED] NYO, Squad CD-22, [REDACTED]                    b2 -1
DOB. [REDACTED] SSAN. [REDACTED] was interviewed. He was      b6 -1
advised of the identity of AI [REDACTED] and the nature of the
interview  He provided the following information:            b7C -1

SA [REDACTED] deployed to Iraq on or about 11/13/2003         b6 -1
through 01/16/2004. His primary duties while in Iraq consisted
of conducting FCI interviews at Camp Cropper in the vicinity of   b7C -1
Baghdad International Airport. He worked primarily with SA
[REDACTED] He went to Abu Ghurayb prison on approximately five
occasions. On one occasion he was searching for a "ghost" .
detainee through both cell blocks and the tent compound, but did
not locate him. He described a "ghost" detainee as someone
detained at the prison by intelligence personnel without any
record of the detainee's presence. He did not know how many such
detainees existed. On one occasion he processed for
fingerprinting and DNA approximately 25-50 detainees at the
prison  He also introduced a detainee whose name he could not
recall to the Iraqi Survey Group (ISG) because of the WMD
knowledge that detainee possessed  The ISG was U S. military, to
the best of his recollection. He also dealt with Department of
Defense (DOD) personnel who were civilian clothes  He believed
they represented Defense Intelligence Agency.

Other than his search for the "ghost" detainee in the
cell blocks, he interviewed detainees in the stand alone
buildings known as "wood" and "steel," respectively. He actually
interviewed the "ghost" detainee prior to the search on one
occasion and saw no signs of abuse. The detainee was            b6 -1,3,4
subsequently released, and that is why SA [REDACTED] could not locate
him during the search. These stand-alone buildings were located   b7C -1,3,4
outside the cell blocks. Those detainees were from the tent
compound, not the main cell blocks. He recalled interviewing     b7D -1
[REDACTED] with SA [REDACTED]
was a tent compound detainee  The detainee was delivered to the   b7F -1
stand alone building by MPs who did not participate in the
interview. The detainee was brought to the interview in hand
cuffs. He also saw detainees wearing hoods while they were
escorted on the prison grounds.

SA [REDACTED] did not observe any misconduct or               b6 -1
mistreatment of prisoners at any time during his presence at Abu
Ghurayb prison  He conducted a thorough search of all the cells   b7C -1

DETAINEES-3471


ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-07-2004 BY 61579 DMH/RCB/sjc

297-HQ-A13276697-E

2

in the prison for the "ghost" detainee and saw no evidence of any mistreatment or misconduct.

SA [        ] had no reason to believe that any misconduct    b6 -1
or mistreatment of detainees was occurring at the prison.  While    b7C -1
processing numerous (25-50) detainees for fingerprints and DNA
samples, he noticed no marks or signs of abuse on the prisoners.
He did not recall meeting the guards who were depicted in the
media allegedly abusing prisoners in the prison.

SA [        ] advised his interviews conducted at Camp    b6 -1
Cropper and Abu Ghurayb prison were reported via EC  He did not    b7C -1
advise detainees of their Miranda Warning rights, and could not
recall why.   His interviews always took place in the stand
alone buildings previously described and none of his interviewees
were housed in units 1A or 1B.  He had no substantive contact
with Military Police personnel in charge of the prison.  The only    b6 -1
other member of his interview team at the prison was SA [        ]    b7C -1
He did not recall a translator being present because the subject
of the interview spoke English.

During his interviews, no interviewee brought to his
attention any acts of misconduct or mistreatment by U.S
personnel  He was in possession of no pictures, video tapes, or
notes of actions depicting misconduct or inappropriate behavior
by U.S. personnel against detainees.  He was not aware of anyone
in possession of such items.  He had no knowledge of DOD or DOJ
authorization for the use of certain interrogation techniques.
He and other interviewers, including the MI handlers, would
discuss interview strategies as to whether or not the interview
would use a positive, rapport building tone, or an accusatorial,
negative tone  No discussion or thought was given to using
physical interrogation techniques during any interview.  He had
no knowledge of sleep deprivation or isolation used on detainees.
He had no additional information relating to the
abuse/mistreatment of detainees.

DETAINEES-3472