# Attachment Y

<u>VIA Fax</u>

May 31, 2005

Co-Director
Office of Information and Privacy
United States Department of Justice
Flag Building , Suite 570
Washington D.C. 20530-0001

Re:   Freedom of Information Act Appeal   FOIA/PA #5-08

Dear Co-Director of Information and Privacy,

    I am writing to appeal the decision by the Office of Intelligence, Policy and Review to neither confirm nor deny the existence or non-existence of records pertinent to our request under the Freedom of Information Act ("FOIA") in the above-referenced matter as set forth in the Office of Intelligence, Policy and Review ("Response"), attached hereto as Exhibit A ("Ex. A"). This administrative appeal is filed based on Section 552(a)(6) of FOIA. The Center for Constitutional Rights requested these records under FOIA in a letter dated December 21, 2004 ("Request"), attached hereto as Exhibit B ("Ex. B"). In the denial of our FOIA request, your office stated,

> It has been determined that the fact of the existence or non-existence of records concerning the matters relating to those set fourth in your request is properly classified under Executive Order 12958, as amended. Accordingly we can neither confirm nor deny the existence of records responsive to your request pursuant to 5 U.S.C § 552(b)(1).[1]

The Center understand your office's response to mean that you have relied upon Exemption 1 under 5 U.S.C. § 521(b)(1). Reliance on this exemption to FOIA's disclosure obligations requires that the materials in question be (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order. *See* 5 U.S.C. § 5521(b)(1), *see also* <u>American Civil Liberties Union v DOJ 265 F. Supp. 2d 20 (D.D. C. 2003)</u>.

    By responding that you neither confirm nor deny the existence or nonexistence of the requested information, you claim that information related to the existence or nonexistence of each of the Center's seventeen requests, or any portion of these requests, is itself classified. The D.C. Circuit Court has construed such a government response to be as "if [we] had requested and been refused permission to see a document which says

---

[1] *See* Exhibit A.

1

either 'Yes, we have records related to [our request]' or 'No, we do not have any such records.'" Phillippi v. CIA, 178 U.S. App. D.C. 243, (D.C.C. 1976).

In your office's initial written response you failed to specify the provision of Sec. 1.4 of Executive Order 12958, as amended, upon which you were relying. While your office has invoked your ability to neither confirm nor deny the existence or nonexistence of requested information under Sec 3.6(a), whenever the fact of its existence or nonexistence is itself classified under Executive Order 12958, as amended, such reliance does not exempt you from likewise meeting the requirements of Sec. 1.4 which sets out the Order's authorized classification categories. *See* Exec. Order No. 12958 as amended by Exec. Order No. 13292 Sec. 1.1(c); Washington Post v. United States Dep't of Defense, 766 F. Supp. 1, (D.D.C.1991). Because your office failed to specify the relevant provision of Sec 1.4, in your written response to the Center's request, we were forced to contact your office directly in order to ascertain the full meaning of your response. In your subsequent response to our inquiry, your office's FOIA Coordinator Ms. GayLa D. Sessoms indicated that your office had denied our request under Executive Order 12958, as amended, by relying on Sec. 1.4(c) "intelligence activities (including special activities), intelligence sources or methods, or cryptology".

Reliance on Exemption 1 requires that disclosure of the requested information "reasonably could be expected to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20, at 28 (D.C.C. 2003) (quoting Exec. Order No. 12,958 §§ 1.2, 1.5 as amended Sec 1.1(4)); Washington Post v. United States Dep't of Defense, 766 F. Supp. 1, (D.D.C. 1991). Based on this understanding of your office's response to the Center's request, we must strongly contest your initial denial of our FOIA request on several grounds. In the first instance, the Center contests that documents which merely state the existence or non-existence of other records pertinent to our request regarding information related to Unregistered, CIA, and/or "Ghost" Detainees "concern" "intelligence activities (including special activities), intelligence sources or methods, or cryptology" under Sec. 1.4 of Executive Order 12958 as amended. Merely revealing that said documents do or do not exist does not "concern" intelligence activities, because doing so will not in any way affect these activities. Even were it found to "concern" national security in some tenuous manner, we cannot accept that the release of limited records, or "reasonably segregable portions" of these records, "reasonably could be expected to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (*quoting* Exec. Order No. 12,958 Sec. 1.2, 1.5, as amended Sec. 1.1(4)).

As held in Nuclear Control Institute v. Nuclear Regulatory Commission, if the government denies disclosure merely because in its view 'confirmation or denial of the existence of the document is so sensitive that its disclosure would cause damage to the national security", the disclosure of its existence must itself "reasonably [be] expected to result in damage to national security". Nuclear Control Institute v. Nuclear Regulatory Commission 563 F. Supp. 768 (DDD C 1983).

Revealing the mere existence or non-existence of records or "reasonably segregable portions" of records that only state the existence or non-existence of the information the Center requested, will not "reveal classified sources or methods of obtaining foreign intelligence" as would be grounds for a "glomar response" under

2

previous case law. See Phillippi v. CIA, 178 U.S. App. D.C. 243, (D.C.C. 1976); Frugone v. CIA, 335 U.S. App. D.C. 144, (D.C.C. 1999).

