UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
AMNESTY INTERNATIONAL USA, CENTER                    :
FOR CONSTITUTIONAL RIGHTS, INC., and                 :
WASHINGTON SQUARE LEGAL SERVICES,                    :
INC.,                                                :
                                                     :
                        Plaintiffs,                  :        **ECF CASE**
                                                     :
            v.                                       :
                                                     :        07 CV 5435 (LAP)
CENTRAL INTELLIGENCE AGENCY,                         :
DEPARTMENT OF DEFENSE,                               :
DEPARTMENT OF HOMELAND SECURITY,                     :
DEPARTMENT OF JUSTICE, DEPARTMENT                    :
OF STATE, and THEIR COMPONENTS,                      :
                                                     :
                        Defendants.                  :
-------------------------------------------------------- x


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF THE
CENTRAL INTELLIGENCE AGENCY'S MOTION FOR SUMMARY JUDGMENT**

                            MICHAEL J. GARCIA
                            United States Attorney for the
                            Southern District of New York
                            Attorney for the Central Intelligence Agency
                            86 Chambers Street, 3rd Floor
                            New York, New York 10007
                            Tel: (212) 637-2678
                            Fax: (212) 637-2702
                            Jeannette.Vargas@usdoj.gov


JEANNETTE A. VARGAS
PIERRE G. ARMAND
BRIAN M. FELDMAN
Assistant United States Attorneys
EMILY DAUGHTRY
Special Assistant United States Attorney

        – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE CIA PROPERLY WITHHELD RECORDS PURSUANT TO FOIA
      EXEMPTIONS 1 AND 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    *De Novo* Review is Not Incompatible with the Substantial
            Deference Accorded to Agency Determinations
            In National Security Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    The Government's *Vaughn* Index and Supporting
            Declarations Provide Sufficient Details to Justify
            The CIA's Withholdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    The CIA Properly Relied Upon the National Security
            Act and the CIA Act as the Bases for Withholding Records
            Under Exemption 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    The CIA Did Not Classify Information Regarding
            The Terrorist Detention and Interrogation Program In
            Order to Conceal Violations of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      E.    The CIA Has Not Withheld Reasonably Segregable Officially
            Acknowledged Information from the Responsive Records . . . . . . . . . . . 20

II.   THE CIA PROPERLY WITHHELD RECORDS PURSUANT
      TO FOIA EXEMPTION 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.    The CIA's *Vaughn* Index and Supporting Declarations
            Provide Sufficient Information to Affirm the CIA's
            Exemption 5 Withholdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            1.    The Deliberative Process Privilege . . . . . . . . . . . . . . . . . . . . . . 25

            2.    The Attorney-Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            3.    The Work Product Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      B.    The CIA Properly Withheld Documents As
            Exempt from Disclosure Pursuant to Exemption 5 . . . . . . . . . . . . . . . . 39

1.      The CIA Properly Withheld Documents that Were
        Exempt from Disclosure Pursuant to the Presidential
        Communications Privilege .............................. 39

2.      The CIA Properly Withheld OIG Witness Statements
        Pursuant to Exemptions 5 and 7(D) ....................... 42

III.    THE CIA PROPERLY WITHHELD DOCUMENTS PURSUANT
        TO EXEMPTION 7(A) ............................................. 45

IV.     THE CIA PROPERLY WITHHELD PERSONAL IDENTIFYING
        INFORMATION PURSUANT TO EXEMPTIONS 6
        AND 7(C) ....................................................... 48

        A.      OIG Witness Names Were Properly Withheld .................... 48

        B.      The Detainee Name in Document 249 Was
                Properly Withheld ......................................... 50

V.      THE CIA PROPERLY WITHHELD INTERNAL AGENCY
        INFORMATION PURSUANT TO EXEMPTION 2 ..................... 52

VI.     THE CIA PROPERLY WITHHELD DOCUMENT 300
        UNDER EXEMPTION 3 ............................................ 53

VII.    THE CIA CONDUCTED AN ADEQUATE SEARCH FOR
        RESPONSIVE RECORDS ........................................... 53

VIII.   THE CIA HAS DEMONSTRATED THAT THE DOCUMENTS
        IT HAS WITHHELD IN FULL CONTAIN NO REASONABLY
        SEGREGABLE, NONEXEMPT INFORMATION ...................... 56

CONCLUSION ........................................................... 58

# TABLE OF AUTHORITIES

## Cases

*A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 7

*A.I.A. Holdings, S.A. v. Lehman Bros.*,
    No. 97 Civ. 4978, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002) . . . . . . . . . . . . . . . 37

*ACLU v. DOD*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19, 20

*ACLU v. FBI*, 429 F. Supp. 2d 179 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 50

*AFGE v. Dep't of the Army*, 441 F. Supp. 1308 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 42

*Access Reports v. DOJ*, 926 F.2d 1192 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32

*Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Agee v. CIA*, 524 F. Supp. 1290 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ahearn v. U.S. Army Materials & Mechs. Research Ctr.*,
    583 F. Supp. 1123 (D. Mass. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Amnesty Int'l v. CIA*,
    No. 07 Civ. 5435 (LAP), 2008 WL 2519908 (S.D.N.Y. June 19, 2008) . . . . . . . . . 51, 55

*Arabian Shield Development Co. v. CIA*,
    No. 3-98-CV-0624-HD, 1999 WL 118796 (N.D. Tex. Feb. 26, 1999) . . . . . . . . . . . . . 16

*Aranha v. CIA*, No. 99 Civ. 8644 (JSM), 2000 WL 1505988 (S.D.N.Y. Oct. 6, 2000) . . . . . . . . 9

*Ashton v. Dep't of Veterans Affairs*, 198 F.3d 233 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 57

*Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55 (D.C. Cir. 2003) . . . . . . . . . . . . . . . 9, 22

*Assoc. of Retired R.R. Workers, Inc. v. U.S.R.R. Ret. Bd.*,
    830 F.2d 331 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Associated Press v. DOD*, 410 F. Supp. 2d 147 (S.D.N.Y 2006) . . . . . . . . . . . . . . . . . . . . . . . 52

*Bassiouni v. CIA*, No. 02 C 4049, 2004 WL 1125919 (N.D. Ill. Mar. 31, 2004) . . . . . . . . . . . . 9

*Bennett v. USDOD*, 419 F. Supp. 663 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Berman v. CIA*, 378 F. Supp. 2d 1209 (E.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Bevis v. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Billington v. DOJ*, 11 F. Supp. 2d 45 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 35

*Brown v. FBI*, 658 F.2d 71 (2d Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Canning v. USDOJ*, 848 F. Supp 1037  (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Casad v. HHS*, 301 F.3d 1247 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Church of Scientology Int'l v. DOJ*, 30 F.3d 224 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 37, 38

*CIA v. Sims*, 471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Citizens for Responsibility and Ethicsin Washington v. DHS*,
 06 Civ 0173 (RJL), 2008 WL 2872183 (D.D.C. July 22, 2008) . . . . . . . . . . . . . . . 40, 41

*Citizens for Responsibility and Ethicsin Washington v. Office of Admin.*,
 249 F.R.D. 1 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cleary, Gottlieb, Steen & Hamilton v. HHS*,  844 F. Supp. 770 (D.D.C. 1993) . . . . . . . . . . . . 28

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) . . . . . . . . . . . . . 35

*Cucci v. DEA*, 871 F. Supp. 508  (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Dep't of Air Force v. Rose*, 425 U.S. 352  (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Dep't of State v. Ray*, 502 U.S. 164 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Diamond v. FBI*, 707 F. 2d 75 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Doherty v. DOJ*, 775 F.2d 49 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*DOJ v. Landano*, 508 U.S. 165 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Dudman Commc'ns Corp. v. Dep't of the Air Force*,
 815 F.2d 1565 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Earth Pledge Foundation*, 988 F. Supp. 623 (S.D.N.Y. 1996)
    128 F.3d 788 (2d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Edmonds v. FBI*, 272 F. Supp. 2d 35 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Elec. Privacy Info Ctr. v. TSA*, No. 03-1846,
    No. 03-1846, 2006 WL 626925 (D.D.C. Mar. 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 58

*Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . 28

*Ferguson v. FBI*, 83 F.3d 41 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Ferguson v. FBI*, 957 F.2d 882 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Friends of Blackwater v. Dep't of Interior*,
    391 F. Supp. 2d 115 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*,
    656 F.2d 856 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Garcia v. DOJ, Office of Info. & Privacy* 181 F. Supp. 2d 356 (S.D.N.Y. 2002) . . . . . . . . . . . 54

*Grand Centr. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 27

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 44, 45

*Hamilton Securities Group, Inc. v. HUD*,
    106 F. Supp. 2d 23, (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Henke v. United States Dep't of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996) . . . . . . . . . . . . . . 44

*Hiken v. DOD*, 521 F. Supp. 2d 1047 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*,
    891 F.2d 414 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*In re Grand Jury Investig.*, 399 F.3d 527 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*In re Grand Jury Proceedings*,
    No. M-11-89 (LAP), 2001 WL 1167497 (S.D.N.Y. Oct. 3, 2001)  . . . . . . . . . . . . . . . 37

*In re Grand Jury Subpoena*, 510 F.3d 180 (2d Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Grand Jury Subpoena*, 103 F.3d 234 (2d Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Joya-Martinez v. FBI*, No. Civ. A. 91-1433, 1994 WL 118206 (D.D.C. Mar. 31, 1994)  . . . . . . 17

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40

*Kimmel v. DOD*, No. 04-1551, 2006 WL 1126812 (D.D.C. Mar. 31, 2006)  . . . . . . . . . . . . . . . 50

*Krikorian v. Dep't of State*, 984 F.2d 461 (D.C. Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lahr v. NTSB*, 453 F. Supp. 2d 1153 (C.D. Cal. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lardner v. DOJ*, Civ. A. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) . . . . . . . . . . . 7, 40

*Larson v. Dep't of State*, 02 CV 1937, 2005 WL 3276303 (D.D.C. Aug. 10, 2005)  . . . . . . . . . 7

*Lead Ind. Assoc. v. OSHA*, 610 F.2d 70 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 56

*Lesar v. DOJ*, 636 F.2d 472 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Local 3, Int'l Bhd. of Elec. Workers  v. NLRB*,
    845 F.2d 1177 (2d Cir. 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Local 32B-32J, SEIU, AFL-CIO v. GSA*,
    No. 97 Civ. 8509 (LMM), 1998 WL 726000 (S.D.N.Y. Oct. 15, 1998)  . . . . . . . . 46, 53

*Lorillard v. Pons*, 434 U.S. 575 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Loving v. DOD*, 496 F. Supp. 2d 101 (D.D.C. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*M.K. v. DOJ*, No. 96 Civ. 1307 (SHS), 1996 WL 509724 (S.D.N.Y.  Sept. 9, 1996) . . . . . . . . 53

*Machin v. Zuckert*, 316 F.2d 336 (D.C. Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*MacNamara v. City of New York*, 249 F.R.D. 70 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . 28

*Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Massey v. FBI*, 3 F.3d 620 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 52

*Maxwell v. First Nat'l Bank of Maryland*, 143 F.R.D. 590 (D. Md. 1992) . . . . . . . . . . . . . . . . 14

*Mead Data Central, Inc. v. U. S. Dep't of the Air Force*,
        566 F.2d 242 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Miller v. DOJ*, __F. Supp. 2d__, 2008 WL 2544659 (D.D.C. June 24, 2008) . . . . . . . . . . . . . 52

*Montrose Chem. Corp. of California v. Train*,
        491 F.2d 63 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Morrison v. DOJ*, Civ. A. No. 87-3394, 1988 WL 47662 (D.D.C. Apr. 29, 1988) . . . . . . . . . . 28

*NARA v. Favish*, 541 U.S. 157 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 49, 51

*Nat'l Wildlife Fed. v. United States Forest Serv.*,
        861 F.2d 1114 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Nat'l Council of La Raza v. DOJ*,
        339 F. Supp. 2d 572 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Nat'l Sec. Archive Fund v. CIA*, 402 F. Supp. 2d 211 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . 56

*Navasky v. CIA*, 499 F. Supp. 269 (S.D.N.Y. 2007 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

New York Times v. DOD, 499 F. Supp. 2d 501 (S.D.N.Y. 2007 ) . . . . . . . . . . . . . . . . . . . . . . . . 40

*News-Press Div. of Multimedia Holdings Corp. v. DHS*,
        No. 2:05CV102FTM29DNF, 2005 WL 2921952 (M.D. Fla., Nov. 4, 2005) . . . . . . . . . 40

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Nuefeld v. IRS*, 646 F.2d 661 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Oglesby v. Army*, 920 F.2d 57 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Horowitz v. Peace Corps*, 428 F.3d 271 (D.C. Cir. 2005), . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Ortiz v. HHS*, 70 F.3d 729 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Peltier v FBI*, No. 03-CV-905S, 2005 WL 735964 (W.D.N.Y. Mar. 31, 2005) . . . . . . . . . . . 17

*People for the Am. Way Found. v. NSA*,
    462 F. Supp. 2d 21 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Perlman v. DOJ*, 312 F.3d 100 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50, 51 52

*Perry v. Block*, 684 F.2d 121 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*Pollard v. FBI*, 705 F.2d 1151 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Public Citizen v. Dep't of State*, 11 F.3d 198 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rabbitt v. Dep't of the Air Force*, 401 F. Supp. 1206 (S.D.N.Y. 1974) . . . . . . . . . . . . . . . . . . 43

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Russell v. Dep't of the Air Force*, 682 F.2d 1045 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 29

*SafeCard Servs. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Salisbury v. United States*, 690 F.2d 966 (D.C. Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Scherer v. Kelley*, 584 F.2d 170 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Schrecker v. DOJ*, 217 F. Supp. 2d 29 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Sirota v. CIA*, 1981 WL 158804 (S.D.N.Y. Sept. 18, 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Southam News v. INS*, 674 F. Supp. 881 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Spannaus v. DOJ*, 813 F.2d 1285 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Stern v. FBI*, 737 F.2d 84 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Strom v. Goldman, Sachs & Co.*, 202 F.3d 138 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tigue v. DOJ*, 312 F.3d 70 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32

*United States v. Abu Marzook*, 412 F. Supp. 2d 913 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . 15

*United States v. Aldman*, 134 F.3d 1194 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Lartey*, 716 F.2d 955 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Weber Aircraft Corp.*, 465 U.S. 792 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Zolin*, 491 U.S. 554 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Weberman v. NSA*, 668 F.2d 676 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Weisberg v. DOJ*, 745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Wheeler v. CIA*, 271 F. Supp. 2d 132 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Wilner v. NSA*, No. 07 Civ. 3883 (DLC),
    2008 WL 2567765 (S.D.N.Y June 25, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 19

*Wilson v. DOJ*, No. 87-2415-LFO, 1991 WL 111457(D.D.C. June 13, 1991) . . . . . . . . . . . . . 14

*Wilson v. McConnell*, 501 F. Supp. 2d 545 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Statutes**

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 552(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

50 U.S.C. § 403-1(i)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

50 U.S.C. § 403q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

50 U.S.C. § 431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

50 U.S.C.A. § 403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

50 U.S.C.A. § 403-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-1(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-1(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

50 U.S.C.A. § 403-1(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-1(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-1(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11

50 U.S.C.A. § 403-1(i)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C.A. § 403-3(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 U.S.C.A. § 403g . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

**Legislative History**

H.R. Conf. Rep. No. 108-796 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Regulations**

68 Fed. Reg. 15315 (March 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Executive Orders**

Executive Order 11652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Executive Order 12065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Executive Order 12356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Executive Order 12958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Executive Order 13292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Defendant the Central Intelligence Agency (the "CIA"), by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to plaintiffs' cross-motion for partial summary judgment and in further support of the CIA's motion for summary judgment in this action brought under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

## PRELIMINARY STATEMENT

In response to plaintiffs' requests for records relating to the CIA's secret detention and interrogation of terrorists, the CIA identified and processed approximately 10,000 records, while providing a *Vaughn* index of hundreds of those records, almost all of which contain classified national security information and reveal intelligence sources and methods.  Plaintiffs oppose the CIA's motion for summary judgment, and cross-move themselves, by ignoring precedent and cursorily dismissing the CIA's extensive evidentiary submissions.

