UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___8/2/10___
```

AMNESTY INTERNATIONAL USA, CENTER   :
FOR CONSTITUTIONAL RIGHTS, INC., &  :
WASHINGTON SQUARE LEGAL             :
SERVICES, INC.,                     :       07 Civ. 5435 (LAP)
                                    :
                  Plaintiffs,       :       OPINION AND ORDER
                                    :
         v.                         :
                                    :
CENTRAL INTELLIGENCE AGENCY,        :
DEPARTMENT OF DEFENSE, DEPARTMENT   :
OF HOMELAND SECURITY, DEPARTMENT    :
OF JUSTICE, DEPARTMENT OF STATE,    :
and THEIR COMPONENTS,               :
                                    :
                  Defendants.       :
                                    :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge:

     Plaintiffs Amnesty International USA ("AI"), the Center for

Constitutional Rights, Inc. ("CCR"), and Washington Square Legal

Services ("WSLS," and together with AI and CCR, "Plaintiffs")

served four requests for records (the "Requests") under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on

Defendant Central Intelligence Agency ("CIA" or "Defendant").[1]

Currently before the Court are the CIA's motion for summary

judgment [dkt. no. 141] and Plaintiffs' cross-motion for partial

summary judgment [dkt. no. 158] which raise the questions of

_____

[1] Plaintiffs served FOIA requests on the other Defendants, but
those requests are not the subject of the current cross-motions.

whether the CIA adequately searched for the requested records

and properly invoked several of the exemptions set forth in the

5 U.S.C. § 552(b).[2]  For the reasons set forth herein, the Court

concludes that the CIA's search for responsive records was

adequate, except for its search for records relating to the

---

[2] The parties have filed the following briefs:  Memorandum of Law
in Support of the Central Intelligence Agency's Motion for
Summary Judgment ("Def. Mem."); Memorandum of Law in Support of
Plaintiffs' Cross-Motion for Partial Summary Judgment and in
Opposition to Motion for Summary Judgment by the Central
Intelligence Agency ("Pl. Mem."); Reply Memorandum of Law in
Further Support of the central Intelligence Agency's Motion for
Summary Judgment and in Opposition to Plaintiffs' Cross-Motion
for Summary Judgment ("Def. Reply"); Reply Memorandum of Law in
Further Support of Plaintiffs' Cross-Motion for Partial Summary
Judgment and in Opposition to Motion for Summary Judgment by the
Central Intelligence Agency ("Pl. Reply").  In addition, the
parties have filed several declarations in support of their
motions, including: Declaration of David J. Barron, dated
September 22, 2009 ("Barron Decl."); Declaration of Margaret P.
Grafeld, dated September 18, 2009 ("Grafeld Decl."); Declaration
of John F. Hackett, dated September 22, 2009 ("Hackett Decl.");
Declaration of Karen L. Hecker, dated September 18, 2009
("Hecker Decl."); Declaration of Mark Herrington, dated
September 22, 2009 ("Herrington Decl."); Declaration of Wendy M.
Hilton, dated September 18, 2009 ("Hilton Decl."); Second
Declaration of Wendy M. Hilton, dated February 26, 2010 ("Second
Hilton Decl."); Declaration of James P. Hogan, dated September
21, 2009 ("Hogan Decl."); Declaration of Philip J. McGuire
("McGuire Decl."); Margaret P. Grafeld, dated September 21, 2009
("Grafeld Decl."); Declaration of Dione Jackson Stearns, dated
September 22, 2009 ("Stearns Decl."); Declaration of Jeannette
A. Vargas, dated September 22, 2009 ("Vargas Decl.");
Supplemental Declaration of Jeannette A. Vargas, dated March 5,
2010 ("Supp. Vargas Decl."); Declaration of William K. Lietzau,
dated March 5, 2010 ("Lietzau Decl."); Declaration of David S.
Brown, dated November 20, 2009 ("Brown Decl."); Supplemental
Declaration of David S. Brown, dated May 7, 2010 ("Supp. Brown
Decl."); Declaration of Margaret L. Satterthwaite, dated
November 20, 2009 ("Satterthwaite Decl.").

CIA's use of the "attention grasp" technique in its interrogations of suspected terrorists.  In addition, the Court finds that the CIA's assertion of the various FOIA Exemptions and its Glomar responses are, for the most part, justified. Accordingly, the CIA's motion and Plaintiff's cross-motion are GRANTED in part and DENIED in part.

I.   BACKGROUND

A.   The Requests

Collectively, Plaintiffs have submitted four FOIA requests to the CIA and other agencies seeking records relating to the detention and treatment of detainees.  The specifics of each request will be discussed in turn.

i.   The CCR FOIA Request

On December 21, 2004, CCR submitted a FOIA request for "records relating to the identity of, transport and location(s) of, authority over, and treatment of all unregistered, CIA, and 'ghost' Detainees interdicted, interrogated, and detained by any agency or department of the United States." (Hilton Decl., Ex. B and Brown Decl., Ex. A ("CCR FOIA Request") at 3.)  The CCR FOIA Request contained seventeen separate record requests which sought:

> 1.   All records that propose, authorize, report on, or describe, or that discuss the legality or appropriateness of holding Unregistered, CIA, and/or "Ghost" Detainees in special CIA or other agency facilities for purposes of interrogation.

2.  All records that discuss the creation, use and/or
    closure of the various centers at which the CIA
    and/or any other agency of the federal government
    has held, and/or continues to hold Unregistered,
    CIA, and/or "Ghost" Detainees.

3.  All records reflecting the use of any private
    companies, other U.S. officials or citizens,
    and/or officials or citizens of any foreign
    governments regarding the interdiction, arrest,
    transfer, detention, questioning, interrogation,
    and/or other treatment of any Unregistered, CIA,
    or "Ghost" Detainee[.]

4.  All records reflecting standards or policies
    governing who may be held as an Unregistered,
    CIA, and/or "Ghost" Detainee and what procedural
    protections or guidelines, if any, are used to
    review the arrest, detention, and treatment of
    these Detainees.

5.  Every location from September 11, 2001 to the
    present at which the CIA or any other
    governmental agency has been or is now holding
    Unregistered, CIA, or "Ghost" Detainees, the
    dates of operation of each such facility, whether
    the facility remains open at this time, the
    purpose of the facility, a complete list of the
    Detainees held at the facility (both past and
    current with indications as to this status), a
    list of techniques used for interrogation at each
    facility, and a list of personnel who have worked
    and those who continue to work at each Center.

6.  All records concerning the treatment of the
    Unregistered Detainees held in any CIA or other
    governmental facility in the world.  Please
    include all records discussing the following
    interrogation methods at such facilities,
    including but not limited to records discussing
    their legality or appropriateness: using "stress
    and duress" techniques on Detainees; using force
    against them; subjecting them to physical injury;
    requiring them to stand or kneel for prolonged
    periods; depriving them of sleep, food or water;
    holding them in awkward and painful positions for

4

prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped, or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; subjecting them to heat or cold; or threatening harm to them or other individuals.

7.   All records setting forth or discussing policies, procedures or guidelines relating to the detention, questioning, interrogation, transfer, and treatment (including, but not limited to the interrogation with use of torture or other cruel, inhuman or degrading treatment or punishment) of the Unregistered, CIA, and/or "Ghost" Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed above.

8.   All records relating to measures taken, or policies, procedures or guidelines put in place, to ensure that CIA Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment. Please include all records indicating how any such policies, procedures or guidelines were, are, or will be, communicated to personnel involved in the interrogation or detention of CIA Detainees.

9.   All records indicating or discussing actual or possible violations of, or derivations from, the policies, procedures or guidelines referred to in Paragraph 4, above.

10.  All records indicating or discussing serious injuries, illnesses, and/or deaths of any Unregistered, CIA, and/or "Ghost" Detainees.

11.   All records, including autopsy reports and death
      certificates, relating to the deaths of any
      Unregistered, CIA, and/or "Ghost" Detainees.

12.   All records relating to investigations,
      inquiries, or disciplinary proceedings initiated
      in relation to actual or possible violations of,
      or derivations from, the policies, procedures or
      guidelines referred to in Paragraph 4, above,
      including but not limited to records indicating
      the existence of such investigations, inquiries
      or disciplinary proceedings.

13.   All records relating to the actual or alleged
      torture or other cruel, inhuman or degrading
      treatment or punishment of any Unregistered, CIA,
      and/or "Ghost" Detainee.

14.   All records relating to policies, procedures or
      guidelines governing the role of health personnel
      in the interrogation of the Unregistered, CIA,
      and/or "Ghost" Detainees, including but not
      limited to the role of health personnel in the
      medical, psychiatric, or psychological assessment
      of Detainees immediately before, during or
      immediately after interrogation.  Please include
      all records indicating how any such policies,
      procedures or guidelines were, are or will be
      communicated to personnel involved in the
      interrogation or detention of Detainees.

15.   All records relating to medical, psychiatric or
      psychological assessment of any Unregistered,
      CIA, and/or "Ghost" Detainee or guidance given to
      interrogators by health personnel immediately
      before, during or immediately after the
      interrogation of any Unregistered, CIA, and/or
      "Ghost" Detainees.

16.   All records indicating whether and to what extent
      the International Committee for the Red Cross
      ("ICRC") had, has or will have access to
      Unregistered, CIA, and/or "Ghost" Detainees,
      including but not limited to records related to
      particular decisions to grant or deny the ICRC
      access to any Detainee or group of Detainees.

17.  All records indicating whether and to what extent
     any other non-governmental organization or
     foreign government had, has or will have access
     to the Unregistered, CIA, and/or "Ghost"
     Detainees, including but not limited to records
     related to particular decisions to grant or deny
     them access to any Detainee or group of
     Detainees.

(Id. at 4-6.)