Even if we were to accept *arguendo* that the disclosure of some of these records could potentially harm national security, the "reasonably segregable portions" of records that would not do so must be released. As you are fully aware, "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt... unless they are *inextricably intertwined* with exempt portions". Mokhiber v. United States Dep't of the Treasury, 335 F. Supp. 2d 65 (D.C.C. 2004), see also Krikorian v. Department of State, 299 U.S. App. D.C. 331, (D.C. C., 1993). It does not seem within the realm of possibility that every portion of every single one of the denied records could be so *inextricably intertwined* with information that even if appropriately redacted they "reasonably could be expected to result in damage to national security" when they merely state the existence or non-existence of the specifically requested records. ACLU v. United States DOJ, 265 F. Supp. 2d 20, at 28 (quoting Exec. Order No. 12,958 §§ 1.2, 1.5 as amended 1.1(4).

Your office cannot rely on negative consequences form the creation of a Vaughn index as a basis for your refusal to confirm or deny the existence or non-existence of the requested records. See Vaughn v. Rosen, *484 F.2d 820*, 827. This is not a case in which a good faith argument could be made that the creation of a Vaughn index solely of the records (or reasonably segregable portions of records) which solely confirm the existence or nonexistence of the requested records, would result in "inferences from Vaughn indexes or selective disclosure... reveal[ing] classified sources or methods of obtaining foreign intelligence." See, e.g., Frugone v. CIA,169 F.3d 772 (D.C.C.. 1999); Minier v. CIA, 88 F.3d 796 (9th Cir. 1996). Such a disclosure is not specific enough that it would reveal information helpful to our adversaries. The general nature of this type of disclosure would also not reveal information that could fit under the "mosaic theory" cited in Nat'l Security v. CIA, 331 F.3d 918, at 928.

In the second instance, your office's withholding of these records under Sec 3.6(a) of 12958, as amended, is invalid in light of the existence of this information within the public domain. As held in Davis v. U.S. Department of Justice, "the Government cannot rely on an otherwise valid exemption claim to justify withholding information that is in the "public domain." Davis v. U.S. Depart. of Justice, 968 F.2d 1276, 1279 (D.C. Cir. 1992). This is because "suppression of already well publicized information would normally frustrate the pressing policies of the Freedom of Information Act without even arguably advancing countervailing considerations". Washington Post v. United States Dep't of Defense, 766 F. Supp. 1; Founding Church of Scientology of Washington, D.C., Inc. v. National Security Agency, 610 F.2d 824, 831 - 32 (1979); Afshar v. Dep't of State, 702 F.2d 1125, 1130 (1983); Lamont v. Dep't of Justice, 475 F. Supp. 761, 772 (S.D.N.Y. 1979); see also Phillippi v. Central Intelligence Agency, 655 F.2d 1325, 1332 (1981) (Mikva, J., concurring). Moreover, as to the Executive Order 12958, as amended, upon which your office relies, when attempting to justify maintaining classification of information already released into the public domain, it must also be the case that this information may "reasonably be recovered" from the public domain. Exec. Order No. 12958 as amended by Exec. Order No. 13292 Sec 1.7(c)(2). This information in question cannot be "reasonably retrieved" from the public domain because it has been too widely

3

disseminated.. The existence or non-existence of the requested records fails all of these requirements because the evidence of some of the requested records is publicly know.

Although the Center bears the burden of asserting that such information is in the public domain, and must "point to 'specific' information identical to that being withheld." Davis v. U.S. Depart. of Justice, 968 F.2d 1276, 1279 (D.C. Cir. 1992). This burden is easily met in the instant case. As the Center can easily demonstrate, the fact that documents relevant to our request actually exist is clearly already within the public domain, and renders a "glomar" response inadequate to our request.

Secretary of Defense Rumsfeld's approval of the creation of a specific ghost detainee, as well as the existence of the widespread practice of holding Unregistered, CIA, and/or "Ghost" Detainees, has been made know to the public through media reports, the Secretary's own statements, and the statements of other prominent government officials.[2] Secretary of Defense Donald Rumsfeld publicly stated on June 17, 2004 that he had approved the creation of a specific "ghost detainee", the very type which is the subject of the Center's request for information.[3] This public disclosure by the Secretary of Defense is necessarily an admission of the existence of the records necessary to authorize such a status. The position taken by your office that the release of records merely confirming the "existence or non-existence" of records pertinent to ghost detainees would create "*further* damage to the national security" is meritless against the backdrop of this direct public disclosure, because the *existence* of at least some of our request records pertinent to at least one detainee is uncontestably public knowledge. Washington Post v. United States Dep't of Defense, 766 F. Supp. 1, at 9.