Plaintiffs rely on legal arguments that have been roundly rejected by the federal courts.  For instance, despite legion precedent rejecting the very same arguments, plaintiffs contend that the CIA must release information that would put the country in grave danger wherever the information might also possibly reveal misconduct, and ask the Court to look beyond the CIA's official acknowledgment of its activities to determine what agency information has been officially acknowledged.  Likewise, contrary to black letter law, plaintiffs insist that the attorney-client privilege does not cover facts, that the presidential communications privilege does not protect communications of final decisions, and that witness names must be released despite the law enforcement privacy exemption.  These, and plaintiffs' other legal arguments, are without merit.

Similarly, plaintiffs flatly mischaracterize the CIA's submissions.  Rather than properly viewing each document in light of the various declarations and indices provided to describe it,

plaintiffs instead charge that the CIA's descriptions are mere boilerplate.  It should come as no surprise, of course, that the bulk of these documents are classified for similar reasons, and the CIA's descriptions appropriately mirror the common elements exempting the records from disclosure.  The CIA has already provided eight separate declarations and hundreds of pages of information detailing the relevant aspects of each and every document, and plaintiffs fail to identify any specific additional information needed to support the exemptions claimed.  Nevertheless, in an abundance of caution, the CIA submits an *ex parte* classified declaration to provide additional classified details to justify its withholding of these documents, details that could not be disclosed without revealing the very information FOIA's exemptions exist to protect.  On the basis of the CIA's initial submissions – and, if necessary, the CIA's additional *ex parte* declaration – the Court should enter summary judgment in the CIA's favor.

## ARGUMENT

## I.    THE CIA PROPERLY WITHHELD RECORDS PURSUANT TO FOIA EXEMPTIONS 1 AND 3

### A.    *De Novo* Review Is Not Incompatible with the Substantial Deference Accorded to Agency Determinations in National Security Cases

Contrary to plaintiffs' suggestions, *see* Opposition to the Central Intelligence Agency's Motion for Summary Judgment and Memorandum of Law in Support of Plaintiffs' Cross Motion for Partial Summary Judgment ("Pl. Br.") at 7-8, there is no incompatibility between the *de novo* standard of review mandated by FOIA and the substantial deference that courts have held must be accorded to agency determinations in the national security context.  *See* Memorandum of Law in Support of the Central Intelligence Agency's Motion for Summary Judgment ("CIA Br.") at 8.  The D.C. Circuit has helpfully laid out "the salient characteristics of *de novo* review in the national

security context," holding that in conducting such a review, courts "must first 'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'"  *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (citation omitted); *cf. Assoc. of Retired R.R. Workers, Inc. v. U.S.R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987) ("*de novo* review in FOIA cases is not everywhere alike").  In other words, while *de novo* review provides for "an objective, independent judicial determination," courts nonetheless defer to an agency's determination in the national security context in acknowledgment that "the executive ha[s] unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record." *Ray*, 587 F.2d at 1194.  Accordingly, in cases that implicate national security issues, courts applying a *de novo* standard properly accord substantial deference to an agency's withholding determinations.  *See, e.g., Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *Diamond v. FBI*, 707 F. 2d 75 (2d Cir. 1983); *ACLU v. FBI*, 429 F. Supp. 2d 179, 186-187 (D.D.C. 2006); *ACLU v. DOD*, 389 F. Supp. 2d 547, 565 (S.D.N.Y. 2005).  As this case implicates national security issues, the CIA's declarations should be accorded substantial weight here as well.

**B.     The Government's *Vaughn* Index and Supporting Declarations Provide Sufficient Details to Justify the CIA's Withholdings**

Plaintiffs allege in cursory fashion that the factual information the CIA submitted to support its withholdings under Exemptions 1 and 3 is insufficient because the CIA allegedly failed to provide specific and particularized details about the documents in its *Vaughn* index.  *See* Pl. Br. at 12.  Yet plaintiffs make scant reference, in either their brief or their attached chart, to the 80-page declaration explaining the specific types of exempt information contained in the withheld materials.  The *Vaughn* index, along with the supporting public declarations, together provide more than sufficient detail to justify the CIA's Exemptions 1 and 3 withholdings.  *See* CIA Br. at 12-14.

Moreover, to the extent that the Court finds that additional information would confirm that the withheld materials fall within the scope of Exemptions 1 and 3, the CIA submits with this brief an *ex parte*, classified declaration for this Court's *in camera* review, which provides additional detail to further justify the withholding of the documents at issue.  *See, e.g.*, *Weberman v. NSA*, 668 F.2d 676, 678 (2d Cir. 1982) (court may conduct *ex parte* and *in camera* review of classified affidavit in FOIA case involving national security issues); *accord Pollard v. FBI*, 705 F.2d 1151, 1153-54 (9th Cir. 1983); *Hayden v. NSA*, 608 F.2d 1381, 1385 (D.C. Cir. 1979); *Edmonds v. FBI*, 272 F. Supp.2d 35, 46 n.4 (D.D.C. 2003).

Plaintiffs' criticism of the supposedly "repetitive" and "boilerplate" nature of the CIA's *Vaughn* index both mischaracterizes the information contained in the index and is, in any event, misplaced.  A simple examination of the *Vaughn* index, which is attached to the Declaration of Ralph S. DiMaio, dated April 21, 2008 ("First DiMaio Decl.") at Exhibit ("Ex.") A, demonstrates that the index provides a description of each document that includes its date; the number of pages; the form of the document; a description of its general contents or subject matter; the originating and receiving offices, agencies or components; the CIA's determination as to segregability; the classification level; and an identification of the FOIA exemptions that apply to the various types of information contained in the document.  This index is supplemented by declarations, which provide more detail regarding the withheld documents and explain the harm that would result from the disclosure of the specific categories of exempt information contained in each document.

This form of *Vaughn* index has been explicitly endorsed by the D.C. Circuit.  *See Morley v. CIA*, 508 F.3d 1108, 1122-23 (D.C. Cir. 2007) (approving an index that ties each document to an exemption, read in tandem with a declaration that links the substance of an exemption "to the

-4-

documents' common elements"); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006) ("The FDA's decision to tie each document to one or more claimed exemptions in its index and then summarize the commonalities of the documents in a supporting affidavit is a legitimate way of serving [the functions of the *Vaughn* index].")). As the D.C. Circuit explained, "categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons. . . . The [agency] explained itself through *commonalities*, not *generalities*. . . . No rule of law precludes the [agency] from treating common documents commonly." *Judicial Watch*, 449 F.3d at 147; *see also Morley*, 508 F.3d at 1123 ("[D]escriptions of the documents in the *Vaughn* index, while categorical and with little variation from page to page, convey enough information for Morley and the court to identify the records referenced and understand the basic reasoning behind the claimed exemptions.").

Finally, and perhaps most fundamentally, plaintiffs do not explain what further information would be required to justify the CIA's withholding of such information as cryptonyms and pseudonyms, the location of covert field installations abroad, cover identities, dissemination control markings, or information that would reveal the fact or nature of the CIA's relationship with a foreign liaison service or clandestine relationships with a foreign government official. *Cf. Morley*, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."). Nor could the CIA provide additional information with respect to these categories of information without revealing the substance of the classified information. The CIA has specified which of the records contain each category of classified information. *See* First DiMaio Decl., Exs A & J. The CIA has also detailed the specific and concrete harm that would come from public disclosure of such information. *Id.* at ¶¶ 65-104.

As the harm related to the release of this national security information – such as cover identities, dissemination markings, foreign liaison information, the location of field installations, or cryptonyms – is common to each document and explained in the context of the CIA's operations, further document-specific context would not assist the Court, and thus is not required. Indeed, courts have routinely found such information properly withheld under Exemptions 1 and 3. *See* CIA Br. at 14 (citing cases).

C.    **The CIA Properly Relied Upon the National Security Act and the CIA Act as the Bases for Withholding Records Under Exemption 3**

Plaintiffs contend that the CIA has improperly invoked the National Security Act of 1947, as amended ("NSA"), 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2008), to withhold documents because the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458 (Dec. 17, 2004) (the "IRTPA") transferred the authority to protect "intelligence sources and methods" from the Director of Central Intelligence ("DCI") to the Director of National Intelligence ("DNI"). Pl. Br. at 34. Thus, according to plaintiffs, a supporting declaration from the DNI himself must be submitted to justify the withholding of documents in this case, and by logical extension, in every FOIA case in which the CIA, the Office of the Director of National Intelligence ("ODNI"), or any other agency relies on the NSA to withhold sensitive intelligence sources and methods. Pl. Br. at 34-35. Additionally, plaintiffs argue that the enactment of the IRTPA somehow abrogates the landmark Supreme Court case affirming the CIA's "sweeping power" to withhold information regarding its activities from disclosure under the NSA, *CIA v. Sims*, 471 U.S. 159, 169 (1985). Pl. Br. at 35. Not only are these arguments completely unfounded, they fly in the face of decades of established precedent on the NSA.

As a threshold matter, because plaintiffs do not present a legal challenge to the CIA's

contention that its Exemption 3 withholdings are also justified by the Central Intelligence Agency Act of 1949, as amended (the "CIA Act"), 50 U.S.C.A. § 403g (West Supp. 2008), the Court may uphold these withholdings without considering plaintiffs' novel arguments concerning the NSA. *See* CIA Br. at 13-15; *see also* First DiMaio Decl. at ¶¶ 55-121, 135.

In any event, plaintiffs' arguments regarding the NSA are meritless. First, FOIA does not require that agency withholdings be justified by a specific official within the Government. Rather, in order to withhold records under Exemption 3, an agency is required to show only that: (1) there is a statute of exemption under FOIA; and (2) the withheld material satisfies the criteria of the exemption statute. *See Sims*, 471 U.S. at 167; *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994); *cf. Lardner v. DOJ*, Civ. A. 03-0180, 2005 WL 758267 at *7-*9 (D.D.C. Mar. 31, 2005) (Exemption 5 withholdings turn only on the content or nature of the record withheld, and not on the official who raises the exemption, as Congress could not have intended to "shift a substantial portion of FOIA responsibilities onto the shoulders of senior agency officials"). The CIA has clearly satisfied this burden. *See* CIA Br. at 9-15.

Second, plaintiffs' claim that the IRTPA eliminated the CIA's authority to withhold documents pursuant to the NSA is meritless. While the IRTPA transferred the duty to protect intelligence sources and methods from the DCI (the former head of the intelligence community) to the DNI (the current head of the intelligence community), it does not follow that the CIA was thereby stripped of its ability to shield its own intelligence sources and methods from disclosure in FOIA cases. When the same responsibility to protect intelligence sources and methods information from disclosure rested with the DCI, other members of the intelligence community routinely invoked the NSA to withhold such information in FOIA cases. *See, e.g.*, *Krikorian v. Dep't of State*, 984

F.2d 461 (D.C. Cir. 1993) (State Department invokes NSA); *Larson v. Dep't of State*, 02 CV 1937, 2005 WL 3276303, at *19 (D.D.C. Aug. 10, 2005) (National Security Agency invokes NSA). Nothing in the text of the statute or the legislative history of the IRTPA suggests that, in transferring that duty from the DCI to the DNI, Congress intended to depart from this longstanding FOIA practice by barring the CIA or other members of the Intelligence Community from invoking the NSA.

Nor does the NSA require the DNI to personally submit a declaration to support the CIA's withholdings in this case. In making this argument, plaintiffs rely upon section 403-1(i)(3) of the NSA, which provides that the DNI "may only delegate a duty or authority given to the Director under [section 403-1(i)] to the Principal Deputy [DNI]." 50 U.S.C. § 403-1(i)(3). Pl. Br. at 34. Plaintiffs' argument misconstrues, however, the role of the DNI. Under the amended NSA, the DNI has extremely high-level responsibilities involving intelligence policy and oversight. For example, section 403(b) requires the DNI to serve as the head of the intelligence community, act as principal advisor to the President on intelligence matters related to national security, and oversee and direct the implementation of the National Intelligence Program. 50 U.S.C.A. § 403(b).[1] Given the nature of the DNI's role, Congress could not possibly have intended for the DNI to be personally responsible for invoking the NSA to protect intelligence sources and methods in every civil and

---

[1] Other high-level responsibilities of the DNI include: ensuring that national intelligence is provided to the President and other senior officials of the Executive Branch, 50 U.S.C.A. § 403-1(a); overseeing intelligence agency budgets, *id.* § 403-1(c); establishing "objectives, priorities, and guidance" on intelligence collection, processing, analysis, and dissemination, *id.* § 403-1(f); overseeing the National Counterterrorism Center, *id.*; establishing policies to ensure access to intelligence information within the intelligence community, *id.* § 403-1(g); implementing policies and procedures with respect to intelligence analysis, *id.* § 403-1(h); and overseeing and coordinating relationships between the intelligence community and foreign governments, *id.* § 403-1(k).

criminal case.  Rather, just as the DNI is not required to personally participate in other operational

decisions that fall within the ambit of his statutory oversight responsibilities, the DNI's duty to

protect intelligence sources and methods is a high-level responsibility to implement general

measures to ensure that members of the intelligence community prevent unauthorized disclosure of

such information.[2]

In any event, although not required by the NSA, in an abundance of caution, the DNI did

become personally involved in the invocation of the NSA in this case.  Here, the CIA provided the

DNI with a draft declaration explaining the CIA's prospective withholdings as well as a

representative sample of the records at issue.  *See* Declaration of Ralph S. DiMaio, dated September

5, 2008 ("Second DiMaio Decl."), at ¶ 16, Ex. B.  On April 11, 2008, the DNI issued a

memorandum to the Director of the CIA ("DCIA") stating that the "information presented in the

draft declaration and the records we reviewed directly implicate sensitive intelligence sources and

methods that must be protected from unauthorized disclosure in the interest of the national security

of the United States."  *Id.*  The DNI further advised the DCIA that he was "authorized to take all

necessary and appropriate measures to ensure that these sources and methods are protected during

the course of this litigation."  *Id.*  Thus, although he was not required to do so, there can be no

dispute that the DNI concluded that the intelligence sources and methods in this case should not be

---

[2]  This is consistent with the way courts viewed the NSA prior to the IRTPA, as the CIA was not required to submit a declaration from the DCI in order to invoke the protections of the NSA.  *See Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 56-58 (D.C. Cir. 2003) (relying on Information Review Officer's declaration in considering whether the CIA had properly invoked NSA protections in responding to FOIA request); *Aranha v. CIA*, No. 99 Civ. 8644 (JSM), 2000 WL 1505988, at *1 (S.D.N.Y. Oct. 6, 2000) (same); *see also Pipko v. CIA*, 312 F. Supp. 2d at 669, 677-79 (D.N.J. 2004) (same); *Bassiouni v. CIA*, No. 02 C 4049, 2004 WL 1125919, at *4-8 (N.D. Ill. Mar. 31, 2004) (same); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 135-36, 140-41 (D.D.C. 2003) (same).

disclosed.

Finally, nothing in the text of the amended NSA supports plaintiffs' assertion that enactment of the IRTPA effectively overturned the Supreme Court's holding in *Sims* that the NSA confers "sweeping power" to protect intelligence sources and methods. Pl. Br. at 35. While the IRTPA transferred the ultimate authority to protect intelligence sources and methods from the DCI to the DNI, Congress left unchanged the language concerning the scope of this authority.[3]  Congress therefore is presumed to have adopted the Supreme Court's interpretation of the NSA in *Sims*. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131 (2d Cir. 1996).[4]

Nor does section 403-1(i)(2) limit the authority conferred by section 403-1(i)(1) of the NSA to protect sources and methods. Pl. Br. at 36. Section 403-1(i)(2) provides:

> Consistent with paragraph (1), in order to maximize the dissemination of intelligence, the Director of National Intelligence shall establish and implement guidelines for the intelligence community for the following purposes:
>
> (A)     Classification of information under applicable law, Executive orders, or other Presidential directives.