     ii.  The AI Requests

On April 25, 2006, AI, together with the WSLS, submitted

two separate FOIA requests to the CIA. (See Hilton Decl. Ex. F

and Brown Decl., Ex. B ("First AI FOIA Request"); Hilton Decl.,

Ex. G and Brown Decl., Ex. C ("Second AI FOIA Request").)   The

First AI FOIA Request, entitled "Request . . . Concerning

Detainees, including 'Ghost Detainees/Prisoners,' 'Unregistered

Detainees/Prisoners,' and 'CIA Detainees/Prisoners[,]'" sought

"any records reflecting, discussing or referring to the policy

and/or practice concerning:"

     1.  The apprehension, transfer, detention, and
         interrogation of persons within the Scope of
         Request, including but not limited to:

         (a)  The transfer of intelligence by one or
              more U.S. agencies or government
              officials to one or more foreign
              agencies or officials, in connection
              with the apprehension or detention of a
              person.

         (b)  A request or direction by one or more U.S.
              agencies or government officials to one or
              more foreign agencies or officials regarding
              the apprehension of any person, and any

> related agreement concerning such
> apprehension.

    (c)    The apprehension of a person in a foreign country by, with the involvement of, or in the presence of one or more U.S. officials.

    (d)    The transfer of a person from any country to any other country for the purpose of detention and/or interrogation, at the direction or request or with the knowledge of one or more U.S. agencies or officials.

    (e)    The transfer of a person from one place of detention to another within the same country at the direction or request or with the knowledge of one or more U.S. agencies or officials.

    (f)    The detention of a person in a foreign country at the direction or request of one or more U.S. agencies or officials, including any agreement concerning the detention.

    (g)    One or more U.S. agencies or officials seeking and/or being granted access to a foreign national detained in a foreign country.

    (h)    One or more U.S. agencies or officials being present in a place of detention in a foreign country.  This does not include visits to U.S. citizens by U.S. officials pursuant to the Vienna Convention on Consular Relations.

    (i)    One or more U.S. agencies having control, direction, or administration of a subdivision, portion, or "cell" of a place of detention in a foreign country.

2.    Current and former places of detention where individuals within the Scope of Request have been or are currently held, including but not limited to:

> (a)   Any place of detention in a foreign country
>        being under the control, direction, or
>        administration of one or more U.S. agencies.
>
> (b)   Any place of detention that is not under the
>        control, direction or administration of one
>        or more U.S. agencies, where a detainee is
>        held at the request or instruction of one
>        or more U.S. agencies or officials.
>
> (c)   Any subdivision, portion, or "cell" of a
>        place of detention in a foreign country
>        under the control, direction, or
>        administration of one or more U.S. agencies.
>
> (d)   Any agreement between the U.S. government or
>        one or more U.S. agencies or officials, and
>        a foreign government or one or more foreign
>        agencies or officials, in relation to a
>        place of detention in a foreign country,
>        regardless of whether that place of
>        detention is foreign or U.S.—controlled.

3.   The names and identities of detainees who fall
      within the scope of this request.

(First AI FOIA Request at 1, 4-5.)  The Second AI FOIA Request,

entitled "Request . . . Concerning Ghost Detainee Memoranda,

Department of Defense Detainee Reporting, Reports to Certain

U.N. Committees, and the Draft Convention on Enforced

Disappearance," sought the following records:

1.   Any memorandum of understanding, or other record
      reflecting an agreement or proposed agreement
      between agencies, or between any agency and any
      subdivision or official, concerning the handling
      of ghost or unregistered detainees.  This
      includes but is not limited to:

> (a)   Any record reflecting communications about
>        whether or not to draft any memorandum of
>        understanding or agreement regarding
>        unregistered or ghost detainees.

9

    (b)   Any record reflecting communications about
          the content of any memorandum of
          understanding or agreement regarding
          unregistered or ghost detainees.

2.    Any record reflecting a policy, whether formal or
      informal, about the reception, detention, or
      movement of unregistered or ghost detainees.

3.    Any memorandum of understanding, or other record
      reflecting an agreement between any agencies, or
      between any subdivision or official or any other
      agency, regarding the transfer of detainees from
      the custody of one agency to that of another.

                          * * *

5.    Communications regarding the United States'
      Second Periodic Report to the Committee Against
      Torture, including but not limited to:

    (a)   Communications regarding whether any
          individual, place of detention, or practice
          should be mentioned or discussed in the
          report to the Committee Against Torture.

    (b)   Communications with a foreign government, or
          agency of a foreign government, regarding
          any provision of the Convention Against
          Torture and Other Cruel, Inhuman or
          Degrading Treatment or Punishment relating
          to apprehension, transfer and detention,
          (including Articles 1, 3, 5, 16), or whether
          any individual, place of detention, or
          practice should be mentioned or discussed in
          the report.

    (c)   Proposed language or earlier drafts of the
          report to the Committee Against Torture.

6.    Communications regarding the United States' Third
      Periodic Report to the Human Rights Committee,
      including but not limited to:

    (a)   Communications regarding whether any
          individual, place of detention, or practice

should be mentioned or discussed in the
report to the Human Rights Committee.

(b) Communications with a foreign government, or
agency of a foreign government, regarding
any provision of the International Covenant
on Civil and Political Rights relating to
apprehension, transfer and detention,
(including Articles 6, 7, 9), or whether any
individual, place of detention, or practice
should be mentioned or discussed in the
report.

(c) Proposed language or earlier drafts of the
report to the Human Rights Committee.

7. Any record reflecting communications regarding
the negotiation or drafting of the draft
Convention on the Protection of all Persons from
Enforced Disappearance.

8. Any record reflecting communications with a
foreign government, or an agency or official of a
foreign government, regarding the drafting of the
draft Convention on the Protection of all Persons
from Enforced Disappearance.

(Second AI FOIA Request at 4-7.)

iii. The Specific FOIA Request

On December 28, 2007, Plaintiffs submitted a fourth FOIA

request entitled "Request . . . for Specific Records Concerning

Information on Secret Detention and Rendition." (Hilton Decl.,

Ex. H and Brown Decl., Ex. D ("Specific FOIA Request").)   The

request sought seventeen different categories of records

including:

1. The spring 2004 report by the Office of the
Inspector General (OIG) on the CIA's compliance
with the Convention Against Torture and Other

11

Cruel, Inhuman or Degrading Treatment or Punishment.

2.  The list of "erroneous renditions" compiled by the CIA's OIG.

3.  The fax sent by the CIA to the Royal Canadian Mounted Police Criminal Intelligence Directorate (RCMP CID) in the afternoon or evening of Oct. 3, 2002, asking a number of questions about Maher Arar.

4.  The document sent by the CIA to the RCMP CID, the Canadian Security Intelligence Service (CSIS), and Project A-O Canada on Nov. 5, 2002 in response to requests for information on the whereabouts of Mr. Arar.

5.  The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of a slap on detainee Abu Zubaydah (Zein al Abideen Mohamed Hussein).

6.  The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of a slap on detainee Khalid Sheikh Mohammed.

7.  The cables between the Deputy Director of Operations (or other agency official(s)) at the CIA and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Abu Zubaydah.

8.  The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) and the operative(s) in the field discussing and/or approving the use of an 'attention shake' on Khalid Sheikh Mohammed.

9.  The cables between the Deputy Director of Operations at the CIA (or other agency official(s)) to the operative(s) in the field discussing and/or approving the use of sleep deprivation on Abu Zubaydah.

10.   The cables between the Deputy Director of
      Operations at the CIA (or other agency
      official(s)) and the operative(s) in the field
      discussing and/or approving the use of sleep
      deprivation on Khalid Sheikh Mohammed.

11.   The cables between the Deputy Director of
      Operations at the CIA (or other agency
      official(s)) and the operative(s) in the field
      discussing and/or approving the use of
      waterboarding on Abu Zubaydah.

12.   The cables between the Deputy Director of
      Operations at the CIA (or other agency
      official(s)) and the operative(s) in the field
      discussing and/or approving the use of
      waterboarding on Khalid Sheikh Mohammed.

13.   Video tapes, audio tapes, and transcripts of
      materials related to interrogations of detainees
      that were acknowledged to exist during the case
      of United States v. Zacharias Moussaoui and
      described in a letter from United States Attorney
      Chuck Rosenberg to Chief Judge Karen Williams,
      United States Court of Appeals for the Fourth
      Circuit, and Judge Leonie Brinkema, United States
      District Court, Eastern District of Virginia,
      dated October 25, 2007, including, but not
      limited to two video tapes and one audio tape of
      interrogations of detainees, the transcripts of
      those tapes submitted for the court's review in
      the Moussaoui case, and the intelligence cables
      summarizing the substance of those tapes.

14.   The Sept. 13, 2007 notification (described in a
      letter from Chuck Rosenberg to Judges Williams
      and Brinkema, dated October 25, 2007) from the
      attorney for the CIA informing the United States
      Attorney for the Eastern District of Virginia
      that the CIA had obtained a video tape of an
      interrogation of one or more detainees.

15.   The communications between the CIA and the U.S.
      Embassy in Sana'a, Yemen, relating to the
      apprehension, transfer and/or detention of
      Mohamed Farag Ahmad Bashmilah (Muhammad

13

Bashmilah).  These communications likely occurred
on or around March 5, 2005, and were preparatory
to a communication between the U.S. Embassy in
Sana'a and the Government of Yemen that has been
acknowledged by the Government of Yemen.

16.   The communications between the U.S. Government
and the Government of Yemen, and/or any documents
pertaining to the transfer of Mohamed Farag Ahmad
Bashmilah from U.S. custody to the custody of the
Government of Yemen on or near May 5, 2005.  The
Government of Yemen has acknowledged the
existence of communications between the U.S.
Government and the Government of Yemen concerning
Mr. Bashmilah's transfer.