Secretary of Defense Rumsfeld's disclosure was an official public disclosure, and does not fall under the ambit of unofficial disclosures under Military Audit Project, 656 F.2d, 724, 744. Moreover, it cannot be argued that "unresolved doubt may still remain in the minds of the United States' potential and actual adversaries" as to the existence of at least some records pertinent to at least some detainees. Military Audit Project, 656 F.2d 724, at 744; accord Abbotts v. Nuclear Regulatory Comm'n, 766 F.2d 604, 608 (1985) After the Secretary's public disclosure that he personally authorized a ghost detainee, the existence or non-existence of a record of some relevant information cannot arguably be said to be a contested fact. Even if the government were to argue that the more specific records we have requested would remove "unresolved doubt... in the minds of the United States' potential and actual adversaries", it cannot be argued that merely releasing some of those records, or the reasonably segregable parts of records, that *do no more than confirm the existence or non-existence of the requested records,* could be said to do so. Military at 744

In this case the public is already aware of the existence of at least *one record* authorizing the creation of *at least one ghost detainee*. This record fits precisely under our requests for information and is not properly excludable under Salisbury v. United

---

[2] *See eg.,Disappeared in Iraq*, BOS. GLOBE. Jun. 18, 2004; Oliver Burkeman, *Rumsfeld defends treatment of 'ghost detainees'*, Guardian, Sep. 11, 2004, at 19.
[3] *See* Dana Priest & Bradley Graham, *U.S. Struggled Over How Far to Push Tactics*, WASH. POST, Jun. 24, 2004, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A756-2004Jun23?language=printer; Pamela Hess, *CIA won't share info on ghost detainees*, UNITED PRESS INTERNATIONAL, Sep. 9, 2004; *Lawmakers troubled by disclosure of more 'ghost detainees'*, ASSOCIATED PRESS, Sep. 10, 2004; Elise Ackerman, *Rumsfeld admits to holding 'ghost detainees'*, KNIGHT RIDDER/TRIBUNE NEWS SERVICE, Jun. 18, 2004.

4

States, 690 F.2d at 971 - 72. Nor can a record of such a general nature fall under the holding in Afshar, which held that "revealing the context in which the information is discussed would itself reveal additional information, release of which is harmful to the national security". Afshar v. Department of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

The Center's view is further supported by the fact that after an even more expansive internal review of the phenomenon, the Secretary of Defense's own office (the Pentagon), has publicly acknowledged the holding of as many as 100 ghost detainees.[4] According to a statement by Senator Patrick Leahy, the Pentagon's own Fay-Jones report/investigation,

> [R]evealed that the ghost detainee problem was far more pervasive than the Defense Department had previously acknowledged. General Kern, the investigation's appointing officer, testified before the Senate Armed Services Committee that there could be as many as 100 ghost detainees, but his panel could not thoroughly investigate the matter because the CIA refused to cooperate in the inquiry.[5]

Moreover, the existence of specific documents which include our requested materials has been publicly acknowledged by Congress. The Congressional Judiciary Committee has not only publicly referenced these documents, but members of the committee have adamantly requested them,

> Among the 23 memos, reports and letters identified in the subpoena request was a directive issued by Rumsfeld to Gen. James Hill, the chief of the Southern Command, which coordinates US military operations in Latin America. The title of the document was "Coercive interrogation techniques that can be used with approval of the Defense Secretary." (*see* Requests 1,3,5,6,7,8,14,15).

> A second document, issued by the legal adviser to Lt. Gen. Ricardo Sanchez, the senior US military officer in Iraq, to military intelligence and military police contingents at the Abu Ghraib prison bore the title, "New plan to restrict Red Cross access to Abu Ghraib."[6] (*see* Requests 1-14).

To argue that the mere existence or non-existence of all records pertinent to our requests is not in the public domain is simply incorrect. Although your office may likely take the view (which the Center contests) that more specific records should be excludable, the refusal to release even just those records, or the reasonably segregable portions of

---

[4] *See* Oliver Burkeman, *Rumsfeld defends treatment of 'ghost detainees'*, Guardian, Sep. 11, 2004, at 19.

[5] *See* Statement of Senator Patrick Leahy On Abuse of Foreign Detainees, Oct. 1, 2004, *available at* http://leahy.senate.gov/press/200405/050504c.html.

[6] *See* Bill Van Auken, Rumsfeld, Rice tied to torture in Iraq, Jun. 19, 2004, *available at* http://www.wsws.org/articles/2004/jun2004/tort-j19.shtml.

5

records, that simply admit the existence or non-existence of requested documents, does not withstand the weight of significant scrutiny.

In the second instance, aside from your office's refusal to confirm the existence or non-existence of the requested records, the Center likewise contests your implicit holding that the release of the request records, beyond those that merely confirm the existence or non-existence of the requested records "reasonably could be expected to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (*quoting* Exec. Order No. 12,958 §§ 1.2, 1.5 as amended Sec 1.1(4)).

While your reliance on a harm to national security within the ambit of "intelligence activities (including special activities), intelligence sources or methods, or cryptology" may be relevant to *some* of our requested information, we cannot believe that such a claim would stand scrutiny as to all, or reasonably segregable parts of all, *seventeen requests* for information. In our original communication of December 21, 2004 we requested:

1. All records that propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding Unregistered, CIA, and/or "Ghost" Detainees in special CIA or other agency facilities for purposes of interrogation.

2. All records that discuss the creation, use and/or closure of the various centers at which the CIA and/or any other agency of the federal government has held, and/or continues to hold Unregistered, CIA, and/or "Ghost" Detainees.

3. All records reflecting the use of any private companies, other U.S. officials or citizens, and/or officials or citizens of any foreign governments regarding the interdiction, arrest, transfer, detention, questioning, interrogation, and/or other treatment of any Unregistered, CIA, or "Ghost" Detainee

4. All records reflecting standards or policies governing who may be held as an Unregistered, CIA, and/or "Ghost" Detainee and what procedural protections or guidelines, if any, are used to review the arrest, detention, and treatment of these Detainees.