---

[3]  *Compare* 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2008) ("[t]he [DNI] shall protect intelligence sources and methods from unauthorized disclosure") *with* 50 U.S.C.A. § 403-3(c)(7) (West 2003) ("the [DCI]  shall . . . protect intelligence sources and methods from unauthorized disclosure").

[4]  Plaintiffs also rely upon purported "legislative history" to support this attenuated argument. Pl. Br. at 34-35.  The Court should not consider legislative history where, as here, plaintiffs' interpretation of the statute is refuted by its plain text. *See, e.g.*, *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 145 (2d Cir. 1999).  In any event, plaintiffs do not actually cite to the legislative history of the IRTPA, which was produced by the 108th Congress, Committee of Conference on Senate Bill No. 2845.  *See* H.R. Conf. Rep. No. 108-796 (2004).  Indeed, Congress made very clear that, other than the Conference Report and Joint Explanatory Statement issued with the IRTPA – which appears nowhere among the sources cited by plaintiffs, *see* Pl. Br. at 34-35 – no other statements or reports reflect the intent of the drafters.  *See* 150 Cong. Rec. E2209-01.

(B)     Access to and dissemination of intelligence, both in final form and in the form when initially gathered.

(C)     Preparation of intelligence products in such a way that source information is removed to allow for dissemination at the lowest level of classification possible or in unclassified form to the extent practicable.

50 U.S.C. § 403-1(i)(2).  Nothing in the text of this provision limits the DNI's separate grant of authority to protect intelligence sources and methods under section 403-1(i)(1) — to the contrary, the authorities set forth in this provision must simply be exercised "consistent with" the DNI's duties under section 403-1(i)(1).  Plaintiffs therefore err in suggesting that the manner in which the DNI may exercise his authority to protect intelligence sources and methods is limited to only those methods prescribed in section 403-1(i)(2).  Pl. Br. at 36.  Indeed, plaintiffs' reading of the statute would render section 403-1(i)(1) a nullity.  Contrary to plaintiffs' suggestion, Pl. Br. at 35, section 403-1(i)(2)(C) does not mandate greater public access to classified information; rather, it speaks only to the manner in which intelligence products are to be prepared, with the purpose of promoting dissemination of intelligence products *within* the Intelligence Community, not to the general public.  *See also* 50 U.S.C.A. § 403-1(g).[5]

Accordingly, the amended NSA continues to afford the same broad powers to protect intelligence sources and methods from disclosure in FOIA cases as it did prior to the reorganization of the intelligence community.  *See, e.g.*, *Lahr v. NTSB*, 453 F. Supp. 2d 1153, 1190-91 (C.D. Cal. 2006); *Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 906 (N.D. Ill. 2006); *People for the Am. Way*

---

[5]  Contrary to plaintiffs' claim that the IRTPA represented a shift from the Cold War paradigm of "need to know" to a modern era "need to share," Pl. Br. at 35; Satterthwaite Decl. at ¶ 44(b), Congress actually reaffirmed the policy that classified intelligence should not be disclosed to individuals, even if they possess the appropriate clearance, unless that person also has a need to know the information in question.  *See* 150 Cong. Rec. E2209-01.

*Found. v. NSA*, 462 F. Supp. 2d 21, 31 n.8 (D.D.C. 2006).

> **D.      The CIA Did Not Classify Information Regarding the Terrorist Detention and Interrogation Program In Order to Conceal Violations of Law**

This Court should reject plaintiffs' attempt to draw this Court in this FOIA case into an unnecessary and distracting debate regarding the legality of the CIA's Terrorist Detention and Interrogation Program.  Pl. Br. at 30-34.  Although the Government maintains that the CIA's terrorist detention and interrogation activities fall within the agency's statutory mandate and are not unlawful, *see* CIA Br. at 14-15, this FOIA litigation is an improper forum for assessing the legality of one of the Government's most highly classified intelligence programs.  The propriety of the Government's withholdings under Exemptions 1 and 3 does not turn on whether such records contain evidence of illegality or government misconduct.  Rather, the only issue before this Court is whether the Government has established that the withheld records are either properly classified and therefore entitled to protection under Exemption 1 or statutorily exempted from disclosure under Exemption 3.  Because the Government's declarations sufficiently establish that the withheld records contain information, which, if disclosed, would reasonably be expected to cause damage to national security, the Court need not reach plaintiffs' arguments concerning illegality.

Plaintiffs, misreading section 1.7(a) of Executive Order ("E.O.") 12958, as amended,[6] argue that records may not be validly withheld under Exemptions 1 or 3 if the information contained therein "relates to activities that . . . were proscribed by law."  Pl. Br. at 30.  As an initial matter, however, the issue of whether the withheld records are properly classified in accordance with E.O. 12958 relates solely to the propriety of the CIA's Exemption 1 claim.  Yet all of the information

---

[6]  E.O. 12958 was amended by E.O. 13292.  *See* Executive Order No. 13292, 68 Fed. Reg. 15315 (March 28, 2003).  All citations to E.O. 12958 are to the order as amended by E.O. No. 13292.

withheld under Exemption 1 has also been withheld under Exemption 3. *See* CIA Br. at 9-16; *see also infra* at Section I.C. The CIA's Exemption 3 withholdings do not depend upon the propriety of its classification of information under E.O. 12958. *See* CIA Br. at 12-13 (citing cases). Thus, the Court need not reach plaintiffs' arguments regarding section 1.7(a) of the E.O., and the legality of the CIA's Terrorist Detention and Interrogation Program, if the Court finds that the withheld records are exempted from disclosure pursuant to the NSA or the CIA Act. *See, e.g.*, *Wilner v. NSA*, No. 07 Civ. 3883 (DLC), 2008 WL 2567765, at *6 (S.D.N.Y. June 25, 2008) ("The Court need not address plaintiffs' substantive arguments concerning the [Terrorist Surveillance Program's] legality, however, because the language of FOIA Exemption 3 and Section 6 of the [National Security Agency Act of 1959] makes clear that the defendants permissibly refused to disclose the information requested by plaintiffs."); *People for the Am. Way Found.*, 462 F. Supp. 2d at 31 (potential illegality of activities described in government records cannot be used as basis for challenging withholding of records under Exemption 3); *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) ("[A] claim of activities ultra vires the CIA charter is irrelevant to an exemption 3 claim.").[7]

In any event, these documents are also appropriately withheld under Exemption 1, as they were properly classified in accordance with E.O. 12958. Section 1.7(a) provides:

In no case shall information be classified in order to:

(1)    conceal violations of law, inefficiency, or administrative error;

(2)    prevent embarrassment to a person, organization, or agency;

---

[7] Although plaintiffs assert that Exemption 3 cannot be used to withhold information relating "to activities that fall outside the scope of the CIA's statutory authority and [that] were prescribed by law at the time the acts were committed," none of the authorities they cite address the issue of whether the NSA or the CIA Act can be used as the bases for withholding records related to purported unlawful activities. *See* Pl. Br. at 30 & nn.76-77.

    (3)      restrain competition; or

    (4)      prevent or delay the release of information that does not require protection in the interest of the national security.

68 Fed. Reg. at 15318. Thus, section 1.7(a) of E.O. 12958 does not address the substance of what may be classified. Rather, it bars the Government from classifying otherwise unclassifiable information "in order to"— *i.e.*, for the purpose of—concealing violations of law. 68 Fed. Reg. at 15318. Accordingly, even assuming that information classified by the Government contains evidence of illegality, E.O. 12958 does not bar such classification where the information is independently subject to classification under the E.O. *See, e.g.*, *Lesar v. DOJ*, 636 F.2d 472, 483 (D.C. Cir. 1980) ("Although the FBI's surveillance of Dr. [Martin Luther] King strayed beyond the bounds of its initial lawful security aim, that does not preclude the possibility that the actual surveillance documents . . . may nevertheless contain information of a sensitive nature, the disclosure of which could compromise legitimate secrecy needs."); *Maxwell v. First Nat. Bank of Maryland*, 143 F.R.D. 590, 598 (D. Md. 1992) ("The Executive Order forbids classification of information that involves violations of law, but is not a threat to national security."); *Wilson v. DOJ*, Civ. A. No. 87-2415-LFO, 1991 WL 111457, at *2 (D.D.C. June 13, 1991) ("[E]ven if some of the information withheld were embarrassing to Egyptian officials, it would nonetheless be covered by Exemption 1 if, independent of any desire to avoid embarrassment, the information withheld were properly classified."); *see also Agee v. CIA*, 524 F. Supp. 1290, 1293 (D.D.C. 1981) (records that reveal evidence of illegal conduct by CIA nonetheless were properly classified under prior version of E.O. and exempt from disclosure under FOIA because information intertwined with national security information); *cf. Bennett v. DOD*, 419 F. Supp. 663, 666 (S.D.N.Y. 1976) ("[E]ven assuming arguendo that the responsive documents reveal such violations [of law], there is nothing

-14-

in the FOIA, its legislative history, or in Executive Order 11652 to suggest that information vital to the national security is not worthy of protection solely because of the means employed to obtain it.").

In other words, to implicate section 1.7(a), there must be evidence that the agency classified information that was not appropriate for classification under the substantive standards established by the Executive Order with the improper motive or intent of concealing illegalities. *See, e.g.*, *United States v. Abu Marzook*, 412 F. Supp. 913, 923 (N.D. Ill. 2006) (rejecting argument that information had been improperly classified to prevent embarrassment and to conceal Israel's use of illegal interrogation methods because, *inter alia*, "there is simply no evidence that these materials [were] classified merely to prevent embarrassment to Israel"); *Billington v. DOJ*, 11 F. Supp. 2d 45, 58 (D.D.C. 1998) (rejecting argument that FBI violated Executive Order provisions barring classification in order to conceal violations of law or prevent embarrassment where plaintiff did "not provide any proof of the FBI's motives in classifying the information" and there was no evidence "that the FBI was involved in an attempt to cover-up information"), *aff'd in part, vacated in part*, 233 F.3d 581 (D.C. Cir. 2000); *Canning v. DOJ*, 848 F. Supp 1037, 1047 (D.D.C. 1994) (rejecting argument that information was classified in order to prevent embarrassment or conceal illegal activities because "the Court finds no credible evidence that the agency's motives for its withholding decisions were improper or otherwise in violation of [section 1.6(a) of prior Executive Order, Executive Order 12356]"). Section 1.7(a) "thus prohibits an agency from classifying documents as a ruse when they could not otherwise be withheld from public disclosure. It does not prevent the classification of national security information merely because it might *reveal* criminal or tortious acts." *Arabian Shield Development Co. v. CIA*, No. 3-98-CV-0624-HD, 1999 WL 118796 at *4

-15-

(N.D. Tex. Feb. 26, 1999).

Here, plaintiffs cannot plausibly maintain that, but for the CIA's purported concern over alleged illegality or embarrassment, information regarding the CIA's detention and interrogation activities – including the employment of alternate interrogation methods, the conditions of confinement, the locations of overseas detention facilities, or the assistance provided by foreign governments in connection with the program – would not have been classified. Yet that is precisely what the plaintiffs must establish to prevail on their challenge to the CIA's Exemption 1 claims.

The CIA has provided unrebutted evidence regarding the exceptionally grave damage to the national security that would result from the disclosure of the withheld records, which contain previously undisclosed information regarding the operational details of the CIA's Terrorist Detention and Interrogation Program. *See* First DiMaio Decl. at ¶¶ 111-127. Further, the CIA has established that it had no improper motive in classifying the information at issue. Ralph S. DiMaio has affirmed that:

> With respect to the information relating to CIA sources, methods and activities described in section III(A)(2) of this declaration for which FOIA Exemption (b)(1) is asserted in this case, I have determined that this information has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

First DiMaio Decl. at ¶ 51.

In response, plaintiffs have offered no evidence of the CIA's motive in classifying information regarding its Terrorist Detention and Interrogation Program, much less evidence indicating that CIA officials, in making classification determinations, did so with an improper motive. Instead plaintiffs appear to suggest that, if the withheld records contain evidence of

illegality or misconduct, then *ipso facto* they must have been classified for an improper purpose. *See* Pl. Br. at 31-34. Yet such flawed logic and unsupported speculation are insufficient to defeat the Government's properly supported summary judgment motion. *Cf. NARA v. Favish*, 541 U.S. 157, 174 (2004) (observing that "[a]llegations of government misconduct are easy to allege and hard to disprove") (internal quotation omitted). Rather, plaintiffs must adduce actual evidence that the national security concerns asserted by the agency as the bases for its classification decisions are pretextual. *See, e.g.*, *Wilner*, 2008 WL 2567765, at *6 n.4 (plaintiffs did not challenge agency's affidavits describing the harm to agency's intelligence operations that would result from disclosure of information, and therefore provided no evidence that information was withheld "simply because its release might uncloak an illegal operation"); *Hiken v. DOD*, 521 F. Supp. 2d 1047, 1058 (N.D. Cal. 2007) ("While the events involved in the Sgrena incident may have been embarrassing, plaintiffs provide no evidence that the classification of these records was pretextual nor have they rebutted the [Government's] declaration. Indeed, the court must give substantial weight to agency determinations of national security needs in invoking Exemption 1."); *Peltier v FBI*, No. 03-CV-905S, 2005 WL 735964, at *8 (W.D.N.Y. Mar. 31, 2005) (rejecting argument that FBI classified materials to conceal past violations of law as plaintiff's speculation regarding FBI's motive was not sufficient to overcome presumption of good faith afforded agency affidavits); *Joya-Martinez v. FBI*, No. Civ. A. 91-1433, 1994 WL 118206, at *2 (D.D.C. Mar. 31, 1994) ("Given the detailed justifications for the claims of Exemption 1 contained in the Machak Declaration, such vague allegations [of improper motive] are insufficient to raise a genuine issue of material fact."). Plaintiffs have not, and cannot, provide any evidence that the CIA's classification was pretextual.

For example, plaintiffs cite to the CIA's release of information regarding Manadel al-Jamadi,

who died while in Army custody in Iraq, as evidence that the CIA has classified particular records pertaining to other "instances of detainee abuse and the death of detainees in custody" "simply because the incidents involve possibly improper or embarrassing conduct." Pl. Br. at 31. But plaintiffs' argument combines speculation about the content of withheld OIG records (*i.e.*, that they would reveal deviations from the agency's internal policies regarding the Terrorist Detention and Interrogation Program) with conjecture that any such records would have been classified solely for the purpose of concealing such improprieties. *Id.* at 30-31. This is insufficient.

Indeed, the fact that the Government chose to release information regarding al-Jamadi, and likewise chose to make public statements with respect to certain controversial aspects of the Terrorist Detention and Interrogation Program, *see infra* Section I.E, is inconsistent with plaintiffs' assertion that the CIA has classified information to conceal unlawful activities or to avoid embarrassment. As one district court reasoned when faced with a similar situation – in which the plaintiffs argued that statements and evidence released by the FBI demonstrated that the agency was allegedly wrongfully withholding other information – it is "difficult to believe that the agency's withholding decisions were motivated by a desire to improperly conceal [embarrassing] facts. If anything, the agency has released sufficient information to facilitate such speculation about the existence of a potentially inappropriate investigation." *Canning*, 848 F. Supp. at 1048; *see also Bassiouni*, 392 F.3d at 247.