17.   A copy of the files relating to Salah Nasser
Salim Ali and Mohamed Farag Ahmad Bashmilah
provided to the Government of Yemen on Nov. 10,
2005 by the United States Government.  The
Government of Yemen has acknowledged the
existence of these files.

(Id. at 2-5.)[3]

B.   Procedural Background

On April 28, 2008, the CIA filed a motion for summary

judgment with respect to the CCR FOIA Request and both the First

and Second AI FOIA Request pursuant to the Stipulation and Order

between Plaintiffs and the Central Intelligence Agency Regarding

Procedures for Adjudicating Summary Judgment Motions (the "First

Stipulation") [dkt. no. 67].  On November 14, 2008, the CIA

---

[3] In their Memorandum of Law in support of their cross-motion,
Plaintiffs withdrew their Categories 3 and 4 requests without
prejudice and withdrew their Category 1 request for "the
disclosure of the 'spring 2004 report by the [CIA] Office of the
Inspector General ("OIG")' based on the CIA's representation
that the document is being litigated in [a separate action]."
(Pl. Mem. at 3 n.6.)

14

filed a second motion for summary judgment with respect to the
Specific FOIA Request [dkt. no. 116], and Plaintiffs filed a
cross-motion for summary judgment [dkt. no. 124].

On January 22, 2009, President Obama issued an Executive
Order entitled, "Ensuring Lawful Interrogations." Exec. Order
No. 13,491, 74 Fed. Reg. 4893 (Jan. 27, 2009).  The Order
suspended all interrogation techniques other than those found in
the United States Army Field Manual and created a panel composed
of various government officials to study whether the Army Field
Manual provided "an appropriate means of acquiring the
intelligence necessary to protect the Nation, and, if warranted,
to recommend any additional or different guidance for other
departments or agencies." Id.  Following the issuance of
President Obama's Executive Order, on or about April 16, 2009,
the CIA released to Plaintiffs portions of the three memoranda
from the Office of Legal Counsel of the Department of Justice,
which had previously been withheld in full, withdrew both of its
summary judgment motions, and Plaintiffs likewise withdrew their
cross-motions.

On or about September 18, 2009, the parties entered into
the Second Stipulation and Order Between Plaintiffs and the
Central Intelligence Agency Regarding Procedures for
Adjudicating Summary Judgment Motions (the "Second Stipulation")
[dkt. no. 154], which set forth an agreement between the parties

15

that set a schedule according to which the CIA would reprocess,

and describe on a Vaughn index, certain records responsive to

all four FOIA requests.

    C.   CIA's Searches

        i.  CIA's Record Systems

Due to the decentralized nature of the CIA's records

systems, all FOIA requests are first processed by the

Information and Privacy Coordinator, Information Management

Systems ("IMS"), located within the Office of the Chief

Information Officer ("OCIO"). (Hilton Decl. ¶ 24.)   The request

is then analyzed by an IMS information management professional

who determines which CIA components reasonably might be expected

to possess responsive records and transmits the records to the

corresponding component. (Id. ¶ 25.)   The various CIA components

are contained within one of five directorates or office

clusters: the National Clandestine Service (NCS), which is

responsible for the clandestine collection of foreign

intelligence from human sources and maintaining records of

information on persons who are of foreign intelligence or

counterintelligence interest to CIA and other U.S. Government

agencies; the Directorate of Intelligence ("DI"), which

analyzes, interprets, and forecasts foreign intelligence issues

and world events of importance to the United States, is

responsible for the production of finished intelligence reports

for dissemination to policymakers in the U.S. Government; the
Directorate of Science and Technology ("DS&T"), which is
responsible for creating and applying technology to fulfill
intelligence requirements; the Directorate of Support ("DS"),
which provides the CIA with mission-critical services, including
the protection of CIA personnel, security matters generally,
facilities, communications, logistics, training, financial
management, medical services, and human resources and maintains
records on all current and former CIA employees as well as other
individuals for whom security processing or evaluation has been
required; and the Director of CIA Area ("DIR Area"), which is a
cluster of offices directly responsible to the Director of CIA
and is distinct from the other directorates. (Id. ¶¶ 26-31.)  In
each directorate, appropriately trained personnel regularly
conduct FOIA and Privacy Act searches. (Id.)

       ii.  The CIA's Initial Search for Responsive Records

     Pursuant to the First Stipulation, the parties agreed that
the "withholding of records that have been or currently are
being litigated in American Civil Liberties Union v. Dep't of
Def., No. 04 Civ. 4151(AKH)" (the "ACLU Action") will not be
litigated in this action. (First Stipulation ¶ 1.)  The parties
also agreed that the search would be limited to non-operational
files. (Id. ¶ 4.)  The CIA's search of non-exempt files for
documents responsive to the CCR FOIA Request and the First and

17

Second AI FOIA Request focused on the CIA directorate determined
by IMS to be the most likely to have records responsive to the
Plaintiffs' request: the DIR Area.[4] (Id. ¶ 36.)

The DIR Area was thought to have responsive documents for
two reasons:  at the time the search was conducted, the
President and the Director of CIA had acknowledged the existence
of the detention program, and the nature of the requests was
such that the responsive records would "likely [] be found in
the cluster of components in the DIR Area, such as the Office of
the General Counsel and the Office of Inspector General
("OIG")." (Id. ¶ 37.)  Professionals in the relevant components
searched their records systems for documents concerning
rendition, including records analyzing the legality of rendition
and records identifying the identities of any persons subject to
detention or rendition. (Id. ¶ 38.)  If a determination could
not be made as to the responsiveness of a document, it was
deemed responsive. (Id.)

---

[4] Although two responsive records were found in the DI (see
Hilton Decl. ¶ 54), the IMS information management professionals
determined that the DI's records systems would not be likely to
contain responsive documents because the systems primarily
contain finished intelligence reports and intelligence for
analysis. (Id. ¶ 55.)  The records maintained at the DI do not
generally contain documents concerning specific covert
operations or link specific analyses to specific intelligence
sources; thus, the DI was not likely to possess responsive
records. (Id.)

The CIA's initial search located more than 7000 responsive records ("Responsive Records"). (Id. ¶ 40.)  Of the Responsive Records, approximately 230 were located in the Office of General Counsel ("OGC"), approximately 89 were located in DIR Area components other than the OGC and OIG, and the remaining Responsive Records were found in the investigation files of the OIG (the "OIG Investigation Files"). (Id.)  OIG Records pertaining to investigations that were open as of the date Plaintiffs filed their Complaint, June 7, 2007, but that had been closed by December 1, 2007 ("Additional OIG Records") were processed separately from the Responsive Records. (First Stipulation ¶ 4; Hilton Decl. ¶ 41.)  In addition to the Responsive Records, the CIA identified more than 2100 responsive Additional OIG Records. (Hilton Decl. ¶ 41.)

### iii. The CIA's Search Pursuant to Plaintiffs' Specific FOIA Request

The CIA conducted searches for records responsive to categories 1, 2, 7, 8, and 11 through 14 of the Specific FOIA Request. (Id. ¶ 42.)  The search for responsive records in each category will be discussed in turn.

#### a.   Category One

Based on Plaintiffs' request, Hilton determined that the record requested refers to the OIG's Special Review regarding counterterrorism detention and interrogation activities, dated

19

May 7, 2004 (the "Special Review"). (Id. ¶ 43.)  The search did
not locate any other OIG report responsive to this category.
(Id.)  According to Hilton, because the Special Review was being
litigated in the ACLU Action, she understood it to be outside
the scope of this litigation and referred Plaintiffs to the
version of the document that was released pursuant to rulings in
the ACLU Action. (Id. ¶ 44.)

    b. Category Two

  The CIA determined that any records responsive to
Plaintiffs' request would be found in the files of the OIG
Investigations Staff. (Id. ¶ 45.)  The CIA officials responsible
for this search consulted with the Deputy Assistant Inspector
General for Investigations within the OIG ("OIG Deputy
Assistant"). (Id. ¶ 46.)  The OIG Deputy Assistant was serving
in the OIG in May 2004 when the OIG issued the Special Review,
so she was "intimately familiar with OIG investigations
regarding CIA counterterrorism detention and interrogation
activities, including renditions." (Id.)  Also, because the OIG
Deputy Assistant was involved in the search of OIG files and the
review of documents in closed OIG investigations in connection
with this case, she, too, was "intimately familiar with the
documents in OIG files relating to CIA detainees." (Id.)  In
response to the search request for Category Two records, the OIG

Deputy Assistant stated that no such documents exist. (Id.
¶ 48.)

### c.    Categories Seven and Eight

In response to these requests, CIA officials consulted with
the relevant NCS officials regarding the existence of such
cables, and they stated that the "attention shake" was not an
interrogation technique used by the CIA; thus, no responsive
documents exist. (Id. ¶ 49.)

### d.    Categories Eleven and Twelve

CIA officers searched within a word-searchable database of
cables concerning Abu Zubaydah and Khalid Sheikh Mohammed during
their detentions and interrogations. (Id. ¶¶ 50-51.)   In
searching the database, the CIA officers used search terms
including "waterboard," "water," and other variations of
"waterboard." (Id.)   For Zubaydah, the search produced two
responsive classified intelligence documents that are not part
of the ACLU Action, and the officials determined that it was not
likely that other responsive documents existed. (Id. ¶ 50)   For
Sheikh Mohammed, the search produced forty-nine classified
intelligence cables, and officials determined that it was not
likely that any other files would contain additional responsive
records. (Id. ¶ 51.)

### e.   Category Thirteen

CIA officers consulted NCS officers, who would be the most likely to identify and to locate responsive records, to search for potentially responsive records. (Id. ¶ 52.)   The NCS officers determined that three transcripts, two video recordings, and one audio recording were the only responsive records that existed. (Id.)