5. Every location from September 11, 2001 to the present at which the CIA or any other governmental agency has been or is now holding Unregistered, CIA, or "Ghost" Detainees, the dates of operation of each such facility, whether the facility remains open at this time, the purpose of the facility, a complete list of the Detainees held at the facility (both past and current with indications as to this status), a list of techniques used for interrogation at each facility, and a list of personnel who have worked and those who continue to work at each Center.

6. All records concerning the treatment of the Unregistered Detainees held in any CIA or other governmental facility in the world. Please include all records discussing the following interrogation methods at such facilities, including but not limited to records discussing their legality or appropriateness: using "stress and duress" techniques on Detainees; using force against them; subjecting them to

6

physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; subjecting them to heat or cold; or threatening harm to them or other individuals.

7. All records setting forth or discussing policies, procedures or guidelines[7] relating to the detention, questioning, interrogation, transfer, and treatment (including, but not limited to the interrogation with the use of torture or other cruel, inhuman or degrading treatment or punishment) of the Unregistered, CIA, and "Ghost" Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed above.

8. All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that CIA Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are, or will be, communicated to personnel involved in the interrogation or detention of CIA Detainees.

9. All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above.

10. All records indicating or discussing serious injuries, illnesses, and/or deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

11. All records, including autopsy reports and death certificates, relating to the deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

12. All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

13. All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Unregistered, CIA, and/or "Ghost" Detainee.

---

[7] In this Request, the phrase "policies, procedures or guidelines" means policies, procedures or guidelines that were in force on September 11, 2001 or that have been put in place since that date.

7

14. All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

15. All records relating to medical, psychiatric or psychological assessment of any Unregistered, CIA, and/or "Ghost" Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Unregistered, CIA, and/or "Ghost" Detainees.

16. All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.

17. All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.

For each and every one of our 17 specific requests we contest the following:

1) That the classified documents were properly classified and "concern" "intelligence activities (including special activities), intelligence sources or methods, or cryptology" under Exec. Order No. 12,958 Sec. 1.2, 1.5 as amended 1.4.

2) That the release of all of the requested records "reasonably could be expected to result in damage to national security" as claimed by your office. ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (quoting Exec. Order No. 12,958 §§ 1.2, 1.5 as amended Sec 1.1(4)).

3) And that even accepting arguendo that the requested records "reasonably could be expected to result in damage to national security", that every single one of the "reasonably segregable portion" of each record pertinent to all of our 17 requests are so '*inextricably intertwined* with exempt portions" that none could be released without harming national security. Mokhiber v. United States Dep't of the Treasury, 335 F. Supp. 2d 65 (D.D.C.2004), *see also* Krikorian v. Department of State, 299 U.S. App. D.C. 331, (D.C.C. 1993).

In addition to these three points, we have made additional observations regarding each of our requests. Each request is addressed in turn.

> 1) *All records that propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding Unregistered, CIA, and/or "Ghost" Detainees in special CIA or other agency facilities for purposes of interrogation.*

Even if you were to successfully rely on Sec. 1.4(c) of Executive Order 12958, as amended, as your basis for refusal of this request, you are still required to submit information responsive to the above request that relates solely to the aspects of the detention that do not "concern" "intelligence activities (including special activities), intelligence sources or methods, or cryptology". Within the ambit of the requested records not all of the records, and/or all portions of records, "concern" intelligence activities and/or intelligence sources or methods. While these issues may play a part in the detention of the aforementioned detainees, an element of these records is also purely focused on the legality or appropriateness of holding them irrespective of the intelligence implications.

> 2) *All records that discuss the creation, use and/or closure of the various centers at which the CIA and/or any other agency of the federal government has held, and/or continues to hold Unregistered, CIA, and/or "Ghost" Detainees.*

The release of records regarding both publicly confirmed and/or non-confirmed centers cannot "reasonably [be] expected to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (*quoting* Exec. Order No. 12,958 Sec. 1.2, 1.5 as amended Sec 1.1(4)).

As stated in "Ending Secret Detentions", a report by Human Rights First, many detainee detention facilities have been publicly confirmed by the United States government. These facilities include:

- Collection Center at the U.S. Air Force Base in Bagram.
- Detention facility in Kandahar (an intermediate site, where detainees await transport to Bagram).
- Approximately 20 outlying transient sites (used to hold detainees until they may be evacuated either to Kandahar or Bagram).
- U.S. Naval Base at Guantanamo Bay
- Naval Consolidated Brig (Charleston, South Carolina). This is where the U.S.

Government is detained at least three individuals as enemy combatants: two U.S. citizens, Jose Padilla and Yaser Hamdi, as well as Ali Saleh Kahlah al-Marri, a Qatari national residing in the United States.[8]

---

[8] *See* Ending Secret Detentions, Human Rights First, 2004, *available at* http://www.humanrightsfirst.org/us_law/PDF/EndingSecretDetentions_web.pdf

9

Additionally, subsequent reports have stated that ghost detainees have also been held at Abu Ghraib[9]

The release of information similar to previously released information cannot in this case be "reasonably [expected] to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (quoting Exec. Order No. 12,958 §§ 1.2, 1.5 as amended Sec 1.1(4)). Even if your office disagrees, such a claim cannot be made as to *past* facilities which are no longer operational.