Unable to establish that the CIA's classification determinations were pretextual, plaintiffs alternatively argue that the Court can order disclosure of classified records if "the CIA's refusal to release records derives in part from its concern that the records contain information that points to improper or embarrassing conduct by the agency or its employees." Pl. Br. at 33. In other words,

-18-

plaintiffs would have this Court hold that records whose disclosure would damage national security nonetheless lose their protected status to the extent they also reveal information regarding illegalities or official misconduct.  The consequences to national security of such a rule would be untenable, and it has been rejected by every court to consider the issue.  *See, e.g.*, *Navasky*, 499 F. Supp. at 275 ("If properly classified under [prior version of Executive Order], then by definition it has not been classified 'to conceal violations of law' as prohibited by [section 1-601 of Executive Order 12065].");  *Bennett*, 419 F. Supp. at 666;  *see supra* at 14-15 (citing additional cases).  It is therefore unsurprising that the plaintiffs are unable to cite to a single case in which a court has ordered the disclosure of records applying such a standard.

Instead, plaintiffs rely on *Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991), and *ACLU v. DOD*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005), but neither supports their argument.  In *Wiener*, the Ninth Circuit expressly declined to address plaintiffs' argument that evidence of improper intent raised a factual issue as to the agency's motive in classifying information, holding that it would be premature to reach this question as the court had reversed and remanded the case on other grounds.  *Wiener*, 943 F.2d at 973, 988.  In the *ACLU v. DOD* litigation, Judge Hellerstein *granted* the CIA's summary judgment motion with respect to its *Glomar* response, notwithstanding a concern that "that the purpose of the CIA's *Glomar* responses is less to protect intelligence activities, sources or methods than to conceal possible 'violations of law' in the treatment of prisoners, or 'inefficiency' or 'embarrassment' of the CIA."  *ACLU*, 389 F. Supp. 2d at 564-65.  As the court explained:

> [U]nder the cases and notwithstanding FOIA's clear statutory command, there is small scope for judicial evaluation in this area.  The Fifth Dorn Declaration sets out that which the cases require.  The agency's arguments that it should not be required officially to acknowledge the precise "intelligence activities" or "methods" it employs or considers – for example, whether it has any role whatsoever in the interrogation of detainees – are given deference by the courts, for the CIA, not the

-19-

> courts, is deemed to have the competence to "weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." On the basis of the Fourth and, in particular, the Fifth Dorn Declarations, I accept the CIA's *Glomar* response . . . .

*Id.* (citations omitted).

In sum, nothing in either decision cited by the plaintiffs supports their broad contention that records that are properly classified cannot be withheld under Exemption 1 if they contain evidence of illegalities or government misconduct.

### E.   The CIA Has Not Withheld Reasonably Segregable Officially Acknowledged Information from the Responsive Records

Plaintiffs have compiled an impressive array of statements from senior government officials, media reports, court cases, and miscellaneous materials regarding both the CIA's Terrorist Detention and Interrogation Program and counter-terrorism efforts more generally.  They now claim that the CIA has failed to release this same information where it is contained within the records in this case. Pl. Br. at 26-29.  Yet plaintiffs have failed to adduce any evidence from which it could be inferred that any officially acknowledged information is contained in the withheld records, never mind that the CIA improperly withheld such reasonably segregable information from the plaintiffs.  As plaintiffs have not met their burden of demonstrating that any officially acknowledged information has been improperly withheld from them by the CIA in this litigation, the Court should deny plaintiffs' request for an order requiring the CIA to assume the enormous burden of reprocessing almost 10,000 classified records.

Although an agency's refusal to release classified information "is generally unaffected by whether the information has entered the realm of public knowledge," *Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999), there is a "limited exception" to this rule, "where the government has officially

-20-

disclosed the specific information the requester seeks," *id. Accord Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989). Courts have "unequivocally recognized," however, "that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *accord Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007). Thus, the test for waiver by official disclosure is necessarily a "stringen[t]" one. *Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 2003). To establish an official disclosure, plaintiffs must show that "the information requested [is] as specific as the information previously released," that "the information requested . . . match[es] the information previously disclosed," and that "the information requested [has] already . . . been made public through an official and documented disclosure." *Fitzgibbon*, 911 F.2d at 765. This test is applied with "exactitude" out of deference to " 'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf*, 473 F.3d at 378 (citation omitted); *see also Assassination Archives*, 334 F.3d at 60.[8]

Plaintiffs propound a list of information, consisting primarily of plaintiffs' characterizations of various public documents, that they seek to have this Court recognize as "officially acknowledged" information. Pl. Br. at 28-29. Yet plaintiffs' characterizations are not official

---

[8] Accordingly, the court should reject plaintiffs' erroneous suggestion that the CIA's "selective" disclosure of information regarding the Terrorist Detention and Interrogation Program undermines its claim that other details regarding this program must remain classified. Pl. Br. at 27 n.75. *See Bassiouni*, 392 F.3d at 247 ("if even a smidgen of disclosure required the CIA to open its file, there would be no smidgens").

acknowledgments under the strict standards set forth above.[9]  Moreover, many of the underlying

documents relied upon by plaintiffs, such as media reports, the 9/11 Commission Report, letters

from members of Congress, court cases, federal statutes, Congressional reports, and reports or

records issued by other executive branch agencies, likewise do not constitute official

acknowledgments by the CIA.  *See, e.g., Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) ("[W]e

do not deem 'official' a disclosure made by someone other than the agency from which the

information is being sought."); *Fitzgibbon*, 911 F.2d at 766; *Salisbury v. United States*, 690 F.2d

966, 971 (D.C. Cir.1982); *Wilson v. McConnell*, 501 F. Supp. 2d 545, 555-60 (S.D.N.Y. 2007);

*Earth Pledge Foundation*, 988 F. Supp. 623, 627-28 (S.D.N.Y.1996), *aff'd*, 128 F.3d 788 (2d

Cir.1997). Accordingly, the Court should not "declare" that the "listed information" propounded by

the plaintiffs "constitutes official acknowledgments."  *See* Pl. Br. at 29.[10]

    In any event, it is far from clear what plaintiffs seek to accomplish with this pointless

exercise.  In performing its classification review, the CIA was clearly aware of public statements

made by the President of the United States or the Director of the CIA regarding the CIA's Terrorist

Detention and Interrogation Program, as evidenced by references to such information in the DiMaio

---

[9]  For example, plaintiffs assert that "the U.S. government has confirmed by name at least
nineteen individuals secretly detained by the CIA."  Declaration of Margaret L. Satterthwaite,
dated June 25, 2008 ("Satterthwaite Decl.") at ¶ 11.  Yet, as the DiMaio Declaration makes clear,
the United States has officially acknowledged only that sixteen individuals have been detained
by the CIA.  First DiMaio Decl. at ¶ 113.

[10]  Although the Government does not believe there is any necessity for the Court to make
rulings in this case as to what information has been "officially acknowledged" by the CIA, the
CIA does not dispute that, to the extent that the documents listed in the Second DiMaio
Declaration contain disclosures of previously classified information by CIA or senior White
House officials, such statements constitute official acknowledgments of that information.  *See*
Second DiMaio Decl. at ¶ 22.

Declaration.  *See* First DiMaio Decl. at ¶¶ 34, 113-14, 117.  Indeed, although plaintiffs fail to acknowledge as much in either their declarations or their brief, several of the documents that plaintiffs cite as the sources of "officially acknowledged information" were, in fact, released by the CIA to the plaintiffs in this very litigation.  *See* Satterthwaite Decl. at Exs. HH, II, JJ.

In light of this background, it is unsurprising that plaintiffs are unable to point to any evidence that the CIA has withheld reasonably segregable and officially acknowledged information from the responsive records.  *See Wolf*, 473 F.3d at 378 ("[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain *that appears to duplicate that being withheld*." (citation omitted) (emphasis added)).  Indeed, plaintiffs have not even suggested a basis for concluding that the cited information is contained in the responsive records.[11]  As plaintiffs have offered no evidence that officially acknowledged information has been withheld from the subject records, there is no basis for requiring the CIA to reprocess almost 10,000 records.  Moreover, to avoid any confusion on this issue, the CIA avers that it released all reasonably segregable and officially acknowledged information from the responsive records, to the extent such information was officially acknowledged at the time the CIA performed its classification review.  *See* Second DiMaio Decl. at ¶ 23.

* * *

Thus, for all of these reasons, the CIA properly withheld information under Exemptions 1

---

[11]  For example, plaintiffs request that the Court order the CIA to reprocess approximately 10,000 documents, all of which were gathered in 2007, to determine if they contain segregable information regarding events that occurred in 2008.  *See* Satterthwaite Decl. at ¶ 55(b); Pl. Br. at 29 (identifying the existence of DOJ's "criminal investigation into the destruction of videotapes [of interrogations] by the CIA," which was commenced in January 2008); Satterthwaite Decl. at ¶ 42(b); Pl. Br. at 29 (identifying statement in a Department of Justice Office of the Inspector General report, dated May 2008).

and 3.

## II.   THE CIA PROPERLY WITHHELD RECORDS PURSUANT TO FOIA EXEMPTION 5

Plaintiffs raise no substantive challenge to the Government's invocation of the deliberative process privilege, the attorney-client privilege, or the work product privilege. *See* Pl. Br. at 13-19. Rather, with respect to these privileges, plaintiffs confine their challenge to the adequacy of the Government's descriptions of these documents in its *Vaughn* index and supporting declarations. *See id.* In making this argument, plaintiffs appear to disregard entirely the numerous supporting declarations that were submitted in support of the CIA's motion for summary judgment. These documents, together with the CIA's *Vaughn* index, provide the Court with the relevant information regarding the contents of the documents themselves and the context in which they were prepared.

Plaintiffs further claim that the CIA improperly invoked the presidential communication privilege with respect to eight of the nineteen documents to which this privilege was applied, apparently conceding that the remaining documents withheld under this privilege are properly exempt from disclosure.[12]  Finally, plaintiffs contend that the CIA improperly withheld witness statements to OIG investigators. *See* Pl. Br. at 38.  All of these arguments are contrary to precedent and without merit.

---

[12]  Plaintiffs do not raise any challenges to Office of the Director of National Intelligence's invocation of the presidential communications privilege to withhold Documents 3, 4, 103-104, 107-111, 130 or 243. *Compare* CIA Br. at 31; Hackett Decl. ¶ 24, *with* Pl. Br. at 36 (limiting challenge to "[t]he CIA's assertion that the presidential communications privilege protects eight of the withheld documents").

A.    **The CIA's** *Vaughn* **Index and Supporting Declarations Provide Sufficient Information to Affirm the CIA's Exemption 5 Withholdings**

1.    **The Deliberative Process Privilege**

Plaintiffs contend that, in support of its assertion of the deliberative process privilege, the CIA "does little more than recite the statutory language without providing details about the nature or topic of the decision" under consideration in the records.  Pl. Br. at 15.  It is unsurprising, given the classified nature of the documents at issue, that the Government is unable to provide extensive details regarding the specific nature of the policy issues under consideration on the public record. Moreover, such information is unnecessary where, as here, the Government provides sufficiently particularized information to satisfy its burden of establishing that the documents are both predecisional and deliberative in nature.[13]  Nevertheless, to the extent that the Court finds that additional information would confirm that the withheld records fall within the scope of the deliberative process privilege, the CIA's *ex parte*, classified declaration provides additional details regarding the deliberative nature of the records at issue.

---

[13]  As the court observed in *Greenberg v. U.S. Dep't of the Treasury*,

> The agency need not pinpoint a particular final decision to which the material contributed. The Court is aware of the fact that the CIA is very vague when it discusses the decisions at issue – the *Vaughn* index usually just says that the materials were used "in arriving at a decision." Normally, the Court would request more specific information about the particular decision.  It is clear in this case, however, that the CIA is concerned that any further information about the decisions would threaten national security.  Agency affidavits are entitled to "substantial weight" in national security cases when they aver that identified documents are exempt.  Thus, the Court will not require a more specific explanation of the decision to which the document contributed.

10 F. Supp. 2d 3, 16 n.18 (D.D.C. 1998) (citations omitted); *id.* (description of record as "contain[ing] a series of questions and issues which were to be addressed by Agency policy makers in arriving at a decision" sufficient to establish deliberative process privilege applied).

For example, the Government's indices and declarations identify ten documents as "letters written by CIA attorneys to their legal advisors at [Department of Justice's Office of Legal Counsel] soliciting legal advice, analysis and opinions regarding the use of an alternative set of interrogation procedures with respect to detainees."  First DiMaio Decl. at ¶ 138.  The Government further describes with particularity thirteen draft opinions and eight final opinions prepared by the Department of Justice's Office of Legal Counsel ("OLC") "in the course of providing legal advice to the CIA regarding the detention and interrogation of certain high value al Qaeda terrorists." Declaration of Paul P. Colborn, dated April 21, 2008 ("Colborn Decl.") at ¶ 4; *see also id.* at ¶ 11 (records "reflect the Office's confidential legal advice to the CIA regarding the development of interrogation and detention policies for al Qaeda terrorists"); First DiMaio Decl. at ¶ 138.  Finally, the Government specifies that Document 82 is "a letter from the Legal Adviser of the Department of State to the acting head of the [OLC] . . . provid[ing] Department of State comments with respect to a draft, pre-decisional legal opinion prepared by [OLC] for the CIA relating to the CIA's Terrorist Detention and Interrogation Program."  Declaration of Margaret P. Grafeld, dated April 18, 2008 ("Grafeld Decl.") at ¶¶ 19-20.

As both the DiMaio and the Colborn Declaration make clear, OLC's legal advice played an integral role in the CIA's deliberative process.  The OLC "is authorized to render advice and opinions on legal questions, especially those of particular complexity and importance, presented to OLC by clients throughout the Executive Branch, including the CIA."  Colborn Decl. at ¶ 2.  In this capacity, the OLC serves a "purely advisory role."  *Id.*  With respect to the specific documents at issue here, the Government explained OLC's role:

> Although OLC's legal advice and analysis may inform decisionmaking, the legal advice is not itself dispositive as to any policy adopted by the Executive Branch,

> including the CIA. OLC itself does not purport, and in fact lacks authority, to make
> any policy decisions. OLC's role is to provide advice and analysis as to, *inter alia*,
> the legal implications of particular policy decisions, not to mandate that an agency
> adopt any particular policy. Here, the signed documents are pre-decisional because,
> like the unsigned drafts, they were prepared to assist the CIA in arriving at decisions
> regarding the treatment and detention of high value al Qaeda terrorists.

Colborn Decl. at ¶ 13; *see also* First DiMaio Decl. at ¶ 145 (requests to OLC for legal advice are

"solicited, received [and] generated as part of the process by which policy is formulated").

These detailed descriptions of the withheld records, and the purpose for which they were

prepared, are a far cry from a "conclusory" recitation of statutory language. Rather, the

Government's declarations clearly establish that these documents were "prepared to assist [agency]

decisionmaking on a specific issue." *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002). Accordingly,

such documents are not "merely peripheral to actual policy formation" but instead "bear on the

formulation or exercise of policy-oriented judgment." *Id.* at 80; *see also Grand Centr. P'ship, Inc.

v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (document is protected if it is "related to the process

by which policies are formulated").

Plaintiffs offer no substantive challenge to the Government's assertion of the deliberative

process privilege with respect to these documents. Nor can they. It is well-established that "legal

advice, given . . . prior to any agency decision on the issues involved, fits exactly within the

deliberative process rationale for Exemption 5." *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C.

Cir. 1980); *see also* CIA Br. at 25 (citing cases). Indeed, numerous courts have concluded that OLC

memoranda specifically are protected by the deliberative process privilege. *Citizens for

Responsibility and Ethics in Washington v. Office of Admin.*, 249 F.R.D. 1 (D.D.C. 2008); *Nat'l

Council of La Raza v. DOJ*, 339 F. Supp. 2d 572, 582 (S.D.N.Y. 2004); *Southam News v. INS*, 674

F. Supp. 881, 886 (D.D.C. 1987); *cf. Morrison v. DOJ*, Civ. A. No. 87-3394, 1988 WL 47662

-27-

(D.D.C. Apr. 29, 1988) (concluding that Government had not waived deliberative process privilege with respect to OLC memoranda).