### f.   Category Fourteen

To search for this record, CIA officers consulted with the attorneys in the CIA Office of General Counsel who were familiar with the CIA's involvement in the case of United States v. Zacharias Moussaoui. (Id. ¶ 53.)   The attorneys stated that no such written notification had been made but instead was made telephonically. (Id.)

### iv.   The Processing of Responsive Records

Information Review Officers ("IROs") reviewed the records described in the Vaughn index attached to the Hilton Declaration (see Hilton Decl., Ex. A) to determine which FOIA exemptions applied to the information contained in the records and which non-exempt information could be segregated from the exempt information. (Hilton Decl. ¶ 57.)   If officers determined that non-exempt portions could not be segregated from the exempt portions, then the documents were withheld in full. (Id.)   This

22

review sometimes required the coordination with or referral to
other CIA components or other agencies. (Id. ¶ 58.)

Once this review was completed, the CIA professionals
conducted a review from a corporate perspective on behalf of the
CIA to resolve conflicting recommendations, to ensure that the
release or withholding determinations complied with the law and
published CIA regulations, to identify additional exempt
information that reflected overall CIA interests, and to produce
the integrated final record copy of each document. (Id. ¶ 59.)
Following the first review of the Responsive Records, the CIA
released: (1) in whole or in part 104 records on April 15, 2008;
(2) in part two additional records on June 20, 2008; and (3) one
additional record on September 3, 2008. (Id. ¶ 61.)  In July
2009, the CIA reprocessed the records listed in the Vaughn index
and released in whole or in part an additional twenty-six
records and re-released nine records that were previously
released in part with fewer redactions. (Id. ¶ 62.)

Subsequent to the filing of the Motion for Summary
Judgment, the CIA processed twenty-six records and determined
that fifteen records (Documents 77, 87, 154, 155, 157, 229, 362,
363, 366, 367, 368, 369, 373, 378, 379, and 380) were properly
withheld in full. (Second Hilton Decl. ¶ 6.)  The CIA determined
that eleven of those records (Documents 15, 22, 23, 38, 361,
362, 365, 371, 372, 381, and 382) were releasable in part and

released those records on February 19, 2010. (Id.)  In addition,
on the same day, the CIA released a portion of additional
material within Document 95. (Id.)  On or about March 5, 2010,
the CIA completed processing an additional five records and
determined that all five records (Documents 370, 374, 375, 376,
and 377) were releasable in part and released the records with
appropriate redactions. (Id. ¶ 7.)  Lastly, the Second Hilton
Declaration attaches twenty-five revised Vaughn index entries
that either withdraw (or restrict the scope of) previously
asserted exemptions, and/or provide revised record descriptions.
(Id. ¶ 9.)

       As a result of the CIA's review and processing of the
several thousand Responsive Records, the CIA has released to
Plaintiffs approximately 133 records (the "Released Records")
that are responsive to the CCR FOIA Request and the First and
Second AI FOIA Requests. (Hilton Decl. ¶ 63.)

II.  LEGAL FRAMEWORK

       A.   FOIA Summary Judgment Standard

       A moving party is entitled to summary judgment only "if the
pleadings, depositions, answers to interrogatories, and the
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
[moving party is] entitled to judgment as a matter of law."
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed.

R. Civ. P. 56(c)).  A fact is material if it "might affect the
outcome of the suit under the governing law." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is
genuine if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." Id.; see also Overton
v. New York State Div. of Military and Naval Affairs, 373 F.3d
83, 89 (2d Cir. 2004).

In assessing whether summary judgment is proper, the Court
construes the evidence in the light most favorable to the non-
moving party. Lucente v. IBM Corp., 310 F.3d 243, 253 (2d Cir.
2002).  The moving party bears the initial burden of providing
the basis for the motion and of identifying the evidentiary
materials, if any, supporting their position. See Grady v.
Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997).  The
non-moving party must then "come forward with specific facts
showing that there is a genuine issue for trial." Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986) (quoting Fed. R. Civ. P. 56(e)).  Mere speculation and
conjecture will not suffice. See Niagara Mohawk Power Corp. v.
Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2002).

FOIA affords the public access to virtually any federal
government record that FOIA itself does not specifically exempt
from disclosure. 5 U.S.C. § 552; Vaughn v. Rosen, 484 F.2d 820,
823 (D.C. Cir. 1973).  Here, in reviewing the CIA's response to

25

a FOIA request, the CIA has the burden of justifying

nondisclosure, and the Court must ascertain whether the agency

has sustained its burden of demonstrating that the documents

requested are exempt from disclosure under FOIA and that the

agency has adequately segregated exempt from non-exempt

materials. 5 U.S.C. § 552(a)(4)(B); Al-Fayed v. C.I.A., 254 F.3d

300, 305 (D.C. Cir. 2001).  An agency may meet its burden by

providing the requester with a Vaughn index, adequately

describing each withheld document and explaining the reason for

the withholding. James Madison Project v. C.I.A., 607 F. Supp.

2d 109, 117 (D.D.C. 2009) (citing Summers v. Dep't of Justice,

140 F.3d 1077, 1080 (D.C. Cir. 1998)); see Vaughn, 484 F.2d 820

(fashioning what is now commonly referred to as a "Vaughn

index").

    The court may grant summary judgment to an agency on the

basis of its affidavits if they:

> [(1)] describe the documents and the justifications
> for nondisclosure with reasonably specific detail,
> [(2)] demonstrate that the information withheld
> logically falls within the claimed exemption, and
> [(3)] are not controverted by either contrary evidence
> in the record nor by evidence of agency bad faith.

Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C.

Cir. 1981).

B.   Adequacy of the Search

"In order to prevail on a motion for summary judgment in a
FOIA case, the defending agency has the burden of showing that
its search was adequate and that any withheld documents fall
within an exemption to the FOIA." Carney v. U.S. Dep't of
Justice, 19 F.3d 807, 812 (2d Cir. 1994); see also 5 U.S.C.
§ 552(a)(4)(B).   "Affidavits or declarations supplying facts
indicating that the agency has conducted a thorough search and
giving reasonably detailed explanations why any withheld
documents fall within an exemption are sufficient to sustain the
agency's burden." Carney, 19 F.3d at 812 (footnote omitted).
"Affidavits submitted by an agency are accorded a presumption of
good faith; accordingly, discovery relating to the agency's
search and the exemptions it claims for withholding records
generally is unnecessary if the agency's submissions are
adequate on their face." Id.; see McCready v. Nicholson, 465
F.3d 1, 14 (D.C. Cir. 2006) ("'At the summary judgment stage,
where the agency has the burden to show that it acted in
accordance with the statute, the court may rely on a reasonably
detailed affidavit, setting forth the search terms and the type
of search performed, and averring that all files likely to
contain responsive materials (if such records exist) were
searched.'" quoting Valencia-Lucena v. U.S. Coast Guard, 180
F.3d 321, 326 (D.C. Cir. 1999))). "When this is the case, the

27

district court may 'forgo discovery and award summary judgment
on the basis of affidavits.'" Carney, 19 F.3d at 812 (quoting
Goland v. C.I.A., 607 F.2d 339, 352 (D.C.Cir.1978), cert.
denied, 445 U.S. 927 (1980)).  "[O]nce the agency has satisfied
its burden, the plaintiff must make a showing of bad faith on
the part of the agency sufficient to impugn the agency's
affidavits or declarations or provide some tangible evidence
that an exemption claimed by the agency should not apply or
summary judgment is otherwise inappropriate." Id. (citation
omitted).

        The CIA "must establish the adequacy of its searches by
showing 'that the agency made a good faith effort to search for
the requested documents, using methods reasonably calculated to
produce documents responsive to the FOIA request.'" Adamowicz v.
I.R.S., 672 F. Supp. 2d 454, 461-62 (S.D.N.Y. 2009) (quoting
Garcia v. U.S. Dep't of Justice, 181 F. Supp. 2d 356, 366
(S.D.N.Y. 2002)).  The CIA's search for records does not have to
be perfect, only reasonable, and the "failure to return all
responsive documents is not necessarily inconsistent therewith:
an agency 'is not expected to take extraordinary measures to
find the requested records, but only to conduct a search
reasonably designed to identify and locate responsive
documents.'" Amnesty Int'l USA v. C.I.A, No. 07 Civ. 5435, 2008
WL 2519908, at *9 (S.D.N.Y. 2008) (quoting Garcia, 181 F. Supp.

2d at 368). Accordingly, the issue to be determined is whether "the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant . . . ." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999). Reasonableness must be evaluated in the context of each particular request. See Davis v. U.S. Dep't of Justice, 460 F.3d 92, 103 (D.C. Cir. 2006); Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Although an agency is not required to search every record system, the agency must set forth in an affidavit why a search of other some record systems, but not others, would lead to the discovery of responsive documents. See Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).

i.    Sufficiency of the Hilton Declaration

"[I]n adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits." Founding Church of Scientology of Wash., D.C., Inc. v. N.S.A., 610 F.2d 824, 836 (D.C. Cir. 1979). The Court's reliance is only appropriate when the agency's supporting affidavits are "'relatively detailed' and nonconclusory and . . . submitted in good faith." Goland v. C.I.A., 607 F.2d 339, 352 (D.C. Cir. 1978) (quoting Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973)). "Even if these conditions are met the requester may nonetheless produce

countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." Founding Church of Scientology, 610 F.2d at 836.  Here, the Court finds that the Hilton Declaration is reasonably detailed, nonconclusory and submitted in good faith.  Moreover, even though Ms. Hilton did not actually participate in the search, the declaration sufficiently details the search efforts made by CIA and other governmental personnel. See Adamowicz, 672 F. Supp. 2d at 462 ("[T]here is no need for the agency to supply the affidavits from each individual who participated in the actual search.") (citation omitted).