Another basis of our appeal is that withholding the requested information regarding the facilities at Guantanamo and Abu Ghraib does not pass scrutiny. Guantanamo and Abu Ghraib have both been the subject of immense public scrutiny and discussion as well as litigation in open court. It cannot be that the release of *all* documents related to these facilities will *further* increase any damage to national security not already done by the current publicly available information. Any finding that the public release of further information regarding Guantanamo or Abu Ghraib, and/or any other known and confirmed facility, must cause *more harm* than that already caused by the initial confirmation of the facility to support a finding that it "reasonably could be expected to result in damage to national security." In Nuclear Control Institute v. United States Nuclear Regulatory, the court implied that to find that additional official disclosures regarding the topic of an unauthorized disclosure "reasonably could be expected to result in damage to national security" required the creation of additional harm beyond that caused by the initial unauthorized release. Nuclear Control Institute v. Nuclear Regulatory Commission 563 F. Supp. 768 (D.C 1983) (citing Stein v. United States Department of Justice, 662 F.2d 1245 (7th Cir. 1981); Military Audit Project v. Casey, 211 U.S. App. D.C. 135, 656 F.2d 724 (D.C. Cir. 1981). Applying this holding to authorized releases, it cannot be that additional authorized releases of similar information can be exempted from disclosure when they create no *new* harm to national security, not already caused by the previous disclosure.

In addition, the release of confirming records regarding the existence of suspected sites are an "open secret", and cannot "reasonably expected to result in damage to national security." Washington Post v. United States Dep't of Defense, 766 F. Supp. 1, 14. The previous willingness of the government to disclose information regarding many other detention facilities would weigh against a determination that the release of any and all information regarding undisclosed detention facilities would be harmful to national security. With each similar previous release of information, the potential additional harm from each new disclosure decreases. The detention facilities that have been identified by non-government sources, but have not been officially confirmed by the government include:

Detention facilities in:
* Asadabad*

---

[9] *See* Dana Priest & Bradley Graham, *U.S. Struggled Over How Far to Push Tactics*, WASH. POST, Jun. 24, 2004, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A756-2004Jun23?language=printer; Pamela Hess, *CIA won't share info on ghost detainees*, UNITED PRESS INTERNATIONAL, Sep. 9, 2004; *Lawmakers troubled by disclosure of more 'ghost detainees'*, ASSOCIATED PRESS, Sep. 10, 2004; Elise Ackerman, *Rumsfeld admits to holding 'ghost detainees'*, KNIGHT RIDDER/TRIBUNE NEWS SERVICE, Jun. 18, 2004.

10

- Kabul*
- Jalalabad*
- Gardez*
- Khost*
- CIA interrogation facility at Bagram
- CIA interrogation facility in Kabul
(known as .the Pit.)
*These sites may be part of the approximately 20 .outlying transient sites..
- Kohat (near the border of Afghanistan)
- Alizai
- Al Jafr Prison (cia interrogation facility)
- U.S. Naval Ships: USS Bataan and USS Peleliu.

Subsequent reports have also identified Diego Garcia as an additional detention facility.[10]

> 3) *All records reflecting the use of any private companies, other U.S. officials or citizens, and/or officials or citizens of any foreign governments regarding the interdiction, arrest, transfer, detention, questioning, interrogation, and/or other treatment of any Unregistered, CIA, or "Ghost" Detainee.*

The refusal to confirm or deny the existence or non-existence of any record related to any "private companies, other U.S. officials or citizens, and/or officials or citizens of any foreign governments" cannot be based on a fear that the release "reasonably could be expected to result in damage to national security." ACLU v. United States DOJ, 265 F. Supp. 2d 20 at 28 (quoting Exec. Order No. 12,958 §§ 1.2, 1.5 as amended Sec 1.1(4)). In addition, such a claim cannot squared with the pre-existing public knowledge of the CIA "renditions jet(s)". The existence and movements of two CIA chartered jets have been extensively reported in the media.[11] Moreover, ownership of the jet by *specific companies* has also been reported and made public.[12] One of the former owners has even publicly addressed and expressed regret as to the involvement of his company in the use of these jets.[13] To say that the release of *all* information by the government involving this request would "reasonably [be] expected to result in damage to national security" in light of this degree of public awareness regarding the specifics of the "renditions jet" is unsubstantiated. ACLU Although the government has relied upon intelligence activities as its specific basis for classification under Executive Order 12958, as amended, Sec.1.4(c), it is additionally clear that not all aspects of the use the cited jet(s) are related to intelligence activities. There is an aspect of the use of the jets that is strictly related to *transportation* and/or non-intelligence activities. Those records regarding the jet which do not relate to intelligence activities must be released.