Plaintiffs similarly do not mount any substantive challenge to the withholding of the 32 documents identified as drafts, or comments on drafts.  *See* CIA Br. at 25 (identifying documents). Nor do they offer any explanation as to what additional information would be required to establish that such drafts, which "by their very nature, are typically predecisional and deliberative," qualify for protection under the privilege.  *MacNamara v. City of New York*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008); *see also La Raza*, 339 F. Supp. 2d at 583 ("Drafts and comments on documents are quintessentially predecisional and deliberative."); *Hamilton Sec. Group, Inc. v. HUD*, 106 F. Supp. 2d 23, 31 (D.D.C. 2000) ('[A] draft document is the type of subjective document that reflects the personal opinion of the writer rather than the policy of the agency."); *Cleary, Gottlieb, Steen & Hamilton v. HHS*, 844 F. Supp. 770, 782 (D.D.C. 1993) ("[T]he disclosure of such draft documents would undercut the openness of decision-making embodied by Exemption 5."); *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983) ("Draft documents . . . are typically predecisional and deliberative [because] they 'reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors.'" (citation omitted)); *see also* CIA Br. at 25 (citing additional cases).[14]  Indeed, even factual material

_____

[14]  Even if draft documents were not, by their very nature, protected under the deliberative process privilege, the declarations submitted in support of the CIA's motion for summary judgment are replete with detail that specifies how these particular draft documents formed an integral part of the process by which policy is formulated.  *See, e.g.*, Colborn Decl. at ¶ 12; Declaration of Karen L. Hecker, dated April 21, 2008, at ¶ 3 (describing Document 20 as a "draft seven-page memorandum of agreement between the CIA and DOD" as to "potential procedures to be used going forward" and which contains "italicized text requesting additional information and highlighting the areas that were still under discussion"); Grafeld Decl., at ¶¶ 13-15 (part of document 103 is a draft summary of "Department of State Recommended Changes," which was

contained in a draft document is privileged from disclosure. *See, e.g.*, *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048-49 (D.C. Cir. 1982). In such cases, factual information is protected because it prevents the "disclosure of editorial judgments – for example, decisions to insert or delete material or to change a draft's focus or emphasis" that "would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work" and "place pressure on authors to write drafts that carefully toe the party line." *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987).

Plaintiffs, however, appear to labor under the misapprehension that factual information can never fall within the ambit of the deliberative process privilege. Pl. Br. at 16 n.46. Plaintiffs therefore assert that the Government's declarations do not sufficiently establish whether there is "purely factual" material contained in any of the withheld records that could be segregated and released. Pl. Br. at 14-15 & n.46. Yet courts have repeatedly rejected any such simplistic distinction between "purely factual" information and opinions, recommendations or other deliberative material. As the D.C. Circuit has explained, "the fact/opinion test . . . is not infallible and must not be applied mechanically. This is so because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Accordingly, agencies may "withhold factual material on the ground that its disclosure would expose an agency's policy deliberations to unwarranted scrutiny." *Id.* at 1538; *see also Nat'l Wildlife Fed. v. United States Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988) ("[A] better

---

distributed to select federal agencies in preparation for an National Security Council-chaired Deputies Committee meeting and "raises five legal issues related to detainees for discussion, describes the then-current practices, and proposes a change or changes for each issue"); First DiMaio Decl. at ¶ 155 ("Document 14 was authored by the National Security Advisor and solicits comments on certain suggestions based on written orders signed by the President.").

analytical tool than merely determining whether the material itself was essentially deliberative or factual should be used: we should focus on whether the document in question is part of the *deliberative process*."); *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("Purely factual material *not reflecting the agency's deliberative process* is not protected. . . . But the documents in the instant case are so short – from one to six pages – that stripping them down to their bare-bone facts would render them either nonsensical or perhaps too illuminating of the agency's deliberative process." (emphasis added)).

Thus, in *Mapother*, the D.C. Circuit Court held that the deliberative process privilege extended to the factual sections of a report prepared by DOJ employees detailing the wartime activities of Kurt Waldheim, which provided the basis for the Attorney General's decision that Mr. Waldheim be barred from entering the United States. 3 F.3d at 1535. The D.C. Circuit reasoned that the factual material contained in the report "was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action," and that the release of such information would therefore expose the deliberative process of the agency. *Id.* at 1539; *see also Lead Ind. Assoc. v. OSHA*, 610 F.2d 70, 85 (2d Cir. 1979) ("Disclosing factual segments from the [government] summaries would reveal the deliberative process of summarization itself by demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker . . . ."); *Montrose Chem. Corp. of California v. Train*, 491 F.2d 63, 68 (D.C. Cir. 1974) (factual summary used to assist in decisionmaking falls within ambit of deliberative process privilege, as staff members who compiled the information "were exercising their judgment as to what record evidence would be important to the Administrator in making his decision . . . [and] were making an evaluation of the relative

-30-

significance of the facts").

Applying these standards, the Government's declarations establish that any "purely factual" information that was withheld either was so intertwined with opinion, recommendation, analysis or other deliberative material that it was not reasonably segregable, or that it was of such a nature that the release of such factual material would itself expose the agency's deliberative processes.  The First DiMaio Declaration addresses this point explicitly, averring that

> the particular facts contained in these drafts, working papers, briefing papers, recommendations, requests for advice, and other similar documents were identified, extracted, and highlighted out of other potentially relevant facts and background materials by the authors, in the exercise of their judgment.  Accordingly, the disclosure of the facts that were selected for inclusion in drafts, briefing materials, recommendations, advice or other such documents would themselves tend to reveal the author's and the agency's deliberative process.

First DiMaio Decl. at ¶ 146; *see also* Grafeld Decl. at ¶ 9; Hackett Decl. at ¶ 20.

Finally, plaintiffs, without any substantiation, speculate that the Government may have waived the privilege with respect to the OLC memoranda or other unspecified records by incorporating them into agency policy.  Pl. Br at 15 n.45.  Plaintiffs are presumably referring to the doctrine of adoption, first articulated by the Supreme Court in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975), which abrogates the deliberative process privilege under very limited circumstances:

> [I]f an agency chooses *expressly to adopt or incorporate by reference* an entire intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5.

421 U.S. at 134 (emphasis added); *see also Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005) (same).

Under this doctrine, however, a document does not lose the protection of the deliberative

process privilege unless the decisionmaker adopts its reasoning. *Sears*, 421 U.S. at 161 (explaining that a document may lose deliberative process protection if a decisionmaker "chooses expressly to adopt or incorporate [it] by reference"); *La Raza*, 411 F.3d at 358 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). Thus, "where an agency, having reviewed a subordinate's non-binding recommendation, makes a 'yes or no' determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report." *Id.* at 359. "Courts have similarly honored the deliberative process privilege where an agency has only casually referred to a document, because a casual reference to a privileged document does not necessarily imply that an agency agrees with the reasoning contained in those documents." *Id.*; *see also Tigue*, 312 F.3d at 81 (holding that two minor references to a document protected by the deliberative process privilege were insufficient to establish adoption or incorporation); *Access Reports v. DOJ*, 926 F.2d 1192, 1197 (D.C. Cir. 1991) (one "confused statement" that might have been a reference to the document at issue "fell far short of the *express* adoption required by *Sears*") (emphasis in original). Rather, "there must be evidence that an agency has *actually adopted* or incorporated by reference the document at issue; *mere speculation will not suffice*." *La Raza*, 411 F.3d at 359 (emphasis added).

The CIA made clear that it did not adopt the OLC memoranda. Second DiMaio Decl. at ¶ 18 ("[T]he analysis, advice and reasoning contained in the OLC memoranda have not been adopted by the CIA in any final decision memoranda."). Nor have plaintiffs cited any instances where the CIA explicitly referenced the memoranda listed on the *Vaughn* index, much less adopted their reasoning.

*See* Pl. Br. at 14-15.[15]  Thus, because there is no "evidence that [the CIA] has actually adopted or incorporated by reference the document[s] at issue," the OLC memoranda are protected by the deliberative process privilege.  *La Raza*, 411 F.3d at 359.

### 2.    The Attorney-Client Privilege

Plaintiffs challenge the applicability of the attorney-client privilege to records between the CIA and OLC,[16] and between and among CIA attorneys and other CIA officials,[17] based on erroneous claims that additional information is needed:  (1) to show that the communications were kept confidential, *see* Pl. Br. at 17; (2) to segregate advice from facts, because plaintiffs claim that facts are not privileged, *see* Pl. Br. at 17 n.48; and (3) to segregate "neutral, objective" legal advice from the remainder of attorney-client communications because plaintiffs assert that objective advice is unprotected, *see* Pl. Br. at 17.  Plaintiffs' three arguments are without merit.

---

[15] *See also Casad v. HHS*, 301 F.3d 1247, 1252-53 (10th Cir. 2002) (holding that a report relied upon by agency in determining whether or not to award a grant had not been adopted, as "[t]here is no indication in the record that, in funding the . . . grant, the [agency] expressly adopted the reasoning" of the report); *Afshar v. Dep't of State*, 702 F.2d 1125, 1143 n.22 (D.C. Cir. 1983) (noting that "[i]f the agency merely carried out the recommended decision without explaining its decision in writing, we could not be sure that the memoranda accurately reflected the decisionmaker's thinking").

[16] Although the DiMaio and Colborn declarations asserted attorney-client privilege over them, the CIA's moving brief inadvertantly failed to include documents 1, 8, 9, 10, 11, 12, 13, 19, 25, 30, 65, 68, and 83 in its list of communications between the CIA and OLC covered by the attorney-client privilege.  *Compare* Colborn Decl. at ¶ 4; First DiMaio Decl., Ex. A *with* CIA Br. at 27.

[17] Plaintiffs do not raise any challenges to the invocation of attorney-client privilege by the State Department over information in Documents 103 and 82 or by the Defense Department over information in Documents 20, 103, and 192.  *Compare* CIA Br. at 28; Hecker Decl. at ¶ 14; Grafeld Decl. at ¶¶ 10, 16, 21, *with* Pl. Br. at 16-17 (limiting challenge to "communications between the CIA and [OLC], as well as from or among attorneys at the CIA's Office of General Counsel").

First, additional information is not needed to evaluate whether "information was actually kept confidential," Pl. Br. at 17, because the CIA and OLC have submitted sworn testimony that these communications were not disclosed, *see* First DiMaio Decl. at ¶ 143 ("These documents were prepared . . . with the joint expectation . . . that they would be held in confidence. Moreover, these documents have been held in confidence."); Colburn Decl. at ¶ 6 ("OLC has maintained the confidentiality of all twenty-one documents, as well as the legal advice and analysis contained within them."). Moreover, all of the challenged records are classified and would reveal the CIA's sources and methods; they therefore have been closely held in confidence. *See* First DiMaio Decl. at ¶¶ 41-75 (explaining CIA classification of records); *id.* at ¶¶ 130-35 (explaining that records reveal sources and methods). No additional information is needed for the Court to conclude that these records have been kept confidential.

Second, contrary to plaintiffs' assertion, the CIA need not segregate the facts contained within its attorney-client communications. Pl. Br. at 17 & n.48. The law is clear that the privilege protects such facts. *See, e.g.*, *In re County of Erie*, 473 F.3d at 417 n.4 (noting the "familiar" rule "that a factual communication sent to an attorney is protected by the attorney-client privilege [where] the communication was generated for the purpose of securing legal assistance"). Indeed, both the Supreme Court and the Second Circuit have noted that the attorney-client privilege exists, in large part, to protect facts communicated between clients and their attorneys. *See Upjohn Co. v. United States*, 449 U.S. 383, 394-95 (1981) (holding that factual material provided by employees to an entity's general counsel "must be protected against compelled disclosure"); *In re Grand Jury Investig.*, 399 F.3d 527, 535 (2d Cir. 2005) ("The government attorney requires candid, unvarnished information from those employed by the office he serves so that he may better discharge his duty

to that office.").[18]  In this case, each written communication from counsel was based on, or related

to, client confidences.  *See* First DiMaio Decl. at ¶ 143; Colburn Decl. at ¶ 11.  Accordingly, no

additional justification is needed to withhold the facts in the attorney-client communications at issue.

Third, plaintiffs' reliance on *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863

(D.C. Cir. 1980), for the proposition that the attorney-client privilege "does not apply to purportedly

'neutral, objective analysis'" is misplaced.  Pl. Br. at 16-17.  The D.C. Circuit's "neutral, objective

analysis" exception in that case applied solely to analyses of information of "third parties," not to

"private information concerning the agency." 617 F.2d at 863.[19]  The D.C. Circuit explicitly rejected

plaintiffs' reading in a later case, in which the court noted that "the existence of the attorney-client

privilege [cannot] turn[] on whether the lawyer's advice may be characterized as 'objective.'" *Tax

Analysts*, 117 F.3d at 619.  Likewise, the Second Circuit has explained that the provision of neutral,

objective legal analysis by government attorneys to other officials is exactly what the attorney-client

privilege is meant to facilitate.  *See In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (noting

public officials must "understand and respect constitutional, judicial and statutory limitations; thus,

---

[18]  Relying on *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980), plaintiffs assert that
factual information "obtained from sources outside the agency" is not protected by the attorney-
client privilege.  Pl. Br. at 16.  This is a misreading of *Brinton*, which held only that, with respect
to communications that originate from counsel rather than the client, facts that the attorney
acquired from sources outside the agency and conveyed to his client are not protected.  636 F.2d
at 603-04.  Factual information that an agency conveys to its counsel in confidence, however, is
always protected.

[19]  *See also Tax Analysts v. IRS*, 117 F.3d 607, 619-20 (D.C. Cir. 1997) (holding that, "[t]o the
extent that [IRS] legal conclusions . . . are based upon [facts] obtained from taxpayers, . . . the
attorney-client privilege does not apply," but that records "reveal[ing] confidential information
transmitted by [agency] personnel regarding 'the scope, direction, or emphasis of [agency]
activity . . . are in a different category . . . [and] clearly covered by the attorney-client
privilege"); *Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983); *Brinton* 636 F.2d at
604.

the[y must have] access to candid legal advice"); *In re Grand Jury Investig.*, 399 F.3d at 534 ("[I]t is . . . in the public interest for high state officials to receive and act upon the best possible legal advice" and thus "the traditional rationale for the privilege applies with special force in the government context."). Accordingly, plaintiffs have not established the need for any additional information to support the invocation of attorney-client privilege.

### 3.     The Work Product Privilege

Plaintiffs likewise present two flawed arguments regarding the CIA's invocation of attorney work product. First, relying on the First Circuit's decision in *Church of Scientology International v. DOJ*, 30 F.3d 224 (1st Cir. 1994), plaintiffs contend that the CIA insufficiently described "the pending or anticipated litigation to which the documents pertain." Pl. Br. at 18. *Church of Scientology*, however, is inapposite. There, the *Vaughn* declaration merely stated that the records "created in contemplation of litigation" related to "other third party individuals' civil and criminal cases." *Church of Scientology Int'l*, 30 F.3d at 236. That declaration was thus completely open-ended in its reference to types of litigation and provided no basis to evaluate the reasonableness of the belief that the matters discussed would become subject to litigation.