### ii.   Adequacy of Search: CCR FOIA Request, First and Second AI FOIA Requests

The searches performed in response to the CCR FOIA Request and the First and Second AI FOIA Requests were conducted in the DIR Area.  As set forth in the Hilton Declaration, the search was limited to the DIR Area for two reasons: (1) because the President and the CIA had acknowledged the existence of the CIA detention program, the Director's Area was likely to contain responsive documents, and (2) the nature of the requests was such that responsive records were likely to be found in a cluster of components in the DIR Area. (Hilton Decl. ¶ 37.) Plaintiffs argue that the reasons given by the CIA for limiting

the search to the DIR Area were the result of a narrow
interpretation of Plaintiffs' requests. (Pl. Mem. at 51-52.)
While Plaintiffs are correct that an agency has a "duty to
construe [FOIA requests] liberally," Nation Magazine v. U.S.
Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995), "FOIA was not
intended to reduce government agencies to full-time
investigators on behalf of requesters." Judicial Watch, Inc. v.
Export-Import Bank, 108 F. Supp. 2d 19, 27 (D.D.C. 2000)
(quotation and citation omitted).  The CIA's search resulted in
thousands of responsive records that are "unrelated to policy
and legal analyses, including operational cables." (Def. Reply
at 46; First Stipulation ¶ 8.)  Moreover, although many of the
responsive documents are located in the CIA's operational
records—records exempt from search by statute (see 50 U.S.C.
§ 431)—the parties agreed to search operational records in non-
exempt files, i.e., the OIG investigation files which are
located in the DIR Area. (Hilton Decl. ¶ 35; Fist Stipulation
¶ 4.)  Accordingly, the Court finds that the CIA's search of the
DIR-Area was "reasonably calculated to discover the requested
documents" even though it may not have "uncovered every document
extant." SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197,
1201 (D.C. Cir. 1991); see Grand Cent. P'ship, Inc. v. Cuomo,
166 F.3d 473, 489 (2d Cir. 1999) (same).

In addition, Plaintiffs argue that the CIA's search was inadequate because subsequent to the CIA's search, two responsive documents were located in the DI. (Pl. Mem. at 52-53.)  The discovery of these two records, Plaintiffs contend, belies the CIA's claim that its search was adequate, and therefore the CIA should have to run searches in the DI as well as other components. (Id.)  However, "[a] reasonably calculated search does not require that an agency search every file where a document could possibly exist, but rather requires that the search be reasonable in light of the totality of circumstances." Cooper v. U.S. Dep't of Justice, No. 03-5172, 2004 WL 895748, at *1 (D.C. Cir. Apr. 23, 2004) (citing SafeCard Servs., Inc., 926 F.2d at 1201).  "[A]n agency need only pursue leads that raise red flags pointing to the probable existence of responsive agency records that arise during its efforts to respond to a FOIA request." Wiesner v. F.B.I., 668 F. Supp. 2d 164, 170-71 (D.D.C. 2009).  Moreover, "an agency's hesitancy to pursue potential leads after its search has been completed," does not lead to the conclusion that the agency's "search [was] inadequate,." Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of the Interior, 503 F. Supp. 2d 88, 100 (D.D.C. 2007).  As discussed above, the CIA's search of the DIR Area was reasonably calculated to locate responsive documents.  The fact that two more responsive documents were

32

located in an area that the CIA determined would probably not
lead to uncovering responsive documents does not render the
CIA's search inadequate.  To find otherwise would reduce the CIA
to "full-time investigators on behalf of requesters." Judicial
Watch, Inc., 108 F. Supp. 2d at 27.

               iii. Adequacy of Search: Specific FOIA Request

                   a.   Categories Seven and Eight

With regard to the CIA's search for responsive records to
the Specific FOIA Request, Plaintiffs again argue that a narrow
interpretation of the individual requests resulted in an
inadequate search.  Specifically, as to Categories Seven and
Eight, concerning the use of the "attention shake," Ms. Hilton
stated that the "'attention shake' was not an interrogation
technique employed by the CIA" and therefore, no responsive
documents exist. (Hilton Decl. ¶ 49.)  Plaintiffs contend that
instead of an "attention shake," an "attention grasp" was
utilized by the CIA in interrogating detainees. (Pl. Mem. at 54;
Satterthwaite Decl., Ex. XX.).  Again, although "an agency is
'not obligated to look beyond the four corners of the request
for leads to the location of responsive documents,'" the CIA's
interpretation of Plaintiffs' request was too narrow in this
instance. Servicemembers Legal Def. Network v. U.S. Dep't of
Def. et al., 471 F. Supp. 2d 78, 86 (D.D.C. 2007) (quoting
Kowalczyk v. U.S. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir.

1996)).  The request specifically asked for cables "discussing

and/or approving the use on an 'attention shake'" on either Abu

Zubaydah or Khalid Sheikh Mohammed. (Brown Decl., Ex. D at 3.)

In describing what was meant by "attention shake," Plaintiffs

included a quote from a former CIA employee who detailed the

technique as "[grabbing] the person by their lapels and

[shaking] them." (Id.)  In one of the three memoranda released

on April 19, 2009, "attention grasp" was defined as follows:

"This technique consists of grasping the individual with both

hands, one hand on each side of the collar opening, in a

controlled and quick motion." (Hilton Decl., Ex. J (May 10, 2005

Memorandum for John A. Rizzo Senior Deputy General Counsel,

Central Intelligence Agency).)  Even though Plaintiffs did not

use the correct terminology, i.e., "attention grasp," the

accompanying definition was sufficient to put the CIA on notice

of the documents Plaintiffs requested.  Accordingly, the CIA's

search for documents responsive to Categories Seven and Eight

was inadequate.

b.    Category Two

With regard to Category Two, the CIA adequately searched

its records for lists pertaining to erroneous renditions.

Plaintiffs' specific request, together with the quote from the

Washington Post article referencing a list, make it clear that

Plaintiffs were seeking an actual list, not information

34

pertaining to erroneous renditions.  "FOIA does not require an agency to create a document in response to a request." Landmark Legal Found. v. E.P.A., 272 F. Supp. 2d 59, 64 (D.D.C. 2003) (citing N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 161-62 (1975)).  Here, Plaintiffs' request was clear: they were searching for a list that was referenced in a Washington Post article. (Specific FOIA Request at 2.)  Having now learned that no such list exists, Plaintiffs cannot recharacterize their request as one for "information responsive to the underlying request." (Pl. Mem. at 55.)  Nor can Plaintiffs rely on the argument that the CIA should have known what information Plaintiffs were seeking, for an agency receiving a FOIA request "is not required to divine a requester's intent." Landmark Legal Found., 272 F. Supp. 2d at 64; see Hudgins v. IRS, 620 F. Supp. 19, 21 (D.D.C. 1985) ("[A]n agency is not required to have 'clairvoyant capabilities' to discover the requester's need."); see also Thomas v. Office of the U.S. Attorney for E.D.N.Y., 171 F.R.D. 53, 55 (E.D.N.Y. 1997) (FOIA requester cannot add to or enlarge underlying FOIA request during pendency of request or litigation).  Accordingly, because the CIA conducted a thorough search for documents responsive to Plaintiffs' Category Two request—a search that included having the person most knowledgeable regarding CIA counterterrorism detention and interrogation activities inquire into the existence of a list of

35

erroneous renditions—the Court finds the CIA's search to be adequate.

     c. Categories Eleven and Twelve

  Plaintiffs' Categories Eleven and Twelve requests seek cables between CIA officials and operatives in the field concerning the waterboarding of Abu Zubaydah and Khalid Sheikh Mohammed. (Specific FOIA Request at 4.)  To conduct this search, CIA officers searched within word-searchable databases of cables maintained by the NCS that were designed to aggregate all CIA cables concerning Abu Zubaydah or Khalid Sheikh Mohammed during the time of his detention and interrogation. (Hilton Decl. ¶¶ 50-51.)  Separate from the documents at issue in the ACLU Action, the search uncovered two records for Zubaydah and forty-nine records for Mohammed. (Id.)  Plaintiffs contend that the CIA's search was inadequate for two reasons.  First, Plaintiffs argue that the CIA's explanation regarding the Zubaydah records is "insufficient because the records withheld in the [ACLU Action] are not described in a manner to permit Plaintiffs to determine the total number of records responsive to Category 11." (Pl. Mem. at 56.)  Second, Plaintiffs point to publicly available documents that state that Khalid Sheikh Mohammed was waterboarded at least 183 times as evidence that the CIA's search was inadequate because it only returned forty-nine records, and according to CIA guidelines, operatives in the

field were required to exchange cables with CIA headquarters before use of each technique. (Id. at 55.)  Plaintiffs' arguments concerning the adequacy of the CIA's search are unavailing; Plaintiffs criticize the results of the CIA's search as "[defying] common sense" but do not criticize the search methods themselves. (Id.)  "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).  Here, the CIA searched through the appropriate databases using different variations of the term "waterboard." The fact that this search did not produce what Plaintiffs consider an appropriate number of documents is irrelevant to the adequacy inquiry.  Accordingly, the Court finds the CIA's search of records in response to Plaintiffs' Categories Eleven and Twelve requests to be adequate.

III. EXEMPTION ANALYSIS

FOIA requires federal agencies to disclose agency records upon request. See 5 U.S.C. § 552(a).  Disclosure is necessary "to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d. Cir. 1999).  "FOIA's broad disclosure mandate consequently requires disclosure of documents unless

37

they fall within one of the enumerated exemptions." Adamowicz v.
I.R.S., 672 F. Supp. 2d 454, 461 (S.D.N.Y. 2009) (citing U.S.
Dep't of the Interior v. Klamath Water Users Protective Ass'n,
532 U.S. 1, 7 (2001)).  The exemptions underscore Congress's
"recognition that not all information should be released to the
public but do not obscure the basic policy that disclosure, not
secrecy, is the dominant objective of the Act." Id. (internal
citations and quotation marks omitted).