---

[10] *See* Linda S. Heard, *Diego Garcia: Paradise Isle or Britain's Shame*, GULF NEWS, Jul. 6, 2004, *available at* http://www.humanrightsfirst.org/us_law/detainees/end_abuse/scottish_mp_statement.htm
[11] *See* Mystery *jet ferries men to torture: CIA suspected: 'Ghost' company jet seen carrying hooded passengers*, AGENCE FRANCE-PRESSE; Farah Stockman,*Terror Suspects' Torture Claims Have Mass. Link*, Dec. 29, 2004; BOS. GLOBE, Nov. 29, 2004.
[12] *Id.*
[13] *Id.*

11

> 4) *All records reflecting standards or policies governing who may be held as an Unregistered, CIA, and/or "Ghost" Detainee and what procedural protections or guidelines, if any, are used to review the arrest, detention, and treatment of these Detainees.*

The Center is especially perplexed about how disclosure of procedural protections or guidelines could *harm* national security. Simply stating the level of protections provided to detainees is "security neutral". Moreover, the release of any elements of this request will not allow "[analysis] of bits of data into a 'mosaic' by skilled intelligence agents who may receive FOIA- released documents" as has been previously relied upon as a basis for withholding even fragmentary information *See, e.g.,* Nat'l Security, 331 F.3d 918, 928 (and cases cited therein). Here, the guidelines or procedural protections are not relevant in any manner to the safety and security of our nation, or for that matter, relevant to our intelligence activities under Sec.1.4(c).

The efforts of our intelligence officers to gain information through interrogations, is distinct from the procedural protections or guidelines regarding the detention and treatment of these detainees. To hold otherwise would be to argue that every element of the record relating to the procedural protection and/or guidelines used in arresting *and* detaining *and* treatment of detainees is so inextricably tied to the efforts of our intelligence officers that it "reasonably could be expected to result in damage to national security". The Center contests, and is perplexed by the assertion that knowledge of a person's level of procedural protections or analogous guidelines can be found to implicate *damage to national security concerns*, let alone that that such an assertion would be "reasonable".

> 5) *Every location from September 11, 2001 to the present at which the CIA or any other governmental agency has been or is now holding Unregistered, CIA, or "Ghost" Detainees, the dates of operation of each such facility, whether the facility remains open at this time, the purpose of the facility, a complete list of the Detainees held at the facility (both past and current with indications as to this status), a list of techniques used for interrogation at each facility, and a list of personnel who have worked and those who continue to work at each Center.*

The Center contests that the release of this information would in any way implicate a harm to national security. The media has reported with great regularity and specificity the locations of United States detention facilities around the world. The physical locations of the great majority of detention facilities would not implicate nationals security because this information is already in the public domain. Even if holding *arguendo* that the release of the physical locations of the detention facilities could "reasonably [be] expected to harm national security", either the specific and/or general physical locations of the facilities could be redacted from the documents, while the rest of the information including: the detainees held at a given facility, the dates of operation of each facility, the purpose of each facility, as well as list of techniques used for interrogation, could be released.

12

> 6) *All records concerning the treatment of the Unregistered Detainees held in any CIA or other governmental facility in the world. Please include all records discussing the following interrogation methods at such facilities, including but not limited to records discussing their legality or appropriateness: using "stress and duress" techniques on Detainees; using force against them; subjecting them to physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; subjecting them to heat or cold; or threatening harm to them or other individuals.*

Your office's blanket denial of information regarding treatment of detainees is unsupported in light of the official disclosure by Secretary Rumsfeld of a list of approved interrogation techniques at Guantanamo, the public review of interrogation techniques by the Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations, as well as the release of official documents regarding prisoner treatment at Abu Ghraib.[14] Moreover, there is extensive information available with references to specific documents regarding the progression of the government's interrogation techniques. *See generally,* "Law of War" *at* http://lawofwar.org/interrogation_techniques.htm. In light of the high level of public knowledge regarding detainee interrogations, the Center contests that the release of the requested information, especially regarding treatment at Guantanamo and Abu Ghraib, *"reasonably* could be expected to harm national security". Moreover, the Center contests that this harm could be directed at "intelligence activities." Your office must hold that the release of the requested information would create harm *additional* to that already caused by similar previous releases, a burden it cannot carry in this case.

> 7) *All records setting forth or discussing policies, procedures or guidelines[15] relating to the detention, questioning, interrogation, transfer, and treatment (including, but not limited to the interrogation with the use of torture or other cruel, inhuman or degrading treatment or punishment) of the Unregistered, CIA, and "Ghost" Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed above.*

---

[14] *See* Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations, 6 March, 2003. http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf.; "Law of War" *at* http://lawofwar.org/interrogation_techniques.htm.
[15] In this Request, the phrase "policies, procedures or guidelines" means policies, procedures or guidelines that were in force on September 11, 2001 or that have been put in place since that date.

13

The Center contests the non-disclosure of this request for the same reasons as listed in regards to paragraph 6 above.

> 8) *All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that CIA Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are, or will be, communicated to personnel involved in the interrogation or detention of CIA Detainees.*

The Center feels that your office's withholding of records regarding this request is simply indefensible. The release of these records cannot "reasonably [be] expected to result in damage to national security." <u>ACLU at 28.</u> Moreover, it cannot reasonably be said to present a potential harm to intelligence activities. The administration has unequivocally stated that it does not allow or condone torture.[16]

The only means by which the Center can contemplate that the release of the requested information could harm national security would be that the absence of policies, procedures, or guidelines, would increase hostility towards the United States. However, the United States has publicly stated that it has contravened its own policies regarding "ghost detainees", and in the case of Abu Ghraib found that the correct policies, procedures and/or guidelines were simply not followed. In light of these admissions it is not reasonable to assume that the release of the requested policies procedures, and/or guidelines reasonably could be expected to cause any additional harm to national security. The Center also cannot accept that merely revealing "how any such policies, procedures or guidelines were, are, or will be, communicated to personnel" without describing the content of the communication, could implicate a risk to national security in any manner.