Here, by contrast, the First DiMaio Declaration explains that the protected records concern "the use of an alternative set of interrogation procedures with respect to detainees," First DiMaio Decl. at ¶ 138, and "the legal implications of certain operational aspects of the Program," *id.* at ¶ 140. Consistent with plaintiffs' view that these two subjects present the most contested "legal issues of our time," *see* Pl. Br. at 1, so too the CIA understood that litigation over these matters would be "virtually inevitable," First DiMaio Decl. at ¶ 139. That is more than a sufficient

expectation of litigation.[20]  In any event, litigation over these issues was not merely inevitable at the time these records were created but, "[a]t the time some of these documents were prepared, criminal, civil and administrative proceedings . . . were already proceeding in a number of forums."  *Id.* at ¶ 141.  The records must thus be afforded work product protection because without it, the CIA would have had to either (a) risk disclosing "its assessment of its strengths and weakness . . . to litigation adversaries[, thus] serious[ly] prejudic[ing its] prospects in the litigation," or (b) "scrimp[] on candor and completeness [with its counsel] to avoid prejudicing its litigation prospects, [thus] subject[ing] itself . . . to ill-informed decisionmaking."  *United States v. Aldman*, 134 F.3d 1194, 1200 (2d Cir. 1998).  This is exactly the Hobson's choice that work product protection exists to prevent.  *Id.*

Plaintiffs' second attack on CIA's assertion of work product is that plaintiffs need more information to determine whether "the communications implicate the crime-fraud exception."  Pl. Br. at 19.  This exception vitiates the attorney-client or work product privilege "only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of [a] crime or fraud."  *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). Moreover, "the crime-fraud exception applies only where there is probable cause to believe that the

---

[20]  *See, e.g.*, *Upjohn Co.*, 449 U.S. at 388, 397 (finding work product protection applied to records compiled in entity's internal investigation into questionable payments, prior to any specific threat of litigation); *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97 Civ. 4978, 2002 WL 31556382, at *6-*7 (S.D.N.Y. Nov. 15, 2002) (holding protection applied as soon as circumstances "undoubtedly impl[ied] the likelihood of litigation"); *In re Grand Jury Proceedings*, No. M-11-89 (LAP), 2001 WL 1167497, at *13 (S.D.N.Y. Oct. 3, 2001) ("A document is prepared in anticipation of litigation if there is the threat of some adversary proceeding").

particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity." *Id.*

Pursuant to the crime-fraud exception, plaintiffs seek "details about the nature of any legal advice" that was offered to the CIA, Pl. Br. at 18 – the very information that is protected under the privilege. Plaintiffs cite no precedent, however, requiring a *Vaughn* declaration to address not only the predicate for work product but also the specific nature of the legal advice provided in order to establish that the crime-fraud exception does not apply. To the contrary, in the Second Circuit, the party invoking work product bears the burden of establishing its general applicability, *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007), but it is the party who seeks to overcome the privilege who must come forward with unprivileged factual evidence establishing "probable cause" for the applicability of the crime-fraud exception. *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994); *see also United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (same); *cf. United States v. Zolin*, 491 U.S. 554, 574-75 (1989) (holding that party seeking *in camera* review of records to establish applicability of crime-fraud exception must come forward with relevant evidence, lawfully obtained, that is not otherwise privileged, sufficient to support a reasonable belief that *in camera* review will yield evidence of the exception's applicability). Plaintiffs have not only failed to come forward with any evidence supporting the applicability of the exception, they have failed even to articulate a theory as to what crimes or frauds may have been committed, or how the privileged material furthered such criminal or fraudulent actions. Accordingly, the CIA's withholdings of work product must stand.

**B.    The CIA Properly Withheld Documents As Exempt From Disclosure Pursuant to Exemption 5**

    **1.    The CIA Properly Withheld Documents that Were Exempt from Disclosure Pursuant to the Presidential Communications Privilege**

Plaintiffs assert that the CIA improperly invoked the presidential communication privilege with respect to eight withheld documents and claim that (1) the CIA's declaration is insufficient as a procedural matter, (2) the law requires CIA to identify "particular presidential decision[s]" linked to the records at issue and (3) the eight documents were not created during the decision-making process and therefore fall outside the scope of the privilege.  Pl. Br. at 36-37.  They are wrong on all counts.[21]

Plaintiffs first assert the CIA cannot invoke the presidential communications privilege because "the CIA is not the holder of the privilege."  Pl. Br. at 37.  Whatever the procedural requirements for invoking the presidential communications privilege in civil discovery, however, in the context of FOIA, "the agency simply makes the determination that a stautory provision [of FOIA] protects the documents from disclosure, and withholds the documents on that ground." *Lardner*, 2005 WL 758267, at *8; s*ee also, e.g., Berman v. CIA*, 378 F. Supp. 2d 1209, 1220-21 (E.D. Cal. 2005), *aff'd on other grounds*, 501 F.3d 1136 (9th Cir. 2007).  In evaluating whether the CIA properly invoked the presidential communications privilege in a FOIA case, therefore, the only question is "whether the records at issue . . . fall within the ambit of the presidential communications

---

[21]  Plaintiffs wisely concede that the privilege applies alike to communications of both the President and his advisors.  Pl. Br. at 36.  As the D.C. Circuit has explained, "few if any of the documents advisers generate in the course of their own preparation for rendering advice to the President . . . will ever enter the Oval Office. . . . Yet . . . [i]f these materials are not protected by the presidential privilege, the President's access to candid and informed advice could well be significantly circumscribed."  *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997); *see also Judicial Watch,* 365 F.3d at 1112.

privilege" not the "*manner* in which the exemption is raised in a particular request." *Lardner*, 2005

WL 758267, at *7 (internal quotations and citation omitted).  Accordingly, courts regularly uphold

agencies' assertions of the presidential communications privilege in FOIA cases on the basis of an

assertion of the privilege by the agencies' FOIA declarants.  *See New York Times v. DOD*, 499 F.

Supp. 2d 501, 516 (S.D.N.Y. 2007); *Loving v. DOD*, 496 F. Supp. 2d 101, 107-09 (D.D.C. 2007);

*Lardner*, 2005 WL 758267, at *10; *Berman* 378 F. Supp. 2d at 1221.[22]

Second, plaintiffs claim that the CIA's declaration is insufficient because it "fail[s] to match

the individual documents to any particular presidential decision."  Pl. Br. at 37.  The presidential

communications privilege, however, affirmatively protects from disclosure the President's final

decisions, not just the deliberations leading up to them.  *See Judicial Watch*, 365 F.3d at 1113-1114.

Thus, to reveal a "particular presidential decision" related to each of the eight records at issue would

require the disclosure of privileged information.  The law does not require such an unworkable

matching.  *See Judicial Watch*, 365 F.3d at 1123 (affirming the withholding of certain pardon

documents pursuant to the presidential communications privilege without linking them to any

particular pardon decision); *Citizens for Responsibility and Ethics in Washington v. DHS* ("*CREW*"),

06 Civ 0173 (RJL), 2008 WL 2872183, at *4, 7 (D.D.C. July 22, 2008) (finding documents

containing communications related to "the President's decisions regarding the Federal response to

---

[22]  In any event, neither of the cases relied upon by plaintiffs, *see* Pl. Br. at 37, actually reaches
the issue of who can invoke the presidential communications privilege. *See Judicial Watch*, 365
F.3d at 1114; *News-Press Div. of Multimedia Holdings Corp. v. DHS*, No.
2:05CV102FTM29DNF, 2005 WL 2921952, at * 8 (M.D. Fla., Nov. 4, 2005).

Hurricane Katrina" properly withheld pursuant to presidential communications privilege, without linking documents to any particular Presidential decisions).[23]

Lastly, plaintiffs argue that the eight documents fall outside the scope of the presidential communications privilege because they are post-decisional, *i.e.*, they describe policy decisions already made and therefore "were not created while the President was 'in the process of shaping policies and making decisions.'" Pl. Br. at 37. Contrary to plaintiffs' suggestion, however, the presidential communications privilege is not limited to communications reflecting pre-decisional deliberations. Rather, the privilege covers "final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745. Likewise, the privilege extends to both presidential communcations themselves and records memorializing or reflecting such communications. *See CREW*, 2008 WL 2872183, at *8 (holding that documents memorializing communications that were solicited and received by the President or his immediate advisers are subject to presidential communications privilege). Accordingly, plaintiffs' contention that these records reflecting decisions already made are outside the scope of the privilege is without merit.

---

[23] The only case plaintiffs cite for their novel proposition, *In re Sealed Case*, *see* Pl. Br. at 37, is inapposite. The language from *In re Sealed Case* quoted by plaintiffs concerns the application of the privilege to "dual hat" presidential advisers, who "exercise substantial independent authority or perform other functions in addition to advising the President." *In re Sealed Case*, 121 F.3d at 752. The court was making clear that the presidential communications privilege applies to the communications of dual hat advisers not when they are acting in accordance with their independent authority but only when those communications "occurred in conjunction with the process of advising the President." *Id.* Nothing in *In re Sealed Case* stands for the proposition that a privileged document must be linked with a particular Presidential decision. To the contrary, the court in *In re Sealed Case* expressly cautions against the disclosure of presidential decisions. *In re Sealed Case*, 121 F.3d at 746.

### 2.     The CIA Properly Withheld OIG Witness Statements Pursuant to Exemptions 5 and 7(D)

Plaintiffs seek to compel the disclosure of confidential statements made to the CIA's Office of the Inspector General ("OIG") in the course of its investigations.  Plaintiffs first contend that confidential witness statements cannot be withheld under Exemptions 5 and 7(D) because the OIG has "ample authority" to compel testimony and the OIG cannot guarantee that the statements will never be disclosed.  *See* Pl. Br. at 38-39.  Yet compelled testimony is not the equivalent of frank and open testimony; and exceptions to confidentiality are not the same as wholesale disclosability.  Plaintiffs simply ignore precedent recognizing these distinctions.

For instance, in *AFGE v. Dep't of the Army*, 441 F. Supp. 1308 (D.D.C. 1977), the court rejected the plaintiffs' request for disclosure of witness statements obtained by the Army Inspector General.  *See id.* at 1309, 1313-14.  There, as here, witnesses could be required to cooperate in the investigation and "promises of confidentiality were not necessary for securing the[ir] testimony."  *Compare id.* at 1313-14 & n.21 *with* First DiMaio Decl. at ¶ 170.  Moreover, there, as here, witnesses could not be given "absolute assurances of confidentiality" because, although applicable agency regulations provided that disclosure would be "kept to the minimum necessary for satisfaction of the legal or public interest requirements," those regulations nevertheless permitted disclosures when necessary.  *Compare id.* at 1314 & n.22 *with* First DiMaio Decl. at ¶ 170.

The *AFGE* court held that the OIG witness statements were privileged under Exemption 5.  *See id.* at 1314.  The court recognized that the ability to compel disclosable testimony is distinct from the ability to obtain the "candid and full testimony" of witnesses in confidence.  *See id.*  The court also explained that limited exceptions to confidentiality differed greatly from the general rule that witness statements were disclosable under FOIA:  "It is doubtful that [a] limited qualification

[on confidentiality would] act[] as a major barrier to candid and full testimony by witnesses . . . [but] common sense dictates that a warning to witnesses that their testimony will be generally disclosable under the FOIA would discourage candor and would severely limit the effectiveness of Inspector General investigations." *Id.*  The court therefore held that confidential witness statements obtained in the course of an inspector general's investigation must be exempt under FOIA.  *See id.*; *see also Ahearn v. U.S. Army Materials & Mechs. Research Ctr.*, 583 F. Supp. 1123, 1124 (D. Mass. 1984) (same).

Plaintiffs nowhere address these arguments, which apply with even greater force to internal investigations at the CIA.  Indeed, in creating an OIG at the CIA that has the authority to compel testimony, *see* Intelligence Authorization Act, Fiscal Year 1990, Pub. L. 101-193, Title VIII, § 801, 103 Stat. 1711, 1711-1715, codified at 50 U.S.C. § 403q, the President of the United States warned that the quality of the OIG's work would "depend[] on the willingness of Agency employees to be candid during confidential interviews," and that "the promise of confidentiality would be cast in doubt" if confidential statements were regularly disclosed.  *See* 2 *Pub. Papers* 1609, 1610 (Nov. 30, 1989); *see also* First DiMaio Decl. at ¶ 134.  Courts have repeatedly noted, moreover, that the need for confidentiality is especially essential in investigations within agencies charged with securing the national defense.  *See, e.g.*, *Machin v. Zuckert*, 316 F.2d 336, 339 (D.C. Cir. 1963); *Rabbitt v. Dep't of the Air Force*, 401 F. Supp. 1206,  1209 (S.D.N.Y. 1974).  Accepting plaintiffs' unsupported arguments to the contrary would undermine the ability of the OIG to do its job, *see* First DiMaio Decl. at ¶134, and abrogate the policy motivating the OIG privilege – "to ensure frank and open discussion and hence efficient governmental operations," *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984).

-43-

Second, Plaintiffs likewise challenge the applicability of Exemption 7(D). Plaintiffs argue that the exemption is inapplicable because, although OIG witness statements are generally kept confidential, they are subject to disclosure in certain circumstances. *See* Pl. Br. at 39. The Supreme Court has rejected this logic, however, explaining that "an exemption so limited that it covered only sources who reasonably could expect total anonymity would be, as a practical matter, no exemption at all." *DOJ v. Landano*, 508 U.S. 165, 174 (1993) ("'confidential' . . . refers to a degree of confidentiality less than total secrecy").

Plaintiffs further claim that Exemption 7(D) is inapplicable because the CIA purportedly has not proven that witnesses were given "an express assurance of confidentiality" from OIG. Pl. Br. at 39. Yet express assurances are not required under Exemption 7(D). *See Landano*, 508 U.S. at 172-74; *see also Halpern*, 181 F.3d at 298-300; *Ferguson v. FBI*, 83 F.3d 41, 42-43 (2d Cir. 1996); *Ortiz v. HHS*, 70 F.3d 729, 733-35 (2d Cir. 1995). Instead, confidentiality may be implied whenever a source "'furnished information with the understanding that the [agency] would not divulge the communication except to the extent the [agency] thought necessary for law enforcement purposes.'" *Ferguson*, 83 F.3d at 42 (quoting *Landano*, 508 U.S. at 172-74). Here, the CIA regulations governing the treatment of OIG witness statements provide that "the substance of th[e] statements" must be kept confidential. *See* First DiMaio Decl. at ¶ 170. This written policy not only establishes that a witness would understand that their statements would be treated confidentiality, but, moreover, the policy itself is an express assurance to OIG witnesses. *See Halpern*, 181 F.3d at 299; *see also Henke v. United States Dep't of Commerce*, 83 F.3d 1445, 1448-49 (D.C. Cir. 1996). Plaintiffs' arguments are thus without merit.

-44-

### III.    THE CIA PROPERLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 7(A)

The CIA properly withheld records relating to pending OIG investigations pursuant to Exemption 7(A).  It cannot be fairly disputed that the records in question all relate to "pending law enforcement proceedings." First DiMaio Decl. at ¶ 162.  The records were therefore compiled for law enforcement purposes.  *See, e.g.*, *Ortiz*, 70 F.3d at 732-33 ("An Inspector General of a federal government agency engages in law enforcement activities within the meaning of FOIA").[24]

Plaintiffs claim, however, that the CIA has failed to demonstrate that the open OIG investigative files were not the product of general agency monitoring or supervision of its employees to ensure compliance with regulations, which plaintiffs contend would not be exempt under Exemption 7(A).  *See* Pl. Br. at 20.  Because the OIG investigations concern "pending law enforcement proceedings," First DiMaio Decl. at ¶ 162, they are not, by definition, part of  some general effort by the agency to monitor the regulatory compliance of its employees.  Nevertheless, to avoid any potential confusion on this issue, the CIA has further attested that the OIG open investigative files at issue here were not "conducted for auditing or employee oversight purposes" but rather "focused upon specific allegations of potentially unlawful activity, for the purpose of determining if there had been a violation of criminal law."   Second DiMaio Decl. at ¶ 12.  Accordingly, all of the open OIG investigative files were compiled for law enforcement purposes within the meaning of Exemption 7.

---

[24]  Plaintiffs, relying on *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982), claim that, in order to invoke Exemption 7, a law enforcement agency must identify particular individuals or incidents as the object of its investigation.  The *Pratt* standard is not followed by the Second Circuit, however.  *See Halpern*, 181 F.3d at 296; *see also Ferguson*, 957 F.2d at 883.