    A.   FOIA Exemption 3

Under FOIA Exemption 3, an agency is permitted to withhold
information that is "specifically exempted from disclosure by
statute." 5 U.S.C. § 522(b)(3).  "Under that exemption, the CIA
need only show that the statute claimed is one of exemption as
contemplated by Exemption 3 and that the withheld material falls
within the statute." Larson v. U.S. Dep't of State, 565 F.3d
857, 864 (D.C. Cir. 2009) (citing Fitzgibbon v. CIA, 911 F.2d
755, 761-62 (D.C. Cir. 1990)).  "Exemption 3 differs from other
FOIA exemptions in that its applicability depends less on the
detailed factual contents of specific documents; the sole issue
for decision is the existence of a relevant statute and the
inclusion of withheld material within that statute's coverage."
Goland v. C.I.A., 607 F.2d 339, 350 (D.C. Cir. 1978).

i.   The NSA and the CIA Act as Withholding Statutes

The CIA relies on the National Security Act of 1947, as amended (the "NSA"), and the Central Intelligence Agency Act of 1949, as amended (the "CIA Act"), as the bases for its withholdings. (Def. Mem. at 12.)  Section 102(A)(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (codified at 50 U.S.C. § 403-1(i)(1)) ("IRTPA") requires the Director of National Intelligence ("DNI") to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1) (formerly 50 U.S.C. § 403-3(c)(7) ("In the [Director of the CIA's] capacity as head of the intelligence community, the Director shall . . . protect intelligence sources and methods from unauthorized disclosure.")).  The amendments made by the IRTPA transferred the authority for protecting intelligence from the Director of the CIA to the DNI.[5]  Section 6 of the CIA Act authorizes the CIA to withhold information that would disclose "the organization, functions, names, official titles, salaries, or numbers of [CIA] personnel." 50 U.S.C. § 403g.

---

[5] Because the IRTPA did not take effect until April 21, 2005, it was not in effect at the time of the CCR FOIA Request. See ACLU v. U.S. Dep't of Def., 389 F. Supp. 2d 547, 559 n.8 (S.D.N.Y. 2005) (apply "the withholding statute in effect at the time of plaintiffs' requests"); see also Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280, 1284 (D.C. Cir. 1983) ("To invoke Exemption 3, an agency must demonstrate that . . . a statute exists and was in effect at the time of the request . . . .").

Plaintiffs do not dispute that either Section 102(A)(i)(1) of the NSA or Section 6 of the CIA Act is an exemption statute. Rather, with respect to the NSA, Plaintiffs argue that the amendments made to the NSA through the IRTPA require a "more searching judicial review than the Supreme Court required in [C.I.A. v. Sims, 471 U.S. 159 (1985)] into whether the CIA is properly withholding 'intelligence sources and methods.'" (Pl. Mem. at 23.)  First, Plaintiffs contend that the DNI's "half-page memorandum" authorizing the withholding is insufficient "to satisfy [his] independent intelligence oversight responsibilities . . . ." (Pl. Mem. at 23 n.50.)  Second, in what Plaintiffs characterize as "an issue of first impression," Plaintiffs argue that the definition of "intelligence sources and methods" established by the Supreme Court in Sims and its progeny no longer controls and must be evaluated "in light of the IRTPA amendments, including provisions facilitating the disclosure to the private sector." (Id. at 24.)  With respect to Section 6 of the CIA Act, Plaintiffs argue that the CIA invoked an overly broad reading of the statute to cover information other than "the organization, functions, names, official titles, salaries, or numbers of [CIA] personnel," 50 U.S.C. § 403g. (See Pl. Mem. at 25.)

40

a.   DNI's Authorization Pursuant to 50 U.S.C.
§ 403-1(i)

The Court finds Plaintiffs' argument--that the DNI's

authorization is insufficient--to be nothing more than a red

herring.[6]  Section 403-1(i) of the NSA provides that the DNI

"shall protect intelligence sources and methods from

unauthorized disclosure" and "may only delegate a duty or

authority given [him] under this subsection to the Principal

Deputy Director of National Intelligence." 50 U.S.C. § 403-

1(i)(1), (3).  Here, by memorandum dated September 18, 2009, the

DNI, Dennis Blair, stated that: (1) he had "been advised that in

connection with [this litigation] . . . certain information must

be protected from public disclosure;" and (2) he "reviewed a

sample" of the withheld records and determined that disclosure

would "directly implicate sensitive intelligence sources and

methods that must be protected from unauthorized disclosure in

the interest of the national security of the United States."

(Hilton Decl., Ex. N ("DNI Authorization").)  As a result, the

DNI authorized the CIA Director "to take all necessary and

appropriate measures to ensure that these sources and methods

are protected during the course of this litigation." (Id.)  By

---

[6] Plaintiffs' argument would only apply to the First and Second
AI FOIA Requests and the Specific FOIA Request because the CCR
FOIA Request would have been subject to the NSA before the IRTPA
amendments.  The IRTPA amendments did not take effect until
April 21, 2005, and the CCR FOIA request was made on December
21, 2004.

41

drafting the DNI Authorization, the DNI sufficiently executed

his duty "to protect intelligence sources and methods." See,

e.g., Gerstein v. C.I.A., No. C-06-4643, 2008 WL 4415080 (N.D.

Cal. Sept. 26, 2008) (noting that the DNI's brief authorization

directing the CIA Director to "take all necessary and

appropriate measures to ensure that [the] sources and methods

are protected" merited a concession from Plaintiff in FOIA

action that the authorization met the requirement set forth in

50 U.S.C. 403-1(i)).

     b. Intelligence Sources and Methods

  Plaintiffs' attack of the CIA's designation of the withheld

information as "intelligence sources and methods" is three-

pronged: (1) the CIA uses the outmoded Sims rubric to define

"intelligence sources and methods;" (2) the discontinued

practices (i.e., the use of black sites and the use of enhanced

interrogation techniques) employed by the CIA are no longer

intelligence sources and methods; and (3) illegal conduct is not

an intelligence source or method. (Pl. Mem. at 21-25.)

     1. Intelligence Sources and Methods

  Plaintiffs contend that the amendments to the NSA through

IRTPA have "undermined" the definition of intelligence sources

and methods as set forth in Sims. (Pl. Mem. at 23.)  Plaintiffs'

argument vastly overstates the effect that the enactment of

IRTPA had on the NSA.  Of the three IRTPA provisions Plaintiffs

reference in their brief as providing proof that Congress has

"not acquiesced to the Sims interpretation of 'intelligence

sources and methods,'" (Pl. Reply at 22), only one provision

actually amended the NSA (see Pub. L. No. 108-457 at § 1101(a))

by conferring upon the DNI the "authority to ensure maximum

availability of and access to intelligence information within

the intelligence community consistent with national security

requirements." 50 U.S.C. § 403-1(g)(1).  Moreover, Plaintiffs'

cherry-picking of one line from the Congressional Record more

than ten years prior to the enactment of IRTPA does not persuade

the Court that Congress disagreed with the Supreme Court's

analysis of intelligence sources and methods in Sims. (Pl. Mem.

at 24 n.52.)  To the contrary, even after the enactment of

IRTPA, several courts, including the Court of Appeals for the

Second Circuit, have continued to use the Sims framework when

analyzing the issue of intelligence sources and methods. See,

e.g., Wilner v. N.S.A., 592 F.3d 60, 72 (2d Cir. 2009)

(following Sims framework in the context of analyzing an

agency's invocation of a Glomar response pursuant to Exemption

3); Larson v. U.S. Dep't of State, 565 F.3d 857, 865 (D.C. Cir.

2009) (acknowledging that "'Congress gave the Agency broad power

to control the disclosure of intelligence sources'" and

therefore concluding that the CIA's affidavits, which confirmed

that the withheld documents related to intelligence sources and

methods, were sufficient to entitle the CIA to withhold the records pursuant to Exemption 3) (quoting C.I.A. v. Sims, 471 U.S. 159, 173 (1985)).  Accordingly, in analyzing the CIA's claim that releasing the withheld documents would reveal intelligence sources and methods, the Court will utilize the Sims framework.

Having resolved that the NSA is a withholding statute (see supra III.A.i.a), the Court "must consider whether the withheld material satisfies the criteria of the exemption statute." Wilner, 592 F.3d at 72 (citations omitted).  To do so, the Court must determine whether the CIA has sufficiently demonstrated that the "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods . . . ." Phillippi v. C.I.A., 546 F.2d 1009, 1015 (D.C. Cir. 1976).  In evaluating this question, the Court "accord[s] substantial weight and due consideration to the CIA's affidavits." Fitzgibbon v. C.I.A., 911 F.2d 755, 762 (D.C. Cir. 1990); Church of Scientology of Cal., Inc. v. Turner, 662 F.2d 784, 785 (D.C. Cir. 1980) (agency's affidavits must make a "showing of the particularized harm that could be expected to occur from production of the requested information").

Here, all but three of the documents in the Vaughn index have been withheld in whole or in part based on Exemption 3. (See Def. Mem., Addendum.)  The CIA, through the Hilton

44

Declaration sets forth the various intelligence sources and
methods that would be compromised should the CIA have to
disclose the withheld documents.  By invoking Exemption 3, the
CIA withheld records concerning:

> the use of human sources for intelligence gathering
> (Hilton Decl. ¶¶ 93-99); the collection of information
> from foreign liaisons and governments (id. ¶¶ 100-10);
> the use of cover identities for CIA employees and the
> mechanisms used to protect those activities (id.
> ¶¶ 119-23); information regarding CIA's operation of
> covert field installations abroad (id. ¶¶ 124-27); the
> use of cryptonyms and pseudonyms (id. ¶¶ 128-32);
> dissemination control markings (id. ¶¶ 136-39);
> clandestine intelligence collection operations (id.
> ¶¶ 140-45); the CIA's terrorist detention and
> interrogation program (id. ¶¶ 146-54); and
> interrogation operations, including the CIA's former
> use of EITs ((id. ¶¶ 149, 161-62).