> 9) *All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above [which reads] All records reflecting standards or policies governing who may be held as an Unregistered, CIA, and/or "Ghost" Detainee and what procedural protections or guidelines, if any, are used to review the arrest, detention, and treatment of these Detainees.*

It is not reasonable to withhold from the public the requested information when the Pentagon has reported publicly that these violations have occurred. The Pentagon could not have found that procedures were violated were it not for the existence of records that stated what these procedures were. The Department has stated that approximately 100 ghost detainees have been created. The Center contests that the release of more specific information on this topic could *further* harm national security in light of these previous disclosures on the topic, especially within the context of "intelligence activities". The claim that the existence of the requested documents can continue to be correctly

---

[16] See *Bush Denies Ordering Torture Of Detainees, Releases Official Documents*, FRONTRUNNER, Jun. 23, 2004.

14

classified in light of public knowledge of their existence is especially weak within this context.

> 10) *All records indicating or discussing serious injuries, illnesses, and/or deaths of any Unregistered, CIA, and/or "Ghost" Detainees.*

The Center contests that the release of records regarding this request "could reasonably be expected to harm national security". The deaths and injuries of many detainees have already been officially reported by the government, and so the Center fails to understand how more specific information "reasonably could be expected to harm national security", nor how this harm would occur within the realm of intelligence activities. In this instance, the Center especially cannot believe that reasonably segregable portions of the records that are "security neutral" are so "inextricably" interwoven with sensitive materials that they cannot be released. The claim is even less tenable in relation to the neutral medical reports of detainees.

> 11) *All records, including autopsy reports and death certificates, relating to the deaths of any Unregistered, CIA, and/or "Ghost" Detainees.*

The Center contests the refusal for the same reasons as listed in regards to the above paragraph 10.

> 12) *All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 4, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.*

The fact that internal investigations have occurred and/or are occurring is information already within the public domain. The center finds it impossible to defend the position that even records which simply state the existence of such investigations, inquiries, or disciplinary proceedings could harm national security. Doing so could not arguably advance any information to our actual or potential adversaries abroad that could assist in efforts to harm our national security. To the extent that releasing the names of agents conducting or subject to the these procedures might endanger them or their families, the names of these officials may simply be redacted from the records. The center cannot understand how records regarding disciplinary proceedings could be said to in any way implicate our nation's national security, let alone our intelligence activities.

> 13) *All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Unregistered, CIA, and/or "Ghost" Detainee.*

The only reason that the Center can fathom national security risks related to this information is that its release might incite attacks against American interests. However, if

15

records of additional mistreatment of detainees were released, they would serve only to confirm pre-existing beliefs of detainee mistreatment or to beneficially correct previous misconceptions.

> 14) All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

We contest that the above request could reasonably be thought to harm national security and/or intelligence activities. If released documents show adequate provision for medical care, then release of the requested information could dispel rumors in the larger world regarding the lack of medical care. On the other hand, if the released docuemtns show inadequate care, such withholding of care is illegal. As held in Davis, if a requester "puts forward compelling evidence that the agency denying the Freedom of Information Act, 5 U.S.C.S. § 552, request is engaged in illegal activity, and shows that the information sought is necessary in order to confirm or refute that evidence" it will be viewed by the court as substantially supportive of the release of records. Davis v. United States Dep't of Justice, 296 U.S. App. D.C. 405.

Secondly, we cannot accept that merely revealing "how any such policies, procedures or guidelines were, are, or will be, communicated to personnel" without describing the content of the communication implicate a risk to national security under any circumstance.

> 15) All records relating to medical, psychiatric or psychological assessment of any Unregistered, CIA, and/or "Ghost" Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Unregistered, CIA, and/or "Ghost" Detainees.

The medical, psychiatric or psychological assessments of detainees have no relevance as to the United States' national security. Releasing these records will not give our actual or potential adversaries additional insight into our intelligence activities. Your office's decision to neither confirm nor deny the existence or non-existence of these records is misapplied in at least the case of one detainee. The Pentagon's own report states that no medical records exist for the ghost detainee that died in American custody. This public statement of the non-existence of these records prohibit a refusal to confirm the records *non-existence*. The *non-existence* of at least one medical record is information within the public domain, and as such cannot legitimately remain classified.

> 16) All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to

16

> *particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.*

The International Red Cross in no way implicates national security. The results of all visits by the Red Cross are confidential, and access to records of their access to detainees has no informational consequence that could harm our national security.

> *17) All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.*

The Center contests that every single record concerning the access of every single non-governmental organization or foreign government can be properly excluded from release. While there may be some records that your office could reasonably withhold, we cannot accept that such record "reasonably could be expected to result in damage to national security". ACLU at 28.

The requested information also constitutes an exceptional case under Executive Order 12958 as amended by 13292 Sec. 3.1(b) which states,

> In some exceptional cases, however, the need to protect such information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified.[17]

This is precisely the kind of case contemplated by Sec. 3.1(b). The existence of detainees held in contravention of international treaties which the United States has ratified such as the Geneva Conventions, the International Covenant of Civil and Political Rights, and the Convention Against Torture, is a highly public matter involving fundamental constitutional and human rights, the disclosure of which must prevail over any need to protect information regarding national security or foreign policy.