-45-

Plaintiffs similarly err in asserting that the CIA has not demonstrated that disclosure of the open OIG investigative files could reasonably be expected to harm the pending law enforcement proceedings. The CIA has already identified the general categories of documents contained in the open OIG investigative files and explained the various ways in which their public disclosure could harm ongoing enforcement proceedings. *See* CIA Br. at 33-36. Agencies are permitted to make categorical exclusions of files relating to pending law enforcement proceedings where, as here, processing of the records could jeopardize the proceedings. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978); *Local 32B-32J, SEIU, AFL-CIO v. GSA*, No. 97 Civ. 8509(LMM), 1998 WL 726000, at *8-*9 (S.D.N.Y. Oct. 15, 1998). Furthermore, the CIA's description of the categories of the withheld documents and the interference with law enforcement proceedings that could result from their disclosure is sufficient to satisfy Exemption 7(A). *Compare, e.g., Spannaus v. DOJ*, 813 F.2d 1285, 1287 (4th Cir. 1987) (categories such as "interviews with witnesses and subjects; investigative reports furnished to the prosecuting attorneys; contacts with prosecuting attorneys regarding allegations, subsequent progress of the investigations, and prosecutive opinions; and, other sundry items of information" were all adequate); *Cucci v. DEA*, 871 F. Supp. 508, 511-12 (D.D.C. 1994) (holding that broad administrative materials category – including administrative instructions, routine reporting communications and inter-agency correspondence – and broad evidentiary matters category – including witness statements and physical evidence – were adequate) *with* First DiMaio Decl. at ¶ 164 (describing categories of "(1) interview documentation . . .; (2) correspondence of OIG investigators . . .; (3) evidence collected . . .; and (4) draft reports and working papers").

Moreover, plaintiffs' proposed alternative to the CIA's categorical assertion of Exemption 7(A) is untenable. Specifically, plaintiffs contend that the CIA must process the open OIG files on a record-by-record basis. *See* Pl. Br. at 21-22.[25] Plaintiffs reason that the CIA has not shown that "processing open OIG investigation records would compromise confidentiality" because "a small number of the CIA's processors subject to nondisclosure requirements" could process the records. *Id.* at 22. As this Court has previously explained in this very case, however, "[t]he FOIA processing mechanism requires consultation with individuals who have substantive knowledge of the documents at issue before any exemption may be claimed." Oral Opinion of Hon. Loretta A. Preska, dated Aug. 29, 2008 ("Aug. 29 Opinion"), at 50, Declaration of Emily E. Daughtry, dated Sept. 4, 2008, Ex. A. Thus, here, the CIA cannot process a FOIA request without necessarily involving personnel from outside of OIG, including, *inter alia*, counsel from the CIA's Office of General Counsel, Information Management Officers, Information Review Officers and their staffs, subject matter experts from the CIA components with equities in the documents to determine the record's classification status, the creator(s) or recipient(s) of the record in question, or counsel with other federal agencies, if the record contains information originating from or pertaining to that agency. First DiMaio Decl. at ¶ 163; Second DiMaio Decl. at ¶ 14. Yet, revealing the nature, scope, and targets of OIG's ongoing internal investigations to persons outside OIG could reasonably be

---

[25] The parties agreed to "litigate as a threshold matter whether the Open Investigative Files were categorically exempt from disclosure pursuant to FOIA Exemption 7(A)." Stipulation ¶ 5, dated April 21, 2008, First DiMaio Decl. Ex. H. If the Court rejects the CIA's categorical argument, however, the CIA would need to conduct a document-by-document review to process individual records. *Id.* (reserving right to assert exemptions over individual records).

expected to harm the related law enforcement proceedings.  *See* CIA Br. at 34-35.[26]  *Cf.* Aug. 29

Opinion at 51 ("[R]evealing those potentially sensitive details regarding the conduct of the

investigation prematurely could well taint the gathering and processing of the documents by

providing further details concerning how the criminal investigation is being conducted.").  Thus,

given that there is much to be risked and nothing to be gained from processing these records, which

are clearly exempt under 7(A), the CIA should not be required to undertake a document-by-

document review of these records.  Accordingly, the Court should hold that the open OIG

investigative files are protected from disclosure under Exemption 7(A).

## IV.    THE CIA PROPERLY WITHHELD PERSONAL IDENTIFYING INFORMATION PURSUANT TO EXEMPTIONS 6 AND 7(C)

Plaintiffs challenge the CIA's invocation of Exemption 6 and Exemption 7(C) as bases to

redact the names of OIG witnesses, *see* Pl. Br. at 22-24, and the name of a detainee described in

Document 249, *see* Pl. Br. at 39-40.[27]  Their arguments do not withstand scrutiny.

### A.    OIG Witness Names Were Properly Withheld

Plaintiffs challenge the CIA's invocation of Exemption 7(C) to protect the names of

witnesses "interviewed as part of an OIG investigation," on the mistaken and unsupported ground

that the CIA purportedly "failed to provide enough information about [the] government personnel

---

[26]  The case plaintiffs cite to support their contention that the CIA should have individually processed all documents contained in the open OIG investigative files is inapposite because, unlike in this case, the records at issue in that case did not concern internal investigations of agency personnel the confidentiality of which could be jeopardized by FOIA processing.  *See Bevis v. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986), *cited at* Pl. Br. at 21 n. 63.

[27]  Although the CIA briefed the applicability of both exemptions in its moving brief, *see* CIA Br. at 37-39, here, the CIA will only address the applicability of Exemption 7(C) because the records at issue are all law enforcement records under Exemption 7(C), and that exemption is more protective than Exemption 6.  *See* CIA Br. at 38.

and non-identified 'persons' interviewed." Pl. Br. at 23-24.[28] Yet, under controlling precedent, witness names are protected under Exemptions 7(C), and plaintiffs identify no additional information that would be relevant to challenging that conclusion.

The Second Circuit has held, as a general matter, that witnesses' names should be withheld under FOIA because "[t]he strong public interest in encouraging witnesses to participate in future government investigations offsets the weak public interest in learning witness and third party identities." *Perlman*, 312 F.3d at 106; *Massey v. FBI*, 3 F.3d 620, 624-25 (2d Cir. 1993) (holding that records "disclosing the identities of FBI agents, cooperating witnesses and third parties, including cooperating law enforcement officials" "implicated . . . exactly the sort of personal privacy interest that Congress intended Exemption 7(C) to protect" (quotations omitted)); *see also Favish*, 541 U.S. at 166 (concluding there "is special reason" to protect the names of witnesses in law enforcement records). "The public's interest in learning the identity of witnesses . . . is minimal

---

[28] Plaintiffs make two other subsidiary arguments. First, they cite *Perlman v. DOJ*, 312 F.3d 100, 105 (2002), *vacated and remanded,* 541 U.S. 970 (2004), *aff'd*, 380 F.3d 110 (2d Cir. 2004), and *Stern v. FBI*, 737 F.2d 84, 89 (1984), to argue that CIA needs to provide additional information about the nature of OIG's investigations. *See* Pl. Br. at 23. Those cases hold that OIG investigations have a law enforcement purpose whenever the investigation is into "acts that could subject [an] employee to criminal or civil penalties." *Perlman*, 312 F.3d at 105; *Stern*, 737 F.2d at 89. The Second DiMaio Declaration establishes that the OIG investigations were indeed of this sort. *See* Second DiMaio Decl. at ¶ 15.

Second, plaintiffs disingenuously claim "it is not clear whether [the] 'persons'" described in the DiMaio declaration are "corporations and other entities." Pl. Br. at 24 n.67. It is entirely clear, however, that the term "person" refers to a person, not an abstraction. The relevant entries state that the records contain "statements from a person who gave statements to the Office of the Inspector General under an expectation of confidentiality," and refer expressly to the same "person" as a "particular, identifiable individual." *See, e.g.*, First DiMaio Decl., Ex. A, Doc. No. 126.

because that information tells little or nothing either about [the agency] or the Inspector General's conduct of its investigation." *Perlman*, 312 F.3d at 106.

Here, privacy is especially important because identification of these witnesses would link them to the subject matter of the requested documents (*i.e.*, a classified CIA program to capture and detain terrorists, *see* First DiMaio Decl. at ¶ 111), and could subject them to stigmatization or harassment. *See, e.g.*, *ACLU v. FBI*, 429 F. Supp. 2d 179, 192 (D.D.C. 2006); *Electronic Privacy Info. Ctr. v. DHS*, No. 04-1625, 2006 U.S. Dist. LEXIS 94615, at *27 (D.D.C. Dec. 22, 2006); *Kimmel v. DOD*, No. 04-1551, 2006 WL 1126812, at *3 (D.D.C. Mar. 31, 2006). Similar concerns underlie the CIA Act's across-the-board restriction on the release of CIA employee names. *See* 50 U.S.C. § 403g.

Despite the well established protections for witness names, and the heightened need for such protections here, plaintiffs complain that the CIA's failure to provide "critical details about personnel's roles in OIG investigations" precludes the Court from granting the CIA's motion for summary judgment. Pl. Br. at 24 & n.68. Yet plaintiffs do not explain why this additional information would be relevant to the Court's analysis under the well established precedents set forth above. *See* Pl. Br. at 22-24. Accordingly, plaintiffs' challenge to the sufficiency of CIA's justification for withholding OIG witness names is without merit.

**B.    The Detainee Name in Document 249 Was Properly Withheld**

Likewise, plaintiffs' challenge to the redaction of a detainee's name in Document 249 is meritless. *See* Pl. Br. at 39-40. Document 249, which was released in redacted form to the plaintiffs, *see* First DiMaio Decl., Ex. I, is an "Initial Serious Sensitive Incident Report related to an allegation of detainee abuse," created by a member of the United States Army Criminal

Investigation Command ("CID"), that "describes the [detainee's] allegations in general terms and provides the status of the investigation." *See* McGuire Decl. at ¶ 5. Plaintiffs have not met their burden of "establish[ing] a sufficient reason for the disclosure" of the detainee's name by demonstrating (1) "that the public interest sought to be advanced is a significant one," and (2) that "the information [sought] is likely to advance that interest." *Favish*, 541 U.S. at 172.

Exemption 7(C) privacy concerns are present because Document 249 links a particular witness and alleged victim to particular allegations of mistreatment. The Second Circuit and this Court have held that individuals possess privacy interests in the dissemination of their names. CIA Br. at 38 (citing cases); *see also* Order, dated June 19, 2008, at 42, *reported at Amnesty Int'l v. CIA*, No. 07 Civ. 5435 (LAP), 2008 WL 2519908, at *16 (June 19, 2008). Indeed, the privacy interest is substantial. An "invasion of privacy becomes significant when . . . personal information" is linked to a particular name. *Dep't of State v. Ray*, 502 U.S. 164, 176 (1991). Here, Document 249 reflects not only the individual's detention, but also allegations of physical and mental abuse. *See* Document 249, First DiMaio Decl., Ex. I. Privacy interests are heightened because the detainee made these allegations as a witness, *see, e.g.*, *Perlman*, 312 F.3d at 106; *Massey*, 3 F.3d at 624-25, as an alleged victim, *see, e.g.*, *Horowitz v. Peace Corps*, 428 F.3d 271, 280 (D.C. Cir. 2005), and as someone who might be sought out to be interviewed, *see Ray*, 502 U.S. at 177; *Hopkins*, 929 F.2d at 88.

Plaintiffs have failed to carry their burden to establish a sufficient countervailing reason for disclosure of the detainee's name. While the allegations stated by the detainee could directly reveal information regarding the Government's conduct, *see* CIA Br. at 38-39, the underlying allegations of misconduct have already been disclosed in full. *See* First DiMaio Decl., Ex. I. Thus, releasing the detainee's name "would not shed any additional light on the Government's conduct." *Ray*, 502

-51-

U.S. at 178 (holding that "public interest ha[d] been adequately served by disclosure of [an] interview summar[y]," which redacted the interviewee's name); *Dep't of Air Force v. Rose*, 425 U.S. 352, 380-81 (1976) (approving disclosure of case summaries with names redacted, as consistent with balancing required by Exemption 6).[29]  Plaintiffs' challenge to the redaction of the detainee's name in Document 249 is thus without merit.

## V.    THE CIA PROPERLY WITHHELD INTERNAL AGENCY INFORMATION PURSUANT TO EXEMPTION 2

The CIA has invoked Exemption 2 only to withhold "administrative, routing, and handling notations," which primarily appear in the cover sheets and routing slips of substantive documents. First DiMaio Decl. at ¶ 129.  These documents include such items as classification markings and office symbols. *Id.*  The DiMaio Declaration makes clear that such information constitutes "internal, clerical information" that would be of no public interest.  *Id.*; *see also Massey*, 3 F.3d at 622; *Scherer v. Kelley*, 584 F.2d 170, 176 (7th Cir. 1978); *Miller v. DOJ*, __F. Supp. 2d__, 2008 WL 2544659, at *13 (D.D.C. June 24, 2008).  Plaintiffs claim that there is, in fact, a public interest in learning the names of government officials who received information regarding secret detention and rendition.  Pl. Br. at 24 n.69.  However, the CIA did not rely on Exemption 2 to withhold names of

---

[29]  *Associated Press v. DOD*, 410 F. Supp. 2d 147 (S.D.N.Y. 2006), upon which plaintiffs rely, *see* Pl. Br. at 40, is wholly inapposite.  In stark contrast to this case, in *Associated Press*, the plaintiff sought the names of detainees appearing on the record of enemy combatant review tribunals, *i.e.*, "sworn testimony at quasi-judicial hearings that were visibly being recorded by the equivalent of a court report," at which "the press was present."  410 F. Supp. at 149, 156. Moreover, the Court analyzed the withholdings under Exemption 6, which applies a standard that is less protective of privacy than Exemption 7(C).  *Id.* at 150.  By contrast, Document 249 reflects the sensitive information of a detainee's allegation of physical and mental abuse, which was communicated from the detainee to investigators, and which controlling precedent instructs should be redacted under the more protective standard of Exemption 7(C), *see, e.g.*, *Perlman*, 312 F.3d at 106; *Massey*, 3 F.3d at 624-25.

-52-

government officials.[30]  *See* DiMaio Decl. at ¶ 129 & n.14.  Plaintiffs offer no explanation as to how the release of "administrative, routing, and handling notations" – *i.e.*, what the CIA actually withheld under Exemption 2 – would advance the public interest.  Pl. Br. at 24 n.69.

## VI.    THE CIA PROPERLY WITHHELD DOCUMENT 300 UNDER EXEMPTION 3

Grand jury information is protected by Rule 6(e) of the Federal Rules of Criminal Procedure and thus exempt from disclosure under Exemption 3.  *See Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 867-68 (D.C. Cir. 1981).  Rule 6(e) "encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like."  *Id.* at 869-70; *see also In re Grand Jury Subpoena*, 103 F.3d 234, 237-38 (2d Cir. 1996); *United States v. Lartey*, 716 F.2d 955, 964 (2d Cir. 1983).  As Document 300 "would tend to reveal the identity of witnesses that testified before a grand jury, the strategy of the prosecution before that grand jury, and the target of that grand jury," it is therefore exempt from disclosure.  Second DiMaio Decl., Ex. A; *see also Fund for Constitutional Gov't*, 656 F.2d at 869; *Local 32B-32J, SEIU, AFL-CIO*, 1998 WL 726000, at *6; *M.K. v. DOJ*, No. 96 Civ. 1307 (SHS), 1996 WL 509724, at *2 (S.D.N.Y. Sept. 9, 1996).

## VII.    THE CIA CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS

The CIA's searches were "reasonably designed to identify and locate responsive documents," *Garcia v. DOJ, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002), and, in fact, did identify and locate approximately 10,000 responsive documents.  Plaintiffs complain that the

---

[30]  To the extent that any CIA names – other than the names of highest-level CIA officials – appear on CIA cover sheets and routing slips, the CIA has invoked Exemption 3 to withhold these names.  *See* First DiMaio Decl. at ¶¶ 133, 135.

CIA's search was limited to certain components of the CIA, Pl. Br. at 25, yet they have neither articulated which other components they believe the CIA should have searched, nor have they provided any "specific argument or evidence suggesting that solicited but undisclosed information remains in agency files." *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982).