As discussed above, Exemption 3 provides the CIA with broad
discretion to withhold records so long as the records are
covered by the withholding statute.  ACLU v. U.S. Dep't of Def.,
664 F. Supp. 2d 72, 78 (D.D.C. 2009) ("It is within defendants'
broad discretion to determine 'whether disclosure of information
may lead to an unacceptable risk of compromising the . . .
intelligence-gathering process.'" quoting Sims, 471 U.S. at
180))).  Several courts have found that the groups of records
set forth in the Hilton Declaration are properly withheld as
"intelligence sources and methods." See Morley v. C.I.A., -- F.
Supp. 2d --,  No. 03 Civ. 2545, 2010 WL 1233381, at **5, 7
(D.D.C. Mar. 30, 2010) ("clandestine human intelligence sources"

were properly withheld under both Exemptions 1 and 3); Halpern
v. F.B.I., No. 94-cv-365A, 2002 WL 31012157, at * 9 (W.D.N.Y.
Aug. 31, 2002) (holding Exemption 3 was applicable to prevent
unauthorized disclosure of "foreign intelligence sources and
methods"); Schoenman v. F.B.I., No. 04 Civ. 2202,  2009 WL
763065, at *25 (D.D.C. Mar. 19, 2009) (finding that Exemption 3
covered intelligence methods including "the use of cryptonyms
and pseudonyms, and the use of dissemination-control markings").
Accordingly, the Court finds that the requested records fit
within the statutory exemption allowing the CIA to withhold
records that would disclose "intelligence sources and methods,"
50 U.S.C. § 403-1(i), or "the organization, functions, names,
official titles, salaries, or numbers of [CIA] personnel," 50
U.S.C. § 403g.

## 2.   Discontinued Practices

Plaintiffs contend that because the use of EITs and the CIA
detention centers have been prohibited by the President, those
"sources and methods the CIA seeks to shield no longer 'fall
within the Agency's mandate.'" (Pl. Mem. at 21 (quoting C.I.A.
v. Sims, 471 U.S. 159, 169 (1985)).)  The District Court for the
District of Columbia addressed a similar argument in ACLU v.
U.S. Dep't of Def., 664 F. Supp. 2d 72 (D.D.C. 2009) where
plaintiffs were seeking documents related to fourteen named
detainees held at the United States Naval Base in Guantanamo

Bay, Cuba.  The plaintiffs argued that the discontinuance of the
EIT program as well as the closure of the CIA detention
facilities justified "full disclosure of the records sought."
Id. at 77.  In rejecting this theory, the Court found that "[a]
government record remains classified until a government official
determines that 'the public interest in disclosure outweighs the
damage to the national security that might reasonably be
expected from disclosure.'" Id. (quoting Exec. Order No. 12,958
§ 3.1(b)).)  Here, Plaintiffs try to distinguish ACLU v. U.S.
Dep't of Def. by arguing that they only seek "records describing
past and discontinued practices, not those still in use under
the [Army Field Manual], and not those with information acquired
during interrogations." (Pl. Reply at 7.)  However, as detailed
in the Hilton Declaration, "[e]ven though . . . certain details
of the CIA Detention Program, such as the use of [EITs], have
been discontinued, the information withheld from the documents
would still be of value to al Qa'ida and must be protected
because the withheld information provides insight not only into
the use of EITs and conditions of confinement, but also into the
strategy and methods used by the United States when conducting
any sort of interrogation, including those under the Army Field
Manual." (Hilton Decl. ¶ 150.)  Hilton further testified that
the disclosure of records "would not only inform al Qa'ida about
the historical use of EITs but also what techniques the United

States would use in a current interrogation." (Id.)  The Court is in no position to second-guess the CIA's determination that the disclosure of such information "would cause serious or exceptionally grave damage to the national security of the United States . . . ." (Id. ¶ 154.)  Accordingly, the Court finds that Exemption 3 applies to the records despite the fact that the cessation of the CIA's use of EITs and foreign detention centers because the CIA's "disclosure of the [information] reasonably could be expected to result in damage to national security . . . ." ACLU, 664 F. Supp. 2d at 78-79.

### 3.    Alleged Illegality of CIA's Sources and Methods

Notwithstanding the fact that the information properly falls within the classification of "intelligence sources and methods," Plaintiffs contend that Exemption 3 "cannot shield unlawful intelligence sources and methods because the unlawful activity falls outside an agency's mandate." (Pl. Mem. at 22.) Plaintiffs' argument, though, is similar to the argument made by the plaintiffs in Wilner v. N.S.A., No. 07 Civ. 3883, 2008 WL 2567765 (S.D.N.Y. June 25, 2008), aff'd, 592 F.3d 60 (2d Cir. 2009).  In Wilner, plaintiffs sought documents concerning the Government's Terrorist Surveillance Program, which enabled the NSA to "intercept the international communications of people with known links to al Qaeda and related terrorist

organizations." Id. at *5.  The defendants invoked FOIA
Exemption 3 and withheld the documents pursuant to Section 6 of
the NSA and Section 102(A)(i)(1) of IRTPA. Id. at *3.
Plaintiffs, in turn, argued that Exemption 3 was inapplicable
because "the [Terrorist Surveillance Program] is illegal
. . . and . . . FOIA exemptions cannot be invoked to facilitate
the concealment of unlawful activity." Id. at *6.  The Court
rejected the plaintiffs' argument finding that "all that is
necessary for the NSA to successfully resist disclosure under
Exemption 3 is to explain how the requested documents would
reveal information integrally related to . . . NSA activity."
Id. (citation and internal quotation marks omitted).  In
addition, "the fact that [President Obama] outlawed the use of
[enhanced interrogation techniques] and the CIA's operation of
detention centers does not warrant full disclosure of the
records at issue in this case." ACLU v. U.S. Dep't of Def., 664
F. Supp. 2d 72, 77-78 (D.D.C. 2009).  Accordingly, because the
records at issue fall under the coverage of Exemption 3, the CIA
is permitted to withhold their disclosure regardless of the
alleged illegality of the practices contained therein. See ACLU
v. Dep't of Def., --- F. Supp. 2d ----, 2010 WL 2787645, at **5,
6 (S.D.N.Y. July 15, 2010) (finding that "to limit Exemption 3
to 'lawful' intelligence sources and methods, finds no basis in
the statute" and that "[d]eclining to reach the legality of the

underlying conduct is not . . . an abdication of . . . the
Court's responsibility . . . under the statutory structure[; i]t
is the result commanded by the statute"); see also Lesar v. U.S.
Dep't of Justice, 636 F.2d 472, 483 (D.C. Cir. 1980) (holding
that although the "surveillance of [the FBI's target] strayed
beyond the bounds of its initial lawful security aim, that does
not preclude the possibility that the actual surveillance
documents and the Task Force materials that comment upon those
documents may nevertheless contain information of a sensitive
nature, the disclosure of which could compromise legitimate
secrecy needs"); see also Agee v. C.I.A., 524 F. Supp. 1290,
1292 (D.D.C. 1981) ("While some of the documents shed light on
the legality or illegality of CIA's conduct, the (b)(1) or
(b)(3) claims are not pretextual. Any possibility of illegal
conduct on the part of the CIA does not defeat the validity of
the exemptions claimed.").

B.   FOIA Exemption 1

Because the Court finds that the CIA properly invoked
Exemption 3 as its basis to withhold the bulk of the documents
listed in the Vaughn index, it need not consider whether the
withheld information also meets the criteria for classification
under Exec. Order No. 12,958. Assassination Archives and
Research Ctr. v. C.I.A., 334 F.3d 55, 58 n.3 (D.C. Cir. 2003)
("Because we conclude that the Agency easily establishes that

50

the records AARC seeks are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1."). Regardless, even if the CIA did not invoke Exemption 3 to withhold most of the records, the CIA still would have been justified in withholding the records by invoking Exemption 1.

Pursuant to FOIA Exemption 1, an agency is allowed to withhold records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A), (B). Here, the CIA relies on Executive Order No. 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995), "which provides a detailed system for classifying documents that the government determines should be kept secret."[7] ACLU v. U.S. Dep't of Def., 664 F. Supp. 2d 72, 75 (S.D.N.Y. 2009). Pursuant to this Executive Order, "[i]nformation shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security . . . and it pertains to one or

---

[7] Executive Order No. 12,928 was amended by Executive Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 28, 2003). Although Executive Order 13,292 was revoked and replaced by Executive Order 13,526, 2009 WL 5179737 (Dec. 29, 2009), for purposes of Exemption 1, a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made. See King v. U.S. Dep't of Justice, 830 F.2d 210, 216 (D.C. Cir. 1987). Accordingly, all citations to Executive Order No. 12,958 are to the Order as amended by Executive Order No. 13,292.

more of the following: . . . (b) foreign government information;
(c) intelligence activities (including covert action),
intelligence sources or methods, or cryptology; [or] (d) foreign
relations or foreign activities of the United States, including
confidential sources." Exec. Order No. 13,526 at § 1.4.   In
addition, the Executive Order provides that "[i]n no case shall
information be classified, continue to be maintained as
classified, or fail to be declassified in order to: (1) conceal
violations of law, inefficiency, or administrative error; (2)
prevent embarrassment to a person, organization, or agency; . .
. or (4) prevent or delay the release of information that does
not require protection in the interest of the national
security." Id. § 1.7(a).

To withhold records under Exemption 1, the CIA must
establish that it complied with proper procedures in classifying
materials and that the withheld information falls within the
substantive scope of Exec. Order No. 12,958. See Salisbury v.