United States officials have publicly admitted that the government has "violated our own policies and regulations by including what has been labeled as "ghost detainees," people who were brought to the detention facility but not registered."[18] The gravity of previous harm, and the correspondingly important need for a further investigation of such findings, clearly presents an exceptional circumstance under Sec. 3.1(c). To hold otherwise would imply that the holding of Unregistered, CIA, and/or "Ghost" Detainees is not itself an exceptional circumstance, and is instead routine. The United States government has repeatedly denied that these circumstances were anything but

---

[17] *See* Exec. Order No. 13292; 22 C.F.R. § 171.22(a).
[18] *See* Investigation Results: Military Intelligence Activities at Abu Ghraib, General Paul Kern, The Appointing Authority for the Investigation; Lt. Gen. Anthony Jones, Lead Investigator; and Maj. Gen. George Fay, Investigating Officer, Foreign Press Center Washington, DC August 25, 2004., *available at* http://fpc.state.gov/fpc/35738.htm.

17

exceptional.[19] Moreover, U.S. army officials have publicly requested that the very subject our of request, Unregistered, CIA, and/or "Ghost" Detainees, be further investigated. General Kern, the Appointing Authority for the Investigation, has stated that the holding of ghost detainees is "against our policies and regulations. [It] shouldn't have been done, *and we are asking for that to be investigated further.*"[20] (emphasis added).

The public interest in disclosure of the requested records is further heightened in light of the fact that Kern has also stated to a Senate panel that the

> "Pentagon investigators believe the CIA has held as many as 100 'ghost' detainees in Iraq without revealing their identities or locations, a much greater number than previously disclosed," Kern told the Senate panel. "However, the precise number of undisclosed prisoners and the conditions in which they have been held remain a mystery,"..."*because CIA officials have refused to cooperate with Pentagon investigators, denying repeated requests for documents and information on the detainees.*"[21] (emphasis added)

Moreover,

> "The Red Cross, according to knowledgeable sources, has repeatedly warned administration officials that they were not complying with international law in the treatment of prisoners. Five weeks ago, Secretary Rumsfeld promised the Senate Armed Services Committee that he would turn over the Red Cross reports but, to date, the administration has failed to deliver on that promise, citing objections from the Red Cross. The Red Cross, however, contacted by NPR, said it did not have objections to the proper turnover of its reports to the Senate and that the Red Cross had so informed the administration five weeks ago.[22]

The Office of Intelligence, Policy, and Review should use its discretion to determine that the public interest in disclosure of these documents outweighs any potential damage, if any, to national security that might reasonably be expected to result from disclosure.

It appears that your office's withholding of these documents is additionally prohibited on separate grounds, because of the illegality of holding Unregistered, CIA,

---

[19] *See* Dana Priest & Bradley Graham, *U.S. Struggled Over How Far to Push Tactics*, WASH. POST, Jun. 24, 2004, *available at* http://www.washingtonpost.com/ac2/wp-dyn/A756-2004Jun23?language=printer; Pamela Hess, *CIA won't share info on ghost detainees*, UNITED PRESS INTERNATIONAL, Sep. 9, 2004; *Lawmakers troubled by disclosure of more 'ghost detainees'*, ASSOCIATED PRESS, Sep. 10, 2004; Elise Ackerman, *Rumsfeld admits to holding 'ghost detainees'*, KNIGHT RIDDER/TRIBUNE NEWS SERVICE , Jun. 18, 2004.

[20] *See* Investigation Results: Military Intelligence Activities at Abu Ghraib, General Paul Kern, The Appointing Authority for the Investigation; Lt. Gen. Anthony Jones, Lead Investigator; and Maj. Gen. George Fay, Investigating Officer, Foreign Press Center Washington, DC August 25, 2004., *available at* http://fpc.state.gov/fpc/35738.htm.

[21] *See* Senators Criticize Army Generals Over CIA "Ghost Detainees" At Abu Ghraib, Frontrunner Sep. 10, 2004.

[22] *See* Steve Inskeep, *Senate Judiciary Committee heats up in discussions over legal memos on torture of prisoners*, Morning Edition (11:00 AM ET) – NPR, Jun. 18, 2004.

and/or "Ghost" Detainees. If a requester "puts forward compelling evidence that the agency denying the Freedom of Information Act, 5 U.S.C.S. § 552, request is engaged in illegal activity, and shows that the information sought is necessary in order to confirm or refute that evidence" it will be viewed by the court as substantially supportive of the release of the records. <u>Davis v. United States Dep't of Justice, 296 U.S. App. D.C. 405, (D.C. C. 1992).</u> As previously stated, government officials attempting to fulfill their duty of review of government conduct have found government agencies to be in violation of the law, and have repeatedly been refused access to many of the relevant documents requested in our FOIA request.[23]

    Separately, the Center seeks a mandatory declassification review pursuant to Exec. Order 12958 for all of the requested information under sec. 552(b)(1). *See* Exec. Order No. 12958, as amended by Exec. Order No. 13292, Sec. 3.5 (March 28, 2003).

We expect a response to this appeal within 20 working days.

Most Sincerely,

*[signature]*

Rachel Meeropol, Esq.

---

[23] *Supra* note 20.

19