The CIA has amply demonstrated that it searched all files likely to contain responsive records.[31] The First DiMaio Declaration explains that the CIA limited its search to the Director of the CIA Area ("DIR area"), which includes the Office of the General Counsel and the Office of the Inspector General, because it "determined that the CIA components reasonably likely to contain responsive records would be in the DIR Area." First DiMaio Decl. at ¶ 34. The First DiMaio Declaration further explains that CIA did not search the Directorate of Intelligence ("DI") because it determined that "the DI was not reasonably likely to have records responsive to Plaintiffs' FOIA Requests," *id.*, n.6, and that, pursuant to stipulation, as well as to the "operational file exemption" of the CIA Information Act of 1984, 50 U.S.C. § 431, the CIA did not search the operational files of the National Clandestine Service for responsive records. *Id.* at ¶ 32 n.5. Plaintiffs have neither identified any other components they believe should have been searched, nor provided any basis for their belief as to other why components would contain responsive records. *See SafeCard Servs. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991). Accordingly, the First DiMaio Declaration adequately

---

[31] Plaintiffs mistakenly rely on *Friends of Blackwater v. Dep't of Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005), for the proposition that the failure of one CIA component to refer the FOIA requests to another CIA component "is sufficient by itself to render the agency's search inadequate." Pl. Br. at 25. Not only is the proposition set forth in *Friends of Blackwater* grounded in a regulation specific to the Department of Interior, *see* 391 F. Supp. 2d at 121, but plaintiffs have not demonstrated any reason to believe that any other CIA components would have responsive records, nor have they even identified any other components that they believe the CIA should have searched.

demonstrates the reasonableness of the CIA's decisions regarding where to search for responsive records. *See Amnesty Int'l*, 2008 WL 2519908, at *10; *Oglesby v. Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Schrecker v. DOJ*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002); *cf. Weisberg v. DOJ*, 745 F.2d 1476, 1487 (D.C. Cir. 1984) ("The Department's detailed affidavits stating that it has no reason to believe materials will be found in those components withstand [plaintiff's] generalized attack.").

Plaintiffs also criticize the CIA's description of its searches for its "generalized language and sample terms for only a portion of the search." Pl. Br. at 25. But the CIA need not "set forth with meticulous documentation the details of an epic search," as long as it "explain[s] in reasonable detail the scope and method of the search conducted." *Perry*, 684 F.2d at 127. The First DiMaio Declaration easily meets this standard. *See* First DiMaio Decl. at ¶¶ 23-28, 33-35.

Plaintiffs rely solely on *Weisberg v. DOJ* to support their contention that the First DiMaio Declaration does not provide sufficiently detailed descriptions of the CIA's searches. Pl. Br. at 25 n.72. However, as the D.C. Circuit subsequently noted in *Perry*, 684 F.2d at 127, the *Weisberg* court relied upon the fact that "the agency's own assertions supported an inference that specifically identified material, solicited by the requester, might have remained in the agency's possession." *Weisberg*, 627 F.2d at 369. Here, there is no suggestion of the existence of unidentified responsive documents. *See Perry*, 684 F.2d at 127-128 (government affidavits that reasonably described search were sufficient – although they "could have been more detailed" – where no argument or evidence suggests that "solicited but undisclosed information remains in agency files"). To the contrary, the CIA's description of its searches, including the Office of Inspector General's identification of "all its case files that concerned detainees or rendition" and the other DIR Area components' use of broad search terms such as "ghost detainee" and "rendition," coupled with the many thousands of

records returned by those searches, indicates the extensive scope of CIA's search.  First DiMaio

Decl. at ¶ 35.

## VIII.  THE CIA HAS DEMONSTRATED THAT THE DOCUMENTS IT HAS WITHHELD IN FULL CONTAIN NO REASONABLY SEGREGABLE, NONEXEMPT INFORMATION

Plaintiffs erroneously contend that the CIA has failed to demonstrate that it has released all

reasonably segregable non-exempt information.  Pl. Br. at 24-25.  While 5 U.S.C. § 552(b) does

require the agency to disclose "[a]ny reasonably segregable portion of a record . . . after deletion of

the portions which are exempt," the agency may withhold the entire record if it determines that non-

exempt material is so "inextricably intertwined" that disclosure would "leave only essentially

meaningless words and phrases."  *Nuefeld v. IRS*, 646 F.2d 661, 663 (D.C. Cir. 1981); *see also Nat'l

Sec. Archive Fund v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (holding that no reasonable

segregable information exists where "the non-exempt information would produce only incomplete,

fragmented, unintelligible sentences composed of isolated, meaningless words").  The agency may

also withhold small segments of non-exempt material if the non-exempt material is relatively small

and so interspersed with exempt material that separation by the agency and policing by the courts

would impose an inordinate burden.  *See Lead Indus. Ass'n*, 610 F.2d at 86 ("[I]f the proportion of

nonexempt factual material is relatively small and is so interspersed with exempt material that

separation by the agency and policing of this by the courts would impose an inordinate burden, the

material is still protected because, although not exempt, it is not 'reasonably segregable'"); *Mead

Data Central, Inc. v. U. S. Dep't of the Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977) ("a court

may decline to order an agency to commit significant time and resources to the separation of

disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content"). The CIA has more than satisfied these standards.

The CIA has separated out and released all reasonably segregable non-exempt information responsive to plaintiffs' FOIA requests within the approximately 10,000 records processed. Indeed, the CIA has withheld numerous records only in part, and has provided copies of such documents in redacted form. The CIA has explained that the records it withheld in full contained no reasonably segregable non-exempt information. First DiMaio Decl. at ¶ 172. To the extent that there is unclassified and unprivileged information in the records that the CIA withheld in full, the information is not reasonably segregable because it is inextricably intertwined with the classified and privileged material. *Id.* Indeed, the IRO has attested that this information, if disclosed, would be nothing but "incomplete, fragmented, unintelligible sentences and phrases that are devoid of any meaning." *Id.* This is not surprising, given that the vast majority of the records responsive to plaintiffs' FOIA requests contain national security information that has been classified at the highest levels. Indeed, most of the responsive records have been classified in their entirety. The CIA has also provided multiple declarations describing all of the responsive documents at issue and the bases of its withholdings. Given the classified nature of the subject matter, the CIA has provided reasonable descriptions of the withheld materials. The CIA's declarations are entitled to a presumption of good faith, and courts have found such showing to be sufficient. *See, e.g., Doherty v. DOJ*, 775 F.2d 49, 53 (2d Cir. 1985); *Ashton v. Dep't of Veterans Affairs*, 198 F.3d 233 (2d Cir. 1999); *Brown v. FBI*, 658 F.2d 71, 74 (2d Cir.1981); *Elec. Privacy Info Ctr. v. TSA*, No. 03-1846, 2006 WL 626925, at *8 (D.D.C. Mar. 12, 2006). Accordingly, the Court should reject plaintiffs' claim that the CIA has failed to satisfy the segregability requirement.

**CONCLUSION**

For the foregoing reasons, and for the reasons stated in the CIA's moving papers, the Court should deny the plaintiffs' cross-motion for partial summary judgment and should grant the CIA's motion for summary judgment.

Dated:  New York, New York
        September 4, 2008

                                          Respectfully submitted,

                                          MICHAEL J. GARCIA
                                          United States Attorney for the
                                          Southern District of New York
                                          Attorney for the Central Intelligence Agency

                              By:     /s/ Jeannette A. Vargas
                                          JEANNETTE A. VARGAS
                                          PIERRE G. ARMAND
                                          BRIAN M. FELDMAN
                                          Assistant United States Attorneys
                                          EMILY DAUGHTRY
                                          Special Assistant United States Attorney
                                          86 Chambers Street, 3rd floor
                                          New York, N.Y.  10007
                                          Tel.:  (212) 637-2678/2777/1579
                                          Jeannette.Vargas@usdoj.gov

# ADDENDUM (REVISED)

For the Court's convenience, the following is a summary chart of the respective exemptions claimed for each document. Parentheticals indicate where an agency other than the CIA is claiming an exemption.

## Exemption 1

| Documents 1 - 250,  except: | | | | |
|---|---|---|---|---|
| 31 | 88 | 152 | 175 | 249 |
| 42 | 125 | 158 | 240 | |
| 59 | 127 | 174 | 247 | |

## Exemption 2

| | | | | |
|---|---|---|---|---|
| 3 | 55 | 104 | 156 | 211 |
| 8 | 56 | 105 | 157 | 212 |
| 14 | 57 | 106 | 158 | 213 |
| 15 | 58 | 107 | 161 | 214 |
| 18 | 59 | 108 | 163 | 215 |
| 21 | 60 | 109 | 174 | 216 |
| 24 | 67 | 110 | 175 | 217 |
| 26 | 69 | 111 | 196 | 218 |
| 27 | 72 | 112 | 197 | 219 |
| 28 | 75 | 114 | 198 | 220 |
| 29 | 76 | 118 | 199 | 221 |
| 31 | 79 | 119 | 200 | 222 |
| 33 | 80 | 125 | 201 | 223 |
| 41 | 81 | 129 | 202 | 224 |
| 42 | 84 | 130 | 203 | 225 |
| 48 | 85 | 132 | 204 | 232 |
| 49 | 88 | 137 | 205 | 240 |
| 50 | 93 | 141 | 206 | 243 |
| 51 | 99 | 152 | 207 | 247 |
| 52 | 101 | 153 | 208 | 249 (DOD) |
| 53 | 102 | 154 | 209 | |
| 54 | 103 | 155 | 210 | |

## Exemption 3

| Documents 1-250, except: | | | | |
|---|---|---|---|---|
| 174 | 247 | 249 | 250 | |

## Exemption 5 (Attorney-Client Privilege)

| | | | | |
|---|---|---|---|---|
| 1 (CIA, OLC) | 25 (CIA, OLC) | 56 | 81 | 177 |
| 6 (CIA, OLC) | 28 | 65 (CIA, OLC) | 82 (DOS) | 184 |
| 7 (CIA, OLC) | 29 | 66 | 83 (CIA, OLC) | 186 |
| 8 (CIA, OLC) | 30 (CIA, OLC) | 67 | 84 | 191 |
| 9 (CIA, OLC) | 33 | 68 (CIA, OLC) | 86 (CIA, OLC) | 192 (DOD) |
| 10 (CIA, OLC) | 34 | 69 | 87 (CIA, OLC) | 194 |
| 11 (CIA, OLC) | 35 | 70 (CIA, OLC) | 93 | 199 |
| 12 (CIA, OLC) | 41 | 71 | 99 | 220 |
| 13 (CIA, OLC) | 43 | 72 | 102 | |
| 16 (CIA, OLC) | 44 | 75 (CIA, OLC) | 103 (ODNI, DOD, DOS) | |
| 18 | 49 | 76 | 137 | |
| 19 (CIA, OLC) | 51 | 78 (CIA, OLC) | 148 | |
| 20 (DOD) | 53 | 80 | 176 | |

## Exemption 5 (Deliberative Process Privilege)

| | | | | | |
|---|---|---|---|---|---|
| 1 (CIA, OLC) | 37 | 79 (ODNI) | 115 | 151 | 186 |
| 3 (CIA, ODNI) | 40 | 80 | 116 | 152 | 191 |
| 4 (CIA, ODNI) | 41 | 81 | 117 | 154 | 192 (CIA, DOD) |
| 5 | 42 | 82 (DOS) | 120 | 155 | 194 |
| 6 (CIA, OLC) | 43 | 83 (CIA, OLC) | 123 | 157 | 198 |
| 7 (CIA, OLC) | 45 | 84 | 126 | 158 | 200 |
| 8 (CIA, OLC) | 46 | 86 (CIA, OLC) | 127 (CIA, EOUSA) | 159 | 202 |
| 9 (CIA, OLC) | 47 | 87 (CIA, OLC) | 128 | 160 | 204 |
| 10 (CIA, OLC) | 48 | 92 | 129 | 161 | 214 |
| 11 (CIA, OLC) | 50 | 93 | 130 (ODNI) | 162 | 223 |
| 12 (CIA, OLC) | 51 | 96 | 131 | 163 | 225 |
| 13 (CIA, OLC) | 56 | 98 | 132 | 164 | 226 |
| 14 | 61 | 99 | 133 | 165 | 228 |
| 16 (CIA, OLC) | 62 | 100 | 134 | 166 | 229 |
| 17 | 63 | 101 | 135 | 167 | 230 |
| 18 | 65 (CIA, OLC) | 102 | 136 | 168 | 231 |
| 19 (CIA, OLC) | 66 | 103 (ODNI, DOD, DOS) | 137 | 169 | 232 |
| 20 (CIA, DOD) | 67 | 104 (ODNI) | 138 | 170 | 233 |
| 22 | 68 (CIA, OLC) | 105 (ODNI) | 139 | 171 | 235 |
| 23 | 69 | 106 | 140 | 173 | 236 |
| 24 | 70 (CIA, OLC) | 107 (ODNI) | 142 | 176 | 237 |
| 25 (CIA, OLC) | 71 | 108 (ODNI) | 143 | 177 | 238 |
| 30 (CIA, OLC) | 72 | 109 (ODNI) | 144 | 178 | 239 |
| 32 | 73 | 110 (ODNI) | 145 | 179 | 241 |
| 33 | 75 (CIA, OLC) | 111 (ODNI) | 146 | 182 | 242 |
| 34 | 76 | 112 | 148 | 183 | 243   (ODNI) |
| 35 | 77 | 113 | 149 | 184 | 244 |
| 36 | 78 (CIA, OLC) | | 150 | 185 | 248 |

## Exemption 5 (Presidential Communications Privilege)

| 3 (ODNI) | 24 | 100 | 108 (ODNI) | 130 (ODNI) |
|---|---|---|---|---|
| 4 (ODNI) | 29 | 103  (ODNI) | 109 (ODNI) | 152 |
| 14 | 62 | 104 (ODNI) | 110 (ODNI) | 243 (ODNI) |
| 17 | 98 | 107 (ODNI) | 111 (ODNI) | |

## Exemption 5 (OIG-Witness Statements)

| 126 | 138 | 146 | 166 | 173 |
|---|---|---|---|---|
| 131 | 139 | 149 | 167 | 230 |
| 133 | 140 | 150 | 168 | 231 |
| 134 | 143 | 151 | 169 | 242 |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |

## Exemption 5 (Work Product Privilege)

| 1 | 18 | 51 | 72 | 87 |
|---|---|---|---|---|
| 6 | 19 | 53 | 75 | 93 |
| 7 | 25 | 56 | 76 | 99 |
| 8 | 30 | 65 | 78 | 102 |
| 9 | 32 | 66 | 80 | 127 (CIA, EOUSA) |
| 10 | 33 | 67 | 81 | 177 |
| 11 | 34 | 68 | 82 | 186 |
| 12 | 35 | 69 | 83 | 300 |
| 13 | 43 | 70 | 84 | |
| 16 | 49 | 71 | 86 | |

## Exemption 6

| 126 | 139 | 150 | 168 | 192 (DOD) |
|-----|-----|-----|-----|-----------|
| 131 | 140 | 151 | 169 | 195 |
| 133 | 143 | 159 | 170 | 227 |
| 134 | 144 | 164 | 171 | 230 |
| 135 | 145 | 165 | 173 | 249 (DOD) |
| 136 | 146 | 166 | 174 | 250 (DOD) |
| 138 | 149 | 167 | 187 | |

## Exemption 7(a)

| 18 | | | | |
|----|----|----|----|----|

## Exemption 7(c)

| 126 | 138 | 146 | 166 | 173 |
|-----|-----|-----|-----|-----|
| 131 | 139 | 149 | 167 | 227 |
| 133 | 140 | 150 | 168 | 230 |
| 134 | 143 | 151 | 169 | 249 (DOD) |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |

## Exemption 7(d)

| 126 | 138 | 146 | 166 | 173 |
|-----|-----|-----|-----|-----|
| 131 | 139 | 149 | 167 | 230 |
| 133 | 140 | 150 | 168 | 231 |
| 134 | 143 | 151 | 169 | 242 |
| 135 | 144 | 164 | 170 | |
| 136 | 145 | 165 | 171 | |