United States, 690 F.2d 966, 971-72 (D.C. Cir. 1982).   An agency
invoking Exemption 1 is entitled to summary judgment on the
basis of agency affidavits "if the affidavits describe the
documents and the justifications for nondisclosure with
reasonably specific detail, demonstrate that the information
withheld logically falls within the claimed exemption, and are
not controverted by either contrary evidence in the record nor

52

by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).  Judicial deference for an agency's justifications under Exemption 1 is only warranted when the agency's affidavits are first found, at a minimum, to "contain sufficient detail to forge the 'logical connection between the information [withheld] and the claimed exemption.'" Physicians for Human Rights v. U.S. Dep't of Def., 675 F. Supp. 2d 149, 167 (D.D.C. 2009) (quoting Oglesby v. U.S. Dep't of Army, 79 F.3d 1172, 1178 (D.C. Cir. 1996)); see Casey, 656 F.2d at 738 (finding that because national security agencies "have unique insights into what adverse [effects] might occur as a result of public disclosures," courts are "required to accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.") (internal quotation marks omitted).  In reviewing the CIA's affidavits, however, the Court is "mindful that issues of national security are within the unique purview of the executive branches, and that as a practical matter, few judges have the skill or experience to weigh the repercussions of disclosure of intelligence information." Physicians for Human Rights, 675 F. Supp. 2d at 166 (citations and internal quotation marks omitted).

Here, the CIA supports its withholdings through the Hilton Declaration and the Declaration of Leon Panetta, the Director of

the CIA (Hilton Decl., Ex. M ("Panetta Decl.")). Based on these
declarations, which the Court finds contain "sufficient detail
to forge the logical connection between information [withheld]
and [Exemption 1]," Physicians for Human Rights, 675 F. Supp. 2d
at 167 (quoting Oglesby, 79 F.3d at 1178), the CIA has
adequately supported its withholding under Exemption 1.
Plaintiffs challenge the CIA's Exemption 1 withholdings on
several grounds; however, for the reasons discussed below, each
of the Plaintiffs' arguments is unavailing.

### i. Disclosure Not Likely to Harm National Security

Plaintiffs argue that the disclosure of the withheld
documents would not result in harm to national security because:
(1) the documents relate to discontinued CIA activities; or (2)
the documents relate to CIA programs whose details have been
disclosed to the public; or (3) the potential of harming foreign
relations is minimal because several foreign governments have
already launched investigations of their own.

### a. Discontinued Activity

As the result of President Obama's order directing the
discontinuance of EITs, Plaintiffs contend that the disclosure
of records concerning the now-defunct interrogation program
cannot harm national security because "revelation cannot reduce
the effectiveness of prohibited practices." (Pl. Mem. at 10.)
However, as discussed above (see supra III.A.b.2), both the

54

Hilton Declaration and the Panetta Declaration provide the Court with a sufficient basis to find that release of the records would harm national security.  For instance, Hilton stated that "[e]ven though . . . certain details of the CIA Detention Program, such as the use of enhanced interrogation techniques, have been discontinued, the information withheld from the documents would still be of value to al Qa'ida and must be protected because the withheld information provides insight not only into the use of EITs and conditions of confinement, but also into the strategy and methods used by the United States when conducting any sort of interrogation, including those under the Army Field Manual." (Hilton Decl. ¶ 150.)  The disclosure of records "would not only inform al Qa'ida about the historical use of EITs but also what techniques the United States would use in a current interrogation." (Id.)  Director Panetta averred in the ACLU Action that "[e]ven if the EITs are never used again, the CIA will continue to be involved in questioning terrorists under legally approved guidelines.  The information in these documents would provide future terrorists with a guidebook on how to evade such questioning." (Panetta Decl. ¶ 11.)

Although Plaintiffs argue that the CIA's unclassified declarations are insufficient "to carry its burden to support its [Exemption 1] withholdings," Plaintiffs request that the Court not conduct an in camera review of the classified

declarations submitted ex parte because the "CIA has failed to
meet [the] burden" that is required for the Court to conduct an
in camera review. (See Pl. Mem. at 10; Pl. Reply at 3-4.)   In a
FOIA action involving information that may be harmful to
national security if revealed, the Court may conduct an in
camera review after the court has attempted "to create as
complete a public record as is possible." Phillippi v. C.I.A.,
546 F.2d 1009, 1013 (D.C. Cir. 1976); see also Wilner v. N.S.A.,
592 F.3d 60, 76 (2d Cir. 2009) (holding that "'[i]f an agency's
statements supporting exemption contain reasonable specificity
of detail as to demonstrate that the withheld information
logically falls within the claimed exemption and evidence in the
record does not suggest otherwise . . . the court should not
conduct a more detailed inquiry to test the agency's judgment
and expertise or to evaluate whether the court agrees with the
agency's opinions'" (quoting Larson v. U.S. Dep't of State, 565
F.3d 857, 865 (D.C. Cir. 2009))).   Here, the public declarations
of Hilton and Panetta provide rationales for the CIA's
withholdings.   However, the Court appreciates Plaintiffs'
complaint that the public declarations do not provide sufficient
detail to warrant withholding pursuant to Exemption 1, and
instead, only conclusory assert that disclosure could detract
from the effectiveness of future interrogations. See Hayden v.
N.S.A., 608 F.2d 1381, 1385 (D.C. Cir. 1979) (recognizing that

"[i]n a limited range of security cases, it is simply not possible to provide for orderly and responsible decisionmaking about what is to be disclosed, without some sacrifice to the pure adversary process"); see also In re N.Y. Times Co., 577 F.3d 401, 410 n.4 (2d. Cir. 2009) ("noting that although there are circumstances in which a nonpublic proceeding is appropriate, "courts seek to balance the need for transparency in the judiciary with the effective protection of sensitive information").  Taking all of this into consideration, the Court reviewed the classified versions of the Hilton and Panetta Declarations and, deferring to these executive declarations predicting harm to the national security, concludes that the disclosure of the withheld documents would pose a significant risk to national security. See Wilner, 592 F.3d at 76 ("'[W]e have consistently deferred to executive affidavits predicting national harm, and have found it unwise to undertake searching judicial review.'" (quoting Ctr. For Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003))).  Accordingly, the Court finds that even though the practices at issue have been discontinued, the CIA is still justified in withholding the requested documents pursuant to Exemption 1.

> b.   Public Disclosure of CIA Practices

In support of their argument in favor of disclosure, Plaintiffs principally rely on the fact that details of the

CIA's use of EITs and its practice of rendition have been
extensively disclosed.  Several of the now-public documents
include, inter alia : (1) a December 30, 2004 fax from an
Associate General Counsel, CounterTerrorism Center, CIA to Dan
Levin, Acting Assistant Attorney General, Office of Legal
Counsel, Dep't of Justice, which contained a background paper on
the CIA's combined use of interrogation techniques
(Satterthwaite Decl., Ex. X ("CIA Background Paper")); (2) a May
10, 2005 Memorandum from Steven G. Bradbury, Principal Deputy
Assistant Attorney Gen., CIA, to John A Rizzo, Senior Deputy
General Counsel, CIA regarding the Application of 18 U.S.C. §§
2340-2340A to the Combined Use of Certain Techniques in the
Interrogation of High Value al Qaeda Detainees (Satterthwaite
Decl., Ex. RRR ("May 10, 2005 Combined Techniques Memo")); (3) a
May 30, 2005 Memorandum from Steven G. Bradbury to John A. Rizzo
regarding the Application of United States Obligations Under
Article 16 of the Convention Against Torture to Certain
Techniques that May Be Used in the Interrogation of High Value
al Qaeda Detainees (Satterthwaite Decl., Ex. Y ("May 30, 2005
Art. 16 Techniques Memo")).

     The Court of Appeals for the Second Circuit recently
addressed the issue of public disclosure of classified
information in Wilson v. C.I.A., 586 F.3d 171 (2d Cir. 2009).
There, the court addressed whether the wide disclosure of

information related to Valerie Plame Wilson's employment with
the CIA constituted an official disclosure.  Classified
information "is deemed to have been officially disclosed only if
it (1) '[is] as specific as the information previously
released,' (2) 'match[es] the information previously disclosed,'
and (3) was 'made public through an official and documented
disclosure.'" Id. at 186 (quoting Wolf v. C.I.A., 473 F.3d 370,
378 (D.C. Cir. 2007)).  As to the last factor, "the law will not
infer official disclosure of information classified by the CIA
from (1) widespread public discussion of a classified matter,
(2) statements made by a person not authorized to speak for the
Agency, or (3) release of information by another agency, or even
by Congress." Id. (internal citations omitted).

       Here, despite the various disclosures of general
information concerning the CIA's EIT and rendition programs,
Plaintiffs are not entitled to the withheld documents because,
according to the government's declarations, the information
sought pertains to the application of the EITs to specific
detainees. (Def. Reply at 17-18.)  Indeed, "the fact that the
government disclosed general information on its interrogation
program does not require full disclosure of aspects of the
program that remain classified." ACLU v. U.S. Dep't of Def., 664
F. Supp. 2d 72, 77 (S.D.N.Y. 2009); see Fitzgibbon v. C.I.A.,
911 F.2d 755, 766 (D.C. Cir. 1990) (recognizing that even though

some general information is publicly available, it "does not
eliminate the possibility that further disclosures can cause
harm to intelligence sources, methods and operations").  The
Court finds that the information contained in the withheld
records are more detailed than the information that already
exists in the public domain and would seriously damage national
security if released. ACLU, 664 F. Supp. 2d at 77.  Accordingly,
the Court concludes that the public disclosures do not require
the CIA to disclose the withheld records because the specific
information sought by Plaintiffs has not been officially
disclosed. Wilson, 586 F.3d at 186.

c.   Further disclosures not likely to harm
foreign relations

Plaintiffs further contend that the CIA makes a spurious
argument that disclosure of documents may harm foreign
relations, especially in light of the fact that several foreign
states "have launched investigations and released information on
their own involvement with the CIA's practices." (Pl. Mem. at
16.)  The CIA argues that because foreign governments provided
substantial assistance to counterterrorism operations "under the
condition that their assistance be kept secret," "[i]f the
United States demonstrates that it is unwilling or unable to
stand by its commitments to foreign governments, they will be
less willing to cooperate with the United States on